Pages 1 – 38

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARILYN HALL PATEL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CR. 07-0765 MHP |
| | ) | |
| MENDEL BEKER, ARIE PRILIK, and | ) | |
| NEWCON INTERNATIONAL, | ) | |
| | ) | San Francisco, California |
| Defendants. | ) | Wednesday |
| | ) | November 17, 2010 |
| _____ | ) | 2:36 p.m. |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          U. S. Department of Justice
                    Antitrust Division
                    450 Golden Gate Avenue, Room 10-0101
                    San Francisco, CA  94102-3478
                    (415) 436-6673
                    (415) 436-6687 (fax)
              BY:  **DAVID J. WARD**
                    **RICHARD B. COHEN**
                    **ANNA TYRON PLETCHER**

**For Plaintiff:**          U. S. Attorney's Office
                    450 Golden Gate Avenue, 11th Floor
                    San Francisco, CA  94102
                    (415) 436-7129
              BY:  **JEANE HAMILTON**

(Appearances continued on next page)

**Reported By:**    **Lydia Zinn, CSR #9223, RPR**
               **Official Reporter – U.S. District Court**

1    APPEARANCES (CONT'D)

2    **For Defendants:**          Law Offices of William L. Osterhoudt
                                  135 Belvedere Street
3                                 San Francisco, CA  94117-3915
                                  (415) 664-4600
4                                 (415) 664-4691 (fax)
                            BY:   **WILLIAM L. OSTERHOUDT**
5
     **For Defendants:**          Winston & Strawn, LLP
6                                 101 California Street
                                  San Francisco, CA  94111
7                                 (415) 591-1439
                                  (415) 591-1400 (fax)
8                           BY:   **JONATHAN ROBERT HOWDEN**

9    **For Defendants:**          Law Offices of Ann C. Moorman
                                  803 Hearst Avenue
10                                Berkeley, CA  94710
                                  (510) 845-3000 ext. 111
11                                (510) 845-3003 (fax)
                            BY:   **ANN CAROLE MOORMAN**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **THE CLERK:**  Calling Criminal 07-0765, *United States*

2  *versus Mendel Beker and Arie Prilik.*

3          **THE COURT:**  May I have your appearances, please?

4          **MR. WARD:**  Good afternoon, your Honor.  David Ward,

5  for the United States.

6          **THE COURT:**  Good afternoon.

7          **MR. HOWDEN:**  Good afternoon.  Jonathan Howden, on

8  behalf of Michael Beker and Newcon International.

9          **DEFENDANT BEKER:**  Good afternoon.

10          **THE COURT:**  Good afternoon.

11          **MR. OSTERHOUDT:**  Good afternoon, your Honor.

12  William Osterhoudt and Ann Moorman, appearing on behalf of

13  Mr. Prilik.

14          **THE COURT:**  Good afternoon.

15          **MR. WARD:**  Your Honor, I'm also joined by

16  Jeane Hamilton, Dick Cohen, and Anna Pletcher, for the

17  Government.

18          **THE COURT:**  Yes, yes.  Good afternoon.

19          Well, here we are again.  I guess, since -- the last

20  time you were here is when you filed your response to the

21  motion, right?

22          **MR. WARD:**  Correct.  There's the defendants' motion

23  to admit the Russian Court records.

24          **THE COURT:**  Right, right.

25          **MR. WARD:**  And then our opposition.

1          **THE COURT:**  Right, right.

2          **MR. WARD:**  I think that's where we are.

3          **THE COURT:**  Right.  And you submitted your response.

4          Well, it seems like we keep coming back to the same

5    question, which I thought was not an issue.  And that is, you

6    know, the difference, if any, in the quality of the goggles.

7    Am I not right?  I mean, that's not an issue.

8          The question is:  What was going on?  What was, you

9    know, the payment that was being made and the false

10   representations that were being made in connection with it; and

11   not -- and essentially, not disclosing it?

12         I thought this was not a contest about -- I mean, I

13   almost feel like we're the reviewing body for a denial of a --

14   you know, of a contract, or you know, "We didn't get the

15   contract, and so we're challenging the contract."  There's a

16   different forum for that.

17         **MR. WARD:**  You're absolutely right, your Honor.  And

18   I feel like -- that we've been through this issue.  And we've

19   made clear and this Court has made clear that we're not

20   adjudicating the contract dispute; that the quality of ATN's

21   goggles is not at issue here.

22         What is at issue is whether or not the defendants

23   reached a secret agreement that they believe they had with ATN,

24   in which ATN would withdraw so the defendants could come in,

25   jack up the price to the Army to the tune of about 11 and a

1   half million dollars; whether they agreed to make a $50,000

2   initial payoff in furtherance of that agreement; and whether

3   they agreed to pay ATN $75 a goggle for the goggles that they

4   provided, under -- when they took over the contract, to the

5   tune of about $225,000; and whether they concealed that

6   information from the Army, with the intent to defraud the Army;

7   whether it was a material concealment.

8           The quality of the goggles has nothing to do with

9   that.

10           The defense argues that their statements about the

11   quality of ATN's goggles were honest and well held, but

12   that's -- it's not an issue.  It's not what the Government's

13   alleging.

14           What the Government is alleging is that they

15   concealed material information, and they did so in order to win

16   this contract, and in order to raise the price to the Army.  It

17   was -- the Government alleges it's a scheme to obtain money or

18   property or a scheme to defraud through these material

19   concealments.

20           **THE COURT:**  On the other hand, you say in your

21   responsive papers on page 8, you know, the defendant may

22   cross-examine Rocklin as to whether he misrepresented the

23   photocathode sensitivity of the tubes that ATN used.

24           What would there be in the direct examination that

25   would trigger that kind of a question on cross-examination?

1          **MR. WARD:**  We hope nothing, your Honor, because

2  again, the quality of ATNs goggles is not at issue.

