Volume 1

Pages 1 – 185

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARILYN HALL PATEL

UNITED STATES OF AMERICA,       )
                                     )
             Plaintiff,       )
                                     )
  vs.                         ) NO. CR. 07-0765 MHP
                                     )
MENDEL BEKER, ARIE PRILIK, and   )
NEWCON INTERNATIONAL,         )
                                   ) San Francisco, California
             Defendants.     ) Tuesday
                                   ) January 11, 2011
_____) 10:00 a.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
**For Plaintiff:**           U.S. Department of Justice
                         Antitrust Division
                         450 Golden Gate Avenue, Room 10-0101
                         San Francisco, CA  94102-3478
                         (415) 436-6673
                         (415) 436-6687 (fax)
            **BY:**  **DAVID J. WARD**
                  **ANNA TYRON PLETCHER**
                  **RICHARD B. COHEN**

**For Plaintiff:**           U. S. Attorney's Office
                         450 Golden Gate Avenue, Box 36055
                         San Francisco, CA  94102
                         (415) 436-7129
            **BY:**  **JEANE HAMILTON**

(Appearances continued on next page)

***Reported by:***     ***Lydia Zinn, CSR 9223 and Debra Pas, CSR 11916***
        *Official Reporters - US District Court*

```
 1   APPEARANCES (CONT'D)

 2   For Defendant:          Winston & Strawn, LLP
                             101 California Street
 3                           San Francisco, CA  94111
                             (415) 591-1439
 4                           (415) 591-1400 (fax)
                       BY:   JONATHAN ROBERT HOWDEN
 5
                             Martha A. Boersch
 6                           Attorney at Law
                             555 California Street, 26th Floor
 7                           San Francisco, CA  94104
                             (415) 626-3939
 8                           (415) 875-5700 (fax)
                       BY:   MARTHA A. BOERSCH
 9
     For Defendants:         Law Offices of William L. Osterhoudt
10                           135 Belvedere Street
                             San Francisco, California  94117-3915
11                           (415) 664-4600
                             (415) 664-4691 (fax)
12                     BY:   WILLIAM L. OSTERHOUDT

13   For Defendants:         Law Offices of Frank S. Moore
                             235 Montgomery Street, Suite 854
14                           San Francisco, CA  94104
                       BY:   FRANK S. MOORE
15

16

17

18

19

20

21

22

23

24

25
```

1                    **P R O C E E D I N G S**

2 Tuesday, January 11, 2011                           10:00 a.m.

3          **THE CLERK:**  Calling Criminal 07-0765, *United States*

4 *versus Mendel Beker, et al.*

5          **THE COURT:**  I'll get your appearances shortly,

6 because I'm going to introduce you, and then you can put your

7 appearance on the record.  And we won't have to go through all

8 of that at that time.

9          Good morning, ladies and gentlemen.

10          **PROSPECTIVE JURORS:**  Good morning.

11          **THE COURT:**  Ah, well, that was pretty good.  Shall we

12 try it again?  Good morning.

13          **PROSPECTIVE JURORS:**  Good morning.

14          **THE COURT:**  There you go.  Okay.  Very good.  I know

15 it's very crowded in here.  We're going to go through the

16 process of jury selection.  Many are called; a number are

17 chosen.  And we'll figure out who those are going to be in just

18 a little while.

19          As I understand from the Jury Commissioner, you've

20 all been prescreened.  You understand that this case may take

21 three weeks.  It's going to come in under that, I'm sure.  And

22 we will be in session from Tuesday threw Friday, from 8:30 to

23 1:30.  One or possibly two breaks, you know; coffee breaks or

24 convenience breaks.  And then you can leave and go about your

25 business, or go home, or whatever you need to do for the rest

1    of the day, so that there will be a chunk of time, and we'll

2    get everything done during that period of time:  8:30 to 1:30.

3    And, as I said, it's going to take, I think, a little less than

4    three weeks.  So we're giving you an outside number, just in

5    case.  Not likely, I think, from everything I've heard from

6    counsel.

7            So I understand everybody's going to be prescreened.

8    So I'm not even, you know, going to ask you about hardship,

9    because I don't want to see a bunch of hands telling me you've

10   got hardship, because you had a chance to say you were not

11   available, and you didn't do that.  And you may find this is an

12   interesting experience, in any event.  So let me tell you what

13   that experience is going to be.

14           What you've been called here to hear and decide is a

15   criminal case.  And they involve charges against three

16   defendants.  And so the case is styled as *United States of*

17   *America against Mendel Beker, Arie Prilik, and Newcon*

18   *International, Limited.*

19           The case involves an alleged scheme -- and we always

20   say "alleged," because this is what is alleged by the

21   Government, and has to be proven -- an alleged scheme to

22   defraud the United States Army Tank Automotive and Armaments

23   Command, which you'll hear us refer to throughout the trial as

24   "TACOM" -- the acronym; to deprive or defraud TACOM of money

25   and property.  That occurred approximately between the period

1    August 2005 and February 2006.

2            Specifically, it involves a contract between a prime

3    contractor -- a company; the acronym is "ITE" -- and the

4    government, namely "TACOM," in this case.

5            It also involves a subcontract between a company

6    known as "ATN," which I think is "American," something,

7    "Networks" -- and the prime contractor, ITE, by which ATN

8    supplied night-vision goggles to ITE, for them to supply to

9    TACOM.

10           The indictment charges the defendants with two counts

11   of wire fraud -- one involving transfer of money, and the other

12   a telephone call -- a count of conspiracy to commit wire fraud;

13   and, as to two of the defendants, money laundering.  So those

14   are generally the charges.

15           Because I'm going to ask you whether any of you know

16   anything about or have heard anything about this case, I think

17   before I ask that question, it would be better for me to

18   introduce the parties to you, and their counsel.

19           And so over here we have the United States.  That's

20   represented by the United States Attorney's Office in this

21   District.  And Ms. Jeane Hamilton, Mr. David Ward,

22   Richard Cohen.  And I see Ms. Pletcher's names' on that; not on

23   this list; but Ms. Hamilton, would you take the responsibility

24   of introducing everyone at your table, please?

25           **MS. HAMILTON:**  Thank you, your Honor.

1          To my right is Mr. Richard Cohen.  Also part of the

2  prosecution team is Ann Pletcher, David Ward, Janice Jacobson,

3  and Sarah Murray.  This is the team.

4          **THE COURT:**  Thank you.  Now, you know, keep all of

5  this in mind, because I'm going to ask you in a little while

6  whether you know any of these people or have heard anything

7  about them, et cetera.

8          The defendants are, as I mentioned earlier,

9  Mendel Beker, also known as Michael Beker; Arie Prilik; and

10  Newcon International, Limited.  And they are represented --

11  Mr. Beker and Newcon are represented by Jonathan Howden.  Where

12  are you, Mr. Howden?  There you are.  I can't see everybody

13  over there.  And that he's from the law firm of Winston and

14  Strawn, here in San Francisco.

15          And Mr. Beker's is also represented by

16  Martha Boersch, who is with the law firm of Jones Day, here in

17  San Francisco, as well.  Mr. -- and they represent both

18  Mr. Beker and Newcon.

19          Mr. Prilik is represented by Mr. Osterhoudt --

20  William Osterhoudt, who has offices here in San Francisco; and

21  Frank S. Moore, also with offices here in San Francisco.

22          Thank you.

23          And is there anybody else at your table you need to

24  introduce?

25          **MR. HOWDEN:**  Yes.  I'd like to introduce

1   Mr. Peter Biro.  Mr. Biro is Mr. Beker's long-time Canadian

2   counsel.  And he's here strictly just to assist us during this

3   proceeding.

4               **THE COURT:**  Thank you.

5               Now, does anything you've heard so far about this

6   case -- the names of the people introduced to you, or the

7   name -- do they sound familiar to you?  Do any of you know

8   anything at all about this?

9               Okay.  And do any of you have --

10              Who has a hand up?  Yes, ma'am.

11              **PROSPECTIVE JUROR PRIEN:**  I don't know anything about

12   the case.

13              **THE COURT:**  Can you stand up?  And we'll give you a

14   mic, because -- tell us your name first, after you get the mic.

15              **PROSPECTIVE JUROR PRIEN:**  Okay.

16              **THE COURT:**  And then what it is --

17              **PROSPECTIVE JUROR PRIEN:**  Thank you.  My name is

18   Alisa Prien.  I don't know anything about the case, but I do

19   work for an orthopedic surgeon.  And we see a lot of

20   personal-injury attorneys.  And maybe some of the names might

21   is sound familiar as far as some of the attorneys.

22              **THE COURT:**  I don't think any of you dabble

23   in-personal injury cases, do you?

24              **MR. HOWDEN:**  No, your Honor.

25              **PROSPECTIVE JUROR PRIEN:**  I just wanted to clarify

1  that.  Thank you, your Honor.

2          **THE COURT:**  Thank you very much.

3          Yes, in the back.

4          **PROSPECTIVE JUROR REED:**  Thank you.  My name is

5  Christie Reed.  And I know Jeane Hamilton from a past life.

6          **THE COURT:**  Oh, yes.  Well, that might be

7  interesting.

8          **MS. HAMILTON:**  You look fabulous.

9          **PROSPECTIVE JUROR REED:**  Thank you.

10          **THE COURT:**  Well, with those niceties aside, can you

11  remain standing for just a moment?

12          **PROSPECTIVE JUROR REED:**  Yes, ma'am.

13          **THE COURT:**  How well did you know her, and under what

14  circumstances?

15          **PROSPECTIVE JUROR REED:**  We worked in the same office

16  together for the same company.  And it was probably early

17  eighties, quite some time ago.

18          **THE COURT:**  And are you an attorney, also?

19          **PROSPECTIVE JUROR REED:**  No, I am not.

20          **THE COURT:**  Okay.  And have you maintained a

21  friendship over the years, and see each other?

22          **PROSPECTIVE JUROR REED:**  We have not.

23          **THE COURT:**  And how would you feel about sitting on a

24  case where you're going to have to be fair to both sides?

25          **PROSPECTIVE JUROR REED:**  That would be --

1          **THE COURT:**  But you know Ms. Hamilton, and you think

2    she can do no wrong, and so --

3          **PROSPECTIVE JUROR REED:**  I worked with her,

4    your Honor.

5          **THE COURT:**  Ha, ha.  Maybe -- well, on the other

6    hand, are you a little concerned maybe this is not such a good

7    case, if she's litigating it?

8          **PROSPECTIVE JUROR REED:**  I think I would be very

9    impartial.

10          **THE COURT:**  Okay.  Thank you.  And did you get on the

11    jury with further questions I'm sure the attorneys may have

12    some questions of you.  And your last name is?

13          **PROSPECTIVE JUROR REED:**  Is "Reed."

14          **THE COURT:**  Reed.  Okay.  Thank you very much.

15          **PROSPECTIVE JUROR REED:**  Thank you.

16          **THE COURT:**  Anyone else know any of these persons who

17    were introduced to you, or anything about them, or anything

18    about the case, or the company?

19          Now the company, ATN, whose name I mentioned, is also

20    a company that's headquartered in South San Francisco, I

21    believe.  And it's -- what is it?  It's American -- something.

22          **MS. HAMILTON:**  American Technologies Network.

23          **THE COURT:**  Okay.  Does that sound familiar to any of

24    you?  Is it a company that you've heard of, or have friends or

25    family that work for it?

```
 1              And are there any of you who have family members,

 2   close personal friends, who -- or you, at any time, have worked

 3   for the United States Attorney's Office, or the FBI?

 4              Yes, ma'am.  Your name?  And then tell us --

 5              PROSPECTIVE JUROR WHITNEY:  My name is Kelly Whitney.

 6   And my father is a retired FBI, San Francisco.

 7              THE COURT:  And what was his last name?

 8              PROSPECTIVE JUROR WHITNEY:  Whitney.

 9              THE COURT:  Also "Whitney"?

10              PROSPECTIVE JUROR WHITNEY:  Yes, ma'am.

11              THE COURT:  How long ago did he retire?

12              PROSPECTIVE JUROR WHITNEY:  About maybe 15 years ago.

13              THE COURT:  Okay.  And did he work in this office

14   here in San Francisco?

15              PROSPECTIVE JUROR WHITNEY:  I believe so.

16              THE COURT:  Okay.  Okay.  Thank you.

17              PROSPECTIVE JUROR WHITNEY:  You're welcome.

18              THE COURT:  And, yes, I think this is a gentleman

19   right here, Mr. Bowser.

20              PROSPECTIVE JUROR NOVICK:  I don't know if it's

21   relevant, but I have a cousin who just retired last year from

22   the FBI.  He works in Virginia.

23              THE COURT:  And do you ever talk to him about his

24   job?

25              PROSPECTIVE JUROR NOVICK:  Just peripherally; not,
```

1   you know, specifics.

2          **THE COURT:**  Okay.  Well, if -- if you get in the jury

3   box, we'll see if there are any other questions about him;

4   about that; but what is your name, sir?

5          **PROSPECTIVE JUROR NOVICK:**  Oh.  Sorry.  My name's

6   John Novick.

7          **THE COURT:**  Novick.  Okay.  Thank you very much.

8          Anyone else have close family members or personal

9   friends who work for the U.S. Attorney's Office, the FBI, or --

10         Now, obviously, a number of you may have served in

11  the Army.  And we may have some other questions about that, but

12  the particular unit that we're talking about that does some

13  contracting on behalf of the Department of Defense -- the

14  United States Army Tank Automotive and Armaments Command -- any

15  of you ever work for or have any family members or close

16  personal friends who have worked for that entity within the

17  United States Army?

18         Or any of you who have family members, close personal

19  friends who work for the Department of Defense or, you work,

20  for the Department of Defense, or you have worked for the

21  Department of Defense?

22         Okay.  A couple down here.  Yes.

23         **PROSPECTIVE JUROR SERMENO:**  Hi.  I'm Alicia Sermeno.

24  For about 15 months, between college and teaching school, I was

25  a secretary in the then-called "Star Wars" program at the

1   Vick's International, in San Leandro.  I've also had a

2   long-term relationship with a V.P. at SAIC.  And one of his

3   jobs is to -- he works with tanks, designing hybrid-powered

4   combat vehicles.

5          **THE COURT:**  Okay.  And anything about that

6   relationship or your experience that would in any way influence

7   how you would listen to and decide a case that involves charges

8   of -- related to contracts with TACOM?

9          **PROSPECTIVE JUROR SERMENO:**  I don't think so.

10          **THE COURT:**  Well, we'll explore that further if we

11   need to later.  Okay?

12          And there was another woman who had her hand up.

13   Yes.

14          **PROSPECTIVE JUROR ASCHWALD:**  Michelle Aschwald.  My

15   son is a U.S. Naval officer, mission control and fire control

16   officer, on a destroyer based in Mississippi, soon to be home

17   ported in San Diego.  And my husband is a U.S. Naval officer,

18   retired reserve.

19          **THE COURT:**  Okay.  Thank you very much.

20          Anyone else who's -- where they're employed by the

21   Department of Defense?

22          **PROSPECTIVE JUROR SERMENO:**  Yes.  I'm sorry.  I have

23   a brother who's retired military.  Army.

24          **THE COURT:**  Mm-hm.  Okay.  Thank you.

25          Yes, ma'am.

 1             **PROSPECTIVE JUROR KAMEOKA:**  My name's

 2   Kathleen Kameoka.  My dad's retired from the Air Force.  And my

 3   nephew, who's very close to me, just retired this last year

 4   from the Army, and served over in Afghanistan twice.

 5             **THE COURT:**  Okay.  Thank you.

 6             And I'm not asking about military service right now.

 7   It's really more, you know, people who are employed by the

 8   agency itself -- Department of Defense -- rather than in one of

 9   the branches of service.

10             **PROSPECTIVE JUROR HARRIS:**  I have a son-in-law who's

11   in the Defense Intelligence Agency, in Washington, D.C.

12             **THE COURT:**  Okay.  And --

13             **PROSPECTIVE JUROR HARRIS:**  I don't know what he does

14   there.

15             **THE COURT:**  He's not supposed to tell you, I think,

16   is why you don't know, right?

17             Okay.  Thank you.  And your name is, again?

18             **PROSPECTIVE JUROR HARRIS:**  Angela Harris.

19             **THE COURT:**  Harris?

20             **PROSPECTIVE JUROR HARRIS:**  Harris.

21             **THE COURT:**  H-a double r-i-s?

22             **PROSPECTIVE JUROR HARRIS:**  Yes.

23             **THE COURT:**  Okay.  Thank you very much.

24             Anyone else?

25             Then what we're going to start doing now, Mr. Bowser,

1    is calling jurors to be seated.  And we're going to have to

2    rearrange you.  I'm sorry about this.  So we will have some of

3    you getting up and moving, and so forth, but we're going to

4    call the requisite number that we need to call in order to ask

5    the remainder of our questions.  And there will be a number of

6    them.

7            So the first names that are called should fill in the

8    jury box up here.  Fill in the first row starting with the

9    first seat closest to the bench.  And then fill in the back row

10   the same way, filling in the first seat closest to the bench,

11   and then filling in that row.  And then we'll start using the

12   first couple of rows over here.  So --

13            **THE CLERK:**  Okay.  Margarita Stathis.

14            **THE COURT:**  How do you spell the last name?

15            **THE CLERK:**  S-t-a-t-h-i-s.

16            **THE COURT:**  Ms. Stathis, if you'd take the first seat

17   in the first row, please.

18            **THE CLERK:**  Angela Harris.

19            **THE COURT:**  And you just come right up and sit next

20   to here, and we'll fill in that front row.

21            **THE CLERK:**  Rachael Gannaway.  Ernest Bonacum.

22   Stanley Lau.  Rex Maffey.  And Alberta Davidson.

23   Judith Martine.

24            **THE COURT:**  And, Ms. Martine, if you'd take the first

25   seat in the back row, please.

```
 1              THE CLERK:  Victor Wong.  Susanna Evans.
 2   Cindie Watson.
 3              MS. HAMILTON:  I'm sorry.  What was the last name?
 4              THE CLERK:  Watson.  W-a-t-s-o-n.
 5              MS. HAMILTON:  Thank you.
 6              THE CLERK:  Mm-hm.  Daniel Schwartzler.
 7   Risa Calderon.  Kelly Whitney.
 8              THE COURT:  Okay.  Could I ask those of you who are
 9   in the front row here to find some other seats now in the
10   courtroom?  I apologize.  You know, this is a smaller
11   courtroom, so we have to rearrange.  That's all right.  Over
12   here.  You're okay.  You can stay.  You can stay, but this just
13   on the front row over here.  And then what we're going to do is
14   fill in that first row.  And then we'll proceed from there.
15   And probably some of you in the second row are going to have to
16   move.
17              THE CLERK:  Ellen Cannon.  Ellen Cannon.
18   Timothy Black.
19              THE COURT:  And if you'd come to the far end of that
20   row, Ms. Cannon.
21              THE CLERK:  Brian Costa.  Lionell Chaney.
22   John Novick.  Yue Chen.  Jason Watts.  Alicia Sermeno.
23              THE COURT:  Well, you're back in the first row.
24              THE CLERK:  You need to clear the second row?
25              THE COURT:  Now we need to clear out the second row.
```

```
 1   I'm sorry about that.  If you can, find other seats.  And we're
 2   going to use that row.  I apologize.  It's always a good idea
 3   to get up and stretch, right?
 4           MS. HAMILTON:  Can you spell the last names for us?
 5           THE CLERK:  Spell the last names for you?  Sure.
 6   Margo Thompson.  T-h-o-m-p-s-o-n.
 7           MS. HAMILTON:  Thanks.  Deanna Merritt.
 8   M-e-r-r-i-t-t.  Paul Cardenas.  C-a-r-d-e-n-a-s.
 9   Natasha Kapoor-Acuna.  K-a-p-o-o-r.  Acuna.  There you go.
10   Brenna Gibson.  Vladmir Butenko.  B-u-t-e-n-k-o.  And
11   Julie Novitski-Godmintz.
12           THE CLERK:  Eight more in that row.
13           THE COURT:  That's seven.  No.  That's seven.
14           THE CLERK:  Okay.  And Richard Ramos.
15           THE COURT:  Now what we're going to do is use that
16   final row back there.
17           THE CLERK:  Right.
18           THE COURT:  Okay.  I'm sorry.  I'm going to have to
19   disturb all of you people in the back row.  See if you can come
20   over here.
21           UNIDENTIFIED SPEAKER:  The whole back row?
22           THE COURT:  Back row.  Front row.  In my opinion, you
23   can find room.  I mean, you're not all going to get in into the
24   back row; that's for sure.
25           Okay.  Kathleen Kameoka.  K.A.M.E.O.K.A.
```

```
 1  Sasha Yamamoto.  Christie Reed.  Danielle Rosenthal.

 2  Mary Guedon.  Guedon.  G-u-e-d-o-n.  Rajeev Ramchandani.

 3  R-a-m-c-h-a-n-d-a-n-i.  And Rebecca Dickinson.  That's it.

 4          THE COURT:  Okay.  That should be enough to cover all

 5  of the challenges that we've agreed to, counsel.

 6          The questions I'm going to ask you will be addressed

 7  to those whose names have been called and seated over here.  So

 8  the rest of you, if you could, listen carefully to the

 9  questions and the answers, in case you need to replace one of

10  the jurors here.  Then be prepared to tell us, if you have any

11  answers that would be important to our inquiry today, because,

12  of course, what we want to do is make sure that we select a

13  jury that will be fair and impartial to both sides in the case,

14  and understanding what the nature of the case is, and what your

15  obligations are as jurors; and that is to follow the

16  instructions as to the law that you're given, but to decide,

17  after hearing the evidence and the witnesses and everything in

18  the case that amounts to evidence, whether -- what facts you

19  believe and what witnesses you believe, and so forth, and then

20  apply the law to the facts that you find, in order to decide

21  whether the Government has proven the charges against the

22  defendants by what is called "proof beyond a reasonable doubt."

23          So, first of all, it doesn't do me any good to ask

24  "Can you hear me," right, because if somebody couldn't hear me,

25  they wouldn't raise their hand, or "Can you not hear me?"
```

1    Excuse me.  So everybody that can hear me, raise your hand.

2    And then see if someone seated next to you doesn't raise their

3    hand, and then let us know.  Anybody next to you that didn't

4    raise their hand?  Okay.  So I'm assuming everybody can hear.

5            If at any point my voice falls down and you can't

6    hear, then please let us know.  Raise your hand.  Just let us

7    know, because it's important that you hear the questions and

8    the answers of the other persons as well.

9            Now, I'm advised that the following persons may be

10   called as witnesses.  And there may have been some changes in

11   this as well; but also, are there any custodian witnesses that

12   are going to be called, or is that all ironed out?

13           **MS. HAMILTON:**  We don't believe so, your Honor.

14           **THE COURT:**  Okay.  So -- and so then I'm just going

15   to go through these names.  And I'll ask you if there are any

16   other names I should give the jury.

17           Either these persons are going to be called as

18   witnesses, or they are going to be -- their names are going to

19   come up in the course of the trial.  So the question is whether

20   you know any of these persons, or know anything about them.

21           Irina Barskova, who probably will be serving as an

22   interpreter, or explaining the meaning of certain words in

23   Russian, because -- and there are going to be a number of

24   conversations and other information that's in Russian, and will

25   be translated for you.  So Irina Barskova.

```
1              Greg Haynie, who is with the FBI.

2              Derek McAleer.  That's with TACOM.

3              James McEdwards, who's an Army criminal

4    investigation -- investigator.

5              From the Department of Justice, Aseem Padukone.  Is

6    he going to testify?

7              MS. HAMILTON:  Yes, your Honor.

8              THE COURT:  And Dmitry Rocklin, R-o-c-k-l-i-n., who

9    is with American Technologies Network -- "ATN" -- that you're

10   going to hear a lot about in this trial.  That's the company I

11   said is from South San Francisco.

12             And Susan Sivok, S-i-v-o-k., from the FBI as well.

13             And then are there any other witnesses besides

14   Byron Harding, and -- is that it?

15             MR. OSTERHOUDT:  Possibly Jeffrey Bean, your Honor.

16             THE COURT:  And Jeffrey Bean.

17             And those names may come up in the trial, or they may

18   be called to testify as witnesses.

19             And Mr. Bean either was with or is with TACOM?

20             MR. OSTERHOUDT:  He is with TACOM.

21             THE COURT:  Okay.  And Mr. Harding is with what

22   company?

23             MR. OSTERHOUDT:  Nivisys Corporation.  It's a company

24   in Phoenix, Arizona.

25             THE COURT:  Okay.  Do any of those names sound
```

1    familiar to you as persons that you may know?

2          Also, there is some information I think is important

3    to know, because we want to know if any of this information

4    will affect anybody's ability to be fair and impartial.

5          First of all, we've had -- the defendants have been

6    introduced to you, and the attorneys who are representing them.

7    Mendel Beker, who is one of the defendants -- goes by the name

8    of "Michael Beker" -- is originally from Moldova, which at one

9    time was a part of the Soviet Union.  He's lived in Canada

10   since 1990, and has been a Canadian citizen since 1994.

11         Also, Mr. Beker's company, which is Newcon, one of

12   the defendants in the case, is a Canadian company.

13         Arie Prilik is also originally from Moldova.  He

14   immigrated to Israel in 1979 at the age of 11, and grew up and

15   was educated in that country.  He moved to Canada in 1990, and

16   is a naturalized citizen of Canada, as well as holding dual

17   citizenship in Israel.

18         Both Mr. Beker and Mr. Prilik are Jewish.

19         Now, also keep in mind that ATN is an American

20   company in -- situated in South San Francisco.

21         Because all of those are sort of the background facts

22   about which I want to ask you some questions, is there anything

23   first of all about any of that history -- being originally from

24   the Soviet Union; being Jewish; being a citizen of Canada

25   and/or Israel, in the case of Mr. Prilik -- that would

1   interfere in any way or affect in any way your ability to be

2   fair to the defendants in this case?

3           Any one at all have any concerns about that?

4           Because, whether you're a citizen of the

5   United States or you're a citizen of Canada or Israel or

6   anywhere else, when you're charged before the courts of this

7   country with criminal charges, you are entitled to have a fair

8   trial, and to have the same benefits under our Constitution

9   that every defendant in a criminal case has.  And I'll go over

10  those with you in a minute.  Does anybody have any concern at

11  all about your ability to be fair to these defendants, for any

12  of those reasons?

13          Also, because Newcon is a Canadian company -- and

14  then you're going to hear testimony about ATN, which is a U.S.

15  company -- is there anything about that that is going to affect

16  you?  Do you think that you have any feeling about contracts

17  with Canadian companies, or companies from other countries, as

18  opposed to contracts with the U.S. companies?  Anyone has any

19  feelings about that, that you think would affect how you listen

20  to and decide this case?

21          Now, we've told you who the witnesses are who may be

22  called to testify; but also, we're going to have people who

23  testify, as I've mentioned the names, but they are from TACOM,

24  and also from ATN, and something called "Metropolitan

25  Interpreters and Translators."  Now, I've ask you about TACOM,

1   but any of you have any family members or close personal

2   friends or anyone who works for Metropolitan Interpreters and

3   Translators, or American Technology Networks, namely "ATN"?  I

4   think I asked you that earlier as well.

5        And have any of you personally or do you have any

6   family members or close personal friends who have ever been

7   employed by -- I think we asked earlier about the FBI, but that

8   question is still out there, if you want to -- if you have

9   anything to add to that.  This is not just you, but family

10  members or close personal friends; people that you interact

11  with on a regular basis, and talk about their work and, you

12  know, what they do, and so forth; those kinds of friends.  Any

13  of you have any family members or close personal friends or

14  you, yourself, who have worked for the FBI or any other

15  law-enforcement agency:  Federal, state, local?

16        And Mr. Bowser is going to be busy running around

17  with the mic.

18        Did you have your hand up, Ms. Harris?

19        **PROSPECTIVE JUROR HARRIS:**  Yes, I did.  Just my

20  son-in-law, who works for the Defense Intelligence Agency.

21        **THE COURT:**  Okay.  And this does involve, after all,

22  an agency of the Department of Defense, essentially.

