Volume 3

Pages 374 – 486

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARILYN HALL PATEL

UNITED STATES OF AMERICA,      )
                               )
             Plaintiff,        )
                               )
   vs.                         ) NO. CR. 07-0765 MHP
                               )
MENDEL BEKER, ARIE PRILIK, and )
NEWCON INTERNATIONAL,          )
                               ) San Francisco, California
             Defendants.       ) Thursday
                               ) January 13, 2011
_____) 8:40 a.m.


### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**
**For Plaintiff:**           U.S. Department of Justice
                             Antitrust Division
                             450 Golden Gate Avenue, Room 10-0101
                             San Francisco, CA  94102-3478
                             (415) 436-6673
                             (415) 436-6687 (fax)
                      **BY:  DAVID J. WARD**
                             **ANNA TYRON PLETCHER**
                             **RICHARD B. COHEN**


**For Plaintiff:**           U. S. Attorney's Office
                             450 Golden Gate Avenue, Box 36055
                             San Francisco, CA  94102
                             (415) 436-7129
                      **BY:  JEANE HAMILTON**


(Appearances continued on next page)

1   APPEARANCES (CONT'D)

2   **For Defendant:**          Winston & Strawn, LLP
                                101 California Street
3                               San Francisco, CA  94111
                                (415) 591-1439
4                               (415) 591-1400 (fax)
                          BY:   **JONATHAN ROBERT HOWDEN**
5
                                Martha A. Boersch
6                               Attorney at Law
                                555 California Street, 26th Floor
7                               San Francisco, CA  94104
                                (415) 626-3939
8                               (415) 875-5700 (fax)
                          BY:   **MARTHA A. BOERSCH**
9
    **For Defendants:**         Law Offices of William L. Osterhoudt
10                              135 Belvedere Street
                                San Francisco, California  94117-3915
11                              (415) 664-4600
                                (415) 664-4691 (fax)
12                        BY:   **WILLIAM L. OSTERHOUDT**

13  **For Defendants:**         Law Offices of Frank S. Moore
                                235 Montgomery Street, Suite 854
14                              San Francisco, CA  94104
                          BY:   **FRANK S. MOORE**
15
    **Also Present:**           Weir Foulds, LLP
16                              Barristers & Solicitors
                                The Exchange Tower, Suite 1600
17                              130 King Street West
                                Toronto, Canada M5X 1/5
18                              (416) 365-1110
                                (416) 365-1876 (fax)
19                        BY:   **PETER L. BIRO**

20

21

22

23

24

25

1                        **P R O C E E D I N G S**

2    January 13, 2011                                    8:40 a.m.

3              (Jury in at 8:40 a.m.)

4              **THE COURT:**  Good morning, ladies and gentlemen.

5              **THE JURORS:**  Good morning.

6              **THE COURT:**  Listen to that.  Wow.  What do we have?

7    Some five-minute energizer stuff in there, or whatever it's

8    called?

9              **JUROR:**  Coffee.

10             **THE COURT:**  Coffee.  Okay.  And good morning,

11   Mr. Rocklin.  I remind you, you're still under oath.  The oath

12   will not be readministered.  And you may continue.

13             (Witness resumes stand)

14             **THE COURT:**  And good morning, counsel.

15                   <u>**DIRECT EXAMINATION RESUMED**</u>

16   **BY MS. HAMILTON**

17   **Q.**   Mr. Rocklin, we ended yesterday with your conversation

18   with Mr. Prilik on August 17th, so we'll pick up from there.

19   **A.**   Okay.

20   **Q.**   Now, at the close of that conversation, what, if anything,

21   was said about future contact between yourself and Mr. Prilik?

22   **A.**   I think I will -- I said something to the extent that I'll

23   call in the end of week, or something like that.

24   **Q.**   Now, at that time how many conversations, if any, had you

25   had with competitors where you had discussed ways to make

 1  both -- where both companies could make money?

 2          **MR. HOWDEN:**  Objection.  Relevance, your Honor.

 3          **THE COURT:**  Objection's overruled.

 4          You may answer the -- you may finish the question,

 5  first of all, and get an answer.  Go ahead.

 6          **MS. HAMILTON:**  Thank you.

 7  **Q.**   So how many times, if ever, had you had conversations with

 8  competitors where you had discussed ways where both companies

 9  could make money?

10  **A.**   Never.

11  **Q.**   How many times, if any, had you had conversations with

12  competitors where you discussed controlling the market?

13  **A.**   Never.

14  **Q.**   Now, after that conversation ended, what, if anything --

15  what, if any, action did you take in response to that

16  conversation with Mr. Prilik?

17  **A.**   I called our lawyers.  I talked to James, and then I

18  called our lawyers.

19  **Q.**   In?

20  **A.**   In Washington, D.C.

21  **Q.**   And when you say "our lawyers," what do you mean?

22  **A.**   We had a legal team:  Barnes & Thornburg.

23          **THE COURT:**  You need to speak a little more clearly

24  and a little slowly, too, please.

25          **THE WITNESS:**  Okay.

```
 1            So I.

 2            THE COURT:  You had lawyers who were -- and then you

 3    mentioned something beyond that.

 4            THE WITNESS:  Yes.  Our lawyers were based out of

 5    Washington, D.C.  So I contacted them.

 6    BY MS. HAMILTON

 7    Q.   Why did you decide to contact ATN's attorneys?

 8    A.   Because when contract was sabotaged, when pressure was

 9    applied to our prime, and then the price fixing was offered, I

10    thought that that was illegal.

11            MR. HOWDEN:  Your Honor, I'm going to object.  This

12    is a legal conclusion on the part of a lay witness.  It's also

13    irrelevant.

14            THE COURT:  Well, it's --

15            The jury is instructed that you're not to consider

16    this, as to whether or not it is legally -- what was being

17    done -- legally price fixing.

18            It's just his opinion as to what was happening, which

19    is a lay opinion; but that doesn't necessarily mean that it

20    constituted what we would call "price fixing," one way or the

21    other.  I'm not opining on that, either; but this is just his

22    view; his characterization.

23            MS. HAMILTON:  Thank you.

24    Q.   So you can continue.

25    A.   So, because of that train of thought, I contacted our
```

1  attorneys and consulted them.  And they thought that --

2  **Q.**    And you did -- you consulted with your attorney.  And I

3  don't want to get into what they said, but after your

4  consultation with your attorney, did you -- what, if, any

5  decision did -- did you make?

6  **A.**    To contact authorities.

7  **Q.**    And who was to contact the authorities?

8  **A.**    Our lawyers.

9  **Q.**    Now, why was the decision made to contact the authorities?

10 **A.**    Because they advised to do.  They thought that the --

11         **THE COURT:**  Okay.  I don't think we can have him

12 talking about what they thought.

13         **MS. HAMILTON:**  Right.

14         **THE WITNESS:**  Right.

15         **THE COURT:**  And also, this is privileged.  And so

16 you're going to have him talk about what he -- what the lawyers

17 said to them, then we've got an issue with waiving the

18 privilege.  So figure out what you're going to do here.

19         **MS. HAMILTON:**  I understand.  Let me rephrase my

20 question.

21         **THE COURT:**  Yes.  Okay.

22 **BY MS. HAMILTON**

23 **Q.**    Why -- after consulting, just -- did you make a

24 decision -- why did you, personally, then decide that was the

25 right thing, or -- to have the FBI contacted?

 1           **THE COURT:**  I think you were on the right track when

 2  you said, "Did you make a decision?"

 3           **MS. HAMILTON:**  Okay.

 4  **Q.**   How about -- what, if any, decision did you decide to make

 5  after the --

 6           **THE COURT:**  Get us out of the.

 7           **THE WITNESS:**  To contact the authorities.

 8  **BY MS. HAMILTON**

 9  **Q.**   And what, if anything, happened after that?

10  **A.**   Our legal team -- they structured a letter and contacted

11  the FBI office.

12  **Q.**   And after -- were you then subsequently contacted by the

13  FBI?

14  **A.**   Yes.

15  **Q.**   And when did that occur?

16  **A.**   I think a couple of days after, or so.

17  **Q.**   So what's the approximate date?

18  **A.**   I think the letter was sent on August 19th.  And I don't

19  recall exact day, but I think it was the 21st, or something.

20  **Q.**   Who, from the FBI then contacted ATN?

21  **A.**   Greg Haynie, Special Agent.

22  **Q.**   Did you speak with Agent Haynie at some point in time?

23  **A.**   Yes.

24  **Q.**   Okay.  And when, approximately, was that?

25  **A.**   At one point, we held a meeting at the ATN, where he

1   interviewed me.

2   **Q.**   When?  When was that date?

3   **A.**   I think it was the 24th, or something.

4   **Q.**   And now, who was at that meeting from the FBI?

5   **A.**   It was Agent Haynie, and one more agent.  I don't recall

6   their name right now.

7   **Q.**   Excuse me.  And where did that meeting occur?

8   **A.**   At the ATN.

9   **Q.**   And what subjects were discussed during that meeting?

10   **A.**   Our previous conversation, taking place on August 17th.

11   **Q.**   And when you say "our previous conversation," what

12   conversation are you referring to?

13   **A.**   Our conversation with Arie Prilik and Michael Beker.

14   **Q.**   Did you -- were any -- the conversation between Mr. Beker

15   and Mr. Prilik and yourself was discussed?

16   **A.**   Yes.

17   **Q.**   Anything else discussed with Agent Haynie at that meeting

18   with the FBI?

19   **A.**   Yes.

20   **Q.**   What?

21   **A.**   It was overall view in the industry of night vision, and

22   more specifically, Battalion Set II.

23   **Q.**   Was your conversation with Mr. Prilik discussed during

24   your meeting with the FBI?

25   **A.**   Yes.

1  Q.   What, if any, action did Agent Haynie then ask you to take

2  at the conclusion of this meeting?

3  A.   I was asked if I'm willing to call back to Newcon, and

4  continue the conversation, and have further conversations to be

5  recorded.

6  Q.   Did you agree to record those conversations right away?

7  A.   Not right away, but I agreed.

8  Q.   Why didn't you agree right away?

9  A.   I was kind of tough decision.  I had to think about it.

10 Q.   What, if any, concerns did you have?

11         MR. HOWDEN:   Objection, your Honor.  Relevance.

12         THE COURT:   Objection sustained.

13 BY MS. HAMILTON

14 Q.   At some -- when, if at all, ever, did you inform

15 Agent Haynie that you would record the conversations?

16 A.   I don't think I informed him.  It was, again, my lawyer.

17 Q.   Did -- after -- at some point in time, then, did you have

18 a contact with Agent Haynie?

19 A.   Yes.

20 Q.   And approximately when was that?

21 A.   After I agreed for -- to continue the conversation or

22 conversations to be recorded, he came in.  And I think it was

23 August the 26th.  He brought in the recording equipment.

24         THE COURT:   Oh, dear.  This is trouble (indicating).

25 Let's see what your work is going to be now, right?

```
1            MS. HAMILTON:  It might be a long day.

2   Q.   When you met with Agent Haynie, you thought, oh,

3   approximately August 26th -- you thought?

4   A.   Yes.

5   Q.   Did he -- what, if anything, did he have you sign?

6   A.   It was a release form that I am agreeing to be monitored

7   on the telephone.

8   Q.   If you could, turn to your Exhibit Binder Number 2, to

9   Exhibit 125.

10           MS. HAMILTON:  It hasn't been published yet.  Sorry.

11  Q.   Do you recognize this document?

12  A.   Yes.

13  Q.   What is it?

14  A.   That's an authorization form.

15           MR. HOWDEN:  Excuse me.  Could you please -- we're

16  not getting that on the screen.

17           THE COURT:  She's trying to lay a foundation for it,

18  I think.

19           MR. HOWDEN:  We still get to look at it while she's

20  laying --

21           THE COURT:  Don't you have copies of all of these

22  exhibits?

23           MR. HOWDEN:  I thought it was going to be on the

24  screen.

25           THE COURT:  Well, get out your books.
```

1              MR. HOWDEN:  All right.

2              THE COURT:  125.  You don't have it.  You will in due

3    course.

4              MR. HOWDEN:  All right.  Thank you.

5              THE COURT:  The few little niceties she has to go

6    through in order to --

7              MR. HOWDEN:  No, we don't have that.

8              MS. HAMILTON:  Is your signature on this document?

9              THE WITNESS:  Yes.

10             MS. HAMILTON:  May I publish it to the jury?

11             THE COURT:  Any objection, since you've been

12   clamoring for it already?

13             Yes, you may publish it.

14             MS. HAMILTON:  Thank you, your Honor.

15   Q.   When you signed -- sorry.  When you signed this document,

16   what did you understand the purpose of it to be?

17   A.   That was me giving agreement to be monitored on the phone,

18   and for the conversations to be recorded.

19             MS. HAMILTON:  Can we move it to be admitted?

20             THE COURT:  And I assume there's no objection.

21             MR. HOWDEN:  No objection.

22             THE COURT:  125 is admitted.  It's 125 in our record.

23             MS. HAMILTON:  Correct.

24             THE COURT:  All right.  125 is admitted.

25

1              (Trial Exhibit125 received in evidence).

2  **BY MS. HAMILTON**

3  **Q.**    Now, did Agent Haynie provide any general instructions

4  about how to conduct yourself when recording conversations?

5  **A.**    Yes.

6  **Q.**    And what were his instructions?

7  **A.**    To record the conversations in its entirety and,

8  obviously, not to omit anything.

9         I was also given an instructions to -- to record time and

10 the place where the conversations were taking place, as well as

11 the telephone number that I was dialing, and, by the end of the

12 conversation, to state the time as well.

13 **Q.**    You stated one of the things -- you were instructed not to

14 admit anything?

15 **A.**    Omit anything.

16             **THE COURT:**   Omit.

17 **BY MS. HAMILTON**

18 **Q.**    Omit?

19 **A.**    Yeah.

20 **Q.**    Excuse me.   What, if any, other instructions did

21 Mr. Haynie or Agent Haynie provide?

22 **A.**    In regards to the conversations?

23 **Q.**    The instructions he provided in terms of how to conduct

24 yourself during the conversations.

25 **A.**    I was supposed to just not to offer anything, but continue

1  the conversation, and be open for any offers.

2  **Q.**   What, if any, instructions on what topics to discuss did

3  Agent Haynie provide to you?

4  **A.**   I don't think we specifically discussed topics.

5  **Q.**   And so did -- what, if any, equipment did Agent Haynie

6  provide to you that day?

7  **A.**   It was tape-recorder, and some tapes.

8          **MS. HAMILTON:**   May I have permission to approach the

9  witness?

10          **THE COURT:**   Yes.

11          **MS. HAMILTON:**   Thank you.

12          **THE COURT:**   And you don't need to repeat the request.

13          **MS. HAMILTON:**   Okay.

14  **BY MS. HAMILTON**

15  **Q.**   I've handed you what's been marked as Exhibit 115.  Do you

16  recognize that?

17  **A.**   Yes.

18  **Q.**   What is it?

19  **A.**   It's a tape-recorder that I used for recording

20  conversations.

21  **Q.**   Recording conversations with whom?

22  **A.**   With Mr. Prilik and Mr. Beker.

23  **Q.**   At the time that this -- this recording device was

24  provided to you, had you had any prior experience recording --

25  using an audio-cassette recorder?

ROCKLIN- DIRECT EXAMINATION / HAMILTON

1   **A.**   I use tape-recorder for -- when I was young, to record

2   some music.  That's about all.

3   **Q.**   When Agent Haynie provided that machine, did you test it?

4   **A.**   Yes.

5   **Q.**   What did you do to test it?

6   **A.**   We plugged the machine, and then we used one of the --

7   well, the microphone had to be attached to the telephone

8   receiver.  And I think we made one call, or something, and

9   tried to record it, and then listen to the recording.

10  **Q.**   And what was the result of your test?

11  **A.**   That it was recorded, and played back accurately.

12  **Q.**   Where was the tape-recorder set up?

13  **A.**   In my office.

14  **Q.**   And who set -- who set the tape-recorder up in your

15  office?

16  **A.**   Agent Haynie.  And I think there was another agent there,

17  too.

18  **Q.**   And how was the tape-recorder set up?

19  **A.**   It was just on my desk, and connected to where the

20  microphone was connected to the headset.

21  **Q.**   And were you shown how to operate the tape-recorder?

22  **A.**   Yes.

23  **Q.**   Can you just show -- briefly, just demonstrate how the

24  recordings would occur.  I know you don't have a phone, but how

25  was the tape-recorder then connected to the telephone?

1    **A.**    For every recording, I had to use a new tape that I would

2    insert.  It was a very simple operation.  There are two buttons

3    to be pushed at the same time:  "Record" and "Play."  And also

4    at that point, I think I would push the "Pause" button, and

5    then release it to record the conversation.

6    **Q.**    And is there an earbud or some other device to attach to

7    the tape-recorder?

8    **A.**    Yes there is a microphone.

