Volume 4

Pages 487 – 602

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARILYN HALL PATEL

UNITED STATES OF AMERICA,                )
                                         )
                Plaintiff,               )
                                         )
  vs.                                    ) NO. CR. 07-0765 MHP
                                         )
MENDEL BEKER, ARIE PRILIK, and           )
NEWCON INTERNATIONAL,                    )
                                         ) San Francisco, California
                Defendants.              ) Friday
                                         ) January 14, 2011
_____) 8:43 a.m.


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
**For Plaintiff:**          U.S. Department of Justice
                           Antitrust Division
                           450 Golden Gate Avenue, Room 10-0101
                           San Francisco, CA  94102-3478
                           (415) 436-6673
                           (415) 436-6687 (fax)
                   **BY:  DAVID J. WARD**
                        **ANNA TYRON PLETCHER**
                        **RICHARD B. COHEN**
                        **JEANE HAMILTON**

**For Defendants:**         Winston & Strawn, LLP
                           101 California Street
                           San Francisco, CA  94111
                           (415) 591-1439
                           (415) 591-1400 (fax)
                   **BY:  JONATHAN ROBERT HOWDEN**


(Appearances continued on next page)

1   APPEARANCES (CONT'D)

2   **For Defendants:**          Martha A. Boersch
                                Attorney at Law
3                                555 California Street, 26th Floor
                                San Francisco, CA  94104
4                                (415) 626-3939
                                (415) 875-5700 (fax)
5                    **BY:   MARTHA A. BOERSCH**

6   **For Defendants:**          Law Offices of William L. Osterhoudt
                                135 Belvedere Street
7                                San Francisco, California  94117-3915
                                (415) 664-4600
8                                (415) 664-4691 (fax)
                     **BY:   WILLIAM L. OSTERHOUDT**
9
    **For Defendants:**          Law Offices of Frank S. Moore
10                               235 Montgomery Street, Suite 854
                                San Francisco, CA  94104
11                   **BY:   FRANK S. MOORE**

12  **Also Present:**            Weir Foulds, LLP
                                Barristers & Solicitors
13                               The Exchange Tower, Suite 1600
                                130 King Street West
14                               Toronto, Canada M5X 1/5
                                (416) 365-1110
15                               (416) 365-1876 (fax)
                     **BY:   PETER L. BIRO**
16

17

18

19

20

21

22

23

24

25

1                        **P R O C E E D I N G S**

2    January 14, 2011                                    8:43 a.m.

3              (Jury in at 8:43 a.m.)

4         **THE COURT:**  You may be seated.  Good morning, ladies

5    and gentlemen.

6         **THE JURORS:**  Good morning.

7         **THE COURT:**  Oh, wow.  You know, there must be a lot

8    of fuel in there, you know.

9         **JUROR:**  That's right.

10        **THE COURT:**  A lot of caffeine in that jury room.  You

11   sound all perky and well rested and everything else.  And we're

12   going to see how much we can bore you today, because we've got

13   more tapes.  Right?  And I guess that's what we're going to do,

14   is start with the tapes.  Is that correct?

15        **MR. WARD:**  That's correct, your Honor.

16        **THE COURT:**  And, if you'll be patient, because Dawn

17   has not really had to work with this equipment in her

18   courtroom, so she's getting familiar with it.  And I'm sure

19   she'll get it up there, and so forth.

20        And you may have a seat.  Good morning, Mr. Rocklin.

21        **THE WITNESS:**  Good morning.

22        **THE COURT:**  I'll remind you, you're still under oath.

23   The oath will not be readministered.  And what -- do you need

24   anything up on the screen now, or --

25        **MS. HAMILTON:**  It --

1          THE COURT:  Why don't you tell us what the first

2   exhibit is that you're going to need to have published up

3   there?

4          MS. HAMILTON:  The first exhibit will be slides

5   from -- well, it will be the playing of the sanction of the

6   transcript --

7          THE COURT:  Okay, which --

8          MS. HAMILTON:  -- as we did yesterday.

9          THE COURT:  Yes, but which one are we on now?  136?

10          MS. HAMILTON:  Oh.  We're on -- that's right.  Yes,

11   your Honor.  It -- 106 is the tape, and 136 is the transcript.

12          THE COURT:  Okay.  Okay.  Fine.  So whenever you need

13   it, then let Dawn know, and she'll get it up there.

14          MS. HAMILTON:  All right.  Thank you.

15          THE COURT:  All right.  You may proceed.  Continue.

16          MS. HAMILTON:  All right.  Thank you.

17          (Witness resumes stand)

18                  **DIRECT EXAMINATION RESUMED**

19   BY MS. HAMILTON

20   **Q.**  So, Mr. Rocklin, yesterday we left off at the end of your

21   conversation with Mr. Beker on August 30th.  At the end of that

22   call, what, if anything, did you understand Mr. Beker was

23   supposed to do?

24   **A.**   Mr. Beker?

25   **Q.**   Correct.

1  **A.**   He was supposed to prepare the ground with Anham.

2  **Q.**   And what, if anything -- what, if anything, were you to

3  do?

4  **A.**   I was supposed to contact Marc Morgovsky and Lenny Gaber.

5  **Q.**   What did you understand you were supposed to do with --

6  when you contacted Mr. Morgovsky?

7  **A.**   Just to make sure that he would also be informed on the

8  agreement with -- between me and Michael Beker.

9  **Q.**   And what, if anything, were you supposed to do -- or did

10 you understand you were to do in contacting Mr. Gaber?

11 **A.**   Same thing:  Just inform him that me and Michael Beker

12 reached some sort of agreement, and he is going along with it.

13 **Q.**   And when you say "he is going along with it," who do you

14 mean?

15 **A.**   Lenny Gaber.

16 **Q.**   Now, after -- what was -- did you then have any contact

17 with Mr. Beker or Mr. Prilik?

18 **A.**   Yes.

19 **Q.**   And when was the next time you spoke with one of the

20 defendants?

21 **A.**   Next day.

22 **Q.**   And how -- who did you speak with?

23 **A.**   I think Arie left a message, and I called back, and he

24 connected us.

25 **Q.**   Now, you had spoken with Mr. Beker on August 30th.  When

1  Mr. Prilik left a message, were you surprised?

2  **A.**   No.

3  **Q.**   Why not?

4  **A.**   He was connecting us in the past, and would talk -- I'd

5  talked in the past with Mr. Prilik a number of times.

6  **Q.**   Did you return Mr. Prilik's call?

7  **A.**   Yes.

8  **Q.**   And did you record that conversation?

9  **A.**   Yes.

10 **Q.**   And did that con -- have you listened to the recording of

11 that conversation?

12 **A.**   Yes.

13 **Q.**   And did it contain the entire conversation?

14 **A.**   Yes.

15 **Q.**   The recording?

16      And was the recording accurate?

17 **A.**   Yes.

18 **Q.**   And have you reviewed an English translation of that

19 recording?

20 **A.**   Yes.

21 **Q.**   And is that English translation accurate?

22 **A.**   Yes.

23       **MS. HAMILTON:**  So, your Honor, we would move to admit

24 Exhibit 106, which is the recording.

25       **THE COURT:**  No objection?  106 is admitted.

 1              (Trial Exhibit 106 received in evidence)

 2              **MS. HAMILTON:**  Thank you.  And we'd also move to

 3     admit Exhibit 136, which is the English translation of the

 4     September 1st conversation.

 5              **THE COURT:**  Hearing no objection, 136 is admitted as

 6     well.

 7              (Trial Exhibit 136 received in evidence)

 8              **MS. HAMILTON:**  Thank you, your Honor.

 9     **Q.**   In the conversation on September 1st, whom did you speak

10     with first from Newcon?

11     **A.**   Arie.

12     **Q.**   And did Mr. Prilik refer to Mr. Beker during that -- your

13     conversation with him?

14     **A.**   Yes.

15              **MS. HAMILTON:**  All right.  If we could, please play

16     page 1, line 14, through page 4, line 4.

17              (Audio clip played)

18     **BY MS. HAMILTON**

19     **Q.**   If I could, please turn your attention, Mr. Rocklin, to

20     page 2, line 24.  Mr. Prilik says -- said,

21              "He, like, told me you reached some

22              agreement.  I am, like -- I am observing a

23              little bit from the side.  That's why I

24              wanted to hear your feedback, because it's

25              not that easy to talk with him."

1    When Mr. Prilik said that Mr. Beker had told him that he'd

2  reached an agreement, were you surprised when Mr. Prilik said

3  that?

4  **A.**    No.

5  **Q.**    Why not?

6  **A.**    My understanding -- they communicated together, and they

7  were exchanging information from the past conversations.  It

8  was very clear to me.

9           **MS. HAMILTON:**  So if we could, then, turn to play the

10  next clip.

11           **THE COURT:**  If -- before you do that, on page 3,

12  line 14, there is a sentence that begins, "Again."  This is

13  Mr. Prilik talking.

14            "Again, one of yours called about

15            something somewhere to the wrong place."

16           What did you understand "one of yours" to be, or

17  mean?

18           **THE WITNESS:**  That was a reference to Lenny Gaber.

19           **THE COURT:**  I see.  Okay.  So it was one of your --

20  your company --

21           **THE WITNESS:**  ATN employees.  Yes.

22           **THE COURT:**  Okay.  Thank you.

23  **BY MS. HAMILTON**

24  **Q.**   And after Mr. Prilik transferred the call, who answered?

25  **A.**   Michael Beker.

1          **MS. HAMILTON:**  So we'll then play page 4, line 5, to

2   page 5, line 21.

3               (Audio clip played)

4   **BY MS. HAMILTON**

5   **Q.**   On page -- referring to page 4, line 16, you told

6   Mr. Beker that you managed to catch Morgovsky.  He is in

7   Greece; in Athens, now.

8        Why did you say that you "managed to catch Morgovsky"?

9   **A.**   Because the previous conversation left that I had to get

10  in contact with Marc Morgovsky.

11  **Q.**   Okay.  So let's then play the next clip, which is --

12  begins at page 5, line 22, and continues from page 6 to

13  line 17.

14        (Audio clip played)

15  **BY MS. HAMILTON**

16  **Q.**   Now, earlier in the conversation --

17          **THE COURT:**  Excuse me.  I don't think it's good to

18  stop at a comma.  I mean, maybe there -- maybe the rest of the

19  conversation isn't very important, but --

20          **MS. HAMILTON:**  I apologize, your Honor.

21          **THE COURT:**  -- or not, but --

22          **MS. HAMILTON:**  I agree.  I apologize.  It's supposed

23  to be a full clip.

24          **THE COURT:**  So then it goes over to the next page,

25  then?

ROCKLIN- DIRECT EXAMINATION / HAMILTON

 1              **MS. HAMILTON:**  Just play the next clip.

 2              **THE COURT:**  -- over to what?  Line 6, page 7?

 3              **MS. HAMILTON:**  Wait.  So the next is page 6, line 16,

 4    through page 10, line 3.  Did a piece get omitted?

 5              **THE COURT:**  Oh, that's quite a bit.  Yeah.  I mean,

 6    we didn't -- we didn't get beyond, "if there is an

 7    opportunity," comma, at line 17.

 8              **MS. HAMILTON:**  Oh, okay.  I apologize.

 9              Do we have that section with that piece?

10              **MR. PADUKONE:**  Yeah.

11              (Audio clip played)

12              **MS. HAMILTON:**  So apparently page 6, line 16 --

13              **THE COURT:**  Mm-hm.

14              **MS. HAMILTON:**  -- through page 6, line 15, is not in

15    this piece.  Is that right, your Honor?

16              **THE COURT:**  Well, it just stopped at line 6 --

17    page 6, line 17.  At the end of that sentence, that ends in a

18    comma.

19              **MS. HAMILTON:**  It's playing here.  So I apologize.

20    Here's where it's picking up:  Page 6, line 6, to page 7,

21    line 17.  So go ahead and play.

22              (Audio clip played)

23    **BY MS. HAMILTON**

24    **Q.**  Excuse me.  So if we could turn your attention first to

25    page 6, line 22.  And you -- you said,

ROCKLIN- DIRECT EXAMINATION / HAMILTON                    497

1              "How I related the plans, correct me if

2          I am wrong."

3      Why did you say that?

4  **A.**   I was just restating a previously discussed agreement; if

5  my understanding of the agreement was the correct

6  understanding.  And it is common to say, "Correct me if I am

7  wrong," so we're on the same page.

8  **Q.**   So let's, then, turn to page 7, line 2, in which you say,

9              "We write to the ITE that that's it;

10             nothing the hell works out for us.  As you

11             said, we are unable to do the export

12             there."

13     Why did you say that?

14 **A.**   Because that was one of the scenarios outlined in the

15 previous agreement, in the last conversations.

16 **Q.**   You then stated,

17             "There probably will be some papers to

18             the fact that we are unable to export."

19     Why did you say that?

20 **A.**   Because this was also discussed before.  And Michael

21 offered an assistance with papers from Russian Customs.

22 **Q.**   So what did papers refer to?

23 **A.**   Going back to the *force majeure*, that papers that would

24 possible limit ATN liabilities in front of ITE.

25 **Q.**   And where did you understand those papers would originate?

1   **A.**    From Russia.  From Russian Customs.

2   **Q.**    On page 7, line 7, Mr. Beker said,

3              "Yes.  Once you get the matter ready

4         from that side, so that -- well, remember,

5         I told you the idea, so that this

6         initiative would originate from them."

7       What did you understand Mr. Beker's reference to "that

8   side" to mean?

9   **A.**    From Russia.  That's -- as if this comes from Russia.

10  **Q.**    And when Mr. Beker, on line 9, refers to "this

11  initiative," what did you understand that to mean?

12  **A.**    The discussed-earlier sentence there, about the paper or

13  document of some sort from Russian Customs.

14  **Q.**    Turning, now, to page 7 still, line 12, you said,

15              "In theory we can be -- well,

16         protected."

17              Why did you say that?

18  **A.**    Well, in theory, that such paper -- such document could

19  theoretically protect ATN from options on behalf of ITE against

20  ATN.

21  **Q.**    On behalf of what?

22  **A.**    ITE against ATN.

23  **Q.**    And when you say "such papers," what papers do you mean?

24  **A.**    Again, the document from Russian Customs.

25  **Q.**    Continuing on page 17, looking now at line 14, continuing,

1   you say,

2               "I can, well, write that we believe

3               that the only ones who could do that, you

4               know, took this obligation on their

5               shoulders, because it, so to speak, would

6               be the Newcon."

7       Why did you say that?

8   **A.**   Well, that was, again, the previously discussed agreement.

9   And, turning to the next stage, that we would tell ITE that the

10  best-possible candidate to fulfill the remainder of the

11  Battalion Set II, phase one, would be Newcon.

12  **Q.**   Continuing on line -- page 7, now, to line 22, you say,

13              "Well, as I understand, as you told me

14              yourself, it's 99 percent or 100 percent

15              that you are not going to work with him."

16      What did you -- why did you make that statement?

17  **A.**   Because time and time again, Michael and I stating that

18  they will not work with ITE, for different reasons.

19  **Q.**   On page 8, line 1, Mr. Beker said,

20              "Well, I would say so, most likely,

21              because -- ah, he will not go for this

22              price.  And secondly, even if he does go

23              for it, I don't want to" --

24              -- to which you reply, on line 4,

25              "I hear you."

```
 1        Why did you say that?
 2   A.   Because in the past conversations, we discussed the
 3   reasons; that Michael Beker had reasons not to work with ITE.
 4   He didn't trust him.  He didn't like him.  And he had Anham in
 5   place for that.
 6   Q.   Anham had a place for what?
 7   A.   For being a prime on this contract.
 8   Q.   On what contract?
 9   A.   Battalion Set II, and yes, here, more specifically,
10   remainder of the phase one.
11        (Reporter requests clarification)
12        (Record read)
13           THE WITNESS:  And he had Anham in place for ITE.
14   BY MS. HAMILTON
15   Q.   "Anham in place for ITE" -- what do you mean by that?
16   A.   ITE was a prime on Battalion Set II.  Anham was a prime on
17   Battalion Set I.  That's what I meant by that.
18        If Newcon would need to deliver, most likely, would need
19   to deliver through the Battalion Set -- I'm sorry -- through
20   the prime.  And they already worked with Anham.
21           THE COURT:  And Anham, again, is an acronym.  What
22   does it mean?
23           THE WITNESS:  I don't think it an acronym.  If it is,
24   I don't know.  Anham.
25           THE COURT:  It's just the name of a company?
```

 1              **THE WITNESS:**  It's just the name of a company in

 2  Vienna, Virginia.

 3              **THE COURT:**  I see.  And so you don't know what it

 4  stands for, if anything?

 5              **THE WITNESS:**  No.  I'm not aware of that.

