Volume 5

Pages 603 – 770

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARILYN HALL PATEL

UNITED STATES OF AMERICA,                    )
                                             )
                 Plaintiff,                  )
                                             )
   vs.                                       ) NO. CR. 07-0765 MHP
                                             )
MENDEL BEKER, ARIE PRILIK, and               )
NEWCON INTERNATIONAL,                        )
                                             ) San Francisco, California
                 Defendants.                 ) Tuesday
                                             ) January 18, 2011
_____) 8:43 a.m.


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
**For Plaintiff:**              U.S. Department of Justice
                                Antitrust Division
                                450 Golden Gate Avenue, Room 10-0101
                                San Francisco, CA  94102-3478
                                (415) 436-6673
                                (415) 436-6687 (fax)
                        BY:  **DAVID J. WARD**
                             **ANNA TYRON PLETCHER**
                             **RICHARD B. COHEN**
                             **JEANE HAMILTON**




(Appearances continued on next page)

604

```
 1   APPEARANCES (CONT'D)

 2   For Defendants:        Winston & Strawn, LLP
                            101 California Street
 3                          San Francisco, CA  94111
                            (415) 591-1439
 4                          (415) 591-1400 (fax)
                     BY:  JONATHAN ROBERT HOWDEN
 5
     For Defendants:        Martha A. Boersch
 6                          Attorney at Law
                            555 California Street, 26th Floor
 7                          San Francisco, CA  94104
                            (415) 626-3939
 8                          (415) 875-5700 (fax)
                     BY:  MARTHA A. BOERSCH
 9
     For Defendants:        Law Offices of William L. Osterhoudt
10                          135 Belvedere Street
                            San Francisco, California  94117-3915
11                          (415) 664-4600
                            (415) 664-4691 (fax)
12                   BY:  WILLIAM L. OSTERHOUDT

13   For Defendants:        Law Offices of Frank S. Moore
                            235 Montgomery Street, Suite 854
14                          San Francisco, CA  94104
                     BY:  FRANK S. MOORE
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2   January 18, 2011                              8:43 a.m.

 3            (Jury in at 8:43 a.m.)

 4            THE COURT:  You may be seated.

 5            Good morning, ladies and gentlemen.

 6            THE JURORS:  Good morning.

 7            THE COURT:  It's been a long time, huh?

 8            And good morning to you, Mr. Rocklin.  I remind you

 9   you're still under oath, and the oath will not be

10   readministered.

11            And you may continue.

12            (Witness resumes stand.)

13            MS. HAMILTON:  Thank you, your Honor.

14                  DIRECT EXAMINATION RESUMED

15   BY MS. HAMILTON

16   Q.  So, Mr. Rocklin, when we left off on Friday, we had just

17   finished up a conversation that you had had with Mr. Prilik on

18   September 20th.  Do you recall?

19   A.  Yes.

20   Q.  Okay.  Now, at the -- did you have any communications with

21   any -- either Mr. Prilik or Mr. Beker after September 20th?

22   A.  Yes.

23   Q.  And who did you communicate with?

24   A.  Mr. Beker.

25   Q.  And was that a telephone conversation?
```

1   **A.**   Yes.

2   **Q.**   How did that conversation come about?

3   **A.**   I think I dialed after a message was left.

4   **Q.**   After a message was left by whom?

5   **A.**   I don't recall right now.  I think it was Jane.

6   **Q.**   Okay.  And when was that conversation with Mr. Beker?

7   **A.**   September 4th.

8   **Q.**   Okay.  Well, the last conversation with Mr. Prilik was

9   September 20th.

10   **A.**   Oh, I'm sorry.  So it would be October.

11   **Q.**   In October.

12   **A.**   Right.

13   **Q.**   And in that conversation with Mr. Beker, did you record

14   it?

15   **A.**   Yes.

16   **Q.**   And have you listened to the recording that you made of

17   that conversation with Mr. Beker?

18   **A.**   Yes.

19   **Q.**   And was that -- did that recording accurately reflect the

20   conversation you had with Mr. Beker?

21   **A.**   Yes.

22   **Q.**   Okay.

23           **MS. HAMILTON:**  So, your Honor, we would now move to

24   admit Exhibit 114, which is the recording of the conversation

25   between Mr. Beker and Mr. Rocklin.

ROCKLIN- DIRECT EXAMINATION / HAMILTON

1          **THE COURT:**  114.

2          **MR. OSTERHOUDT:**  (Shakes head from side to side)

3          **THE COURT:**  No objection.  114 is admitted.

4          (Trial Exhibit 114 received in evidence)

5   **BY MS. HAMILTON**

6   **Q.**  And did you subsequently review a transcript -- English

7   transcript of that conversation with Mr. Beker that's

8   Exhibit 114?

9   **A.**  Yes.

10  **Q.**  And did that English translation accurately reflect the

11  conversation that you had with Mr. Beker?

12  **A.**  Yes.

13          **MS. HAMILTON:**  Then, your Honor, the United States

14  would move to admit Exhibit 143, which is the English

15  translation of that.

16          **THE COURT:**  I assume there's no objection, so 143 is

17  admitted.

18          (Trial Exhibit 143 received in evidence).

19  **BY MS. HAMILTON**

20  **Q.**  Now, from August 18th -- before we go to the conversation,

21  from August 18th through this conversation, what was the status

22  of ATN's deliveries for night-vision goggles under the

23  Battalion Set II contract?

24  **A.**  I think at this point, we restarted deliveries.

25          **MS. HAMILTON:**  Okay.  So, if we could, then

ROCKLIN- DIRECT EXAMINATION / HAMILTON

1              play the first passage, which is page two,

2              line 2, through page 5, line 22.

3              (Audio clip played)

4  **BY MS. HAMILTON**

5  **Q.**   Okay.  So let me ask you first, after listening to the

6  recording, now do you recall when this conversation occurred?

7  **A.**   Yes.

8  **Q.**   And when was that?

9  **A.**   October 4th.

10 **Q.**   Okay.  Thank you.  I'd now like to turn your attention to

11 page 13 -- excuse me -- page 3, line 19.

12      Mr. Beker said,

13              "I have transferred the money like the

14              advance."

15      What did you understand the word the "advance" to mean, in

16 this context?

17 **A.**   The $50,000 that were previously transferred.

18 **Q.**   Okay.  Excuse me.

19      Mr. Beker then said,

20              "You said, 'Money first.  All the rest

21              is later.  Later -- there is nothing.'"

22      -- to which you replied, on line 23,

23              "And what else is needed?"

24      Why did you say that?

25 **A.**   I just wanted to hear what Mr. Beker was dissatisfied

 1  with.

 2          **MS. HAMILTON:**  Let's then, if we can, play the next

 3  clip, which is page 5, line 23, through page 9, line 14,

 4  please.

 5          (Audio clip played)

 6          **MS. HAMILTON:**  And then -- so let's just go ahead and

 7  play the next piece, which is page 9, line 10, through page 10,

 8  line 6, please.

 9          (Audio clip played)

10  **BY MS. HAMILTON**

11  **Q.**  If I could please turn your attention to page 9, line 21,

12  you said to Mr. Beker,

13              "Really try to understand that.  I

14          can't do what you are asking me."

15          Why did you say that?

16  **A.**  Well, I think here, the discussion was in regards to the

17  written agreement, and I wasn't planning to sign it.

18  **Q.**  Mr. Beker then replied, on page 10, line 3.

19              "First of all, I'm not asking -- I paid

20          for it."

21          What did you understand Mr. Beker to say, "I paid for it"?

22  **A.**  Well, the advance payment.  The $50,000 was paid.

23  **Q.**  And what did you understand "it" -- the reference to

24  "it" -- to mean that Mr. Beker made?

25  **A.**  For ATN to coöperate with the Newcon to -- not to deliver

 1  to goal to TACOM, and inform them that we no longer will

 2  supply.

 3      And here he is also implying that the written agreement

 4  was part of the overall agreement.

 5              **MS. HAMILTON:**  If we could, then, play the last part

 6  of the last tape, which is page 10, line 7, through the end,

 7  which is page 19, line 9.

 8              (Audio clip played.)

 9  **BY MS. HAMILTON**

10  **Q.**   If I could turn your attention, please, to page 11,

11  line 21.  Mr. Beker said?

12              ":  You understand only too well that you

13              could not continue working.

14              Was that an accurate statement?

15              **THE WITNESS:**  No.

16  **Q.**   Why not?

17  **A.**   ATN had and me personally full intentions on working and

18  for filling this contract.  And we did.

19  **Q.**   I'm sorry?

20  **A.**   And we did.

21  **Q.**   After this conversation on October 4th, 2005, did you ever

22  speak with Mr. Beker again?

23  **A.**   No.

24  **Q.**   And did you ever speak with Mr. Prilik again?

25  **A.**   No.

1   Q.   What, if any, legal action did the defendants take after

2   the October conversation?

3   A.   At first, we received a formal e-mail demanding a loan

4   money back.  And then we received a registered letter with the

5   same demand; now official.  And later on, I think next year, in

6   February, Newcon filed for a lawsuit, demanding the money back.

7   Q.   Okay.  So I'd like to turn your attention to what's been

8   previously marked as Exhibit 48, which is Tab 14 in your

9   binder.  Do you have Tab 14?

10  A.   Yes.

11  Q.   And do you recognize this document?

12  A.   Yes.

13  Q.   What is it?

14  A.   Summons.

15  Q.   Summons for what?

16  A.   To appear in court.  And it's a summons for the lawsuit in

17  the Superior Court of California, filed by Newcon, against ATN

18  and me, personally.

19  Q.   What was the first time that you saw this document?

20  A.   I think, the beginning of February.

21  Q.   How did it come to your attention?

22  A.   We were served with the documents.

23  Q.   Now, you stated that the document was from -- was from

24  Newcon.  How do you know that?

25  A.   The complaint had the --

1  Q.   I'm sorry?

2  A.   The complaint here reflected that plaintiff is Newcon

3  International.

4          MS. HAMILTON:  So, your Honor, the United States

5  would move to admit Exhibit 48.

6          MR. HOWDEN:  No objection, your Honor.

7          THE COURT:  Exhibit 48 is admitted.  In its entirety,

8  correct?

9          MS. HAMILTON:  Yes, your Honor.

10          THE COURT:  All --

11          MS. HAMILTON:  Including the attachments as well.

12          THE COURT:  -- the attachments?  Yes.  Okay.  Thank

13  you.

14          (Trial Exhibit 48 received in evidence)

15  BY MS. HAMILTON

16  Q.   And, speaking of the attachments, before we actually move

17  to the allegations contained in the complaint, I would like to

18  turn your attention first to page 17 of Exhibit 48.  Do you

19  have that?

20  A.   Yes.

21  Q.   And do you recognize that document?

22  A.   Yes.

23  Q.   And when was the first time that you saw this document?

24  A.   October 18th, 2005.

25  Q.   And what is it?

1  **A.**    That's an e-mail sent to me by Michael Beker, and it

2  demands of loan refund.

3  **Q.**    And how did you know this was actually from Mr. Beker?

4  **A.**    It was signed by Mr. Beker, and it was from his e-mail

5  address.

6  **Q.**    Now, in -- in the body of the top part of the text, under

7  the bullet points, it reads,

8              "All of the above leads me to believe

9          that you do not intend to keep your part of

10         the agreement.  Unless you can advise

11         otherwise, I have no choice by asking you

12         to refund the loan, and cancel our

13         arrangement."

14     On October 18th, 2005, did you understand what -- what was

15  the loan that Mr. Beker was referring to?

16  **A.**    The advance payment for $50,000.

17  **Q.**    And did you understand that advance payment to be a loan

18  to ATN from Newcon?

19  **A.**    No.

20  **Q.**    Okay.  And then, if I could now turn your attention to

21  page 19 of Exhibit 48, and in the copy that you have, are you

22  able to actually read the document?

23  **A.**    Yes.

24  **Q.**    So it's legible to you -- the one that's in the complaint?

25  **A.**    Barely legible.

1   Q.   So, just to make it clear to the jury, what I'd like to do

2   then is have the same document, which is Exhibit 52, and a

3   legible copy, and just compare the two.  I shouldn't say "the

4   same."

5        I'd like you could to compare Exhibit 52 to the document

6   that's in the complaint.  And for you, Exhibit 52 is on Tab 12.

7   So, if you could, look at Tab 12, and compare the text of that

8   document -- Exhibit 52 -- to page 19 of Exhibit 48.  Are those

9   the same documents?

10  A.   Yes.

11  Q.   Okay.  So then, if I could turn your attention, just for

12  this purpose, to Exhibit 52, I have some questions about that

13  document.  And what is this document?

14  A.   The same demands that were in October 18th e-mail were

15  later on delivered by registered mail on the letter dated

16  November 8th.

17  Q.   And who did you understand this letter was from?

18  A.   Michael Beker.

19  Q.   And why did you believe that?

20  A.   Because it was signed by him.

21  Q.   Did you recognize his signature?

22  A.   Not really, but I assumed it was the true Michael's

23  signature.

24  Q.   And did the contents within the letter also give you any

25  indication of who was the -- who sent this letter to you?

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415)  531-6587

 1   **A.**   Yes.

 2   **Q.**   So, if we could turn -- I'd like to turn your attention to

 3   the first paragraph, which states,

 4            "The primary purpose of this letter is

 5            to inform you as per our contractual

 6            agreement that the entire loan amount and

 7            accompanying interest is overdue, and

 8            payment must be made to Newcon Optik

 9            immediately."

10            Now, at this point in November of 2005, what did you

11   understand Mr. Beker's reference to a "contractual agreement"

12   to mean?

13   **A.**   Well, ATN nonparticipation in first -- for remainder of

14   first phase one Battalion Set II.

15   **Q.**   Okay.  And on -- I'd like to now turn your attention to

16   the second paragraph, the last line, in which Mr. Beker writes,

17            "Additionally, you have not supplied,

18            as mutually agreed, a signed, hard-copy

19            version of our contract that I sent you on

20            September 1st, 2005."

21            Was it your understanding that there had been a

22   mutual agreement that the hard-copy version of the contract

23   Mr. Beker sent on September 1st would be signed by you?

24   **A.**   I never agreed that I was going to sign it.

25   **Q.**   The third paragraph, then, in this letter starts --

1    If we could (indicating).  Thank you.

2    (Reading)

3         "Your actions and omissions to date

4         have indicated that you have no intention

5         of maintaining your end of our contractual

6         agreement.  Therefore, I require the loan

7         refunded, and all accruing interest be paid

8         in full immediately.  Interest is to be

9         paid and calculated as to date of transfer,

10        September 7th, 2005, at the market rate of

11        5 percent applied to 50,000 U.S. (loan

12        amount) until payment is made by you in

13        full."

14   In this portion of the letter, Mr. Beker refers or demands

15   interest rate to be applied at a market rate of 5 percent.

16   When, if ever, did Mr. Beker discuss interest rate to be paid

17   on the $50,000?

18  **A.**   Never.

19  **Q.**   When, if ever, did Mr. Prilik discuss with you an interest

20   rate to be paid on the $50,000?

21  **A.**   Never.

22  **Q.**   When, if ever, did anyone at Newcon discuss an interest

23   rate to be paid on the $50,000?

24  **A.**   No one ever discussed with me.

25  **Q.**   If I could now turn your attention to page 20 of

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415)  531-6587

ROCKLIN- DIRECT EXAMINATION / HAMILTON    617

1    Exhibit 48 -- back to the civil suit.  Do you have that?

2    **A.**    Yes.

3    **Q.**    Do you recognize that document?

4    **A.**    Yes.

5    **Q.**    What is it?

6    **A.**    It's, I think, a letter from attorneys that were

7    representing Newcon that was sent us in December for settlement

8    purposes.

9    **Q.**    And did you see this letter in December 2005?

10   **A.**    Yes.

11   **Q.**    How did it come to your attention?

12   **A.**    I don't recall right now.

13   **Q.**    I'd like to ask you about the first -- some of the

14   statements made in that first paragraph.  The first -- the

15   second -- third sentence says,

16           "This letter will respond to your

17           request and Karen McGee's request of

18           Monday, November 20, 2005, that we explain

19           in writing Newcon's position regarding the

20           refusal of your client, American

21           Technologies Network, to return to Newcon

22           an advance that it paid to ATN in the

23           amount of $50,000."

24       Just to make sure that it's -- the letter is clear, who --

25   who is Karen McGee, if you know?

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415)  531-6587

1   **A.**    ATN attorney with Barnes & Thornburg.

2   **Q.**    Now, turning to the actual wording, where the letter

3   states, "to return to Newcon an advance it paid to ATN in the

4   amount of $50,000," was it your understanding that -- or what

5   was your understanding regarding this -- this statement that

6   the $50,000 was an advance?

7   **A.**    Yes.  That was advance payment.

8   **Q.**    And in this letter anywhere, is the $50,000 described as a

9   loan?

10  **A.**    No, not to my recollection.

11  **Q.**    Where, if anywhere, in this letter is there discussion

12  about the interest rate to be paid on the $50,000?

13  **A.**    Nowhere.

14  **Q.**    On the second paragraph that starts, "In early 2005," and

15  the second sentence starts -- states,

16                   "In August 2005, after ATN's delivery

17              of approximately the first 3,000 pieces,

18              ATN President Dmitry Rocklin obtained

19              Newcon's agreement to take over the order

20              as to the delivery of the final 3,000

21              pieces."

22         And that's the second sentence.

23  **A.**    Yes.

24  **Q.**    Okay.  Was that an accurate statement?

25  **A.**    If anything, Newcon, in my view, obtained ATN's agreement.

 1           **MR. OSTERHOUDT:**  I'm sorry, your Honor.  I didn't

 2   hear his answer.

 3           (Record read)

 4           **THE WITNESS:**  If anything.

 5           **THE COURT:**  I'm going to strike the answer, because

 6   apparently it's not clear in the record.  And that concerns me.

 7   We should not have answers in the record that are not clear.

 8   You want to reask the question, or shall we have the question

 9   read back?

10           **MS. HAMILTON:**  You can read the question back.

11           (Record read)

12   **BY MS. HAMILTON**

13   **Q.**   So was it an accurate statement?  I'll reask the question.

14   Was the statement that in -- that ATN Present, Dmitry Rocklin,

15   obtained Newcon's agreement to take over the order as to the

16   delivery of the final 3,000 pieces an accurate statement?

17   **A.**   No.

18   **Q.**   Why not?

19   **A.**   Because Newcon obtained ATN's agreement for ATN no longer

20   to deliver of these remainder of 6,000 pieces.

21           **THE COURT:**  If you're having a problem understanding,

22   please tell us.  Please tell us, Madam reporter, because I

23   don't want a transcript that's doesn't accurately --

24           You're going to have to speak into the mic.  Don't

25   mumble.  Speak clearly and distinctly.

1  **BY MS. HAMILTON**

2  **Q.**   The last sentence of paragraph two states,

3          "The parties orally agreed to the above

4       terms by telephone."

5       Was that an accurate statement?

6  **A.**   If it pertains to the full paragraph, then no.

7  **Q.**   Can you explain your answer, please?

8  **A.**   As I stated before, in my opinion, Newcon -- ATN was

9  agreeing for ATN to no longer deliver the units.  And --

10         **THE COURT:**  No longer deliver the what?  Your voice

11  drops off or it mumbles.  Every word has to be clear and

12  distinct.

13         **THE WITNESS:**  Okay.  ATN was agreeing on no longer

14  delivering the units:  Night-vision goggles.

15  **BY MS. HAMILTON**

16  **Q.**   And what, if any, portion of this paragraph did you

17  believe, then, was inaccurate?  If you could, identify the

18  particulars, please.

19  **A.**   That ATN obtained Newcon's agreement.

20       The rest of the stuff is close to what we discussed:  $75

21  per pair, and so on, and so forth.

22  **Q.**   All right.  So the parties agreed that Newcon would

23  deliver its approximately 3,000 pieces, in exchange for its

24  payment to ATN of $75 per piece, resulting in future payments

25  to ATN of $225,000 for night-vision equipment that it would

1    never have to manufacture or deliver.

2         Did you believe that statement was an accurate reflection

3    of the arrangement that Mr. Beker and Mr. Prilik had reached

4    with you?

5    **A.**   Yes.

6    **Q.**   If we could turn your attention, then, to the next page,

7    21, of Exhibit 48, in the paragraph, beginning "The following

8    day, on September 2nd, 2005," which is paragraph 5, the letter

9    states that,

10                   "Mr. Beker sent an e-mail to

11              Mr. Rocklin, attaching a draft of the

12              agreement that, as discussed, ATN had

13              promised to review and sign in exchange for

14              $50,000 payment."

15              Was that an accurate statement?

16   **A.**   The proper statement was that ATN had promised to review,

17   to agree upon the text of written agreement, and then possibly

18   sign.

19   **Q.**   So was that an accurate statement, as I just read in this

20   letter?

21   **A.**   No.

22   **Q.**   The next paragraph then, paragraph 6, states,

23                   "On or around Tuesday, September 6,

24              2005, Mr. Rocklin advised Mr. Beker by

25              telephone that he agreed to the terms of

1              the draft agreement."

2              Was that an accurate statement?

3    **A.**    No.

4    **Q.**    Why not?

5    **A.**    I never agreed on what was in the statement -- in the

6    written statement.

7    **Q.**    If I could then turn your attention to the next page of

8    this letter, which is page 22 of Exhibit 48, in paragraph 9, it

9    states -- the beginning states.

10              "It is and has always been clear to all

11              of the parties involved that the payment of

12              $50,000 to ATN was not a gift; but rather,

13              an advance."

14              Was that an accurate statement?

15   **A.**    Yes.

16   **Q.**    And did you understand that the advance was the same as a

17   loan?

18   **A.**    No.

19   **Q.**    Why not?

20   **A.**    Advance is not there to be returned.

21        Loan is just -- is there to be returned.

22   **Q.**    The last two sentences of that paragraph state,

23              "ATN's delivery of its product to the

24              Iraqi Army, after agreeing to substitute

25              Newcon for that delivery in its place, also

1                    raises a significant issue of its liability

2                    to Newcon for lost profits.  We believe

3                    that those lost profits amount to several

4                    million dollars."

5          What, if any, understanding did you have about the

6   profits to be made on the -- the -- selling night-vision

7   goggles to -- under the Battalion Set II contract?

8   **A.**    If Newcon would sell the goggles for the targeted range of

9   $2,000, there is a good chance that they would make a large

10  profit.

11  **Q.**    Then in the next paragraph, that states, "Further, in

12  reliance," which is paragraph 10 --

13                    "Further, in reliance upon

14                    Mr. Rocklin's promise to review and sign

15                    the contract that he received from

16                    Mr. Beker, and after Mr. Rocklin stated

17                    that ATN would not deliver its product to

18                    the Iraqi Army, and needed Newcon to step

19                    in, Newcon began specifically manufacturing

20                    the equipment that would be substituted for

21                    ATN's equipment."

22         Now, what, if any, discussions did you have with

23  Beker about Newcon specially manufacturing equipment to

24  substitute for ATN's equipment?

25  **A.**    We never had that discussion.

1  Q.   What, if any, discussion did you have with Mr. Prilik

2  about Newcon's specially manufacturing equipment to use for the

3  Battalion Set II contract?

4  A.   Never had that discussion.

5  Q.   Did you ever have a discussion with anyone at Newcon about

6  Newcon's specially manufacturing equipment to use for the

7  Battalion Set II contract?

8  A.   No.

9  Q.   All right.  I'd now like to turn to the actual civil

10 complaint itself.  What was your understanding of the basis for

11 the Newcon lawsuit?

12         MR. HOWDEN:  Your Honor, I'm going to object that

13 calls for a legal conclusion.

