```
                                            Volume 6

                                            Pages 771 - 945

                      UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA

                 BEFORE THE HONORABLE MARILYN HALL PATEL

UNITED STATES OF AMERICA,          )
                                   )
              Plaintiff,            )
                                   )
  vs.                              ) NO. CR. 07-0765 MHP
                                   )
MENDEL BEKER, ARIE PRILIK, and     )
NEWCON INTERNATIONAL,              )
                                   ) San Francisco, California
              Defendants.          ) Wednesday
                                   ) January 19, 2011
_____) 8:50 a.m.
```

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**
**For Plaintiff:**          U.S. Department of Justice
                            Antitrust Division
                            450 Golden Gate Avenue, Room 10-0101
                            San Francisco, CA 94102-3478
                            (415) 436-6673
                            (415) 436-6687 (fax)
                      **BY: DAVID J. WARD**
                            **ANNA TYRON PLETCHER**
                            **RICHARD B. COHEN**
                            **JEANE HAMILTON**

(Appearances continued on next page)

1    APPEARANCES (CONT'D)

2    **For Defendant**s:            Winston & Strawn, LLP
                                101 California Street
3                                San Francisco, CA  94111
                                (415) 591-1439
4                                (415) 591-1400 (fax)
                          BY:  **JONATHAN ROBERT HOWDEN**
5
     **For Defendants:**           Martha A. Boersch
6                                Attorney at Law
                                555 California Street, 26th Floor
7                                San Francisco, CA  94104
                                (415) 626-3939
8                                (415) 875-5700 (fax)
                          BY:  **MARTHA A. BOERSCH**
9
     **For Defendants:**           Law Offices of William L. Osterhoudt
10                               135 Belvedere Street
                                San Francisco, California  94117-3915
11                               (415) 664-4600
                                (415) 664-4691 (fax)
12                         BY:  **WILLIAM L. OSTERHOUDT**

13   **For Defendants:**           Law Offices of Frank S. Moore
                                235 Montgomery Street, Suite 854
14                               San Francisco, CA  94104
                          BY:  **FRANK S. MOORE**
15

16

17

18

19

20

21

22

23

24

25

1                        **P R O C E E D I N G S**

2    January 19, 2011                                    8:50 a.m.

3              (Jury in at 8:50 a.m.)

4              (Witness resumes stand.)

5              **THE COURT:**  You may be seated.  Good morning, ladies

6    and gentlemen.

7              **THE JURORS:**  Good morning.

8              **THE COURT:**  Enthusiastic group.  Good.

9              Thank you.  And I apologize.  This was my fault; not

10   the attorneys' or -- some other matters came up.

11             So, in any event, we are all ready to settle in and

12   listen to some more testimony.  We do have other witnesses

13   besides Mr. Rocklin.

14             **MR. HOWDEN:**  We may even get to them today.

15             **THE COURT:**  We may even get to some of them.

16             Mr. Rocklin, I remind you, you are still under oath,

17   and the oath will not be readministered.

18             Mr. Howden, you may proceed or continue.

19             **MR. HOWDEN:**  Thank you, your Honor.

20                   **CROSS-EXAMINATION RESUMED**

21   **BY MR. HOWDEN**

22   **Q.**  Mr. Rocklin, I believe yesterday you mentioned at some

23   point that, in fact, in about August of 2005, your suppliers

24   were having some trouble with Russian Customs.  Is that

25   correct?

1   **A.**   Yes.

2   **Q.**   And at the time you began experiencing delays in receiving

3   shipments from NPZ from Russia, do you know if NPZ had an

4   export license for the goggles they were shipping you?

5   **A.**   I am not aware of that.

6   **Q.**   You don't know if they did, or not?

7   **A.**   I don't know if they did, or not.

8   **Q.**   Okay.  And did ATN -- was it -- did Russian Customs

9   require ATN to have any kind of export license, so that you

10   could import the goggles from Russia to the United States?

11   **A.**   No.

12   **Q.**   Isn't it true that the Russian Customs service contended

13   that the goggles that were being shipped to ATN did require an

14   export license?

15          **MS. HAMILTON:**  Objection, your Honor.  This is --

16   there's no foundation for this question.

17          **THE COURT:**  Objection is sustained.

18          You'd have to lay a foundation.

19   **BY MR. HOWDEN**

20   **Q.**   Are you aware of the nature of the customs dispute that

21   NPZ had with Russian Customs?

22   **A.**   I know that one of the shipments was held.

23          I don't know all the details; why it was held.

24   **Q.**   Were you aware that NPZ ended up getting into a series of

25   lawsuits with Russian Customs?

```
 1              MS. HAMILTON:  Objection, your Honor.  Calls for
 2  speculation.
 3              MR. HOWDEN:  I'm asking him if he was aware.
 4              THE COURT:  And what is the relevance of it?
 5              MR. HOWDEN:  Well, I'm trying to establish that he
 6  was aware of the actual reason why his shipments were delayed
 7  from Russia.  He's already try to lay it at somebody else's
 8  feet.
 9              THE COURT:  Well, why don't you ask the him the
10  question:  What the reason was, if he knows.
11              First of all, I mean, the jury -- you know, you're
12  asking the questions.  And I've instructed the jury they're not
13  to assume anything from the, you know, facts contained in the
14  question.  It depends upon the answer.
15              So there are other ways of positing the question,
16  without making it sound as if that is, in fact, the fact.
17              MR. HOWDEN:  I'll try again, your Honor.
18  Q.  Do you know why Russian Customs delayed the NPZ shipment
19  of goggles to ATN?
20  A.  To my knowledge, it was stopped because of the corrupt
21  customs officials in Novosibirsk.
22  Q.  And what's the basis of your knowledge?
23  A.  That's what NPZ was telling Lenny, and Lenny was telling
24  me.
25              (Reporter requests clarification)
```

1            **THE WITNESS:**  Lenny Gaber, because he was in charge

2  of communicating with the factory.

3  **BY MR. HOWDEN**

4  **Q.**   Third-hand hearsay.  Is that correct?

5  **A.**   I don't know what third-hand hearsay is; but again, the

6  information was from Lenny, that he got from NPZ.

7            **MR. HOWDEN:**  Your Honor, I'd ask that that answer be

8  struck regarding the reason for --

9            **THE COURT:**  You asked.  You wanted to find out how he

10 knew, and -- and --

11            **MR. HOWDEN:**  Right.  And I also wanted to explore

12 whatever else he knew about the nature of it.  I wanted to ask

13 him about the --

14            **THE COURT:**  And the jury is -- you are instructed

15 that hearsay -- this is, essentially, what is referred to as

16 "hearsay."  You understand it.  And it cannot be offered for

17 the truth of the matter.  And that's what it's being offered

18 for.  And so the answer is stricken, and you're to disregard

19 it.

20 **BY MR. HOWDEN**

21 **Q.**   And the fact of matter is you, yourself, never spoke

22 directly to NPZ about the -- the reasons for the delay in their

23 shipments?

24 **A.**   No, I did not.

25 **Q.**   Everything you know, you know from somebody else?

1  **A.**    Yes.

2  **Q.**    Did you have any direct communications with anyone from

3  Russian Customs about the delay in your shipments?

4  **A.**    No, I did not.

5  **Q.**    And -- and, as I understand your testimony here today, the

6  only delay that -- that you've identified is -- is this one

7  delay in a shipment of 350 goggles.  Is that correct?

8  **A.**    Yes.

9  **Q.**    Now, I want to turn to the -- the series of recorded

10  telephone calls that you had with Mr. Prilik and -- and

11  Mr. Beker.

12      We've listened to those calls.  The vast majority of those

13  calls are in Russian, correct?

14  **A.**    Yes.

15  **Q.**    And did the FBI give you any instruction as to whether to

16  conduct the conversations in Russian, as opposed to English?

17  **A.**    No, I don't recall any instructions like that.

18  **Q.**    Did you make any effort that you considered speaking to

19  Mr. Prilik, for instance, in English in those calls?

20  **A.**    Sometimes I switched to English.

21  **Q.**    Okay, but the vast majority of it's in Russian.  Why

22  didn't you -- why didn't you attempt to speak to him in

23  English?

24  **A.**    Because from the past conversation, it was common that we

25  would speak Russian.

1  Q.   Okay.  And in your conversations with Mr. Beker -- those

2  also were in Russian.  Was there a particular reason those

3  conversations were in Russian?

4  A.   Again, past conversations were in Russian, so --

5  Q.   By --

6  A.   And this conversation was representative of those other

7  conversations.

8  Q.   And, by "past conversations," you're referring to those

9  once or twice a year, when you would see Mr. Beker at a trade

10  show?

11  A.   Yes.

12  Q.   Now, the first telephone call that you recorded was with

13  Mr. Prilik.  Is that right?

14  A.   Yes.

15  Q.   And that was on August 26th, 2005?

16  A.   Yes.

17  Q.   That was -- what?  Nine days after your last conversation

18  with him, on August 17th?

19  A.   Yes.

20  Q.   And during that nine-day period of time, neither

21  Mr. Prilik nor Mr. Beker had called you?

22  A.   No.

23  Q.   And you received the -- the tape-recorder and the cassette

24  tapes from the FBI on -- what? -- the 24th of August?

25  A.   I think that was the day.

1  Q.   And so, two days later, you called Newcon?  Is that right?

2  A.   Yes.

3  Q.   Now, I'd like to take you through part of this transcript.

4  Could we go to page 2?  And, directing your attention to

5  line 16, you stated,

6              "When we were speaking last time."

7       Were you referring to the 17th there?

8  A.   Yes.

9  Q.   And you said to Mr. Prilik,

10              "And obviously, when things, as they

11          say in Russia, don't get any better" --

12       You were referring to the delay in your shipments by

13  Russian Customs.  Isn't that right?

14  A.   Yes.

15  Q.   If we could go to page 4.  And then, on page 4, at line

16  15, you'd been discussing with Mr. Prilik different ideas.  And

17  he said,

18              "I can give my unofficial -- yes,

19          unofficial opinion, because the official

20          opinion is reserved for the boss with us."

21          And you understood "the boss" to be Mr. Beker,

22  correct?

23  A.   Yes.

24  Q.   And that what Mr. Prilik was telling you was his personal

25  opinion?

1    A.    Yes.

2    Q.    Let's go to page 5.  And at line 5 you say,

3              "Yes.  There are enough difficulties.

4              This is for sure.  Between TACOM and

5              Russia, I have this headache."

6              And again, you were discussing, at least in general

7    terms, problems you were having with your contract supplying

8    ITE with night-vision goggles.  Isn't that correct?

9    A.    Yes.

10   Q.    And -- and your problems didn't just include

11   Russian Customs.  It also included TACOM.  Isn't that correct?

12   A.    Yes.

13   Q.    And Mr. Prilik responded to you at -- beginning at

14   line 12.  Well, he's talking about "the boss."  And you

15   understood that to be Mr. Beker, correct?

16   A.    Yes.

17   Q.    (Reading)

18              "He'll be trying to make obstacles if

19              he knows, well, that you don't have the 750

20              FOM, or he thinks that he knows, he'll be

21              trumpeting about this wherever he can."

22        And you understood, Mr. Prilik was talking about whether

23   or not ATN had met the FOM requirement in the contract.  Isn't

24   that correct?

25   A.    Yes, but later on Michael, himself, refers to this as a

1   slander to TACOM.

2   **Q.**   Okay.  Thank you again.

3   **A.**   You're welcome.

4   **Q.**   And what he's -- he's saying to you -- what you understood

5   him to be saying was that Mr. Beker was going to continue to,

6   in your words, slander you regarding allegations that ATN could

7   not meet the 750 FOM requirement in the contract, right?

8   **A.**   It's in his words; not in my words.

9   **Q.**   Okay, but that's what Mr. Prilik is saying here.  Isn't

10  that correct?

11  **A.**   Yes.

12  **Q.**   And at least at this juncture, you don't deny that

13  that's -- that's one of the problems that you're having.  Is

14  that correct?

15  **A.**   I was not there to volunteer information.

16  **Q.**   Or to respond to Mr. Prilik's statements?

17  **A.**   I was responding, but I did not, I guess, comment on a

18  that fact here?

19  **Q.**   Okay.  You didn't contest Mr. Prilik's allegation that you

20  guys were having problems with the 750 FOM.  Isn't that

21  correct?

22  **A.**   No.

23          **MR. HOWDEN:**  Let's go to page 10.

24  **Q.**   Page 10 -- we'll start with line 1, but you say,

25              "Let me put it this way.  Especially

1                with the way things are going right now --

2                I'll be honest with you -- I'm not making

3                this call because my life is so good.  And

4                honestly, I simply was very busy."

5           Your life wasn't so good right then, because you were

6    having problems with the contract, right?

7    **A.**   Yes.  And the problems were instigated, in my opinion, by

8    Newcon.

9    **Q.**   Okay.  And so you called Newcon about your problems?

10   **A.**   And they confirmed that they were instigating those

11   problems.

12   **Q.**   They did that back on the 17th, according to you.  Isn't

13   that right?

14   **A.**   On the 17th.  More specifically, I recall Michael saying

15   that he confirmed that he was the one who complained to TACOM.

16        And, in the broader sense, it was, "I'll do everything to

17   stop this contract from continuing."

18   **Q.**   And so now, on the 26th, you've called them again.  And

19   you've let them know you're unhappy because you're still having

20   problems with the contract.  Is that correct?

21   **A.**   Yes.

22   **Q.**   And the reason that you called them is that you were

23   looking for some sort of solution to your problems.  Isn't that

24   right?

25   **A.**   No.

1  Q.    Let's go to page 12.  At line 10, Mr. Prilik said,

2              "Yes.  Getting back to our issues" --

3          And what were your issues back on August 26th?

4  A.    I think here, he's just coming back to the subject of the

5  Battalion Set II.

6  Q.    So the issues related to Battalion Set II, right?

7  A.    Yes.

8  Q.    And Mr. Prilik made a proposal to you, or floated an idea

9  by you.  He said,

10              "I don't think that one could do a

11              legal arrangement for two companies to

12              deliver the devices.  This is my personal

13              opinion.  This, neither -- the main

14              contractor" --

15              That being ITE.

16              -- "wouldn't want this headache, nor

17              TACOM would want this headache.  Also, I

18              don't think we that want to see two models

19              in one order."

20      Now, you understood that -- that he was floating an idea

21  about two companies supplying goggles to ITE.  Isn't that

22  right?

23  A.    No.

24      What he was saying here is that he didn't think that that

25  would be possible.

1   **Q.**   But that's the general idea that he was discussing:   The

2   idea of two companies supplying goggles to ITE.   Isn't that

3   right?

4   **A.**   And he didn't believe that it was a valuable idea.

5   **Q.**   Okay.   Okay, but the point is that was the idea that he

6   didn't think would work out:   Having two companies supplying

7   goggles to ITE, right?

8   **A.**   Yes.

9   **Q.**   And you, in fact, respond that,

10                  "Well, I don't know.   In fact, I think

11              they care about it least of all -- they

12              need it now.   You know, get the product

13              there."

14       And the "they" you're referring to is TACOM, correct?

15   **A.**   Yes.

16   **Q.**   And the point you're making is that they want the goggles

17   now, correct?

18   **A.**   Later on, I'm making a point that --

19   **Q.**   I'm asking you about this now, please, Mr. Rocklin.   Could

20   you answer my question?

21   **A.**   Yes.

22       And lower there, I'm stating there were two models

23   delivered were delivered already.

24       (Reporter requests clarification)

25              **THE WITNESS:**   Were delivered already, at that time.

1  **BY MR. HOWDEN**

2  **Q.**   And by the "two models," you're referring to the models

3  that TACOM [sic] delivered under Battalion Set I -- excuse me.

4  Not TACOM -- Newcon delivered under Battalion Set I.  Is that

5  correct?

6  **A.**   Yes.

7  **Q.**   And the model that ATN was delivering under

8  Battalion Set II?

9  **A.**   Yes.

10  **Q.**   An the point, you were trying to make to Mr. Prilik was

11  that, gee, in your view, TACOM wouldn't necessarily look down

12  their nose at the idea of two companies supplying goggles for

13  one contract.  Isn't that right?

14  **A.**   Would you repeat the question?

15  **Q.**   Sure.  The point you were trying to make to Mr. Prilik was

16  that you disagreed with his -- with -- with his negative view

17  of two companies supplying goggles to TACOM.  Isn't that right?

18  You thought it could be done?

19  **A.**   That was not a discussion here.

20  **Q.**   Well, you were pointing out to him that, in fact, two

21  companies were supplying goggles to TACOM under -- under two

22  separate contracts, right?

23  **A.**   Yes.

24  **Q.**   So that TACOM was already receiving two different models

25  of night-vision goggles, correct?

ROCKLIN - CROSS EXAMINATION / HOWDEN

1   **A.**   Yes.

2   **Q.**   And, in fact, on the next page, on page 13 at line 5 and

3   6, you elaborate on that just a little bit.  You say that,

4                   "Nobody says, well, for them to be

5              interchangeable and all that."

6         And the point you were making was that, in

7   Battalion Set II, TACOM could have specified, essentially,

8   interchangeable goggles with those supplied under

9   Battalion Set I, but they didn't, right?

10  **A.**   Correct.

11  **Q.**   And then you and Mr. Prilik have some further discussion.

12  And at the bottom of page 13, line 23, you say,

13                   "I just want to -- my problems to be

14             solved."

15        And again, the problems you were referring to were

16  your problems with the contract.  Isn't that right?

17  **A.**   Arie made overtures with offers how to solve this in the

18  business.  He had a business idea on how to solve it, and how

19  to pacify the situation.  That's what I was here referring to.

20  **Q.**   The problems you were referring to were your problems with

21  the contract.  Isn't that correct?

22  **A.**   Yes.

23  **Q.**   And you were looking for a solution to those problems,

24  right?

25  **A.**   Not from Newcon.

1  Q.   But you're talking to Mr. Prilik about looking for a

2  solution.  Isn't that correct?

3  A.   Yes.  I'm playing along in the conversation.

4  Q.   Well, whether you were playing along or not, the point is

5  you were talking to Arie Prilik, looking for a solution to your

6  problems.  Isn't that right?

7  A.   Yes.

8  Q.   And on the next page, at lines 1 and 2, you say to

9  Mr. Prilik,

10            "And we can come to an agreement.

11            Whatever."

12            And the agreement you were looking for was an

13  agreement that would solve your problems.  Isn't that correct?

14  A.   Arie made an -- some sort of proposal.  And we were

15  discussing it here.

16      Now, all I was doing is playing along.  I was saying that

17  whatever you propose, I'm open to hear.  And if we can come to

18  the agreement, I'd like to hear.

19  Q.   And I understand you say you were playing along.

20      You were looking for Arie to say something incriminating,

21  right?

22  A.   I did not ask him to say something incriminating.

23  Q.   But that's why you were playing along?  That's what you

24  were looking for?

25  A.   I was having conversation at the direction of FBI.  And

1   they were telling me to play along.

2   **Q.**   Okay.  And in the course of playing along, you proposed

3   that you could reach an agreement with Mr. Prilik.  Isn't that

4   right?

5   **A.**   I was agreeing on it; not proposing anything.

6   **Q.**   Well, in this conversation did Mr. Prilik propose an

7   agreement?

8   **A.**   I think the agreement was offer on the second conversation

9   with Arie on August 17th.

10  **Q.**   Oh.  So you were referring back to that earlier

11  conversation?

12  **A.**   Yes.

13  **Q.**   But in this conversation, you're the one who raised the

14  idea of an agreement.  Isn't that right?

15  **A.**   It was a discussion about Battalion Set II.  And it was --

16  the idea of the agreement -- it was not my idea.

17  **Q.**   In this conversation, this is the first time that an

18  agreement is suggested.  Isn't that correct?

19  **A.**   I don't remember whether it was the first time in this

20  conversation, or not.

21  **Q.**   Briefly, let's look at page 16.  You have further

22  conversation with Mr. Prilik.  And on page 16 he -- he mentions

23  to you that,

24          -- "as a very -- as one simplistic

25          possibility."

```
 1        In this conversation, Mr. Prilik was floating ideas by
 2   you.  Isn't that correct?
 3   A.   Yes.
 4   Q.   And on the next page -- page 17 -- Mr. Prilik said,
 5             "Even if we are to proceed from this
 6             working price, one could boost it for him
 7             up to the limit:  1,798.  What choice does
 8             he have, may I ask?"
 9             Who's the "him" he's referring to?
10   A.   At this point, our conversation involving this scenario
11   was to raise the price to ITE.
12   Q.   To ITE?
13   A.   Yes.
14   Q.   In other words, take away his profit margin?
15   A.   Yes.
16   Q.   Okay.  And on the next page, page 18, beginning at line 6,
17   he says,
18             "Well, let's examine the possibilities.
19             Let's say the first possibility is Dima
20             would boost it for him till $1,798, and he
21             won't make money on this, or will make the
22             minimum."
23             Again, the "him" there is ITE?
24   A.   Yes.
25   Q.   And he goes on.
```

1                    "He has an option to refuse to deliver

2               it.  He can't take it, because then he

3               would destroy his entire contract, because

4               don't forget:  The night vision is

5               approximately 25 percent of it all."

6          And again, he's referring to ITE.  Isn't that correct?

7     **A.**    Yes.

8     **Q.**  And then he goes on.

9                    "He has an option to swallow it, and to

10              rage, and to tell Dima how bad he is."

11              And again, he's talking about ITE there.  Isn't that

12    correct?

13    **A.**    Yes.

14    **Q.**  Going on to the next page, page 19, Mr. Prilik goes on.

15                   "What other options" --

16              Starting at line 6,

17                   "What other options does he have?  He

18              has an option.  Excuse me.  That's none of

19              my damn business, but if he makes money on

20              Tommy guns and radios, well, then, he will

21              move aside a little bit."

22              And again, Mr. Prilik is referring to ITE.  Isn't

23    that correct?

24    **A.**    Yes.

25    **Q.**  And what he's saying is that ITE still can -- has a profit

1  margin on the weapons and the communications equipment in the

2  contract, right?

3  **A.**    Yes.

4  **Q.**    And then he goes on.

5            "Okay.  Let's examine this further.

6            The worst case, he would say, 'No, I don't

7            want to.'  And what would happen?  He

8            simply wouldn't deliver it in full, right?"

9            And again, he's referring to ITE, right?

10 **A.**    Yes.

11 **Q.**    That ITE has an option of defaulting on that part of the

12 contract, right?

13 **A.**    Yes.

14 **Q.**    And he goes on and says,

15            "And the Americans would swallow it."

16            And when he says, "the Americans would swallow it,"

17 there hasn't been any reference to higher prices to TACOM at

18 that point.  Is that correct?

19 **A.**    Well, if he would increase the price, assuming that ITE

20 would be selling it at $1,800 -- that's the subject of the

21 conversation.

22            **MR. HOWDEN:**  Your Honor, I object.  This is

23 nonresponsive.  And it's not -- and he's volunteering, and not

24 answering the question.

