Volume 7

Pages 946 – 1136

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARILYN HALL PATEL

UNITED STATES OF AMERICA,       )
                                )
              Plaintiff,         )
                                )
  vs.                           ) NO. CR. 07-0765 MHP
                                )
MENDEL BEKER, ARIE PRILIK, and  )
NEWCON INTERNATIONAL,           )
                                ) San Francisco, California
              Defendants.       ) Thursday
                                ) January 20, 2011
_____ ) 8:40 a.m.


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
**For Plaintiff:**              U.S. Department of Justice
                                Antitrust Division
                                450 Golden Gate Avenue, Room 10-0101
                                San Francisco, CA  94102-3478
                                (415) 436-6673
                                (415) 436-6687 (fax)
                          BY:   **DAVID J. WARD**
                                **ANNA TYRON PLETCHER**
                                **RICHARD B. COHEN**
                                **JEANE HAMILTON**




(Appearances continued on next page)

1   <u>APPEARANCES (CONT'D)</u>

2   **For Defendant**s:          Winston & Strawn, LLP
3                                101 California Street
                                 San Francisco, CA  94111
                                 (415) 591-1439
4                                (415) 591-1400 (fax)
                            BY:  **JONATHAN ROBERT HOWDEN**
5
6   **For Defendants:**          Martha A. Boersch
                                 Attorney at Law
7                                555 California Street, 26th Floor
                                 San Francisco, CA  94104
8                                (415) 626-3939
                                 (415) 875-5700 (fax)
                            BY:  **MARTHA A. BOERSCH**
9
10  **For Defendants:**          Law Offices of William L. Osterhoudt
                                 135 Belvedere Street
11                               San Francisco, California  94117-3915
                                 (415) 664-4600
12                               (415) 664-4691 (fax)
                            BY:  **WILLIAM L. OSTERHOUDT**
13
14  **For Defendants:**          Law Offices of Frank S. Moore
                                 235 Montgomery Street, Suite 854
                                 San Francisco, CA  94104
15                          BY:  **FRANK S. MOORE**

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2   January 20, 2011                                    8:40 a.m.

3          (Jury in at 8:50 a.m.)

4                      **DMITRY ROCKLIN**,

5   called as a witness for the Plaintiff herein, having been

6   previously sworn, resumed the stand and testified further as

7   follows:

8          **THE COURT:**  You may be seated.

9          And you may be seated, Mr. Rocklin.  And again, as I

10  do every day, I remind you you're still under oath, and the

11  oath will not be readministered.

12         Good morning.

13         **THE JURORS:**  Good morning.

14         **THE COURT:**  Good morning, everyone.

15         **MS. HAMILTON:**  Good morning, your Honor.

16         **MR. HOWDEN:**  Good morning.

17         **THE COURT:**  Ready to continue?

18         **MR. HOWDEN:**  For just 30 minutes.

19         **THE COURT:**  Yes.  There we are.  We're all watching

20  the clock.

21         **MR. HOWDEN:**  In fact, if you want to give me a

22  heads-up at maybe ten minutes left.

23         **THE COURT:**  I need one of those, you know, flip cards

24  or something, or a buzzer.

25         **MR. HOWDEN:**  A buzzer?  Not attached to me.

1              **CROSS-EXAMINATION RESUMED**

2    **BY MR. HOWDEN**

3    **Q.**   Mr. Rocklin, I'd like to direct your attention to

4    Exhibit 51.  Do you have exhibits up there still?

5    **A.**   No.

6    **Q.**   This is that same binder of exhibits.  And I believe 51 is

7    in there.  If you could, go to that, and take a look at it,

8    please.  And again, Exhibit 51 includes the e-mail from

9    Mr. Beker, and the draft agreement, correct?

10   **A.**   Yes.

11          **MR. HOWDEN:**   Can we put the first page 51 up, please?

12   **Q.**   And again, briefly, the cover e-mail clearly states that

13   attached is a draft of the agreement.  Is that correct?

14   **A.**   Yes.

15   **Q.**   And in the second line of the e-mail, it says,

16          "Please confirm or comment."

17          Correct?

18   **A.**   Yes.

19   **Q.**   Turning to the agreement, itself, beginning at the second

20   page of Exhibit 51, the first substantive part of it, below the

21   addresses of the companies, is -- is labeled a "preamble."  Do

22   you see that?

23   **A.**   Yes.

24   **Q.**   And the substance of the preamble -- that first paragraph

25   -- is that ATN had many difficulties with the contract.

1       Do you see that?

2   **A.**   Yes.

3   **Q.**   And that's essentially true, isn't it correct, that ATN

4   had problem with the contract?

5   **A.**   But what is in here is not true.

6   **Q.**   Can you answer my question, please?

7       ATN had problems with the contract?

8   **A.**   Yes.

9   **Q.**   And the item that's listed as Item Number 1 -- failure to

10  obtain necessary paperwork export permits -- I believe you

11  testified yesterday that you didn't know whether or not NPZ had

12  obtained exports -- or export permits or needed export permits.

13  Is that correct?

14  **A.**   Yes.

15  **Q.**   So you don't know whether Item Number 1 is true, or not.

16  Is that right?

17  **A.**   But ATN -- it says here, but ATN was a failure to obtain

18  the export papers.

19      And we did not need any export papers.

20  **Q.**   Well, that's right, because you weren't exporting

21  anything.  You were importing night-vision goggles into the

22  United States?

23  **A.**   Yes.

24  **Q.**   And it was your partner, NPZ, that was exporting the

25  goggles from Russia?

ROCKLIN - CROSS EXAMINATION / HOWDEN

1  **A.**   That's right.

2  **Q.**   And you don't know whether they had export permits, or

3  not?

4  **A.**   No, I do not.

5  **Q.**   Okay.  Item Number 2 says,

6              "The inability to obtain sufficient

7          quantities of image-intensifier tubes

8          required for the contract, especially tubes

9          which can meet the mandated 750 FOM minimum

10         performance level."

11        And you told us yesterday that, in fact, you had had -- or

12  ATN had had an issue with TACOM regarding the FOM level of your

13  product.  Isn't that correct?

14  **A.**   Yes.  We had an issue that was resolved.

15  **Q.**   Okay.  And with respect to Item 3, this talks about issues

16  relating to negotiations with government-controlled Russian

17  manufacturers.

18        Was NPZ a government-controlled Russian manufacturer?

19  **A.**   I do not know for sure.

20  **Q.**   Mr. Gaber was in charge of --

21  **A.**   Yes.

22  **Q.**   -- the -- the negotiations with NPZ?

23  **A.**   Yes.

24  **Q.**   So you don't know whether or not NPZ had any cost or price

25  issues with respect to the Russian government.  Is that right?

1  A.   I don't know what part, if any, Russian government control

2  had on NPZ.

3  Q.   Okay.

4  A.   I know that it was never brought up to me -- and it would

5  be, if there would be any steep cost increases involving

6  materials.

7           MR. HOWDEN:   Your Honor, I'd ask that the latter part

8  of that an be stricken as nonresponsive, and lacking

9  foundation.

10          MS. HAMILTON:   But your Honor, I mean, he was asked

11 what his understanding is.   That's what his understanding is.

12          MR. HOWDEN:   Well, what he said was what would have

13 happened --

14          THE COURT:   I understand what he said.   You don't

15 need to have it repeated; but in fact, the motion to strike is

16 denied.

17 BY MR. HOWDEN

18 Q.   Turning to Item Number 4, it says,

19              "The limited number of NVGs which were

20              produced did not meet 100 percent the

21              required 750 FOM minimum performance

22              levels, and were supplied behind earlier

23              agreed said schedule."

24      And, once again, you did have trouble with TACOM regarding

25 the FOM level of your goggles?

 1  **A.**    Yes, we did.

 2  **Q.**    And, in fact, you did -- you were late in supplying the

 3  goggles?  You never met the October 15th deadline?

 4  **A.**    No, we did not.

 5  **Q.**    And then the balance of that page relates to Newcon Optik.

 6  The Item 1 says,

 7              "Newcon Optik has obtained a contract

 8         and delivered a certain number of NVGs for

 9         the same client in 2004/2005."

10         That was essentially true; at least, as far as you

11  knew?

12  **A.**    Yes.

13  **Q.**    And Item 2.

14              "The goods were delivered as per

15         required quality levels on budget, and six

16         months ahead of schedule."

17         Again, true, as far as you knew?

18  **A.**    I didn't know.

19  **Q.**    Okay.  Item 3.

20              "Newcon Optik has a production capacity

21         of about 30,000 tubes per year."

22         Do you know if that's true, or not?

23  **A.**    No, I do not.

24  **Q.**    Okay.  Item 4.

25              "Newcon Optik has the necessary

1          knowledge, experience" --

2          -- et cetera.

3      Do you know if that's true, or not?

4  **A.**   I do not know for sure.

5  **Q.**   Okay.  So you couldn't -- you couldn't say, one way or the

6  other, whether Items 1 through 4 are accurate, or not.  Is that

7  correct?

8  **A.**   I could not.

9  **Q.**   Now I want to take you back to September 8th.  I believe,

10 if I'm not mistaken, that's the day after the $50,000 was

11 wire-transferred to ATN.  Is that right?

12 **A.**   Yes.

13 **Q.**   And -- and on September 8th, do you remember having a

14 telephone conversation with Derek McAleer?

15 **A.**   Yes.

16 **Q.**   That conversation was not recorded?

17 **A.**   I did not record that conversation, but I'm not aware

18 whether it was recorded, or not.

19 **Q.**   Fair enough.

20     And -- and Derek McAleer -- who was he, to your

21 understanding, at that time?

22 **A.**   He was point of contact on Battalion Set II at TACOM.

23 **Q.**   Where were you -- well, did you call him, or did he call

24 you?

25 **A.**   I believe I called him.

1    **Q.**    And where were you when you made that call?

2    **A.**    In my office.

3    **Q.**    And did you have just one conversation with him on

4    September 8th?

5    **A.**    Yes.

6    **Q.**    Just one telephone call; not more than one?

7    **A.**    I believe, yes.

8    **Q.**    Okay.  And who else was present at your office when the

9    call was made?

10   **A.**    I think, Greg Haynie.

11   **Q.**    How about your lawyer, Karen McGee?

12   **A.**    I believe she was there, too.

13   **Q.**    Ms. Hamilton?

14   **A.**    That, I don't recall.

15   **Q.**    Anyone else from the FBI?

16   **A.**    Could be another agent, but I don't recall right now.

17   **Q.**    How about Sarah Harlan?  Do you remember her name?

18   **A.**    Yes.

19   **Q.**    She's an FBI agent?

20   **A.**    Yes.

21   **Q.**    Was she there that day?

22   **A.**    Whether she was there that day or not, I don't remember.

23   **Q.**    Okay.  How about anyone from the Army's Criminal

24   Investigation Division -- "CID," so called?

25   **A.**    I don't recall whether they were there on that day.

1  Q.   How about an individual by the name of Derek Lindbom?  Was

2  he there?

3  A.   I don't recall.

4  Q.   Anyone else from ATN present?

5  A.   I don't recall for sure, but I think James was there.

6  Q.   James Munn?

7  A.   James Munn, yeah.

8  Q.   And was there anyone else in your office at the time you

9  made the call that you can recall now?

10  A.   No.

11  Q.   And, of course --

12  A.   I do not recall.  Maybe somebody else --

13  Q.   That's fine.

14  A.   -- could be there.

15  Q.   That's fine.  And there was no tape-recorder attached to

16  the phone you were using at your office.  Is that right?

17  A.   No.  It was -- I don't recall that conversation being

18  taped.

19  Q.   What -- okay.  And I phrased the question badly.  The

20  tape-recorder may have been attached to your phone still, but

21  no one recorded the call from your end.  Is that correct?

22  A.   No.

23  Q.   Okay.  And did you know who was on the line at the other

24  end; at Derek McAleer's end?

25  A.   Other than Derek McAleer?

1  **Q.**   Right.

2  **A.**   I did not.

3  **Q.**   Okay.  Did -- in your discussions leading up to this call,

4  did the FBI tell you, for instance, "These people will be on

5  the other end with Mr. McAleer," or words to that effect?

6  **A.**   I did not recall that discussion.

7  **Q.**   All right.  And what was the purpose of this call to

8  Mr. McAleer?

9  **A.**   At the direction of the FBI, I had to make a call; inform

10 them that ATN will not perform on the remainder of the

11 Battalion Set I, but also inform them that I am acting at the

12 direction of the FBI, and that ATN had the full intention to

13 fulfill an order.

14 **Q.**   And did Agent Haynie or anyone else from the FBI explain

15 to you why you were supposed to say these things to

16 Mr. McAleer?

17 **A.**   It was a discussion on why I was doing this.  I don't

18 recall exactly what was the reasoning.

19 **Q.**   But in any event, this was a -- a preplanned call.  This

20 isn't something that just happened on the spur of the moment?

21 **A.**   Yes.

22 **Q.**   And do you have any reason to believe that Mr. McAleer was

23 expecting your call at that time?

24 **A.**   Yes.

25 **Q.**   And why do you believe he was expecting your call?

 1  **A.**   I think he knew that I am going to call.

 2  **Q.**   When -- when you -- at some point, you actually placed the

 3  call to Mr. McAleer?

 4  **A.**   Yes.

 5  **Q.**   Did he answer the phone?

 6  **A.**   Yes.

 7  **Q.**   And what did you say to him when you talked to him?

 8  **A.**   Exactly what I just told you.

 9  **Q.**   Okay.  You told him, first, that ATN could not perform on

10  the contract?

11  **A.**   Yes.

12  **Q.**   And then you said, "But we can perform on the contract"?

13  **A.**   I think I said that we have an intention to fully -- that

14  I was calling on behalf of FBI, and that ATN, in reality, has

15  intention to perform on the contract.

16  **Q.**   And what, if anything, did Mr. McAleer say to you after

17  you said these words to him?

18        **MS. HAMILTON:**  Objection, your Honor.  That's

19  hearsay.

20        **THE COURT:**  Well, for what purpose is it being

21  offered?

22        **MR. HOWDEN:**  I think to establish his state of mind.

23  And -- and, frankly, I'd like to know what Mr. McAleer --

24        **THE COURT:**  Well, the "frankly, I'd like to know"

25  doesn't cut it.  Okay?  You know, that's not an exception to

```
 1  the hearsay rule; but if, in fact, it explains the conduct of

 2  the parties, rather than being offered for the truth of the

 3  matter -- it's just that the statement was made --

 4            Let me hear the -- let's go ahead with the answer.

 5            MR. HOWDEN:  That's fine.

 6            THE COURT:  And if I have to strike it, I'll let you

 7  know, ladies and gentlemen.

 8            THE WITNESS:  "I don't recall" was the answer.

 9            THE COURT:  We went through all of that.

10            MR. HOWDEN:  There you go.  Yes.  You saved us all a

11  lot of trouble.  Thank you.

12            THE WITNESS:  Sure.

13  BY MR. HOWDEN

14  Q.   And after the call, did anyone offer any further

15  explanation as to why the FBI wanted you to make this call?

16  A.   I don't recall.

17  Q.   As you sit here today, do you have any greater

18  understanding of what the purpose of that call was?

19  A.   Yes.

20  Q.   And what was it?

21  A.   It -- my understanding --

22            MS. HAMILTON:  Your Honor, I think this lacks

23  foundation.

24            THE COURT:  Objection is overruled.

25            You may answer.
```

1          **THE WITNESS:**  It was constituting an act on behalf of

2    ATN.

3    **BY MR. HOWDEN**

4    **Q.**   I'm sorry.  I honestly didn't follow that.  Can you repeat

5    that, please?

6    **A.**   Yes.  I was acting on the agreement that we took with

7    Newcon.

8    **Q.**   I see.  All right.  I'd like to turn back to where we left

9    off yesterday.  We were talking about the demand letters, and

10   other communications that were sent on behalf of Newcon, to you

11   and ATN.  Do you remember that?

12   **A.**   Yes.

13   **Q.**   And I think when we stopped yesterday, we were talking

14   about the December 12th demand letter.  And that's part of

15   Exhibit 48.  Do you have that there?

16   **A.**   Yes.

17   **Q.**   And -- and I think I pointed out that, in the body of the

18   demand letter it talks about, among other things, the

19   $75-per-goggle payment that Newcon had agreed would pay ATN

20   after Newcon finished delivering goggles under the

21   Battalion Set II contract.  Is that correct?

22   **A.**   Yes.

23   **Q.**   And also in the body of the demand letter, it talks about

24   the $50,000 advance payment to ATN.  Is that correct?

25   **A.**   Yes.

1   Q.   And on page 2 of the agreement, in the third full

2   paragraph, it says,

3              "On September 7, 2005, Newcon issued

4          wiring instructions to the Bank of

5          Nova Scotia, which wired $50,000 to the

6          account that Mr. Rocklin had previously

7          identified.  I am including copies of the

8          wiring instructions and confirmation with

9          this letter."

10         Do you see that?

11  A.   Yes.

12  Q.   And, in fact, weren't those wiring instructions attached

13  to the demand letter?

14  A.   I believe so, yes.

15  Q.   And -- and those wiring instructions -- those are all

16  instructions from Newcon's end, correct?

17  A.   Yes.

18  Q.   So those aren't documents that you or anyone else had seen

19  before, right?

20  A.   No.

21  Q.   And then, on page 3 of the demand letter, in the third

22  paragraph down, the Newcon lawyer says,

23             "At this time, Newcon seeks only to

24         recover the $50,000 that ATN wrongfully

25         obtained from it.  Newcon is willing to

1              forgo litigation on all of the above claims

2              for damages that far exceed the $50,000

3              that ATN wrongfully retained."

4         Do you see that?

5    A.   Yes.

6    Q.   So at this point in time, Newcon was still looking just to

7    recover the $50,000.  Isn't that correct?

8    A.   That's my understanding.

9    Q.   And then, on January 23rd, 2006, in -- the Newcon lawyer

10   sent your lawyer a reminder about his demands.  And that can be

11   seen at the next page, at page numbered CIVI-0023.

12        Do you see that?

13   A.   Yes.

14   Q.   And your lawyer didn't respond to this letter, either, did

15   he?

16   A.   I don't recall.

17   Q.   At any rate, on about February 6th, Newcon ended up --

18   February 7th -- I'm sorry -- Newcon ended up filing its civil

19   suit against ATN, and you individually, correct?

20   A.   Yes.

21   Q.   Now, at some point after the lawsuit was filed, ATN --

22   your lawyers, at least -- moved the case from state court to

23   federal court.  Do you recall that?

24   A.   It is possible, but I don't recall exactly what was the

25   motion.

1  Q.   Okay.  And before I get into that, I should point out

2  that, attached to the lawsuit -- and it's -- you can see it in

3  the full body of Exhibit 48 -- Newcon attached all of the

4  documents that we've been talking about, correct?

5  A.   Yes.

6  Q.   They also attached a copy of the invoice that you'd sent

7  to ATN -- or to Newcon.  I'm sorry.  I think you can find that

8  at Exhibit A to the complaint.

9  A.   Yes.

10  Q.   And they also attached the wire-transfer instructions that

11  you had provided to Newcon for them to wire you the $50,000?

12  A.   Yes.

13  Q.   And all of the demand letters that we've just reviewed?

14  A.   Yes.

15  Q.   ATN never had to provide any substantive response to that

16  lawsuit, did it?

17  A.   I don't recall at this time.

18  Q.   You didn't have to give a deposition, or anything like

19  that?  You didn't have to testify?

20  A.   No.

21  Q.   In fact, the reason that -- that nothing happened was that

22  the Government intervened in the action, didn't they?

23  A.   I believe so.  Yes.

24  Q.   And -- and stayed the action?  Stopped the -- any further

25  proceedings?

1   **A.**   That's what I recall.

2           **MS. HAMILTON:**  Your Honor, could I have a limiting

3   instruction on this; that Mr. Howden's testimony or statements

4   are not facts in evidence?

5           **THE COURT:**  Well, we've had that before.  You

6   understand that the statements contained in the questions asked

7   by -- by the attorney are not evidence.  It's only as it

8   supplies meaning to the answer.

9           In other words, it depends on the witness' answer.

10  It's the witness' answer that's the evidence.

11          So you should not assume the accuracy or the lack of

12  accuracy of statements contained by the -- in the questions by

13  the attorney.

14          **MS. HAMILTON:**  Thank you.

15          **MR. HOWDEN:**  I'm not sure I got an answer to that

16  last question; I may have.

17          **THE COURT:**  I'm not sure you did, either.  I think

18  there was -- we may have been talking over it.

19          Did you get an answer to that last question?  It's

20  probably "I don't recall."

21          **MR. HOWDEN:**  Okay.

22          (Record read)

23  **BY MR. HOWDEN**

24  **Q.**  And those proceedings remained stayed, or stopped, for

25  about two years.  Isn't that right?

```
 1  A.    I believe so.

 2  Q.    And at the end of the day, Newcon ended up dismissing its

 3  action?

 4  A.    I believe so.

 5          MR. HOWDEN:  Okay.  I don't have anything further at

 6  this time, your Honor.

 7          THE COURT:  Thank you.

 8          MR. OSTERHOUDT:  Your Honor, I have no additional

 9  questions for the witness at this time.

10          THE COURT:  Oh, okay.  Thank you.

11          MS. HAMILTON:  Everyone was looking forward to

12  hearing from you.  I guess we'll just have another

13  opportunity --

14          MR. OSTERHOUDT:  We'll look forward to that.

15          THE COURT:  -- in the coming days.  Okay.

16          Redirect examination.

17                      REDIRECT EXAMINATION

18  BY MS. HAMILTON

19  Q.    Good morning, Mr. Rocklin.

20  A.    Good morning.

21  Q.    I'd like to turn your attention, first, to -- Mr. Howden

22  asked you yesterday about your first recorded conversation with

23  Mr. Prilik on August the 26th.  Okay?

24          And what I'd like to do is turn your attention to

25  Exhibit 131, page 4, line 17.  And I think I need to give you
```

1    the transcripts.  So it's the first recorded conversation, page

2    4, line 17.

3        And, turning to line 17, Mr. Prilik said,

4            "Yes.  My unofficial opinion, because

5            the official opinions are reserved for the

6            boss with us."

7            To which you reply,

8            "Well, that's clear."

9            Mr. Prilik said,

10           "My unofficial opinion is very simple.

11           It's by as much bigger than that which you

12           offered.  And if we coördinated something

13           jointly, then, as a result, both our

14           companies would make much more than

15           provisionally those 100 or $200 that you

16           most likely make, and on that, with great

17           difficulties."

18           Now, yesterday are --

19           Well, first, on line 17 -- excuse me -- line 24,

20   Mr. Prilik refers to, "if we coördinated something jointly."

21           And who did you understand "we" to refer to?

22   **A.**   ATN and Newcon.

23   **Q.**   And yesterday you told Mr. Howden that you believed that

24   this statement by Mr. Prilik to be Mr. Prilik's personal

25   opinion?  Is that right?

1   **A.**   Yes.

2   **Q.**   Now, during this conversation with Mr. -- with you on

3   August 26th, did Mr. Prilik provide his personal opinion about

4   how ATN and Newcon would coördinated jointly?

5   **A.**   It was part of the discussion.

6   **Q.**   Okay.  So now, if you could, turn to page 15.  Beginning

7   at line 13, Mr. Prilik said,

8               "I have an approximate notion of how

9           much you are making on this contract, and I

10          think that you are making terribly little,"

11          -- to which you reply,

12              "absolutely correct.  That which you

13          said at the beginning of the conversation

14          is very close to reality."

15          And Mr. Prilik replied,

16              "Yes.  And I think that the goggles

17          were sold, but we are the only one who

18          should know about this; not the Russians,

19          naturally,"

20          -- to which you replied,

21              "Yes."

22          Mr. Prilik then said,

23              "With them, there is no need to teach

24          them what they don't need.  If the goggles

25          are sold conditionally for $2,000, well, to

 1              be sure, our goggles cost more.  This, I

 2              will also tell you, honestly and frankly,

 3              because Loktionov doesn't do it himself.

 4              He buys the case optics, and so on.  Until

 5              today, I could live with it.  That is to

 6              say, approximately the same that you earn

 7              today, you could continue to earn, I don't

 8              know, from us.  We would sign, give the

 9              word of honor, and pay honestly,"

10              -- to which you replied,

11                  "I've got it."

12              And Mr. Prilik said,

13                  "As one simplistic possibility."

14              And Mr. Prilik stated,

15                  "If the goggles were sold conditionally

16              for $2,000" --

17              Who -- what, if any, understanding did you have about

18  who the goggles would be sold to for $2,000?

19  **A.**   We are not clear here.  Would we either --

20          **MR. OSTERHOUDT:**  Excuse me, your Honor.  I'll object

21  as to speculation, if he's not clear.

22          **THE COURT:**  Well, you can reask the question,

23  perhaps, and in a way that can elicit an answer, without it

24  being speculation, but that's up to you.

25

1   **BY MS. HAMILTON**

2   **Q.**   When Mr. Prilik said the goggles would be sold

3   conditionally for $2,000, what did you understand him to mean?

4   **A.**   Either to prime, or to TACOM.

5   **Q.**   On line 15, Mr. Prilik said,

6              "You could continue to earn, I don't

7           know, from us."

8      What did you understand Mr. Prilik meant by, "You could

9   continue to earn" -- by the word, "earn"?

10  **A.**   That there could be some arrangement where ATN would get

11  paid from Newcon.

12  **Q.**   Thank you.  Now, yesterday Mr. Prilik [sic] asked if --

13  asked you if Mr. Prilik was just floating these ideas by you,

14  to which you replied, "At this time point, yes," but when you

15  expressed interest in Mr. Prilik's proposal that he was

16  floating, what did Mr. Prilik say he would do?

17  **A.**   That he would go back, and talk to Michael about it.

18  **Q.**   So if we could, turn to page 20, line 16.

19     Mr. Prilik said,

20              "I'll talk about that with Michael if I

21           get through to him now.  He is now, by the

22           way, on his way to New York,"

23           -- to which you replied,

24              "Okay."

25           And Mr. Prilik said,

1           "Therefore, I hope that I will reach

2       him on the phone."

3       You said,

4           "Okay."

5       Mr. Prilik said,

6           "I don't think he is flying.  He is

7       driving.  That's why there's a good chance

8       I'll be able to catch him,"

9       -- to which you reply again,

10          "Okay."

11      And Mr. Prilik then said,

12          "And I'll ask him preliminarily that --

13      well, and that will -- which we'll try to

14      organize -- this is called an 'illegal

15      antitrust.'"