3          I think the point we were trying to make is that,

4  even if you accept the defendants' argument that ATN made false

5  statements to TACOM or ITE, which we don't think is the case,

6  the only recourse they would have in that instance, under

7  608(b), is to question him on those statements; but not to use

8  extrinsic evidence, and certainly not these court records.

9  That was the point the Government was trying to make.

10          It's the Government's position that all of the

11  quality of goggles and all of this is a side show, is not

12  relevant, and is meant to confuse and will confuse and mislead

13  the jury as to the issues in this case.

14          What the Government's alleged is pretty

15  straightforward:  They had a secret agreement.  There was a

16  pay-off.

17          **THE COURT:**  Well, not totally.  We had some questions

18  about the indictment, as you seem -- you must recall, right?

19          **MR. WARD:**  I do.  And --

20          **THE COURT:**  And trying to really zero in on what --

21  what is the misrepresentations being made?

22          **MR. WARD:**  And I believe, your Honor, where we --

23          **THE COURT:**  So now it's clear?

24          **MR. WARD:**  I hope it's clear.  We've tried to make it

25  clear over and over that we are alleging material concealment;

1  that that is the fraud here; that any belief the defendants had

2  about the quality of ATNs goggles and any statements they made

3  are not the false statements that we're alleging, and are not a

4  fraud that we're alleging.

5           **THE COURT:**  Well, what seems to be happening is that,

6  you know, there is the allegation in the indictment that Prilik

7  told -- or informed the TACOM official that Newcon could supply

8  the --

9           No.  Excuse me.  Let me back up.

10          -- that false and misleading statement were made, in

11 that Prilik told TACOM that ATN could not longer supply

12 night-vision goggles, due to production, export, and quality

13 problems.

14          And I gather that they're coming back and saying,

15 "Well, but that was not false because, in fact, there were

16 production, export, and quality problems."

17          **MR. WARD:**  The terms used in the indictment,

18 your Honor, was that these were the false pretenses that

19 Arie Prilik used; but the fraud was the concealment of these

20 material facts.  And what your Honor said at the last hearing

21 when we went through this same issue in the context of expert

22 testimony --

23          **THE COURT:**  I do feel like we've chewed this over

24 before.

25          **MR. WARD:**  We have chewed this over, your Honor.  We

1  chewed this over extensively in the motions to admit expert

2  testimony.  And your words were, "Well, that was just the ruse.

3  And they aren't coming in for the truth of those statements."

4          What we alleged was the fraud is not what you said.

5          **THE COURT:**  But those statements were made; but in

6  fact, that wasn't the reality.

7          The reality was, in fact, this underlying agreement.

8  And --

9          **MR. WARD:**  What was --

10         **THE COURT:**  -- a failure to disclose that that money

11  was being paid, or offered to, et cetera.

12         **MR. WARD:**  And it was a material concealment.  And we

13  believe we can prove that the defendants knew it was a material

14  concealment, and concealed it with fraudulent intent; with the

15  intent to deceive TACOM into giving them the contract, without

16  revealing the fact that they paid their competitor to withdraw

17  so they could step in and jack up the price to the Army, and

18  they had a side deal to pay them off if they withdrew.  That's

19  the material concealment.

20         **MR. HOWDEN:**  Your Honor, if I may.

21         **THE COURT:**  Because it seems to me we'd be coming

22  back to the same thing over and over and over again.  And it

23  seems to me like it's a distraction from, you know, what the

24  theory of the case is, in trying to get involved in something

25  else.  It's sort of, you know --

1          MR. HOWDEN:  Well --

2          THE COURT:  -- deflect the jury from the real issue.

3          MR. HOWDEN:  Well, if the Government was willing to

4  concede that we were telling the truth when we characterized

5  ATN's position in this case, then it wouldn't be such an issue;

6  but we fully expect that, in one form or another, we're going

7  to be accused of making misstatements when we said that ATN

8  couldn't perform; that they had production, export, and quality

9  problems.

10          THE COURT:  Well, then, maybe the presentation has to

11  be that this is what -- you know, this is what the Government

12  was told.  And we're not arguing that those statements are

13  false; but that that wasn't the real reason, and that was

14  essentially a ruse.  Isn't that my word?

15          MR. HOWDEN:  Not the real reason for what, your

16  Honor?  I'm sorry.  Was --

17          THE COURT:  For not, you know, disclosing the

18  underlying activity that was concealed; namely, this payment of

19  $50,000, and what it was for, et cetera.

20          MR. HOWDEN:  But the two interact in a very important

21  way for our defense.

22          I mean, what's really ultimately at issue in this

23  case is what our intent was when these conversations occurred

24  between one of the defendants and the representative from

25  TACOM; what was in our mind.  Did we intend to materially

1   conceal some fact that was known to us?

2          And so, in order to interpret what our intent was not

3   only in that call, but in all of these other calls that the

4   Government wants to play leading up to it, between us and

5   Mr. Rocklin -- it's what was in our mind?  What was our intent?

6          And it's really vital to our defense that we be able

7   to establish that we believed and, in fact, were factually

8   correct in our assertions that ATN could not perform under the

9   contract because of quality issues, production issues, and

10  export issues.

11         **THE COURT:**  But it's not the fact that those

12  statements were made, but that the rest of it was not

13  disclosed; and even though those facts may have, in fact, been

14  true, that there was a concealment of this $50,000 payment.

15         **MR. OSTERHOUDT:**  Excuse me.  Sorry to interrupt.

16         **MR. HOWDEN:**  That's all right.

17         When the issue's framed that way, I agree with you

18  completely --

19         **THE COURT:**  Okay.  That's it.

20         **MR. HOWDEN:**  -- but that presumes that we are not

21  going to be challenged and told that, in fact, we were lying or

22  making misrepresentations when we made those representations

23  about ATN.