23        Would you tend to think:  Well, it's the Department

24  of Defense; you know, they probably have the better argument,

25  and I tend to lean toward them?

```
 1            PROSPECTIVE JUROR HARRIS:  Possibly.  It's difficult.
 2   I really don't know what he does there.
 3            THE COURT:  Mm-hm.  That's all right.  And you're not
 4   able to tell us, and not required to; but is there anything at
 5   all about the fact that the Department of Defense is involved
 6   that you think would influence how you would listen to and
 7   decide this case?
 8            PROSPECTIVE JUROR HARRIS:  I would -- I think I could
 9   be fair.
10            THE COURT:  Well, maybe this is a good time to --
11   before I follow up on that question with everybody else, you
12   understand that in a criminal case, a defendant is entitled to
13   the presumption of innocence.  A defendant is charged in a
14   criminal case with something called an "indictment."  And the
15   indictment is just a means of telling the defendant what he's
16   charged with.
17            It's sort of like, you know, if you have a neighbor
18   who was upset with a tree you've got on your property.  And
19   they sue you, you know, in small-claims court.
20            That doesn't mean -- the fact that they've sued
21   you -- that there is any truth to the allegations.  You go.
22   You get a summons and a complaint from them, or from the Court.
23   And then you go in to court, but they have to prove their
24   claim.  It's just a means of getting you into court.
25            And that's what an indictment is.  It is to put the
```

```
1   defendant on notice of what he is charged with, and that -- you

2   know.  And this is what the Government is going to have to

3   prove at trial; but it's essentially a means of notifying a

4   defendant of the charges against him, because that's only fair.

5   Right?  You know, you should not have to stand trial on charges

6   when you don't know what they are.  And so in this country that

7   doesn't happen.  You're told what the charges are; but the

8   indictment is not evidence of the crime that is alleged in the

9   indictment.  It is merely the means of notifying the defendant

10  of the charges.

11          And then this is where, in the course of the trial,

12  the Government is required to prove by proof beyond a

13  reasonable doubt the charges, as to each and every element of

14  the charges.  And the Government always has that

15  responsibility.

16          The defendant is presumed innocent.  And in this

17  case, the defendants have entered please of not guilty, and

18  they are entitled to stand by their presumption of innocence.

19  They may or may not testify.  They can't be compelled to

20  testify.  It's up to them to decide whether they will testify.

21  And you can't presume anything from a defendant not testifying,

22  because it's always the Governments' responsibility to prove

23  the charges by proof beyond a reasonable doubt.

24          Now, does anybody have a problem with that, where you

25  think:  You know, this just make it too tough on the
```

1   Government, because, you know, they've got to bring these

2   cases, and they've got to put on all of this evidence, and then

3   they've got to prove beyond a reasonable doubt?  Why couldn't

4   it be just like the standard in civil cases?

5           Anybody have any problem with that?

6           Anybody think:  Well, defendants are sitting there,

7   and they're charged in an indictment?  You know, there's the

8   old saying, "Where there's smoke there's fire."  There must be

9   something to it?  Anybody feel, well, it's more likely

10  probable, as they're sitting here now, they're guilty, because

11  otherwise, they wouldn't be here?  Anybody who has that

12  feeling?

13          You think that rule that we have or those rules that

14  we have embodying the Constitution are good ideas?

15          **PROSPECTIVE JUROR DAVIDSON:**  Yes.

16          **THE COURT:**  Good, good.  Okay.  Okay.

17          Now, that doesn't mean that the Government has to,

18  you know, prove beyond all doubt.

19          It's beyond what is called a "reasonable doubt."  And

20  we'll explain that as best we can to you, as best as the law

21  allows us to explain it to you; but you have to follow the

22  instructions as to the law that I give you.

23          Will there be anyone who would find it difficult to

24  follow instructions that the Court gives, and says, "This is

25  the law.  It's up to you to find the facts from the evidence,

1   but apply the law," and not to, if you don't like the law,

2   change it?  If you don't like the law, then you have to write

3   your Congressperson.  Anyone who has a problem with that?

4   They'd want to second-guess the law and say, "Well, I think

5   that's a crazy law, and so I'm just not going to find" -- you

6   know, whatever action you're going to take, independent of the

7   instruction?  Anybody would have a problem with that?

8           And I told you, just generally, the nature of the

9   charges.  When we get into the -- you know, the beginning of

10  the trial, I will tell you what has to be proved in order to

11  prove the charges.

12          Anyone have any reservation at all about anything I

13  said?

14          I don't want to raise my hand?  I might look like a

15  fool?  It won't make you look foolish.  If you have reasonable

16  questions about things, you should ask them.

17          Somebody in the back has their hand up.  Yes.  You

18  really need to wave back there, because I don't see you that

19  well.  Yes.  Tell us your name, and --

20          **PROSPECTIVE JUROR ROSENTHAL:**  My names'

21  Danielle Rosenthal.  Is it Arie?

22          **THE COURT:**  Yes.

23          **PROSPECTIVE JUROR ROSENTHAL:**  I think he might be a

24  patient at my work.

25          **THE COURT:**  You think he may be what?

```
 1              PROSPECTIVE JUROR ROSENTHAL:  A patient at my work.

 2   I think I've met him before.

 3              THE COURT:  The gentleman seated --

 4              You want to stand up again, so she can see you?

 5              PROSPECTIVE JUROR ROSENTHAL:  Oh.  I'm sorry.  No.

 6              THE COURT:  He's from Canada.  Not --

 7              PROSPECTIVE JUROR ROSENTHAL:  No.  I'm sorry.  Two

 8   over.

 9              THE COURT:  Oh.  Mr. Beker?

10              PROSPECTIVE JUROR ROSENTHAL:  I'm sorry.  Mr. Beker.

11              THE COURT:  You're from Canada also, right?

12              DEFENDANT BEKER:  Yeah.

13              PROSPECTIVE JUROR ROSENTHAL:  Okay.  Sorry.

14   Peninsula Periodontal, in San Mateo.

15              THE COURT:  Have you had any dental work while you've

16   been here in the States?

17              PROSPECTIVE JUROR ROSENTHAL:  Okay.  Sorry.

18              DEFENDANT BEKER:  Not yet.

19              THE COURT:  Not yet.

20              PROSPECTIVE JUROR ROSENTHAL:  Sorry.

21              THE COURT:  Well, I hope you don't have to, because

22   we don't have the same health coverage that you have in Canada.

23              Okay.  Anyone else?  That didn't really -- that

24   didn't have to do with the question I asked, but I'm glad you

25   brought it up, because if you think you know anybody who's
```

```
 1   involved in the case, you should tell us.  So that's the right
 2   thing to do.
 3           But anyone who says, "You know, those rules are just
 4   too tough on the government," or you know, "Too much slack for
 5   a defendant.  And defendants -- if they're charged in an
 6   indictment, there must be some -- you know, they must be
 7   somewhat guilty, at least" -- anybody feel that way?
 8           Okay.  So you're willing -- oh, well.  Okay.  Okay.
 9   Yes, sir.  You're -- I'm sorry.  I don't know if I've got your
10   name here, but --
11           PROSPECTIVE JUROR WATTS:  Jason Watts.
12           THE COURT:  Mr. Watts.  Yes.
13           PROSPECTIVE JUROR WATTS:  I have reservations about
14   some parties being held accountable, and some parties not being
15   held accountable by the Government.
16           THE COURT:  Okay, but you understand the question
17   here is not whether or not there's been any selective
18   prosecution, for example, as sometimes it's called.  That's a
19   matter of law that's taken up if it is ever raised in a case.
20           The question is whether, in this particular case, the
21   Government has proven the charges as to these defendants -- one
22   or all of them -- beyond a reasonable doubt.
23           And each, of course, defendant is entitled to your
24   independent consideration as well.
25           PROSPECTIVE JUROR WATTS:  I understand, but because I
```

```
 1  feel that the prosecutions are often -- often have political

 2  motives behind them, it makes me question the motives of the

 3  U.S.  So --

 4          THE COURT:  Well, do you have any reason to --

 5          PROSPECTIVE JUROR WATTS:  Like I'm questioning, you

 6  know:  Why these defendants?  Why not Halliburton?  Why not

 7  Blackwater?

 8          THE COURT:  Well, that may be, but that's not going

 9  to be the question in this case.

10          The question is only going to be:  Can the Government

11  prove the charges?

12          And the Government has to decide whom they're going

13  to charge, and whom they're not going to charge.  And if you

14  don't agree with that, then I guess you write the Attorney

15  General, or something, and/or your Congresspeople, but once the

16  charges are brought, and a jury is impaneled, you have to

17  decide whether the Government has proven or can prove those

18  charges against the particular defendants that are before the

19  Court, and not --

20          PROSPECTIVE JUROR WATTS:  I understand.

21          THE COURT:  -- not be concerned with any other case.

22  Can you do that, or are you going to be wondering about that so

23  much, you're going to be saying, "Well, if they haven't charged

24  Halliburton, why should thee these guys get charged?"

25          PROSPECTIVE JUROR WATTS:  All I can say is I'm highly
```

```
 1   skeptical of the Government bringing cases of some people, and
 2   not others.
 3            THE COURT:  Do you know anything about these -- this
 4   case?
 5            PROSPECTIVE JUROR WATTS:  No, I don't know anything
 6   about that case.
 7            THE COURT:  And whether it's a meritorious case or
 8   not?
 9            PROSPECTIVE JUROR WATTS:  I don't know until I hear.
10            THE COURT:  And already do you feel you're
11   predisposed to the defendants in this case?
12            PROSPECTIVE JUROR WATTS:  Yes.
13            THE COURT:  Mm-hm.  Okay.  Well, I'll let the
14   Government ask you a couple of questions and the defendants ask
15   you a couple of questions, but -- and we'll see where it goes
16   from there.
17            There was somebody else that had their hand up.
18            Thank you very much, Mr. Watts, yeah, for being very
19   candid with us.
20            PROSPECTIVE JUROR GUEDON:  My name is Mary.
21            THE COURT:  Could you stand, please, because I can't
22   see you?  And tell us your name.
23            PROSPECTIVE JUROR GUEDON:  My name is Mary Guedon.
24   And I harbor very strong feelings against corporate scamming of
25   one type or another.  Part of it is my affiliation with a
```

1  women's leftist organization.  And we frequently demonstrate

2  against corporations.  And I'm not sure that I can be impartial

3  in these proceedings.

4           THE COURT:  Well, we have two individuals and a

5  corporation for which, you know, which -- one of them, I guess,

6  owns, and one of them works.

7           But the question -- you know, so the question is:

8  Can you be fair to them, because they do have a corporate

9  entity that also is charged, and to the corporate entity, in

10  deciding whether the Government can prove the charges?

11          PROSPECTIVE JUROR GUEDON:  I'm not certain that I

12  could.

13          THE COURT:  And, well, Ms. Hamilton and defense

14  counsel -- I'm not sure which of you:  Mr. Howden;

15  Mr. Osterhoudt; whoever -- do you wish to stipulate to excuse

16  these two defendants [sic] -- or two jurors?  Excuse me.  I'm

17  sorry.  Two jurors?

18          MR. OSTERHOUDT:  I think so.

19          MR. HOWDEN:  We're prepared to stipulate, your Honor.

20          THE COURT:  To both of them?

21          MR. HOWDEN:  Yes.

22          MS. HAMILTON:  We will as well, your Honor.

23          THE COURT:  So I'm going to excuse you, Mr. Watts.

24  And I'll excuse you, Mr. Guedon.  And maybe there will be a

25  case that doesn't involve a corporation, or a civil case.

1    Thank you very much.  And if you'd go back to the jury room,

2    please.

3              **PROSPECTIVE JUROR RAMOS:**  Good morning, your Honor.

4    Richard Ramos.  You asked earlier about law enforcement.

5              **THE COURT:**  Yes.  I'll get back to that in a minute.

6    Hold on just one minute.  Hold it there.

7              Mr. Bowser, you have to come tripping back up here

8    and call two jurors to be seated in those two seats.

9              **THE CLERK:**  John Gillespie.

10             **THE COURT:**  Mr. Gillespie, if you'd take this seat

11   that was just vacated up here in this first row.

12             **THE CLERK:**  Robert Miller.

13             **THE COURT:**  And, Mr. Miller, that's it.  Right there

14   in that spot.  Thank you very much.

15             Mr. Gillespie and Mr. Miller, did you hear all of the

16   questions that were asked of the other jurors, and their

17   answers?

18             **PROSPECTIVE JUROR GILLESPIE:**  Yes, indeed.

19             **THE COURT:**  Okay.  Did any of them trigger any

20   thought in your mind?  You know.  "When I get there, I'd better

21   tell them about this," or, "This is how I feel," or "This is

22   some -- you know, someone I know," or whatever that might be

23   involved in --

24             **PROSPECTIVE JUROR GILLESPIE:**  No.  Not at all.

25             **THE COURT:**  And Mr. Miller?

1              **PROSPECTIVE JUROR MILLER:**  No.

2              **THE COURT:**  Okay.  Thank you.

3              Now back to law enforcement, and Mr. Ramos.

4              **PROSPECTIVE JUROR RAMOS:**  I'm a retired police

5    officer, and currently teach criminal justice administration at

6    community-college level.

7              **THE COURT:**  And where were you a police officer?

8              **PROSPECTIVE JUROR RAMOS:**  Berkeley.

9              **THE COURT:**  And where are you teaching?

10             **PROSPECTIVE JUROR RAMOS:**  I'm teaching at Contra

11   Costa College, in San Pablo.

12             **THE COURT:**  Good.  Are you enjoying that experience?

13             **PROSPECTIVE JUROR RAMOS:**  It's fun.  It's fun.  We're

14   off for a break right now.

15             **THE COURT:**  Okay.  Well, anything at all about what

16   you've learned in your experience that you think would tend you

17   toward Government in this case, or the defendant?

18             **PROSPECTIVE JUROR RAMOS:**  It's possible.  I've worked

19   a lot of white-collar crime investigations in the Special

20   Investigations Bureau at Berkeley.  So it just depends on what

21   I hear, but I might have some preconceived notion that could

22   come through.

23             **THE COURT:**  Well, what?  You want to give us a hint

24   what might that be?

25             **PROSPECTIVE JUROR RAMOS:**  It just depends on what I

1   hear, you know.

2           **THE COURT:**  Well, can you keep an open mind through

3   all of the proceedings, and hold --

4           **PROSPECTIVE JUROR RAMOS:**  I will certainly try.

5           **THE COURT:**  -- hold the Government to the burden of

6   proof; that they will have to prove it beyond a reasonable

7   doubt?

8           **PROSPECTIVE JUROR RAMOS:**  I would certainly try.

9           **THE COURT:**  And you think just automatically, because

10  of the -- you know, some of the white-collar cases you've

11  worked on, "Aha!  You know, this is another one"?

12          **PROSPECTIVE JUROR RAMOS:**  It's possible.

13          **THE COURT:**  Mm-hm.  Well, I'll let the attorneys

14  follow up with some questions, and we'll see where that goes.

15          Yes.  Seated right next to you is --

16          **PROSPECTIVE JUROR NOVITSKI GODMINTZ:**  I'm

17  Julie Novitski Godmintz.

18          **THE COURT:**  Yes.

19          **PROSPECTIVE JUROR NOVITSKI GODMINTZ:**  My husband

20  currently works for the San Francisco Police Department as a

21  police service aide.  I, upon occasion, also work for the

22  Department, for their training of recruits.

23          **THE COURT:**  What detail is he on, or --

24          **PROSPECTIVE JUROR NOVITSKI GODMINTZ:**  Oh, he's at the

25  airport.

1          **THE COURT:**  I see.  Anything at all about your

2  experiences with the Police Department or his experiences that

3  you think would affect your ability to be fair in this case?

4          **PROSPECTIVE JUROR NOVITSKI GODMINTZ:**  No, I don't

5  believe so.

6          **THE COURT:**  Do you have any preconceptions about it,

7  toward one side or the other?

8          **PROSPECTIVE JUROR NOVITSKI GODMINTZ:**  Not

9  particularly.

10          **THE COURT:**  Well, how about just generally?

11          **PROSPECTIVE JUROR NOVITSKI GODMINTZ:**  No.  I could be

12  impartial, I hope.

13          **THE COURT:**  Okay.  Thank you.  Anyone else whose

14  family member, or you, or a close personal friend works for law

15  enforcement?

16          **PROSPECTIVE JUROR SCHWARTZLER:**  Hello.  My names'

17  Dan Schwartzler.  My cousin works for the Dublin Police

18  Department.  He's been doing that.  And he also worked for

19  Oakland as an undercover police officer.

20          **THE COURT:**  Okay.  Did he ever do any white-collar

21  kind of investigation work; that kind of thing?

22          **PROSPECTIVE JUROR SCHWARTZLER:**  Not to my knowledge.

23  Not that he's directly shared with me.

24          **THE COURT:**  And what's his relationship to you?  He's

25  a cousin?

1           **PROSPECTIVE JUROR SCHWARTZLER:**  He's my cousin, yeah.

2           **THE COURT:**  Do you talk with him about his work?

3           **PROSPECTIVE JUROR SCHWARTZLER:**  Yes.

4           **THE COURT:**  And do you have a particular attitude

5    toward police officers; that they're more likely to tell the

6    truth or less likely to tell the truth than other people?

7           **PROSPECTIVE JUROR SCHWARTZLER:**  I guess part of me,

8    kind of going backwards to something that you said earlier,

9    tends to side with the Government a little bit.  How you

10   mentioned, you know, "If there's smoke, there's fire," part of

11   me -- my gut reaction to that, after I kind of thought about

12   it, is that, yeah, that's probably true; but I would hope that

13   I could be impartial, but I don't know.

14          **THE COURT:**  Well, can you -- can you -- can you just

15   sort of go by the book?

16          **PROSPECTIVE JUROR SCHWARTZLER:**  Mm-hm.

17          **THE COURT:**  And say, okay.  These are defendants who

18   are charged in an indictment.  The indictment is not evidence.

19   I'm going to have to hear what the witnesses testify to, and

20   keep an open mind, and keep an open mind through the time that

21   the Governments' witnesses testify.  And if the defendants call

22   witnesses or testify, that -- they don't have to.  They can

23   rely upon the state of the evidence by the Government, but it's

24   always the Governments' job to prove their guilt by proof

25   beyond a reasonable doubt.

```
 1              And would you, if they decided not to testify, if
 2    they didn't call any witness, say, "Well, you know, that looks
 3    bad"?
 4              PROSPECTIVE JUROR SCHWARTZLER:  Yeah.  I mean --
 5              THE COURT:  Yeah?  "I expect them to get up there and
 6    speak for themselves."
 7              PROSPECTIVE JUROR SCHWARTZLER:  Right.
 8              THE COURT:  Is that what you would do?
 9              PROSPECTIVE JUROR SCHWARTZLER:  Well, I would want to
10    kind of hear sort of firsthand.
11              THE COURT:  Okay.  We all want to hear things.  You
12    know, we like to know everything there is to know, right?  But
13    that's not the question.
14              We're not here, as I explained to one of my
15    colleagues who was a canon-law expert, we're not here to find
16    the ultimate truth, you know.
17              What we're here is to find out whether the Government
18    can prove what they're required to prove under the law.  Either
19    they can, or they can't.
20              And you always have to presume that the defendant is
21    innocent, until they've met that burden of proof.  Can you do
22    that?
23              PROSPECTIVE JUROR SCHWARTZLER:  Yeah, I would
24    definitely try.
25              THE COURT:  I'm sure you're going to get some
```

```
 1  questions from the lawyers about that.

 2           Anyone else whose family member, close --

 3           PROSPECTIVE JUROR WHITNEY:  Hi.  My name is

 4  Kelly Whitney.

 5           THE COURT:  Your father, I guess, was it?

 6           PROSPECTIVE JUROR WHITNEY:  My father is retired FBI,

 7  correct.  And I have a few friends in law enforcement,

 8  including an ex-boyfriend, an ex-fiancé, and a cousin who is a

 9  police officer in Virginia; but I know a few police officers in

10  Martinez, in Berkeley, San Francisco, Union City.

11           THE COURT:  And anything about those -- your, you

12  know, relationships with those or your knowledge of them and

13  their work and so forth that would in any way affect how you

14  would listen to and decide this case?

15           PROSPECTIVE JUROR WHITNEY:  No, ma'am.

16           THE COURT:  Do you think that law-enforcement

17  officers are more likely to tell the truth than other people,

18  or less likely?

19           PROSPECTIVE JUROR WHITNEY:  Not one way or the other.

20           THE COURT:  Because I'm going to give you, you know,

21  instructions.  And the law provides that you're to evaluate all

22  witnesses by the same standards.  Nobody, by virtue of their

23  status, gets more credence than anyone else.

24           PROSPECTIVE JUROR WHITNEY:  I agree.

25           THE COURT:  You understand that what you have to look
```

1  for are things like the ability of the witness to see or hear

2  that which they're testifying about; and, you know, how --

3  what's the quality of their memory; and the manner and demeanor

4  they testify; anything they have to either gain or not, you

5  know, suffer by reason of their -- of the testimony; things

6  like that; the kinds of things you use every day, but no -- to

7  decide whether somebody's telling you the truth or not.

8          But nobody gets any extra points because of their

9  status.

10          **PROSPECTIVE JUROR WHITNEY:**  Right.  I agree.

11          **THE COURT:**  Do you understand?

12          **PROSPECTIVE JUROR WHITNEY:**  Yes, ma'am.

13          **THE COURT:**  Anybody have a hard time following that

14  instruction?  You don't get any extra points for being a

15  law-enforcement officer, but you don't get any points taken

16  off.

17          I remember one time picking a jury.  And to that

18  question, a woman with white gloves on -- I kid you not.  An

19  elderly woman with white gloves raised her hand.  I thought:

20  Oh, boy.  Here it comes.

21          She got up and said, "I don't believe any of them."

22          And I was stunned.  So I don't know what happened;

23  what bit her; but of course, we said goodbye to her; but that

24  really surprised me.

25          So, you see, you cannot tell a book by its cover.

1    And that's why, you know, we have to hear what these witnesses

2    have to say.

3              Anybody disagree with that rule?

4              Now, a little bit more about this case.  And we'll

5    see if -- you know, what reaction you have to any of this.

6              I told you generally what -- what the charges are,

7    but the defendants are alleged to have failed to disclose a

8    particular financial arrangement that ATN came up in the course

9    of their dealing with ATN and TACOM, and in connection with

10   conversations they had with TACOM.  So it really involves a

11   failure to disclose certain information.

12             Now, does it necessarily involve an outright

13   misstatement or misrepresentation?

14             Is there anyone who feels that, well, concealment is

15   different from an outright misrepresentation, and I'd have a

16   hard time holding someone responsible for that, even if the

17   Court tells you that concealment can, under certain

18   circumstances, you know, commit -- and -- be a crime, under the

19   statute that we have?

20             Now, I know this is all in a vacuum, so it's a little

21   hard I understand that, but anyone who says, "Well, if it's a

22   concealment, I mean, you know, that's different from just

23   outright lying"?  Anyone at all?

24             Have any -- or is this one of those questions that --

25   there's not enough information?

1          Does anyone think that -- that it's -- it really

2    should not be against the law or make it -- or be a crime to

3    obtain money by hiding information, as opposed to giving false

4    information outright?

5          **PROSPECTIVE JUROR DAVIDSON:**  Can you repeat that?

6          **THE COURT:**  Does anyone feel that it should not be a

7    crime to attempt to obtain money or make false representations

8    or -- or to obtain money or property by hiding information, as

9    opposed to just giving outright false information?

10          Do you -- and in connection with dealing with the

11   Government, and in particular, the Defense Department in this

12   case, do you think that the failure to disclose information is

13   as important as the -- or less important than giving false

14   information?  Anybody have any attitude or feeling about that?

15          As I said, I know it's difficult to deal with it in a

16   vacuum, but I'm just wondering if -- under certain

17   circumstances, would you find that the failure to give certain

18   information would not be improper?

19          Well, in the course of the trial, I will give you the

20   instructions as to what amounts to concealment, and when it may

21   constitute a violation of the law or not.  Is there anyone who

22   thinks that they would have difficulty in following that

23   instruction, assuming that it's given to you in plain English?

24          And so you could live with that notion that

25   concealment, under some circumstances, may be a violation of

1  the law?  And then we'll get into all kinds of questions about

2  whether it's material, and so on, and so forth; but anyone who

3  thinks they would have a problem with that?

4          And I want to ask you just generally about things

5  related to contracts with the Defense Department.  You've

6  probably read things in the newspaper and heard things about

7  contracts with the Defense Department.  Have any of you, first

8  of all, or have family members or close personal friends who

9  have entered into contracts with the Defense Department, or any

10 other Government agency, actually, to provide services or goods

11 to the Government?

12         Yes.  It's Sermeno, or Sermeno?

13         **PROSPECTIVE JUROR SERMENO:**  Sermeno.

14         **THE COURT:**  Sermeno.  Okay.

15         **PROSPECTIVE JUROR SERMENO:**  Yeah.

16         My long-term relationship contracts with TARDEC.

17         **THE COURT:**  Which is?  That's another one of those

18 acronyms I don't know.

19         **PROSPECTIVE JUROR SERMENO:**  I don't know what that

20 stands for itself, but he does a lot of defense work with the

21 Army and stuff.  It's the Department of Defense.

22         **THE COURT:**  Do you talk with him about his work?

23         **PROSPECTIVE JUROR SERMENO:**  Not frequently.

24         **THE COURT:**  Mm-hm.

25         **PROSPECTIVE JUROR SERMENO:**  Mainly because I don't

1   understand it.

2            THE COURT:  And what is the nature of your

3   employment?

4            PROSPECTIVE JUROR SERMENO:  I'm a schoolteacher.

5            THE COURT:  Okay.  And I'm sure you could understand

6   it, but maybe you just choose not to.  Is that it?

7            PROSPECTIVE JUROR SERMENO:  Well, when he starts

8   going all scientific on me, it's way over my head.

9            THE COURT:  I see.  I see.  Okay.

10           Do you have any opinion about companies or persons

11   who enter into contracts with the Government to provide goods

12   and services?

13           PROSPECTIVE JUROR SERMENO:  No.  When I worked as a

14   secretary, we were contracting -- or we were trying to gain

15   contracts from the military.  That was a long time ago.

16           THE COURT:  Were you successful in doing so?

17           PROSPECTIVE JUROR SERMENO:  I believe we were,

18   occasionally.

19           THE COURT:  Mm-hm.  Mm-hm.  And is there anything

20   about that process that -- you think that the Government does a

21   shoddy job?

22           PROSPECTIVE JUROR SERMENO:  No, not at all.

23           THE COURT:  Or they're too demanding, or --

24           PROSPECTIVE JUROR SERMENO:  No.

25           THE COURT:  And do you think that -- that there is a

```
 1  practice of cheating them on a regular basis?

 2            PROSPECTIVE JUROR SERMENO:  No.

 3            THE COURT:  By a lot of companies?

 4            PROSPECTIVE JUROR SERMENO:  I don't know.

 5            THE COURT:  Anything at all that you've heard so far

 6  that would make you a little uneasy about being a juror in this

 7  case?

 8            PROSPECTIVE JUROR SERMENO:  No.

 9            THE COURT:  Okay.  Thank you.

10            Anyone else?  Any contracts with any governmental

11  agencies to provide goods or services, including, of course,

12  the Department of Defense?

13            And, in fact, what this involves is the contracting

14  to provide night-vision goggles.  Does anybody know anything

15  about night-vision goggles?  Do you have any expertise in that

16  field?

17            Mr. Ramos.

18            PROSPECTIVE JUROR RAMOS:  Just -- just having used

19  them in training.  Range programs, and stuff like that.

20            THE COURT:  I see.

21            PROSPECTIVE JUROR RAMOS:  I don't really know them.

22  I couldn't build them for you.

23            THE COURT:  Okay.  And so you're not going to

24  contract with anybody to provide them with night-vision

25  goggles?
```

```
 1              PROSPECTIVE JUROR RAMOS:  No.

 2              THE COURT:  But is there anything at all that

 3   you've -- any experiences that you've had with any governmental

 4   agency that has left a bad taste in your mouth, and

 5   particularly with respect to the Department of Defense?  Any of

 6   you?  Any personal experience or family members who have had

 7   experiences?

 8              Yes, ma'am.

 9              PROSPECTIVE JUROR KAPOOR-ACUNA:  Just --

10              THE COURT:  I'd ask you stand up.  And just tell us

11   your last name, please.

12              PROSPECTIVE JUROR KAPOOR-ACUNA:  Kapoor-Acuna.

13              THE COURT:  Yes.

14              PROSPECTIVE JUROR KAPOOR-ACUNA:  You said "bad

15   experience."  I'm not sure if that's my experience.  I worked

16   for Hewlett-Packard for ten years.  On occasion, we'd get

17   orders from the Government that we'd have to turn around

18   quickly, for ink.

19              THE COURT:  Was it a bad experience?

20              PROSPECTIVE JUROR KAPUR-ACUNA:  I can't say it was a

21   bad experience.  Sometimes the priority was urgent, and I had

22   to upset some other customers, but --

23              THE COURT:  I see.  I see.  Okay, but would any --

24   did any of that involve the Defense Department?

25              PROSPECTIVE JUROR KAPUR-ACUNA:  Not that I'm aware
```

1  of.

2          THE COURT:  Whatever that experience was, could you

3  put that aside and just listen to what you hear in this case?

4          PROSPECTIVE JUROR KAPUR-ACUNA:  I think so.

5          THE COURT:  And decide it based on what you hear in

6  this case only?

7          PROSPECTIVE JUROR KAPUR-ACUNA:  Uh-huh.

8          THE COURT:  Okay.  Thank you.

9          Anyone else?

10          Now, do any of you have any negative feelings about

11  law enforcement, generally?  I mean, we do have some law

12  enforcement that is involved here, and, of course, prosecutors.

13  Any of you have any negative feelings or experiences?

14          Have any of you had family members or close personal

15  friends or you, yourself, who have ever charged somebody else

16  with fraud?  Maybe sued them in a civil action, or been charged

17  with fraud in a civil or criminal action?  Have you been

18  charged by somebody else?  Ever been involved, or a family

19  member involved, in fraud charges?