9    **Q.**    And how -- how was that then attached to the tape

10   recorder, and also attached to the phone?

11   **A.**    To the tape-recorder, there is a plug in.  And to the

12   telephone, there was a small sticker; an adhesive sticker that

13   had to be attached to the headset.

14   **Q.**    And was that the machine that you used to record all of

15   your conversations with the defendants?

16   **A.**    Yes, I believe so.

17   **Q.**    Could we move to admit the tape-recorder, your Honor?

18           **THE COURT:**  Any objection?

19           **MR. HOWDEN:**  No objection, your Honor.

20           **THE COURT:**  That's -- 115 is admitted.

21           **MS. HAMILTON:**  Yes, your Honor.  Thank you.

22           (Trial Exhibit 115 received in evidence)

23   **BY MS. HAMILTON**

24   **Q.**    Did Agent Haynie provide any audio cassette tapes to you?

25   **A.**    Yes.

1   Q.   And at the time did you -- were the tapes blank?

2   A.   Yes.

3   Q.   How did you know they were blank?

4   A.   They were -- they were brand new tapes that were packaged

5   in cellophane.

6   Q.   What, if any, instructions did Agent Haynie provide to you

7   about what to do --

8        And you did record conversations with the defendants,

9   though, right?

10  A.   Yes.

11  Q.   What, if any, instructions did Agent Haynie provide about

12  how to care for the tapes after they were used to record a

13  conversation?

14  A.   That I was supposed to contact Agent Haynie, and tell him

15  that a conversation occurred, and give him tapes.  And while I

16  had the possession of the tapes, they had to be stored securely

17  somewhere.

18  Q.   You were asked --

19       And did you, then, store those tapes securely?

20  A.   Yes.

21  Q.   What did you do?

22  A.   They were -- after I recorded something, and before I was

23  giving it to Agent Haynie, they were in my desk, in my office.

24  Q.   How were they secured in the desk of your office?

25  A.   There was no lock on my desk, but if I would leave my

1   office, I would lock it.

2   **Q.**   Did you ever deviate from locking your -- your office door

3   when you left it?

4   **A.**   No.

5   **Q.**   And you testified that you called Agent Haynie after the

6   telephone conversation was recorded.  Were there times when

7   he -- Agent Haynie -- was there when the conversation occurred?

8   **A.**   Yes.

9   **Q.**   And what -- when you did call Agent Haynie, what, if

10  anything, did he do when you called him?

11  **A.**   I think, with the exception of the first two tapes, where

12  he was there, he would come in and pick up the tapes, and

13  interview me.  Also, I would mark the tapes with a Post-it

14  notes.  And he would copy the time, and pick up the tape.

15  **Q.**   Now, between the time that Agent Haynie then picked up the

16  tape, and the time after the recording occurred, did other

17  people have access to any of the recordings that you made?

18  **A.**   No.

19  **Q.**   Why not?

20  **A.**   There were either in my desk or -- always in my desk, or

21  in the locked office.

22  **Q.**   How many conversations with the defendants did you record?

23  **A.**   I think total was 12 conversations.

24  **Q.**   And have you listened to the actual the original audio

25  recordings of each of those conversations?

1  **A.**    Yes.

2  **Q.**    And did those audio recordings accurately reflect the

3  conversations that you had?

4  **A.**    Yes.

5  **Q.**    Now, and for each of those 12 conversations, have you

6  listened to computer copies of those audio -- original audio

7  cassettes?

8  **A.**    Digital copies?  Yes.

9  **Q.**    And do the digital copies -- are they -- what, if any,

10  differences are there between the digital copies and the

11  original audio-cassette copies?

12  **A.**    I believe that they're exact copies.

13  **Q.**    Were each of the 12 conversations that you had with the

14  defendants -- was the language spoken primarily in Russian, or

15  in English?

16  **A.**    Russian.

17  **Q.**    And have you reviewed the translation -- English

18  translation?  And were there English translations that you

19  reviewed for each of those conversations?

20  **A.**    Yes.

21  **Q.**    Do you -- did the -- English translations accurately

22  reflect the conversations that you had with the defendants?

23  **A.**    Yes.

24  **Q.**    So let's turn, then, to the first conversation that you

25  had with the -- one of the -- with the defendants that you

1  recorded.  When did that occur?

2  **A.**    August the 26th; the same date.

3  **Q.**    And who did you speak with on August 26th?

4  **A.**    Arie Prilik.

5  **Q.**    How did you come to speak with Mr. Prilik on that day?

6  **A.**    I dialed the general number, and then his extension.

7  **Q.**    And how did you know what Mr. Prilik's extension was?

8  **A.**    From the past conversations.

9  **Q.**    Was anyone in with you in your office at the time you

10 placed that -- that phone call?

11 **A.**    Yes.

12 **Q.**    Who?

13 **A.**    Agent Haynie.

14 **Q.**    And did you -- you called Mr. Prilik.  Did you

15 subsequently speak with him?

16 **A.**    Yes.

17        **MS. HAMILTON:**  Okay.  So let's go ahead, if we could

18 play Clip Number One, which is -- begins on the English

19 transcripts on page 1, line 1, through page 2, line 24, if we

20 can.  And we can publish those to the jury, your Honor?

21        **THE COURT:**  Yes.

22        (Audio clip played)

23        **THE COURT:**  Can you possibly turn it down a little

24 bit?

25        (Audio clip played)

 1  **BY MS. HAMILTON**

 2  **Q.**   Is that the beginning of the first conversation that you

 3  had that you recorded with Mr. Prilik?

 4  **A.**   Yes.

 5  **Q.**   So, your Honor, we'd move to admit Exhibit 101, which is

 6  the audio -- the audio recording, and Exhibit 131, which is the

 7  English translation.

 8          **MR. HOWDEN:**  Your Honor, it -- I don't expect to

 9  object to it coming in, but I don't think the complete

10  foundation's been laid.

11          I'd like to see the -- the -- at least identified,

12  the cassette that was used for this recording, and get that

13  linked up to the digital audio.

14          **THE COURT:**  Do you have those?

15          **MS. HAMILTON:**  We have the cassette, your Honor.

16          **THE COURT:**  Mm-hm.

17          **MS. HAMILTON:**  And --

18          **THE COURT:**  Are they marked, such that he can tell by

19  looking at them, and identify them?

20          **MS. HAMILTON:**  Yes.

21          **THE COURT:**  Then why don't you go ahead and do that?

22          **MS. HAMILTON:**  Okay.

23  **Q.**   So Mr. -- Mr. Rocklin, I'm handing you what's been marked

24  as Exhibit 131.  Do you recognize this?

25  **A.**   Yes.

1    **Q.**   And what is it?

2    **A.**   This is the first tape of the conversation.

3    **Q.**   Of what conversation?

4    **A.**   This is the conversation with Arie on August the 26th.

5    **Q.**   And how do you know that?

6    **A.**   There's a date on it.  This is one of the first tapes.

7    They actually were Department of Justice marked.  And it's also

8    marked "Number 1."

9    **Q.**   And have you listened to that recording?

10   **A.**   Yes.

11   **Q.**   And have you listened to a digital -- the digital

12   recording being played to the jury today?

13   **A.**   Yes.

14   **Q.**   And are they the same?

15   **A.**   Yes.

16             **MR. HOWDEN:**  Thank you very much.  That's all I was

17   asking.

18             **THE COURT:**  Okay.  Now, the transcription is -- or --

19   is 101.  And the tape is 131.  Is that correct?

20             **MS. HAMILTON:**  Yeah.  The transcription is 131 -- is

21   101.  And the tape is 131.

22             **THE COURT:**  Right.  Okay.  And any objection now to

23   those being admitted?

24             **MR. HOWDEN:**  No, your Honor.

25             **THE COURT:**  Okay.  They are admitted.

 1              **MS. HAMILTON:**  Thank you.

 2          (Trial Exhibits 101 and 131 received in evidence)

 3  **BY MS. HAMILTON**

 4  **Q.**  Now I'd like to ask you about the beginning of the

 5  conversation.  On page 2, line 16, you said -- you referred to,

 6  "The last time when we were speaking, last time, I was very

 7  busy."

 8       Why did you say that?

 9  **A.**  Because I was referring to the conversation in August 17th

10  with Arie.

11  **Q.**  Now what, if any, topics that were discussed on

12  August 17th did you also discuss with Mr. Prilik on

13  August 26th?

14              **MR. HOWDEN:**  Well, your Honor, the tape speaks for

15  itself.  If there are additional topics on this tape of the

16  26th, we should just play the tape.

17              **THE COURT:**  Objection's overruled.

18              You may answer the question.

19              **THE WITNESS:**  It was discussion of -- much -- for

20  Battalion Set II, and for night-vision goggles, and overall,

21  Arie's perspective on the market.

22  **BY MS. HAMILTON**

23  **Q.**  What, if anything else, was also discussed?  The topics.

24              **THE COURT:**  Are you referring to August 18th now,

25  still?

 1 | **BY MS. HAMILTON**

 2 | **Q.**   What was discussed on August 26th that had also been

 3 | discussed on August 18th?

 4 |           **THE COURT:**  Oh, okay.

 5 |           **THE WITNESS:**  Again, about -- just like in the

 6 | August 17th, it was about the -- if the price would be

 7 | controlled, and we -- and the product would be sold 10 to 15

 8 | percent less.

 9 |           **MR. HOWDEN:**  Your Honor, I need to renew my

10 | objection.  I mean, Mr. Rocklin is characterizing a

11 | conversation that's been put into evidence.  The jury hasn't

12 | had a chance to -- to see what was actually said.  And I don't

13 | think the Court can evaluate his characterization of it until

14 | we see exactly what is said.

15 |           **THE COURT:**  The objection's overruled.

16 |           **MS. HAMILTON:**  Thank you.

17 | **Q.**   I'd like to turn to the second clip, which begins at page

18 | 4, line 10.  And we'll play through page 5, line 4.

19 |      (Audio clip played)

20 | **BY MS. HAMILTON**

21 | **Q.**   I'd like to turn your attention to page 4, line 10, of

22 | this portion of the conversation.

23 |      You, again -- excuse me -- referred to the last time.  And

24 | Mr. Prilik said, you -- and then you said the last time.  And

25 | then you said you started telling me something.

1          And Mr. Prilik said, on line 13, "Concerning the other

2    project," to which you replied, "Yes, naturally."

3          Why did you say that:  "Yes, naturally"?

4    **A.**    Because I was confirming that a subject of conversation

5    here was whatever we discussed in the past, on August 17th:

6    The Battalion Set II.

7    **Q.**    So you understood -- and how did you believe that this was

8    about Battalion Set II contract -- this conversation, here?

9    **A.**    Because later on, we were talking about it as well.

10   **Q.**    Let me then turn your attention to -- starting at page 4,

11   line 17, in which Mr. -- oh, I apologize.  Excuse me.

12         Looking to page 4, line 17, Mr. Prilik said:  I can give

13   my unofficial opinion.

14         And then on line 17, the unofficial -- "Yes, the

15   unofficial opinion, because the official opinion is reserved

16   for the boss with us," to which you reply, on line 19, "Yes,

17   well, that's clear."

18         Why did you say that?

19   **A.**    I was agreeing with Arie that my understanding that

20   Michael Beker still was the boss, and decision maker.

21   **Q.**    Did -- and -- did you understand -- who did you understand

22   Mr. Prilik was referring to when he said "the official" -- or

23   "the boss"?

24   **A.**    Michael Beker.

25   **Q.**    And why did you believe that Mr. Prilik was referring to

1   the boss to be Mr. Beker?

2   **A.**   He was CEO and president of the company.

3   **Q.**   Now, starting at page 4, line 24, Mr. Prilik said to you,

4   "And if we coördinated something jointly, then, as a result,

5   both our companies would make much more than provisionally

6   those 100 or $200 that you most likely make, and on that, with

7   great difficulties."

8        Were you surprised when Mr. Prilik suggested coördinating

9   jointly?

10            **MR. HOWDEN:**   Objection, your Honor.   Relevance.

11            **THE COURT:**   Objection sustained.

12  **BY MS. HAMILTON**

13  **Q.**   What, if anything, did you understand Mr. Prilik to be

14  proposing by coördinating jointly?

15            **MR. HOWDEN:**   Your Honor, this calls for an

16  explanation for something that's right there in front of the

17  jury.

18            **THE COURT:**   The objection is overruled.

19            I mean, his understanding, because it's -- the

20  conversation goes on.   And I assume that conversation is based

21  on his understanding, and -- as well as, of course, whoever

22  else was in the conversation.

23            So you may answer the question, if you have it in

24  mind.

25            **THE WITNESS:**   My understanding is that Arie was

1   offering some sort of price-fixing scheme here, where both of

2   the companies -- Newcon and ATN -- would benefit.

3            **MR. HOWDEN:**  Well, your Honor, I mean, this is my

4   point.  We're now -- he's offering opinions about legal issues.

5            **THE COURT:**  Well, and the jury has already been

6   instructed.  And I'll remind them that this is his

7   interpretation of what was meant, and not some legal

8   definition, or whether it meets the legal definition of, quote,

9   "price fixing."

10  **BY MS. HAMILTON**

11  **Q.**  Now, as -- there's -- Mr. Prilik then references, on page

12  5, line 2, "And provisionally, those 100 or $200 that you most

13  likely make."

14       As part of the contract negotiations with ITE, did ATN

15  estimate the profits expected to make on the sales of

16  night-vision goggles under the Battalion Set II contract?

17  **A.**  Yes.

18  **Q.**  And Mr. Prilik refers to the 100 or $200 you most likely

19  make.

20       How close, if at all, was ATN's profit margin to

21  Mr. Prilik's estimate?

22  **A.**  It was a close estimate for the gross profit.

23  **Q.**  Okay.  And during this conversation, did you and

24  Mr. Prilik discuss whether or not other night-vision-goggle

25  suppliers could supply Generation II night-vision goggles,

1  under the Battalion Set II contract?

2  **A.**   Yes.

3          **MS. HAMILTON:**   If we could, play the third clip,

4  which is page 5, line 5, to page 7, line 18.

5          (Audio clip played)

6  **BY MS. HAMILTON**

7  **Q.**   All right.  I'd like to ask you a few questions about this

8  segment.  On page 5, beginning at line 5 through 7, you state,

9  "Yes, there are enough difficulties; this is, for sure.  Ah,

10  between the TACOM and Russia, I have this headache."

11      When you say, "I have this headache," what did you mean,

12  or why did you say that?  Excuse me.  Why did you say that?

13  **A.**   Well, because in the past conversation, on August 17th,

14  Michael admitted that he was a source of complaints to TACOM,

15  and also one of the shipments in Russia was held.  So this is

16  the two things I was referring to.

17  **Q.**   And when you say, "One of the shipments was held," can you

18  please explain in a little more detail what you're talking

19  about?

20  **A.**   One of the shipments that NPZ was sending over to us --

21  approximately 350 units, after they deliver over two and a half

22  thousand units -- was stopped, and held by Russian Customs.

23  **Q.**   Okay.  Thank you.  And so did that have an impact on ATN's

24  ability to deliver goggles for some period of time?

25  **A.**   Yes.

1    Q.    Was that problem resolved?

2    A.    Yes.

3    Q.    I'd like to now turn your attention to page 5, line 19.

4          Mr. Prilik asked, "And what would the Americans do if,

5    shall we say, neither the ATN nor Newcon would deliver the

6    goggles?  Where would they get the goggles of the second

7    generation, and at what price, if that's not a secret?"

8          Who did you understand "the Americans" to be, in that --

9    the reference to "the Americans" by Mr. Prilik, in that

10   context?

11   A.    TACOM.

12   Q.    And why did you believe that to be the case?

13   A.    Because we were discussing here Battalion Set II.

14   Q.    And, given your understanding of the market in 2005, where

15   would TACOM get night-vision goggles for the Battalion Set II

16   contract, if ATN were -- and Newcon would not deliver those

17   night-vision goggles?

18   A.    Probably they could get it from another source, but that

19   would be for a much higher price.

20   Q.    Now, on page 6 at line 2, Mr. Prilik then asks would he

21   been able to find anything today that is cheaper than 2,000 to

22   $2,500.

23         You replied, "If it not us?  Not likely, especially in

24   such quantities."

25         Why did you say this?

1  A.   Because Mr. Prilik here was referring to the next level of

2  pricing, based on a different tube supplier --

3  image-intensifier tube supplier.

4  Q.   On page 6, line 8, Mr. Prilik then said, "What are the

5  cheapest tubes in quantities that could be delivered by" -- and

6  then:  Unintelligible.

7       Are you familiar with the term "tubes," as used on line 8?

8  A.   Yes.

9  Q.   And what does that phrase mean to you?

10  A.   Image-intensifier tubes; the core of night-vision

11  equipment.

12  Q.   And Mr. Prilik refers to or asks, "What are the cheapest

13  tubes in quantities that could be delivered by" -- and it's

14  unintelligible.