 6              **THE COURT:**  Okay.  Excuse me.

 7  **BY MS. HAMILTON**

 8  **Q.**   On line 4 of page 8, you say,

 9                  "So because of this, he doesn't have

10              any fall-back.  And you will, afterwards,

11              offer to the TACOM basically the same

12              units; the same quality.  Well" --

13      And then the rest of your statement there is

14  unintelligible.  Let me go back and ask about some of the

15  statements that we can understand.  Pardon me.

16      When, on page, on line 4, you say, "He doesn't have any

17  fall-back," to whom are you referring when you say "he"?

18  **A.**   Ramzi Abu-Taleb.

19  **Q.**   I'm sorry?

20  **A.**   Yeah.  Go ahead.  Sorry.

21  **Q.**   You should finish your answer.  Your answer.  I'm sorry.

22  **A.**   Ramzi Abu-Taleb, president of ITE.

23  **Q.**   Why did you say he doesn't have any fall-back?

24  **A.**   Because the scenario that we discussed before was that we

25  recommend Newcon to ITE; Newcon doesn't want to work with ITE;

 1  and one of the scenarios, where Newcon would offer the units

 2  directly to TACOM.

 3          **MR. OSTERHOUDT:**  Excuse me, your Honor.  I don't

 4  think that's responsive.  There's nothing about offering units

 5  to TACOM directly there.

 6          **THE COURT:**  Well, you see the answer there.

 7          The objection's overruled.

 8  **BY MS. HAMILTON**

 9  **Q.**  Mr. Beker then responds -- oh, I'm sorry.  Let me back up.

10  On page -- on line 6 you then say,

11              "Offer to TACOM basically the same

12              units, the same quality."

13      Why did you say that?

14  **A.**  Because this goes to our past conversation, when Mr. Beker

15  mentioned that one of these plans was to start bringing in

16  units from NPZ; the same units that were already manufactured

17  for ATN.

18  **Q.**  And did you understand, based on your conversation with

19  Mr. Beker, that the -- the units would be the exact same units

20  that -- if you know this -- that NPZ had provided to ATN?

21  **A.**  There was no indication that it would be any other units.

22  The same units.

23  **Q.**  Well, what, if anything, did Mr. Beker say that led you to

24  believe that the IITs might be different than those that were

25  in place, than the ones applied by ATN?

1    **A.**    That they would be different?

2    **Q.**    That they would be those not supplied under the ATN

3    contract to ITE.

4    **A.**    Nothing.

5    **Q.**    That they would be substituted by -- from another supplier

6    into the bodies provided by NPZ.

7    **A.**    He didn't indicate anything like that.

8    **Q.**    On line 8 Mr. Beker then says,

9                 "excuse me for interrupting.  I can do

10               so only such a decision is made by our

11               entire conglomerate." [sic]

12        On line 9, Mr. Beker says, "can do so only if such a

13    decision is made."

14        What did you understand he was -- Mr. Beker was referring

15    to when he said, "a decision"?  What decision did you

16    understand he was referring to?

17    **A.**    I think, here, the decision of possibly selling the units

18    by Newcon to ITE.  They would need an approval from Anham; that

19    they would allow them.  They would maybe do it.

20    **Q.**    But let's go back to line 4, through -- this whole piece.

21    I'm sorry.  Line 4 through line 12.

22        And just -- if you could, I'll read that, and make sure

23    that you're -- my question is clear and your answer is clear.

24        On line 4 you say.

25                 "I hear.  So, because of this, he

1           doesn't have any fall-back.  You will

2           afterwards offer to TACOM basically the

3           same units; the same quality" --

4           -- to which Mr. Beker replies, on line 8,

5               "Excuse me for interrupting.  I can do

6           so only if such a decision is made by our

7           entire conglomerate." [sic]

8       So when -- so that's kind of the setup.  And my question

9   was:  When Mr. Beker refers to the decision that would be made

10  by our entire conglomerate, what did you understand that

11  decision to be?

12          **MR. OSTERHOUDT:**  Well, I think the record should be

13  clear that Mr. Rocklin inserts -- uses the word "conglomerate."

14  That's not -- and not Mr. Beker.  Mr. Beker says.

15              "If such a decision is made by our --

16          ah, entire" --

17          And then Mr. Rocklin says, "conglomerate."

18          **MS. HAMILTON:**  I apologize.

19          **THE COURT:**  And then Beker says, "The entire set."

20          **MS. HAMILTON:**  I apologize.

21  **Q.**   So, getting back to line 9, what did you understand

22  Mr. Beker's reference to "the decision" to be?

23  **A.**   Again, the decision to -- either for Newcon to sell

24  directly to TACOM, or to ITE.

25  **Q.**   On page 8, line 14, you say, "I got all that.  Yes."

1          Why did you say that?

2   **A.**    Because I was counting on previous count by Michael Beker.

3   Be so I understood.

4   **Q.**    What did you understand?

5   **A.**    That here-discussed scenario of if Anham will allow, then

6   Newcon would sell the goggles to either TACOM or ITE.

7   **Q.**    On line 15?

8          **THE COURT:**  I know there's cross-examination, but

9   while we're on this, if we could clear it up.

10         You used the word "conglomerate."

11         **THE WITNESS:**  Right.

12         **THE COURT:**  The entire conglomerate -- what did you

13  mean by that?

14         **THE WITNESS:**  In the past conversation, Michael was

15  referring to -- I'm looking for exact words right now -- a

16  serious or strategic structure.  The Anham was a large prime

17  company; a large prime bidder that was consortium of, I think,

18  six companies that were involved in different business in Iraq:

19  In the reconstruction; in deliveries of various supplies and

20  equipment.  So it was a large conglomerate.

21         **THE COURT:**  So you were referring to the Anham

22  conglomerate?

23         **THE WITNESS:**  Yes.  And Newcon was a part of that

24  kind of structure, because they were a subcontractor for

25  night-vision-goggle piece for Battalion Set I.

1  **BY MS. HAMILTON**

2  **Q.**    On page 8, line 15, Mr. Beker said,

3              "If, shall we say, Anham, with me, with

4          England, with all of these, well, roughly

5          speaking, guys -- if they decide to end

6          this contract, fuck it.  Let it be already

7          finished by, shall we say, ITE" --

8          -- to which you reply,

9              "Yes."

10         Mr. Beker said,

11             "And they, like, approve this, then

12         it's all the same to me."

13         And on line 91, Mr. Beker then said,

14             "If he agrees on this price, but

15         basically, I think they would not say so,

16         because I am not going to advise that" --

17         -- to which you reply,

18             "I've got it."

19     Why did you say that?

20  **A.**    I understand that the plan was to deliver the goggles.

21  And even if ITE would agree to the higher price, which they

22  would -- most likely would not, because then Michael would not

23  work with ITE anyway.

24  **Q.**    Continuing, on line 9, page 5, you say.

25             "Let's say TACOM receives today, but,

Lydia Zinn, CSR, CRR, and Debra Pas, CSR, CRR
Official Reporters - U.S. District Court
(415)  531-6587

```
1                    well, this is such a fine point, but I
2                    think there are no -- well, like, options,
3                    right?"
4         Why did you say that?
5    A.   Well, because TACOM had to procure night-vision goggles
6    somehow.  And they didn't really have many options left, if ATN
7    would not deliver.
8    Q.   Mr. Beker then said, "May I finish for you?"
9         "May I finish for you?"
10        And then, on line 12, Mr. Beker said,
11                   "It turns out that you are unable to
12                   deliver.  They say, 'Well, all right.  So
13                   don't do it anymore.  We are bringing the
14                   rest of the new tender'" --
15                   -- to which you reply,
16                   "Well, or they can simply switch."
17        Why did you say that?
18   A.   Because that was one of the scenarios discussed in the
19   past conversation, although I don't think they could simply
20   switch.  It was already awarded; but I was going along.
21   Q.   And when you say "simply switch," what a -- why did you
22   say that?  Switch what?
23   A.   Switch the contract -- the remainder of deliveries for
24   Battalion Set I -- to another supplier.
25   Q.   And in this sentence you say, "or they can simply switch."
```

1      Was there -- what was the other alternative you understood

2   was being discussed?

3   **A.**   The other alternative was that it would go back for

4   bidding process.

5   **Q.**   You then said -- oh, and then on line 20 you say,

6                   "Well, I understand to the one who is,

7                as you said, filled the first

8                Battalion Set."

9                Mr. Beker said on line 22,

10                   "Correct."

11                You said, on line 23,

12                   "Yes."

13                Mr. Beker then said,

14                   "But it the same thing."

15                And you said, on page 10, line 1,

16                   "Yes.  The same thing."

17      Why did you say that?

18   **A.**   Because whether -- in the first scenario, the -- Newcon

19   sells it to -- to TACOM whether it's going to go back for

20   bidding process, or whether they're going to sell it, because

21   the contract would be simply switched.  In both cases, it's the

22   same thing.  Newcon would still sell it.

23   **Q.**   On line 2, of page 10, Mr. Beker says.

24                   "But it absolutely does not change our

25                decisions" --

1              -- to which you reply, on page 10,

2         line 3,

3              "That's clear."

4     Why did you say, "That's clear"?

5  **A.**   Well, because here we were referring to a previously

6  discussed agreement that ATN and then Newcon somehow would need

7  to coöperate.

8  **Q.**   Did -- moving to another topic, did the concept of Newcon

9  paying ATN come up in this conversation?

10 **A.**   Yes.

11 **Q.**   Okay.  Let's move on, then, to the next portion of this

12 conversation.

13        (Audio clip played)

14            **MS. HAMILTON:**   Okay.  So just so the record's clear,

15 this clip was page 10 line 4, to page 12, line 20.

16 **Q.**   And if we could turn your attention to page 10, line 12,

17 Mr. Beker said,

18              "From my point of view, that's worth

19              paying for.  And simply, like, well, just

20              because somebody drove somebody somewhere,

21              so what?"

22        What did you understand Mr. Beker's statement,

23 "somebody drove somebody somewhere," to mean?

24 **A.**   Corner someone.  Push someone in a situation that is

25 difficult to get out of.

1    Q.    Mr. Beker then, on page -- excuse me -- on line 15, said.

2              "This is a different position."

3        What did you understand this to mean -- that "this is a

4    different position" -- in this context?

5    A.    Where ATN and Newcon would coöperate, that would be

6    different.

7    Q.    Different than what?

8    A.    Than just if ATN would get out of the -- just stop

9    delivering, because they're cornered; in a difficult position.

10   Q.    You then, on line 17, on page 10, said,

11             "I hear you."

12       Why did you say that?

13   A.    I'm just continuing the conversation.  And I had an

14   understanding that the -- that coöperation would be worth

15   paying for.

16   Q.    On page 11, line 7, Mr. Beker said.

17             "Well, I can tell you that Anham bought

18          higher than -- than the Jordanian is

19          selling."

20       What did you understand Mr. Beker to mean in that

21   sentence?

22   A.    Well, "the Jordanian" is ITE -- was buying -- I'm sorry --

23   was selling the units to TACOM for $1,760.

24       And here, Mr. Beker tells me that Anham was buying them

25   for higher price than what ITE was selling to TACOM.

1    Q.   And did you understand where Anham was buying the

2    night-vision goggles from?

3    A.   From Newcon.

4    Q.   On page 11, line 12, you then say.

5             "Well, that would require the price of

6          TACOM to rise."

7        Why did you say that?

8    A.   Well, because there was no other way, if -- if Anham, in

9    this scenario, would be selling the units to TACOM, and they're

10   buying it for more than another prime is selling it for, then

11   the price would need to go up.

12   Q.   Now, was the subject of a good-faith deposit raised during

13   this conversation?

14   A.   Yes.

15          **MS. HAMILTON:**  Let's then play the next clip, which

16   is page 12, line 20, through page 16, line 23.

17          (Audio clip played)

18   **BY MS. HAMILTON**

19   Q.   If I can turn your attention, please, to page 13, line 10,

20   you told Mr. Beker,

21             "I need a step from you."

22        Why did you say that?

23   A.   Because the next -- the next step was to receive a

24   good-faith deposit.  And that's what I was asking here for.

25   Q.   And why were you asking for a good-faith deposit?

1   **A.**   At the direction of FBI.

2   **Q.**   On page 15, line 8, Mr. Beker said,

3           "No, unlike -- like, upon my word,

4           there's no need either to talk me into it,

5           or to convince.  I, like, trust you.  I

6           believe you.  You and I reached an

7           agreement.  If now you, like, say, 'Yes I

8           am ready to join the coalition,' and

9           afterwards already the way it will turn

10          out, I will do what you say, like" --

11      And then, continuing on line 16,

12          -- "well, meaning:  Within reason,

13          well, then, there is no need to keep

14          convincing me anymore.  So you and I

15          reached an agreement.  Tell me what you

16          want in the form of a good faith, and I

17          don't have problems with it.  I'm telling

18          you once again."

19      Looking at line 12, Mr. Beker said to -- if -- quote,

20          "I am ready to join the coalition."

21      What coalition did you understand he was referring to?

22  **A.**   He'd join the coalition of ATN and Newcon.  ATN and Newcon

23  would coöperate.

24  **Q.**   Okay.  Was there any further discussion of a financial

25  arrangement --

1    **A.**    Yeah.

2    **Q.**    -- with Mr. Beker?

3           **MS. HAMILTON:**   If we could then play the next clip in

4    the conversation, which begins at page 16, line 24, to page 17,

5    line 4.

6           (Audio clip played)

7           **MS. HAMILTON:**   So I apologize.   Just again, I want

8    the record to be really clear about which portions you're

9    hearing, when this is page 16, line 24, to page 19, line 19.

10          **MR. HOWDEN:**   I'm sorry.   Line?

11          **THE COURT:**   Nineteen.

12          **MS. HAMILTON:**   Nineteen.

13   **Q.**   Now, turning now to page 17, line 2, you said,

14                "You, well, mentioned 75, or can we

15                agree on a hundred dollars, I think, if you

16                go sell them for over $2,000 to TACOM?"

17       Why did you bring up the amount?   You mentioned 75.   What

18   did that number refer to?

19   **A.**   In the past conversation, there was a range discussed of

20   50, 75, to a hundred dollars per each unit that will not be

21   delivered on Battalion Set I -- I'm sorry -- Battalion Set II,

22   phase one.   And that's the range he was referring to.

23   **Q.**   When you say, "not be delivered on Battalion Set II," what

24   do you mean?

25   **A.**   That ATN would not deliver on that; but Newcon would

1  deliver.

2  **Q.**   And you then say,

3             "Can we agree on a hundred dollars?"

4       Why did you ask if you could agree on a hundred dollars?

5  **A.**   I was negotiating.  It was the upper range of the offer,

6  so I was asking for the higher range.

7  **Q.**   Page 17, line 3, you say -- you said,

8             "If you go sell them for over $2,000 to

9         TACOM."

10      Why did you say that?

11 **A.**   Because the $2,000 price was brought up just in this

12 conversation prior to that; that if Michael said something to

13 the extent that -- that the goggles were sold for the

14 Battalion Set I, that $2,000 or over.

15 **Q.**   On page 18, line 21, Mr. Beker asked you to,

16            "Send me, please, the invoice with the

17        requisites."

18      How did the topic of an invoice come up?

19 **A.**   I offered the invoice.

20 **Q.**   And how did you come to propose the idea of an invoice?

21 **A.**   It was discussed with FBI, because if Newcon would make a

22 good-faith deposit, it's a choose action between two companies

23 to -- money would be transferred somehow.  And they would need

24 some sort of a receipt for what is it that they transferred the

25 money.

1        So I brought this up with FBI.  And they suggested some

2    sort of invoice, or some goods -- perhaps nontangible goods or

3    services, which is a consulting fee, or something like this.  I

4    think that's what I'm mentioning here.

5    Q.   Mr. Beker also said to send requisites with the invoice.

6    Are you familiar with the term "requisites"?

7    A.   Yes.

8    Q.   How do you know that term?

9    A.   It's a common term in a business.  It's banking wiring

10   instructions.

11   Q.   And wiring instructions for what?  What does that mean?

12   A.   To make -- well, that's paying instrument to transfer the

13   money from one account to the other account.

14   Q.   And who first mentioned the idea of requisites?

15   A.   Michael did.

16   Q.   Turning to page 19, line 2, Mr. Beker said,

17              "And you give me your word of honor

18         that, in case this somehow doesn't work out

19         for you guys" --

20         Continuing on line 5,

21            -- "you'll return this money to me."

22        When Mr. Beker refers to "this," on line -- on 3; that "in

23   case this somehow doesn't work out" -- what did you understand

24   the reference to "this" to mean?

25   A.   The agreement that we're discussing here, where Newcon

1  would be delivering the goggles for the remainder of the

2  Battalion Set II, phase one.

3  **Q.**   And the reference, "if it doesn't work out for you guys" -

4  what did you understand that portion to mean?