14         THE COURT:  I think the objection is sustained.  The

15 way it is framed --

16         MS. HAMILTON:  Okay.

17         THE COURT:  -- that certainly calls for that.  And

18 maybe matters that are outside his knowledge, as well, or

19 understanding.

20 BY MS. HAMILTON

21 Q.   Let me turn your attention to page 8 of the complaint,

22 which -- and specifically to paragraph 48.  The --

23         THE COURT:  Page 8?

24         MS. HAMILTON:  Correct.  Page 8.

25         THE COURT:  Forty-eight is on page 7?

1          **MS. HAMILTON:**  Exhibit 48, page 8.

2          **THE COURT:**  Oh, okay.  I thought you were referring

3   to paragraph 48 in the document.

4          **MS. HAMILTON:**  It is paragraph 48 on page 8 on

5   Exhibit 48.

6          **THE COURT:**  Well, but in the copy we have,

7   paragraph 48 is on page 7, so are we talking about the same

8   paragraph?

9          **MS. HAMILTON:**  I think the summons, though, is the

10  first page.  Do you have the summons?

11         **THE COURT:**  You're talking about the summons, or the

12  complaint?

13         **MS. HAMILTON:**  Well, the summons has been included as

14  part of the exhibit.  So okay.  As part of the complaint on

15  what's labeled as page 7 of the complaint.

16         **THE COURT:**  You're using the Bates numbers.  Is that

17  it?

18         **MS. HAMILTON:**  Yes.

19         **THE COURT:**  All right.

20         **MS. HAMILTON:**  What's identified as page 7 on the

21  actual complaint itself, paragraph 48.  Thank you, your Honor.

22         **THE COURT:**  Yes.  Okay.

23         **MS. HAMILTON:**  Make sure the record is clear.

24  Q.   Paragraph 48 states,

25              "As a direct and proximate breach of

                    Lydia Zinn, CSR,  RPR
          Official Reporter -  U.S. District Court
                       (415)  531-6587

1          ATN's breach of contract, Newcon's been

2          injured in the amount of $50,000, and

3          ultimately in the amount to be proven at

4          trial with the loss of profits associated

5          with the provision of night-vision

6          equipment to the new Iraqi Army, which

7          amount is expected to exceed $645,000."

8          Do you see that?

9  **A.**   Yes.

10 **Q.**   What, if any, understanding did you have about that

11 paragraph?

12        **MR. HOWDEN:**  Objection, your Honor.  Lack of

13 foundation.

14        **THE COURT:**  The objection is overruled, but this goes

15 not to what is the correct legal interpretation of that

16 paragraph; but rather, what his understanding was.

17        **THE WITNESS:**  That this part of the demand deals with

18 Newcon feels that $50,000 are to be returned, as well as --

19 they were asking for non -- loss of profit associated for --

20 that they could make on this contract if they delivered the

21 units in the amount of 645,000.

22 **BY MS. HAMILTON**

23 **Q.**   And when you say "on this contract," what do you mean?

24 **A.**   Battalion Set II.

25 **Q.**   So, if I could now turn your attention to page 3 of the

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415)  531-6587

 1   complaint, to paragraph 12 --

 2            **THE COURT:**  Now, this is Bates --

 3            **MS. HAMILTON:**  No.  I'm not following your lead.  And

 4   this is the actual page 3 that's on -- stated on the complaint.

 5            **THE COURT:**  Let's be consistent.  It's page 04.  Is

 6   that right?

 7            **THE WITNESS:**  Correct.

 8   **Q.**   Paragraph 12 states,

 9                 "By August 2005, ATN supplied the first

10              approximately 3,000 pieces of night-vision

11              equipment to the new Iraqi Army, but was

12              unable to complete delivery of the

13              remaining approximately 3,000 pieces."

14            Was the statement, "ATN was unable to complete

15   delivery of the remaining approximately 3,000 pieces" an

16   accurate statement?

17   **A.**   No.

18   **Q.**   Why not?

19   **A.**   Because ATN was able to deliver the remainder of phase

20   one, as well as the phase two and three.

21   **Q.**   Okay.  Staying on this page, paragraph 13 states,

22                 "In August 2005, Rocklin approached

23              Newcon for assistance in the delivery of

24              the remaining approximately 3,000 pieces of

25              night-vision equipment."

ROCKLIN- DIRECT EXAMINATION / HAMILTON

```
 1              Was that an accurate statement?

 2  A.    No.

 3  Q.    Why not?

 4  A.    I never asked for help or assistance.

 5  Q.    Paragraph 14 states,

 6              "In various telephone conversations

 7              that month between Rocklin and Newcon,

 8              Rocklin promised to assign ATN's rights and

 9              obligations in the remainder of the

10              contract to Newcon."

11              Did you promise to assign ATN's rights and

12  obligations?

13  A.    No.

14  Q.    Was this an accurate statement?

15  A.    No.

16  Q.    Why not?

17  A.    ATN could not assign rights and obligations.  We did not

18  have a contract with TACOM directly.

19  Q.    What about its rights and obligations under ATN's contract

20  with ITE?

21  A.    No.  The subcontract did not allow us to assign the

22  contract to ITE.

23  Q.    To whom?

24  A.    Anyone.  We could not assign any entity, other than ATN,

25  to the ITE -- to the deliver the goggles to ITE.
```

```
 1   Q.   On paragraph 15, it states,

 2              "In exchange for this promise, Newcon

 3          agreed to tender to Rocklin and ATN a

 4          payment of $75 per piece of night-vision

 5          equipment that Newcon would supply under

 6          the assigned contract.  The parties agreed

 7          that the payment was intended to compensate

 8          ATN for its efforts through August 2005 and

 9          attempting to fulfill the TACOM contract."

10          I'd like to ask you about this statement that the

11  parties agreed that the payment was intended to compensate ATN

12  for its efforts through August 2005.

13          Was that an accurate statement?

14  A.   No.

15  Q.   Why not?

16  A.   Seventy-five dollars per pair of goggles that would not be

17  delivered on the remainder of phase one Battalion Set II --

18  that was the agreement.

19  Q.   On paragraph 17, it states,

20              "Rocklin then requested, as a gesture

21          of good faith from Newcon, an initial

22          payment of $50,000 as an advance on the

23          approximately 225,000 in future payments

24          that it would receive under the assignment

25          agreement."
```

1          Did you request $50,000 as an advance on future

2   payments that ATN would receive under an assignment agreement?

3   **A.**   No.

4   **Q.**   What was -- in your understanding, what was the payment of

5   the $50,000 for?

6   **A.**   For ATN not to participate; not to deliver for the

7   remainder of phase one.

8   **Q.**   Anywhere in this complaint did -- was that $50,000

9   identified as a loan?

10  **A.**   Not that I recall, no.

11  **Q.**   Now, turning to the next page, which is page 4 of the

12  complaint and page 5 of the Bates numbers, and referring your

13  attention to paragraph 21 -- oh.  I'm sorry -- paragraph 20 --

14  excuse me -- which reads,

15          "On September 2nd, 2005, Newcon sent

16          Rocklin a draft of an agreement containing

17          the terms that the parties had previously

18          discussed, along with an e-mail requesting,

19          as discussed, oral confirmation of the

20          agreement to the specific terms contained

21          therein."

22          I just want to ask you about the phrase "containing

23  the terms that the parties had previously discussed."

24          How -- how accurate was that -- that claim?

25  **A.**   What was in the proposed written agreement and what we

```
 1  discussed over the telephone were two very different things.

 2  Q.   And what was -- what did you understand was different

 3  between the proposed written agreement, and what you discussed

 4  on the telephone with Mr. Beker?

 5  A.   The main part was how ATN was paid.  And there's a bunch

 6  of misleading and non-true facts there about ATN.

 7       And, second, money were not mentioned anywhere on proposed

 8  written agreement.

 9  Q.   And when you say the money was not mentioned anywhere,

10  what do you mean by the word "money"?

11  A.   $50,000 advance payment, or $75 per each unit that we will

12  get paid having not delivered on phase one Battalion Set II.

13  Q.   Turning, then, to paragraph 21, which states,

14            "On or around September 6th, 2005,

15            Rocklin advised Newcon by telephone that he

16            agreed to the terms of the draft

17            agreement."

18            Was that an accurate statement?

19  A.   No.

20  Q.   Why not?

21  A.   I never agreed to the terms very clearly, time and time

22  again.

23  Q.   Just turning back, then, to the Battalion Set II contract

24  itself, what -- did ATN receive orders to continue to supply

25  night-vision goggles under the Battalion Set II contract after
```

1    October of 2005?

2    **A.**    Delivery orders for phase two and phase three, you mean?

3    **Q.**    For the contract itself:  Phase one, phase two, or phase

4    three.

5    **A.**    Yes.

6    **Q.**    And was -- did ATN supply the goggles that were ordered?

7    **A.**    Yes.

8    **Q.**    Were there any orders that were not fulfilled by ATN?

9    **A.**    No.

10   **Q.**    And were any of the night-vision goggles that ATN supplied

11   returned under warranty by the Army?

12   **A.**    Never.

13   **Q.**    By any other party?

14   **A.**    No.

15           **MS. HAMILTON:**  So, your Honor, we've completed

16   direct.

17           **THE COURT:**  Thank you.  Now, who's going to proceed

18   first with cross?

19           **MR. HOWDEN:**  I will, your Honor.

20           **THE COURT:**  You, Mr. Howden.

21           **MR. HOWDEN:**   If I could have a brief.

22           **THE COURT:**  Five minutes.  If anyone needs to use the

23   restroom, you may do so.  I hesitate to take a real break at

24   this point, but if you wish to do so, don't all of you leave at

25   once, but you can stand up and, you know, stretch or whatever.

```
 1              And you may step down.

 2              But everybody be back in five minutes.

 3         (Whereupon there was a recess in the proceedings

 4          from 9:43 a.m. until 9:48 a.m.)

 5         THE COURT:  Ready, Mr. Howden?

 6         MR. HOWDEN:  Yes, your Honor.

 7              What I'd like to do for everyone's convenience -- I

 8    expect to use certain exhibits with this witness.  And I'd like

 9    to give him a binder.  These are all exhibits that have been

10    premarked either by the Government or by the defense.

11         THE COURT:  Fine.  Mm-hm.  So now you're going to get

12    a new binder.

13         THE WITNESS:  Thank you.

14         THE COURT:  And do we have your exhibits, also?  I

15    have two binders of the Governments' exhibits.

16         MR. HOWDEN:  Yes, you do.

17         THE COURT:  Oh.  I'm about to have them.

18         MR. HOWDEN:  We won't be using --

19         THE COURT:  I'm so glad I asked.

20         MR. HOWDEN:  It looks a lot worse than it really is.

21    We won't be using anywhere near all of those.  And, in fact, in

22    today's examination, I think we're only going to be using a

23    couple.

24         THE COURT:  Oh, you know, these are very hard to

25    handle, too.  So for those of us who have carpal tunnel
```

634

1    syndrome, trying to lift these things is not easy.  So

2    somewhere during the direct examination or something, I think I

3    dropped one.  When that happens, that means either I was clumsy

4    and couldn't hold onto it, or I saw that some juror was

5    sleeping, and I purposely allowed it to drop with a real thud.

6    That way, we get your attention; but you've been very

7    attentive, and I haven't observed any of that, so probably if

8    you hear a thud, it's because I couldn't hold onto it.

9              Okay.  Mr. Howden.

10             **MR. HOWDEN:**  Thank you, your Honor.

11                         **CROSS EXAMINATION**

12   **BY MR. HOWDEN**

13   **Q.**   Mr. Rocklin, my name's Jonathan Howden.  Ms. Boersch and I

14   represent Mr. Beker, and Newcon International.

15             Am I correct in saying that you and I have not met before?

16   **A.**   Yes.

17   **Q.**   And we haven't spoken before?

18   **A.**   Never.

19   **Q.**   We certainly haven't spoken about this case at all?

20   **A.**   No.

21   **Q.**   Now, you have spoken with the prosecutors before about

22   this case?

23   **A.**   Yes.

24   **Q.**   Specifically, Ms. Hamilton and Mr. Ward?

25   **A.**   Yes.

1  Q.   How many times during the past five years would you

2  estimate that you've met with them, and discussed matters

3  related to this case?

4  A.   About a dozen times.

5  Q.   Dozen times?  And how about during the last six months?

6  How many times have you met with them?

7  A.   Approximately less than ten, I would say.

8  Q.   Less than ten?

9  A.   Yeah.

10  Q.   More than six?

11  A.   Possibly, yes.

12  Q.   Yeah.  And the purpose of those meetings, at least in

13  part, was to review the events that you've testified about in

14  the last few days?

15  A.   Yes.

16  Q.   Now, during the course of those meetings and discussions

17  with the prosecutors, was someone from the Government taking

18  notes?

19  A.   I believe so.  Yes.

20  Q.   Yeah.  Someone working on the computer, and typing into it

21  while the interviews were going on?

22  A.   Not that I recall, no.

23  Q.   Not that you recall?  Who was taking notes during those

24  meetings?

25  A.   Jeane did.  Jeane Hamilton.

ROCKLIN - CROSS EXAMINATION / HOWDEN

1    Q.    Yes.  Anyone else?

2    A.    I don't recall.

3    Q.    Okay.  During some of those meetings during the last six

4    months, on occasion, wasn't there someone other than

5    Ms. Hamilton and Mr. Ward present?

6    A.    Yes.

7    Q.    And what was -- who was that other person?

8    A.    Aseem was present there.  And Dick was there.

9    Q.    What was Aseem doing while he was in attendance at those

10   meetings?

11   A.    I think he mainly was showing me parts of the transcripts

12   in digital format.

13   Q.    Okay.

14   A.    That's what he was doing.

15   Q.    When did you first meet with Ms. Hamilton?

16   A.    Back in August 2005, I think.

17   Q.    All right.  That was during your first interview with the

18   FBI?

19   A.    Yes.

20   Q.    And that was an interview that occurred at the ATN

21   offices.  Is that right?

22   A.    Right.

23   Q.    And also present at that meeting and interview was your

24   lawyer?

25   A.    Yes.

1   Q.   And I believe you mentioned her name earlier in your

2   testimony today?

3   A.   Karen McGee.

4   Q.   Karen McGee.  Thank you.

5        And Mr. Munn was also present?

6   A.   Yes.

7   Q.   Agent Haynie, with the FBI, was present?

8   A.   Yes.

9   Q.   And Ms. Hamilton?

10  A.   Yes.

11  Q.   Anyone else that you can recall?

12  A.   Yes.  There were also another FBI agent whose name I don't

13  recall right now.  And there were, I think, two people from

14  military investigation units.  I'm sorry.

15  Q.   Okay.  And this first meeting occurred after your

16  August 17th telephone call with Newcon.  Is that correct?

17  A.   Yes.

18  Q.   And before you began recording any telephone calls on

19  behalf of the FBI?

20  A.   Yes.

21  Q.   And -- and what was the purpose of that first meeting with

22  the FBI and everybody else?

23  A.   I think the purpose of the meeting was to interview me to

24  find out what the August 17th conversations were about, and the

25  general state of ATN Battalion Set II; what relevant facts

ROCKLIN - CROSS EXAMINATION / HOWDEN

1    would be.

2    **Q.**    And as part of your discussion with the agents and

3    everyone else present, you described in -- in more general

4    outline, ATN's business model, and the night-vision business in

5    general.  Is that correct?

6    **A.**    Yes.

7    **Q.**    Kind of gave an overview of -- of the business from ATN's

8    point of view?

9    **A.**    Yes.

10   **Q.**    And also as part of that discussion, you -- you obviously

11   had to get into the ins and outs of the Battalion Set II

12   contract.  Is that right?

13   **A.**    Yes.

14   **Q.**    And you described for everyone who was present what the

15   shape of the market was at the time of the Battalion Set II

16   contract?

17   **A.**    Yes.

18   **Q.**    Who your competitors were?  And, in particular, what would

19   happen if ATN was unable to complete its portion of that

20   contract?

21   **A.**    I think that was a part of conversation, yes.

22   **Q.**    And -- and you told the agents and the prosecutors and

23   everyone else who was present on that day that if, for any

24   reason, ATN was unable to meet its obligations to ITE and

25   TACOM, the contract would, of necessity, go to Newcon, as the

1  only other Generation II manufacturer of night-vision goggles

2  capable of meeting the military's requirements for quantities

3  needed and price.  Is that correct?

4  **A.**   I think I mentioned something to that extent; but more,

5  that Newcon would be -- if ATN had not delivered, then Newcon

6  would be a front runner.

7  **Q.**   I'm sorry.  I didn't catch the last part of your answer.

8  **A.**   If ATN would not deliver, Newcon would be the front runner

9  to deliver; the most likely supplier on Battalion Set II.

10  **Q.**   Most likely?

11      Why don't you take a look at Exhibit 43 -- or 46, which is

12  in front of you there.  And take a look at the page numbered

13  Bates number FBI 003 -- the last the paragraph on that page.

14  Read it to yourself, if you would, please.  It carries over a

15  little bit to FBI 004, the next page; but read through it, and

16  let me know when you've had a chance to read it.

17  **A.**   I believe this is a copy of the report written by

18  Agent Haynie.

19  **Q.**   I'm not asking what the document is.

20  **A.**   Okay.

21  **Q.**   Have you read the paragraph I referred you to on FBI 003?

22  **A.**   Yes.

23  **Q.**   Okay.  And let me ask you again.  Didn't you tell the FBI

24  and the others present at the meeting on that day that if, for

25  any reason, ATN is unable to meet its obligations to ITE and

1   TACOM, the contract would, of necessity, go to Newcon, as the

2   only other Generation II manufacturer of night-vision goggles

3   capable of meeting the military's requirements for quantities,

4   and needed price?

5   **A.**   I think we generally discussed the night-vision industry

6   at that time, and that's what Agent Haynie's perception was.

7        I don't think we exactly said there were only two

8   manufacturers of Generation II.  I don't recall that.

9   **Q.**   You don't recall saying that to the FBI agents that day?

10  **A.**   There were only two?

11  **Q.**   That if you failed, the contract, of necessity, would go

12  to Newcon.

13  **A.**   I could say something to -- I think so.

14  **Q.**   Now, at some point in time, someone from ATN also prepared

15  a written overview of the industry, as it -- as it appeared to

16  ATN at the time of the Battalion Set II contract.  I'd ask you

17  to take a look at Exhibit 465, which is the next in order

18  there.  Take a look at it for a minute.

19  **A.**   Yes.

20  **Q.**   What is Exhibit 465?

21  **A.**   I think it was a letter that I prepared, I think, for our

22  legal team then, outlining possible parties involved in

23  Battalion Set II.

24  **Q.**   And did you or your legal team provide it to the

25  Government subsequently?

1    **A.**    Yes.

2    **Q.**    And -- and what does Exhibit 465 purport to show?

3    **A.**    The contract in question, where it was published, and some

4    entities -- commercial entities -- that were in discussion in

5    the previous -- or relevant in the previous August 17 -- or

6    relevant to Battalion Set II.

7    **Q.**    Parties and entities relevant to the Battalion Set II

8    contract?

9    **A.**    Yes.

10   **Q.**    And what was the purpose of preparing Exhibit 465?

11   **A.**    During that interview, and in order to explain to our

12   legal team that were a lot of different entities, so there is

13   an understanding who is who.

14   **Q.**    Okay.  So it -- in other words, it's like a who's who of

15   who are the relevant players for the night-vision portion of

16   the Battalion Set II contract.  Is that correct?

17   **A.**    Yes.

18            **MR. HOWDEN:**  Your Honor, I'd ask that we admit

19   Exhibit 465 into evidence.

20            **THE COURT:**  Any objection?

21            **MS. HAMILTON:**  No objection, your Honor.

22            **THE COURT:**  465 is admitted.

23            (Trial Exhibit 465 received in evidence)

24   **BY MR. HOWDEN**

25   **Q.**    Now, in that first interview with the FBI in August of

ROCKLIN - CROSS EXAMINATION / HOWDEN                642

1  2005, you never mentioned NiViSys, did you?

2  **A.**    No, I did not.

3  **Q.**    And you didn't tell the FBI that NiViSys was another

4  night-vision company that was in the mix for the

5  Battalion Set II contract?

6  **A.**    No, I did not.

7  **Q.**    The fact of the matter is, for the Battalion Set II

8  contract, if ATN couldn't perform under it, NiViSys was another

9  likely alternative to fulfill the remainder of the contract.

10  Isn't that right?

11  **A.**    My understanding that NiViSys at that point were only

12  entering this specific business segment of Generation II

13  goggles, based on Russian technology, which was the most

14  competitive to submit to Battalion Set II.  So, although they

15  could be a supplier, they were not likely supplier.

16  **Q.**    Not a likely supplier for Battalion Set II?

17  **A.**    In my opinion.

18  **Q.**    Okay.  In point of fact, when ITE won the Battalion Set II

19  contract -- when they won the contract, they had lined up

20  suppliers for each and every item in the contract.  Isn't that

21  right?

22          **MS. HAMILTON:**  Your Honor, this assumes facts that

23  are not in evidence, and is -- exceeds the scope of the direct

24  examination.

25          **THE COURT:**  Objection is overruled.

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415)  531-6587

1          You may answer, if you know.

2          **THE WITNESS:**  My understanding, when the

3   Battalion Set II was awarded, ITE had not yet determined for

4   sure who the sub for night vision would be.

5   **BY MR. HOWDEN**

6   **Q.**   Well, that's --

7   **A.**   They were still shopping.

8   **Q.**   That's not my question, though.

9          My question was:  Isn't it true that ITE had to have a

10  listed supplier for each and every item that it proposed to

11  provide to the Army under the Battalion Set II contract?

12  **A.**   Yes, that's my understanding.

13  **Q.**   And didn't they have NiViSys listed as their proposed

14  supplier for night-vision goggles on the Battalion Set II

15  contract?

16  **A.**   Yes, it's possible.

17  **Q.**   Possibly?

18  **A.**   I think I found out about this later, but yes.

19  **Q.**   Ah.  Now, the Battalion Set II contract was awarded to ITE

20  on or about February 14, 2005?

21  **A.**   Sounds right.  Yes.

22  **Q.**   Okay.  And so at that time, ITE had to at least have

23  listed, for TACOM's benefit, who it, at that point in time,

24  proposed -- they proposed to use to supply the night-vision

25  goggles.  Isn't that right?

1  **A.**   Yes.

2  **Q.**   And that wasn't you?

3  **A.**   No.

4  **Q.**   It was NiViSys?

5  **A.**   Right.

6  **Q.**   And at that point in time, at the time the contract was

7  awarded to ITE, ATN didn't have any part in the

8  Battalion Set II contract?

9  **A.**   No.

10 **Q.**   Now, ATN had -- had bid to other prime contractors who --

11 who ultimately did not win the Battalion Set II contract.  Is

12 that right?

13 **A.**   Yes.

14 **Q.**   Do you know if, in fact, any of those other prime

15 contractors even made use of ATN's bid in -- in trying to get

16 the Battalion Set II contract from TACOM?

17 **A.**   I don't think I ever confirmed that.

18 **Q.**   Okay.  So you don't know?

19 **A.**   I don't know.

20 **Q.**   And it was after ITE was awarded the prime contract that

21 Ramzi Abu-Taleb approached you.  Isn't that right?

22 **A.**   No.

23 **Q.**   How did you get the contract, then?

24 **A.**   The -- we bid ITE prior to award, but I guess he decide

25 for ATN to be a supplier later on.

1  **Q.**   I'm sorry.  I didn't follow that.  Can you run that by me

2  again?

3  **A.**   The process of bidding started -- I don't recall exactly,

4  but it was end of 2004.  ITE was one of the companies ATN bid

5  to.  I think it was a short time between the time that award

6  was published and finalized, to the time when it was awarded.