25            **THE COURT:**  I'll strike the answer.  Try it again.

```
 1              MR. HOWDEN:  All right.

 2              THE COURT:  The jury is instructed to disregard the

 3    answer.

 4    BY MR. HOWDEN

 5    Q.   At this point, when Mr. Prilik says, "and the Americans

 6    would swallow it," he hasn't mentioned anything about raising

 7    prices to TACOM.  Isn't that correct?

 8    A.   At this point, no.

 9    Q.   And, in fact, what he is talking about is ITE defaulting

10    on a portion of the contract, right?

11    A.   That was one of the scenarios.

12    Q.   That's what the Americans would have to swallow?

13    A.   Yes.

14    Q.   Now, at no point during this conversation did Mr. Prilik

15    say that -- in any of these proposals -- that a higher price

16    should be charged to TACOM.  Isn't that correct?

17    A.   Do you have a -- I need to see them on -- the later part

18    of this conversation.  I think there was a discussion.

19              MS. HAMILTON:  (Indicating)

20              MR. HOWDEN:  Is this all of the transcripts?

21              MS. HAMILTON:  It's all of the transcripts.

22              MR. HOWDEN:  What exhibit is this?

23              MS. HAMILTON:  It's 101.  131.  131 is the actual

24    transcript.

25              MR. HOWDEN:  131.  Okay.
```

1   **Q.**   Showing you Exhibit 131, take a look at it, please.

2   **A.**   No.

3   **Q.**   Let's turn to the second conversation.  And -- and this

4   second conversation -- it also occurred on August 26th, later

5   that same day?

6   **A.**   Yes.

7   **Q.**   Directing your attention to page 3, beginning at -- at

8   line 8, going through line 10, Mr. Prilik told you that Michael

9   basically said that, ah, he doesn't want to burn the bridges.

10  He's willing to talk.

11       And you responded,

12           "What doesn't he want to do?  I didn't

13       get it."

14       And Mr. Prilik said, again,

15           "No.  He doesn't want to burn the

16       bridges that he -- yes, he is willing to

17       talk and meet, ah, along the lines of my

18       proposal, or something close to it, ah, but

19       the best thing to do, in order to make it

20       specific, is perhaps for Marc to get in

21       touch with him.  He'll be back in his

22       office on Monday for them to schedule a

23       meet somewhere."

24       Now, "Marc" was Marc Morgovsky?

25  **A.**   Yes.

1  **Q.**   And he was your boss.  Is that correct?

2  **A.**   Yes.

3  **Q.**   And in this conversation, Mr. Prilik isn't floating any

4  additional ideas by you at this point, right?

5  **A.**   No.

6  **Q.**   He's just telling you that Michael is willing to talk to

7  you?

8  **A.**   Yes.

9  **Q.**   And again, in this conversation, there's no suggestion

10 that Newcon or ATN should increase its prices to TACOM.  Isn't

11 that right?

12 **A.**   Not at this point.

13 **Q.**   Okay.  Let's go to the third conversation.  You called

14 Newcon and recorded this call on or about August 29, 2005.  Is

15 that correct?

16 **A.**   Yes.

17 **Q.**   And again, in this call, you spoke to Arie Prilik?

18 **A.**   Yes.

19 **Q.**   Let's go to page 2, at the bottom of page 2, lines 23 and

20 24.  And it carries over to page 3.  And Mr. Prilik told you

21 that he talked to Mr. Beker, and he is trying to ascertain for

22 himself what -- what to talk about.

23      He was telling you that Mr. Beker wants to know what you

24 want to talk about.  Isn't that right?

25 **A.**   Yes.

1           More specifically, he is asking what constitutes the idea.

2  **Q.**   Right.  Let's go on to the next page.  We'll go over that.

3  Mr. Prilik goes on.

4                "What constitute the idea?  What

5           constitutes the offer?  What constitutes

6           the request?"

7           So Mr. Prilik was telling you that Mr. Beker wanted

8  to know what your proposal was.  Isn't that right?

9  **A.**   Yes.

10 **Q.**   And in response you said, at lines 7 and 8,

11                "The contracts.  And I have

12           difficulties with them."

13          Correct?

14 **A.**   Could you go back for a second?

15 **Q.**   Sure.

16 **A.**   No.  In response to that, there is, at line 3?

17                "Well, the requests.  The ideas.  You

18           gave them, yourself."

19          That's the answer --

20 **Q.**   Okay.

21 **A.**   -- to that response.

22 **Q.**   You told Mr. Prilik that you wanted to hear Mr. Prilik's

23 idea, right?

24 **A.**   No.  I was saying here that the ideas were Mr. Prilik's

25 ideas; not mine.

1  Q.   Oh.  And then you went on and you said,

2              "The contracts.  I have difficulties

3        with them."

4        Right?

5  A.   Yes.

6  Q.   And again, in -- your idea in talking to Newcon was to

7  find solutions to your difficulties.  Isn't that right?

8  A.   We discussed this before.  And, back to the question, the

9  thing that was important for Michael is that I would ask for

10 help.  And I made a point not to ask for help.

11 Q.   But in the very next line, you did tell Mr. Prilik,

12              "And as far as I understand, you had

13       some ideas how to resolve it."

14       Right?

15 A.   Yes.

16 Q.   Resolve the problems that you were having with the

17 contract.

18 A.   But I'm not asking for help.

19 Q.   Okay.  And -- and then you go on.  At lines 16 and 17, you

20 say to Mr. Mr. Prilik,

21              "If there is a business solution."

22        You were looking for a business solution to your

23 problem.

24 A.   I was speaking with Mr. Prilik's words back to him,

25 because he referred in the past conversation to this as a

1  "business solution."

2  **Q.**   Okay.  And you're asking him for that business solution.

3  Isn't that right?

4  **A.**   No.  What I'm saying is, if there is a business solution,

5  I'm willing to listen to it.

6  **Q.**   And then Mr. Prilik says to you,

7              "When you talk about the problems, we

8          are talking about the problems of the

9          administration nature, or the production,

10         or both?"

11         And what he was asking you is:  What was the nature

12  of the problems you were having with the contract?  Right?

13  **A.**   Yes.

14  **Q.**   Were they administrative problems?  Were they production

15  problems?  Correct?

16  **A.**   In this case, the reference of administration problems --

17  my understanding was the conversation about complaints to TACOM

18  and the production problems or delivery problems from Russia.

19  **Q.**   Okay, but the point is:  Mr. Prilik is asking you about

20  the nature of your problems with the contract.  Right?

21  **A.**   Yes.

22  **Q.**   And -- and you respond both, but you, yourself, probably

23  know everything.

24      So you were admitting to him that you were having

25  different kinds of problems with the contract, correct?

1  A.   Yes.

2  Q.   And then you go on and elaborate a little bit about the

3  nature of those problems.  At line 24 you begin,

4           "Well, there is the TACOM."

5        And then it continues to page 4.

6           "The TACOM pressures from one side up

7           to kazoo.  And in Russia, they cut off

8           everything.  Nothing is coming out."

9        So you were having problems.  You told Mr. Prilik you were

10  having problems with both TACOM, and exports from Russia,

11  right?

12  A.   Right, but in my first conversation on August 17th,

13  Michael mentioned something to the extent that, "I can

14  guarantee you that nothing will come out from Russia."

15  Q.   That's the 17th?  The unrecorded call?

16  A.   Yes.

17  Q.   And Mr. Prilik goes on.  He asks you, at line 6 and line 7

18  of page 4,

19           "The TACOM pressure is in terms of the

20           quality, or in terms of the deliveries?"

21           Right?

22  A.   Yes.

23  Q.   He wants to know what kind of problems you're having with

24  TACOM, correct?

25  A.   He's trying -- he was trying to fish out as much

1   information as possible.

2   Q.   The question he was asking was:  What kind of problems are

3   you having with TACOM?  Isn't that correct?

4   A.   Yes.  That was the question.

5   Q.   And you respond to him,

6           "Well, what am I to tell you?

7           Naturally, if nothing is coming out, then

8           it's in terms of the deliveries.

9               In terms of the quality, you, as a

10          creator, you most likely know everything."

11          So you told him that you were having -- TACOM was

12   giving you problems because you were having deliveries issues

13   on the contract.  Is that correct?

14   A.   No.  What I was telling him here -- well, the part was the

15   delivery.  And I was saying here that Newcon was a creator of

16   those problems.  And he's not denying it.

17   Q.   Okay.  And then you go on.

18          "In terms of the quality, as you

19          know" --

20          Or,

21          "In terms of the quality, you, as a

22          creator, you most likely know everything."

23          What were your quality problems with TACOM?

24   A.   The Newcon complained that our unit did not meet 750 FOM.

25   Q.   Okay.  And what did you care, if -- if Newcon complained

1  to TACOM about the quality of your product?

2  **A.**    TACOM responded to that complaints.

3  **Q.**    And how did they respond to those complaints?

4  **A.**    A number of units were recalled from Iraq, and tested in

5  the Night Vision Labs.

6  **Q.**    When, approximately, did that occur?

7  **A.**    In June of 2005.

8  **Q.**    And in June of 2005, did TACOM inform you or anyone else

9  at ATN what the results of those tests were?

10  **A.**    Yes.

11  **Q.**    And what were the results of the tests?

12         By the way, who conducted those tests?

13             **MS. HAMILTON:**  Your Honor, this is not relevant.  In

14  terms of the testing and what the result were, I would argue

15  this is not relevant.

16             **MR. HOWDEN:**  Well, I think it's directly relevant,

17  your Honor.

18             **THE COURT:**  The objection is overruled.

19             But which question are you asking?  You asked two of

20  them there.

21             **MR. HOWDEN:**  The question that's pending?  If he

22  knows who actually tested them.

23             **THE COURT:**  Okay.  That was the last one you asked.

24  There was -- you slipped in two of them there.

25             **MR. HOWDEN:**  I'm just asking the last one.

1          THE COURT:  We'll take one.  Okay?

2          MR. HOWDEN:  There we go.

3          THE COURT:  Yes.

4          THE WITNESS:  My understanding -- the Night Vision

5    Labs were testing them.

6    BY MR. HOWDEN

7    Q.   The Army's Night Vision Labs?

8    A.   Yes.

9    Q.   And did you see the results of their tests?

10   A.   Yes.

11   Q.   And what were the results of their tests?

12   A.   The initial result that were there that we did not meet

13   750 FOM.

14   Q.   And was there a second round of tests conducted by the

15   Night Vision Labs?

16   A.   Yes.

17   Q.   And that again was of ITN [sic] image -- ATN

18   image-intensifier tubes?

19        Excuse me.  Too many letters in the alphabet here.

20   A.   Right.  It -- are we talking about the tubes that ATN

21   delivered?

22   Q.   Yes.

23   A.   Yes.

24   Q.   And what were the results of that second round of testing

25   by the Night Vision Labs?

1  **A.**    The second round of testing also found that FOM was not

2  met to 750, but also attributed the findings to the differences

3  in testing procedures in Russia and Army lab.

4  **Q.**    And, in point of fact, despite the fact that the ATN

5  image-intensifier tubes failed two tests by the Night Vision

6  Laboratory, TACOM decided to keep accepting your night-vision

7  equipment anyway.  Is that right?

8  **A.**    Again, they, at one point, issued a stop-work order; then

9  tested it; then attributed the differences in findings to

10 differences in testing procedures in Russia and U.S.

11     My understanding also --

12 **Q.**    Well, I'm not asking for your understanding.  Let me ask

13 you another question.

14     Did ATN's image-intensifier tubes ever meet the

15 specifications in the Battalion Set II contract, according to

16 the Night Vision Laboratory?

17         **MS. HAMILTON:**  Objection, your Honor.  That's

18 speculative, because the witness has already answered the

19 question.

20         **THE COURT:**  I think he's answered the factual

21 questions.

22         **MR. HOWDEN:**  Very good.

23 **Q.**    And so you were permitted -- you, ATN, were permitted to

24 continue providing goggles to the Army under the contract,

25 right?

1  **A.**    Yes.

2  **Q.**    And Mr. Prilik goes on in this conversation, and -- and

3  says,

4              "No.  We need to understand, because

5              any solution -- it depends, because, for

6              instance, if it's the quality that they are

7              totally dissatisfied with, this is one

8              scenario.  If the only problem is with

9              deliveries, and they would eat any quality.

10             This is another scenario.  That is why I'm

11             asking."

12         Now, you understood that Mr. Prilik was trying to get you

13  to -- to flesh out the nature of your problem, because any

14  proposal he could make to you for a solution depended on the

15  nature of the problem.  Isn't that right?

16  **A.**    Yes.

17  **Q.**    And -- and the last two lines on that page, in response to

18  Mr. Prilik's inquiry about the nature of the problem, you said,

19              "That is to say, ah, I think that at

20             the moment, they are satisfied with the

21             quality."

22         The "they" being TACOM.  Is that correct?

23  **A.**    Yes.

24  **Q.**    You didn't tell Mr. Prilik about these testing issues

25  that -- that you'd had in June with TACOM, right?

1   **A.**   No, I did not.

2   **Q.**   And do you know if -- if TACOM ever informed anyone at

3   Newcon about those test results?

4              **MS. HAMILTON:**  Your Honor, that calls for

5   speculation.

6              **MR. HOWDEN:**  Well, I'm asking if he knows.

7              **THE COURT:**  Ask him if he knows.  Then he may -- that

8   question is to be a "Yes" or "No."

9              **THE WITNESS:**  No, I did not know.

10  **BY MR. HOWDEN**

11  **Q.**   Okay.  Directing your attention to page 5, last three

12  lines, 22 through 24, you told Mr. Prilik,

13              "You told me then whatever, well, ideas

14          you had, they are not official; therefore,

15          I cannot act upon them."

16          So you understood that what Mr. Prilik had been

17  discussing with you up to this point had been his personal

18  opinion?

19  **A.**   I understood that he had a discussion with Michael.  I

20  understood that the final decision will be up to the

21  decision maker, Michael Beker.

22  **Q.**   And so at this point, anything that Mr. Prilik had told

23  you was not final; was not official.  Is that right?

24  **A.**   Yes.

25  **Q.**   Directing your attention to page 8 -- actually, let's back

 1  up to the bottom of page 7.  Sorry about that.

 2      Mr. Prilik said, actually, beginning at about line 20,

 3          "That is to say, I'm now thinking

 4          aloud.  And what if there is a problem, or

 5          even -- or, shall we say, it's not under --

 6          it's not under -- not under Michael's

 7          control to change those membranes.  Do we

 8          have some other alternatives?"

 9      When he said "membranes," did you understand him to

10  mean the shipping channels out of Russia?

11  A.   Yes.  Customs.

12  Q.   Okay.  And -- and he's telling you that it's not under

13  Michael's control.  Isn't that correct?

14  A.   He's proposing:  What if it is not under Michael's

15  control?

16  Q.   You didn't believe him?

17  A.   I did not believe him.

18  Q.   Okay.  And then you go on, and you say.

19          "The way -- the way it is ordered,

20          something else can be ordered this way.

21          You understand?  And this is firstly.

22          Secondly, well -- well, I guess he probably

23          knows about this a little bit more than you

24          do.  And it's up to him to make those

25          decisions.  And he will probably know how

1          he would be able to help, or wouldn't be

2          able to help, or what he wants to do."

3          Right?

4          You're suggesting that Mr. Beker may have a solution

5    to the customs problem.  Isn't that right?

6    **A.**   I'm suggesting that he was the one who started these

7    problems.

8    **Q.**   And -- and because he started it, in your mind, you

9    thought he could fix it for you?

10   **A.**   Yes.

11   **Q.**   So you are looking for Mr. Beker to suggest a solution to

12   your customs problem?

13   **A.**   No.

14   **Q.**   Well, let's look at page 9, lines 21 through 24.  You say

15   to Mr. Prilik,

16          "Well, Dude, once again, when I feel

17          that -- I want to solve problems that are

18          being forced upon me.  And I don't have any

19          other choice right now."

20          And, again, you felt Mr. Beker was to blame for your

21   problems in Russia, but you were looking to him for some sort

22   of solution to that problem.  Isn't that correct?

23   **A.**   No.

24   **Q.**   And again, in this conversation, no one made any

25   suggestion about charging TACOM higher prices.  Isn't that

1   correct?

2   **A.**    No.

3   **Q.**    Let's turn to Call Number 4.  That call occurred on -- on

4   August 29th, 2005.  Is that correct?

5   **A.**    Yes.

6   **Q.**    And in that call, you spoke to Arie Prilik again.  Is that

7   right?

8   **A.**    Yes.

9   **Q.**    Up to this point, you haven't spoken to Mr. Beker at all,

10  correct?

11  **A.**    With the exception of August 17 conversation.

12  **Q.**    Okay.  Thank you.

13        And -- and Mr. Prilik tells you, at the bottom of page 2,

14  carrying over to page 3,

15               "He apologized for the fact that he

16           wouldn't call back today, and basically

17           asked for a little timeout -- a day or

18           two -- in order to probe all of the ends

19           and exits, and to understand what is

20           possible or impossible to do."

21        Mr. Prilik was referring to Mr. Beker there?

22  **A.**    That was my understanding.  Yes.

23  **Q.**    Okay.  And Mr. Prilik told you that -- that Mr. Beker

24  wanted time to look at the problem more closely.  Is that

25  right?  That's what you understood he was saying?

ROCKLIN - CROSS EXAMINATION / HOWDEN

1  **A.**   To look at the problem more closer?

2  **Q.**   Sure.  To understand what is possible or impossible to do.

3  Right?

4  **A.**   My understanding is that he had to call to Russia, and

5  figure out what he could do, or not.

6  **Q.**   And -- and what's that understanding based on?

7  **A.**   My past conversation.

8  **Q.**   And -- and your understanding of the entire customs

9  problem is based on something that Mr. Gaber told you?

10 **A.**   And Michael confirms this later on, in the --

11 **Q.**   Okay.  On the 17th?  On the 17th?

12 **A.**   Later on here, in -- in our conversations later on.

13 **Q.**   Okay, but again, your original information about the

14 customs problem came from Mr. Gaber?

15 **A.**   Yes.

16 **Q.**   Who got it, in turn, from NPZ?

17 **A.**   Yes.

18 **Q.**   And you, yourself, never talked to anybody in Russia about

19 the true nature of that problem.  Isn't that right?

20 **A.**   I did not.

21 **Q.**   And Mr. Prilik goes on.  He says,

22              "The question that arose, if we think

23         in the direction of how, after all, not to

24         let down the Americans, but indeed, to

25         finish and deliver what they need to them."

1              By "the Americans," he was referring to TACOM,

2    correct?

3    **A.**    Yes.

4    **Q.**    And he's not talking about raising prices to TACOM at that

5    point.  Isn't that right?

6    **A.**    Not at this point, no.

7    **Q.**    Okay.  He's talking about finishing the contract; the

8    contract that ATN was performing at this point in time.  Isn't

9    that right?

10   **A.**    Yes.

11   **Q.**    And then he asks you --

12              "And then what quantities and terms

13          were subscribed to?"

14       He's referring to quantities and terms under the

15   Battalion Set II contract, right?

16   **A.**    Yes.

17   **Q.**    He's asking you about how much you had to deliver, and

18   when you had to deliver it?

19   **A.**    Battalion Set II, phase one -- that's what we were

20   discussing.

21   **Q.**    Right.  And -- and you tell him, at the bottom of the

22   page, lines 21 and 22,

23              "Until the end of October.  The faster

24          the better.  Approximately 3,500 units."

25       Right?

1   **A.**   Yes.

2   **Q.**   And, in fact, it was October 15th; not the end of October.

3   **A.**   Yes.

4   **Q.**   Mr. Prilik says,

5              "October 31st you have the shortage.

6          How many?  2,500?"

7          And you respond,

8              "Three and a half thousand."

9          That was how many goggles ATN still had to deliver

10  under the Battalion Set II contract by October 15th.  Is that

11  correct?

12  **A.**   Yes.

13  **Q.**   Let's turn to the bottom of page 5, carrying over to

14  page 6.  And Mr. Prilik says, beginning at line 22,

15              "Theoretically, it is possible to move

16          somebody aside to stretch somebody out.

17          That is to say, this won't be my decision

18          against 3,671 pieces.  And we are now

19          September.  October.  He'd say it's a

20          science fiction, but I think this is here.

21          They will accept that which they would be

22          given.  There's no way about it."

23          Now, the person that Mr. Prilik was referring to as

24  "he" -- that was -- you understood that was Michael Beker,

25  correct?

1  **A.**    Yes.

2  **Q.**    And -- and, "He'd say it was science fiction" -- Prilik

3  was telling you that -- that Mr. Beker would say that it would

4  be impossible to supply that many goggles in that short period

5  of time, correct?

6  **A.**    Yes.

7  **Q.**    And at that point, you say to him, at lines 10 and 11,

8              "Well, for that, we need to agree on

9          something:  How exactly you want to do it.

10          You understand."

11          And again, you're soliciting ideas from Mr. Prilik.

12  Is that right?

13  **A.**    We are discussing production here, and deliveries.

14  **Q.**    Okay.

15  **A.**    But there is no scenario on how to deliver.  That's why

16  I'm asking him.

17  **Q.**    Okay, but the point is you're asking him how exactly you

18  want to do it, right?

19  **A.**    Yes.

20  **Q.**    You're asking for him to propose some sort of solution?

21  **A.**    Because we're discussing a solution here.

22  **Q.**    Okay.  And -- and, in fact, you say that in the next

23  paragraph.  At lines 18, 19, and 20, you say,

24              "The thing is, we would like to feel

25          secure.  We would like to find a solution,

1              as they say."

2              Right?

3  **A.**   Yes.

4  **Q.**   It's Mr. Prilik you're talking to about finding that

5  solution, correct?

6  **A.**   Yes.

7  **Q.**   On the next page, page 7, at line 14, you say,

8              "And how this -- you see for this to be

9              resolved?"

10             Again, you're asking Mr. Prilik for his idea about

11 how this can be -- what kind of solution he could offer, right?

12 **A.**   Yes.

13 **Q.**   And you respond -- and he responds,

14             "I'm trying to understand your

15             preliminary opinion.  You and I or Michael

16             and you could reach an agreement about

17             whatever you want."

18             He's telling you that -- that he's looking for you to

19 suggest something, right?

20 **A.**   No.  He's finishing the phrase later on.

21             "But what it boils down to that, in all

22             likelihood, that comrade from Jordan" --

23             That would be Ramzi, with ITE.

24             -- "that the price for him will need to

25             be raised.  And likely he will need to

1                     change his supplier."

2  Q.   "Change the supplier," meaning switch to Newcon?

3  A.   That was one of the scenarios here.

4  Q.   Okay.  One of the scenarios.  Again, that's all we're

5  talking about in this conversation, is possible scenarios?

6  A.   Yes.

7  Q.   All right.  And then on page 8, towards the bottom,

8  line 22, Mr. Prilik says,

9               "I apologize once again that Michael

10              didn't call back.  It's just that he wants

11              to understand the entire situation, and to

12              probe on that side what is possible, and

13              what is impossible."

14              And he continues,

15               "Both the administration issues and the

16              production issues.  So it would be easier

17              for you guys, so to speak, to talk."