16      You then say,

17          "Well, Dude, you might also, well" --

18      And then Mr. Prilik then said,

19          "I'm joking,"

20      -- to which you replied.

21          "That, well" --

22      And Mr. Prilik then said,

23          "In America, the monopoly is

24      prohibited. Can we do a monopoly

25      internationally?"

1          And you said,

2               "I don't know, but to me, you --

3          well" --

4          Mr. Prilik then said,

5               "Well, this is like all of the oil

6          companies.  We had this thing in Canada.

7          We have four oil companies, but you

8          approach an intersection and -- shoot! --

9          all four have the same price,"

10         -- to which you reply,

11              "Well, it's everywhere like this, I

12         think."

13         And Mr. Prilik then said,

14              "Really?  And what is it called?

15         'Competition,' or everybody conspires

16         illegally?"

17         -- to which you reply,

18              "Well, this -- they -- this -- there

19         are different things.  Sometimes such

20         things are dictated by the market."

21         -- to which you -- Mr. Prilik replies.

22              "Yes."

23         Then you say,

24              "If they buy all for the same money,

25         if, for them -- well, the refinery costs

1          the same.  Is one thing.  You understand."

2          And -- and Mr. Prilik states,

3               "When you approach an intersection and

4          you see four ladders, and everybody changes

5          those prices simultaneously, you understand

6          right away.  There are no coincidences."

7          **MR. OSTERHOUDT:**  Your Honor, I beg your pardon.  I

8  hate to interrupt, but I do think this is improper redirect.

9  We've done all this before.

10         **THE COURT:**  Well, I don't think it's improper

11 redirect, but you know, the jury is instructed -- and I think

12 we may have given an instruction or tend to give an

13 instruction -- that there is no charge or claim or anything in

14 this case about antitrust activity, and so forth.  That's not

15 an issue at all.  And this is just in the context of their

16 discussions about working together, but there is no allegation

17 of antitrust.

18         And so, just -- and there's no -- you know, we're not

19 going to opine on whether or not what they're saying about,

20 quote, "antitrust," is, in fact, the law.  It's a lot more

21 nuanced and refined than that, but at any rate --

22         **MR. OSTERHOUDT:**  Thank you, your Honor.

23         **THE COURT:**  -- you may continue.

24         **MS. HAMILTON:**  Thank you.

25 **Q.**  Now, based on this portion of the conversation, what did

1  you understand Mr. Prilik was going to tell Mr. Beker?

2  **A.**    About what we previously discussed with Mr. Prilik in that

3  day conversation about the proposal where ATN could continue --

4  could get an agreement with Newcon, and continue somehow to get

5  paid.

6  **Q.**    And you spoke with Mr. Prilik after this first

7  conversation on August 26th?

8  **A.**    Yes.

9  **Q.**    When?

10  **A.**    Same day.

11  **Q.**    And about how much later after this first conversation did

12  you speak with Mr. Prilik?

13  **A.**    Very shortly after.

14  **Q.**    And during that second conversation, which is at

15  Exhibit 132, did Mr. Prilik tell you that he spoke with

16  Mr. Beker?

17  **A.**    Yes.

18  **Q.**    All right.  If we could turn to, please, page 3, line 14

19  -- excuse me -- Mr. Prilik said,

20              "Yes, he is willing to talk and meet,

21          ah, along the lines of my proposal, or

22          something close to it; but the best thing

23          to do in order to make it specific is,

24          perhaps, ah, for Marc to get in touch with

25          him.  He'll be back at the office on

1              Monday -- or for them to schedule a meet

2          somewhere."

3              Now, first of all, on line 14, when Mr. Prilik said,

4    "He is willing to meet," who did you understand Mr. Prilik to

5    mean when he said "He"?

6    A.   Michael Beker.

7    Q.   And, "He was willing to meet along the lines of my

8    proposal."

9          What, if any, did you understand were the concepts

10   discussed between Mr. Beker and Mr. Prilik?

11              MR. HOWDEN:  Objection, your Honor.  That calls for

12   complete speculation.

13              MS. HAMILTON:  Well, Mr. Prilik has said --

14              THE COURT:  Reframe.  Rather than arguing about it,

15   reframe the question --

16              MS. HAMILTON:  Okay.

17              THE COURT:  -- please, if you can.

18   BY MS. HAMILTON

19   Q.   When Mr. Prilik said that he had -- that Mr. Beker had met

20   or was willing to talk "along the lines of my proposal," what

21   did you understand "my proposal" to mean when Mr. Beker --

22   Prilik referred to it?

23   A.   Proposal where, again, ATN and Newcon somehow would agree

24   on some sort of coöperation, where Newcon would pay ATN for

25   something.

1  Q.   And at this point, that -- that was your understanding?

2  A.   Yes.

3  Q.   Now, based on what Mr. Prilik said here -- that Mr. Beker

4  was willing to meet along the lines of my proposal -- did you

5  have an understanding about the proposal being related to

6  Mr. Beker?

7  A.   Would you repeat the question?

8  Q.   Sure.  Based on the conversation you had with Mr. Prilik

9  here, what, if any, understanding did you have about the

10 proposal being related to Mr. Beker by Mr. Prilik?

11 A.   My understanding was that he related the exact proposal

12 that we discussed in the previous conversation.

13 Q.   Okay.  And why do you believe that?

14 A.   Because that's what he's telling me here.

15 Q.   Now, did you have any understanding about what terms

16 Mr. Prilik discussed with Mr. Beker?

17         MR. HOWDEN:  Objection.  Calls for speculation.

18         THE COURT:  Objection sustained.

19 BY MS. HAMILTON

20 Q.   Now, after this conversation with Mr. Prilik, and a later

21 conversation, did Mr. Prilik refer to any other conversations

22 that Mr. Prilik had had with Mr. Beker?

23 A.   Yes.

24 Q.   If we can turn, then, to Exhibit 134, what date was the

25 next time that you spoke with Mr. Prilik after August 26th?

1   **A.**   Over the weekend.  I think it was the 29th.

2   **Q.**   When you say "over the weekend," what do you mean?

3   After --

4   **A.**   After the weekend.  I'm sorry.  It was Friday.  Obviously,

5   the 26th.  And the next in time, it was Monday, August the

6   29th.

7   **Q.**   So if we could, please turn to page 2, line 21, of

8   Exhibit 134.

9        Mr. Prilik said,

10            "I had time to speak with Michael.  He

11            stopped by for about ten minutes.  He

12            apologized for the fact that he wouldn't

13            call back today, and basically asked for a

14            little time out -- day or two -- in order

15            to -- ah, to probe all of the ends and

16            exits, and to understand what is possible

17            or impossible to do."

18        Mr. Prilik said,

19            "If it's okay with you."

20        And you replied,

21            "Well, along the general consensus."

22        Mr. Prilik then said,

23            "Yes.  The question that arose -- if we

24            think in the direction of how, after all,

25            not to let down the Americans, but indeed,

```
 1                  to finish to deliver what they need to

 2                  them, then, what quantities and terms, ah,

 3                  were subscribed to?"

 4             What was your understanding of -- at this point in

 5   time, about the -- what, if any, conversations had occurred

 6   between Mr. Beker and Mr. Prilik?

 7             MR. HOWDEN:  Objection, your Honor.  This still calls

 8   for speculation.

 9             THE COURT:  Objection is sustained.

10   BY MS. HAMILTON

11   Q.  Mr. Prilik stated he had time to speak with Michael, who

12   stopped by for about ten minutes.  Is that right?

13   A.  Yes.

14   Q.  And then Mr. Prilik said, on page 3, line 9,

15                  "The question arose, if we think in the

16                  direction of how, after all, not to let

17                  down the Americans, but indeed, to finish

18                  to deliver what they need to them."

19             Now, based on this conversation with Mr. Prilik, what, if

20   any, understanding did you have about who would deliver what

21   the Americans, as Mr. Prilik said -- the Americans needed?

22             MR. HOWDEN:  Again, your Honor, that still calls for

23   speculation.

24             THE COURT:  Objection is overruled.

25             THE WITNESS:  My understanding -- that Newcon would
```

1  deliver the units.

2  **BY MS. HAMILTON**

3  **Q.**   And why is -- why did you believe that to be the case?

4  **A.**   That was my understanding, because that's what we were

5  talking about in the context of the conversation.

6  **Q.**   Now, what, if any, understanding did you have at this

7  point in time about the price to be charged for the

8  night-vision goggles to be delivered to the Americans?

9             **MR. HOWDEN:**  Lack of foundation.

10            **THE COURT:**  Objection is overruled.

11            **THE WITNESS:**  We had a discussion -- previous

12  discussion that it would be somewhere around $2,000 to $2,500.

13  That was the established mark.

14  **BY MS. HAMILTON**

15  **Q.**   And at this point in time, what was the price that ATN --

16  or excuse me.  You testified previously that you knew what

17  price ITE was charging TACOM, is that right, for the

18  Battalion Set II night-vision goggles?

19  **A.**   Yes.

20  **Q.**   And what price was that?

21  **A.**   $1,760.

22  **Q.**   Now, during this conversation, at any time did Mr. Prilik

23  tell you that he would speak with Mr. Beker?

24  **A.**   I believe so, later on.

25  **Q.**   So, if we could turn to page 9, line 5, Mr. Prilik said,

1                    "Seriously, I, with him, will come to

2              the bottom of this matter.  And then,

3              either tomorrow or the day after tomorrow,

4              he will already call."

5       What did you understand Mr. Prilik to mean when he refers

6    to "this matter," on line 6?

7    **A.**    Again, the proposal that we discussed in first

8    conversation with Arie.

9    **Q.**    "The proposal" being what?

10   **A.**    That ATN and Newcon somehow agree, where Newcon would pay

11   ATN.

12   **Q.**    And did you, in fact, speak with Mr. Beker after this

13   conversation on August 29th with Mr. Prilik?

14   **A.**    Yes.

15   **Q.**    And what date did you first -- what was your first

16   recorded conversation with Mr. Beker?

17   **A.**    August 30th.  Next day.

18   **Q.**    And on that -- you testified previously on that day, on

19   August 30th, Mr. Prilik was the first person you spoke with.

20   Is that right?

21   **A.**    Yes.

22   **Q.**    And then what did Mr. Prilik do with the telephone call?

23   **A.**    He transferred me.

24   **Q.**    And during your telephone -- and you then spoke with

25   Mr. Beker?

1  **A.**    Yes.

2  **Q.**    And when Mr. Beker and you then spoke, did he indicate he

3  had spoken with Mr. Prilik about Mr. Prilik's proposal?

4  **A.**    Yes.

5  **Q.**    If we could turn to Exhibit 135, beginning at page 3,

6  line 17, Mr. Beker said,

7              "Yeah.  I know, in general, everything

8          that you said, as it were, with Arie."

9          You replied,

10             "Yes".

11         Mr. Beker said,

12             "I apologize in advance if I'm going to

13         ask something again, that which you guys

14         already discussed one way or another.  I,

15         like, didn't get into the details,"

16         -- to which you replied,

17             "I've got it."

18         And Mr. Beker then said,

19             "So the most important thing that I

20         want to understand is this, ah, how you see

21         what kind -- I apologize in advance for the

22         expression, but assistance should come from

23         my side or, well, how -- how do you see it?

24         What do you want me to do?"

25         -- to which you replied,

 1                    "But in all seriousness, we didn't have

 2               any suggestions.  Ah, the conversation was

 3               started by Arie.  He said that he, well,

 4               ah, possibly sees some kind of exclusions.

 5               Well, to this, I basically told him that I

 6               was willing, like, to talk without

 7               emotions, and to close, as they say, the

 8               mouth, and to open the ears, and to listen

 9               to what might be offered.  And he had,

10               there, various suggestions about the

11               rise -- about how to raise the prices,

12               about" --

13               -- to which Mr. Beker replies,

14                    "That is to say, let's not rehash what

15               you discussed with him.  And since you know

16               what you spoke about, and I know in general

17               what you talked about, I can say, like, now

18               we are talking -- and you are talking with

19               the primary source.  That is to say, there

20               is no longer any sense in duplicating it."

21               Now, first, Mr. Beker said, on line 17, that he knew,

22       in general, everything that you said, as it were, to Arie.

23               And then you replied -- or then you alert stated, on

24       page 4, line 16, that,

25                    "He had various suggestions about the

```
1            rise -- about how to raise the prices."
2            And when you say "he," who are you referring to
3   there?
4   A.   Arie.
5   Q.   Mr. Beker responds,
6                "Let's not rehash what you discussed
7            with him, since you know what you spoke
8            about, and I know, in general, what you
9            talked about."
10           Now, based on this conversation, what, if any,
11  understanding did you have about what was discussed between
12  Mr. Prilik and Mr. Beker?
13  A.   It was my understanding that Mr. Prilik discussed
14  everything that me and Mr. Prilik discussed in the previous
15  conversation with Michael.
16  Q.   Now, on line 17, or starting at --
17           MR. HOWDEN:  Your Honor, I'm sorry.  I'm trying to
18  parse through that question and that answer.  And I think, even
19  given his understanding, it lacks foundation.
20           THE COURT:  Can we have the answer read back?  Let's
21  listen to it, and see if there's still an objection.
22           (Record read)
23           THE COURT:  Well, I will strike it, unless you ask a
24  follow-up question as to how he --
25           MS. HAMILTON:  Right.
```

1          THE COURT:  -- how he has that understanding.

2  BY MS. HAMILTON

3  Q.   Why did you believe that to be the case?

4  A.   Because here, Michael was telling me that he talked to

5  Arie, and Arie told him to all what I and Arie discussed in the

6  previous conversation.

7          MR. HOWDEN:  Well, I don't believe that's exactly

8  what the transcript says, and I renew my objection.

9          THE COURT:  The objection is overruled.

10         You can go into it on recross.

11  BY MS. HAMILTON

12  Q.   On line 16 you said,

13              "He had various --

14          "He," meaning Arie.

15              -- "had various suggestions about how

16          to raise the prices."

17         Now, what, if anything, did Mr. Beker say that led

18  you to believe he disagreed that Mr. Prilik had discussed

19  raising prices with you?

20  A.   Nothing.

21  Q.   And what, if anything, did Mr. Beker say that led you to

22  believe he disagreed with Mr. Prilik's proposal to raise the

23  prices on the Battalion Set II contract night-vision goggles?

24  A.   Nothing.

25  Q.   Now, did Mr. Beker discuss pricing under the night-vision

1    goggles?

2    **A.**    Yes.  If we could turn to Exhibit 135, which is the fifth

3    recording, on page 10, beginning at line 11 -- okay.  Mr. Beker

4    said,

5              "But the facts speak for itself.  Well,

6         people came over and offered cheap prices

7         and stole it.  Well, right -- after all, I

8         don't have any complaints.  On the

9         contrary, well, by all means, you were

10        entitled to do it.  You made a normal

11        decision how you believed, from the point

12        of view of, ah, business.  If you had fit

13        in a normal price niche, I wouldn't have

14        said a single word to you.  Kudos to you,

15        as they say; but unfortunately, the

16        Jordanian guy fucked us all.  Well, and

17        that's it.  Nothing else.  I'm without

18        any -- I swear, Dima, I am without

19        complaints.  I'm just ascertaining, because

20        for this money, it is impossible to receive

21        the product, well, and not to mention, to

22        sell it."

23        Now, Mr. Prilik, on page -- or excuse me.  Mr. Beker,

24   on page 10, line 23, said,

25             "It is impossible to receive the

1         product, well, and not to mention, to sell

2         it."

3         And what, if any, understanding did you have that

4  Mr. Beker intended to increase the price of night-vision

5  goggles under the Battalion Set II contract, if Newcon supplied

6  the goggles, instead of ATN?

7  **A.**   My understanding was that Newcon was buying the goggles

8  for more money than what ATN was selling it for.

9  **Q.**   And what's the significance of that information?

10 **A.**   Then, if Newcon would sell their goggles, that the price

11 would need to be raised.

12 **Q.**   And Mr. Beker offered a consolation prize to you on

13 August -- to ATN on August 30th.  Is that right?

14 **A.**   Yes.

15 **Q.**   And what was your understanding of what Mr. -- of what ATN

16 was to do in order to earn that consolation prize?

17 **A.**   To step back; to -- not to deliver the remainder of phase

18 one.

19 **Q.**   Anything else?

20 **A.**   And recommend Newcon as a potential supplier.

21 **Q.**   And what did you understand, then -- and we've already

22 said that you understood that ATN -- or excuse me -- Newcon

23 would increase prices for the night-vision goggles that it

24 would sell under the Battalion Set II contract.  Is that right?

25 **A.**   Yes.

1  Q.   And what was the amount that ATN would be paid under the

2  consolation prize?

3  A.   In the end, it was agreed $75 per every goggle that was

4  not delivered.

5  Q.   Now, what, if any, similarities did you understand there

6  to be between the proposal that Mr. Prilik made to you on

7  August 26th, and -- and the proposal to pay a consolation prize

8  that Mr. Beker made to you on August 30th?

9  A.   The similarities were that ATN and Newcon are in agreement

10  of some sort.  And ATN is getting paid, and earning something.

11  Q.   All right.  Now I'd like to turn your attention to another

12  subject.  Now, Mr. Howden discussed the telephone conversations

13  that you had with the defendants on August 17th, 2005, and

14  pointed out that those conversations were not recorded.  Why id

15  you not record those August 17th conversations?

16  A.   I recorded all of the conversations.

17  Q.   These are the first two conversations that you had on

18  August 17th.

19  A.   Oh.  On the 17th?  I'm sorry.

20  Q.   That's okay.

21       So why were those first two conversations that you had

22  with the defendants on August 17th not recorded?

23  A.   Because the recording started later, when the proposal was

24  made by Arie, and then when we contact our lawyers, and they

25  contacted the FBI.

 1  **Q.**   Were you expecting a telephone call from -- any

 2  conversation with Mr. Prilik on August 17th?

 3  **A.**   No, I did not.

 4  **Q.**   Did you have any recording equipment in your office on

 5  August 17th?

 6  **A.**   No.

 7  **Q.**   Do you make it a practice of recording conversations with

 8  other individuals?

 9  **A.**   No.

10  **Q.**   And Mr. Howden also pointed out that during the nine days

11  between August 17th and August 26th, you had no contact with

12  the defendants.  Is that right?

13  **A.**   Would you repeat the question?

14  **Q.**   Sure; that between August 17th and the first recording, on

15  August 26th, you had no contact with the defendants.  Is that

16  right?

17  **A.**   I did not.

18  **Q.**   On August 17th, in your second conversation with

19  Mr. Prilik, how was that conversation left?

20          **MR. OSTERHOUDT:**  Objection.  Vague, your Honor.

21          **THE COURT:**  Objection overruled.

22          You may answer.

23          **THE WITNESS:**  I think after the discussion, the end

24  of it was -- after Arie proposed whatever he proposed, I said

25  something that -- I'll give you a call back; I'll think about

1    it, and I'll give you a call back; something to that extent.

2    **BY MS. HAMILTON**

3    **Q.**   What, if any, time frame did you provide to Mr. Prilik

4    about when you would give a call back?

5    **A.**   I don't recall right now.

6    **Q.**   Okay.  Now, Mr. Howden pointed to several statements

7    purporting to show that ATN requested Newcon's assistance on

8    the Battalion Set II contract.  What, if any, assistance did

9    you request from Newcon during that first call on August 17th

10   with the defendants?

11   **A.**   I'm sorry.  Repeat the question, please.

12   **Q.**   On August 17th, what, if any, assistance did you request

13   from Newcon for the Battalion Set II contract?

14   **A.**   I did not request any assistance.

15   **Q.**   On the second conversation with just Mr. Prilik on

16   August 17th, what, if any, assistance did you request from

17   Mr. Prilik for Newcon to provide to ATN for Battalion Set II

18   contract?

19   **A.**   I did not request any assistance.

20   **Q.**   I'd like to turn your attention back to the first recorded

21   conversation, which is Exhibit 131, page 4, beginning at line

22   10.  You said, starting on line 10,

23              "No.  You -- last time you" --

24          Mr. Prilik said,

25              "Ah."

1           You said,

2                "You started telling me something."

3           Mr. Prilik said,

4                "Concerning the other project?"

5           -- to which you replied,

6                "Yes, naturally."

7           And then Mr. Prilik then said,

8                "I can give my unofficial" --

9           -- to which you said,

10               "I'm out to the" --

11          Mr. Prilik said,

12               "Yes, unofficial opinion, because the

13          official opinion is reserved for the boss

14          with us."

15          Now, on line 10, you refer to "the last time."  Why

16   did you say that?

17   **A.**   I was referring to August 17th conversation.

18   **Q.**   And during this conversation on August 26th -- and you

19   referred to "the last conversation."  And during the -- I'm

20   sorry.  In the August 718th conversation to which you are

21   referring, what subjects were discussed by Mr. Prilik with you?

22          **MR. HOWDEN:**  Asked and answered, your Honor.

23          **THE COURT:**  Objection's overruled.

24          You may answer it.

25          **THE WITNESS:**  It was about same thing that we

1  discussed later on in this conversation, where we would need to

2  find some level of pricing of what the next competitor would

3  be, and we'd need to sell it 10 to 15 percent less.

4  **BY MS. HAMILTON**

5  **Q.**   So what, if any, subjects were discussed on this

6  conversation on August 26th that were also discussed Mr. Prilik

7  on August 17th?

8  **A.**   General agreement between ATN and Newcon about some sort

9  of price control.

10  **Q.**   Excuse me.  Now, what, if any, requests for assistance did

11  you make to Mr. Prilik on August 26th?

12  **A.**   What, if any, what?

13  **Q.**   Requests for assistance.

14  **A.**   I did not make any.

15  **Q.**   And did Mr. Prilik -- what, if any, assistance did

16  Mr. Prilik offer on August 26th?

17  **A.**   I don't think anything in terms of assistance was offered

18  at that conversation.

19  **Q.**   Now, during the first conversation that you had with

20  Mr. -- both Mr. Beker and Mr. Prilik on August 17th, what

21  subjects were discussed?

22  **A.**   About some sort of agreement between Newcon and ATN, and

23  about pricing.

24  **Q.**   What about pricing?

25  **A.**   Again, how the next level of competitors would be

1  somewhere $2,000 to 2,500.

2  **Q.**   I'm sorry.  I want to make sure we're really clear.  I'm

3  asking about the August 17th conversation that you had with

4  both Mr. Beker and Mr. Prilik.  Is that clear?

5  **A.**   First of --

6  **Q.**   Is that clear?  I apologize.  I think there might have

7  been a misunderstanding.

8  **A.**   Oh.  I'm sorry.

9  **Q.**   So between the August 17th conversation -- or on the

10  August 17th conversation, the first one with Mr. Beker and

11  Mr. Prilik, what subjects were discussed?

12  **A.**   That I called in.  And I confronted them; whether they

13  were the ones who complained to ITE.  And they agreed on that.

14      I also asked them whether they were the ones who

15  complained to TACOM, and they agreed on that.

16      And I also mentioned something to the extent that they're

17  instigators of what going on in Russia.  And they did not deny

18  that.

19      And I told them that I believed that they sabotaging the

20  contract that we had, and that we'll sue them.

21  **Q.**   Okay.  What, if anything, did Mr. Beker say about ATN's

22  pricing on the Battalion Set II contract?

23  **A.**   He alluded to -- that ATN sold it really cheaply; and the

24  Jordanian was the only one who was making money; and ATN stole

25  the contract; and he will do everything in his power to get the

1    contract back.

2    **Q.**    So if I could, please, then, turn your attention to the

3    August 30th conversation that you had with Mr. Beker, which is

4    Exhibit 105, at any time during that conversation and at any

5    time, did Mr. Beker refer to speaking with you previously?

6    **A.**    Yes.

7    **Q.**    Okay.  If we could turn, please, to page 9, beginning

8    at -- excuse me -- page 10, beginning at line 1, Mr. Beker

9    said,

10                    "Most certainly, one of the goals is to

11                stop the fulfillment of this contract,

12                because it was stolen from me, to put it

13                mildly.  And I spoke about it during the

14                last conversation, but it was totally

15                not -- was not and is not the chief thing."

16        When Mr. Beker stated he "spoke about it during the last

17    conversation," what last conversation did you understand he was

18    referring to?

19    **A.**    The first conversation, on August 17th.

20    **Q.**    Mr. -- you then asked Michael,

21                    "Explain to me.  And why do you believe

22                that we stole it?  Well" --

23        -- to which Mr. Beker said,

24                    "But I am without complaints towards

25                you."

1              And you said,

2                    "Well."

3              And Mr. Beker said,

4                    "But the fact speaks for itself.  Well,

5              people came over, and offered cheap prices,

6              and stole it."

7              What did you understand Mr. Beker's reference to

8    "cheap prices" to mean?

9    **A.**   That ATN offered more competitive prices than Newcon.

10   **Q.**   On -- on what?

11   **A.**   On Battalion Set II.

12   **Q.**   And you testified that Mr. Beker had complained about

13   ATN's prices during the August 17th conversation.  Is that

14   right?

15   **A.**   Yes.

16   **Q.**   Did he discuss ATN's low price again during the

17   August 30th conversation?

18   **A.**   Yes.

19   **Q.**   If we could turn to page 44, beginning at line 8,

20   Mr. Beker said,

21                   "In the end, you will offer some prices

22              that are probably acceptable to you, but on

23              the whole, are not acceptable to the

24              market, because we work, ah, very closely

25              both with DEP Photonis, and we work with

 1                    representatives of ITT.  We also work with

 2                    Inside Technology.  Well, practically, we

 3                    don't even hesitate to pick up the phone

 4                    and discuss the questions of whether or not

 5                    they're going or not going, one way or the

 6                    other, to participate."

 7         Now, Mr. Beker said,

 8                        "You will offer prices that are

 9                    probably acceptable to you, but on the

10                    whole, are not acceptable to the market."

11         What did you understand by Mr. Beker's reference to prices

12    "acceptable to the market" to mean?

13    **A.**    That the prices that we were offered were lower to --

14    compared to what, for example, DEP Photonis had.  They were

15    lower than the Newcon would offer.

16    **Q.**    Whose prices were lower than what Newcon would offer?

17    **A.**    ATN's prices.

18    **Q.**    Now, on August 26th -- we just covered Mr. Prilik's

19    statement that, if ATN and Newcon coördinated jointly, then

20    both would make money.

21         Did Mr. Beker discuss Newcon and ATN coördinating actions?

22    **A.**    Yes.

23    **Q.**    And, if I could turn your attention to the August 30th

24    conversation with Mr. Beker, which is Exhibit 135, turn to page

25    44, line 20.