24         **THE COURT:**  Well, then, you make those objections

25  during the trial.

1      **MR. WARD:**  And the Government isn't alleging that

2 those statements are false.  We're not alleging the truth or

3 falsity of the statements, one way or the other.

4      We're saying the fraud was concealing these other

5 things; this material information from TACOM.

6      **THE COURT:**  No.  I understand that.

7      **MR. WARD:**  Oh.

8      **THE COURT:**  And I think that, really, it's sort of an

9 attempt to take this in another direction.  Call it "proving

10 the intent" and so forth, or "disproving the claimed intent",

11 however you want to characterize it, but in fact, it's an

12 attempt to try the merits of these goggles, one versus the

13 other, and not really the -- you know, what was actually --

14 what was going on; the sub rosa, you know, $50,000 payment, and

15 what that was for, and so forth, that wasn't disclosed.

16      **MR. OSTERHOUDT:**  Well, I find it really disturbing

17 that you think that, because we are in good faith here, as we

18 always have been.

19      And what we've looked at is the record of the case

20 from when we got into it, and from the time of the grand

21 jury -- we have the grand jury transcripts, as does your

22 Honor -- but the Government's theory was different than this.

23 It's quite clear that it was charged that we lied about the

24 quality of ATN stuff.  That's what we did wrong.

25      Mr. McAleer -- his testimony in the Canadian

1  extradition proceeding was:  That was our misrepresentation.

2  And it stopped being our misrepresentation only after we made

3  motions here challenging it.  Challenging it.

4          And the Government, for the first time, said, "Oh,

5  no.  The misrepresentation is your failure to tell McAleer

6  about the side deal."  That wasn't emphasized before.

7          **THE COURT:**  It's not well worded in the indictment.

8  I would agree with you.

9          **MR. OSTERHOUDT:**  No.  I'm saying it wasn't emphasized

10 ever in any proceeding before -- in any proceeding -- until we

11 challenged it.

12         Then they said here is fraudulent concealment by

13 Prilik on the telephone.

14         Well, okay.  That's the first time we saw that; but

15 they also kept saying that we smeared ATN, who, frankly, we

16 believe, are totally corrupt, but -- we smeared them, by

17 falsely saying they couldn't perform this contract.

18         And they've never really, until recently, I guess,

19 gotten off of that.

20         Now they're finally off it.  It -- if we're only

21 talking about --

22         **THE COURT:**  Well, there's nothing in the indictment

23 about smearing ATN.

24         **MR. OSTERHOUDT:**  But that's been the Government's

25 approach to how they're trying this case until recently.  We

1   didn't smear.  Our clients were telling the truth.  And it

2   makes a difference, because on the telephone with Rocklin, the

3   president of ATN, you know, Prilik and Beker are talking about

4   this.  And they're saying, "You know you can't perform the

5   contract."

6           Of course, he doesn't correct them, you know.

7           And they believe, in good faith, that ATN can't do

8   it.

9           That puts the case in an entirely different light.

10  They don't believe they're paying someone, or they don't

11  believe they're arranging to move into a contract where

12  somebody can't do it, but they're paying them not to.  They

13  believe they're doing it because they can't do it, and they

14  want to take over the contract for a lot of business reasons

15  that we think will be shown to be legitimate.  That's our

16  defense.

17          **THE COURT:**  Fine.  If you want to make that your

18  defense, fine.

19          **MR. OSTERHOUDT:**  Well, it is our defense.

20          **THE COURT:**  Well, but I think it's also clear that

21  the Government is not -- and you'll have to make that clear.

22  If you don't, I will -- that the Government is not saying that

23  the representations that were made with regard to -- that they

24  didn't have a reasonable basis for believing the -- you know,

25  questioning the quality of the -- and ability to export, and,

1  you know, get them that requisite number of glasses; in other

2  words, the number in production; that they did not have a

3  good-faith belief in that, or that they didn't believe that.

4         It's just that they were not giving -- your rationale

5  is that they were not giving you some of the back story of what

6  was going on; namely, that -- this $50,000 payment.  And if

7  they want to make it look like they were trying to be generous

8  to the Government, well, that's -- they can.  They can, you

9  know, spin it that way.  You're going to have to spin it the

10 other way.

11         **MR. WARD:**  And we think we've been clear from the

12 beginning; but to the extent that we haven't, we've been over

13 and over and over this same issue.

14         **THE COURT:**  Well, I know.  And, you know, I think

15 it's getting us going down some track and bringing in documents

16 that, in fact, if you could get them in, that really are a

17 distraction from the real issue, you know, in the case.

18         And, in terms of using these, you know, as -- first

19 of all, I've never seen the records.  And somebody said they

20 were going to get them delivered today.

21         **MR. HOWDEN:**  Yes.  I sent them over.

22         **THE COURT:**  But they still haven't come in.

23         **MR. HOWDEN:**  Well, I apologize for that, your Honor.

24         **THE COURT:**  And I assume they were translated --

25         **MR. HOWDEN:**  They are.  And there were --

1          **THE COURT:**  -- so I will be able to read them.

2          And I'd really be curious how could those possibly

3    used for impeachment, because -- is there anything in there as

4    to what Mr. Rocklin had previously said?

5          **MR. HOWDEN:**  There are no Rocklin statements in

6    there.

7          **THE COURT:**  Okay.  So how --

8          **MR. HOWDEN:**  These describe the documents that are

9    being delivered to him and his company, or they describe the

10   equipment that's being delivered to him and his company.

11         **MR. WARD:**  I think you're absolutely right to key on

12   that question, your Honor, because even if you admit the

13   documents, as we say in our motion, there are about six steps

14   to prove some alleged false statement by Rocklin.  You have to

15   call the custodians to authenticate the documents; a

16   translator; someone to describe --

17         What they want is to -- is the court records to say

18   that this Court found these goggles to have a photocathode

19   sensitivity of under 350.  And that requires a bunch of

20   testimony to get to that point.  And -- but that's only the

21   beginning.