20          Yes.  Let me see if I can figure out who you are.

21          PROSPECTIVE JUROR GANNAWAY:  Gannaway.

22          THE COURT:  Gannaway?

23          PROSPECTIVE JUROR GANNAWAY:  Uh-huh.  I was a child.

24  My mother was taken to court for fraud, because she was

25  claiming me as her child still, but I had never lived with her.

```
1   So she was trying to collect money on my behalf, apparently.
2           THE COURT:  Mm-hm.  Did you have to go to court and
3   testify?
4           PROSPECTIVE JUROR GANNAWAY:  No.  I was too young.
5   So --
6           THE COURT:  Mm-hm.  Mm-hm.  And anything at all that
7   you remember about that experience that would in any way -- I'm
8   sure you remember about it, but --
9           PROSPECTIVE JUROR GANNAWAY:  Yeah.
10          THE COURT:  -- that would affect anything having to
11  do with this case?
12          PROSPECTIVE JUROR GANNAWAY:  No.  I mean, I have been
13  involved with the Government a lot, because I was a foster kid
14  for a long time, but no.  It was mostly, you know, feelings
15  towards her, but not the Government.
16          THE COURT:  Okay.  Thank you.
17          PROSPECTIVE JUROR GANNAWAY:  Yeah.
18          THE COURT:  Thank you.
19          And have any of you -- or do you have family members
20  or close personal friends who have been charged in a criminal
21  case; or you have been a victim, and you have sought to have
22  charges brought; or you've been a witness in a civil or a
23  criminal case?  Anyone up here at all?
24          Yes.  In the back row.  Is it Ms. Calderon?
25          PROSPECTIVE JUROR CALDERON:  Yes.  Yes.  My name's
```

1  Risa.  About when I was 18 -- I think it was four years ago --

2  I had to testify.  My father was pressing charges on a distant

3  relative who had robbed our house.  And we did press charges, I

4  pointed him out in a line-up.  I ended up testifying against

5  him.

6        **THE COURT:**  Mm-hm.  And did you feel that you and

7  your family were treated fairly in the process?

8        **PROSPECTIVE JUROR CALDERON:**  Yes.  Yes.

9        **THE COURT:**  Any really negative feelings about that

10 experience, other than it's not pleasant to go to court and

11 have to testify?

12        **PROSPECTIVE JUROR CALDERON:**  No, no feelings against,

13 I guess, police, or anything like that, and the court; just

14 against the family member.  That's all.

15        **THE COURT:**  Yes, yes.  Okay.  And, as you sit here

16 today, if you're selected to sit on this jury, can you assure

17 the defendants they would get a fair trial from you?

18        **PROSPECTIVE JUROR CALDERON:**  Absolutely.

19        **THE COURT:**  Okay.  Thank you.

20        Who else had their hand up?

21        Yes.  Mr. Chaney.

22        **PROSPECTIVE JUROR CHANEY:**  Chaney.

23        **THE COURT:**  Mr. Chaney.

24        **PROSPECTIVE JUROR CHANEY:**  I testified in court for a

25 police officer once, about five years ago.

1          THE COURT:  For or against the police officer?

2          PROSPECTIVE JUROR CHANEY:  On behalf of the police.

3          THE COURT:  I see.  And how did that come about?  And

4    can you speak into the mic just a little?

5          PROSPECTIVE JUROR CHANEY:  Oh, okay.  Yes.  The

6    police officer was assaulted, and I was a witness.

7          THE COURT:  I see.  I see.  And did you feel that you

8    were treated fairly and everybody else was treated fairly in

9    the process?

10          PROSPECTIVE JUROR CHANEY:  I believe so, yes.

11          THE COURT:  Okay.  And anything at all about that

12    experience that would affect how you would listen to and decide

13    this case?

14          PROSPECTIVE JUROR CHANEY:  No.

15          THE COURT:  And does that tell us anything about

16    whether you would be pro prosecution, or more likely to be for

17    the defendant?

18          PROSPECTIVE JUROR CHANEY:  No.  I can be completely

19    impartial.

20          THE COURT:  Okay.  Thank you very much.

21          Who else had their hand up?  It was in the next row.

22          PROSPECTIVE JUROR MERRITT:  Hello.  My name is

23    Deanna Merritt.

24          THE COURT:  Yes.

25          PROSPECTIVE JUROR MERRITT:  And I had a family member

```
1    that has been charged and convicted of grand theft and drug

2    possession.

3              THE COURT:  And was this in California?

4              PROSPECTIVE JUROR MERRITT:  Yes.

5              THE COURT:  And did you attend any of the

6    proceedings?

7              PROSPECTIVE JUROR MERRITT:  No.

8              THE COURT:  From what you know about the case, do you

9    believe he was treated fairly?

10             PROSPECTIVE JUROR MERRITT:  Yeah.  She was guilty.

11             THE COURT:  "She."  She was treated.

12        You see?  I just jumped to the conclusion, right?

13             PROSPECTIVE JUROR MERRITT:  You did.

14             THE COURT:  She was treated fairly?

15             PROSPECTIVE JUROR MERRITT:  Yeah.  Yeah.

16             THE COURT:  And anything at all about that experience

17   that you might think would color how you would listen to and

18   decide this case?

19             PROSPECTIVE JUROR MERRITT:  No, not at all.

20             THE COURT:  Okay.  Thank you.

21        And I guess it's -- oh, yes.  Thank you.

22   Ms. Thompson.

23             PROSPECTIVE JUROR THOMPSON:  Yes.  I have two things.

24        My former husband was a criminologist at Fresno

25   State, and did -- was consulted a number of years ago by the
```

1  FBI, mostly in the case of the Unabomber.

2          And my oldest son is an attorney for Triple A in

3  Fresno, and he does prosecute fraud.  So --

4          **THE COURT:**  Okay.  And anything at all about what

5  you've learned from them and their experiences that you think

6  would affect your impartiality in this case?

7          **PROSPECTIVE JUROR THOMPSON:**  I'm not sure.  My son

8  will tell me things once in a while.  And so I think I tend to

9  set -- you know, side with him; that people are trying to take

10  advantage of the system --

11          **THE COURT:**  Mm-hm.

12          **PROSPECTIVE JUROR THOMPSON:**  -- in that case with the

13  insurance company.

14          **THE COURT:**  So what happens when you hear "fraud"?

15  You -- your ears perk up, and you say, "Aha!  I know"?

16          **PROSPECTIVE JUROR THOMPSON:**  I don't -- I'm hoping

17  that I am impartial.

18          **THE COURT:**  Well, can you promise both sides that you

19  will be, throughout this case?

20          **PROSPECTIVE JUROR THOMPSON:**  Yes.

21          **THE COURT:**  And that you won't let whatever you've

22  learned in these other situations color what you decide, but

23  you'll listen to it, and decide it based on the evidence you

24  hear here?

25          **PROSPECTIVE JUROR THOMPSON:**  Yes.

```
 1            THE COURT:  Okay.  Thank you.
 2            And I think -- yes.  We'll come up to you.  And there
 3  was someone in the back row.  We want to keep Mr. Bowser, our
 4  courtroom deputy, walking around.  This is how he gets his
 5  exercise.
 6            Yes, ma'am.
 7            PROSPECTIVE JUROR DICKINSON:  Rebecca Dickinson.  I'm
 8  a nurse.  And several times I've been called upon by the
 9  hospital attorneys to give depositions about certain cases
10  where people were suing the hospital, but I've never been
11  called to court.
12            THE COURT:  I see; but you've been called as a
13  witness or had your deposition taken, right?
14            PROSPECTIVE JUROR DICKINSON:  Yes.
15            THE COURT:  Okay.  And did you feel that sometimes
16  the charges that were brought by those persons were phony, or
17  they were not substantiated?
18            PROSPECTIVE JUROR DICKINSON:  Yes.  Yes.  I mean, on
19  occasion, it was -- it was justified; but on other occasions,
20  no.
21            THE COURT:  Okay.  And so anything at all about
22  that -- there are good cases, and there are bad cases, right?
23            PROSPECTIVE JUROR DICKINSON:  Correct.
24            THE COURT:  Anything at all that is going to affect
25  how you would listen to and decide this case?
```

1          **PROSPECTIVE JUROR DICKINSON:**  I don't think so.

2          **THE COURT:**  Okay.  Thank you very much.  And I think

3  there's a gentleman up here in the front row.  And I should be

4  able to figure your name out from my chart here.

5          **PROSPECTIVE JUROR MAFFEY:**  Good morning.  About 30

6  years ago, I was working for an alarm company, and I was called

7  in to testify about how an alarm was tripped.  That was my only

8  testimony I've ever given in court.

9          But I also have a close friend who's a correctional

10  officer at the men's colony at Atascadero State.

11          I believe it is -- those are the only two points.

12          **THE COURT:**  Yes.  And what about any of those

13  experiences might possibly affect how you would listen to and

14  decide this case?

15          **PROSPECTIVE JUROR MAFFEY:**  Nothing whatsoever.

16          **THE COURT:**  Okay.  Okay.  Thank you.

17          **PROSPECTIVE JUROR MAFFEY:**  You're welcome.

18          **THE COURT:**  Anyone else?

19          **PROSPECTIVE JUROR NOVICK:**  Your Honor, this is off

20  topic.  What's the protocol?  Sixty-second bathroom break,

21  possibly?

22          I appreciate it.

23          **THE COURT:**  Just go ahead.  How long have we been at

24  this?

25          **THE CLERK:**  An hour and five minutes.

1        **THE COURT:**  Generally, around an hour and a half or

2  so, I'd give everybody a break, but why don't we do this, so

3  that we don't miss the general questions?  I think what we lost

4  two people there that left.  Why don't we start with you,

5  Ms. -- you each have a sheet of paper, so that you can tell us

6  about yourselves.  And we'll start doing that.  And then, when

7  the others come back, we'll get to the general questions again.

8        Is it Ms. -- I can't read my own writing.

9  Ms. Stathis?

10        **PROSPECTIVE JUROR STATHIS:**  Yes.

11        **THE COURT:**  Just go down the list.

12        **PROSPECTIVE JUROR STATHIS:**  My name's

13  Margarita Stathis.  I live in Fremont.  I've lived in the --

14  born and raised in the Bay Area.  I am married.  And I have no

15  children.  I am a teacher -- third-grade teacher in Fremont for

16  the last 23 years.  My spouses' occupation -- he was a postal

17  worker, and he retired because of stress.  My educational

18  background -- I have a B.A. in Liberal Studies, and a teaching

19  credential.  No military service.  My hobbies and leisure -- I

20  like to go shopping and read.  Membership in organizations?  I

21  am a Greek Orthodox, and there's a lot of activities that we do

22  with our church.  My mother lives with us now.  And I always

23  take her to Greek family activities.  Reading materials.  *Time*

24  magazine, and *Readers' Digest*.  Television.  My mom likes to

25  watch lately at night.  Not much.  My husband likes to watch

1   CNN.  My mom likes to watch something else.  Whatever they're

2   watching, I watch with them.  But no bumper stickers.  Type of

3   Internet use.  E-mail, and I just got on Facebook.

4           THE COURT:  And if you actually could get a hold of

5   that remote, what would you put on for yourself?

6           PROSPECTIVE JUROR STATHIS:  Lifetime movie network.

7           THE COURT:  Okay.  Thank you.

8           Ms. Harris.

9           PROSPECTIVE JUROR HARRIS:  Thank you.  Angela Harris

10  is my name.  I live in --

11          THE COURT:  Can you put the mic up even closer?

12  There you go.

13          PROSPECTIVE JUROR HARRIS:  Angela Harris is my name.

14  I live in Marin.  We've lived in the Bay Area for about 35

15  years.  And I'm from Canada; and from England before that.  I

16  have four daughters:  42, 40, 38, and 35.  I'm a physical

17  therapist -- or I was a physical therapist.  And I've also been

18  a book seller at Book Passage, in Marin County.

19          THE COURT:  And how is Elaine Petrocelli?

20          PROSPECTIVE JUROR HARRIS:  She is well, as far as I

21  know.

22          THE COURT:  Good.

23          PROSPECTIVE JUROR HARRIS:  I'm no longer there, but

24  as far as I know, she's still going strong.  My husband's

25  occupation -- he is a businessman.  He works in real estate in

1  the city here.  And then when he retired from that, he worked

2  in Russia and in Poland and in Italy, which was very

3  interesting.

4          **THE COURT:**  Did you join him in any of those trips?

5          **PROSPECTIVE JUROR HARRIS:**  I've visited Russia and

6  Poland, and I lived with him in Italy.

7          **THE COURT:**  I see.

8          **PROSPECTIVE JUROR HARRIS:**  My educational background

9  is physical therapy.  I have a degree in physical therapy.  I

10  have no military service.  My hobbies.  I go to the gym.  I

11  read.  I sew.  And I'm a housewife.  Membership in

12  organizations.  I belong to Marin Abused Women's Services, and

13  Mothers Against Drunk Driving.  Reading materials.  *The*

14  *Economist*, and *Bon Appetit*.  PBS television is what we watch

15  most of the time, news programs, documentaries.  I like the

16  mysteries.  No bumper stickers.  And e-mail is about the limit

17  of my Internet use.

18          **THE COURT:**  Okay.  And what was the nature of your

19  husband's employment?

20          **PROSPECTIVE JUROR HARRIS:**  He was in real estate.  He

21  was in real estate in the city.  And when he went to Russia and

22  Poland, he did general business.  He joined a friend who had

23  been in the diplomatic service, and they tried to do business

24  in Russia and Poland; but it was quite, quite difficult.  And

25  then in Italy, he joined a hotel company and worked with them a

```
 1   while.

 2           THE COURT:  Okay.  Thank you.  And, being a Canadian,

 3   do you have some sympathy for the defendants who are from

 4   Canada, and are charged in this court?

 5           PROSPECTIVE JUROR HARRIS:  If -- you know, if they

 6   did something that was not honest, I have no feelings that they

 7   should get away with it.

 8           THE COURT:  You're not going to be too hard on them

 9   because they're Canadian -- just a because they're Canadian --

10   right?

11           PROSPECTIVE JUROR HARRIS:  I won't be too hard on

12   them.  No, no, no.

13           THE COURT:  Yes.  Ms. Gannaway.  Sorry.

14           PROSPECTIVE JUROR GANNAWAY:  That's okay.

15   Rachael Gannaway.  I live here in San Francisco.  I am from

16   Santa Cruz, so I've lived in pretty much the Bay Area my whole

17   life.  I'm married.  No children.  I manage a restaurant, which

18   I've been doing for a very long time; probably ten years.

19           THE COURT:  Where is that?

20           PROSPECTIVE JUROR GANNAWAY:  Universal Café.  It's in

21   the Mission.

22           THE COURT:  Mm-hm.  Well, you might as well get a

23   plug in, right?

24           PROSPECTIVE JUROR GANNAWAY:  Yeah, right.  My

25   husband's a chef.  My educational background is I got a
```

1  bachelors' in Creative Writing at Mills.  And I'm now working

2  on getting my masters' in Forensics.  No military service.

3  Hobbies and leisure.  I run marathons.  No memberships in

4  anything.  Reading materials.  *Runners' World.*  Television?  We

5  watch "Dexter," "X Files," things like that.  No car.  And

6  Internet use -- mostly just research for school, and e-mail.

7  Yada, yada.

8         THE COURT:  And what do you plan to do with your

9  degree in Forensics?

10         PROSPECTIVE JUROR GANNAWAY:  I'm debating between

11  being C.S.I., or getting more on the science end, like DNA and

12  fingerprinting.  So --

13         THE COURT:  Now, does that -- does that indicate some

14  interest in law enforcement?

15         PROSPECTIVE JUROR GANNAWAY:  Yeah, I guess it does.

16  Yeah.

17         THE COURT:  Okay.  Should the defendants worry about

18  that; having you on the jury?

19         PROSPECTIVE JUROR GANNAWAY:  Ha, ha.  No, I don't

20  think so.  No.

21         THE COURT:  Okay.  Thank you.  Mr. -- is it Bonacum?

22         PROSPECTIVE JUROR BONACUM:  Yes.  Mr. Bonacum.

23         THE COURT:  Bonacum.  Okay.

24         PROSPECTIVE JUROR BONACUM:  Two Irish words put

25  together.  I live in Concord about 20 years now.  I'm married.

1    No children.  I work at PG&E as a senior I.T. product manager.

2    I've been doing that about three years, but work worked at PG&E

3    for 33 years.  My wife works at Bank of America as a vice

4    president, also in I.T. project management.  I have a B.S. in

5    Mechanical Engineering from Washington State University.  No

6    military service.  I like backpacking, outdoor activities,

7    photography.  No membership in organizations.  I like -- I like

8    military history, so I have a subscription to *Military History*,

9    and to *Naval History*; *Time* magazine; *Readers' Digest*.  There

10   are probably a couple of others.  We just rotate them around.

11   I read lots and lots of books, also.

12        **THE COURT:**  What are you reading right now?

13        **PROSPECTIVE JUROR BONACUM:**  A whole ton of books we

14   got from my stepmom that just passed away.  So it's -- again,

15   they had a lot of military-type books, like Clive Cussler, and

16   most of the other big authors in that.

17        **THE COURT:**  Are you excited about the fact that this

18   involves contracts with the military?

19        **PROSPECTIVE JUROR BONACUM:**  No.  That doesn't bother

20   me at all.  I mean, I don't know -- other than just what

21   anybody could read about military-type things and stuff, I

22   don't know, you know -- like, I like reading about mechanical

23   things.  So, yes, I like reading about tanks and things, but I

24   don't really have any direct involvement with that.

25        **THE COURT:**  Does it cause you to have some sympathy

1   for the Government in this case?

2           **PROSPECTIVE JUROR BONACUM:**  No, no.  I don't think

3   so.  I think I'd be very impartial.

4           **THE COURT:**  Okay.  And I think I interrupted you.

5   I'm sorry.

6           **PROSPECTIVE JUROR BONACUM:**  Oh, that's okay.

7   Television.  I don't watch much TV.  I like "Survivor" and

8   '49ers football.  I like the Discovery Channel.  That's about

9   it.  No bumper stickers.  I don't believe in that.  Internet

10  use.  I run a Web server of my photographs at home.  And

11  otherwise, I do just lots of Internet serving.  I use the

12  Internet a lot at work, so I'd say I'm a heavy Internet user.

13  So I browse around a lot.  I'm curious, so I go all over.

14          **THE COURT:**  Well, let me ask you this.  And this goes

15  for all of jurors.  I'm going to give you some instructions

16  when you ultimately -- when we swear you in on that matter; and

17  that is that you're not to do any independent research or

18  investigation.  You're not to Google or use any of the other

19  search engines to look up things about the case or -- or any of

20  the people involved, and that kind of thing.

21          You have to just decide the case based on what you

22  hear in the courtroom, as a whole jury, so that no one is privy

23  to any other information, or information you're bringing in

24  from outside, as well as researching the law, and so forth.  So

25  are you going to be able to follow that instruction?

1          **PROSPECTIVE JUROR BONACUM:**  Yes, I will.  I'll

2  restrict any activities like that.  And I won't Tweet, and I

3  won't Facebook about it.

4          **THE COURT:**  You know the rest of the instruction.  No

5  Twittering, no Tweeting -- whatever is you do, and then any of

6  those other social media.

7          Anybody would have a problem with that, and say, "Oh,

8  I can't wait to get on my computer and tell everybody I'm

9  sitting on this case"?  And -- I hope you have more exciting

10  lives than that.

11          Okay, but at any rate, whether you do or not, that's

12  going to be the instruction that applies.

13          And why don't we go ahead and finish with the first

14  row?  And then we'll get back to our general questions.  So we

15  can go ahead with you, Mr. Lau, please.

16          **PROSPECTIVE JUROR LAU:**  Yeah.  My name is

17  Stanley Lau.  I lived in the Bay Area for almost 35 years.  I'm

18  married.  Three children:  26, 23, 21.  And my occupation is

19  property management.  Helping a family member do the

20  investment.  My wife is accounting.  She works for Ericson

21  Corporation.  Ericson.  E-r-i-c-s-o-n.

22          **THE COURT:**  Sure.  E-r-i-c-s-o-n. or -- s-s-o-n.

23          **PROSPECTIVE JUROR LAU:**  Education.  Junior college.

24  Military?  No, I don't have military background.  And hobbies?

25  Just walking.  Membership?  No.  Reading?  I don't do much

1    reading.  Television.  I like to watch some funny show;

2    whatever the funny is, I do watch.  Bumper stickers -- I don't

3    have it.  Type of Internet?  Just Cable TV.  Comcast cable.

4    That's it.

5               **THE COURT:**  Okay.  Thank you very much.

6               Mr. Maffey, please.

7               **PROSPECTIVE JUROR MAFFEY:**  Good morning.  My name is

8    Rex Maffey.  And I live in American Canyon, which is in

9    Napa County.  I've lived in the Bay Area all of my life, which

10   is 57 years.  I am married.  We don't have any children.  My

11   occupation is -- I'm a financial advisor.  And I've been doing

12   that for 15 years.  My spouse's occupation is -- she's in wine

13   sales with Cape Red Cellars, in Napa.

14              **THE COURT:**  Good wine.

15              **PROSPECTIVE JUROR MAFFEY:**  My educational background

16   is high-school graduate, with roughly two years of college.  No

17   military service.  Hobbies and leisure activities?  I would say

18   cooking, and I like to travel.  No memberships in

19   organizations.  My reading materials?  Subscriptions are

20   *Investors Business Daily*, *The Wall Street Journal*, *Barron's*,

21   and *Bon Appetit* magazine.  Television programs?  Bloomberg TV,

22   Discovery Channel, History Channel, and C.S.I.  No bumper

23   stickers.  Type of Internet use?  Surfing the Internet, looking

24   up news and financial.  I use it for financial analysis with

25   Yahoo! Finance, Emerson, money websites like that.

```
1            THE COURT:  And are you self-employed, or are you
2   employed by --
3            PROSPECTIVE JUROR MAFFEY:  I'm employed by a CPA firm
4   in Richmond, California.
5            THE COURT:  Okay.  Thank you very much.
6            PROSPECTIVE JUROR DAVIDSON:  Yes.  My name is
7   Alberta Davidson, and I go by "Ally."  I live in Sonoma County.
8   I've lived in the Bay Area for 25 years.  I'm divorced,
9   thankfully.  Number of children -- I have one beautiful
10  18-year-old daughter who's in university right now.  We do talk
11  quite a bit with each other.  We're very close.  And she'd like
12  to go into intellectual-property law, so I've done a bunch of
13  research on that, so if you know of any good leads, let me
14  know.  My educational background -- I have -- I'm a licensed
15  landscape architect in the State of California.  It's a
16  five-year degree.  And no military service.  Hobbies?  I have a
17  sewing studio.  I love fabric, yarns, whatever.  Membership in
18  organizations?  American Society of Landscape Architects,
19  California Landscape Contractors' Association.  Reading
20  materials?  Patrick.net.  Real estate.  *Threads* magazine.
21            THE REPORTER:  I'm sorry, ma'am.  Which magazine?
22            PROSPECTIVE JUROR DAVIDSON:  *Threads*.
23            THE REPORTER:  *Threads*.  Thank you.
24            PROSPECTIVE JUROR DAVIDSON:  And lots of library
25  chips.  I just read a book on counterfeiting.  We haven't had
```

1  television for 25 years.  No bumper stickers.  I do have a box

2  Volkswagen, a Beetle, though.  And type of Internet use?  I buy

3  fabric online.  I listen to Bloomberg.  And I read the news a

4  lot.

5          **THE COURT:**  Okay.  Now, you mentioned a magazine and.

6  I still didn't understand.  Was it *Drudge*?

7          **PROSPECTIVE JUROR DAVIDSON:**  *Threads*.

8          **THE COURT:**  *Threads*.  Okay.

9          **PROSPECTIVE JUROR DAVIDSON:**  Yeah.  *Threads*.

10          **THE COURT:**  It's a little bit different than *The*

11  *Drudge Report*.

12          **PROSPECTIVE JUROR DAVIDSON:**  Yeah.  Some people would

13  think sewing is drudgery, but no, it's not.

14          **THE COURT:**  Now, before we pass it on and start with

15  some of the individual questions.

16    I think we have everybody back -- so I have some more of

17  the general questions I want to ask everyone.

18          **MS. HAMILTON:**  Your Honor, I'm sorry.  Mr. Ramos is

19  actually gone.

20          **THE COURT:**  Mr. Ramos left?  Well, okay.  How are we

21  doing?  Let's get a few more people and then we'll all take a

22  break.  How is that?  So if we can go -- oh, Tony, can you

23  bring it over here for Ms. Martine?  We are creatures of habit

24  here.  So she is the next in order so to speak.

25          **PROSPECTIVE JUROR MARTINE:**  My name is Judy Martine,

 1   Judith.  I live in Orinda.  I have been in the Bay Area all my

 2   life, 69 years.  I was born in San Francisco.  I am married for

 3   the second time after having been widowed once.  I have three

 4   children ages 42, four -- 41, 43 and 45.

 5          My occupation was primarily housewife, and various

 6   part-time jobs and volunteer work.  My last job was at a tennis

 7   club.  My husband is a patent attorney, although he is pretty

 8   much retired now and volunteering in the San Francisco schools.

 9   And occupations of any children.  Well, he has five children

10   and I have three.  His oldest son is a patent attorney, has his

11   own firm in Sunnyvale.  And the second is a rolfing -- teacher

12   of rolfing.  And the third is a daughter, a housewife.  And

13   another daughter is an airline attendant.  And the last son is,

14   works in Colorado, in the Denver area.

15          No military service.

16          Hobbies.  I play tennis, golf, hike with my dog,

17   cook, garden.

18          I belong to the S.F. museums, support public

19   television, SPCA, and belong to local garden clubs and library

20   groups.  We subscribe to the *Economist* and *Cooking Light* right

21   now.  Various other materials that come and go.

22          Television.  I mainly watch public television

23   Discovery, History, some sports events.  I did get very wrapped

24   up in the Giants this year.

25          And no bumper stickers.

1           And internet use is email and research.

2           **THE COURT:**  Hold onto that for just a minute.  You

3   say your husband is a retired patent attorney?

4           **PROSPECTIVE JUROR MARTINE:**  Yes.

5           **THE COURT:**  What firm was he with?

6           **PROSPECTIVE JUROR MARTINE:**  He was with his son's

7   firm.

8           **THE COURT:**  What firm?

9           **PROSPECTIVE JUROR MARTINE:**  His son's firm.  I'm

10  trying to think of the name.  Martine Penilla.

11          **THE COURT:**  I see, okay.  And their offices are down

12  on the peninsula?

13          **PROSPECTIVE JUROR MARTINE:**  Sunnyvale.  They do a lot

14  of Silicon Valley.

15          **THE COURT:**  And they did not do any criminal work at

16  any time?

17          **PROSPECTIVE JUROR MARTINE:**  No, intellectual

18  properties, et cetera.

19          **THE COURT:**  Thank you.

20          Mr. Wong?

21          **PROSPECTIVE JUROR WONG:**  My name is Victor Wong.  I

22  live in Fremont.  I'm between here, Modesto and Fresno.  Pretty

23  much been in the Bay Area all my life.  I'm single.  No

24  children, that I know of.

25          I'm currently a business owner.  Prior to that I was

1   an engineer for Applied Materials.

2         No spouse.

3         I have a B.S. in mechanical engineering.  Since then

4   I have gotten my M.B.A. and M.S.E.

5         No military service.

6         Hobbies, I like to play basketball.  No membership

7   in -- no memberships in any organizations.

8         Reading material would be various car magazines and

9   *Fortune* magazine.

10         Television, limited to just sports.

11         No bumper stickers.

12         Internet use is just business and email.

13         **THE COURT:**  And your current employment is?

14         **PROSPECTIVE JUROR WONG:**  I'm self employed.

15         **THE COURT:**  You're self employed.  What do you do?

16         **PROSPECTIVE JUROR WONG:**  I own a couple of yogurt and

17   gelato chains called to Tutti Melon.

18         **THE COURT:**  Very good.  Thank you.

19         And Ms. Evans.

20         **PROSPECTIVE JUROR EVANS:**  Yes.  I'm Susanna Evans.  I

21   live in Concord.  I have lived in the Bay Area for about 19

22   years.  I'm married.  I have two children, twenty months and

23   five months.

24         I am an insurance broker and have done that for four

25   and a half years.

```
 1              My spouse is a tile setter.  My children don't work.

 2              THE COURT:  Your spouse is what?

 3              PROSPECTIVE JUROR EVANS:  Tile setter.  Stone.

 4              THE COURT:  I see.  Thank you.

 5              PROSPECTIVE JUROR EVANS:  My educational background,

 6   I have a bachelor's in history and a minor in German.

 7              No military service.

 8              I have no hobbies.  Raising children.

 9              I am a member of the National Surety Association.

10              I have no time to read.

11              We have Modern Family on DVR, which I haven't seen in

12   four months.

13              I have no bumper stickers, and I use the internet to

14   spy on my cousins, who are 14 and 13, on FaceBook.

15              THE COURT:  I see, okay.  How are your investigatory

16   skills?

17              PROSPECTIVE JUROR EVANS:  They are getting very good.

18              THE COURT:  Okay.  Thank you.

19              Ms. -- is it --

20              PROSPECTIVE JUROR WATSON:  Watson.

21              THE COURT:  Watson, okay.

22              PROSPECTIVE JUROR WATSON:  I'm Cindie Watson.  I live

23   in Livermore.  I have lived there for 33 years, and been in the

24   Bay Area obviously all that time.  I'm married.  I have two

25   sons; one is 31 and one is 34.  I had to think about that.
```

```
1              And I was -- I'm a retired teacher.  I was a teacher

2    for 27 years, just retired this last year.  My husband is an

3    architect, and my oldest son is a lawyer in New York.  My

4    younger son is an artist slash musician.

5              My educational background, I have a Bachelor's Degree

6    in child development and a teaching credential.

7              No military service.

8              Hobbies.  Cooking, running, reading, and trying to

9    learn French.

10             Membership organizations.  California Teachers

11   Association and National California Teachers of Mathematics.

12             And I love to read.  I read novels and non-fiction.

13   I like to read about history.  Subscribe to cooking magazines,

14   the San Francisco Chronicle.  I think that's really it.

15             Television.  We watch the local news and Giants

16   baseball.  That's about it.

17             And bumper stickers, I have a Giants bumper sticker

18   on my car.  World Champion Giants, thank you.

19             And I, on the internet, just email and the Giants

20   website.  And, you know, just to Google certain things.

21             THE COURT:  You have that bookmarked.

22             PROSPECTIVE JUROR WATSON:  Yes, yes.

23             THE COURT:  Now, the son who is in New York -- is it

24   a son who is in New York that's a lawyer?

25             PROSPECTIVE JUROR WATSON:  Yes.  Yes, your Honor.
```

1              THE COURT:  What is the nature of his legal work,

2   practice?