15      Did you have what -- who did you understand -- or did you

16  understand who the recording was referring to?

17             MR. HOWDEN:  Objection.  Lack of foundation.  That

18  calls for speculation:  What Mr. Prilik was thinking at the

19  time.

20             THE COURT:  Well, the question was what he

21  understood; what the witness understood.

22             You may answer the question as to what you

23  understood.

24             THE WITNESS:  I had the pretty clear understanding

25  that the conversation was here about DEP Photonis, a

1  conglomerate and producer of second-generation -- high-end

2  second-generation, in France and Netherlands; and more

3  specifically, mentioned here a merger that just happened

4  between these two companies.

5  **Q.**   And --

6  **A.**   At that time.

7  **Q.**   And what, if any, significance does the reference to the

8  merger have to you?

9  **A.**   Well, that indicates that we are talking here about

10  DEP Photonis.

11  **Q.**   And in 2005, were you familiar with the company

12  DEP Photonis?

13  **A.**   Yes.

14  **Q.**   How did you come to be familiar with that company?

15  **A.**   Throughout years we were conducting business.  We were

16  also dealing with DEP Photonis.

17  **Q.**   And -- and in 2005 what, if any, products did DEP Photonis

18  sell?

19  **A.**   DEP Photonis was a manufacturer of, among other products,

20  but most in terms of night-vision equipment, they were

21  producing second-generation high-end image-intensifier tubes.

22  **Q.**   Did -- so image-intensifier tubes.

23       Were you aware of whether or not Photonis also

24  manufactured the systems the tubes went into?

25  **A.**   Yes.  There were not manufacturing systems.

1  Q.   Okay.  On page 6, line 15, Mr. Prilik said, "I think that

2  today, they wouldn't even go as low as these prices if they

3  don't have competition," to which you replied, "Right.  They

4  are busy."

5      Why did you say that?

6  A.   Although Photonis could provide competitive pricing for

7  small amount of tubes, there were flooded at that time with

8  orders, and they were busy.  And if -- on the large volume, the

9  prices would be a lot higher.

10          MR. HOWDEN:  Your Honor, there's no foundation for

11  any of this.  He's really just opining, going far beyond --

12          THE COURT:  The objection is overruled.

13          He's in the business, and he can give his lay

14  opinion.  It's not an expert opinion, but it's -- certainly, he

15  can give his opinion as to what the market is doing in that

16  respect.

17  BY MS. HAMILTON

18  Q.   Did -- let me then turn your attention now to page 7, line

19  1.  Mr. Prilik asked, "Yes.  And are there other literate

20  people besides Newcon and ATN that would be able to get, in

21  quantities, the inexpensive Russian goggles?"

22      You said, "Of course not.  I don't think so."

23      What did you understand Mr. -- first, Mr. Prilik's

24  reference to "inexpensive Russian goggles" to mean?

25  A.   Night-vision goggles with Generation II.

1    Q.    And why did you say, "Of course not.  I don't think so"?

2    A.    I was agreeing with Mr. Prilik there were just few

3    companies in the market that could deliver the product in

4    needed quantities for such contract.

5    Q.    And you say "for such contract."  Which contract?

6    A.    Battalion Set II.

7    Q.    Now, on page 7, line 8, Mr. Prilik then asks about --

8    says, "There are -- and a what about Comrade Max"?

9         Did you understand -- what did you understand Mr. Prilik's

10   reference to "Comrade Max" to be?

11   A.    He was referring to a principal of another night-vision

12   company, N-Vision:  Max Rivkin.

13   Q.    Why did you believe that was the individual being referred

14   to?

15   A.    We just had the common understanding.  I didn't know any

16   other Maxes in the night-vision industry, so --

17   Q.    Now, and there's a reference to -- or you said Max Rivkin

18   was the principal in a company called N-Vision?

19   A.    Yes.

20   Q.    What -- in 2005, what, if any, night-vision devices did

21   N-Vision sell?

22   A.    Various night-vision devices; among them, Generation II

23   goggles.

24   Q.    Now, in 2005, based on your observations of the market,

25   did you believe that N-Vision would be able to supply the

1  quantities of night-vision goggles required under the

2  Battalion Set II contract?

3  **A.**    It was possible, but highly unlikely.

4  **Q.**    I'd like to now turn your attention to page 16, line 17.

5  Oh, excuse me.  Page 6, yes.  16.  Sorry.  No.  I apologize.

6  I --I have the wrong cite.  Page 7, line 18.  I apologize.

7       Mr. Prilik said, "And who was the manufacturer of the

8  IITs?  That's the key to the whole thing," to which you reply,

9  "Yes.  That's for certain.  That's for certain."

10      Why did you answer Mr. Prilik in that way?

11 **A.**    Because it was a lot of manufacturers of night-vision

12 systems.  There were just a handful of manufacturers of the

13 core technology:  Image-intensifier tubes.  So those who could

14 somehow control the manufacturing and distribution of

15 image-intensifier tubes, therefore, could control the market.

16 **Q.**    If we can now -- and was ITE discussed during this

17 conversation?

18 **A.**    Yes.

19 **Q.**    If we could, listen to Clip Four, which begins at page 7,

20 line 18, and continues through page 10 to line 6.

21      (Audio clip played)

22 **BY MS. HAMILTON**

23 **Q.**    If I could turn your attention to page 7, line 22.  You

24 said, "You understand, don't you, that for me to go to

25 Jordanian, as you say, and raise all that stench."

1        When you said, "the Jordanian, as you say" -- why did you

2    say that?

3    **A.**    Because in the past conversations, Michael and Arie were

4    referring to president of ITE, Ramzi Abu-Taleb, as Jordanian.

5    **Q.**    And you then, on -- starting on page -- excuse me.  Line

6    22, say -- refer to, "raising all that stench."

7        What stench were you referring to there?

8    **A.**    We were discussing, here, a possibility of raising prices,

9    and obviously, prime would be unhappy about it.

10   **Q.**    Turning now your attention to page 8, line 12, Mr. Prilik

11   stated that, "I doubt that TACOM will ever give him something

12   again," and then said, beginning on line 16, "I don't know.

13   There are two questions.  What to do with the remainder of this

14   contract, and what to do with the next one," to which you

15   replied, on line 25, "I've got it."

16       Why did you say "I've got it" there?

17   **A.**    The discussion was, here, about actual Battalion Set II.

18   Although the whole contract was awarded already, Prilik's take

19   that only first phase will be awarded, and second and third

20   phase will not be awarded to ITE.

21   **Q.**    And just so we have the numbers clear, how many goggles

22   were involved in -- or did you understand were to be ordered

23   under the phase-one portion of the Battalion Set II contract?

24   **A.**    6,371.

25   **Q.**    And for the second and third phase, how many night-vision

1    goggles were -- were remaining to be supplied under that

2    portion of the contract?

3    **A.**    Approximately the same amount for each phase.

4    **Q.**    So 6,371 times two?

5    **A.**    That's right.

6    **Q.**    Did you understand why -- what -- how it was going to be

7    that the second and third phases of the -- of the contract for

8    the Battalion Set II were not going to be assigned or continue

9    to be supplied by ITE, under Mr. Prilik's belief?

10           **MR. HOWDEN:**   Well, that really does call for

11   speculation.

12           **THE COURT:**   Yes.  Objection sustained.  That sort of

13   wandered off there at the end.

14   **BY MS. HAMILTON**

15   **Q.**    If we could -- I'll just turn your attention to page 8,

16   line 21.  Mr. Prilik said, "Because I don't think that they

17   would give him the rest of the order.  So, whether you would be

18   able to deliver these 6,000 or not, but the balance would be up

19   for grabs."

20        At this point in time -- oh, and you responded -- I'm

21   sorry -- on page 9, line 2, "Well, I've got it."

22        Why do you think so; that it would be up for grabs?  Why

23   did you say that?

24   **A.**    Because my understanding that -- full contract was already

25   awarded.  And both phase two and phase three had to be

1   delivered by ITE.

2   **Q.**   Now, on page 9, beginning at line 20, Mr. Prilik said that

3   the balance of the order -- they would either give it back to

4   AHNHAM, or throw it again to the tender.

5        On line 20 Mr. Prilik refers to "they" would either give

6   it back to ANHAM.  Who did you understand "they" to be, in that

7   context?

8   **A.**   TACOM.

9   **Q.**   And why did you believe that TACOM was the reference

10  there, to them?

11  **A.**   Because TACOM was the discussion here.  And TACOM was the

12  one who would award the contract.

13  **Q.**   And in 2005, were you familiar with a company called

14  "AHNHAM"?

15  **A.**   Yes.

16  **Q.**   And did you -- what -- how were you familiar with that

17  company?

18  **A.**   AHNHAM was a prime consolidator for Battalion Set I for

19  delivery of different product.

20  **Q.**   And when, on line 21, Mr. Prilik refers to "they would" --

21  they would either give it back to the ANHAM, or throw it again

22  to tender.  What was your understanding about the pronoun "it"?

23  What was "it" referring to in this -- in your understanding, in

24  this context?

25  **A.**   Remainder of Battalion Set II.

1  Q.   Now, are you familiar with the term "tender"?

2  A.   Yes.

3  Q.   Okay.  Mr. Prilik said, beginning on line 22, "or they'll

4  throw it again to the tender."

5      What does the term "tender" mean to you?

6  A.   In this context, it's referring to the bidding process.

7  Q.   Did you understand what "throw it again" -- in this

8  context, what did it mean to you?

9  A.   Well, there are two scenarios here.  One is, it's going to

10 be given back to the AHNHAM, just passed through; because if

11 ATN will not perform, and Newcon was delivering goggles for

12 Battalion Set I to AHNHAM.

13     Or the second scenario, where it would be going back for

14 bidding process, and then Newcon would be in a good shape to

15 receive that.

16 Q.   If we can then turn and play the next portion, which is

17 page 12, line 10, through page 15, line 15.

18     (Audio clip played)

19 **BY MS. HAMILTON**

20 Q.   If I could turn your attention to page 13, line 7, you

21 said, "As I understand it -- as you said, that it's

22 unofficial," to which Mr. Prilik replied, "It's absolutely

23 unofficial."

24     And then on line 9 you replied, "No.  I know the way

25 Michael can get."

1        And Mr. Prilik said, "I know, but he only likes," to which

2   you replied, "Yeah."

3        Mr. Prilik said, "I've been living with him somehow for 15

4   years."

5        And you said, "Yes."

6        And on line 16, Mr. Prilik said, "And he's been somehow

7   listening up until now," to which you replied, "Well, that's

8   what I think as well."

9        Why did you say that?

10  **A.**   At that point, my understanding was that Arie's proposal

11  was unofficial, and for the proposal to become official, it had

12  to be approved by Michael.  He was the decision maker of the

13  company.  And that's the discussion here; what it's all about.

14  **Q.**   Then did you and Mr. Prilik discuss phase one of the

15  night-vision -- of the night-vision-goggle portions of the

16  Battalion Set II contract again in this conversation?

17  **A.**   Yes.

18  **Q.**   Let's then listen to Clip Number Seven, which is page 15,

19  line 9, through page 16, line 21.

20       (Audio clip played)

21  **BY MS. HAMILTON**

22  **Q.**   So if I could turn your attention to page 15, beginning at

23  line 14, Mr. Prilik says, "I have an approximate notion of how

24  much you are making on this contract, and I think that you are

25  making terribly little," to which you replied, certainly, on

 1  line 16, "Absolutely correct.  That which you said at the

 2  beginning of the conversation is very close to reality."

 3       Why did you say this?

 4  **A.**   Because I was confirming that what we were making -- the

 5  previous estimate, the 1- to $200 of what we were making was

 6  the right estimate.

 7  **Q.**   And on page 15, beginning at line 24, Mr. Prilik says --

 8  said, "Oh, if the goggles were sold conditionally for $2,000."

 9       At the time of this conversation, were you aware of the

10  price at which ATE [sic] was selling night-vision goggles to

11  TACOM?

12  **A.**   ITE?

13  **Q.**   Yes.

14  **A.**   Yes.

15  **Q.**   How did you know how much ITE was charging TACOM?

16  **A.**   In the logistics process, we had to fill out the paperwork

17  at the time of the shipping.  That had price that ITE was

18  charging TACOM.

19  **Q.**   And when you say in the part of the logistics, what do you

20  mean?

21  **A.**   There was a specific document:  DD250.  It's a form based

22  on which government would accept a delivery, and later on

23  process a payment.

24  **Q.**   And was ITE's price on that document?

25  **A.**   Yes.

1   Q.   And how did you understand that price came to be there?

2   A.   We were told by ITE what price should be there.

3   Q.   And then you put that price on that document?

4   A.   Yes.

5   Q.   And what number did you put down?

6   A.   $1,760.

7   Q.   Now, on page 15, line 24, Mr. Prilik suggests that goggles

8   sold conditionally for $2,000.

9        And you stated that the goggles were -- at the time, TACOM

10  was paying $1,760.

11       So approximately how much of a minimum increase was

12  Mr. Prilik's suggestion, from the current price being paid to

13  TACOM?

14          MR. HOWDEN:   Objection, your Honor.   That just

15  completely lacks foundation.   The price to whom, when?

16          THE COURT:   If you'd lay a foundation.

17          Objection is sustained as it stands now.

18  BY MS. HAMILTON

19  Q.   You just testified that you saw documents in which -- that

20  you wrote down the price that ITE was charging TACOM, correct?

21  A.   Yes.

22  Q.   And Mr. Prilik was suggesting that prices could be sold

23  conditionally for $2,000, correct?

24  A.   Yes.

25  Q.   Did you have an understanding to whom those goggles would

1   be sold for $2,000?

2            MR. HOWDEN:  Objection, your Honor.  There's still no

3   foundation.  There's no mention to whom they're taking about

4   selling these goggles, and who Mr. Prilik is referring to.

5   This is just speculation.

6            THE COURT:  Objection's overruled.  No speaking

7   objections.  Okay?  The objection is overruled.

8            You may answer the question.

9            THE WITNESS:  Even if the goggles would be sold at

10  $2,000, not to the prime, but at this level, to the TACOM, that

11  would be a minimum of $240 increase.

12  **BY MS. HAMILTON**

13  **Q.**  And when you say, "not to the prime, but just to TACOM,"

14  what do you mean?

15  **A.**  Well, if the $2,000 would be sold to AHNHAM or ITE, then

16  it would be resold to the TACOM for even higher.

17            MR. HOWDEN:  Again, there's -- there's no foundation

18  for that.  It's total speculation.

19            THE COURT:  Objection is overruled.

20  **BY MS. HAMILTON**

21  **Q.**  Now I'd like to turn your attention to page 16, line 12.

22  Mr. Prilik said, "That is to say, approximately the same that

23  you earn today."

24            "You could" -- starting on line 15 -- "continue to earn, I

25  don't know, from us.  We would sign, give the word of honor,

1  and pay honestly," to which you replied, on line 20, "I've got

2  it."

3       Why did you say that?

4  A.   I understood that the proposal was made, some sort, where

5  ATN could make money by not performing on the Battalion Set II,

6  and money was made from Newcon.

7  Q.   What would ATN do to earn this -- this -- the payment from

8  Newcon at this -- at this time?

9            MR. HOWDEN:  Again, lack of foundation.  Calls for

10  speculation.

11            THE COURT:  The objection's overruled.

12            THE WITNESS:  I don't think there is a solid scenario

13  at this point, so --

14  BY MS. HAMILTON

15  Q.   Now, did the conversation of increasing prices under ATN's

16  current contract with ITE come up in this conversation with

17  Mr. Prilik?

18  A.   Yes.

19  Q.   All right.  So, if we could, then, turn to Clip Eight,

20  which is page 16, line 21, to page 17, line 24.

21       (Audio clip played)

22  BY MS. HAMILTON

23  Q.   I'd like to first turn your attention to page 17, line 3,

24  in which you say, "After all he sold them.  Well, I don't know

25  for something.  I don't know.  I don't remember exactly, but

1  shall we say, well, in dollars, about around 1,800 bucks,

2  right?"

3      To whom are you referring when you said "he" sold them?

4  **A.**   ITE.

5  **Q.**   And you --

6  **A.**   Ramzi.

7  **Q.**   And on line 6 of page 17, you refer to -- you say, "around

8  1,800 bucks," right?

9      Why did you say that?

10 **A.**   Because that was approximately an amount that Ramzi was

11 selling it for.

12 **Q.**   To whom?

13 **A.**   To TACOM.

14 **Q.**   On page 18, line 6, Mr. Prilik says, "Well, let's examine

15 the possibilities."

16     So I'd like to walk through those possibilities with you

17 that Mr. Prilik refers to.  Turning first to page 18, line 11,

18 Mr. Prilik said, "He has an option to refuse to deliver it.  He

19 can't take it, because then he would destroy his entire

20 contract, because don't forget that the night vision is

21 approximately 25 percent from it all."