5  **A.**   It's kind of my word that, if it doesn't work out for you

6  guys.  That's, I think, how it's interpreted here.

7  **Q.**   Now you just testified to -- that earlier you proposed --

8  or that you discussed creating an invoice for consulting

9  services or camera adapters.

10      Did you continue to discuss with Mr. Beker what to write

11  on the invoice?

12  **A.**   Yes.

13          **MS. HAMILTON:**  So if we could now hear the next part

14  of the conversation, which is page 9 -- 19, line 20, through

15  page 22, line 5.

16          (Audio clip played)

17  **BY MS. HAMILTON**

18  **Q.**   Okay.  If I could turn your attention to page 20, line 3,

19  Mr. Beker said,

20              "I would prefer something like a loan,

21          so that later on, if there is anything" --

22          And he continues on line 6.

23              -- "one would be able, like, to at

24          least talk."

25      Did you understand the $50,000 good-faith deposit being

1  discussed to be a loan?

2  **A.**   No.

3  **Q.**   When, if ever, did you discuss with Mr. Beker Newcon

4  loaning ATN money?

5  **A.**   Never.

6  **Q.**   When, if ever, did you discuss with Mr. Prilik the concept

7  of Newcon loaning ATN money?

8  **A.**   Never.

9  **Q.**   Did you ever discuss with anyone Newcon loaning ATN money?

10 **A.**   No.

11 **Q.**   Let's, then, turn to the next portion, which is -- the

12 next question I have.  I apologize.  On page 21, line 15 -- I

13 apologize -- you say, "I have *arie@newconoptik.com*," to

14 Mr. Beker.

15      How did you come to have Mr. Prilik's e-mail address?

16 **A.**   In the beginning, I mentioned that we had an e-mail

17 exchange when, a couple of years prior to this, we were looking

18 into a rangefinding line from Newcon.

19 **Q.**   And at the end of this conversation what -- well, what did

20 you understand -- well, I'm sorry.  Let me just --

21          **MS. HAMILTON:**  Let's play Clip Nine, page 22

22 through -- line 6, through page 27, line 2.

23          (Audio clip played)

24          **MS. HAMILTON:**  Let's go ahead and play the next

25 portion of his conversation, which is page 27, line 3, through

1  page 31, line 3.

2           (Audio clip played)

3           **MS. HAMILTON:**  Let's play the last clip page 31,

4  line 12, through page 34, line 21.

5           **MR. HOWDEN:**  What?

6           **MS. HAMILTON:**   Page 31, line 12, through page 34,

7  line 21.

8           (Audio clip played)

9  **BY MS. HAMILTON**

10 **Q.**   If I could please turn your attention to page 34, line 7,

11 Mr. Beker said,

12           "I can confirm once again, Dima, I am

13           interested in coöperation.  And I hope that

14           the first step that we will do tomorrow

15           will ultimately lead to a mutual interest,"

16           -- to which you replied,

17           "Agreed."

18     What did you understand the first step that Mr. Beker

19 referred to there to mean?

20 **A.**   The first step -- the agreement on transferring advance

21 payment.

22 **Q.**   And what was the amount of the advance payment to

23 transfer?

24 **A.**   $50,000.

25 **Q.**   After this call ended, did you do anything as part of the

1  follow-up to that conversation?

2  **A.**   Yes.

3  **Q.**   What did you do?

4  **A.**   I prepared an invoice.  I asked our bookkeeper to open up

5  a separate bank account in our bank.  And I faxed and e-mailed

6  an invoice for $50,000, for loan amount and the bank

7  requisites.  And I -- I'm worry.  I faxed it, and I e-mailed.

8  **Q.**   So you -- you -- did you -- I'm sorry.  Did you create the

9  invoice, or did you have someone create the invoice?

10  **A.**   I asked someone to create the invoice.

11  **Q.**   And was -- in addition to the invoice, was any other

12  document created?

13  **A.**   Yes.

14  **Q.**   What?

15  **A.**   The banking requisite document.

16  **Q.**   I'm worry.  I couldn't hear you.

17  **A.**   Banking requisite document.  The wiring instructions.

18  **Q.**   And was that also created by one of your employees?

19  **A.**   Actually, I did that.

20  **Q.**   So let's, then, start with the invoice.  I would like to

21  show you what's been previously marked as Exhibit 4.  And

22  it's -- for you, it would be in your binder, on Tab 3.

23       Have you seen this document before?

24  **A.**   Yes.

25  **Q.**   What is it?

```
 1   A.   It's the invoice I asked to create.

 2   Q.   That you asked -- I'm sorry?

 3   A.   Yes.  I asked someone to create this invoice.

 4   Q.   And when you say "someone," who was it?

 5   A.   I think I asked James to make it.

 6   Q.   James who?

 7   A.   James Munn, V.P. of ATN.

 8   Q.   And what instructions did you provide to Mr. Munn?

 9   A.   To make an invoice for a loan amount of $50,000, in the

10   name of Newcon.

11   Q.   And did you instruct Mr. Munn the identities of any --

12   what, if any, individuals should be identified on the invoice?

13   A.   Yes.

14   Q.   And did you instruct Mr. Munn what to write under the

15   "Miscellaneous" heading?

16   A.   Yes.

17   Q.   And did you instruct Mr. Munn to include the dollar

18   amount?

19   A.   Yes.

20   Q.   And reviewing this -- this invoice -- did Mr. Munn create

21   the document according to your instructions?

22   A.   Yes.

23   Q.   Did you receive this invoice from Mr. Munn?

24   A.   Yes.

25   Q.   And what did you do with it then?
```

 1  **A.**    I signed, I put the corporate stamp, and I printed my name

 2  and title.

 3  **Q.**    Okay.  And you say you signed.

 4         The lower middle portion of the document, there appears to

 5  be a signature.  Whose is it?

 6  **A.**    Mine.

 7  **Q.**    And after you signed this invoice, what did you do with

 8  it?

 9  **A.**    Together with other document, I e-mailed and faxed it.

10              **MS. HAMILTON:**  Your Honor, we would move to admit

11  Exhibit 4 into evidence.

12              **MR. OSTERHOUDT:**  No objection.

13              **THE COURT:**  Exhibit 4 is admitted.

14         (Trial Exhibit 4 received in evidence)

15  **BY MS. HAMILTON**

16  **Q.**    Mr. Rocklin, I would like to ask you a few questions about

17  this document.

18         Now, under the heading of "Bill to" are the names:

19  Newcon Optik, Mike Beker, and Arie Prilik.  Did you instruct

20  Mr. Munn to plays those three names on this invoice?

21  **A.**    Yes.

22  **Q.**    Why did you instruct Mr. Newcon -- Mr. Munn to place

23  Newcon's name on this invoice?

24  **A.**    Because it was -- Newcon was there because it was business

25  transaction -- supposed to be -- between ATN and Newcon.  And I

 1  was communicating with Michael Beker and Arie Prilik, so I put

 2  this invoice to their attention.

 3  Q.   So -- and why did you put it to Mr. Prilik's attention?

 4  A.   Because I was talking to him as well.

 5  Q.   About what?

 6  A.   About deliveries on Battalion Set II.

 7  Q.   Now, under the "Miscellaneous" heading is the word "loan."

 8  And it's circled.  Why did you instruct Mr. Munn to insert the

 9  word "loan" on this document?

10  A.   Because it was previously agreed with Michael Beker in

11  conversation to include the word "loan" there.

12  Q.   And under the "Price" section, why did you instruct

13  Mr. Munn to put "$50,000"?

14  A.   Because that was the amount that we agreed on -- me and

15  Michael Beker.

16  Q.   Let's turn, then, to the requisites.

17       You can take that one down, please (indicating).  Thanks.

18       And now I'd like to show you what's been marked as

19  Exhibit 2, which, in your binder, will be under Tab 4.  Do you

20  have that?

21  A.   Yes.

22  Q.   Have you seen this document before?

23  A.   Yes.

24  Q.   What is it?

25  A.   That's a document I created.  That's bank wiring

1  instructions, to transfer funds.

2  **Q.**   And when did you prepare this document?

3  **A.**   On that date.

4  **Q.**   What day is that?

5  **A.**   What was it?  September 1st?  Yeah.  September 1st.

6  **Q.**   September 1st of what year?

7  **A.**   2005.

8  **Q.**   How did you prepare this document?

9  **A.**   I asked my bookkeeper to open a separate account.  And

10  when she had that information, I used the information provided

11  by the bank to create this document.

12  **Q.**   And why did you prepare this document Exhibit 2?

13  **A.**   Because, in my discussion with Michael, he asked for

14  wiring instructions.

15  **Q.**   After you prepared this document, what did you do next?

16  **A.**   Together with the invoice, I faxed it and e-mailed it to

17  Newcon.

18          **MS. HAMILTON:**  So, your Honor, we'd now move to admit

19  Exhibit 2 into evidence.

20          **MR. OSTERHOUDT:**  No objection.

21          **THE COURT:**  Exhibit 2 is admitted.

22          (Trial Exhibit 2 received in evidence)

23          **MS. HAMILTON:**  Thank you, your Honor.

24  **Q.**   Mr. Rocklin, on this document, under -- there's a heading

25  that says, "American Technologies Network Corp."  And then

1  this -- the second line under that heading says "r-o-u-t-i-n

2  number," and then "12200496."  Do you see that?

3  **A.**    Yeah.

4  **Q.**    What is that?

5  **A.**    That's a routing number to -- for money to be wired to.

6  **Q.**    And are you -- what is a routing number?

7  **A.**    Routing number and the SWIFT code are specific -- two

8  specific numbers that -- it's an address where the money will

9  land.

10  **Q.**    I'm sorry.  Where the money will land?

11  **A.**    Well, the money will be transferred.

12  **Q.**    And you stated that you obtained the banking information

13  from your bookkeeper.  Is that right?

14  **A.**    Yes.

15  **Q.**    How -- why did you obtain the information from your

16  bookkeeper?

17  **A.**    She would be usually in charge of opening an account; some

18  of the accounts.

19  **Q.**    And she opened up an account for this specific

20  transaction?

21  **A.**    Yes.

22  **Q.**    And why did she do that?

23  **A.**    Because, at the discussion with the FBI, my understanding

24  was that these funds would be seized, and I didn't want to use

25  the general ATN account.

1   Q.   Now, is the information on this page accurate?

2   A.   Yes.

3   Q.   And when -- when did you send this -- the requisite -- to

4   Newcon?

5   A.   Same date:  September 1st, 2005.

6   Q.   And why did you send this requisite to Newcon?

7   A.   Because we agreed in a conversation that I will do so.

8   Q.   Now, you testified earlier that you e-mailed and faxed

9   both the invoice and the requisite to Newcon.  Is that right?

10  A.   Yes.

11  Q.   Do you know if anyone at Newcon received this information?

12  A.   Yes.

13  Q.   And how do you know that?

14  A.   From the next conversation with Michael Beker.

15  Q.   Before that, did you obtain any indication that the fax

16  that you had transmitted was received -- the fax phone number

17  that you've been provided for Newcon, or that you had obtained

18  from Newcon?

19  A.   When I faxed it, I got confirmation from our fax machine.

20  Q.   Okay.  So let me now turn your attention to Exhibit 3.

21  And that is, for you, on Tab 5.  Do you recognize that

22  document?

23  A.   Yes.

24  Q.   What is it?

25  A.   That's an activity report from our fax machine --

1  **Q.**    And --

2  **A.**    -- at that date, at that time.

3  **Q.**    Under the heading "Fax Number/Name" is a phone number.  Do

4  you recognize that number?

5  **A.**    Yes.

6  **Q.**    What is it?

7  **A.**    It's a fax number.  Newcon.

8  **Q.**    And where did you get that fax number?

9  **A.**    I think it was on Arie's signature.  On the e-mail, it was

10 customary to put the fax number there.

11 **Q.**    When you say a "signature on the e-mail," what do you

12 mean?

13 **A.**    Past e-mail exchange, the -- it is customary to have the

14 part of your signature, your contact information.  And part of

15 it would be a fax number.

16 **Q.**    Do you know how this activity report was created?

17 **A.**    After I faxed it, I just dialed a button -- I don't

18 know -- on a fax machine.  And that allows you to print a

19 report.

20 **Q.**    That's where you obtained this report from?

21 **A.**    Yes.

22 **Q.**    And at that time you used the fax machine, was it in

23 working condition?

24 **A.**    Yes.

25 **Q.**    And, to your knowledge, was it accurately sending and

1  receiving copies of the original documents?

2  **A.**    Yes.

3  **Q.**    And at the time that you faxed the loan invoice and the

4  bank wiring instructions, did that machine accurately record

5  the date and time of its fax transmissions?

6  **A.**    To my best knowledge, yes.

7  **Q.**    And what time is on the activity report?

8  **A.**    17:31.  5:31 p.m. Pacific Standard Time.

9  **Q.**    And did the activity report indicate that the fax had been

10  received?

11  **A.**    Yes.

12  **Q.**    How do you know that?

13  **A.**    Because it said that there were -- two pages were sent,

14  which were invoice, and then wiring instructions.  And the

15  results are okay.

16      If it wouldn't go, there's a trouble code that is listed

17  below.

18          **MS. HAMILTON:**  So, your Honor, the United States

19  moves to admit Exhibit 3 into evidence.

20          **THE COURT:**  No objection?

21          **MR. OSTERHOUDT:**  No objection.

22          **THE COURT:**  Exhibit 3 is admitted.

23      (Trial Exhibit 3 received in evidence)

24          **MS. HAMILTON:**  Thank you, your Honor.

25  **Q.**    Now, in addition to faxing the invoice and the requisite,

1  did you also transmit those two documents to Newcon in some

2  other way?

3  **A.**    Yes.

4  **Q.**    And what was that?

5  **A.**    By e-mail.

6  **Q.**    So I'd like to show you what's now been marked as

7  Exhibit 47.  And for you, that will be under Tab 7.  Do you

8  have it?

9  **A.**    Yes.

10  **Q.**    Do you recognize this document?

11  **A.**    Yes.

12  **Q.**    What is it?

13  **A.**    That's my e-mail to Michael and Arie.

14  **Q.**    And you say, "my e-mail."  Who prepared that e-mail?

15  **A.**    I did.

16  **Q.**    And when did you prepare it?

17  **A.**    On September 1st, around 6:00 p.m. or so.  Faxed it.

18  **Q.**    September 1st 2005?

19  **A.**    2005, yeah.

20  **Q.**    Why did you prepare this e-mail?

21  **A.**    Because we had the discussion with Michael that I will

22  send the invoice and banking wiring instructions by e-mail.

23  **Q.**    And after you prepared this e-mail, what did you do?

24  **A.**    I attached two documents, and I sent it.

25  **Q.**    And how did you send it to Mr. Beker?

1  **A.**   By e-mail.

2  **Q.**   There's an e-mail address:  m-i-k-e at newcon dot -- optik

3  dot com.

4      Why did you send the e-mail to that address?

5  **A.**   Because in that last conversation we had, that's the

6  e-mail that was given to me, just like Arie; only Mike, instead

7  of Arie.

8  **Q.**   And the address: *arie@newcon.optik.com?*

9  **A.**   Yes.

10  **Q.**   How did you -- why did you send it to that address?

11  **A.**   Because that was the address I had from the past

12  communications with Arie.

13          **MS. HAMILTON:**  Your Honor, we would now move to admit

14  Exhibit 47 into evidence.

15          **THE COURT:**  Any objection?

16          **MR. OSTERHOUDT:**  No.

17          **THE COURT:**  Exhibit 47 is admitted.

18          **MS. HAMILTON:**  Thank you.

19          (Trial Exhibit 47 received in evidence)

20  **BY MS. HAMILTON**

21  **Q.**   Now, what was -- just so the record's clear, what was

22  attached to this e-mail?

23  **A.**   Invoice that we just saw, and wiring instructions.

24  **Q.**   All right.  Now, did you receive a response to this

25  invoice, or -- excuse me -- to this e-mail?

1  **A.**    Yes.

2  **Q.**    And I'd like you now to look at the rest of, again,

3  Exhibit 47.  And do you recognize the upper portion of this

4  e-mail chain?

5  **A.**    Yes.

6  **Q.**    And what is this?

7  **A.**    This is the e-mail that I received as reply to my original

8  message to Michael, from Michael Beker.

9           **MS. HAMILTON:**  Can you zoom in on the top portion,

10  please?

11           (Discussion off the record)

12  **BY MS. HAMILTON**

13  **Q.**    When was the first time that you saw this portion of the

14  e-mail chain?

15  **A.**    Same day:  September 1st, shortly after.  I think whenever

16  you open an e-mail or receive it, there's a time stamp there.