7  And my understanding was that prior to final approval, ITE had

8  the right to choose other suppliers.

9  **Q.**   With TACOM's approval?

10 **A.**   Yes.

11 **Q.**   TACOM had to approve whatever subcontractors were going to

12 be working with the prime contractor on the contract?

13 **A.**   I believe so.  Yes.

14 **Q.**   In point of fact, didn't Ramzi Abu-Taleb come to you and

15 tell you the contract was yours, if you could beat NiViSys'

16 price?

17 **A.**   No.  We -- at the very early stages when we were bidding,

18 the price was not tied up to NiViSys.

19 **Q.**   So at any point in time, did you lobby Mr. --

20 Mr. Ramzi Abu-Taleb for ATN to get the subcontract after they

21 were awarded the prime?

22 **A.**   Could you define "lobbying"?

23 **Q.**   Well, asked him if you could get it.

24 **A.**   I recall us providing the quote.  I recall him calling

25 back.  And said that I would like some condition to be

ROCKLIN - CROSS EXAMINATION / HOWDEN

1   improved.  I don't recall exactly what the conditions were

2   improved.

3       I think he wanted to us to have the most competitive

4   bidding, and that's what we did.

5       The initial price was, I think, quoted somewhere in the

6   neighborhood of $1,300 or right below that.  And then it was

7   improved, but it just a few dollars.  We looked into if we

8   could further improve it.

9       We also -- the solicitation called for 12 months of

10  warranty.  We looked whether we could improve that.  And it was

11  18 months later on.

12      And on delivery schedule, it had to be done, I think, the

13  end of the year.  And we improved that to be until October.

14  **Q.**   All right.  We'll talk about the delivery schedule in a

15  little while; but first, Mr. Taleb, when he came to you and

16  asked you if you were interested in -- in competing, after he

17  was awarded the contract, for the subcontract, he was mostly

18  interested in price, wasn't he?

19  **A.**   Well, he was interested in overall that the contract would

20  be --

21  **Q.**   Including price?

22  **A.**   Including price.

23  **Q.**   He wanted a price lower than NiViSys' price?

24  **A.**   No.  He wanted the price to be lower than what we

25  initially bid.  I don't recall him putting it against the

1   NiViSys price.

2   Q.   What was the original price?

3   A.   I think it was $1,300 or 1,297.  Something like that.

4   Q.   Why didn't he use that bid in connection with his efforts

5   to get the prime contract?

6   A.   He is in the business.  And one of the things that is very

7   logical to try to --

8            MS. HAMILTON:  Your Honor, this is all speculation

9   about the witness.

10           THE COURT:  It's beginning to sound like it.

11           This last part, where he said, "One of the things,"

12   et cetera, is stricken.  The rest of the answer remains.

13  BY MR. HOWDEN

14  Q.   And eventually the price that you quoted to Mr. Taleb for

15  the goggles was $1,277.  Is that right?

16  A.   Yes.

17  Q.   That's your price to him?

18  A.   Yes.

19  Q.   Do you know how that compared to the price that NiViSys

20  had quoted to him?

21  A.   I don't recall right now.  No.

22  Q.   It was substantially lower, wasn't it?

23  A.   Could be.

24  Q.   Now, when you talked to the FBI and the prosecutors back

25  in August of 2005, you never mentioned anything about NiViSys

1   to them.  Isn't that right?

2   **A.**   I don't recall right now.

3   **Q.**   Well, why don't you look back at the FBI 302, the report

4   that you have in front of you, that was Exhibit 46.  Is NiViSys

5   mentioned anywhere in that report?

6   **A.**   I think you asked me if I recall whether it mentioned it.

7   I don't recall if I mentioned it --

8        Whether it's reflected -- most likely, not.

9   **Q.**   Most likely not?

10  **A.**   It's not.

11  **Q.**   It's not in the report?

12  **A.**   No.

13  **Q.**   And why don't we take a look at Exhibit 465?

14       (Discussion off the record)

15          **THE COURT:**  No.  You didn't have to do that.

16  Mr. Bowser may have to, though.  We'll tell him that when he

17  gets back.

18  **BY MR. HOWDEN**

19  **Q.**   Does everybody have that on their screens right now?

20          **THE COURT:**  Can you see it?

21          **JUROR:**  Now it's fine.

22          **THE COURT:**  Ah, okay.  You're right.  It's warming

23  up.  Okay?

24  **BY MR. HOWDEN**

25  **Q.**   Mr. Rocklin, you still don't have it?

1   **A.**    Yeah, I have it now.

2   **Q.**    Okay.  So this is Exhibit 465 is a three-page document.

3   This is the one that you said was an overview of the relevant

4   players for the Bat. Set II contract.  Is that correct?

5   **A.**    Yes.

6   **Q.**    Okay.  First page the first bullet point discusses the

7   solicitation, right?

8   **A.**    Yes.

9   **Q.**    And then it goes to the prime contractor -- the second

10  bullet point?

11  **A.**    Yes.

12  **Q.**    And the prime contractor, of course, was ITE?

13  **A.**    Yes.

14  **Q.**    And then the third bullet point on the first page shows

15  ATN as the subcontractor?

16  **A.**    Yes.

17  **Q.**    Then, going to the second page, it shows ATN's system

18  integrator.  And that was NPZ, your Russian supplier?  Is that

19  correct?

20  **A.**    Yes.

21  **Q.**    And then below that, the last bullet point on page 2, it

22  shows your technology partner.  That's the company that

23  actually was manufacturing the image-intensifier tubes?

24  **A.**    Correct.

25  **Q.**    That was Ekran-FEP?

1  **A.**    Yes.

2  **Q.**    And then on the third page, it shows "Competitor."

3        And you identified Newcon Optik.  Isn't that is right?

4  **A.**    Yes.

5  **Q.**    And you showed the competitor's supplier in the bullet

6  point below that; and that was Katod, another Russian company?

7  Isn't that right?

8  **A.**    Yes.

9  **Q.**    And nowhere in this document, again, is NiViSys mentioned?

10 **A.**    No, because NiViSys were never part of August 17

11 conversation.  And this document was prepared in lieu of that

12 August 17th conversation.

13 **Q.**    But the August 17th conversation was about who was capable

14 of doing the Battalion Set II contract, right?  And you were

15 trying to provide an overview of the relevant players for the

16 Battalion Set II contract?

17 **A.**    Yeah.  At that point, NiViSys was not a part of the

18 conversation.

19 **Q.**    Okay.  Let's talk for a minute about NPZ and Katod and

20 Ekran FEP.  All of those companies are located in the Russian

21 city of Novosibirsk.  Is that right?

22 **A.**    Correct.  Yes.

23 **Q.**    And, in fact, Ekran FEP and Katod, at one point in time,

24 were part of a larger state-owned business, isn't that correct?

25 **A.**    I believe so.

1  Q.   Called "Ekran"?

2  A.   I believe so.

3  Q.   As opposed to "Ekran-FEP"?

4  A.   Yes.

5  Q.   And after the fall of the Soviet Union, after

6  privatization came in, Ekran FEP [sic] broke up into three

7  companies.  Isn't that right?

8  A.   You mean Ekran?

9  Q.   Ekran broke up into three companies?

10  A.   Yes.

11  Q.   I'm sorry.  Did I misspeak?

12  A.   You said "Ekran FEP."

13  Q.   Ekran broke up into three companies.  One of them was

14  Ekran FEP?

15  A.   Yes.

16  Q.   And one of them was Katod.  And Ekran also continued as an

17  independent business.  Isn't that correct?

18  A.   Yes.

19  Q.   And all thee of those businesses manufactured

20  image-intensifier tubes?

21  A.   Yes.

22  Q.   And, in fact -- well, who did you list as the principal at

23  Ekran-FEP?  Wasn't it Mr. Aksenov?

24  A.   Yes.

25  Q.   And the principal that you listed at Katod was

1    Mr. Loktionov?

2    **A.**    Yes.

3    **Q.**    Those gentlemen used to work together at Ekran.  Isn't

4    that your understanding?

5    **A.**    Yes.

6    **Q.**    In fact, those three companies and their principals

7    remained close in 2005?

8    **A.**    Yes.

9    **Q.**    Not only physically close, but they socialized together.

10   **A.**    Yes.

11   **Q.**    Now, in order for you to be approved by TACOM, you had to

12   establish to them that you were qualified to do the contract.

13   Isn't that right?

14   **A.**    Yes.

15   **Q.**    You had to describe your product to them?

16   **A.**    Yes.

17   **Q.**    You had to represent that you could meet the delivery

18   schedule?

19   **A.**    Yes.

20   **Q.**    You could meet all of the technical specifications that

21   were required?

22   **A.**    Yes.

23   **Q.**    And in every respect, fulfill the night-vision portion

24   of -- of the contract?

25   **A.**    Yes.

1    **Q.**   And for -- NiViSys, in order to be the supplier listed by

2    ITE, when they bid on the project, had to do all of those same

3    things.  Isn't that right?

4    **A.**   Yes, probably.

5    **Q.**   So, in essence, NiViSys, at the time the contract was let

6    to ITE, was a preapproved supplier.  Is that right?

7    **A.**   Yes.

8    **Q.**   And you mentioned one of the advantages that ATN offered

9    to ITE was an improved delivery schedule.  Isn't that right?

10   **A.**   Yes.

11   **Q.**   And, as part of your subcontract with ITE, you agreed that

12   ATN would provide the first 6,371 sets of goggles by

13   October 15th, 2005.  Isn't that right?

14   **A.**   That was the target date, yes.

15   **Q.**   Well, target date, or the contract date?

16   **A.**   Contract date.

17   **Q.**   And, in fact, that was one of the selling points to TACOM:

18   The fact that your delivery schedule was better than the

19   NiViSys schedule?

20   **A.**   That, I don't know.

21   **Q.**   Well, why don't you know that that's one of the things

22   that was significant to TACOM?

23   **A.**   No.  I never reviewed NiViSys' bid.

24   **Q.**   Okay.  And, just so we're really clear, ATN's contract for

25   the Battalion Set II contract was a subcontract with ITE?

1    Isn't that right?

2    **A.**    Yes.

3    **Q.**    All your negotiations and -- and business dealings were

4    with ITE?

5    **A.**    Yes.

6    **Q.**    You didn't quote TACOM any prices?

7    **A.**    No.

8    **Q.**    You didn't negotiate prices directly with TACOM?

9    **A.**    No.

10   **Q.**    And you didn't have any contractual relationship with

11   TACOM?

12   **A.**    No.

13   **Q.**    And if you were to get in trouble in performing on your

14   contract with ITE, you were going to be liable to ITE.  Isn't

15   that right?

16   **A.**    Possibly.

17   **Q.**    Well, not to TACOM.  You didn't have a contract with

18   TACOM, did you?

19   **A.**    But our performance on the contract could be later on

20   viewed as nonperformance, but we did not have a direct contract

21   with TACOM; that's true.

22   **Q.**    It could have ramifications for some contract further down

23   the road.  Isn't that right?

24   **A.**    Did you say that we couldn't?

25   **Q.**    If you failed to perform, it could have ramifications for

1   TACOM down the road?

2   **A.**   It could be, yes.

3   **Q.**   But not with respect to this contract?  You were liable to

4   ITE?

5   **A.**   That's right.

6   **BY MR. HOWDEN**

7   **Q.**   And the price you quoted was your price to ITE to supply

8   these goggles to ITE, right?

9   **A.**   Yes.

10   **Q.**   ITE, in turn, quoted whatever price they felt was

11   appropriate to TACOM?

12   **A.**   Correct.

13   **Q.**   Did you ever know what that price was?

14   **A.**   Eventually yes.

15   **Q.**   Eventually.  And so ITE marked up your price to TACOM?

16   **A.**   Correct.

17   **Q.**   But ITE is the one who decided how much to mark it up,

18   isn't that right?

19   **A.**   Absolutely, yes.

20   **Q.**   In essence, you didn't have any say in what price ITE was

21   going to charge to TACOM, isn't that right?

22   **A.**   No.  But it would be based on the price that we would

23   quote ITE or sell to it ITE.

24   **Q.**   You believe?

25   **A.**   Are you implying if we would sell it for twelve

1  seventy-five -- or twelve seventy-seven, rather, they could

2  sell it cheaper?

3  Q.   I'm not implying anything.  I'm saying that ITE determined

4  the price that they were going to quote to TACOM, isn't that

5  right?

6  A.   Yes.

7  Q.   Now, after your first meeting with the FBI, at some point

8  shortly thereafter they asked you to work with them and record

9  your telephone conversations with Mr. Beker and Mr. Prilik; is

10 that correct?

11 A.   Yes.

12 Q.   And they provided you with the tape recorder?

13 A.   Yes.

14 Q.   They provided you with tapes, cassette tapes?

15 A.   Yes.

16 Q.   And they provided you with instructions as to how to go

17 about taping your calls and how you're supposed to conduct

18 yourself in those calls, is that right?

19 A.   Yes.

20 Q.   And who provided you with those instructions?

21 A.   Greg Haynie.

22 Q.   Anyone else?

23 A.   I don't recall at this point, no.

24 Q.   And what did he tell you to do?

25 A.   In regards to what?

1   Q.   How to conduct yourself in the calls?

2   A.   Well, in the beginning, in general, was not to offer

3   anything and -- but be open to any offers.

4   Q.   Did he give you any additional directions as to how you

5   should act in those calls?

6   A.   In essence, it was pretty much just to follow the

7   conversation and be open to what will be offered.

8   Q.   But at some point the FBI asked you to see if you could

9   get a payment out of Mr. Beker, isn't that right?

10  A.   Yes, that's true.

11  Q.   Was it Agent Haynie who suggested that you ask for a

12  payment?

13  A.   Yes.

14  Q.   Agent Haynie suggested that you ask for $50,000?

15  A.   Yes, I believe so.

16  Q.   Did he tell you why $50,000 was an important number?

17  A.   No.

18  Q.   Did he tell you that that was the FBI's internal

19  guidelines for when they would accept a case or not?

20          MS. HAMILTON:  Your Honor, I have to object.

21  A.   Never.

22          MS. HAMILTON:  The witness will have no way of

23  knowing this information.

24          THE COURT:  Well, the question was whether he was

25  told that.

1              You may answer the question.  I think your answer to

2    that was "no."

3              **THE WITNESS:**  No.

4    **BY MR. HOWDEN**

5    **Q.**   Now, did Agent Haynie also ask you to record all of your

6    calls with the -- with Mr. Prilik and Mr. Beker?

7    **A.**   Yes.

8    **Q.**   And did you do that?

9    **A.**   Yes.

10   **Q.**   So in the relevant time period between August -- after

11   August 17th and October 4, which I believe you testified was

12   your last conversation with each gentleman, you recorded all of

13   your telephone conversations with them?

14   **A.**   Yes.

15   **Q.**   And that would cover all phones?

16   **A.**   Yes.

17   **Q.**   All right.  So there aren't some unrecorded calls on cell

18   phones or somebody else's phone between you and Mr. Prilik and

19   Mr. Beker?

20   **A.**   No.

21   **Q.**   And what, if anything, did Agent Haynie tell you about

22   collecting and saving other communications that you might have

23   with Mr. Beker and Mr. Prilik; emails, for example?

24   **A.**   That I would need to inform him if I would receive some

25   emails.

1   Q.   Okay.  Did he ask you to keep them, to give him copies?

2   A.   I think I had to print them out and give it to him.

3   Q.   When you say "had to," was that your decision or was that

4   something he asked you to do?

5   A.   He asked me to do.

6   Q.   Okay.  And did you do that?

7   A.   Yes.

8   Q.   Did you provide Agent Haynie with all of your written

9   communications of any sort between, say, August 17th and

10  October 4, 2005?

11  A.   Yes.

12  Q.   And, again, that would be all your communications between

13  Mr. Prilik and Mr. Beker?

14  A.   Yes.

15  Q.   Or anyone else at Newcon?

16  A.   I don't recall communicating with anyone else at Newcon.

17  Q.   Okay.  And as far as you know, did anyone else at ATN have

18  other telephone calls or other communications with anyone else

19  at Newcon during that same time period?

20  A.   Not to my knowledge, no.

21  Q.   So as far as you're aware, you turned over to the FBI all

22  the communications between anyone at ATN and anyone at Newcon

23  between August 17th, 2005 and October 4, 2005?

24  A.   Yes, to my best knowledge.

25  Q.   Why did you stop taking calls on October 4?

1   **A.**   Because I think at that point it was clear to Michael that

2   we're -- that ATN will perform on the remainder of Battalion

3   Set I.  I thought there was no more point of talking to them

4   about it.

5   **Q.**   Was it your understanding that in that last conversation

6   that we heard on October 4, Mr. Beker was walking away from

7   whatever arrangement he had with you and ATN?

8   **A.**   Yes.

9   **Q.**   And did you have any discussion with Agent Haynie or

10  anyone else from the FBI at that point on October 4 as to the

11  status of the investigation; that it was over, or words to that

12  effect?

13  **A.**   I believe so, yes.

14  **Q.**   Did anybody disagree with you as to that characterization?

15  **A.**   I don't recall right now exactly what was the parting with

16  FBI.

17  **Q.**   But at any rate, you didn't record any more calls?

18  **A.**   No.

19  **Q.**   And at some point you gave the tape recorder back to the

20  FBI?

21  **A.**   Yes.

22  **Q.**   Do you remember when that was?

23  **A.**   I think it was a lot later.  I don't recall when.

24  **Q.**   So you had the tape recorder for some period of time after

25  that, but there just weren't any other calls?

1    **A.**    That's right.

2    **Q.**    Now, as a matter of routine, during the course of making

3    these recordings, did you contact Agent Haynie after you --

4    after you recorded a call with either Mr. Prilik or Mr. Beker?

5    **A.**    Yes.

6    **Q.**    And why did you contact him?

7    **A.**    Because that's how I was instructed.

8    **Q.**    Okay.  To let him know when you had another call recorded?

9    **A.**    Yes.

10   **Q.**    And then he would come out to ATN?

11   **A.**    Yes.

12   **Q.**    Pick up the tape?

13   **A.**    Yes.

14   **Q.**    Talk to you about the call?

15   **A.**    Yes.

16   **Q.**    And Agent Haynie -- the calls, as we've heard, are

17   virtually entirely in Russian, right?

18   **A.**    For the most part, yes.

19   **Q.**    And was it your understanding that Agent Haynie spoke

20   Russian or not?

21   **A.**    No.  My understanding that he did not.

22   **Q.**    So in order for him to get a sense of what was said in

23   those calls, he had to talk to you?

24   **A.**    Yes.

25   **Q.**    And you described to him generally what was said in the

1  calls, is that correct?

2  **A.**    Yes.

3  **Q.**    And what did Agent Haynie do with the cassette tapes after

4  he took them from you?

5  **A.**    He would copy the information from --

6              **MS. HAMILTON:**  Objection, your Honor.  Speculation.

7  How would Mr. Rocklin know this information?

8              **THE COURT:**  Objection is sustained.

9  **BY MR. HOWDEN**

10  **Q.**    To your knowledge, what did Agent Haynie do with the

11  cassette tapes?

12  **A.**    While I was there present, usually he would copy the --

13  whatever I was writing on, post -- post-it notes, what the tape

14  number was and put down in the cassette the relevant time.  And

15  then usually he would also break out, there is a -- on the

16  tape, on the cassette tape there are two tabs that would not

17  allow anything to being recorded further.

18  **Q.**    And on the cassette itself, he would break those tabs out?

19  **A.**    Yes.

20  **Q.**    So that no one could record over the tape?

21  **A.**    Right.

22  **Q.**    Okay.  And then he took the tapes away?

23  **A.**    Yes.

24  **Q.**    Now, at some point in time did you have an opportunity to

25  review the taped conversations?

1   **A.**   Yes.

2   **Q.**   And when was the first time you reviewed the taped

3   conversations?

4   **A.**   The actual tape or digital copies of the tape?

5   **Q.**   The first time you reviewed any recording of the

6   conversations?

7   **A.**   I don't recall.  It was years ago.

8   **Q.**   Was it years after you finished recording the calls?

9   **A.**   Yes.

10  **Q.**   In fact, was the first time in a series of interviews that

11  you had again with Ms. Hamilton and Mr. Ward beginning on

12  December 12, 2007?

13  **A.**   Sounds right.

14  **Q.**   And again on December 18, 2007?

15  **A.**   Yes.

16  **Q.**   And then finally a third review on January 8th, 2008?

17  **A.**   Yes.

18  **Q.**   Now, at the time you reviewed those recordings, did the

19  government or anyone else provide you with a transcript of the

20  calls?

21  **A.**   Yes.

22  **Q.**   In English or Russian?

23  **A.**   I think at first they were in Russian and then in English.

24  **Q.**   So you spent parts of those three days reviewing the

25  recordings with the prosecutors?

1  A.    Yes.

2  Q.    And during the course of your review, you described to

3  them what was being said and what your interpretation was of

4  what was being said, is that correct?

5  A.    Yes.

6  Q.    And present for those interviews were -- who else besides

7  Ms. Hamilton and Mr. Ward?

8  A.    I don't recall right now.  I think it was someone else who

9  was taking maybe notes or something.

10 Q.    Again, on a computer, on a laptop?

11 A.    At that time, yes, I think.

12 Q.    And during the course of your review, at some point you

13 realized that there was a part of one of the conversations that

14 was missing, that wasn't recorded, isn't that right?

15 A.    Yes.

16 Q.    And do you remember which call it was?

17 A.    Call number?  Tape number five, the first call with

18 Michael Beker.

19 Q.    That was the long call, the one that went over an hour?

20 A.    Yes.

21 Q.    And when you realized that part of that conversation was

22 missing, you brought that to the attention of the prosecutors,

23 is that right?

24 A.    Yes.

25 Q.    And you explained to them how that gap occurred, isn't

1  that correct?

2  **A.**   I said that --

3  **Q.**   You explained to them how that gap occurred, isn't that

4  correct?

5  **A.**   No.  What I said, that I thought that's how it could

6  occur.

7  **Q.**   Okay.  The point is, you told them that the FBI had given

8  you 60-minute cassettes, isn't that right?

9  **A.**   Yes.

10  **Q.**   Thirty minutes per side?

11  **A.**   Maybe the -- my understanding at that time.  I did not

12  have the tape number five in my hands, and that was my

13  understanding, yes.

14  **Q.**   Okay.  Point is, that's what you told the prosecutors?

15  **A.**   Right.

16  **Q.**   And you told them that while you were talking to Mr.

17  Beker, the tape ran out?

18  **A.**   I said it could be that the tape ran out.

19  **Q.**   Could be.  And you didn't realize it at first, right?

20  That's what you told the prosecutors, you didn't realize the

21  tape had run out?

22  **A.**   I said that it could be that the tape could ran out, but

23  in reality it was fully taped.

24  **Q.**   Okay.  But the point is at the time you added more detail

25  when you described what had happened to the prosecutors on

ROCKLIN - CROSS EXAMINATION / HOWDEN

1  those dates.  You said you remembered that the tape recorder

2  had a counter on it.  Do you remember that?

3  **A.**    Yes.

4  **Q.**    And that at some point you realized that the counter had

5  stopped counting?

6  **A.**    The -- I was proposing one of the possibilities.  At that

7  time I had only -- was given a digital copy of the original

8  tape and that had a part missing, and I mentioned that that

9  could be a -- the possibility.

10 **Q.**    Well, you figured out what happened afterwards, but I'm

11 talking about what you told the prosecutors during the course

12 of those interviews.  You told them that at some point you

13 realized you had to switch the tape, isn't that right?

14 **A.**    I said that it could be that.  I recall that it -- in one

15 of the conversations that I realized which conversation was it.

16 I didn't remember.

17 **Q.**    Well, you said this to them in connection with the missing

18 portion of tape number five, isn't that right?