18              And again, he's telling you that Mr. Beker is -- just

19  wants to -- an understanding of what the situation is.  Isn't

20  that correct?

21  A.   Yeah.  He wants me to make a proposal.

22  Q.   He's asking for you to describe what your problem is,

23  right?

24  A.   Yes.

25  Q.   And finally, on page 10, towards the end of the

1    conversation, at lines 4 through 9, Mr. Prilik says,

2                "I know, off the -- off the record, I

3            know that our production would come up to a

4            thousand items a month."

5        You say, "Yes."

6        And Prilik says,

7                "But -- but still it's a significant

8            amount in such time limits.  Oh, boy."

9        Mr. Prilik was telling you that, if Newcon was to --

10   to try to fulfill this contract, it would be a stretch for

11   them, right?

12   **A.**    Yes.

13   **Q.**    And again, in this conversation, there's no talk about

14   raising prices to TACOM.  Is that correct?

15   **A.**    No, it's not correct.

16        Right there, on page 8, my comment --

17        Well, we can go more specifically to that conversation,

18   but what I'm saying hypothetically --

19                "Well, we can -- he can difficult, but

20            I told you that, to go anywhere

21            hypothetically above $1,800, or even close,

22            he will be forced to raise the price."

23   **Q.**    Oh, right.  That's you, saying that?

24   **A.**    Right.

25   **Q.**    You're the one who suggests that maybe prices will have to

 1  be raised to TACOM.  Isn't that correct?

 2  **A.**    No.  The $1,800 idea was discussed before.

 3  **Q.**    But you're the one who says that's what's going to have to

 4  be charged to TACOM, right?  Mr. Prilik never says that?

 5  **A.**    Yes, he does, right there on page 7.

 6        Prior to me confirming that, his words are,

 7              "The likelihood it would be required

 8          from comrade from Jordan to raise the

 9          cost."

10  **Q.**    It doesn't say that ITE would charge more to TACOM.

11  You're the one who draws that conclusion.  Isn't that right?

12  **A.**    Yes.

13  **Q.**    And makes that suggestion?

14  **A.**    Yes.

15  **Q.**    Mr. Prilik doesn't say that?

16  **A.**    Well, he is suggesting raising the cost, and --

17  **Q.**    He's --

18  **A.**    -- not just coming to the conclusion --

19  **Q.**    He's suggesting, and you're --

20  **A.**    -- that he is not --

21  **Q.**    -- inferring from that, that prices will have to be raised

22  to TACOM?

23  **A.**    You asked me if there was a discussion of raising the

24  price.

25        And there was a discussion.  And I just read you that.

1   Q.   Right.  And you're the one who says prices will have to be

2   raised to TACOM?

3   A.   After Arie suggested it.

4   Q.   Okay.  Now, in the fifth call, on August 30th, this is the

5   first time since August 17th that you speak to Mr. Beker.  Is

6   that correct?

7   A.   Yes.

8   Q.   And at page 3, beginning at line 21, Mr. Beker says,

9               "I apologize in advance if I'm going to

10              ask something again that -- which you guys

11              already discussed one way or another.  I,

12              like, I didn't get into the details."

13      And when he said, "I didn't get into the details," he

14   meant with Arie Prilik.  That's what you understood.  Is that

15   correct?  He didn't get into the details with Arie Prilik?

16   A.   Right.

17   Q.   And -- and the first issue he puts to you in that

18   conversation on page 4, beginning at line 2, is,

19              "So the most important thing that I

20              want to understand -- this is -- ah -- how

21              you see -- ah, what kind -- I apologize in

22              advance for the expression, but assistance

23              should come from my side, or, well, how --

24              how do you see it?  What -- what do you

25              want me to do?"

1    Isn't that right?  That's the first thing he asks

2  you?

3  **A.**   Yes.

4  **Q.**   And he goes on.  On page 5, beginning at line 15, he says

5  to you,

6         "As I see it, if not today, then

7         tomorrow, you have to report a failure to

8         fulfill the contract, from my point of

9         view, because everything that I know has

10         to -- ah -- leads to the fact that you

11         wouldn't be able to fulfill your

12         obligations, for various kinds of reasons.

13         Once again, this is my opinion.  This is

14         what I know; what I think that I know.  Let

15         me put it this way."

16         Right?

17         And what Mr. Beker was telling you -- that, again, in

18  his view, ATN would not be able to perform under the contract.

19  **A.**   I think that was a continuation of another phrase.  And --

20  where I commented, "Uh-huh"; but it started with,

21         "The customs is closed.  The shipping

22         is not possible" --

23  **Q.**   Okay, but it --

24  **A.**   (Reading)

25         -- "the shipping is not possible.  From

1          this side, the problems I know as well --

2          well, I wouldn't say a hundred percent, but

3          90 percent."

4          And then he is saying what you just mentioned.

5   Q.   Okay.  Let's assume for the sake of argument that in --

6   and you're -- in this passage -- let me start again.

7       In this passage you just read, you infer from that, that

8   Mr. Beker is responsible for your problems with customs, right?

9   A.   Yes.

10  Q.   And you don't know that, yourself, directly from customs

11  or -- or your supplier in Russia, right?

12  A.   No, I do not.

13  Q.   You're relying on just what Mr. Beker is saying in this

14  conversation?

15  A.   Yes.

16  Q.   What your inference is; what your read on what his

17  statement was, right?

18  A.   Yes.

19  Q.   Just assuming, for the sake of argument, that Mr. Beker

20  had something to do with your problems in Russia, the fact of

21  the matter is that he still tells you that he thinks:  You

22  won't be able to -- "you" being ATN -- won't be able to

23  complete the contract, right?

24  A.   Yes.  He is applying the pressure here.

25  Q.   For a variety of reasons?  Isn't that right?

 1  **A.**    Yes.

 2  **Q.**    And your response is, "I've got it."  Right?

 3  **A.**    Yes.

 4  **Q.**    You don't argue with him?  You don't say, "No.  Absolutely

 5  ATN can live up to its obligations.  We can finish the

 6  contract"?

 7  **A.**    No.  I'm just listening to what his view is.

 8  **Q.**    Okay.  The point is:  You don't dispute his view?

 9  **A.**    No, not here.

10  **Q.**    And he goes on.  He says,

11                  "I have two ways, as it were.  The

12              first way is to continue working, like I

13              have been working, and to wait and see how

14              it all will end."

15          And what he's telling you is that he can just watch,

16  and see how you do under the contract, right?

17  **A.**    Yes.

18  **Q.**    And then you suggest that,

19                  "Yes, but with us, it could also

20              somehow get resolved."

21          And by the "resolved," you mean your problems with

22  customs?

23  **A.**    Yes.

24  **Q.**    And then Mr. Beker goes on, and talks more about his

25  perception of your problems.  Let's go to page 7, line 4.

```
 1           He says,

 2                   "And IITs -- first of all, he can't

 3             make this much."

 4             The "he" he's referring to is Mr. Aksenov, right?

 5  A.   Yes.

 6  Q.   And Mr. Aksenov runs the factory in Novosibirsk:

 7  Ekran-FEP?

 8  A.   He was.

 9  Q.   And at that time, Ekran-FEP and Mr. Aksenov were supplying

10  the image-intensifier tubes that you were using in the goggles

11  you were supplying under the Bat. Set II contract?

12  A.   Yes.

13  Q.   And he's saying that Mr. Aksenov can't make enough tubes

14  to satisfy the contract requirements, correct?

15  A.   That was Michael's view.

16  Q.   Yeah.  And then he says,

17                   "Second of all, he will really make

18             crap.  No -- or, for the most part; for the

19             most part of it."

20             And again, he's talking about Mr. Aksenov and

21  Ekran-FEP.  Isn't that correct?

22  A.   Yes.

23  Q.   And he's saying that the image-intensifier tubes that

24  Ekran-FEP is are producing just aren't very good quality?

25  A.   Right.  That's what he's saying.
```

 1  Q.   And, in his view, they won't meet the requirements of the

 2  Battalion Set II contract?

 3  A.   We could leap to that conclusion.

 4  Q.   And then he says,

 5           "And the third thing -- in all

 6           probability, they wouldn't allow him to

 7           move it out."

 8           And again, he's -- the "him" is Mr. Aksenov, correct?

 9  A.   Correct.

10  Q.   And the "they" is customs?

11  A.   Yes.

12  Q.   And, in point of fact, the reason that customs was giving

13  Mr. Aksenov trouble was because they alleged that he needed an

14  export permit for his image-intensifier tubes?

15  A.   Oh, interesting.

16      "They were crap," in terms of performance; but they would

17  require an export license, which would need to be

18  high-performing tube.

19  Q.   But that's what Mr. Beker was telling you.  Isn't it true?

20  A.   That's what he was telling me.

21  Q.   And your response to his allegations is simply, "I've got

22  it", right?

23  A.   Yeah.  I keep repeating this, because I'm listening to his

24  point of view.

25  Q.   Okay.  You don't dispute it, though?

1  **A.**   No.

2  **Q.**   You don't tell him he's wrong?

3  **A.**   No.

4  **Q.**   You don't tell him, "Our goods don't need export permits"?

5  **A.**   No.

6  **Q.**   Or that they meet spec.?

7  **A.**   No.

8  **Q.**   Or that Mr. Aksenov can produce enough?

9  **A.**   I think all that, he knew.

10 **Q.**   Okay.  And then he goes on, at the bottom of page 7, and

11 he says,

12              "From my point of view, this will all

13         come to a poor end.  Well, in fact, that

14         was my opinion right from the start."

15         And -- and by "all this," he means ATN's performance

16 on the contract.  Isn't that right?

17 **A.**   It was not about ATN's performance on the contract.  He's

18 laying out just that -- the problems that are there; the

19 problems that they instigated.  And those -- in my point of

20 view, what all this will lead to for him.

21 **Q.**   Well, I'm asking you what you understood Mr. Beker was

22 telling you when he said these words.

23      The "poor end," when he was speaking to you, you

24 understood he was talking about a poor end to ATN's performance

25 under the contract?

1          **MS. HAMILTON:**  Your Honor, excuse me.  The witness

2   has already answered the question.

3          **MR. HOWDEN:**  I don't think he has.

4          **THE COURT:**  Objection is sustained.

5   **BY MR. HOWDEN**

6   **Q.**  Later on in the conversation, at page 10, beginning at

7   line 6, you say,

8                "Michael, explain to me.  Why do you

9          believe that we stole it?"

10         Stole -- "it," being the contract, right?

11  **A.**  Correct.

12  **Q.**  And he tries to explain to you.

13               "But the fact speaks for itself.  Well,

14         people came over and offered cheap prices,

15         and stole it.  Well, right.  After all, I

16         don't have complaints.  On the contrary,

17         well, by all means, you were entitled to do

18         it.  You made a normal decision, how you

19         believed, from the point of view of

20         business.  If you had fit in a normal price

21         niche, I wouldn't have said a single word

22         to you.  'Kudos to you,' as they say, but

23         unfortunately, the Jordanian guy fucked us

24         all.  Well, and that's it.  Nothing else.

25         I'm without any -- I swear, Dima, I'm

1              without complaints.  I'm just ascertaining,

2              because for this money, it's impossible to

3              receive the product, well, and -- not to

4              mention sell it."

5         He goes on,

6              "Well, it's impossible.  I don't know

7              how it is with you.  It's totally

8              impossible."

9         So he was complaining about your low prices that you

10 offered on the contract, right?

11 **A.**   Yes.

12 **Q.**   But he's also adding that, from his point of view, it's

13 impossible to provide the equipment called for in the contract

14 at the prices that you were charging, correct?

15 **A.**   Impossible to Newcon; not to ATN.

16 **Q.**   Okay, but that's the gist of that part of his complaint,

17 correct?

18 **A.**   Yes.

19 **Q.**   Okay.  And then, going to page 13, beginning at line 21,

20 Mr. Beker says,

21              "And now it seems to me that all this

22              would come to no good; that is to say, this

23              is quite serious over there.  Ah, as to how

24              your relationship is forming here, I can

25              only guess by those, ah, shall we say,

1              calls from TACOM, or our discussions or our

2              slanders, if one can call them so, to

3              TACOM, and the answer to them, I mean, in

4              terms of the quality."

5          You were aware by this point in time that Newcon had

6    complained to TACOM about ATN's performance on the contract?

7    **A.**    Yes.

8    **Q.**    Including quality issues?

9    **A.**    Performance issues.

10   **Q.**    Performance issues; specifically, that -- that ATN was

11   providing image-intensifier tubes that did not meet the

12   contract specifications?

13   **A.**    Yes.

14   **Q.**    And he refers to those complaints here as -- as

15   "slanders," right?

16   **A.**    Yes.

17   **Q.**    But, in point of fact, there was truth to what he was

18   saying?

19   **A.**    No.  It wasn't --

20   **Q.**    Well, again, in -- in June of this year, the -- the Army's

21   Night Vision Laboratory tested your product twice, and, in both

22   instances, found that your image-intensifier tubes did not meet

23   the FOM requirement.  Isn't that correct?

24   **A.**    According to U.S. measure procedures.

25   **Q.**    Okay.

1   **A.**    According to the Russian measure procedures, we conducted

2   three different certifications; the -- whatever we could do in

3   that short of a time.  Every possible entity verified that they

4   were 750, and above.

5   **Q.**    No entity in the United States ever verified that.  Isn't

6   that correct?

7   **A.**    No.

8   **Q.**    And it was the United States that was buying those

9   goggles.  Isn't that right?

10  **A.**    Yes.

11  **Q.**    Let's turn to page 15.  Beginning at line 17, Mr. Beker

12  says,

13              "And now we are returning, once again,

14          to the very first issue.  So I have two

15          options.  The first one is to do nothing;

16          to sit and to wait for where it would lead

17          to.

18          The second one is, ah, well, like, I

19          understood it correctly.  Now I'm going to

20          make you -- repeating it now, whether my

21          help is needed or my help is not needed, if

22          there are, so to speak, either questions or

23          requests, I'm ready to answer them, or to

24          react."

25          So you understood Mr. Beker was saying he had two

1  options, as he saw it, right?

2  **A.**   Yes.

3  **Q.**   One option was to do nothing, and see how ATN makes out on

4  the contract?

5  **A.**   Right.

6  **Q.**   And the other option was to find out whether his help was

7  needed, or not needed, right?

8  **A.**   Again, he was applying the pressure on the first part; and

9  on the second, was waiting for me to make an offer.  And I did

10  not.  He wants me to ask for help.  He wants me to make an

11  offer, and I did not.

12  **Q.**   But he hadn't suggested doing anything on behalf of Newcon

13  at this point.  Isn't that correct?

14  **A.**   At this point?  No.

15  **Q.**   And so you respond to him,

16        "But I wanted -- if, once again, there

17      were some ideas how you see it, if -- you

18      understand only too well what kind of help

19      we need."

20      And he responds to you,

21        "I don't know."

22      Right?  He doesn't understand what kind of help you

23  need?  At least, that's what he says, correct?

24  **A.**   Yes.  At this point, there's no -- he doesn't understand.

25  **Q.**   Okay.  And so you try to tell him.  You tell him, at lines

ROCKLIN - CROSS EXAMINATION / HOWDEN

```
 1   17 through 19,

 2              "From the other side, currently, it's

 3         been a month already, and I haven't

 4         received the units."

 5      "The units" are the night-vision goggles?

 6   A.   Yes.

 7   Q.   And you haven't received any for a month, from Russia.  Is

 8   that correct?

 9   A.   Yes.

10   Q.   And he responds to you that,

11              "You won't receive them.  That's

12         unequivocal.  That's a hundred percent; not

13         even 99; a hundred.

14              "Furthermore, there are big problems

15         that our friends are having, both as a

16         private matter, and personal matters; as a

17         company matter.  I know that Kim has

18         serious problems.  He will or -- he is

19         having" --

20      And then he goes on with.

21              -- "which I, fortunately, have nothing

22         to do; but they exist."

23      And you respond, "I've got it."

24      The "Kim" he's referring to is Kim Schwartz?

25   A.   Yes.
```

1  **Q.**   And he's an employee at NPZ?

2  **A.**   He was.  Yes.

3  **Q.**   And again, yesterday, we talked about the fact that you

4  were aware that the businessmen in Novosibirsk all worked

5  closely together and knew each other?

6  **A.**   Yes.

7  **Q.**   And Mr. Beker had an ongoing relationship with his

8  image-tube manufacturer Mr. Loktionov, at Katod?

9  **A.**   Yes.

10  **Q.**   And Mr. Loktionov had worked with Mr. Aksenov -- your

11  supplier -- at Ekran-FEP?

12  **A.**   Yes.

13  **Q.**   And that they weren't as business colleagues; they were

14  also personal associates.  Is that right?

15  **A.**   That was my understanding.

16  **Q.**   Yeah.  They socialized together?

17  **A.**   Socializing?  I'm not sure a hundred percent about that.

18  **Q.**   Well, later on in the conversations, the subject comes up

19  of -- of them getting together for one or the other's birthday.

20  Is that right?

21  **A.**   Right.

22  **Q.**   And, in fact, Mr. Beker indicates that -- that he heard

23  about the birthday party, and he heard about what they were

24  talking about at the birthday party, right?

25  **A.**   Right.

1   Q.   And at this juncture, Mr. Beker's telling you,

2                "Fortunately, I have nothing to do" --

3        Let me read it accurately.

4                -- "with which I, fortunately, have

5            nothing to do; but they exist."

6        He's telling you he has nothing to do with these

7   problems that are going on in Russia.  Is that correct?

8   A.   Well, at this point, yes.

9   Q.   You didn't believe him?

10  A.   Because later on in the conversation, he admits that he

11  has his hand in it.

12  Q.   Okay.  And he goes on, on this same page, beginning at

13  line 16,

14                "Well, this is why he has serious

15            problems.  And if you were somehow tied to

16            this, then watch your ass; but once again,

17            I'll repeat it to you one more time.  I

18            have nothing to do with this whatsoever."

19        And you respond,

20                "Yes, [chuckle] but who, then?"

21        You don't believe what he's saying?

22  A.   No, I don't.

23  Q.   And you don't believe his denials?

24  A.   No, I don't.

25  Q.   He goes on at page 18.  Let's pick it up at about line 21.

1   He says,

2               "I'm saying one more time:  Despite the

3           fact that this is working to my advantage,

4           well, to say that it's 100 percent my

5           fault, even all things considered, it would

6           be pleasant for me to say that, well, I am

7           such -- such -- that's fucking it.  And I

8           stopped it.  No such fucking thing; that is

9           to say, I, with all -- can't take

10          everything upon myself."

11          Right?

12          Is this one of those passages where you interpret it

13  as him admitting that he's responsible for the problems?

14  **A.**   Yes.

15  **Q.**   And, in fact, he's saying:  Gee, you know, despite the

16  fact that all of these things are -- are working in favor of my

17  company, I can't take credit for them.

18          Isn't that right?

19  **A.**   Not a hundred percent.

20  **Q.**   Not a hundred percent.  Okay.

21          And again, he goes on.  At lines 11 and 12, he says,

22              "The responsibility -- well, so I can't

23          claim all of responsibility myself for the

24          situation."

25          And -- and adds,

1                    "Even though I'm not going to hide it.

2            I most certainly -- I did do my bit."

3            Right?

**A.**   Yes.

**Q.**   And that's another point where you believe that he's

admitting his role for whatever problems you were having with

customs in Russia, right?

**A.**   Yes.

**Q.**   The -- the problems in Russia that you have no firsthand

knowledge about?

**A.**   Yes.

**Q.**   And the fact of the matter is you don't know what, if

anything, Mr. Beker did or said to anyone in Russia that had

anything to do with your problems in Russia?

**A.**   No.

**Q.**   He goes on.  He says, beginning at the bottom of page 19,

17                    "That's not because I'm -- I'm

18            laughing; but rather, because -- well, I'm

19            giving you my word.  I'm trying to fight by

20            methods available to me; by respectable

21            ones.  I'm saying, once again, I have done

22            nothing that was not respectable.  All the

23            rest that got stuck to it -- this is not --

24            not from me."

25            And you understood what he was saying was:  If he's

1  done anything, it's only been on a respectable, legal level.

2  Isn't that right?

3  **A.**   I don't see the word "legal" in there.

4  **Q.**   Okay.

5  **A.**   My understanding is:  His definition of "respectable."

6  **Q.**   Okay.  And he never hid the fact that he's the one who

7  complained to TACOM about your performance on -- on the

8  contract?

9  **A.**   No.

10  **Q.**   Later on, the subject matter turns to ATN's exposure to --

11  potential exposure to ITE.  Let's go to page 26, beginning at

12  line 9.  And you say,

13            "And what he -- he'll try to do it to

14            us, because of this.  And for how much

15            he'll sue us -- he is the only one who

16            knows this."

17            Right?

18            And the "he" you're referring to is Ramzi Abu-Taleb,

19  of ITE?

20  **A.**   Yes.

21  **Q.**   And you're expressing your concern about Mr. Taleb suing

22  you if you fail to perform on the contract?

23  **A.**   Yes.

24  **Q.**   Because that's who ATN was on the hook to on this

25  contract:  To ITE?  Right?

1   **A.**   Divine being "on the hook."

2   **Q.**   Okay.  Any civil liability that ATN had as a result of

3   inability to perform on the Battalion Set II contract was

4   liability to ITE.  Isn't that correct?

5   **A.**   Yes.

6   **Q.**   Not to TACOM?

7   **A.**   If ATN did not deliver on the contract, ATN potentially

8   could be blacklisted later on.

9   **Q.**   On other contracts, down the road?

10  **A.**   Yes.

11  **Q.**   Not with respect to this contract?

12  **A.**   If we don't deliver, already, then not with respect to

13  this contract.

14  **Q.**   Let's turn to page 31, beginning about line 13.  You say,

15           "Everything is clear.  It's just that,

16           once again, I wanted everything to be

17           perfectly clear.  Well, Arie called.  He

18           said that there are options.  And I

19           responded, because" --

20           And what were you referring to there, when you said,

21  "Arie called, and he said that there are options"?

22  **A.**   That Arie called on August 17th.

23  **Q.**   And -- and made a proposal, and that's the proposal that

24  you reported to your lawyer, and ultimately, to the FBI, right?

25  **A.**   Yes.

 1  Q.   And -- and here, weren't you fishing?  Weren't you trying

 2  to get Mr. Beker to -- to revisit that issue?

 3  A.   Is that page 31?

 4  Q.   Yeah.

 5  A.   Right.  This is my comment.  And there are about two pages

 6  of a conversation, starting,

 7            "Dima.  I don't want now like take

 8            advantage of the situation, and put you on

 9            your knees" --

10            And so on, and so forth.

11            So we keep having a discussion.  And I'm referring to

12  the first conversation here, of what Arie offering at

13  August 17th.

14  Q.   Okay.  And you were hoping, in raising this issue, that

15  Mr. Beker would also say something similar.  Isn't that

16  correct?

17  A.   I wasn't there to offer anything; and I didn't.

18  Q.   But that's why you brought the subject back to the Arie's

19  conversation with you on the 17th -- 17th -- to see if

20  Mr. Beker would say something similar.  Isn't that right?

21  A.   We're discussing here why we're having the conversation.

22  Q.   Okay.  And -- and Mr. Beker responds to you,

23            "That is to say, you have to agree that

24            Arie is entitled to have, like, some sort

25            of his own opinion."