1          Actually, let's just go to page 45.  No.  I'm sorry.

2          Mr. Beker said -- it's 44, line 22 --

3                  "And, well, to talk somewhat,

4              Mr. Rocklin."

5              Then you said,

6                  "I mean."

7              And then, if we could go to the next page, 45,

8     line 1,

9                  "Thank you."

10             So Mr. Beker said,

11                 "And, well, to talk somewhat -- bolder;

12             for instance, to coördinate some of our

13             actions together.  Well, to do that which

14             is not allowed by law, to allot spheres of

15             influence, well, or, to understand,

16             somehow, who's going to be where later on.

17             Well, for this, as it were, one should

18             either buy Newcon or buy ATN or, on some

19             other basis, enter into some coöperation.

20             That is to say, this is something more

21             complex, not -- not at today's, as it were,

22             well, telephone conference.  Isn't that

23             true?"

24             -- to which you reply.

25                 "I've got it.  I've got everything."

1            And, just to clear up, you had testified previously

2    that the con -- Mr. Beker's statement that one should either

3    buy Newcon or buy ATN was not an issue that was in conversation

4    at this point in time.  Is that right?

5    **A.**   Yes.

6    **Q.**   Now, on page 45, line 1, Mr. Beker said,

7                   "To talk somewhat bolder, for instance,

8                   to coördinate some of our actions

9                   together."

10           What did you understand him to mean by coördinating

11   "some of our actions together"?

12   **A.**   An agreement of some sort, where the prices would be

13   controlled and agreed upon.

14   **Q.**   And on page 45, line 3, Mr. Beker says,

15                  "To allot spheres of influence."

16           What did you understand that to mean?

17   **A.**   Well, I think in this conversation, somewhere later on, we

18   were discussing the possibility on who's going to be

19   controlling which share of the market.

20   **Q.**   Now, after this August 30th conversation, did Mr. Beker

21   ever make a statement to you that you understood to be a

22   reference to the August 17th conversation?

23   **A.**   Yes.

24   **Q.**   Okay.  If we could turn to Exhibit 108, which is the

25   conversation that you had with Mr. Beker on September 1st,

 1   starting at page 9, line 9 -- and I'd like to just read the

 2   portions starting at line 19.

 3            "He asked my permission to communicate

 4            with me, Dima, on the subject of preparing

 5            the issue, because Dima called, and so on,

 6            and so on.  And I say, 'By all means.'

 7            After all, he is not a stranger, right?"

 8       Now, who did you understand Mr. Beker was referring to

 9   when he said "he"?

10   **A.**   Arie Prilik.

11   **Q.**   And what, if any, understanding did you have about

12   Mr. Beker's reference to preparing the issue?

13   **A.**   The issue of Newcon and ATN coöperation of some sort that

14   me and Arie discussed on August 17th conversation.

15   **Q.**   Okay.  So -- so what, if any, understanding do you have of

16   the date, then, that Mr. Beker provided permission to

17   Mr. Prilik to communicate with you on that subject of preparing

18   the issue?

19   **A.**   Back on the first day we talked:  August 17th.

20   **Q.**   Okay.  And why do you believe August 17th was the day that

21   Mr. Beker gave Mr. Prilik permission to prepare the issue?

22            **MR. HOWDEN:**  Your Honor, I'm sorry.  This really

23   lacks foundation.  It's abject speculation.

24            **THE COURT:**  Also, the question was a bit -- it was a

25   convoluted -- a little complicated.

 1              **MS. HAMILTON:**  Okay.  I apologize.

 2              **THE COURT:**  You know, you can break it down, and then

 3   let's see what we have.

 4              **MS. HAMILTON:**  Okay.

 5   **Q.**   Did you have an understanding as to what day Mr. Beker

 6   gave Mr. Prilik permission to prepare "the issue," as Mr. Beker

 7   called it?

 8   **A.**    Yes.

 9   **Q.**   And what is that understanding based on?

10   **A.**    It says here, "because Dima called."  And I called, the

11   first time, on August 18th.

12   **Q.**   So what is your understanding as to the date that

13   Mr. Beker gave Mr. Prilik permission to call you to prepare the

14   issue?

15              **MR. HOWDEN:**  I'm going to renew my objection.

16              **THE COURT:**  I think that is asking for more than may

17   be within, without more foundation -- may be within his

18   knowledge.

19   **BY MS. HAMILTON**

20   **Q.**   When Mr. Beker said that he gave -- or that Mr. Prilik

21   asked permission to communicate, Mr. Beker replied, on line 21,

22              "'By all means.'  After all, he is not

23              a stranger, right?"

24              What did you understand that to mean?

25              Shall I rephrase the question?

1  **A.**    Yes.

2  **Q.**    When Mr. Beker said, "By all means," what did you

3  understand that to mean?

4  **A.**    That he was giving okay to Arie to prepare the grounds for

5  the second conversation on August 17th that I had with Arie.

6           **MR. HOWDEN:**  I'm going to renew my objection,

7  your Honor.

8           **THE COURT:**  Objection is sustained.

9           The answer is stricken.  The jury is instructed to

10 disregard it.

11 **BY MS. HAMILTON**

12 **Q.**    Mr. Beker referred to, on line 20 and 21, "because Dima

13 called."

14          What was the first day you called Newcon to discuss

15 the Battalion Set II contract?

16 **A.**    August 17th.

17 **Q.**    And did you subsequently have a conversation with

18 Mr. Prilik about the Battalion Set II contract on August 17th?

19 **A.**    Yes.

20 **Q.**    Now, on August 17th you testified that Mr. Beker had said

21 ATN had offered too low a price to ITE.

22          Did Mr. Beker ever discuss ATN's price on night-vision

23 goggles during the recorded conversations?

24 **A.**    Yes.

25 **Q.**    Let me turn your attention to Exhibit 111, which is a

 1  conversation you had on September 8th, 2005, with Mr. Beker.

 2  And it begins at page 9, line 24, and then goes to page 10.

 3       Oh, excuse me.  This is -- I --

 4       And if we could actually, then, go ahead, and go to page

 5  10, line 19.

 6            **THE COURT:**  Where do you want to start?

 7            **MS. HAMILTON:**  Right.  I apologize, your Honor.

 8            So if we could just start with page 10.

 9            **THE COURT:**  Okay.

10            **MS. HAMILTON:**  I'll start reading at line 10.

11  Mr. Beker said,

12                 "I understand you, but, like, I'm

13                 telling you in advance that it's unlikely

14                 anything positive would transpire.  In any

15                 event, in the nearest future, secondly, so

16                 to speak, you have to get a really serious

17                 thought, young man, if you want to stay on

18                 the market, and to deal with these devices;

19                 that is to say, the analogous ones" --

20                 And Mr. Beker continues, on line 19,

21                 -- "like we do.  So you either have to

22                 give it a really serious thought, because I

23                 will continue with the pressuring.  I can't

24                 give to you guys an opportunity to freely,

25                 ah, do the dumping; but I would put it this

1          way.  Because that which you guys did

2          not -- not on purpose.  I'm not saying --

3          once again, I'm not accusing you of doing

4          it for some special -- well, you -- you are

5          just not informed.  One can't make an offer

6          at such prices.  You understand?"

7          And you say,

8              "But" --

9          And then Mr. Beker says,

10             "Such a device cannot cost $1,500.  It

11         can't."

12         You say,

13             "I" --

14         And then Mr. Beker said,

15             "Well, meaning, from you guys, I mean.

16         You say I've got it."

17         And Mr. Beker says,

18             "It can't."

19         Now, Mr. Beker said, "Such a device cannot cost

20 $1,500."  What device was he referring to, to your

21 understanding?

22 **A.**   Night-vision goggles, second generation.

23 **Q.**   And did you believe Mr. Beker's statement to be accurate;

24 that a device could not cost $1,500?

25 **A.**   It wasn't.

1    Q.   Pardon?

2    A.   No, it was not accurate.

3    Q.   Why not?

4    A.   Because we were selling it for less.

5    Q.   And when Mr. Beker says, "Such a device cannot cost

6    $1,500, well, meaning, from you guys, I mean," what did you

7    understand Mr. Beker to be saying when he said, "meaning, from

8    you guys"?

9    A.   That he was very displeased that ATN was selling it for

10   this low price.

11   Q.   And then turn to another subject.

12       THE COURT:   I want to make an inquiry, because both

13   in this one and in one of the earlier conversations, there was

14   reference to "market."  I mean.  And does that refer to -- what

15   market does that refer to?

16       THE WITNESS:   Sales of night-vision equipment, and

17   here, more specifically, of night-vision equipment,

18   Generation II.

19       THE COURT:   And does that refer to "market" in

20   connection with Government contracts, or with commercial -- the

21   commercial market, or both?

22       THE WITNESS:   I think the discussion was here on

23   possibly agreeing --

24       THE COURT:   Well, you "think," and "possibly."

25       THE WITNESS:   Yeah.

1              **THE COURT:**  Do you understand what was being said in

2    this conversation; what market was, in fact, being referred to?

3              **THE WITNESS:**  My understanding -- it was both

4    Government, law-enforcement, and the commercial market.

5              **THE COURT:**  Okay.

6    **BY MS. HAMILTON**

7    **Q.**   And now I'd like to turn your attention to some questions

8    about the proposed written agreement.

9    **A.**   Okay.

10   **Q.**   If we could, turn first to Exhibit 139, page 3, beginning

11   at line 14.

12             **MR. HOWDEN:**  Counsel, which conversation is that?

13             **MS. HAMILTON:**  This is Exhibit 139, the

14   September 2nd, 2005.

15             **MR. HOWDEN:**  Thank you.

16   **BY MS. HAMILTON**

17   **Q.**   Mr. Beker said,

18             "So all of this is possible.  The only

19             thing is this.  I thought we'll prepare a

20             draft now, from our side, the way I think

21             this document should look."

22             -- to which you say,

23             "Mm-hm."

24             Mr. Rocklin said,

25             "We'll send it to you by e-mail."

1              You said,

2                   "Well."

3              And Mr. Beker said,

4                   "You'll look at it.  What you don't

5              like, you'll tell."

6              Now, when Mr. Beker said, "We'll prepare a draft from

7    our side, the way I think this document should look," what did

8    you understand Mr. Beker to mean by "the way I think this

9    document should look"?

10   **A.**   I need bigger piece of conversation than this, because

11   there -- there are two documents that are being discussed, back

12   and forth.  So I want to make sure that here it's a written

13   agreement or --

14   **Q.**   Oh, I apologize.  When we discussed the draft here, did

15   you understand what Mr. Beker to mean -- or you need to see

16   more of it?

17   **A.**   I need to see more.

18   **Q.**   I apologize.

19        So this is conversation 9 -- recorded conversation 9,

20   page 3, line 14.  And you've got your transcripts there, if

21   that's easier.

22        So does that refresh your recollection of what this

23   conversation was about?

24   **A.**   Yes.  Yes.

25   **Q.**   So when Mr. Beker referred to "the draft," what do you

1  understand that to mean?

2  **A.**    The draft of proposed written agreement between ATN and

3  Newcon.

4  **Q.**    Okay.  And when Mr. Beker said, "We'll prepare a draft

5  now, from our side, the way I think this document should look,"

6  what did you understand Mr. Beker to mean by, "the way I think

7  this document should look"?

8  **A.**    We discussed written agreement.  And he was proposing the

9  draft in a way he thought it should be appropriate, I guess.

10 **Q.**    I'm sorry.  Should be -- I didn't hear you.

11 **A.**    Appropriate.

12 **Q.**    And what do you mean by that:  The way he thought it

13 should be appropriate?

14 **A.**    What facts should be there; what should not be.

15 **Q.**    And at some point --

16        And you didn't want to sign the agreement?

17 **A.**    No.

18 **Q.**    And at some point, did you explain that to Mr. Beker?

19 **A.**    I did.

20 **Q.**    So if we could turn to Exhibit 110, which is the

21 conversation that you had with Mr. Beker on September 7th --

22 and I'd like to just turn to page 5, line 21 through 24.  And

23 you say,

24            "You understand?  If you take out the

25            money of the -- out of this thing, it

1          doesn't make sense."

2          Those were your words?

3   **A.**    Yes.

4   **Q.**    Now, during this conversation on September 2nd with

5   Mr. Beker, did he ever offer to put the money into the written

6   agreement?

7   **A.**    No, not during this conversation.

8   **Q.**    At any time during your conversations with Mr. Beker, did

9   he offer to include the $50,000 payment into the written

10  agreement?

11  **A.**    At any time in this conversation?

12  **Q.**    In any conversation.

13  **A.**    I don't think he ever offered.

14  **Q.**    At any time in any conversation that you had with

15  Mr. Beker, did he offer to put the $75 price -- the price to be

16  paid to ATN by Newcon for the goggles -- into the proposed

17  written agreement?

18  **A.**    No.  No.

19  **Q.**    And did Mr. Beker explain why the money should not appear

20  in the written agreement?

21  **A.**    Because that was not kosher, in my words.

22  **Q.**    Let's turn to Exhibit 108, page 25.  And Mr. Beker said,

23              "Let's put it this way.  If we reach an

24          agreement about something, this is kosher;

25          but if it is also connected with the money,

1              this is no longer kosher; but after all, we

2              can reach an agreement that we take over

3              3,700, or as many as there is, according to

4              the contract, this and that, due to the

5              fact" --

6         And when you just said, "because it's, in your words,

7    no longer kosher," did -- what was your understanding about

8    whether or not Mr. Beker agreed with your analysis?

9    **A.**   Here, he was agreeing with me that it was not kosher.

10   **Q.**   Now -- and at any time did you discuss the proposed

11   written agreement with Mr. Prilik?

12   **A.**   Yes.

13   **Q.**   If we could, turn to Exhibit 142, which is your

14   conversation with Mr. Prilik on September 20th, 2005.  And

15   beginning at page 13, line 14, you say,

16              "As of today, I don't quite understand

17              why you guys need it."

18         What was the "it" you were referring to there?

19   **A.**   The written agreement.

20   **Q.**   Mr. Prilik said,

21              "It's needed from a purely legal

22              standpoint between us, so that one would

23              understand, ah, the money movement, ah, and

24              then" --

25         And you reply,

1           "But money is not mentioned there in

2       any way."

3       -- to which Mr. Prilik said,

4           "Okay, Dima.  I am only reporting what

5       I was asked to report."

6       Now, you mentioned that money -- you said, "Money is

7   not mentioned there in any way."At any point during this

8   conversation, did Mr. Prilik --

9           Well, let me back up.

10          Why did you say money was not mentioned?

11  **A.**   Because right there on line 18, Mr. Prilik, referring to

12  the legal standpoint, that written agreement would explain the

13  money movement.

14  **Q.**   Now, during this conversation with Mr. Prilik, did he ever

15  offer to put, as you call it, the "money movement" -- the

16  money -- into the proposed written agreement?

17  **A.**   Not during this conversation, no.

18  **Q.**   Did he offer it during any conversation to put the $50,000

19  payment from Newcon to ATN into the proposed written agreement?

20  **A.**   I don't recall right now.

21  **Q.**   Do you have some -- are you -- do you have some

22  recollection that he may have offered to put the $50,000

23  payment into the written agreement?

24  **A.**   I think at one point, there was a discussion of some sort,

25  very late in one of the last conversations, or something that

1  just give us some sort of agreement.  And I -- I don't recall

2  right now.

3  **Q.**  So this conversation occurred on September 20th with

4  Mr. Prilik.  What, if any, other conversations did you have

5  with him after this conversation?

6  **A.**  That was the last conversation.

7  **Q.**  Now, Mr. -- Mr. Howden said yesterday that Mr. Beker

8  claimed he suggested putting money into the contract.

9      And did -- was money discussed in connection with the

10  proposed written agreement?

11  **A.**  Would you repeat the question?

12  **Q.**  Sure.  Was -- was putting any money -- well, money was

13  discussed in connection with the proposed -- or with the actual

14  agreement between ATN and Newcon.  Is that right?

15  **A.**  Yes.

16  **Q.**  And at some point in time, was the subject of putting

17  money into -- at the very beginning, putting money into a --

18  some type of draft or some type of letter discussed with

19  Mr. Beker?

20  **A.**  Yes.

21      **MS. HAMILTON:**  So, if we could, turn to Exhibit 138,

22  which is your conversation with Mr. Beker on September 2nd.

23  And if we could, go to page 22, line 23.

24      And then you can -- actually, more -- put more of the

25  text on the screen, please.  The next part, too.

1   Q.   Mr. Beker said,

2              "We don't work, either.  Therefore, in

3         order not to lose time, you need right now,

4         in the morning, put aside all the matters

5         that are, well, less urgent, and prepare

6         that draft for the customs, which would

7         allow subsequently to prepare the letter

8         for Ramzi."

9         -- to which you say,

10            "Okay."

11        And then Mr. Beker said,

12            "I think that maybe you simply write

13        freely what we decided concerning this

14        contract.  You can write everything you

15        want, if you want to write there

16        everything.  And we need contract."

17        To which Mr. Rocklin says,

18        "Yes."

19        And -- to which you -- and Mr. Beker then says,

20            "But I don't think" --

21        And, Mr. Rocklin said -- you said,

22            "Do you hear what -- do you hear what

23        you were talking about?"

24        And Mr. Beker said,

25            "But I think that it is bad."

1          And you replied,

2              "Well, of course, it is bad.  So,

3          once" --

4          Mr. Beker said,

5              "I think it is bad."

6          When, if ever, did he suggest putting money into the

7  agreement -- into the proposed written contract?

8  **A.**   Not after that.

9  **Q.**   Pardon?

10 **A.**   He did not propose.

11 **Q.**   And, turning to -- staying with the proposed written

12 contract, and whether or not there was ever an offer to put --

13 put money, by either -- by Mr. Prilik, that perhaps the $50,000

14 should be placed into the written agreement, can I turn your

15 attention to Exhibit 142, which is the conversation with

16 Mr. Prilik on the 20th, page 10?  And starting at line 8,

17 Mr. Prilik said,

18             "As of today, we don't have anything

19         but oral agreements oral agreements, then.

20         In order to have it done right, could I ask

21         you to edit it?  Take out whatever you

22         don't like, but, like, to put it in

23         writing -- our agreement."

24         What, if any, understanding did you have based on

25 this statement that Mr. Prilik was offering to put $50,000 --

1    the $50,000 payment from Newcon to ATN into the proposed

2    contract?

3    **A.**   He did not specifically discuss that.

4    **Q.**   And then, turning to page 11, line 24, just the bottom

5    line.

6              "Okay," Mr. Prilik said.

7         You said,

8              "I am not entirely sure why we need to

9         put everything on the paper."

10        Mr. Prilik said,

11             "Okay.  Not to put everything, but

12        there was some agreement reached, and one

13        would like to put it in writing.  Take out

14        everything that you don't like.  To save

15        time, we produced the first draft, so to

16        speak.  If you can, spend a couple of

17        minutes, and produce your draft."

18        Now, based on this -- this portion of the

19   conversation, what, if any, understanding did you have that

20   Mr. Prilik was offering to put the $50,000 payment from Newcon

21   into ATN -- into the proposed written agreement?

22   **A.**   I don't think he was offering that at all.

23   **Q.**   And what, if any, was your understanding that Mr. Prilik

24   was offering to put into the proposed written agreement the $75

25   payment by Newcon to ATN for each pair of goggles Newcon

1    supplied?

2    **A.**    He wasn't offering that, either.

3    **Q.**    So, based on your review, then, of this -- of the portions

4    of the conversation with Mr. Prilik, when, if ever, did he

5    offer to put the $50,000 payment from Newcon to ATN into the

6    proposed written agreement?

7    **A.**    Never.

8    **Q.**    And when, if ever, did he offer to put this $75 payment

9    from Newcon to ATN for goggles Newcon would supply into the --

10   **A.**    Never.

11   **Q.**    -- into the proposed written agreement?

12   **A.**    Never.

13   **Q.**    Okay.  Now, Mr. Howden pointed out yesterday that, at the

14   time that the agreement was sent, the proposed written

15   contract, on September 2nd, that -- that no financial terms had

16   been reached, and that the $50,000 wasn't paid until five days

17   after the proposed written agreement had been sent to you.  Is

18   that right?

19   **A.**    Yes.

20   **Q.**    Now, what date was the proposed written agreement sent to

21   you?

22   **A.**    September 2nd.

23   **Q.**    And you've already testified about the consolation prize

24   that Mr. Beker offered to you.  What date did you first discuss

25   a consolation prize with Mr. Beker?

1    **A.**    August 30th.

2    **Q.**    If we could turn to Exhibit 105, page 54 -- beginning at

3    page 54, line 17.

4              **THE COURT:**    Page 54?

5              **MS. HAMILTON:**    Yes, your Honor, beginning at line 17.

6    **Q.**    Mr. Beker said:

7              "As for the 3,000, the rest I'm willing...

8              ah, willing, probably in case of a successful

9              scenario, a completion of this entire

10             scenario, probably I'm willing to discuss the

11             matter of, well, that consolation prize.

12             Well, naturally it's not going to be

13             100 percent of what you guys have today."

14    So just to set the stage, what was your understanding of

15    what Mr. Beker meant by "completion of this entire scenario"?

16    **A.**    That ATN would not deliver the remainder of the goggles

17    for phase one of Battalion Set II, and Newcon would deliver

18    those goggles.  Then we are discussing the consolation prize.

19    **Q.**    When Mr. Beker referred to on line 22, "It's not going to

20    be 100 percent of what you guys have today," what did you

21    understand him to mean when he said "what you guys have today"?

22    **A.**    We have discussed in the past approximate profit that ATN

23    was making and approximate range of $200.

24    **Q.**    And was there additional discussion with Mr. Beker on that

25    day about that additional range of ATN's profits?

1  **A.**    Yes.

2  **Q.**    And about what payment, then, Mr. Beker would make to ATN

3  based on that additional range?

4  **A.**    Yes.

5  **Q.**    Okay.  So if we could then just stay on the same exhibit,

6  move to page 59, line 4?  Mr. Beker said:

7              "Yes, I... I think that... on the whole, that

8              any half of your profit that it's fair."

9       What did you understand Mr. Beker to mean when he said

10 "any half of your profit, that it's fair"?

11 **A.**    That he thought it would be fair to pay approximately half

12 of the $200 that ATN was making by selling goggles to ITE in

13 Battalion Set II.

14 **Q.**    And that amount, half of your profits would be paid by

15 whom to ATN?

16 **A.**    By Newcon.

17 **Q.**    You then say:

18              "That is to say, in the neighborhood of

19              $100."

20       And Mr. Beker said:

21              "Well, I don't know how much you guys have...

22              but you say 200, which, like, I don't agree,

23              but..."

24       And you said:  "Well..."

25       Mr. Beker said:

1           "I can't... I can't argue because, as it

2           were -- oh, well, any rate between... between

3           as I thought 75, 50, 150, well, that is to

4           say, well such is the range."

5      Now, at this point what did you understand Mr. Beker's

6  reference to 75, 50, 100 to mean?

7  **A.**   It was a range between 50 to $100 representing about half

8  of the profit that ATN was making and to be paid by Newcon to

9  ATN in the event that ATN will not deliver.

10 **Q.**   And was that range then in the subsequent conversation

11 with Mr. Beker, was there -- discussed further?

12 **A.**   Yes.

13 **Q.**   And let's then turn to your conversation with Mr. Beker

14 that's reflected in Exhibit 136.

15     When was the next time you spoke with Mr. Beker?

16 **A.**   On, I believe, next day.

17 **Q.**   That would be August 31st, I think?  Was it -- was it

18 September 1st?

19 **A.**   September 1st.

20 **Q.**   Okay.  If we could turn to page 17, line 15.

21     Mr. Beker said:

22          "That's why I think that... I am afraid that

23          I... well, not... I won't go higher than 75

24          because I checked all the numbers one more

25          time.  Well... your, your net profit ah...

1                   based on all the information that I have is

2                   lower than $150.  That is to say, it's

3                   unfair."

4      When Mr. Beker said he won't go higher than 75, what did

5  you understand he was referring to?

6  **A.**   Again, the amount from that range of 50 to $100 that would

7  be paid to ATN by Newcon for not delivering, for each goggle

8  that would not be delivered.

9  **Q.**   And that amount was based on Mr. Beker's calculation of

10  half of ATN's profits?

11  **A.**   Approximately.

12  **Q.**   Okay.  And then if we could turn to page 18, line 8,

13  beginning on line 8.  Mr. Beker said:

14                   "I understand, but if I... I don't want to

15                   use now, take it or leave it."

16      To which you reply:

17                   "I... I understand everything."

18      Mr. Beker said:  "I don't want to..."

19      And you said:

20                   "75, you... put me on the frigging spot."

21      Mr. Beker said:  I..."

22      You replied:  "Fine."

23      Mr. Beker then said:

24                   "I believe that it is more than reasonable by

25                   all means."

1    And then you again -- excuse me.  Then you said:

2         "But you have to understand that..."

3    And Mr. Beker said:

4         "You want 50?  I'll send you 50 tomorrow."

5    To which you replied:  "Okay."

6    So let me just work with -- or ask about the first part

7    beginning on page 8.  When Mr. Beker said, "I understand, but

8    if... I don't want to use now take it or leave it," what did

9    you understand he was referring to?

10   **A.**   That $75 was his final offer at this point.

11   **Q.**   And you then said:  "You put me on the frigging spot."

12   Why did you say that?

13   **A.**   Because prior we discussed $100 per goggle.

14   **Q.**   And on line 14 you say:  "Fine."  Why did you say that?

15   **A.**   I was agreeing on $75,000.

16   **Q.**   Okay.  And looking then down to line 18, Mr. Beker said:

17        "You want 50?  I will send you 50 tomorrow."

18   To which you reply:  "Okay."

19   What did you understand Mr. Beker's reference to 50 to be

20   there?

21   **A.**   In previous discussion it's $50,000 as advance payment.

22   **Q.**   So when Mr. Beker said:  "I'll send you 50 tomorrow," what

23   did you understand him to mean?

24   **A.**   That tomorrow he will arrange for the wire for $50,000.

25   **Q.**   And when you said, "Okay," why did you say that?

1  **A.**    I was agreeing with that.

2  **Q.**    And this was on September 1st.

3       On what day then did you receive the proposed written

4  agreement from Mr. Beker?

5  **A.**    September 2nd.

6  **Q.**    So what, if any, was your understanding as to the

7  financial terms that were reached on September 1st in your

8  conversation with Mr. Beker before you received that

9  September -- that proposed written agreement on September 2nd?

10 **A.**    That on September 2nd I was expecting a wire already to be

11 taken place.