22         From there, then they want to say, well, ATN then

23   misrepresented the quality of its goggles when it told TACOM

24   that its goggles had an FOM, which is a different measurement,

25   of between 750 and 1250.

1          And they say, well, the way you get that is that

2    photocathode sensitivity under 350, coupled with what we know

3    about the signal-to-noise resolution -- signal to noise and

4    resolution --

5               THE COURT:  But why -- why is that even relevant?

6    What, you know, ATN -- I mean, if you -- you know, if ATN gave

7    false information, got a contract on that basis, that's a whole

8    different case.  That's a case that involves ATN.

9          If, in fact, you know, you're able to establish that

10   there was an under-the-table agreement with ATN with respect to

11   this payment, and so forth, that goes to these defendants.  And

12   that's what's charged here.

13              MR. HOWDEN:  But it certainly bears on his

14   credibility, if he's making false statements to his prime

15   contractor in the Army.

16              MR. WARD:  Well, he's not making any --

17              I'm sorry.

18              MR. HOWDEN:  And, in fact, he is.  The Russian Court

19   records say these goggles are no greater than 350 photocathode

20   sensitivity.  And he tells his prime contractor in the Army

21   that they're 500 to 650 photocathode sensitivity.

22              THE COURT:  Is it even relevant what he told the

23   Army?

24              MR. HOWDEN:  That he's lying to them about a material

25   fact?  Yeah.  I think that's relevant.

1           **MR. WARD:**  It wasn't.  It was information from his

2    suppliers in Russia that he provided to his prime contractor;

3    information that we don't believe was provided to TACOM, and

4    information that wasn't relevant to TACOM's determination.

5           You're -- this is becoming an argument in a case

6    about a contract dispute between TACOM and ATN, and that's not

7    what this case is about.

8           Your Honor --

9           **MR. HOWDEN:**  Let me approach it from one of the other

10   angles, your Honor.  And that is, as I pointed out in the last

11   hearing and as I repeat here, you know, the Government, among

12   other things, is attempting to get into evidence a binder full

13   of excerpts from the transcripts of calls, where, allegedly,

14   the defendants are admitting their role in some underhanded

15   manner causing these -- these Customs investigations to go

16   forward, and thereby delaying ATN's ability to export.

17          And we're entitled to rebut that inference.  You

18   know, they've alleged it as inextricably intertwined and,

19   slash, alternately 404(b) information.  Whatever they want to

20   call it, these court records conclusively demonstrate that this

21   was an entirely aboveboard, legitimate, and serious

22   investigation that occupied these Russian courts, literally,

23   for years.

24          And it is not a question of what their ultimate

25   findings were.  It's not a question of what the burden of proof

1   was.

2         It's that there was this issue; this issue that had

3   to be litigated.  And that was:  Did these goggles require an

4   export permit?  A perfectly legitimate reason for Customs to

5   examine, and seize, and ultimately allow the export of these

6   particular goggles.

7         And it simply is unconscionable to allow an inference

8   to be offered against our clients that we bribed

9   Russian Customs officers in order to create --

10        **THE COURT:**  Well, is that -- is there any --

11        **MR. WARD:**  No.  Let me correct the record, because --

12        **THE COURT:**  Is that something that you're trying to

13   establish?  Because, if so --

14        **MR. WARD:**  No.

15        **THE COURT:**  -- that's not an issue in the case, and I

16   don't want to hear anything about it.

17        **MR. WARD:**  We have said that -- and we said in our

18   motion that the issue of the Customs investigation in Russia is

19   only admissible and only would be used by the Government to

20   provide some context for part of the reason why ATN was

21   contacting the defendants:  Because he was having trouble

22   exporting one set of goggles from Russia.  And that was part of

23   the basis of his call.

24        We don't allege that the defendants' acts were

25   404(b), or a bad act.

1          Ironically, what we believe is that defendants

2    believed at the time that the goggles were too high of a

3    quality to be exported without an export permit; and yet

4    they're telling TACOM they're too low to meet TACOM's quality.

5          But at the end of the day, it's not 404(b).  We're

6    not alleging anything underhanded.  It's just tied up in the

7    conversations and the tapes, but it's not inextricably

8    intertwined.  And, as the Government said --

9          **THE COURT:**  Why don't you just take it out, then?

10         **MR. WARD:**  We can take it out.  We don't have to talk

11   about Russian Customs.  At the end of the day --

12         **THE COURT:**  We're not going to get Russian documents,

13   and we're not going to -- I mean, there are all kinds of

14   problems with them, for one thing.  Things are done differently

15   in Russia, as you may well know.  And any -- and the records

16   don't necessarily purport -- they may not be what they purport

17   to be.  Of course, I've never even seen them yet, but in any

18   event, that is really a side issue.  And it really is not

19   necessary to go into it.  So just excise any -- or redact

20   anything in those transcripts having to do with problems with

21   Russian exports.

22         **MR. WARD:**  Yes, your Honor.  That's fine.

23         **THE COURT:**  The question is:  What was represented

24   here?