3              PROSPECTIVE JUROR WATSON:  He passed the bar I think

4   now three years ago and he works for Legal Aid in the Bronx and

5   works in housing law.

6              THE COURT:  Tough job.

7              PROSPECTIVE JUROR WATSON:  Yeah.

8              THE COURT:  And has he ever done any criminal defense

9   work or any criminal work of any kind?

10             PROSPECTIVE JUROR WATSON:  No, no, your Honor.

11             THE COURT:  Thank you.

12             And Mr. Schwartzler, is that correct?

13             PROSPECTIVE JUROR SCHWARTZLER:  That's correct.

14             My name is Dan Schwartzler.  I live in Clayton.  I

15   have resided in the Bay Area all my life.

16             I'm not married.  Don't have any children.

17             Currently unemployed, by did work in sales and

18   customer service.

19             Educational background is, I have an Associate's

20   degree and hoping to go back and get my Bachelor's.

21             No military service.

22             Hobbies and leisure.  I like to travel, go out and

23   sightsee.  Go to the movies.

24             I don't have any memberships.

25             Reading materials.  I like self-help kind of books,

1    things of that nature.

2           Television.  I like informative stuff, so anything

3    pretty much on Discovery channel, History channel.  Things like

4    Creation, like How and How, or something like that.

5           Bumper stickers.  Don't have any.

6           Types of internet use.  Just general information,

7    email, social networking; things of that nature.

8           **THE COURT:**  And what kind of sales work or what kind

9    of companies were you working for when you were doing the sales

10   and service?

11          **PROSPECTIVE JUROR SCHWARTZLER:**  It was more or less

12   in telecommunications.

13          **THE COURT:**  Okay.  Thank you.

14          Ms. Calderon, please?

15          **PROSPECTIVE JUROR CALDERON:**  My name is Risa.  I have

16   been living in Santa Rosa for the past 22 years.  I'm not

17   married.  I don't have any children.

18          I have been a medical receptionist for five years.

19          I have had some junior college.

20          No military service.

21          Hobbies and leisure activities is kind of just

22   hanging out with the family, friends, scrapbook.

23          No memberships.

24          Reading materials.  Kind of just the newspapers,

25   *Press Democrat*, *Chronicle*.  Sometimes I read *Time* magazine.

1           Television is SVU, Law and Order, lots of times; kind

2    that type of stuff.

3           I don't have any bumper stickers, and usually use are

4    the interpret for shopping or email use at work.

5           **THE COURT:**  Okay.  Thank you.

6           Ms. Whitney?

7           **PROSPECTIVE JUROR WHITNEY:**  My name is Kelly, and I

8    live in Concord.  I have been in Concord or the Bay Area for

9    the last past 33 years.  I'm not married, but I do have a

10   domestic partner.  I have no children.

11          My occupation was -- I just real got laid off in

12   October, but for six years I worked for Rosenbloom Cellars

13   Winery in Alameda doing inside sales.

14          My educational background is I do have an Associate's

15   in computer business.  I plan to go back to get my Bachelor's

16   in psychology.

17          No military service.

18          Hobbies and leisure activities.  I like to go to the

19   gym.  I like to work out, take kickboxing classes.  I like to

20   read.  I like to go on hikes.  I like to cook.

21          Membership in organizations.  Does 24-hour fitness?

22   No.  Okay.

23          Reading materials.  Right now I'm currently reading a

24   book called *Emotional Intelligence*.

25          Television.  I like SVU.  I like Criminal Minds, and

1 now that I'm off work the Young and the Restless.

2          Bumper stickers.  I have an "Equality" bumper sticker

3 and a bumper sticker that says "Meow."

4          Type of internet use is just social networking, email

5 and the news.

6          **THE COURT:**  And what was -- some criminally -- the

7 crime-related type show you like to watch, what was that

8 called?

9          **PROSPECTIVE JUROR WHITNEY:**  Criminal Minds.

10         **THE COURT:**  Oh, Criminal Minds.

11         **PROSPECTIVE JUROR WHITNEY:**  Criminal Minds, yeah, and

12 Law and Order SVU.

13         **THE COURT:**  And that is a program?

14         **PROSPECTIVE JUROR WHITNEY:**  What is that?

15         **THE COURT:**  That is a program?

16         **PROSPECTIVE JUROR WHITNEY:**  Yes.

17         **THE COURT:**  And what's it about?

18         **PROSPECTIVE JUROR WHITNEY:**  It's pretty scary

19 actually.  My girlfriend doesn't like to watch it.  She leaves

20 the room all the time because it's kind of bloody and gory, but

21 it's just about a bunch of FBI agents who solve -- they solve

22 the crimes.  They do -- I can't think of the word.

23         **THE COURT:**  Forensic?

24         **PROSPECTIVE JUROR WHITNEY:**  They profile criminals.

25         **THE COURT:**  I see.  Okay.

```
 1          So now is there -- you know, have you got that sort
 2   of mindset now so that that somehow gets transported into this
 3   case in some way?
 4          PROSPECTIVE JUROR WHITNEY:  It could, I don't know.
 5   I don't know.  I'm pretty addicted.
 6          THE COURT:  I see.  I see.
 7          PROSPECTIVE JUROR WHITNEY:  So I'm not sure, to be
 8   honest.
 9          THE COURT:  Well, would you just listen to the
10   evidence in this case and not let any of that other stuff come
11   into mind?
12          PROSPECTIVE JUROR WHITNEY:  Absolutely.  Sure, sure.
13          THE COURT:  Yes.
14          PROSPECTIVE JUROR DAVIDSON:  I failed to add that I
15   worked 25 years for Sonoma County Water Agency, water
16   conservation.
17          THE COURT:  Now, I think you all have been very
18   patient.  Some of you have taken a break.  So those of you who
19   haven't, you should get the first dibs on the restrooms, I
20   think, but -- before the people who have already left, but I'm
21   going to allow all of you to take a break for about 10 minutes,
22   probably about 15 by the time we get everybody back here, but
23   say 10 minutes.
24          But before you bolt for the door here, there are some
25   very important instructions you must follow and that is that
```

1   you are not to discuss anything about this case, anything

2   related to it, the parties or the charges or anything else

3   amongst yourselves or with anyone else or to the extent you

4   could possibly form or express any opinion, form or express any

5   opinion.  So when you're talking to your fellow jurors, and

6   certainly you should do that and get to know them, but talk

7   about other things.  Anything except this case, okay?  And that

8   instruction will follow through all the proceedings until we

9   pick the jury, and then I will give you further instructions

10   after we pick the jury.

11          So we'll take 10 minutes -- and, actually, will I get

12   anything done in 10 minutes?  No.  Maybe you should take 15

13   minutes.  So if you want to go down to the second floor, get

14   some coffee or anything like that, you can do that.  But all

15   come back here and resume your seats.  Wherever you were,

16   resume those seats in 15 minutes.

17          (Whereupon there was a recess in the proceedings

18           from 11:34 a.m. until 11:53 a.m.)

19          **THE COURT:**  Okay.  Can you stand, please?  Because

20   it's going to be hard to hear everyone, even with the mic.

21          Okay.  Thank you.

22          **PROSPECTIVE JUROR CANNON:**  My name is Ellen Cannon,

23   and I was born and raised in San Francisco.  I have been living

24   in Pacifica for the last 30 years.  I'm single.  I don't have

25   any children.

1          I have been a registered nurse for over 40 years.  I

2   went to nursing school in Massachusetts.  I have a diploma in

3   nursing.

4          No military service.

5          Hobbies.  Sewing, gardening.

6          Membership -- and reading.

7          Membership in organizations.  Just the California

8   Nursing Association.

9          I love to read.  I read mainly mysteries.

10         And television, I watch HDTV and PBS.  I like

11  comedies and mysteries.

12         No bumper stickers.

13         And internet use for email and looking up how to do

14  things, how to fix things or medical information.

15         **THE COURT:**  Thank you very much, Ms. Cannon.

16         Mr. Black, please?

17         **PROSPECTIVE JUROR BLACK:**  My name is Timothy Black.

18  I live in San Leandro.  I have lived in the Bay Area for 26

19  years.  I'm married.  I have no children.

20         I'm a computer and network tech for Bloomberg, and I

21  have been at that job for 12 years.  My wife is a housewife.

22         My educational background is high school.

23         I served in the United States Navy for six years, and

24  I was an E-5 when I got out.

25         Hobbies, golf.

1              No organizations.

2              What I read is usually non-fiction.  No subscriptions

3   to anything.

4              TV is mostly sports, maybe some comedies.

5              No bumper stickers.

6              Internet use would be reference, news; that's it.

7              **THE COURT:**  And what kind of non-fiction do you like

8   to read?

9              **PROSPECTIVE JUROR BLACK:**  Maybe like history type

10  stuff.

11             **THE COURT:**  Okay.  Thank you.

12             Mr. Costa?

13             **PROSPECTIVE JUROR COSTA:**  Good afternoon.  My name is

14  Brian Costa.  I currently live in Danville.  I have been here

15  for about 21 years and some change.  I am not married.  And I

16  have no children.

17             I am currently a deli clerk and I'm also a student.

18             **THE COURT:**  What are you studying?

19             **PROSPECTIVE JUROR COSTA:**  I study mass communications

20  at Cal State East Bay in Hayward.

21             I have not served in the military.

22             As far as hobbies go, I like to hike, mountain bike,

23  anything outdoors.  I like to paint.  Golf and snowboard when I

24  can afford it.

25             I'm not an active member in any organization.

```
 1              I like reading anything satirical.  I like
 2    non-fiction too, but fiction is fun.
 3              As far as television, goes I like mocumentaries, kind
 4    of like faux TV.
 5              I currently have a couple window decals that say "Old
 6    Soul."
 7              And for the internet, usually research,
 8    entertainment.  Actually, going back to reading materials, I
 9    use it for reading the news, and a little bit of gaming and
10    social networking; that's about it.
11              THE COURT:  Okay.  Thank you.
12              Mr. Chaney, please.
13              PROSPECTIVE JUROR CHANEY:  I'm Lionell Chaney.  I
14    live in Oakland.  I lived in the Bay Area for 48 years.
15    Single, no children.
16              My occupation is attorney services clerk.
17              No spouse.
18              High school.
19              No military services.
20              Hobbies.  10 and 13 go together.
21              THE COURT:  I'm sorry, I missed that.
22              PROSPECTIVE JUROR CHANEY:  10 and 13 go together.
23    I'm a TV junkie.
24              THE COURT:  So somebody may understand that.
25              PROSPECTIVE JUROR CHANEY:  I have a membership in the
```

```
 1    National Notary Association.

 2              THE COURT:  What, national what?

 3              PROSPECTIVE JUROR CHANEY:  Notary Association.

 4              THE COURT:  Notary?

 5              PROSPECTIVE JUROR CHANEY:  Yeah.

 6              THE COURT:  I see, okay.

 7              PROSPECTIVE JUROR CHANEY:  Television.  Like I said,

 8    I'm a TV junkie.

 9              THE COURT:  What do you like to watch most?

10              PROSPECTIVE JUROR CHANEY:  Sci-fi.

11              THE COURT:  I see, okay.

12              PROSPECTIVE JUROR CHANEY:  Bumper stickers, none.

13              Type of internet usage is email and Netflix.

14              THE COURT:  And by whom are you employed?

15              PROSPECTIVE JUROR CHANEY:  I'm employed by

16    Fitzgerald, Albert and Beasley.

17              THE COURT:  Fitzgerald, Albert and Beasley?

18              PROSPECTIVE JUROR CHANEY:  Yes.

19              THE COURT:  And you work solely for that company --

20    or that law firm rather.

21              PROSPECTIVE JUROR CHANEY:  Yes.

22              THE COURT:  Okay.  Thank you very much.

23              PROSPECTIVE JUROR NOVICK:  Hi, my name is John --

24              THE COURT:  Could you stand up for us Mr. Novick,

25    please, and tell us about yourself?
```

1      **PROSPECTIVE JUROR NOVICK:**  Yes, your Honor, I can.

2           Okay.  My name is still John Novick.  I live in Mill

3  Valley, California.  I lived in the Bay Area since '84.  I am

4  married to a girl I dated in high school.  Took her 19 years to

5  be convinced to marry me.  We have four kids ranging from 17,

6  14, 10 and 9.

7           I'm a retired Wall Street guy.  My wife is a

8  psychiatric nurse by profession, but she currently works as a

9  school nurse.

10          I have a B.A. from Franklin Marshal College in

11  Lancaster, Pennsylvania.

12          I have never been in the military.

13          I work out a lot, do everything, hike, run, go to the

14  gym, do yoga, the works.  I drive my kids around and go to all

15  their games.  And I serve on the board of the best inner city

16  school in America, Oakland's Northern Lights School.

17          I'm a member -- let's see, organizations.  NRA.  I am

18  a member of the Republican National Committee.

19          I like to read.  I read mostly non-fiction.

20  Subscribe to local newspapers, the *Wall Street Journal*, *Forbes*,

21  *Sports Illustrated*.

22          Watch a lot of comedy on TV when I can.  With four

23  kids, you need the comedy.

24          I -- funny, I agree with the gentleman who said he

25  doesn't believe in bumper stickers, but I have four.  One is

1  the American flag.  One is my NRA sticker.  The next two always

2  get a big chuckle in the Bay Area.  I have one that has a --

3  drawings of Jefferson, Washington and Ben Franklin and

4  underneath it says "Right Wing Extremists."  My next one says,

5  "Please nobody tell Obama what comes after trillions."

6          Type of internet use.  Email, reference, and keep an

7  eye on my knucklehead head 14-year old FaceBook's entries, and

8  I think that's it.

9          **THE COURT:**  When you say you are a Wall Street guy,

10 did you work for a firm?

11         **PROSPECTIVE JUROR NOVICK:**  I worked on a trading

12 desk, equity trader for a bunch of different firms and then

13 traded my own account.

14         **THE COURT:**  Okay.  Thank you.

15         Mr. Chen, please.

16         **PROSPECTIVE JUROR CHEN:**  Hi, my name is Yue Chen.  I

17 have been in the Bay Area for five years.  Prior to that I was

18 living in Massachusetts.  The length of -- I'm married, and I

19 have one nine year old.

20         My occupation is marketing director for Telecom in

21 Cupertino, in the Bay Area.  And my wife, she used to work at a

22 similar industry as an engineer, but she is now a homemaker.

23         I have a Master's degree in double E, electrical

24 engineering.

25         No military services, and I'm registered for

1   Selective Service years back.

2           Hobbies, I -- my own hobby nowadays is just my

3   daughter, but prior to that I used to play tennis.

4           And membership, I -- through my employer affiliation,

5   I'm a -- chair a marketing organization in answer stored, a

6   broker firm.

7           And I read, primarily magazine-wise; *Time*, *Wall*

8   *Street Journal*, and so on.  And I like to read books that talks

9   about minds and the potential of the human minds.

10          I don't watch TV much at all.  No time for that.

11          No bumper stickers.

12          And internet use is very heavy both for work and for

13  personal use.  And I listen to NPR.

14      **THE COURT:**  What kinds of things do you use the

15  internet for personally?

16      **PROSPECTIVE JUROR CHEN:**  Personally I use it to --

17  for informational purposes and for shopping as well for work.

18  Of course, email.  I'm on email all the time, both for personal

19  and for work.  Don't do too much research until something

20  breaks in my house.  So that's another thing, and then that

21  usually gets me to fix the problem very quickly.

22      **THE COURT:**  Well, and you find that helpful?

23      **PROSPECTIVE JUROR CHEN:**  Yes.

24      **THE COURT:**  Good for you.  Okay.  Thank you.

25          Mr. Gillespie, please.

1          **PROSPECTIVE JUROR GILLESPIE:**  Yes.  John, John

2   Gillespie.  I have been in Mendocino County for about 14 years,

3   and I moved to Santa Rosa about five years ago.  I'm divorced.

4   I have a 24-year old daughter.  She is a therapist.

5              I am currently a bus driver for Santa Rosa City

6   Transit.  Before then my former wife and I had a physical

7   therapy clinic for about 11 years in Mendocino County.

8              My education was at Santa Cruz, political science,

9   anthropology, psychology.  And I'm now taking training in

10  Feldenkrais down in San Rafael.

11             No military service.

12             I'm a fair archer.  I'm a ceramicist of some low

13  repute, and I belong to our local union.

14             I read voraciously.  I take the *New Yorker*.  Mostly

15  non-fiction.  I like history, that sort of thing.

16             I attend lectures at SSU and our local community

17  college.

18             No television.

19             No bumper stickers.

20             And I use the internet for research.

21         **THE COURT:**  What kinds of things do you like to

22  research?

23         **PROSPECTIVE JUROR GILLESPIE:**  Neolithic cave

24  paintings, new world cave paintings.  I go to some of the

25  sites.

1              THE COURT:  Thank you.  Ms. Sermeno.

2              PROSPECTIVE JUROR SERMENO:  My name is Alicia

3    Sermeno.  I live in San Ramon.  I have been in the Bay Area 44

4    years.  I am single, no children.

5              I am a school teacher in Hayward.  I teach first

6    grade.  This is my 22nd year in the classroom.

7              I have a B.A. in English from U.C. Davis, a teaching

8    credential from Saint Mary's College.

9              No military service.

10             My hobbies are reading, ballet dancing, horseback

11   reading, sailing and I play the piano.

12             I'm a member of the California Teachers Association.

13             I like to read novels and biographies.  I subscribe

14   to *Women's Day* and *Glamour*.

15             On TV I like to watch CNN, QVC, Oprah, All My

16   Children and Glee.

17             I have no bumper stickers.

18             And I use the internet for email and online shopping

19   information, Wikipedia.

20             THE COURT:  Okay.  Thank you very much.

21             Now, can you get that mic back to the next row and

22   Ms. Thompson, please?

23             PROSPECTIVE JUROR THOMPSON:  I'm Margo Thompson.  I

24   have only lived in the Bay Area four and a half years.

25             THE COURT:  Where did you live before that?

1          **PROSPECTIVE JUROR THOMPSON:**  Before that I was in

2    Fresno.

3          I'm married.  I have four children and two

4    stepchildren.  My children are ages 36, 35, 31 and 26.  And my

5    stepchildren are 31 and 33.

6          I was a school librarian in Fresno and then got my

7    teaching credential and taught first grade.  Oh, I have a

8    Bachelor of Science.  My husband is in informatics at Novartis

9    in Emeryville.

10          No military service.

11          We like to hike and I like to walk and spend time

12    with my grandchildren, which are mostly in Fresno.

13          Member of the LDS Church, and work in the women's

14    organization and the children's organization.

15          I read mostly psychology self-help books and

16    subscribe to *Oprah* and *Sunset*.

17          We watch PBS, news and college football.

18          And no bumper stickers, and use the internet for

19    email.

20          **THE COURT:**  Thank you.

21          Ms. Merritt, please?

22          **PROSPECTIVE JUROR MERRITT:**  If my name is Deanna

23    Merritt.  I live in Antioch.  I was born and raised in the Bay

24    Area.  I am single.  I have two daughters, age 24 and 27.

25          I was a meat cutter for 15 years, but now I do

1  billing disputes for a major phone company.

2          I had a high school education with some technical

3  training.

4          No military service.

5          My hobbies and leisure activities.  I do -- I'm an

6  avid reader, and I like to attend a lot of Native American

7  activities.

8          I'm not a member of any organization.

9          I read mostly non-fiction, paranormal, Steven King.

10         Don't watch a whole lot of television, but I like

11 American Pickers or Bones.

12         The only bumper sticker I have is a Native American

13 medicine wheel.

14         And the internet use is just email and FaceBook.

15         **THE COURT:**  And your daughters, if they are employed,

16 what is the nature of their employment?

17         **PROSPECTIVE JUROR MERRITT:**  They are not employed.

18         **THE COURT:**  Okay, thank you.

19         Mr. Cardenas?

20         **PROSPECTIVE JUROR CARDENAS:**  Yes.  Hello.  I'm Paul

21 Cardenas.  I live in San Ramon.  I have been in the Bay Area

22 about 17 years.  I am married.  I have three daughters, ages

23 seven, four and two.  My wife is a stay-at-home mom, so she

24 takes the kids around.

25         I skipped over number six.  My occupation, I'm the

1    director of finance and administration for the Department of

2    Labor here in San Francisco, just a few blocks away.  And I

3    have been there about 10, 11 years.

4              **THE COURT:**  Is this the U.S. Department of Labor or

5    the state?

6              **PROSPECTIVE JUROR CARDENAS:**  U.S. Department of

7    Labor.

8              My educational background is I have a Master's degree

9    in business from Saint Mary's college in Moraga.

10             No military service.

11             Hobbies and leisure.  Generally, it's golf and hiking

12   and taking my kids around to activities.

13             Memberships and organizations.  I don't really have

14   any.

15             Reading.  *Golf Digest, Wall Street Journal,*

16   *San Francisco Chronicle.*

17             Television.  When I'm not watching kids shows with my

18   children, it's generally something of a historical nature,

19   History channel, Discovery channel.

20             No bumper stickers.

21             And internet use be email, general research for

22   household things and stock quotes.

23             **THE COURT:**  Thank you very much.

24             Ms. Kapoor-Acuna?

25             **PROSPECTIVE JUROR KAPOOR-ACUNA:**  Hi.  I'm Natasha

1   Kapoor—Acuna, currently living in Lafayette, California.  Born

2   in Canada, but lived in the Bay Area since I was 13.  I'm

3   married.  I have three children, seven, five and four.  Their

4   job is to go to school.

5           My husband is a physician, Oakland Kaiser.

6           I did my M.B.A. and worked in a supply chain for some

7   time.

8           No military service.

9           I like skiing, bike riding, gardening, composting,

10  raising chickens.

11          In terms of organization, I now work in property

12  management, so the AOA or Apartment Owners Association, those

13  types of organizations.

14          I love to read fiction.

15          I play poker.

16          I watch Parenthood.

17          No bumper stickers.

18          I'm on the internet for everything; to shop, to

19  research, to learn, to post ads on Craigslist, and on occasion

20  to look into what other people are doing on FaceBook.

21          **THE COURT:**  Okay.  Thank you.

22          And, also, what do you do?  You are in property

23  management?  What does that mean?

24          **PROSPECTIVE JUROR KAPOOR—ACUNA:**  So we have

25  apartments in the Oakland —— in Oakland and Berkeley that we

1    rent.  So we rent them out.

2                THE COURT:  And you take care of the management

3    aspects of it?

4                PROSPECTIVE JUROR KAPOOR-ACUNA:  That's right.

5                THE COURT:  Thank you very much.

6                PROSPECTIVE JUROR KAPOOR-ACUNA:  Sure.

7                THE COURT:  Ms. Gibson?

8                PROSPECTIVE JUROR GIBSON:  My name is Brenna Gibson.

9    I live in San Francisco.  I have been living in the Bay Area

10   for four years.  I am married.  I don't have any children.

11               I just graduated from San Francisco State University

12   with a Bachelor's in cell biology.  And I'm currently taking

13   classes at the community college and hoping to get into medical

14   school in the fall.

15               My husband is an engineer.

16               I don't have any military service.

17               For hobbies, I do research with one of my professors

18   at S.F.S.U. so that takes up a lot of time and outside of that,

19   I play the piano.  I like to cook.  I like to travel.

20               I'm not a member of any organizations.

21               Reading material.  I haven't been reading very much

22   lately.  I have a subscription to the *Atlantic*, and sometimes I

23   like to read things like *Discover*, Scientific *American*, that

24   sort of thing.

25               Television.  I like old sitcoms like Seinfeld.  I

1   like Curb Your Enthusiasm.  I watch a lot of news, a lot of

2   sports, because my husband watches that.

3         I don't have any bumper stickers.

4         And I use the internet for email and looking up

5   recipes, that sort of thing.

6         **THE COURT:**  And where are you hoping to go to medical

7   school?

8         **PROSPECTIVE JUROR GIBSON:**  Anywhere in California.

9         **THE COURT:**  Good luck.

10        **PROSPECTIVE JUROR GIBSON:**  Thank you.

11        **THE COURT:**  And is it Butenko?

12        **PROSPECTIVE JUROR BUTENKO:**  Yeah.  Yes.  My name is

13  Vladimir Butenko.  City of residence, I am living in Walnut

14  Creek for last 14 years.  I am married.  I have two children, a

15  daughter 23 years old and son is 25.

16        **THE COURT:**  One is 23, and how old is the other?

17        **PROSPECTIVE JUROR BUTENKO:**  My son 25 my daughter 23.

18        **THE COURT:**  Are they employed?  And if so, what is

19  their employment?

20        **PROSPECTIVE JUROR BUTENKO:**  Hmm?

21        **THE COURT:**  Are they employed?

22        **PROSPECTIVE JUROR BUTENKO:**  Yes.  My son is working

23  in San Francisco.  He is a machine operator.  And my daughter,

24  she is in Wisconsin and she work in Wal-Mart store.

25        **THE COURT:**  She working where?

1          **PROSPECTIVE JUROR BUTENKO:**  In Wal-Mart store,

2    Wal-Mart.

3          **THE COURT:**  I see, I see.  Thank you.

4          **PROSPECTIVE JUROR BUTENKO:**  My spouse is self

5    employed.  She owns a home business.  She is a seamstress in

6    Walnut Creek.

7          I have a Master degree in engineering, mechanic --

8    mechanical engineering.

9          No military service.

10         My hobbies.  Sometimes I like to create something,

11   some devices.  I like to cook something.

12         No membership.

13         Reading material, just I check my mail, maybe some

14   use.

15         Television.  I like to watch History channel, and

16   Animal Planet, Discovery channel and I like to watch news.

17         No bumper stickers.  About three months ago I have

18   one bumper sticker says "Mystery Spot," but I took it off.

19         **THE COURT:**  Says what?

20         **PROSPECTIVE JUROR BUTENKO:**  "Mystery Spot."  Just one

21   and I took it off.

22         Type of internet use.  How I said, for email, for

23   some use with my son because he is teaching me all the time.

24         **THE COURT:**  And what is -- what is the nature of your

25   employment?  What do you do?

1          **PROSPECTIVE JUROR BUTENKO:**  For now I am -- I receive

2    unemployment benefits.  I.

3          **THE COURT:**  You what?

4          **PROSPECTIVE JUROR BUTENKO:**  I'm looking for a job.  I

5    receive unemployment benefits.

6          **THE COURT:**  You are looking for a job?

7          **PROSPECTIVE JUROR BUTENKO:**  Yes.

8          **THE COURT:**  What country -- in what country were you

9    born?

10         **PROSPECTIVE JUROR BUTENKO:**  What?

11         **THE COURT:**  What country were you born in?

12         (Brief pause.)

13         **THE COURT:**  Where were you born?

14         **PROSPECTIVE JUROR BUTENKO:**  In Russia.

15         **THE COURT:**  Russia, yes.  And I sort of suspected

16   that from your name.  And you speak Russian, right?

17         **PROSPECTIVE JUROR BUTENKO:**  Yes.

18         **THE COURT:**  Well, I'm going to ask you a question,

19   but I'm then going to ask everybody else this question as well.

20         In this case there are going to be some conversations

21   that were taped.  There's going to be other testimony that may

22   be in Russian, and I'm -- we're going to have that translated.

23   There will be translations into English.

24         So what I'm asking to ask everybody -- if there is

25   anybody else who speaks Russian, you can raise your hand and

1   tell me that -- that, in fact, you're going to have to go by

2   the official translation that we give you.

3          Now, would that be difficult for you?  Because you

4   might say to yourself, "Well, I don't think that's what it

5   means," but if there is an official translation, we have to use

6   that.

7          **PROSPECTIVE JUROR BUTENKO:**  In Russian I can

8   understand everything, but in English, I'm not sure.  That's

9   why.

10         **THE COURT:**  And I couldn't quite understand that.

11         **PROSPECTIVE JUROR BUTENKO:**  I'm not sure I can

12   translate everything you will say.

13         **THE COURT:**  In other words, but you're not to

14   translate it for other people on the jury; you understand?  You

15   just have to understand it the way you understand it and use

16   the official translation.

17         For the most part, the government and the defendants

18   have agreed as to most of the translations.  They have been

19   officially translated and they agree that those translations

20   are accurate.  There may be a couple of places where there is a

21   variance, is that correct?

22         **MS. HAMILTON:**  Your Honor, I think that's been worked

23   out.