22     Did -- who did you understand Mr. Prilik was referring to

23 when he said "he," on line 11?

24 **A.**   Again, ITE.  Ramzi.

25 **Q.**   And did you -- what did you understand, when Mr. Prilik

 1  said, "an option to refuse to deliver it"?

 2  A.   Well, one of the options that Ramzi -- and this is in the

 3  words of Prilik here.  He's proposing that one of the options

 4  that he could take:  That he would make no deliveries or make

 5  no money on a portion of night-vision goggles, but will make

 6  some money on a portion by delivering weapons and communication

 7  equipment.

 8  Q.   On page 18, line 18, Mr. Prilik said, "He has an option to

 9  swallow it, and to rage, and to tell Dima how bad he is."

10      What was your understanding of the "it" that was referred

11  to by Mr. Prilik on line 18 to mean?

12  A.   Price increase.

13  Q.   And on line 19, who -- who was the "Dima" that Mr. Prilik

14  was referring to?

15  A.   That's me.

16  Q.   And then page 18, line 19, Mr. Prilik said, "He has an

17  option to turn around and run to Byron, run to Max, run to

18  Shmax, and run there to Yukos, Yunos, well, to all of the

19  others," to which you replied, on line 23, "Well, I

20  understand."

21      Were you familiar with the names that Mr. Prilik referred

22  to here?

23  A.   Yes.

24  Q.   How were you familiar with them?

25  A.   Mr. Prilik here was making references to the other

1  night-vision suppliers.  By "Ron" -- by -- Ron Harding is

2  principal of NiViSys.

3       Max, we already discussed, is principal at N-Vision.

4       And then Yukos.  And Yukos -- that's just overtures to

5  different night-vision companies.

6  Q.  When you say, "overtures to different night-vision

7  companies," what do you mean?

8  A.  I think it's the brand names.

9  Q.  Brand names for what?

10 A.  For different than Newcon and ATN night vision.

11 Q.  Did you understand that either of these companies sold

12 night-vision goggles?

13 A.  Yes.

14 Q.  Well, let's walk through each one, then, starting with

15 Byron.  You said that was Byron Harding, from NiViSys.  Is that

16 right?

17 A.  Yes.

18 Q.  Why did you believe that that was the reference that

19 Mr. Prilik was referring to:  Byron Harding at NiViSys?

20 A.  I didn't know any other Byron.  And -- but I knew

21 Byron Harding.

22 Q.  Now, in 2005, based on your knowledge of the industry of

23 night-vision goggles, did you believe that NiViSys was -- would

24 be able to supply a large volume of night-vision goggles

25 required in the Battalion Set II contract?

1  **A.**    It was one of the possibilities.

2  **Q.**    When you say, "one of the possibilities," what do you

3  mean?

4  **A.**    At that time, in 2005, I believed it would be -- NiViSys

5  could theoretically supply, but highly unlikely, because they

6  were not yet a player in Generation II product out of Russia.

7  **Q.**    There's -- Mr. Prilik then, on line 21, refers to "Max."

8      And you said you believed that to be a reference to the

9  proprietor of N-Vision.  Is that right?

10 **A.**    Yes.

11 **Q.**    Why did you believe that?

12 **A.**    I didn't know any other Maxes in the business.

13 **Q.**    Now, in 2005 did you -- did you believe, based on your

14 market experience, that N-Vision was a viable option to supply

15 night-vision goggles for the Battalion Set II contract?

16 **A.**    Yeah, theoretically, they could deliver, but not in -- not

17 practical.

18 **Q.**    Why did you believe that?

19 **A.**    N-Vision was a much smaller company, to my understanding.

20 And it needed -- you needed an experience working with Russian

21 suppliers, and financial capital to work on a contract with

22 this amount.

23 **Q.**    And then Mr. Prilik referred to "Shmax."  Did you

24 understand who that was?

25 **A.**    I think that's just play on "Max."  Just means to someone

1  else.

2  Q.   Mr. Prilik then referred to -- on line 21, to Yukos.  Were

3  you familiar with Yukos?

4  A.   Not very much familiar, no; but my understanding was it

5  was just another night-vision manufacturer.

6  Q.   In 2005 did you have enough information to make an opinion

7  as to whether or not Yukos could supply a large quantity of

8  night-vision goggles required in the Battalion Set II contract?

9  A.   Well, since I wasn't even aware of them, I didn't believe

10 they were much of a player in that setting.

11 Q.   Okay.  And the final reference was to "Yunos," on page 18,

12 line 22.  Who did you believe Yunos was?

13 A.   I don't know.  I think it was a reference to "Yukos";

14 similar to "Max" and "Shmax."

15 Q.   Okay.  After Mr. Prilik read through these companies --

16 various companies' names, on line 23, you said, "Well, I

17 understand."

18     Why did you say that?

19 A.   Well, I was agreeing with him that, other than Newcon and

20 ATN, there would be probably not that many players that priced

21 well.

22 Q.   On page 18, line 4, Mr. Prilik said, "If we were going to

23 hold our position firmly and the factories that manufacture the

24 IITs are going to hold their factories firmly accordingly, in

25 what will it end?"

1        What did you understand the word "position" to mean in

2   that; in Mr. Prilik's sentence that, "We're going to hold our

3   position" -- "If we're going to hold our position firmly"?

4   **A.**    If we agree on the pricing of some sort, and then hold

5   that pricing level together, then that's what Mr. Prilik was

6   referring to in here.

7   **Q.**    On -- and also on that -- on page 19, line 3, Mr. Prilik

8   asked, "In what will it end?"

9        And on line 4, it says, "In nothing."

10       What did you understand Mr. Prilik's reference to "it"

11  meant there, in, "In what will it end?"

12  **A.**    Ramzi's possible looking for other suppliers than ATN and

13  Newcon.

14  **Q.**    When Mr. Prilik said that it will end in nothing, did

15  you -- did you believe that he was accurate?

16  **A.**    Yes.

17  **Q.**    Why?

18  **A.**    ATN and Newcon were best possible candidates to deliver in

19  that country.

20  **Q.**    Now on page 19, line 9, Mr. Prilik said -- "And what

21  happens afterwards?  Afterwards a new tender come comes out" --

22       Oh, I'm sorry.  I jumped ahead.  I apologize.  On page 1,

23  line 9 -- line 1.  Excuse me.  I'm sorry.  One minute.  I

24  apologize.

25       So on page 19, beginning at line 6, Mr. Prilik said, "What

 1  other options does he have?  He has an option -- excuse me.

 2  That's none of my damn business, but if he make money on Tommy

 3  guns and radios, well, then he will move aside a little bit."

 4       Did you -- did you -- what did you understand Mr. Prilik

 5  meant when he said, "He will move aside a little bit"?

 6  **A.**   Well, that was one of the scenarios discussed.  If the

 7  price to ITE would be raised, he would absorb that price

 8  increase.

 9  **Q.**   And when you say, "He would absorb" -- whom do you mean?

10  **A.**   ITE.

11  **Q.**   And did you believe that ATN might absorb a price increase

12  at that point in time, if one was instituted?

13  **A.**   You mean ITE?

14  **Q.**   I apologize.

15       Did you believe Mr. Prilik's statement was accurate?

16  **A.**   No.

17  **Q.**   Why not?

18  **A.**   If the scenario that we're discussing here -- that he is

19  buying goggles at 1,800, and you offer it to him for 1,798, I

20  didn't believe that would be valuable, kind of, for prime to

21  continue delivering night-vision goggles, making $2 per unit.

22            **MR. HOWDEN:**  Your Honor, this is all speculation.

23            **THE COURT:**  It sounds like it.  I'm going to strike

24  the answer.  So the answer's stricken, and you are to disregard

25  it.

1          **MS. HAMILTON:**  Okay.

2   **Q.**   And page 19, line 12, Mr. Prilik said, "Okay.  Let's

3   examine this further.  The worst case he would say no, I don't

4   want to.  And what would happen?  He simply wouldn't deliver in

5   full, right," to which you reply, on line 16, "Yes."

6          And Mr. Prilik said, on line 17, "And the Americans

7   would swallow it," to which you reply, on line 18, "Yes."

8          Here on line 17, when Mr. Prilik said, "and the

9   Americans would swallow it," what did you refer -- what did you

10  understand it to mean?

11  **A.**   The fact that one of the scenarios, nondelivery on

12  Battalion Set II, the TACOM would need to be dealing with the

13  fact that Ramzi is unable to supply night-vision goggles.  And

14  they would need to swallow this, and continue buying them

15  elsewhere.

16  **Q.**   Did you tell Mr. Prilik that you were interested in his

17  proposal?

18  **A.**   Yes.

19  **Q.**   Pardon?

20  **A.**   I said that I'm willing to hear more, or something to that

21  extent.

22  **Q.**   Okay.  So let's then turn to listen to page 20, line 1,

23  through page 23, line 20.

24      (Audio clip played)

25

1  **BY MS. HAMILTON**

2  **Q.**   Turning your attention to page 20, line 14, Mr. Prilik

3  said, "And I'll ask him preliminarily that and that which we'll

4  try to organize this is called an illegal antitrust."

5      To whom did you understand Mr. Prilik would be asking that

6  which we'll try to organize is called and illegal antitrust.

7  **A.**   Michael Beker.

8  **Q.**   And why did you believe that?

9  **A.**   Because he just mentioned that he's going to contact him,

10  and he will need his approval to proceed.

11  **Q.**   Now, on page -- excuse me.  Line 8, Mr. Prilik said, "I'm

12  joking."

13      Did you understand Mr. Prilik to be joking?

14  **A.**   No.

15  **Q.**   Why not?

16  **A.**   I think that was in response to my reaction when he

17  mentioned illegal antitrust.  And I said, "Well."  That "Well."

18  **Q.**   Was there any other reason that you believed he was not

19  joking?

20  **A.**   Yes.  Because he continued on to discussing, and he was

21  talking later on about contacting Michael.

22  **Q.**   So approximately how long did this conversation last?

23  **A.**   This conversation -- I don't recall.  About 20 minutes or

24  so, or a little over.

25  **Q.**   And did you then subsequently speak with Mr. Prilik again?

1   **A.**    Yes.

2   **Q.**    And when was that?

3   **A.**    Same day, very shortly after.

4   **Q.**    And did you record that conversation?

5   **A.**    Yes.

6   **Q.**    I'm going to hand you what's been previously marked as

7   Exhibit 102.  Do you recognize that?

8   **A.**    Yes.

9   **Q.**    What is it?

10  **A.**    This is marked "Tape Number Two."  And it's original

11  recording of the second conversation.

12  **Q.**    And who made that recording?

13  **A.**    I did.

14  **Q.**    And have you listened to that recording?

15  **A.**    Yes.

16  **Q.**    And have you listened to the -- and did that recording

17  accurately reflect the conversation that you had with

18  Mr. Prilik?

19  **A.**    Yes.

20  **Q.**    And have you compared that audio-recording original to the

21  duplicate that the jury's hearing?

22  **A.**    Yes.

23  **Q.**    Are they the same?

24  **A.**    Yes.

25         **MS. HAMILTON:**  We'd move to admit, your Honor.

 1          **MR. HOWDEN:**  No objection, your Honor.

 2          **THE COURT:**  That's Exhibit 102?

 3          **MS. HAMILTON:**  Yes.

 4          **THE COURT:**  And then the transcription's what?  Okay.

 5  So that's 132, then, right?

 6          **MS. HAMILTON:**  Correct.  The transcript is 132.

 7          **THE COURT:**  Okay.  Okay.

 8          (Trial Exhibit 102 received in evidence)

 9          **MS. HAMILTON:**  We're on our way to, hopefully, 132.

10  **Q.**  So have you reviewed an English transcription of this

11  conversation?

12  **A.**  Yes.

13  **Q.**  And after reviewing it, did you -- and did you compare it

14  to the conversation that you had with Mr. Prilik?

15  **A.**  Yes.

16  **Q.**  And what -- did that English translation accurately

17  reflect the conversation that you had with Mr. Prilik?

18  **A.**  Yes.

19          **MS. HAMILTON:**  Move to admit Exhibit 132.

20          **THE COURT:**  And 132 -- I understand there's no

21  objection, correct?

22          **MR. HOWDEN:**  Correct.

23          **THE COURT:**  And maybe we could find a way to do --

24  have a stipulation that that formality pertains to all of the

25  tapes that you've agreed to, and the transcripts, so we don't

 1   have to go through this all of the time.

 2              MR. HOWDEN:  That would be fine, your Honor.

 3              THE COURT:  Okay.  Thank you.  Thank you.

 4         (Trial Exhibit 132 received in evidence)

 5              THE COURT:  132 and 102 are admitted.

 6              MS. HAMILTON:  Okay.  So if we could play the

 7   introduction to the recording before asking -- I ask you any

 8   questions, that begins at page 1, line 1, through page 1, line

 9   17.

10              (Audio clip played)

11   BY MS. HAMILTON

12   Q.   On line 17, you say, "That was fast."

13        How soon after the first conversation ended with

14   Mr. Prilik did this conversation begin?

15   A.   Arie called back very shortly after.  I want to say 15, 20

16   minutes, or something.

17              MS. HAMILTON:  If we could then play the next

18   portion, which is page three, line five, to page 6, line 17.

19              (Audio clip played)

20   BY MS. HAMILTON

21   Q.   Now, if I can turn your attention to page 3, line 14,

22   Mr. Prilik said, "Yes, he is willing to talk and meet along the

23   lines of my proposal, or something close to it."

24        Did you understand who Mr. Prilik was referring to when --

25   on line 14, when he said "he is willing"?

1  **A.**   Yes.

2  **Q.**   And who was that?

3  **A.**   Michael Beker.

4  **Q.**   And why did you believe that to be the case?

5  **A.**   Because previous conversation was left to where Arie had

6  to contact Michael.

7  **Q.**   And Mr. Prilik then went on in this portion of the

8  conversation to say, "They're willing to talk and meet along

9  the lines of my proposal, or something close to it, but the

10 best thing to do, in order to make it specific, is perhaps for

11 Marc to get in touch with him."

12      Who did you understand "Marc" to mean?

13 **A.**   Marc Morgovsky, CEO of ATN.

14 **Q.**   And was -- what was -- what did you understand was to

15 occur between Mr. Marc Morgovsky and Mr. Beker, according to

16 Mr. Prilik?

17 **A.**   Well, he was proposing a meeting of some sort between

18 Michael and Marc.

19 **Q.**   And did -- did that meeting occur?

20 **A.**   No.

21 **Q.**   Why not?

22 **A.**   Because I was the one who was working on this contract;

23 Marc wasn't.  And Marc wasn't a part of the conversation with

24 Newcon.

25 **Q.**   Mr. Prilik said at the end of this conversation that he

```
 1   would -- he would let Mr. Beker know that -- to -- that, on

 2   Monday, that you would tell him that -- he would tell Mr. Beker

 3   that you'd be calling on Monday.  Is that right?

 4   A.    Yes.

 5   Q.    And then did you subsequently have another conversation

 6   with Mr. Prilik?

 7   A.    Yes.

 8   Q.    Or Mr. Beker after this conversation, August 29th -- 26th?

 9   Excuse me.

10   A.    Yes.  I called the following Monday, on August the 29th.

11   Q.    And did you record that conversation?

12   A.    Yes.

13             THE COURT:  Would this be a good place to perhaps

14   take a break?  It is a little wearying.

15             Let's try to keep it to ten minutes, though, because

16   I think you're going to want a second break at some point.  And

17   keep it to ten minutes.  I know that doesn't give you a lot of

18   time, but we'll try to do that.  Aim for ten minutes, please.

19             Follow the instructions you've been given about not

20   discussing the case with anyone else.

21             Do not discuss your testimony with any other persons

22   who may be witnesses.  Thank you.

23             (Jury out at 10:17 a.m.)

24             THE COURT:  Okay.  So make a dash for it.  Ten

25   minutes.  Thank you.
```

```
 1              (Whereupon there was a recess in the proceedings

 2               from 10::18 a.m. until 10:37 a.m.)

 3              (Jury in at 10:37 a.m.)

 4              THE COURT:  And you may continue.

 5              MS. HAMILTON:  Thank you, your Honor.

 6  BY MS. HAMILTON

 7  Q.   Mr. Rocklin, we just started to talk about the first

 8  conversation that you had with Mr. Prilik on August 29th.

 9  A.   Yes.

10  Q.   Did you record that conversation?

11  A.   Yes.

12  Q.   And did you review an English translation of that

13  conversation?

14  A.   Yes.

15  Q.   And did the conversation, did it accurately reflect the

16  conversation -- did the recording reflect the conversation you

17  had with Mr. Prilik?

18  A.   Yes.

19              MS. HAMILTON:  So I move to admit tape number Exhibit

20  No. 103, your Honor.

21              MR. OSTERHOUDT:  No objection.

22              MR. HOWDEN:  No objection.

23              THE COURT:  Admitted.

24              (Trial Exhibit 103 received

25               in evidence)
```

 1  **BY MS. HAMILTON**

 2  **Q.**   And, also, you reviewed the English translation and it was

 3  an accurate reflection of the conversation that you had with

 4  Mr. Prilik on August 29th?

 5  **A.**   Yes.