17  So it was about 7:25 p.m.

18  **Q.**    And how did this e-mail come to your attention?

19  **A.**    I opened it, and -- I was in front of my computer, and

20  opened an e-mail.

21  **Q.**    So you had saw an e-mail came into your in box, and opened

22  it.  Is that it?

23  **A.**    Yes.

24  **Q.**    Now, at the time that you received this e-mail, did you

25  have reason to believe that the computer system at ATN was

1   accurately sending and receiving e-mails?

2   **A.**   Yes.

3   **Q.**   And who did you understand this e-mail was from?

4   **A.**   Michael Beker.

5   **Q.**   And how did you know it was from Mr. Beker?

6   **A.**   Because it was -- the signature stated Michael Beker.  And

7   it was his e-mail address:  *michael@newconoptik.com.*

8   **Q.**   And you recognized the e-mail address in the "From" line?

9   **A.**   Yes.

10  **Q.**   Now, Mr. Beker said,

11              "I did not authorize you to send a copy

12          to Arie.  Please be advised that our

13          agreement is canceled."

14      What agreement did you understand Mr. Beker was referring

15  to?

16  **A.**   The agreement that we discussed in the past two

17  conversations with Michael Beker.

18  **Q.**   And were you surprised when you received this e-mail from

19  Mr. Beker?

20  **A.**   Yes.

21  **Q.**   Why?

22  **A.**   I didn't understand the response at all.  I didn't --

23              **MR. OSTERHOUDT:**  Well, I object to his characterizing

24  his response to this.

25              **THE COURT:**  Objection is overruled.

1          You may answer.

2          **THE WITNESS:**  I was surprised, because I was in

3    discussion with Michael and Arie at all the time.  My

4    understanding was when I talked to one, I talked to the other,

5    because they were sharing the information.

6          I -- in the past conversation, I was not specifically

7    told not to send this documents to Arie, so I was surprised.

8          **MS. HAMILTON:**  Okay.  Now, if we could just blow up

9    on to the rest of the document.  Looking down at the address,

10   where it says "Michael and Arie," can you just highlight that,

11   please, and that whole section?  It looks like part of the --

12   part of the text seems to be missing there.

13   **Q.**   What's your understanding of the beginning of the

14   sentence; of I might loan Arie to say --

15         **MR. HOWDEN:**  Objection, your Honor.  The document has

16   to speak for itself.

17         **THE COURT:**  I think -- is there another whole copy of

18   this?  Because it looks as if what has happened is a hole was

19   bunched, to allow it to be inserted into our volumes here; but

20   there must be an original document where -- or a document from

21   which this copy was made, that does not have the hole punched.

22   And I think your --

23         **MS. HAMILTON:**  We'll have to find -- to see if there

24   is one.  Oh, would you --

25         **THE COURT:**  Yes.

1    BY MS. HAMILTON

2    Q.    So if I can hand you what appears to be the original or

3    another copy of Exhibit 47, if you could, just read into the

4    record.

5    A.    (Reading)

6                    "Michael and Arie, Per agreement, see

7                two attached documents."

8    Q.    Thank you.

9            THE COURT:  Do you have the Elmo there, that you can

10   put that on, or -- so that everybody can see exactly what it

11   says?  I'm just testing your ability to use that.

12           MS. HAMILTON:  I think I'm about to be challenged

13   even more than I already have been.

14           THE COURT:  Everybody see that?

15           (Jury panel nodding affirmatively.)

16           THE COURT:  Okay.

17           MS. HAMILTON:  Thank you.

18           THE COURT:  So we don't have to guess.

19           MS. HAMILTON:  And I didn't break anything.

20   BY MS. HAMILTON

21   Q.    After receiving the email from Mr. Beker, what, if

22   anything, did you do?

23   A.    I attempted to contact him.

24   Q.    And were you successful immediately?

25   A.    No, not the same day.

1  **Q.**   Did you connect with Mr. Beker eventually?

2  **A.**   Yes.  The next day.

3  **Q.**   And when did that conversation occur?

4  **A.**   The following day, September the 2nd.

5  **Q.**   Of 2005?

6  **A.**   2005.

7  **Q.**   And did you record that conversation?

8  **A.**   Yes.

9  **Q.**   And that conversation, did you listen to the recording?

10  **A.**   Yes.

11  **Q.**   Did the recording accurately reflect the conversation that

12  you had with Mr. Beker?

13  **A.**   Yes.

14          **MS. HAMILTON:**  We move Exhibit 108 into evidence,

15  your Honor.

16          **THE COURT:**  Any objection, 108?

17          **MR. OSTERHOUDT:**  No.

18          **THE COURT:**  It's admitted.

19          (Trial Exhibit 108 received

20           in evidence)

21          **THE COURT:**  And if 108 is admitted, I assume 138

22  isn't far behind.

23  **BY MS. HAMILTON**

24  **Q.**   And turning to Exhibit 138, have you read an English

25  translation of the conversation that you had with Mr. Beker on

1    September 2nd?

2    **A.**    Yes.

3    **Q.**    And is that English translation an accurate reflection of

4    the conversation that you had with Mr. Beker on that day?

5    **A.**    Yes.

6           **MS. HAMILTON:**  And, your Honor, we would move to

7    admit Exhibit 138.

8           **MR. OSTERHOUDT:**  No objection.

9           **THE COURT:**  138 is admitted.

10           (Trial Exhibit 138 received

11            in evidence)

12   **BY MS. HAMILTON**

13   **Q.**    Now, why did you try to call Mr. Beker?

14   **A.**    Because I was surprised to receive an email like that.

15   **Q.**    And what was the purpose in calling him?

16   **A.**    To understand why is it that he cancel on the agreement.

17   **Q.**    If we could listen to the first clip, page 1, line 14,

18   through page 10, line 10.

19           (Audiotape played in open court.)

20   **Q.**    If we could turn your attention to page 6, line 20.  Mr.

21   Beker said:  "No, you don't quite understand.  You think that

22   all this... like, what you and I are doing... well, to put it

23   mildly, somebody can use it against us."

24           To which you replied on line 20:  "I understand only too

25   well."

1      Why did you say that?

2  **A.**   Because the documents that I faxed or email, one with the

3  knowledge of the agreement could use it as evidence of -- of a

4  crime.

5  **Q.**   On page 9, line 2 Mr. Beker said:  "You see that there are

6  such things that well... especially by your laws... and our

7  laws are almost identical."

8      What did you understand the reference to "our laws are

9  almost identical" to mean?

10 **A.**   Canadian laws as compared to laws of the United States.

11 **Q.**   And did you have an understanding of what type of laws Mr.

12 Beker was referring to there?

13         **MR. HOWDEN:**  Objection, your Honor.  Speculation.

14         **THE COURT:**  Objection is sustained.

15 **BY MS. HAMILTON**

16 **Q.**   Turning to page 9 still, line 14 you said:  "Michael, from

17 now on communications are with you only."

18     To which on line 15 Mr. Beker replied:  No, the

19 communications be my best... one can't write them to... one

20 can't attach them to a case."

21     Did you understand what Mr. Beker's reference to "a case"

22 was there?

23 **A.**   Yes.

24 **Q.**   What was your understanding based on?

25 **A.**   Russian language, when you say "it cannot be attached to

1   the case" it means to legal case.  It cannot be attached as an

2   evidence because it means that the case of the documents which

3   is usually being used in the legal case.

4          MR. HOWDEN:  Your Honor, I'm going to ask that that

5   answer be stricken.  It's completely speculative.

6          THE COURT:  Objection is sustained:  Answer is

7   stricken.  I don't think there is enough context unless you can

8   lay a foundation for it.

9   BY MS. HAMILTON

10  Q.   The particular word that's used by Mr. Beker, the Russian

11  word that's used by Mr. Beker, translates as "case."  Does that

12  word have a particular meaning to you, that Russian word?

13         MR. HOWDEN:  Objection, your Honor.  That calls for

14  an expert opinion.  This is the stipulated transcript --

15         THE COURT:  The question is what it means to him.

16  Whether or not that, in fact -- and the jury should only

17  understand it as what it means to him.

18         So you may answer the question.

19  A.   To me it meant that such communications could be used as

20  evidence in --

21         THE COURT:  No, that's not the question.  The

22  question is:  What -- the term that was used that translates to

23  "case," what does that word mean to you?

24         THE WITNESS:  Legal case.

25

1    **BY MS. HAMILTON**

2    **Q.**    Continuing with that portion, Mr. Beker said, starting

3    line 15 again:  "No, the communications... be my guest.  One

4    can't write them to...  One can't attach them to a case

5    nowhere... stick them up your ass.  He does the communications

6    that I entrust them with.  He asked my permission to

7    communicate with Dima on the subject of preparing the issue

8    because Dima called, and so on and so on... I say by all means.

9    After all, he is not a stranger, right?"

10        To which you reply on line 23:  "Well, I understand."

11        Mr. Beker refers beginning on line 17 to "he."  "He does

12    the communications that I entrust him with."  Who did you

13    understand that Mr. Beker was referring to there?

14   **A.**    Arie Prilik.

15   **Q.**    Why did you believe that to be the case?

16   **A.**    Because it's the subject of discussion here.

17   **Q.**    Now, on page 9, line 19, Mr. Beker says:  "He asked my

18    permission to communicate with Dima on the subject of preparing

19    the issue."

20        What did you understand the phrase "preparing the issue"

21    to mean?

22   **A.**    After my initial call on August 17th, I had a number of

23    conversations with Arie.  In my understanding here that Michael

24    is asking to prepare some of the -- to discuss some of the

25    issues, because I call initially.

Lydia Zinn, CSR, CRR, and Debra Pas, CSR, CRR
Official Reporters - U.S. District Court
(415) 531-6587

1  Q.   And when you say "some of the issues," what issues are you

2  referring to?

3  A.   Whatever was discussed in the first few conversations with

4  Michael -- I'm sorry, with Arie.  The -- pertaining second

5  generation market.

6  Q.   Now, based on what Mr. Beker was telling you about

7  communicating with Mr. Prilik, what did you conclude about

8  having future conversations with Mr. Prilik related to the

9  arrangement between ATN and Newcon?

10  A.   That I could still have future communications.

11  Q.   Why did you -- why did you reach that understanding?

12  A.   Because he's specifically telling me that I can

13  communicate with Arie.

14  Q.   In his email response to you, which we have seen

15  previously as Exhibit 47 --

16        MS. HAMILTON:  Do you want to pull that Exhibit 47 up

17  just briefly?

18        (Document displayed)

19  BY MS. HAMILTON

20  Q.   Up at the top Mr. Beker said.  "Please be advised that our

21  agreement is cancelled."

22        After this conversation, did you understand that the

23  agreement was cancelled?

24  A.   After the September 2nd?

25  Q.   After your conversation here, did you understand that the

 1  agreement was cancelled?

 2  **A.**   No.  My understanding that we were to continue with the

 3  agreement.

 4  **Q.**   Okay.  Let's then turn to play the next clip, which is

 5  page 10, line 11, through page 12, line 15.

 6           (Audiotape played in open court.)

 7  **Q.**   Okay.  Please turn your attention to page 10, line 18.

 8  Mr. Beker said:  "Well, did you pay for... well you paid for

 9  something and didn't receive something."

10      To which you replied on line 20:  "Absolutely correct, as

11  I understand."

12      Why did you say that?

13  **A.**   Because I understood at the time that the conversation was

14  about ATN making payment to NPZ for night vision goggles and

15  that we haven't received the product that we paid for.

16  **Q.**   What was your understanding as to why Mr. Beker was

17  raising this subject with you?

18  **A.**   Because later on he's saying right there just one

19  should -- something to the extent care about how to get the

20  units here.

21  **Q.**   How to get the units where?  I'm sorry.

22  **A.**   In this instance, my understanding it's how Newcon would

23  get the units from NPZ.

24           **MS. HAMILTON:**  So, your Honor, we have two kind of

25  lengthy clips just to play through before I have any questions.

```
 1   I don't know if you were thinking of a break?

 2            THE COURT:  Is this a good time to take a break?

 3            MS. HAMILTON:  Now or after the clips, whatever you

 4   prefer.

 5            THE COURT:  How are we doing?  Should we take a

 6   break?

 7            (Jury panel nodding affirmatively.)

 8            THE COURT:  Yeah, I think so probably, yeah.

 9            MS. HAMILTON:  It's hard work.

10            THE COURT:  Ten minutes.  Try to get back here in 10

11   minutes.  Probably by the time we get everybody converged, it

12   will be a little later than that.

13            Please follow the instructions about not discussing

14   the case amongst yourselves or anyone else and we will see you

15   at the close of the recess.

16            (Jury exits courtroom at 10:37 a.m.)

17            THE COURT:  You may step down, but do not discuss

18   your testimony with any other persons who may be witnesses.

19            (Witness steps down.).

20            THE COURT:  So we'll see you in 10 minutes.  Thank

21   you.

22            MS. HAMILTON:  Thank you, your Honor.

23            (Whereupon there was a recess in the proceedings

24             from 10:37 a.m. until 10:55 a.m.)

25
```

1  **BY MS. HAMILTON**

2  **Q.**   I just finished up questioning you about information about

3  ATN suppliers.  Now what we'll just do is play the next set of

4  clips, which are page 12, line 15, through page 17, line 7.

5           (Audiotape played in open court.)

6  **Q.**   And during the conversation, did Mr. Beker raise the idea

7  of a paper to sign between ATN and Newcon?

8  **A.**   Yes.

9  **Q.**   And to the next clip, which is page 17, line 8, through

10  page 21, line 2.

11          (Audiotape played in open court.)

12  **Q.**   If we could turn your attention to page 18, line 5.  Mr.

13  Beker said:  "This is not the ground for presenting it to

14  Ramzi, if that one wants to initiate a lawsuit against you

15  guys."

16     To which you reply on line 8:  "Well, let's put it this

17  way.  If you also help me with the paper that you promised to

18  help me with, I think that I will be covered."

19     What paper were you referring to there in that passage?

20  **A.**   The paper that Michael offered in the past conversation

21  that he would procure from possibly Russian customs.

22  **Q.**   And did you understand what the content of that paper

23  would be?

24  **A.**   That the units would no longer be able to be delivered to

25  ATN.

1  Q.   On page 19, line 3, Mr. Beker said: "You will prepare the

2  draft, whatever kind you need... from whom..."

3       And continues on line 7:  "I will send it there and ask to

4  prepare all business, then you will have the grounds."

5       On line 7 when Mr. Beker states, "I will send it there,"

6  where did you understand "there" to be?

7  A.   Russia.

8  Q.   And the draft that Mr. Beker refers to on line 3, "you'll

9  prepare the draft," what draft did you understand Mr. Beker was

10 referring to?

11 A.   Basically he was asking for me to write the letter that

12 would later be issued by customs.  The letter would

13 theoretically protect ATN from the actions by ITE.

14 Q.   If we could then listen to the next clip, page 21, line 3,

15 through page 30, line 10.

16         (Audiotape played in open court.)

17 Q.   Turn your attention please to page 21, line 7, and Mr.

18 Beker said:  "Because of what happened now, I think that we

19 need some paper for us to sign, together with this invoice,

20 that which we agreed on.  It we take over this contract till

21 the end... with it, we... you guys do everything to help us to

22 fulfill it.  We do everything to help you guys to fulfill it."

23      To which you reply:  "Do you want to send it to me?"

24      Why did you ask that?

25 A.   Because for the first time here Michael brought up an idea

1    of a written agreement between ATN and Newcon.  I wasn't

2    exactly clear on what he wants to write in there, so I ask him

3    if he wants to send me an agreement like that.

4    **Q.**   And on line 18 you then ask:  "Do you, in fact, understand

5    what you are talking about?"

6        Why did you ask that?

7    **A.**   Just a few minutes before Michael mentioned in the

8    conversation that this is -- would be something that he would

9    not let his brother know, and all of a sudden now he wants to

10   put everything on the paper.  And I'm surprised.

11   **Q.**   After this piece, was there additional conversation about

12   a written agreement or proposal between ATN and Newcon?

13   **A.**   Yes.

14   **Q.**   But before that conversation, part of the conversation

15   occurred, did the conversation turn to other papers that might

16   be created?

17   **A.**   Yes.

18   **Q.**   Let's then go to page 21, line 20.  Mr. Beker said:  "I

19   understand only one thing" -- continuing on line 23 -- "that

20   tomorrow I will send request this letter..."

21       Continuing page 22, line 2:  "And the first thing I will

22   be told, and are you going to deliver in accordance with this

23   contract?  I say, yes.  And how would we know?"

24       Who to which you reply:  "You mean, where?"

25       And then on line 7 Mr. Beker says:  "Well, there -- where

1  all this is lying about.  They are waiting.  They know that one

2  way or the other somebody is going to fulfill this contract,

3  one way or the other."