19 **A.**    It was over two years and -- after that conversation, and

20 I was saying that because I was surprised that part of the

21 conversation was missing.  But later on I reviewed the actual

22 tape five and it was taped in it's entirety, just like it was

23 played here.

24 **Q.**    I'm not asking about later on.  I'm asking what you told

25 the prosecutors on those days when you were reviewing the tape.

1        In fact, you went on.  You told them that you remembered

2   having to place Mr. Beker on hold to switch the tape, isn't

3   that right?

4   **A.**    Could be that I'm examining why that -- the reason why

5   there was a bridge.

6   **Q.**    Isn't that what you told the prosecutors back in December

7   of '05?

8   **A.**    Yes.

9   **Q.**    Excuse me, of '07.

10        And then at that point you flipped the cassette tape and

11   continued recording?

12   **A.**    That's what I proposed at the time.

13   **Q.**    Well, it's not what you proposed.  It's what you told the

14   prosecutors you remembered happening, isn't that right?

15   **A.**    The part of the conversation was missing.  It was -- I was

16   really surprised, and I was -- you know, telling them that I

17   think something like that happened at one point, but it was not

18   on that tape.  And actually I realized that some of the tapes

19   were actually 90 minutes and some of them were taped in slower

20   speed.  So all of the conversations were recorded in its

21   entirety.

22   **Q.**    I'm not arguing with you.  We know that all the

23   conversations were recorded.  We heard them all.  We heard all

24   of conversation number five.

25        What I'm asking you is what you told the prosecutors back

1  in December of '07.  And what you told them was the tape ran

2  out.  You didn't realize it.  You had to flip it, and that's

3  how the missing portion of the tape occurred?

4  **A.**   I said maybe that's what happened, yes.

5  **Q.**   You didn't tell them:  Gee, I don't know what happened?

6  **A.**   No, I did not.

7  **Q.**   You didn't tell them:  I forget what happened?

8  **A.**   No, I did not.

9  **Q.**   You told them --

10 **A.**   Well, I told them that I don't remember exactly what

11 happened, this could be something that happened.

12 **Q.**   Ah.  And point of fact, that's not what happened.

13 **A.**   No.

14          **MR. HOWDEN:**  Your Honor, may I approach the witness?

15          **THE COURT:**  Yes, you may.  And you don't need to

16 repeat the question.

17          **MR. HOWDEN:**   Thank you, your Honor.

18 **BY MR. HOWDEN**

19 **Q.**   Mr. Rocklin, I'm showing as you Exhibit 105, which you

20 already testified is the original cassette recording of your

21 conversation on August 30th.  I'm going to ask you to take a

22 look at it as soon as I take a look at it.

23          (Brief pause.)

24 **Q.**   Take a look at it and let me know when you have had a

25 chance to examine it.

ROCKLIN - CROSS EXAMINATION / HOWDEN

```
 1                    (Whereupon, cassette tape was tendered
 2                    to the witness.)
 3   A.   Yes.
 4   Q.   That's the original tape that you used to record your
 5   call, call number five with Michael Beker on August 30th?
 6   A.   Yes.
 7   Q.   And, in fact, it's a 90-minute cassette?
 8   A.   Yes.
 9   Q.   Forty-five minutes per side?
10   A.   Yes.
11   Q.   And the notation on the tape indicates that it was
12   recorded at slow speed?
13   A.   Yes.
14   Q.   So that the entire hour and six minute call could be
15   recorded on one side?
16   A.   Yes.
17   Q.   There was no need to flip the tape in order to record the
18   entire conversation?
19   A.   No.
20   Q.   And, in fact, the entire conversation is on there?
21   A.   Yes.
22   Q.   Okay.  Now, when did you first listen to a recording of
23   the entire conversation?
24   A.   It was much later on, I think.
25   Q.   Just this last year, wasn't it?
```

1  **A.**   Yes.

2  **Q.**   July?

3  **A.**   I think it could be July, yes.

4  **Q.**   So almost five years after the first, after the tape was

5  recorded, you listened to the entire recording for the first

6  time?

7  **A.**   Yes.

8  **Q.**   Did the prosecutors explain to you where they had found

9  the missing 30 minutes?

10  **A.**   Yes.

11  **Q.**   Did they tell you my client, Mr. Beker, is the one who

12  found it in reviewing the evidence?

13  **A.**   Yes.

14  **Q.**   And brought it to their attention?

15  **A.**   Yes.

16  **Q.**   Let me recover that tape from you.

17          (Whereupon cassette tape was returned

18           to counsel.)

19  **Q.**   Now, I think it was yesterday you testified about Exhibit

20  51.  That was the email sent to you from Mr. Beker that had two

21  attachments to it.  Do you recall that?

22  **A.**   Not yesterday, but I did testify to that.

23  **Q.**   Sorry.  Yes.  You're right.  It wasn't yesterday.  Was

24  that Friday?

25  **A.**   I think so.

 1  Q.   And you testified that Exhibit 51, again, was an email

 2  that was sent to you by Mr. Beker, is that right?

 3  A.   Do you have the exhibits there?

 4  Q.   Sure.  We could look at Exhibit 51.  Is there a copy of it

 5  there?  Should be on one of the tabs.  Is it there?

 6  A.   Yes.

 7  Q.   Okay.  And Exhibit 51 was an email that Mr. Beker sent to

 8  you, is that correct?

 9  A.   Yes.

10  Q.   And it had two attachments to it?

11  A.   Yes.

12  Q.   One was his proposed agreement that, I believe, is also

13  included at page -- the second and third page of Exhibit 51, is

14  that correct?

15  A.   Yes.

16  Q.   And the other attachment was a draft of a short letter, is

17  that correct?

18  A.   Yes.

19  Q.   It's also included in Exhibit 51.

20       That one page, that short letter, the second attachment

21  has a designation FBI-043 at the bottom of it, is that correct?

22  A.   Yes.

23  Q.   And I believe your testimony -- and again, correct me if

24  I'm wrong -- was essentially this was a proposed draft of a

25  letter that you understood was supposed to come from Russian

1  customs, is that correct?

2  **A.**   That's my understanding.

3  **Q.**   For the sake of convenience, I'm going to refer to it as

4  the customs letter, is that all right?

5  **A.**   Okay.

6  **Q.**   Now, I want to talk about the customs letter for a minute.

7  Again, that proposed letter was supposed to be, as you

8  understood it, a letter from Russian customs?

9  **A.**   Yes.

10  **Q.**   To whom?

11  **A.**   Well, that would be a letter from -- to ATN.

12  **Q.**   I see.  And what did you understand Michael was proposing

13  that you do with this draft of the customs letter?

14  **A.**   To use such letter to limit ATN's liability to ITE.

15  **Q.**   And how did you understand that letter would limit ATN's

16  liability to ITE?

17  **A.**   My understanding was that between -- in the subcontract

18  between ATN and ITE we had a force majeure statement which

19  could make ATN not liable if they would not deliver for the

20  reasons beyond ATN control.

21  **Q.**   Well --

22  **A.**   For example, act of government or act of customs.

23  **Q.**   But why didn't you just draft such a letter?

24  **A.**   Because Michael proposed to draft such a letter in our

25  conversation.

1   Q.   And was it your understanding that somehow he intended to

2   get someone at Russian customs to actually issue the letter?

3   A.   Yes.

4   Q.   And why was that significant to you?

5   A.   He proposed such letter.  It was something that he said he

6   could possibly do, so I was going along.

7   Q.   Okay.  And you brought it to the attention of the FBI when

8   you received it?

9   A.   Yes.

10  Q.   And at least in your mind did Michael's proposed letter,

11  the customs letter, reflect his influence with things going on

12  in Russia?

13  A.   Possibly.

14  Q.   Possibly, okay.

15       Now, when you received the email from Mr. Beker that had

16  these two attachments, what did you do?

17  A.   I printed them out and give the copies to FBI.

18  Q.   Okay.  By "them," you mean the email and the two

19  attachments?

20  A.   Yes.

21  Q.   Did you show the email or the attachments to anybody else

22  at ATN?

23  A.   Yes.

24  Q.   To whom?

25  A.   I think I showed this to James.

ROCKLIN - CROSS EXAMINATION / HOWDEN

```
 1   Q.   James Munn?

 2   A.   Yes.

 3   Q.   Did you forward the email with the attachments to him

 4   electronically?

 5   A.   I don't think I did.  I don't recall right now.

 6   Q.   You don't recall if you just showed him hard copies or

 7   showed him electronic copies of the documents?

 8   A.   I don't recall.

 9   Q.   After you printed both documents -- well, the email and

10   the two attachments -- did you save the email and the

11   attachments?

12   A.   I believe I did.

13   Q.   Did you save it just in an email archive or as a PDF, some

14   other form of document?

15   A.   I don't recall right now.

16   Q.   Do you know if you sent it to anybody else?

17   A.   I don't recall right now.

18   Q.   And after you printed out the hard copies of the email and

19   the two attachments, what did you do with the hard copies?

20   A.   I give the copies to FBI.

21   Q.   Did you keep any copies for yourself?

22   A.   Possibly.

23   Q.   When did you give -- and, again, we're talking about Agent

24   Haynie with the FBI?

25   A.   Yes.
```

1  Q.   When did you give Agent Haynie the hard copies of these

2  documents?

3  A.   At our meeting when he picked up the tape.

4  Q.   By the way, did you send copies of your communications

5  with Newcon to your attorneys?

6  A.   I don't recall right now.

7  Q.   You kept them up to speed with what was going on in the

8  investigation, is that right?

9  A.   Yes.

10 Q.   Did you send them hard copies or electronic copies of any

11 of the documents that you received from Newcon?

12 A.   I don't recall.

13 Q.   And you don't recall whether or not you sent them

14 electronic copies of the customs letter in particular, do you?

15 A.   I don't recall right now.

16 Q.   So when did Agent Haynie come out to ATN to pick up the

17 copy of the cassette and to get copies of the email and the

18 attachments?

19 A.   I don't recall the exact date.  It was obviously after the

20 conversation and the email.

21 Q.   And when you gave the cassette and the email and the

22 attachments to Agent Haynie, what did you to tell him about the

23 documents?

24 A.   I think documents were discussed in the previous

25 conversation, and I told him that that's the set of documents

1   that Michael sent.

2   **Q.**   And did Agent Haynie ask to see the email in electronic

3   format?

4   **A.**   I don't recall right now.

5   **Q.**   Did you ever send him a copy of the email and the

6   attachments electronically?

7   **A.**   I don't remember.  I don't think I ever have his email.

8   **Q.**   Did the FBI at any point during this investigation ask you

9   or anyone else at ATN to preserve electronic documents that

10  might be relevant to the case; in particular, preserve

11  electronic copies of the documents between people at Newcon and

12  you?

13  **A.**   I don't recall them asking us that.

14  **Q.**   And did anyone from the FBI or any law enforcement agency

15  ever come out and recover any electronic data from ATN?

16  **A.**   I don't recall that.

17  **Q.**   Now, in keeping with your sort of standard operating

18  procedure, Agent Haynie debriefed you about your call with Mr.

19  Beker?

20  **A.**   Yes.

21  **Q.**   And did he also debrief you about the email?

22  **A.**   Yes.

23  **Q.**   And the two attachments?

24  **A.**   Yes.

25  **Q.**   What did you tell him about the customs letter?

1   **A.**   I don't recall right now all of the details, but to me it

2   was just the letter that we discussed with Michael prior in the

3   conversations.

4   **Q.**   Did you express to the agent why you thought it was

5   significant?

6   **A.**   Possibly.

7   **Q.**   Well, what's your best recollection?

8   **A.**   I don't recall the conversation at this moment.

9                **MR. HOWDEN:**   If I could have one moment?

10               (Discussion held off the record

11                amongst defense counsel.)

12   **BY MR. HOWDEN**

13   **Q.**   Well, let's take a look at Exhibit 51.

14               **MR. HOWDEN:**   Can we have that up?

15               (Document displayed)

16   **BY MR. HOWDEN**

17   **Q.**   What's on the screen now is page 1 of Exhibit 51, is that

18   correct?

19   **A.**   Yes.

20   **Q.**   And this is the email --

21               **JUROR WATSON:**   Excuse me.  We have "Video Input" and

22   "Out of Range" again, so it's blocking part of our view.

23               **MR. HOWDEN:**   Okay.  Does it need to warm up?

24               **THE CLERK:**   That should clear off.

25               **MR. HOWDEN:**   We'll wait for a minute until that

1   clears off.  Let us know, okay?

2           (Brief pause.)

3           **MR. HOWDEN:**  Has it cleared up?

4           (Jurors responding negatively.)

5           **MR. HOWDEN:**  So much for technology.

6           **JUROR WATSON:**  Gone.  Thank you.

7   **BY MR. HOWDEN**

8   **Q.**   Mr. Rocklin, directing your attention to the first page of

9   Exhibit 51, the top line says it's from Mike at Newcon Optik,

10  correct?

11  **A.**   Yes.

12  **Q.**   And it's sent on September 2nd, 2005?

13  **A.**   Yes.

14  **Q.**   To you?

15  **A.**   Yes.

16  **Q.**   No one else is copied on it?

17  **A.**   No.

18  **Q.**   So you were the only one at ATN who received the email,

19  isn't that right?

20  **A.**   Yes.

21  **Q.**   At least directly from Mr. Beker?

22  **A.**   Yes.

23  **Q.**   And on the subject line it references "Agreement

24  ATN-Newcon Optik," correct?

25  **A.**   Yes.

1  Q.   It doesn't mention the customs letter?

2  A.   No.

3  Q.   And on the attachments line, it shows "Agreement

4  ATN-Newcon Optik.doc," do you see that?

5  A.   Yes.

6  Q.   It only shows one attachment, isn't that correct?

7  A.   Yes.

8  Q.   And that attachment has been labeled "Agreement ATN-Newcon

9  Optik"?

10 A.   Yes.

11 Q.   There is no reference to the customs letter, isn't that

12 correct?

13 A.   Yes.

14 Q.   And then in the body of the email it says in the first

15 sentence:  "As discussed, see attached a draft of the

16 agreement."  Do you see that?

17 A.   Yes.

18 Q.   Makes no reference to the customs letter, isn't that

19 correct?

20 A.   Doesn't make any reference.

21 Q.   By the way, on the attachment line where it says "Newcon

22 Optik.doc," does that tell you what kind of file that is?

23 A.   Word document.

24 Q.   It's a Word document.

25      And that -- is it your understanding that that attachment

1    line is something that's included automatically by the computer

2    system?

3    **A.**    Yes.

4    **Q.**    And the system on your end at ATN, were you using Outlook?

5    **A.**    Yes.

6    **Q.**    And then before the signature line there is a last line

7    that says:  "Please advise."  Do you see that?

8    **A.**    Yes.

9    **Q.**    We'll come back to that in a moment.

10        Now, I would like to turn to the two attachments.  Let's

11   go first to the agreement, the first attachment.  And the

12   agreement is titled "Agreement," right?

13   **A.**    Yes.

14   **Q.**    And that matches the subject line in the email?

15   **A.**    Yes.

16   **Q.**    And it matches the description of the attachment to the

17   email, isn't that right?

18   **A.**    Yes.

19   **Q.**    And in the --

20             **MR. HOWDEN:**  You know what?  Let's -- can we get both

21   attachments upside by side?  At least the first page?

22             (Documents displayed)

23             **MR. HOWDEN:**  Can we blow them up, the top portion

24   just a little bit?  That would be good.

25

1   **BY MR. HOWDEN**

2   **Q.**   The two attachments have different fonts, isn't that

3   correct?

4   **A.**   Yes.

5   **Q.**   Different type size?

6   **A.**   Yes.  Actually, there are at least three font sizes there,

7   and font types.

8   **Q.**   In the first attachment?

9   **A.**   That's right.

10  **Q.**   And only one font size in the second attachment?

11  **A.**   Right.

12  **Q.**   And the address, American Technologies on the agreement

13  says "American Technologies Network, Trading as ATN," isn't

14  that right?

15  **A.**   Yes.

16  **Q.**   And the address of the American Technologies Network on

17  the customs letter doesn't include the "Trading as ATN,"

18  correct?

19  **A.**   No.

20  **Q.**   And the address on the agreement says, "20 South Linden

21  Avenue, Unit 1-B"?

22  **A.**   Yes.

23  **Q.**   And the address on the customs letter says "20 South

24  Linden Avenue, Suite 1-B"?

25  **A.**   Yes.

1    Q.    And the zip code on the agreement says "South San

2    Francisco 94080," isn't that correct?

3    A.    Yes.

4    Q.    And that, in fact, is ATN's zip code?

5    A.    In fact.

6    Q.    On the customs letter the zip code is 94121, isn't that

7    correct?

8    A.    Yes.

9    Q.    And that's not ATN's zip code, isn't that right?

10   A.    Yes, it's not.  No, it's not.

11   Q.    It's not a South San Francisco zip code?

12   A.    No.

13   Q.    It's a San Francisco zip code?

14   A.    That's right.

15   Q.    You lived in San Francisco in 2005?

16   A.    Yes.

17   Q.    The Richmond District?

18   A.    Yes.

19   Q.    That's your zip code, isn't it?

20   A.    Yes.

21   Q.    And in the body of the customs letter it says in the first

22   line:  "This letter is to advice that our office is currently

23   evaluating..."  Do you see that?

24   A.    Yes.

25   Q.    And that's different from the way "advice" is spelled,

1  "advise" is spelled in the email, is that right?

2  **A.**    Yes.

3  **Q.**    And there are other differences as well.  There's

4  telephone numbers and fax numbers are included in the

5  agreement?

6  **A.**    Yes.

7  **Q.**    Not included in the customs letter?

8  **A.**    Right.

9  **Q.**    Signature lines are very different?

10  **A.**    Yes.  The first letter appears to be what's copy and paste

11  off my signature.

12  **Q.**    I'm sorry.  Can you repeat that?

13  **A.**    Yes.  If you review the agreement, the FBI forwarded, the

14  below between the ATN address --

15  **Q.**    On the agreement?

16  **A.**    Yes.  Looks like this is copied off my email signature.

17  **Q.**    Okay.  And that's not true of the customs letter?

18  **A.**    Doesn't look like that.

19  **Q.**    Now, looking at the customs letter once again, it says in

20  the middle of that paragraph, that -- it mentions a contract

21  number, Contract N840611, is that correct?

22  **A.**    Yes.

23  **Q.**    And that was your contract number, the contract number

24  between ATN and NPZ, is that right?

25  **A.**    That could be.  I don't recall right now the contract

ROCKLIN - CROSS EXAMINATION / HOWDEN

1   number.

2   **Q.**   Okay.  Point is, that when you do business in Russia,

3   people like to have contract numbers?

4   **A.**   That's true.

5   **Q.**   And there was a contract number for your contract with

6   NPZ?

7   **A.**   Right.

8   **Q.**   You never gave Mr. Beker that contract number, did you?

9   **A.**   No, I did not.

10  **Q.**   So Mr. Beker never attached this customs letter to his

11  email to you, isn't that right?

12  **A.**   That's not right.  I recall right now that it was

13  attached.  And although I did not give Mr. Beker contract

14  number, he had a lot of different information that I did not

15  give to him in the past.

16  **Q.**   Including the NPZ contract number?

17  **A.**   Well, he had a ten fifty exact cost, that what NPZ was

18  buying it for --

19  **Q.**   That's not what my question was.  That's not what my

20  question was.

21      You're saying that he learned on his own what your

22  contract number was?

23  **A.**   Yes.

24  **Q.**   Were you surprised to see that your contract number was

25  included in the draft that he sent to you?

1  **A.**    Not after he knew everything else.

2  **Q.**    Did you bring it to Agent Haynie's attention when you saw

3  that that level of detail was included in this letter?

4  **A.**    I don't recall.

5  **Q.**    You never said a word to him about it, did you?

6  **A.**    I don't recall.

7  **Q.**    The fact of the matter is that you drafted the customs

8  letter, isn't that correct?

9  **A.**    No, I did not.

10 **Q.**    And you gave it to Agent Haynie and represented that it

11 came from Mr. Beker?

12 **A.**    No, I did not.

13 **Q.**    Mr. Rocklin, did you know that after I was retained for

14 this case, one of the first things I did was to have the entire

15 Newcon computer system forensically imaged?

16 **A.**    I did not know that.

17 **Q.**    Would it surprise you to know that that computer system

18 has been analyzed and this letter in particular has been

19 analyzed?

20 **A.**    I'm not surprised.

21 **Q.**    Would you be surprised to letter learn that there was only

22 one attachment to this particular email?

23 **A.**    I'm surprised to find out that.

24 **Q.**    And, in fact, the only attachment ever to that particular

25 email was the agreement?

1    **A.**    This is not the fact.

2    **Q.**    Okay.  In point of fact, you manufactured this evidence?

3    **A.**    No, I did not.

4    **Q.**    You gave it to the FBI?

5    **A.**    Well, maybe I gave it to FBI, but I did not manufacture

6    that.

7    **Q.**    And when you gave it to the FBI, you told them that you

8    got it from Michael Beker?

9    **A.**    Yes.

10   **Q.**    And that wasn't true?

11   **A.**    It was true.

12   **Q.**    And when you talked to the prosecutors about it, again,

13   you told them that the customs letter came from Michael Beker?

14   **A.**    Yes.  Because it did.

15   **Q.**    And you insist to this jury here and now that this email

16   was -- or that this attachment, the customs letter was attached

17   to the email that Michael Beker sent to you?

18   **A.**    Yes.

19           **MR. HOWDEN:**  Your Honor, would this be a convenient

20   place to take a break?

21           **THE COURT:**  Well, I think at some point we probably

22   do need to take a full-fledged break, unlike what we did a

23   little while ago.  So if this is a good spot.

24           **MR. HOWDEN:**  It would be.

25           **THE COURT:**  Then, ladies and gentlemen, please follow

1    the instructions about not discussing the case amongst yourself

2    or anyone else.  We'll see you at the close of the recess and

3    we'll take 15 minutes.

4            And you may step down, but do not speak with anyone

5    who may be witnesses.

6            **MR. HOWDEN:**  And, your Honor, we would ask that the

7    witness be directed not to speak to prosecutors while he is on

8    examination.

9            **MS. HAMILTON:**  Agreed.

10           **THE COURT:**  Okay.

11           (Jury exits courtroom at 11:12 a.m.)

12           **THE COURT:**  Wait one moment, Mr. Rocklin.

13           You are not to have any conversations with the

14   prosecutors or agents, other persons who are acting under the

15   direction or having anything to do with the prosecution, okay?

16           **THE WITNESS:**  Okay.

17           **MS. HAMILTON:**  During cross-examination.

18           **THE COURT:**  And we'll see you --

19           **MS. HAMILTON:**  I'm sorry.  During the course of the

20   cross-examination.

21           **THE COURT:**  Yes.  Right, right, right. That's what

22   I'm talking about.  I assume this is going to go on for awhile.

23   We have Mr. Osterhoudt, who will go on longer, right?

24           What's your best estimate of time -- you may step

25   down Mr. Rocklin.

```
 1              (Witness steps down.)

 2              THE COURT:  What's your best estimate of time on your

 3   cross?  I know you just started.

 4              MR. HOWDEN:  I think there is a good chance I will

 5   use up most of the rest of the day.  It may go quicker than

 6   that.  I'll just have to see.

 7              MR. OSTERHOUDT:  I won't be very lengthy after that's

 8   over with.  We won't recover.

 9              THE COURT:  Okay, okay.  And I understand -- is it

10   Mr. Biro?

11              MR. HOWDEN:  Yes.

12              THE COURT:  That he is -- this is off the record.

13              (Discussion held off the record.)

14              (Whereupon there was a recess in the proceedings

15               from 11:13 a.m. until 11:36 a.m.)

16   BY MR. HOWDEN

17   Q.   Mr. Rocklin, what model of night vision goggle were you

18   supplying to TACOM through your contract with ITE?

19   A.   ATN NVG-72I.

20   Q.   The "I" stands for international?

21   A.   That's right.

22   Q.   Designating overseas sales?

23   A.   Yes.

24   Q.   You mentioned in your earlier testimony that ATN also sold

25   night vision equipment over the internet?  You advertised on
```

1    the internet your various products?