1              Isn't that correct?"

2   **A.**    Yes.

3   **Q.**  He's not buying into Mr. Prilik's earlier suggestions,

4   right?

5   **A.**   That, I cannot conclude from here.

6              **MR. HOWDEN:**  Your Honor, I'm only about halfway

7   through this call.  Would it be a convenient time to take a

8   break?  I can continue just as easily, but --

9              **THE COURT:**  How much longer are you going to be with

10  this call?

11             **MR. HOWDEN:**  It's the longest call.  Yeah.  And I'm

12  about --

13             **THE COURT:**  The longest day.

14             **MR. HOWDEN:**   The longest day.

15             I'm only about halfway through it; not even quite

16  that.

17             **THE COURT:**  You need a break, or shall we forge

18  forward?

19             You don't get to -- you don't get to say much about

20  all of this.  So I'm giving you an opportunity.  You want to

21  take a break now, or --

22             (Jurors nod)

23             **THE COURT:**  We'll take 15 minutes now, and then we'll

24  be ready to forge forward after.

25             Please follow the instructions about not discussing

 1   the case amongst yourselves or anyone else, or form or express

 2   any opinions about what you've heard.  We'll see you at the end

 3   of the recess.

 4          You may step down, Mr. Rocklin; but again, do not

 5   discuss your testimony with any other person.

 6          (Jury out at 10:21 a.m.)

 7          (Whereupon there was a recess in the proceedings

 8           from 10:21 a.m. until 10:46 a.m.)

 9          **THE COURT:**  You may continue.

10          **MR. HOWDEN:**  Thank you, your Honor.

11   **BY MR. HOWDEN:**

12   **Q.**   Mr. Rocklin, I would like you to direct your attention to

13   page 33 beginning at line 6.  Mr. Beker tells you:

14          "So one way or the other, the

15      information that I have there, there are

16      also ones in the form of semi-finished

17      products.  They're manufactured

18      approximately... from 1,000 to 2,000.

19      The question is... in various stages.  He

20      simply doesn't have enough to complete

21      all of this.  I'm telling you this

22      100 percent.  Even given the fact that...

23      we will forget about quality."

24      And you respond:  "Well, I've got it."

25      My first question to you is:  What was your understanding

ROCKLIN - CROSS EXAMINATION / HOWDEN

```
 1   of the "he" that Mr. Beker was referring to?  Who was that?

 2            (Brief pause.)

 3            THE COURT:  Have you found the right spot?

 4            THE WITNESS:  I'm looking for the page prior to this,

 5   page 32.

 6            THE COURT:  You can't tell from the substance of that

 7   who is being refers to?

 8            THE WITNESS:  I just want to make sure.

 9            THE COURT:  Okay.  Well...

10   BY MR. HOWDEN

11   Q.   Let me ask it another way and maybe it would be easier to

12   answer.  Is he referring to either Mr. Aksenov or

13   Mr. Metelskiy?

14   A.   I believe he is referring here to Mr. Metelskiy.

15   Q.   And, again, Mr. Metelskiy was the manager of the NPZ

16   plant?

17   A.   Yes.

18   Q.   And NPZ was your supplier for the completed goggles?

19   A.   Yes.

20   Q.   NPZ assembled -- put all the pieces together, put the

21   tubes in the goggles and shipped them to ATN, is that correct?

22   A.   Yes.

23   Q.   Okay.  And so the semi-finished products that Mr. Beker

24   refers to in this passage, did you understand those to be the

25   goggles themselves?
```

1    **A.**    Yes.

2    **Q.**    And so was it your understanding that he was telling you

3    he understood that he had between 1,000 -- "he" being

4    Mr. Metelskiy, had between 1,000 and 2,000 semi-finished sets

5    of goggles?

6    **A.**    Yes.

7    **Q.**    And, by the way, was that accurate or close?

8    **A.**    I recall that it was a large number that was already

9    assembled and some number that was not.  It was in parts.

10   **Q.**    In Russia?

11   **A.**    Yes.

12   **Q.**    Okay.  Let's move forward to page 39.  This has been a

13   long conversation and we're not even close to the end, but on

14   age page 39 at line 15, Mr. Beker says:

15            "But all this is working out a

16        little bit differently.  If you guys

17        decide that you really... so far, to tell

18        you the truth I haven't... haven't heard

19        from you a clear understanding of what

20        you guys have already decided for

21        yourselves what to do.  That is to say, I

22        think that you... this..."

23        You understood that Mr. Beker was asking your view of what

24   a solution was to your problems, isn't that right?

25   **A.**    Yes.

1   Q.   And he was asking because he hadn't heard that yet?

2   A.   Yes.

3   Q.   And on the next page, page 40, he goes on and he says,

4   beginning at line 20:

5          "I'm also all for... I... I don't

6       understand the main point for now.  I

7       don't understand on what platform we can,

8       ah... like, combine our ambitions.  This

9       is what I don't understand for now, in

10      the big picture."

11      Mr. Beker was telling you that he didn't understand how

12   you proposed to work with him to solve this problem, is that

13   right?

14   A.   He was referring here to the Arie's suggestions, that's

15   what we're discussing here.

16   Q.   But the "we" he is referring to when he says "what

17   platform we can combine our ambitions," he's talking about him

18   and ATN, right?

19   A.   Yes.

20   Q.   Okay.  Let's go over to page 44, and from line 8 through

21   line 17.  And, again, this is Mr. Beker talking, I believe.

22   And he says:

23          "In the end, you'll offer some

24       prices that are probably acceptable to

25       you, but on the whole are not acceptable

1          to the market because we work very

2          closely both with DEP Photonis and we

3          work with representatives of the ITT.  We

4          also work with, eh... Inside Technology.

5          Well, practically we don't even hesitate

6          to pick up the phone and discuss the

7          questions of whether or not they are

8          going... or not going -- one way or the

9          other -- to participate.  That is to say,

10         that we will now be talking about, 'No

11         don't participate.  We will give you a

12         payment to step back.'  For what?"

13         DEP Photonis is the European manufacturer of image

14    intensifier tubes, that I believed you described them earlier

15    in your testimony?

16    **A.**    Yes.

17    **Q.**    And they produce a full range of Gen II tubes, is that

18    right?

19    **A.**    Yes.

20    **Q.**    They weren't -- they didn't participate in the Battalion

21    Set II contract in any way, did they?

22    **A.**    Not to my knowledge.

23    **Q.**    Or the Battalion Set I contract?

24    **A.**    Not to my knowledge.

25    **Q.**    And ITT, that's the big American company?

1  **A.**    Yes.

2  **Q.**    They produced Gen III tubes?

3  **A.**    Yes.

4  **Q.**    And they have an exclusive arrangement with the United

5  States military to provide them with Gen III equipment, is that

6  right?

7  **A.**    Not sure if the arrangement is exclusive.

8  **Q.**    Okay, fair enough.  But as a Gen III producer, they

9  weren't a competitor for the Battalion Set I or Battalion Set

10  II contracts, correct?

11  **A.**    No, not to my understanding.

12  **Q.**    In fact, based on your experience, does the military

13  call for night vision to be supplied that is either Gen II or

14  Gen III?

15  **A.**    No.

16  **Q.**    Generally those two categories of products don't compete

17  against each other, isn't that right?

18  **A.**    Well, sometimes they do.

19  **Q.**    Okay.  But generally?

20  **A.**    I think in many markets DEP successfully -- I mean,

21  Photonis now competed against Generation III.

22  **Q.**    And that's because DEP also produces extremely high end

23  Gen II products, isn't that right?

24  **A.**    Yes.

25  **Q.**    That are comparable to Gen III performance?

1   **A.**    Yes.

2   **Q.**    But that's not what we're talking about in the Battalion

3   Set I or Battalion Set II contracts?

4   **A.**    No.

5   **Q.**    And when Mr. Beker made this statement to you, you didn't

6   believe that he was really picking up the phone and talking to

7   either of these companies, did you?

8   **A.**    No.

9   **Q.**    You thought he was just kind of showing off?

10  **A.**    I thought that he was explaining his level of cooperation

11  with the other competitors.

12  **Q.**    But you didn't think he was actually call these other

13  competitors?

14  **A.**    No.

15  **Q.**    Let's go to page 50, beginning at line 10.  Mr. Beker

16  explained to you that:

17          "Newcon... Newcon always said one in

18          the same thing:  Guys, watch out for

19          quality.  We lost the tender because,

20          ah... the price turned out to be lower,

21          but we know that there are

22          requirements -- 750 FOM.  And if we were

23          told that 500 FOM would be accepted, we

24          would have lowered the price as well.

25          That's Newcon's position."

 1       And you said:  "Well, I understand."

 2       And he went on:

 3           "Nothing more.  That's why we demand

 4       that you guys check the quality.  And if

 5       the devices don't comply with 750 FOM,

 6       then they don't supply the devices that

 7       are supposed to be supplied, and that's

 8       why Newcon would have made it cheaper as

 9       well."

10       Now, the "guys" that he was referring to was TACOM, wasn't

11  it?

12  **A.**   Yes.

13  **Q.**   And Mr. Beker was referring to his past complaints to

14  TACOM about ATN's performance, isn't that right?

15  **A.**   Yes.  He was responding to me, saying that it is to say

16  that you're not going to explain to TACOM that ATN did not make

17  good on the promises because Newcon had such a ruthless hand in

18  it.

19  **Q.**   Okay.  And what Mr. Beker explained to you is that his

20  complaints about ATN to TACOM included an allegation that ATN

21  couldn't meet the FOM requirement in the contract, right?

22  **A.**   Yes.

23  **Q.**   And he said, if he had understood that there was actually

24  a lower FOM requirement in the contract, he could have offered

25  on lower price, isn't that right?

1  **A.**    That's what he was saying here, yes.

2  **Q.**    Okay.  The conversation continued and on page 59 beginning

3  at line -- well, let's start with your entire statement.  Let's

4  go with beginning at line 16:

5          "Say I hear you.  Next question, if

6       I start here all this, and once again,

7       that which is considered, ah... in this

8       contract... ah, the decision is up to me

9       because I worked on it and I... Lyonya,

10      naturally, well, took care of the Russian

11      and all that, but I'm a decision maker,

12      that's for sure.  But I'll have to, well,

13      run by, obviously, Marc, and sometimes,

14      as they say, ah, a bird in the hand is

15      worth two in the bush."

16   And you continued on the next page and said:

17          "For me to start working on this, I

18      would like some, I don't know, well, good

19      faith deposit or something like that.  Is

20      it possible?"

21   When you said a "bird in the hand is worth two in the

22  bush" -- by the way, is that the Russian phrase the same as the

23  English phrase?

24  **A.**    No.

25  **Q.**    Okay.

 1   **A.**   The Russian phrase is the bird in the hand better than the

 2   bird in the sky.

 3   **Q.**   Does it mean essentially the same thing?

 4   **A.**   Yes.

 5   **Q.**   Which is to say you were -- you were telling Mr. Beker

 6   that having something is better than hoping for getting more

 7   but not having any guarantee to it, is that right?

 8        Boy, that's a horrible way of expressing that phrase.

 9             **THE COURT:**   Want to try that again?

10             **MR. HOWDEN:**   Yeah, why don't I?

11   **BY MR. HOWDEN**

12   **Q.**   It's better to get something than risk losing everything,

13   is that roughly correct?

14   **A.**   If you could help me.  Is this after the $75 range; 50,

15   75, 100 range for each goggle not to be delivered?  If it is

16   after, then I'm referring to some sort of advance payment.

17   **Q.**   But -- but -- okay.  But the point being, though, that the

18   idea you are expressing to Mr. Beker is it's better to have

19   something in your hand rather than risking everything and maybe

20   not getting anything?

21   **A.**   No.  What I'm referring here is with advance payment I

22   could go and prove that Newcon is serious about their offer to

23   pay for each goggle that is not delivered.

24   **Q.**   Okay.  And so that then leads to your next statement:

25        "For me start working on this, ah, I

1        would like some, I don't know, well good

2        faith deposit or something.  Is that

3        possible?"

4   A.   Yes.

5   Q.   And that good faith deposit, this is the first time that

6   the idea of Michael paying you money up front is raised?

7   A.   Yes.

8   Q.   And you raise it?

9   A.   Yes.

10  Q.   And did you raise it because the FBI asked you to raise

11  the subject?

12  A.   Yes.

13  Q.   And Mr. Beker, at least at this point, resists that

14  notion, isn't that right?

15  A.   Yeah, he is reluctant.

16  Q.   Okay.  And as your conversation continues, he says at page

17  61 link at line 19:

18        "That's why you should probably

19        think about it again.  Consult Marc

20        again.  Consult Lyonya again.  And if you

21        guys make such...  Not because, as it

22        were...  I doubt that you can't make such

23        a decision alone.  I think that is such a

24        discussion that one just needs to consult

25        on it, as it were, at the least."

1  **Q.**   The Marc is Marc Margovsky?

2  **A.**   Yes.

3  **Q.**   And the Lyonya is Lenny Gaber?

4  **A.**   Yes.

5  **Q.**   Your colleagues at work?

6  **A.**   Yes.

7  **Q.**   Mr. Morgovsky your boss, in fact?

8  **A.**   Yes.

9  **Q.**   And he is urging you to consult with them and consider all

10  these possibilities, is that correct?

11  **A.**   That's in response...  On the prior page Mr. Beker states:

12         "In general I took it we have, as it

13     were, want to do something.  Isn't that

14     true?"

15     And instead of confirming that, I'm saying, well, I have

16  no other option.  And he wants to make sure now that I go back

17  to other people in Newcon -- I'm sorry, in ATN and confirm that

18  we are on the same page.

19  **Q.**   He goes on on the next page, page 62, and he says:

20         "Then I think that, ah, if you

21     could... shall we say, having taken at

22     least all the necessary papers so that we

23     could do all this here correctly, after

24     all, all this needs to be thought through

25     step-by-step, prepared correctly."

1       And by "papers," he is referring to a written agreement,

2   isn't that right?

3   **A.**   Not at this point, no.

4   **Q.**   Okay.  Let's go to page 66, beginning at line 19.  Mr.

5   Beker says:

6            "Not because you told them to go,

7       but after all, now, no matter whom and

8       how there is, but the fact speaks for

9       itself:  You are here without that.  They

10      are there with that, and one can't turn

11      all this over."

12  **Q.**   Do you need to put that in context to understand or to

13  tell us what you think he was saying?

14  **A.**   Right.  I would like to roll.

15  **Q.**   I'm asking:  Do you need additional context --

16  **A.**   Yes.

17  **Q.**   (Continuing) -- in order to tell us what you think you

18  were saying?

19  **A.**   Yes.  I need an additional page.

20  **Q.**   Okay.  At this point isn't he talking about your Russian

21  suppliers?

22           (Brief pause.)

23  **Q.**   In fact, why don't we just go on?  Maybe that will help

24  give you the context.

25  **A.**   One second.  I think that was prior to this.  One second.

ROCKLIN - CROSS EXAMINATION / HOWDEN

```
 1              (Brief pause.)
 2  A.    Yes, I think this starts on the page 65.  When Mr. Beker
 3  says:
 4             "Up to the point, like even those
 5        devices that were turned out, is most
 6        likely that we also will discuss in order
 7        to take this and deliver it there, to
 8        that would be faster."
 9        So he was talking about exactly the same devices that were
10  already assembled at the factory.
11  Q.    And he was talking about doing something with the NPZ
12  devices?
13  A.    That was my understanding at this point.
14  Q.    Okay.  And that's also what he's talking about on page 66,
15  beginning at line 19?
16  A.    Yes.
17  Q.    And, again, by "devices" we're talking about the night
18  vision goggles?
19  A.    Yes.
20  Q.    That NPZ was putting together in Russia?
21  A.    Yes.
22  Q.    Okay.  And he goes on and he says:
23             "But, and that... and that which
24        Newcon so to speak, well... well, I
25        roughly... well, your friends there
```

1      arranged for them.  This doesn't...

2      doesn't work in Metelskiy's head?  Or

3      what?"

4      Was Mr. Beker asking you if Mr. Metelskiy was concerned

5  about this situation, was worried about the customs situation

6  and having problems with this contract?

7  **A.**   Yes.

8  **Q.**   And he goes on:

9          "It does work, but he proceeds from

10      a different point for things not to get

11      worse."  Again, referring to Metelskiy?

12  **A.**   Yes.

13  **Q.**   And then he says:

14          "Basically, I believe that the time

15      has come when all of us need to

16      coordinate our work... not to spoil the

17      market the way that it was spoiled with

18      the zero thing."

19      The "us" he is referring to is Newcon, ATN and NPZ, isn't

20  that right?

21  **A.**   I think "us" here is ATN and then Newcon.

22  **Q.**   Okay.  Let's go to conversation number six, and this

23  occurred on September 1st, 2005?

24  **A.**   Yes.

25  **Q.**   Is that the day after the conversation we just went

1  through?

2  **A.**   Yes.

3  **Q.**   And at the beginning of the conversation -- this is a

4  conversation between you and Mr. Prilik in the beginning?

5  **A.**   Yes.

6  **Q.**   And on page 3, beginning at line 7, you say to Mr. Prilik:

7         "But he suggested specifically

8      enough that he wants to, and all that...

9      well, and we have feelings, ah... that we

10     can come to the general consensus, ah...

11     I would like to continue the

12     conversation."

13     When you said that to Mr. Prilik, you were telling him

14  that you were hoping to come to some sort of an agreement with

15  Mr. Beker, isn't that right?

16  **A.**   On the previous page 2, line 24, Mr. Prilik says:  "He

17  like told me that he reached some agreement," and I was

18  commenting here on that.

19  **Q.**   Okay.  And what you said was:

20        "We have feelings that we can come

21     to the general consensus.  I would like

22     to continue the conversation."

23     Weren't you telling him that you were hoping to reach an

24  agreement?

25  **A.**   I was telling him that I like to continue the

ROCKLIN - CROSS EXAMINATION / HOWDEN

 1  conversation.

 2  **Q.**   Okay.  And directing your attention to page 13.  By this

 3  point in the conversation your talking to Mr. Beker, correct?

 4  **A.**   Yes.

 5  **Q.**   And you say beginning at line 4, you said:

 6          "And I hope that you would forgive

 7       him for that and the last time, you asked

 8       me, can I help you in any way?  Well,

 9       then... well, now, there is a rather

10       sensible offer.  Yes, you guys will help

11       me.  And, yes, I will be playing your

12       game and not because of too good a life.

13       You understand?  But... ah, I need a step

14       from you.  So last time I asked for that,

15       you were kind of reluctant.  I understand

16       that."

17       And Mr. Beker was reluctant the last time when you asked

18  him for a good faith deposit, isn't that correct?

19  **A.**   Yes.

20  **Q.**   And so in this conversation you say beginning at line 17:

21          "One second, one second.  I... I am

22       not telling you to pay me, well, all the

23       money up front.  I am not telling you to

24       pay me 50 percent.  I am not telling

25       you... to me, well, I need to go to

1          Morgovsky and tell him that, here, they

2          are serious about it."

3       At this point you are asking Mr. Beker to consider making

4  some sort of up-front payment to you, is that right?

5  **A.**   Yes.

6  **Q.**   And you are asking because that's what the FBI asked you

7  to do?

8  **A.**   Yes.

9  **Q.**   And then on the next page your conversation with him

10 continues, and beginning at line-- well, let's take it from the

11 top.  Mr. Beker says:

12             "Dima, don't waste your strength on

13        that.  You don't need to explain it to

14        me.  I've got it."

15        And you answer:

16             "So it's forgotten.  I will never go

17        back there, and after that, you see... I

18        have things to do.  I have my commercial

19        market and all the rest, okay?  And you

20        know only too will that most likely TACOM

21        will never again regard us in a positive

22        way.  So it's a lot of sacrifice, right?

23        So I simply ask you to help me solve this

24        problem with Morgovsky."

25        And you were trying to explain to Mr. Beker that if you

1   failed to perform on the Battalion Set II contract, it would

2   have serious repercussions for your company in dealing with the

3   military down the road, is that right?

4   **A.**   Yes.

5   **Q.**   And then you say:

6           "I'll help you.  Well, I will do an

7           invoice for you for consulting services.

8           I don't know.  For camera adapters, for

9           something."

10           And Michael says:

11           "It absolutely doesn't matter."

12           "Yes" -- and you said:

13           "Yes, you will give me some good

14           faith deposit, which once again, in any

15           event, if I, on... on... on an hour after

16           I have this money, I will call Morgovsky

17           and tell everything that there is."

18       You are the one who suggested doing an invoice for this

19   financial transaction, isn't that right?

20   **A.**   Yes.

21   **Q.**   And you suggest that you put on it that it reflect that

22   it's for consulting services?

23   **A.**   Yes.

24   **Q.**   And you also offer the option that you can put on it that

25   it's for camera adapters?

1    **A.**    Right.

2    **Q.**    And, obviously, it's neither of those things, the invoice?

3    **A.**    Yes.

4    **Q.**    And then if you -- you were saying that when you get the

5    good faith deposit, you'll call Morgovsky; that being your

6    boss?

7    **A.**    Yes.

8    **Q.**    And in your mind that would -- or at least in the scenario

9    you were laying out, that would convince Mr. Morgovsky to okay

10   the deal and you could move forward?

11   **A.**    Yes.

12   **Q.**    Mr. Beker this time responds on page 15, line 8:

13          "No, unlike... I like... upon my

14       word, there is no need either to talk me

15       into it or to convince, I... like, trust

16       you, I believe you.  You and I reached an

17       agreement if now... how you like say, yes

18       I am ready to join the coalition.  And

19       afterwards already, ah... the way it will

20       turn out, I will do what you say like..."

21       So Mr. Beker, in principle at least at this point, is

22   agreeing to pay you something up front?

23   **A.**    Yes.

24   **Q.**    But he expects you to join the coalition.  What did you

25   understand the "coalition" to be?

1  **A.**    To -- coalition ATN with Newcon, and for ATN not to

2  deliver remainder of the phase one of Battalion Set II.

3  **Q.**    Not to work together with Newcon on the project?

4  **A.**    You can interpret it that way.

5  **Q.**    Ah, okay.  Mr. Beker goes on:

6          "Well, then, there is no need to

7          keep convincing me any more.  So you and

8          I reached an agreement?  Tell me what you

9          want in the form of good faith.  I don't

10         have problems, I'm telling you once

11         again."

12         So he's agreeing that he will pay you a good faith

13  deposit, right?

14  **A.**    Yes.

15  **Q.**    When the FBI asked you to ask for an upfront payment, did

16  they also suggest the idea of an invoice?

17  **A.**    It was a discussion with the FBI --

18  **Q.**    I'm sorry.  Go ahead.  I didn't mean to interrupt.

19  **A.**    I mentioned usually there is a money transaction between

20  the companies, then it requires some sort of receipt of

21  payment.  And that's how the idea of an invoice was brought up.