12 **Q.**    So what did you understand were the terms -- you expected

13 a wire?  What did you mean?

14 **A.**    That the terms were that ATN will be paid $75 for every

15 goggle that ATN will not deliver, and the downpayment of

16 $50,000 will be made.

17 **Q.**    Okay.  So I would like to turn your attention to Exhibit

18 48.  And if I could turn your attention to CIVI-0017 within

19 Exhibit 48.

20 **A.**    Okay.

21 **Q.**    This was in -- you've seen this document before?

22 **A.**    Yes.

23 **Q.**    And what is it?

24 **A.**    That's email sent to me by Mike asking for a loan refund.

25 **Q.**    So after the bullet points the sentence reads:

1              "All of the above leads me to believe that

2              you do not intend to keep your part of the

3              agreement."

4      What did you understand the reference to "agreement" to

5  mean in this email from Mr. Beker?

6  **A.**   The agreement that ATN would not deliver on Battalion Set

7  II and Newcon will.

8  **Q.**   And if I could then turn your attention to CIVI-19 of

9  Exhibit 48?

10             (Document displayed)

11             **MS. HAMILTON:**  And, your Honor, this is a little

12  complicated, but the copy that's in the civil suit of Exhibit

13  48, CIVI-0019 is illegible.  So what I would like to do is just

14  admit into evidence a legible copy.  It's been previously --

15             **THE COURT:**  That would be better, yes.

16             **MS. HAMILTON:**  I think so.  It's been previously

17  marked as Exhibit 52.  If you wanted just to admit 52 as well?

18             **MR. HOWDEN:**  No objection, your Honor.

19             **THE COURT:**  52 is admitted.

20             (Trial Exhibit 52 received

21              in evidence)

22             **MS. HAMILTON:**  Thank you.

23             **THE COURT:**  And for the jurors' assistance when they

24  get the exhibits, that is the  legible copy of what is in 48.

25  This is the legible copy of a page, one of the pages in Exhibit

1   48, right?

2              MS. HAMILTON:  Correct.

3              THE COURT:  Which page is that?  Does it have a Bates

4   No. or an exhibit -- separate sub-exhibit number?

5              MS. HAMILTON:  What we have -- it is Bates stamped as

6   Exhibit Number CIVI-0019.  And what we will do is substitute

7   it, or also submit FBI-068.

8              THE COURT:  Okay.  Go on.

9   BY MS. HAMILTON

10  Q.   The first paragraph of the letter states:

11           "The primary purpose of this letter is to

12           inform you as per our contractual agreement

13           that the entire loan amount and accompanying

14           interest is overdue and payment must be made

15           to Newcon Optik immediately."

16       Do you recognize this letter?

17  A.   Yes.

18  Q.   And who did you receive it from?

19  A.   From Michael Beker.

20  Q.   And the reference to "as per our contractual agreement,"

21  in the first paragraph, what did you understand that to refer

22  to?

23  A.   We did not have a written contractual agreement.

24  Q.   Was there -- what, if any, verbal agreement did you

25  believe there was between yourself and Mr. Beker?

1  A.   That ATN would get paid $75 per each goggle to get out of

2  the Battalion Set II, not to deliver, and Newcon will.

3  Q.   I would like to change -- move to another subject.

4  A.   Okay.

5  Q.   This is the invoice that has been previously discussed,

6  which is Exhibit 4.

7      Now, you previously testified that Mr. Beker instructed

8  you to write "loan" on this invoice, is that right?

9  A.   Yes.

10  Q.  And Mr. Howden yesterday said that -- pointed a statement

11  by Mr. Beker indicating that Mr. Beker expected the $50,000 to

12  be paid back if Newcon did not supply the night vision goggles

13  under the Battalion Set II contract; do you remember that?

14  A.   Yes.

15  Q.   I would like to turn your attention to a conversation you

16  had with Mr. Beker on September 2nd., which is Exhibit 138, and

17  specifically to page 8, line 22.

18      Now, Mr. Beker said:

19          "Dima, there are things that, well, even a

20          brother is not... well, not entrusted it

21          because... when three people know, everybody

22          knows it then."

23      To which you reply:

24          "A pig knows it.  This is unequivocal."

25      Mr. Beker then said:

1              "You see there are such things that, well...

2              especially by your laws, and our laws are

3              almost identical."

4        You said:  "Yes."

5        And Mr. Beker said:

6              "Listen, I want to sleep in peace."

7        What was your understanding -- what, if anything, did you

8   do that precipitated this response from Mr. Beker?

9   **A.**   They send that invoice to Arie and Mr. Beker.

10            **MS. HAMILTON:**  Your Honor, I have just a few more.

11   The next portion is rather long.  I don't know if you want to

12   stop for a break now.

13            **THE COURT:**  This might be a good time.  How much

14   longer do you plan on being redirect?

15            **MS. HAMILTON:**  I'm hoping no longer than 30 to 45

16   minutes at the most.

17            **THE COURT:**  Okay.  So we'll take a recess.

18            Please follow the instructions about not discussing

19   the case amongst yourselves or with anyone else at all, and not

20   forming or expresses any opinion at all until the matter is

21   submitted to you ultimately for deliberation.  And we'll see

22   you in 15 minutes.

23            And you may step down, Mr. Rocklin.  And, again, do

24   not discuss your testimony with anyone.

25            (Jury exits courtroom at 10:26 a.m.)

ROCKLIN - REDIRECT EXAMINATION / HAMILTON

 1         **THE COURT:**  We'll see you in 15 minimums.

 2         **MR. HOWDEN:**  Your Honor, perhaps before of the jury

 3   comes back, we could take up an issue that I don't think is

 4   appropriate to raise in front of them.  Do it now or before

 5   they come in?

 6         **THE COURT:**  Do it now.

 7         **MR. HOWDEN:**  The government informed us yesterday

 8   that they had contacted this witness's counsel --

 9         **MS. HAMILTON:**  I'm sorry.  Should Mr. Rocklin be

10   present for this?

11         **MR. HOWDEN:**  You're right.  He should be excused.

12   Thank you.

13              (Witness steps out.)

14         **THE COURT:**  Yes.  They contacted his counsel?  Mr.

15   Rocklin's counsel?

16         **MR. HOWDEN:**  Yes, following his testimony and

17   regarding the attachments to the email, and that they, in turn,

18   contacted their client, had a discussion with him and that he

19   took some actions thereafter, checking on the status of the

20   email and then -- well, perhaps --

21         **MS. HAMILTON:**  We called counsel to find out about if

22   we could produce the electronic version of this document, of

23   the agreement, and which there's a statement made by defense

24   counsel that a letter, the force majeure letter was not

25   attached.  And so we reached out to counsel to try to get

1  electronic copies so we could then produce it to defendants,

2  and we could review it as well to see if there was any reality

3  or truth there was to the allegation.

4          That's -- and then what we were told by counsel is

5  that Mr. Beker had independently, apparently, reviewed his

6  files and found that document, the email, with the proposed

7  written agreement --

8          **MR. COHEN:**  Rocklin.

9          **MS. HAMILTON:**  I'm sorry.  Mr. Rocklin had

10 independently used his computer, had found that electronic file

11 emailed to Mr. Beker that contained the proposed written

12 agreement, but that that email did not contain the other

13 document, what we've been referring to as the force majeure

14 letter, which was purported to be a letter --

15         **THE COURT:**  This was the draft of a proposed force

16 majeure letter?

17         **MS. HAMILTON:**  Correct.  That would be signed by

18 Russian customs.

19         **THE COURT:**  Which, of course, we should have

20 explained that term to the jury, other than have them get it

21 from the witness, but maybe we could do that as well.

22         **MS. HAMILTON:**  Okay.

23         **THE COURT:**  But, so Mr. Rocklin did not have it, but

24 the attorneys had it?  Is that what you are saying?

25         **MS. HAMILTON:**  They had a -- they have a copy of

 1   it -- or they are trying to get -- we still haven't gotten it

 2   yet.  They have take copy of the electronic version that we are

 3   trying to get a hold of.  We do not have it in our custody.

 4           MS. BOERSCH:  But it does not have the second

 5   attachment.

 6           MS. HAMILTON:  Right.

 7           MS. BOERSCH:  Nobody has that second that.

 8           THE COURT:  The second attachment being the force

 9   majeure letter.

10           MS. HAMILTON:  That's right.

11           THE COURT:  Well, so what's the --

12           MS. HAMILTON:  I assumed that there was going to be

13   cross-examination on it.

14           MR. HOWDEN:  Well, it's hard for us to cross examine

15   on something that we don't understand the facts and we haven't

16   seen the document.

17           MS. HAMILTON:  What document?  I'm sorry?

18           MS. BOERSCH:  The electronic version --

19           MR. HOWDEN:  The electronic version of the email that

20   does not have the customs letter attached to it.

21           THE COURT:  Well, because you can't tell right now

22   where it came from, right?  I mean, it's there, but where did

23   it come from?

24           MR. OSTERHOUDT:  It came from -- he created it

25   himself.  It's a lie.  It's perjury.

 1              THE COURT:  Well, I know that's what your contention

 2   is, and maybe that's correct; but if it -- so what are we

 3   supposed to do about this?

 4              MR. OSTERHOUDT:  Have a Grand Jury investigation.

 5              MR. HOWDEN:  Well, I think there should be some

 6   inquiry, at a minimum, with the witness outside the presence of

 7   the jury as to what actually happened, what he found, have him

 8   produce whatever it is that he has, so we can satisfy ourselves

 9   what the actual facts are.

10              MS. BOERSCH:  And another issue, your Honor --

11              THE COURT:  Well, should that be done outside the

12   presence of the jury?

13              MR. HOWDEN:  That's what I'm suggesting.

14              THE COURT:  Outside the presence of the jury?  I

15   mean, after all, he has testified about it.

16              If, in fact, it didn't exist and was created, then it

17   seems to me that's the kind of facts you want to bring out

18   before the jury, right?

19              MR. MOORE:  Perhaps he should have advice of counsel

20   as to whether he may need to be taking some Fifth Amendment to

21   protect himself.

22              MR. HOWDEN:  I'm happy to cross examine him on it and

23   let him dig the hole further, but I -- I'm just uneasy about

24   this whole procedure.

25              MS. BOERSCH:  Your Honor, the other issue -- I mean,

1  the government is now on notice that he's -- so far, at least,

2  it appears he's committed perjury, and I think the government

3  has certain obligations to inquire further as to that on its

4  own, quite apart from this case.

5          Another concern of mine is that he was instructed,

6  and they were instructed, not to have any contact with him

7  while he was on cross-examination, and I think contact through

8  his counsel is the same as contact with him.  That also seems

9  to me to be an issue that we ought to explore.  I don't know

10 what conversations they had with his counsel that might have

11 been passed on to him.

12         But at any rate, at the minimum, the government, it

13 seems to me, has an obligation to determine -- this witness, it

14 appears, has committed perjury and the government is on notice.

15         **MR. OSTERHOUDT:**  And obstructed justice.

16         **MS. BOERSCH:**  And obstructed justice, because this

17 was presented to the Grand Jury as if it were the second

18 attachment to the email.

19         **MS. HAMILTON:**  Well, the representations to -- the

20 United States made -- or made no representations or no

21 communications with counsel other than to ascertain if there is

22 an electronic version of that document, because we believed it

23 was our obligation to determine if that was the case, as -- if

24 there were issues with it, to make sure that they were fully

25 developed in the context of this trial.

1          **MR. HOWDEN:**  They certainly aren't fully developed at

2     this point.

3          **MS. HAMILTON:**  Well, it's certainly a step in that

4     direction.  We have done nothing --

5          **THE COURT:**  The question now is whether or not you,

6     you know, take some testimony from him outside the presence of

7     the jury and, you know, if you believe that it was created by

8     him, then instruct him as to his Fifth Amendment rights; but

9     ultimately he's going to have -- you know, they are certainly

10    entitled to go into that before the jury.

11         **MS. HAMILTON:**  We don't disagree with that, your

12    Honor.  I mean, I agree that he needs to be instructed as to

13    his rights to determine whether or not he wants to take the

14    Fifth Amendment on the issue, but we are not opposing

15    cross-examination on this issue, other than making sure that

16    Mr. Prilik knowingly -- if he does waive that right, he

17    knowingly waives it.

18         **THE COURT:**  You mean, Mr. Rocklin.

19         **MS. HAMILTON:**  I'm sorry.  Mr. Rocklin, yes.

20         **MR. OSTERHOUDT:**  We have no problem with going

21    forward in front of the jury.  I think we thought we would

22    raise it with the Court because we are concerned about it.

23         We are prepared to examine him in the jury's presence

24    about it, if that's the Court's pleasure, but --

25         **THE COURT:**  As you know, whenever a witness takes the

 1  stand, there is the possibility that they will commit perjury,

 2  you know.

 3         And if you're examining him about certain documents

 4  and he has made certain representations, you can't just, you

 5  know, advise him before asking him a set of questions, you

 6  know, if you give false testimony with respect to your answers,

 7  that is perjury, which is a felony, and you may be charged,

 8  et cetera, and you have a right to assert your Fifth Amendment

 9  right.

10         I mean, that happens with all testimony.  You never

11  know what a witness is going to say, whether the witness is

12  going to, you know, be truthful or commit perjury.  So --

13         **MS. HAMILTON:**  Well, I guess the first issue, your

14  Honor, is if we have -- the United States has the opportunity

15  to contact ATN's counsel, who is also -- had been the liaison

16  with Mr. Rocklin to lay out the issue and whether or not he --

17  we could find out whether or not he is going to invoke his

18  Fifth Amendment -- what, if any, Fifth amendment --

19         **THE COURT:**  But they're not here.

20         **MS. HAMILTON:**  I can call them on the telephone.

21         **MR. MOORE:**  Your Honor, I thought that was the whole

22  purpose of the instruction not to contact him while he was on

23  the stand.  I mean, now we're going a step further, to give his

24  counsel a heads up that maybe he is going to come in here and

25  commit perjury.

ROCKLIN - REDIRECT EXAMINATION / HAMILTON

1    I think we are entitled to the benefit of your order

2  so that he can get on the stand and we can cross examine him.

3  If it comes up to the point where it looks like there is a

4  problem, then the Court can intervene.  But I think to preview

5  this --

6         **THE COURT:**  Well, I don't know, and I don't think

7  that -- that doesn't preclude them from contacting his

8  attorney.  And, certainly, the order did not go that far,

9  because he is entitled to consult with counsel as well.  I

10  mean, and they are not acting under the direction of the U.S.

11  Attorney's Office.

12    So, you know, in their attempt to find where is this

13  missing page from the email, they certainly were entitled to

14  contact his counsel.

15    What would you -- who is going to conduct the

16  recross?  Are you going to be doing that, Mr. Howden?

17         **MR. HOWDEN:**  We haven't decided.  I probably will.

18         **THE COURT:**  And you're going to ask him about those

19  documents?

20         **MR. HOWDEN:**  I certainly will, your Honor.

21         **THE COURT:**  Um-hum.  Why don't we take care of that

22  when we get there --

23         **MR. HOWDEN:**  Very good.

24         **THE COURT:**  (Continuing) -- see what happens?

25         **MS. HAMILTON:**  So do not contact his counsel

 1  regarding this issue?

 2          **THE COURT:**  Well, you've already contacted them --

 3          **MS. HAMILTON:**  I mean, in terms of his Fifth

 4  Amendment rights, just to make sure he's clear on -- that he

 5  has them and that there's a knowing waiver.  That's my only

 6  concern.

 7          **THE COURT:**  Well, the thing is, you know, he may have

 8  committed perjury several times on the stand already.  I don't

 9  know, you know.  Maybe he didn't.  I'm not opining.

10          I'm just saying.  I don't know with a witness, you

11  know, necessarily whether they have or not.  And so why is this

12  question different from all other questions?

13          **MS. BOERSCH:**  I think it's different because the

14  government is on notice now, given the response from Rocklin's

15  lawyers, that, in fact, there was no second attachment to that

16  email.  It's not just speculation as to whether he lied about

17  it.  They are on notice.  Everybody is on notice that he, in

18  fact, lied repeatedly about the fact that that second letter

19  was attached to the email.

20          **THE COURT:**  Well, you want to call his counsel then,

21  and then we'll bring him back and just before we call the jury

22  back in.  Okay?

23          **MR. HOWDEN:**  Very good, your Honor.

24          **MS. HAMILTON:**  Thank you, your Honor.

25          **THE COURT:**  Okay.  So you need to get on the phone

 1   and talk with him right away.

 2            (Whereupon there was a recess in the proceedings

 3            from 10:37 a.m. until 11:05 a.m.)

 4            **THE COURT:**  You may be seated.

 5            What do we know now that we didn't know before the

 6   recess?

 7            **MS. HAMILTON:**  That Mr. Rocklin is prepared to

 8   testify at this time about the force majeure already.

 9            **THE COURT:**  Okay.  And have you spoke with his

10   attorney?

11            **MS. HAMILTON:**  I spoke with his counsel and his

12   counsel said that he's fully aware and ready to testify.

13            **THE COURT:**  Okay.  You understand that?

14            **THE WITNESS:**  Yes, I do.

15            **THE COURT:**  And if you make any false statements on

16   the stand, that may subject you to perjury, which is a felony;

17   do you understand that?

18            **THE WITNESS:**  Yes.  I understand that.

19            **THE COURT:**  Okay.  Fine.

20            I don't want to shout.  You want to go knock on the

21   door and tell Mr. Bowser that we're ready?

22            (Jury in at 11:06 a.m.)

23            **THE COURT:**  You may be seated.  And may be seated,

24   Mr. Rocklin.

25            And you may continue.

 1          MS. HAMILTON:  Thank you, your Honor.

 2   BY MS. HAMILTON

 3   Q.   I had a quick follow-up question just regarding the

 4   proposed written agreement.

 5        Yesterday Mr. Howden made a point how you never modified

 6   that agreement.  Why did you not modify that agreement?

 7   A.   Because ATN at the time was truly intent to deliver it.  I

 8   knew that any agreement would be used against ATN.

 9   Q.   Used by whom?

10   A.   By Newcon.

11   Q.   Did you have an understanding as to how Newcon would use

12   that letter, that proposed agreement?

13          MR. HOWDEN:  Lack of foundation.  Calls for

14   speculation.

15          MS. HAMILTON:  I asked, did he have an understanding.

16          THE COURT:  Or maybe a belief.

17          MS. HAMILTON:  A belief.

18          THE COURT:  We are not talking about his

19   understanding, what was said to him by someone else.

20          MS. HAMILTON:  That's true.

21          THE COURT:  Okay?

22          MS. HAMILTON:  Yes, your Honor.

23          THE COURT:  But that's answered with just a "yes" or

24   "no."  Then depending on your answer, we'll take it from there.

25   A.   Yes.

 1  **BY MS. HAMILTON**

 2  **Q.**   And what was that belief based on?

 3          **MR. HOWDEN:**  Objection.  Relevance, your Honor.

 4          **THE COURT:**  Objection is overruled.

 5  **A.**   Later on they demanded a written agreement very strongly.

 6  And I believed that this agreement would be used to send that

 7  to TACOM or Russian suppliers or anyone in the industry.

 8  **BY MS. HAMILTON**

 9  **Q.**   And what was the basis for that belief that you had?

10  **A.**   Just the way they were -- keep asking for it.  And the

11  information within the agreement itself was so misleading.

12  There were so many statements that were not true, that have I

13  taken everything out, then there would be nothing pretty much

14  left of that agreement.

15  **Q.**   Nothing left that agreement to provide to the defendants?

16  **A.**   Yes.

17  **Q.**   So I'd like to turn to another subject now.

18      And during your questioning by Mr. Howden yesterday, if I

19  could turn your attention to your tab number eight, and it's

20  Exhibit No. 51.  Your tab eight is the email, nine is the

21  agreement, and ten is the document labeled "Letterhead."  Do

22  you have those?

23  **A.**   Yes.

24  **Q.**   Now, you testified that the document that -- Exhibit 51,

25  that's labeled FBI-043, was attached to the email that Mr.

1    Beker sent to you on September 2nd, is that right?

2              (Document displayed)

3    **A.**   I did not testify to that yesterday.  I testified to that

4    on Tuesday.

5    **Q.**   Okay.  And on Tuesday you said that this document, FBI-043

6    was attached to the email that you received from Mr. Beker on

7    September 2nd, is that right?

8    **A.**   Yes.

9    **Q.**   And why did you say that?

10   **A.**   Because at the time I was asked that on Tuesday, that was

11   my best recollection.

12   **Q.**   And is that accurate?

13   **A.**   No.

14   **Q.**   Why not?

15   **A.**   Umm, that they, counsel, ticked me off with suggesting

16   that I fabricated this to get over the FBI.  And I went back

17   that night to the emails of 2005, wanted to find this

18   attachment, and I did not find that attachment.

19   **Q.**   Did you find the email that is at the beginning of

20   Exhibit 51?

21   **A.**   Yes.

22   **Q.**   And did you -- and where did you find that?

23   **A.**   In my archive files.

24   **Q.**   And when you say your "archive files," what does that

25   mean?

1  **A.**    In my archive files of emails from 2005 at ATN.

2  **Q.**    On your computer?

3  **A.**    Yes, on my computer.

4  **Q.**    And what was attached to the email that you received from

5  Mr. Beker on September 2nd?

6  **A.**    It had only one attachment, the proposed agreement, but

7  not this letter.

8  **Q.**    Okay.   When you say "this letter," you mean FBI-043?

9  **A.**    Yes.

10  **Q.**    What, if any, is your understanding as to where this

11  letter came from?

12  **A.**    I read this and re-read this and more and more I start

13  understanding that -- it was five years between me seeing this

14  letter and when it was at first discussed with the FBI, and I

15  believed that I was the one who wrote that letter.

16  **Q.**    Why do you believe that?

17  **A.**    Well, because at first I thought that, gosh, maybe this

18  letter came in through the fax, but then it had no fax stamping

19  on it or anything like this.   So I started reading this letter

20  time and time again, and some of the language in here I started

21  understanding could be language that I used.

22       In that conversations prior to September 2nd, and on

23  September 2nd, I think, we going back and forth who is going to

24  be preparing this letter.   And five years after when I reviewed

25  the report, it said there are two attachments in there.   So I

1  start believing that it was an attachment.

2      But then after me testifying on Tuesday and checking into

3  it, I wanted to have a clear conscience.  So I contacted my --

4  I mean, I talked to my attorneys and was trying to inform

5  somehow Court here that I -- what I said in regards of this

6  specific document was wrong on Tuesday.

7  **Q.**   Now, the letter itself discusses -- excuse me.

8          (Brief pause.)

9  **Q.**   Now, you referred to a report that you reviewed that said

10 that there were two attachments.  What were you referring to

11 there?

12 **A.**   Well, the letter actually had only one attachment, but it

13 could be that one -- when I discussed this with the FBI, I

14 mentioned that it had a two-page attachment, and that's how

15 that was interpreted.  I don't know.

16     At no moment I had an intention to --

17          **MR. OSTERHOUDT:**  Excuse me.  There is no question.

18          **THE COURT:**  There is no question.  "At that moment,"

19 et cetera, et cetera, is stricken at the beginning of this last

20 sentence.

21 **BY MS. HAMILTON**

22 **Q.**   So what, if anything, did you tell the FBI about that

23 force majeure letter -- excuse me, about the FBI-043 letter?

24 **A.**   Back in 2005 I don't recall exactly what happened, but I

25 definitely did not tell them that -- I think it was -- this

1  letter was discussed with FBI and I showed it to them, because

2  it was a discussion of preparation of force majeure letter.

3  Q.   Looking at Exhibit 138, which is a transcript of a

4  conversation you had with Mr. Beker on September 2nd, if you

5  could turn to page 23, line 1 Mr. Beker said:

6              "Put aside all the parties that are, well,

7              less urgent.  Prepare that draft for the

8              customs which would, would allow subsequently

9              to prepare the letter for Ramzi."

10     What did you understand was being -- Mr. Beker was

11 referring to when he said "prepare that draft for the customs"?

12 A.   We were discussing here preparation of the letter that

13 would later -- the language of the letter that would be

14 later -- look like a letter from, or submitted from Russian

15 customs that could possibly limit ATN's liability to ITE.

16 Q.   And by the end of this conversation with Mr. Beker, what,

17 if any, instructions did he provide about preparing the draft

18 for customs?

19 A.   Don't recall right now.

20 Q.   What, if any, understanding did you have at the end of

21 this conversation that you would create a letter to prepare a

22 draft for customs or that Mr. Beker would create a letter to

23 prepare a draft for customs?

24 A.   I think it was up to me to prepare the draft for customs.

25 Q.   When you provided this letter, number FBI-043, to the FBI,

1  did you intend to mislead the FBI --

2  **A.**   No.

3  **Q.**   (Continuing) -- into believing that Mr. Beker had provided

4  this letter?

5  **A.**   I never intended to mislead an FBI.  If Agent Haynie filed

6  this as second attachment, it was misunderstanding of some

7  sort.

8  **Q.**   And when you testified originally that you believed this

9  letter was attached to an email sent from Mr. Beker, did you

10 intend to mislead this jury?

11 **A.**   No.  And as soon as I realized this, I tried to correct

12 it.

13 **Q.**   Let me turn to another subject, then, which is --

14             **THE COURT:**  I have to try to move back to the center

15 here.

16             Just a couple of things for the jurors'

17 clarification, because sometimes there's a reference to

18 numbering.  The mere fact that there is a reference, for

19 example, of FBI dash and numbers down in the lower right-hand

20 corner -- and there are lots of other pages with other, like,

21 QWE, I'm not sure what that one stands for, DOJ, and so

22 forth -- that's part of a numbering system to number the pages.

23 Those -- and I think counsel agree, those were not on the pages

24 when they were originally created.

25             **MS. HAMILTON:**  That's right.

1          **THE COURT:**  For example, when they were sent by

2    someone or received by someone.  It's what is called Bates

3    stamping.

4          I don't know if any of you are in business.  Bates

5    stamping is used or a numbering system is used to identify

6    legal documents and medical documents and so forth.  Comes from

7    some company that had invented something back in the late

8    1800's called the Bates numbering machine.  So that's what

9    that's all about.

10         And that's a way when they are using -- when they are

11   using documents in a case, for example, in court, or in their

12   law firms as well, of keeping the documents in order and

13   identifying them more readily and so forth, because they have

14   these what are called Bates stamps in the lower left-hand

15   corner.  Those are applied by the parties to the litigation and

16   not part of the document.  I just want to be clear.