25         And, you know, between the parties.  And, yes, I know

```
 1  you're going to have to impeach Rocklin, but we don't have to
 2  have all of this extraneous, you know, material, and impeaching
 3  him on extrinsic evidence.  And I don't know how you can
 4  impeach him on something that is of questionable admissibility
 5  to begin with.
 6          And you can cross-examine him, but getting it in as
 7  an exhibit or somehow to show that, in fact, it said, you know,
 8  something else was said -- that's -- you know, if you want to
 9  use it to refresh his recollection, which you probably --
10  you're good cross-examiners.  You don't want to refresh his
11  recollection, right?
12          MR. OSTERHOUDT:  One thing, your Honor, is that it's
13  not -- we're not trying to divert anyone.  We're not trying to
14  divert it to another channel, but --
15          THE COURT:  Oh, come on.  You're defense lawyers.
16  Why not?  You know.
17          MR. OSTERHOUDT:  No, no.  I always like to divert
18  things, but I'm disclaiming that intent today --
19          THE COURT:  Yes.  Okay.
20          MR. OSTERHOUDT:  -- because what happened -- the
21  thing from the very beginning, the complaint that our clients
22  had, and another company had, too, was about the quality of the
23  thing; that they're lying; they're committing a fraud; you're
24  being defrauded.
25          Finally, they said, "Well, either they're defrauding
```

1  you or the Russians," because they say it's, you know -- this

2  is poor, not being licensed.  I mean, all of that was the

3  communication that led up to the things in this case.

4          Now, you know, the defendants didn't get out of bed

5  one morning and call, you know -- they didn't call at all --

6  and start talking to ATN's people.

7          This all came in a progression, after numerous

8  communications with TACOM directly, and with ITE, the general

9  contractor, in an attempt to alert them to this problem.  And

10  that's why it's so difficult, your Honor, to take the entire

11  issue of quality out of the case.

12          I understand what -- I understand what your Honor to

13  be ruling is that you know the defendant.

14          **THE COURT:**  That's not an issue.

15          **MR. OSTERHOUDT:**  The defendants can talk about their

16  view, though; their feelings; their reasoning --

17          **THE COURT:**  Mm-hm.

18          **MR. OSTERHOUDT:**  -- why they did the things they did,

19  because if you take that out of that, then they have nothing,

20  you see, because they absolutely believed from the beginning

21  that they were in the right.  And we believe the facts would

22  show that to be true.  That's what all of the expert testimony

23  is about.

24          **THE COURT:**  Fine, fine, fine.  They can take that

25  position.

1        **MR. OSTERHOUDT:**  That's what it takes.  It's not an

2 out-there-in-left-field position, trying to lead anybody away

3 from what the Government says now is the truth.

4        **THE COURT:**  Mixed motives, perhaps.

5        **MR. OSTERHOUDT:**  No.  Pure-as-the-driven-snow

6 motives, absolutely.

7        **THE COURT:**  Right.  Okay.

8        **MR. OSTERHOUDT:**  And I think we have to be able to --

9 we're just going to be -- we don't want to over-argue the

10 matter, but we do think that --

11        **THE COURT:**  You have.  Then, shall we just stop it

12 right here?

13        **MR. OSTERHOUDT:**  As long as we can present our

14 defense --

15        **THE COURT:**  Sure.

16        **MR. OSTERHOUDT:**  -- fairly and completely.  That's

17 what we really want to --

18        **THE COURT:**  I'm not sure what that means, you know.

19 It's rather an oblique statement:  Fairly and completely.

20        It means without going into these Russian records, or

21 what happened before the Russian courts, and -- I don't know

22 whatever else may be out there by now that I'm not aware of,

23 but we'll have to take it as it comes, I guess.

24        **MR. OSTERHOUDT:**  I understand.

25        **MR. WARD:**  Thank you, your Honor.

1    **THE COURT:**  Now, with -- are you somehow -- then I

2  gather, by what I've asked and what you've said and whatever,

3  that the Government is not attempting to show the defendants

4  interfered with ATN's ability to export from Russia?

5    **MR. WARD:**  No, that is not --

6    **THE COURT:**  Is that correct?

7    **MR. WARD:**  What the Government's alleged is the

8  fraud.  And we'll stay away --

9    **THE COURT:**  You're going to stay away from that

10  altogether?

11    **MR. WARD:**  Yeah.  We're happy to leave all of the

12  discussion of Russian Customs and export problems out, because,

13  as your Honor said, it's just not -- it's a distraction.  It's

14  confusing.  It will mislead the jury.  And, yeah --

15    **THE COURT:**  And the whole business also with the

16  allegations in the indictment about the false pretenses that

17  were used, and to then sell the goggles at inflated prices --

18  we clarified this the last time; that -- whenever it was before

19  this issue came up -- that, by "inflated prices," it didn't

20  have anything to do with the quality of the respective

21  goggles -- ATN's and Newcon's -- but it was just pushing up a

22  higher price for goggles.

23    **MR. WARD:**  That's all it is.  It has nothing to do

24  with the quality.  It just has to do with the defendants

25  wanting to take over, and charge the Government more money.

1  And that's the fraud.  It would have been an overcharge to the

2  Government.

3          The Government got the goggles it wanted at a

4  competitive price.  And these defendants used this secret

5  agreement -- this little scheme -- to take out the low bidder,

6  so they could come in and charge a higher price.  That's it.

7          **THE COURT:**  Okay.  So that's where we are now.

8          Anything else that we need to take up today?

9          **MR. HOWDEN:**  Minor administrative matter.

10          **THE COURT:**  You've got the words right.

11          **MR. HOWDEN:**  I'm learning, your Honor.

12          In your Honor's order permitting the clients to go

13  home to Canada, I believe it has a -- they're supposed to

14  depart by the 19th.  Mr. Beker currently has reservations for

15  the 21st, and I just didn't want that to be --

16          **THE COURT:**  We're not vanishing him.  As a matter of

17  fact, we want them to stay here or come back.  And come back,

18  you know; but as long as it's within the time frame that's, you

19  know, intended, it doesn't have to be an exact date.

20          **MR. HOWDEN:**  Thank you.

21          **MS. HAMILTON:**  Along those lines, if you could

22  actually order the defendants to return on January 4th, 2011.

23  So in fact if they did --

24          **THE COURT:**  Did the order have an exact date in it?

25          **MS. HAMILTON:**  January 4th was the date in the order

1  and the stipulation.