24         **THE COURT:**  And it's all been worked out.  So they

25   agree on the translations.  So you cannot substitute your

```
1   knowledge of Russian for what they say it means.  You

2   understand that?

3              PROSPECTIVE JUROR BUTENKO:  It's my pleasure.

4              THE COURT:  Pardon?

5              PROSPECTIVE JUROR BUTENKO:  It's my pleasure.

6              THE COURT:  You can do that?

7              PROSPECTIVE JUROR BUTENKO:  Yes.

8              THE COURT:  Okay, thank you.  And the attorneys may

9   have some other questions of you.  Thank you very much.

10             Does anybody -- is anybody else conversant in

11  Russian?  You can either read Russian or understand it?

12             (No response.)

13             THE COURT:  Okay.  And I think that's the only other

14  language that's involved, is that correct, counsel?

15             MR. HOWDEN:  That's right.

16             THE COURT:  Okay.  Thank you.

17             Now, where are we?  Ms. Novitski?

18             PROSPECTIVE JUROR NOVITSKI:  I'm Julie Novitski

19  Godmintz.  I reside in San Francisco.  I'm born and raised

20  here.  I'm married and have a seven-year-old daughter.

21             I'm a first grade teacher.  I have been teaching at

22  my school for 22 years.  My husband works for the San Francisco

23  Police Department as a police service aid.

24             I have a Master's in educational administration.

25             No military service.
```

1            My hobbies are traveling and I dance hula.

2            Membership in United Educators.

3            Reading.  Magazines like *Travel and Leisure* and *Wine*

4  *Advocate*.

5            Television.  Things like the Amazing Race, Grey's

6  Anatomy, kind of shows like CSI.

7            No bumper stickers.

8            And internet mainly for email and just research.

9            **THE COURT:**  Thank you.

10            Now, is your husband a sworn officer or is he a

11  civilian employee?

12            **PROSPECTIVE JUROR NOVITSKI:**  He is a civilian

13  employee.

14            **THE COURT:**  Okay.  I'm getting worried about the

15  first graders in the Bay Area, because it sounds like there's a

16  lot of first grade teachers who are not in their classes.

17            Okay.  Mr. Ramos, please.

18            **PROSPECTIVE JUROR RAMOS:**  My name is Richard Ramos

19  and I have lived in the Bay Area all my life, 54 years.  I'm

20  married.  I have three children.  Nicholas, 28, he is a manager

21  at Best Buy in Emeryville.  Kelly is 25, she is as financial

22  aid advisor at Contra Costa college.  Ricky is 22, and he is a

23  student at U.C. Irvine.

24     I already talked about the fact that I was a retired

25  police officer, Berkeley P.D.  And I'm currently a professor at

1   Contra Costa College in San Pablo, and I teach criminal justice

2   administration justice.  My wife is a manager at AT&T.

3        Let's see.  I have a Bachelor's in criminal justice and

4   ethics studies from Cal State East Bay, a Master's in criminal

5   justice administration from Sac State, and I'm in the middle of

6   a doctorate program in educational leadership at San Francisco

7   State.

8        No military service.

9        Oh, also I'm a music and -- music producer and recording

10  artist for a record company in Europe.

11            THE COURT:  And so what is your musical talent in?

12            PROSPECTIVE JUROR RAMOS:  I play guitar, but I have a

13  group that was popular, like, in the '70s, and 30 years later

14  this record company found -- we did one 45 and it went to

15  England and became a big hit and they didn't know how to get a

16  hold of us, and 30 years later they found us.

17            THE COURT:  Well, congratulations.  Royalties late

18  are better than no royalties at all, right?

19            PROSPECTIVE JUROR RAMOS:  Yeah, right.

20        Let's see, golf, work out would be my leisure

21  activities I guess.

22        I'm a member of the Rod and Gun Club in Richmond and

23  the California Association of Administration of Justice

24  Educators.

25        Reading materials lately have been a lot based on

1  education, the achievement gap and the success rates of

2  students from community college toward four-year degrees, but I

3  do have subscriptions to, like, the *Alameda County Legal*

4  *Update*, which is pretty much a legal update from the level of a

5  police officer, what they do on the street, stop and search and

6  detentions, that sort of information. Also have a subscription

7  to the *Peace Officer Research Association of California*, a

8  magazine that comes out.

9          Television. I like a lot of, you know, the reality

10 shows everybody likes, like Survivor.

11         Bumper stickers. I have got one. It says "No Bad

12 Days" from Cabo San Lucas, which means don't have any bad days.

13 Have good days, right?

14         And internet usage, I teach online. A lot of

15 research online for this doctorate, and that's about it.

16         **THE COURT:** Thank you.

17         Could you hand the mic to the first woman in the back

18 row, and we'll hear from her and then everybody in the back

19 row?

20         Is it Ms. Kameoka?

21         **PROSPECTIVE JUROR KAMEOKA:** Yes. My name is Kathy

22 Kameoka. I live up in Petaluma. I have lived there for 42

23 years. I'm married. I have two children, 32 and 30. One

24 works down in Tucson for Roche. She does biotech research.

25 The other one is a high school counselor down in Los Angeles.

1   My husband is a mechanical engineer.

2          My education is an Associate Science in radiology.

3          No military service, but I did grow up as an Air

4   Force brat.

5          Hobbies, I enjoy travel, photography and outdoor

6   sports.

7          I belong to the National Professional Photography

8   Association and the academy of -- American Academy of

9   Radiology.

10         Reading materials.  Subscriptions are photography and

11  radiology, and I specialize in orthopedic and special

12  procedures with myelograms and arthrograms and stuff.

13         Television.  Kind of depends, a lot of travel.  HDTV,

14  All My Children and Oprah.

15         No bumper stickers.

16         And internet is mostly with FaceBook, to keep track

17  of my kids and grandkids, email, and then just doing research

18  for school work.

19         **THE COURT:**  Thank you very much.

20         Ms. Yamamoto?

21         **PROSPECTIVE JUROR YAMAMOTO:**  Good morning.  My name

22  is Sasha Yamamoto.  I live in Castro Valley currently, and I

23  have been in the Bay Area my entire life.  I'm single.  No

24  children.

25         Currently doing customer service at an insurance

1   company.   No spouse.

2         Working on my Bachelor's in psychology.

3         No military service.

4         Hobbies, incense and candle making.

5         No membership in organizations.

6         Reading material.  I'm so busy with school right now,

7   no time for extra reading.

8         Television.  My favorite shows are House and NCIS.

9         No bumper stickers.

10        And internet use for school, media and social

11  networking mostly.

12        **THE COURT:**  And what are you studying?

13        **PROSPECTIVE JUROR YAMAMOTO:**  Psychology.

14        **THE COURT:**  And what's your ultimate goal?

15        **PROSPECTIVE JUROR YAMAMOTO:**  I think child

16  psychology.  Because of my past, I think I would be a strong

17  asset there.

18        **THE COURT:**  Thank you very much.

19        Ms. Reed, please?

20        **PROSPECTIVE JUROR REED:**  I am Christie Reed, and I

21  live until Concord.  I am a lifelong Bay Area resident.  I am

22  a -- have am domestic partner.  We have no children.

23        I'm a self employed irrigation and landscape

24  designer.  My spouse is an occupational therapist specializing

25  in neurology.

1          I have a Bachelor's in international economics and

2     politics.  I have ongoing training in horticulture and

3     three-dimensional design, landscape design.

4          No military service.

5          Because I run my own company, my hobbies and leisure

6     activity are actually just the chance to do nothing.

7          I'm a member with the Sierra Club.

8          My reading material is primarily landscape,

9     horticulture, garden design.

10         Actually, I do have one hobby.  I have been

11    purchasing and remodeling houses in my neighborhood.

12         Television.  Primarily Homes on Homes, Glee, every

13    Giants game they play.

14         No bumper stickers.

15         A lot of internet use.  No social networking, but

16    primarily research design use.

17         **THE COURT:**  Thank you.

18         Ms. Rosenthal?

19         **PROSPECTIVE JUROR ROSENTHAL:**  My name is Danielle

20    Rosenthal.  I live in Foster City.  I have been a resident in

21    the Bay Area for 27 years.  I'm a dual citizen, also a citizen

22    of Israel.  I'm single.  I have one son, seven years old.

23         I'm a registered dental assistant and a clinical

24    coordinator.

25         And I have some college and went to trade school.

101

1              Nothing in the military.

2              And my hobbies, coaching and playing soccer,

3   snowboarding.

4              I'm a Lyon's member.

5              And my reading material.  I like travel magazines.  I

6   subscribe to *Eretz*, *People* and a lot of reading of my son's

7   homework.

8              I like watching House, Grey's Anatomy, lot of

9   Nickelodeon and Discovery.

10             No bumper stickers.

11             And internet use is for email.

12             **THE COURT:**  Okay.  Thank you very much.

13             Mr. Miller, please.

14             **PROSPECTIVE JUROR MILLER:**  Yes.  My name is Bob

15   Miller.  I'm an Oakland resident for 33 years.  I'm married.

16   No children.

17             I have been working for Chevron for 33 years and it

18   ends April 4th.  I have been an IT manager.  Right now I'm

19   managing the DATA centers, or actually I'm transitioning that

20   job.  My spouse is -- she is a clinical microbiologist,

21   virologist.  She's lab director for Clinical Diagnostic Labs.

22   Was in San Francisco city for -- through the 80's, but

23   currently is working part time at several biotech companies.

24             I have a B.S. in mathematics.

25             No military service.

1          Hobbies and leisure activities are cooking, hiking,

2    reading, theater and music.

3          Don't really have any specific memberships in

4    organizations, except some associations professionally.

5          Reading materials tend to be fiction or management,

6    management books.  How we make decisions, how organizations

7    work.  Subscriptions are cooking magazines and professional

8    magazines and *Newsweek* and *Scientific American*.

9          Television is movies, sports, the Daily Show and the

10   Colbert Report.

11         Bumper stickers, none.

12         And internet usage is email, shopping and just

13   general knowledge.

14         **THE COURT:**  Okay.  Thank you very much, Mr. Miller.

15         Mr. Ramchandani?

16         **PROSPECTIVE JUROR RAMCHANDANI:**  I am Rajeev

17   Ramchandani.  Live in Emeryville.  Been in the Bay Area for

18   about 15 and a half years.  Married.  No children, but one on

19   the way.

20         Occupation is information systems and business

21   process auditor.  My wife's work is she is an HR specialist at

22   a pharmaceutical company.

23         I have an M.B.A.  I also am certified information

24   systems auditor and pursuing a certified fraud examiner

25   certification.

1              No military service.

2              Hobbies, leisure activity mostly leisurely travel,

3    going to the movies.

4              Membership in professional organizations, Information

5    Audit and Control Association and Association of Certified

6    Fraud Examiners.

7              No regular reading material or subscriptions, but I

8    an occasion read *Time*, *Economist*, *Business Week*.

9              Television.  I mostly watch sitcoms, reruns or

10   current shows.

11             No bumper stickers.

12             And heavy internet use, email, gaming use, research,

13   shopping.

14             **THE COURT:**  Now, tell me about this certified fraud

15   investigators, whatever it's called.  In what setting or

16   context are you using those skills and talents?

17             **PROSPECTIVE JUROR RAMCHANDANI:**  Primarily financial

18   reporting.

19             **THE COURT:**  Financial reporting?

20             **PROSPECTIVE JUROR RAMCHANDANI:**  Yes.

21             **THE COURT:**  And what kinds of things are you

22   examining?  Are you examining -- is it internal that you're

23   looking at or are you looking at other companies?

24             **PROSPECTIVE JUROR RAMCHANDANI:**  It's mostly other

25   companies.  I work for the Public Company Accounting Oversight

1    Board and we regulate the accounting firms that perform

2    year-end financial statement audits for public companies.

3              **THE COURT:**  Okay.  Now, who is your actual employer

4    then?

5              **PROSPECTIVE JUROR RAMCHANDANI:**  It's PCAOB, Public

6    Company Accounting Oversight Board.

7              **THE COURT:**  I see, okay.  And then do they contract

8    with various accounting firms and auditing firms and so forth

9    or --

10             **PROSPECTIVE JUROR RAMCHANDANI:**  No.  It's actually a

11   regulatory agency.  It's not government, but it's quasi

12   government and it was formed with the *Sarbanes-Oxley Act* of

13   2002.

14             **THE COURT:**  I see, okay.  Good old *Sarbanes-Oxley*.

15             Now, what I want to know -- because, obviously, you

16   have heard that this case involves allegations of wire fraud.

17   You understand that?

18             **PROSPECTIVE JUROR RAMCHANDANI:**  Yes.

19             **THE COURT:**  Okay.  Have you been involved in any

20   cases where you have had to go to court and testify or have

21   your deposition taken?

22             **PROSPECTIVE JUROR RAMCHANDANI:**  No.

23             **THE COURT:**  Does that kind of thing occur in your --

24   you know, with other employees that you worked with?

25             **PROSPECTIVE JUROR RAMCHANDANI:**  Not that I know of.

1       **THE COURT:**   So how do your -- do you make findings

2   and then make a report?   What happens with the information have

3   you gather?

4       **PROSPECTIVE JUROR RAMCHANDANI:**   Our job is to really

5   understand if there was fraud incurred in financial reporting

6   at a publicly listed company in the U.S.   And if there was, how

7   did the engagement team of the firm that performed the audit of

8   that corporation respond to those risks of fraudulent financial

9   reporting.

10      **THE COURT:**   I see.   Okay.   Now, what is charged here

11  is something called wire fraud.   We have federal statutes

12  related to mail fraud and wire fraud.   In those cases it has to

13  do with what the party who is alleged to have engaged in the

14  fraud intended and whether, you know, the statements or the

15  admissions or whatever were material, but it is not necessary

16  that the fraud, the purpose of the fraud be successful.   In

17  other words, you don't have to actually have gotten any money

18  or been -- succeeded in doing whatever it is you were

19  attempting to do.   The question is whether or not there was an

20  intent to deceive and so forth.

21          Is there anything about your experience that gives

22  you some particular knowledge or expertise that might play into

23  this?

24      **PROSPECTIVE JUROR RAMCHANDANI:**   I have come across

25  situations where fraud was uncovered at certain corporations

1 and I have been through, for example, the investigative work

2 that went through by a forensics group to follow up on the

3 allegations and the ultimate conclusions as it reports to

4 financial reporting and the reliability of financial statements

5 of that corporation.

6          **THE COURT:**  Now, what's involved here is charges of

7 the kind of fraud that constitutes criminal conduct.  You know

8 there's other kinds of fraud.  Maybe they would give rise to a

9 civil action or something like that.  So you will get specific

10 instructions as to what constitutes wire fraud.

11          Are you going to be able to just follow those

12 instructions and put aside whatever you think may be fraud in

13 your context?  In other words, it's not just a question of

14 ethics, it's a question of:  Is this against the law?

15          **PROSPECTIVE JUROR RAMCHANDANI:**  Yes, I believe so.

16          **THE COURT:**  Okay.  Any concerns at all that -- you

17 know, that it would be difficult for you to be fair and

18 impartial to both sides in this case -- or to all the parties I

19 should say?

20          **PROSPECTIVE JUROR RAMCHANDANI:**  Nothing that I could

21 think of no.

22          **THE COURT:**  Okay.  Thank you very much.

23          Now, given what I have just -- before we go to our

24 last juror, Ms. Dickinson, while we have those thoughts in mind

25 about fraud and the fact that it doesn't have to be successful,

1   but you have to have all of the elements that are there -- and

2   I will tell you what those are when I give you the jury

3   instructions -- is there anyone who thinks, Well, if it didn't

4   succeed then, you know, that shouldn't be criminal and I

5   couldn't follow that instruction?  Yes.

6            **PROSPECTIVE JUROR YAMAMOTO:**  I didn't hear you.  Can

7   you repeat?

8            **THE COURT:**  I'm sorry.  Maybe I have the mic too far

9   away.  Can you hear me now?

10           **MS. YAMAMOTO:**  Yes.

11           **THE COURT:**  The question that I have is under our

12  criminal law it is not necessary that the fraud that is being

13  alleged be successful.  In other words, the party being

14  defrauded doesn't have to have lost money or whatever.  It's a

15  question of whether or not there was an intent to deceive and

16  it was material and there are certain other factors.

17           So what I want to know is if you find that, in fact,

18  well, nobody lost any money on this deal, even though the

19  elements of fraud may be met under the instructions that I give

20  you, would you be -- would it be difficult for you to return a

21  verdict of guilty if, in fact, all of those elements were met

22  even though the fraud wasn't successful?

23           Do you understand my question?

24           **MS. YAMAMOTO:**  Yes.

25           **THE COURT:**  Would that be difficult for you?

108

```
1            MS. YAMAMOTO:  I don't believe so.

2            THE COURT:  Pardon?

3            MS. YAMAMOTO:  I don't believe so.

4            THE COURT:  Okay.  Anyone else?

5            (No response.)

6            THE COURT:  And, obviously, again, you will get the

7    instructions and they will be clearer.

8                 Now, also, how -- how many of you have served on a

9    jury before would you raise your hands?  Okay.  And I'm really

10   only going to talk with these people right now over here.

11   Thank you.

12                Okay.  Of those of you who raised your hand, how many

13   of you sat on a criminal case?  Okay.  And anything at all that

14   happened in those cases that you found particularly

15   disconcerting, and you thought:  I could never sit on another

16   jury?  Do you think it would influence how you would think

17   about this case?  Any of you have any concerns about that?

18                And how many of you sat on civil cases?  You got to

19   sit on all kinds of cases?  Is that it?  Okay.  Well, you know,

20   you know the answer, then.

21                But understand that in a civil case, the burden of

22   proof is different than in a criminal case.  So if you sat on a

23   civil case, you had to decide whether somebody was liable and

24   had to pay money for some injury that somebody sustained, or

25   something like that.  And the burden of proof is different.
```

1  It's less.  It's a preponderance of the evidence.  So put that

2  out of your mind.

3          In a criminal case, it's proof beyond a reasonable

4  doubt.  Can that -- anybody who sat on a civil case -- you --

5  did you have any problem making distinction before?

6          **PROSPECTIVE JUROR MAFFEY:**  None.

7          **THE COURT:**  Anyone else?

8          Okay.  And also, how many of you, other than what

9  you've already told us, have family members or close personal

10 friends or you, yourself, who have worked in the legal

11 profession, either as a lawyer or as a legal secretary or a

12 paralegal or whatever else?  Gentleman who worked for

13 attorneys' services here.  Yes.  Ms. -- where are we going

14 here?  Ms. Evans.

15         **PROSPECTIVE JUROR EVANS:**  Yes.

16         **THE COURT:**  Is that right?

17         **PROSPECTIVE JUROR EVANS:**  Yes.  My mother's an

18 attorney.

19         **THE COURT:**  Okay.  What -- and where does she

20 practice, and what kind of law does she practice?

21         **PROSPECTIVE JUROR EVANS:**  She practices in

22 California.  And she is a consultant on title law, and oil and

23 gas law, regarding title.

24         **THE COURT:**  Okay.  Has she ever done any kind of

25 criminal work, either as a prosecutor or criminal defense

110

```
 1   lawyer?

 2              PROSPECTIVE JUROR EVANS:  Not that I know about.

 3         THE COURT:  Okay.  Thank you.

 4              Anyone else whose family member, close personal

 5   friend, or you, yourself, have worked for a law firm?

 6              PROSPECTIVE JUROR MARTINE:  My husband was.

 7         THE COURT:  We talked about that.  Right.

 8              Anyone else, other than what we've already discussed?

 9         THE COURT:  Thank you.  Yes, Mr. Miller.  Hi, back

10   there.  You want to stand up and shout at us.

11              PROSPECTIVE JUROR MILLER:  Yeah.  Just a friend of

12   mine that I went to high school with is a lawyer in L. A.

13         THE COURT:  Do you talk with him about his work?

14              PROSPECTIVE JUROR MILLER:  Some of it, yes.

15         THE COURT:  Does he do any kind of prosecutorial

16   work, or criminal defense work?

17              PROSPECTIVE JUROR MILLER:  He does mostly corporate

18   litigation.

19         THE COURT:  I see, but does he do criminal defense

20   work, then?

21              PROSPECTIVE JUROR MILLER:  No.

22         THE COURT:  Okay.  Thank you.

23              Anyone else?

24              As you may have heard -- well, as I know you've

25   heard, you've heard that these involve military-supply
```

1  contracts.  Do any of you have any concerns about

2  military-supply contracts with outside contractors?  You say,

3  "Why doesn't the military just do it, itself?  Why are they

4  contracting out"?  And the fact that that may be involved --

5  would that in any way affect how you listen to and decide the

6  case?  Anyone at all?

7          And also -- and you will hear testimony that the

8  goggles that were involved in this case were being supplied to

9  the armed forces, and particularly to the Iraqi armed forces.

10  And so it involves, you know, obviously, you know, what was

11  going on in Iraq, and the Iraqi armed forces themselves, as I

12  understand it; not our own military forces.

13          Is that correct, Ms. Hamilton?

14          **MS. HAMILTON:**  Yes, your Honor.

15          **THE COURT:**  But is there anyone who has any strong

16  feelings about the fact that Iraq is involved -- the Iraq war

17  is tangentially involved -- that would make it very difficult;

18  would make it difficult for you to be a juror in this case?

19          Any of you been very outspoken about the war, either

20  pro or against?

21          Do any of you belong to any kind of advocacy groups

22  that have been involved, either in pro- or anti-war issues; or

23  with respect to criminal cases, with respect to arguing in

24  favor of victims, or criminal defendants?  Any of you involved

25  in any of those kinds of organizations at all?

```
1              And again, does any -- do any of you have any
2    feelings about the military, one way or the other, that would
3    possibly affect how you would listen to and decide this case?
4    Nobody at all?  Everybody can be fair to both the Government,
5    and to the defendants in this case?
6              Have any of you owned your own business?
7              Some of you have already told me that you owned your
8    own business.  Okay.  Let me ask you this.  For those of you
9    who have owned your own business -- you, or a family member, or
10   close personal friend -- did you ever feel you were cheated by
11   other people at some point, on a contract or some kind of
12   arrangement that you had?  Did you ever feel that you were
13   cheated by somebody else?
14             PROSPECTIVE JUROR GILLESPIE:  Yes, indeed.
15             THE COURT:  Who was that?  John Gillespie.
16             PROSPECTIVE JUROR GILLESPIE:  Insurance companies.
17             THE COURT:  Okay.  And that is in connection with --
18             PROSPECTIVE JUROR GILLESPIE:  A --
19             THE COURT:  -- an actual business that you have, or
20   just your personal insurance?
21             PROSPECTIVE JUROR GILLESPIE:  No.  It was a
22   physical-therapy practice that we owned.  We deal with Blue
23   Shield and Blue Cross.
24             THE COURT:  I see.  I see.
25             PROSPECTIVE JUROR GILLESPIE:  Just a generalized.
```

```
 1              THE COURT:  And were there -- was there ever any

 2    lawsuit as a result of any of those --

 3              PROSPECTIVE JUROR GILLESPIE:  No.

 4              THE COURT:  -- incidents or situations?

 5              Did it have any significant impact on you?

 6              PROSPECTIVE JUROR GILLESPIE:  Financially, yes.  Lost

 7    about 29 percent per year.

 8              THE COURT:  Now, how do you feel about sitting on a

 9    case where there are charges or allegations of fraud?

10              PROSPECTIVE JUROR GILLESPIE:  Well, as a

11    professional, we had to set that aside, and take it as business

12    as usual.

13              THE COURT:  Can you do that here?

14              PROSPECTIVE JUROR GILLESPIE:  Absolutely.

15              THE COURT:  Well, not treat it as business as usual;

16    but can you put it aside, and say, well, that's not -- you

17    know, this is just one set of facts that we're going to hear

18    about, and it's confined to this set of facts, and not to any

19    other experiences I've had in life?

20              PROSPECTIVE JUROR GILLESPIE:  Absolutely.

21              THE COURT:  Okay.  Anyone else?

22              PROSPECTIVE JUROR NOVICK:  Yes.

23              THE COURT:  Yes, Mr. Novick.

24              PROSPECTIVE JUROR NOVICK:  I'm part -- excuse me.

25    I'm part of a class-action suit against a securities-fraud
```

1    case, but yeah, I think they were dishonest, but that would not

2    affect me on how I feel about somebody else.

3              THE COURT:   What is the status of that case?

4              PROSPECTIVE JUROR NOVICK:   They're trying to settle

5    right now.  They're coming up with a final number.  And then,

6    obviously, they've got to weigh in all of the claims.  And so I

7    don't know how it will turn out as of yet.

8              THE COURT:   Now, on which side of the equation are

9    you?  Are you a member of the class, or are you a defendant?

10             PROSPECTIVE JUROR NOVICK:   I'm a member, suing the

11   firm; suing the financial institution that engaged in fraud.

12             THE COURT:   I see.  I see.

13             And do you know if the SEC has brought any charges

14   against the firm that you're suing?

15             PROSPECTIVE JUROR NOVICK:   Yes, they have.  They

16   definitely have.

17             THE COURT:   And are there any criminal charges

18   pending against that firm?

19             PROSPECTIVE JUROR NOVICK:   You know, I don't know.

20   I'm just concerned if I'm going to get any money back.  I pay

21   attention to the nitty-gritty.

22             THE COURT:   I see.  Okay, but the -- so the SEC has

23   its own enforcement proceeding, but that may be a civil

24   proceeding, or it could be a criminal proceeding, but you don't

25   know?

 1              **PROSPECTIVE JUROR NOVICK:**  I'm just waiting around

 2     for --

 3              **THE COURT:**  Again, when the word "fraud" jumps out at

 4     you do, you say "Aha"?

 5              **PROSPECTIVE JUROR NOVICK:**  It's a separate issue from

 6     my case.

 7              **THE COURT:**  Okay.  And you're able to keep it that

 8     way?

 9              **PROSPECTIVE JUROR NOVICK:**  Yes, your Honor.

10              **THE COURT:**  During the entire trial?

11              **PROSPECTIVE JUROR NOVICK:**  I promise.

12              **THE COURT:**  Okay.  Now, does anybody have any problem

13     with the fact that, hey, these are white-collar crimes, if

14     they're crimes at all, and why is the Government spending its

15     time prosecuting people like this, when we've got all of this

16     violence around?  Anybody have those -- any feelings about

17     that?  You feel:  I'm just going to talk -- even if it sit on

18     this case, I'm not going to give it, you know, much

19     consideration, because it's not important?  Anyone have those

20     feelings?  If so, you should tell us now; not later on.

21              Okay.  And are there some people who feel that fraud

22     against the Government is just, you know -- it just happens,

23     so, so what?  It's not a significant problem?

24              Or you think it is a significant problem, and this is

25     your chance to get even, or something like that?  Anyone has

116

```
 1   any of those feelings?

 2           And also, you understand that there will be witnesses

 3   testifying for the Government, and witnesses who may testify

 4   for the defendants.  And the defendants may or may not testify.

 5   As I told you before, they don't have to.  And they don't have

 6   to present any evidence, but you understand that you have to

 7   apply the same standards to all of the testimony, and not give

 8   anybody -- any testimony any less weight or less credibility

 9   assigned to it, just because they are on one side or the other?

10   Anybody would have any difficulty following that instruction?

11           Counsel, I think you know I've probably beaten a dead

12   horse.  And so I think it's time to have some follow-up

13   questions.  Is there anything?

14           MR. OSTERHOUDT:  One more juror.

15           THE COURT:  Oh, yes.  Ms. Dickinson.  I'm sorry.

16   We'll get to her, but -- and then after she has talked with us,

17   is there -- are there any other questions you intended I ask?

18           I've consolidated a lot of them, if you can believe

19   it.  I know -- but I have consolidated a lot of the proposed

20   questions.

21           MR. HOWDEN:  I don't think so, your Honor.

22           THE COURT:  Is it okay?

23           Ms. Dickinson, please tell us about yourself.

24           PROSPECTIVE JUROR DICKINSON:  Rebecca Dickinson.

25   I've lived in San Leandro since 1982.  Not married.  No
```

1  children.  I started nursing straight out of high school.

2  Qualified as an R.N. in 1978.  No military service.  Hobbies?

3  Reading, music, movies, theater.  No membership in any

4  organizations.  I read a great deal, fiction and nonfiction.

5  Television?  BBC America, sports networks, reality shows.  No

6  bumper stickers.  And I use the Internet for e-mail.

7           **THE COURT:**  Okay.  Thank you.  And you have a

8  wonderful accent.

9           **PROSPECTIVE JUROR DICKINSON:**  I'm Welsh.

10          **THE COURT:**  Wonderful.  That accounts for watching

11  BBC, I guess.

12          **PROSPECTIVE JUROR DICKINSON:**  Yeah.

13          **THE COURT:**  But we all love BBC, so -- okay.  Thank

14  you.

15          Ms. Hamilton, are you -- who's going to conduct --

16          **MS. HAMILTON:**  I will, your Honor.

17          **THE COURT:**  -- *voir dire* for the Government?

18          **MS. HAMILTON:**  Thank you.

19          **THE COURT:**  Each side -- excuse me.  Each side has

20  just a few minutes to ask you -- well, more than a few minutes,

21  but not as long as I've spent, asking you a few questions, and

22  following up with you.

23                        **JURY VOIR DIRE**

24          **MS. HAMILTON:**  First, I wanted to thank you for being

25  here.  I know it's by summons.  You feel like you probably

**JURY VOIR DIRE**

 1   don't have much of a choice, but the fact that you're here

 2   helps us determine justice, however that is that you make

 3   decisions that you make.  So thank you for your time, however

 4   long you serve.  Thank you.