 6          **MS. HAMILTON:**  So, your Honor, we move to admit

 7  Exhibit No. 133.

 8          **THE COURT:**  133 is admitted.

 9          (Trial Exhibit 133 received

10           in evidence)

11  **BY MS. HAMILTON**

12  **Q.**   And did you speak with Michael Beker on August 29th?

13  **A.**   No.

14  **Q.**   Did you speak with Mr. Prilik?

15  **A.**   Yes.

16  **Q.**   So let's now listen to the first clip, which is page 1,

17  line 13, to page 5, line 6.

18          (Audiotape played in open court.)

19  **Q.**   Turning your attention to page 2, line 24.  Mr. Beker --

20  excuse me, Mr. Prilik said:  "He is trying to ascertain for

21  himself what to talk about, what constitutes the idea, what

22  constitutes the offer, what constitutes the request."

23      When Mr. Prilik referred to "he" was trying to ascertain

24  for himself what to talk about, who did you understand the "he"

25  to mean?

1  **A.**   Michael Beker.

2  **Q.**   You then on page 3, line 3 respond:  "Well, the

3  requests... the ideas you gave them yourself, as they say."

4       Why did you say that?

5  **A.**   Because in the past conversation, Arie was giving ideas of

6  some sort on what the business solutions to this contract would

7  be.

8  **Q.**   So let's then play the remainder of this conversation,

9  which begins on page 5, line 7, and concludes on page 11, line

10 7.

11         (Audiotape played in open court.)

12 **Q.**   Now, when, if ever, did you next hear from one of the

13 defendants?

14 **A.**   Same day.

15 **Q.**   And did you have a conversation with one of the

16 defendants?

17 **A.**   Yes.

18 **Q.**   And who was it?

19 **A.**   Arie Prilik.

20 **Q.**   Did you record that conversation?

21 **A.**   Yes.

22 **Q.**   Okay.  Now, prior to your conversations with Mr. Prilik,

23 how did you hear from someone at Newcon?

24 **A.**   Someone would just dial me directly or leave a message.

25 **Q.**   On August 29th did you receive any type of message or

 1  voicemail or some other form of communication from one of the

 2  defendants?

 3  **A.**    Yes.  I received a voicemail from Arie Prilik.

 4  **Q.**    And did you record that voicemail as well?

 5  **A.**    I believe so, yes.

 6  **Q.**    And did you record that voicemail on the same recording as

 7  conversation number four?

 8  **A.**    Yes.

 9  **Q.**    Okay.  And did the recording of conversation number four,

10  was it an accurate -- did it accurately reflect the

11  conversation you had with Mr. Prilik?

12  **A.**    Yes.

13         **MS. HAMILTON:**  Move to admit Exhibit No. 104, your

14  Honor.

15         **THE COURT:**  104, admitted.  I hear no objection.

16         **MR. OSTERHOUDT:**  No objection.

17         (Trial Exhibit 104 received

18          in evidence)

19         **MS. HAMILTON:**  Thank you.

20  **BY MS. HAMILTON**

21  **Q.**    And did you subsequently review an English translation of

22  that conversation you had with Mr. Prilik on August 29th at

23  3:00 o'clock?

24  **A.**    Yes.

25  **Q.**    And did that translation accurately reflect the

 1  conversation you had with Mr. Prilik?

 2  **A.**   Yes.

 3          **MS. HAMILTON:**   Your Honor, I move to admit Exhibit

 4  134, the English translation.

 5          **MR. OSTERHOUDT:**   No objection.

 6          **THE COURT:**   Hearing no objection, so 134 is admitted.

 7          (Trial Exhibit 134 received

 8           in evidence)

 9          **MS. HAMILTON:**   Thank you.

10  **BY MS. HAMILTON**

11  **Q.**   So if we could play the first clip of the conversation,

12  which begins at page 1, line 13, through page 2, line 8.

13          (Audiotape played in open court.)

14  **Q.**   What, if anything, did you do after receiving this

15  voicemail?

16  **A.**   I returned the call.

17  **Q.**   And did you speak with Mr. Prilik?

18  **A.**   Yes.

19  **Q.**   During the call, did Mr. Prilik discuss Mr. Beker?

20  **A.**   Yes.

21  **Q.**   Let's play the next clip starting at page 2, line 9,

22  through page 6, line 5.

23          (Audiotape played in open court.)

24  **Q.**   If I could turn your attention, please, to page 3, line 8.

25  Mr. Prilik said:  "The question arose if we think in the

1  direction of how, after all, not to let the Americans down --

2  not to let down the Americans, but indeed to finish... to

3  deliver what they need to them.  Then what quantities and terms

4  were subscribed to."

5       To which you replied on line 16:  "I've got it."

6       Why did you say, "I've have got it"?

7  A.   I was continuing the conversation, understanding that for

8  next stage of working scenario Arie was asking for details,

9  units were remained to be delivered.

10 Q.   Okay.  And the reference to -- on line 13 to "quantities

11 and terms", what did you understand that was a reference to?

12 A.   How many units remained to be delivered and when to be

13 delivered, what the delivery schedule was.

14 Q.   What was the purpose in eliciting this information?

15 A.   To -- again, to work out the working scenario for proposed

16 offer.

17 Q.   Turning your attention now to page 6, line 1.  Mr. Beker

18 says:  "We are now September, October.  He'd say it's a science

19 fiction."

20       Who did you understand Mr. Prilik was referring to when he

21 said "he'd say"?  Who was the pronoun "he" was referring to

22 there?

23 A.   I think Michael Beker.

24 Q.   And then on page 6, line 2, Mr. Beker said:  "But I think

25 this is here.  They will accept that which they would be given.

1    There is no way about it."

2         Who did you understand "they" was in that sentence?

3    A.    TACOM.

4    Q.    And why did you believe Mr. Prilik was referring to TACOM?

5    A.    Because this is what we're discussing here, the schedule.

6    And TACOM will take the schedule, whatever the schedule will

7    be.

8    Q.    And on line 5 of page 6 you say:  "Let's assume that."

9    Why did you say that?

10   A.    Well, I don't think you can predict for sure what TACOM

11   will do.  That's my response, so.  I'm assuming the proposal,

12   whatever Prilik is proposing here.

13   Q.    Now, in this section after discussing how many night

14   vision goggles were left to be delivered, did you and Mr.

15   Prilik discuss ITE's reaction from a possible switch from one

16   supplier to another?

17   A.    Yes.

18   Q.    Let's then listen to the next clip, which begins at

19   page 6, line 6, and continues to page 9, line 4.

20             (Audiotape played in open court.)

21   Q.    All right.  If we could turn your attention to page 6,

22   line 7?

23        Mr. Prilik asked:  "And in your opinion... what in your

24   opinion will be the regard of the comrade from Jordan for any

25   proposed changes in the suppliers or models?"

1       To which you replied to page 10:  "Well, for that we need

2   to agree on something, how exactly you wanna do it.  You

3   understand?"

4       Why did you say that?

5   **A.**   Arie at this point was looking for a scenario, and I was

6   asking him exactly how he was looking -- what the scenario he

7   was proposing.

8   **Q.**   And on line 14 you then say:  "I am sure you have all the

9   numbers, and whatever you proposed before we'll be in the same

10  realm, so to speak."

11      Why did you say that?

12  **A.**   Because I was telling Arie that I had already all the

13  numbers of units to be delivered at that point, and prior to

14  that he also mentioned profit that ATN was making.  So I was

15  referring to that numbers.

16  **Q.**   After you referred to the numbers on page 6, line 24, Mr.

17  Prilik responded:  "That is to say from your side, you

18  understand, that we... such prices... that which we discussed,

19  for us it is simply physically impossible, no way to claim into

20  it."

21      To which you replied on line 5:  "Well, if that's what you

22  say."

23      Why did you say that, "If that's what you say?

24  **A.**   Because a number of times it was brought up that the

25  Newcon cost for night vision goggles was higher than ATN cost.

1   And, therefore, they couldn't supply the goggles at that price

2   level as ATN so the price had to be raised.

3   **Q.**     On page 11, line 21 Mr. Prilik said:  "But... but what it

4   boils down that in all likelihood it would be required from the

5   comrade from Jordan to raise the cost and very likely to change

6   the supplier and the model."

7        What did you understand "raise the cost" to mean in this

8   context?

9   **A.**     That the cost of night vision goggles to be delivered on

10  Battalion Set II to ITE would need to be going up.

11  **Q.**     Raise the cost to whom?  I'm sorry.

12  **A.**     To ITE in this specific instance.

13  **Q.**     Mr. Prilik then goes on to say starting to line 23:  "And

14  the question how well it's going to bond with him or this

15  comrade who is used to selling camels will say no, well, this

16  one... I know this model.  And you can all go to hell."

17       To which you reply on line 4:  "Well, he can be difficult,

18  that's why I told you that you can go anywhere hypothetically

19  above $1,800 or even close to it, he will be forced to raise

20  the prices.  And how it's going to play out further, I have no

21  idea."

22       First off, let's -- walking through some of your phrases,

23  sentences.  You said, "Well, he can be difficult."  To whom are

24  you referring?

25  **A.**     President of ITE, Ramzi Abu-Taleb.

1  **Q.**   And why did you say that Ramzi Abu-Taleb could be

2  difficult?

3  **A.**   He was negotiating hard during the bidding process and he

4  would -- I am stating here that he would be very adamant to any

5  price increase, and to retain the profit that he would -- was

6  making by buying the units from ATN, he would be forced to

7  raise the prices to TACOM.

8  **Q.**   Turning your attention then to page 8, line 10.  Mr.

9  Prilik said:  "The question is whether we would prefer to work

10  with a little profit or without profit and to save his

11  contract, or if he would prefer to put a big pile of crap on

12  the TACOM and not deliver in its entirety."

13      To which you reply on line 16:  "Well, this is, as they

14  said, dangerous game."

15      Why did you say that?

16  **A.**   Because it was highly unlikely that ITE would work with

17  little profit.  And then the second scenario, that he would not

18  deliver the units, so then the contract would go back on the

19  bidding process.

20  **Q.**   Now, you previously -- you just a moment ago said that ITE

21  was negotiating hard during the bidding process.  What did you

22  mean by "negotiating hard"?

23  **A.**   As a prime, they were looking for the best delivery terms,

24  best price, best warranty and best payment terms.

25  **Q.**   After you and Mr. Prilik discussed the subject of -- of

1    Ramzi's reaction to a change in supplier, did the subject of

2    Mr. Beker come up again in this conversation?

3    **A.**    Yes.

4    **Q.**    All right.  Let's listen to page 9, line 5, to page 11,

5    line 24.

6              (Audiotape played in open court.)

7    **Q.**    Now, I want to turn your attention to page 10, line 21.

8    Mr. Prilik asked:  "Will it play a role if the TACOM presented

9    the LC for the comrade from Jordan who reassigned it to you...

10   and afterwards it should be reassigned."

11        What did you understand the reference to "LC" on  line 22

12   to mean?

13   **A.**    It was a reference to letter of credit.

14   **Q.**    And when Mr. Prilik asked, "Would it play a role if the

15   TACOM presented a letter of credit for the comrade from Jordan

16   who reassigned it to you," how does a letter of credit work in

17   the context that Mr. Prilik was speaking here?

18   **A.**    Letter of credit is a payment instrument in which one

19   entity would usually deliver product or the services and

20   another entity would go to the bank, secure the funds, and then

21   on some condition payment would be released to whoever is

22   delivering goods or services.

23        And in this instance there is also a possibility where a

24   payment, a letter of credit can be transferred.  So, let's say,

25   TACOM would open the letter of credit to ITE and then ITE would

 1  be transferring a letter of credit to ATN.  But this was not

 2  the case, so I'm stating it there.

 3  Q.   When you say "this was not the case," what do you mean?

 4  A.   There was not a letter of credit and Ramzi was paying to

 5  us directly without the letter of credit.

 6  Q.   Now, on page 9, line 5, just Mr. Prilik says:  "Seriously,

 7  I with him will come to the bottom of this matter and then

 8  tomorrow... either tomorrow or the day after tomorrow, he will

 9  already call."

10      Who did you believe Mr. Prilik was referring to when he

11  said "him" on line 5?

12  A.   Michael Beker.

13  Q.   And did you subsequently speak with Mr. Beker?

14  A.   Yes.

15  Q.   And when was that?

16  A.   Next day.

17  Q.   How did you come to speak with Mr. Beker?

18  A.   I think Arie made a call and connected us.

19  Q.   And did you record the telephone conversation with Mr.

20  Prilik and then Mr. Beker?

21  A.   Yes.

22  Q.   And does that -- have you reviewed that recording?

23  A.   Yes.

24  Q.   And does it accurately reflect the conversation that you

25  had with Mr. Prilik and then Mr. Beker?

 1   A.    Yes.

 2            MS. HAMILTON:   Your Honor, I would move to admit

 3   Exhibit 105, the recording of the fifth conversation into

 4   evidence.

 5            THE COURT:   105?  Admitted.

 6            (Trial Exhibit 105 received

 7             in evidence)

 8            MS. HAMILTON:   Thank you.

 9   BY MS. HAMILTON

10   Q.    Did you subsequently review an English translation of the

11   conversation you had with Mr. Prilik and then Mr. Beker on

12   August 30th?

13   A.    Yes.

14   Q.    And was the English translation accurate, an accurate

15   reflection of your conversation with Mr. Prilik and Mr. Beker

16   on August 30th?

17   A.    Yes.

18            MS. HAMILTON:   Your Honor, I move to admit Exhibit

19   135, which is the English translation of the fifth conversation

20   into evidence.

21            THE COURT:   And no objection?  135 is admitted.

22            (Trial Exhibit 135 received

23             in evidence)

24            MS. HAMILTON:   Thank you.

25

1  **BY MS. HAMILTON**

2  **Q.**   Okay.  You spoke with Mr. Prilik first that day, you said?

3  **A.**   Yes.

4  **Q.**   Let's turn to the conversation and begin listening.  So

5  beginning on page 2, line 5 -- line 5, through page 2, line 22.

6          (Audiotape played in open court.)

7  **Q.**   Mr. Prilik said he would transfer the telephone

8  conversation.  Did you then speak with Mr. Beker?

9  **A.**   Yes.

10 **Q.**   Let's -- and then did Mr. Beker speak about Mr. Prilik at

11 all?

12 **A.**   Yes.

13 **Q.**   Let's turn to page 2, line 24, through page 5, line 5 and

14 listen to that segment.

15          (Audiotape played in open court.)

16 **Q.**   If I could turn your attention to page 5, line 2, Mr.

17 Beker said:  "I can say... like now we are talking and you are

18 talking with the primary source.  That is to say, there is no

19 longer any sense in duplicating it."

20     To which you replied on line 5, "I've got it.  Well,

21 that's why."

22     Why did you reply, "I've got it"?

23 **A.**   I understood at that moment that Arie was communicating to

24 Michael, Michael was communicating to Arie, and he was the

25 primary source of negotiation and I should have -- I can

Lydia Zinn, CSR,  CRR, and Debra Pas, CSR, CRR
Official Reporters - U.S. District Court
(415)  531-6587

1  discuss everything further with him.

2  **Q.**   The "he" was the primary source, to whom are you

3  referring?

4  **A.**   Michael Beker.

5  **Q.**   We can then play the next portion, which is page 5, line

6  6, page 9, line 17.

7            (Audiotape played in open court.)

8  **Q.**   Okay.  I would turn your attention to page 5, line 10.

9  Mr. Beker said:  "The customs is closed.  The shipping is not

10 possible.  From this side, like all the problems are known to

11 me as well.  Well, I wouldn't say 100 percent, but 90."

12       When Mr. Beker referred on line 11 to "this side," what

13 did you understand that to mean?

14 **A.**   My understanding, that was a reference to TACOM, that

15 pressure was applied to TACOM in regard to the performance on

16 this contract.

17 **Q.**   And on line 10 Mr. Beker refers to the "customs is

18 closed."  What did you understand the reference to "customs" to

19 mean there?

20 **A.**   The customs in Russia seized this shipment from our

21 supplier.

22 **Q.**   On page 6, line 10 you say -- excuse me.  First, page 6,

23 line 2, Mr. Beker said:  "I have two ways, as it were.  The

24 first is to continue working like I have been working and to

25 wait and see how it will all end, right?"

1    And on page 6, line 10 you say:  "Yes, but with us it

2  could also somehow... could get resolved."

3    Why did you say that?

4  **A.**   I was giving an indication that we would keep working on

5  the contract, that we want to perform and deliver on the

6  contract.

7  **Q.**   Moving down to line 15, on page 6, Mr. Beker said:  "Maybe

8  you are hoping, shall we say, to resolve the matter by way

9  of... well, shall we say a Belarussian-Ukrainian cooperation."