4      When Mr. Beker on line 8 refers to "they know that one way

5  or the other somebody is going to fulfill this contract," what

6  did -- who did you understand that he was referring to?

7  **A.**   Right here the reference is NPZ, supplier of the goggles

8  to ATN.

9  **Q.**   Mr. Beker then goes on page 22, line 10 to say:

10 "Concerning our oral agreements, frankly speaking, I don't know

11 in what form they should be.  And then one would need to

12 prepare Ramzi as well.  And for Ramzi, one would have to

13 prepare him in the light of that which we'll receive from

14 there."

15      Turning first to what begins on line 12, "And then one

16 would need to prepare Ramzi as well," what did you understand

17 Mr. Beker was referring to there?

18 **A.**   Again, we're here back to the paper from Russian customs.

19 Then having that paper ATN could prepare Ramzi; that ATN is --

20 no longer can perform on remainder of phase one.

21 **Q.**   Mr. Beker says starting on line 14, "One would have to

22 prepare him in the light of that which we'll receive from

23 there."

24      What did you understand Mr. Beker was referring to when he

25 said "from there?"

1 **A.** Again from Russian customs.

2 **Q.** Turning to page 23, line 2, Mr. Beker said: "Prepare that

3 draft for the customs, which would... would allow subsequently

4 to prepare the letter from Ramzi."

5 As to which you said, "Okay."

6 Why were you saying, "Okay," why did you say okay there.

7 **A.** Going along I understood what the subject matter was

8 about; that having a letter from customs would allow ATN to

9 prepare the letter for Ramzi.

10 **Q.** And on line 7 Mr. Beker says: "I think that maybe you

11 simply write freely what we decided concerning this contract.

12 You can write everything that you want. If you want to write

13 there everything the way it looks, the amount, well, money and

14 so on... a mini contract."

15 To which you reply: "You..."

16 And Mr. Beker on 14 said, line 14, "But I don't think..."

17 To which you reply, "Do you hear what you are talking

18 about?"

19 Why did you ask, "Do you hear what you are talking about?"

20 **A.** Because I believed that had we put everything on the paper

21 that we just discussed, such document could be used as evidence

22 against ATN or Newcon, and I was surprised that Michael was

23 offering something like that.

24 **Q.** Mr. Beker then said on line 17: "But I think it is bad."

25 To which you replied: "Well, of course it is bad."

1        Why did you say that?

2   **A.**    When I acted surprised, he continued the conversation.

3   He's saying, yeah, I think it's bad and I'm agreeing with him.

4   Of course, it's bad.

5   **Q.**    Mr. Beker then on line 22 said:  "No, I'm talking about

6   two.   I'm talking about two."

7        And on page 24, line 1 says:  "I'm already talking about

8   two."  This is on page 24.

9        To which you replied on line 4:  "That is to say, I don't

10  have any problems...  Where the paper that I need to get in

11  order to cover my ass with Ramzi, as they say."

12       And what paper was that?

13  **A.**    Again, that would be a paper that would be issued by

14  Russian customs that would limit the liabilities of ATN.

15  **Q.**    Okay.  Then continuing on page 24, line 15, Mr. Beker

16  said:  "The second paper, one needs to understand in what form

17  we can" -- continuing to line 19 -- "we can sign it."

18       And then asks on line 21:  "Or you don't want to?  After

19  all, I don't insist.  I'm telling you once again.  It is

20  important for me to understand your position."

21       To which you replied on line 24:  "I wouldn't want to do

22  it."

23       Why did you say that?

24  **A.**    Because that was the first time that the subject of

25  written agreement between ATN and Newcon just was brought up,

1   because this is the second paper that is being discussed here.

2   And I felt at that moment very uncomfortable of putting such

3   agreement on the paper.

4   **Q.**   Turning then to the next page, page 25 of the transcript.

5   On line 2, beginning on line 2 you say:  "As you understand

6   only too well, as it is said by friendly rabbis, this is not

7   kosher."

8        What did you understand the word "kosher" to mean when you

9   used it there?

10  **A.**   The word "kosher" is the -- "not kosher."  There is a

11  religious laws of eating certain food in Jewish religion and

12  eating something that is not kosher or referring to not kosher,

13  that means breaking the law.

14  **Q.**   Why did you say this is not kosher to Mr. Beker here?

15  **A.**   Because outlining the agreement that we just reached, in

16  my opinion, the paper could be used as evidence by someone that

17  we just reached illegal agreement.

18  **Q.**   On page 25, line 13 Mr. Beker said:  "Well, let's put it

19  this way.  If we reach an agreement about something, this is

20  kosher, but if it's also connected with the money, this is no

21  longer kosher."

22       What did you understand Mr. Beker to mean in that

23  statement?

24  **A.**   In theory ATN and Newcon could reach an agreement of some

25  sort.  That's his view; that ATN would assist Newcon somehow to

1  deliver the units, or ATN would not perform on the remainder.

2  But if the money would be involved, that would be a clear

3  indication that this is illegal.

4  **Q.**   When you say "the money would be involved," what do you

5  mean?

6  **A.**   The $75 per pair of goggles that ATN would not deliver.

7  **Q.**   Involved -- the money would not be involved where?

8  **A.**   That Newcon would pay to ATN.  Money involved in this

9  contract.  Agreement.

10  **Q.**   Turning to page 26, line 4 you said.  "Well, let's put it

11  this way.  Do you mind... if I were to give you something like

12  that... after at least I receive the money?"

13       Why did you ask that question?

14  **A.**   My understanding that after the money would be wired, that

15  somehow -- I wanted all these conversations to come to the

16  closure somehow.  And after the money would be received, I

17  wouldn't need to continue doing these conversations.

18  **Q.**   I'm sorry.  Can you repeat?

19  **A.**   I wouldn't need to be -- continue conversations with

20  Newcon.

21  **Q.**   With whom?

22  **A.**   With Newcon, with Michael and Arie.

23  **Q.**   How was the topic of a written agreement between ATN and

24  Newcon left in this conversation?

25  **A.**   Of this agreement?

1  Q.   Of the concept of a written agreement?  How was it left at

2  the end of this conversation?

3  A.   I don't recall exactly, but somebody -- I think he wanted

4  a draft, to prepare a draft or something like that.

5  Q.   Turning -- and at the end of this portion of the

6  conversation, did you have an understanding of what were the

7  next steps to be taken in accordance with your discussion with

8  Mr. Beker?

9  A.   Yes.

10 Q.   And what were they?

11 A.   I think the discussion there, who is going to prepare some

12 drafts of the proposed agreement.

13 Q.   And in addition to the proposal being drafted, were there

14 any other steps to be taken by you or by Mr. Beker?

15 A.   If I could review the transcript?

16 Q.   Would you like to review the transcript to refresh your

17 recollection?

18 A.   Yes, please.

19 Q.   Okay.  So tape 6, transcript 6.  Do you have that in front

20 of you?  And on page 26, line 4 you asked:  "Well, let's put it

21 this way.  Do you mind if we're -- if I were to give you

22 something like that after at least -- I at least receive the

23 money?"

24      That's on page 26.

25 A.   Yes.

1  **Q.**   Do you recall saying that?

2  **A.**   Yes.

3  **Q.**   Okay.  So what did you understand were the -- what, if

4  any, were the next steps to be taken based on your discussion

5  with Mr. Beker?

6  **A.**   The advanced payment should take place, that the -- Newcon

7  should wire the money.

8  **Q.**   And what, if any, other steps were to occur after that?

9  **A.**   And after that I would review the agreement and possibly

10 sign it.

11 **Q.**   Okay.  Now, I would like to turn your attention to

12 page 28, line 7 -- I'm sorry.  Let's back up to page 27, just

13 to create the context.

14     On page 27, line 17 you say:  "I'm simply explaining my

15 contract with Ramzi.  I have everything."

16     And on line 21 say:  "And with the NPZ I only have some

17 details."

18 **A.**   I apologize.  I'm sorry.  I'm not following here.

19 **Q.**   On page 27, do you see on transcript number six?  I should

20 say Exhibit No. 8.  It's -- let me start over again, I

21 apologize.

22     So it's Exhibit No. 138, which is also known as

23 conversation number eight on September 2nd with Mr. Beker.

24 Referring to page 27.

25 **A.**   Yes.

1  Q.   On page 27, line 17 you said:  "Maybe I have copies

2  somewhere.  I'm simply explaining my contract with Ramzi.  I

3  have everything.  And with NPZ I only have, well, some details.

4  Therefore, after all you will need specifically" -- turning to

5  page 28 -- "the number of the contract, when and what."

6       To what were you referring in that portion of the

7  conversation?

8  A.   Where the information Michael would need to provide us

9  with the letter from Russian customs.  He would need the number

10  of the contract between ATN and NPZ, and that information I did

11  not have at 6:00 o'clock in the morning.

12  Q.   You, then, on line 7 ask, page 28:  "And you, well, can't

13  you give advice as to what's better?"

14       Why did you ask that question?

15  A.   I didn't really know what kind of paper would be issued by

16  Russian customs, so I was suggesting him writing it.

17  Q.   And on line 11 you then say:  "After all, they over there

18  won't sign anything indiscriminately."

19       Why did you say that?

20  A.   That I doubted that whatever I would put on the paper

21  would be signed by Russian customs.

22  Q.   And after this discussion, did you then subsequently speak

23  with either Mr. Beker or Mr. Prilik again?

24  A.   Yes.

25  Q.   And when was that, the next conversation?

1  **A.**    I think it was the same day.

2  **Q.**    Who did you speak with?

3  **A.**    Michael again.

4  **Q.**    And how did you come to speak with Mr. Beker?

5  **A.**    I think Jenny or someone from Newcon left a message and

6  then I returned the call.

7  **Q.**    And did you record that conversation?

8  **A.**    Yes.

9  **Q.**    And was that conversation an accurate reflection of the

10  conversation between yourself and Mr. Beker?

11  **A.**    Yes.

12          **MS. HAMILTON:**  So, your Honor, we would move to admit

13  Exhibit 109.

14          **THE COURT:**  109 is admitted.

15          (Trial Exhibit 109 received

16           in evidence)

17          **MS. HAMILTON:**  Thank you, your Honor.

18  **BY MS. HAMILTON**

19  **Q.**    And was an English translation of that conversation made?

20  **A.**    Yes.

21  **Q.**    And did you review it?

22  **A.**    Yes.

23  **Q.**    And did that translation accurately reflect the

24  conversation that you had with Mr. Beker on September 2nd?

25  **A.**    Yes.

1          **MS. HAMILTON:**  And we now move to admit Exhibit 139,

2   your Honor.

3          **THE COURT:**  And 139 is admitted.

4          (Trial Exhibit 139 received

5           in evidence)

6   **BY MS. HAMILTON**

7   **Q.**   Now, you stated that you received a voicemail from a woman

8   named Jenny asking you to call back.  Did you record that

9   portion of the conversation?

10  **A.**   Yes.  I believe so, yes.

11  **Q.**   So let's just listen to that first; page 14, line 14,

12  through page 2, line 9.

13          (Audiotape played in open court.)

14  **Q.**   Did you subsequently return that phone call?

15  **A.**   Yes.

16  **Q.**   All right.  Then let's play that clip, page 2, line 10,

17  through page six, line 13.

18          (Audiotape played in open court.)

19  **Q.**   Turning your attention to page 4, line 6, Mr. Beker said:

20  "In order to transfer the money" -- and then continuing on

21  line 8, "you and I have to sign the paper."

22      What paper did you understand that Mr. Beker was referring

23  to there?

24  **A.**   Now he's referring to a written agreement between ATN and

25  Newcon in regards of remainder of Battalion Set I.

 1  Q.   Mr. Beker said:  "In order to transfer the money, you and

 2  I have to sign the paper."

 3      Was that -- how, if at all, was this statement a different

 4  proposition than what you and Mr. Beker had discussed in the

 5  previous conversation?

 6  A.   Well, in the past conversation the first step should have

 7  been transfer the money, and now there is a paper.

 8  Q.   Let's then, if we could, turn to page 6, line 14, through

 9  page 10, line 5.

10          (Audiotape played in open court.)

11  Q.   So, Mr. Rocklin, if I could turn your attention to page 7,

12  line 7, Mr. Beker said:  "It is needed that Mr. Gaber pick up

13  the phone and call Metelskiy."

14      And again, who is Metelskiy?

15  A.   The director of NPZ, the plant that was supplying night

16  vision goggles to ATN.

17  Q.   Mr. Beker then says on line 20, to:  "Pick up the phone

18  and call him and to say from now on... please, everything that

19  originates from Mikhail Lvovich, this is my name."

20      To which you reply, "I have got it."

21      Why did you say that, "I've got it?"

22  A.   Because I understood that Michael was asking for Lenny to

23  call to NPZ to relate to NPZ that now ATN and Newcon are in

24  agreement.

25  Q.   Now, you grew up in Soviet culture, is that right?

1  **A.**    Yes.

2  **Q.**    That's what you told the jury?

3  **A.**    Yes.

4  **Q.**    In your personal experience, what does the reference to

5  Mikhail Lvovich mean?

6  **A.**    Not so much Soviet culture.  It's Russian language

7  addressing by full name.  Usually you address -- it's a sign of

8  respect, and in this context it's sign of that authority,

9  someone who is giving out orders.

10 **Q.**    And who did you understand Mikhail Lvovich to be?

11 **A.**    Michael Beker.

12 **Q.**    On page 9, line 4, Mr. Beker said:  "It is sufficient for

13 him to call him and say that everything is okay.  We reached an

14 agreement about everything.  Further... all the entire

15 coordination goes through Newcon, Beker and that's it."

16      To which you replied:  "Agreed.  But once again, I have

17 one condition."

18      Turning to line 4, when Mr. Beker says:  "It is sufficient

19 for him to call him."

20      I just want to walk through the pronouns there.  The first

21 one is "is sufficient for him."  Who did you understand that

22 particular phrase, who that "him," "it's sufficient for him" to

23 be?

24 **A.**    Lenny Gaber.

25 **Q.**    So it's sufficient for Gaber to call.  And then there is a

1  second "him," "to call him."  Who did you understand that "him"

2  to be?

3  **A.**   Metelskiy.

4  **Q.**   So it is sufficient for Gaber to call Metelskiy, is that

5  right?

6  **A.**   Yes.  As opposed to no need to put something in writing.

7  **Q.**   And then Mr. Beker says:  "Say that everything is okay.

8  We reached an agreement about everything."

9      What did you understand the agreement of "about

10  everything" to mean in that reference?

11  **A.**   That agreement that we discussed with Michael, where ATN

12  is no longer going to deliver the units, Newcon will.

13  **Q.**   What, if any, agreement was there regarding ATN's

14  supplier?

15  **A.**   At this point I don't think we discussed really a

16  supplier.

17  **Q.**   After this conversation was over, did you receive

18  anything, any communications from Mr. Beker?

19  **A.**   Yes.

20  **Q.**   And what did you receive?

21  **A.**   I think we had the next conversation same day.

22  **Q.**   Did you discuss the -- Mr. Beker and you discussed a

23  proposed written agreement in this last conversation, is that

24  right?

25  **A.**   Yes.

ROCKLIN- DIRECT EXAMINATION / HAMILTON

1   **Q.**   Did you then receive anything from Mr. Beker?

2   **A.**   I received an email with proposed written agreement and --

3   actually, two proposed written agreements.

4   **Q.**   I'm sorry?

5   **A.**   There are two documents, I think, was in there.

6   **Q.**   So you received an email from Mr. Beker?

7   **A.**   Yes.

8   **Q.**   And what was attached to that email?

9   **A.**   A proposed written agreement between ATN and Newcon.

10  **Q.**   And what else?

11  **A.**   And a proposed document that would be originated later on,

12  I think, from the Russian customs.

13  **Q.**   When did you receive that email?

14  **A.**   If you have a copy for me to review?  I think it was the

15  same day.

16  **Q.**   Okay.  You believe it was the same day?

17  **A.**   Yes.

18  **Q.**   Why don't we -- if you could turn your attention to

19  Exhibit 51, which is on tab 8 and 9 and 10 in your binder.

20       Do you have those?

21  **A.**   I don't see those.

22  **Q.**   I think it's in your exhibit binder.

23  **A.**   Oh.

24  **Q.**   There you go.

25  **A.**   Yes.

1  Q.   So do you recognize -- and how many pages did you receive

2  on that day in that email?  Include the email and the

3  attachments all together?

4  A.   Four.

5  Q.   Okay.  And reviewing Exhibit 51, do you recognize this

6  document?