2    **A.**    We had a website, yes.

3    **Q.**    And did you advertise the NVG-72I on your website?

4    **A.**    Yes.

5    **Q.**    Back in 2004 and 2005 you advertised it, didn't you?

6    **A.**    Possibly, yes.

7    **Q.**    And your web advertisement, that was an important part of

8    ATN's business model at the time, wasn't it?

9    **A.**    Yes.

10   **Q.**    You wanted to convey information to your customers about

11   your products, get them out there in the public eye?

12   **A.**    Yes.

13   **Q.**    And you advertised your full range of night vision

14   equipment on the website, isn't that correct?

15   **A.**    Yes.

16   **Q.**    And the model NVG-72I that you were advertising on the web

17   in 2005, that's the same NVG-72I that you were telling to ITE?

18   **A.**    Model changed throughout the years and was modified but it

19   was the model that was initially offered.

20   **Q.**    I'm not sure I understand that.  The model of NVG-72I that

21   you were advertising on the web in 2005, at the time that you

22   entered into the subcontract with ITE was that the same model

23   NVG-72I1?

24   **A.**    Define "the same?

25   **Q.**    Same specification, same parts, same essential function?

ROCKLIN - CROSS EXAMINATION / HOWDEN

1   **A.**    Same essential functions, but some of the specifications,

2   the manufacture have the right to change.

3   **Q.**    May have changed?

4   **A.**    Yes.

5   **Q.**    During 2005?

6   **A.**    Possibly.

7   **Q.**    Possibly?

8   **A.**    Yes.

9   **Q.**    Okay.  The contract with -- well, let's look at the

10  contract.  Do you have U.S. Exhibit 5 that folder -- in that

11  binder?  I'm not sure that you have it, but I want to make

12  sure.  Look on the tab, see if you have a number five there.

13          Do you have it?

14  **A.**    Yes.

15  **Q.**    Take a look at it.  Is Exhibit 5 your subcontract with ITE

16  that relates to the Bat Set II contract?

17  **A.**    Yes.

18  **Q.**    You signed that contract?

19  **A.**    Yes.

20  **Q.**    And Ramzi Abu-Taleb also signed it?

21  **A.**    Yes, he did.

22  **Q.**    And in that contract it lists the model number of the

23  goggles?

24  **A.**    Yes.

25  **Q.**    The specifications of the goggles?

1  **A.**   Yes.

2  **Q.**   Reflects the fact that it meets all the TACOM

3  specifications for the Bat Set II contract?

4  **A.**   Yes.

5  **Q.**   And it even includes your delivery schedule, isn't that

6  right?

7  **A.**   Yes.

8           **MR. HOWDEN:**  I move Exhibit 5 into evidence, your

9  Honor.

10          **MS. HAMILTON:**  No objection.

11          **THE COURT:**  Exhbit 5 is admitted.

12          (Trial Exhibit 5 received

13           in evidence)

14 **BY MR. HOWDEN**

15 **Q.**   Let's go to what's Bates numbered as ATN 0042, which is a

16 few pages into the contract.

17      And why don't we do this first?  If we could display the

18 cover page of the contract first?  Are we going to have to wait

19 for this to warm up again?

20          **THE COURT:**  I think we are going to have to wait for

21 Mr. Bowser.

22          (Brief pause.)

23          (Document displayed)

24 **BY MR. HOWDEN**

25 **Q.**   Looking at Exhibit 5, the first page, which is Bates

1  numbered ATN 0035, this is the contract, is that right?

2  **A.**    Subcontract, yes.

3  **Q.**    And the date on the contract is March 12, 2005?

4  **A.**    Yes.

5  **Q.**    That was practically a month after ITE won the prime

6  contract, isn't that correct?

7  **A.**    It was sometime after.  I'm not sure if that's a month.

8  **Q.**    Okay.  And then going to what's been Bates numbered ATN

9  0042, this shows the model number on some ATN literature.  It's

10 ATN NVG-2I, is that correct?

11 **A.**    Yes.

12 **Q.**    And the NVG-2I was a Gen II model night vision goggle, is

13 that correct?

14 **A.**    Yes.

15 **Q.**    And then looking at the next page, what's been labeled

16 ATN 0043, this shows ATN certain specifications of the goggles

17 that you were selling to ITE, is that correct?

18 **A.**    Yes.

19 **Q.**    And one of the measures is "Resolution"?  Do you see down

20 under the tube description, it says -- second item there is

21 "Resolution Range"?

22 **A.**    Yes.

23 **Q.**    And that's -- it's measured in terms of line pairs per

24 minimum, is that correct?

25 **A.**    Line pair per millimeter, actually.

1  Q.   Per millimeter, thank you.

2  A.   You're welcome.

3  Q.   So when we see "45 minimum - 51 typical," that means 45

4  line pairs per millimeter minimum, 51 line pairs per millimeter

5  typical, is that right?

6  A.   Yes.

7  Q.   And that's one measure of quality of the image intensifier

8  tube, is that right?

9  A.   Of performance actually.

10 Q.   Yeah, okay.  And two items down from that is "Signal to

11 Noise"?

12 A.   Yes.

13 Q.   And what's signal to noise?  Just briefly so the jury has

14 some idea of what's on here?

15 A.   That's another parameter on which -- performance of the

16 image intensifier tubes and, therefore, night vision system

17 being measured.  It's how much background noise you will get to

18 the initial signal.

19 Q.   Sort of the clarity of the image in some sense, or how

20 much interference there is in that signal?

21 A.   That's right.

22 Q.   And, again, here, it doesn't matter what the number

23 actually means, but it has a number value; in this case

24 16 minimum - 20 typical?

25 A.   Yes.

1   Q.   Okay.  And then if we go on in the contract to what's been

2   Bates numbered ATN 0045.

3        (Document displayed)

4   Q.   It's a little bit faint, but if we look in that middle

5   section next to number one, and we follow number one over

6   through the quantity and unit cost, you were -- you contracted

7   to provide 6,371 pairs of goggles, is that right?

8   A.   Yes.

9   Q.   And 1277 per pair is your unit price?  That's how much you

10  were selling the goggles per pair to ITE, correct?

11  A.   Yes.

12  Q.   And if we go to the next page, ATN 0046, on the first full

13  line at the top of that paragraph it says "Good Description,

14  individual night vision ATN NVG-2I."  And after that in parens

15  is, "FOM 750 to 1250."  Do you see that?

16  A.   Yes.

17  Q.   What's FOM?

18  A.   Figure of Merit, determined by if you multiply resolution

19  by signal to noise.

20  Q.   So if you multiply those two figures that we looked at

21  earlier, then you end up with what's called the FOM, or Figure

22  of Merit, is that correct?

23  A.   Yes.

24  Q.   And that's significant for this contract because that was

25  a specification in the contract?

1   **A.**   That's correct.

2   **Q.**   Each of the pairs of goggles was supposed to have a Figure

3   of Merit of between 750 and 1250, is that right?

4   **A.**   That's right.

5   **Q.**   And then below that description there is a delivery

6   schedule.  Do you see that?

7   **A.**   Yes.

8   **Q.**   And this was the delivery schedule you agreed to meet in

9   order to fulfill the contract?

10  **A.**   Yes.

11  **Q.**   It called for final delivery of all 6,371 pairs of goggles

12  by October 15, 2005, correct?

13  **A.**   Yes.

14  **Q.**   You didn't meet that deadline, did you?

15  **A.**   We were a couple months late.

16  **Q.**   A couple months late.  You didn't finish delivering the

17  first 6,371 goggles until sometime in January of 2006, is that

18  correct?

19  **A.**   Yes.

20  **Q.**   Now, at the time you entered into this contract, ATN was

21  advertising on the web the same goggles, the NVG-72I, isn't

22  that correct?

23  **A.**   Yes.

24  **Q.**   And except that the NVG-72I that you were advertising on

25  the web had different specifications than the one that you

1  offered to sell to ITE, isn't that correct?

2  **A.**    I don't recall what the specifications were that we

3  advertised on the internet at that time.

4  **Q.**    Okay.  In fact, the NVG-72I that you were advertising on

5  the web in 2005 had substantially lower quality numbers than

6  that which you were selling to ITE, isn't that correct?

7  **A.**    I don't recall anything like that.

8          **MR. HOWDEN:**  Okay.  I would ask that the clerk to

9  mark for me what would be marked as next -- defendant's next in

10 evidence.  It's not on the list.

11         **THE CLERK:**  472.

12         **MR. HOWDEN:**  472.

13         (Trial Exhibit  472 marked

14          for identification).

15         **MR. HOWDEN:**  I can show him another copy it doesn't

16 have a mark on it.  It doesn't have a stamp on it.  I can

17 provide your Honor with another copy.

18         **THE COURT:**  That's fine.  Go ahead.

19         **MS. HAMILTON:**  Your Honor, we object as hearsay, if

20 this is regarding quality.  It has nothing to do -- it's

21 irrelevant.  It has nothing to do with the quality of the

22 goggles that are being supplied to ITE and it's, apparently,

23 being offered for the truth of the matter asserted.

24         **MR. HOWDEN:**  Well, what it is is a prior inconsistent

25 statement.

1      **THE COURT:**  Is it being offered into evidence?

2      **MR. HOWDEN:**  Not yet.  We'll see if it is.

3      **THE COURT:**  Okay.  Tony, may I have a copy?

4      (Whereupon, document was tendered

5      to the Court.)

6  **BY MR. HOWDEN**

7  **Q.**  I'm showing you what's been marked for identification as

8  Defendants' No. 472.  Take a look at it and let me know when

9  you have had a chance to look it over.

10     (Whereupon, document was tendered

11     to the witness.)

12     **THE COURT:**  And the objection is overruled at this

13  point and we'll wait and see where this goes.

14     **MR. HOWDEN:**  Very good, your Honor.

15     (Brief pause.)

16  **BY MR. HOWDEN**

17  **Q.**  Have you had a chance to look it over, Mr. Rocklin?

18  **A.**  Yes.

19  **Q.**  Let me ask you again:  Isn't this a copy of what ATN was

20  advertising on its website back in 2005 for the NVG-72I?

21  **A.**  Could be.

22  **Q.**  Could be.

23  **A.**  Yes, could be.

24  **Q.**  And the specifications listed in what you were advertising

25  on the web for this same model are substantially lower?  The

1   resolution and signal to noise numbers are substantially lower

2   than that that's listed in your contract with ITE, isn't that

3   correct?

4   **A.**    Which specifications?

5   **Q.**    Resolution and signal to noise.

6   **A.**    Right.  In order to meet a requirement for Battalion Set

7   II, the minimum of 750 FOM had to be met, and we agreed that we

8   will be selecting only image tubes of that minimum quantity.

9   **Q.**    So if I understand you, the NVG-72I that you were -- that

10  model that you were selling to ITE under the contract was

11  different from the NVG-72I that you were selling to the general

12  public, is that right?

13  **A.**    It would go to more specific selection process against one

14  very important parameter, yes.

15  **Q.**    Okay.  And was that fact reflected anywhere in your

16  subcontract with ITE?

17  **A.**    Yes.  The specifications were different.

18  **Q.**    The specifications.  But the fact that the model that ITE

19  would be getting would be different from the one that you were

20  advertising to the rest of the world?

21  **A.**    What we were submitting in the subcontract was to meet the

22  contract specifications.

23  **Q.**    It just happened to have the same name and model number as

24  these goggles that you were advertising on the web?

25  **A.**    Yes.  Because this could be a broader -- this lists a

1 minimum.  The image tube could be used of the higher grade to

2 meet the specifications of Battalion Set II.

3 Q.   So you changed a key component of the goggles that you

4 were selling to ITE as compared to the ones you were

5 advertising on the web?

6 A.   Yes.  We had to meet.

7 Q.   And was that fact reflected in your subcontract with ITE?

8 A.   The fact that the unit will meet the requirement, yes.

9 It's throughout the contract.

10 Q.   Okay.  So the NVG-72I -- and I don't want to belabor this.

11 The NVG-72I that you were selling to ITE was different than the

12 NVG-72I that you were advertising at the same time to the

13 general public, is that right?

14 A.   Yes.

15        MR. HOWDEN:  Well, your Honor, I think I would like

16 to offer it into evidence at this point.

17        THE COURT:  Well, what is the relevance?

18        MR. HOWDEN:  Well?

19        THE COURT:  Objection?  Is there an objection.

20        MS. HAMILTON:  Yes, your Honor.  There is an

21 objection.

22        THE COURT:  The Court's objection is sustained.

23 Sustained.

24 BY MR. HOWDEN

25 Q.   Now, as it turns out, Newcon was complaining to TACOM

1  during the course of 2005 about ATN's performance or what they

2  perceived as lack of performance on the Bat Set II contract,

3  isn't that right?

4  **A.**   As it turns out.

5  **Q.**   And, in fact, one of the things that Newcon was

6  complaining about to TACOM was that ATN couldn't meet these

7  specification standards that were included in the contract?

8  **A.**   Are you asking me whether I know?

9  **Q.**   Yeah, yeah.

10  **A.**   I think that's one of the things that Michael confirmed.

11  **Q.**   And, in particular, Newcon complained that ATN's product

12  couldn't meet that FOM standard, isn't that right?

13  **A.**   Yes.

14  **Q.**   And as it turns out, as you found out in June of 2005,

15  they were correct?

16       **MS. HAMILTON:**   Objection.   Objection, your Honor.

17  This is irrelevant.

18       **THE COURT:**   Objection is sustained.

19       But, also, I -- I don't know why I didn't hear

20  objection before, because what is the basis for his knowledge

21  of what Newcon, you know, knew?

22       **MR. HOWDEN:**   Well, I can establish that as well, your

23  Honor.

24       **THE COURT:**   In any event, the objection to his last

25  question is the one that was made, and the objection is

1    sustained.

2            **MR. HOWDEN:**  At some point can I make a proffer to

3    the Court?

4            **THE COURT:**  At some point.

5            **MR. HOWDEN:**  Okay.

6            **THE COURT:**  At the end of the day.

7    **BY MR. HOWDEN**

8    **Q.**    Now, in 2005 ATN was also the subject of an investigation

9    by the immigration and customs service, isn't that correct?

10   **A.**    I'm not sure of when the investigation started.  In 2005 I

11   wasn't aware of it.

12   **Q.**    At some point in time you came to learn that Immigration

13   and Customs Enforcement was investigating ATN for possible

14   export violations?

15   **A.**    Yes.

16   **Q.**    That is, night vision is a highly regulated product and

17   there are a lot of export restrictions on that product

18   depending -- especially depending on the quality of the goods,

19   is that correct?

20   **A.**    Yes.

21   **Q.**    And oftentimes, in order to export certain kinds of

22   night-vision equipment, you have to get export permits,

23   correct?

24   **A.**    Yes.

25   **Q.**    And when did you learn that ATN was the subject of an ICE

ROCKLIN - CROSS EXAMINATION / HOWDEN

1 investigation; "ICE" being the acronym for "Immigration and

2 Customs Enforcement"?

3 **A.** Did you ask me when?

4 **Q.** When.

5 **A.** I think it was April 2006.

6 **Q.** And how did you come to be aware of the investigation?

7 **A.** ICE made a visit to our facility in South San Francisco.

8 **Q.** It wasn't just a visit.  They served a search warrant on

9 your business?

10 **A.** Yes, they did.

11 **Q.** Were you present when the search warrant was executed?

12 **A.** No.

13 **Q.** How did you learn about the search?

14 **A.** Someone called.

15 **Q.** Did you go down to the business after you learned about

16 it?

17 **A.** No, I did not.

18 **Q.** So you weren't there at all while the agents were still

19 present?

20 **A.** No, not on that day.

21 **Q.** Not on that day?

22 **A.** No.

23 **Q.** At some point in time, did you get a copy of the search

24 warrant?

25 **A.** I don't recall reviewing it, but it was my understanding

1  that agents had it.

2  **Q.**   Okay.  And at some point after the search, did you come to

3  understand the -- the subject or nature of the investigation?

4  **A.**   Yes.

5  **Q.**   And part of that, at least, was involved in potential

6  export violations.  Is that correct?

7  **A.**   Yes.

8  **Q.**   Specifically, exporting certain night-vision equipment

9  without first obtaining an export license, correct?

10  **A.**   Correct.

11  **Q.**   Now, once you had learned about the investigation, you

12  went and talked to your lawyers?

13  **A.**   That's right.

14  **Q.**   And these are the same lawyers who had, in August of 2005,

15  gone and talked to the FBI about your telephone call with

16  Mr. Beker and Mr. Prilik.  Is that right?

17  **A.**   Yes.

18  **Q.**   And at the time you talked to the lawyers about the ICE

19  investigation, they were well aware that you had been

20  coöperating with the federal prosecutors in recording the

21  telephone calls with Newcon.  Is that right?

22  **A.**   Yes.

23  **Q.**   You kept them informed about that.  Is that correct?

24  **A.**   Yes.

25  **Q.**   Now, eventually, your lawyers went and talked to the

1  federal prosecutors here in San Francisco, who are in charge of

2  the ICE investigation.  Is that right?

3  **A.**   Yes.

4  **Q.**   And the purpose of -- of their approaching the prosecutors

5  here was to try and convince them not to bring any charges

6  against ATN, right?

7  **A.**   Yes.

8  **Q.**   And as part of their pitch to the prosecutors here, they

9  were going to bring to their attention the fact that you had

10 been coöperating with an ongoing federal investigation,

11 correct?

12 **A.**   No.

13 **Q.**   No?

14 **A.**   No.

15 **Q.**   You -- they didn't tell you that it would be important

16 consideration to federal prosecutors in San Francisco that, in

17 fact, the CEO of ATN was coöperating with an ongoing undercover

18 investigation?

19 **A.**   I was the president; not the CEO.  And they never told me.

20 **Q.**   Okay?

21 **A.**   And, as a matter of fact, no charges were ever filed.  We

22 were told that our export-compliance program, after years of

23 review -- that is true -- and hundreds of thousands of dollars

24 in legal bills -- we were told that it's in the top one-tenth

25 of a percent.  If you notice, Karen McGee is in

 1  Washington, D.C.  We hired our lawyers for -- to have the best

 2  export-compliance program possible, and that's what happened.

 3      After their review by ICE, they told us that the program

 4  that we have implemented was in top one-tenth of a percent.

 5          **MR. OSTERHOUDT:**  Your Honor, if that's offered for

 6  its proof, I certainly object to it, and ask that it be

 7  stricken.

 8          **THE COURT:**  For what purpose is it offered, or should

 9  it be stricken?

10          **MR. HOWDEN:**  I think it should be stricken.  It was

11  narrative, among other things.

12          **THE COURT:**  Well, you didn't pipe up while he was

13  talking, so I'm not going to strike the answer; but as to what

14  he was told, which is the last part of it, that is stricken.

15  **BY MR. HOWDEN**

16  Q.  Who?  Who told you?  Who did you talk to who explained?

17          **THE COURT:**  That which has been stricken?  Who told

18  him that which has been stricken?  Is that what you're asking?

19          **MR. HOWDEN:**  Well, I'm trying to figure out who he

20  talked to; who informed him.

21          **THE COURT:**  You've got to ask a better question than

22  that, because I just struck that part of the preceding answer.

23  **BY MR. HOWDEN**

24  Q.  Who talked to you about why the investigation was shut

25  down?

1   **A.**    James Munn.

2   **Q.**    Someone from within ATN?

3   **A.**    Yes.

4   **Q.**    And do you know who he talked to, to find out why the

5   investigation was shut down?

6   **A.**    My understanding, to our legal team.

7   **Q.**    Did your legal team ever explain to you why the

8   investigation was shut down?

9           **MS. HAMILTON:**  Objection, your Honor.  That's

10  privileged information.

11          **THE COURT:**  Well --

12          **MR. HOWDEN:**  I'm not asking for the substance of it.

13          **THE COURT:**  He has -- he holds the privilege; but

14  also, we're getting into territory that is certainly hearsay.

15          **MR. HOWDEN:**  Did -- well, can I ask that question?

16          **THE COURT:**  No.  Let's move on.

17          **MR. HOWDEN:**  All right.

18  **Q.**  At any point --

19          **THE COURT:**  It's going nowhere.

20  **BY MR. HOWDEN**

21  **Q.**    At any point, did anyone -- your lawyers, anyone at ATN,

22  or anyone from the government -- federal government -- explain

23  to you that one of the reasons the investigation was shut down

24  was because of your ongoing coöperation with the Antitrust

25  Division?

1  **A.**    Never.

2  **Q.**    Okay.  At this point, I'd like you to take a look at

3  Exhibit 468, which should be in your binder there.  Do you see

4  that document?

5  **A.**    Yes.

6  **Q.**    And if I could direct your attention to page 2, the third

7  full paragraph there, I'd like you to read to yourself the last

8  two lines of that document.

9  **A.**    Okay.  I just read it.

10 **Q.**    Okay.  You've read the third full paragraph on page 2?

11 **A.**    Yes.

12 **Q.**    So let me let me ask you again.  At any point in time, did

13 anyone tell you that one of the reasons that the prosecutor

14 shut down the investigation -- one of the reasons was your

15 ongoing coöperation with federal prosecutors in this

16 investigation?

17 **A.**    No.

18 **Q.**    Now, in connection with the ICE investigation, did ATN

19 fire an employee in Ukraine?

20 **A.**    Yes.

21 **Q.**    Who was that?

22        **MS. HAMILTON:**  Objection, your Honor.  What's the

23 relevance of these questions.

24        **MR. HOWDEN:**  I'll link it up, your Honor.

25        **THE COURT:**  You may answer the question.

1              Objection is overruled.

2              **THE WITNESS:**   It was off-site salesperson who was

3    managing sales of a specific -- I think -- web accounts.

4    **BY MR. HOWDEN**

5    **Q.**   What kind of business presence, if any, did ATN have in

6    Ukraine?

7    **A.**   ATN formally doesn't have any office, but we subscribe to

8    the services of one company that provided us, among other

9    things, with salespeople.

10   **Q.**   What was the name of that company?

11   **A.**   Sfera.

12   **Q.**   Can you spell that for the court reporter?

13   **A.**   S-f-e-r-a.

14   **Q.**   And -- and briefly, can you describe for us, please, what

15   is Sfera?

16   **A.**   It's a factory in Ukraine that, among other things,

17   manufactures systems for ATN, bodies --

18   **Q.**   When you say systems and bodies --

19   **A.**   -- and fully --

20   **Q.**   I'm sorry.  Go ahead.  I'll come back.

21   **A.**   -- and a fully functioning night-vision systems.  Also,

22   some other offices are providing ATN with outsourced services,

23   like web support, IT administration, and some sales support.

24   **Q.**   Does Sfera manufacture any image-intensifier tubes?

25   **A.**   No.

1    Q.   Do you know where they get their tubes?

2    A.   From a number of sources.

3    Q.   Okay.  And -- and in connection with the -- the shutdown

4    of the ICE investigation, did ATN have to provide information

5    about its exports and compliance program to ICE?

6    A.   Yes.

7    Q.   And did you have to make disclosure about any and all

8    questionable sales by ATN?

9         In other words, account for all of your overseas sales?

10   A.   Yes.

11   Q.   And did ICE -- did -- well --

12        Sfera -- you mentioned that in your testimony earlier as a

13   company that somehow got involved in the Battalion Set II

14   contract?