22  **Q.**    Okay.  And who suggested the idea of putting consulting

23  services on the invoice?

24  **A.**    I don't recall right now.

25  **Q.**    Was it your idea?

1    **A.**   I don't recall right now.

2    **Q.**   How about the camera adapters, whose idea was that?

3    **A.**   Again, it was a discussion with FBI and something to the

4    extent it had to be -- if it had to be invoice, it had to be

5    for something, non-tangible goods.  For example, consulting

6    services.  Or some minor accessories, like a camera adapters.

7    **Q.**   And why did it have to be some minor accessory or

8    intangible goods?

9    **A.**   The -- what was on an invoice, invoice was only a receipt.

10   The understanding was that it was just an advance payment for

11   ATN not to participate for the remainder of phase one.

12   **Q.**   But I'm asking you in your discussion with the FBI, why

13   did the label that was going to be put on the invoice have to

14   be for something non-intangible or for inconsequential goods?

15   **A.**   Because it didn't matter what it was for, because the real

16   reason would not be on an invoice.

17   **Q.**   Okay.  And that was your discussion with the FBI?

18   **A.**   Something to that extent.

19   **Q.**   All right.  And at the bottom of page 16 you say:

20             "Okay.  I don't know, is $50,000

21        too" -- and then it continues -- "too

22        much?"

23        This is the first time that a dollar amount for the good

24   faith deposit is mentioned, right?

25   **A.**   Yes.

1  Q.   And that was an amount that the FBI suggested to you?

2  A.   I don't recall.

3  Q.   And then you go on.  You say:

4        "Yes, and one thing... let us agree

5        on one thing.  You can, well, mention

6        75... or can we agree on $100?  I think

7        that if you go sell them for over 2,000

8        to the Tacom..."

9        Again, those are your words, right?

10 A.   Yes.

11 Q.   You're the one who says Newcon can sell the night vision

12 goggles to TACOM for over $2,000?

13 A.   But that was a discussion before the price range was

14 established, 2,000 to $2,500, in one of the conversations with

15 Arie.

16 Q.   Okay.  But that assumes that whoever the prime contractor

17 is is going to increase the price, right?

18 A.   Yes.

19 Q.   That's not a decision that was up to ATN in the case of

20 the Battalion Set II contract, right?  You couldn't tell ITE

21 what to charge TACOM?

22 A.   No.

23 Q.   And if someone took your place, they couldn't tell ITE

24 what to charge TACOM?

25 A.   But if the price would be higher, that would be the

1    result.

2    **Q.**    Well, that might be a logical conclusion, but that's

3    supposition, isn't it?

4    **A.**    It's a logical conclusion.

5    **Q.**    Okay.  So Mr. Beker agrees to pay you the $50,000, and at

6    page 18 beginning at line 21, he tells you:

7              "Send me please the invoice..."

8         You say, "Okay."

9         And he says: "...with the requisites."

10        And you respond to him:  "So I'll send you the invoice" --

11   and then continuing to the next page -- "with the requisite."

12        And Mr. Beker says:

13             "And you give me your word of honor

14        that in case this somehow doesn't work

15        out for you guys..."

16        And you say:  "Both mine and well..."

17        Mr. Beker says:  "You will return the money to me."

18        And you say:  "Yes."

19        Right?

20   **A.**    Yes.

21   **Q.**    So in the first instance Mr. Beker reminds you to send him

22   the invoice, right?

23   **A.**    Yes.

24   **Q.**    In your discussions with the FBI, did they tell you that

25   they would prefer that there not be any written document

1    relating to the payment of the $50,000?

2    **A.**    No.

3    **Q.**    But -- but -- and you didn't suggest or insist, rather,

4    that there be some sort of writing so that on ATN's books you

5    would have some rationale for receiving $50,000?

6    **A.**    Not that I recall, no.

7    **Q.**    Okay.  But at any rate Mr. Beker reminds you to please

8    send him the invoice, right, on page 18?

9    **A.**    Yes.

10   **Q.**    With the requisites.  And I think you've already explained

11   the requisites are the details for the wire transfer?

12   **A.**    Yes.

13   **Q.**    And you know from your business experience that the -- the

14   records for a wire transfer include detailed bank account

15   information, bank information, routing numbers and the like,

16   right?

17   **A.**    Yes.

18   **Q.**    Completely documents the financial transaction itself?

19   **A.**    Not really.  It documents the actual wiring of the funds.

20   What they were for, it doesn't.

21   **Q.**    Right.  But the fact of the wire itself is going to be

22   completely documented by two different banks, and all the

23   instructions that flow between them, right?

24   **A.**    Yes.

25   **Q.**    And Mr. Beker added that:

1          "And you give me your word of honor

2      that in case this somehow doesn't work

3      out for you guys, you'll return the money

4      to me."

5      That was part of what he understands the conditions were

6  for him paying you the $50,000?

7  **A.**   Yes.

8  **Q.**   And you agreed?

9  **A.**   Yes.

10  **Q.**   And at the bottom of that page, page 19, beginning at

11  about line 20, you said:

12          "I've got it.  Let me do this for

13      you.  I'll now send you the invoice

14      for... the other way around:  From us.

15      If you want, I can simply write,

16      consulting services, whatever you tell me

17      or not, or I can write for you once

18      again" -- continuing to the next page --

19      "I would prefer camera adapters."

20      All right.  So for a second time you're suggesting that

21  you put a false label on it, camera adapters or consulting

22  services, isn't that right?

23  **A.**   Yes.  We're discussing invoice and what's to put on it.

24  So for the second time I'm offering that, yes.

25  **Q.**   Okay.  And Mr. Beker says:

 1           "I would prefer something like a

 2      loan so that later on, if there is

 3      anything..."

 4      You say:  "I have got it."

 5      He continues:

 6           "One would be like... at least to

 7      talk."

 8      So Mr. Beker's idea is to call it a loan, right?

 9  **A.**   Yes.

10  **Q.**   And the reason he gives you here is so that if later on

11  there is a problem, he can at least talk to somebody about

12  getting it back, right?

13  **A.**   Right.  But both of us understand that this is not a loan

14  or consulting services.  It's an advance payment for ATN not to

15  perform on the contract.

16          **MR. HOWDEN:**  Your Honor, I would ask that that last

17  answer be stricken.  It's completely nonresponsive and it

18  assumes all kind of facts.

19          **THE COURT:**  It is stricken as nonresponsive, and the

20  jury is instructed to disregard that statement.

21          And when I say it's stricken, that means disregarded,

22  so.  Okay.  So I don't -- so you don't have to hear me say it

23  over and over again.

24  **BY MR. HOWDEN:**

25  **Q.**   And Mr. Beker continues.  He says at line 13 through 15:

1            "Write that it's a loan.  Sign and

2        affix the seal on the left side.  I'll

3        sign and affix it on the other side."

4        Now, the seal he was referring to is the ATN corporate

5   seal, is that right?

6   **A.**   Yes.

7   **Q.**   And he's proposing that he will put the Newcon seal on it

8   as well?

9   **A.**   Yes.

10  **Q.**   And then eventually he asked you to email him a copy of

11  the invoice to him, is that right?

12  **A.**   Email and a fax.

13  **Q.**   Well, does he actually ask you to fax it to him?

14  **A.**   I think it was a discussion.  One second.

15  **Q.**   Well, fax came up in the discussion, but he never asked

16  you to fax it to him.  Take a look, please.  I believe the next

17  page, page 21.

18            (Brief pause.)

19  **A.**   Can you point out specifically where we're discussing fax?

20  **Q.**   Yeah, it's page 21.  If you look at the beginning of

21  page 7, you suggest:

22            "I've got it.  So that we shook

23        hands just now.  I promise you that...

24        well, I don't have your email... if you

25        like, I'll fax it or if you like, I'll

1        send."

2        And he never asks you to fax it, does he?

3   **A.**   I proposed that, but he never denied that I -- or he did

4   not tell me not to fax it.

5   **Q.**   Okay.  But he didn't ask you to fax it to him --

6   **A.**   No.

7   **Q.**   (Continuing) -- isn't that correct?

8            **THE COURT:**  Can we stop right there?  I have an

9   interruption.  I need to take care of something.

10           **MR. HOWDEN:**  Time?

11           **THE COURT:**  A couple minutes, I'm hoping.

12           So please follow the instructions you have been given

13  about not discussing the case amongst yourselves or anyone

14  else.  If you want to use the restroom, you can do that or just

15  mill around here.  Okay.

16           (Whereupon there was a pause in the proceedings

17            from 11:29 a.m. until 11:45 a.m.)

18           **THE COURT:**  Okay.  Sorry about that.

19           **MR. HOWDEN:**  We are back on?

20           **THE COURT:**  You're back on.

21           **MR. HOWDEN:**  Okay.

22  **BY MR. HOWDEN:**

23  **Q.**   Mr. Rocklin, following the conclusion of this conversation

24  with Mr. Beker, you sent to him a copy of the invoice and the

25  wiring instructions, is that correct?

1   **A.**   Yes.

2   **Q.**   And following that, Mr. Beker sent you an email saying

3   your agreement was cancelled?

4   **A.**   Yes.

5   **Q.**   And you had a conversation with him about it the following

6   day, September 2nd, is that right?

7   **A.**   Yes.

8   **Q.**   And he was upset with the way that you had sent the

9   invoice to him?

10  **A.**   Yes.

11  **Q.**   He was unhappy that you had also sent it to Mr. Prilik?

12  **A.**   Yes.

13  **Q.**   And he was unhappy that you said you had faxed it to his

14  business as well?

15  **A.**   Yes.  And I did.

16  **Q.**   And as the government pointed out on page 6, beginning at

17  line 16, Mr. Beker said in the course of the conversation:

18           "No.  You don't quite understand.

19       You think that all this... like... ah,

20       what you and I are doing, well, to put it

21       mildly, somebody can use it against us."

22       Right?

23  **A.**   Yes.

24  **Q.**   But this is relating to you sending the invoice again,

25  right?  The "this" is you sending the invoice to him, right?

1  **A.**    Not the invoice itself, that's my understanding.

2  **Q.**    But Mr. Beker agreed to have you send the invoice to him,

3  right?  He didn't argue with that -- with you about it at all?

4  **A.**    No.

5  **Q.**    In fact, he reminded you to send him the invoice during

6  that conversation the previous day?

7  **A.**    Yes.

8  **Q.**    And it was his suggestion that you put your corporate

9  stamp on the invoice?

10  **A.**    Yes.

11  **Q.**    And sign the invoice?

12  **A.**    Yes.

13  **Q.**    That he said he'd also put his stamp on it?

14  **A.**    Yes.

15  **Q.**    And sign it as well?

16  **A.**    That's what he said.

17  **Q.**    I don't want to jump around, but Mr. Beker -- his main

18  concern was that you hadn't done what you had agreed to do, at

19  least in his view, isn't that right?

20  **A.**    I think his main concern here was the way he was relating

21  to me that I sent it, the copy to Arie.

22  **Q.**    Okay.  And if we look at page 8, beginning at line 14, he

23  tells you:

24          "I replied to you immediately, as

25          soon as I saw that you deemed it

1         necessary you decided for me.  Why are

2         you deciding for me?  If you are deciding

3         for -- this for me today, what are you

4         going to decide for me tomorrow?"

5       That's how he explained what he was unhappy about, isn't

6  that right?

7  **A.**   That's how he explained it.

8  **Q.**   Okay.  Now, also during this conversation, he pointed out

9  to you on page 7, beginning at line 8 that, "Lyonya flew away."

10 And Lyonya is Mr. Gaber?

11 **A.**   Yes.

12 **Q.**   And what was your understanding about where Mr. Gaber had

13 flown away from?

14 **A.**   From Russia back to U.S.

15 **Q.**   And Mr. Beker added:  "Without calling Metelskiy."

16       Right?

17 **A.**   Yes.

18 **Q.**   And, again, Metelskiy is NPZ?

19 **A.**   Yes.

20 **Q.**   And he repeated it:

21           "Lyonya flew away without calling

22       Metelskiy."

23       And he added that:

24           "Without.  Metelskiy doesn't know

25       anything."

1       All right?  And he was concerned about that, isn't that

2  right?

3  **A.**    Yes.  And I'm asking, "Without calling?"  I'm somewhat

4  surprised, because I don't recall us discussing it prior to

5  this.

6  **Q.**    Okay.  But by this point you understood that having

7  someone from ATN call Mr. Metelskiy was important to Mr. Beker?

8  **A.**    At this point, yes.

9  **Q.**    Okay.  Now let move forward to page 10, at line 13 Mr.

10  Beker says to you:

11          "I didn't ask yesterday, but today I

12      realize that you still have some money

13      left.  You didn't tell me anything, the

14      ones the were paid."

15      And you replied:  "What do you mean?"

16      He said:

17          "Well, you paid for something and

18      didn't receive something."

19      And you answer:  Absolutely correct.  I understand."

20      Now, Mr. Beker was talking about goggles, isn't that

21  right?

22  **A.**    Yes.

23  **Q.**    Goggles in Russia?

24  **A.**    Yes.

25  **Q.**    The goggles and components that NPZ had in Russia?

ROCKLIN - CROSS EXAMINATION / HOWDEN

```
 1  A.   Yes.

 2  Q.   And some of those, some of that equipment ATN had already

 3  paid for?

 4  A.   Yes.

 5  Q.   And so was owed to ATN at that point, isn't that right?

 6  A.   Yes.

 7  Q.   And Mr. Beker added:

 8          "But you didn't tell me anything

 9          about this.  I, like, found out from that

10          side."

11          He found out from someone in Russia, right?

12  A.   Yes.

13  Q.   And you responded on the next page, page 11, line 1:

14          "They will return it somehow."

15          What was the "it" that they would return?

16  A.   Well, we were talking about the money.  So I was saying

17  that they could possibly return the money.

18  Q.   What about the goggles?

19  A.   Not in this moment, no.

20  Q.   Okay.  And your conversation continued with Mr. Beker.  In

21  fact, he says on page 12, beginning at line 2:

22          "Well, Dima, be serious.  What

23          dough?  What money?  They don't have

24          anything.  Everything has been shit out a

25          long time ago, spent a long time ago.
```

```
 1        Well, God willing, one would retrieve the

 2        devices.  I, I don't know.  That is to

 3        say... I wouldn't have been so sure."

 4        And Mr. Beker was telling you that in his view any money

 5   that you had sent to NPZ was gone, isn't that right?

 6   A.   It was his view, yes.

 7   Q.   But that maybe you would be able to recover some of the

 8   goods there, the goggles or the components?

 9   A.   I'm not sure whether he's referring to us recovering the

10   components -- not components, but the actual goggles.  Whenever

11   we're getting components, it was assembled goggles.

12   Q.   Okay.  Are you suggesting that he was -- that he was

13   expressing his interest in obtaining the inventory from NPZ?

14   A.   I don't know.  It says here one would.

15   Q.   Directing your attention to page 17.  Later in the

16   conversation beginning at line 14 Mr. Beker says:

17             "But after all, in a good way, we

18        don't have any paper that would be signed

19        to the effect that you and I have reached

20        an agreement, isn't that so?"

21        And you respond:

22             "Well, you want to make some

23        contract as well?"

24        And Mr. Beker says:

25             "That is to say, I... I... no, no.
```

1      I can tell you so as well that I'll

2      transfer the money to you, but it seems

3      that you and I have no agreement about

4      anything."

5      Mr. Beker was telling you he'd go ahead and transfer the

6  $50,000 to you, but there still was no agreement between the

7  two of you about exactly what you were supposed to do, isn't

8  that right?

9  **A.**   What he means here is written agreement.

10 **Q.**   Okay.  And that's what he wanted?

11 **A.**   Yes.  Later on, I understand, yes.

12 **Q.**   And so then later on at page 20, line 15 Mr. Beker says:

13          "What got me worried, I told you the

14      most important thing:  That if we reached

15      an agreement that you somehow act

16      differently from what we agreed, then I

17      don't understand how I can proceed

18      further.  I am accustomed that I... that

19      I will, in fact, do what we agreed upon."

20      You say:  I have got everything so..."

21      And he continues:

22          "If I want to do something

23      different, I'll ask."

24      Now, part of his conversation here, part of his statement

25 here was referring to his problem with the way you sent the

ROCKLIN - CROSS EXAMINATION / HOWDEN

1  invoices to him, isn't that right?

2  **A.**   Yes.

3  **Q.**   He was concerned that you hadn't followed what he thought

4  were his clear instructions about how you were supposed to send

5  the invoice to him?

6  **A.**   I think here he was -- it was very important that in the

7  future I take orders from him.

8  **Q.**   Do it -- do what he asked you to do?

9  **A.**   Yes.

10  **Q.**   And he goes on, on the next page, page 21, beginning at

11  line 3 he says:

12          "All right, the money.  I'm telling

13       you once again, I believe that, after

14       all... I believe that we need some,

15       because of what... I apologize for what

16       I'm about to say.  I have already

17       apologized 100 times, but because of what

18       happened now, I think that we need some

19       paper for us to sign... together with

20       this invoice, that which we agreed on,

21       that which we take over this contract

22       till the end... with it, we... you guys

23       do everything to help us fulfill it.  We

24       do everything to help you guys fulfill

25       it."

1      And, again, he's referring here -- he's saying that he

2  wants a written agreement, isn't that right?

3  **A.**   Yes.

4  **Q.**   And he's saying one of the reasons that he wants that

5  written agreement is that he's still uneasy about what happened

6  with the invoice?

7  **A.**   Yes.

8  **Q.**   And you ask him, line 15:

9          "Do you want to send it to me?"

10      He responds:

11          "You think I know what should be in

12      there?"

13      And you respond:

14          "You think I know what should be in

15      there?  You, you... you, in fact,

16      understand what you are talking about?

17      You want this to..."

18      So when you say, "Do you want to send it to me," you're

19  suggesting that he draft the agreement and send it to you,

20  isn't that correct?

21  **A.**   Yes.

22  **Q.**   And he responds that he's not sure what should be in

23  there, right?

24  **A.**   Yes.

25  **Q.**   And you say the same thing.  You think I know what should

1  be in here?  Because you don't know what should be in there

2  either, right?

3  **A.**    Well, because outlining an agreement like that could be an

4  evidence a crime.

5  **Q.**    Well, wouldn't that be just the perfect thing for the FBI

6  to have?

7  **A.**    Maybe.

8  **Q.**    Oh, okay.  Mr. Beker says:

9             "That tomorrow when I'll send with

10        this letter."

11        And -- I'm sorry.  He begins at the bottom of line 21 by

12  saying that:

13            "Tomorrow when I send with this

14        letter."

15        Going on to the next page, you say, "Well."

16        And he says:

17            "Ah, the first thing I will be told,

18        and... are you going to deliver in

19        accordance with this contract?  And I say

20        yes.  And how would we know?"

21        He's referring to NPZ's reaction to him taking over the

22  contract, isn't that right?

23  **A.**    I'm not clear about this here.

24  **Q.**    All right.  But he goes on.

25        And you say:  "You mean where?"

1          And he says:

2               "Well, there, where all this is

3          lying about.  They are waiting.  They

4          know that one way or another, somebody is

5          going to fulfill this contract one way or

6          the other."

7          Does that clarify it for you?

8     A.   Yes.

9     Q.   He's talking about the goggles?

10    A.   Yes.

11    Q.   With NPZ?

12    A.   Yes.

13    Q.   He thought it was important that NPZ understand that he

14    potentially was stepping in to take over the contract, isn't

15    that right?

16    A.   My understanding, when I saw the written agreement later,

17    that was not for the eyes of the NPZ.

18    Q.   Well, at this point in time didn't you understand that he

19    was looking for cooperation from NPZ?

20    A.   I think he was using that as an excuse to get the written

21    contract.

22    Q.   At this point in time wasn't he asking or expressing his

23    need for cooperation from NPZ?

24    A.   Yes.

25    Q.   Then on the next page, page 23, he adds:

ROCKLIN - CROSS EXAMINATION / HOWDEN

```
 1                "I think that maybe you simply write

 2           freely what we decided concerning this

 3           contract.  You can write everything that

 4           you want.  If you want to write there

 5           everything the way it looks, the amount,

 6           well, money and so on... a mini

 7           contract."

 8           And, again, this is Michael referring to the proposed

 9    written contract, right?

10    A.   Yes.

11    Q.   And he's proposing that you draft it?

12    A.   Yes.

13    Q.   And he's telling you, you can put everything in there?

14    A.   Yes.

15    Q.   You can put in the amount?

16    A.   Yes.

17    Q.   And what's he referring to by amount?  What was your

18    understanding of what he was referring to?

19    A.   The amount that we agreed per goggle.

20    Q.   Okay.  And the money?  How much would be paid for the

21    goggles?

22    A.   We did not discuss that, that -- oh, you mean per the

23    goggles?  Yes.  I'm assuming that this including the advance

24    payment.

25    Q.   Everything would be in the agreement?
```

1   **A.**   At this point, yes.

2   **Q.**   Okay.  And then you say to him:

3        "Do you hear what you're talking

4        about?"

5        And he says:  "But I think it is bad."

6        And you say:  "Well, of course it's bad."

7        So here it sounds as though he's saying, geeze, what's

8   going on?  This is a bad idea, right?

9   **A.**   Yes.

10  **Q.**   But beginning at the very next page, he says -- and this

11  is the top of page 24, he says:  "But I'm talking about two."

12       He's talking about two different writings, isn't that

13  right?

14  **A.**   At this point, yes.

15  **Q.**   And one of the writings was the proposed -- a letter from

16  Russian customs, right?

17  **A.**   Yes.

18  **Q.**   And the other writing was the written agreement, right?

19  **A.**   Yes.

20  **Q.**   And you say:

21        "Well, that is to say I don't have

22        any problems with the paper that I need

23        to get in order to cover my ass with

24        Ramzi, as they say."

25       In that you're referring to the force majeure letter?

1   **A.**    Yes.

2   **Q.**    But then you go on and you say:

3              "And the second paper that you're

4         talking about."

5         Mr. Beker responds:

6              "The second paper, one needs to

7         understand in what form we can... we can

8         sign it."

9         And that second writing, that was the written agreement?

10  **A.**    Yes.

11  **Q.**    And so he's still talking about having a written

12  agreement, about your agreement with him?

13  **A.**    Yes.

14  **Q.**    And he's still talking about signing that written

15  agreement, right?

16  **A.**    Yes.

17  **Q.**    And then he asks:

18              "Or you don't want to?  After all, I

19         don't insist.  I'm telling you once

20         again.  It's important for me to

21         understand your position."

22         And you respond:  "I wouldn't want to do it."

23         Isn't that right?

24  **A.**    Yes.

25  **Q.**    You didn't want a written agreement?

1  **A.**   No.

2  **Q.**   And then you say on the next page, beginning at line 2:

3        "As you understand only too well,

4       ah... as is said by ah... friendly

5       rabbis, this is not kosher."

6       Right?

7  **A.**   Yes.

8  **Q.**   And "kosher" is your word, right?

9  **A.**   Yes.

10  **Q.**   And you ask him:

11        "Or you... well, you don't agree

12       with me?"