17         And then I had said I would explain force majeure.

18   You've heard "force majeure" used here a number of times and we

19   should have explained it to you.  It's actually -- you know,

20   lawyers love Latin.  Well, this isn't Latin.  This is French.

21   And force majeure is -- force is spelled just like force is

22   spelled.  Majeure is spelled m-a-j-e-u-r-e.  And what it means

23   is a really significant or superior force, something that

24   overcomes -- that's the literal translation.

25         What it means in the context when you say "force

 1   majeure," it's some act of God or something like that.  The

 2   traditional explanation, for example is, you know, if you have

 3   a contract to purchase or sell a house and there is an

 4   earthquake and the house is demolished, you can be excused from

 5   your contract because of force majeure, that you couldn't

 6   comply with the contract.

 7           It doesn't just have to be an act of God.  It could

 8   be an act of a government, you know, because they have a

 9   limitation on what kinds of products come into their country

10   and there is a contract and you can't comply with the contract,

11   then -- it happens a lot with clothing items, for example, in

12   an attempt to import or export them.  And it may be that there

13   are certain limitations that a government has and, therefore,

14   you can't make good on the contract because you can't ship the

15   goods to the party that you contracted with in that country,

16   and those kinds of things.  It's that nature.

17           So that's what is meant by force majeure.  In other

18   words, there really is just not because of my own in adequacy,

19   but there is some greater force which means I can't comply

20   with.

21           Okay.  Is that sufficient?  Would you add anything

22   else to all that?  You would have stopped earlier?

23           Okay, continue.

24           **MS. HAMILTON:**  Thank you, your Honor.

25

1  **BY MS. HAMILTON**

2  **Q.**    Turning to another subject.

3        During his cross-examination, on several occasions Mr.

4  Howden pointed to statements by Mr. Prilik and Mr. Beker that

5  indicated the defendants believed ATN could not supply night

6  vision goggles under the Battalion Set II contract; do you

7  recall that?

8  **A.**    Yes.

9  **Q.**    Now, was there ever any statement made by Mr. Beker to

10 indicate that he wasn't certain that ATN couldn't perform?

11 **A.**    Yes.

12 **Q.**    Okay.  Let's then turn to September 1st, 2005,

13 Exhibit 136, page 30, please.

14        On line 17 you say to Mr. Rocklin:

15            "Your crystal ball is way too good."

16        And Mr. Beker laughs.

17        And then you say:  "Let's put it this way..."

18        To which Mr. Beker replies:

19            "I'm just begging you, don't overestimate my

20            abilities."

21        And you say:

22            "Well, it will be hard for me to do now."

23        And Mr. Beker laughs again.

24        Then you say:

25            "After you guys... I don't know my steam

1           engine crashed going full speed ahead."

2       And Mr. Beker replied:

3           "No, I can only -- Dima, I can only say one

4           thing.  I pay money and it seems to me that

5           by doing so I confirm that I am not

6           omnipotent.  I don't want at all to appear

7           omnipotent."

8       When Mr. Beker said he pays money, "and it seems that by

9   doing so I confirm I am not omnipotent," what did you

10  understand Mr. Beker to mean?

11  **A.**   My understanding is at this moment Mr. Beker had an

12  understanding that ATN is working and has a good possibility to

13  start getting deliveries again very shortly, and by paying

14  money he wanted to come to an agreement of some sort so that

15  will not happen.

16  **Q.**   So what will not happen?

17  **A.**   That ATN will not continue delivering goggles.

18  **Q.**   Now, did Mr. Beker ever discuss options where ATN could

19  obtain night vision goggles for the Battalion Set II contract?

20  **A.**   Would you repeat the question?

21  **Q.**   Sure.  So one of the points was that ATN couldn't supply

22  because they were having difficulties getting night vision

23  goggles out of Russia, is that right?

24  **A.**   Yes.

25  **Q.**   Did Mr. Beker ever discuss options, other options where

```
 1   ATN could obtain night vision goggles?
 2   A.   Yes.
 3   Q.   Okay.  So if we could turn then to Exhibit 135, which is
 4   your August 30th conversation with Mr. Beker, and specifically
 5   page 6, line 10.  You say:
 6              "Yes, but with us, it could also somehow get
 7              resolved."
 8        And what did you -- why did you say, "it could also get
 9   resolved?
10   A.   Because ATN was working to receive the goggles.
11   Q.   To receive?  I'm sorry?
12   A.   To receive the goggles.
13   Q.   Oh.  And Mr. Beker said:
14              "Yes.  Well, again, you have your own
15              opinion... probably it could be that I don't
16              know something. Maybe you were hoping, shall
17              we say, to resolve the matter by way of,
18              well... shall we say, a Belarussian-Ukrainian
19              cooperation.  I shall call it so in all
20              modesty.  No other... I don't see any other
21              well options."
22        What did you understand Mr. Beker to mean by the
23   "Belarussian-Ukrainian cooperation?"
24   A.   This indicates to me that Mr. Beker knew that ATN had also
25   a fall back plan to provide the goggles through, also, other
```

1    suppliers of the systems from Belarussia or Ukraine.

2    **Q.**    Did ATN use, as you call it, the fall back plan?

3    **A.**    Yes, we did.

4    **Q.**    And what, if any, of those goggles from Belarussia were

5    used to supply night vision goggles for the phase one of the

6    Battalion Set II contract?

7    **A.**    I think some of the later deliveries on phase one were

8    from -- Belarussian goggles.

9    **Q.**    And what, if any, goggles from the Ukrainian cooperation

10   were used on the Battalion Set II contract?

11   **A.**    We delivered some of them, but for later stages.

12   **Q.**    And now turning to -- Mr. Howden had asked you, went

13   through the conversations regarding Lyonya Gaber.  Do you

14   recall that?

15   **A.**    Yes.

16   **Q.**    And, also, in connection with that NPZ, do you remember

17   that?

18   **A.**    Yes.

19   **Q.**    Questions about NPZ?

20   **A.**    Yes.

21   **Q.**    Now, just again to set the stage, who is Gaber?

22   **A.**    Vice-president of production with ATN.

23   **Q.**    And what was his role with regard to the Battalion Set II

24   contract?

25   **A.**    He was in charge of working with Russian suppliers.

1  Q.   And can you identify what NPZ is?

2  A.   That's a supplier of the fully assembled goggles to ATN

3  under Battalion Set II, phase one.

4  Q.   And who was the primary point of contact for ATN at NPZ?

5  A.   Director Metelskiy or Kim, who was in charge of

6  international distribution.

7  Q.   So if we could turn first to Exhibit 135, which was your

8  conversation with Mr. Beker on August 30th.  Page 61, and

9  beginning at line 19, Mr. Beker said:

10             "That's why you should probably think about

11             it again, consult Marc again, consult Lyonya

12             again, and if you guys make such... not

13             because eh... as it were, I doubt that you

14             can't make such a decision alone, I think

15             that it's such a decision that one just needs

16             to consult on it as it were... at least.

17             Isn't that so?"

18      Now, based on the conversation that you had with Mr. Beker

19  on August 30th, did you have an understanding of what the

20  purpose of consulting with Mr. Gaber to be?

21  A.   Yes.

22  Q.   And what was your understanding?

23  A.   It was just to make sure that Lenny and Marc is on the

24  same page with me.

25  Q.   And when you say "on the same page," what do you mean?

**A.**   On the agreement with Newcon and ATN, that the goggles will not be delivered.

**Q.**   Now, during your August 30th conversation what, if any, discussion -- well, here.  What, if any, discussion was there about -- by Mr. Beker regarding using -- Newcon using NPZ products?

**A.**   On August 30th?  I don't recall right now that we had a specific...

**Q.**   Let's turn to page 65, line 16.  Mr. Beker said:

          "Up to the point that... like, we even... and
          those devices that were turned out, it's most
          likely that we also... will discuss in order
          to take this and to deliver it there, and so
          that it would be faster."

     To which you replied:  "I have got it."

     And Mr. Beker then said:

          "In any event, I have already got not once,
          but at the very least three times an offer
          from Mr. Metelskiy."

     And you said:  "Umm-hum."

     And then turning to page 66, Mr. Beker said:

          "Just so you know?  In that..."

     And to which you replied:  "This is interesting."

     And Mr. Beker said:  "Interesting?"

     And you said:  "Yes."

 1      Mr. Beker said:

 2              "Well, now you know.  With a request... well,

 3              to help, ah, getting out of all this, they

 4              are also, like, well in a rather serious

 5              situation, because they twisted, turned

 6              things out and they told them to go -- and

 7              you told them to go fuck themselves."

 8      To which you replied:  "We told them to go."

 9      And Mr. Beker said:

10              "No.  Well, well, like... well, in a bigger

11              effect in fact."

12      And, Mr. Rocklin, you said:  "Well, I've got it."

13      And Mr. Beker said:

14              "Not... not because you told them to go...

15              but after all, now... now, whom and how there

16              is, the fact speaks for itself.  You are here

17              without that.  And they are there with that,

18              and one can't turn all this over."

19      And you say:

20              "But... and that... which, ah... Newcon" --

21              can you go to the next page?  Sorry.  "so to

22              speak, well... well... I roughly, ah... well,

23              and... your friends there arranged for them,

24              this... this doesn't... doesn't work in

25              Metelskiy's head or what?"

1       And Mr. Beker said:

2               "It does work, but he proceeds from a

3               different point:  For things not to get

4               worse."

5       To which you reply:  "I've have got it."

6       When you said:  "I've got it," why did you say  that?

7  **A.**   This is part of the conversation starting on page 65 where

8  Michael indicates that he's in conversation with NPZ and his

9  intentions are possibly to deliver the same units that were

10 already prepared for ATN.  And I'm surprised, and I'm asking

11 him:  Did Metelskiy, why is he talking to you and calling you

12 for three times?  Doesn't he understand that the problems that

13 they have were arranged by you and your friends?  And he's

14 saying that he knows that, but he doesn't want for the things

15 to get worse.

16 **Q.**   If we could go back to page 65, to line 17, just I want to

17 ask a question about Mr. Beker's statement.

18      On line 17 Mr. Beker refers to "devices that were turned

19 out."  What did you understand Mr. Beker was referring to

20 there?

21 **A.**   The devices that were prepared already to be shipped to

22 ATN.

23 **Q.**   And does the term "devices" in your understanding have any

24 particular significance?

25 **A.**   Right here it was specific reference to Generation II

1  goggles.

2  **Q.**    And the Generation II goggles, the complete set or some

3  lesser component or portion of the Generation II goggles?

4  **A.**    Complete set.

5  **Q.**    Okay.  Now, during this conversation, the entire

6  conversation, what, if any, request did Mr. Beker make about

7  actions that ATN should take with regard to NPZ?

8  **A.**    I don't recall right now, but there were some conversation

9  about it.

10 **Q.**    I'm asking about this conversation that you just reviewed.

11 **A.**    Okay.

12 **Q.**    In this segment what, if any, request did Mr. Beker make

13 about actions by ATN?

14 **A.**    Oh, none.  Sorry.

15 **Q.**    Was there any request by Mr. Beker to contact Mr. Gaber in

16 this segment of the conversation?

17 **A.**    No.

18 **Q.**    In this segment of the conversation, what, if any, offer

19 did Mr. Beker make to pay ATN for funds ATN had expended

20 purchasing product from NPZ?

21 **A.**    No offers.

22 **Q.**    Now, after this conversation, did Mr. Gaber ever raise --

23 excuse me.  Did Mr. Prilik ever raise the subject of Lenny

24 Gaber?

25 **A.**    Yes.

1  **Q.**   Of Lyonya Gaber.

2       If we could turn your attention to Exhibit 136, page 3,

3  which is the conversation that you had with Mr. Prilik on

4  September 1st.  And beginning at line 7, you said:

5            "But, but he suggested specifically enough

6            that he wants to... and all that, well, and

7            we have feelings, ah... that we can come to

8            the general consensus; but I would like to

9            continue the conversation.  Is he there

10           or..."

11      And Mr. Prilik said:

12           "Good question.  I know that yesterday he was

13           pissed off.  There is something, well, in

14           Russia.  Again, one of yours called about

15           something somewhere to the wrong place..."

16      Did you understand what Mr. Prilik's reference to "one of

17  yours" to mean?

18  **A.**   My understanding was reference to Lenny Gaber.

19  **Q.**   So this conversation occurred on September 1st, is that

20  right?

21  **A.**   Yes.

22  **Q.**   And Mr. Beker -- Mr. Prilik said, "Yesterday he was pissed

23  off."  Who is "he" that Mr. Prilik is referring to?

24  **A.**   Mr. Beker.

25  **Q.**   So Mr. Prilik stated Mr. Beker was pissed off because

1  there was something, well, in Russia.  Someone from ATN called

2  something somewhere to the wrong place.

3      What, if any, understanding did you have of what was

4  occurring in Russia in August 30th or September 1st of 2005?

5  **A.**    Lenny was telling NPZ to continue to produce the units

6  because we had intention to take hold of deliveries.

7  **Q.**    And then after Mr. Prilik completed this -- after you were

8  done speaking with Mr. Prilik, he transferred the call to Mr.

9  Beker, is that right?

10 **A.**    Yes.

11 **Q.**    Okay.  And then during that conversation with Mr. Beker on

12 September 1st, did Mr. Beker discuss Lyonya Gaber?

13 **A.**    Yes.

14 **Q.**    If we could turn your attention, please, to page 5,

15 line 13 of Exhibit 136?  You said:

16              "I've got it.  Well, ah... let's... first of

17              all, let's, ah... I'll tell you the right

18              way... whether I related the story to him,

19              ah, and in the right way and whether you will

20              agree with me or not.  This is the first

21              order of business because, obviously, umm,

22              well, I don't promise you many happy faces

23              there.  That is to say, nobody likes to talk

24              ah... about something in the business, when

25              he is being driven into a corner."

1      What were you referring to when you said, I'll tell you

2  whether I related the story to him in the right way and whether

3  or not you will agree with him or not?

4  **A.**   I think this is a part when I had to call to Marc

5  Morgovsky and tell him about the agreement that we discussed

6  with Michael Beker.

7  **Q.**   And Mr. Beker responds:

8           "By the way, do you know that Lyonya has a

9           completely different opinion?  Judging by his

10          reaction, by his... and by his actions and so

11          on."

12          And you asked:  "What do you mean?"

13          And Mr. Beker said:

14          "Well, he is somewhat creates a wind in a

15          washbasin when there is no need."

16          You say:  "Well..."

17          And Mr. Beker says:

18          "Not at this stage at any rate."

19          Now, when Mr. Beker said "he is somewhat creates a

20  wind in a washbasin," who is that that he was referring to?

21  **A.**   Lenny Gaber.

22  **Q.**   And the reference to Gaber creating a wind in a washbasin,

23  what did you understand that to mean?

24  **A.**   That Lenny was trying to do some actions that would not

25  lead to any success, and it's a reference to a kind of small

 1  non-important storm that Lenny is trying to create.

 2  Q.    And a non-important storm Lenny is trying to create where?

 3  A.    In the Russia and NPZ.

 4  Q.    And Mr. Beker then says, "Not at this stage at any rate."

 5  What did you understand him to mean there?

 6  A.    Not at that moment.  Not at the stage of the affairs being

 7  in NPZ and Russia.

 8  Q.    What, if any, request did you understand Mr. Beker was

 9  making regarding Lenny Gaber in this segment of the

10  conversation?

11  A.    That at this point Michael is not clear that whether Lenny

12  is aware that me and Michael are in agreement.

13  Q.    Okay.  And did Mr. Beker discuss Gaber again during the

14  same conversation?

15  A.    Yes.

16  Q.    Let's turn then to page 27, beginning at line 17, please.

17        Mr. Beker said:

18            "Please, if you can, to Lyonya."

19        You said:  "Yes."

20        Mr. Beker said:

21            "Please give him either a valuable

22            instruction or a piece of advice."

23        To which you replied:

24            "Well, as soon as...  I'll tell you honestly

25            because he, ah... you have enough people

 1              there who would tell you that he, he has an

 2              option to fly out, ah... on Friday.  Or he

 3              was supposed to stay until he wins the

 4              battle."

 5       When you said, "he has an option to fly out on Friday,"

 6  whom were you referring to?

 7  **A.**   Lenny Gaber.

 8  **Q.**   Flying out from where?

 9  **A.**   From Russia.

10  **Q.**   To where?

11  **A.**   Back to U.S.

12  **Q.**   And so -- and then you said, "or he was supposed to stay

13  until he wins the battle."

14       To which Mr. Beker replies on page 28:

15              "He won't win."

16       And you say:

17              "Well, let's put it this way.  The best

18              confirmation for you will be the fact that he

19              will fly away on Friday if everything is

20              fine."

21       And Mr. Beker said:

22              "He doesn't impede me.  All that I'm saying

23              is for him, ah... well, like..."

24       And you stay:  "To stop making waves?"

25       To which Mr. Beker replies:

1          "No, it's all the same to me, all that...

2          once again, I'm only proceeding from a

3          friendly point of view, so that he wouldn't

4          look a little bit like unserious."

5     And you say:  "I've got it."

6     Mr. Beker then says:

7          "Well, well, and that's it.  All the rest is

8          like... it's all the same to me what he would

9          say, but he also wants to appear also like to

10         return, one shouldn't do that."

11    And then you say:

12         "Like a boy with a slingshot, right?"

13    And Mr. Beker said:  "Yes, yes, yes, yes."

14    Mr. Beker first said on page 27, line 17 to, "please give

15 Mr. Gaber valuable instruction or a piece of advice."  But then

16 on line 6 says that Mr. Beker doesn't impede him, all that.

17    What did you understand him to mean when he said, "he

18 doesn't impede me"?

19 **A.**   Whatever Lenny do or doesn't do will not interfere with

20 Michael's actions.

21 **Q.**   So what actions, if any, did you understand Gaber was

22 taking that could interfere with Newcon, with Newcon's options?

23 **A.**   Well, he was pressing for deliveries to restart.

24 **Q.**   Now, Mr. Beker asked if you -- please, if you can, to

25 Lyonya give him either valuable instruction or a piece of

1    advice.

2         What, if any, request was Mr. Beker making to you there?

3    **A.**    That he wants Lenny to cool off, and otherwise he would

4    not succeed anyway and will not look seriously.

5    **Q.**    I missed the first.  That Mr. Gaber should go off, is

6    that --

7    **A.**    No, no.  To cool off.

8    **Q.**    Cool off, sorry.  And what do you mean by that?

9    **A.**    That he should stop pressing NPZ to renew deliveries.

10   **Q.**    Now, in this conversation -- this segment that we just

11   reviewed, what, if any, information did you understand that

12   Gaber was to provide to NPZ?

13   **A.**    Only an indication of some sort that I've talked to Lenny

14   and Lenny is now -- is aware that Newcon and ATN is in

15   agreement.

16   **Q.**    Now, did Mr. Beker raise the subject of Gaber again with

17   you?

18   **A.**    Yes.

19   **Q.**    Let's then turn to the next conversation that you had with

20   Mr. Beker, which is Exhibit 108.  And that conversation

21   occurred on September 2nd, 2005, is that right?

22   **A.**    Yes.

23   **Q.**    Now, let's turn to page 7, line 3, please.

24        You said:  "If you see" -- starting at line 5:

25            "If you see, the first step is taken.  They

Lydia Zinn, CSR,  CRR, and Debra Pas, CSR, CRR
Official Reporter -  U.S. District Court
(415)  531-6587

```
 1                     must have told you already that Lyonya took

 2                     the flight, right?"

 3          And Mr. Beker said:  "Lyonya flew away."

 4          You said:  "So."

 5          Mr. Beker said:  "Without calling Metelskiy."

 6          You said:  "Huh?  Ah..."

 7          And Mr. Beker said:

 8                  "Lyonya flew away without calling Metelskiy."

 9          And you said:  "Without calling?"

10          And Mr. Beker said:

11                  "Without.  Metelskiy doesn't know anything."

12          Now, and Mr. Metelskiy is the -- one of the primary

13   representatives for NPZ for ATN, is that right?

14   A.   Yes.

15   Q.   Okay.  Now, when Mr. Beker said that Metelskiy doesn't

16   know anything, what did you understand Beker to mean there?

17   A.   Well, at this point Lenny did not give the confirmation

18   that ATN and Newcon is in agreement.

19   Q.   Didn't give the confirmation to who?

20   A.   To Metelskiy.

21   Q.   And what did you understand to be the significance of

22   telling Metelskiy about the agreement between ATN and Newcon?

23   A.   That it's a confirmation that whatever we discuss with

24   Michael where we're now, he has another source to confirm.

25   Q.   When you say "he has another source to confirm," what do
```

1    you mean?

2    **A.**    That other than me.  Because he wanted to -- somehow to

3    confirm that I'm -- that I'm -- I will be acting and, on the

4    agreement.

5    **Q.**    And how would -- how, if at all, would Mr. Metelskiy,

6    knowing about the agreement between ATN and Newcon, confirm

7    that ATN was a participant in that agreement between ATN and

8    Newcon?

9    **A.**    Because Lenny would tell him so.

10   **Q.**    And after this conversation, was the topic of Mr. Gaber

11   discussed again with Mr. Beker?

12   **A.**    Yes.

13   **Q.**    So if we could turn to Exhibit 109, please?  And I guess

14   if we could start on page 8 -- page 7, line 20.

15         Mr. Beker said:

16              "To pick up the phone, to call him and to

17              say, from now on, please, everything that

18              originates from Mikhail Lvovich.  That is my

19              name."

20         And just what -- who was to pick up the phone?

21   **A.**    Lenny.

22   **Q.**    And Lenny Gaber?

23   **A.**    Lenny Gaber.

24   **Q.**    And who was Lenny Gaber to call?

25   **A.**    Metelskiy.

 1  Q.    And then if we can just go ahead to page 9, line 4?  On

 2  line 4 Mr. Beker said:

 3              "It is sufficient for him to call him and say

 4              that everything is okay.  We reached an

 5              agreement about everything.  Further all the

 6              entire coordination goes through, ah...

 7              Newcon, Beker and that's it."

 8        So this -- at this point in time Mr. Beker had asked,

 9  previously asked that Mr. Gaber call Metelskiy; is that right

10  or no?

11  A.    Yes.

12  Q.    And had Mr. Gaber done that?

13  A.    No, not in -- he called Metelskiy, but not because I asked

14  him to.

15  Q.    And is it your understanding that Mr. Metelskiy was -- was

16  or was not told about the agreement between ATN and Newcon

17  regarding Battalion Set II contract?

18  A.    My understanding, he was not told.

19  Q.    And so Mr. Beker was now asking that Mr. Metelskiy be

20  told?

21  A.    Yes.

22  Q.    Now, up to this point Mr. Beker has said that Mr. Gaber is

23  making wind in a washbasin, and you had agreed that he was

24  acting like a boy with a slingshot.

25        So what, if any, understanding did you have in this

 1  conversation about what would be accomplished by Gaber telling

 2  Metelskiy that the entire coordination goes through Newcon?

 3  **A.**     That it would be a confirmation.  It says that -- we

 4  reached an agreement and now the NPZ should be taking orders

 5  from Newcon and Beker.

 6  **Q.**     So you believed -- so there's two things.  There's a

 7  confirmation, and by a confirmation what does that -- what does

 8  that -- what's the purpose of that confirmation?

 9  **A.**     That Mr. Beker now will have a confirmation that ATN and

10  Newcon is in agreement.

11  **Q.**     All right.  And then was the subject of Mr. Beker -- did

12  Mr. Beker and you discuss Mr. Gaber again?

13  **A.**     Yes.

14  **Q.**     All right.  If we could turn to Exhibit 140, which is the

15  conversation you had on September 7th, 2005 with Mr. Beker.

16  And page 8, line 1, please?

17       Mr. Beker said:

18            "Lyonya called..."

19       You said:  "Well?"

20       Mr. Beker said:  "On Sunday, right?"

21       You said:  "Yes."

22       And Mr. Beker said:

23            "And he said, well, in short there -- well,

24            speaking roughly, all this is fucking crap.

25            Do as if you were doing.  Work and continue,

1          without making the devices for us in

2          accordance with that, which..."

3     And you said:

4          "What would you want me to tell Lyonya?"

5     And Beker said:  "No, no, no."

6     You said:  "For him to cool off?"

7     Mr. Beker said:  "I don't want anything."

8     You said:

9          "Yes.  We are still here... so far nothing

10         happened."

11    Mr. Beker said:

12         "Again, I don't... I don't want anything at

13         all."

14    You said:  "The first step was not taken."

15    And Mr. Beker said:

16         "I don't want anything at all.  The problem

17         is that you don't quite possess the

18         information of what Lyonya does over there.

19         Lyonya has absolutely no information of

20         what... and what Dima is responsible for."

21    Now, three times Mr. Beker said, "I don't want anything at

22    all."  What did you understand him to mean when he said that?

23 **A.**  Well, here he is kind of stating that it's not important

24 to him whether Lyonya will call or not.

25 **Q.**  And is that a change from the previous conversation with

```
 1   Mr. Beker in terms of the importance of Mr. Gaber contacting

 2   NPZ?

 3   A.   You can interpret this as change.

 4   Q.   Well, not interpret, but what's your understanding?

 5   A.   I think here he still wants him to call to confirm, but he

 6   is just saying, I don't care if he does.

 7   Q.   Did you then subsequently speak with Mr. Beker again about

 8   Mr. Rocklin?

 9   A.   About Mr. Rocklin?

10   Q.   Excuse me, Mr. Gaber.  I'm sorry?

11   A.   Sure.

12   Q.   Yes?

13   A.   Yes.

14   Q.   Okay.  If we could go to Exhibit 110, page -- I'm sorry,

15   page 15, line 1.

16        Mr. Beker said:

17             "That is to say, you talked with Lyonya.

18             Lyonya said something.  Well, then something

19             else transpired, but I'll do it the way you

20             want it, but all means."

21        When Mr. Beker said, "You talked with Lyonya.  Lyonya said

22   something.  Well, then something else transpired," what did you

23   understand Mr. Beker to mean by "something else transpired"?

24   A.   Not sure.  I need the previous part of the conversation

25   exactly.
```

1    Q.    Okay.  Put page 14 and page 15 up, please?  Well, actually

2    so let's go to 13, and I'll read starting at line 8.

3          Mr. Beker said:

4                "I gave valuable instruction, appropriate

5                ones.  It stays on hold.  I talk with people.

6                I communicate with people.  With people I try

7                to find... a solution for this issue.  In

8                order not to waste time, I asked on my side

9                to give me the information, like how many

10               finished devices there are, how... how am I

11               supposed to get ready to this quantity?  Do

12               you understand?  Nothing else."