2              **THE COURT:**  That's what it is, right?

3              Is there any reason to change that?

4         **MS. HAMILTON:**  Not as far as we know.

5         **THE COURT:**  So January the 4th return.

6         **MR. OSTERHOUDT:**  Right, right.

7         **THE COURT:**  Okay.

8         **MS. HAMILTON:**  And then, yes.  And then, your Honor,

9  there was -- late yesterday afternoon the defendants filed an

10 *ex parte* application for a subpoena to be served on ATN.

11             **THE COURT:**  Had you seen that?

12             **MS. HAMILTON:**  We had not seen that before it was

13 filed yesterday afternoon.  The first --

14             **THE COURT:**  Were a couple of my questions -- my

15 questions were just answered.  Does that have something to do

16 with, then, the need for this subpoenas?

17             **MR. OSTERHOUDT:**  I -- I would argue that it's still

18 necessary.  I mean, admissibility of such documents would be a

19 matter for the Court; but I believe that they're appropriate

20 requests.  All of them are appropriate requests.  The

21 Government's not a party to it.  It was an *ex parte* subpoena.

22 We didn't put it under seal, but the Government -- I don't

23 know.

24             **THE COURT:**  But the last couple of questions I asked

25 you were really asked for the reasons that you espoused in your

1   papers.   *Ex parte* application.

2           **MR. OSTERHOUDT:**  Right.

3           **THE COURT:**  And the Government says it has no

4   intention of showing that defense were attempting to interfere

5   with the ability to export from Russia.   And --

6           **MR. HOWDEN:**  Well beyond.

7           **THE COURT:**  And we also have the whole thing about

8   the inflated prices, and so forth.

9           **MR. HOWDEN:**  Well, beyond the issue of interference

10   with their exportability, there's still, in our mind, the issue

11   as to whether or not Rocklin made false statements.   And a lot

12   of these documents would go -- take his credibility directly.

13   And I believe the last paragraph --

14           **THE COURT:**  Well, before we end up getting -- excuse

15   me.   Before we end up getting a motion to quash, is there any

16   reason why you couldn't go over it with the Government, and see

17   if -- and then they may be able to put some pressure on Rocklin

18   or ATN, if you know they're going to balk at providing the

19   information?   Because these are directed to ATN, correct?

20           **MR. HOWDEN:**  That's correct.

21           **MR. OSTERHOUDT:**  These are things the Government --

22           **THE COURT:**  And people at ATN?   Individuals at ATN?

23           **MR. OSTERHOUDT:**  Right.   The Government doesn't have

24   these things.

25           **THE COURT:**  I thought you mentioned something about

1    the -- that you've seen the *ex parte* application?

2              **MS. HAMILTON:**  What we saw -- yes, your Honor.  I

3    mean, we saw --

4              **THE COURT:**  So then they know about it, then?

5              **MR. HOWDEN:**  They don't have the documents, I

6    believe, is what I --

7              **THE COURT:**  No, no.  I'm just saying.

8              **MR. OSTERHOUDT:**  Right.

9              **THE COURT:**  But before we have ATN and its people

10   coming in here and moving to quash the subpoena, which they

11   might do, right?

12             **MR. OSTERHOUDT:**  Yes.

13             **THE COURT:**  Maybe sit down with the Government and go

14   over, you know, whether they have any objection to any of

15   these, and see if you need to pare it down a little bit, or

16   whatever.  And then maybe they can put some pressure on ATN to

17   just go ahead and provide the documents.  And let's not have a

18   big fight over it.  Does that not make sense?

19             **MR. OSTERHOUDT:**  Perfectly willing to do that,

20   your Honor, but we understood that the Government doesn't

21   represent ATN.

22             **THE COURT:**  Oh, I know that.  I know that, but I'm

23   sure they have the ability to put some pressure on them.

24             **MR. OSTERHOUDT:**  I don't know if they're putting

25   pressure on ATN nowadays.

1        **THE COURT:**  You can instruct -- you can tell them

2   that I've instructed you to tell them that, if you agree to

3   those documents being turned over, you think they're relevant,

4   and so forth, then turn them over.

5        **MS. HAMILTON:**  Well, your Honor, I think that you,

6   just going through the first three requests -- I mean, we've

7   just covered this.  And we don't believe they're relevant.

8        The first three requests, again, relate to documents

9   necessary to prove the quality or specifications of the

10  image-intensifier tubes that ATN supplied to TACOM.

11       The second request is for documents that the

12  manufacturer of the tubes provided, again, including

13  specifications of the tubes, so the defendants could then prove

14  that the quality of ATN's goggles did not meet the

15  specifications of the contract.

16       And again, the third request is for documents between

17  ATN and its suppliers regarding the Russian Customs export

18  issues.

19       I mean, we're back at it again.  This is -- these

20  are -- first three are for issues regarding the quality of

21  ATN's goggles, and/or the quality of them in connection with

22  the Russian Customs investigation.

23       **THE COURT:**  And certainly this -- this other

24  incident, or whatever, with N-i-v-i-s-y-s.

25       **MR. OSTERHOUDT:**  Nivisys.

1           **THE COURT:**  Nivisys.  Is that what it is?

2           **MR. OSTERHOUDT:**  Mm-hm.

3           **THE COURT:**  That's getting into totally extraneous

4    matters.

5           **MR. OSTERHOUDT:**  No.  It's the same Murgovsky

6    (phonetic).  Goes by another name there.  That -- he's a direct

7    superior of Rocklin.  ATN is not a big corporation.  It's a

8    small group of people.

9           **THE COURT:**  Mm-hm, mm-hm.

10          **MR. OSTERHOUDT:**  And the information we have is that

11   they extorted Nivisys.