 5          What I'd like to do is -- as Judge Patel said, she

 6   covered a lot of territory.  So what I'd like to do right now

 7   is just ask some follow-up questions of particular individuals.

 8          First, Mr. Butenko.

 9          **THE CLERK:**  Ms. Hamilton, she's not going to be able

10   to hear.

11          **THE COURT:**  That's all right.  Stay there, and hold

12   the mic.  Let her hold the mic.  And then she can hand it to

13   Mr. Butenko to answer.

14          **MS. HAMILTON:**  So, Mr. Butenko, you -- when

15   Judge Patel asked you about Russian, and speaking Russian, you

16   said, "I can understand everything; but in English, I'm not so

17   sure."

18          **PROSPECTIVE JUROR BUTENKO:**  I am not so sure I can

19   translate everything into English.

20          **MS. HAMILTON:**  And when you say you're not so sure

21   about translating everything into English, can you explain what

22   you mean?

23          **PROSPECTIVE JUROR BUTENKO:**  I have not enough words

24   for everything.

25          **MS. HAMILTON:**  Not enough words in English?

1           **PROSPECTIVE JUROR BUTENKO:**  Yes.

2           **MS. HAMILTON:**  Do you read books and magazines in

3 English?

4           **PROSPECTIVE JUROR BUTENKO:**  Sometimes.

5           **MS. HAMILTON:**  And at home, what language do you

6 speak?

7           **MR. BUTENKO:**  It depends.  If my son come with his

8 friends, I like to speak English.  Mostly, Russian.

9           **MS. HAMILTON:**  When we -- most -- the evidence

10 would -- I'm sorry.  The evidence will be presented in English,

11 with individuals testifying in English.

12          Do you believe that you'll -- how do you feel about

13 listening to that?  Will you be able to listen to that

14 testimony and understand it?

15          **PROSPECTIVE JUROR BUTENKO:**  I think I cannot say.

16          **MS. HAMILTON:**  I'm sorry?

17          **PROSPECTIVE JUROR BUTENKO:**  I cannot say.

18          **MS. HAMILTON:**  You cannot say?

19          **PROSPECTIVE JUROR BUTENKO:**  Experience.

20          **MS. HAMILTON:**  Would it be hard for you?

21          **PROSPECTIVE JUROR BUTENKO:**  Maybe.  Maybe not.

22          **MS. HAMILTON:**  One of the other parts that.

23          **PROSPECTIVE JUROR BUTENKO:**  Yes.

24          **MS. HAMILTON:**  I'm sorry?

25          **PROSPECTIVE JUROR BUTENKO:**  Most likely, yes.

1          **MS. HAMILTON:**  Most likely, yes, it will be hard for

2  you.

3          Judge Patel also talked about the fact that we'll be

4  listening to recorded conversations in which Russian is the

5  language that's spoken.  Those translations or those

6  conversations have been translated into English.  Will you be

7  able to put aside your understanding of Russian, and only look

8  at the English translations, and not think about how you might,

9  perhaps, have translated that language or those words

10  differently?

11          **PROSPECTIVE JUROR BUTENKO:**  Maybe.

12          **MS. HAMILTON:**  Maybe.  Is there a possibility that

13  you might think about a better translation, in your own mind,

14  than the one that you've been provided by the court?

15          **PROSPECTIVE JUROR BUTENKO:**  Yes.

16          **MS. HAMILTON:**  I'm sorry?

17          **THE REPORTER:**  I'm sorry, Mr. Butenko.  Can you speak

18  up?

19          **THE COURT:**  You're going to need to give him the mic.

20          **PROSPECTIVE JUROR BUTENKO:**  Restate correctly what

21  you asked me?

22          **MS. HAMILTON:**  I'm sorry?

23          **PROSPECTIVE JUROR BUTENKO:**  Can you repeat your

24  question?

25          **MS. HAMILTON:**  Sure.  Will you be able to put aside

<u>**JURY VOIR DIRE**</u>

```
1   your understanding and knowledge of Russian, and take -- only

2   look at the English translation that's been provided by the

3   court?

4           PROSPECTIVE JUROR BUTENKO:  I think, yes.

5           MS. HAMILTON:  Or will you take your own life

6   experiences and your own knowledge of Russian, and apply that,

7   in order that there are better ways to translate a particular

8   word or phrase than the way that the court has provided a

9   translation?

10          PROSPECTIVE JUROR BUTENKO:  Probably not.

11          MS. HAMILTON:  That you would probably not what?  I'm

12  sorry.  That you probably would not put your own translation

13  into English?

14          PROSPECTIVE JUROR BUTENKO:  Yes.

15          MS. HAMILTON:  Thank you.

16          Mr. Ramos, I have a question for you.

17          PROSPECTIVE JUROR RAMOS:  Yes.

18          MS. HAMILTON:  You've had experience in white-collar

19  crimes, is that right, and investigating them?

20          PROSPECTIVE JUROR RAMOS:  Yes.

21          MS. HAMILTON:  Have there been instances where an

22  individual was wrongfully arrested?

23          PROSPECTIVE JUROR RAMOS:  I try not to arrest if

24  there's not a probable cause to arrest.

25          MS. HAMILTON:  If -- it's a serious thing to convict
```

**JURY VOIR DIRE**

1    someone for crime.  Is that right?

2                 **PROSPECTIVE JUROR RAMOS:**  Yes, it is.

3                 **MS. HAMILTON:**  And you believe in our system of

4    criminal justice?

5                 **PROSPECTIVE JUROR RAMOS:**  Yes, I do.

6                 **MS. HAMILTON:**  So -- and in the concept of innocent

7    until proven guilty?

8                 **PROSPECTIVE JUROR RAMOS:**  Yes, I do.

9                 **MS. HAMILTON:**  And you're committed to following the

10   law?

11                **PROSPECTIVE JUROR RAMOS:**  Yes, I am.

12                **MS. HAMILTON:**  So will you follow the law in this

13   case?

14                **PROSPECTIVE JUROR RAMOS:**  Of course.

15                **MS. HAMILTON:**  And you'll be able to deliberate with

16   the jury, if you're chosen to sit, openly and honestly, in a

17   way that pertains to the evidence you've heard in this case?

18                **PROSPECTIVE JUROR RAMOS:**  Yes.

19                **MS. HAMILTON:**  Thank you.

20                Ms. Martine, I don't think we were -- we obtained the

21   employment of your children.

22                **PROSPECTIVE JUROR MARTINE:**  Oh.  My daughter, who's

23   45 -- almost 46 -- is a V.P. with Bank of the West.  And my

24   older son is with Riva Software Company, in Wisconsin.  And my

25   youngest son is a chef, although not -- due to health reasons,

1  he hasn't been able to chef any longer, and he's legally

2  growing marijuana in Washington.

3          **MS. HAMILTON:**  Oh, okay.

4          Mr. Black, I just want to make sure there's no

5  conflict.  You work at Bloomberg.  Is that right?

6          **PROSPECTIVE JUROR BLACK:**  Yes.

7          **MS. HAMILTON:**  Have you ever worked with or have you

8  been aware of an individual named "Dave Ward"?

9          **MR. WARD:**  (Indicating)

10         **PROSPECTIVE JUROR BLACK:**  I'm sorry?

11         **MS. HAMILTON:**  Do you recognize Dave Ward?

12         **PROSPECTIVE JUROR BLACK:**  No.

13         **MS. HAMILTON:**  Are you familiar with a woman named

14  "Jillian Cohen"?

15         **PROSPECTIVE JUROR BLACK:**  I know her name.  I've

16  never worked directly with her.

17         **MS. HAMILTON:**  Okay.

18         Judge Patel, I've -- just kind of show of hands for

19  this.  Judge Patel talked about the fact that this case is

20  about information being concealed from the Army.  And what I'd

21  like to do is back up a little bit.

22         This is -- the Army contract was one in which the

23  Army was to supply night-vision goggles to the multinational

24  forces in Iraq, who would then supply the Iraqi defense forces.

25  That's kind of the context.

1              To say that -- does anyone have a situation or

2    believe there's a situation where it would be permissible to

3    withhold information in a business setting, whether it's

4    regarding, you know, any contract with the military, or just in

5    your own personal business setting, when you're negotiating a

6    contract, or king representations, or talking; just that it

7    would be -- that it would be permissible not to tell all of the

8    information?

9              No hands.

10             **PROSPECTIVE JUROR MILLER:**  I mean, yes.  I mean,

11   because you don't tell --

12             **THE COURT:**  Can you stand, Mr. Miller, please?

13             **PROSPECTIVE JUROR MILLER:**  Yes.  When you're --

14             **THE COURT:**  We can hear you pretty well without the

15   mic.

16             **PROSPECTIVE JUROR MILLER:**  When you're having a

17   negotiation with someone, you don't tell them what your cost of

18   goods were.  You don't tell them what your manufacturing costs

19   were.  There are certain things that are not expected to be

20   disclosed in those kinds of conversations.

21             **MS. HAMILTON:**  And what about -- is there a

22   determination, in your mind, about when a line -- about when

23   things should be disclosed, and when things need not be

24   disclosed?

25             **PROSPECTIVE JUROR MILLER:**  Well, there are usually

1   rules about what the expectation is.  And there's a discussion

2   about that; at least, in the dealings that I've had on a

3   contractual basis, but it's -- you know, it's like when you

4   sell a how's.  You're required to disclose everything that you

5   know is relevant.  Then that becomes something that you do, but

6   you don't tell them how much it cost, necessarily -- how much

7   it cost to build the addition on it.

8           **MS. HAMILTON:**  And when you say there are rules

9   there, are those general rules for a particular industry, or

10  just generally?

11          **PROSPECTIVE JUROR MILLER:**  Well, so, I guess

12  there's -- that's hard to answer, because I think there are

13  sort of some general ethics associated with it.  There's -- you

14  know, nondisclosure is something that doesn't even come up.

15  That's different, in my mind, than nondisclosure as something

16  that you let the other person assume that it's somewhat --

17  right?  I mean, there are differences from that perspective.

18          **MS. HAMILTON:**  Okay.  So in this -- in the case, if

19  you hear the facts, and the argument is that there was no --

20  that certain information was important, and wasn't disclosed,

21  how -- are you able to look at either the defense's arguments

22  or the prosecution's arguments impartially, to make a

23  determination of that point?

24          **PROSPECTIVE JUROR MILLER:**  I guess there are three

25  things.  There are the two agents, and then there's:  What's

 1   the basis for the transaction?  What are the rules and the

 2   legal issues associated with the transaction?

 3          And it seems to me those three things need to be

 4   taken into consideration.

 5          **MS. HAMILTON:**  Okay.  Thank you.

 6          **THE COURT:**  I think Mr. Chen has his hand up.

 7          **MS. HAMILTON:**  I'm sorry, Mr. Chen.  I apologize.

 8          **PROSPECTIVE JUROR CHEN:**  I have a similar something.

 9   I'm kind of struggling in my head.  When you say that

10   information was withheld -- there's so much information you're

11   dealing with in this environment.  So I'm trying to figure out,

12   you know, when you say some information is withheld, whether

13   that information was specifically asked for, or whether this

14   information was obvious that it was relevant, and it was not

15   provided; or is it a point where you -- you are making a

16   conscious stipulation that you need to provide all this

17   information, and there was no chance for the person who's

18   providing the information to miss that information?  Or is it

19   something that's obvious?

20          I guess I would have to see the circumstances.  If

21   it's a formal case, I would say in my head, it seems to me it's

22   hard to make a criminal -- a -- making a criminal case, where,

23   if the information was just omitted not because of a very

24   specific asking for it.

25          **MS. HAMILTON:**  Thank you.

1              So Mr. Chen said it would be hard to envision a

2    criminal case where there was information that was omitted.

3              Does anyone else feel or have ideas along those lines

4    and that concept?

5              Would you -- were you raising -- you're nodding your

6    head?

7              **PROSPECTIVE JUROR YAMAMOTO:**  Oh.  Me?

8              **THE COURT:**  Ms. Yamamoto.

9              **PROSPECTIVE JUROR YAMAMOTO:**  I was just kind of

10   agreeing with what he said.  If -- in the context the

11   information was requested, and they chose not to answer the

12   question or omit some information, then, yes, that's extremely

13   dishonest; but if it wasn't asked for, or if they didn't know

14   to disclose that information, then I don't see, you know,

15   without -- how much they could be judged or said that they were

16   being dishonest.  If they didn't know to disclose it, then how

17   could they be wrong for not putting it in the information?

18             **MS. HAMILTON:**  So I'm sorry.  Just make sure I heard

19   you.  So he if the individuals didn't know to disclose the

20   information, then it wouldn't be fair to prosecute them?

21             **PROSPECTIVE JUROR YAMAMOTO:**  Yes.

22             **MS. HAMILTON:**  I'm sorry.  Get the mic passed.

23             **PROSPECTIVE JUROR DAVIDSON:**  Alberta Davidson.  I am

24   struggling with this, because -- struggling with this, because

25   was there -- was there national risk or security involved?  I

 1   mean --

 2           **MS. HAMILTON:**  Would that be important to you?

 3           **PROSPECTIVE JUROR DAVIDSON:**  Could be.

 4           **THE COURT:**  I think, Ms. Hamilton -- I think the

 5   difficulty is that, you know, we're talking about this in a

 6   vacuum.

 7           **MS. HAMILTON:**  Right.

 8           **THE COURT:**  And you're going to be given

 9   instructions.  And essentially the instructions will be that a

10   scheme was devised to -- or participated in a scheme to

11   essentially give -- either to give information, or omit -- and

12   what we're talking about omissions that were material, first of

13   all.  So there were -- and we'll tell you a definition of what

14   is material.  And that is, it had a tendency to influence or

15   was capable of influencing a person to make a decision in a

16   certain way; and that there was an intent to defraud, or to

17   deceive.

18           **PROSPECTIVE JUROR DAVIDSON:**  Oh.

19           **THE COURT:**  So does that complete the picture a

20   little more?

21           **PROSPECTIVE JUROR DAVIDSON:**  Mm-hm.

22           **THE COURT:**  So we're not just talking about what is

23   your ethical obligation, but also this is defining what the

24   legal obligation is.

25           **PROSPECTIVE JUROR DAVIDSON:**  Okay.  So I think I

**JURY VOIR DIRE**

```
 1   would need to put aside my ethical judgment of it, if --

 2              THE COURT:  If it differs with the instructions we

 3   give you.

 4              PROSPECTIVE JUROR DAVIDSON:  Exactly.

 5              THE COURT:  Okay.  Can you do that?

 6              PROSPECTIVE JUROR DAVIDSON:  Yes.

 7              THE COURT:  Mr. Miller, can you do that?

 8              PROSPECTIVE JUROR MILLER:  Yes.

 9              THE COURT:  Mr. Chen?

10              PROSPECTIVE JUROR CHEN:  Yes.

11              THE COURT:  Did we get that clarified, Ms. Hamilton,

12   so we can move on?  I'll tell you what I'm aiming for here.  I

13   know you're tired.  And I'm hungry, but they have questions to

14   ask.  And I want to get finished with this.  Then we can decide

15   who's going to be on the jury.  And those who are not going to

16   be on the jury can leave, and those who are going to be on the

17   jury will stay only for couple more minutes, and then we'll let

18   you go, and to come back tomorrow.

19              MS. HAMILTON:  Thank you, your Honor.

20              THE COURT:  Okay.  So, moving right along.

21              MS. HAMILTON:  Moving along, this case also, as

22   you've heard, has recordings made that you will listen to.

23   Those recordings were made by an individual coöperating with

24   the FBI at the time.  The defendants were not aware that those

25   recordings were being made.
```

```
 1              Does anyone -- just raise your hand -- have issues
 2   with that:  The fact that, during the recordings, the
 3   defendants are not aware that their voices were being recorded?
 4   Does anyone think that might not be fair?
 5              PROSPECTIVE JUROR DAVIDSON:  Isn't that illegal?
 6              THE COURT:  Not if the Government does it.
 7              PROSPECTIVE JUROR DAVIDSON:  I mean, I --
 8              MS. HAMILTON:  Let me give you the mic.
 9              PROSPECTIVE JUROR DAVIDSON:  I didn't mean to be
10   funny, but is that -- I don't know of much about the law, but I
11   thought that you couldn't record someone without their
12   knowledge.  Is that still --
13              THE COURT:  You're correct, but it's -- you know,
14   that would have been an issue that would have been disposed of
15   this whole case, if, in fact, that had occurred, and they
16   hadn't had the authority to do it.  So that's not an issue.
17              PROSPECTIVE JUROR DAVIDSON:  I look forward to being
18   educated about this.
19              MS. HAMILTON:  Do you think --
20              THE COURT:  If you did it, it would be a problem; or
21   if I did it, it would be a problem.
22              PROSPECTIVE JUROR DAVIDSON:  Okay.
23              MS. HAMILTON:  Do you have issues with it being,
24   perhaps, unfair to do that?
25              PROSPECTIVE JUROR DAVIDSON:  No, I don't have any
```

1  definite stand, but I -- I try to follow the law.  So, you

2  know, I don't know, actually.  I would have to look at it.

3          MS. HAMILTON:  As you stand here today, what kind of

4  feelings does this bring up in you?

5          PROSPECTIVE JUROR DAVIDSON:  Well, the feelings that

6  I'm thinking about is I work for a special district.  We're a

7  wholesale water supplier.  We get sued a lot by individuals,

8  groups, that think we are doing something illegal.  From our

9  point of view, that may or may not be true, but our charge, our

10 mission, is to provide potable water.  So I'm not quite sure.

11         MS. HAMILTON:  Thank you.  Pardon me.

12         Judge Patel made a point of talking about -- that the

13 standard of proof here is beyond a reasonable doubt.  As she

14 said, it's not a hundred percent, but it's beyond a reasonable

15 doubt.

16         In other words, taking your own common sense, and

17 applying it to the evidence we hear.

18         Is there anyone here -- raising your hand -- who

19 would be uncomfortable with that standard?  Who needs more

20 proof?  I need a hundred percent?  If I'm going to stand in

21 judgment of another person, I want to be a hundred percent sure

22 that that -- that that person did break the law, or didn't?

23 Anybody?

24         And I think Judge Patel checked, but I just want to

25 be extra clear.  Is there anyone else who speaks Russian who's

1    sitting on the panel today?

2              Other languages, but not Russian?

3              All right.  Thank you.  Your Honor, I will pass the

4    baton.

5              **THE COURT:**  Who is proceeding first?

6              **MS. BOERSCH:**  I think Will.  Mr. Osterhoudt.

7              **MR. OSTERHOUDT:**  Well, good afternoon.  I'm not going

8    to go on a long time, because you've been pretty thoroughly

9    questioned, I think, by Judge Patel and by Ms. Hamilton.  There

10   are a couple of things, though, that were raised and not

11   developed too much.  And I just wanted to dispose of them.

12             We talked a little about omissions.  You conceal or

13   you don't say something.  And some people expressed a view that

14   that seems odd.

15             I think what you'll hear in this case -- and this

16   isn't the time to do it detailed -- a lot about intent, and the

17   concept that, to be guilty of a fraud, a person has to have

18   criminal intent.  That, here, means the intent -- it was based

19   on concealment.  It has to be something that should be

20   concealed; that defendant knows it; and the defendant doesn't

21   do it, on purpose, to keep it away from somebody.  So we'll be

22   talking about that element in our case.

23             Does everyone understand that?  Comfortable with that

24   concept?  Our law has intent, and acts.  They always have to

25   both be there.  And in this case, you will hear a lot about

**JURY VOIR DIRE**

1    that element.

2           Now, Mr. Ramos, I was a little concerned.  And I

3    appreciate particularly that you've been very open and candid

4    with us here about your background, and what you do, and how

5    you're feeling; but my understanding is you have -- you're a

6    retired police officer, correct?  You spend a lot of time

7    believing that you acted properly as such, and you didn't

8    arrest people unless there was probable cause, you said,

9    correct, in your judgment?  And since then, you've taught in a

10   law enforcement field, right?

11          **PROSPECTIVE JUROR RAMOS:**  Correct.

12       **MR. OSTERHOUDT:**  And, as I understand, when you

13   shared with us when Judge Patel was asking questions -- is it

14   difficult for you to lay that background aside when you're in

15   this case, listening to this evidence?  I know you mean to do

16   it, but is it maybe a little hard?

17          **PROSPECTIVE JUROR RAMOS:**  It might be hard.

18       **MR. OSTERHOUDT:**  I mean, do you think that perhaps in

19   a case like this, and even -- I appreciate how fair -- we all

20   want to be fair.  We all bring with it our life experiences;

21   everything we've ever done and learned, as experience.  Would

22   that be, maybe, a case that would better if you didn't sit on a

23   particular criminal case like this?

24          **PROSPECTIVE JUROR RAMOS:**  I'm not sure.  It's going

25   to be hard, because I think I'm probably going to be more

<u>**JURY VOIR DIRE**</u>

1  judgmental of how the investigation was handled than -- than,

2  you know, what's really going on.  So that's a good question.

3        MR. OSTERHOUDT:  Well, let me put it this way.

4  Sometimes we ask you this.  Imagine, if you can, yourself in a

5  place where Mr. Prilik was here, facing these serious charges,

6  to be judged by this jury.  Would you be comfortable with 12

7  people in the box -- jury box -- who had your state of mind?

8        PROSPECTIVE JUROR RAMOS:  Well, I think I would be --

9  you'd challenge.  I mean, if I was the attorney, I wouldn't

10 have me on it.

11       MR. OSTERHOUDT:  And that -- well, I didn't say that.

12       PROSPECTIVE JUROR RAMOS:  I mean, I'm being honest

13 with you.

14       MR. OSTERHOUDT:  I appreciate it very, very much.

15 These are difficult things.  We all try to be honest as we can.

16 We all do that.  And I think that sometimes it's very hard.

17 And maybe it's a little hard for you in this particular case,

18 in view of your background.

19       PROSPECTIVE JUROR RAMOS:  It's possible.

20       MR. OSTERHOUDT:  Okay.  Would you prefer not to sit,

21 because of that feeling?  You know how sure we have to be that

22 people can be completely --

23       PROSPECTIVE JUROR RAMOS:  I think I could be fair.  I

24 just think that the experience part of it -- it is going to be

25 tough for me to put that aside --

1          **MR. OSTERHOUDT:**  Yes, right.

2          **PROSPECTIVE JUROR RAMOS:**  -- in looking at it, but

3    that doesn't mean I can't be fair.  I mean --

4          **MR. OSTERHOUDT:**  Because you try to be?

5          **PROSPECTIVE JUROR RAMOS:**  Yes, I would try to be.

6          **MR. OSTERHOUDT:**  But you don't know if you can be, or

7    not?

8          **PROSPECTIVE JUROR RAMOS:**  I would not want them to

9    get convicted if they didn't do anything.

10         **MR. OSTERHOUDT:**  You don't know, though, whether you

11   might -- whether you can really do that, or not?  Is that a

12   fair statement?  You'd try, but you don't know?

13         **PROSPECTIVE JUROR RAMOS:**  I would try.  I don't know.

14         **MR. OSTERHOUDT:**  Okay.

15         **THE COURT:**  Well, you mentioned something about your

16   being concerned you might second-guess the investigation?

17         **PROSPECTIVE JUROR RAMOS:**  Not really second-guess.

18   Just how well was it organized?  Did they cover all of the

19   basics?

20         **THE COURT:**  Would that -- would that -- how would

21   that cut?  Would that cut against the Government, maybe, and

22   say, "Look.  They did a lousy job, you know"?

23         **PROSPECTIVE JUROR RAMOS:**  I don't know.  They might

24   do a great job here.

25         **THE COURT:**  Or you might say they did a lousy job.

**JURY VOIR DIRE**

1    And what would happen then?

2         **PROSPECTIVE JUROR RAMOS:**  It's still going to be

3    based upon what -- you know, the evidence that you present.

4         **THE COURT:**  Okay.

5         **PROSPECTIVE JUROR RAMOS:**  And it's -- you know, they

6    could do a great job.  And these two teams could do a terrible

7    job.  So it just depends on, you know, what comes out.

8         **THE COURT:**  Okay.

9         **MR. OSTERHOUDT:**  As long as you can be open,

10   completely, and fair, that's all we can ask, you know.  That

11   you're satisfied with your ability to do that -- that's all

12   that anybody can ask.

13        I had a question for Ms. Harris.  You mentioned a

14   couple of times to us the Defense Intelligence Agency.  Your

15   son-in-law, is it --

16        **PROSPECTIVE JUROR HARRIS:**  My son-in-law.

17        **MR. OSTERHOUDT:**  -- is there?

18        Now, you know, in this case, that agency is not

19   involved, but we have an allegation of fraud; defrauding a

20   government agency.  Is that -- does that create any kind of

21   doubt in your mind about your ability to judge it openly and

22   fairly?  Hard question.

23        **PROSPECTIVE JUROR HARRIS:**  I don't think -- you know,

24   I think I could judge on what I hear.

25        **MR. OSTERHOUDT:**  We'll have contracting officers come

1  in, I think, from the agency, TACOM, which is involved in our

2  case.  And they'll be testifying.  And their testimony may

3  differ or diverge from that of defense witnesses in some ways,

4  or from that of the people on trial.  Would that be a problem

5  for you, in view of that connection?  Only you know that, so

6  that's why I'm asking you that.

7         PROSPECTIVE JUROR HARRIS:  It would depend on how I

8  judge the witnesses; whether I felt they were being truthful.

9         MR. OSTERHOUDT:  In other words, Judge Patel will

10 give jury instructions about how you look at witnesses, in

11 general, right?

12        PROSPECTIVE JUROR HARRIS:  Right.  I mean, it's a

13 difficult thing for me to say, "Yes," you know; to say, "Yes, I

14 would feel that way," or, "No, I wouldn't."

15        MR. OSTERHOUDT:  I guess all I can ask is:

16 Automatically, would you feel that way?

17        PROSPECTIVE JUROR HARRIS:  Not automatically.

18        MR. OSTERHOUDT:  Fine.  You think you can judge a

19 Government witness, an Army witness, or a person who works for

20 the Army by just the same standards that the Court advises you

21 to look at all witnesses?

22        PROSPECTIVE JUROR HARRIS:  I hope so.

23        MR. OSTERHOUDT:  Can you assure us that you can do

24 that to the best of your ability?

25        PROSPECTIVE JUROR HARRIS:  To the best of my ability.

1        **MR. OSTERHOUDT:**  We're not trying to seek perfection

2   here, but it's very important to both sides that everybody has

3   a fair, level playing field here, because the stakes are very

4   high.  So I appreciate you being candid with us in that regard.

5        **THE COURT:**  She just wants to know what her

6   son-in-law is doing, right?

7        **PROSPECTIVE JUROR HARRIS:**  That's true.

8        **MR. OSTERHOUDT:**  He won't tell.  He's keeping it

9   quiet.

10       Mr. Maffey, you had some experience with a friend.

11  Is it a friend that's a correctional officer at Atascadero?

12       **PROSPECTIVE JUROR MAFFEY:**  Yes.

13       **MR. OSTERHOUDT:**  You mentioned that to us in response

14  to a general question; but is that -- is there anything about

15  that that causes you to think you might view the evidence in

16  this case differently than you would otherwise?

17       **PROSPECTIVE JUROR MAFFEY:**  No, not at all.

18       **MR. OSTERHOUDT:**  Do you talk do you talk to him about

19  his responsibilities in caring for people or finding people?

20       **PROSPECTIVE JUROR MAFFEY:**  Yes.

21       **MR. OSTERHOUDT:**  And does that make you feel -- I'll

22  just ask you.  Does it create any doubt in your mind of your

23  ability to fairly judge this case -- this evidence in this

24  case?

25       **PROSPECTIVE JUROR MAFFEY:**  No.

1          **MR. OSTERHOUDT:**  Now, Mr. Schwartzler.

2          **PROSPECTIVE JUROR SCHWARTZLER:**  Yeah.

3          **MR. OSTERHOUDT:**  I appreciated your comments, because

4    you were pretty candid with us.  I think that you said that

5    you -- you have your experience of police work, right?

6          **PROSPECTIVE JUROR SCHWARTZLER:**  My cousin is.

7          **MR. OSTERHOUDT:**  Your cousin.  And are you,

8    yourself -- you're -- you're a design -- you're in the design

9    field.  Is that right?

10         **PROSPECTIVE JUROR SCHWARTZLER:**  No.  Sales.

11         **MR. OSTERHOUDT:**  Sales.  Oh, okay.  Sorry.

12   Telecommunications?

13         **PROSPECTIVE JUROR SCHWARTZLER:**  Correct.

14         **MR. OSTERHOUDT:**  And you said, I think, if I've got

15   it down right here, that it might cause you to side with the

16   Government in some ways?  I had that down.  Could you elaborate

17   on that a bit?

18         **PROSPECTIVE JUROR SCHWARTZLER:**  It wasn't about

19   telecommunications originally.  It was something that

20   Judge Patel had mentioned, in that she mentioned the example,

21   "If there's smoke, that there's fire."

22         **MR. OSTERHOUDT:**  That's it.

23         **PROSPECTIVE JUROR SCHWARTZLER:**  Part of me -- my gut

24   reaction to that is, yes, that's something that I tend to side

25   with or believe in; but I would obviously, to the best of my

1  ability, look at what was presented, and make a decision on

2  that.

3         MR. OSTERHOUDT:  I see.  Now, I think that we often

4  do use that comment and analogy of, "Where there's smoke,

5  there's fire."  These gentlemen wouldn't be here if, you know,

6  maybe there wasn't some something against them.