10    At the time that ATN's supplier in Russia began to

11  experience difficulties, did ATN look for other sources to

12  obtain night vision goggles to supply under the Battalion

13  Set II contract?

14  **A.**   Yes.

15  **Q.**   And where was those companies located?

16  **A.**   One company was in Belarussia and the second one was in

17  the Ukraine.

18  **Q.**   And what was the name of the Belarussian company?

19  **A.**   Belamo.

20  **Q.**   And do you recall the name of the Ukrainian company?

21  **A.**   Sphera.

22  **Q.**   Did ATN use night vision goggles from either one of these

23  companies to fulfill its obligations under the Battalion Set II

24  contract?

25  **A.**   Yes.

1   **Q.**   Now, before turning to the next segment, I just want to

2   ask how, if at all, during this conversation did Mr. Beker

3   refer to the Battalion Set II contract?

4   **A.**   As "the contract" or "contract."

5   **Q.**   Then let's listen to Mr. Beker starting at page 9, line

6   18 --

7          **MR. HOWDEN:**  Your Honor, with respect to that last

8   answer, I don't think there is any foundation for that.  It's

9   speculation.  We're talking about two contracts in this case.

10          **THE COURT:**  Can you lay a foundation for that?

11          **MS. HAMILTON:**  We will play the next section and I

12   will lay it then, your Honor.

13          **THE COURT:**  And how do you spell what you were

14   saying?  Because I didn't understand it.  It sounded like --

15   did you say "contractor" or was it some other word?

16          **THE WITNESS:**  No, the contract or --

17          **THE COURT:**  How do you spell that?

18          **THE WITNESS:**  C-o-n-t-r-a-c-t.

19          **MS. HAMILTON:**  The contract.

20          **THE COURT:**  Oh, contract.  Okay.

21          **THE WITNESS:**  Yeah.

22          **THE COURT:**  It sounded like the name --

23          **THE WITNESS:**  No, no, no.

24          **THE COURT:**  It sounded differently to me.  Just

25   thought I -- sorry about that.

1        **THE WITNESS:**  We just didn't refer to the Battalion

2  Set II, we just referred to it as "the contract."

3        **THE COURT:**  Contract, okay.  Okay.

4        **MR. HOWDEN:**  Well, there is a subcontract.  It's not

5  the Battalion Set II contract, which we --

6        **THE COURT:**  You can go into it on cross-examination,

7  how is that?

8        **MR. HOWDEN:**  Thank you.

9        **THE COURT:**  Thank you.

10  **BY MS. HAMILTON**

11  **Q.**  All right.  If we could turn and play page 9, line 18, to

12  page 13, line 19.

13        (Audiotape played in open court.)

14  **Q.**  Okay.  If I could turn your attention to page 10, line 11.

15  Mr. Beker said:  "But the fact speaks for itself.  Well, people

16  came over and offered cheap prices and stole it."

17      First of all, what did you understand the reference to

18  "it" to mean, "stole it," on line 12?

19  **A.**  Battalion Set II contract.

20  **Q.**  And Mr. Beker's reference to "people" that came over on

21  line 11, what did you understand who the "people" to mean?

22  **A.**  ATN.

23  **Q.**  On page 10, line 17 Mr. Prilik -- Mr. Beker said:  "If you

24  had fit in a normal price niche, I wouldn't have said a single

25  word to you.  Kudos to you, as they say, but unfortunately the

1 Jordanian guy took us all.  And, well... and that's it.

2 Nothing else.  I am without any..."

3      And then it goes on.  But what I want to ask you is on

4 line 17 Mr. Beker said:  "If you had fit in a normal price

5 niche."  In this conversation did you ask Mr. Beker what he

6 meant by "normal price niche"?

7 **A.**   I think we discussed this.  I don't remember right now.

8 **Q.**   What did you understand Mr. Beker meant when he said "if

9 you fit in a normal price niche"?

10 **A.**   That ATN offered the product for very low pricing that

11 allowed prime ITE to make very large, unfair profits.

12 **Q.**   On page 10, line 23 Mr. Beker said:  "That because for

13 this money it is impossible to receive the product.  Well, and

14 not to mention to sell it."

15      What did you understand the reference for "this money" to

16 mean on line 23 at page 10?

17 **A.**   For the price that ATN was selling to ITE, Newcon was

18 unable to even buy the product for that money.

19 **Q.**   And what price was ATN selling its night vision goggles to

20 ITE?

21 **A.**   $1,277.

22 **Q.**   So was it impossible for ATN to buy night vision goggles

23 at the price Beker was referring to?

24 **A.**   No.

25 **Q.**   Was it impossible for ATN to sell night vision goggles at

1  that price?

2  **A.**    No.

3  **Q.**    Okay.  And moving on.  Did Mr. Beker provide his opinion

4  on ITE's chances of being awarded phase two and three of the

5  Battalion Set II contract?

6  **A.**    Yes.

7  **Q.**    And did he explain what he thought would happen to phase

8  two and phase three of that contract?

9  **A.**    Yes.

10  **Q.**    Let's turn to page 13, line 21 to page 16, line 8.

11         (Audiotape played in open court.)

12  **Q.**    If you could please turn your attention to page 14,

13  line 7.  Mr. Beker said:  "It's 100 percent that they said that

14  there would be no... no renewal of the contract for the

15  Jordanian guy."

16      On line 8 Mr. Beker refers to "they" said that.  What --

17  who did you understand Mr. Beker was referring to?

18  **A.**    TACOM.

19  **Q.**    And the reference on page 9 -- excuse me, line 9 that

20  there would be "no renewal of the contract," what contract did

21  you understand Mr. Beker was referring to?

22  **A.**    Battalion Set II.  More specifically phases two and three.

23  **Q.**    Staying on page 14 then, going to line 18, Mr. Beker said:

24  "Either it will be given already automatically like to the

25  company that proved its worth and accomplished the first part,

1   okay?"

2        Before I move on, I just want to ask you a couple

3   questions about this.  Did you understand who the company -- on

4   line 19 "the company that proved its worth," who did you

5   understand the company to be in this context?

6   **A.**   Newcon.

7   **Q.**   And what did you understand the reference to "accomplish

8   the first part" to mean?

9   **A.**   It was a reference to Battalion Set I where Newcon was

10  delivering night vision goggles.

11  **Q.**   Why did you believe that was the -- what was being

12  referred to here?

13  **A.**   Because that's the scenario we're discussing here.

14  **Q.**   On page 14, line 20 Mr. Beker said after referring to they

15  would automatically -- given automatically to the company that

16  proved its worth, then said on line 20:  "Or they will bring it

17  as the last resort to the tender, where we have all the chances

18  of winning.  Let's put it this the way.  Well, such are, from

19  my point of view... well, I, as it were... told you in plain

20  language, without, without ah... without hiding anything...

21  like, great.  Nothing grand... nothing hidden."

22       To which you replied on page 15, line 4, "Well, it's

23  clear".

24       Why did you say that?

25  **A.**   Well, I understood the two proposed scenarios that Mr.

1   Beker was proposing here; that the one scenario would be that

2   if ATN does not perform, then the contract would be just given

3   to Newcon.

4       And the second scenario is if ATN does not perform,

5   contract is going to go back on the bidding process and then

6   would be most likely awarded to Newcon.

7   **Q.**   Did Mr. Beker discuss what he believed to be the situation

8   with ATN suppliers in Russia?

9   **A.**   Yes.

10  **Q.**   Okay.  Let's listen to page 16, line 9, through page 18,

11  line 18.

12          (Audiotape played in open court.)

13  **Q.**   So that was page 16, line 9, through page 18, line 18.

14  Let's go ahead and just play the next clip, page 18, line 18,

15  through page 18, line 23.

16          (Audiotape played in open court.)

17  **Q.**   And did Mr. Beker continue to discuss his perceptions of

18  the activities in Russia?

19  **A.**   Yes.

20  **Q.**   All right.  Then let's go ahead and play page 19, line 24,

21  through page 22, line 24.

22          (Audiotape played in open court.)

23  **Q.**   Now, and during this August 30th conversation with Mr.

24  Beker, was the subject of ITE discussed again?

25  **A.**   Yes.

1  **Q.**   Let's turn to page 23, line 1, through page 27, line 8,

2  please.

3         (Audiotape played in open court.)

4  **Q.**   Okay.  If we could turn your attention to page 24, line

5  11, please.  Mr. Beker said:  "That is... that is, say, for

6  some reason it seems to me that now you should worry.  At this

7  point not so much about the execution of this contract, pardon

8  me for saying so, as for your ass to remain with its whole

9  skin."

10        You then reply:  "Well, we have... well, naturally you,

11  yourself, understand only too well.  We are exposed."

12        Why did you say that?

13  **A.**   Because I understood what Mr. Beker was implying here,

14  that have we not deliver the remainder of the goggles for

15  Battalion Set II, we would be exposed as a company for illegal

16  actions by ITE against ATN.

17  **Q.**   On page 26, line 10 you say:  "And for how much he'll sue

18  us; he is the only one who knows this, right?"

19        Who were you refusing to when you said "he" in that

20  sentence?

21  **A.**   I was referring to ITE president Ramzi Abu-Taleb.

22  **Q.**   Why did you say, "And for how much he'll sue us.  He is

23  the only one that knows this, right"?

24  **A.**   Because that was the discussion here, was a possible

25  liability by ATN to ITE and he could sue us for whatever he

ROCKLIN- DIRECT EXAMINATION / HAMILTON

1   would decide to sue us for.

2   **Q.**   Mr. Beker then replied on line 12:  "Yes, but if you're

3   going to involve... precisely from the point of view of force

4   majeure, that it doesn't depend on you.  If... I hope that you

5   have this in the contract, the force majeure circumstances, and

6   this has to do with the Russian authorities that you are unable

7   to control."

8        Are you familiar with the term "force majeure"?

9   **A.**   Yes.

10  **Q.**   What does it mean to you?

11  **A.**   It's a common clause in the business contracts where one

12  of the parties would be protected for non-performance based on

13  the acts that are above and beyond the influence of that party;

14  for example, wars, influenced by government.  I don't know,

15  revolutions, acts of God and so on and so forth.

16  **Q.**   Have you seen those clauses in business contracts ATN has

17  used?

18  **A.**   Yes.

19  **Q.**   Now, I would like to turn and play from page 27, line 9,

20  to page 34, line 22.

21           (Audiotape played in open court.)

22  **Q.**   During this conversation, did Mr. Beker discuss supplying

23  night vision goggles to ITE?

24  **A.**   Yes.

25  **Q.**   Let's then listen to page 35, line 1, to page 39, line 14.

1              (Audiotape played in open court.)

2    Q.    If you would turn your attention to page 36, line 12.  Mr.

3    Beker said:  "I 99 percent don't want to sell it to him."

4         Who did you understand the him was that Mr. Beker was

5    referring to there?

6    A.    Ramzi Abu-Taleb, president of ITE.

7    Q.    And then on page 37, line 18.  Mr. Beker says:  "I don't

8    trust him.  And in addition, why should I go with him if we

9    have a strategic structure with Anham that can implement this

10   contract."

11        At this time what, if anything, did you believe was

12   Newcon's relationship with Anham?

13   A.    Newcon was a subcontractor for Battalion Set I and they

14   delivered under battalion Set I the night vision goggle portion

15   of it.

16   Q.    What, if any, other understanding did you have about the

17   relationship between Newcon and Anham?

18   A.    If the second battalion set would be up for grabs, as

19   we're discussing here, and would be awarded to -- for phases

20   two and three to Anham, then Newcon would be delivering the

21   night vision goggle part.

22   Q.    What led to your understanding on that part?

23   A.    Because Mr. Beker here states this.

24   Q.    Now, was Mr. Prilik discussed during this conversation?

25   A.    Yes.

 1  Q.   Let's then play page 39, line 15, through page 42, line

 2  12.

 3          (Audiotape played in open court.)

 4  Q.   If you would turn your attention to page 40, line 15.

 5  Mr. Beker said:  "And he wants to see, as it were.... ah, is

 6  the end result of this, but unfortunately I can only hear out

 7  his ideas, conversations, but... well whether to accept them or

 8  not to accept them.  I know, ah, his suggestions as well, shall

 9  we say, but..."

10      Who did you understand Mr. Beker was referring to in that

11  passage?

12  A.   Arie.  Arie Prilik.

13  Q.   And continuing at line 20 on page 40:  "I'm also all for,

14  ah, I... I... I don't understand the main point for now.  I

15  don't understand what platform we can, like, combine our

16  ambitions.  This is what I don't understand for now, in the big

17  picture.  We... well, as it were competitors after all."

18      To which you reply on page 41, line 2:  "That's a fact."

19      Why did you say that?

20  A.   I was agreeing with Michael that we were competitors.

21  Q.   Mr. Beker refers to you as Dimochka.

22  A.   Yes.

23  Q.   Does that have some particular -- when is the word -- your

24  name, when are you called that name?  Under what circumstances?

25  A.   Usually that's how parents would address their children.

1  Q.   Now, did Mr. Beker discuss any other companies besides ITE

2  and ATN during this conversation?

3  A.   Yes.

4  Q.   Let's listen to page 44, line 8, to page 45, line 10.

5       (Audiotape played in open court.)

6  Q.   If you could turn your attention first to page 44, line

7  11.

8       THE COURT:  Before you do that, I don't know

9  whether -- does the jury have access to this or will they have

10 access to the written transcripts?

11      MS. HAMILTON:  Yes, your Honor.  We anticipate giving

12 it with redactions at the end.

13      THE COURT:  Okay, okay.  So there are redactions.

14 And I gather from my understanding of what's been agreed to

15 that the redactions should not concern the jury.

16      In other words, there will be big black lines

17 omitting certain things because, in fact, all the parties agree

18 that what has been redacted or blackened out is not relevant to

19 the proceedings here.  There may have been some personal

20 conversation or something else, whatever it was, but it's not

21 relevant to what's involved here.

22      Is that correct?

23      MS. HAMILTON:  Yes, your Honor.

24      MR. HOWDEN:  That's correct, your Honor.

25

1          **THE COURT:**  Okay.  Okay.

2    **BY MS. HAMILTON**

3    **Q.**  So Mr. Beker says, starting on line 10:  "We work very

4    closely with DEP Photonis and we work with representatives of

5    the ITT.  We also work with... eh, Inside Technology."

6          Are you familiar with DEP Photonis?

7    **A.**  Yes.

8    **Q.**  How do you know that, DEP Photonis?

9          **THE COURT:**  We talked about that earlier, didn't we?

10          **MS. HAMILTON:**  Yes.

11          **THE COURT:**  So that particular company.

12          **MS. HAMILTON:**  I was kind of saying in this stage.

13    It's been awhile and there has been a lot of conversations

14    since then.

15    **BY MS. HAMILTON**

16    **Q.**  So in 2005 what product did DEP Photonis say?

17    **A.**  Generation II image intensifier tubes, among other

18    products.

19    **Q.**  Was there any other generation technology that was sold by

20    DEP Photonis?

21    **A.**  No.

22    **Q.**  Only Generation II?

23    **A.**  Yes.

24    **Q.**  Next reference is on line 11 to "representatives of the

25    ITT."  In 2005 did you have an understanding of who ITT was?

1  **A.**    Yes.

2  **Q.**    And who was it?

3  **A.**    U.S. largest producer of Generation III.

4  **Q.**    I'm sorry.  Generation III what?

5  **A.**    Image intensifier tubes and the full systems.

6  **Q.**    And there's also on line 12, Mr. Beker references Inside

7  Technology.  In 2005 were you familiar with this, with Inside

8  Technology?

9  **A.**    Yes.

10  **Q.**    And how were you familiar with Inside Technology?

11  **A.**    Inside Technology was the company that manufactured

12  complete systems Generation III.

13  **Q.**    And when you say "complete systems," what does that mean?

14  **A.**    Fully functioning units, like night vision goggles and

15  stuff like that.  And they are also manufactured non-core

16  technology bodies.

17  **Q.**    Now, on page 44, line 15, Mr. Beker said:  "That is to

18  say... excuse me.  Discuss the question of whether or not they

19  are going...  Or not going – one way or the other – to

20  participate."

21     What did you understand the phrase "participate" to mean

22  in this context.

23  **A.**    How these competitors would participate in any given

24  bidding process for night vision.

25  **Q.**    Mr. Beker then says, beginning on line 15:  "That is to

1   say... what we'll now be talking about, no, don't participate.

2   We'll give you a payment to step back.  For what?"

3   **A.**   He is --

4   **Q.**   I --

5   **A.**   I thought for what?  Okay.

6   **Q.**   "For what" is actually one of the statements Mr. Beker

7   makes.

8        Did you understand to whom Mr. Beker was referring when he

9   said you, "We'll give you a payment to step back?"

10  **A.**   Yes.

11  **Q.**   And who did you understand him to be referring to?