7  A.   It's not marked as an exhibit here.

8  Q.   Okay.  Are you reviewing an email dated September 2nd?

9  A.   Yes.

10  Q.   Okay.  And do you recognize that email?

11  A.   Yes.

12  Q.   What is it?

13  A.   That's an email Michael sent to me.

14  Q.   And when you say "Michael" who do you mean?

15  A.   Michael Beker.

16  Q.   And when was the first time that you saw this email?

17  A.   On September 2nd.

18  Q.   How did it come to your attention?

19  A.   I checked my email box and it was there.

20  Q.   Okay.  At the time you received this email, did you have

21  reason to believe that the computer system used by ATN was

22  accurately sending and receiving emails?

23  A.   Yes.

24  Q.   And who was this email from, again?

25  A.   Michael Beker.

1    **Q.**    And how did you know it was from Mr. Beker?

2    **A.**    It was from his email address and it was -- had his

3    signature.

4    **Q.**    And were there attachments to this email?

5    **A.**    Yes.

6    **Q.**    Looking then at page 2 of Exhibit 51, and page 3 of

7    Exhibit 51, which is tab 9 in your binder, do you see those?

8    **A.**    Yes.

9    **Q.**    And do you recognize them?

10   **A.**    Yes.

11   **Q.**    Those two documents.  And what is it?

12   **A.**    First one is proposed agreement between ATN and the

13   Newcon.

14   **Q.**    When you say the "first one," you mean --

15   **A.**    The first document.

16   **Q.**    Okay.  And how did you get this document?

17   **A.**    It was attachment in that email.

18   **Q.**    And was there anything else attached to the email you

19   received from Mr. Beker on September 2nd?

20   **A.**    Yes.

21   **Q.**    Now, turning your attention to page 4 of Exhibit 51, do

22   you recognize this document?

23   **A.**    Yes.  It was a proposed language -- proposed letter

24   possibly from Russian customs.

25   **Q.**    How did you get this letter?

1    **A.**   It was also attachment in the email.

2          **MS. HAMILTON:**  Your Honor, we would move to admit

3    Exhibit 51.

4          **THE COURT:**  Any objection?

5          **MR. HOWDEN:**  No objection.

6          **THE COURT:**  51 is admitted.

7          (Trial Exhibit 51 received

8           in evidence)

9          **MS. HAMILTON:**  Thank you.

10         **THE COURT:**  Do you intend to publish it?

11         **MS. HAMILTON:**  Yes, your Honor, now that it's

12   admitted.

13         We would like to start by having the jury see page 2

14   of Exhibit 51.

15         And we will go through it in a little more detail,

16   but then page 3 of Exhibit 51.

17         (Document displayed)

18   **BY MS. HAMILTON**

19   **Q.**   What was -- and did you read this proposed written

20   agreement when you received it?

21   **A.**   Yes.

22   **Q.**   What was your reaction?

23   **A.**   That there is no way I'm going to sign something like

24   this.

25   **Q.**   And why was that your reaction?

1   **A.**    Because I thought that this would be a very damaging to

2   ATN document.

3   **Q.**    If -- I would like to turn your attention to the -- to

4   page 3, and -- which starts out:  "Based on the above, the

5   parties agree on the following."

6         And I'm not going to walk through all the terms of the

7   proposed written agreement here, but just ask about some of

8   them.

9         The first is -- and the one I would like to ask about is

10  number two:  "ATN will inform all relevant parties about its

11  decision."

12        Based on your conversation with Mr. Beker, what relevant

13  parties did you understand would be informed -- well, let me

14  back up.  I'm sorry.

15        What did you understand "its decision" to mean in this

16  situation?

17  **A.**    For ATN not to perform on Battalion Set II remainder of

18  phase one.

19  **Q.**    And when the reference is made to relevant parties being

20  informed, what, if any, understanding about who those relevant

21  parties were?

22  **A.**    In discussion it was Ramzi, but here it was a broader

23  understanding.

24  **Q.**    What do you mean?

25  **A.**    All relevant parties, also suppliers and possibly TACOM.

1  Q.   Now, did you understand based on your conversation with

2  Mr. Beker, that you were -- that ATN was to inform relevant

3  parties of the agreement that Newcon would pay ATN $75 for

4  every pair of goggles that Newcon would supply instead of ATN?

5  A.   Well, as the discussion evolved, the agreement initially

6  was that for ATN not to perform, and then everything else was a

7  part of it in terms of how we would need to contact ITE and how

8  Lenny later on would need to contact Metelskiy.

9  Q.   What, if anything, did you understand was to be told to a

10 relevant party about the payment of $75 from Newcon to ATN?

11 A.   Oh, about $75?  Nothing.

12 Q.   What, if anything, did you understand would be -- was to

13 be disclosed to a relevant party, as you've stated, about a

14 $50,000 payment from Newcon to ATN?

15 A.   Nothing.

16 Q.   Why not?

17 A.   Because that could be interpreted as pay-out.

18 Q.   And what do you mean when you say that would be determined

19 [sic] by pay-out?  What do you mean?

20 A.   That Newcon was paying ATN not to perform.

21 Q.   Now, the next portion I would like to ask about is number

22 four:  "ATN will confirm that considering unexpected increases

23 in raw material costs, it is impossible to produce night vision

24 goggles of the required quality and per schedule at earlier

25 agreed pricing."

1      At any time had you discussed raw material costs with Mr.

2  Beker?

3  **A.**    No.

4  **Q.**    Had you ever discussed raw material costs with Mr. Prilik?

5  **A.**    No.

6  **Q.**    Turning then to line -- excuse me, number 8, the last

7  entry:  "Newcon will assist ATN to the best of its ability to

8  compensate for funds (if any) prepaid to Russian suppliers for

9  non-delivered goods."

10      When, if ever, did you have a conversation with Mr. Beker

11  about Newcon assisting ATN to be compensated for prepaid funds

12  to Russian suppliers?

13  **A.**    Never.

14  **Q.**    When, if ever, did you have a conversation with Mr. Prilik

15  about Newcon assisting ATN to compensate for funds prepaid to

16  Russian suppliers?

17  **A.**    Never.

18  **Q.**    What did you understand the prepaid funds -- what, if any,

19  understanding did you have about what the prepaid funds

20  referred to?

21          **MR. HOWDEN:**  Your Honor, that has to be speculation,

22  if he never had any discussions with Mr. Beker and Mr. Prilik.

23          **THE COURT:**  Lay a foundation for it.  Objection is

24  sustained as it is.

25          **MS. HAMILTON:**  Okay.

1  **BY MS. HAMILTON**

2  **Q.**   When -- what, if any, understanding did you have that

3  Newcon would purchase parts of any type from ATN's supplier?

4  **A.**   I never had an understanding of that.

5  **Q.**   What, if any, understanding did you have that Newcon would

6  purchase image intensifier tubes from any of ATN's suppliers?

7  **A.**   I did not have any understanding of that.  We never

8  discussed that.

9  **Q.**   What, if any, understanding did you have that Newcon would

10  purchase the night vision goggle bodies from ATN's supplier?

11  **A.**   There was no understanding of that.

12  **Q.**   So turning to page 1 of the email exhibit -- excuse me,

13  Exhibit 51, which is the email.  Mr. Beker's text says:  "Dear

14  Dmitry:  As discussed, see attached a draft of the agreement

15  which will need to be signed.  Please confirm or comment.  Upon

16  your oral confirmation, we'll conclude the financial issues,

17  and you'll sign the agreement afterward."

18       What was your understanding of the financial issues that

19  were referred to there by Mr. Beker?

20  **A.**   Advance payment of $50,000.

21  **Q.**   Was the advance payment of $50,000 contained in the

22  written agreement anywhere?

23  **A.**   No.

24  **Q.**   Is there any reference to any payment being made by Newcon

25  to ATN in Exhibit 51?

1   **A.**   No.

2   **Q.**   Let me then turn your attention to page 4 of Exhibit 51.

3   What is this?

4   **A.**   That's proposed language, supposed to be of the letter

5   that would be issue from Russian customs.

6   **Q.**   How did Mr. Beker come to send this to you?

7   **A.**   By email.

8   **Q.**   And why -- well, did you understand how it would be used?

9   **A.**   If we would get such letter later on from Russian customs,

10  we could potentially use such letter to -- again, to limit

11  liabilities.  ATN in front of the ITE.

12  **Q.**   In reading this letter, what, if anything, was contained

13  in it that led you to believe it was, in fact, a proposed

14  letter to come from Russian customs?

15  **A.**   Language here that this letter advised that our office is

16  currently evaluating export compliance procedures.  Who else

17  would be evaluating export compliance procedures other than

18  customs?

19  **Q.**   Okay.  And what day did you -- did you receive this email?

20  **A.**   September 2nd.

21  **Q.**   Did you try to -- did you have any further contact with

22  Mr. Beker or Mr. Prilik after that time?

23  **A.**   Not on that day, no.

24  **Q.**   What about after that day?

25  **A.**   Yes.

 1  Q.   Did you try to respond to this email immediately?

 2  A.   No.

 3  Q.   Why not?

 4  A.   I wasn't -- I didn't want to sign this agreement.

 5  Q.   Now, this -- this email is received on September 2nd.  Was

 6  there any event or time occurring in that time frame that also

 7  took your attention away from your interactions with Mr. Beker

 8  and Mr. Prilik?

 9  A.   I think it was a long weekend.  We had to attend a

10  wedding.

11  Q.   And Labor Day weekend?

12  A.   Yes.

13  Q.   Does that sound right?

14       After you returned from work, did you then -- or then you

15  returned back to the offices, did you then speak with Mr. Beker

16  again?

17  A.   Yes.

18  Q.   And how did that conversation come about?

19  A.   Again, I think -- I think Jenny called and left a message,

20  and I returned the call.

21  Q.   When you returned the call, with whom did you speak?

22  A.   With Michael Beker.

23  Q.   And did you record that conversation?

24  A.   Yes.

25  Q.   And have you listened to that conversation that you

1  recorded?

2  **A.**  Yes.

3  **Q.**  And does it accurately reflect the conversation that you

4  had with Mr. Beker on September 7th?

5  **A.**  Yes.

6  **Q.**  And did you subsequently review an English translation of

7  that conversation?

8  **A.**  Yes.

9  **Q.**  And did that English translation accurately reflect the

10  conversation you had with Mr. Beker?

11  **A.**  Yes.

12  **MS. HAMILTON:**  So, your Honor, we would move to admit

13  Exhibit 110, which is the tape recording of the conversation.

14  **THE COURT:**  102?

15  **MS. HAMILTON:**  110.

16  **THE COURT:**  110, okay.  Thank you.

17  110 is admitted.

18  (Trial Exhibit 110 received

19  in evidence)

20  **MS. HAMILTON:**  And the English translation of that

21  conversation 140, we would move to admit.

22  **THE COURT:**  And I gather there is no objection, so

23  140 is admitted.

24  (Trial Exhibit 140 received

25  in evidence)

1              **MS. HAMILTON:**   Thank you, your Honor.

2    **BY MS. HAMILTON**

3    **Q.**   And you testified you had gotten a voicemail, is that

4    right?

5    **A.**   Yes.

6    **Q.**   And did you record that voicemail?

7    **A.**   I did.

8    **Q.**   Let's listen to that portion first, which begins on

9    page 1, line 14, through line 24.

10             (Audiotape played in open court.)

11   **Q.**   Okay.  And just to make sure the record is clear, page 1

12   line 14, through page 1, line 24.

13        Now, in this conversation with Mr. Beker, do you and Mr.

14   Beker discuss the proposed written agreement that we have just

15   reviewed?

16   **A.**   Yes.

17   **Q.**   All right.  Let's listen to, then, page 2, line 1, through

18   page 6, line 14.

19             (Audiotape played in open court.)

20   **Q.**   Turning your attention to page 5, line 19.  You said:

21   "I'm sorry.  It would be so one-sided, one wouldn't be able to

22   show it to anybody."

23        Why did you say that?

24   **A.**   Because I believe that the agreement was full of

25   misrepresentings and lies and could be used against the ATN.

1  Q.   You, then, on page line 21 -- excuse me, page 5, line 21

2  say:  "You understand if you take the money out of this thing,

3  it doesn't make sense."

4       Why did you say that?

5  A.   Why would ATN -- just to me it didn't make any business

6  sense without pay-off money.  Why would ATN act on an agreement

7  like this if there wouldn't be a pay-out.

8  Q.   As president of ATN, you have signed other contracts with

9  other parties, is that right?

10  A.   Yes.

11  Q.   When, if ever, have you entered into a contract in which

12  the payment terms were not included?  If payment terms -- let

13  me just ask that.

14  A.   That would be very unusual.  Never.

15  Q.   Now, after discussing the proposed written agreement, did

16  Mr. Gaber come up as a topic of conversation?

17  A.   Yes.

18  Q.   Let me then turn your attention to page 6, line 15,

19  through page 11, line 3.

20       (Audiotape played in open court.)

21  Q.   Turning your attention to page 8, line 10, you asked Mr.

22  Beker:  "And what would you want me to tell Lyonya?"

23  Continuing on line 13.  "For him to cool off?"

24       Why did you say that?

25  A.   I was asking what Michael wanted from me, because what

ROCKLIN- DIRECT EXAMINATION / HAMILTON

1  exactly did he wanted me to tell Lenny.  That's what I was

2  asking him here.

3  **Q.**   Why did you ask that?

4  **A.**   Because he's keep, umm -- he's keep stating there that why

5  Lenny didn't yet inform Metelskiy that we had reached an

6  agreement.

7  **Q.**   And what, if any, understanding did you have about what

8  Mr. Gaber was to say to Mr. Metelskiy as part of your -- based

9  on your communications with Mr. Beker?

10  **A.**   My understanding was that Michael wanted Lenny to state

11  that now Newcon and ATN is in agreement and to take orders from

12  Michael.

13  **Q.**   On page 9, line 8, you told Mr. Beker:  "I want to take it

14  one step at a time.  First, you make a payment.  Then I'll make

15  a call to the TACOM, and, ah, then we'll be sorting things out

16  with Russia."

17       Why did you include "sorting things out with Russia" as

18  part of this statement?

19  **A.**   Because here the discussion was that one of the things

20  that Michael wanted is that Lenny to give an indication to

21  Metelskiy that now Newcon and ATN is in agreement.

22  **Q.**   Let's then play the next section of this conversation,

23  which is page 11, line 4, through page 16, line 3.

24            (Audiotape played in open court.)

25  **Q.**   Turn your attention to page 11, line 6.  Mr. Beker said:

1   "You want to receive the money from me immediately, as proof of

2   our body motions?"

3        What did you understand "body motions" to mean in this

4   context?

5   **A.**   As a proof of the agreement between two companies, ATN and

6   Newcon.

7   **Q.**   But does "body motions" itself have a particular -- do you

8   have an understanding about that phrase?

9   **A.**   Again, it's my understanding in this could be from

10  physics; two bodies, one moving in relationship to another.

11  **Q.**   Is there a particular phrase in Russian used here that

12  provided you some context of the phrase "body motions"?

13  **A.**   That's the Russian phrase that he's using here.

14  **Q.**   What's the connection to physics?

15  **A.**   Could be from physics, could be physical bodies, human

16  bodies.

17  **Q.**   Okay.  Then on line 21, Mr. Beker said:  "Well, I have the

18  payment.  It's been lying ready since September 1st.  I just

19  didn't sign it."

20       To which you replied, "Well it's your call, man."

21       Why did you say that?

22  **A.**   Because I believed that it was Michael's decision to sign

23  and transfer the money.

24  **Q.**   And was the -- and when you say "the money," what money

25  are you referring to?

1   **A.**   $50,000 advance payment.

2   **Q.**   And was the $50,000 discussed in any more of this

3   conversation?

4   **A.**   Yes.

5   **Q.**   Let's then listen to page 16, line 4 through page 21,

6   line 24.

7          (Audiotape played in open court.)

8   **BY MS. HAMILTON**

9   **Q.**   If I could turn your attention, please, to page 17,

10   line 3, Mr. Beker said,

11              "I signed."

12       What did you understand Mr. Beker had signed?

13   **A.**   The instructions to transfer money.

14   **Q.**   Then on page 18, line 20, you asked Mr. Beker,

15              "We're taking it to the next step,

16          right?"

17       Why did you ask that?

18   **A.**   I want the to confirm that we had an agreement that he

19   will transfer the money.

20   **Q.**   And -- and what was the next step that you refer to?

21   **A.**   The money transfer that's --

22   **Q.**   On page 18, line 22, you said,

23              "And can I tell them to get in touch

24          with you or how -- because you tell me.

25          The website?"

1              And they -- and Mr. Beker, on line 19, page 1, said,

2                  "It is better if we got into contact

3              with ones."

4         And then, on line 3, you said,

5                  "Let me call and tell you with whom to

6              call.  How is that?"

7         And Mr. Beker, on line 5, said,

8                  "Yes."

9         On line 22, who was the "them" that you were referring to?

10                 "How can I tell them to get into touch

11             with you?"