15   A.   They are one, yes.  They were a supplier to us.

16   Q.   What did they supply?

17   A.   Either complete systems, or just bodies.

18   Q.   Of night-vision goggles?

19   A.   Of night-vision goggles, yes.

20   Q.   Do they supply any other night-vision products?

21   A.   For this contract?  It was only one.

22   Q.   No.  In general.

23   A.   In general, yes.

24   Q.   Rifle scopes?

25   A.   Yes.

 1  **Q.**   Especially after the investigation, ATN paid close

 2  attention to licensing for exports.  Is that correct?

 3  **A.**   ATN was paying -- I'm sorry -- attention to export control

 4  prior to ICE investigation.

 5  **Q.**   Does anyone at ATN have an ownership interest of any sort

 6  in Sfera?

 7  **A.**   Not to my knowledge, no.

 8  **Q.**   It's arm's-length business relationship with them?

 9  **A.**   I don't know all of the details, but to my best knowledge,

10  no.

11  **Q.**   As far as you know, does Marc Morgovsky or Lenny Gaber

12  have any ownership interest in Sfera?

13  **A.**   Not that I know.

14  **Q.**   By the way, do you have any ownership interest in ATN?

15  **A.**   Yes.

16  **Q.**   What kind of interest?

17  **A.**   Right now, it's around 7 percent or so.

18  **Q.**   Okay.  And how about Mr. Gaber?

19  **A.**   He has the ownership of the company.

20  **Q.**   And how about Mr. Morgovsky?

21  **A.**   He's a major shareholder.

22  **Q.**   Back in 2005, did you have an ownership interest in ATN?

23  **A.**   I think I did.

24  **Q.**   Do you recall how much?

25  **A.**   Somewhere in the same range -- I think, somewhere around

1    5 percent.

2    **Q.**    Okay.  And do you know someone named Simon Barsky, at

3    Sfera?

4    **A.**    I heard that name.

5    **Q.**    Ever had any direct dealings with him?

6    **A.**    Very limited.

7    **Q.**    Now, in June of 2005, ATN applied for an export permit to

8    ship night-vision rifle scopes to Indonesia.  Do you recall

9    that?

10   **A.**    I don't.

11   **Q.**    Does ATN handle a line of night-vision weapon scopes known

12   as the NVWS 17 Series 6 Aries 6800?

13   **A.**    I think at one point, we were selling them.

14   **Q.**    In 2005?

15   **A.**    Yes.

16   **Q.**    And, in fact, ATN, in 2005, wanted to sell 190 of that

17   model of rifle scopes to someone in Indonesia.  Is that

18   correct?

19   **A.**    It's possible.  I don't recall.  I wasn't -- I don't

20   recall being involved in that.

21   **Q.**    And, in fact, the State Department turned down your

22   application for a license.  Do you remember that?

23          **MS. HAMILTON:**  Your Honor, the witness has already

24   said he does not recall and has no memory of this transaction.

25          **THE COURT:**  Well, ask it as a question.

1              And -- and the jury should not assume that set of

2    facts that are contained in the question are necessarily true.

3    It depends upon the answer that is given to the question.  So

4    you want to reask the question.

5    **BY MR. HOWDEN**

6    **Q.**   Do you recall applying for a license to ship 190

7    night-vision rifle scopes to Indonesia in June of 2005?

8    **A.**   No, I do not.

9    **Q.**   Okay.  At this time, I'd like to have this exhibit marked

10   next in evidence.

11             (Whereupon a document was tendered to the Court)

12             **MR. HOWDEN:**  Sorry.

13             **THE CLERK:**  473?

14             **MR. HOWDEN:**  473.  Sorry.  Yeah.

15             (Defendants' Exhibit 473 marked for identification)

16             **MR. HOWDEN:**  This is P.X. 1088.  And I can provide a

17   copy to your Honor.

18             **THE COURT:**  We've got.  Okay.  That's a copy for me.

19   He wants an original.

20   **BY MR. HOWDEN**

21   **Q.**   Mr. Rocklin, I'm showing you what's been marked for

22   identification as Government's Exhibit 473, a two-page

23   document.  Take a look at it, and let me know when you've had a

24   chance to look it over.

25   **A.**   Yes.

1   Q.   Does that refresh your recollection at all as to whether

2   or not ATN applied for an export permit to ship 190

3   night-vision rifle scopes to Indonesia in June of 2005?

4   A.   It looks like a copy of the application, but I don't

5   recall being really involved in it.

6   Q.   Who was involved in that, if you know?

7   A.   Could be one of our salespeople.  And the application

8   process is obviously signed by James Munn.  He's an expert

9   compliance manager.

10  Q.   Was -- was the export of 190 night-vision rifle scopes --

11  proposed export of 190 night-vision rifle scopes a part of the

12  ICE investigation?

13  A.   I don't remember.

14           MS. HAMILTON:  Objection, your Honor.  It's

15  speculative.

16           THE COURT:  You may answer, if you know.

17           THE WITNESS:  I don't remember.

18  BY MR. HOWDEN

19  Q.   And do you remember anything else about this proposed

20  sale?

21  A.   No.

22           MR. HOWDEN:  Let me show you another document, and

23  see if it refreshes your recollection.

24           If I could have this document marked next in order.

25  And I'll give you a second copy for the Judge.

1          **THE CLERK:**  474.

2          (Defendants' Exhibit 474 marked for identification)

3          **MR. HOWDEN:**  This is 846373.

4  **Q.**   Mr. Rocklin, I'm now showing you what's been marked for

5  identification as Defendant's Exhibit 474.  Take a look at

6  that.  Let me know when you've had a chance to look it over.

7          **THE WITNESS:**  Appears to be an ATN invoice.

8          **THE COURT:**  Wait for a question.

9          **THE WITNESS:**  I'm sorry.

10 **BY MR. HOWDEN**

11 **Q.**   What is 474?

12 **A.**   It appears to be an ATN it invoice.

13 **Q.**   Does it refresh your recollection that ATN was proposing

14 to sell 190 night-vision weapon scopes to someone in Indonesia

15 in 2005?

16 **A.**   ATN has literally thousands of sales.  Hundreds of them

17 could be of this magnitude.  So I don't recall this specific

18 sale.

19 **Q.**   And again, my question was:  does that refresh your

20 recollection as to --

21 **A.**   No.

22 **Q.**   -- whether or not you were involved in that sale?

23      Do you know if ATN ended up selling 190 night-vision

24 weapon scopes to someone in Indonesia in 2005?

25 **A.**   I know that we sold in Indonesia in the past.  I don't

1    recall whether we sold something specifically in 2005 and

2    whether it was 190 weapons sites.

3    **Q.**    Was anything about this proposed transaction disclosed to

4    ICE in the course of their investigation?

5    **A.**    I don't recall.

6    **Q.**    Let me talk to you a moment about your job description at

7    ATN.  You told us a little bit about it, way back in the

8    beginning of your testimony.  Who at ATN was responsible for

9    quality control of your products?

10   **A.**    Quality control is multi-step, multi-layer process.  There

11   are a lot of people, depending on what and how you define

12   "quality control", could be responsible.

13   **Q.**    And what responsibilities in 2005 did you have, if any,

14   for quality control?

15   **A.**    I don't know.  I was mainly supervising people that were

16   responsible for it.

17   **Q.**    And who did you supervise in that regard?

18   **A.**    A number of people.

19   **Q.**    For instance?

20   **A.**    Again, there is -- if it's someone on assembly line, and a

21   lot of things can be interpreted as quality control.  So if

22   somebody assembles the product, and has problems, I was

23   addressing it.  So it was a lot of people.

24   **Q.**    All right.  Well, let me try and narrow it down a little

25   bit.  In the Bat. Set II contract, as we've already discussed,

1   there were certain technical requirements that the -- the IITs

2   had to meet.  Is that correct?

3   **A.**   Yes.

4   **Q.**   And part of the contract was that ATN had to certify that

5   the equipment that you were supplying met those specifications.

6   Is that right?

7   **A.**   Yes.

8   **Q.**   And how did ATN go about certifying the product?

9   **A.**   The supplier of systems was certified at the delivery

10  time -- the performance.

11  **Q.**   Is that NPZ?

12  **A.**   Yes.

13  **Q.**   NPZ was providing certifications?

14  **A.**   Yes.

15  **Q.**   Saying that, in essence, these goggles meet the

16  specifications of the contract?

17  **A.**   Yes.

18  **Q.**   And what, if anything, did ATN do with that information?

19  **A.**   Well, if you're referring to -- specifically to FOM

20  requirement -- is that what you're referring to?

21  **Q.**   Among other things, but let's start with that; with the

22  FOM requirement.

23  **A.**   To determine a FOM, as we just discussed, we need to

24  determine resolution, and signal to noise.  And it would be a

25  very -- it would be a process that would require special

1   equipment.  And ATN did not have that equipment.

2   **Q.**   You'd need to do the actual measurement of those -- those

3   factors, those aspects of quality?

4   **A.**   ATN could not measure those.

5   **Q.**   Okay.  And so who did measure them for ATN?

6   **A.**   My understanding, it was NPZ; and prior to that, the tube

7   manufacturer.

8   **Q.**   And the tube manufacturer, again, was Ekran-FEP?

9   **A.**   That's right.

10  **Q.**   So when the goggles and the image-intensifier tubes arrive

11  at ATN, they had with them certifications, saying, "These

12  goggles and this image-intensifier tube meets the

13  specification" --

14  **A.**   Yes.

15  **Q.**   -- in essence?

16       Did ATN do anything on its own to verify that those

17  numbers were correct?

18  **A.**   No.

19  **Q.**   And what form did these certifications from NPZ and

20  Ekran-FEP take?

21  **A.**   Every unit would come with a passport that would indicate

22  what the parameters were.  And also, I think it was duplicated

23  somehow over the e-mail.  I don't recall right now, but --

24  **Q.**   Okay.

25  **A.**   -- we had a tally up for every system.  We had the tube

1  number.  And for every tube, the tube needed parameters to

2  arrive to the FOM.

3  **Q.**  Okay.  And what did ATN do with those numbers to assure

4  TACOM that they were providing a compliant product?

5  **A.**  Part of the requirement of the Battalion Set II was that

6  we had to keep a full accountability and supply the kind of

7  certificate-of-compliance document that would tally up every

8  single unit that was delivered; a system number; tube number;

9  and relevant specifications.

10  **Q.**  And that certification that you're referring to was a

11  certification that had to be provided to TACOM?

12  **A.**  My understanding, yes, eventually.

13  **Q.**  And what, if any, responsibility did you have for making

14  sure that those certifications were accurate?

15  **A.**  I was in charge of supplying the documentation, because it

16  was a part of -- yes, it was documentation package that we

17  assemble with every shipment.  And I was the one who was

18  usually mailing it to all relevant parties.

19  **Q.**  Now, the actual certification that was sent -- it was sent

20  to Iraq.  Is that correct?

21  **A.**  Yes.

22  **Q.**  With the goggles?

23  **A.**  Yes.

24  **Q.**  And did you review those certifications before they were

25  sent with the goggles to Iraq?

1   **A.**    Yes.

2   **Q.**    Who actually compiled the certifications?  Put all of the

3   numbers together in --

4   **A.**    Jacob Baystinn.

5   **Q.**    Baystinn -- or maybe Baystinn?

6   **A.**    Baystinn.  Sorry.

7   **Q.**    Do you know how to spell that last name?  Might help the

8   court reporter.

9   **A.**    B-a-y-s-t-i-n-n, I believe.  That's the best --

10  **Q.**    Okay.  And were you his boss?

11  **A.**    Yes.

12  **Q.**    You oversaw his work?

13  **A.**    Yes.

14  **Q.**    Did you review the -- the compliance forms that he put

15  together that were sent to Iraq?

16  **A.**    Yes.

17  **Q.**    And do you know -- where did the information come from

18  that that was included in the certifications?

19  **A.**    It would come from NPZ.

20  **Q.**    Now, it's my understanding that Mr. Baystinn is no longer

21  with us?

22  **A.**    Yes.  He passed away.

23  **Q.**    How long ago?  Do you know?

24  **A.**    A couple of months ago.

25          **MR. HOWDEN:**  Excuse me just a moment.

1  Q.   I'm not sure if this is in your binder or not, but I'd

2  like you to refer to Defense Exhibit 331.  Is that in there?

3  A.   Yes.

4  Q.   It is.  Okay.  Good.

5       If you'd look at 331 for me, I'd appreciate it.  Have you

6  had a chance to look at it?

7  A.   Yes.

8  Q.   What is Exhibit 331?

9  A.   This is ATN's certificate of conformance for

10 Battalion Set II, for final two deliveries.

11 Q.   This is the kind of certification you were just testifying

12 about?

13 A.   Yes.

14 Q.   And you recognize it as one of the certifications that ATN

15 actually sent in connection with the Battalion Set II contract

16 to Iraq?

17 A.   Yes.

18 Q.   It's actually signed by Jacob Baystinn.  Is that correct?

19 A.   Yes.

20 Q.   And you reviewed this before it was sent to Iraq.  Is that

21 right?

22 A.   Yes.

23 Q.   And the -- it was prepared by ATN the regular course of

24 business?

25 A.   Yes.

```
 1              MR. HOWDEN:  I'd offer this exhibit into evidence,
 2   your Honor:  Exhibit 331.
 3              MS. HAMILTON:  Well, your Honor, we would object on
 4   the basis of hearsay; relevance, as well.
 5              These are all goggles that were produced prior to the
 6   time at issue here in the.
 7              THE COURT:  Well but it -- it is in fulfillment of
 8   the Bat. Set II contract, correct?
 9              MR. HOWDEN:  That's correct, your Honor.
10              THE COURT:  Mm-hm.  And he's laid a foundation for
11   it.  Is there something wrong with the foundation?
12              MS. HAMILTON:  Well, it's for part -- it's also for
13   the relevance, your Honor.  This is for --
14              THE COURT:  I understand that.
15              MS. HAMILTON:  Okay.
16              THE COURT:  The objection's overruled.  And so it is
17   admitted.  This is 331.
18              (Trial Exhibit 331 received in evidence)
19              MR. HOWDEN:  Could we display publish 331 to the
20   jury?
21   Q.   Now, this certification -- this was actually for the first
22   shipment of goggles that ATN sent to Iraq for Battalion Set I.
23   Is that correct?
24   A.   It's possible.  I don't remember, exactly, the schedule,
25   but --
```

1   Q.   Well, let's look at the top of the document.  See where it

2   says, "Quantity:  400"?

3   A.   Yes.

4   Q.   It -- after that, it shows total 6,371 order.  400 units

5   shipped under above invoice.  5.971 back order.

6        Doesn't that indicate that this is the first 400 goggles

7   that were shipped?

8   A.   Yes.  Yes.

9   Q.   And, if we look at the headings of the columns on the

10  certification, certification shows different things about the

11  goggles that are being shipped.  It shows the system serial

12  number.  That's something that ATN kept track of?

13  A.   Yes.

14  Q.   And by "system serial number," that's the number on the

15  goggle itself -- the entire package?

16  A.   Yes.  On the body.

17  Q.   Okay.  And then the second column, the date the tube was

18  produced -- or what does it say?  "Date of tube production"?

19  A.   I think that's it.

20       THE COURT:  Can we just -- can I just ask a question,

21  for clarification?

22       MR. HOWDEN:  Sure.

23       THE COURT:  And, Mr. Rocklin, these numbers reflect

24  each individual set of goggles that went out in this shipment,

25  or does that number one or number two, et cetera, represent a

1  set or some greater quantity than one?

2           **THE WITNESS:**  No.  That's each number for --

3           **THE COURT:**  Each set of goggle?

4           **THE WITNESS:**  -- each set of goggles.

5           **THE COURT:**  Each goggles.

6           **THE WITNESS:**  So, assuming 400 of them were

7  shipped --

8           **THE COURT:**  There should be 400 entries?

9           **THE WITNESS:**  -- there should be 400 entries.

10           **THE COURT:**  Okay.  Thank you.

11  **BY MR. HOWDEN**

12  **Q.**   So the next column over, the date of tube production --

13  "tube" is the image-intensifier tube?

14  **A.**   Yes.

15  **Q.**   That's, as you've testified, the core technology?

16  **A.**   Correct, yeah.

17  **Q.**   The little tube that fits inside the goggles and actually

18  turns dark things bright?

19  **A.**   Yes.

20  **Q.**   Okay.  And the next column is "Date of tube testing."

21  What does that reflect?

22  **A.**   I think that was just the information that was passed to

23  us when they made the tube.  And I think the process was then,

24  later on, they tested the image tubes.

25  **Q.**   Okay.

1   **A.**    And that's the date.

2   **Q.**    Tested for quality, right?

3   **A.**    For performance.

4   **Q.**    Performance.  Thank you.

5   **A.**    Yeah.

6   **Q.**    And you have to test the tube for quality before you put

7   it in the goggles?  You can't tell test it after you put it in

8   the goggles, unless you take it all apart?

9   **A.**    Yes.

10  **Q.**    And then the next column is "Image-Intensifier Tube Serial

11  Number."  Each image-intensifier tube had its own serial

12  number?

13  **A.**    Yes.

14  **Q.**    And you kept records of that.

15          And then the next three columns:  Resolution; Signal to

16  Noise; and FOM.  And, as we've already discussed, those are --

17  are different measurements of quality.  Is that right?

18  **A.**    Performance.

19  **Q.**    Performance.  Thank you.

20          And -- and you get FOM -- the last column, again -- by

21  multiplying resolution times signal to noise?

22  **A.**    Yes.

23  **Q.**    Okay.  Now we can leave those numbers aside.

24          What I want you to look at is the date of tube production.

25          And -- and if you go through each of the pages in this

1   certification --

2           **THE COURT:**  Are you talking about production?

3           **MR. HOWDEN:**  Yeah.

4           **THE COURT:**  Because I think testing is highlighted.

5           **MR. HOWDEN:**  We need the production column; not the

6   testing column.  Thank you.

7   **Q.**   This certification shows that all 400 image-intensifier

8   tubes were produced on February 5th, 2005.  Is that correct?

9   **A.**   Oh, I don't think that this is the production -- actual

10  production date of a tube.

11       I think it could be a process which I am not familiar,

12  to -- very specifically, but my understanding is they take the

13  image tube.  They produce it, and then they store it.  And so

14  I'm not familiar with that.

15          **MS. HAMILTON:**  Your Honor, I'm sorry.  This is

16  speculation.

17          **THE COURT:**  Is this something of which the witness

18  has personal knowledge?  Do you have personal knowledge of what

19  they do?

20          **THE WITNESS:**  I once heard to me said -- I could

21  understand that 400 tubes could not be produced on the same

22  day.

23          **THE COURT:**  The answer is stricken.

24          **MR. HOWDEN:**  That's fine.

25  **Q.**   But -- but this column reflects the dates they were

1  provided to ATN by NPZ and Ekran-FEP.  Isn't that correct?

2  **A.**    Yes.

3  **Q.**    And then that information was entered by ATN in this

4  column?

5  **A.**    Correct.

6  **Q.**    And these dates indicate that all 400 of these goggles

7  were manufactured on the same day?

8  **A.**    Image tubes.

9  **Q.**    Image tubes.  Thank you.

10 **A.**    Yes.

11 **Q.**    And that's impossible, isn't it?

12 **A.**    Probably not, depending, again, on what they knew of the

13 day production.

14 **Q.**    So it's a variable date?  It could mean one thing, or

15 something else?

16 **A.**    Yes.

17 **Q.**    Okay.  And then the column that has date of tube testing,

18 again, going through the entire certification, it reflects that

19 all of the tubes were tested on March 16th, 2005.  Isn't that

20 correct?

21 **A.**    Yes.

22 **Q.**    And again, that's impossible, isn't it?

23 **A.**    Most likely.

24 **Q.**    Yeah.  And yet, this information was certified by ATN

25 before the goggles were sent to Iraq.  Is that correct?

1  **A.**    Yes.

2  **Q.**    Certifying that these were the dates the tubes were

3  produced, and these were the dates the tubes were tested?

4  **A.**    Yes.

5  **Q.**    I direct your attention to Exhibit 470.  It's in your

6  binder there.  If you'd take a look at it, please.  Do you have

7  Exhibit 470 in front of you?

8  **A.**    Yes.

9  **Q.**    And again, this is another one of the ATN certifications?

10  **A.**    Yes.

11  **Q.**    Produced in the same manner as the previous exhibit?

12  **A.**    Yes.

13  **Q.**    Again, business record produced by ATN in connection with

14  the Battalion Set II contract?

15  **A.**    Yes.

16          **MR. HOWDEN:**  Again, I'd offer Exhibit 470 into

17  evidence, your Honor.

18          **MS. HAMILTON:**  No objection.

19          **THE COURT:**  470 is admitted into evidence.

20          (Trial Exhibit 470 received in evidence)

21          **MR. HOWDEN:**  Ben, can we put up the first page of

22  Exhibit 470, please?  And again, let's tart with the top

23  portion of it.

24  **Q.**    Mr. Rocklin, if you'd take a look at this certification,

25  the date on this one is April 21st, 2005.  Is that correct?

1   A.    Yes.

2   Q.    And if you look under the "quantity" line, it says, "500

3   total."  Again, the total amount of the back order -- or the

4   total order, that 500 units were shipped on this above invoice,

5   leaving 5,471 on back order.

6            Doesn't that indicate that this was the second

7   shipment of tubes to Iraq?

8   A.    Yes.

9   Q.    And it reflects the shipment of 500 night-vision goggles

10  to Iraq.  Is that correct?

11  A.    Yes.

12  Q.    And we have the same columns slightly different format,

13  but the same columns we had on the last exhibit?

14  A.    Yes.

15  Q.    So we've got the serial numbers of the systems.  Is that

16  correct?

17  A.    Yes.

18  Q.    And then the date of the tube production?

19  A.    Yes.

20  Q.    The date of the system testing?

21  A.    Yes.

22  Q.    And the IIT serial number.

23       And again, this was all information that ATN received from

24  NPZ and Ekran FEP.  Is that right?

25  A.    Yes.

1   **Q.**    And ATN's job was to take this information and include it

2   in the certifications that were sent with the goggles to Iraq,

3   correct?

4   **A.**    Yes.

5   **Q.**    Now, this document -- Exhibit 470 -- if we look through

6   the date of tube production, and if we could scroll through the

7   entire document on that column, if you could hold it there for

8   a minute, and go to 150, it shows that the first 150 pairs of

9   goggles in this shipment were -- the tubes, rather, were all

10  manufactured on February 5th, 2005.  Isn't that correct?

11  **A.**    Right.

12  **Q.**    Just like all 400 of the tubes listed in the previous

13  exhibit?

14  **A.**    Once again, my understanding had to deal with how they

15  were signing them off from the warehouse.  they had a certain

16  procedure when they did it, to my best knowledge, in batches --

17  batch of tubes would be manufactured.  And then the way they

18  were signing it off from warehouse to -- from warehouse that

19  manufactured IITs to -- to system assembler, or something to

20  that extent.

21      We were never actually paying much of attention to the

22  dates, because it was not a part of the requirement.  We were

23  paying attention to resolution, signals to noise.

24  **Q.**    So the date of tube production wasn't really the date of

25  tube production.  Is that correct?

1    **A.**    Not as we would understand the actual tube production.

2    **Q.**    Okay.  And then, if we go through the rest of the date of

3    production, we see that all of the rest of the goggles in this

4    shipment were listed as having been produced on March 5th,

5    2005.  And that's not correct, either, is it?

6    **A.**    Not the way we would understand the actual day of

7    manufacture, no.

8    **Q.**    And can we run through the rest of those?