13       And Mr. Beker explains:

14        "Well, if we are to talk about the

15       money, yes.  If we are to talk about the

16       principle as a whole, then no.  That is

17       to say, they can be separated, these

18       issues, because..."

19       And you say:

20        "And I agree.  I don't quite... I

21       don't quite understand.  How so?"

22       And he goes on.  Mr. Beker goes on.  He says:

23        "Let's put it this way.  If we reach

24       an agreement about something, this is

25       kosher.  But if it is also connected with

1    the money, this is no longer kosher."

2    And you took that to mean that a written agreement was

3  okay in his view unless it involved money, right?

4  **A.**   Yes.

5  **Q.**   And that if it involved money somehow it wasn't kosher any

6  more?

7  **A.**   Yes.

8  **Q.**   But Mr. Beker goes right back to pressing for a written

9  agreement that's signed by both parties, isn't that right?

10  **A.**   Yes.

11  **Q.**   And finally you respond to him at page 26, line 4.  You

12  say:

13         "Well, let's put it this way.  Do

14      you mind if I were to give you something

15      like that... after I at least receive the

16      money?"

17    And the "something like that" that you're referring to is

18  a signed written agreement, isn't that correct?

19  **A.**   Yes.

20  **Q.**   And you're telling him, send me the money first and I'll

21  sign the agreement later, right?

22  **A.**   That's not what I'm saying.

23  **Q.**   Okay.  With regard to the force majeure letter, let me

24  direct your attention to the bottom of page 27, carrying over

25  to 28.

1    You had been talking about the force majeure letter with

2  Mr. Beker, and at this point in the conversation you said:

3         "Therefore, after all, you will need

4      specifically the number of the contract,

5      when and what."

6    The contract you are referring to is your contract with

7  NPZ?

8  **A.**   Yes.

9  **Q.**   And you're talking about including the contract number in

10  a draft of the force majeure letter, right?

11  **A.**   Yes.

12  **Q.**   Because at that point in time Mr. Beker did not have that

13  contract number?

14  **A.**   No.

15  **Q.**   Now, that conversation occurred on the morning of

16  September 2nd, right?

17  **A.**   Yes.

18  **Q.**   And shortly thereafter you had a second conversation with

19  Mr. Beker on September 2nd?

20  **A.**   Yes.

21  **Q.**   And in that conversation beginning on page 3, line 14, Mr.

22  Beker says:

23         "So all this is possible.  The only

24      thing is this.  I thought, we'll prepare

25      a draft now from our side, the way I

1       think this document should look."

2       You respond:  "Um-hum."

3       And he says:  "We'll seen it to you by email."

4       You say:  "Well?"

5       And he says:

6            "You'll look at it.  What you don't

7       like... you'll tell."

8       And you say:  "Well?"

9       And he adds:

10           "Well, and we'll sign it.  The order

11      to transfer, I prepared and signed it.

12      That is to say, what's left is for you

13      and me to decide about this paper."

14      And when Mr. Beker said that we'll prepare a draft now

15 from our side, that was a draft of the proposed agreement?

16 **A.**   Yes.

17 **Q.**   And, again, he said "draft," right?

18 **A.**   Yes.

19 **Q.**   And he said:

20           "It's the way I think this document

21      should look?"

22      In other words, what he thought would be important in the

23 agreement?

24 **A.**   Yes.

25 **Q.**   And -- but he told you that you'll look at it.  What you

1  don't like, you'll tell.  And he meant tell him, right?

2  **A.**    Yes.

3  **Q.**    He was giving you a chance to add what you thought was

4  important to the agreement?

5  **A.**    Yes.

6  **Q.**    And then he said:

7           "We'll sign it.  The order to

8           transfer, I prepared and signed it.  That

9           is to say, what's left is for you and me

10          to decide about the paper."

11          So he said he was prepared to transfer the money to you,

12  is that right?

13  **A.**    Yes.

14  **Q.**    But that what remained was for you and him to decide about

15  the agreement, right?

16  **A.**    That's what I'm clarifying later on, yes.

17  **Q.**    He wanted you to look at his proposed agreement and

18  suggest your changes so that you could reach a mutually

19  acceptable set of terms, right?

20  **A.**    He wanted some sort of document from me in writing.

21  **Q.**    And he offered to let you put what terms you thought were

22  important in it, didn't he?

23  **A.**    Yes.

24  **Q.**    And he continued on the same thing:

25          "And you and I have to sign the

1          paper.  The paper is being prepared now,

2          a draft."

3          And, again, your understanding was that the paper was a

4     written agreement?

5     **A.**   Yes.

6     **Q.**   And, again, he makes it clear he's talking about a draft,

7     right?

8     **A.**   Yes.

9     **Q.**   And he says:

10              "The essence of this issue is that

11         we have to retrieve, to help, to

12         transfer... well, so forth.  Everything

13         that is connected with this issue.

14         Because it so happens that we have no

15         agreement at all on paper about the very

16         fact of the transfer of this contract to

17         Newcon."

18          Now, when he said "we have to retrieve," he was talking

19     about the goggles at NPZ, wasn't he?  Retrieve the goggles from

20     NPZ?

21     **A.**   Possibly.

22     **Q.**   And when he says "to help," he was looking for help from

23     you, isn't that right?

24     **A.**   Once again, we were talking about the document that would

25     be just like a loan; not exactly outlining what the true, the

1   agreement was.

2   **Q.**   When he asked -- when he said "to help," he was talking

3   about ATN helping, isn't that right?

4   **A.**   ATN helping to Newcon?

5   **Q.**   Yes.

6   **A.**   My understanding that ATN had to just not to deliver.

7   That was the agreement.

8   **Q.**   And he says "to transfer."  He was talking about

9   transferring the contract?

10  **A.**   I'm not clear here on that.

11  **Q.**   Okay.  But he's talking about transferring something,

12  right?

13  **A.**   Yes.

14  **Q.**   And he elaborates by saying:

15          "Everything that is connected with

16      this issue."

17      Right?

18  **A.**   Yes.

19  **Q.**   And you say -- you respond at lines 18 and 19:

20          "I understand everything only too

21      well, but you and I did agree that

22      it's... after the money."

23      In other words, you want to get paid first?

24  **A.**   Yes.

25  **Q.**   And you add at lines 23 and 24:

1               "But I'm not against it.  I told you

2        that we would do everything."

3        The "it" was the written agreement, right?

4   **A.**   The "it" was what we agreed before, that ATN will not

5   participate for the remainder of the deliveries.

6   **Q.**   Well, he was just talking about what should be in the

7   written agreement.  And you say:

8               "I am not against it.  I told you

9        that we would do everything."

10       You're talking about the written agreement there, aren't

11  you?

12  **A.**   Can you scroll down a little bit?

13  **Q.**   Pardon?

14  **A.**   Could you scroll down a little bit?

15  **Q.**   You mean, to the next page?

16  **A.**   This is the end of the page.  Yes, please.

17  **Q.**   Okay.  Let's go to the next page.

18       And Mr. Beker says:  "Now I will give."

19       You say:  "But it's clear."

20              "We are losing... we are only losing

21       time.  So it will be left for the next

22       week then."

23       Right?

24  **A.**   Yes.

25  **Q.**   He's expressing to you that the time is important in this

1  arrangement, right?

2  **A.**    Yes.

3  **Q.**    Because you have a deadline of October 15th to complete

4  the deliveries, isn't that right?

5  **A.**    Well, there, I think, it was more conversation about the

6  time difference between Russia and U.S.

7  **Q.**    Well, certainly, there is a time difference; but at this

8  point in time he's saying we are only losing time.  And the

9  time that you're losing is the time to get the deliveries done

10 by October 15th, isn't that correct?

11         **MS. HAMILTON:**  Your Honor, the witness has answered

12 the question.

13         **MR. HOWDEN:**  I don't think he has.

14         **THE COURT:**  Objection is overruled.

15         Do you understand the question?

16         **THE WITNESS:**  Yes.

17         **THE COURT:**  You may answer it.

18 **A.**    I think the time here was about the time difference that

19 he wanted to contact someone in Russia.

20 **BY MR. HOWDEN**

21 **Q.**    Okay.  And -- well, let's take a look at it.  You go on:

22         "Well... well, on Tuesday now we are

23         dealing with... with this paper."

24         By the "paper," you're referring to the written agreement,

25 isn't that right?

1  **A.**    No.  I was talking here back to the force majeure letter.

2  And that's why he had to contact Russia.

3  **Q.**    Okay.  And he adds:

4           "But I'm flying away on Friday so

5           that, you know, if I don't manage to do

6           it on Tuesday and Wednesday... Tuesday is

7           here, and there it remains Wednesday and

8           Thursday.  That is to say, practically

9           two days.  That's the question."

10          In other words, he would be losing two days, right?

11 **A.**    Yes.

12 **Q.**    Losing two days to meet the October 15th deadline, isn't

13 that right?

14 **A.**    Possibly.

15 **Q.**    And on that page, at line 20, you say:

16          "The draft, okay.  You can send the

17          draft.  I'll look at it.  I'll sign, if

18          you don't mind, on Tuesday or when?

19          Well... (pause) Hello?"

20          And I take it that you -- that writing you're

21 referring to is the force majeure letter?

22 **A.**    Here we're already talking back to the written agreement.

23 **Q.**    Oh, okay.  And you say:

24          "I'll sign it, if you don't mind, on

25          Tuesday or when."

1          Right?

2    **A.**    Yes.

3    **Q.**    You're agreeing to sign the writing?

4    **A.**    After I will read the draft.

5    **Q.**    Okay.  And Mr. Beker adds:

6                "That is to say, you insist, after

7          all, first to receive the money and then

8          to sign."

9          And you say yes, right?

10   **A.**    Yes.

11   **Q.**    And then he says:

12               "Okay.  Then we will do an

13          intermediary version.  You and I will

14          coordinate this text."

15         Again, this is another way of him saying that he'll send

16   you a draft?

17   **A.**    Yes.

18   **Q.**    And when he says "you and I will coordinate the text,"

19   he's saying that you and he will work together to work out the

20   final terms, right?

21   **A.**    That I will need to prior to signing -- my understanding

22   was that I will prior to signing will need to be agreeing on

23   the text.

24   **Q.**    Right.  And contributing to whatever you think needs to be

25   in the draft, right?

1   **A.**   Possibly.

2   **Q.**   And he says it again, lines 7 and 8:

3         "And then I will transfer the money

4         so that I would know that... the next

5         that we coordinated, you'll sign."

6         And when he says "the text that we coordinated," again,

7   he's referring to a written agreement that you both contribute

8   to?

9   **A.**   Yes.

10  **Q.**   And you agreed?

11  **A.**   Yes.

12  **Q.**   And continuing with the conversation on page 7 at line 7,

13  Mr. Beker says:

14        "It is needed that Mr. Gaber pick up

15        the phone and Metelskiy."

16        And, again, Gaber is one of your partners?

17  **A.**   Yes.  It's a supplier.

18  **Q.**   And Mr. Metelskiy is with NPZ, your supplier?

19  **A.**   Yes.

20  **Q.**   And Mr. Beker wants Gaber to call NPZ, correct?

21  **A.**   Yes.

22  **Q.**   And you question him at line 13 and 14:

23        "But... and you... that is to say,

24        before you transfer the dough?"

25        So you're asking him whether or not that call should be

ROCKLIN - CROSS EXAMINATION / HOWDEN

1  made before -- or needs to be made before the money is actually

2  transferred to you, correct?

3  **A.**   Yes.

4  **Q.**   And Mr. Beker says:  "No, I trust you."

5       And then he adds at line 17 and 18:

6           "If he doesn't do it, you will

7       return the money to me."

8       The "it" that he's refusing to is having Gaber call

9  Metelskiy, isn't it?

10 **A.**   Yes.

11 **Q.**   It's important, right?

12 **A.**   I think it was important for him because that would be a

13 sign that we're all on the same page and ATN will cooperate.

14 **Q.**   It was so important to him that, in his view, the deal

15 would be off if it didn't occur, right?

16 **A.**   Yes.

17 **Q.**   And what he wanted Mr. Gaber to tell Mr. Metelskiy he

18 expresses beginning at line 20:

19           "...to pick up the phone, to call

20       him and to say, from now on... please,

21       everything that originates from Mikhail

22       Lvovich, this is my name."

23       And it goes on.  You discuss the Russian names and he

24 continues at page 4, the next page -- or line 4, I'm sorry, of

25 the next page:

1          "That these are our activities that

2      are coordinated with them and further, go

3      head... please, do that... which is

4      better for all of us."

5      Right?

6          In the first part of that quote, he's -- he's saying that

7  he needs Gaber to tell Metelskiy that Newcon is now handling

8  the contract, right?

9  **A.**    Yes.

10 **Q.**    And that NPZ should now work with Newcon on this project?

11 **A.**    They should coordinate with them.

12 **Q.**    Okay.  And the only way that NPZ could coordinate with

13 Newcon is to do the only thing that they were doing for ATN,

14 which is to supply him with goggle parts, right?

15 **A.**    The only thing NPZ did with ATN, they were supplying

16 goggles, not goggle parts.

17 **Q.**    Okay.  So he wanted goggles supplied from NPZ to Newcon?

18 **A.**    Still not clear here about it.  My understanding at this

19 point, that if Lenny would call NPZ, that would be an act of

20 confirmation that me and Lenny are on the same page.

21 **Q.**    What in the world else could Mr. Beker be interested in in

22 NPZ other than that which they had and were supposed to give to

23 ATN?

24 **A.**    Just what I said a second ago; that would be a

25 confirmation of our agreement.

1  Q.   Okay.  Mr. Beker adds, beginning at line 8 going through

2  line 10:

3           "Because in case he doesn't do it

4       then for me, I'm telling in advance, it

5       will be extremely hard to continue this."

6       And the "this" is to move forward with the proposed

7  agreement that Newcon begin supplying under the contract,

8  right?

9  A.   "This" means paying for it.

10 Q.   Paying for what?

11 A.   For ATN not to perform for the remainder.

12 Q.   And it contemplated -- your agreement contemplated Newcon

13 taking over, right, and fulfilling the contract?

14 A.   Somehow, yes.

15 Q.   Somehow, right?

16 A.   Yes.

17 Q.   And Mr. Beker is telling you that in order for Newcon to

18 fulfill the contract, they need cooperation from NPZ, isn't

19 that right?

20 A.   He's telling me that he wants Lenny to call Metelskiy.

21 Q.   To cooperate with Newcon, isn't that right?

22 A.   I don't know.

23 Q.   Mr. Beker stays on this point, page 9 beginning at line 4

24 he says again to you:

25           "It is sufficient for him to call

1        him and say that everything is okay, we

2        reached an agreement about everything.

3        Further... all... the entire coordination

4        goes through Newcon, Beker and that's

5        it."

6        Now, you've already testified that the first "him" there

7   is Mr. Gaber, is that right?

8   **A.**   Yes.

9   **Q.**   And the second "him" there is Mr. Metelskiy, right?

10  **A.**   Yes.

11  **Q.**   So it's sufficient for Gaber to call Metelskiy and to say,

12  "...that everything is okay, we reached an agreement."  And the

13  "we" there is Newcon and ATN, right?

14  **A.**   Yes.

15  **Q.**   So that Newcon and ATN reached an agreement about

16  everything?

17  **A.**   Yes.

18  **Q.**   And, further, that the entire coordination goes through

19  Newcon, Beker and that's it?

20  **A.**   Yes.

21  **Q.**   Why in the world would it be so important to Mr. Beker to

22  contact NPZ and to tell him -- to make sure that NPZ understood

23  that Beker had the contract, if it wasn't to get NPZ's

24  equipment from them?

25  **A.**   I think that's a great question for Mr. Beker.

1  Q.   Okay.  Thank you very much.

2       And, again, he reiterates at line 16, that if the call

3  isn't made, you'll return the money to him, right?

4  A.   Yes.

5  Q.   Now, following this second conversation on September 2nd,

6  Mr. Beker sent you the draft agreement, is that correct?

7  A.   Yes.

8  Q.   And you received it on September 2nd?

9  A.   Yes.

10 Q.   And you didn't respond to him about it?

11 A.   No.

12 Q.   You didn't redraft it?

13 A.   No.

14 Q.   You certainly didn't sign it?

15 A.   No.

16 Q.   You didn't call him up and say, Hey, what is all this?

17 This is ridiculous.  We need to change the terms of this?

18 A.   No.

19 Q.   You just sat on it?

20 A.   Yes.

21 Q.   And waited?

22 A.   Because the letter was -- would be extremely damaging to

23 ATN, in my view.

24 Q.   Okay.  But you made no effort whatsoever to change its

25 terms to make it less damaging to ATN, did you?

ROCKLIN - CROSS EXAMINATION / HOWDEN

1   **A.**   No.

2   **Q.**   And as a result, on September 7th -- what's that, five

3   days later -- Mr. Beker called you back?

4   **A.**   Yes.

5   **Q.**   And you ended up returning his call?  I think that's the

6   way the sequence went?

7   **A.**   I think so, yes.

8   **Q.**   Okay.  And during that preceding five days, nothing had

9   happened with respect to the draft?

10  **A.**   No.

11  **Q.**   And when you spoke to Mr. Beker on the 7th, he told you at

12  page 3, beginning at line 20:

13          "But since you didn't react to me,

14      to my email, the way I understand it, you

15      either didn't read it or you don't want

16      to react, and I'm flying away on Friday."

17      The email he was referring to, you understood that that

18  was the email that had the agreement attached to it, correct?

19  **A.**   Yes.

20  **Q.**   And when he says, "you didn't read it or you don't want to

21  react," he's referring to the draft of the agreement, right?

22  **A.**   Yes.

23  **Q.**   And when he told you he was leaving on Friday, he was

24  flying away on Friday, that meant he was leaving town, right?

25  **A.**   Yes.

1    **Q.**    And at that point you told him that you've got the letter,

2    and you went on to explain how you couldn't possibly sign it

3    because it was so damaging and one sided to ATN, right?

4    **A.**    I did.

5    **Q.**    And on page 5, beginning at line 6, you added that:

6              "I agree to the following.  I'll

7         make a call myself to TACOM."

8         Right?

9    **A.**    Yes.

10   **Q.**    And that was your suggestion, right?

11   **A.**    Yes.

12   **Q.**    Mr. Beker hadn't suggested it in any way, shape or form

13   that you call TACOM, right?

14   **A.**    No.

15   **Q.**    And you went on and told him some additional reasons why

16   you thought this was a bad draft, a bad agreement.

17        And at line 21, you point out to him:

18             "If you take the money out of the

19        thing, this doesn't make sense."

20        Right?

21   **A.**    Yes.

22   **Q.**    Because he hadn't mentioned money, at least not the

23   $50,000 or $75 per pair of goggles.  He hadn't mentioned that

24   in the draft agreement, right?

25   **A.**    Yes.

1  Q.  But you didn't offer to put those terms in, right?

2  A.  No, I did not.

3  Q.  You didn't make any effort to put those terms in?

4  A.  No.

5  Q.  And you don't know what Mr. Beker's reaction would have

6  been if you had put those terms in?

7  A.  No.

8  Q.  And you went on.  On page 6 beginning on line 3, you add:

9          "There's no need.  There's no need

10         for Loktionov to call Metelskiy and talk

11         about the fact that we have already

12         reached an agreement about everything."

13         Now, there, Mr. Loktionov is the principal at Katod,

14  right?

15  A.  Yes.

16  Q.  That's the image intensifier tube manufacturer that was

17  working with Newcon?

18  A.  Correct.

19  Q.  And Mr. Loktionov, again, is another one of those

20  businessmen located in Novosibirsk?

21  A.  Yes.

22  Q.  And, again, Metelskiy is NPZ, right?

23  A.  Yes.

24  Q.  So you were saying there's no need for Loktionov, Mr.

25  Beker's partner, to call Metelskiy at NPZ and tell them about

1   the agreement that you have reached, right?

2   **A.**    Yes.

3   **Q.**    This despite the fact that Mr. Beker had made it very

4   clear that he was very interested in having someone tell NPZ

5   that Newcon was now running the contract, right?

6   **A.**    Would you repeat the question?

7   **Q.**    Well, let me ask a better question, because that was a

8   really long one.

9        You were telling Mr. Beker that there is no need for NPZ

10   to know about your agreement with Newcon?

11   **A.**    Yes, because it was not an agreement yet.  The agreement

12   was to take a first step and transfer the money.

13   **Q.**    So at this point on September 7th, 2005, you and Mr. Beker

14   still didn't have an agreement?

15   **A.**    The agreement was not there for -- we did not discuss the

16   NPZ.

17   **Q.**    And Mr. Beker tried to explain his point of view to you.

18   Beginning at line 18 -- actually, let's start with the whole

19   quote at line 17:

20            "The first thing is the preamble."

21        Now, the "preamble" refers to an actual term in the draft

22   agreement, isn't that right?

23   **A.**    Yes.

24   **Q.**    So he's talking about the draft agreement?

25   **A.**    Yes.

1   Q.   Okay.

2           "The first thing is the preamble.

3        In the email itself it is written, please

4        confirm or comment, okay?"

5        Mr. Beker was pointing out to you that he wanted you

6   either to agree or to comment on what they had put in the

7   draft, right?

8   A.   Would you repeat that?  I'm sorry.

9   Q.   Mr. Beker was pointing out to you that they had asked you

10  either to confirm or comment what was in the draft that they

11  had sent to you?

12  A.   Yes.

13  Q.   And you never did comment or offer your suggestions as to

14  what should go in that draft, right?

15  A.   Prior in this conversation I commented that I could not

16  sign the agreement like this.

17  Q.   Right.  You just said, you can't sign it, end of story?

18  A.   Well, I was going to explanation why, but I wasn't

19  planning to sign it.

20  Q.   And you weren't planning on adding any additions of your

21  own, right?

22  A.   No.

23  Q.   And he pointed out to you further, he said:

24          "You know only too well that you

25        were not ready to write anything."

ROCKLIN - CROSS EXAMINATION / HOWDEN                    902

```
 1        Right?  He actually had pointed that out to you earlier;
 2   that you weren't ready to write the agreement yourself?
 3   A.   Yes.
 4   Q.   And he went on and said:
 5            "I asked to prepare what I deemed
 6        necessary."
 7        He was telling you that he drafted what he thought the
 8   most important things were.
 9   A.   Yes.
10   Q.   And he goes on at line 23:
11            "I tried to provide some kind of
12        base.  Why?  For... for what?"
13        Continues on to the next page.
14            "Reasons you guys can't continue you
15        to fulfill this contract, in order, from
16        my point of view, to leave your face more
17        or less... well, if not beautiful, well,
18        then at the very least clean."
19   Q.   He was telling you that, at least from his point of view,
20   he was trying to write a draft agreement that wouldn't be so
21   harmful to you, right?
22   A.   Right.
23   Q.   You disagree though?
24   A.   Yes.
25   Q.   And then on that page, going down to line 14, Mr. Beker
```

```
 1  said:
 2              "As for the calls, Metelskiy came,
 3       I'm just telling you."
 4       And you said:  "Well, yes?"
 5       Beker says:  "Together with Aksenov to Loktionov."
 6       And just so we're clear, Metelskiy is NPZ, right?
 7  A.   Yes.
 8  Q.   Aksenov is Ekran FEP?
 9  A.   Yes.
10  Q.   And Loktionov is Katod?
11  A.   Yes.
12  Q.   All in Novosibirsk?
13  A.   Yes.
14  Q.   And Mr. Beker says:
15              "Nobody called anybody.  They were
16       there, at his place, as guests, and
17       discussed it.  And on the contrary, they
18       said that Lyonya" -- that's Mr. Gaber?
19  A.   Yes.
20  Q.   (Continuing) -- "...was the one who called."
21       And then you added:
22              "Yes, they wished him a happy
23       birthday."
24  A.   Yes.
25  Q.   How did you know they wished him a happy birthday?
```

 1  **A.**   I had a conversation with Lenny Gaber around that time

 2  when he told me that, yes, Metelskiy, Aksenov and Loktionov

 3  were -- Aksenov and Loktionov in the past worked together and

 4  they suspected that it was Loktionov who orchestrated, in part,

 5  the -- all troubles in the customs.  And they came to his

 6  birthday, to the extent asking him, how could you do this?