13         To which you reply:  I, I, everything..."

14         And Beker said:  "But you guys..."

15         And you say:  I, I..."

16         And Mr. Beker said:

17               "But you guys on your side decided

18               differently.  Lyonya with his... the way he

19               knows, fuck it, one needs nothing, let them

20               go fuck themselves.  Okay, but I can say it

21               too.  Well, all right.  You don't want to,

22               but let us wait till the end.  That's it."

23         So reviewing that section, does that refresh your

24    recollection?

25    A.    Yes.

1  Q.   When Mr. Beker said, "You talked with Lyonya.  Lyonya said

2  something.  Well, then something else transpired," what did you

3  understand "then something else transpired" to mean?

4  A.   Well, that Lenny never give instructions to NPZ to start

5  taking orders from Newcon and continue to press them to

6  manufacture goggles.

7  Q.   Did you ever tell Mr. Gaber what -- excuse me.  Did you

8  ever tell Mr. Beker what Mr. Gaber was or was not saying to

9  NPZ?

10  A.   I think yes.

11  Q.   Were you telling Mr. Gaber that Lenny was telling -- Lenny

12  was then telling NPZ that one needs nothing; that continue to

13  work on it -- continue to work on the NPZ contract?

14  A.   No.

15  Q.   So Mr. Beker was getting the information about what Mr.

16  Gaber was telling NPZ from some other source than you?

17  A.   Yes.

18  Q.   Okay.  Now what, if any, is the significance of Mr. Beker

19  saying -- in your mind, what's your understanding of him

20  saying:  You talked with Lenny, but Lenny said something, but

21  then something else transpired.  What did you understand was

22  occurring here?

23  A.   He didn't get the confirmation of the agreement between me

24  and him that we discussed before.

25  Q.   And when you say "he didn't get confirmation of the

 1   agreement," whom do you mean?

 2   **A.**   Michael Beker.

 3   **Q.**   Okay.  And did the subject of Mr. Gaber come up again in a

 4   subsequent conversation with Mr. Beker?

 5   **A.**   Yes.

 6   **Q.**   Let's turn to Exhibit 131, which is the September 8th

 7   conversation you had with Mr. Beker -- oh, it's number 11,

 8   sorry.  141, I apologize.

 9            And it's -- what I'd like to do is just turn to page

10   7, line 21.  Oh, excuse me.  Page 7 -- page 6, line 17.

11   Mr. Beker said,

12                 "I'm going to ask you, in accordance

13            with our agreements, to tell Lyonya.  Let

14            him call, and tell what he deems necessary.

15            It makes no difference to me, but

16            basically, he has to say something, because

17            they, themselves, don't know what to do

18            now."

19            -- to which you reply,

20                 "I understand.  Can we postpone this a

21            little bit, or -- or you have big problems

22            with that?  Because I'll explain it to you.

23            To completely lose relations with them, I

24            would dislike it very much, as you

25            understand very well."

1              And Mr. Beker said,

2                  "Well, they" --

3              And you replied,

4                  "The same thing as you, this is not the

5              only one, ah, that -- not the only

6              contract.  Let's put it this way.  And

7              that's why, what it comes to, I -- that is

8              to say, one would need to say something.

9              And I understand that they don't know what

10             to do, but once again, ah, let's give it, I

11             don't know, at least a few days, or -- you

12             have problems with that?"

13             -- to which Mr. Beker replied,

14                 "Well, let's put it this way.  First of

15             all, a portion of our agreement consists of

16             the fact that you will call and say -- but

17             I don't, even in this -- not in this

18             connection.  The fact that it drags on --

19             it's not to everybody's benefit."

20             And you say,

21                 "Yes, I understand."

22             When, going back to page 6, line 22, Mr. Beker said,

23   "Let him call and tell what he deems necessary.  It makes no

24   difference to me" -- so in -- Mr. Beker is saying to call

25   Gaber.  Is that right?

1   **A.**    Yes.

2   **Q.**    And when Mr. Beker says, "It makes no difference to me,"

3   what did you understand that to mean?

4   **A.**    Well, here, he's saying:  I don't care what he's going to

5   say; just let him confirm something.

6   **Q.**    Then continuing on page 7, line 21 --

7         And why did Mr. Beker just want Gaber to confirm

8   something?  Back to your previous answer.

9   **A.**    Because if he keeps telling people to continue working,

10  continue to produce, then ATN would be responsible to take this

11  product in.

12  **Q.**    "To take this product in"?  Is that what you said?

13  **A.**    They received and paid for night-vision goggles that NPZ

14  was manufacturing.

15  **Q.**    And if ATN continued to receive goggles from NPZ, what, if

16  any, indication would that be that ATN intended to continue

17  working on the Battalion Set II contract?

18  **A.**    Well, that would be an indication that ATN was continuing;

19  was to continue the work on Battalion Set II.

20  **Q.**    Go ahead to page 8, line 10.  Mr. Beker said,

21                  "You understand.  That is to say, I'm

22              saying this aloud now, just in order to

23              repeat myself, and understand what the

24              person, like, is trying to count on.  And

25              if we started doing something, then, why

1          the right hand knows it, and the left hand,

2          like, doesn't want to -- well, I simply

3          want to understand for myself.  It makes no

4          difference to me.  I'm saying it once

5          again.  If he doesn't want to call, let him

6          not call.  In fact, basically, I don't

7          fucking need them at all, in the big scheme

8          of things.  I am not going to deliver their

9          devices."

10          When Mr. Beker said, "I am not going to deliver their

11  devices," what did you understand him to mean?

12  **A.**    That at this point, he's not planning to use NPZ goggles.

13  **Q.**    And you say "at this point."  When did this conversation

14  occur?  Was it September 7th?

15  **A.**    Yes.

16  **Q.**    And after this call, was Beker [sic] ever discussed again

17  with Mr. -- was Gaber ever discussed again with Mr. Beker?

18  **A.**    I don't think so, no.

19  **Q.**    Was the fact that Mr. Beker [sic] hadn't called Russia

20  discussed after this conversation?

21          **MR. COHEN:**  Gaber.

22          **MS. HAMILTON:**  Sorry.

23  **Q.**    Was Mr. -- did Mr. -- on the topic of Mr. Gaber, was that

24  discussed with Mr. Beker after this conversation?

25  **A.**    No.

1  Q.   Did Mr. Beker say anything to you after the September

2  conversation about the fact that Gaber had not called Russia?

3  A.   No, not that I recall.

4  Q.   Well, let's just turn your attention to the last

5  conversation with Mr. Beker, on October 4th, which is

6  Exhibit 143.  And just on page 12, line 6, Mr. Beker said,

7            "I thought that you and I, together,

8            having, ah, all that put on paper, present

9            it to TACOM, and then fulfill this

10           contract.  We -- you get your stipulated

11           and agreed-upon-with-me share, but you have

12           rejected your actions from the very

13           beginning.  It means Lyonya didn't call

14           Russia.  You didn't stop.  All that had to

15           be, since you are only telling me verbally

16           about the fact that something -- about the

17           fact that you called.  This is also verbal

18           again."

19           Now, there was one reference to Mr. Beker saying that

20  Lyonya didn't call Russia.  Does that -- do you recall that?

21  A.   Yes.

22  Q.   Okay.  And then Mr. Beker said, "You didn't stop."  What

23  did you understand he was referring to there?

24  A.   We did not stop pushing on NPZ to deliver the goggles.

25  Q.   Now, and what, if any, indication would that be of ATN's

 1  intention to continue in the agreement with -- with NP --

 2  excuse me -- with Newcon?

 3  **A.**    That ATN had an intention to deliver the goggles.

 4  **Q.**    So what would that communicate about ATN's intention, in

 5  connection with its agreement with Newcon?

 6  **A.**    Well, here, that ATN will not follow the agreement with

 7  Newcon.

 8  **Q.**    So it was confirmation that ATN was not going to follow

 9  the agreement with Newcon.  Is that what you believed?

10  **A.**    Yes.

11  **Q.**    Okay.  And then, just turning briefly to Mr. -- another

12  subject, well, along those lines, but when -- looking at the --

13  yesterday, Mr. Howden pointed out that he -- Mr. Beker --

14  thought having someone from ATN call Metelskiy, mention NPZ,

15  was important to Mr. Beker, right?

16  **A.**    Yes.

17  **Q.**    Now, we talked about the proposed written agreement

18  already, but I just wanted to ask you:  What, if anything, is

19  in that proposed written agreement --

20            **MS. HAMILTON:**  If we could just pull that up.  It's

21  Exhibit 51.  And if you could turn -- page -- Exhibit 51, the

22  second page.

23            **MR. PADUKONE:**  What's the Bates number on that?

24            **MS. HAMILTON:**  FBI 041.  And it's Tab 9 for you,

25  Mr. Rocklin.

1  Q.    Okay.  So in reviewing this contract, where in the

2  agreement, if anywhere, does it contain terms requiring ATN to

3  notify its supplier that ATN will use product slated for --

4  that Newcon will use product slated for ATN?

5  A.    Nothing specifically to Russian suppliers.

6  Q.    Where, if anywhere, in this -- in the contract does it

7  require ATN to notify NPZ that Newcon's taking over the

8  contract?

9  A.    Nowhere.

10  Q.    Is there even any requirement in this contract at all

11  requiring ATN to even contact NPZ?

12  A.    No.

13  Q.    Let's turn to next subject.  Now, Mr. Howden pointed out

14  on several occasions that, during your conversations with the

15  defendants, there was -- at least at times -- no suggestion

16  that Newcon or ATN would increase its prices to TACOM.  Do you

17  recall that?

18  A.    Would you repeat the question?

19  Q.    Yeah.  Mr. Howden pointed out on several occasions that

20  during your conversations with the defendants, there was no

21  suggestion that Newcon or ATN would increase the price of its

22  night-vision goggles to TACOM.  Do you recall Mr. Howden asking

23  about that?

24  A.    Yes.

25  Q.    Okay.  What I'd like to do is first turn your attention to

1   ITE.  Okay?

2   **A.**    Okay.

3   **Q.**    Now, during your conversations with Mr. Beker, what, if

4   anything, did Mr. Beker say about working with ITE?

5   **A.**    Time and time again, he mentioned that he will not work

6   with ITE.

7   **Q.**    Okay.  So I'd like to turn your attention, then, to

8   Exhibit 135, page 10.  Mr. Beker said, starting on line 1,

9              "But the fact speak for itself.  Well,

10             people came over, and offered cheap prices,

11             and stole it.  Well, right.  After all, I

12             don't have complaints.  On the contrary,

13             well, by all means, you're entitled to do

14             it.  You made a normal decision how you

15             believed, ah, from the point of view of,

16             ah, business.  If you had fit in a normal

17             price niche, I wouldn't have said a single

18             word to you.  Kudos to you, as they say;

19             but unfortunately, the Jordanian guy fucked

20             us all.  Well, and that's it.  Nothing

21             else."

22             What did you understand Mr. Beker to mean there, by

23   "the Jordanian guy fucked us all"?

24   **A.**    That, again, reference to Jordanian guy's reference to

25   Ramzi Abu-Taleb, principal of ITE; and the fact that ITE was

1  making the large percentage of profit.

2  **Q.**   The large percentage of what?  I'm sorry.  I didn't hear

3  you.

4  **A.**   Of profit.

5  **Q.**   Profit.

6      And large percentage of profit on what?

7  **A.**   On Battalion Set II.  This is the more specific reference

8  to night-vision goggles.

9  **Q.**   Now, did Mr. -- in addition, did Mr. Beker express any

10 reasons why he didn't want to work with ITE?

11 **A.**   Yes.

12 **Q.**   If we could, turn to page 27 of this August 30th

13 conversation.  And, starting with line 13, Mr. Beker said,

14           "You can't buy them because they, price

15      wise, totally would not do.  To say to the

16      Jordanian guy that, 'Well, we can't

17      deliver.  Um, Newcon can deliver' - once

18      again, we can't deliver to him at this

19      price; that is to say, a direct substitute,

20      shall we say, in order to get out of this

21      thing, and, like, directly to substitute

22      it, even -- even we -- and we are going to

23      have a desire to switch places -- we can't,

24      because we can't deliver to him at this

25      price."

1              When Mr. Beker said, "we can't deliver to him at this

2   price," what did you understand that to mean?

3   **A.**   That Newcon could not deliver night-vision goggles to ITE

4   at the price that the ATN was delivering it.

5   **Q.**   And what price was that?

6   **A.**   At the $1,277.

7   **Q.**   And in that same conversation, did Mr. Beker elaborate on

8   why he didn't want to sell to ITE?

9   **A.**   Yes.

10  **Q.**   Okay.  Let's go to page 36, please.  Thank you.  Starting

11  at line 9, Mr. Beker said,

12              "You see here -- here, the issue is

13         this.  I can't -- I won't sell it to him.

14         That's where the problem is."

15         And when Mr. Beker, on line 10, says, "I won't sell

16  it to him," to whom do you understand he's referring?

17  **A.**   To Ramzi Abu-Taleb.

18  **Q.**   Mr. Beker goes on to say,

19              "Ah, 99 percent don't want to sell it

20         to him, because I believe that he is a

21         fucking jerk; that he behaved himself

22         rather unseemly.  He behaved himself as if

23         at a fucking bazaar, like a gypsy; not

24         like -- not like a regular businessman,

25         right?"

1      We can continue.  You -- you say,

2          "Yes."

3      And Mr. Beker then says,

4          "I don't know, as it were.  He would

5          come over once again.  Our test stand was

6          there.  Our representative was there.  We

7          talked with him on the phone several times.

8          He behaved himself insolently, obnoxiously.

9          Even considering that one was awarded the

10         contract, it doesn't give one a right to

11         behave this way, you know."

12     You said,

13         "Yes."

14     And Mr. Beker said,

15         "There are such -- I don't know.  You

16         work with him, of course.  I apologize if I

17         talk about him in some wrong way, but I'm

18         telling you my feelings."

19     And you said,

20         "Yes."

21     And on line 7, Mr. Beker said,

22         "And to start working with him now,

23         after all -- I don't know.  You now have,

24         shall we say, a letter of credit opened.

25         You guys are on some financial terms with

1      him."

2      And you said,

3          "Well, naturally."

4      Mr. Beker said,

5          "It means one would need to close it,

6      to open, in my -- and I don't trust him."

7      And then, on line 18, Mr. Beker said,

8          "And, in addition, why would I go with

9      him, if -- if we have a strategic

10     structure" --

11     You said,

12         "Yes."

13     Mr. Beker said,

14         -- "with Anham that could implement

15     this contract?"

16     Now, what did you understand were the reasons that

17  Mr. -- Mr. Beker would not work -- did not want to work with

18  ITE?

19  **A.**   So, my understanding is that, in addition, that the price

20  that Newcon would have to sell it to ITE would be too high.

21     Second reason was that Mr. Beker did not trust Ramzi.

22     And another reason:  He didn't like him.

23     And another reason:  He had Anham in place as

24  strategic structure to work through.

25  **Q.**   And in the next conversation that you had with Mr. Beker,

1   on September 1st, did -- did Mr. Beker elaborate any further on

2   why he didn't want to work with Mr. -- with Ramzi Abu-Taleb?

3   **A.**   Would you repeat the question?

4   **Q.**   Yes.  You spoke with Mr. Beker again on September 1st?

5   **A.**   Yes.

6   **Q.**   During that conversation, did he raise additional reasons

7   or further elaborate on why he did not want to work with ITE?

8   **A.**   Yes.

9   **Q.**   Okay.  So, if we could, turn to page 7.  Oh.  Exhibit 136.

10  Mr. -- you said,

11                  "Well, as I understood it, as you told

12              me yourself, it's 99 percent or a hundred

13              percent that you are not going to work with

14              him."

15      And when you said "him," whom do you mean there right?

16  **A.**   ITE.  Ramzi.

17  **Q.**   And Mr. Beker said,

18                  "I will say so, most likely, because,

19              A, he will not go for this price.  And

20              secondly, even if he does go for it, I

21              don't want him."

22      Okay.  Now, during your discussions --

23      And did you also discuss ITE with Mr. Prilik?

24  **A.**   Yes.

25  **Q.**   And let me turn your attention, then, to the first

1  conversation you had with Mr. Prilik, on August 26th.

2  Beginning on page 18, line 6, Mr. Prilik said,

3           "Well, let's examine the possibilities.

4        Let say the first possibility is Dima would

5        boost it for him, till $1,798, and he won't

6        make a money on this, or will make the

7        minimum.  He has an option to refuse to

8        deliver it.  He can't take it, because

9        then, he would destroy the entire contract;

10       his entire contract, because, don't forget

11       that the night vision is approximately

12       25 percent from it."

13       Now, on line 11, Mr. Prilik said, "He has an option

14  to deliver it."  What -- who was he referring -- Mr. Prilik

15  referring to there?

16  **A.**   Ramzi.  ITE.

17  **Q.**   And the "option to refuse to deliver it" -- what did you

18  understand him to mean?

19  **A.**   That, in the event that the price would be raised to ITE,

20  one of the options that he would have is not to deliver the

21  night vision.

22  **Q.**   And then Mr. Prilik said,

23           "Because -- don't forget -- the night

24        vision -- oh, that he -- he can't take it,

25        because then he would destroy his entire

1          contract, because -- don't forget that the

2          night vision is approximately 25 percent

3          from it all."

4          What did you understand Mr. Prilik was referring to

5   when he said it would destroy his entire contract, because

6   approximately 25 percent -- the night vision is approximately

7   25 percent from it all?

8   A.   Here, he's just referring to that -- in his opinion, that

9   the night vision was approximately only 25 percent of the

10  entire Battalion Set II.

11  Q.   But -- and why, then, could Mr. Prilik not take -- or

12  Mr. Ramzi [sic] not take -- take the option of refusing to

13  deliver, because he would destroy this entire contract?

14  A.   I'm afraid I don't understand the question.

15  Q.   Okay.  I apologize.  Let me break it up a little bit.

16       Mr. Prilik said he -- Ramzi -- can't take the option to --

17  to refuse to deliver the contract.  Is that right?

18  A.   Yes.

19  Q.   And then Mr. Prilik said, "because night vision is

20  approximately 25 percent from it."

21          What did you understand was why Mr. Prilik -- why

22  Mr. Ramzi [sic] was not going to refuse to deliver, if there

23  was a price increase, according to Mr. Prilik?

24  A.   That he could just continue delivery; not make money on

25  the night-vision portion, but continue to make money on the

1   communication equipment and weapons.

2   **Q.**   Was the night-vision-goggles portion of the contract

3   approximately 25 percent of the Battalion Set II contract?

4   **A.**   I am not aware of the exact numbers.

5   **Q.**   Let me turn, then, to page 19, beginning, on line 12,

6   Mr. Prilik said,

7               "Okay.  Let's examine this further.

8            The worst case, he would say, 'No, I don't

9            want to.'  And what would happen?  He

10           simply wouldn't deliver in full, right?"

11           And you say,

12              "Yes."

13           And Mr. Prilik said,

14              "And the Americans would swallow it."

15           And then Mr. Prilik said,

16              "And what happens afterwards?

17           Afterwards, a new tender comes out, or he

18           receives a continuation of this tender."

19           Now, what did you understand Mr. Prilik's reference

20   to "a new tender to come out" to mean?

21   **A.**   That if ITE would not deliver the night-vision portion,

22   that TACOM would need to reissue the bid for night-vision

23   portion of the Battalion Set II.

24   **Q.**   And what, if any, is your understanding as to if ITE had

25   refused to deliver on the previous contract?  What, if any,

 1   effect would that have on ITE's ability to supply night-vision

 2   goggles under the new tender?

 3          **MR. OSTERHOUDT:**  Calls for speculation, your Honor.

 4          **THE COURT:**  Objection is overruled.

 5          You may answer.

 6          **THE WITNESS:**  But now I need you to ask the question

 7   again.

 8   **BY MS. HAMILTON**

 9   **Q.**   If ATN had defaulted on supplying night-vision goggles for

10   the Battalion Set II contract, what was your understanding

11   about -- what, if any, is your understanding as to ITE then

12   being able to win or to supply night-vision goggles under a new

13   tender?

14   **A.**   It would be highly unlikely that ITE would again be given

15   a contract to deliver night-vision goggles.

16   **Q.**   And why do you believe that?

17   **A.**   Because ITE once failed to deliver.

18   **Q.**   Now, under the agreement between ATN and Newcon, if that

19   new tender came out, would ATN be permitted to bid on that

20   contract?

21          **MR. HOWDEN:**  Objection, your Honor.  Complete lack of

22   foundation.

23          **THE COURT:**  Objection is sustained.

24          And also, you've gone over the time that you

25   indicated.

1          **MS. HAMILTON:**  Oh, I'm sorry.  I have.  I have one

2    more set of questions.

3          **THE COURT:**  Substantially.

4          **MS. HAMILTON:**  I have literally this piece and

5    another piece, and I'm done with the questions.  I apologize.

6          **THE COURT:**  We need to finish up.  We need to finish

7    with Mr. Rocklin.

8          **MS. HAMILTON:**  Okay.  I agree.

9          **THE COURT:**  And I'm sure he agrees as well.

10          **THE WITNESS:**  Yes.  I agree.

11          **MS. HAMILTON:**  Okay.

12   **Q.**   Did you discuss with Mr. Beker the impact on TACOM if

13   Newcon supplied night-vision goggles, instead of ATN?

14   **A.**   Yes.

15   **Q.**   Okay.  Let's turn to Exhibit 136, page 9, line 4.  You

16   said,

17              "I've got it.  And here's the question,

18              then.  Let's say TACOM received today,

19              but -- well, this is such a fine point, but

20              I think there's no, well, like, options,

21              right?"

22              And Mr. Beker said,

23              "May I finish for you?"

24              And you said,

25              "Let's assume that they -- yes."

---

Lydia Zinn, CSR,  CRR, and Debra Pas, CSR, CRR
Official Reporter - U.S. District Court
(415)  531-6587

1          And Mr. Beker said,

2               "May I finish for you?"

3          And you said,

4               "Yes."

5          And Mr. Beker said,

6               "It turns out that you are unable to

7          deliver.  They say, 'All right.  Don't do

8          any more.  We are bringing the rest to the

9          new tender.'  And you say, 'Well, or they

10         can simply switch.'"

11         And Mr. Beker said,

12              "Or simply."

13         And you said,

14              "And their task."

15         And Mr. Beker said,

16              "Switch to what?

17         And you said,

18              "Well, I understand to -- to the one

19         who, as you said, filled the first

20         Battalion Set."

21         And you said,

22              "Correct" --

23              -- or Mr. Beker said,

24              "Correct."

25              You said,

```
 1                      "Yes."

 2                      Mr. Beker said,

 3                      "Yes.  It's the same thing."

 4              And you said,

 5                      "Yes, the same thing."

 6              And Mr. Beker said,

 7                      "But it absolutely does not change our

 8              decision."

 9              Then, on page -- a little bit further down that page,

10      on line 19, you say,

11                      "Well, I've got it.  Well, that is to

12              say you believe -- I think so, as well --

13              that basically, they won't have any choice.

14              They -- they'll get it; get it at whatever

15              price you'll give them.  You see, despite

16              everything, you know every kopeck.  Today I

17              don't know, to tell you the truth, for how

18              much you sold to Anham, or how much they

19              sold.  And I think you wouldn't want to

20              tell me, though it would be better."

21              Mr. Beker said,

22                      "Ah."

23              You said,

24                      "If I understood."

25              And Mr. Beker said,
```

1              "Well, I can tell you that Anham bought

2         higher than the Jordanian is selling.

3         Well, like this."

4         And Mr. Beker said,

5              "All right."

6         And you said,

7              "Everything is clear.  Well, that would

8         require the price to TACOM to rise."

9         Looking at page 9, line 13, Mr. Beker said,

10             "If it turns out you are unable to

11        deliver, they say, 'Well, all right.  So

12        don't do any more.  We are bringing the

13        rest to the new tender.'"

14        And what -- who did you understand Mr. Beker was

15   referring to when he said, "They say, 'Well, all right.  Don't

16   do any more.  We are bringing the rest to the new tender'"?

17   **A.**   That TACOM would bring the bid to the new -- I'm sorry --

18   contract to the new bid.

19   **Q.**   And based on this conversation with Mr. Beker, what, if

20   any, understanding did you have as to who would then supply the

21   night-vision goggles under this scenario?

22   **A.**   Newcon would.

23   **Q.**   And based on Mr. -- Mr. Beker's statements, did you

24   understand what amount -- what price amount Mr. Beker would, at

25   a minimum, bid for this contract?

1  **A.**    It would be for -- well, since -- Anham was buying it for

2  more than what Ramzi was selling it, that would be for higher

3  than 1,760.

4  **Q.**    So more than what TACOM was currently paying on the

5  Battalion Set II contract?

6  **A.**    Yes.

7  **Q.**    Now, yesterday Mr. Howden asked you:  Why would you

8  accept, or why would a businessman like yourself forgo making

9  $200 a unit, which is what you said the profit was, and accept

10  $75 a unit, which is what Mr. Beker offered to pay, instead?

11        Now, if the agreement had gone forward as the defendants

12  proposed, what -- what actions was ATN required to take?

13  **A.**    My understanding:  Not do deliver.

14  **Q.**    Anything else?

15  **A.**    Well, we had to endorse Newcon.

16  **Q.**    And anything else?

17  **A.**    That's it.

18  **Q.**    Now, if -- if ATN had continued to -- or ATN did continue

19  to supply the night-vision goggles for $200 a pair,

20  approximately, for profit, what actions did ATN have to take to

21  earn that $200 per pair of goggles?

22  **A.**    Well, we -- we'd have to continue performing, and bringing

23  in goggles, and supplying them to ITE.

24  **Q.**    And what would -- what actions would that consist of, on

25  the part of ATN?

1  **A.**   Continue to work on contract.

2  **Q.**   And you'd -- when you say "continue to work" -- what type

3  of work would you have to do?

4  **A.**   Well, purchase the goggles.  Conduct the quality control.

5  Logistics.  Shipping.  All other things that are associated.

6  Finance it.  Take risk.

7              **MS. HAMILTON:**  Okay.  Thank you.

8              Thank you, your Honor.

9              **THE COURT:**  Mr. Howden or Mr. Osterhoudt, who's going

10 to wrap up here with the recross?

11             **MR. HOWDEN:**  I'll go as quickly as possible,

12 your Honor.

13             **THE COURT:**  Thank you, Mr. Howden.