12          Now, Nivisys -- you've heard that name before.  That

13   was the company that was the original recipient of the

14   subcontract from ITE to supply night-vision goggles.  ATN came

15   later, and undercut their price by a long way.  Nivisys

16   complained, and wrote a series of letters and e-mails to TACOM,

17   which we've got -- it's a provided us -- and made the same

18   complaints that our clients were making, you know:  They're

19   undercutting their prices; they can't possibly do it; it

20   won't -- they don't have the facilities.

21          So we take the position that, if this is true -- this

22   allegation, which I've spoken to the attorney from -- and so

23   has the Government.  The two prosecutors went down.  Took them

24   seriously enough.  Even though they're an Antitrust Division,

25   they're not regular Justice Department, they went down to

```
 1   Tempe, I think, last week or so, and interviewed the Nivisys
 2   victims about this incident.
 3          They didn't tell us about it.  I learned it from a
 4   Nivisys attorney, an attorney in Virginia by the name of
 5   Brownley (phonetic); one of the casualties of the U.S.
 6   Attorneys who were discharged during the last administration.
 7   And he told me about it.  He told me.  He said, "I told the
 8   Government I would provide this to you at some point."
 9          So we thought there was a parallel.  If it works out,
10   it shows that they --
11          THE COURT:  Why does this --
12          MR. OSTERHOUDT:  -- are punishing Nivisys and
13   extorting, just as they, we believe, are trying to get rid of a
14   competitor in our clients in this case.
15          THE COURT:  This case is going to have to depend on
16   its own facts.  We're not going to try some other case.
17          MR. OSTERHOUDT:  But if they're criminals, we should
18   be able to show it.
19          THE COURT:  Well, is there a conviction?
20          MR. OSTERHOUDT:  No, but if they're acting like
21   criminals and thugs, with people extorting people, why is that
22   -- if it were the defendants doing it --
23          THE COURT:  Because we're not trying that case.
24   We're trying this case.
25          MR. HOWDEN:  Well, among other things, your Honor --
```

```
 1              THE COURT:  It's another distraction.

 2              MR. HOWDEN:  -- the president of Nivisys is on our

 3    witness list.  And he's the one that was approached in all of

 4    this.

 5              THE COURT:  Well, I don't know what he's going to

 6    testify to that's relevant, but we're not going to have -- you

 7    know, we're going to try this case, and not other cases.

 8              MR. OSTERHOUDT:  This case, though -- it consists of

 9    these witnesses, too.  And we want to show what kind of

10    people --

11              THE COURT:  If they have any testimony that's

12    relevant.

13              MR. OSTERHOUDT:  All right.  Well, I understand that.

14    We're not -- anyway.

15              THE COURT:  So tread, you know, carefully.  I mean, I

16    don't want to have to just, you know, strike the witness after,

17    you know, you've got his name and, you know, all the other

18    identifying information on the record, and the first questions

19    come out, and -- sorry.

20              Okay?

21              MR. OSTERHOUDT:  That's why.  That's why we asked for

22    that, though.  That's the reason why the Government knows about

23    this.

24              THE COURT:  Yeah.  Well, they know about it, but the

25    Government may know about a lot of things, but that doesn't
```

1  mean they're going to be able to get into all of the things

2  they know about.  And you're not going to be able to get into

3  all of the things you know about.  This is sort of trying a

4  case on some other alleged fraud.

5          MR. OSTERHOUDT:  If a primary complaining witness is

6  engaging in unlawful conduct that has relevance, then we should

7  be able to show it.

8          MS. HAMILTON:  Well --

9          THE COURT:  It's getting into extraneous matters and

10  extrinsic to this case, so the objection will be sustained.

11          I would assume that if you think he's -- you know

12  he's untrustworthy, as you say he is, there's probably plenty

13  of fodder relevant to this case or in this case.

14          MR. OSTERHOUDT:  There is.

15          THE COURT:  Then go to it.

16          MR. OSTERHOUDT:  We've talked about all of his lies

17  directly to the Government.

18          THE COURT:  I guess they're willing to take a chance.

19  It wouldn't be the first time the Government's tried a case

20  with a liar as the primary witness, right?  Oh, no.  Really?

21          MR. OSTERHOUDT:  All right.  So --

22          THE COURT:  Okay.  So is that it?

23          MS. HAMILTON:  I have two very small --

24          THE COURT:  I'm really reluctant to, you know, sign

25  off on this, because this is really allowing, essentially, a

1    fishing expedition.  So I am going to deny this.

2              **MS. HAMILTON:**  Thank you, your Honor.

3              **THE COURT:**  Now, was there something else?

4              **MS. HAMILTON:**  I had just two very small issues, just

5    given the timing of when trial starts, and what we're doing in

6    December.  One of the issues I wanted just to ask is if it

7    would be appropriate or permissible to basically provide

8    binders to the jury's -- the jurors.

9              **THE COURT:**  How many documents are you going to have?

10             **MS. HAMILTON:**  Well, the exhibit list has

11   approximately a hundred, but you know, depending -- now that

12   we've had this additional discussion, I imagine it won't be

13   that many.  What I was envisioning for the binders would be

14   transcripts that will have been properly excised, and we're

15   hoping will have been stipulated to with the defendants.

16             Our thought is that we would play the tapes -- the

17   relevant portions of the tapes; that the English would be --

18   there would be, on the screens, the English translations

19   rolling as the jurors listened to the tapes.  They would also

20   have at their disposal a binder with those portions of the

21   transcripts.

22             **THE COURT:**  Well, give them the binder; but I think

23   what you do is you give them the binder.  It's pretty much

24   empty, unless there are matters that are entries that have been

25   stipulated to.

1          **MS. HAMILTON:**  Yes.

2          **THE COURT:**  And then they only get them, you know, to

3    put in the binder once they've been admitted.

4          **MS. HAMILTON:**  Okay.

5          **THE COURT:**  Okay?