7         PROSPECTIVE JUROR SCHWARTZLER:  Right.

8         MR. OSTERHOUDT:  You know, is that what you kind of

9  think?

10        PROSPECTIVE JUROR SCHWARTZLER:  Like I said, that's

11 kind of my gut reaction to this scenario, yes.

12        MR. OSTERHOUDT:  And you heard Judge Patel tell the

13 state of the law, which is that the indictment is just a way of

14 getting us here.  You know, there's no evidence of anything.

15        PROSPECTIVE JUROR SCHWARTZLER:  Right.

16        MR. OSTERHOUDT:  They're presumed to be innocent.

17 The burden is on the Government throughout the case.  They

18 don't have any obligation to present anything.

19        PROSPECTIVE JUROR SCHWARTZLER:  Right.

20        MR. OSTERHOUDT:  Are you okay with those rules?

21        PROSPECTIVE JUROR SCHWARTZLER:  Yes.

22        MR. OSTERHOUDT:  I don't think you're unique in

23 thinking what you told us; that, you know, maybe we're all here

24 together for this serious proceeding; somebody must have

25 thought there was a reason to do it.

<u>**JURY VOIR DIRE**</u>

1              **PROSPECTIVE JUROR SCHWARTZLER:**  Right.

2              **MR. OSTERHOUDT:**  Are you willing to accept the

3    Judge's instruction that that's not the rule?  The rule is that

4    this charge means nothing at all?

5              **PROSPECTIVE JUROR SCHWARTZLER:**  Yeah, I'm willing to

6    accept the instructions given, and to try and follow those to

7    the best of my ability, but part of me is still somewhat

8    skeptical that my gut reaction might come into play.  Yeah,

9    it's a possibility.

10             **MR. OSTERHOUDT:**  And what I want to know -- it's very

11   important to know that you think you can overcome that gut

12   reaction, because if you can't, there's nothing wrong with

13   that, as long as we know about it.

14             **PROSPECTIVE JUROR SCHWARTZLER:**  I still would tend to

15   believe that we're all here for some reason, obviously.  The

16   point of it is to figure out whether they're guilty or not

17   guilty.  And I do believe that I would be able to overcome that

18   feeling; that gut reaction.

19             **MR. OSTERHOUDT:**  I think the Judge said what we're

20   here for is to see if the Government can prove beyond a

21   reasonable doubt.  Is that okay with you?

22             **PROSPECTIVE JUROR SCHWARTZLER:**  Yes.

23             **MR. OSTERHOUDT:**  Thank you.  I'm sorry to belabor the

24   point.  You can see where we have to be really careful.

25             **PROSPECTIVE JUROR SCHWARTZLER:**  Sure.

<u>**JURY VOIR DIRE**</u>

1          MR. OSTERHOUDT:  Thank you very much.

2          I think sometimes we -- we grab hold of a turn of

3   phrase that somebody uses, which reminds me -- which might mean

4   nothing at all.  That's why we have to inquire about it.

5          I think, Ms. Thompson, the phrase I heard was -- was

6   "I'm hoping I can be impartial."  Is it a hope or a wish or a

7   prediction?

8          PROSPECTIVE JUROR THOMPSON:  No.  I think that,

9   hearing the facts, I'd be able to weigh them evenly.

10          MR. OSTERHOUDT:  And you did have a friend, I think,

11   that goes after fraudsters?

12          PROSPECTIVE JUROR THOMPSON:  My son.

13          MR. OSTERHOUDT:  Your son.  That's a good friend.

14          PROSPECTIVE JUROR THOMPSON:  My son's an attorney.

15          MR. OSTERHOUDT:  He pursues fraud cases?

16          PROSPECTIVE JUROR THOMPSON:  With insurance.  He

17   works for Triple A.

18          MR. OSTERHOUDT:  He works for Triple A.  Okay.  And

19   in our case, of course, the defendants are in business; a

20   business up in Canada which supplies night-vision goggles, you

21   know, for these different contracts.  And they're accused of

22   committing fraud against this Government agency, TACOM,

23   because.  The Government says they omitted to tell them about

24   an arrangement they had that you'll hear about.

25          Now, anything in what you've heard when you spoke to

1    your son about his work that affects your judgment of that kind

2    of case that I described?

3         **PROSPECTIVE JUROR THOMPSON:**  I don't think so, no.

4    This isn't with individuals who are trying to, you know, take

5    advantage of the insurance.

6         **MR. OSTERHOUDT:**  Right.  People are trying to scam

7    the insurance company.

8         And you understand that's not this kind of a case.

9         **PROSPECTIVE JUROR THOMPSON:**  Exactly.

10        **MR. OSTERHOUDT:**  And again, Mr. Beker and

11   Mr. Prilik -- you know, they can be assured and comfortable in

12   your fairness openmindedness when you listen to this case.  Is

13   that right?

14        **THE COURT:**  We need to have a verbal answer for the

15   record.

16        **PROSPECTIVE JUROR THOMPSON:**  Yes.

17        **THE COURT:**  What was it?

18        **PROSPECTIVE JUROR THOMPSON:**  Yes.

19        **THE COURT:**  Okay.  Thank you.

20        **MR. OSTERHOUDT:**  I wanted to just ask a couple of

21   questions of Ms. Novitski.

22        Ms. Novitski, your husband -- he's with San Francisco

23   Police Department, but he's not an officer, right?

24        **PROSPECTIVE JUROR NOVITSKI GODMINTZ:**  Right; not

25   sworn.

1          MR. OSTERHOUDT:  Pardon me?

2          PROSPECTIVE JUROR NOVITSKI GODMINTZ:  Nonsworn.

3          MR. OSTERHOUDT:  Does that -- can you say you do

4    identify with law enforcement more than you do with other

5    people that might be testifying or in trial?

6          PROSPECTIVE JUROR NOVITSKI GODMINTZ:  I guess maybe

7    think about it might, having worked for the Police Department,

8    just in their training facility; but I can't -- I don't think I

9    really --

10         MR. OSTERHOUDT:  What did you do for their training

11   facility?

12         PROSPECTIVE JUROR NOVITSKI GODMINTZ:  I helped

13   trained the police-officer recruits.

14         MR. OSTERHOUDT:  Pardon?

15         PROSPECTIVE JUROR NOVITSKI GODMINTZ:  I was a role

16   player for the training of the police-officer recruits.

17         MR. OSTERHOUDT:  As a role player?

18         PROSPECTIVE JUROR NOVITSKI GODMINTZ:  Mm-hm.

19         MR. OSTERHOUDT:  What kind of roles did you play?

20         PROSPECTIVE JUROR NOVITSKI GODMINTZ:  Scenarios of

21   domestic violence, child abuse.

22         MR. OSTERHOUDT:  Our case is a world away from that

23   kind of situation.  You understand that?

24         PROSPECTIVE JUROR NOVITSKI GODMINTZ:  Yes.

25         MR. OSTERHOUDT:  How about our case?  Can you fairly

1    judge it?

2             **PROSPECTIVE JUROR NOVITSKI GODMINTZ:**  I believe so.

3         **MR. OSTERHOUDT:**  Nothing in your experience causes

4    you to have any doubt about that, that you would share?

5             **PROSPECTIVE JUROR NOVITSKI GODMINTZ:**  No.

6         **MR. OSTERHOUDT:**  That's the final thing I wanted to

7    say before I hand this over, is that -- is that all we're

8    asking for is your best assessment, your honest assessment,

9    reassuring all parties of your impartiality.  No one wants any

10   side's favored, but as long as -- I appreciate you've all told

11   us that you can do this, and we take you at your word, and

12   appreciate it.  And thank you.

13        **THE COURT:**  I gather you're going to be doing the

14   remaining questions, Ms. Boersch?

15        **MS. BOERSCH:**  I'll be quick, because I know

16   everyone's getting very tired of sitting here.

17            And I just echo what Mr. Osterhoudt just said, and

18   thank you all for your forthrightness.  It is really, really,

19   important that we understand everybody's views on things, so

20   that we can assure that both sides get a fair trial, because

21   that's what this system is based on.  It's very important.

22            Can I get a show of hands of the number of you?

23   Several of you had either been a witness in a criminal case, or

24   testified in a criminal case before.  Could I get a show of

25   hands again of those of you who had?

1          So I have a general question for those of you who

2   have.  Was there anything about the process that might hinder

3   your ability to be fair here in this criminal trial?

4          In other words, do you have the view, having

5   participated in this process from one side, that the guy who --

6   or girl -- whoever -- they were guilty in my case, and so I

7   assume that's the case in most criminal cases?  Is there

8   anything about your involvement in the process that would lead

9   you to have a bias, one way or the other, in a criminal case?

10          **PROSPECTIVE JUROR CALDERON:**  No.  Risa Calderon.

11          **MS. BOERSCH:**  Okay.  You think you could be fair,

12   although you've had experience in a criminal case which was a

13   very different criminal case than this one?

14          **PROSPECTIVE JUROR CALDERON:**  Yes.

15          **MS. BOERSCH:**  Has anyone here ever traveled to the

16   former Soviet Union?

17          Ms. Harris, you have you mentioned that.

18          And I'm sorry.  You were in the former --

19          **PROSPECTIVE JUROR KAMEOKA:**  I've just been over to

20   Russia on a tour.

21          **MS. BOERSCH:**  Where did you go?

22          **PROSPECTIVE JUROR KAMEOKA:**  St. Petersburg.

23          **MS. BOERSCH:**  St. Petersburg.  Did you enjoy it?

24          **PROSPECTIVE JUROR KAMEOKA:**  Yes.  It was beautiful.

25          **MS. BOERSCH:**  And someone else back there has been?

1          **PROSPECTIVE JUROR DICKINSON:**  Leningrad.

2          **MS. BOERSCH:**  When was that, that you were there?

3          **PROSPECTIVE JUROR DICKINSON:**  Few years ago.  Ten

4    years ago.

5          **MS. BOERSCH:**  Did you enjoy it?

6          **PROSPECTIVE JUROR DICKINSON:**  Yes.

7          **MS. BOERSCH:**  Either of you have any negative

8    experiences that you think might affect your ability to be fair

9    in this case to these defendants?

10          **PROSPECTIVE JUROR DICKINSON:**  No.

11          **MS. BOERSCH:**  Ms. Harris, anything in your

12   experience?

13          **PROSPECTIVE JUROR HARRIS:**  My husband did not have a

14   good business experience.

15          **MS. BOERSCH:**  And do you think you might have a hard

16   time setting that aside, if you were to sit on a jury in this

17   case with these defendants?

18          **PROSPECTIVE JUROR HARRIS:**  I would try.

19          **MS. BOERSCH:**  I appreciate that.  Do you have some

20   doubts, though, that you might not be able to?  We -- it would

21   be understandable, but we just need your honest opinion about

22   it.

23          **PROSPECTIVE JUROR HARRIS:**  Maybe if I saw a

24   similarity with one of the characters to one of the characters

25   that my husband dealt with, that didn't go -- it would be

1    difficult.

2         **MS. BOERSCH:**  So you might have some difficulty

3    setting aside your own personal experience, in order to judge

4    the evidence in this case?

5         **PROSPECTIVE JUROR HARRIS:**  It's possible.

6         **MS. BOERSCH:**  I think you also mentioned that you --

7    because of the work of your son-in-law, you might have a

8    tendency to favor the Defense Department?  Is that correct?

9         **PROSPECTIVE JUROR HARRIS:**  I don't remember saying

10   that.

11        **MS. BOERSCH:**  Or a tendency to believe the Defense

12   Department?  I might have you -- I might have it wrong.  You

13   don't think you would have a tendency to?

14        **PROSPECTIVE JUROR HARRIS:**  I would like to think I

15   could be, you know -- have a sort of well-balanced view.

16        **MS. BOERSCH:**  And do you feel confident that you

17   would be able to, particularly given your husband's experience?

18        **PROSPECTIVE JUROR HARRIS:**  It could be difficult.

19        **MS. BOERSCH:**  Okay.

20        Mr. Miller, I think did you mention that your wife

21   worked for a clinical laboratory.

22        **PROSPECTIVE JUROR MILLER:**  Clinical diagnostic

23   laboratory director.

24        **MS. BOERSCH:**  For which clinical lab?

25        **PROSPECTIVE JUROR MILLER:**  Right now?  It was years

1   ago.  San Francisco Health Department; but recently, she's been

2   doing a couple of small labs biotechnology.  One of them is

3   XDx, which does heart-rejection blood tests for transplant

4   patients.

5          And then the other one is a company that does

6   prediagnostic testing for diabetes.

7          **MS. BOERSCH:**  No DNA or any testing related to the

8   criminal testing system?

9          **PROSPECTIVE JUROR MILLER:**  No, nothing related to

10  criminal tests.

11         **MS. BOERSCH:**  Okay.  Thank you.

12         Ms. Reed, you were acquainted with Ms. Hamilton, as I

13  understand, from years ago.  Do you think you would be able to

14  fairly judge my client and Mr. Osterhoudt's client in this

15  case, despite your acquaintance with Ms. Hamilton?

16         **PROSPECTIVE JUROR REED:**  Certainly.

17         **MS. BOERSCH:**  You think you'd be able to set aside

18  feelings, one way or the other, you may have had about

19  Ms. Hamilton in the past?

20         **PROSPECTIVE JUROR REED:**  Yes.

21         **MS. BOERSCH:**  If I could have just one sec.

22         (Discussion off the record)

23         I don't have any other questions.  Thank you all

24  again very much for your patience, and for being very

25  forthright with us.  We appreciate it.  Thanks.

1            THE COURT:   You can give it to Mr. Bowser?

2            Ms. Harris, you said it might be difficult.

3            The question is:  Can you assure, even if it is

4    difficult, that you can set aside any of this other information

5    that's coming -- you know, that's come to you from outside this

6    case, put that aside, and satisfy the defendants in this case

7    and the Government in this case that they will each get a fair

8    trial from you?

9            PROSPECTIVE JUROR HARRIS:   Yes, I think so.

10           THE COURT:   And you say you think so.  Can you assure

11   them?

12           PROSPECTIVE JUROR HARRIS:   I would certainly like to

13   think that I could, and -- but it's very difficult to be

14   certain.

15           THE COURT:   Okay.  What kind of thing might -- might

16   trigger your being -- you know, you're going from "I'm going to

17   be fair" to, "Oh, my God."  You know?  You know what I'm

18   talking about?

19           PROSPECTIVE JUROR HARRIS:   Yes.

20           My husband had a very bad business experience.

21           THE COURT:   And where was it?  In what part of Russia

22   was it?

23           PROSPECTIVE JUROR HARRIS:   That was in Moscow.

24           THE COURT:   Was this when it was still in the Soviet

25   Union?

1          **PROSPECTIVE JUROR HARRIS:**  Yes.  Yes.

2          **THE COURT:**  You understand that there are a lot of

3   people who are Russian here.  And they're not all the same,

4   right?

5          **PROSPECTIVE JUROR HARRIS:**  I know.  And some of them

6   are delightful.  Many of them are delightful, but --

7          **THE COURT:**  Do you have any preconception about these

8   individuals who are here?  I mean, they left Russia, right; or

9   left Moldova?

10          **PROSPECTIVE JUROR HARRIS:**  I don't have any

11   preconception, no.  I'm sure they're delightful people.  And --

12          **THE COURT:**  And even if they're not delightful, the

13   question is:  They're presumed to be innocent, right?

14          **PROSPECTIVE JUROR HARRIS:**  Right.

15          **THE COURT:**  And --

16          **PROSPECTIVE JUROR HARRIS:**  And honest.

17          **THE COURT:**  Can you give them that presumption, and

18   then hold the Government to the burden of proving the charges

19   by proof beyond a reasonable doubt?

20          **PROSPECTIVE JUROR HARRIS:**  I think so.

21          **THE COURT:**  Well, if --

22          **PROSPECTIVE JUROR HARRIS:**  I can't do better than "I

23   think so."  I'm sorry.

24          **THE COURT:**  And the question is:  is that good

25   enough?

1          If you were seated at -- you know, in the place of

2    one of the defendants in the case, or their attorney, would you

3    be satisfied?  I mean, we just asked the defendants -- the

4    defendants in this case -- would you be satisfied having you on

5    the jury, any more than anybody else?  I mean, any reason why

6    you couldn't be as fair as anybody else on the jury?

7          **PROSPECTIVE JUROR HARRIS:**  Because that's a sort of

8    negative feeling I have, I probably would not be happy having

9    me on the jury, no.  That's -- I would -- I would really try to

10   be fair, and judge as it was; but I would find it very

11   difficult to put all of these -- because it was very bad

12   experience.  And --

13          **THE COURT:**  Okay.  Counsel, is there a stipulation,

14   or --

15          **MR. HOWDEN:**  Yes, your Honor.

16          **MR. OSTERHOUDT:**  Yes, your Honor.

17          **MS. BOERSCH:**  Yes.

18          **THE COURT:**  Ms. Hamilton?

19          **MS. HAMILTON:**  We're content with Ms. Harris.

20          Okay.  Yes.  Yes, we will stipulate.

21          **THE COURT:**  You will stipulate.  Oh, okay.

22          I have a feeling that you'd be perfectly fine, and do

23   a very good job; but I think we can't we have to appreciate

24   your honesty, and we can't second-guess.  So I am going to

25   excuse you from this case.

1          And I'm sure there are some other cases around the

2    courthouse -- I'm sure you're happy to hear that, right? --

3    where these kinds of issues are not going to be in play.

4          So I assume you're asking for her to be excused,

5    right?

6          **MR. HOWDEN:**  Yes, your Honor.

7          **MR. OSTERHOUDT:**  Yes.

8          **THE COURT:**  Okay.  I will excuse you.  Thank you very

9    much very, very much for your candidness.  I appreciate it.  So

10   if you go back -- I'll excuse you, and you can go back to the

11   jury room.

12         **PROSPECTIVE JUROR HARRIS:**  Thank you.

13         **THE COURT:**  And then they'll give you further

14   directions.

15         And we'll have to replace Ms. Harris in Juror Seat

16   Number Two.  Just when the rest of you thought you were -- you

17   were home free now, right?

18         Does the Government have any -- Ms. Hamilton, is the

19   Government going to have any challenges for cause?

20         **MS. HAMILTON:**  Yes, your Honor.

21         **THE COURT:**  Are there any others, as well?

22         **MR. OSTERHOUDT:**  Yes.

23         **MR. HOWDEN:**  Yes.

24         **THE COURT:**  Let me see you with the reporter at the

25   side bar very quickly.

154

```
 1              (Whereupon the following proceedings were held at
 2              Side bar, out of the presence of the jury)
 3         MR. OSTERHOUDT:  Did the Government have any
 4    challenges?  Did the Government?  Do you want to hear the
 5    Government's challenges?
 6         MS. HAMILTON:  Mr. Butenko does not understand
 7    English very well.
 8         MR. OSTERHOUDT:  I would agree with that.  I don't
 9    think we can --
10         MR. HOWDEN:  To the extent that he does, it's an
11    impossible burden to put on him to ignore the Russian language.
12         MS. HAMILTON:  We agree.
13         THE COURT:  He may not be that refined in his
14    thinking.  Okay.  Is that it?
15         MS. HAMILTON:  Yes.
16         MR. OSTERHOUDT:  Mr. Ramos.  He -- he tried to
17    rehabilitate himself, but first he said --
18         THE COURT:  I thought he did a remarkable job.
19         MR. OSTERHOUDT:  But it wasn't honest, though,
20    because he said that he would rather not.  He wouldn't want
21    these people to -- he would not want to be judged by people
22    like him; his attitude.  He's totally immersed in police work,
23    and I don't think that he can put that aside.  And, in spite of
24    his stations, I do think that it's clear enough that he
25    shouldn't serve.
```

1        **MS. BOERSCH:**  I would think he did.  He was very

2   clear that -- he said if he was an attorney, he wouldn't want

3   him on the case.

4        **THE COURT:**  Well, I don't know about that.  I always

5   wonder what that really means.

6        **MS. BOERSCH:**  He also said that he was -- he is -- he

7   thought that he would not be able to set aside his white-collar

8   work.

9        **MS. HAMILTON:**  I don't think he said that.

10       **THE COURT:**  I think he repeated himself a number of

11  times, in terms of assuring that he would be -- you know, he

12  could be fair.

13       So any other challenge for cause, or is that it?

14       **MR. HOWDEN:**  Not on behalf of Mr. Beker.

15       **MR. OSTERHOUDT:**  I'm sorry, your Honor.  One moment.

16  Well --

17       **THE COURT:**  Somebody you'd like to get rid of on

18  peremptories?

19       **MR. OSTERHOUDT:**  That Republican guy.  You know,

20  there's a reason why he can't --

21       **THE COURT:**  Whole slouching attitude's --

22       **MR. OSTERHOUDT:**  Slouches.  Therefore, we move --

23       **THE COURT:**  But that's a peremptory, I'm afraid.

24       **MR. OSTERHOUDT:**  I guess that's it.

25       **MS. HAMILTON:**  Thank you, your Honor.

1          (End of proceedings at side bar)

2          **THE COURT:**  I appreciate you all are getting

3   exhausted, but I want to get it finished, and let you go.

4          Mr. Butenko, we're going to excuse you, also, from

5   the jury.  If you would, go back to the jury room, please.

6   Thank you.

7          And Mr. Bowser will call two names; one to be seated

8   here, and one to be seated in Mr. Butenko's seat.

9          **THE CLERK:**  Jeffrey Day.

10          **THE COURT:**  Mr. Day, if you'd come up here and take

11   this seat, please.

12          **THE CLERK:**  Richard Pascual.

13          **THE COURT:**  And, Mr. Pascual, there's an empty seat

14   over there.  If you would, take that one, please.

15          And are there some of those sheets there, so that

16   Mr. Day can tell us about himself?  Can you tell us about

17   yourself, please?  And good afternoon.

18          **PROSPECTIVE JUROR DAY:**  Well, certainly.  Good

19   afternoon.  I'm Jeff Day.  I live in San Francisco.  I have

20   lived in the Bay Area all my life:  Sunnyvale, Berkeley, and

21   San Francisco for the last couple of years.  I'm single.  No

22   kids.  I am a software engineer.  I've been there for -- I've

23   been in my current company for almost three years; been a

24   software engineer for about five.

25          **THE COURT:**  What company with you with now?

1          **PROSPECTIVE JUROR DAY:**  I'm at a company called

2   "Quantcast."  I have a bachelor's of science in Electrical

3   Engineering and Computer Science.  I went to Cal Berkeley.  I

4   have no military service.  Hobbies and leisure activities?

5   Computer games, cooking, music.  Not a member of any

6   organizations.  Reading material or subscriptions -- I have one

7   subscription to, like, a British music magazine called *"The*

8   *Wire*."  Most of my reading is just the Internet, really.

9   Television.  I don't really watch much, aside from the

10  occasional sports game.  I don't own a car, so I don't have any

11  bumper stickers.  As far as the Internet goes, just the usual

12  stuff:  social networking, keeping in touch with people, news,

13  stuff like that.

14          **THE COURT:**  Okay, thank you.

15          And -- you can be seated.  Have you served on a jury

16  before?

17          **PROSPECTIVE JUROR DAY:**  I have not.

18          **THE COURT:**  Okay.  And have you heard all the

19  questions and the answers, ad nauseum, right?

20          **PROSPECTIVE JUROR DAY:**  Yes.

21          **THE COURT:**  Yes, okay.

22          **PROSPECTIVE JUROR DAY:**  So I should probably tell you

23  I have two friends that are lawyers and neither have done any

24  work with criminal proceedings or anything like that.  And I

25  have one friend who works for Applied Singles, which does

158

contracting work for the defense industry, but I don't really

talk to him that much.

THE COURT:  Okay.  So anything about those

relationships that would in any way -- things that you have

learned from them?  For example, that would spill over into how

you listen to and decide this case?

PROSPECTIVE JUROR DAY:  No, that would not influence

my thinking on the case.

THE COURT:  And how about your willingness to adhere

to the rules of defendants are merely charged in the indictment

and that's a means of telling them what the charges are, it's

not evidence?

PROSPECTIVE JUROR DAY:  Yes, I have no problem.

THE COURT:  That the evidence comes from witnesses

and so forth and the government has the burden of proof and

they are presumed innocent, so it's the government's job to

prove their guilt by proof beyond a reasonable doubt.

Do you agree with all those principles?

PROSPECTIVE JUROR DAY:  Yes.  Yes, I do.

THE COURT:  And you could live with them in this

proceeding?

PROSPECTIVE JUROR DAY:  I certainly can.

THE COURT:  And you have had a chance to sit and

listen to what the attorneys had to say and look at some of the

parties involved in the case and so forth.  Anything trigger in

1  your mind, Hmm, I don't know if -- it would be a little hard

2  for me to be fair to one or the other for some reason?

3              **PROSPECTIVE JUROR DAY:**  No, I didn't have any

4  thoughts like that.

5              **THE COURT:**  Do you have any feelings about the

6  government and the government bringing fraud charges against

7  people?

8              **PROSPECTIVE JUROR DAY:**  Not really.

9              **THE COURT:**  Any feelings about the military or any

10 feelings about Iraq that might spill over into this case?

11             **PROSPECTIVE JUROR DAY:**  Nothing that would influence

12 my view of the case.

13             **THE COURT:**  And do you speak Russian?

14             **PROSPECTIVE JUROR DAY:**  I certainly don't.

15             **THE COURT:**  Okay.  Is there anything about the fact

16 that the defendants originally came from Russia -- they are

17 Canadian now, one has Israeli citizenship as well, but any of

18 that that would taint your thinking in any way?

19             **PROSPECTIVE JUROR DAY:**  No, definitely not.

20             **THE COURT:**  Have you ever traveled to Russia or the

21 Soviet Union?

22             **PROSPECTIVE JUROR DAY:**  I have not.

23             **THE COURT:**  Yes.  Thank you for standing.  And I will

24 get your name here in just a minute.

25             Mr. Pascual.  And what is your first name?

1              **PROSPECTIVE JUROR PASCUAL:**  Richard.

2              **THE COURT:**  Richard.  Tell us about yourself, please?

3              **PROSPECTIVE JUROR PASCUAL:**  Let's see.  I have lived

4  in the Bay Area for about 37 years, minus five years for

5  college down in San Diego.  I am single, but I have a domestic

6  partner.  No kids.

7              My occupation is a business analyst for Charles

8  Schwab and Company, so I write business requirements.  My

9  partner's occupation, he's a staff attorney for the Court of

10  Appeals, state level.

11              I have a Bachelor's in finance.

12              No military service.

13              Hobbies.  I like to run, swim, snowboard.

14              No membership organizations.

15              Reading material.  I have a subscription to *Newsweek*,

16  read a lot of online and news sites and finance sites.

17              Television.  Mostly sporting events, HDTV.

18              No bumper stickers.

19              Internet use, mostly email and again kind of online

20  use sites.

21              **THE COURT:**  Okay.  Thank you.

22              Now, obviously, I have a couple of questions about

23  your partner.  Did your partner ever work either as a

24  prosecutor or  criminal defense attorney at any time?

25              **PROSPECTIVE JUROR PASCUAL:**  No.

161

```
 1              THE COURT:  And is your partner working for a

 2   particular judge or assigned to a pool of judges?

 3              PROSPECTIVE JUROR PASCUAL:  He works for Judge

 4   McGinnis.

 5              THE COURT:  Okay.  And what does he -- or she talk

 6   about you about their work?

 7              PROSPECTIVE JUROR PASCUAL:  Not a whole lot.

 8              THE COURT:  Okay.  Do you hear anything about

 9   criminal cases in your discussions at all?

10              PROSPECTIVE JUROR PASCUAL:  Not a whole lot, other

11   than, you know, once it's complete, I might have some general

12   things to say about it.

13              THE COURT:  Do you hear anything about lawyers?

14              PROSPECTIVE JUROR PASCUAL:  Just general stuff,

15   nothing in particular.

16              THE COURT:  Anything that gives you sort of any

17   negative feelings about lawyers?

18              PROSPECTIVE JUROR PASCUAL:  No.

19              THE COURT:  Okay.  And did you hear all the questions

20   and answers of the other jurors?

21              PROSPECTIVE JUROR PASCUAL:  Yes, I have.

22              THE COURT:  Too many times, right?

23              PROSPECTIVE JUROR PASCUAL:  Yes.

24              THE COURT:  So your job was to think, Gee, is there

25   something I should tell them when I got there?  Is there
```

1  something you should tell us?

2       **PROSPECTIVE JUROR PASCUAL:**  No, other than just kind

3  of disclosing my partner is an attorney.

4       **THE COURT:**  And have you ever served on a jury

5  before?

6       **PROSPECTIVE JUROR PASCUAL:**  Yes, and it was a civil

7  case.

8       **THE COURT:**  And so you remember that that's a

9  different burden of proof?

10      **PROSPECTIVE JUROR PASCUAL:**  Correct.

11      **THE COURT:**  And you could live with that?

12      **PROSPECTIVE JUROR PASCUAL:**  Correct.

13      **THE COURT:**  And I just went over with Mr. Day, so I

14 don't want to repeat it again, but you heard what we talked

15 about with respect to the presumption of innocence and the

16 burden of proof and all of that.

17      Anything about any of that that concerns you in terms

18 of being fair in this case?

19      **PROSPECTIVE JUROR PASCUAL:**  No.

20      **THE COURT:**  Do you know of any reason why you

21 couldn't be fair to both sides?