12  **A.**   ATN.

13  **Q.**   And what did you understand the payment to give you a

14  payment to step back to mean?

15  **A.**   Taking cooperation between competitors to the next level.

16  So that's a payment to ATN for not performing for the remainder

17  of Battalion Set II contract.

18  **Q.**   And who did you understand would make that payment to ATN?

19  **A.**   Newcon.

20  **Q.**   Beginning on page 44, line 18 you say:  "No.  Well, I

21  understand this is..."

22       And then on line 21 say," This is your business decision,

23  as they say."

24       Why did you say that?

25  **A.**   Because to make a decision to pay ATN for not performing

ROCKLIN- DIRECT EXAMINATION / HAMILTON   460

1  on a contract, that would be a business decision for Newcon to

2  make.

3  Q.   Now, turn to -- so would that discussion with -- did the

4  discussion with Mr. Beker continue?

5  A.   Yes.

6  Q.   And let's go ahead and than play page 45, line 11, to page

7  47, line 3.

8       (Audiotape played in open court.) is

9  Q.   Let's go ahead and play the next clip then, page 47,

10 line 4, through 48, line 15.

11      (Audiotape played in open court.)

12 Q.   Turn your attention to page 47, line 6 -- or line 5.  Mr.

13 Beker says:  "Is ATN going to be by that time up shit creek or

14 next to us in some... well... well, I don't know, a consolation

15 prize or just next to us, or indeed to give some serious

16 thought as to how we should live subsequently together or a

17 part or, that is to say, it is even hard for me now, to phrase

18 it."

19      And on line 12 you say:  "And what consolation prize could

20 there be?"

21      Why did you ask that question?

22 A.   My understanding was this is where the pay out of some

23 sort was offered, some sort of consolation prize and I wanted

24 to know how much was offered.

25 Q.   What did you understand the reference to "consolation" to

1   mean in this setting, in this context?

2   **A.**   Well, that would be some sort of payment for ATN to do

3   something, some sort of payment from Newcon.

4   **Q.**   Let's then play -- well, let's go ahead and play the next

5   clip, which is page 49, line 5, through 50, line 2.  Is that

6   right?

7        I'm sorry.  48, line 16 through 49, line 8.

8            (Audiotape played in open court.)

9   **Q.**   Let's go ahead and play the next clip, 49, line 5, to 50,

10  line 2.

11           (Audiotape played in open court.)

12  **Q.**   Okay.  On page 49, line 5, Mr. Beker said:  "That is to

13  say, there is another scenario.  For instance, this.  To take a

14  stand together against Ramzi.  Well, it's a for instance."

15       What did you understand this scenario "to take a stand

16  against Ramzi," how that would work?

17  **A.**   Well, that was proposed scenario, ATN would propose a

18  price increase or non-delivery of the units, rather, for the

19  remainder of Battalion Set II phase one and would recommend

20  purchasing these units, remainder of the units from Newcon.

21           **MR. HOWDEN:**  This really is speculation.

22           **THE COURT:**  It's beginning to sound like that.  Why

23  don't we just stop at the last sentence and then pick it up

24  with another question?

25           **MS. HAMILTON:**  Okay.

1  BY MS. HAMILTON

2  Q.   On page 49, line 12, Mr. Beker says:  "We can no longer

3  deliver.  You can go to Newcon."

4       Mr. Beker said, "We can no longer deliver," who was the

5  "we" that you understood he was referring to there?

6  A.   ATN.

7  Q.   And when -- then ATN could no longer deliver -- to whom

8  was this statement -- did you understand who Mr. Beker was

9  making or suggesting this statement be made to?

10  A.   That ATN would make the statement to ITE.

11          THE COURT:  While you are asking for explanations,

12  since it's in here and it's been -- and it's been played, could

13  you ask him about page 48, line 16 and what he understood was

14  meant by that statement by Mr. Beker?

15          MS. HAMILTON:  Page 48, line 16.

16          THE COURT:  16, 17.

17          MS. HAMILTON:  Sure.

18          THE COURT:  Because it seems somewhat inexplicable.

19  Maybe he understands it.

20          MS. HAMILTON:  Okay.

21  BY MS. HAMILTON

22  Q.   If we could -- if you could pull up page 48, please?  And

23  then highlight line 16 through 24.

24          (Document displayed)

25  Q.   Mr. Beker said:  "Well, let's put it this way... you

1  should have bought Newcon, it would have been better."

2      What did you understand Mr. Beker was referring to?

3  **A.**    There is a reference being made that -- you see that it

4  would be better if ATN would buy Newcon.  One company would buy

5  another one.  And he's referring to many years in the past at

6  one of the trade shows, 15 years prior to that or so, it was

7  rumored that ATN might buy Newcon.

8  **Q.**    And then Mr. Beker said on page 48, line 22:  "When I

9  first said it about 15 years ago, I don't remember... there was

10 such... or how many.  There was such turmoil there."

11      What did you understand Mr. Beker to refer to when he

12 said, "When I first said it."  What was the "it" he was

13 referring to?

14 **A.**    The fact that the rumor that ATN would buy Newcon was, I

15 think, instigated by Mr. Beker.  And when I first mentioned

16 that, it was a lot of talk at that trade show.

17 **Q.**    And were there ever discussions about ATN purchasing

18 Newcon?

19 **A.**    No.

20 **Q.**    That you are aware of?

21 **A.**    That I'm aware of, no.

22          **THE WITNESS:**  If it would be okay, can we take a

23 break?

24          **THE COURT:**  Probably the jury would like that also.

25 Why don't we do this?  Rather than take a full-on break -- this

 1  is tedious, I know.

 2          You go ahead.  Go ahead.  Don't discuss your

 3  testimony with any other witnesses.  You know that rule.

 4          (Witness steps down.)

 5          **THE COURT:**  So if any of you want to just go back and

 6  use the restroom or you want to stand up, you can do that.  But

 7  you can stay here, that's fine, too, and just stretch.  There

 8  you go.  We should have a period of calisthenics I guess.

 9          (Whereupon there was a brief

10           recess in the proceedings.)

11          **THE COURT:**  Ms. Hamilton?

12          **MS. HAMILTON:**  Thank you, your Honor.

13  **BY MS. HAMILTON**

14  **Q.**  I would like to ask you some questions of Mr. Beker's

15  statements of another scenario, "to take a stand together

16  against Ramzi," which is on page 49, line 5.

17      If we could pull up all of page 49?

18          (Document displayed)

19  **Q.**  Starting at line 10 -- can you actually pull up the page

20  from the transcript?  Thanks.

21          (Document displayed)

22  **Q.**  Mr. Beker says:  "Well, due to these circumstances that we

23  have, you can go fuck yourself."

24      What circumstances did you understand Mr. Beker was

25  referring to there?

1  A.    That ATN would not deliver -- ATN would go and tell Ramzi

2  that that they no longer will deliver product for the remainder

3  of phase one of Battalion Set II, and then tell him to buy the

4  product from Newcon, and Newcon would tell him that they will

5  not sell it.

6  Q.    Let's then -- so the next part of the conversation that

7  occurred, let's play that piece, which is page 50, line 3, page

8  51 -- through page 51, line 3.

9            (Audiotape played in open court.)

10 Q.    And then the next part of the conversation on page 51,

11 line 4, through page 52, line 9.

12           (Audiotape played in open court.)

13 Q.    Okay.  If I could turn your attention to page 51, line 7,

14 Mr. Beker said:  "It can be deliberated.  It can be discussed.

15 One could give some thought as to what angle, you know, the

16 internal, you can set up for Ramzi.  Turning to... if there are

17 premises to this, that is to say one can... one can look at

18 this at the angle of that."

19      Let me ask about that section first.  When Mr. Beker said,

20 "One could give some thought as to what angle, you know, the

21 internal, you can set up for Ramzi," what did you understand

22 him to mean?

23 A.    In the past conversation we discussed on how to limit

24 ATN's liability in front of ITE, and this is how to limit

25 liability in front of TACOM.  So we could turn to TACOM and

1   tell him that ATN is not going to perform on the remainder of

2   Battalion Set II because Ramzi isn't paying.

3   **Q.**    And let me get to that section.  So on page 51, line 11,

4   Mr. Beker said:  "He, well, doesn't pay regularly."

5        Who did you understand that Mr. Beker was referring to

6   when he said "he"?

7   **A.**    Ramzi.

8   **Q.**    And was that true?  Was -- was ITE not paying ATN

9   regularly?

10  **A.**    That wasn't true.  They were paying on time.

11  **Q.**    On line 12 Mr. Beker said:  "He no longer can be trusted?"

12  Again, who is the "he" referred to there?

13  **A.**    Again, Ramzi with ITE.

14  **Q.**    And was that true, that ITE could no longer be trusted by

15  ATN?

16  **A.**    No.

17  **Q.**    And on page 51, line 12 Mr. Beker said:  "We no longer

18  want to supply through him."  And what did you understand that

19  sentence to mean?

20  **A.**    That that would be something that ATN would state to

21  TACOM; that ATN is no longer want to deliver the goggles

22  through ITE because he is not paying for it.

23  **Q.**    And was that true?

24  **A.**    No.

25  **Q.**    What purpose did you understand there was in providing

1  these reasons to TACOM?

2  **A.**   To make this working scenario for ATN.  If ATN limits the

3  liability in front of TACOM, if ATN limits liability in front

4  of ITE, ATN has a better reason not to perform.

5  **Q.**   Did -- was Ramzi of ITE discussed in the next portion of

6  the conversation?

7  **A.**   Yes.

8  **Q.**   Let's turn, then, to page 52, line 10, through page 54,

9  line 16.

10         (Audiotape played in open court.)

11  **Q.**   So if you would turn your attention to page 53, line 2,

12  Mr. Beker said:  "Yes, yes, but Ramzi, I think... that if you

13  guys present well my idea... in the form of force majeure."

14         And then going on to line 5:  "In what probably... in what

15  we probably also could... on our part, organize this... As it

16  were... paper, if you guys couldn't organize it from Russian

17  authorities."

18         What did you understand was the paper Mr. Beker was

19  referring to there on page -- on line 6?

20  **A.**   Some sort of document from Russian customs that would go

21  into the -- again, protecting possibly ATN against ITE, against

22  some legal actions from ITE stating that ATN is unable to

23  deliver the product because of the action of Russian customs.

24  **Q.**   And Mr. Beker refers to on page 53, line 7 to the term,

25  "if you guys could organize it."  What did you understand the

1  phrase "organize it" to mean in this context?

2  **A.**   Get the paper, an official document from Russian customs.

3  **Q.**   And did you have an understanding based on Mr. Beker's

4  statements how -- who would organize this paper?

5  **A.**   If we couldn't do it, then Newcon could assist it and get

6  such paper from Russian customs.

7  **Q.**   Turning to page 54, line 7, Mr. Beker said:  "And the

8  other way around, to secure a letter from over there.

9  Gentlemen, we could no longer produce.  You can go fuck

10  yourselves.  For such-and-such reasons, here is a letter of our

11  Russian authorities, pursuant to such, m... m... and such

12  paragraph.  It's not up to us and... and... you can go fuck

13  yourselves.  And you write that Ramzi with the very same

14  boomerang.  Based on all this...  And here you are.  How bad is

15  this?"

16      To which you reply on line 16.  "I see.  I see.  I see."

17      Why did you say that?

18  **A.**   Because I understood the proposed scenario where we would

19  take such paper and show this to Ramzi, and that would protect

20  ATN, limit liabilities and performance under the contract.

21  **Q.**   When Mr. Beker refers on line 13 to "the very same

22  boomerang," that "you write with Ramzi with the very same

23  boomerang," what did you understand the phrase "the very same

24  boomerang" to mean?

25  **A.**   Well, we would get such paper and then just pass it to

1    Ramzi to show that not performing is not really ATN's fault.

2    **Q.**    Did the subject of a consolation prize come up again in

3    the next part of the conversation?

4    **A.**    Yes.

5    **Q.**    All right.  Let's play that at page 54, line 17, to page

6    59 line 16.

7              (Audiotape played in open court.)

8    **Q.**    If we could turn your attention to page 54, line 17.  Mr.

9    Beker says:  "As for the 3,000, the rest I'm willing... I'm

10   willing probably in case of a successful completion of this

11   entire scenario probably, I'm willing to discuss the matter

12   of... well, that consolation prize.  Well, naturally it's not

13   going to be 100 percent of what you guys have today."

14        And on page 55, line 1 you say -- excuse me, line 3 you

15   say:  "Well, in order for me to be able to discuss it here, can

16   I inquire... if you have some ideas, at least the

17   neighborhood?"

18        Why did you say that?

19   **A.**    Mr. Beker was here making an offer.  I just wanted to know

20   specifically what the offer was.

21   **Q.**    And on line 19 of page 54 Mr. Beker refers to "completion

22   of this entire scenario."  What did you understand him to mean

23   there?

24   **A.**    Well, the scenario that -- by which ATN would not perform

25   on the remainder of Battalion Set I phase one -- I'm sorry,

1    Battalion Set II phase one where Newcon would deliver the

2    units.

3    **Q.**   On page 55, line 7, Mr. Beker said -- was it line 6:  "I

4    know that you guys are selling, if I'm telling it correctly, at

5    1,277."

6            To which you replied on line 12:  "You are accurate

7    within a kopeck.  What's a kopeck?

8    **A.**   That's an equivalent of one cent in Russian currency.

9    **Q.**   And was Mr. Prilik -- Mr. Beker accurate within a kopeck?

10   **A.**   Yes, he was.

11   **Q.**   Page 55, line 20, Mr. Beker said: "I know that you are

12   buying for 1,050."

13          To which on page 56 you replied:  "You are right again.

14   Accurate within a kopeck."

15          Was Mr. Beker accurate within a kopeck?

16   **A.**   Yes.

17          **THE COURT:**  Can you go back for just a minute?  On

18   55, line 15 in response to something Mr. Beker says, you say:

19   "You have way too much information for the person."  What did

20   you mean by that?

21          **THE WITNESS:**  For the person who is not participating

22   in this contract.

23          **THE COURT:**  Are you suggesting that Mr. Beker had

24   more information than you thought he would have?

25          **THE WITNESS:**  Mr. Beker knows how much ATN buys the

1  product for, which is not advertised information.

2          He also knows how much ATN sells it for, which is

3  also -- ATN did not publicly made any statements on how much he

4  was selling the product to ITE.  So that would require some

5  work to find out both of those figures with the exact

6  knowledge.

7  **BY MS. HAMILTON**

8  **Q.**   Turning to page 56, line 19.  Mr. Beker said:  "You have

9  200, yes?"  To which you replied, "Yes."

10     What did you understand that 200 that Mr. Beker was

11  referring to there to mean?

12  **A.**   An approximate profit that ATN would be making is $200 by

13  buying it at $1,050 by selling it at 1277.

14  **Q.**   And was that an accurate accounting of ATN's profits?

15  **A.**   Yes, pretty near accurate.

16  **Q.**   Page 57, line 11 Mr. Beker said:  "I believe... actually,

17  by and large I believe that your net profit couldn't be higher

18  than $100."

19     To which you replied beginning on line 14:  "Well, with

20  this you're already laying it on thick."

21     Why did you say that?

22  **A.**   My understanding the payment that he was about to offer

23  was based on amount of the profit that he was trying to figure

24  out that we were making.  So I was negotiating.  I wanted to be

25  believable.  So I'm saying, look, 200 was a much more realistic

1  number than the 100.

2  **Q.**   And on page 58, beginning on line 13 Mr. Beker said:

3  "That I would probably be willing to offer you, if you are

4  waiting for it.  You don't want Monomakh's cap to fall off

5  you."  Excuse my Russian accent.  "So I'm willing to offer

6  it" --

7      First of all, what did you understand the reference to

8  Monomakh's cap to be?

9  **A.**   Monomakh's cap, and that's the reference to Russian czar

10  crown.

11  **Q.**   When Mr. Beker said you don't want the cap to fall off

12  you, what did you understand him to mean?

13  **A.**   Well, there's two things.  I'm being too proud to offer

14  anything myself; because he is waiting there for me to make an

15  offer, but I'm not making it.  I'm not asking for anything.

16      So what he's saying, I'm offering to you.  If you don't

17  want to bend over and let the cap would fall off from you; that

18  you're so proud like you're carrying crown, czar's crown, then

19  I will be offering you.  And then he proposed the amount.

20  **Q.**   Mr. Beker then did say on line 17:  "I'm willing to offer

21  it to you... ah... for...  Well, this contract's difference.  I

22  want you to understand me correctly, that for the specific

23  contract's difference how much is left there - three, three and

24  a half?  I don't remember how much."

25      What did you understand the reference to "three, three and

1  a half" on line 23 to mean?

2  **A.**   Quantity of night vision goggles remaining to be delivered

3  on phase one Battalion Set II was approximately three and a

4  half thousand, 3600 units.