12   A.   Well, previously we were discussing that they -- after get

13   the money, my next step would be to contact TACOM.  And then if

14   TACOM decides to respond to that call, I am finding out what

15   would be the best way of getting in touch with Mike.

16   Q.   And did -- did you receive the payment referred to in this

17   telephone conversation?

18   A.   Yes.

19   Q.   And when did you receive that payment?

20   A.   I think it was next day.

21   Q.   How much was received?

22   A.   $50,000.

23   Q.   And how -- how was it received?

24   A.   The account information of TACOM that I provided to

25   Michael before.

ROCKLIN- DIRECT EXAMINATION / HAMILTON

1  Q.   I'm sorry?

2  A.   To the account information of that account I provided to

3  Michael before.

4  Q.   Now, I'd like to show you what's been marked as

5  Exhibit 99, which is Tab 11 in your binder.  Have you seen this

6  document before?  There's -- to make sure you have the right

7  document, it's dated September 2nd, 2005, on the top.

8  A.   September 7th?

9  Q.   Seventh.  I'm sorry.  September 7, 2005, on the top,

10 entitled, "Wire Services Department."

11      Have you seen that document before?

12 A.   Yes.

13 Q.   And what is it?

14 A.   This is a receipt from Union Bank Wire Services Department

15 that transferred to ATN account for amount of $50,000 from Bank

16 of Nova Scotia; and the originator, Newcon Optik.

17 Q.   When was the first time you saw this document?

18 A.   I think this is the following day, September 8th.

19 Q.   And how was it brought to your attention?

20 A.   My bookkeeper was -- she contacted the bank, and she was

21 informed that she received the funds, and then she told me.

22 Q.   And how did you get the document?

23 A.   I asked bookkeeper to get a receipt from the bank, and

24 then she give me a document.  It was faxed to us or something,

25 and then that's how I got the document.

 1          **MS. HAMILTON:**  Your Honor, the parties have reached a

 2    stipulation regarding this document that has not yet been read

 3    into the record.

 4          **THE COURT:**  Yes.

 5          **MS. HAMILTON:**  And so I'm apologize, because it got

 6    late.  And I don't know if I should read it now -- excuse the

 7    witness, and read it, so that we can then introduce this

 8    document to the jury.

 9          **THE COURT:**  Well, is there something about the

10    contents of the document that would require excusing him?

11          No.

12          **THE COURT:**  Okay.

13          **MS. HAMILTON:**  Okay.

14          **THE COURT:**  Can't you just read it, then, with him

15    remaining there?

16          **MS. HAMILTON:**  Yes, your Honor.

17          So this is what's been marked as Exhibit 149.  So --

18    and it stated,

19               "The United States of America versus

20               Mendel Beker.  Stipulation regarding

21               Union Bank of California.  The

22               United States of America and Defendants

23               Mendel Beker and Arie Prilik, by and

24               through their counsel, hereby stipulate

25               that the bank records introduced as the

1              Government's Exhibit 99 is a true and

2              correct copy of a Union Bank of California

3              record for American Technologies Networks.

4                  The parties further stipulate that the

5              Exhibit 99 meets the evidentiary

6              requirements of bank business record, and

7              of indication under federal rules of

8              Evidence 8036901, and 90211."

9              So at this point, your Honor, here's Exhibit 149.

10   May it be entered into evidence?

11          **THE COURT:**  Okay.  The stipulation is Exhibit 194?

12          **MS. HAMILTON:**  Correct.

13          **THE COURT:**  And it's to admit Exhibit 99?

14          **MS. HAMILTON:**  Correct.

15          **THE COURT:**  And are you asking to admit 99 at this

16   point as well?

17          **MS. HAMILTON:**  I'm also asking to admit Exhibit 99.

18          **THE COURT:**  I gather from the stipulation there's no

19   objection.

20          **MR. OSTERHOUDT:**  No.

21          **THE COURT:**  So Exhibit 99 is admitted into evidence,

22   as well as 149.

23          (Trial Exhibits 99 and 149 received in evidence)

24          **MS. HAMILTON:**  Thank you, your Honor.  So we would

25   now like to publish Exhibit 99 to the jury.

 1            **THE COURT:**  You may do so.

 2            **MS. HAMILTON:**  So if we could zoom in on the portion

 3   that says, "incoming wires" -- no, not that portion.  Down

 4   below, the next piece:  "outgoing wire transfer."  There.

 5   Thank you.

 6   **Q.**  Did you subsequently learn that the $50,000 shown in this

 7   wire transfer was placed in ATN's bank account?

 8   **A.**  Yes.

 9   **Q.**  And how did you learn that?

10   **A.**  From my bookkeeper.

11   **Q.**  All right.  And then what, if anything, did you do with

12   the $50,000?

13   **A.**  I did with the 50,000?

14   **Q.**  What, if anything, did you do with that $50,000?

15   **A.**  Nothing.

16   **Q.**  Did you ever learn what happened to the $50,000?

17   **A.**  My understanding is it was seized by the FBI.

18   **Q.**  After this conversation -- okay.  After receiving this

19   $50,000, did you have any subsequent conversations with either

20   of the defendants?

21   **A.**  Yes.

22   **Q.**  And who was -- who did you have the next conversation

23   with?

24   **A.**  Michael.

25   **Q.**  And when was that conversation?

1   **A.**   Next day.

2   **Q.**   How did you come to have that conversation?

3   **A.**   I mean, I just called.

4   **Q.**   I'm sorry?

5   **A.**   I think I just made a call.

6   **Q.**   Okay.  Was it in response to a call from a Newcon

7   employee, or -- or not?

8   **A.**   I don't recall right now.

9   **Q.**   Okay.  Did you -- and when you say "the next day," what

10  day was that conversation?

11  **A.**   It should be September the 8th.

12  **Q.**   Did you record your conversation on September 8th that you

13  had with Mr. Beker?

14  **A.**   Yes.

15  **Q.**   And have you subsequently listened to that conversation --

16  the tape-recording of that conversation?

17  **A.**   Yes.

18  **Q.**   And does it accurately reflect the conversation you had

19  with Mr. Beker?

20  **A.**   Yes.

21  **Q.**   And did you then listen to -- or review an English

22  translation of that recording?

23  **A.**   Yes.

24  **Q.**   And is that -- does that translation accurately reflect

25  the conversation you had with Mr. Beker?

1  A.   Yes.

2         MS. HAMILTON:  So, your Honor, we would move to admit

3  Exhibit 111, which is the tape-recording between Mr. Rocklin

4  and Mr. Beker on September 8th.

5         THE COURT:  And no objection?

6         MR. HOWDEN:  No objection.

7         THE COURT:  111 is admitted.

8         (Trial Exhibit 111 received in evidence)

9         MS. HAMILTON:  Thank you, your Honor.

10        And then we move to admit Exhibit 141, which is the

11 English translation of the conversation.

12        THE COURT:  Any objection?

13        141 is admitted.

14        (Trial Exhibit 141 received in evidence)

15        MS. HAMILTON:  Thank you, your Honor.

16 Q.   Was the $50,000 wire transfer discussed with Mr. Beker

17 during the September 8th conversation?

18 A.   Yes.

19        MS. HAMILTON:  Just listen to that clip of the

20 conversation from page 1, line 14, through page 3, line 18.

21        (Audio clip played)

22        MS. HAMILTON:  So again, just to make sure the record

23 is very clear page 1, line 14 -- it's through page 6, line 19.

24 Q.   Now, on page 3, line 9, you said,

25        "Well, so steps were taken."

1      Why did you say that?

2  **A.**   Because I was telling Michael, per our agreement, that I

3  will inform him if I know that we received the money.  So,

4  since we received the money, I was informing him that the steps

5  were taken.  Both of us are having an understanding here.

6  **Q.**   And continuing, on page 3, to line 14, you said,

7               "Well, and -- so I'm calling to tell

8            you that we received it, and I'm telling to

9            tell that I made the first step.  I just

10           finished talking.  Do you know who

11           Derek McAleer is, I hope?"

12     On line 15 you say,

13               "I'm calling to tell that we received

14           it."

15     Why did you say "it" there?

16 **A.**   I was referring to the $50,000 advance payment.

17 **Q.**   Okay.  And then on line 1, you said,

18               "Do you know who Derek McAleer is, I

19           hope?"

20     Why did you say that?

21 **A.**   I was informing Michael that, as discussed in the

22 conversation the day before, I made the call to TACOM.

23 **Q.**   And who's Derek McAleer?

24 **A.**   He was contracting officer; point of contact in TACOM.

25 **Q.**   I'm sorry?

1   **A.**    He was a contracting officer in TACOM.

2   **Q.**    Then on line 20, you said,

3              "Well, this is what I started -- I

4              don't know if -- I called him.  He is

5              obviously the main contracting officer on

6              this contract.  And I informed him

7              officially that we are no longer going to

8              perform on this contract; that we have

9              difficulties, and" --

10             Then, turning to page 4 --

11             -- "that he needs to look for another

12             option to close it.  And I mentioned you

13             positively.  And I think you're up for the

14             next step, so to speak."

15         Back to page 3, line 21, you told Mr. Beker,

16             "I called him."

17         Who's the "him" you're referring to there?

18  **A.**    Derek McAleer, at TACOM.

19  **Q.**    And why did you tell Mr. Beker that you called

20  Derek McAleer, at TACOM?

21  **A.**    Because the last conversation, I said that I will.

22  **Q.**    On line 22 you then said,

23              "I informed him officially that we are

24              no longer going to perform on this

25              contract."

1          Why did you say that to Mr. Beker?

2    **A.**    Because that's the step I had to take:  to call TACOM, and

3    inform them that ATN would not perform on the remainder of

4    phase one Battalion Set II.

5    **Q.**    You then, on line 24, say,

6                    -- "and that we have difficulties."

7          Why did you say that to Mr. Beker?

8    **A.**    Well, I had to give the reason of some sort to TACOM why

9    we are not performing, so I said that we had difficulties.

10   **Q.**    Okay.  And then, turning to page 4, line 1, you say,

11                   "And he needs to look for another

12              option to close it."

13         Who's the "he" you're referring to there?

14   **A.**    Derek McAleer.

15   **Q.**    And why did you say, "Derek McAleer," or why,

16                   -- "and he needs to look for another

17              option to close it?"

18         Why did you say that to Mr. Beker?

19   **A.**    Because the agreement was that I would endorse Newcon as a

20   replacement to ATN to fill the remainder of this contract.

21   **Q.**    Okay.  Mr. Beker responds on line 5 of page 4,

22                   "I called you yesterday, first of all,

23              to say that everything had been done.

24              Second of all -- but it is -- but it is,

25              like, I wanted to give you -- to give a

1              piece of advice, or to consult -- in -- in

2              order to move the accents to the

3              Jordanian."

4     When Mr. Beker told you everything has been done, what did

5 you understand him to mean?

6 **A.**   That he wired the money.

7 **Q.**   When you say "the money," what do you mean?

8 **A.**   $50,000.

9 **Q.**   And then on -- beginning on line 8, Mr. Beker says,

10              "I wanted to give you a piece of advice

11              or to consult, in order to move the accents

12              to the Jordanian."

13     What did you understand him to mean -- "in order to move

14 the accents to the Jordanian"?

15 **A.**   If ATN was in contact with TACOM, one of the reasons to

16 explain why ATN was not delivering was to blame Ramzi for not

17 paying.

18 **Q.**   On line 11, Mr. Beker said,

19              "Because I talked with my colleagues

20              from Anham --

21              Continuing.  14.

22              -- "well, with Farouki."

23     Who did you understand Farouki to be?

24 **A.**   Principal of Anham.

25 **Q.**   And on line 18, then, Mr. Beker said,

ROCKLIN- DIRECT EXAMINATION / HAMILTON

1              "So, well, over there, his song is sung

2              one hundred percent; that is to say, he

3              will have no continuation of the contract."

4      When Mr. Beker said "his song is sung," to whom did you

5  understand he was referring?

6  **A.**    To ITE and Ramzi.  He was indicating here that -- one

7  hundred percent, that he will not get the continuation of the

8  contract.

9  **Q.**    When you -- just going back for a moment to page 3, line

10 24, when you told Mr. Beker, "We have difficulties," at that

11 point in time, what, if any, was -- were there difficulties, to

12 the point that ATN -- were there difficulties that ATN

13 experienced with the Battalion Set II contract -- the

14 Battalion Set II contract, to the point where ATN would

15 withdraw from that; from supplying those night-vision goggles?

16 **A.**    No.

17 **Q.**    Now, in this conversation with Mr. Beker, was Lenny Gaber

18 again discussed?

19 **A.**    Yes.

20         **MS. HAMILTON:**  Let's turn to page 6, line 15, through

21 page 10, line 9.  If you could, play that, please.

22         (Audio clip played)

23 **BY MS. HAMILTON**

24 **Q.**    If I could turn your attention, please, to page 6,

25 line 17.  Mr. Beker says,

1          "I'm going to ask you, in accordance

2          with our agreements, to tell Lyonya."

3          Continuing on, at line 21,

4          "Let him call and tell him what he

5          deems necessary.  It makes no difference to

6          me."

7          Continuing on line 24,

8          "But basically he has to say something,

9          because they, themselves, don't know what

10         to do now."

11     And on page 7, line 2, you respond.

12          "I understand."

13     Why did you say that?

14  **A.**  Because at this point of the conversation, I understood

15  Michael was asking me to ask Lenny to make a call to Metelskiy,

16  to NPZ, and tell him to start taking orders -- or instructions

17  from Michael.

18  **Q.**  Did the subject of the proposed agreement -- written

19  agreement -- come up in this conversation with Mr. Beker?

20  **A.**  Yes.

21  **Q.**  All right.  Let turn, then, to page 10, line 7, through

22  page 11, line 13.

23     (Audio clip played)

24          **MS. HAMILTON:**  Now, does this continue playing,

25  page -- line -- page 11, line 14, through page 13, line 19, but

```
 1   I think --
 2              (Audio clip played)
 3   BY MS. HAMILTON
 4              THE COURT:  What is the --
 5              THE WITNESS:  Your Honor, I'd like to apologize.  I
 6   didn't realize that this is a touchscreen.  I was trying to
 7   just remove something.
 8              MS. HAMILTON:  Is that where the arrow came from?
 9              THE COURT:  I just swiped it with my hand, and then
10   the line appears.  I see a lot of --
11              THE COURT:  Can you undo the line?
12              THE WITNESS:  I don't know how.  I'm not --
13              THE COURT:  Well, you did it.  You'll have to fix it.
14              THE CLERK:  I don't know how to clear it, either.
15              THE WITNESS:  It says "Clear" and "Undo."  I don't
16   see any buttons here.
17              UNIDENTIFIED SPEAKER:  Can you bring something up?
18              THE COURT:  Maybe the last page it was on.
19              THE CLERK:  Thank you.
20              MS. HAMILTON:  With one touch of one finger.
21              MR. HOWDEN:  I thought that was important.
22              MS. HAMILTON:  Not prejudicial.
23              Then let's go ahead and play page 13, line 20,
24   through page 18, line 19.
25         (Audio clip played)
```

1      **MS. HAMILTON:**  And then go ahead, please, and play

2   page 18, line 19, through page

3          (Audio clip played)

4      **MS. HAMILTON:**  If you could, pull up page 19, please.

5   **Q.**  On line 11, you state,

6              "I received the money today.  Now there

7          will be different valuable instructions."

8      **MS. HAMILTON:**  I'm sorry.  If you could -- and

9   highlight from line 6 through line 12.

10  **Q.**  Why did you say that?

11  **A.**  I just wanted to finish the conversation, so that's why I

12  stated it.

13  **Q.**  When Mr. Beker said, on line 6,

14              "After all, all that I ask is for

15          Lyonya to call.  As long as he

16          interferes -- it's not because I want him

17          to call, but -- call.  He calls and gives

18          completely different valuable instructions;

19          not the ones upon which we agreed,"

20      -- what were the valuable instructions that you understood

21  had been agreed to with regard to Lenny Gaber at that point?

22  **A.**  Well, he was supposed to call, and tell me to ask me to

23  start taking orders from Michael.  And he wasn't giving those

24  instructions.

25  **Q.**  And when you say, "start taking orders from Michael," what

1   do you mean?

2   **A.**   We discussed that.  He said in the past that Lenny should

3   call, and tell him that ATN and Newcon is now in agreement, and

4   they should take instructions from me.  And that's it.

5              **MS. HAMILTON:**  Now, turning to page 20, line --

6              What I'd like to do -- excuse me -- is now play page

7   20, line 9, through page 21, to the end.

8              (Audio clip played)

9   **BY MS. HAMILTON**

10  **Q.**   So if I could now turn your attention to page 20, line 10,

11  Mr. Beker said,

12              "Now, keeping in mind that I am flying

13              away, I will probably tell Arie regarding

14              his dealings with TACOM -- well, if he gets

15              in touch with you, then you can discuss

16              with him in its entirety."