9          And if we then -- I'm sorry.

10         So if we now look at the date of system testing, we can

11   see that, according to the certification, the first 150 pairs

12   of goggles were tested on April 13th?

13   **A.**    I think this is the date that ATN tested the system.

14   That's what was referred to.

15   **Q.**    That ATN tested the system?

16   **A.**    Well, they had to light up.  They had to have all of the

17   components.  They had to be sitting on headsets, and that kind

18   of stuff.

19   **Q.**    Is that part of what you did in -- at ATN, in preparing to

20   ship these goggles to Iraq?

21   **A.**    Yes.

22   **Q.**    Who had that responsibility?

23   **A.**    A number of people.

24   **Q.**    Who?

25   **A.**    Usually, people that worked in assembly, and quality

1  control, and shipping.

2  **Q.**   In 2005, who at ATN had responsibility for conducting the

3  testing of -- of the systems at ATN?

4  **A.**   A number of people.

5  **Q.**   Can you give me some names, please?

6          **THE COURT:**  Well, are you talking about the person

7  who was supervisorially responsible, or the people actually

8  doing it?

9          **MR. HOWDEN:**  Well, Mr. Baystinn, the man who signed

10 these, is no longer with us.  So I'm trying to find out who

11 actually conducted -- physically conducted these tests.

12         **THE WITNESS:**  There were some people in assembly line

13 that would report to Baystinn -- to Jacob -- that the units are

14 there, equipped in what was the -- that the set would be full;

15 that it had -- that it lit up; that it had the batteries; that

16 the goggles were functioning.

17 **BY MR. HOWDEN**

18 **Q.**   Again, I'm asking you for some names.  Who did that in

19 2005?

20 **A.**   I don't recall right now.

21 **Q.**   You can't give me one name?

22 **A.**   No.

23 **Q.**   But the fact of the matter is that you're saying there was

24 someone at ATN who did something to these goggles on

25 April 13th, 2005, to test the system?

1   **A.**   Again, the basic test would include that the system would

2   light up; that it would be equipped.   Yes.

3   **Q.**   And you're telling us that the first 150 goggles in this

4   shipment were tested by somebody at ATN on April 13th, 2005.

5   Is that right?

6   **A.**   I don't recall, but it could be compiled that way, yes.

7   **Q.**   Well, what does that mean -- "could be compiled in that

8   way"?

9   **A.**   Look.   I don't remember exactly what the procedure was in

10  regards to the date.

11  **Q.**   Are you saying that these dates aren't necessarily

12  correct?

13  **A.**   I think we were not paying much of attention to the dates.

14  And I believe that it was done in batches.

15       Once again, it was a continuous process; but at one point,

16  when somebody would turn over the certain number of them, that

17  would be the date of system that somebody would sign off on

18  the -- the process; that they checked that the system worked.

19  **Q.**   So you're telling us that the date of system testing isn't

20  actually the date the system was tested?

21  **A.**   No.   Could be.

22  **Q.**   Could be.   And if we look at the rest of the system

23  testing dates for the remainder of these 500 goggles -- that

24  would be 350 pairs -- it indicates that all of the rest of the

25  systems were tested by ATN on April 19th, 2005.   Isn't that

1  correct?

2  **A.**   Yes.

3  **Q.**   Are you telling us that, in fact, not all of these goggles

4  were tested on April 19th, 2005?

5  **A.**   It could be that they all were examined and tested on that

6  date, but it could be done in the previous day or two days, and

7  then when they sign off for a whole batch, they would put that

8  day as a day of testing.

9  **Q.**   Well, who's responsible for putting the date of testing?

10  **A.**   I think Jacob was.

11  **Q.**   And he's no longer with us?

12  **A.**   No.

13  **Q.**   Let me direct your attention to Exhibit 471.  Do you have

14  that in front of you?

15  **A.**   Yes.

16  **Q.**   Exhibit 471 is another certification from ATN regarding

17  the goggles that were being shipped to Iraq in connection with

18  the Battalion Set II contract.  Is that right?

19  **A.**   Yes.

20  **Q.**   And this document was prepared in the regular course of

21  business, much as the first two exhibits we just looked at?

22  **A.**   Yes.

23        **MR. HOWDEN:**  Your Honor, I would offer Exhibit 471 in

24  evidence.

25        **MS. HAMILTON:**  No objection, your Honor.

ROCKLIN - CROSS EXAMINATION / HOWDEN

1          **THE COURT:**  471 is admitted.

2          (Trial Exhibit 471 received in evidence)

3   **BY MR. HOWDEN**

4   **Q.**   Now, if you can, look at the top portion of the first page

5   of this exhibit.  This was for a shipment of goggles sent to

6   Iraq on May 23rd, 2005.  Is that correct?

7   **A.**   Yes.

8   **Q.**   And this was for 600 units?

9   **A.**   Yes.

10  **Q.**   And again, given those numbers, this indicates that it was

11  the third shipment of goggles that ATN sent to Iraq in

12  connection with the Battalion Set II contract.  Is that right?

13  **A.**   Yes.

14  **Q.**   Now, again, we have the same column numbers or same column

15  designations.  We have the system serial number in the first

16  column?

17  **A.**   Yes.

18  **Q.**   Followed by the date of tube production?

19  **A.**   Yes.

20  **Q.**   Followed by the date of tube testing?

21  **A.**   Yes.

22  **Q.**   Image intensifier, serial number, resolution, signal to

23  noise, and FOM, correct?

24  **A.**   Yes.

25  **Q.**   Now, in this case, the dates are given European fashion.

1   And I direct your attention to Item Number 5.  Do you see the

2   date of tube testing?

3   **A.**   Yes.

4   **Q.**   That has to be February 15th, 2005.  Isn't that correct?

5   **A.**   Right.

6   **Q.**   And there are other examples.  We go to 162, for instance.

7   Again, that has to be February 21st, 2005?

8   **A.**   Right.

9   **Q.**   All right.  So, going back to the first page and the date

10  of tube production, in this case, not all the tubes are

11  indicated as having been manufactured on the same day, correct?

12  **A.**   Yes.

13  **Q.**   And again, this is information that you're receiving --

14  ATN is receiving from your shippers, from your suppliers in

15  Russia.  Is that correct?

16  **A.**   Yes.

17  **Q.**   Do you know why there was suddenly a change in dates, and

18  that no longer everything was listed as being produced on a

19  single day?

20  **A.**   I do not know.

21  **Q.**   But that's the information you got, and that's the

22  information that ATN included in the certification?

23  **A.**   Certification was here mainly to certify for items:

24  system serial number [sic], system -- I'm sorry -- tube image

25  serial number, resolution, and signal to noise, and then to

1   arrive the FOM for that specific tube.

2       We were never obligated to certify the date.  I think they

3   were transferred there as we were receiving the product off the

4   documents.

5   **Q.**   Okay, but that's -- that's -- with regard to the date of

6   tube production.  You already told us that the dates -- the

7   date of tube testing are dates of testing by ATN personnel in

8   San Francisco, correct?

9   **A.**   No, that's not what I said.

10  **Q.**   What did you say?

11  **A.**   If you go back and look in the previous document, it will

12  say "system testing."  That's an assembled unit.  There's no

13  column like this on this document.

14      This is just only to certify that that system turned on;

15  that it has 25 batteries on it.  And this specific -- and

16  that's also not something that we had to certify, so it's not

17  on this certificate of conformance.

18  **Q.**   Well, why don't you tell me, the column that says "Date of

19  Tube Testing," what does that reflect?

20  **A.**   That would be something that would be done by tube

21  manufacturer.

22  **Q.**   Okay.  So, again, this is something that's done in Russia?

23  **A.**   Yes.

24  **Q.**   And you merely get the numbers on whatever form of

25  documents they provide to you?

1    **A.**    Yes.

2    **Q.**    And then, in turn, those numbers are entered in the

3    certification in that column?

4    **A.**    Yes.

5    **Q.**    So no one at ATN had anything to do with either tube

6    production or coming up with the date of tube production or the

7    date of tube testing, is that correct?

8    **A.**    That's correct.

9    **Q.**    All right.  But at ATN you did compile all these numbers

10   and include them in the document certification?

11   **A.**    Yes.

12   **Q.**    All right.  Now, let me direct your attention to the last

13   item on this first page, number 27.

14        And, again, you already told us that what we're looking at

15   are European style dates.  So the first date is the day of the

16   month, the second date is the month, and the third date is the

17   year, is that correct?

18   **A.**    Yes.

19   **Q.**    And for this part of the certification it indicates that

20   the tube was produced on April 5th, 2005, isn't that correct?

21   **A.**    Yes.

22   **Q.**    And it shows the date the tube was tested was April 2nd,

23   2005, isn't that correct?

24   **A.**    Yes.

25   **Q.**    So that it was tested several days before it was actually

1  produced?

2  **A.**    It could be a discrepancy, yes.

3  **Q.**    It's -- it's not possible to test the tubes before they

4  are produced, isn't that correct?

5  **A.**    Actually it is, but I don't want to get into -- it is

6  possible to test it before they are finally produced.

7  **Q.**    Well, if we look at the next page, if we look at, for

8  instance, all the yellow highlighted items, each one of those

9  items indicates that the tubes were tested on a date earlier

10  than the date they were actually produced, isn't that correct?

11  **A.**    It appears to be so, yes.

12  **Q.**    And, again, that just can't be right, can it?

13  **A.**    Yes, it can be right.  If you would like to know that the

14  tube can be tested prior to potting -- I mean, I need to get

15  into how the actual tube manufacture works, and then can be

16  returned back for some sort of adjustments on the parts supply

17  repotted, I don't know.  But it is possible that some of the

18  parameters that are relevant here can be tested before the tube

19  final date of production.

20  **Q.**    What parameters that are listed here can be tested before

21  the tubes are manufactured?

22  **A.**    Signal to noise.

23  **Q.**    Yeah.  What else?

24  **A.**    Well, theoretically there is a way of testing resolution

25  as well.

1  **Q.**   So it's your testimony here today that these dates are

2  possible?

3  **A.**   Possible.

4  **Q.**   And how difficult is it to test tubes before they are

5  manufactured?

6  **A.**   For signal to noise?

7  **Q.**   Sure.

8  **A.**   The -- my understanding that most of the tubes for signal

9  to noise need to be tested before the final assembly of the

10  tube takes place.

11  **Q.**   Before the final assembly of the tube takes place or the

12  system?

13  **A.**   Tube.

14  **Q.**   Okay.  And how did -- first off, who in your supply chain

15  tested the tubes?

16  **A.**   My understanding, a tube manufacturer.

17  **Q.**   Ekran FEP?

18  **A.**   Yes.

19  **Q.**   And are you aware of what policies and procedures they

20  followed to test the tubes?

21  **A.**   Not in regards of the dating.

22  **Q.**   Did it ever come to your attention that they were testing

23  the tubes before they were manufactured?

24  **A.**   I know that there is a process where it is possible.

25  **Q.**   But you don't know whether or not Ekran FEP ever did that?

1    **A.**    No, I did not.

2    **Q.**    Or whether they even had the equipment to do that?

3    **A.**    Well, that I know, that they did have that.

4    **Q.**    Okay.  Let me direct your attention to entry 255.

5            (Document displayed)

6    **Q.**    255 indicates that this tube was tested on April 5th, 2005

7    after it had been manufactured on January -- January 8th, 2003,

8    is that correct?

9    **A.**    Yes.

10   **Q.**    Were you providing two-year old tubes to the Iraqi Army?

11   **A.**    Could be a typo.  Could be something that was manufactured

12   previously.  I'm not aware.

13   **Q.**    Okay.  So the certification may or may not be correct?

14   **A.**    Again, it could be, yes.

15   **Q.**    And, in fact, if we were to go through and add up all of

16   the goggles that indicate the tubes were tested before they

17   were manufactured, we would find 144 examples of that.  Does

18   that sound about right?

19   **A.**    I just explained to you how that could be possible.

20   **Q.**    Okay.  Well, and by the way, do you know why it is that

21   all of a sudden the information you're receiving from Russia

22   shows different dates of tube production as opposed to batches,

23   as in the first two certifications?

24   **A.**    I never followed.  No, I do not know.

25   **Q.**    Okay.  Just put the numbers down on the certifications?

1  **A.**    Yes.

2  **Q.**    And did it ever come to your attention as to why the date

3  of tube testing in the information you received for this

4  shipment indicated that the tests were conducted on a variety

5  of different days, as opposed to all being done on one given

6  day?

7  **A.**    Could you repeat the question?

8  **Q.**    Sure.   In the previous two certifications that we saw, all

9  the testing had been done -- or at least it said it had been

10  done on a particular day, right?  Now, in this certification we

11  have many different days.

12      Did you ever ask anybody as to why all of a sudden the

13  recordkeeping system changed in Russia?

14  **A.**    No.

15  **Q.**    Before we leave this document, I'd just like you to take a

16  note of the two columns "Resolution" and "Signal to Noise."

17  And you can see that just looking at the first page the --

18  those resolution numbers are oftentimes expressed in fractions

19  or decimals, not whole numbers, is that right?

20  **A.**    Yes.

21  **Q.**    That's fairly common with respect to resolution

22  measurements, is that right?

23  **A.**    I guess, yes.

24  **Q.**    And the signal to noise values senior also expressed in

25  fractions or decimal numbers, is that correct?

 1  **A.**    Yes.

 2  **Q.**    And that also is common for measurements of signal to

 3  noise values, is that correct?

 4  **A.**    Yes.

 5  **Q.**    Let's take a quick look at Exhibit 353.

 6              **MR. HOWDEN:**  Do we need to take a break?

 7              **THE COURT:**  Five minutes.  You can't wait till 1:30,

 8  huh?

 9              **THE WITNESS:**  No, I can't.

10              **THE COURT:**  We will take five minutes then.  Please

11  follow the instructions about not discussing your testimony

12  with anyone.  And we'll see you in five minutes.

13              And if any of you wish to go into the jury room to

14  use the restroom you may do that or just stretch.

15              (Whereupon there was a recess in the proceedings

16              from 1:00 p.m. until 1:05 p.m.)

17              **THE COURT:**  Continue.  We have everyone here?  Mr.

18  Osterhoudt?  Mr. Moore is here.

19              **MR. HOWDEN:**  We can proceed, your Honor.

20              **THE COURT:**  We can proceed.

21              **MR. HOWDEN:**  Defendant Arie --

22              **THE COURT:**  Mr. Prilik is not here -- oh, here they

23  come.

24              And before we move to 353, which is another one of

25  these...

 1           **MR. HOWDEN:**  The last one of these.

 2           **THE COURT:**  It's the last one?  Okay.  Well, it's

 3  better than the tapes, I guess.  Just columns of meaningless

 4  numbers.

 5           But at any rate, Mr. Rocklin, there's -- these are --

 6  we see these in a format, right?  I'm showing you one of them.

 7  Whose format is this?

 8           **THE WITNESS:**  This is ATN format.

 9           **THE COURT:**  So you designed the form that you use to

10  insert all the information, is that correct?

11           **THE WITNESS:**  Yes.

12           **THE COURT:**  Is there any reason why, in one of them

13  we have the date of tube testing -- or two of them we have the

14  date of tube testing, and in another one we have the date of

15  the system testing.

16           **THE WITNESS:**  It was an ongoing procedure, especially

17  in the beginning.  We knew that the important part to have

18  is --

19           **THE COURT:**  Were the last three columns, I know.

20           **THE WITNESS:**  In the serial system number to align to

21  the specific system and the tube number.  That's all we really

22  cared about.  The rest of the stuff was not called under -- it

23  was mass supply kind of a deal.  So it was there in the

24  beginning.  It wasn't there in the beginning.  I didn't really

25  pay attention to it.

1          **THE COURT:**  Does that explain, I guess, the next form

2  we are going to look at?

3          **MR. HOWDEN:**  Perhaps.

4          **THE COURT:**  So you're saying all those columns we

5  went over was TMI, too much information?  Is that what you are

6  saying?

7          **THE WITNESS:**  We were, again, trying to supply a data

8  that was requested.

9          **THE COURT:**  Okay.  Okay.  Well, I just thought maybe

10  the jurors were as curious as I was.  Lawyers aren't allowed to

11  ask questions out of curiosity, but judges get away with that.

12          Okay.  Go ahead.

13          **MR. HOWDEN:**  Thank you, your Honor.

14  **BY MR. HOWDEN**

15  **Q.**   Let me direct your attention to Exhibit 353.  Again, do

16  you have that in front of you?

17  **A.**   Yes.

18  **Q.**   And, again, this is another ATN certification form?

19  **A.**   Yes.

20  **Q.**   In connection with the Battalion Set II contract?

21  **A.**   Yes.

22  **Q.**   Produced in the ordinary course of business?

23  **A.**   Yes.

24  **Q.**   Shipped to Iraq with the goggles?

25  **A.**   Yes.

1          **MR. HOWDEN:**  And, your Honor, I would offer 353 into

2    evidence.

3          **MS. HAMILTON:**  No objection.

4          **THE COURT:**  353 is admitted.

5          (Trial Exhibit 353 received

6           in evidence)

7    **BY MR. HOWDEN**

8    **Q.**  And, again, if we look at the information in the top

9    portion of the certification, this refers to a shipment of 600

10   goggles shipped to Iraq on June 13, 2005, is that correct?

11   **A.**  Yes.

12   **Q.**  And, again, if we do the math in terms of goggles shipped

13   and goggles remaining on back order, this would be the fourth

14   shipment of goggles in the Battalion Set II contract sent to

15   Iraq?

16   **A.**  Yes.

17   **Q.**  And this time when we look at the certification form, the

18   two columns that Judge Patel was just asking but are no longer

19   there, right?

20   **A.**  Right.  And I think I answered that question.

21   **Q.**  So tube testing and tube manufacturer no longer included?

22   **A.**  Yes.

23   **Q.**  What we do have though are what you've described as the

24   key numbers, the important numbers, the resolution, signal to

25   noise and FOM, right?

ROCKLIN - CROSS EXAMINATION / HOWDEN

1    **A.**    Yes.

2    **Q.**    If you look at the signal to noise values for all 600 of

3    these goggles, the signal to noise values are either 18, 19 or

4    20, isn't that right?

5    **A.**    Yes.

6    **Q.**    And they are all whole numbers; no fractions, no decimals,

7    just those three whole numbers, is that correct?

8    **A.**    It appears to be so, yes.

9    **Q.**    And the resolution values on these goggles, with the

10   exception of five entries, are all either 42, 44 or 47, isn't

11   that correct?

12   **A.**    Yes.

13   **Q.**    Based on your experience in the night vision business,

14   isn't that rather extraordinary that you could have this many

15   pairs of goggles and only have those three signal to noise

16   value for 600 pairs of goggles?

17   **A.**    No, it's not extraordinary by any means.

18   **Q.**    And, in fact, isn't it also extraordinary that -- to have

19   600 sets of resolution values all that are either 42, 44, 47 or

20   44.5?

21   **A.**    No, it's not.

22   **Q.**    Okay.

23           (Brief pause.)

24   **Q.**    Do you have Exhibit 14 in front of you?  Is that included

25   in those?

1   **A.**    Yes.

2   **Q.**    I'm not sure I have Exhibit 14 in front of me.

3            (Brief pause.)

4   **Q.**    What is Exhibit 14?

5   **A.**    It's a letter that was sent to me on August 17th by Ramzi

6   Abu-Taleb by email.

7   **Q.**    And it relates to the Battalion Set II contract?

8   **A.**    Yes.

9   **Q.**    Communications he was receiving about it from Newcon?

10  **A.**    Would you repeat the question?

11  **Q.**    Questions that he was getting about your performance under

12  the contract that were raised by Newcon?

13  **A.**    Yes.

14  **Q.**    And he was expressing his concerns to you?

15  **A.**    Yes.

16  **Q.**    And you received this email in the ordinary course of

17  business?

18  **A.**    Yes.

19  **Q.**    And you ended up responding to it in a couple of different

20  forms, didn't you?

21  **A.**    Yes.

22  **Q.**    Okay.

23            **MR. HOWDEN:**  Your Honor, I would offer Exhibit 14

24  into evidence.

25            **MS. HAMILTON:**  No objection.

1          **THE COURT:**  Exhibit 14 is admitted.

2          (Trial Exhibit 14 received

3           in evidence)

4          **MR. HOWDEN:**  Can we publish that, please?

5          (Document displayed)

6    **BY MR. HOWDEN**

7    **Q.**  So this was sent by Ramzi, who is the president of ITE, to

8    you on the morning of August 17th, 2005, correct?

9    **A.**   Yes.

10   **Q.**  And that was before you called Newcon on that same

11   morning, correct?

12   **A.**   Yes.

13   **Q.**  And in his message to you he told you that he had been

14   contacted by your competition and were pressed to start dealing

15   with them for the following reasons, and he listed those

16   reasons.

17       Among other things he said that ATN is dealing with a

18   small factory and will not be able to meet the upcoming

19   requirements on schedule;

20       That ATN will ship in very small quantities;

21       And that the ATN people in Russia are not getting

22   anywhere.

23       And he asked you:  "What's going on?  We have a lot riding

24   on this, as you do."  And he says:  "Get everything back on

25   track for our mutual benefit."

ROCKLIN - CROSS EXAMINATION / HOWDEN

1      And he said that to you because everything was not on

2   track at that time, isn't that correct?

3   **A.**   Define "everything"?

4   **Q.**   Well, in point of fact, at that moment in time you were

5   having difficulty -- your suppliers, rather, were having

6   difficulty exporting the goggles to you?  They were having

7   trouble getting them out of Russia, isn't that correct?

8   **A.**   Yes.  One shipment was held.

9   **Q.**   And you didn't know if there were going to be additional

10  shipments withheld?

11  **A.**   I did not know.

12  **Q.**   And, in fact, you had not received goggles for several

13  weeks from Russia?

14  **A.**   That's true.

15  **Q.**   And you were beginning to fall behind your delivery

16  schedule?

17  **A.**   That I'm not sure, but possible.

18  **Q.**   And you understood when Ramzi sent you this email, that

19  the competition he was referring to was Newcon?

20  **A.**   After I made the call, I verified that.

21  **Q.**   Okay.  And part of this message from Ramzi is an implicit

22  threat from him, isn't it?

23  **A.**   More kind of a demand.

24  **Q.**   Okay, a demand.  And the demand is either get your act

25  together or I may go deal with your competition, right?

1   **A.**    Yes.

2   **Q.**    That did not make you happy?

3   **A.**    No.

4   **Q.**    That and a number of other things made you mad at Newcon?

5   **A.**    Yes.

6   **Q.**    Including the fact that you suspected them of complaining

7   to TACOM about your product?

8   **A.**    Yes.

9   **Q.**    And you thought that they might be responsible for your

10  delays in Russia, in getting your goods out of Russia?

11  **A.**    Yes.

12  **Q.**    And now your prime contractor is hinting that if you don't

13  get your act together, he may go do business with them?

14  **A.**    Yes.

15  **Q.**    And it was with all those things in mind that you called

16  Newcon later on on the morning of the 17th?

17  **A.**    Yes.

18  **Q.**    And you weren't happy with Newcon?

19  **A.**    No, I was not.

20  **Q.**    And you let them know that when you called them up?

21  **A.**    Yes.

22  **Q.**    And in that first call to Newcon, you were talking to both

23  Mr. Beker and Mr. Prilik?

24  **A.**    Yes.

25  **Q.**    And you let them know what you thought?

1  **A.**    Yes.

2  **Q.**    You threatened legal action?

3  **A.**    Yes, I did.

4  **Q.**    In fact, at the time you called them, hadn't you already

5  made up your mind to go see your lawyers to see what they could

6  do to intercede with Newcon?

7  **A.**    Whether I made up my mind and don't recall, but I wanted

8  first for them to confirm whether they are doing all that, and

9  they did.