 7  **Q.**   So now you're saying that Mr. Gaber told you that it was

 8  Mr. Loktionov at Katod who caused the problems with customs?

 9  **A.**   Well, he was, in part, responsible for it.

10  **Q.**   Okay.  Later on in the conversation at page 9, beginning

11  at line 6, you said:

12          "I told him that currently I don't

13       have an agreement, that's why, and I want

14       to take it one step at a time.  First,

15       you make a payment, and then I'll make a

16       call to the TACOM, and then we will be

17       sorting out things with Russia."

18       Mr. Beker responds:

19          "You see, the fact that you will

20       make a call to TACOM, that is to say, I'm

21       not certain that's the best thing.  This

22       is... ah, to work with them on the phone

23       calls."

24       Again, you're the one who suggests calling TACOM, correct?

25  **A.**   Yes.

1   Q.   And Mr. Beker at this point is telling you he's not sure

2   that's a good idea, right?

3   A.   Yeah.  He would prefer sending something in writing.

4   Q.   Okay.  Thank you.

5   A.   You're welcome.

6   Q.   Later on in the conversation at page 12, beginning at line

7   20 you say to Mr. Beker:

8            "So I'm begging you for now.  There

9        is no need to make anyone in Russia privy

10       to this.  It should not, ah, go further

11       than it should be, right?"

12  A.   Yes.

13  Q.   You didn't want NPZ to know that you and Newcon had

14  reached some sort of an agreement, right?

15  A.   No.

16  Q.   But that was a fact, that was an important fact with Mr.

17  Beker in continuing with that project, right?

18  A.   That's not the question for me.

19  Q.   On the next page, page 13, beginning at line 8, Mr. Beker

20  said:

21           "I gave valuable instruction,

22       appropriate ones.  It stays on hold.  I

23       talk with people.  I communicate with

24       people.  With people I try to find a

25       solution for this issue.  In order not to

ROCKLIN - CROSS EXAMINATION / HOWDEN                    906

1          waste time, I asked, on my side, to give

2          me the information, like how many

3          finished devices there are.  How am I

4          supposed to get ready to this quantity?

5          Do you understand?  Nothing else."

6          When Mr. Beker said, "how many finished devices," he was

7    talking about goggles?

8  **A.**    Yes.

9  **Q.**    Goggles that NPZ had?

10 **A.**    Yes.

11 **Q.**    And when he said:

12          "How am I supposed to get ready to

13          this quantity, he was talking about the

14          quantity of goggles to be delivered under

15          the Battalion Set II contract, isn't that

16          right?

17 **A.**    Yes.

18 **Q.**    Then he adds, beginning at line 19:

19          "But you guys, on your side, decided

20          differently.  Lyonya" -- again that's

21          Gaber, correct?

22 **A.**    Yes.

23 **Q.**    (Continuing)

24          "...with his, the way he knows, fuck

25          it, one needs nothing.  Let them go fuck

1          themselves.  Okay, but I can say it, too.

2          Well, all right, you don't want to, but

3          let's wait until the end.  That's it."

4          And what he's talking about is the failure of Lyonya or

5  anybody else at ATN calling NPZ, right?

6  **A.**    Yes.

7  **Q.**    And then at page 15, beginning at about line 9, Mr. Beker

8  tells you,

9                "Of course, you can set some, but it's

10               just that -- I -- proceeding from the fact

11               that I already gave my word, I can't

12               return, like, back.  I promised to do that.

13               I'll do it.  You need to have the money

14               transferred to you, I'll transfer it."

15               And it was at that point that Mr. Beker finally

16  committed to sending you the $50,000.  Isn't that right?

17  **A.**    Yes.

18  **Q.**    So this is September 7th, correct?

19  **A.**    Yes.

20  **Q.**    This is five days after he's sent you the draft agreement?

21  **A.**    Yes.

22  **Q.**    At the time he sent you the draft agreement, no money had

23  changed hands?

24  **A.**    No.

25  **Q.**    And you hadn't agreed on the terms of a written agreement?

1   **A.**   No.

2   **Q.**   But -- and finally, he sends you the money on

3   September 7th, right?

4   **A.**   Yes.

5   **Q.**   And at this point in time, wouldn't it be fair to say

6   that -- that Mr. Beker was not at all happy with the state of

7   affairs between ATN and Newcon?

8   **A.**   But he transferred the money.

9   **Q.**   Right.

10  **A.**   Yes.

11  **Q.**   And right after he said this, he -- he added,

12                  "I'm saying once again, but it still

13              seems to me that you have to clearly

14              explain to me now how it will happen, and

15              what will happen, and -- and what are you

16              hoping for, because I have this feeling

17              that Lyonya drags out the time; it's not

18              clear for what purpose."

19          He's trying to understand what ATN actually is going

20  to do to help Newcon.  Right?

21  **A.**   He wants a confirmation that Lyonya is on the same page as

22  me.  And the only confirmation he can get is by NPZ.  That's my

23  understanding here.

24  **Q.**   He still wanted Lyonya to call NPZ?

25  **A.**   Yes.

1   Q.   And he points out, right after that, lines 23 and 24,

2                "After all, I'll be the one who'll have

3            to fulfill the contract afterwards."

4            Right?

5   A.   Yes.

6   Q.   He'll have to supply the goggles to ITE?

7   A.   ITE?  I think, time and time again, he indicates that he

8   would not work with ITE.

9   Q.   ITE had the contract.  Isn't that right?

10  A.   Yes.

11  Q.   There wasn't anybody else to supply the goggles to at that

12  point in time.  Isn't that correct?

13  A.   We can go back to the conversations.  Time and time again,

14  for different reasons, Michael said that he will not work with

15  ITE.

16  Q.   But it ultimately wasn't up to Michael, was it?

17  A.   No.

18  Q.   It was up to ITE?

19  A.   And Michael -- if Michael wouldn't want to work with them,

20  then how could we just opt to ITE?

21  Q.   Well, if Michael didn't want to work with ITE, maybe he

22  didn't get to work on the contract at all, right?

23  A.   Maybe.

24  Q.   So Michael wire transferred the $50,000 to you shortly

25  thereafter, correct?

1  **A.**    Yes.

2  **Q.**    And before the end of the conversation, he indicated to

3  you that -- that he'd be traveling for two to three weeks?

4  **A.**    Yes.

5  **Q.**    And, in fact, didn't you receive the wire transfer the

6  next day; on September 8th, I believe?

7  **A.**    Yes.

8  **Q.**    And on that same day -- on the 8th -- you had another

9  conversation with Mr. Beker.  Is that right?

10  **A.**    Yes.

11  **Q.**    And during the course of that conversation, Mr. Beker said

12  to you, at page 6, beginning at line 15,

13               "And I will wait.  If they deem it

14          necessary, they'll find us.  They'll know

15          only too well where to look for us.  I'm

16          going to ask you, in accordance with our

17          agreements, to tell Lyonya.  Let him call,

18          and tell what he deems necessary.  It makes

19          no difference to me; but basically, he has

20          to say something, because" --

21          -- carrying on to page 7 --

22              -- "they, themselves, don't know what

23          to do now."

24          The "they" that he's referring to is NPZ.  Isn't that

25  correct?

ROCKLIN - CROSS EXAMINATION / HOWDEN

1    **A.**    Yes.

2    **Q.**    And they need what to do -- know what to do, according to

3    Mr. Beker, right?

4    **A.**    Yes.

5    **Q.**    And the only thing they do with respect to the

6    Battalion Set II contract is to provide goggles, right?

7    **A.**    Yes.

8    **Q.**    And he emphasizes, beginning at line 15,

9                 "Well, let's put it this way.  First of

10                all, a portion of our agreements consist of

11                the fact that he would call and say; but I

12                don't even, in this -- not in this

13                connection -- the fact that it drags on --

14                it's not in everybody's benefit."

15                Right?

16                You answer, "I understand."

17   **A.**    Yes.

18   **Q.**    Again, Mr. Beker is referring to the fact that calling

19   NPZ, at least in his understanding, was part of your agreement

20   with him?

21   **A.**    Yes.

22   **Q.**    He stays on this theme.  At page 8, beginning at line 17,

23   he adds,

24                "If he doesn't want to call, let him

25                not call.  In fact, basically, I don't

ROCKLIN - CROSS EXAMINATION / HOWDEN                    912

1               fucking need them at all, in the big scheme

2               of things.  I am not going to deliver their

3               devices."

4          When he says, "If he doesn't want to call," he's

5    referring to Mr. Gaber.  Isn't that right?

6    **A.**    Yes.

7    **Q.**    Mr. Gaber doesn't want to call Metelskiy?

8    **A.**    Yes.

9    **Q.**    Then he -- Mr. Beker -- doesn't need them at all.  In the

10   big scheme of things, he's not going to deliver their --

11   NPZ's -- devices.

12        Is that right?

13   **A.**    Yes.

14   **Q.**    And -- and at some point during this conversation, you

15   begin to -- to push back on this notion of -- of having NPZ

16   coöperate with Newcon.

17        Beginning on page 9, line 4, you say,

18               "I understand; but once again, I am

19               repeating" --

20               And this goes on to page 10.

21               -- "one more time to you, ah,

22               naturally, we are interested in that.  And

23               now you already understand it clearly, in

24               this -- that we still need these units.

25               And, ah, not even for that, but we need

1          them as the breath of life."

2          What you were telling Mr. Beker was that ATN still

3   needed the NPZ goggles.  Isn't that right?

4   **A.**   Yes.

5   **Q.**   It was important to your continued operation?

6   **A.**   Yes.

7   **Q.**   And you really didn't want NPZ to coöperate with Newcon in

8   connection with this contract, right?

9   **A.**   No.

10  **Q.**   Your conversation continued.  And at page 11, line 14,

11  Mr. Beker said,

12          "And the last thing I would probably

13          still ask you -- that draft that I sent

14          you" --

15          That was the draft agreement --

16  **A.**   Yes.

17  **Q.**   -- that he sent to you on --

18  **A.**   September 2nd.

19  **Q.**   Thank you.

20          And he added,

21          "Treat it really seriously.  If you

22          want, cross out everything that you want.

23          If you don't want, don't cross it out; but

24          we still -- we'll have to sign something

25          eventually."

1          He was telling you you could make whatever changes

2    you thought were necessary to the written agreement.  Isn't

3    that right?

4    **A.**   But he never answers the question:  What is it that he's

5    intending to do with this document?  Never.

6    **Q.**   In this statement, he's telling you that you can change

7    the agreement, and include whatever terms you want.  Isn't that

8    right?

9              **MS. HAMILTON:**  Objection, your Honor.

10             **THE WITNESS:**  Yes.

11             **MS. HAMILTON:**  I mean, that's not what this passage

12   actually says.

13             **THE COURT:**  Well, that's -- the witness is the one to

14   answer that.

15             **MS. HAMILTON:**  I don't believe he was asked for what

16   his understanding of it was.

17             **THE COURT:**  The objection -- the objection is

18   overruled.

19   **BY MR. HOWDEN**

20   **Q.**   Mr. Beker goes on.  On the next page, beginning at line 3,

21   he says,

22             "Well, yes.  Frankly speaking, for now,

23             I'm not very -- I -- I would say it this

24             way.  This is not -- not quite what you and

25             I agreed to; and not because you don't want

```
 1              it, because, unfortunately, this is not --

 2              this is not coöperation.  This is not

 3              coöperation.  I am not worried about the

 4              money that I transferred to you.  I am

 5              simply stating a fact.  There is a Russian

 6              proverb."

 7         And you interject,

 8              "You believe that the fact that I

 9         called, and I said we no longer can

10         perform" --

11         And Mr. Beker continued,

12              "No.  This is -- well, you would --

13         Dima, you would have called either way, but

14         you -- like, anyway, you have no choice.

15         You can't deliver, either today or

16         tomorrow."

17         Mr. Beker was looking for something more than just
```

18  ATN telling TACOM that they couldn't perform under the

19  contract.  Isn't that true?

20  **A.**   That's possible.

21  **Q.**   He was looking for coöperation.

22  **A.**   That's possible.

23  **Q.**   Coöperation, in part, in dealing with NPZ?

24  **A.**   That's not clear to me.

25  **Q.**   And when you told him that,

1             "You believe the fact that I called,

2        and that I said we no longer can

3        perform" --

4      -- you were referring to your call to TACOM?

5  **A.**   Yes.

6  **Q.**   The call that he never asked you to make?

7  **A.**   But we agreed that I will make a call.

8  **Q.**   Well, you'll have to point that out to us later; but at

9  this point, he responds to you,

10            "Dima, you would have called, either

11        way."

12      Isn't that right?

13      He means you would have called TACOM, no matter what?

14  **A.**   That was his opinion, yes.

15  **Q.**   Okay.  And the reason that he said you would have called

16  either way is that, in his view, you can't deliver, either

17  today or tomorrow?  Isn't that right?

18  **A.**   That was -- yes.  He was relating:  That's why I should

19  have called.

20  **Q.**   Because ATN, in his view, couldn't perform under the

21  contract?

22           **THE REPORTER:**  Was that "Yes"?

23           THE WITNESS:  I haven't answered.  No.

24           **THE COURT:**  What is your answer?

25           **THE WITNESS:**  If you could, repeat the question.

1  **BY MR. HOWDEN**

2  **Q.**   Because, in Mr. Beker's view, ATN could not have performed

3  under the contract?

4  **A.**   I'm not sure that he had the clear understanding of that.

5  I think he knew that the troubles in Russia were temporary.

6  And he knew that NPZ was working to resolve them.  And that's

7  why he agreed to pay for ATN not to perform.

8          **MR. HOWDEN:**  Your Honor, I'd ask that that answer be

9  stricken.  It's totally nonresponsive, and based on nothing but

10  speculation.

11          **THE COURT:**  The answer is stricken.

12          The jury is instructed to -- you can say it

13  together -- disregard it.

14  **BY MR. HOWDEN**

15  **Q.**   And on page 15, Mr. Beker tells you, beginning at line 6,

16              "I don't know; but so far, I haven't

17              heard anything.  So you refuse to sign some

18              papers to revise to look at the draft.

19              So -- well, it's unclear as well.  Now you

20              are not there.  Now you are not there.  Now

21              Lyonya, well, doesn't want to.  Now, you

22              guys, ah, like, need to get out of it.  Now

23              it turns out you need the devices now,

24              well, and so forth.  That is to say, you

25              guys decide for yourselves what you want to

1            do."

2            When Mr. Beker said you refuse to sign some papers,

3  he was referring to the written agreement, right?

4  **A.**   Yes.

5  **Q.**   And when he says "to revise," he's saying -- he's telling

6  you that you refused to revise the written agreement?

7  **A.**   Yes.

8  **Q.**   To look at the draft?  To even review the draft?

9        That's what he's saying, right?

10 **A.**   Well, we discussed the draft before.

11 **Q.**   That's what he's saying, though, right?

12 **A.**   Yes.

13 **Q.**   And when he says,

14            "Now, you are not there.  You are not

15            there.  Now Lyonya, well, doesn't want

16            to" --

17            -- he's referring to his desire to have Mr. Gaber

18 call NPZ.  Isn't that right?

19 **A.**   Yes.

20 **Q.**   And Mr. Gaber won't call NPZ?

21 **A.**   No.

22 **Q.**   And then he adds,

23            "Now Lyonya, well, doesn't want to.

24            Now you guys, like, need to get out of it.

25            Now it turns out you need the devices now."

1           And the devices he's talking to -- talking about are

2   the night-vision goggles that NPZ has?

3   **A.**    Yes.

4   **Q.**    And now, suddenly, ATN says we're not going to -- we're

5   not going to communicate with NPZ and tell them to coöperate

6   with you?

7   **A.**    There's nothing sudden.  I never promised that Lenny will

8   give a call, really.

9   **Q.**    Okay.  Even though Mr. Beker said at one point, if he

10  doesn't make the call, the deal's off, and you'll pay him the

11  money back, right?

12  **A.**    Yes.

13  **Q.**    And finally Mr. Beker says, at the bottom of page 15,

14            "But -- but you have to decide

15            yourselves what you want."

16            He's expressing his frustration.  Isn't that correct?

17  **A.**    Yes.

18  **Q.**    And it was after that call that Mr. Beker left town,

19  right?

20  **A.**    That was my understanding.

21  **Q.**    And he was gone for two or three weeks?

22  **A.**    Yes.

23  **Q.**    And while he was gone on September 20th, 2005, you had a

24  call with Arie Prilik, correct?

25  **A.**    Yes.

1  **Q.**   And during that call -- page 10, begin at line 3,

2  Mr. Prilik said,

3              "I see.  Well, and one more little

4              question, then.  Did you see the draft of

5              the agreement that I sent, which you may

6              like or may not like?"

7        He was referring to the draft agreement that was sent

8  to you on September 2nd?

9  **A.**   Yes.

10 **Q.**   You said, "Uh-huh."

11       And Mr. Prilik added,

12              "As of today, we don't have anything

13              but oral agreements, then.  In order to

14              have it done right, could I ask you to edit

15              it; to take out whatever you don't like,

16              but, like, to put -- to put in writing our

17              agreement?"

18       He was offering you the opportunity to edit the draft

19 in any way you saw fit, correct?

20 **A.**   Yes.

21 **Q.**   And you declined?

22 **A.**   Yes.

23 **Q.**   But you what told Mr. Prilik on that day was,

24              "I understand.  I spoke about it with

25              Michael.  I believe that it needs to be

```
 1                    done one step at a time."

 2          Right?

 3   A.     Yes.

 4   Q.     And Mr. Prilik responded,

 5                    "Yes.  One step at a time.  Michael

 6              took the first step.  And my understanding

 7              was that, after that, you would review it,

 8              and offer your edited version."

 9              Correct?

10   A.     Yes.

11   Q.     And you never offered your edited version?

12   A.     No.

13   Q.     You added,

14                    "However, but for the time being, that

15              which he sent is very difficult to edit."

16          Right?

17   A.     Yes.

18   Q.     The point is:  You made no effort to edit it?

19   A.     No.

20   Q.     And then you told him, page 11, line 22,

21                    "I'm not entirely sure.  Why do we need

22              to put everything on a paper?"

23              Right?

24   A.     Yes.  I was asking what this document would be used for.

25   Q.     And Mr. Prilik responded,
```

```
 1                    "Okay.  Not to put everything; but

 2              there was some agreement reached.  And one

 3              would like to put it in writing.  Take out

 4              everything that you don't like.  To save

 5              time, we produced the first draft, so to

 6              speak.  If you can, spend a couple of

 7              minutes, and produce your draft."

 8          He's offering to let you, again, rewrite it, or

 9  basically write whatever you thought was appropriate, correct?

10  A.   Yes.

11  Q.   And your response was,

12                    "But I'm telling you honestly that I'm

13              uncomfortable to put anything in writing."

14          Right?

15  A.   Yes.

16  Q.   And, once again, Mr. Prilik says, beginning at line 13,

17                    "You can take out everything that you

18              don't like.  I don't know what else can be

19              offered from our side."

20          But again, you declined any offer to -- to add any

21  terms or change any terms in the agreement, correct?

22  A.   Right.

23          And the first word there was "Confidentiality."  He also

24  offer to make sure that this is confidential; that it will not

25  be shown to anyone.
```

1  Q.    Where does Mr. Prilik say that?

2  A.    Right there.

3  Q.    That's what you think he's saying, when he's saying

4  "Confidentiality"?

5  A.    Yes.

6  Q.    Okay.  Mr. Prilik adds -- at the beginning of the bottom

7  of page 1, line 4, and carrying over to page 13, he says,

8              "Well, let's stick to the agreement.

9         We said that we would sign something.

10        Let's sign something.  The main points.

11        What you agreed to.  What we agreed to.  If

12        you don't like the preamble, take away the

13        preamble."

14        And Mr. -- and you respond,

15            "Well, okay.  Let me think about it;

16        but I'm not promising anything to you."

17        Right?

18 A.    Yes.

19 Q.    You're just staying noncommittal.  You want the issue to

20 go away?

21 A.    Yes.

22 Q.    And you add,

23            "Just as I promised Michael, I did not

24        promise that I would sign it.  I said that

25        I would review it; but to review it -- to

```
 1               review something -- it means -- as of

 2               today, I don't quite understand why you

 3               guys need it."

 4   A.   Yes.

 5   Q.   Asking --

 6   A.   I was trying to figure that out, because Michael never

 7   told me why, other than that we agreed on it, was it that he

 8   wanted to do with this agreement.

 9        And Arie, twice in this conversation, mentions that this

10   agreement there is to show a money movement, or receipt of the

11   money in the agreement, which is not even mentioned -- the

12   money.  Mentioning the money.  So, to me, all that didn't make

13   any sense.

14   Q.   And he says,

15               "it's needed from a purely legal

16               standpoint between us, so that one would

17               understand the money movement."

18               Right?

19   A.   Yes.

20   Q.   And you point out that money is not mentioned there in any

21   way, right?

22   A.   Yes.

23   Q.   But, in fact, you were invited many times in this

24   conversation to put whatever terms you thought were significant

25   in the agreement, right?
```

1  A.    Yes.

2  Q.    And you didn't?

3  A.    I didn't.

4  Q.    That was on September 20th.

5        And your next and last conversation occurred about two

6  weeks later, on October 4th?

7  A.    Yes.

8  Q.    And that was a conversation with Michael Beker, right?

9  A.    Yes.

10 Q.    And in that conversation, you told him -- at page 4,

11 beginning at line 3, you said,

12               "Arie called me.  He said that the

13          contract is needed again.  I don't

14          understand why it's needed."

15      Right?

16 A.    Yes.

17 Q.    And you were referring to this conversation that occurred

18 on September 20th, between you and Mr. Prilik?

19 A.    Yes.

20 Q.    And Mr. Beker told you,

21               "We didn't talk about it -- you picking

22          up the phone and calling."