14                      **RECROSS EXAMINATION**

15 **Q.**   Mr. Rocklin, did you see Special Agent Haynie today?

16 **A.**   Yes.

17 **Q.**   Where did you see him?

18 **A.**   When I was coming out.  And I think he was sitting there.

19 **Q.**   Did you talk to him at all?

20 **A.**   No.

21 **Q.**   Not at all today?

22 **A.**   Not at all.

23 **Q.**   At any point in time in the last few days, have you seen a

24 copy of his report of the day when you gave Exhibit 51 to him?

25 **A.**   Yes.

1  Q.   When did you see that report?

2  A.   It was during the -- right now, during the preparation for

3  this trial.

4  Q.   This week?

5  A.   No, not this week, but I had the copy from -- I want to

6  say about a few weeks ago.

7  Q.   Okay.  And is that the same report that you mentioned in

8  your testimony a little while ago that you looked at, and --

9  and thought it wasn't correct?

10 A.   Yes.

11 Q.   All right.  At the time you first looked at it, when you

12 were preparing for your testimony here today, did you tell the

13 prosecutors that it wasn't correct?

14 A.   No.

15 Q.   And, in fact, in that report agent Haynie reports that you

16 told him, essentially, the same story that you first told this

17 jury about where the customs letter came from.  Isn't that

18 right?

19 A.   Yes.

20 Q.   Since you've had a chance to revisit the issue of

21 Exhibit 51 and the customs letter, your testimony now is that

22 you are the author of the customs letter.  Isn't that correct?

23 A.   I believe so, yes.

24 Q.   And now, your testimony is that that customs letter was

25 not attached to the e-mail that was sent to you by

1  Michael Beker?

2  **A.**    Yes.  I realized on Tuesday, and I was trying to correct

3  that.

4  **Q.**    Okay.  And it was only after your testimony here that you

5  realized that you had made a mistake in your testimony.  Is

6  that right?

7  **A.**    Yes.

8           **MR. HOWDEN:**    Okay.  Can we get Exhibit 51 on the

9  screen?

10  **Q.**    I'd like you to look at Exhibit 51.  Do you still have a

11  copy of it in your --

12  **A.**    Yes.

13  **Q.**    -- exhibit binder?

14     Okay.  Looking at the first page of it, when we went over

15  this -- when you and I went over this before, I pointed out to

16  you that the subject line in this only referred to the

17  agreement.  Isn't that right?

18  **A.**    Yes.

19  **Q.**    It didn't refer to the customs letter.

20  **A.**    Yes.

21  **Q.**    And that fact didn't jog your memory at that time, right?

22  **A.**    Not at that moment, no.

23  **Q.**    Okay.  And I pointed out to you in the attachment line

24  that there was only one attachment there.  Isn't that right?

25  **A.**    You did.

1    Q.    And that didn't jog your memory, either?

2    A.    No.

3    Q.    Nor, did the fact that in the draft of the agreement, it

4    says, "See attached," or in the body of the e-mail it says,

5    "See attached a draft of the agreement" -- but there was no

6    mention of the customs agreement, right?

7    A.    Right.

8    Q.    And then we went through the two documents.

9          MR. HOWDEN:  Get both of them up there.

10   Q.    And I pointed out to you that they were different font

11   sizes?

12   A.    Right.

13   Q.    And that didn't jog your memory?

14   A.    No.

15   Q.    Different typefaces.  And that didn't jog your memory?

16   A.    No.

17   Q.    I even pointed out to you the two different ZIP codes,

18   correct?

19   A.    Right.

20   Q.    And the fact that the ZIP code on the document that you

21   authored has your own ZIP code on it.  Is that correct?

22         (Reporter requests clarification)

23         THE WITNESS:  I said, "Yes."

24   BY MR. HOWDEN

25   Q.    Did not jog your memory.  Is that correct?

1  **A.**    It did not jog my memory at that point.

2          **THE COURT:**  And by "your own ZIP code," you're

3  referring to his home ZIP code?

4          **MR. HOWDEN:**  His home ZIP code.  Thank you,

5  your Honor.

6  **Q.**    Is that right?  That's your home ZIP code?

7  **A.**    Yes.

8  **Q.**    And I pointed out to you that in the customs letter -- if

9  we could go back to that, the customs letter contained the

10  contract number or a contract number that purported to be

11  between ATN and NPZ, correct?

12  **A.**    You did point it out.

13  **Q.**    And I asked you:  How did Mr. Beker communicate that to

14  you, since it's not in any -- in a record of any of the

15  communications that we have before us between ATN and Newcon,

16  right?

17  **A.**    Right.

18  **Q.**    And you told the jury Mr. Beker must have gotten that

19  number somewhere else, right?

20  **A.**    I did.

21  **Q.**    And that didn't jog your memory that you were the author

22  of the customs letter, correct?

23  **A.**    It was five years ago.  That did not jog my memory.

24  **Q.**    Okay.  Well, let's talk about five years ago.  On

25  September 2nd, 2005, Mr. Beker sent you the e-mail portion of

1  Exhibit 51, correct?

2  **A.**    Yes.

3  **Q.**    And attached to that e-mail was the two-page agreement,

4  right?

5  **A.**    Yes.

6  **Q.**    The customs letter was not attached to it?

7  **A.**    No.

8  **Q.**    Later, you gave it to Agent Haynie, right?

9  **A.**    I did.

10  **Q.**    And when gave Agent Haynie the e-mail and the agreement,

11  you also gave him a copy of the customs letter?

12  **A.**    That, I don't remember.

13  **Q.**    When you gave Agent Haynie the e-mail and the two

14  documents, you told him that there were two attachments to the

15  e-mail, correct?

16  **A.**    I don't recall me doing that, no.

17  **Q.**    Do you remember, at least, that you gave Agent Haynie a

18  copy of the customs letter?

19  **A.**    I think it was discussed.

20  **Q.**    You don't remember giving him a copy of the customs

21  letter?

22  **A.**    I had to give it to him at one point.  Whether it was on

23  that day, I don't remember.  It was possible that I did.

24  **Q.**    Isn't it true that you gave the e-mail and both of the

25  documents to Agent Haynie on September 6th, 2005?

1  **A.**    Again, it's possible.  I don't remember.

2  **Q.**    Four days after you received the e-mail from

3  Michael Beker?

4  **A.**    It is possible.

5  **Q.**    And at the time you gave the e-mail and the two documents

6  to Agent Haynie, you told him that the customs letter was an

7  attachment to the e-mail?

8  **A.**    That, I don't remember.

9       Once again, as soon as I realized this, I was trying to

10 correct it.

11 **Q.**    Did you ever tell Agent Haynie that you were the author of

12 the customs letter?

13 **A.**    I think that letter was discussed with Agent Haynie,

14 because it was discussed in the previous conversation that I

15 had to create it.  And I was showing it to him; whether the

16 language there was appropriate; but that letter -- it was never

17 sent to Newcon, because, by September 2nd, he already sent the

18 proposed agreement.  And during that conversation that I gave

19 the copy of this letter to Agent Haynie, I don't recall ever

20 telling him that that's what I received from Michael at that

21 attachment; but later on, when I saw it in a report, I believed

22 that that was the truth.  That's why I testified to that on

23 Tuesday.

24 **Q.**    Let me ask that question again.

25      Did you ever tell Agent Haynie that you were the author of

1  the customs letter?

2  **A.**   I believe I did.

3  **Q.**   When?

4  **A.**   At that time, in 2005.

5  **Q.**   When you gave him the copy of the letter?

6  **A.**   I think we had a discussion whether that was an

7  appropriate language, or not.

8  **Q.**   Did you tell him you were the author of the letter?

9  **A.**   I had to.

10  **Q.**   You had to?

11  **A.**   Yes.

12  **Q.**   So it's your best recollection as you sit here today that

13  you told Agent Haynie that you wrote that letter.  Is that

14  correct?

15  **A.**   I had to.

16  **Q.**   Okay.  And did you ever tell the prosecutors in this case

17  that you were the author of the customs letter?

18  **A.**   No.

19  **Q.**   And do you have testimony from Volume 4?

20          **MR. MOORE:**   4?

21          **MR. HOWDEN:**   Yeah.

22          Can you go to page 560?  Can you highlight lines 21

23  through 25, please?

24  **Q.**   Now, a few days ago, Ms. Hamilton asked you,

25          "Turning your attention to page 4 of

```
 1              Exhibit 51, do you recognize this

 2              document?"

 3       Right?

 4  A.   Yes.

 5  Q.   And Exhibit 4 is the customs letter, correct?

 6  A.   Yes.

 7  Q.   And you answered,

 8                 "Yes.  It was a proposed language --

 9              proposed letter, possibly from

10              Russian Customs."

11       Correct?  That was your answer?

12  A.   Yes.

13  Q.   And then Ms. Hamilton asked you,

14                 "How did you get this letter?"

15       And your answer was, if we can go to the top line of the

16  next page,

17                 "It was also an attachment to the

18              e-mail."

19              Right?

20  A.   That's what I answered there.

21  Q.   And that answer wasn't true?

22  A.   No.

23  Q.   I think I want to start at 671.  No.  Let's start -- I'm

24  sorry.  Let's start at 670, lines 19, and let's go to the

25  bottom of the page, 25.  Now, when I began asking you questions
```

```
 1   about Exhibit 51, I asked you,

 2                "Now, I think it was yesterday you

 3             testified about Exhibit 51, that was an

 4             e-mail sent to you from Mr. Beker that had

 5             two attachments to it."

 6        Do you recall that?

 7   A.   Yes.

 8   Q.   And your answer was,

 9                "Not yesterday, but I did testify to

10             that."

11        Right?

12   A.   Yes.

13   Q.   And, going to page 671, I went on and asked you, at

14   line 7,

15                "Okay.  And Exhibit 51 was an e-mail

16             that Mr. Beker sent to you.  Is that

17             right?"

18        And you answered,

19                "Yes."

20        Right?

21   A.   Yes.

22   Q.   And I asked you,

23                "And it had two attachments to it?"

24        And your answer was,

25                "Yes."
```

1      Correct?

2  **A.**    Yes.

3  **Q.**    And that answer was false?

4  **A.**    At that time, I thought I was telling the truth.

5  **Q.**    Your answer was false?

6  **A.**    At that time, I thought I was telling the truth.

7  **Q.**    And then I asked you, at line 16,

8              "And the other attachment was a draft

9          of a short letter.  Is that correct?"

10     And you answered,

11              "Yes."

12     Correct?

13  **A.**    Yes.

14  **Q.**    And that answer was false?

15  **A.**    Yes.

16  **Q.**    And, in fact, that draft letter -- you were the author of

17  that draft letter?

18  **A.**    I believe so, yes.

19  **Q.**    And on the next page, at page 11 [sic], I asked you again

20  about a customs letter.  Beginning at line 6, I said,

21              "Now I want to talk to you about the

22          customs letter for a minute.  Again, that

23          proposed letter was supposed to be, as you

24          understood it, a letter from

25          Russian Customs."

ROCKLIN- RECROSS EXAMINATION/ HOWDEN                    1100

```
 1        And you said,

 2                  "Yes."

 3        Right?

 4   A.   Yes.

 5        (Reporter requests clarification)

 6   BY MR. HOWDEN

 7   Q.   I'm sorry.  Let me rephrase.  Turning to page 672, at line

 8   11 -- actually, at line 10, I asked you,

 9                  "To whom?"

10        And your answer was,

11                  "Well, that would be a letter from --

12             to ATN."

13             Correct?

14   A.   Yes.

15   Q.   And then at that point, I asked you,

16                  "And what did you understand Michael

17             was proposing that you do with this draft

18             of the customs letter?"

19             And your answer was,

20                  "To use such letter to limit ATN's

21             liability to ITE."

22             Isn't that correct?

23   A.   Yes.

24   Q.   But the letter didn't come from Michael, did it?

25   A.   It did not.
```

1  **Q.**   All right.  Going to the next next page, page 673, I asked

2  you about the letter at line 7.

3           **"QUESTION:**  Okay.  And you brought it to the

4           attention of the FBI when you received it?"

5     And your answer was:

6           **"ANSWER:**  Yes."

7     Correct?

8  **A.**   Yes.

9  **Q.**   And that was false?

10 **A.**   That was my best recollection at that moment, yes.

11 **Q.**   Okay.  And then at line 14 -- actually, beginning at

12 line 15 I asked you:

13          **"QUESTION:**  Now, when you received the email

14          from Mr. Beker that had these two

15          attachments, what did you do?"

16    And your answer was:

17          **"ANSWER:**  I printed them out and I gave the

18          copies to the FBI."

19          And that's simply not true, isn't it?

20 **A.**   No.

21 **Q.**   And I asked you specifically:

22          **"QUESTION:**  By "them" you mean the email and

23          the two attachments?"

24    And your answer was:

25          **"ANSWER:**  Yes."

1       Isn't that correct?

2  **A.**   That's what I answered.

3  **Q.**   And, again, it wasn't correct?

4  **A.**   I realized it that night and I tried to correct it.

5  **Q.**   Then I asked you:

6           "**QUESTION:**  Did you show the email or the

7           attachments to anybody else at ATN?

8       And you said:

9           "**ANSWER:**  Yes."

10          Correct?

11 **A.**   I did.

12 **Q.**   You said:

13          "**ANSWER:**  I think I showed them to James."

14          "James" being James Munn, right?

15 **A.**   Right.

16 **Q.**   And that's not true either?

17 **A.**   I was showing the proposed written agreement.  It was not

18 the attachment.

19 **Q.**   And on the next page, beginning at line 18, I asked you:

20          "**QUESTION:**  And after you printed out the

21          hard copies of the email and the two

22          attachments, what did you do with the hard

23          copies?"

24       And your answer was?

25          "**ANSWER:**  I gave the copies to the FBI."

1          Right?

2   **A.**    Yes.

3   **Q.**    Did you give those two documents to the FBI?

4   **A.**    I had to give him just one document, and the second

5   document was discussed with him previously.

6   **Q.**    You didn't give both documents to the FBI at the same

7   time?

8   **A.**    I don't recall.

9   **Q.**    And specifically I asked you:

10             "**QUESTION:**  When did you give -- and, again,

11             we're talking about Agent Haynie with the

12             FBI?"

13         You answered:

14             "**ANSWER:**  Yes."

15         And I asked you on the next page, that's page 675,

16   beginning at line 1:

17             "**QUESTION:**  When did you give Agent Haynie

18             the hard copies of these documents?"

19         And your answer was:

20             "**ANSWER:**  At our meeting when he picked up

21             the tape."

22         Isn't that correct?

23   **A.**    That was my best recollection at that time.

24   **Q.**    And, in fact, he picked up the tape on September 6th,

25   2005, correct?

1  **A.**    It's possible, yes.

2  **Q.**    Later in that page at line 21 I asked you:

3              **"QUESTION:**  And when you gave the cassette

4              and the email and the attachments to Agent

5              Haynie, what did you tell him about the

6              documents?"

7      And your answer was:

8              **"ANSWER:**  I think the documents were

9              discussed in the previous conversation, and I

10             told him that that's the set of documents

11             that Michael sent."

12     Isn't that right?

13  **A.**    Yes.

14  **Q.**    The fact of the matter is that this is the same story that

15  you told Agent Haynie when you first gave him the documents

16  back in September of 2005, isn't that correct?

17  **A.**    No.

18  **Q.**    And that you have been telling that same story since then?

19  **A.**    The same story?  I only had an ability to review his

20  report five years after.  We were going in the conversation who

21  will create that letter back and forth.  And when -- the letter

22  was addressed to me.  When I saw that in the report, in the

23  discussion, it was also attached at that time to written

24  proposed agreement.  That's how I remembered it.

25      And on Tuesday the first thing I wanted to do at night, to

1   go back to the original email and find out the second

2   attachment.  And when I realized it wasn't there, I started

3   going back in my memory and realized that the attachment, the

4   second letter, was not sent.

5   **Q.**   Mr. Rocklin, the story that you told to this jury is the

6   same story that you told to Agent Haynie on September 6th,

7   2005, isn't that correct?

8   **A.**   No.  It was a mixup of some sort.  I gave him the written

9   agreement and, to the best of my recollection right now, the

10  second letter was just discussed as a proposed language of that

11  letter.

12  **Q.**   I just want to cover one other point with you.

13        In your redirect examination, I think even in

14  cross-examination when I was originally asking you questions, I

15  was asking you what your understanding was of Mr. Beker

16  insisting that someone from ATN call NPZ and Metelskiy; do you

17  recall that?

18  **A.**   Yes.

19  **Q.**   And correct me if I'm wrong, but generally speaking your

20  answer was that that would serve as corroboration for Mr. Beker

21  that everyone at ATN was on board with the agreement; is that a

22  fair characterization?

23  **A.**   Yes.

24  **Q.**   Isn't it true that, in fact, you understood that Mr. Beker

25  wanted Mr. Gaber to call Metelskiy at NPZ and tell Metelskiy to

1  coordinate everything at NPZ with Mr. Beker?

2  **A.**    Later on.  That's what he's saying in later conversations,

3  but my understanding was that he was looking for confirmation.

4  **Q.**    Didn't you tell the prosecutors back in December of 2007

5  that Mr. Beker was saying that he needed the cooperation of

6  Metelskiy in order to prepare the Russian customs papers that

7  he would give to ATN to shield ATN from ITE?

8  **A.**    Would you repeat the question?

9  **Q.**    Didn't you tell the prosecutors back in 2007, in December

10  of 2007, that Beker was saying that he needed the cooperation

11  of Metelskiy in order to prepare the Russian customs papers

12  that he would give ATN to shield ATN from ITE?

13  **A.**    In our conversation at first he's offering such papers,

14  and he's offering it at first from Russian customs, but later

15  on he's saying that this also could be just from Metelskiy.

16  **Q.**    That's not my question.  My question is:  Didn't you tell

17  the prosecutors in December of 2007 that Beker was saying in

18  that conversation that he needed the cooperation of Metelskiy

19  in order to prepare the Russian customs papers that he would

20  give to ATN to shield ATN from ITE?

21  **A.**    It was a part of the discussion.

22  **Q.**    Did you tell the prosecutors that back in 2007?

23  **A.**    Possible.

24  **Q.**    And didn't you also tell the prosecutors in December of

25  2007 that Beker's need for Metelskiy's cooperation could also

 1  have been related to Newcon wanting to supply TACOM with NPZ

 2  product?

 3  **A.**    It is also in conversation, in the beginning there.

 4  **Q.**    What I'm asking you is:  Did you tell the prosecutors that

 5  back in 2007?

 6  **A.**    It's possible, yes.

 7  **Q.**    Didn't you also tell the prosecutors back in December of

 8  2007 that you understood that Beker was looking to obtain

 9  product for Newcon from NPZ to supply to TACOM because Beker

10  was asking about production numbers and knew what was going on

11  with the production in previous discussions?

12  **A.**    It was a part of the conversation.

13  **Q.**    Again, my question is:  Did you tell the prosecutors that

14  back in 2007?

15  **A.**    Yes, because it was a part of conversation.

16  **Q.**    And didn't you also tell them that there was no other

17  reason for Beker to seek cooperation from NPZ?

18  **A.**    I don't recall that.

19          **MR. HOWDEN:**  I don't have anything further, your

20  Honor.

21          **THE COURT:**  Thank you.

22          **MR. OSTERHOUDT:**  Briefly.

23                  <u>**RECROSS EXAMINATION**</u>

24  **BY MR. OSTERHOUDT**

25  **Q.**   Mr. Rocklin, you were asked questions about the -- either

1    Mr. Beker or Mr. Prilik speaking to you about price, right, and

2    the impossibility of buying products under the contract for the

3    price that you were paying, is that correct?

4    **A.**    Yes.

5    **Q.**    And you said that that wasn't -- that was one of the

6    things that was incorrect because, indeed, you could get night

7    vision goggles from your sources, you know, and fund the -- and

8    perform the contract at the cost that you were charging, right?

9    **A.**    Yes.

10   **Q.**    In the same conversations, several times during these

11   conversations both Mr. Beker and Mr. Prilik expressed a view

12   that what you -- your goggles could not do was to meet the U.S.

13   Army FOM 750 requirement; do you remember that?

14   **A.**    I think it was once or twice, yes.

15   **Q.**    In these conversations, that was the view that both Mr.

16   Beker and Mr. Prilik expressed to you; was that your product

17   that you were going to be supplying from your sources could not

18   meet that contract specification, correct?  That's what they

19   were saying to you?

20   **A.**    There are two references.  One from Arie, when he's saying

21   that boss will complain if he thinks or knows.  And then a

22   second reference from Mr. Beker, when he's saying he recalls

23   these things as a slander, yes.

24   **Q.**    All right.  At any time during the conversation, did you

25   see a reference that either Mr. Beker or Mr. Prilik believed

 1  that you could supply goggles that met the 750 specifications?

 2  If so, maybe you can direct us to it.

 3          (Brief pause.)

 4  **A.**   I can't recall anything like that.

 5  **Q.**   So when -- when the defendants, Mr. Beker and Mr. Prilik,

 6  are discussing cost with you, that it would take to supply

 7  these goggles, they -- your understanding was they were talking

 8  about products, goggles that they felt would be compliant with

 9  the requirements of this contract, right?

10  **A.**   That I don't know.

11  **Q.**   And, in fact, the goggles that you provided, you told us,

12  I think, were found non-compliant by the Army Night Vision

13  Laboratory under American testing methods, right?

14  **A.**   Under American testing methods.

15  **Q.**   Yes.  This was an American contract by the U.S. Army,

16  correct?

17  **A.**   The goggles did not meet 750 FOMs.

18  **Q.**   That's right.

19  **A.**   When measured by an American standard, but they were 750

20  and above when measured by Russian.

21  **Q.**   And there was a stop order issued first though, right?

22  **A.**   Yes.

23  **Q.**   And they sent Ramzi a stop order that said, your goggles

24  didn't meet that specification, correct?

25  **A.**   That's right.

1   **Q.**   And it was enforced for a couple of weeks during which no

2   goggles were accepted?

3   **A.**   That's true.

4   **Q.**   Then you and lawyers went back to talk to the Army and

5   convinced them somehow that you had a Russian method of testing

6   that made them okay, right?

7   **A.**   I don't recall lawyers ever talking to Army.

8   **Q.**   You did though?

9   **A.**   We did.

10  **Q.**   And that was your pitch, right?  That, well, we use

11  Russian testing?

12  **A.**   It was not a pitch.  It was a fact.

13  **Q.**   But under the United States Army contract, under the U.S.

14  Army specifications and testing methods, your goggles were

15  non-compliant?

16  **A.**   They were not meeting 750 FOM at U.S. labs, no.

17  **Q.**   And isn't it your understanding that what Mr. Beker and

18  Mr. Prilik were telling you in these conversation, that nobody

19  could produce goggles that met that standard at the price you

20  were paying?

21  **A.**   No.  That was not my understanding at all.

22  **Q.**   The repeated references in your redirect examination to --

23  reference to money in the contract that was sent out, the

24  proposed contract, you've seen repeated references this these

25  transcripts to where both Mr. Beker and Mr. Prilik told you to

 1  change that document any way you saw fit, correct?

 2  **A.**   Yes.

 3  **Q.**   And it was your decision not to do that?

 4  **A.**   Yes.

 5  **Q.**   Because you thought it would be bad for ATN?

 6  **A.**   That's right.

 7  **Q.**   But this document, this entire exercise, you told us, I

 8  think, was an investigatory process in conjunction with the

 9  government, the FBI, right?

10  **A.**   Yes.

11  **Q.**   But you thought that if you put anything down in the

12  course of that cooperation, that was responsive to what Beker

13  and Prilik were requesting that would somehow compromise your

14  business?

15  **A.**   Correct.

16  **Q.**   That's what you thought.  And that was your decision?

17  **A.**   Yes.

18  **Q.**   Now, this -- this document number 51 that we discussed,

19  this is the customs letter that you drafted yourself, right?

20  Do you remember doing it now?  Do you remember doing it now at

21  your house?

22  **A.**   I don't think it was at my house.  I don't remember where

23  it was right now.

24  **Q.**   When was it?

25  **A.**   Again, I don't recall when was it.  It was around that

 1   time, but by now I start thinking that I -- I mean, I was the

 2   one who wrote the letter.

 3   Q.   And you just started thinking that after Mr. Howden asked

 4   you those questions yesterday, correct?

 5   A.   Yes.

 6   Q.   All right.

 7   A.   Not yesterday.  On Tuesday.

 8   Q.   You, sir, you provided that customs letter to the

 9   government and told them that Mr. Beker had created it,

10   correct?

11   A.   No.

12   Q.   You didn't?

13   A.   I did not.

14   Q.   So Mr. Haynie would be incorrect in his report?

15   A.   A mistake was made, I believe.

16   Q.   And you saw the report before your testimony here,

17   correct?

18   A.   Yes, I did.

19   Q.   And you didn't call to his attention that was a mistake?

20   A.   I saw the report five years after.

21   Q.   And you didn't call to his attention that it was an error

22   in it that was fundamental?

23   A.   No.

24   Q.   As a matter of fact, Mr. Rocklin, this -- you presented

25   this to the government and saying, Mr. Beker did it because you

1  thought that was important to your cooperation with the FBI,

2  right?

3  **A.**   Then why did I just correct it myself?

4  **Q.**   Because you got caught, sir.

5  **A.**   No, I did not.

6  **Q.**   The --

7          **THE COURT:**  We're better off if the attorney asks the

8  questions and you just answer them.

9          **THE WITNESS:**  Okay.

10         **THE COURT:**  Rather than you asking questions.

11 **BY MR. OSTERHOUDT**

12 **Q.**   Mr. Rocklin, you presented -- I put it to you.  I asked

13 you this question:  You presented this letter to the government

14 representing that Mr. Beker did it because it demonstrated you

15 thought it would demonstrate his influence in Russian official

16 circles; isn't that what you were trying to convey?

17 **A.**   No.

18 **Q.**   Why did you put down in the letter the contract number

19 between you and your supplier in Russia?

20 **A.**   Because that's what we were discussing in the previous

21 conversation, a proposed language of some sort.

22 **Q.**   You put it down there because -- that contract number,

23 because if it came from Mr. Beker, you would be in a position

24 to claim that it demonstrated his influence in Russia, correct?

25 **A.**   I just was preparing the letter, with that language.

1  **Q.**   And you didn't want people to think that because he had

2  that number and put it in the -- in the proposed customs

3  letter, that he was connected to the Russian customs people and

4  could make things happen?  That wasn't your intention?

5  **A.**   No.  I think that he had enough connection on his own,

6  that I need to further illustrate that.