6          **MS. HAMILTON:**  Okay.  Thank you, your Honor.

7          **THE COURT:**  So that we don't have them leafing

8    through, and seeing things that may not get admitted for some

9    reason.

10          **MS. HAMILTON:**  Right.  Okay.

11          **THE COURT:**  Okay?

12          **MR. OSTERHOUDT:**  Sure.

13          **THE COURT:**  Is it better to do it that way, or to

14    bring them up on the handy screens we have over there for the

15    jury, so that --

16          **MS. HAMILTON:**  Well, to the extent that the jurors

17    might want to take notes, it provides an opportunity for them

18    to put it next to what the -- whatever it is they've heard that

19    they find relevant.  That would be the only benefit, I think,

20    to doing it this way.

21          **THE COURT:**  Well, that's fine; but then don't -- you

22    know, don't put anything in the binder.  Just have binders

23    ready for them.  And, as soon as they start to put stuff in,

24    then we can hand them out, and then they can, as items come

25    in -- unless they're already stipulated to, and then you can

```
 1   put them in the binders then.  The items come in.  Then they
 2   can insert them in those binders.  They'll get a little
 3   homework.  Then, during the break, they can go fill up their
 4   binder.
 5            MS. HAMILTON:  Exactly.
 6            THE COURT:  Okay?
 7            MS. HAMILTON:  One more issue, your Honor.  At the
 8   last conference, at the last appearance, there was a discussion
 9   briefly about the transcripts.  And I believe that one of the
10   points that you had made -- but I just wanted to clarify -- was
11   that we would have an expert on Russian language available
12   throughout the trial.  Is that what you had he envisioned, or
13   was it -- I mean, if we stipulate to the transcripts --
14            THE COURT:  Well, I don't have one.
15            MS. HAMILTON:  Well, I my assumption was that the
16   Government would have to provide that, but if the transcripts
17   are -- at least the majority of them stipulated to, and then
18   the United States will put on an expert to testify as to why
19   these are, you know, the translations that she's provided --
20   the defense has not identified an expert, but I assume they'll
21   cross-examine ours.  Is there a reason for the United States to
22   have an expert witness in the Russian language here for the
23   entire time of the trial?
24            THE COURT:  I don't know.  I guess.  I don't know how
25   extensive, you know, all of that is going to be.  Probably not
```

1 necessarily that; but at least have somebody on call, perhaps;

2 but are you going to be able to stipulate, do you think, to the

3 translations?

4       **MR. HOWDEN:**  To, I think, the vast majority of it,

5 but those areas -- yeah.  I think those areas where we have

6 differences will be very few in number, but they'll be

7 significant differences.

8       **THE COURT:**  And there are differences in the

9 translations?  We're not talking about differences with respect

10 to admissibility and that kind of thing.

11       **MR. HOWDEN:**  Differences in the translation.

12       **THE COURT:**  Translation.  So have you figured out a

13 way how to handle that?

14       **MR. HOWDEN:**  I think they've been getting closer.

15       **MS. HAMILTON:**  I would say at this point, we're down

16 to probably less than, you know, 5 percent -- not even.  Like,

17 1 or 2 percent of the specific passages in which there's some

18 difference of opinion.  And again, after our conversation

19 today, and we go back and excise a lot of the transcripts,

20 then -- or portions of the transcripts, there might be, in

21 fact, even fewer.

22       **THE COURT:**  Maybe less.

23       Well, then, could you not have -- with the

24 translation, would you need to have a witness, as opposed to

25 having each of the translators render their own translation,

1   and give it to the jurors?  And then I can give them an

2   instruction, or you can propose an instruction that can be

3   given to them to explain that there is some difference of

4   opinion, and -- and they're just going to have to weigh that

5   over?

6            **MR. OSTERHOUDT:**  Dueling translators.

7            **THE COURT:**  Yeah.  In other words, can we have the

8   dueling on paper, or can we do it that way?

9            **MR. HOWDEN:**  Right.

10           **THE COURT:**  Or do we have to have the duelers come in

11  here and take the stand?

12           **MR. HOWDEN:**  I think we can do it on paper.  I think

13  my final position on that -- I'd want to see exactly where we

14  end up.

15           **THE COURT:**  Yes, exactly, exactly, but I'm just

16  saying --

17           **MR. HOWDEN:**  I think that's a possibility.

18           **THE COURT:**  -- looking *in futuro*, how we can do that.

19           **MR. HOWDEN:**  Yeah.

20           **THE COURT:**  Okay?

21           **MS. HAMILTON:**  Yes.

22           **MR. OSTERHOUDT:**  Yeah.

23           **MS. HAMILTON:**  That was my last one.

24           **THE COURT:**  That was the last one.  Okay.

25           Anything else, then?

1          **MR. HOWDEN:**  Not for now, your Honor.

2          **MR. OSTERHOUDT:**  I don't think so, your Honor.

3          **MS. HAMILTON:**  Thank you very much, your Honor.

4          **MR. OSTERHOUDT:**  I don't know if we see your Honor

5  again before --

6          **MR. HOWDEN:**  -- pretrial conference, which is on --

7          **THE COURT:**  What date is that?

8          **MS. HAMILTON:**  January 6th.

9          **MR. OSTERHOUDT:**  Have a nice holiday.

10          **MS. HAMILTON:**  Safe journeys.

11          **THE COURT:**  Thank you.  Thank you.  Can we go off the

12  record now?

13          **MR. OSTERHOUDT:**  Yes.

14          (At 3:17 p.m. the proceedings were adjourned)

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, LYDIA ZINN, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in CR. 07-0765 MHP, USA v. Beker, et al., were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

/s/ Lydia Zinn, CSR 9223, RPR

Thursday, December 2, 2010

Lydia Zinn, CSR, RPR
Official Reporter - U.S. District Court
(415) 531-6587