22      **PROSPECTIVE JUROR PASCUAL:**  No.

23      **THE COURT:**  And any feelings that you have about the

24 government or the Department of Defense or the Army or --

25      **PROSPECTIVE JUROR PASCUAL:**  No.

```
 1              THE COURT:  (Continuing) -- Iraq, the Iraq war --

 2              PROSPECTIVE JUROR PASCAL:  No.

 3              THE COURT:  (Continuing) -- that would influence you

 4  would you would listen to and decide this case?

 5              PROSPECTIVE JUROR PASCUAL:  No.

 6              THE COURT:  Okay.  Anything else that you think you

 7  should tell us?

 8              PROSPECTIVE JUROR PASCUAL:  I don't speak Russian.

 9              THE COURT:  Okay.  Very good.  Maybe you know all the

10  questions better than I do, so anything else?

11          Okay.  Anything about the fact that the defendants

12  originally came from Russia and they are Canadian citizens and

13  all that that might --

14              PROSPECTIVE JUROR PASCUAL:  No.

15              THE COURT:  (Continuing) -- that might interfere with

16  your thinking about this case?

17              PROSPECTIVE JUROR PASCUAL:  No.

18              THE COURT:  Okay.  Ms. Hamilton, do you have any

19  questions of either of these gentlemen?

20              MS. HAMILTON:  Just very briefly.

21          You heard the questions I had about concealment and

22  the -- this case being about what wasn't told.  Based on what

23  you heard, do either of you have any questions or feel like

24  that might be unfair, to bring a criminal case about

25  information that wasn't provided?
```

```
 1              (Prospective jurors respond negatively.)

 2              MS. HAMILTON:  Any of you had any negative

 3  experiences with law enforcement?

 4              (All prospective jurors respond negatively.)

 5              THE COURT:  Mr. Osterhoudt?

 6              MR. OSTERHOUDT:  I have no questions, your Honor.

 7              THE COURT:  Ms. Boersch?

 8              MS. BOERSCH:  No questions.  Thank you.

 9              THE COURT:  Okay.  Pass for cause except for the one

10  that I already dealt with?

11              MR. HOWDEN:  Yes, your Honor.

12              MS. HAMILTON:  Yes, your Honor.

13              THE COURT:  Okay.  Thank you.  Now it's the

14  logistics.  I think you deserve a break, but this isn't the

15  final break, okay.  Take about 15 minutes and then I will have

16  you all come back and resume your places, and that includes

17  those of you who are still in the courtroom but never had to

18  answer any questions.  Come back and at that time we will tell

19  you who is goes going to be on the jury and who is not and then

20  we will recess for the day.  Okay?

21              So follow the instruction.  Do not discuss the case

22  or anything about it with anyone else, and we will see you in

23  15 minutes.  But all the jurors should leave the courtroom

24  because we are going to have to have some discussions about who

25  gets to stay and who gets to go.
```

```
 1              (All Prospective jurors exit courtroom.)

 2              (Discussion held off the record amongst all counsel.)

 3          THE COURT:  All right.  They are going to start

 4  returning in a few, so we have got to go.  If your first two

 5  could be joint ones.  The way we divided it up -- Mr. Bowser

 6  divided it up nicely so the first two defense challenges will

 7  be joint, and then separate, separate, then a joint, then

 8  separate, separate, et cetera.  Okay?

 9              Okay.  Does the government have a challenge?

10          MS. HAMILTON:  Yes.  The government would excuse

11  juror number one.  Ms. Stathis.

12          THE COURT:  Okay.  Joint challenge?

13          MR. HOWDEN:  Number five and number 12, your Honor.

14          THE COURT:  One at a time right now at the outset.

15              Number five, and give me the names.  Is that Lau?

16          MR. HOWDEN:  Yes.

17          THE COURT:  The government has one?  And then you'll

18  get three.

19          MR. HOWDEN:  Got it.

20          MS. HAMILTON:  Number seven, Ms. Davidson.

21          THE COURT:  Ms. Davidson?

22          MS. HAMILTON:  Yes.

23          THE COURT:  Okay.  Now, one joint one.

24          MR. HOWDEN:  Number 12, Mr. Schwartzler.

25          THE COURT:  Mr. Schwartzler.
```

```
 1              And then separate ones, two -- one each here now?
 2         MR. HOWDEN:  We would exclude number 14, Ms. Whitney.
 3         THE COURT:  Ms. Whitney.  And that's a Beker
 4  challenge.
 5              And for Mr. Prilik?
 6         MR. OSTERHOUDT:  We excuse number 19, Mr. Novick.
 7         THE COURT:  Really?  Okay.  I'm sorry.
 8         MS. HAMILTON:  Was it the bumper sticker?
 9         MR. HOWDEN:  Which one?
10         (Laughter.)
11         THE COURT:  But using the services of the federal
12  courts, apparently, to recoup some money.
13              Okay.  Now, the government has one?
14         MS. HAMILTON:  Number 20, Mr. Chen.
15         THE COURT:  And now one joint one and two separate
16  ones?
17         MR. HOWDEN:  Ms. Sermeno, number 22.
18              And then number 23 Mr. Thompson.
19         THE COURT:  Thompson?  Ms. Thompson?
20         MR. HOWDEN:  Ms. Thompson, I'm sorry, your Honor.
21         THE COURT:  Okay.  And for Mister -- that's for
22  Mr. Beker.
23              And for Mr. Prilik?
24         MR. OSTERHOUDT:  Yes.  Number 29, Ms. Novitski.
25         THE COURT:  29, Ms. Novitski.
```

```
 1              Okay.  Does the government have one?

 2              MS. HAMILTON:  Number 35, Mr. Miller.

 3              THE COURT:  And a joint one and then two individual

 4  ones?

 5              MR. HOWDEN:  Mr. Ramos, number 30.

 6              THE COURT:  And for Mr. Beker?

 7              MR. HOWDEN:  Ms. Reed, number 33.

 8              THE COURT:  And for Mr. Prilik?

 9              MR. OSTERHOUDT:  Your Honor, number 36,

10  Mr. Ramchandani.

11              THE COURT:  Yes.  Okay.  And the government have any

12  challenge?

13              MS. HAMILTON:  Number 34, Ms. Rosenthal.

14              THE COURT:  And one joint and two individual.

15              DEFENSE COUNSEL:  Ms. Martine, number eight.

16              THE COURT:  Is that the joint one?

17              MR. HOWDEN:  Yes.

18              THE COURT:  Okay.  And for Mr. Beker?

19              MR. OSTERHOUDT:  If I could have just one moment,

20  your Honor?

21          (Brief pause.)

22              MR. HOWDEN:  Mr. Beker will pass.

23              THE COURT:  Okay.  And you understand you lose that

24  one, you know.

25              MR. HOWDEN:  That's correct your Honor.
```

```
 1              THE COURT:  Okay.  And Mr. Prilik?

 2          (Brief pause.)

 3              MR. OSTERHOUDT:  Your Honor, thank you.  We would

 4   excuse number 25, Mr. Cardenas.

 5              THE COURT:  25, Mister --

 6              MR. OSTERHOUDT:  Paul Cardenas.

 7              THE COURT:  Okay.  Does the government have a --

 8              MS. HAMILTON:  Yes, your Honor.  Number 32,

 9   Ms. Yamamoto.

10              THE COURT:  What's the name?

11              MS. HAMILTON:  Yamamoto.

12              THE COURT:  Ms. Yamamoto, okay.

13          Now, you have one joint one to exercise now, and then

14   the government has one, and you have two individual ones.  I

15   mean, that's how we sorted it out and that gives you each the

16   number that you were assigned.

17              MR. HOWDEN:  Where does that put us with respect to

18   the alternates, your Honor?

19              THE COURT:  Well, let's see.  What we've got are Day,

20   Gannaway, Bonacum, Maffey.  That's one, two, three, four, five,

21   six, six, seven, eight, nine, 10, 11, 12, 13, 14 -- am I right?

22   Merritt and Gillespie would be the alternates?  And all of the

23   ones before that that have not been excused would be the

24   regular jurors.

25          So Merritt and Gannaway -- Gillespie, rather, would
```

1   be the -- Merritt and Gillespie would be the alternates?

2               **THE CLERK:**  Right.

3               **THE COURT:**  No, no.  That's not right.  Gillespie

4   would be a regular juror -- no, that's right, 13.  Yeah.

5               **THE CLERK:**  Gillespie and Merritt.

6               **THE COURT:**  Gillespie and Merritt would be the

7   alternates right now.

8               **MR. WARD:**  That's what I have.

9               (Brief pause.)

10              **THE COURT:**  Going?  Going?  Pass?

11              **MR. OSTERHOUDT:**  Your Honor, we would excuse

12  Mr. Chaney, number 18.

13              **THE COURT:**  Mr. Chaney?  That's the joint one.

14              Does the government have a challenge now?

15              **MS. HAMILTON:**  Number 15, Ms. Cannon.

16              **THE COURT:**  And now you have two separate ones.  And

17  now I've lost track.  Now you're up to Kapoor and Gibson.  Is

18  that right?

19              **THE CLERK:**  Gibson and Kapoor.

20              **THE COURT:**  Kapoor and Gibson would be the

21  alternates, right?

22              **MR. HOWDEN:**  Your Honor, Mr. Beker will excuse

23  Ms. Calderon, number 13.

24              **THE COURT:**  Okay.  And Mr. Prilik has one and then

25  that's it.  So that gets us up to Gibson and Pascual as the

170

```
 1   alternates.

 2             MR. OSTERHOUDT:  We would excuse Mr. Maffey.

 3             THE COURT:  Mr. Maffey?

 4             MR. OSTERHOUDT:  Maffey, yeah.  He's number six.

 5             THE COURT:  Okay.  So that's it then.  So then that

 6   gets us up to Pascual and Kameoka as the alternates?

 7             MR. HOWDEN:  That's correct.

 8             THE COURT:  So let me read the list so we are all on

 9   the same page before we call them in here.

10             Mr. Day, Gannaway -- I can't remember whether

11   Gannaway is a man or woman, I guess a woman -- Mr. Bonacum,

12   Mr. Wong, Ms. Evans, Watson, Black, Costa, Gillespie, Merritt,

13   Kapoor-Acuna, Gibson.  Right?

14             MR. HOWDEN:  Yes, your Honor.

15             THE COURT:  Those are the regular jurors?  And

16   Pascual and Kameoka are the alternates.

17             And we lose Dickinson because there was one pass.  Is

18   that correct?

19             MS. BOERSCH:  Correct.

20             MR. HOWDEN:  Correct.

21             THE COURT:  We are all on the same page on this?

22             Okay.  You can bring them in.  We'll excuse them and

23   then I'm going to give them a couple instructions about not

24   discussing the case and all that kind of stuff, and Mr. Bowser

25   will take them back to the jury room and get them their badges
```

1    and so forth and then we will recess.

2              **MR. WARD:**  Lunch?

3              **THE COURT:**  Something like that.  Dinner, I don't

4    know, supper, afternoon tea.

5              (Prospective jurors enter courtroom.)

6              **THE COURT:**  Okay.  We have everyone here?  Just

7    about?  You may be seated, if you aren't already.

8              Okay, ladies and gentlemen.  Good news and bad news,

9    right, depending on how you look at it, I guess.

10             First of all, I want to thank you everyone who is not

11   going to end up serving on this jury for your time and your

12   patience and being willing to listen to these questions or

13   having to listen to the questions over and over again.  But

14   it's very important that we be able to do it in this fashion so

15   that -- as you can see, there weren't that many jurors left

16   over to question, that we are sort of having a representative

17   and fair and impartial jury as much as that is possible.

18             So I appreciate all of you who have had to answer the

19   questions and to go through this process and, also, for those

20   of you who had to listen, but didn't have to respond to any of

21   them.  Again, thank you very much very, very much on behalf of

22   the Court because by participating in it it's helped us to, in

23   fact, be able to get a jury.

24             So I will excuse those, other than the names I am

25   going to read.  It's easier just to read the names who are

1  going to be seated on the jury.  And I'll read it twice, just

2  to make sure we're correct.  So nobody head for the door until

3  you're sure that you are not on this jury.

4          So the following persons will be seated on the jury:

5  Mr. Day, Ms. Gannaway, Mr. Bonacum -- whose name I will learn

6  to pronounce properly at some point -- Mr. Wong, Ms. Evans, Ms.

7  Watson, Mister -- where are we here?  Mr. Black, Mr. Costa,

8  Mr. Gillespie, Merritt, Ms. Kapoor-Acuna, Mr. Gibson --

9  Ms. Gibson, I'm sorry.  I can't see there.  And Mr. Pascual.

10 And Ms. Kameoka.

11         Is that correct, Mr. Bowser?

12         **THE CLERK:**  Yes.

13         **THE COURT:**  That gives us our full 14?  And does

14 everyone agree with that?

15         **MS. HAMILTON:**  Yes, your Honor.

16         **MR. HOWDEN:**  Yes, your Honor.

17         **THE COURT:**  Okay.  So doing it again to make sure.

18 All of the names I have just read are on the jury and if you'll

19 wait here, then I will give you your instructions.  And the

20 rest of you are to go back to the jury room, is that correct,

21 for further instructions?

22         **THE CLERK:**  Yes.

23         **THE COURT:**  So, again, thank you very much.

24         Mr. Day, Ms. Gannaway, Mr. Bonacum, Mr. Wong,

25 Ms. Evans, Ms. Watson, Mr. Black, Mr. Costa, Mr. Gillespie,

1   Ms. Merritt, Ms. Kapoor-Acuna, Ms. Gibson, Mr. Pascual and Ms.

2   Kameoka.

3           Is Ms. Kameoka?  Oh, there you are.  Okay.  I

4   couldn't see.

5           You are all to remain.  And the rest of you may leave

6   and again thank you very, very much.

7           (Prospective jurors exit courtroom.)

8           **THE COURT:**  And now we will reassemble a little bit.

9   Mr. Day and Ms. Gannaway and Mr. Bonacum, if you could move up

10  here.  And then if you will come down, Mr. Wong, and take the

11  next seat in line.  And the same thing with you, Ms. Evans and

12  Ms. Watson.  And then, Mr. Black, if you take that seat?  And

13  then Mr. Costa, if you would start the back row.  And who is

14  next?  Mr. Gillespie?

15          **THE CLERK:**  Yes, Gillespie.

16          **THE COURT:**  Okay.

17          **THE CLERK:**  And then Merritt.

18          **THE COURT:**  Ms. Merritt?  If you would take the next

19  seat in the back row?

20          Ms. Kapoor-Acuna, Ms. Gibson, Mr. Pascual, and

21  Ms. Kameoka.  Okay.  Thank you.

22          And, counsel, you may all be seated.

23          So you are with us for the time that we are going to

24  try this case.  And I'm sure we can bring it in in less time

25  than what I indicated.  I gave you the outside on that.

1            Right, counsel?

2            MR. HOWDEN:  That's correct, your Honor.

3            THE COURT:  Yes, okay.

4            And what I'm going to do is just give you a couple of

5    instructions and then Mr. Bowser, the courtroom deputy, will

6    take you to the jury room right adjoining this courtroom and

7    that's where you will come every day when you report in.  You

8    will get juror badges, he will give those to you.  And then you

9    come in and show your badge so that you can get into the

10   courthouse a little more readily.  And then come directly to

11   this floor, the 18th floor, and you'll -- he'll explain to you

12   how you buzz to get in and then come directly to the jury room.

13   Don't come into the courtroom, but come into the jury room.

14           We can't start until you are all here.  So, please,

15   make sure you are here promptly at 8:30.  If you take public

16   transportation or drive across one of those bridges then, you

17   know, you have to figure that out because it can sometimes be a

18   little difficult.

19           So we'll start at 8:30 and we will recess at 1:30.

20   You know, if we happen to be in the course of a witness's

21   testimony at around 1:30 and we can finish it up in a few

22   minutes, then I may ask you to stay a few minutes longer; but

23   if we have got a big chunk of testimony from that witness, we

24   will just pick up with it the next day.  So we will try to

25   break as close to that time as possible so you can have lunch

1    after and go do whatever else you want to do for the rest of

2    the day.

3           There is an instruction that will apply throughout

4    the trial, and that is that you are not to discuss the case,

5    even amongst yourselves, until it's submitted to you for

6    deliberation.  So, you know, even though you may have heard

7    some interesting testimony and you would like to find out what

8    the juror sitting next to you thinks about it during the course

9    of the trial, you just have to wait.  You will have a chance to

10   talk among yourselves about it when the case is submitted to

11   you for deliberation.  But you are not to talk about it with --

12   amongst yourselves or with anyone else, including when you go

13   home, your family members.  Say, Well, I'm stuck on this jury,

14   you know, for whatever time your going to tell them, and it's a

15   criminal case and that's it.  I can't tell you anything more

16   about it.  That's how to answer that question, because you are

17   not supposed to talk about the case outside of the courtroom.

18          Nor are you to read anything about it.  If there

19   should be anything at all -- of course, we have to talk about

20   reading about it in the newspapers or listening to it on the

21   news, but now we have to talk to you about some of those things

22   that we were talking about earlier, Google and Twitter and all

23   the media, FaceBook, and so on and so forth.  And doing any

24   research about the case or doing any legal research, you are

25   not to do any of that or try to go on court websites and find

1   out something about the case.  No.  Just -- you will be happy

2   at the end of the day not to have to hear anything more about

3   the case and go about your business and do something else

4   that's more interesting and talk to your family about other

5   things.

6           So just make sure you don't do that, because it

7   jeopardizes the proceedings if anybody is getting information

8   that other jurors do not get.  And it can end up -- I don't

9   want to see people's, you know, cell phones and so forth, but,

10  you know, if that happens that's what we have to do, and I

11  would prefer not to do that.  That you -- if you have a cell

12  phone that has search capability and so forth, then you're not

13  to use it for anything related to this case, at all.  Period.

14  You are not to do any investigation or research or anything

15  else.  And as I said, you are not to talk about it.

16          Now, you may coming and going run into people or in

17  the hallway the attorneys or the parties.  If they don't meet

18  and greet you, that's not because they are unfriendly or don't

19  like you, but because they are under instructions not to talk

20  to the jurors.  And so you'll understand that you are not

21  supposed to talk with them either.  You can smile, but that's

22  all right, or nod.  It's up to you.

23          But if you hear anybody talking in the hallway about

24  the case, you know, then move away.  If someone should try to

25  talk to you about the case -- generally this doesn't happen,

1  but if it does, then you should let Mr. Bowser or myself know

2  immediately so that appropriate instructions are given, because

3  you all, as I said, have to hear the case from the same

4  witnesses and the same evidence at the same time.

5          And then, also, you are not to form or express any

6  opinion based upon what you have heard at various stages.  Keep

7  an open mind through all the proceedings until all of the

8  evidence is submitted and until the attorneys have made their

9  arguments to you and then you go into deliberate.  That's when

10 you talk about it and begin to formulate, after you've talked

11 with your fellow jurors about, you know, your decision and

12 about the case and what you think of it and the witnesses and

13 so forth.

14         Are there any questions about any of that?

15         (No response.)

16 **THE COURT:**  Now, there's generally not a transcript

17 available at the end of proceedings because the court reporter

18 will be in another courtroom or some other proceeding taking

19 down those proceedings.  So you're going to have to rely upon

20 your own recollection, but you can take notes.  And if you wish

21 to take notes, we'll provide you with a pad and pencil or pen

22 and you can take notes here in the courtroom, and I'll give you

23 some instructions tomorrow about the use of those.  Because

24 they are for your own personal use.  You leave them here during

25 the trial with your name on them, and you will have an envelope

1    to put them in so nobody else can look at them and so forth.

2    And then at the end of the trial if you wish to take them with

3    you, you can do that.  But they will stay here during the

4    course of the trial.

5            And so Mr. Bowser will ask you either tonight before

6    you leave or tomorrow morning:  Do you wish to have -- to take

7    notes?  And you shouldn't be overly influenced by somebody else

8    who takes notes if you decide not to.  You do what seems to

9    work best for you.  Because it's important -- you know,

10   sometimes we are told that body language is important, you

11   know, and so you're so busy writing things down that you miss

12   some nuances of the witness or the witness's expression or, you

13   know, whatever on the stand.  So you have to figure out what

14   works best for you in terms of taking notes.

15           Questions, that's every lawyer's dream, right?  The

16   jury asks questions.  You know, if you don't understand

17   something, it's important that it be made known -- you know,

18   that you understand it and so that's all right.  But you have

19   to write the question out and give it to Mr. Bowser, and I will

20   take it up with the attorneys.  And you're subject to the same

21   Rules of Evidence that they are.  So just keep that in mind.

22   But if something is not clear, you should let us know, if it's

23   not clear.

24           On the other hand, if it has something to do, like,

25   "We need a rest break," or something like that, or "We can't

1  hear the witness," certainly just raise your hand.  But if it

2  has anything at all to do with the case or the testimony, then

3  write the question out and give it to Mr. Bowser and we'll

4  figure out what to do with it.

5          Okay?  So we'll see you tomorrow morning at 8:30.  We

6  will give you a couple coffee breaks.  Are they getting some

7  continental breakfast kind of thing in?

8          **THE CLERK:**  They are.  They are.

9          **THE COURT:**  You don't get that.  So what do they get?

10          **THE CLERK:**  Coffees, juices, fruits, bagels with the

11  spreads, Danish.

12          **THE COURT:**  So get here early, a little bit, so you

13  can at least grab something or have your choice of what to

14  grab, okay?

15          And yes.

16          **JUROR KAMEOKA:**  Is there a specific dress code?

17          **THE COURT:**  No -- well, come clothed, but not

18  specific.  If you want to wear jeans or something, what you're

19  comfortable in, some other kind of attire, that's fine.

20          If you want to drink coffee or water, just make sure

21  it has a cap on it or a top on it.  In here.  And, of course,

22  you know there will be coffee in there.  Look, the coffee

23  that's in there, hey, it's not Peet's.  What can I tell you?

24          Yes.  Okay?  And did you have a question.

25          **JUROR MERRITT:**  Yeah.  So I can -- when I call my

1  work and inform them of this wonderful news, I'm going to tell

2  them it's three weeks, just to be on the safe side?

3          **THE COURT:**  Tell them the outside is three weeks,

4  but, hopefully, it will be finished earlier than that.

5          Whom do you work for?

6          **JUROR MERRITT:**  I work for HOV Services.  I'm the

7  supervisor of my department, so I need --

8          **THE COURT:**  What is HOV Services?  I know HOV Lanes.

9          **JUROR MERRITT:**  It stands for Hands On Ventures.  We

10  are like a -- we're a call center.  I just actually work for --

11  T-Mobile has hired me out to dispute their bills.  I

12  investigate the billing disputes.

13          **THE COURT:**  You tell them that -- is this mostly

14  telecommunication companies?

15          **JUROR MERRITT:**  Yeah.  Just telephones, but I'm the

16  boss of it, so I'm going to have a to let them know.

17          **THE COURT:**  You tell them they use our services and

18  clutter up the courts with their cases all the time, so they

19  ought to keep that in mind.

20          **JUROR MERRITT:**  Yeah, yeah, I know.  Okay.

21          **THE COURT:**  Okay.  Yes?

22          **JUROR BONACUM:**  Two questions.  How do we address

23  you?  I don't know what your title is.  And then do you think

24  that --

25          **THE COURT:**  It's easy.  You don't even remember my

```
 1  name.  Just call me judge.  Okay?  It doesn't have to be Your
 2  Worship or Your Highness or anything.
 3          MS. BOERSCH:  We have to.
 4          THE COURT:  You have been doing it all that time,
 5  right?
 6          MR. OSTERHOUDT:  Years.
 7          JUROR BONACUM:  And do you take lunch?  Do we get
 8  lunch?
 9          THE COURT:  No, no.  I take lunch, but after you
10  leave.  And you take lunch after you leave.
11          No.  We're going to go -- we'll take one or two
12  coffee breaks, whatever I can get away with.  If I can get away
13  with one, you know, so we can keep plowing forward.  But if we
14  need to take two, you know, a rest break or whatever, we will
15  do that.  But they will be short, 10, 15 minutes.  And then we
16  break at 1:30, so you can go get lunch after that.
17          But spending -- trying to find a place to have lunch
18  in beautiful downtown Civic Center area is not so great.  So
19  you will be happy not to have to be limited to the resources
20  around here.  Okay?
21          JUROR MERRITT:  I'm sorry.  One more.  So we are
22  going to be coming in 8:30 to 1:30, and then we are done for
23  the day?
24          THE COURT:  Yes, yes.
25          JUROR MERRITT:  I may be able to work in the evening.
```

182

```
 1            THE COURT:  You can do that.  Whatever works for you.
 2            Okay.  Fine.  So have a very pleasant afternoon and
 3       evening.  Mr. Bowser will see you, if you wait with him, back
 4       in the jury room.
 5            Then we'll see you tomorrow morning at 8:30, ready to
 6       get started with some instructions and then opening statements
 7       and the evidence.  Have a very pleasant afternoon and evening.
 8            (Jury exits courtroom at 2:33 p.m.)
 9            MS. PLETCHER:  Your Honor, before we adjourn, I would
10       like to bring up a matter for the record and possibly
11       everyone's amusement.
12            THE COURT:  You got this task?
13            MS. HAMILTON:  She got the note.
14            MS. BOERSCH:  She has an admirer.
15            THE COURT:  One from the jury?
16            MS. PLETCHER:  As the dismissed jurors were walking
17       out, one of them handed me a note that read:  "I love your
18       hair.  Call me sometime."  And he gave his phone number, and
19       his name is Matthew Garavito.  So there is no impropriety here.
20            THE COURT:  So when will you be calling him?
21            MS. HAMILTON:  After the case is over.
22            MS. PLETCHER:  I don't know.  So I'm --
23            THE COURT:  He's not on the jury?
24            MS. PLETCHER:  He is not on the jury and he told me
25       that as he handed it to me.  He said, "I'm so glad I didn't get
```

```
 1  picked for the jury."

 2          THE COURT:  So now he can propose to you, right?

 3          MS. PLETCHER:  It's very amusing.  I will tell my

 4  husband of 13 years.  He will like to know that.

 5          THE COURT:  You can hold that --

 6          MS. BOERSCH:  Take it home.

 7          MS. PLETCHER:  I'm going to bring it home.

 8          (Discussion held off the record.)

 9          THE COURT:  Now there was some other issue, but I

10  think it's time for everybody to have lunch, it's getting late,

11  and I have a meeting in about another hour.

12          MS. BOERSCH:  We do have one jury instruction issue

13  which I think will need to be resolved before -- you are going

14  to call Mr. Rocklin tomorrow?

15          MS. HAMILTON:  Yes, but we haven't had the

16  opportunity to review it.

17          MS. PLETCHER:  We should talk some more about it.

18          MS. HAMILTON:  We need an opportunity to review it.

19          MS. BOERSCH:  We raised this with the Court before.

20  It's the question of whether or not Mr. Rocklin can opine on

21  what is meant on the tapes.  And we had submitted -- I can't

22  remember if we submitted a proposed instruction, but we had

23  briefed it.  I will submit a proposed instruction.

24          I have sent it to them and they will look at it and

25  that -- we should resolve that before Mr. Rocklin testifies.
```

```
 1              MS. PLETCHER:  And we oppose the instruction.  So it

 2    will take a little argument.

 3              THE COURT:  Well, we'll figure out some way to deal

 4    with it, but I'm going to preinstruct them as to the usual

 5    instructions, what their duties are and evidence and

 6    credibility and so forth.  And then just sort of the brief

 7    instruction, definitional instruction of this, what has to be

 8    proved as to each count, without any further elaboration.  Then

 9    we will do opening statements.

10              What did you say?  You need about an hour?  Less than

11    that?

12              MS. HAMILTON:  I think Mr. Ward --

13              THE COURT:  That's your --

14              MR. WARD:  We'll come in at about a half hour, your

15    Honor.

16              THE COURT:  And each of you need what, about a half

17    hour?

18              MR. OSTERHOUDT:  Probably at the outside.

19              MR. HOWDEN:  At the outside.

20              THE COURT:  And who is going to go first, or have you

21    decided that?

22              MR. HOWDEN:  I will be going first.

23              THE COURT:  Okay.  Okay, fine.  Okay.  So we'll see

24    you tomorrow morning then 8:30.  And somewhere in between after

25    the opening statements maybe or -- and before Mr. Rocklin
```

```
 1  testifies, because he is going to be your first witness?

 2           MS. HAMILTON:  Yes.  Unless we --

 3           THE COURT:  We can take up this issue.

 4           MS. HAMILTON:  Unless you get it agreed to.

 5           THE COURT:  Okay.  Well, work on that.  Okay.  Thank

 6  you.

 7           (Whereupon at 2:38 p.m. further proceedings

 8            in the above-entitled cause was adjourned

 9            until Wednesday, January 12, 2011 at 8:30 a.m.)

10

11                         -  -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

### CERTIFICATE OF REPORTER

WE, LYDIA ZINN, and DEBRA PAS, Official Reporters for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in CR. 07-765 MHP, United States of America v. Mendel Beker, et al., were reported by us, certified shorthand reporters, and were thereafter transcribed under our direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by us at the time of filing

The validity of the reporters' certification of said transcript may be void upon disassembly and/or removal from the court file.


_____/s/ Lydia Zinn_____
Lydia Zinn, CSR 9223, CRR


_____/s/ Debra L. Pas_____
Debra L. Pas, CSR 11916, CRR


Tuesday, January 11, 2011