5  **Q.**   Then on page 59, line 4 Mr. Beker said:  "Yes, I... I

6  think that on the whole any half of your profit, that it's

7  fair."

8      To which you said:  "That is to say in the neighborhood of

9  $100."

10     Why did you say that?

11  **A.**   Well, if the profit was approximately $200, Mr. Beker is

12  offering half of that, that would be about a hundred dollars.

13  **Q.**   Mr. Beker then on line 12 of page 59 said:  "I can't... I

14  can't agree [sic] because as it were... oh, well, at any rate

15  between... between, as I thought, 75, 50, 100.  Well, that is

16  to say... well, such is the range."

17     What did you understand the reference to those numbers,

18  75, 50, 100 to mean?

19  **A.**   Well, that's exactly a payment that is approximately

20  50 percent.  That's the range between $50 to $100 per each

21  goggle that is not being delivered.

22          **THE COURT:**  I thought I heard when you read that, you

23  said, Ms. Hamilton, "I don't agree" or "I can't agree."  It

24  says, "I can't argue," right?  I thought I heard "agree."

25  Maybe I'm wrong.

1              **MS. HAMILTON:**  I'm sorry.

2              **THE COURT:**  At any rate, we should be clear about it

3    anyway, and it says "I can't argue."

4              **MS. HAMILTON:**  That's right.  Thank you, your Honor.

5              **THE COURT:**  Maybe I heard wrong.

6              **MS. HAMILTON:**  I have done a lot of reading today.

7              **THE COURT:**  We have all done a lot of listening, too.

8              **MS. HAMILTON:**  Yes, a lot.

9    **BY MS. HAMILTON**

10   **Q.**   Now, after Mr. Beker offered to pay half of ATN's profits

11   on the Battalion Set II contract, did Mr. Beker discuss paying

12   ATN any money in advance?

13   **A.**   Yes.

14   **Q.**   If we could turn to page 59, line 16, through page 61,

15   line 14.

16              (Audio clip played)

17   **BY MS. HAMILTON**

18   **Q.**   Could you turn your attention to page 60, line 2?  You

19   say, "I would like some -- I don't know.  Well, good-faith

20   deposit, or something like that.  Is it possible?"

21              How did you come to request a good-faith deposit from

22   Mr. Beker?

23   **A.**   From the discussion with FBI.

24   **Q.**   What, if any, instructions did the FBI provide to you

25   regarding a good-faith deposit?

1  **A.**    That once the agreement will be reached, to try to get a

2  good-faith deposit; an advance payment of some sort.

3  **Q.**    On page 60, line 15, Mr. Beker said, starting on line 15,

4  "I don't even think that it should be discussed now.  Well, you

5  know why?  Because, to tell you the truth, not because I, as it

6  were, think that you are all idiots there, and you don't know

7  what you're doing, but I think that it would probably be better

8  if you flew in here for a day."

9      Did you understand where you were to fly in to, based on

10  Mr. Beker's request?

11  **A.**    Yes.  To Newcon.

12  **Q.**    And where -- where physically?

13  **A.**    Toronto, Canada.

14  **Q.**    Did you fly up to Toronto, Canada?

15  **A.**    No.

16  **Q.**    Why not?

17  **A.**    Because I didn't feel like flying to Canada would be a

18  good idea in this situation.  I wouldn't be able to have

19  conversations that were, you know, recorded by the FBI.

20  **Q.**    Now, what, if any, was your understanding about how the

21  decision of an advance payment was left, based on this

22  conversation?

23  **A.**    At this point, Michael was reluctant to make an advance

24  payment.

25  **Q.**    After discussing this -- the subject of a good-faith

1   deposit -- were there -- did you discuss any next steps?  Did

2   you and Mr. Beker discuss any next steps to be taken by ATN or

3   Newcon?

4   **A.**   Yes.

5   **Q.**   Let's listen to the next part of the conversation, then,

6   which is page 61, line 10, through page 63, line 8.

7        (Audio clip played)

8   **BY MS. HAMILTON**

9   **Q.**   If I could turn your attention to page 61, line 19,

10  Mr. Beker said, "That's why you should probably think about it

11  again.  Consult Marc again.  Consult Lyonya again.  And if you

12  guys make such -- not because, as it were, I doubt that you

13  can't make such a decision alone.  I think that such a

14  decision -- one just needs to consult on it, as it were, at

15  least.  Isn't it so," to which you reply, "Yes, there are no

16  two ways about it."

17       Mr. Beker refers to Marc and Lyonya, on line 20 of page

18  61.  Who did you understand Marc to be?

19  **A.**   Marc Morgovsky, the CEO of ATN at that time.

20  **Q.**   And who did you understand Mr. Beker's reference to Lyonya

21  to be?

22  **A.**   Lenny Gaber, vice president of production of ATN at that

23  time.

24  **Q.**   And on page 62, line 1, you said "there are no two ways

25  about it," in reply to Mr. Beker's statements.

 1        Why did you say that?

 2   **A.**   Well, I'm confirming that I would -- if we're reaching

 3   some sort of agreement here, I would need to confirm an

 4   agreement with Marc and Lenny.

 5   **Q.**   Why did you believe that -- let's turn to page 62, line 8,

 6   in which Mr. Beker said, "In the meantime, I would also be able

 7   to prepare the ground, discuss it with ANHAM with Farouki.  I

 8   hope you heard this name -- Mr. Farouki."

 9        Did you understand who Mr. Farouki was?

10   **A.**   Yes.

11   **Q.**   Who is Mr. Farouki?

12   **A.**   The principal of ANHAM.

13   **Q.**   And Mr. Beker refers to, starting on line 8, "I would also

14   be able to prepare the ground."

15        What did you understand "prepare the ground" to mean, in

16   this context?

17   **A.**   To possibly discuss further action with ANHAM.

18   **Q.**   And when you say the "further action," what do you mean?

19   **A.**   Further on, it's opined in my next -- in his next comments

20   that there are two ways of going further.  If we agree -- ATN

21   and Newcon -- then either they would deliver it through the

22   ANHAM, or the ANHAM would allow deliveries to TACOM directly,

23   but they would need to approve that.

24   **Q.**   Did you and Mr. Beker discuss ATN's supplier at that time:

25   NPZ?

1  **A.**    Yes.

2  **Q.**    Let me turn you to page 63, line 4.  I'm sorry.

3       So Mr. Beker referred to the delivery dates on line 4, and

4  says, "It seems -- as I understand the delivery dates, it seems

5  until the end of this year, or even sooner," to which you

6  reply, "Even sooner."

7       And, on line 7, Mr. Beker says, "Even sooner."

8       Had you discussed with Mr. Beker the delivery date --

9  ATN's delivery dates under the Battalion Set II contract?

10 **A.**    Not at this point, no.

11 **Q.**    Did you -- had you, at this point in time, discussed the

12 delivery terms with anyone from Newcon?

13 **A.**    Yes, with Arie, prior -- in a conversation prior to --

14 taking place prior to this conversation.

15 **Q.**    Let's now, then, go to the next portion of the

16 conversation that occurred, which is on 65, line 1, through

17 page 67, line 8.

18      (Audio clip played)

19 **BY MS. HAMILTON**

20 **Q.**    If I could turn your attention to page 65, beginning at

21 line 16, Mr. Beker said, "Up to the point that, like, we

22 even -- and those devices that were turned out it most likely

23 that we also will discussed in order to take this and deliver

24 it there so that it would be faster."

25      What did you understand Mr. -- Mr. Beker was referring to

ROCKLIN- DIRECT EXAMINATION / HAMILTON

1  in that passage?

2  **A.**    Oh, he was telling me here that the actual plan was to

3  deliver the very same units that were ready for us, and were

4  manufactured for ATN from the NPZ, and deliver these units to

5  remainder of the Battalion Set I phase one.

6  **Q.**    And when you say, "the very same units," did you

7  understand that to also include the image-intensifier tubes

8  contained within the units?

9  **A.**    Yes.  That's my understanding.

10  **Q.**    And Mr. Beker then says, "In any event, I've already got

11  not once, but at the very least, three times enough from

12  Mr. Metelskiy," and on page 66, line 2, says, "Just so you

13  know," to which you say -- reply, on line 3, "This is

14  interesting."

15      Why did you say, "This is interesting"?

16  **A.**    Well, because I was surprised that Mr. Metelskiy would

17  make calls to Mr. Beker, because Mr. Metelskiy had all his

18  problems in Russia in the -- instigated, my understanding,

19  though, possibly by Newcon.

20      (Reporter requests clarification)

21      (Record read)

22          **MR. OSTERHOUDT:**  I'd like to move to strike the last

23  part, about his understanding, because there's no basis for

24  that in the evidence.

25          **THE COURT:**  That portion of it is stricken.

1          **MR. OSTERHOUDT:**  Thank you.

2          **THE COURT:**  It starts -- I don't know if that's where

3  the "instigated" starts, but that -- that section of it.

4          And unless he has some --

5          **MS. HAMILTON:**  We'll move on, your Honor.

6          **THE COURT:**  Thank you, but can you explain who

7  Mr. Metelskiy is, for the record?

8  **BY MS. HAMILTON**

9  **Q.**   And who is Mr. Metelskiy?

10  **A.**   That's the director of NPZ, the Russian supplier of

11  night-vision goggles to ATN.

12  **Q.**   Did you and Mr. Beker discuss the subject of coördination

13  between Newcon and ATN any further in this conversation?

14  **A.**   I'm sorry.  Would you repeat the question?

15  **Q.**   Sure.  Did you and Mr. Beker continue to discuss the

16  subject of coördination between Newcon and ATN in this

17  conversation?

18  **A.**   Yes.

19          **MS. HAMILTON:**  Let's move to the next piece of the

20  conversation that occurred, which -- excuse me -- is page 67,

21  line 9, through page 67, line 24.

22          (Audio clip played)

23  **BY MS. HAMILTON**

24  **Q.**   Turning your attention to page 67, line 12 -- or excuse

25  me.  Line 10.  Mr. Beker said, "Basically, I believe the time

1  has come when all of us need to coördinate our work, not to

2  spoil the market the way that it was spoiled with the zero

3  thing."

4       What did you understand Mr. Beker's reference to "the zero

5  thing" to mean?

6  **A.**   Night-vision devices for Generation Zero.

7  **Q.**   And what did you understand Mr. Beker's reference to "the

8  way it was spoiled" to mean?

9  **A.**   The night-vision devices, Generation Zero, mainly were

10 used for commercial retail market in the United States, and

11 were -- and it was the easiest and the first market to be

12 populated, so to speak.  And there were a lot of players in

13 Generation Zero market.  And eventually, became commoditized,

14 and the profit margins were very suppressed.  So those who

15 worked in Generation Zero usually would need to do a lot of

16 work for very little profit.

17 **Q.**   And, turning your attention to page 67, line 1, Mr. Beker

18 said, "Well, one can't allow the only Photonis-DEP and ITT

19 would play."

20      What did you understand Mr. Beker to mean when he said

21 that "one can't allow that only Photonis-DEP and ITT would

22 play"?

23 **A.**   Those were two major producers of Generation II and

24 Generation III.  And Generation II and Generation III would be

25 much bigger, more important market.  So they should not be the

 1   only major players in that market.

 2          MS. HAMILTON:  So let's then play the next portion of

 3   the conversation, which is page 68, line 1, through page 70,

 4   line 16.

 5              (Audio clip played)

 6   BY MS. HAMILTON

 7   Q.   Was ITE a subject of -- a topic of conversation before

 8   this conversation ended?

 9   A.   Yes.

10          MS. HAMILTON:  Let's play that clip.  It's page 70,

11   line 1, through page 73, line 1.

12              (Audio clip played)

13   BY MS. HAMILTON

14   Q.   Turning your attention to page 71, line 1, Mr. Beker said,

15   "Once again, that's my opinion.  It's not like I'm going to

16   impose it.  Maybe I'm wrong.  Maybe I'm mistaken.  Maybe back

17   win again the next contract.  Well, the only question is where

18   is he going to get the devices," to which you reply, "Well,

19   that's clear.  Everything is clear."

20       Why did you say that?

21   A.   Well, I was agreeing with Mr. Beker here that if Ramzi

22   wouldn't get the devices from ATN or Newcon, that would be

23   tough for him to get it somewhere else.

24          MS. HAMILTON:  So, your Honor, that concludes

25   Tape Five, except there's one issue that was pointed out to me.

 1  Because of the last-minute redaction, one portion of the

 2  recording was divided into two.  And apparently, that portion

 3  was not played to the jury.  So if we -- of Tape Five.  So

 4  could we maybe just play it into the record now, so when the

 5  jury gets the transcript, it will be complete?

 6          MR. HOWDEN:  How long?

 7          THE COURT:  Which portion is that?  How long is it?

 8          MS. HAMILTON:  It's three pages.  Four pages.

 9          THE COURT:  But we're not going to have any questions

10  about it?

11          MS. HAMILTON:  No questions.  That's one of the

12  reasons --

13          THE COURT:  You've got about three minutes to play

14  it.

15          MS. HAMILTON:  Three minutes to play it.  Play it

16  fast.  This is page 28.  Exhibit -- line 22.

17          (Audio clip played)

18          MS. HAMILTON:  Thank you, your Honor.

19          THE COURT:  Okay.  That was really six pages, but

20  who's counting, right?

21          Okay.  Ladies and gentlemen, we will recess for the

22  afternoon, to reconvene tomorrow.  If it's any consolation,

23  none of the rest of the tapes are as long as this one, but I

24  won't tell you how many more tapes there are.  Okay?  But thank

25  you.  You've been very patient and attentive.  And I appreciate

484

```
 1  that.  So have a very pleasant afternoon and evening.  And

 2  we'll see you tomorrow morning at 8:30.  Thank you.

 3          And you may step down, Mr. Rocklin, but do not

 4  discuss your testimony with any other persons who may be

 5  witnesses until the trial is over.

 6          And you follow the instructions I've given you before

 7  also.  Right?  Okay.  Everybody's got them in mind.

 8          Okay.  I'll see you tomorrow morning --

 9          MS. HAMILTON:  Thank you, your Honor.

10          THE COURT:  -- at 8:30.  Now, am I going to be

11  pleasantly surprised that, in fact, there is no Number 7?

12          MS. HAMILTON:  There is no Number 7.

13          THE COURT:  Well, okay, but it's not 10.  There are

14  14 I count here.

15          MS. HAMILTON:  One of them is not Mr. Rocklin's.

16          THE COURT:  Oh, I see.  Wow.  Wow.

17          MR. HOWDEN:  And it's in English.

18          THE COURT:  And it's in English.  Okay.  Ah.  Be

19  thankful for small favors, right?  Okay.  Well, have a good

20  afternoon and evening, everyone.

21          MS. HAMILTON:  Thank you, your Honor.

22          THE COURT:  And we'll see you.

23          MR. HOWDEN:  Oh, your Honor, I was wondering.  It's

24  my understanding Monday's a holiday.

25          THE COURT:  Yes, Monday is a holiday.
```

```
 1              MR. HOWDEN:  Is that going to affect your dark day?

 2   Is that going to affect your law-and-motion day?

 3              THE COURT:  Yes, it certainly is.  It means I'm not

 4   going to have any.

 5              MR. HOWDEN:  So we're going to proceed.

 6              THE COURT:  No criminal law or motion or sentencings

 7   in the morning, but we'll see you on Tuesday.

 8              MR. HOWDEN:  Very good.

 9              THE COURT:  We're not pushing it.  And, you know,

10   Mondays are great, you know, to have law and motion on, because

11   once in a while, you get a holiday.

12              (Whereupon at 1:35 p.m. further proceedings

13               in the above-entitled cause was adjourned

14               until Friday, January 14, 2011 at 8:30 a.m.)

15

16

17

18

19

20

21

22

23

24

25
```

<pre>
 1                        I   N   D   E   X

 2
   PLAINTIFF'S WITNESSES                              PAGE     VOL.
 3
   Direct examination Resumed by Ms. Hamilton         376       3
 4
                        E X H I B I T S
 5

 6 TRIAL EXHIBITS                 IDEN   VOL.   EVID     VOL.

 7 125                                          385       3
   115                                          388       3
 8 101 and 131                                  395       3
   102                                          426       3
 9 132                                          427       3
   103                                          430       3
10 133                                          431       3
   104                                          433       3
11 134                                          434       3
   105                                          442       3
12 135                                          442       3

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

### CERTIFICATE OF REPORTER

WE, LYDIA ZINN, and DEBRA PAS, Official Reporters for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in CR. 07-765 MHP, United States of America v. Mendel Beker, et al., were reported by us, certified shorthand reporters, and were thereafter transcribed under our direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by us at the time of filing

The validity of the reporters' certification of said transcript may be void upon disassembly and/or removal from the court file.


_____/s/ Lydia Zinn_____
                   Lydia Zinn, CSR 9223, CRR



_____/s/ Debra L. Pas_____
                   Debra L. Pas, CSR 11916, CRR



                   Thursday, January 13, 2011