17       And then he continues on line 16.

18              "Everything that is needed.  Well,

19              there are details there that are -- we

20              discussed money.  We -- either way, he

21              already knows, therefore, here already,

22              basically."

23       And then on line 22,

24              "You can discuss whatever you like.  He

25              is not going to make a decision, but you

1          can discuss."

2      On line 17, Mr. Beker says,

3              "We discussed money."

4      What did you understand him to mean by, "We discussed

5  money"?

6  A.   My understanding that Mr. Beker here is relating to me

7  that Arie is in the loop on $50,000, and perhaps $75 for a pair

8  of goggles.

9  Q.   And on line 13, when Mr. Beker said, "You can discuss with

10 him in it entirety," and then, line 16, "everything that is

11 needed," what did you understand Mr. Beker to mean there?

12 A.   The -- whatever we discussed with Beker:  the agreement.

13 Q.   I'm sorry.  I just didn't hear you.  I'm sorry.

14 A.   Oh.  I said the -- I and Arie could discuss anything and

15 everything in its entirety:  the agreement that I discussed

16 previously with Michael.

17 Q.   Thank you.  And did you subsequently speak with Mr. Prilik

18 after this conversation?

19 A.   Yes.

20 Q.   And, based on this conversation with Mr. Beker, had --

21 had -- did you -- were you surprised when Mr. Prilik called

22 you?

23 A.   No.

24 Q.   Why not?

25 A.   Because he told me in this conversation that Arie might

1    follow up.

2    **Q.**    And when was the next time you spoke with anyone from

3    Newcon?

4    **A.**    It was some time after.  I don't remember.  It was -- I

5    want to say over a week or ten days; something like that.

6    **Q.**    Who was it that you spoke with next from Newcon?

7    **A.**    Arie.

8    **Q.**    And how did you come to speak with him?

9    **A.**    I think he called me.

10   **Q.**    And did you record that conversation?

11   **A.**    Yes.

12   **Q.**    And have you listened to a recording of that conversation?

13   **A.**    Yes.

14   **Q.**    And does that recording accurately reflect the

15   conversation that you had with Mr. Prilik?

16   **A.**    Yes.

17   **Q.**    And have you then listened to an English translation -- or

18   excuse me -- read an English translation of that conversation?

19   **A.**    Yes.

20   **Q.**    And does that conversation -- that English translation

21   accurately reflect the conversation that you had with -- the

22   next conversation that you had with Mr. Prilik?

23   **A.**    Yes.

24            **MS. HAMILTON:**  So, your Honor, we would move to admit

25   Exhibit 113, which is the tape-recording of the conversation

1   that Mr. Prilik -- Beker -- Mr. Rocklin recalls having with

2   Mr. Prilik; and then admitting Exhibit 142, which is the

3   English translation of that document.

4           **THE COURT:**  Is it 112, or 113?

5           **MS. HAMILTON:**  It's 113 and 142.

6           **THE COURT:**  Oh, okay.  Got us confused a little bit.

7           **MS. HAMILTON:**  I'm sorry.

8           **THE COURT:**  112, then.  No objection to either of

9   those.  Is that correct?

10          **MR. OSTERHOUDT:**  No objection.

11          **MS. HAMILTON:**  113.

12          **THE COURT:**  113 and 142 are admitted.  Thank you.

13          (Trial Exhibits 113 and 142 received in evidence)

14  **BY MS. HAMILTON**

15  **Q.**   So let's listen -- and -- did you recall how you came to

16  talk to or speak with Mr. Prilik?

17  **A.**   Yeah.  Either I called, returning his call, or he called,

18  and --

19  **Q.**   Okay

20  **A.**   -- and I was in my office.

21          **MS. HAMILTON:**  All right.  Well, then, let's play the

22  first -- the first clip, page 2, line -- line 4, through page

23  4, line 24.

24          (Audio clip played)

25  **Q.**   Play page 5, line 1, through page 10, line 2.

 1          (Audiotape played in open court.)

 2  **Q.**   If you could turn your attention to page 6, line 24,

 3  through to the beginning of page 7; but starting at page 6,

 4  line 24.  Mr. Prilik said:  "Michael asked me to find out

 5  whether you talked again with TACOM, whether there were some

 6  further communications."

 7          To which you replied:  "No.  As of today, no.  I made one

 8  call which I told him."

 9          When you said "which I told him," to whom did you refer?

10  **A.**   To Michael Beker.

11              **MS. HAMILTON:**  Your Honor, there is one more section

12  to play on this.

13              **THE COURT:**  Same tape?

14              **MS. HAMILTON:**  But between the playing of the section

15  and the questions it's probably another 10 minutes or so.

16              **THE COURT:**  Can we just manage to finish that up

17  everybody?

18              (Jury panel nodding affirmatively.)

19              **THE COURT:**  Okay.

20              **MS. HAMILTON:**  Thank you.  Thanks for the

21  perseverance.

22  **BY MS. HAMILTON**

23  **Q.**   If we could go page 10, line 3, to page 14 till the end,

24  which is on line 18.

25              (Audiotape played in open court.)

1  **Q.**   If you could turn your attention first to page 10,

2  beginning at line 13.  You said: "I understand.  I spoke about

3  it with Michael.  I believe that it needs to be done one step

4  at a time."

5       When you said "it" there, what were you referring to?  "I

6  spoke about it," stated on line 13?

7  **A.**   Here we were talking about the written contract.

8  **Q.**   And when you say the written contract, what do you mean?

9  **A.**   Proposed written agreement that was sent to me from

10  Newcon.

11  **Q.**   Prior to this conversation had you discussed the proposed

12  written agreement with Mr. Prilik before?

13  **A.**   No.

14  **Q.**   You then say, line 13:  "I believe that needs to be done

15  one step at a time."

16       To which Mr. Prilik replies, starting on line 16:  "Yes,

17  one step at a time.  We... Michael took the first step.  And my

18  understanding was that, after that you would review it and

19  offer your edited version."

20       When Mr. Prilik referred to "the first step" on line 17,

21  what did you understand him to be referring to?

22  **A.**   The payment of $50,000.

23  **Q.**   Why was that your understanding?

24  **A.**   Because that was the agreement with Michael, and they took

25  that step.  They wired the money.

1  Q.   Turning your attention to page 12, line 16.  You asked Mr.

2  Prilik:  "And why do you need such a contract?  Explain it to

3  me."

4       Why did you ask that question?

5  A.   I just wanted to understand what was the purpose of having

6  such agreement.  How is it going to be used?

7  Q.   Mr. Prilik responds on line 18:  "Because money loves to

8  be counted..."  Are you familiar with that phrase, "money loves

9  to be counted"?

10  A.   It's a translation, pretty much exact translation from

11  Russian.

12  Q.   And what's your understanding of the -- of the -- in the

13  context of the spoken Russian, your understanding of what

14  "money loves to be counted"?

15  A.   In this context, the agreement would act as a receipt for

16  the payment of 50,000.

17  Q.   On page 13, line 14, you said:  "As of today, I don't

18  quite understand why you guys need it."

19       To which Mr. Prilik replied on line 16:  "It's needed from

20  a purely legal standpoint between us, so that one would

21  understand the money movement, and then..."

22       And on line 20 you said:  "Money is not mentioned there...

23  in any way."

24       Why did you say "money is not mentioned there... in any

25  way"?

1  **A.**    Because this is the second time Arie is mentioning that

2  this is, agreement would be a receipt for $50,000, but $50,000

3  or any other exact money are not mentioned in that contract or

4  agreement.

5  **Q.**    So when Mr. Prilik refers to "the money movement" on line

6  18, what did you understand him to mean by "the money

7  movement"?

8  **A.**    Advance payment of $50,000 (moment) movement).

9  **Q.**    Turning to page 14, line 2, Mr. Prilik said:  "And the

10 second question.  Your further help will be required.  It's

11 just that we don't know yet how, most likely.  I will start

12 with TACOM again, and talk to them next week.  It very well may

13 be that we'll have to involve you again."

14      To which you replied:  Well, we'll be working."

15      And Mr. Prilik then says: "Yes.  Because, yes.  I think

16 you guys would also want to earn, okay?"

17      And you reply on line 11:  "Yes, okay."

18      What did you understand Mr. Prilik to mean when he said:

19 "You guys" -- "you guys would also want to earn"?

20 **A.**    To earn beyond the first advance payment of $50,000.  So

21 that's the indication.

22      He was also aware of agreement for $75 per each goggle

23 that was not going to be delivered.

24 **Q.**    Had you discussed the $75 amount with Mr. Prilik at any

25 time?

1   **A.**   No.

2             **MS. HAMILTON:**  So, your Honor, that's -- that

3   concludes take 13 -- or Exhibit 111.

4             **THE COURT:**  Okay.

5             **MS. HAMILTON:**  112.

6             **THE COURT:**  1-1-2, right?

7             **MS. HAMILTON:**  Right.

8             **THE COURT:**  Okay.  Now, so that the jurors don't lose

9   hope and think that it only springs eternal, right, that as I

10  see it, we have one more tape with Mr. Rocklin.

11            **MS. HAMILTON:**  Yes, one more.

12            **THE COURT:**  Very short one.  Is that correct?

13            **MS. HAMILTON:**  Yes.

14            **THE COURT:**  Okay.  Well, there you are.  We'll save

15  that one for Tuesday then.  And you understand that's when we

16  will be reconvening.

17            So if you would take your notebooks and leave them in

18  your envelopes in the jury room, please, and follow the

19  instructions about not discussing the case amongst yourself or

20  anyone else or form or express any opinion based upon what you

21  heard so far.  Don't do any Googling or researching or

22  investigating or Twittering or whatever one does these days,

23  you know, all the various forms of communications, about the

24  case or looking into the case or anything like that.

25            And I'm sure after today you'll be happy to think

1  about some other things besides this, right?  There are other

2  things in life and you're going to pursue them this long

3  weekend.

4             So I trust you'll all have a very good weekend and we

5  will see you back here on Tuesday morning at 8:30.  Thank you

6  very much.

7             (Jury exits courtroom at 1:37 p.m.)

8             **THE COURT:**  You may step down, Mr. Rocklin.  I remind

9  you again you are still under the admonition not to discuss the

10 matter with any other persons who may be witnesses in the

11 proceeding.  But you may step down, thank you.

12            (Witness steps down.)

13            **THE COURT:**  Now, how much longer are you going to be

14 with Mr. Rocklin?

15            **MS. HAMILTON:**  There is tape 14, and then we have

16 very little left to follow up after that.  About 30 minutes at

17 the most.  And the final recording, I can actually even tell

18 you the time...

19            **THE COURT:**  Number 14?

20            **MS. HAMILTON:**  Number 14 --

21            **THE COURT:**  That's a relatively short one, I think.

22            **MS. HAMILTON:**  Yes.

23            **THE COURT:**  I think, as I recall from sizing them up

24 earlier.

25            And then cross-examination, which, I imagine, is

1    going to take most of the rest of the day if not all of it,

2    right?

3              MR. HOWDEN:  I would anticipate it, your Honor.

4              MR. OSTERHOUDT:  It could.

5              THE COURT:  All right.  And then who is going to be

6    your next witness in order -- or witnesses, I should say, in

7    order?

8              MS. HAMILTON:  Special Agent Haynie will testify, and

9    then we'll have, then, our paralegal just introduce, very

10   quickly, our 1006 summary chart of the communications that

11   occurred and relevant communications.  And then Derek McAleer,

12   we anticipate, at this point to be our last witness.

13             THE COURT:  Okay.  Yes.

14             MR. OSTERHOUDT:  Your Honor, I wanted to raise.  We

15   had before trial subpoenaed Jeffery Bean, who is a contract

16   officer also, and we interviewed pretrial and so did the

17   government.  There was some proceedings before trial on the

18   admissibility issue and it was determined he could testify and

19   there was some strictures about the subject matter.

20             Well, we had subpoenaed Mr. Bean for, actually,

21   the -- actually the 14th, actually today.

22             THE COURT:  That would have been.  Still is, I guess.

23             MR. OSTERHOUDT:  And yesterday we tried to -- my

24   fault, but upon recalling that, we made efforts to get ahold of

25   TACOM, the officer who -- or the attorney who has been handling

PROCEEDINGS                                    600

1  matters for TACOM.  She wasn't available.  There was a machine

2  said she was out.  We went all the follow-ups to try to see if

3  we could.  We couldn't.

4          Today she returned the message.  She, apparently,

5  attorney Tiffany Hall's is her name.  She's in San Francisco,

6  actually.  She said Mr. Bean was, apparently, scheduled to come

7  in today from TACOM in Michigan.  And I'm sorry to

8  inconvenience him.  I know he has good things to do.

9          I was going to suggest though that -- that if we

10 could have Mr. Bean on call, perhaps, because the government's

11 case, seems to me, is going to take probably not all of next

12 week, but by the time we have the agent --

13         **THE COURT:**  A couple more witnesses.

14         **MR. OSTERHOUDT:**  (Continuing) -- and McAleer, it

15 probably will be toward the end of the week before we get to

16 Mr. Bean.  I would like him to be able to go back to work.  Of

17 course, that's our responsibility to compensate him for that,

18 but I would like him to go back to work and be able to come

19 back when it is necessary.

20         **THE COURT:**  That's fine.  Maybe by the end of

21 Tuesday, maybe we can give him a better idea.

22         **MR. OSTERHOUDT:**  Right.

23         **THE COURT:**  Where is he headquartered?  In Michigan?

24         **MR. OSTERHOUDT:**  Warren, Michigan.

25         **THE COURT:**  If I were he, I would prefer to just stay

PROCEEDINGS

1    here and work from here.

2           **MR. OSTERHOUDT:**  Mr. Howden and I went there and

3    certainly enjoyed it very much.

4           **THE COURT:**  Did you go in January?

5           **MR. OSTERHOUDT:**  Well, you really should take a

6    camera when you go, but...  And the prosecution also went

7    there, too.  Warren, Michigan.

8           So, anyway, I just want to put on the record we are

9    sorry any inconvenience we caused him not letting him know

10   earlier, but we --

11          **THE COURT:**  Well, this is TACOM's case, so those

12   things happen.  And you can't be accused of having siphoned off

13   all the time.

14          **MR. OSTERHOUDT:**  They'll get a tank in there somehow,

15   I guess...

16          **THE COURT:**  Okay.  So we will see you then on Tuesday

17   at 8:30.

18          **MR. OSTERHOUDT:**  Thank you very much.

19          **MR. HOWDEN:**  Very good your Honor.

20          **THE COURT:**  Have a very, very nice long weekend.

21          (Whereupon at 1:41 p.m. further proceedings

22

23          in the above-entitled cause was adjourned

24          until Tuesday, January 18, 2011 at 8:30 a.m.)

25                         -  -  -  -

Lydia Zinn, CSR, CRR, and Debra Pas, CSR, CRR
Official Reporters - U.S. District Court
(415) 531-6587

PROCEEDINGS                                            602

**I  N  D  E  X**

**PLAINTIFF'S WITNESSES**                          **PAGE**      **VOL.**

Direct Examination Resumed by Ms. Hamilton          490          4

**E X H I B I T S**

**TRIAL EXHIBITS**              **IDEN**   **VOL.**   **EVID**   **VOL.**

| | | | |
|---|---|---|---|
| 106 | | 493 | 4 |
| 136 | | 493 | 4 |
| 4 | | 521 | 4 |
| 2 | | 523 | 4 |
| 3 | | 527 | 4 |
| 47 | | 529 | 4 |
| 108 | | 534 | 4 |
| 138 | | 535 | 4 |
| 109 | | 553 | 4 |
| 139 | | 554 | 4 |
| 51 | | 561 | 4 |
| 110 | | 568 | 4 |
| 140 | | 568 | 4 |
| 99 and 149 | | 577 | 4 |
| 111 | | 580 | 4 |
| 141 | | 580 | 4 |
| 113 and 142 | | 592 | 4 |

Lydia Zinn, CSR, CRR, and Debra Pas, CSR, CRR
Official Reporters – U.S. District Court
(415) 531-6587

### CERTIFICATE OF REPORTER

WE, LYDIA ZINN, and DEBRA PAS, Official Reporters for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in CR. 07-765 MHP, United States of America v. Mendel Beker, et al., were reported by us, certified shorthand reporters, and were thereafter transcribed under our direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by us at the time of filing

The validity of the reporters' certification of said transcript may be void upon disassembly and/or removal from the court file.


_____/s/ Lydia Zinn_____
               Lydia Zinn, CSR 9223, CRR


_____/s/ Debra L. Pas_____
               Debra L. Pas, CSR 11916, CRR


               Friday, January 14, 2011