10  **Q.**    Well, what Mr. Beker confirmed was that he had

11  communicated with TACOM about what he perceived as ATN's

12  shortcomings, isn't that correct?

13  **A.**    Among other things, yes.

14  **Q.**    He didn't tell you that he had meddled with Russian

15  customs in that call, did he?

16  **A.**    I don't recall whether he said that in that call, no.

17  **Q.**    But he wasn't bashful about the fact that he had

18  complained to TACOM about ATN?

19  **A.**    He did not hide that fact, no.  But I believe in general

20  when I refer about the problems in Russia, the exact wording

21  was:  "I think that the contract was stolen from me and I will

22  do everything in my power to take it back."

23  **Q.**    Well, thank you for volunteering that, but --

24  **A.**    You're welcome.

25  **Q.**    (Continuing) -- but what he really explained about

1  stealing the contract was more specific, wasn't it?  He said

2  it again later in the recorded calls?

3  **A.**   Yes, he did.

4  **Q.**   He said that you stole the contract?

5  **A.**   Because we sold it too cheaply.

6  **Q.**   Yeah, because your goods didn't meet the quality standards

7  required by the contract?

8  **A.**   I don't recall him saying that.  It was all about the

9  price, not about the quality.

10  **Q.**   Well, we'll see when we review the calls.

11  **A.**   Okay.

12  **Q.**   And in that first call on the 17th, you weren't happy with

13  any of the answers that Newcon was giving you, were you?

14  **A.**   No.

15  **Q.**   But you were having trouble in holding up your end and

16  performing on the contract with ITE, correct?

17  **A.**   Yes.

18  **Q.**   You asked Newcon for some kind of assistance?

19  **A.**   No.  I did not ever ask Newcon for any help or assistance.

20  **Q.**   Ever?

21  **A.**   Ever.

22  **Q.**   Okay.

23  **A.**   With an exception of the $50,000 later on.  That was the

24  only instance.

25  **Q.**   The 50,000 that the FBI asked you to ask for?

1  **A.**   Yes.

2  **Q.**   And after your conversation with -- the first call with

3  Mr. Beker and Mr. Prilik, how did you leave things with them?

4  **A.**   I think it was to the extent:  Guys, think what you're

5  doing.  You're sabotaging the contract.  We'll use all --

6  basically I alluded that we will sue him.

7  **Q.**   And then a little while later Mr. Prilik called you back?

8  **A.**   Yes.

9  **Q.**   And in that telephone call you say that he made some

10  suggestions that you found alarming and untoward, is that

11  correct?

12  **A.**   Yes.

13  **Q.**   So much so that you went to your lawyers then?

14  **A.**   Yes.

15  **Q.**   Reported your conversation to them and that they, in turn,

16  went to the FBI?

17  **A.**   Yes.

18  **Q.**   And eventually, what was it, on the 24th of August is when

19  the FBI and the prosecutors came to see you?  I won't hold you

20  to the exact date.

21  **A.**   Right.  But somewhere in that range.

22  **Q.**   Okay.  And between the 17th and the day that the FBI came

23  to see you, no one from Newcon had called you back, is that

24  right?

25  **A.**   No.

1  Q.   There had been no further discussions between you and Mr.

2  Prilik about anything?

3  A.   No.

4  Q.   And after the FBI recruited you to record telephone calls

5  for them, you still hadn't heard back from Mr. Prilik?

6  A.   Could you define "recruitment"?

7  Q.   Well, they asked you and you agreed.

8  A.   That's a recruitment?  Then, yes.

9  Q.   I take back the word "recruitment."  The FBI asked you to

10  tape calls for them?

11  A.   Yes.

12  Q.   And you agreed?

13  A.   Yes.

14  Q.   And after you agreed to tape calls for them, Mr. Prilik

15  did not call you?

16  A.   No, he did not.

17  Q.   And Mr. Beker did not call you?

18  A.   No, he did not.

19  Q.   After you agreed to start taping calls, you called them?

20  A.   Yes.

21       MR. HOWDEN:  Your Honor, I would suggest this would

22  be a perfect time to stop for the day, because I'm about to get

23  into the tape recordings.

24       THE COURT:  Okay.  Didn't seem like we got very far

25  today.

 1          **MR. HOWDEN:**  Your Honor, should I take personal

 2   offense at that?

 3          **THE COURT:**  No, you shouldn't take personal offense.

 4   I just don't know what happened to the time.  It just went

 5   speeding away, I guess.  It's almost 1:30.

 6          But the jurors certainly expect to be excused at this

 7   point, and we'll do that.  I have some other matters this

 8   afternoon anyway I'm going to have to attend to, but in any

 9   event would you please follow the instructions about not

10   discussing the case amongst yourselves or anyone else and do

11   not form or express any opinion based upon what you've heard so

12   far.

13          You're excused for the day.  We'll see you tomorrow

14   morning at 8:30.  And I appreciate all of you being here on

15   time.  That really is very important and very helpful to us.

16   Thank you.  Have a very great, everyone, and evening.

17          (Jury exits courtroom at 1:24 p.m.)

18          **THE COURT:**  I will remind you, Mr. Rocklin, that

19   you're not to discuss your testimony with any other persons,

20   including the prosecutors until the cross-examination is over.

21          **THE WITNESS:**  Okay.

22          **THE COURT:**  Okay.  "Prosecutors" being, you know, the

23   team.

24          **MS. HAMILTON:**  Understood.

25          **THE COURT:**  All people working under its direction

1   and control, et cetera.

2            Anything else we need to take care of?

3        **MR. HOWDEN:**  I don't think so, your Honor.

4        **THE COURT:**  I didn't mean to say that you were

5   dragging.  Did we take a break that was too long?  It seemed

6   like the time went faster than I had thought.

7        **MR. OSTERHOUDT:**  I'm sorry, your Honor.  We are

8   considering whether to take something else up.

9            (Discussion held off the record

10            amongst defense counsel.)

11       **MR. OSTERHOUDT:**  Could we excuse the witness, your

12  Honor?  We have a brief matter to raise.

13       **THE COURT:**  Outside the presence of the witness?

14       **MR. OSTERHOUDT:**  Yes.

15           (Witness steps down.)

16       **MR. OSTERHOUDT:**  Your Honor, what I was worried about

17  in listening to the examination was I think that we can't

18  preclude inquiry fairly into his performance of this contract.

19           I understand you ruled at one point we can't have a

20  bunch of experts trot in from Russia.  Totally accepted.  But

21  what the government has done is take that and make it into an

22  absolute prohibition against mention of the fact that he's not

23  complying with contract specifications, and he's not.  The

24  government is keeping the truth from the jury.

25           And it doesn't have to be a big deal, but what

PROCEEDINGS

 1   happened was on the 17th of June, they tested his stuff and it

 2   failed.

 3           **THE COURT:**  Well, let me go to the heart of it.  If,

 4   in fact, it involves some misrepresentation by him or people

 5   working under his direction and control of which he was aware,

 6   et cetera, it goes to his credibility, then certainly you can

 7   go into it.

 8           If it's just, you know -- I mean sometimes even

 9   though goods may not meet specifications exactly, that doesn't

10   mean that the purchaser of the goods or person, you know,

11   entitled to the performance necessarily doesn't accept them or

12   is not willing to just sort of overlook it or waive it or

13   whatever.

14           So the question is, it seems to me, if, in fact,

15   there were misrepresentations made on various forms or other

16   information provided or whatever, then that is fair game

17   because, you know, that goes to his credibility.

18           **MR. OSTERHOUDT:**  I understand, your Honor.

19   Appreciate it.  But going just a bit beyond that.  What

20   happened was --

21           **THE COURT:**  Why did I have a feeling that's where it

22   was going.

23           **MR. OSTERHOUDT:**  No, no.  Please.  He keeps saying, I

24   complied with this.  Didn't have a problem.  Everything they

25   said in their proposed contract was false.

1          It wasn't.  And that has not to do with whether TACOM

2    had not had a right to take what they took and decide as they

3    did.  But the facts are so glaring.

4          Here is Prilik and Beker for months saying in emails

5    to TACOM, You know, it isn't going to work because they can't

6    meet the specifications basically.  And then finally TACOM

7    says, Okay, we're going to have a look.  They test it.  They

8    don't make the specifications, even close to the 750.

9          So they put a stop order to Ramzi.  Ramzi leaned on

10   this guy.  They persuaded TACOM to take another look.  They

11   tested more.  They also failed.  But then they persuaded TACOM

12   that in Russia they have a different resolution metric and they

13   had a different -- and that that accounted for the difference.

14         And so McAleer, the contract officer -- and this is

15   what's going to be here -- and Bean said, All right.  We can

16   fight about this.  He has an argument.  Why litigate it for a

17   long time?  They are not complaining in Iraq.  We will take

18   them.  And they accepted them.

19         Now, that's all there is there.  Nobody wants to

20   fight about whether TACOM was right or wrong on that, but we do

21   think that has to be in front of the jury because that's what

22   animated these guys when they're telling him, You know you

23   can't perform.  You didn't call because I asked you to.  You

24   had to call.

25         They really always believed that this fellow was

1  fraudulently bilking the government.  And that's what -- and if

2  we don't have this kind of evidence before the jury, I'm really

3  afraid that the argument will be made, or at least the

4  inference will be left, or so they thought that.  They had no

5  ground to think that.  So they thought he couldn't perform.

6  Obviously, he did.  And that's the end of the story.

7          And I don't think he should be protected from that

8  scrutiny.  It doesn't have to be experts.  It doesn't have to

9  be all that.  But we have to be able to explain the state of

10 mind of these defendants when they were on these phone calls,

11 and that's what I'm afraid is getting lost and very, very

12 concerned about.

13         **MS. HAMILTON:**  Your Honor, what I start with is the

14 documents I believe that Mr. Osterhoudt is referring to are

15 documents with which the defendants already conceded.

16         They had no idea that any of these events were

17 occurring at the time they occurred.  They had no idea that

18 ATN's goggles were being tested.  They had no idea what the

19 test results were.  They had no idea of any --

20         **THE COURT:**  Tested by whom?

21         **MS. HAMILTON:**  By Night Vision Laboratory.  By

22 TACOM's -- the Army's facility testing --

23         **THE COURT:**  Okay.  Okay.  That's what I'm trying to

24 find out.

25         **MS. HAMILTON:**  Sorry.  By the Army's unit that tests

 1  night vision goggles.  So, therefore, none of that information

 2  can be used to show the state of mind of the defendants because

 3  they've already conceded.  They didn't know about any of that

 4  information at the time.

 5          What we're -- and the other piece here is, just in

 6  terms of with -- at least with Mr. Rocklin, all that

 7  information is just -- it's 608(b).  I mean, Mr. Rocklin can be

 8  impeached on the information contained in the recordings.

 9  There is discussion about the quality of the goggles in the

10  recordings.

11          The United States has no intention of objecting about

12  what occurred in those conversations as it goes to the state of

13  mind the defendants.  But this other evidence, it can't

14  really be relevant to the defendants' state of mind because the

15  defendants weren't aware of it at the time.

16          MR. OSTERHOUDT:  They were aware of the testing

17  because they got an email on June 2nd that said:  Arie, with

18  take this very seriously, your complaints about ATN.  We're

19  going to have it -- we're going to deal with it.  We're going

20  to test everything and see about it --

21          MR. WARD:  I think that misstates the document.

22          MR. OSTERHOUDT:  No, it doesn't.

23          MR. WARD:  We can look at the document, but the

24  document says:  This is now a matter between the Army and its

25  prime contractor.  We thank you for your complaints.  We take

PROCEEDINGS

1  this seriously.  We'll be conducting an investigation.

2          The point that Ms. Hamilton is making is correct.

3  They had no knowledge of the testing.

4          The other, larger point is at the end of the day

5  TACOM, in consultation with the Night Vision Labs, accepted the

6  goggles, found that they were in compliance, moved on.

7  Everyone was happy, except for the defendants.  Thus, the calls

8  in August and the payments and everything else.  They are

9  separate things.

10         **MR. OSTERHOUDT:**  The point is that they didn't know

11  about it, what the result was.  They did know there would be an

12  investigation.  They didn't know that TACOM had done this

13  whitewash.  They didn't know that.  If they had, there would

14  have been no recorded conversations.  Why would they

15  approach -- why would he even talk to Rocklin about cooperating

16  to complete the contract if they knew it was all cool with

17  TACOM and he stood to gain $20 million or whatever.  He doesn't

18  want their $250,000.  It only happened because they didn't know

19  that.

20         But he knew it, and he shouldn't be allowed to get up

21  here and parade his compliance that way.  It's not fair.  It's

22  not fair not to allow that fact to be before the jury.  He can

23  say, and he will say:  Look, we settled this.  We -- Our

24  lawyers, we went back.  We settled it.  We explained, it's a

25  different Russian metric.  We're stuck with that.  We

PROCEEDINGS

1  understand, because you didn't allow the expert.  But we

2  shouldn't be stuck without that.  It's not fair.  Not fair that

3  the government shouldn't shield at least those facts from

4  coming out.

5       **MR. HOWDEN:**  And, in fact, your Honor, during the

6  telephone calls the defendants raised this issue with Mr.

7  Rocklin and say, You have this quality issue.  We're going to

8  keep going on about the 750, 1250.

9       And Rocklin is going to be up here continuing to

10  insist that he was fine; that it was fine without us being able

11  to inquire that he knew when our clients said those things to

12  him in those calls, that, in fact, the Night Vision Laboratory

13  had tested his goggles and they had failed.

14       **MR. WARD:**  No.  What the Night Vision Laboratories --

15  what he knew at the time was that they had tested it.  They had

16  met with ATN officials.  They had determined different testing

17  methodologies.  And most important, that TACOM had blessed ATN

18  and told them, We're satisfied.  You're in compliance.  Resume

19  deliveries.

20       So during all these conversations, what Dmitry

21  Rocklin says is -- I think the quote is "I think for now they

22  are satisfied with the quality."  So Dmitry Rocklin's state of

23  mind is, we're moving forward on the quality issue.  They've

24  addressed it.  They've resolved it.

25       Certainly, Derek McAleer in his mind the issue was

 1   addressed.  It was resolved.  ATN was continuing to deliver.

 2          **MR. HOWDEN:**  And both of those witnesses can say

 3   those things, your Honor, but the fact of the matter remains

 4   their goggles were tested and they failed both tests that the

 5   Night Vision Laboratory applied to them.

 6          Now, again, as you've said, TACOM is entitled to do

 7   with that information what it want.  It can make whatever

 8   decision what it wants.

 9          But Rocklin knew that his goggles had been tested and

10   failed and when he had the conversations with the defendants,

11   he knew that that was still lurking in the background.  Even if

12   he thought they were past it already, he knew that there was

13   this sore issue, if you will, still lurking out there.

14          **MR. OSTERHOUDT:**  He kept --

15          **THE COURT:**  Is the issue whether there was some sore

16   issue lurking out there with TACOM and so forth, or is it

17   whether actual misrepresentations were made or being made

18   regarding any issue?

19          **MS. BOERSCH:**  And it's the defendants' intent.  It's

20   their state of mind.

21          I mean, I think this issue, as Mr. Osterhoudt says,

22   goes straight to the heart of the defendants' defense.  If they

23   didn't intend to defraud, they honestly believed that he could

24   not comply.  The agreement that's discussed on the tape was not

25   an agreement not to perform.  They believe, based on all this,

1  he couldn't possibly perform.  They are entitled to put on

2  evidence of.

3          The government is basically bootstrapping your order

4  on the experts to preclude the entire defense as to the intent

5  of the defendants when they're having these conversations was

6  Mr. Rocklin.

7          MR. OSTERHOUDT:  They didn't know that.  They didn't

8  know this thing that TACOM had blessed it.  And that's why they

9  kept on pestering TACOM.  That's why they kept on doing it.

10          You heard the Prilik conversation on the 9th of

11  September.  That was because he didn't know that.  So he

12  couldn't understand how -- you said you were going to

13  investigate.  Apparently, they are still producing.  What's

14  going on?

15          MR. MOORE:  Your Honor --

16          MR. WARD:  And --

17          MR. MOORE:  Wait, hold on.

18          There's something that's not yet in evidence.  It's

19  going to be the tape between Mr. Prilik and Mr. McAleer.  Mr.

20  Prilik raises the quality issue, the 750 FOM, in that

21  conversation.  It will be played.  And at no time does

22  Mr. McAleer with -- he's got the knowledge that they have

23  changed course now.  They are going to let these things pass,

24  even though they weren't in conformance.  He never elucidates

25  that to Mr. Prilik during that conversation.

1            **MR. WARD:**  That's --

2            **MR. MOORE:**  During that conversation, Mr. Prilik is

3    under the false impression that there's still a 750 FOM

4    non-compliance issue.

5            It goes to his state of mind.  And this is a very key

6    conversation, because this is the conversation that the

7    government says is the date of omission.  And so when this

8    guy's state of mind, talking to Mr. McAleer, the very person

9    he's supposed to be defrauding, and he asks specifically

10   Mr. McAleer in the tape, Look, if you guys are happy with it,

11   great.  But as far as I know, you're not.  And Mr. McAleer

12   never discloses that they are happy with it.

13           So this goes directly to the state of mind of Arie

14   Prilik, not only on September 9th, but all the conversations

15   that follow with Mr. McAleer.

16           **MR. WARD:**  Maybe we should look at --

17           **THE COURT:**  Well, maybe what should happen is we will

18   wait until that comes in during Mr. McAleer's testimony.

19           **MR. WARD:**  Because I think what Mr. McAleer says

20   is -- Arie Prilik says, Well, then there's the quality issue

21   and that's a secondary issue.  And I think Mr. McAleer's exact

22   words, and we should check the transcript, are "Well, we

23   resolved that one."

24           **MR. OSTERHOUDT:**  "We addressed that."

25           **MR. WARD:**  Or addressed that.  "We addressed that

1    issue."

2              **MR. OSTERHOUDT:**  Period.

3              **MR. WARD:**  So I don't think it's right to say he

4    didn't say anything.  In fact, he said, "We addressed that

5    issue."

6              **MR. OSTERHOUDT:**  Well, we can take it up with

7    McAleer, your Honor, if you suggest we try to do that.  If the

8    Court finds it --

9              **THE COURT:**  Well, if that conversation is going to

10   come in, then it seems to me that's the time to raise it.

11             **MR. OSTERHOUDT:**  But we shouldn't be -- might I

12   respectfully say, I don't think we should be precluded from

13   relevant inquiry of this witness as to these developments,

14   because I don't see what the harm to anybody is.

15             **MS. BOERSCH:**  And it goes to his credibility.

16             **MR. OSTERHOUDT:**  I mean, I don't see any problem with

17   it.  It's not going to take up court time.  It's not

18   irrelevant.

19             And it's not a sideshow, as they used to say, where

20   we're going to go investigate whether he --

21             **THE COURT:**  Those might have been my words.

22             **MR. OSTERHOUDT:**  No.  Mr. Ward did that.

23             **MS. HAMILTON:**  But I think Mr. Ward took them from

24   Judge Patel.

25             **MR. MOORE:**  And it's also material to the fact that

1   ATN is having delivery problems, because there was a delay and

2   the delay was because of the stop work order.  So he's having

3   problems --

4           **THE COURT:**  Well, you can ask him about that.  I

5   mean, about all of -- you know, the delay, the dates of

6   delivery and so forth.  They're here.  They're at issue and so

7   forth.

8           But exactly how is it that you intend -- with what

9   questions do you intend to get into it with this witness about

10  their compliance?

11          **MR. OSTERHOUDT:**  I think you'd say -- among other

12  things, you -- there are other credibility questions about

13  specific documents, but beyond that I think you'd say:  Mr.

14  Rocklin, you testified that you completed this contract.  There

15  is no -- did the contract and the things it says -- alludes to

16  in this agreement and on the telephone about what you can't do

17  or are having problems with, those are false.  But isn't it a

18  fact that you did have a big problem, a huge bump in the road,

19  because Night Vision Labs said you didn't comply with the 750

20  specification.  And he'll say:  Yes, but we settled it.  What

21  did you do?  Well, we went back to Washington.  You know, it

22  was a different Russian thing.

23          But that was a big problem.  It caused a stop order,

24  and it got Mr. Abu-Taleb excited because that was a stop order

25  and it endangered the contract.  But you say you managed to

 1   overcome it.  That's all.  We should be able to show that.  He

 2   shouldn't get a pass from saying, he's got no problems here --

 3            **THE COURT:**  Well, I'll let you ask it as a general

 4   question and see where it goes.  You know, whether, in fact, he

 5   was -- they were in compliance and whether there were any

 6   questions regarding their compliance.  But I don't want to go

 7   into excruciating detail or also into what other testing was

 8   done and so forth.  He doesn't -- he doesn't know what testing

 9   was done, other than what he was told.

10            **MR. OSTERHOUDT:**  He knows.

11            **THE COURT:**  Well, yeah, but, again, other than what

12   he was told.  So, you know, in terms of questions about, "Were

13   there issues with your compliance?"  You know, and you can ask

14   it in that general fashion, then follow up.  I guess we'll have

15   to take it question-by-question.

16            **MR. OSTERHOUDT:**  And you'll stop us if we go too far,

17   but I don't to go too far.  I don't want him to get away with

18   misleading.

19            **THE COURT:**  Okay?  Anything else?

20            **MR. HOWDEN:**  No, your Honor.

21            **MS. HAMILTON:**  No, your Honor thank you.

22            **MR. WARD:**  Thank you.

23            **THE COURT:**  Okay, okay.  I do have a hearing in here

24   this afternoon.

25            **MS. HAMILTON:**  Everything goes.

1            MR. HOWDEN:  Do you want us to clear up?

2            THE COURT:  We are not going to have any people

3  brought in in custody, and I'm not sure if any parties are

4  here.  It's just going to be attorneys arguing.

5            MR. OSTERHOUDT:  We should take our stuff and get

6  out.

7            THE COURT:  This the is off the record.

8            (Discussion held off the record.)

9            (Whereupon at 1:43 p.m. further proceedings

10            in the above-entitled cause was adjourned

11            until Wednesday, January 19, 2011 at 8:30 a.m.)

12                          -   -   -   -

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                                        770

1                        **I   N   D   E   X**

2
**PLAINTIFF'S WITNESSES**                    **PAGE**    **VOL.**
3

4    Direct Examination resumed by Ms. Hamilton      605       5

5
Cross Examination by Mr. Howden                 634       5
6

7

8                     **E X H I B I T S**

9
**TRIAL EXHIBITS**              **IDEN.   VOL.**    **EVID.    VOL.**
10
114                                           607       5
11   143                                           607       5
48                                            612       5
12   465                                           641       5
5                                             691       5
13   472                  696      5
331                                           721       5
14   470                                           727       5
471                                           734       5
15   353                                           745       5
14                                            748       5
16   **473                  712      5**
**474                  712      5**
17

18

19

20

21

22

23

24

25

                    Lydia Zinn, CSR,  RPR
           Official Reporter -  U.S. District Court
                        (415)  531-6587

## CERTIFICATE OF REPORTER

WE, LYDIA ZINN, and DEBRA PAS, Official Reporters for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in CR. 07-765 MHP, United States of America v. Mendel Beker, et al., were reported by us, certified shorthand reporters, and were thereafter transcribed under our direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by us at the time of filing

The validity of the reporters' certification of said transcript may be void upon disassembly and/or removal from the court file.


_____/s/ Lydia Zinn_____
          Lydia Zinn, CSR 9223, CRR


_____/s/ Debra L. Pas_____
          Debra L. Pas, CSR 11916, CRR


          Tuesday, January 18, 2011


Lydia Zinn, CSR,  RPR
Official Reporter - U.S. District Court
(415)  531-6587