23          He's referring to calling TACOM, right?

24 A.    That's what he said here.

25 Q.    He said,

ROCKLIN - CROSS EXAMINATION / HOWDEN    926

```
 1                   "You will call anyway.  You would call

 2              anyway."

 3        Right?

 4        That's what he told you before about your call to TACOM;

 5   that you would have called anyway?

 6   A.   That was his perception that he was trying to tell me.

 7   Q.   Okay.  He said,

 8                   "I asked you to review the contract, to

 9              take away what you -- you think doesn't

10              suit you; to say what doesn't suit you.

11              And we would move on."

12        Right?  He's again saying you could make whatever changes

13   you thought were necessary?

14   A.   Yes.

15   Q.   And you asked him.

16                   "Explain why you need it."

17        And his answer was,

18                   "It was part of our agreement."

19              Right?

20   A.   That's his understanding.

21   Q.   And you added, on the next page -- page 5, beginning at

22   line 4, you said,

23                   "I told you that I wouldn't sign

24              anything.  I went and took the step that we

25              agreed upon."
```

 1              And when you say, "I took the step that we agreed

 2   upon," you're referring to your call to TACOM.  Is that right?

 3   **A.**   Yes.

 4   **Q.**   And at this point, you're telling Mr. Beker that -- that

 5   you weren't -- you wouldn't sign anything.  Right?

 6   **A.**   Right.

 7   **Q.**   And Mr. Beker pointed out to you -- beginning at the

 8   bottom of page 5, and line 23, he said,

 9              "You haven't called Russia, as we

10          discussed, to discuss this with the

11          gentlemen upon Lyonya's arrival."

12              Again, he's referring to NPZ there?

13   **A.**   Yes.

14   **Q.**   (Reading)

15              "That is to say, you've done

16          practically nothing, except you called,

17          according to you; called our friends in

18          TACOM."

19              Correct?

20   **A.**   That's what he is saying.

21   **Q.**   Yeah.  He's saying that basically, all you've done is call

22   TACOM, right?

23   **A.**   Yes.

24   **Q.**   Beginning at line 16, he says,

25              "That is to say, you -- you believe

```
 1              that -- I still don't quite understand you.

 2              You -- do you realize that you're now

 3              putting a big question mark on our

 4              agreements?"

 5         He's wondering whether or not you guys have any kind

 6  of an agreement at all, right?

 7  A.   At this point, he doesn't like my options.  He wants me to

 8  do more.  So that's why he's stating it.

 9  Q.   And your response is,

10              "I can't understand why you need this

11              contract."

12              Right?

13  A.   Yes.

14  Q.   And he responds again,

15              "Because it's part of our agreement

16              that you'd have a written agreement."

17              Correct?

18  A.   Yes.

19  Q.   And you tell him that,

20              "I stopped working on the contract."

21         That's page 7, beginning at line 3, correct?

22  A.   Yes.

23  Q.   And -- and Mr. Beker said,

24              "That I had nothing to do with it.  You

25              stopped working on it anyway, without me,
```

1               that is to say."

2          And what he's saying is:  You would have had to stop

3    working on the contract anyway, right?

4    **A.**   To me, it was:  You're not doing enough.  I'm not going to

5    pay you anymore.

6    **Q.**   Okay.  And at the bottom of page 7 he says,

7               "We reached an agreement with you about

8               the coöperation.  You and I talked that we

9               would move forward as a united -- further

10              as a united front, so to speak.  There is

11              no front.  There is no unity."

12         In his view, you -- ATN -- were supposed to work with

13   Newcon to finish this contract.  Isn't that right?

14   **A.**   You're asking me again to give a view of what -- how I

15   perceive Mr. Beker's view.

16   **Q.**   I'm asking you:  Wasn't it your understanding that that's

17   what Mr. Beker was telling you; that he expected the two of

18   you -- the two companies to work together to finish the

19   contract?

20   **A.**   It was not about working together.

21         It was about ATN not delivering.

22   **Q.**   And you said to him, on page 8, beginning at line 19,

23              "Explain to me what was your goal,

24              then, when we were reaching an agreement?"

25         And on page 9, beginning at line 1, he explains to

1   you.  He says,

2                   "I thought that you and I were reaching

3               an agreement about coöperation and future

4               joint activities; that is to say,

5               addressing TACOM in writing."

6   **A.**   I think this is the first time --

7   **Q.**   Sorry.  I'm not finished.

8   **A.**   Okay.

9   **Q.**   (Reading)

10                  "The presence of written agreements

11              that you refused.  And now, as I understand

12              it, it doesn't matter what's written there.

13              What matters is that you don't want to, ah,

14              either look at it or sign it.  It totally

15              doesn't matter whatever is written there.

16              Do I get that right?"

17      Mr. Beker told you that he was expecting that the written

18  agreement that both were going to sign, among other things, was

19  going to be presented to TACOM.  Isn't that right?

20  **A.**   Yes, finally, here.

21  **Q.**   And again, this is the agreement that he told you you were

22  free to add any terms to that you thought were relevant, right?

23  **A.**   Yes.

24  **Q.**   And on page 10, beginning at line 9, you finally tell him,

25                  "Well, it means we didn't understand

1              each other regarding the agreement."

2              Right?

3  **A.**    Yes.

4  **Q.**    At that point in time, you weren't sure that you guys even

5  had any kind of actual understanding between each other, right?

6  **A.**    Well, because he just point out for the first time that

7  the agreement was there to show to TACOM.

8  **Q.**    You didn't understand that before this conversation?

9  **A.**    He never pointed it out.

10  **Q.**    So at this point in time, once he brought up this subject,

11  you're saying, "Gee, I guess we never really had an agreement,

12  then," right?

13  **A.**    In regards to the written agreement, yes, we did not have

14  an agreement.

15  **Q.**    And he went on.  He said,

16              "It means that you and I had to

17              prepare, then, a joint paper to TACOM.  You

18              say I -- I decided -- that is to say, you

19              decided, alone, to call TACOM.  Well, you

20              decided -- you would have called TACOM

21              anyway."

22          Again, he's reiterating that, in his view, the joint

23  agreement was to be presented to TACOM, right?

24  **A.**    Here, yes.

25  **Q.**    And again, he's telling you that your call to -- your call

1    to TACOM, in his view, was something that you would have done

2    in any event?

3    A.    Yes.

4    Q.    Not pursuant to an agreement with him?

5    A.    That's what he was saying here.

6    Q.    And on page 11, beginning at line 16, you said,

7                    "And all that we did -- we, per your

8              agreement, per our agreement, practically

9              transferred it into your hands."

10             And the "it" you're referring to is the -- the

11   contract to finish the Bat. Set II phase one contract, right?

12   A.    Yes.

13   Q.    And Mr. Beker responded,

14                   "Well, like, I don't know.  Our

15             conversation is veering to not -- not so

16             serious sphere, because you -- you

17             understand only too well that you could not

18             continue working; not because you or I

19             wanted it this way."

20             And he's telling you that, in his view, you couldn't

21   have finished the contract anyway, right?

22   A.    Are you asking me what he's telling me?

23   Q.    Yes.

24   A.    That's what he's telling me there.

25   Q.    And -- and you ask him again on the next page, page 12, at

```
 1   line 3.  You say,

 2             "Explain to me what would have been

 3         your next step, if you were to have such a

 4         letter" --

 5         And by "letter," you mean the written agreement,

 6   right?

 7   A.   Yes.

 8   Q.   And he says,

 9             "I thought you and I, together, having

10         all that put on paper, present it to TACOM,

11         and then fulfill this contract.  You get

12         your stipulated and agreed-upon-with-me

13         share; but you, having given up your

14         actions from the very beginnings, it means

15         Lyonya didn't call Russia.  You didn't stop

16         all that had to be, and -- and so on."

17         Again, he's telling you that his understanding was

18   that, having reached a written agreement, it would be presented

19   to TACOM, correct?

20   A.   Yes.

21   Q.   And then the contract would be fulfilled, correct?

22   A.   Yes.

23   Q.   And you would get your agreed-upon 50 percent share of

24   your original profits, right?

25   A.   Yes.
```

1   Q.   The $75 per unit?

2        But that -- that subsequently, your actions showed that

3   you weren't interested in following through, correct?

4   A.   Correct.

5   Q.   Finally, at page 16, Mr. Beker tells you, beginning at

6   line 6,

7              "I want to let you know once again

8              that, from my point of view, you violated

9              all of our agreements with you.  That is to

10             say, you don't want, on principal, to

11             follow our agreements, in connection with

12             which I'm just letting you know that I am

13             getting out of this deal with you, and I'll

14             continue further at my own discretion."

15       Mr. Beker told you he was done, and he was walking

16   away from any kind of deal with you.  Isn't that correct?

17  A.   Yes.

18  Q.   Now, shortly after -- well, actually, not shortly after.

19  On October 18, 2005, you received an e-mail from Mr. Beker?

20  A.   I believe that was the date, yes.

21  Q.   And I think the jury's already seen it.  It was the e-mail

22  on October 18, in which he told you that he'd tried to reach

23  you several times over the last two weeks.  Do you recall that?

24  A.   Yes.

25  Q.   And was --

1          **MR. HOWDEN:**  Excuse me.  Jeane, was that admitted as

2   part of exhibit --

3          **MS. HAMILTON:**  Exhibit 48 is the civil suit.

4          **MR. HOWDEN:**  38 -- isn't it?  Oh, 48.  I'm sorry.

5   You're correct.  It was part of Exhibit 48.

6   **Q.**  Can you take a look at that?  And --

7   **A.**  Yes.

8          **MR. HOWDEN:**  Can you pull that up?  It's Exhibit 48,

9   at 0017.  Do you have that?

10  **Q.**  And he tells you that he's tried several times during the

11  last two weeks to get a hold of you, right?

12  **A.**  I think it states here, "my secretary" and "my assistant."

13      Yes.

14  **Q.**  Okay.  And at the third bullet point it says,

15              "I've asked Mr. Arie Prilik, my V.P.,

16              to talk to your colleagues at the recent

17              Night Vision Conference in U.S.A.

18              Mr. Leon Gaber has flatly refused to talk,

19              which was done in a very impolite,

20              not-businesslike manner."

21          In fact, Mr. Prilik had approached Mr. Gaber at that

22  conference.  Isn't that right?

23  **A.**  Yes.

24  **Q.**  And demanded the $50,000 back?

25          **MS. HAMILTON:**  Your Honor, there's no foundation for

```
 1   this line of questioning at this point.

 2            THE COURT:  Well, you may ask him -- you know what

 3   you need to ask in order to lay a foundation.

 4            MR. HOWDEN:  Yes.

 5            THE COURT:  So the objection is sustained.

 6   BY MR. HOWDEN

 7   Q.   Did Mr. Garber [sic] tell you that he had been approached

 8   by Mr. Prilik at that conference?

 9   A.   Yes.

10   Q.   And what did he tell you Mr. Prilik said to him?

11   A.   I don't recall the details, but I think he mentioned

12   something; that he didn't talk to him.

13            MS. HAMILTON:  Your Honor, this is hearsay.

14   Objection on hearsay grounds.

15            THE COURT:  Elicit what, in fact, was said.  Then

16   you've got a hearsay problem.

17            MR. HOWDEN:  It's not offered for the truth,

18   your Honor.

19            THE COURT:  Well, I'm not so sure.  And I don't want

20   to find out afterwards that, in fact, that is not the case.

21   Okay?

22            MR. HOWDEN:  All right.

23            THE COURT:  Maybe you think it is.  Maybe I'll think

24   otherwise, but --

25            MR. HOWDEN:  All right.  I'll move on.
```

1              **THE COURT:**  I think he said he doesn't know, anyway.

2     So he's not going to help you out there, I guess.

3              **MR. HOWDEN:**  Very good.

4     **Q.**   You attended what's called the "Shot Show," in Las Vegas,

5     in February of '06?

6     **A.**   Yes.

7     **Q.**   And that's another trade show that includes night-vision

8     products?

9     **A.**   Yes.

10    **Q.**   And -- and Mr. Prilik approached you at the Shot Show in

11    February of '06, didn't he?

12    **A.**   He attempted to.

13    **Q.**   Yeah.  And he loudly and publicly asked you to return the

14    $50,000 to him, didn't he?

15    **A.**   Yes.

16    **Q.**   Nothing secret about his request for the $50,000?

17    **A.**   No.

18    **Q.**   Or his announcement that he wanted it back?

19    **A.**   No.

20              **THE COURT:**  Is that the Shot Show?

21              **MR. HOWDEN:**  Shot Show.  I think that's it.

22              **THE COURT:**  S-h-o-t?

23              **MR. HOWDEN:**  I believe that's correct.

24    **Q.**   Is that correct?

25    **A.**   That's correct.

1  **Q.**   What other kinds of things are exhibited?  Weapons, and

2  weapons systems; things like that?

3  **A.**   Yes.

4  **Q.**   Is "shot" an acronym, if you know?

5  **A.**   Sportsmen's and Hunter Outdoor --

6          **THE COURT:**  We can figure it out.

7          **THE WITNESS:**  Yeah, something.  "Trade," or

8  something.

9          **THE COURT:**  I just wanted the record to be clear, if

10 it was "Shock" or "Shot."

11         **THE WITNESS:**  No.  Shot Show.  S-h-o-t.

12 **BY MR. HOWDEN**

13 **Q.**   And in this e-mail, Mr. Beker demanded that the $50,000 be

14 repaid to him.  Isn't that correct?

15         **MS. HAMILTON:**  I'm sorry, your Honor.  What e-mail?

16         **MR. HOWDEN:**  The e-mail that --

17         **THE COURT:**  This is the exhibit that's --

18         **MR. HOWDEN:**  Yeah.

19         **THE COURT:**  -- being exhibited now, correct?

20         **MR. HOWDEN:**  That's correct, your Honor.

21         **THE COURT:**  48.

22 **BY MR. HOWDEN**

23 **Q.**   He demanded the repayment of the loan; of the 50 --

24 **A.**   He wanted the loan back.  Yes.

25 **Q.**   And he called it a "loan" in this document?

1  A.    Yes.

2  Q.    And he copied his lawyer, Mr. Alexander Gertsburg, on this

3  letter?

4  A.    Yes, I believe so.

5  Q.    And then, on November 8th, if you turn to page 0019 of

6  Exhibit 48, Mr. Beker sent you a letter by registered mail.

7  Isn't that correct?

8  A.    Yes.

9  Q.    And again, he referenced it as "loan refund."  Isn't that

10  correct?

11  A.    Yes.

12  Q.    And again, he demanded the return of the $50,000, right?

13  A.    Yes, and interest.

14  Q.    And he again copied his lawyer, Mr. Gertsburg, correct?

15  A.    Yes.

16  Q.    And then, on December 12th, the next month, his lawyer,

17  Mr. Gertsburg, sent your lawyer, Mr. Streeter, another demand

18  letter.  That's at 0020 in Exhibit 48.  Do you see that?

19  A.    Yes.

20  Q.    And in that demand letter, again, Mr. Gertsburg sought the

21  return of the $50,000, right?

22  A.    Yes.

23  Q.    And in this letter, he went on.  He went on at some length

24  to describe the $75 per unit that Newcon had agreed to pay to

25  ATN under its deliveries to finish the -- the Bat. Set II

1  contract, correct?

2  **A.**    Yes.

3  **Q.**    It included the total amount that would be due, if and

4  when the agreement was completed, which was $225,000, correct?

5  **A.**    I think so.

6  **Q.**    Now, during the course of your discussions with Mr. Beker,

7  you told him that your profit margin on the Battalion Set II

8  contract for each pair of goggles was approximately $200 per

9  pair, right?

10  **A.**    Yes.

11  **Q.**    And his proposal was to pay you less than half of that

12  margin -- $75 per pair of goggles -- in connection with what

13  I'll call your "coöperation" with Newcon, right?

14  **A.**    In connection with ATN nonparticipation.

15  **Q.**    Right.  And -- and so the way -- you proposed to

16  Mr. Beker -- you agreed with Mr. Beker that you would accept

17  less that half your expected profit on your contract with ITE,

18  and instead, would take $75 per unit, and -- and do nothing,

19  right?

20  **A.**    That was the proposal.  And I was going along with that

21  proposal.

22  **Q.**    Yeah.  And -- and why in the world would he expect a

23  businessman like yourself to forgo making $200 a unit, and

24  accept $75 a unit instead?

25  **A.**    Because he believed that my understanding -- that he

1   wanted ATN to get out of the phase one, and that's what he was

2   paying for.

3           **MR. HOWDEN:**  Okay.  Your Honor, this might be a good

4   place to break.

5           **THE COURT:**  Well, it's the right time in terms of the

6   hour.  Is it the right time in terms of completion of your

7   cross-examination?

8           **MR. HOWDEN:**  I will probably take at least another

9   half an hour with him.

10          **THE COURT:**  And overnight, can you shorten it?

11  Rather than have work -- you know, the examination expand?

12          **MR. HOWDEN:**  I will make every effort.  I will

13  shorten it.

14          **THE COURT:**  Let's keep it to a half an hour.

15          **MR. HOWDEN:**  Very good.

16          **THE COURT:**  We've got to do that, because we still

17  have to hear from Mr. Osterhoudt, who might have a few

18  questions.

19          **MR. OSTERHOUDT:**  Several days, your Honor.

20          **THE COURT:**  He's joking, I think.  In my book, he's

21  joking, because he told me he was going to be much, much

22  briefer, and let Mr. Howden do the laboring oar this time.

23          So keep it to half an hour, so we can then move on

24  Mr. Osterhoudt.  And then, of course, we have redirect, you

25  know, and -cross.  And who knows how long that's going to take,

1    right?

2            So you will have occupied most of our week,

3    Mr. Rocklin; I know not at your choice, but at any rate, thank

4    you very much, ladies and gentlemen, for your patience.  And

5    have a very good afternoon and evening.  And we'll see you

6    tomorrow morning at 8:30.  And thank you for being on time,

7    again, and being so attentive.  And we appreciate it, because I

8    know it's gets a little tedious after a while.

9            (Jury out at 3:15 p.m.)

10           **THE COURT:**  And, Mr. Rocklin, I'll remind you that

11   you are not to discuss your testimony with any other persons.

12   And that includes not only all of the other witnesses, but I

13   mean, members of the prosecution team we talked about earlier.

14   And we'll see you tomorrow morning at 8:30.  Thank you.

15           **THE WITNESS:**  Okay.

16           **THE COURT:**  And so I really need to keep it to --

17   that's why I did it in front of the jury:  To keep you to about

18   a half hour.

19           **MR. HOWDEN:**  I agree, your Honor.  I will finish in a

20   half an hour.

21           **THE COURT:**  I'm sorry we started a little bit late.

22   Couldn't be helped.

23           And how much time are you going to need,

24   Mr. Osterhoudt?

25           **MR. OSTERHOUDT:**  Well, I have to go over what's been

```
 1  done, but I don't think -- I don't think an hour.  I think less

 2  than that.

 3          THE COURT:  Okay.  Good.

 4          And then you have some estimate as to recross or

 5  redirect, rather?  Because I gather that, you know, you have a

 6  pretty good idea of how much more is going to come in.  I don't

 7  know what it is specifically, but --

 8          MS. HAMILTON:  Well, our hope is to keep it under two

 9  hours, your Honor, if not less.  I mean, I can't guarantee it.

10          THE COURT:  Zero in on what needs to be zeroed in on,

11  and then move on.

12          MS. HAMILTON:  Absolutely.  Our goal is to let Mr. --

13          THE COURT:  Don't open too many doors, so that we can

14  have a brief recross.

15          MS. HAMILTON:  We're trying to keep our house air

16  shut.

17          THE COURT:  Then who's going to be your next witness?

18  I don't know if we'll get to that witness tomorrow or Friday.

19          MS. HAMILTON:  Currently, Special Agent Haynie.

20          THE COURT:  Currently is he on call?

21          MS. HAMILTON:  Yes, your Honor.  He's been here since

22  Monday.

23          THE COURT:  Well, at least he's had decent weather,

24  for the most part.

25          MS. HAMILTON:  He's here from Portland, so I think
```

944

1  he's appreciating it more.

2          **THE COURT:**  It's not like coming from Minnesota or

3  something.

4          **MS. HAMILTON:**  Yeah.  Detroit.

5          **THE COURT:**  Detroit.  Okay.  So we'll see you

6  tomorrow morning at 8:30.

7          **MR. HOWDEN:**  Thank you, your Honor.  Very good.

8          **THE COURT:**  I started to say 7:30.  I must be

9  thinking like Judge Alsup, huh?

10         **MS. HAMILTON:**  Actually, your Honor, if I could just

11 bring a logistics question, I was trying to figure out the

12 quickest way to get through our questions regarding the

13 transcripts that will come up in redirect.  And one of things

14 we can do is to provide to the jury, now, the copies of the

15 transcripts, so that, instead of having to read entire

16 portions, just -- we could possibly cite the witness to that

17 section.  The jury could read that while the witness reads it,

18 and then zoom in on the particular question; but that way, the

19 context has been set.

20         And I don't know if that's something that we could --

21 we can consider, or is it just better to read all of the pieces

22 back into the evidence again?  I mean, obviously, on the

23 record, we'd cite, "Starting at page this, line this, ending at

24 page this, line this."

25         **MR. HOWDEN:**  My only concern is that -- whether or

 1  not that actually is going to save time.  I'm not sure that it

 2  will.

 3          THE COURT:  What you may get with that -- I mean, I

 4  see what you're doing, and it does make some sense.

 5          MS. HAMILTON:  Right.

 6          THE COURT:  But you have fast readers, and slow

 7  readers.  So when you start to then say, now, to ask the

 8  question, one juror say, you know, or couple have said, "I

 9  haven't finished reading it."  So then we've done that kind

10  of -- you know, in other instances, where we've had to have the

11  jurors read something.

12          So I think it's -- just try to speed it up, is all.

13          MS. HAMILTON:  I'll read fast.

14          THE COURT:  Have those pages quickly premarked, and

15  everything, and then just zero in on them.  Okay?

16          MS. HAMILTON:  Yeah.  Sounds good.  All right.

17  Thanks, your Honor.

18          (Whereupon at 1:30 p.m., further proceedings

19           in the above-entitled cause was adjourned

20           until Tuesday, January 20, 2011, at 8:30 a.m.)

21                           -  -  -  -

22

23

24

25

946

```
 1

 2

 3                          I   N   D   E   X

 4
    PLAINTIFF'S WITNESSES                      PAGE    VOL.
 5
    Cross-Examination Resumed by Mr. Howden     773      6
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Lydia Zinn, CSR,  CRR, and Debra Pas, CSR, CRR
Official Reporters –  U.S. District Court
(415)  531–6587

### CERTIFICATE OF REPORTER

WE, LYDIA ZINN, and DEBRA PAS, Official Reporters for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in CR. 07-765 MHP, United States of America v. Mendel Beker, et al., were reported by us, certified shorthand reporters, and were thereafter transcribed under our direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by us at the time of filing

The validity of the reporters' certification of said transcript may be void upon disassembly and/or removal from the court file.


_____/s/ Lydia Zinn_____
                   Lydia Zinn, CSR 9223, CRR


_____/s/ Debra L. Pas_____
                   Debra L. Pas, CSR 11916, CRR


           Wednesday, January 19, 2011