7  **Q.**   And you told Mr. Howden in response to his questions

8  yesterday, when he asked you how that could happen, you said

9  that:  Well, he has connections there, right?

10  **A.**   On Tuesday, that's what I said.

11  **Q.**   You didn't say, Because I wrote the letter myself, you

12  know, and it wasn't his -- it wasn't him at all, right?

13  **A.**   Because at that time that was the best of my recollection.

14          **MR. OSTERHOUDT:**  No further questions.

15          **THE COURT:**  May the witness be excused?

16          **MS. HAMILTON:**  Yes, your Honor.

17          **THE COURT:**  Does he need to be subject to being

18  recalled?

19          **MR. OSTERHOUDT:**  I think he should be subject to

20  recall.

21          **THE COURT:**  You are subject to being recalled.  You

22  are excused.

23          And they can only recall you if I allow them to do

24  it, and it has to be for a very good reason, okay?  But you're

25  not to discuss your testimony with any other persons who may be

 1  witnesses until the trial is over.  Understand?

 2          **THE WITNESS:**  Yes.  And I have a quick question.  Can

 3  I travel locally to Las Vegas for one day or no?

 4          **THE COURT:**  You talk with the government and see when

 5  you may be needed and work it out with them.  As far as I'm

 6  concerned, yes.  But you need to be able to get back here if

 7  you're needed, you understand?

 8          **THE WITNESS:**  Yes.

 9          **THE COURT:**  Okay.  So I think you can talk with

10  whomever you're working with from the prosecutors, the U.S.

11  Attorney's Office, and let them know so that if they think

12  you're going to be needed on a particular date, you're not

13  going on that date.  Thank you.

14          **THE WITNESS:**  Thank you.

15          **THE COURT:**  Yes.

16          **MR. WARD:**  Your Honor, we have our next witness, and

17  it looks like we have about 20 minutes.  Should we get started?

18          **THE COURT:**  Let's do it.

19          **MR. WARD:**  Absolutely.  We'll bring him in.

20          **THE COURT:**  Step right up here and be sworn.

21  **WHEREUPON:**

22                          <u>**GREG HAYNIE,**</u>

23  called as a witness for the Plaintiff herein, having been first

24  duly sworn, was examined and testified as follows:

25          **THE CLERK:**  Please state your full name and spell

1    your last name for the record.

2              **THE WITNESS:**  My name is Greg Haynie, H-a-y-n-i-e.

3              **THE COURT:**  And you may proceed.

4                        <u>**DIRECT EXAMINATION**</u>

5    **BY MR. WARD**

6    **Q.**   Good afternoon, Agent Haynie.  Welcome.

7         Agent Haynie, what do you do?

8    **A.**   I'm a retired FBI agent.

9    **Q.**   And when did you retire?

10   **A.**   In January of 2008.

11   **Q.**   Prior to your retirement, how long were you an FBI agent?

12   **A.**   Approximately 24 years.

13   **Q.**   Could you walk through for us your assignments as an FBI

14   agent starting with your first assignment?

15   **A.**   My first office assignment was Phoenix, Arizona.  I was

16   assigned to a general white collar crime squad.

17        In 1988 I was transferred to San Francisco division for

18   approximately three years, worked out of the divisional

19   headquarters.  Again, another full-service white collar crime

20   squad.

21        Between 1992 and 1998 I've worked out of the Concord

22   office.  Again, another full-service white collar crime squad.

23        And when I say "full service," we covered everything from

24   mail fraud, wire fraud, consumer fraud, bankruptcy fraud, on

25   and on.

 1        And then for my last few years here in the San Francisco

 2   division, worked out of the Oakland office from, I believe it

 3   was, June of 1995 to December of 2006, where in addition to all

 4   of the other violations, we also worked public corruption and

 5   price fixing.

 6   **Q.**   So overall how much experience have you had investigating

 7   fraud cases?

 8   **A.**   I have worked hundreds of cases.

 9   **Q.**   Okay.  And that includes wire fraud cases?

10   **A.**   Routinely.

11   **Q.**   Now, do you know Dmitry Rocklin?

12   **A.**   I do.

13   **Q.**   How did you come to know Mr. Rocklin?

14   **A.**   Our Concord office received a letter dated August 19th,

15   2005 which was a summary letter of potential allegations of

16   criminal activity on the part of the principles of Newcon,

17   Mr. Arie Prilik and Mr. Michael Beker against ATN and Mr.

18   Rocklin.

19   **Q.**   How did this complaint come to your attention?

20   **A.**   For a period of years I was detailed to the antitrust

21   division to help with investigating price fixing cases and I

22   was the detailee at that point.

23   **Q.**   Okay.  And, Agent Haynie, can you just give us a brief

24   synopsis of your understanding of the complaints in that

25   letter?

 1              **MR. OSTERHOUDT:**  Your Honor, I'm going to object to

 2    that.  He has already said the letter prompted him to become

 3    acquainted with Rocklin.  So I object to further testimony.

 4              **THE COURT:**  Well, shouldn't we just move to his

 5    testimony about the investigation and the information that he

 6    developed and so forth?  It seems to me that is more pertinent.

 7              **MR. WARD:**  That's fine, your Honor.

 8    **BY MR. WARD**

 9    **Q.**   Let me ask you this, Agent Haynie.  Did you take any

10    action upon receiving this letter from ATN?

11    **A.**   I did.

12    **Q.**   And just so we're clear, the letter -- who was the letter

13    from specifically?

14    **A.**   It was from a Ms. Karen McGee, which was the counsel for

15    ATN.

16    **Q.**   And what did you do after receiving this letter?

17    **A.**   Based upon the information in the letter, I opened up a

18    FBI case by computer over at my office.

19    **Q.**   Is it standard procedure for you to open an investigation

20    upon receipt of a letter like this?

21    **A.**   It is.

22    **Q.**   All right.  And following the opening of this

23    investigation, what did you do next?

24    **A.**   Coordinated my efforts with the antitrust division, which

25    resulted in a scheduled interview of Mr. Rocklin at his offices

1  in South San Francisco.

2  **Q.**   And when was that interview?

3  **A.**   On August 24, 2005.

4  **Q.**   And who was present for this interview?

5  **A.**   Mr. Rocklin was obviously there.  His attorney, Karen

6  McGee, as well as ATN Vice-President James Munn, myself, and

7  then one of the antitrust attorneys.

8  **Q.**   All right.  And where was this meeting held?

9  **A.**   ATN has its corporate offices in South San Francisco,

10  California.

11  **Q.**   And during this meeting, did you discuss with Dmitry

12  Rocklin the allegations that had been raised in this letter

13  from ATN's counsel?

14  **A.**   I did.

15  **Q.**   All right.  And based on that interview, what was your

16  understanding of the allegations that were being raised here?

17  **A.**   Presented -- using the letter largely as a guide, and then

18  filling in with additional interview information, the first

19  thing that caught my eye was a letter -- or a telephone

20  conversation which was referenced in the letter, which occurred

21  on August 17, 2005 between Mr. Prilik and Mr. Rocklin, which

22  described an overt --

23          **MR. OSTERHOUDT:**  Excuse me, your Honor.  I'm going to

24  object to the content of this communication being offered on

25  hearsay grounds.

1          **THE COURT:**  Well, I will allow it because it informs,

2   then, the actions that this agent took in conducting the

3   investigation.

4          But the agent -- you should avoid any

5   characterization of it and try to give it essentially as close

6   as you can, if not verbatim, what the language in the letter

7   stated.

8          **THE WITNESS:**  Okay.

9   **A.**   In this particular conversation Mr. Prilik encouraged

10  their two companies, meaning ATN and Newcon, to engage in price

11  fixing against the U.S. Army.  Specifically he wanted -- or he

12  encouraged to Dmitry Rocklin to increase the prices that he was

13  charging to a level that matched Newcon's.

14  **Q.**   Based on this interview, who did you understand the

15  participants to be in this activity?

16  **A.**   The two names mentioned were Michael Beker and Arie

17  Prilik.

18  **Q.**   All right.  Agent Haynie, based on that interview, what,

19  if any, action did you take?

20  **A.**   As I said before, the case had been officially opened on

21  the FBI side, and I gave instructions or had a conversation

22  with Dmitry Rocklin to see if he would feel comfortable in

23  participating operationally as a part of our investigation.

24  Specifically, to -- with our help and our assistance, to record

25  telephone conversations that he might have with Mr. Prilik and

HAYNIE - DIRECT EXAMINATION / WARD                1121

1   Mr. Beker.

2   **Q.**    Did Dmitry Rocklin agree to cooperate in this

3   investigation?

4   **A.**    He did.

5   **Q.**    After he agreed to cooperate, did you develop an

6   investigation plan that involved Mr. Rocklin's cooperation?

7   **A.**    Yes.

8   **Q.**    What, in general, was that plan?

9   **A.**    We were to attempt to gather any kind of records that

10  might be available.  We were interested in emails, facsimiles,

11  wire transfers, things that would establish any kind of

12  criminal activity; but the core to all that was going to be a

13  series, if we could, of recorded telephone conversations.

14  **Q.**    Why did you include as part of this plan recording the

15  calls that Dmitry Rocklin had with Arie Prilik and Michael

16  Beker?

17  **A.**    In a traditional white collar crime financial kind of

18  case, it's usually not the case that the developing records or

19  finding records or finding the appropriate records is a

20  problem.  The art of that kind of an investigation is simply

21  knowing where to look and what to -- what to obtain.

22       In situations like this, there is no -- as it turned out,

23  there were no face-to-face meetings between Dmitry Rocklin and

24  Arie Prilik or Michael Beker.  Institutional -- institutional

25  records were non-existent, and the kind of representations and

1  threats that were made toward Mr. Rocklin were done over the

2  phone.

3      And so to prove the gist of those conversations and the

4  tenor of those conversations and the seriousness of those

5  conversations, nothing short of recordings of those telephone

6  conversations would work.

7  **Q.**    Did you explain this plan to Mr. Rocklin?

8  **A.**    I did.

9  **Q.**    And what was his reaction to your proposal?

10 **A.**    He agreed, nervously, to help.

11         **MR. OSTERHOUDT:**  Objection, your Honor, to the detail

12 about what he -- what Mr. Rocklin, how he -- he responded.  He

13 agreed.  That's enough.  I object.

14         **THE COURT:**  You're objecting to the "nervously"?

15         **MR. OSTERHOUDT:**  Yeah.

16         **THE COURT:**  I don't know if it is really pertinent

17 anyway, so I'll strike the nervously."  And if there is some

18 reason for it, then you can ask more appropriate questions to

19 get there.

20 **BY MR. WARD**

21 **Q.**    Agent Haynie, did you subsequently put your investigation,

22 investigative plan in action utilizing Mr. Rocklin's

23 cooperation?

24 **A.**    I did.

25 **Q.**    I want to ask you about those steps, but first during this

1   investigation, were there other law enforcement agencies

2   involved?

3   **A.**    There were.

4   **Q.**    What agencies were involved?

5   **A.**    Specifically, Army Criminal Investigative Division, which

6   is the law enforcement arm of the U.S. Army.

7   **Q.**    What was their role in the investigation?

8   **A.**    We anticipated that there would be a series of phone

9   calls, outgoing or incoming, from Mr. Beker and Mr. Prilik to

10  TACOM, the contracting arm of the U.S. Army.  And to shepherd

11  that process, I pulled in Army CID and asked them if they would

12  coordinate the taping, the physical taping of any of those

13  conversations with the appropriate representatives at TACOM.

14  **Q.**    Were there other FBI agents working with you on this

15  investigation?

16  **A.**    There was.

17  **Q.**    And you testified that there were prosecutors at the

18  meeting with Mr. Rocklin.  Were you working with federal

19  prosecutors on this investigation?

20  **A.**    I was.

21  **Q.**    All right.  What, if anything, did Mr. Rocklin ask for in

22  return for his cooperation?

23  **A.**    Nothing.

24  **Q.**    And what conditions, if any, did Mr. Rocklin place on his

25  cooperation with the FBI?

1   **A.**    None at all.

2   **Q.**    And what offers, if any, did the FBI make to Mr. Rocklin

3   in return for his agreement to cooperate?

4   **A.**    None.

5   **Q.**    What promises, if any, did the FBI make to Mr. Rocklin in

6   return for his cooperation?

7   **A.**    None.

8   **Q.**    And threats.  What threats, if any, did the FBI make to

9   Mr. Rocklin in return for his cooperation?

10  **A.**    No threats.

11  **Q.**    You said that you asked Dmitry Rocklin to record telephone

12  conversations.  Who specifically did you ask him to record his

13  conversations with?

14          (Brief pause.)

15  **A.**    My hesitation is I'm reading the document in my mind.

16  Specifically, Arie Prilik and Michael Beker.

17  **Q.**    And before these conversations could be recorded, did

18  Dmitry Rocklin have to agree to record these calls?

19  **A.**    He did.

20  **Q.**    And was -- was Mr. Rocklin required to sign anything

21  before he began recording calls?

22  **A.**    Yes, he did.

23  **Q.**    What was he required to sign?

24  **A.**    Within the FBI, it's Form FD-472.

25          **MR. WARD:**  May I approach, your Honor?

 1              **THE COURT:**  Yes, you may.  And you don't have to

 2    repeat the request.

 3              **MR. WARD:**  Thank you.

 4              (Whereupon, binder was tendered

 5               to the witness.)

 6    **BY MR. WARD**

 7    **Q.**   Agent Haynie, would you turn to tab two in your -- in the

 8    binder I just handed you?

 9    **A.**   Yes.

10    **Q.**   I'm showing you what has been previously marked Government

11    Exhibit 125, and I should say previously marked and admitted.

12         Are you familiar with this document?

13    **A.**   Yes, I am.

14    **Q.**   What is it?

15    **A.**   It is the FD-472 which is a -- it's a form that documents

16    the voluntary and knowing nature of what Mr. Rocklin was about

17    to do and what we were going to ask him to do.

18    **Q.**   Is this a copy of the form that you had Dmitry Rocklin

19    sign on August 26th, 2005?

20    **A.**   Yes, it is.

21    **Q.**   And why did you have Mr. Rocklin sign this?

22    **A.**   So he would affirm that what he was doing was of his own

23    free will and choice and was being done voluntarily.

24    **Q.**   And what, if anything, did you explain to him from this

25    form?

1  **A.**    Unlike many forms in the FBI, this is one of those that

2  would last for the pendency of the case.  So if he -- if he

3  signed this particular form, it was good for the entire

4  investigation.

5       We simply -- we normally put just one name when it talks

6  about the subject of a potential over here.  In this particular

7  case it was Arie Prilik, but it also says "and others as yet

8  unknown," which is -- which provides very broad, over here,

9  authority on our part.

10  **Q.**    And do you see the -- the signature at the bottom of this

11  document?

12  **A.**    Yes.

13  **Q.**    Whose signature is that?

14  **A.**    Dmitry Rocklin.

15  **Q.**    And below that, do you see two additional signatures?

16  **A.**    Uh-huh.

17  **Q.**    Starting with the one on the stop, whose signature is

18  that?

19  **A.**    That's my personal signature.

20  **Q.**    And the signature below, whose signature is that?

21  **A.**    That was an additional agent, Agent Susan Sivok.

22  **Q.**    Is the recording of telephone calls with the cooperation

23  of one party known at times as consensual monitoring?

24  **A.**    Yes, it is.

25  **Q.**    Approximately how many investigations have you been

1  involved in that have included consensual monitoring?

2  **A.**    Perhaps 20 or 30.

3  **Q.**    And why does the FBI use consensual monitoring as an

4  investigative technique?

5  **A.**    Recorded telephone calls are perhaps the most potent form

6  of evidence that we gather.  It's done, obviously, with the

7  full permission and knowledge of at least one party in the

8  federal system.

9       But people -- people are apt to say things on telephone

10  calls that are quite forthcoming; not just the pattern of

11  potential criminal activity, but perhaps their motivation.  And

12  it's quite compelling when you hear someone explain something

13  in their own words.

14  **Q.**    Agent Haynie, did you provide recording equipment for Mr.

15  Rocklin to use?

16  **A.**    I did.

17  **Q.**    And what kind of equipment did you provide him?

18  **A.**    Fairly high fidelity desk top cassette recording

19  equipment.

20  **Q.**    Where did this recording equipment come from?

21  **A.**    The FBI has a technical offsite, which has specialists

22  that provide for our needs.

23  **Q.**    And where did you obtain the recording equipment?

24  **A.**    From the technical offsite.

25  **Q.**    Once you obtained the equipment, what did you do with it?

1    **A.**    Took it over to Dmitry's office in South San Francisco and

2    provided it to him.

3    **Q.**    And what happened after you provided it to him?

4    **A.**    Provided him with some hands-on experience, some

5    instructions, some cautions.

6    **Q.**    Let me back up.  Did you help him set it up?

7    **A.**    I did.

8    **Q.**    Did you show Mr. Rocklin how to operate it?

9    **A.**    I did.

10   **Q.**    Was Mr. Rocklin provided tapes?

11   **A.**    He was.

12   **Q.**    And what was on the tapes?

13   **A.**    Nothing.  They were blank tapes.

14   **Q.**    How do you know the tapes were blank?

15   **A.**    Were they were brand new tapes.  We only use new tapes in

16   their original cellophane.

17   **Q.**    Was Dmitry Rocklin given any instructions as to what he

18   was to do as he was beginning to make a recorded phone

19   conversation?

20   **A.**    Yes.

21   **Q.**    And what instructions were those?

22   **A.**    Most importantly for his part was what we call a preamble.

23   It is simply speaking into the telephone, which then picks up

24   the recording and puts it onto the tape.

25        We're looking for:  Today's date is thus and such.  My

1  name is Dmitry Rocklin.  I'm making a phone call from this

2  phone number.  I am now calling this phone number and

3  anticipate speaking with so-and-so.

4      So that preamble, I asked him specifically to provide that

5  by merely talking into the telephone receiver before he

6  actually pressed the buttons on his telephone to make the call.

7  **Q.**  What's the purpose of this preamble?

8  **A.**  If the tape gets separated from the herd, you have all the

9  information you need to identify it discretely.

10 **Q.**  To your knowledge, did Mr. Rocklin follow these

11 instructions?

12 **A.**  Yes, he did.

13 **Q.**  And how do you know that?

14 **A.**  I asked him.  We practiced it.

15 **Q.**  Did you provide Mr. Rocklin with any general instructions

16 about what to say when he was speaking with either Michael

17 Beker or Arie Prilik on the phone?

18 **A.**  I did.

19 **Q.**  What were those general instructions?

20 **A.**  I cautioned him against trying to elicit certain things to

21 hear specifically, but more to be a listening ear and to leave

22 the conversation open ended.  And if there were representations

23 to be made, if there were overtures or proposals, I wanted them

24 to come through on their own, on their own accord.

25 **Q.**  Did you give Dmitry Rocklin any instructions on

1  maintaining the tape recorder?

2  **A.**    I did.

3  **Q.**    And what were those instructions?

4  **A.**    The kinds of things that you might think of.  I

5  specifically asked him to limit access to where the telephone

6  was, which was simply on the corner of his desk.  He let his

7  staff know that he wanted his office to be private and when he

8  wasn't using the machinery, from time to time he placed a cloth

9  over the top of it so it was quite unobtrusive.

10  **Q.**    Did you also give him instructions on what to do with the

11  cassette tapes once he made a recording?

12  **A.**    Yes.

13  **Q.**    And what were those instructions?

14  **A.**    I wanted -- to the degree possible, I wanted him to have

15  one conversation on one tape and not -- and not add a layer of

16  complexity to that.

17       I asked him as soon as he withdrew the tape, to write on

18  the physical tape a number of items; such as, the file number,

19  the people that he overheard or actually was talking to on the

20  tape, and the date.  Basic information.

21  **Q.**    Did you give any additional instructions about what to do

22  after making a recording?

23  **A.**    Asked him to call me immediately.

24  **Q.**    And did, in fact, Dmitry Rocklin call you after each

25  conversation with either Michael Beker or Arie Prilik?

1  **A.**    He did.

2  **Q.**    And did you speak to Mr. Rocklin after each conversation

3  he recorded with either Michael Beker or Arie Prilik?

4  **A.**    I did.

5  **Q.**    Did Mr. Rocklin also provide you with the cassette tapes

6  of the recordings of these conversations with Michael Beker or

7  Arie Prilik?

8  **A.**    Yes.  Depending on what my schedule was like on that given

9  day, I made every effort to go over and retrieve each

10  individual tape as soon as I could.

11  **Q.**    How many cassette tapes did he give you in total?

12  **A.**    Total of 13.

13  **Q.**    All right.  What did you do when Mr. Rocklin handed you

14  the tape?

15  **A.**    I went directly back to my desk, which was physically

16  located in Oakland.  You'll notice on most cassette tapes they

17  have little tabs on the upper corners.  I punched those out so

18  that it couldn't be recorded over.

19       And then, again, to the degree possible, when I had some

20  time, I physically listened to each tape, which was odd in

21  itself because they were in Russian.  I wasn't listening to

22  determine content.  I was listening to it to make sure that the

23  recording equipment was functioning properly and that we didn't

24  have any problems with that.

25  **Q.**    When you were handed the tapes, did you write anything on

HAYNIE - DIRECT EXAMINATION / WARD

1  them?

2  **A.**   If there was a date missing or something, I added it at

3  that point.  Nothing more.

4          **MR. WARD:**  Your Honor, this is a --

5          **THE COURT:**  A good time?

6          **MR. WARD:**  As good a time as any.

7          **THE COURT:**  After all the instructions, now we are

8  going to get into the substance; is that it?

9          **MR. WARD:**  I've got a little more of the stage

10  setting, but it's about 1:35.

11          **THE COURT:**  That's all right.  Maybe we can just

12  finish setting the stage and get into the substance tomorrow.

13  Want to do that?

14          **MR. WARD:**  Very well, yes.

15          **THE COURT:**  Okay.

16  **BY MR. WARD**

17  **Q.**   You said you took possession of the tapes.  Did you have

18  them translated?

19  **A.**   I did.

20  **Q.**   Where were they sent to be translated?

21  **A.**   I reached out to FBI headquarters and they provided me

22  with a list of Russian-to-English translators that were already

23  certified.  And I believe in total there were three, three sets

24  of translators that were provided tapes.

25  **Q.**   And were the tapes, in fact, translated?

1   **A.**    They were.

2   **Q.**    And how do you know?

3   **A.**    The tapes went out.  I spoke to the translator myself, and

4   the tapes came back with completed transcripts.

5   **Q.**    Where were those transcripts sent?

6   **A.**    Different states.  I'm not sure my memory is quite that

7   good, but there were multiple states where these people were

8   physically residing; that was protocol at the time, you simply

9   send them directly to the translator.

10  **Q.**    Let me be a little more clear.  Once the translators had

11  made transcripts in English, where were those transcripts sent?

12  **A.**    I provided the transcripts to the Antitrust Division.

13  **Q.**    All right.  Now, were you present for any of Mr. Rocklin's

14  recorded calls with the defendants?

15  **A.**    A few.

16  **Q.**    Do you know which ones?

17  **A.**    I know that I was there for two calls on August 26, 2005.

18  They all tend to run into each other beyond that for me, but I

19  was there for three or four conversations.

20  **Q.**    For the calls where you were present, did Mr. Rocklin

21  record the entire conversation?

22  **A.**    He did.

23  **Q.**    And did you interview Mr. Rocklin immediately following

24  this conversation?

25  **A.**    I did.

1  **Q.**   And could you understand the conversation while it was

2  occurring?

3  **A.**   Not at all.

4  **Q.**   Do you speak Russian, Agent Haynie?

5  **A.**   I do not speak Russian.

6         **MR. WARD:**  This is actually a good spot.

7         **THE COURT:**  Fine.  So, ladies and gentlemen, thank

8  you for your patience staying a few more minutes longer.

9         We'll see you tomorrow morning, 8:30; same time, same

10 place.  Please follow the instructions about not discussing the

11 case amongst yourselves or anyone else, or form or expressing

12 an opinion based upon what you've heard so far.

13        We will see you tomorrow morning at 8:30.  Have a

14 very good afternoon and evening.

15        (Jury exits courtroom at 1:34 p.m.)

16        **THE COURT:**  And, Agent Haynie, you may step down, but

17 do not discuss your testimony with any other persons who may be

18 witnesses until the trial is over.  And we'll see you tomorrow

19 morning at 8:30 also.

20        (Witness steps down.)

21        **THE COURT:**  And if you would advise opposing counsel

22 as to who your next witness is going to be after the agent?

23        **MR. WARD:**  We have.  Aseem Padukone, who is going to

24 authenticate some documents.  And then we'll have Derek

25 McAleer.

```
1              So I would expect -- I don't know how long the cross

2    of Agent Haynie is going to be.

3              MR. HOWDEN:  Two days...

4              MS. HAMILTON:  You're going easy on him.

5              MR. WARD:  Because our direct is three days.

6              THE COURT:  This doesn't have to be on the record.

7         (Discussion held off the record.)

8         (Whereupon at 1:35 p.m. further proceedings

9          in the above-entitled cause was adjourned

10          until Friday, January 21, 2011 at 8:30 a.m.)

11

12                        -   -   -   -

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PROCEEDINGS                                    1136

1

2

3                    **I  N  D  E  X**

4

**PLAINTIFF'S WITNESSES**                     **PAGE**   **VOL.**
5

6

7    **ROCKLIN, DMITRY**
     (PREVIOUSLY SWORN)                          948      7
8    Cross-Examination Resumed by Mr. Howden     949      7
     Redirect Examination by Ms. Hamilton        965      7
9    Recross Examination Resumed by Mr. Howden  1089      7
     Recross Examination Resumed by Mr. Osterhoudt 1107   7
10

11   **HAYNIE, GREG**
     (SWORN)                                     1115     7
12   Direct Examination by Mr. Ward              1116     7

13

14                  **E X H I B I T S**

15

**TRIAL EXHIBITS**              **IDEN**  **VOL.**   **EVID**  **VOL.**
16
     52                                             1020      7
17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

WE, LYDIA ZINN, and DEBRA PAS, Official Reporters for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in CR. 07-765 MHP, United States of America v. Mendel Beker, et al., were reported by us, certified shorthand reporters, and were thereafter transcribed under our direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by us at the time of filing

The validity of the reporters' certification of said transcript may be void upon disassembly and/or removal from the court file.

_____/s/ Lydia Zinn_____
Lydia Zinn, CSR 9223, CRR

_____/s/ Debra L. Pas_____
Debra L. Pas, CSR 11916, CRR

Thursday, January 20, 2011