Volume 8

Pages 1137 – 1310

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARILYN HALL PATEL

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
  vs.                           ) NO. CR. 07-0765 MHP
                                )
MENDEL BEKER, ARIE PRILIK, and  )
NEWCON INTERNATIONAL,           )
                                ) San Francisco, California
            Defendants.         ) Friday
                                ) January 21, 2011
_____) 8:40 a.m.


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
**For Plaintiff:**            U.S. Department of Justice
                              Antitrust Division
                              450 Golden Gate Avenue, Room 10-0101
                              San Francisco, CA  94102-3478
                              (415) 436-6673
                              (415) 436-6687 (fax)
                    BY:  **DAVID J. WARD**
                         **ANNA TYRON PLETCHER**
                         **RICHARD B. COHEN**
                         **JEANE HAMILTON**


(Appearances continued on next page)

1138

```
1   APPEARANCES (CONT'D)

2   For Defendants:          Winston & Strawn, LLP
                             101 California Street
3                            San Francisco, CA  94111
                             (415) 591-1439
4                            (415) 591-1400 (fax)
                       BY:   JONATHAN ROBERT HOWDEN
5
    For Defendants:          Martha A. Boersch
6                            Attorney at Law
                             555 California Street, 26th Floor
7                            San Francisco, CA  94104
                             (415) 626-3939
8                            (415) 875-5700 (fax)
                       BY:   MARTHA A. BOERSCH
9
    For Defendants:          Law Offices of William L. Osterhoudt
10                           135 Belvedere Street
                             San Francisco, California  94117-3915
11                           (415) 664-4600
                             (415) 664-4691 (fax)
12                     BY:   WILLIAM L. OSTERHOUDT

13  For Defendants:          Law Offices of Frank S. Moore
                             235 Montgomery Street, Suite 854
14                           San Francisco, CA  94104
                       BY:   FRANK S. MOORE
15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

January 21, 2011                                                    8:40 a.m.

        (Jury in at 8:40 a.m.)

        **THE COURT:**  You may be seated.  May I have my next witness?

        **MR. WARD:**  We have the same witness.

        **THE COURT:**  The same witness?

        **MR. WARD:**  Yes.

        **THE COURT:**  Well, that's good.  That's usually how it works.  We had the same witness for a long time there.

        **MS. HAMILTON:**  Yeah.

        **THE COURT:**  And good morning, ladies and gentlemen.

        **THE JURORS:**  Good morning.

        **THE COURT:**  You know, every morning they're just in unison and enthusiastic.  Great.

        And, Agent Haynie, if you'd just step right up here and be seated, I'll remind you you're still under oath, and the oath will not be readministered.  And you may continue.

        **MR. WARD:**  Thank you, your Honor.

**GREG HAYNIE**,

called as a witness for the Plaintiff herein, having been previously sworn, resumed the stand and testified further as follows:

1                       **DIRECT EXAMINATION RESUMED**

2   **BY MR. WARD**

3   **Q.**   Good morning, Agent Haynie.

4   **A.**   Good morning.

5   **Q.**   Yesterday we were talking about your work with

6   Mr. Rocklin, and I'd like to pick up there.

7        Did the topic of asking the defendants for money come up

8   in your conversations with Dmitry Rocklin?

9   **A.**   It did.

10  **Q.**   And when did that come up?

11  **A.**   In the earliest stages of the investigation, it was

12  apparent this was -- this was a financial investigation, and

13  large amounts -- large dollar amounts were in play between the

14  two companies.

15          **MR. OSTERHOUDT:**   Objection, your Honor.  Not

16  responsive.

17          **THE COURT:**   The objection is overruled.

18          **MR. WARD:**   You may continue.

19          **THE WITNESS:**   And so I made the comment to Dmitry

20  that the day may very well come when a -- a formal proposal of

21  money may come his way, and if it did, he was to accept it, and

22  ask for money.

23  **BY MR. WARD**

24  **Q.**   At some point, did the -- did the topic of specifically

25  asking the defendants for $50,000 come up in your conversations

HAYNIE- DIRECT EXAMINATION / WARD

1    with Dmitry Rocklin?

2    **A.**    It did.

3    **Q.**    And when did that come up?

4    **A.**    On August 30, 2005.

5    **Q.**    And what was the context for that discussion?

6    **A.**    There was a telephone conversation between Mr. Rocklin and

7    Mr. Beker on the 30th.  And Mr. Beker made a proposal or an

8    offer to Mr. Rocklin to pay him 75 to $100 per unit that they

9    might provide to the U.S. Army in place of ATN.

10        And Mr. Rocklin heard the overture, and expressed his

11   willingness to -- to accept a certain amount of money; but no

12   dollar -- dollar amount, at that point, had been decided upon.

13   **Q.**    And following that conversation, what was your discussion

14   with Dmitry Rocklin about asking for $50,000?

15   **A.**    That was the trigger we had been waiting for.  And we --

16   we had a kind of a -- an ongoing conversation between the two

17   of us.  There's no FBI protocol for how much money you ask in a

18   situation like that.  There's no mathematical formula.  It was

19   simply:  What do you think would be appropriate in a situation

20   like this?  And what might -- what might go forward?  What

21   would Beker feel comfortable with?

22   **Q.**    Did the topic of creating a documentary record of any

23   payments from the defendant come up; and was that discussed

24   with Mr. Rocklin?

25   **A.**    Yes.

HAYNIE- DIRECT EXAMINATION / WARD

1   Q.   And what was the nature of that discussion?

2   A.   Similar to the exchange of funds, I -- I impressed upon

3   him the importance of, if possible, to document the transaction

4   on some sort of piece of paper:  A hard copy.  And in this

5   case, we ultimately landed on a commercial invoice.

6   Q.   Did -- at some point did you then learn that Newcon and

7   Michael Beker had agreed to make a payment to ATN?

8   A.   I did.

9   Q.   And how did you find that out?

10  A.   There was a subsequent conversation between Mr. Beker and

11  Mr. Rocklin on September 1, 2005.  Again, the conversation came

12  up as to how much Mr. Beker might be willing to pay Mr. Rocklin

13  for each of the units.  Whereas before it was $75 to $100; now

14  it was $75 firm.

15       And Mr. Beker, at that time, told Mr. Rocklin that he

16  was -- he was still willing to pay some sort of good-faith

17  amount in furtherance of that -- of that proposal.  And at that

18  time, Mr. Rocklin asked for $50,000.

19  Q.   Did you give Dmitry Rocklin any specific instructions on

20  accepting that $50,000 in regard of a bank account for

21  accepting those -- that $50,000?

22  A.   I wanted the transaction to be as pure as possible, so I

23  instructed Mr. Rocklin to set up another -- another account,

24  under ATN's logo locally, in the area.  And the purpose of that

25  account would be simply for the receipt, potentially, now, of

HAYNIE- DIRECT EXAMINATION / WARD

1    the $50,000 that he had asked Mr. Beker for.

2    **Q.**   And was that -- that bank account set up?

3    **A.**   It was.

4    **Q.**   I'd like to turn your attention to Tab 5 in your binder,

5    if you would.  I'm showing you what has been previously marked

6    and admitted as Government's Exhibit 2.  Are you familiar with

7    this document, Agent Haynie?

8    **A.**   I am.

9    **Q.**   And what is it?

10   **A.**   It's a one-page informational sheet that was provided

11   to -- that Dmitry Rocklin provided, both by fax and by e-mail

12   attachment, to Mr. Beker on the 1st of September of 2005.

13        Thank you.

14        It simply provides ATN's banking information.  Yeah.  As

15   you can see on the top there, it says,

16   "Union Bank of California, San Mateo Office"; the complete

17   address; phone number, followed by -- it says, "American

18   Technologies Network corporation"; the account number.

19        That was the account that was set up specifically for the

20   receipt of the $50,000 payment.

21        Below that, the routing number, which is the Federal

22   Reserve coding, which designates a particular bank, and a

23   branch within a bank; and then the SWIFT code, which is the

24   code used for wire transfers.

25   **Q.**   To your knowledge, was this document sent to Arie Prilik

1   and Michael Beker?

2   **A.**   Yes, it was.

3   **Q.**   How was it sent?

4   **A.**   It was sent both by fax and by e-mail.  I was physically

5   present when -- when the fax was sent.

6   **Q.**   Did you participate in the sending of this fax?

7   **A.**   I did.

8   **Q.**   Were there other documents in addition to this document

9   that were faxed?

10  **A.**   Yes.  On September 1 there was one additional document,

11  which was a commercial invoice.  It was a bogus invoice.  It

12  was something that Dmitry drafted up on ATN letterhead, once

13  again, to -- to show the $50,000.  And on the invoice, it was

14  shown as a loan from Newcon to ATN, which was false.

15      Mr. Beker had asked Dmitry to furnish the corporate "Inc."

16  stamp of ATN, as well as an original signature on that, which

17  Dmitry did.

18          **MR. HOWDEN:**  Your Honor, excuse me.  Could I ask that

19  parts of that answer be stricken?

20          And I'd ask that you direct the agent not to

21  editorialize or comment, referring to the document as "bogus,"

22  telling the jury that the "loan" designation is false.  It is

23  the kind of editorialization that's not required by his

24  testimony.

25          **MR. OSTERHOUDT:**  We'd join that specifically.

1              THE COURT:   The objection is overruled.

2    BY MR. WARD

3    Q.   Agent Haynie, please turn to Tab 6 in your binder.

4         I'm showing you what has previously been marked and

5    admitted as Government's Exhibit 3.  Are you familiar with this

6    document?

7    A.   Yes, I am.

8    Q.   And what is it?

9    A.   It's called an "Activity Report," which simply shows

10   whether the -- a fax has -- has gone through appropriately.

11   Q.   And how did you come to be familiar with this document?

12   A.   It was printed off the fax machine at the conclusion of

13   the fax on September 1.

14   Q.   This was the fax where you were present?

15   A.   Yes.

16   Q.   Did the fax go through?

17   A.   It did.

18   Q.   How do you know?

19   A.   If you look across the top box, there's a box labeled

20   "Result," and below that, it says, "Okay."

21   Q.   Agent Haynie, you testified that you faxed these documents

22   to Newcon on September 1st.  Did you speak to Dmitry Rocklin

23   following this interaction?

24   A.   I did.

25   Q.   And when was the next time you spoke to Dmitry Rocklin?

HAYNIE- DIRECT EXAMINATION / WARD                    1146

1   **A.**   On September 2, the next day.

2   **Q.**   On September 2nd, did he provide you with any documents?

3   **A.**   He did.

4   **Q.**   And what documents did he provide you?

5   **A.**   There was an e-mail dated September 2.

6   **Q.**   If you could look at Tab 7, I'm showing you what's been

7   marked previously admitted as Government's Exhibit 51.  This

8   was the first page.  For the record, the Bates number is

9   FBI-038.  Is this the e-mail Mr. Rocklin provided to you?

10  **A.**   Yes, it is.

11  **Q.**   Did he provide you with any other documents?

12  **A.**   There were -- were two other -- two other documents that

13  he provided me with.

14  **Q.**   And if you'd look at Tab 8, please, this is also a

15  portions of Government Exhibit 51:  FBI-40, FBI-41, and FBI-43.

16  Are you familiar with those documents?

17  **A.**   Yes, I am.

18  **Q.**   And were these the documents Dmitry Rocklin provided to

19  you?

20  **A.**   Yes.

21  **Q.**   What did he tell you about these documents?

22  **A.**   The one document is an agreement -- a *pro forma*

23  agreement -- a proposed agreement that was provided to him by

24  Mr. Beker.  It basically had a series of -- of bullet points

25  describing their relationship over time.

HAYNIE- DIRECT EXAMINATION / WARD

1        The first part talks about the difficulties Mr. Rocklin

2    was having in -- in filling up his contract.

3        The second part talks about Newcon's ability to -- to

4    carry on with Government contracts.

5        And the third portion simply talks about how the two of

6    them might orchestrate their behavior into the future.

7        So this was -- this was kind of a status document between

8    the two companies.

9    **Q.**   And the second document?

10   **A.**   The second document was -- was simply a sample paragraph;

11   verbiage, if you will, of something that might have been

12   provided to Russian Customs to explain why their -- their

13   inventory hadn't been able to get out and be shipped properly.

14   **Q.**   Did Dmitry Rocklin tell you how he came to receive these

15   documents?

16   **A.**   My understanding is that they both came through on the

17   e-mail dated September 2.

18   **Q.**   Did you obtain an electronic copy of these documents?

19   **A.**   I did not.

20   **Q.**   Did you obtain any other copies of these documents?

21   **A.**   Just hard copy.

22   **Q.**   All right.  Now, at some point did you become aware that

23   $50,000 had, in fact, been deposited into the

24   Union Bank of California bank account that you testified was

25   set up in this case?

HAYNIE- DIRECT EXAMINATION / WARD

1   A.    Yes.

2   Q.    And how did you become aware of that?

3   A.    I received a telephone call from Mr. Rocklin on

4   September 7th, who -- who mentioned that he had checked the

5   account, and the money had arrived.

6   Q.    Did you tell Dmitry -- did you provide Dmitry Rocklin with

7   any instructions as to what he was to do with that money?

8   A.    Yes.  I -- I made my express interest known that he was to

9   do nothing with the money; that that was no longer -- that it

10  was not his money.  Obviously, it was evidence of a crime, and

11  that was now FBI money.  He was not to commingle it.  He was

12  not to touch it.  He was not to withdraw it.  He was to wait

13  for further instructions.

14  Q.    At some point, did the FBI take possession of that

15  $50,000?

16  A.    We did.

17  Q.    How was that done?

18  A.    On -- on November 21, 2005, I obtained process, and went

19  over to the bank, Union Bank of California in San Mateo, with

20  another agent, Agent Susan Sivok, and there, with the help of

21  the branch manager and another financial-services

22  representative, asked for the money and was given the money.

23  Q.    After you obtained -- well, first, in what form did you

24  obtain the $50,000?

25  A.    It was given to us in 500 $100 bills, totaling $50,000.

HAYNIE- DIRECT EXAMINATION / WARD

1   Q.   After you obtained the $50,000, what did you do?

2   A.   First and foremost, we counted it by mechanical counter in

3   a separate room, twice, to make sure it was $50,000.  And then

4   the branch manager and I exchanged formal invoices, documenting

5   the receipt of the $50,000, with both of our signatures on each

6   document.

7   Q.   After documenting the receipt of the funds, did you take

8   the money somewhere?

9   A.   We did.  Agent Susan Sivok and myself went directly to

10  San Francisco.

11       There is a portion of the Field Office which is dedicated

12  to those kinds of things.  I again counted the money -- the

13  $50,000 -- by mechanical counter, to make sure I hadn't left

14  one in my front pocket, and then placed it into a plastic bag;

15  heat sealed it; put it into evidence.  And an evidence-control

16  technician then placed it in a vault.

17  Q.   At some point, Agent Haynie, did you stop your work on

18  this case?

19  A.   I did.

20  Q.   And when was that?

21  A.   Approximately March of 2006.

22  Q.   At that point, was this investigation complete?

23  A.   Oh, not at all.

24  Q.   At that point, was the investigation then assigned to any

25  other agents?

HAYNIE- DIRECT EXAMINATION / WARD                1150

1   **A.**   Yes, it was.

2   **Q.**   And at the time that you left, had anyone been indicted in

3   this case?

4   **A.**   No.

5   **Q.**   And had anyone been arrested?

6   **A.**   Not at all.

7   **Q.**   And, to your knowledge, did the investigation, in fact,

8   continue after you transferred off of this case?

9   **A.**   Yes.

10               **MR. WARD:**  I have no further questions.  Thank you.

11               **THE COURT:**  And who is proceeding first, Mr. Howden?

12               **MR. HOWDEN:**  I am, your Honor.  Thank you.

13                        **CROSS EXAMINATION**

14   **BY MR. HOWDEN**

15   **Q.**   Agent Haynie, for convenience, I'm going to give you a

16   binder that has some exhibits in it.

17   **A.**   Okay.

18   **Q.**   We'll probably talk about at least one of them.  I guess

19   the one I want to talk about first is Exhibit 51, which I think

20   should be in there.  I'm not, actually, positive.

21   **A.**   Yes.

22   **Q.**   Now, I believe you testified that Exhibit 51 -- that's

23   comprised of four pages.  Is that right?

24   **A.**   Yes.

25   **Q.**   And those were documents that you received from

1   Dmitry Rocklin on September 6th, 2005.  Is that correct?

2   **A.**   I'd have to check my report for the actual receipt, but I

3   did receive them from Dmitry Rocklin.

4   **Q.**   Okay.  And when you received them from Dmitry Rocklin, did

5   you append copies of them to the report that you wrote about

6   that incident?

7   **A.**   I did.

8   **Q.**   Okay.  And the documents in Exhibit 51 aren't appended to

9   anything at this point, are they?

10  **A.**   No.

11  **Q.**   Okay.  What I'd like to do is show you what has been

12  marked for identification as next in order; actually, as

13  Exhibit 477.

14       Do you have a copy of that yet?  I think it's new.

15            (Whereupon a document was tendered to the Court)

16            **MR. HOWDEN:**   I'll provide an extra copy for the

17  Judge.

18  **Q.**   Could you check and see if there's a copy of Exhibit 477

19  in that binder?  I think there should be one.  If not, I'll

20  give you one.

21  **A.**   Are we looking for the agreement?

22  **Q.**   I'm looking for your 302.

23  **A.**   My 302?

24  **Q.**   If it's not there, I'll give you a copy.

25  **A.**   Yes, I believe I have it here in.  Tab 45.

1    **Q.**    Hm?

2    **A.**    No.  It's not it.

3    **Q.**    Is that your entire 302?  Let me give you a copy of 477.

4    **A.**    Please.

5    **Q.**    Take a moment.  Look through it.  Let me know when you've

6    had a chance to look it over.

7    **A.**    Okay.

8    **Q.**    Is that an accurate copy of your original FBI Form 302?

9    **A.**    Yes, it is.

10   **Q.**    Including the attachments?

11   **A.**    Correct.

12   **Q.**    Let's talk a moment about what we're referring to as

13   "302."  302 is the number of the form that we're discussing?

14   **A.**    Right.  It's FBI Form FD-302.

15   **Q.**    Okay.  And just commonly referred to as "302s" by those

16   who have to talk about them.  Isn't that right?

17   **A.**    Correct.  It is simply a report of an investigation.

18   **Q.**    Okay.  Now, the FBI, as a matter of policy, does not

19   tape-record interviews.  Isn't that right?

20   **A.**    Correct.

21   **Q.**    And, instead, the FBI relies on the reports -- the 302s --

22   written by their agents.  Isn't that correct?

23   **A.**    That is correct.

24   **Q.**    And, as a result, special agents for the FBI take great

25   pains to be accurate and thorough when they write up their

1    302s.  Isn't that correct?

2  **A.**    Correct.

3  **Q.**    Now, a moment ago, you said that it was your understanding

4  that Mr. Rocklin had received both of the attachments to the

5  e-mail that are included in Exhibit 51 from Mr. Beker.  Isn't

6  that correct?

7  **A.**    Correct.

8  **Q.**    And your understanding is based on the fact that

9  Mr. Rocklin told you that's where he received those two

10  documents.  Isn't that right?

11  **A.**    My only recollection of this particular e-mail, and then

12  the, you know -- the apparent two attachments that I -- that I

13  placed with it, is really based upon my FD-302.

14  **Q.**    Does looking at your 302 refresh your recollection as to

15  what Mr. Rocklin told you on September 6th?

16  **A.**    Inasmuch as I -- did I talk about the two being received

17  on the same date -- and I attached them both as part of my

18  report -- my understanding at that point in time and my

19  understanding here this morning is that they were both received

20  on that date.

21  **Q.**    Well, that both of what were received on that date?

22  **A.**    Both attachments.

23  **Q.**    Right.  And when you say "that date," are you referring to

24  September 6th?

25  **A.**    September 2, 2005.

1  **Q.**   Okay, but the 302 was written by you, or -- actually, let

2  me rephrase that.  You picked up the documents from Mr. Rocklin

3  on September 6th, 2005.  Isn't that correct?

4  **A.**   I can't tell that from looking at my report.  The date

5  that you're referring to -- it says "investigation on."  That

6  simply -- well, I guess that would be.  That would be the date

7  that I -- that I obtained this from Mr. Rocklin, correct.

8  **Q.**   Okay.  So that's -- four days after he received the

9  original e-mail from Mr. Beker.  Isn't that right?

10  **A.**   Correct.

11  **Q.**   Now, I think you've just testified that, as you sit here

12  today and testify to this jury, you cannot remember what

13  Mr. Rocklin said to you, other than with reference to what's

14  actually said in your 302.  Is that right?

15  **A.**   That is correct.

16  **Q.**   But again, at the time in 2005 on September 6th, you took

17  careful notes and wrote a 302 representing, as best you could

18  recall, what Mr. Rocklin said to you.  Isn't that right?

19  **A.**   Correct.

20  **Q.**   And, in fact, it was part of your agent training to write

21  accurate 302s.  Isn't that right?

22  **A.**   Of course.

23          **MR. HOWDEN:**  Your Honor, at this time, I'd move to

24  admit the substance of the original 302 -- or the copy of the

25  original 302 to the jury, pursuant to 8035.  It's recorded

 1   recollection.

 2            **MR. WARD:**  Objection, your Honor.  Lack of

 3   foundation.  It's also hearsay.

 4            **THE COURT:**  Well, the exception is recorded

 5   recollection.  And he's seeking to introduce it.  And it is

 6   admitted.

 7            (Trial Exhibit 477 received in evidence)

 8            **THE COURT:**  And all of the objections are overruled.

 9   **BY MR. HOWDEN**

10   **Q.**  Directing your attention to the page numbered as

11   FBI-036 --

12   **A.**  Yes.

13   **Q.**  Excuse me for just one moment.

14       So let me first direct your attention to the first page of

15   your FBI-035.  And, looking at the first substantive line of

16   the 302, it states that,

17            "On September 2nd, 2005, Dmitry Rocklin

18            received the following e-mail message on

19            his work computer from Michael Beker at

20            Newcon Optik, Limited, of Toronto,

21            Ontario."

22       And then you go on.  And you basically have typed out in

23   your 302 the substance of the e-mail that was sent or that

24   Mr. Rocklin told you was sent to him by Mr. Beker.  Is that

25   correct?

1    **A.**    Correct.

2    **Q.**    And below the substance of it, you've noted in the 302 it

3    says,

4                    "See Exhibit A attached."

5             Correct?

6    **A.**    Correct.

7    **Q.**    And attached to Exhibit 477, as part of your 302, at page

8    307, you included --

9    **A.**    Yes.

10   **Q.**    -- a cover sheet for Exhibit A, correct?

11   **A.**    I did.

12   **Q.**    And under that cover sheet is a copy of the actual e-mail

13   itself.  Is that correct?

14   **A.**    Correct.

15   **Q.**    And again, if we wanted to read through this e-mail, it

16   would read just what you included in the body of your 302?

17   **A.**    Word for word.

18   **Q.**    And then, going back to the first page of your 302 -- that

19   is, FBI-035 -- the next line reads,

20                    "Attached to the above e-mail were two

21             documents."

22             Do you see that?

23   **A.**    Yes.

24   **Q.**    And those are the documents that you've just described.

25   One was the proposed two page agreement.  Is that right?

1   **A.**   Yes.

2   **Q.**   And the other document was the, ah, proposed customs

3   letter.  I'll call it "customs letter."  All right?

4   **A.**   Yes.

5   **Q.**   But it was the other document you were referring to at

6   this line.  Is that correct?

7   **A.**   Correct.

8   **Q.**   And then you note in the next line that,

9               "Document 1 is a two-page copy of a

10          proposed agreement."

11          And if we go to the next page, FBI-036, when you

12   finish discussing the agreement, you note,

13               "See Exhibit B, attached."

14          Correct?

15   **A.**   Correct.

16   **Q.**   And again, if we go through the body of the 302, at what's

17   been Bates numbered FBI-039, we have a Bates -- or a "B"; a

18   cover sheet for Attachment B, correct?

19   **A.**   Correct.

20   **Q.**   And under that cover sheet is the two-page agreement?

21   **A.**   Correct.

22   **Q.**   Now, following the reference to Exhibit B on page FBI-036,

23   you've also reproduced -- well, it says "Document."

24               "Document Number 2 is a one-page letter

25          which, in its entirety, reads as follows."

HAYNIE - CROSS EXAMINATION / GREG

```
 1              And then you've typed in the substance of the

 2   so-called "customs letter."  Isn't that right?

 3   A.    Correct.

 4   Q.    And again, you took some care in putting that in there;

 5   even reproducing the misspelling of the word "advice."  Do you

 6   see that?

 7   A.    Yes, I do.

 8   Q.    And following that section that you've typed in there, it

 9   says,

10              "Document 2 was furnished to Rocklin by

11              Beker."

12              Isn't that correct?

13   A.    Correct.

14   Q.    And that's because that's what Mr. Rocklin told you on

15   September 6th?

16   A.    That is correct.

17   Q.    And it goes on.

18              "With the intent that Rocklin would

19              send a similar version to the Russian -- to

20              Russian Customs."

21              (As read)

22              And that's also what Mr. Rocklin told you on

23   September 6th?

24   A.    Correct.

25   Q.    And then finally, on FBI-036, it says,
```

1              "See Exhibit C, attached."

2         Right?

3   A.   Yes.

4   Q.   And if we go to FBI-042, that's your Exhibit C cover

5   sheet, right?

6   A.   Yes.

7   Q.   And below that, following that, is FBI-043, which is the

8   copy of the so-called "customs letter" that Mr. Rocklin

9   provided to you.  Is that right?

10  A.   Correct.

11  Q.   Nowhere in your 302 does it say anything to the effect

12  that Mr. Rocklin was the author of the customs letter, does it?

13  A.   No, it does not.

14  Q.   Because he didn't tell you that on September 6th?

15  A.   No, he did not.

16  Q.   You would have noted that in your 302 if he had said

17  something that significant.  Isn't that right?

18  A.   Yes.

19  Q.   And you certainly wouldn't have written in your own 302

20  that the letter -- the customs letter -- had been furnished by

21  Rocklin -- had been furnished to Rocklin by Beker if, in fact,

22  Mr. Rocklin had said he had written the letter?

23  A.   Correct.

24  Q.   Agent Haynie, you mentioned that at some point in time,

25  you sent the tape-recorded conversations out for translation?

1   **A.**   Yes.

2   **Q.**   When did that occur?

3   **A.**   I don't know, exactly.  They were sent out at different

4   times to various -- to various translators.  It wasn't just one

5   translator.

6   **Q.**   So they came back in at different times, too?

7   **A.**   They did.  They did.

8   **Q.**   Did you have a chance to read any of the translations of

9   the transcripts?

10  **A.**   I did.

11  **Q.**   When do you recall first reading -- and again,

12  approximately when do you recall first reading a translation of

13  any of the conversations?

14  **A.**   My recollection was that it took at least -- it was longer

15  than I had hoped for -- potentially, three to four weeks -- for

16  the first -- first transcript to come back.

17  **Q.**   But again, what I'm trying to figure out is when during

18  the course of the investigation you began to get

19  English-language translations of the tape-recorded calls.

20  **A.**   I don't remember.  There was a delay.  That's all I

21  remember.

22  **Q.**   Well, did you receive translations of any of the calls

23  during 2005?

24  **A.**   Yes.

25  **Q.**   Okay.  While the -- the calls were still being recorded?

HAYNIE - CROSS EXAMINATION / GREG                    1161

1   **A.**   Correct.

2   **Q.**   Okay.  Had you received translations of -- of any of the

3   calls by the time you were discussing with Mr. Rocklin the idea

4   of asking for $50,000 from Mr. Beker?

5   **A.**   Dmitry and I had that general conversation almost from the

6   very beginning of the case.

7   **Q.**   Okay, but at that stage in the case, again, you don't

8   speak Russian, right?

9   **A.**   I do not.

10  **Q.**   So you were relying on what Mr. Rocklin told you about the

11  nature of the conversations, in order to have these

12  conversations.  Isn't that right?

13  **A.**   That would be true; but what's going through my mind is

14  based solely upon the initial predicated information that we

15  used to even open the case.  I would have made the same comment

16  to Mr. Rocklin, based solely upon that letter.

17  **Q.**   Okay.  And at the beginning of the investigation, I

18  believe you told us yesterday that you were looking at -- at it

19  as a potential price-fixing case.  Isn't that right?

20  **A.**   That's how the information initially came to us.

21  **Q.**   And when you interviewed Mr. Rocklin, he gave you

22  additional information about the nature of the industry and the

23  business that he was in.  Is that correct?

24  **A.**   Correct.

25  **Q.**   And correct me if I'm wrong, but didn't he characterize

1    the -- the proposition that had been made to him by Mr. Prilik

2    on August 17th as, essentially, an agreement between Newcon and

3    ATN to fix prices?

4    **A.**    Correct.

5    **Q.**    And -- but in order for two companies to fix prices and

6    actually do that successfully, they have to be the only two

7    competitors in the market.  Isn't that right?

8    **A.**    No.

9    **Q.**    No?  Okay.

10          In that first conversation with Dmitry Rocklin on

11   August 24th -- the first time you interviewed him --

12   **A.**    Correct.

13   **Q.**    -- did he mention the company NiViSys at all?

14   **A.**    I don't think so.  I'd have to refresh myself based upon

15   my own my own report, but I don't recall that.

16   **Q.**    You want to take a look at your 302?

17   **A.**    Yes, please.

18   **Q.**    See if you have it up there.  It should be Exhibit 46.  If

19   not, I'll give you a copy.

20   **A.**    Okay.  Yes, I have it.

21   **Q.**    Okay.

22   **A.**    I don't see NiViSys mentioned here in my report.

23   **Q.**    Okay.  So he didn't tell you that NiViSys had been the

24   original bidder to ITE at the time that ITE had won the

25   Battalion Set II contract?

1    **A.**    No.

2    **Q.**    Oh, okay.  Now, from your description, it sounds as if

3    you've been working white-collar cases, basically, your entire

4    law-enforcement career.  Is that largely accurate?

5    **A.**    Yes, it is.

6    **Q.**    As a result of your experience, you know that when a

7    businessman complains about the activities of a competitor,

8    it's important to vet the -- to corroborate the substance of

9    that businessman's complaints, isn't it?

10   **A.**    Of course.

11   **Q.**    Because one competitor might have ulterior motives when

12   complaining about the activities of another competitor, right?

13   **A.**    Correct.

14   **Q.**    And in this case, Newcon was a competitor to ATN, right?

15   **A.**    Right.

16   **Q.**    So what did the FBI do to corroborate the information that

17   you received from Dmitry Rocklin?

18   **A.**    In every criminal investigation, you start with where you

19   are, and you move forward.

20       And, as the e-mails came in and out, as we had

21   conversations with, you know, James Munn -- his vice

22   president -- as I saw facsimiles, as I saw transcripts of

23   conversations, we at that point had conversations about all of

24   these issues.

25   **Q.**    Conversations with people at ATN?

HAYNIE - CROSS EXAMINATION / GREG        1164

1   **A.**    Yes.

2   **Q.**    Did you talk to anybody at NiViSys?

3   **A.**    No, I did not.

4   **Q.**    When did you first learn about the existence of a company

5   called NiViSys?

6   **A.**    This morning.  May I simply add --

7            **THE COURT:**  There's no question.

8            **MR. HOWDEN:**  The Government attorneys are going to

9   get up here and allow you to clarify any misperception you

10  think I'm leaving in the minds of jury.

11  **Q.**    Who else at ATN did you interview?

12  **A.**    The only other person present during my interview of

13  Mr. Rocklin was James Munn.

14  **Q.**    Did you interview Mr. Munn?

15  **A.**    No, I did not.

16  **Q.**    Did you interview Marc Morgovsky?

17  **A.**    I did not.

18  **Q.**    Did you interview Lenny Gaber?

19  **A.**    I did not.

20  **Q.**    Did -- in that initial interview with Mr. Rocklin, he

21  asserted that Newcon had been causing problems for ATN in

22  Russia.  Isn't that right?

23  **A.**    Correct.

24  **Q.**    And did he provide you any evidence of the fact that

25  Newcon was causing those problems?

1   **A.**    No.

2   **Q.**    Did he tell you who at ATN was responsible for dealing

3   with their Russian suppliers?

4   **A.**    No.

5   **Q.**    Now, part of Mr. Rocklin's complaint -- at least, as you

6   understood it -- was that Newcon was complaining to TACOM that

7   ATN's product did not meet the specifications in the

8   Battalion Set II contract, correct?

9   **A.**    Correct.

10  **Q.**    And Mr. Rocklin, I assume, assured you that, in fact,

11  ATN's product did meet those specifications.

12  **A.**    Yes.

13  **Q.**    Did you do -- you or anybody else at the FBI -- do

14  anything to corroborate his assertion?

15  **A.**    Not at that point, no.

16  **Q.**    At any point?

17  **A.**    Not while I was there.

18  **Q.**    Okay.  So while you were there, no one went to interview

19  anyone at the Army's Night Vision Laboratory, for example?

20  **A.**    No.

21  **Q.**    As far as you know, did anyone ever go to interview anyone

22  at the Army's Night Vision Laboratory?

23  **A.**    Not that I'm aware of.

24  **Q.**    So basically, the investigation just took Mr. Rocklin at

25  his word when he said, "Our goggles meet spec"?

1   **A.**   Correct.

2   **Q.**   And I assume -- correct me if I'm wrong.  Did anyone from

3   the FBI reach out to any of the -- the suppliers:  ATN's

4   suppliers in Russia?

5   **A.**   No.

6   **Q.**   NPZ?

7   **A.**   No.

8   **Q.**   Or Ekran-FEP?

9   **A.**   No.

10  **Q.**   The FBI has a presence in Russia, doesn't it?

11  **A.**   We have a legal attaché.

12  **Q.**   Yeah.  And he's a special agent?

13  **A.**   He is.

14  **Q.**   And he's located in Moscow?

15  **A.**   He is.

16  **Q.**   Okay.  And he's fluent in Russian?

17  **A.**   He is.  Some are.

18  **Q.**   Is it still Brian Earl?

19  **A.**   I don't know.

20  **Q.**   But no one reached out to your legate in Washington [sic]

21  -- or Washington -- in Moscow, to have him try to find out what

22  the problem was with Russian Customs?

23  **A.**   Correct.

24  **Q.**   Now, you were aware that ATN didn't have a contract with

25  the United States Army, with TACOM.  Isn't that correct?

HAYNIE - CROSS EXAMINATION / GREG                                      1167

1   **A.**    They had a contract directly with ITE.

2   **Q.**    Okay.  And it was ITE who, in turn, had the contract with

3   the military?

4   **A.**    Correct.

5   **Q.**    And I believe Mr. Rocklin described to you who the

6   principles were at ITE; who he dealt with at ITE.

7   **A.**    Mr. Ramzi Abu-Taleb.

8   **Q.**    Did you or anyone else from the FBI interview anyone from

9   ITE?

10  **A.**    No.

11  **Q.**    Did anyone pick up the phone and try to call

12  Mr. Ramzi Abu-Taleb?

13  **A.**    No.

14  **Q.**    Some people involved in the investigation did talk to the

15  Army, however.  Is that correct?

16  **A.**    Correct.

17  **Q.**    To this organization called "TACOM"?

18  **A.**    Yes.

19  **Q.**    And they're the -- the administrative part of the Army

20  that was responsible for administering the contract?

21  **A.**    Correct.

22  **Q.**    Did you have any direct dealings with TACOM?

23  **A.**    I did not.

24  **Q.**    Who did?

25  **A.**    Army Criminal Investigative Division.

HAYNIE - CROSS EXAMINATION / GREG

1    **Q.**   So am I correct in assuming that if the investigation

2    wanted to get information from TACOM, you went through Army

3    CID?

4    **A.**   Correct.

5    **Q.**   Is there a particular reason for that?

6    **A.**   Yes, there is.  When we reach out to other governmental

7    agencies, we almost exclusively go through their affiliates.

8    And, with respect to the Army, there's a protocol, and there's

9    a -- there are authorizations, and so forth.  And so it was --

10   it was the that way that we do work.

11   **Q.**   Okay.  But Army CID -- that's Criminal Investigation

12   Division -- as you understand it, they're criminal

13   investigators?

14   **A.**   They are.

15   **Q.**   And at some point in time, CID agreed to assist in

16   recording a telephone call between Mr. Prilik and somebody at

17   TACOM?

18   **A.**   Yes.

19   **Q.**   And do you know who that someone at TACOM was?

20   **A.**   Derek McAleer.

21   **Q.**   And what's your understanding of his position at CI -- or

22   at TACOM?

23   **A.**   Contracting officer.

24   **Q.**   Did you ever have any direct contact with Mr. McAleer?

25   **A.**   I don't believe so.

1   Q.   Did anyone else from the FBI, as far as you know?

2   A.   No.  We went through Army CID.

3   Q.   And to arrange that telephone call, you had to work

4   through CID?

5   A.   We did.

6   Q.   Okay.  And one call was taped.  Is that right?

7   A.   Yes.

8   Q.   Do you remember when that call was?

9   A.   I don't remember the date on that one.  There was one

10  phone call, though.

11  Q.   And only one phone call; as least, as far as you're aware?

12  A.   Yes.

13  Q.   Now, you told us yesterday that taped telephone calls are

14  some of the most potent forms of evidence that you can gather,

15  correct?

16  A.   Yes.

17  Q.   But not all of the telephone calls between Mr. Prilik and

18  Mr. McAleer were tape-recorded.  Isn't that right?

19  A.   I have come to hear that.

20  Q.   Okay.  You didn't know it at the time?

21  A.   I did not.

22  Q.   So you don't know why those other calls weren't recorded?

23  A.   I do not.

24  Q.   Do you know when those other calls occurred?

25  A.   All I've been told:  It was after the one -- the one that

1  was recorded.

2  **Q.**   While you were still working on this investigation, were

3  you aware that there were other untaped telephone calls between

4  Mr. Prilik and Derek McAleer?

5  **A.**   No.

6          **MR. HOWDEN:**  If I could have one moment, your Honor.

7          **THE COURT:**  Yes.

8          **MR. HOWDEN:**  I have nothing further, your Honor.

9          Shall I give you the original?

10         **THE COURT:**  Thank you.

11         **MR. OSTERHOUDT:**  I have no additional questions,

12 your Honor.

13         **THE COURT:**  Thank you.

14         Any redirect?

15         **MR. WARD:**  Just briefly, your Honor.  Thank you.

16                    <u>**REDIRECT EXAMINATION**</u>

17 **BY MR. WARD**

18 **Q.**   Agent Haynie, you were asked about steps you took, if any,

19 to corroborate ATN's assertion as to the quality of their

20 night-vision goggles.  At the time you were investigating these

21 price-fixing allegations, did you believe that the quality of

22 ATN's goggles was relevant to these allegations?

23 **A.**   Not at all.

24         **MR. HOWDEN:**  Objection.  Relevance.

25         **THE COURT:**  Objection is overruled.

1  **BY MR. WARD**

2  **Q.**   You were asked if you contacted ITE or Ramzi Abu-Taleb at

3  the time of your investigation.  Did you believe that it was

4  necessary to contact Mr. Abu Taleb to investigate these

5  price-fixing allegations?

6  **A.**   Absolutely not.

7  **Q.**   And you were asked if -- what, if any, steps you took to

8  vet the complaints of one businessman against a competitor.

9      Why did you make tapes in this case?

10 **A.**   The context of the conversations and the sequence of the

11 proposals, the timing of everything, was critical.

12     And again, I wanted to hear the conversations and the

13 representations that would be made between parties in real

14 time.  And so I chose to spend my efforts that way.  And that

15 is traditionally the way many consensually monitored kinds of

16 cases proceed.

17 **Q.**   Was the taping actually an effort to vet the complaints?

18 **A.**   Absolutely.

19          **MR. WARD:**   Thank you.  Nothing further.

20          Thank you, Agent Haynie.

21          **THE COURT:**   Anything further, Mr. Howden?

22                    **RECROSS EXAMINATION**

23 **BY MR. HOWDEN**

24 **Q.**   Just one question.  How many foreign-language,

25 consensually monitored investigations have you worked before?

1  **A.**    Zero.

2          **THE COURT:**  Okay.  Anything further, Mr. Osterhoudt?

3          **MR. OSTERHOUDT:**  No.  No, thank you, your Honor.

4          **THE COURT:**  May the witness be excused, without being

5  subject to being recalled?

6          **MR. WARD:**  Yes, your Honor.  Thank you.

7          **THE COURT:**  Does he need to be recalled at all?

8          **MR. HOWDEN:**  I don't believe so, your Honor.

9          **THE COURT:**  On recall status?

10         Okay.  Then you are excused, but do not discuss your

11  testimony with any other witnesses until the proceedings are

12  over.  Thank you very much.

13         **THE WITNESS:**  Thank you.

14         **MS. HAMILTON:**  So, your Honor, our next witness is

15  Aseem Padukone, but before we call him, we have a few

16  stipulations to read into the record to serve as the basis for

17  his testimony.

18         **THE COURT:**  Are you going to make them scintillating?

19         **MS. HAMILTON:**  As dramatic and fascinating as

20  possible.  I'm sorry.

21         **THE COURT:**  How many of them are there?

22         **MS. HAMILTON:**  Four.

23         **THE COURT:**  Okay.

24         **MS. HAMILTON:**  Actually --

25         **THE COURT:**  And you have been advised previously, but

 1  that was a while ago -- right? -- that the stipulations are

 2  agreements that are reached by the parties.  And so you should

 3  deem the facts that are contained in those stipulations as

 4  being true facts.  And you don't need to make any findings on

 5  them.  You accept them as facts, unlike the testimony of

 6  witnesses, where you have to weigh it over, and decide what you

 7  believe, and so forth.

 8          And, in fact, you're looking at me, Mr. Osterhoudt.

 9  All of these are agreed-to stipulations, right?

10          **MR. OSTERHOUDT:**  Certainly.

11          **THE COURT:**  Okay.  Thank you.

12          **MR. OSTERHOUDT:**  No question about it.

13          **THE COURT:**  Okay.  Thank you.

14          **MS. HAMILTON:**  And there are, in fact, five

15  stipulations.

16          The first has been marked as Exhibit 150.  It is a

17  stipulation regarding Rogers Communication records.

18              "The United States of America and

19              defendants Newcon, Mendel Beker, and

20              Arie Prilik, by and through their counsel,

21              hereby stipulate that the telephone records

22              introduced as Government's Exhibits 59 and

23              60 are true and correct copies of Rogers

24              Communications records of Newcon

25              International.  The parties further

```
1              stipulate that Exhibits 59 and 60 meet the
2              evidentiary requirements of a business
3              record and authentication, under Federal
4              Rules of Evidence 8036, 901, and 18 USC
5              Section 3505."
6          So, your Honor, we would now move to admit
7    Government's Exhibit 59 and 60 into evidence.
8          THE COURT:  59 and 60 are admitted, pursuant to the
9    stipulation.
10         (Trial Exhibits 59 and 60 received in evidence)
11         MS. HAMILTON:  And I guess Exhibit 150 into evidence:
12   the stipulation.
13         THE COURT:  The stipulation is admitted as well.
14   It's one five zero?
15         MS. HAMILTON:  One five zero.
16         (Trial Exhibit 150 received in evidence)
17         MS. HAMILTON:  All right.  The next stipulation
18   reads,
19              "Stipulation regarding the U.S. Army
20              Tank Automotive and Armaments Command
21              (TACOM) records.  The United States of
22              America and defendants Mendel Beker and
23              Arie Prilik, by and through their counsel,
24              hereby stipulate that the telephone records
25              introduced as Government's Exhibits 95 and
```

1      96 are true and accurate copies of the

2      records of the United States Army's Tank

3      Automotive Armaments Command (TACOM).  The

4      parties further stipulate that Exhibits 95

5      and 96 meet the evidentiary requirements of

6      a business record and authentication, under

7      Federal Rules of Evidence 8036, 901, and

8      90211."

9          So the United States now moves to admit Exhibits 95

10  and 96 into evidence.

11          **THE COURT:**  Along with the stipulation, which is 151?

12  Okay.  All of them are admitted as exhibits.

13          (Trial Exhibits 95, 96, and 151 received in evidence)

14          **MS. HAMILTON:**  Thank you, your Honor.

15          Next is a stipulation regarding Qwest records.

16          "The United States of America and

17          defendants Newcon, Mendel Beker, and

18          Arie Prilik, by and through their counsel,

19          hereby stipulate that the telephone records

20          introduced as Government's Exhibits 53, 54,

21          and 55, are true and correct copies of

22          Qwest records of American Technology

23          Networks.  The parties further stipulate

24          that Exhibits 53, 54, and 55 meet the

25          evidentiary requirements of a business

1176

```
 1              record and authentication, under Federal

 2              Rules of Evidence 8036, 901, and 90211.

 3              The United States now moves to admit Government's

 4    Exhibits 53, 54, 55; and the stipulation is 152.

 5              THE COURT:  152, 53, 54, and 55 are admitted.

 6              (Trial Exhibits 152, 53, 54, and 55 received in

 7              evidence)

 8              MS. HAMILTON:  Thank you, your Honor.

 9              This is a stipulation regarding Bell Canada records.

10                 "The united States of America and

11              defendants Mendel Beker and Arie Prilik, by

12              and through their counsel, hereby stipulate

13              that the telephone records introduced as

14              Government's Exhibits 11, 12, and 13 are

15              true and correct copies of the Bell Canada

16              records of Newcon International.  The

17              parties further stipulate that Exhibits 11,

18              12, and 13 meet the evidentiary

19              requirements of a business record and

20              authentication, under Federal Rules of

21              Evidence 8036, 901, and 18

22              United States Code Section 3505."

23              So the United States now moves to introduce into

24    evidence Exhibits 11, 12, 13, and the stipulation at 153.

25              THE COURT:  And they are all admitted: 11, 12, 13,
```

1177

1  and 153.

2          (Trial Exhibits 11, 12, 13, and 153 received in

3           evidence)

4          **MS. HAMILTON:**  Thank you, your Honor.

5          And finally, this is a stipulation regarding Bank of

6  Nova Scotia records.

7              "The United States of America and

8              defendants Mendel Beker and Arie Prilik, by

9              and through their counsel, hereby stipulate

10             that the bank records introduced as

11             Governments' Exhibit 6 is a true and

12             correct copy of Bank of Nova Scotia records

13             of Newcon International.  The parties

14             further stipulate that Exhibit 6 meets the

15             evidentiary requirements of a business

16             record and authentication, under Federal

17             Rules of Evidence 8036, 901, and

18             18 United States Code Section 3505.

19         So the United States now moves to admit Exhibit 6 and

20  the stipulation at Exhibit 154.

21         **THE COURT:**  And they are admitted.

22         (Trial Exhibits 6 and 154 received in evidence)

23         **MS. HAMILTON:**  Thank you, your Honor.

24         So now the United States calls Aseem Padukone to the

25  stand.

1          **ASEEM PADUKONE,**

2   called as a witness for the Plaintiff herein, having been first

3   duly sworn, was examined and testified as follows:

4          **THE WITNESS:**  Yes, I do.

5          **THE CLERK:**  Please state your full name for the

6   record.

7          **THE WITNESS:**  Aseem Padukone.  P-a-d-u-k-o-n-e.

8          **THE COURT:**  You want to spell your first name, also,

9   please.

10          **THE WITNESS:**  A-s-e-e-m.

11          **THE COURT:**  Thank you.

12          **DIRECT EXAMINATION**

13  **BY MS. HAMILTON**

14  **Q.**   Good morning.

15  **A.**   Good morning.

16  **Q.**   Mr. Padukone, where do you work?

17  **A.**   I work at the U.S. Department of Justice Antitrust

18  Division, in San Francisco.

19  **Q.**   And what do you do there?

20  **A.**   I'm a paralegal.

21  **Q.**   And how long have you been worked at the Department of

22  Justice?

23  **A.**   I've worked at the DOJ for about 17 months.

24  **Q.**   And before that, what did you do?

25  **A.**   I was a full-time student at U.C. Berkeley.

1    **Q.**    And what did you study there?

2    **A.**    I was a major in Political Science and Economics.

3    **Q.**    And at some point when you became an employee of the

4    Department of Justice, were you assigned to the case known as

5    *United States versus Mendel Beker, Arie Prilik, and Newcon*

6    *International?*

7    **A.**    Yes.

8    **Q.**    And approximately when were you assigned to this case?

9    **A.**    In July of 2010.

10   **Q.**    And now, as part of your duties with that, working on that

11   case, were you given an assignment to identify communications?

12   **A.**    Yes, I was.

13   **Q.**    And what was that assignment?

14   **A.**    My assignment was to look at phone records, transcripts,

15   as well as e-mail and bank records, in order to identify the

16   communication between certain parties that are relevant to that

17   case.

18   **Q.**    Okay.  And the parties that are relevant to this case --

19   can you please identify those?

20   **A.**    Yes.  So the communications I was asked to identify were

21   communications between Newcon and ATN; Newcon and ITE; Newcon

22   and TACOM.

23   **Q.**    Why don't you go ahead and repeat that a little slower?

24   **A.**    Sorry.  Newcon and ATN; Newcon and TACOM; Newcon and ITE;

25   and ATN and ITE.

PADUKONE - DIRECT EXAMINATION / HAMILTON 1180

1  Q.   Okay.  Thank you.  And who assigned this task to you?

2  A.   You did.

3  Q.   Okay.  Now, for the parties that you just identified, what

4  types of communications were you required to identify?

5  A.   I was required to look at phone calls, e-mails, and bank

6  wire records.

7  Q.   And when you say "phone calls," were -- were there types

8  of phone calls you were supposed to review?

9  A.   I was looking at the phone records in order to identify

10  phone calls.  And those include phone records from ATN and

11  Newcon, as well as phone records from Mr. Prilik and

12  Mr. Beker's cell phones.

13  Q.   And were -- sorry.

14  A.   Sorry.  We also received records from TACOM from their

15  internal records.

16  Q.   And what types of communications were you able to review?

17  A.   Can you restate the question?

18  Q.   Sure.  So you talked about e-mails, bank wires, and phone

19  calls.  And "Between what date and what date?" is my question.

20  A.   Oh, sorry.  I reviewed the communications between

21  August 17th, 2005, and October 27th, 2005.

22  Q.   And how many -- approximately how many telephone records

23  were you -- did you have to review, in other words, to

24  ascertain the calls -- communications?

25  A.   I reviewed between 200 and 300 pages' worth of records.

 1  They ranged from about July to October.  And those were the

 2  records for both ATN and Newcon, as well as Mr. Beker and

 3  Mr. Prilik's cell phones.  And TACOM pulled internal records

 4  and provided them to the Government as well.

 5  **Q.**    Now, in addition to telephone records, what, if any, other

 6  documents did you review?

 7  **A.**    I reviewed e-mails that we received.  We received

 8  documents from TACOM and ATN.  And I conducted searches on the

 9  documents that we had, to identify e-mail communications that

10  occurred during this period.

11  **Q.**    And approximately how many e-mails were you required to

12  review?

13  **A.**    There were a couple thousand.

14  **Q.**    And any other types of documents you reviewed?

15  **A.**    I also looked at bank wire records from the Bank of

16  Nova Scotia, which is Newcon International's bank, as well as

17  the Union Bank of California, which is ATN's bank.

18  **Q.**    And approximately how many records were there?

19  **A.**    There were probably about ten pages that I looked at,

20  between the two of them.

21  **Q.**    And then, finally, what, if any, other documents did you

22  review as part of this project?

23  **A.**    I also looked at the prints of the taped phone

24  conversations, to corroborate any of the information in the

25  phone records.

1  Q.   Okay.  Now, these records that you just identified -- to

2  your knowledge, were they made available to the defendants?

3  A.   Yes, they were.

4  Q.   And how do you know that?

5  A.   I reviewed correspondence that -- that confirmed the fact

6  that these documents were produced to the defendants.

7          MS. HAMILTON:  Okay.  So I'd like to show you what's

8  been previously marked as Government's Exhibit 1.

9          May I approach the witness?

10         THE COURT:  Yes, you may.

11         MS. HAMILTON:  Thank you.

12 Q.   Do you recognize this document?

13 A.   Yes.

14 Q.   And what is it?

15 A.   It's a summary of wire communications between August 17th,

16 2005, and October 27th, 2005.

17         MR. HOWDEN:  Counsel, excuse me.  Could we get a look

18 at it?

19         MS. HAMILTON:  I'm sorry.  I apologize.

20         MR. HOWDEN:  Thank you.

21 BY MS. HAMILTON

22 Q.   I'm sorry.  Again, what -- what is this document?

23 A.   It's a summary of wire communications between August 17th

24 of 2005, and October 27th, 2005.

25 Q.   And what, if any, role did you have in creating this

PADUKONE - DIRECT EXAMINATION / HAMILTON

1    document?

2    **A.**    I was responsible for reviewing the phone records and

3    e-mails and the bank wire records, as I stated earlier.  And I

4    put together this summary that summarized the relevant

5    communications that I had discussed before.

6              **MS. HAMILTON:**  Your Honor, the United States would

7    move to admit this exhibit into evidence.

8              **THE COURT:**  Any objection?

9              **MR. HOWDEN:**  No, your Honor.

10             **THE COURT:**  It is admitted.  And what is the exhibit

11   number, again?

12             **MS. HAMILTON:**  1.

13             **THE COURT:**  1.

14             (Trial Exhibit 1 received in evidence)

15   **BY MS. HAMILTON**

16   **Q.**    So, just briefly, I'd like to walk through the chart, so

17   it makes sense.  And then the first is talk -- I'd like to ask

18   you just about the format that you chose to put this chart in.

19        And the first column is marked as "Communication

20   Identification."  What information is contained in that column?

21   **A.**    The first piece of information is the type of

22   communication that occurred.  So you'll see that some rows are

23   identified as "Phone," so that indicates a phone call.  Other

24   rows are identified as "E-mail," and that's when there was an

25   e-mail communication.  And there was one row that's

PADUKONE - DIRECT EXAMINATION / HAMILTON

1  indicated -- that's denoted as a "Bank Wire," and that's the

2  bank wire transfer that occurred.

3  Q.   Okay.  Now, are there any types of notations that you made

4  in -- on the -- in this column, in addition to just identifying

5  the type of communication?

6  A.   There were.  In certain instances, the calls referred to

7  the recorded conversations.  So there were transcripts that

8  correspond to the phone call.

9      So in this cell that you see up on the screen, the phone

10  call appears in the transcript at Exhibit 134.  And that's the

11  fourth recorded conversation.

12  Q.   So just so the record's clear, the entry you're talking

13  about says -- is -- states, "Phone."  And then, "(VM)"  And

14  then, underneath, "EX. 104/EX. 134."  Is that right?

15  A.   Yes.

16  Q.   And what does the "VM" stand for there?

17  A.   The "VM" represents voice mail.  So in that instance, I

18  had an indication from the phone transcript that it was a

19  voice-mail message that was left.

20  Q.   And how did you know what's a voice-mail message that was

21  left?

22  A.   Mr. Rocklin played that in the phone conversation, and it

23  was recorded.  So the recording of the voice mail appears in

24  the transcript.

25  Q.   So you heard that voice mail.  You listened to it, and

1   then put that information on this chart?

2   **A.**    And I also checked the transcript as well; and, yes, I put

3   it in the chart.

4   **Q.**    Let's turn your attention, then, to the second column,

5   which is labeled "Wire Date."  What is the information

6   contained in that column?

7   **A.**    The "wire date" is the date of the phone call, or the date

8   the e-mail was sent, or the date of the wire -- bank wire

9   transfer.

10  **Q.**    Okay.  And the third column is labeled "Start Time"?

11  **A.**    Yes.  The "Start Time" indicates the time that the phone

12  call occurred, according to the phone records; or if it was an

13  e-mail, the time -- the sent time for the e-mail.  And for the

14  bank wire transfer, the records also show a time that that

15  occurred.

16  **Q.**    And the next column states "Duration."  What does that

17  column stand for?

18  **A.**    The duration is the length of time that the call lasted.

19  So for e-mails and for the bank wire, there's a not-applicable

20  notation, because there is no indication of how long that

21  lasted; but for phone calls, the phone records contained a

22  duration for how long the phone call lasted.

23       And in some cases, for example, in Newcon's phone records,

24  it appears as if the duration is rounded.  So this is an

25  approximation, based on what appears on the phone record.

1  Q.   Okay.   And the next column is "Origin of the

2  Communication."   What does that column represent?

3  A.   The origin of the communication represents where the

4  communication originated from; so whoever is making the call or

5  sending the e-mail or sending the bank wire transfer.

6  Q.   And what -- how are you able to identify, or were you

7  able -- it says the "Origin of the Communication," which is the

8  company or individual.   And then what is the number that's

9  underneath the column?   In that same column, what does that

10 number represent?

11 A.   The number represents either the phone number, or the bank

12 account number, or, in the case of e-mail, the e-mail address

13 that was used to send the communication.

14 Q.   Okay.   So it's the identifier that attributes where the

15 communication is from -- came from?

16 A.   Yes.

17 Q.   And then the final column is "Recipient of Communication."

18 What -- what is -- what's contained within that column?

19 A.   It's exactly the same as the origin of communication, with

20 the main difference being that it's the person or entity

21 receiving the communication, rather than sending it.

22 Q.   Now, just very -- looking at the origin of communication

23 and recipient of communication, at times, the name of the

24 company is identified.   At other times, the name of an

25 individual is identified.   Why is that?

PADUKONE - DIRECT EXAMINATION / HAMILTON

 1   **A.**   In many instances, you have a general company phone number

 2   that's being used to make the call.  So in those instances, I

 3   listed the name of the company, rather than an individual,

 4   since I was mainly looking at the phone records to identify the

 5   phone calls; but in certain instances, cell-phone records were

 6   used, or these phone calls were identified on individual

 7   cell-phone records.

 8        So, for example, in -- in this row, which is an 8/17 phone

 9   call at 9:41 a.m., ATN called Ramzi Abu-Taleb on his cell-phone

10   number.

11   **Q.**   And when you say "his cell-phone number," whom are you

12   referring to?

13   **A.**   Mr. Ramzi Abu-Taleb.

14   **Q.**   Now, what -- I'd like to just turn, briefly -- so is

15   there -- different rows have different colors.  So can you just

16   briefly describe the coloring that you put into this chart?

17   **A.**   The coloring indicates the origin of the communication.

18        So the pink coloring applies for Newcon.  So any

19   communication that origin originated from Newcon, with one

20   exception, which I'll go into later on, is colored in pink.

21        The blue coloring represents communications that

22   originated with ATN.

23        The green coloring indicates any color -- any

24   communication that originated with TACOM.

25        And there's one light-blue coloring, which represents

PADUKONE - DIRECT EXAMINATION / HAMILTON          1188

1   ITE's communication that was initiated.

2        And the exception is the bank wire transfer is marked as

3   yellow, because that's a unique communication amongst the phone

4   calls and e-mails.

5   **Q.**   Now, is there any -- are there any rows that don't have

6   any colors associated with them?

7   **A.**   Yes.  There's one row on the second page that is white.

8   **Q.**   Why did you not provide a color for that particular --

9   **A.**   Because there is no origin of communication.  We just have

10  a location.

11  **Q.**   Okay.  Now, did you -- as -- when you were going through

12  this, creating this chart, did you combine any particular calls

13  within one row?

14  **A.**   Yes.

15  **Q.**   So why did you do that?

16  **A.**   The main reason I did that is to make the chart more

17  compact.

18  **Q.**   Okay.  And what -- what would the -- was the criteria that

19  made you or that combined more than one communication to one

20  row?

21  **A.**   There were a number of conditions.

22       First of all, the calls had to originate from the same

23  entity; so either Newcon, or ATN.

24       And on top of that, the calls had to be less than a minute

25  long; a minute or less.

1      And they also had to be consecutive, and on the same day.

2  **Q.**   Okay.  Thank you.

3      So, just briefly, let's turn to the source of these -- the

4  data that you entered into this chart.  Starting with the phone

5  records, how were the phone records that are in this chart

6  obtained?

7  **A.**   We received them through subpoena.

8      And, in the case of Newcon's phone records, since Newcon

9  is based in Canada, we received them through the Mutual Legal

10 Assistance Treaty.

11 **Q.**   Just briefly, do you have an understanding of what that

12 is:  The Mutual Legal Assistance Treaty?

13 **A.**   I believe that that allows us to obtain phone records from

14 Canada.

15 **Q.**   Okay.  And, aside from subpoena and treaty, was there any

16 other way that phone records were obtained?

17 **A.**   I don't believe so.

18 **Q.**   With the TACOM records -- how were they obtained?

19 **A.**   TACOM provided their records to us on their on own.

20 **Q.**   When you say "on their own"?

21 **A.**   From their internal phone records.

22 **Q.**   Those were obtained voluntarily?

23 **A.**   Yes.

24 **Q.**   And what were your sources for the phone numbers that are

25 contained within this chart?

1   **A.**   I received Newcon's phone number from the transcript of

2   the taped conversations.

3   **Q.**   And what about -- and what phone number did you -- did you

4   use for the Newcon?

5   **A.**   I used (416) 663-6963.

6   **Q.**   And for American Technologies Network, what phone

7   number -- or how did you obtain their phone number?

8   **A.**   I also got that number off of the taped conversations.

9   **Q.**   What telephone number or numbers did you review and put

10  into this chart?

11  **A.**   ATN actually had multiple phone-number extensions.  I

12  think the main phone number was 4 -- sorry.  The main phone

13  number was (650) 875-0130.  And that's what's used on the

14  transcripts of the taped telephone conversations.  However,

15  they have a number of phone lines that roll over.  And those

16  appear on the phone records as well.  So they have been

17  included on this chart.

18  **Q.**   And now, Mr. Prilik has his cell phone -- specific

19  entries, with his name on them.  How did you receive

20  Mr. Prilik's cell phone?

21  **A.**   Mr. Prilik shares his cell-phone number with Mr. Rocklin

22  in Exhibit 132, and so I found that number in that transcript.

23  **Q.**   Okay.  And same question for Mr. Beker.  Are there records

24  here contained within here of Mr. Beker's cell phone?

25  **A.**   Yes.

 1  Q.   And how did you obtain Mr. Beker's cell phone record?

 2  A.   Mr. Beker shares his cell-phone number in the transcripts

 3  as well with Mr. Rocklin.

 4  Q.   Okay.  Now, turning to other information contained in the

 5  chart in the source for it, is there an e-mail somewhere in

 6  your chart from Mr. Ramzi Abu-Taleb, from ITE?

 7  A.   Yes.

 8  Q.   And where did you obtain Mr. Abu-Taleb's e-mail address?

 9  A.   Amongst the documents that we received from ATN and TACOM,

10  there were e-mails from Mr. Abu-Taleb, which indicated that

11  this was his accurate e-mail address.

12  Q.   And finally, for TACOM, are there a number of e-mails to

13  various individuals within TACOM?

14  A.   Yes.

15  Q.   And how did you obtain those e-mail addresses?

16  A.   There was an e-mail a document that Mr. Harry Hallock, of

17  TACOM, sent out.  And on that e-mail were various phone numbers

18  for TACOM individuals, including Mr. McAleer, Mr. Bousquet, and

19  himself.

20  Q.   The various phone numbers -- is that what you said?

21  A.   Yes.

22  Q.   And what about e-mails?

23  A.   E-mail -- it's the same thing.  That e-mail that was sent

24  contains all of their e-mails.  And other documents that we

25  have with their e-mails corroborate the e-mail address.

PADUKONE - DIRECT EXAMINATION / HAMILTON          1192

1   Q.   Now, on this chart are there any telephone-records entries

2   for ITE?

3   A.   No, there are not.

4   Q.   Why not?

5   A.   We were not able to -- I was not able to review documents

6   from ITE for the phone records.

7   Q.   And do you have an understanding as to why you were not

8   able to obtain phone records from ITE?

9   A.   I believe that we do not have a Mutual Legal Assistance

10  Treaty with Jordan, which is where ITE is based.

11  Q.   Now, once you have the information about the phone numbers

12  and the e-mail, where did you actually, then, look for the

13  information that's contained in this chart?

14  A.   Once I received all of the -- once I knew what to look

15  for, I primarily looked at the phone records that we received

16  by subpoena and through the MLAT --

17       (Reporter requests clarification)

18           THE WITNESS:   The Mutual Legal Assistance Treaty.

19           So that includes Qwest phone records for ATN,

20  Bell Canada records for Newcon, and Rogers Communications

21  cell-phone records for Mr. Prilik and Mr. Beker's cell phones.

22  And that also includes the records that TACOM provided us.

23  BY MS. HAMILTON

24  Q.   Okay.  And, in addition to reviewing the telephone records

25  to find the source, how did you identify e-mails that are

PADUKONE - DIRECT EXAMINATION / HAMILTON          1193

1   contained in this chart?

2   **A.**    I ran searches in our database to identify relevant

3   documents.  So, for example, I ran a search for "Arie" or

4   "Prilik" or "Michael" or "Mike" or "Beker" or "Newcon" in order

5   to identify Newcon documents that were relevant.

6   **Q.**    And you've already testified that there's an entry for a

7   bank wire in this chart.  Is that right?

8   **A.**    Yes.

9   **Q.**    And what was the source for that information?

10  **A.**    We received that information from the Union Bank of

11  California, as well as the Bank of Nova Scotia, which are the

12  banks of ATN and Newcon, respectively.

13  **Q.**    Okay.  How long did it take you to make this chart?

14  **A.**    It took about a month or two.

15  **Q.**    Now, I just want to move away from questions about the

16  source, and ask about a couple of entries on your chart.  And,

17  just generally, how many communications are recorded on your

18  chart?

19  **A.**    There are 64 communications recorded.  And that

20  includes -- that's counting every single communication, even if

21  they are in one row.

22  **Q.**    And how many calls are -- did you log in here from ATN to

23  the defendants?

24  **A.**    There were 18 calls from ATN to either Mr. Beker,

25  Mr. Prilik, or Newcon.

PADUKONE - DIRECT EXAMINATION / HAMILTON

1  Q.   And how many calls did you identify from the defendants to

2  ATN?

3  A.   There were 25 calls from either Mr. Beker, Mr. Prilik, or

4  Newcon to ATN.

5  Q.   Now, you talked about the e-mails, phones, bank wires, and

6  kind of the origins.  Are there any telephone calls or that you

7  received here, where it's not clear who the origin of the

8  telephone conversation is?

9  A.   Yes.  As I mentioned earlier, there's one row that does

10  not have a color and does not have an origin.

11  Q.   And why is this included in your chart?

12  A.   Like I said earlier, one of my assignments was to look at

13  the transcripts of the phone calls that occurred between

14  Mr. Rocklin and Newcon.  And, in the process of reviewing the

15  records, in Exhibit 130 [sic] -- there were two calls on the

16  morning of August 26th:  Exhibit 131 and Exhibit 132.  The

17  first call -- that occurred at 10:37 a.m.  And the second call

18  occurred at 11:06 a.m.

19       And on the transcripts of that second call, on

20  Exhibit 132, Mr. Prilik says -- Mr. Prilik tells Mr. Rocklin

21  that he spoke to Mr. Beker.  And, as a result, when I was

22  looking through Mr. Beker's cell-phone records, there was a

23  call at 10:56 a.m. that lasted about 11 minutes between the

24  first and second phone call that occurred between ATN and

25  Newcon.  So, believing that that was a relevant communication,

 1  I added that onto the chart; but the only identification we had

 2  for the origin was that the call originated from Toronto.

 3  **Q.**   Okay.  Thank you.

 4       So -- in reviewing this chart -- or when you created it,

 5  were there any patterns that you noticed in the types of

 6  communications that occurred?

 7  **A.**   Yes.  For a majority of the taped phone conversations,

 8  Newcon called ATN before ATN called Newcon.

 9            **MS. HAMILTON:**  Okay.  All right.  We have no further

10  questions, your Honor.

11            **THE COURT:**  Any examination of this witness?

12            **MR. HOWDEN:**  A couple of quick questions, your Honor.

13                        **CROSS EXAMINATION**

14  **BY MR. HOWDEN**

15  **Q.**   Good morning.

16  **A.**   Good morning.

17  **Q.**   Did the Newcon office phone records reflect the source of

18  long-distance, incoming calls?

19  **A.**   No, it did not.

20  **Q.**   Okay.  So if there was a call from Jordan to the Newcon

21  offices, that wouldn't show up in the records?

22  **A.**   No.  I believe the records I reviewed were outgoing calls

23  from Newcon's office.

24  **Q.**   Where did you come up with Ramzi Abu-Taleb's cell number?

25  **A.**   I came up with that cell number from documents that I

 1   reviewed.

 2   **Q.**   Okay.  Do you remember when you came up with that number?

 3   **A.**   I don't remember.

 4            **MR. HOWDEN:**  I don't think I have anything else,

 5   your Honor.  Bill?

 6            **THE COURT:**  Mr. Osterhoudt?

 7            **MR. OSTERHOUDT:**  No additional questions.  Thank you.

 8            **THE COURT:**  Oh, okay.

 9            Then I guess you're free to sit down, but do not

10   discuss your testimony with any other persons who may be

11   witnesses.

12            **THE WITNESS:**  Thank you, your Honor.

13            **THE COURT:**  That applies to you as well.  Okay.

14   Thank you.

15            **MR. WARD:**  Your Honor, at this time the Government

16   would call Derek McAleer, unless you would like to take a

17   break.

18            **THE COURT:**  It's a little bit early.  On the other

19   hand -- how long do you expect to be on direct with

20   Mr. McAleer?

21            **MR. WARD:**  I expect most of the rest of the day with

22   Mr. McAleer.  We can take a break now.  If you'd like to get

23   started --

24            **THE COURT:**  I think maybe it would be a good idea,

25   because we'll get into his testimony for about 15 minutes or 20

1    minutes, and then probably time for a break.  So maybe it's

2    just better to do it now.

3              So we'll take 15 minutes now.  Please follow the

4    instructions you've been given about not discussing the case

5    amongst yourselves, or with anyone else.  And we will see you

6    at the close of the recess.  Thank you.

7              (Jury out at 9:58 a.m.)

8              (Whereupon there was a recess in the proceedings

9               from 9:58 a.m. until         a.m.)

10             (Whereupon there was a recess in the proceedings

11              from 10:00 a.m. until 10:27 a.m.)

12             **MR. WARD:**  Your Honor, at this time the government

13    calls Derek McAleer.

14                         **DEREK MCALEER,**

15    called as a witness for the Plaintiff herein, having been first

16    duly sworn, was examined and testified as follows:

17             **THE WITNESS:**  I do.

18             **THE CLERK:**  Please state your name for the record and

19    spell your last name.

20             **THE WITNESS:**  Derek McAleer, M-C-A-L-E-E-R.

21             **THE COURT:**  You may have a seat.

22             **THE WITNESS:**  Thank you.

23

24

25

1          <u>**DIRECT EXAMINATION**</u>

2    **BY MR. WARD**

3    **Q.**    Good morning, Mr. McAleer.

4    **A.**    Good morning.

5    **Q.**    Where do you work?

6    **A.**    I work for the United States Army Tank Automotive and

7    Armaments Command in Warren, Michigan.

8    **Q.**    Is that at times referred to as TACOM?

9    **A.**    Yes, that is the acronym.

10   **Q.**    What is TACOM?

11   **A.**    TACOM is a command that has responsibility for providing

12   life cycle management for all the Army's ground, combat and

13   tactical vehicles.  By that I mean TACOM develops the

14   requirement.  We procure the requirement.  We field the

15   requirement.  We sustain the requirement and at the end of its

16   life cycle, it's addressed.

17   **Q.**    In how long has TACOM been in existence?

18   **A.**    Since the early '40s.  I believe it was 1942 or '41.

19   **Q.**    As part of its mission, does TACOM purchase weapons and

20   equipment for the U.S. Army?

21   **A.**    Yes.

22   **Q.**    How generally does it purchase those items?

23   **A.**    Usually on a very competitive basis.

24   **Q.**    And does TACOM award contracts for weapons and equipment?

25   **A.**    Yes.

1  Q.   And does it administer those contracts after they are

2  awarded?

3  A.   Yes, we do.

4  Q.   What does it mean to administer a contract generally?

5  A.   Once a contract is awarded, there is a responsibility to

6  ensure that the equipment being supplied meets the government's

7  requirements.

8       On larger contracts there are usually a number of

9  administrative actions that are ongoing.  We issue

10 modifications to the contract.  We negotiate at times changes

11 to a contract.  There's a lot of work entailed in maintaining

12 some of the larger and more complicated contracts.

13 Q.   How long have you worked at TACOM?

14 A.   For a little over 34 years.

15 Q.   Could you describe the positions you have held at TACOM?

16 A.   Yes.  Initially when I hired in in 1976, I worked on

17 purchase orders and smaller type contracts, primarily in the

18 area of supporting and sustaining commercial equipment that the

19 Army was using.

20      I've progressed from there to handling a number of more

21 complicated type actions.  We've purchased -- throughout the

22 80's and 90's I was involved in some rather large contracts for

23 some complex equipment that was being fielded.  That was very

24 challenging.  That was through the 80's into the 90's.

25      I moved up the promotion scale.  I'm currently in the R&D

1  arena, and what we to in R&D is we purchase research and

2  development.  That is our primary mission.

3      As a contracting officer, I'm responsible for ensuring

4  that the contracts are complete and accurate, represent our

5  requirements and that they are executable.

6  **Q.**   Have you held management positions during your career at

7  TACOM?

8  **A.**   Yes, I have.

9  **Q.**   And what were those?

10 **A.**   I am currently a team chief and contracting officer.  That

11 means that I have under my direct control anywhere from 8 to 13

12 personnel who work on my team.  I'm responsible for all the

13 personnel actions associated with them.  I'm also responsible

14 for the contract actions that they are working on.

15     At various times I have been a group leader, which is one

16 level above.  That's where you have multiple teams working

17 under you.  I prefer to work at the team chief level, not at

18 the higher level.  I like working on contracts and not as much

19 personnel.

20 **Q.**   How long have you been a team chief in one form or another

21 at TACOM?

22 **A.**   Since 1995, I believe.

23 **Q.**   And how many of your years at TACOM have you been involved

24 in the contracting process?

25 **A.**   Every year.  That's what I do.

MCALEER - DIRECT EXAMINATION / WARD          1201

1  **Q.**   And just approximately how many contracts have you

2  overseen during your time at TACOM?

3  **A.**   It would have to be into the thousands.  Somewhere between

4  1,000 and 2,000, I would guess.

5  **Q.**   Have you also received any formal training in contract

6  letting and administration?

7  **A.**   Yes.

8  **Q.**   And what type of training have you received?

9  **A.**   Well, the Army likes to conduct a lot of training.  So

10 we've had -- there's a lot of courses that we take on basic

11 contracting principles.  And every year I believe I have

12 accrued at least 80 hours of formal training, be it in the

13 leadership -- in a leadership capacity or in the -- at the

14 working level contracting capacity.

15 **Q.**   Have you sat on any committees at TACOM relating to

16 contract administration and management?

17 **A.**   Yes.

18 **Q.**   And what sort of committees have you -- what committees

19 have you sat on?

20 **A.**   A fair number of what we call source selection committees

21 where I've functioned as the contracting officer.  A source

22 selection committee is an entity that is pulled together for

23 the purpose of evaluating contract proposals and determining

24 which proposal represents the best value to the government.

25 That involves a lot of different subject matter experts in that

1  arena.

2       I have been on teams that worked with customers in

3  Columbia and the Phillippines developing their requirements.

4  I have done presentations in both Columbia and the Philippines

5  on requirements.  I have worked with their requirement

6  generators to ensure that we could put together a package and

7  award and field the requirements that they have.

8       I have been on a number of promotion teams, where we

9  conduct the interviews and make recommendations on selection

10  for appointments.  And I'm constantly teaming with my

11  customers, that goes on constantly.

12  **Q.**   Do you conduct any training in --

13  **A.**   Yes.

14  **Q.**   (Continuing) -- contract management and administration?

15  **A.**   Yes.

16  **Q.**   What type of trainings have you conducted at TACOM?

17  **A.**   I have conducted classes with our customers, who are

18  primarily engineers, on how to write a scope of work such that

19  they can define what it is they need so that I, as a

20  contracting officer, can award the contract and ensure that

21  they get what they need.

22       I have also conducted a number of classes on contracts.

23  It's kind of dry stuff, but on contracts that pertain to

24  different types of contracts that can be awarded, different

25  types of actions that can be handled under contracts.

 1           We have a great number of interns that we've hired in the

 2      past five years.  We conduct a boot camp for the interns.  Some

 3      call it death by PowerPoint, but we're trying to -- we're

 4      trying to inundate them with the basics of contracting and I,

 5      as a contracting officer, am usually one of the instructors at

 6      some point during their boot camp.

 7      **Q.**   Do you train contract specialists at TACOM?

 8      **A.**   I'm sorry?

 9      **Q.**   Do you train contract specialists at TACOM?

10      **A.**   Yes.

11      **Q.**   What is a contract specialist?

12      **A.**   A contract specialist is -- that's a job title, and they

13      are tasked with handling the majority of the effort on most

14      contracts.  They have to work with the customer to ensure that

15      we have a valid requirement.  They have to develop the

16      solicitation that we are going to issue.  They have to assist

17      in determining the evaluation criteria that will be used to

18      make a selection.

19           They handle most of the administration, with a lot of

20      oversight by myself and other contracting officers.  So they

21      are doing the day-to-day effort and in my capacity as a

22      contracting officer and team leader, I'm working with them to

23      ensure that they are on the right path and to oversee that

24      which they are working on.

25      **Q.**   Do you have a security clearance?

MCALEER - DIRECT EXAMINATION / WARD      1204

1   **A.**   Yes, I do.

2   **Q.**   What level clearance is that?

3   **A.**   Top secret.

4   **Q.**   Why do you have that clearance?

5   **A.**   One of the other roles that I play at TACOM is that I'm --

6   I am a SEC contracting officer.  What that SEC stands for is

7   Secure Environment Contracting.  That means classified

8   contracts.  So one of the hats that I wear pertains to --

9               **MR. MOORE:**  Objection, your Honor.  I'm going to

10   object on relevance.

11               **MR. WARD:**  We are establishing his background, his

12   expertise, his experience.

13               **THE COURT:**  Well, I think we spent a lot of time on

14   that.  Could we maybe move on to substance?

15               **MR. WARD:**  I think we should -- we will move on to

16   substance then.

17               **THE COURT:**  Yes.

18   **BY MR. WARD**

19   **Q.**   What was your position at TACOM in 2005?

20   **A.**   I was a team chief contracting officer.

21   **Q.**   And are you familiar with a TACOM contract called the

22   Battalion Set I contract?

23   **A.**   Yes I am.

24   **Q.**   And how is it that you're familiar with the Battalion Set

25   I contract?

1   **A.**    Upon award of the Battalion Set contract, it was

2   transferred to me and I became the contracting officer on the

3   Bat Set I contract.

4   **Q.**    Do you know when the Battalion Set I contract was awarded?

5   **A.**    I believe it was in May of '04.

6   **Q.**    How do you know when it was awarded?

7   **A.**    Because as the contracting officer, I -- I'm charged with

8   managing and handling the entirety of that contract.  So I

9   would be intimately aware of when it was awarded.

10  **Q.**    And are you familiar with the items that were called for

11  in the Battalion Set I contract?

12  **A.**    Yes.

13  **Q.**    And let me just ask you:  Is this contract also known as

14  the Bat Set I contract?

15  **A.**    Yes.

16  **Q.**    How are you familiar with the items that were called for

17  in the Bat Set I contract?

18  **A.**    Well, we had over 50 items on that contract for delivery.

19  And as the contracting officer, I was responsible for ensuring

20  that those deliveries occurred.  I worked daily with my

21  customer in country on the Battalion Set contract to coordinate

22  actions.  I became intimately familiar with all of the

23  equipment and the suppliers who were providing that equipment

24  under that contract.

25      We did all the administration.  There were many

MCALEER - DIRECT EXAMINATION / WARD                    1206

1  modifications and many actions that required a lot of intense

2  oversight on our part.

3  **Q.**   What types of items were being procured under the

4  Battalion Set I contract?

5  **A.**   The objective of that contract was to provide all the

6  equipment that the Iraqi Armed Forces would need to train and

7  equip battalion-sized units.

8       So the equipment that we procured, we procured a vast

9  array of vehicles, different types of vehicles.  We provided a

10 lot of soldier equipment, down to canteens, night vision

11 goggles, all the weapons that they would need, all the

12 communication gear that they would need to fully train and

13 equip and to get them operational, so.

14 **Q.**   I believe you said this, but to be clear:  Did the

15 Battalion Set I contract include a requirement for night vision

16 goggles?

17 **A.**   Yes, it did.

18 **Q.**   Okay.  Do you know how it was determined what type of

19 items would be called for in the Battalion Set I contract?

20 **A.**   Yes.

21 **Q.**   And how do you know that?

22 **A.**   From working with our customer.  Requirements are always

23 generated by customers.  As contracting folks, we award them.

24 We don't normally generate the requirement.

25 **Q.**   Who was your customer in this case?

MCALEER - DIRECT EXAMINATION / WARD                1207

1  **A.**   My customer was the Multi National Security Transition --

2  it's called MNSTCI, but it's the Multi National Security

3  Transition Command Iraq.

4  **Q.**   And at the time who commanded MNSTCI?

5  **A.**   General Petraeus.

6  **Q.**   And where was MNSTCI headquartered?

7  **A.**   Their headquarters was in the Green Zone in Baghdad, a

8  safe zone, as any can be.

9  **Q.**   Do you know where the items called for in the Battalion

10 Set I considered were to be delivered?

11 **A.**   Yes.

12 **Q.**   And how do you know that?

13 **A.**   Because it was set forth in the contract.

14 **Q.**   And where, in fact, were the items to be delivered?

15 **A.**   There were four different locations, but almost all of the

16 equipment went to one location; that would be Tadji.

17 **Q.**   What's Tadji?

18 **A.**   Tadji was a warehouse and a base that the equipment was

19 delivered to.  It was outside of -- just outside of Baghdad.

20 **Q.**   To whom were the items under the Battalion Set I contract

21 delivered?

22 **A.**   To United States personnel.

23 **Q.**   And do you know what the U.S. military was then doing with

24 those items?

25 **A.**   Yes.

1    **Q.**    And how do you know that?

2    **A.**    From working with my customer in MNSTCI.

3    **Q.**    What was the military doing with those items?

4    **A.**    They were training and equipping the Iraqi Armed Forces.

5    **Q.**    Turning back to your role in the Battalion Set I contract,

6    what were your responsibilities with regard to the Battalion

7    Set I contract?

8    **A.**    As the contracting officer, I was managing the contract.

9    I was working with the prime contractor on the contract to

10   ensure that equipment was being delivered, that we knew the

11   status of all deliverables, that our customer was available to

12   inspect and accept the equipment.

13         Any time there was a hiccup in a delivery or there were

14   problems with getting equipment delivered on time, we worked

15   directly with the prime contractor to resolve those issues.

16   **Q.**    You said you worked directly with the prime contractor.

17   Who was the prime contractor for Battalion Set I?

18   **A.**    Anham.

19   **Q.**    And what is Anham?

20   **A.**    Anham, I believe, was a consortium or is a consortium.

21   They are an entity, a commercial entity that was the prime

22   contractor.

23   **Q.**    Did Anham apply the night vision goggles provided under

24   the Battalion Set I contract?

25   **A.**    Yes.

MCALEER - DIRECT EXAMINATION / WARD                 1209

1  Q.   How did they supply the night vision goggles?

2  A.   They utilized a subcontractor.

3  Q.   Do you know who that subcontractor was?

4  A.   Yes, I do.

5  Q.   How do you know who the subcontractor was?

6  A.   Because I knew who all the subcontractors were on the

7  Battalion Set contract.  All of the subcontractors had been

8  evaluated during the award process, but I was intimately

9  familiar with who all the subcontractors were.

10 Q.   Who, in fact, was this subcontract for night vision

11 goggles under Battalion Set I?

12 A.   Newcon Optik.

13 Q.   Do you know how much TACOM paid for each set of night

14 vision goggles under Battalion Set I?

15 A.   Yes.

16 Q.   And how do you know this?

17 A.   Because it's in the contract, and I'm familiar with the

18 contract.

19 Q.   And how much did TACOM pay for each set of night vision

20 goggles under Battalion Set I?

21 A.   $2,250 each.

22 Q.   And to whom did TACOM pay this 2250 apiece?

23 A.   To the prime contractor, Anham.

24 Q.   I want to turn your attention now to a new contract.

25      Are you familiar with a contract known as the Battalion

 1  Set II contract?

 2  **A.**   Yes.

 3  **Q.**   And how are you familiar with that contract?

 4  **A.**   Because I was also the contracting officer on that

 5  contract.

 6  **Q.**   What were your responsibilities in connection with the

 7  Battalion Set II contract?

 8  **A.**   My responsibilities covered the full gauntlet on the

 9  Battalion Set II contract.  I worked directly with the

10  customer, MNSTCI, in developing their requirements and

11  determining their requirements.

12       We put together the solicitation, the competitive

13  solicitation that we issued for it.  And as the contracting

14  officer once the contract was awarded, again, I was in charge

15  of administering that contract.

16  **Q.**   I want to show you some documents.

17            **MR. WARD:**  May I approach, your Honor?

18            **THE COURT:**  Yes you may.

19            (Whereupon, binder was tendered

20             to the witness.)

21  **BY MR. WARD**

22  **Q.**   Mr. McAleer, could you turn to tab two in your binder,

23  please?

24  **A.**   Okay.

25  **Q.**   Are you familiar with this document?

MCALEER - DIRECT EXAMINATION / WARD

1   **A.**   Yes, I am.

2   **Q.**   I'm showing you what has been marked Government Exhibit

3   65.  Looking at the first page of this document, do you see a

4   box labeled "Issued By"?

5   **A.**   Yes.

6   **Q.**   And what's in that box?

7   **A.**   It says "U.S. Army Command, Contracting Command,

8   CCTA-ASGA, Warren, Michigan," and the zip code.  It also

9   says -- it gave the cite for TACOM contracting.

10  **Q.**   What is that entity?

11  **A.**   That entity is TACOM, the contracting center at TACOM.

12  **Q.**   Okay.  Turning to the bottom of the page, do you see a box

13  labeled "Name of Contracting Officer"?

14  **A.**   Yes.

15  **Q.**   And whose name is in that box?

16  **A.**   My name.

17  **Q.**   Is there anything else in the box?

18  **A.**   Yes.

19  **Q.**   What's that?

20  **A.**   My telephone number and my -- and my website -- or my

21  email address, excuse me.

22  **Q.**   Is there a date on the bottom of this first page?

23  **A.**   Yes.

24  **Q.**   And what is the date?

25  **A.**   The date is 14 February, 2005.

1  Q.   Have you reviewed this document recently?

2  A.   Yes.

3  Q.   When?

4  A.   This week.

5          MR. WARD:  Your Honor, at this time I would move to

6  admit Government's 65.  We won't be publishing it, but I would

7  like to admit it.

8          THE COURT:  Any objection?

9          MR. MOORE:  No objection.

10         THE COURT:  65 is admitted.

11         (Trial Exhibit 65 received

12          in evidence)

13         MR. WARD:  And just so the record is clear, that's

14 Bates labeled TACOM 11523 through 11613.

15         THE COURT:  What is the first page?  11523?

16         MR. WARD:  11523, and then the last page -- I'll go

17 back to it again -- 11613.

18         THE COURT:  Can you hold just a moment?

19         (Discussion held off the record.)

20 BY MR. WARD

21 Q.   Just so we're clear, what is this document?

22 A.   This is the Bat Set II signed contract.

23 Q.   Do you know why the Battalion Set II contract was created?

24 A.   Yes.

25 Q.   And how do you know this?

1    **A.**    Because I was involved in the process of generating a

2    second solicitation for additional requirements.

3    **Q.**    What was this contract for generally?

4    **A.**    This contract was to purchase additional equipment to

5    equip and to train the Iraqi Armed Forces.

6    **Q.**    And do you know why additional equipment was being sought?

7    **A.**    Yes.

8    **Q.**    Why?

9    **A.**    They had underestimated the need and the requirements on

10   the first contract, my customer.  So...

11   **Q.**    And do you know what items were called for in the

12   Battalion Set II contract?

13   **A.**    Yes.

14   **Q.**    What items were called for?

15   **A.**    Basically, we ended up buying communication gear, night

16   vision goggles and weapons.  Originally we were -- we also had

17   a requirement for a variety of trucks, but those were

18   ultimately removed from the solicitation.

19   **Q.**    Who requested the items in the Battalion Set II contract?

20   **A.**    That would be MNSTCI.

21   **Q.**    Did the Battalion Set II contract include a requirement

22   for night vision goggles?

23   **A.**    Yes.

24   **Q.**    Where were the items in this contract to be delivered?

25   **A.**    We had multiple destinations, but ultimately I believe

1    everything was delivered to Tadji.

2    **Q.**   And do you know who took possession of the items when they

3    were delivered?

4    **A.**   Yes.

5    **Q.**   Who was that?

6    **A.**   U.S. government personnel.

7    **Q.**   I would like to talk to you about the bidding process for

8    the Battalion Set II contract.

9         How did TACOM go about obtaining the items they needed for

10   the Bat Set II contract?

11   **A.**   We put together a very highly competitive solicitation

12   that was open to any and all offerors who thought that they

13   could meet the requirements.

14   **Q.**   What does that mean, a competitive solicitation put out

15   for offerors?

16   **A.**   Well, the solicitation identified what our requirements

17   were.  And we requested that offerors submit a -- it also

18   identified the -- not only what the requirements were, but it

19   also identified what the evaluation criteria would be.

20   **Q.**   Were you involved in the preparation and issuance of this

21   solicitation?

22   **A.**   Yes.

23   **Q.**   And what was your role in the preparation and issuance of

24   the solicitation for the Bat Set II contract?

25   **A.**   As the contracting officer, I'm charged with ensuring that

1  we put together a solicitation that accurately reflects the

2  requirements of our customer, that contains all the mandatory

3  and required clauses for the type of action that you're

4  contemplating, and, also, that the evaluation criteria is both

5  fair and reasonable and is a -- is an accurate way to ensure

6  that the government receives the best value on the contract.

7  **Q.**    Did TACOM, in fact, receive bid proposals in response to

8  this solicitation?

9  **A.**    Yes, we did.

10 **Q.**    Do you know how many?

11 **A.**    Yes.

12 **Q.**    How many?

13 **A.**    Sixteen.

14 **Q.**    Did Anham, the winner of the Battalion Set I contract, bid

15 on the Battalion Set II contract?

16 **A.**    Yes, they did.

17 **Q.**    Was Newcon a proposed subcontractor in any of the bids for

18 night vision goggles?

19 **A.**    Yes.

20 **Q.**    How do you know that?

21 **A.**    During the evaluation phase, we looked at all of the

22 subcontractors.  The subcontractors provided us with all the

23 technical data that we were looking at.  Many times it was

24 provided through the prime contractor.  Other times the prime

25 had the subs submit the information directly.  So we not only

MCALEER - DIRECT EXAMINATION / WARD

1  knew who they -- who they were, but we evaluated their

2  proposals.

3  Q.   Are you familiar with how TACOM chose a winning bidder for

4  the Battalion Set II contract?

5  A.   Yes.

6  Q.   What was that process?

7  A.   It was a two-phase process.

8  Q.   And how are you familiar with the process?

9  A.   I was part of the development of that process, and I was

10  involved in the execution of that process and tasked with

11  ensuring that the process followed the criteria in the

12  solicitation.

13  Q.   Is this process known as the source selection process?

14  A.   Yes.

15  Q.   You said there were two phases.  What was the first phase?

16  A.   The first phase was a review of the offeror's technical

17  proposals to make a determination.  If what they were offering

18  met our requirements, that was phase one.  Under phase one you

19  were either acceptable or not acceptable.  You had to meet the

20  minimum requirements.

21  Q.   Did you participate in the phase one selection process?

22  A.   Yes.

23  Q.   Approximately how many other people participated in the

24  phase one selection process?

25  A.   Thirty-plus individuals.  Upwards of 40 I think, yeah.

MCALEER - DIRECT EXAMINATION / WARD

1  Q.   Were any bids eliminated during this first phase?

2  A.   Yes.

3  Q.   How many proposals remained at the end of the first phase?

4  A.   Six.

5  Q.   Was there a second phase of the bid selection process?

6  A.   Yes, there was.

7  Q.   Was there a criteria for determining the winning bidder in

8  the second phase?

9  A.   Yes, there was.

10 Q.   Are you familiar with that criteria?

11 A.   Yes, I am.

12 Q.   Did you participate in the second phase?

13 A.   Yes, I did.

14 Q.   What was the criteria TACOM was using in the second phase

15 to evaluate proposals -- the remaining proposals?

16 A.   The second phase is what we call a trade-off or a best

17 value process.  What we're really looking to get is the offeror

18 whose proposal represents the best value to the government.

19 That is the objective and that is how we conducted it.

20      We had three areas that we looked at.  The first area was

21 project management and delivery.  We evaluated their capability

22 to manage -- manage, integrate and deliver the equipment and

23 the services into Iraq.

24      The second area that we looked at was price.  In price we

25 looked at the realism and reasonableness of what they were

1    offering and whether it was affordable.

2         The third area was past performance.  Past performance is

3    where we take a look at each of the offeror's performance under

4    prior contracts and we use that information as a predicter of

5    future performance.

6         So those were the three areas.

7    **Q.**   How many people participated in this second phase of the

8    source selection authority?

9    **A.**   Probably in the range of 25 to 30 people.

10            **THE COURT:**  Excuse me.  You used the term

11   "individuals."  Were these individual persons applying or were

12   these generally entities, companies, partnerships, things like

13   that?

14            **THE WITNESS:**  All individuals.

15            **THE COURT:**  Individuals?

16            **THE WITNESS:**  Individuals, yes, ma'am.

17   **BY MR. WARD**

18   **Q.**   To be clear, when you say "individuals," you're referring

19   to the people that were reviewing the bids?

20   **A.**   The subject matter experts, yes.

21   **Q.**   The entities who submitted bids, were those individuals or

22   entities?

23   **A.**   Oh, I'm sorry.  They were corporations or entities.  They

24   were -- that submitted the proposals.  I'm sorry.

25            **THE COURT:**  Okay.

1          **MR. WARD:**  Okay.

2    **BY MR. WARD**

3    **Q.**    Now, was a winning bidder selected based on this source

4    selection process?

5    **A.**    Yes.

6    **Q.**    Who made that determination?

7    **A.**    That would be the source selection authority, Mr. Dan

8    Mehney.

9    **Q.**    Do you know who the winning bidder was?

10   **A.**    Yes.

11   **Q.**    Who was the winning bidder?

12   **A.**    ITE.

13   **Q.**    What is -- first, what does ITE stand for?

14   **A.**    International Trading Establishment.

15   **Q.**    And what is ITE?

16   **A.**    As I recall, ITE is a consortium of representatives from

17   Jordan, Spain and Czechoslovakia.  So that is the company that

18   actually submitted the proposal.

19   **Q.**    Do you know what ITE's winning bid price was for the Bat

20   Set II contract?

21   **A.**    Yes, I do.

22   **Q.**    And how do you know that?

23   **A.**    Because I was involved in the entire process.

24   **Q.**    And what was its bid price?

25   **A.**    $174,400,000, approximately.  A few odd dollars here or

1    three.

2    **Q.**    Did ITE accept the contract award?

3    **A.**    Yes, they did.

4    **Q.**    Was there a night vision goggles requirement in this bid?

5    **A.**    Yes.

6    **Q.**    How many night vision goggles did the U.S. Army solicit

7    for the Battalion Set II contract?

8    **A.**    19,113.

9    **Q.**    Was ITE going to supply the night vision goggles for this

10   contract?

11   **A.**    As the prime contractor, yes.

12   **Q.**    How was ITE going to supply the night vision goggles for

13   this contract?

14   **A.**    They were utilizing a subcontractor.

15   **Q.**    Do you know who ITE's original night vision goggles

16   subcontractor was?

17   **A.**    Yes.

18   **Q.**    And how do you know this?

19   **A.**    Because they were evaluated and I was aware of who all the

20   subcontractors were.

21   **Q.**    Who was its original night vision goggles supplier?

22   **A.**    NiViSys.

23   **Q.**    And what is NiViSys?

24   **A.**    They are a company located in Arizona, and they are a

25   commercial night vision goggle manufacturer.

1    Q.    Some point after the contract was awarded, did ITE seek to

2    switch night vision goggle subcontractors?

3    A.    Yes.

4    Q.    And how do you know this?

5    A.    Because they came in and requested a change, that we allow

6    them to change from one subcontractor to another.

7    Q.    When, approximately, did this occur?

8    A.    It was within 30 days of contract award.

9              THE COURT:   Stop right there for just a moment.

10             As I understand it, then, when these bids by the

11   prime contractor are made, they delineate in the contract who

12   all the subcontractors are that are going to he provide the

13   various elements that go into the contract?

14             THE WITNESS:   Actually, the contract, that is

15   proprietary information, subcontractor information to primes.

16   So the contract itself does not detail who the subcontractors

17   are.

18             THE COURT:   Will they have already, if you know, made

19   arrangements with various subcontractors that they want to be

20   on the contract --

21             THE WITNESS:   Yes.

22             THE COURT:   (Continuing) -- or do they do that after

23   the prime contract has been let?

24             THE WITNESS:   That is all done before the prime

25   contract.  And that's all part of the process and the

MCALEER - DIRECT EXAMINATION / WARD          1222

1   information that we look at and evaluate, is their

2   subcontractor information.

3           I mean, I'm aware, as a contracting officer, and the

4   evaluators are aware who the prime and their subs are, but we

5   don't normally -- in fact, our lawyers tell me that it's

6   proprietary, so I cannot tell another entity who the

7   subcontractors are.

8           **THE COURT:**  Oh sure, but you know.

9           **THE WITNESS:**  I know.

10          **THE COURT:**  And the people evaluating the contract

11  know who the subcontractors are before they let the prime

12  contract, is that correct?

13          **THE WITNESS:**  Yes, yes.

14          **THE COURT:**  Okay, okay.

15  **BY MR. WARD**

16  **Q.**  So to be clear, when the prime submits its proposal, does

17  it include a list of its subcontractors?

18  **A.**  Yes.

19  **Q.**  And does it include any technical specifications the

20  subcontractor must meet for the requirement?

21  **A.**  Yes.

22  **Q.**  You stated that ITE submitted a request to change its

23  subcontractor.  Did ITE submit materials in support of this

24  request?

25  **A.**  Yes.

1  **Q.**    Did you see those materials?

2  **A.**    Yes.

3  **Q.**    And what did ITE provide to you?

4  **A.**    They provided information concerning their proposed

5  subcontractor, revised subcontractor.  This is the same

6  information that they had submitted that -- the subcontractor

7  had submitted as part of another proposal under this

8  solicitation.  I'm not sure I was clear on that.

9        The information that we got on their proposed

10  subcontractor, the one they wanted to change to, we actually

11  had that information from our evaluation process because that

12  subcontractor had submitted a proposal under one of the other

13  prime contractor's proposals.

14        So we had evaluated -- already evaluated their technical

15  approach.

16  **Q.**    Let me make sure this is clear.  First, who did they

17  propose changing subcontractors to?

18  **A.**    They proposed changing to ATN.

19  **Q.**    And did they provide you with materials from ATN in

20  support of their request to change their subcontractor?

21  **A.**    Yes.

22  **Q.**    And you had seen ATN's materials before?

23  **A.**    Yes.

24  **Q.**    Why?

25  **A.**    Because it was evaluated as part of the best value

1    process.

2    **Q.**   Had ATN actually submitted its materials to be a

3    subcontractor on other bids?

4    **A.**   Yes.

5    **Q.**   And that was how you came to --

6    **A.**   Yes.

7    **Q.**   All right.  Did ITE supply a reason for switching

8    subcontractors?

9    **A.**   Yes.

10   **Q.**   What was that?

11   **A.**   They felt that they could get a better delivery schedule.

12   **Q.**   And did you make a decision related to ITE's request to

13   change subcontractors?

14   **A.**   Yes.

15   **Q.**   And what was that decision?

16   **A.**   The decision was to accept the change.

17   **Q.**   Under this decision, did the price that TACOM was paying

18   to ITE for its night vision goggles change?

19   **A.**   No.

20   **Q.**   All right.  The decision to change subcontractors, did you

21   memorialize that in writing?

22   **A.**   Yes.

23   **Q.**   I would like you to turn to Tab 5 in your binder.  I'm

24   showing you what has previously been marked Defendant's

25   Exhibit 317.

```
 1                (Witness complied.)

 2    Q.   Are you familiar with this document?

 3    A.   Yes, I am.

 4    Q.   What is it?

 5    A.   It's entitled an Award Recommendation, but basically what

 6    it is it lays out the basis of what we're doing.  It gives

 7    the -- it really memorializes that the contractor had requested

 8    a change in subcontractors and it laid out the basis for our

 9    accepting that change.

10    Q.   Do you know who wrote this document?

11    A.   It would have initially been drafted by the contract

12    specialist.

13    Q.   Do you know who that is?

14    A.   Yes.

15    Q.   Who is that?

16    A.   That would have been Jeff Bean.

17    Q.   Did you review this document at the time?

18    A.   Oh, yes.

19    Q.   Would you turn to the last page of the document?

20                (Witness complied.)

21    Q.   Are there signatures on the last page of the document?

22    A.   Yes.

23    Q.   The signature at the bottom, whose signature is that?

24    A.   My signature.

25    Q.   And is there a date next to that signature?
```

1  **A.**    Yes.

2  **Q.**    What's the date?

3  **A.**    11 March, '05.

4  **Q.**    And do you see a signature above yours?

5  **A.**    Yes.

6  **Q.**    Whose signature is that?

7  **A.**    Jeff Bean's.

8           **MR. WARD:**  At this point I would move to admit

9  Defendant's Exhibit 317.

10          **MR. MOORE:**  No objection.

11          **THE COURT:**  317 is admitted.

12          (Trial Exhibit 317 received

13           in evidence)

14          **MR. WARD:**  Thank you.

15 **BY MR. WARD**

16 **Q.**   I would like you to take a look at the Award

17 Recommendation.

18          (Document displayed)

19 **Q.**   Can you look at the paragraph at the bottom of the page

20 under the title marked "General"?

21     Do you see the sentence that says:

22          "After award, the contractor is locked in to

23           providing the proposed items unless the

24           government reviews the proposed substitutes

25           and agrees that they meet the

1          specifications."

2    **A.**    Yes.

3    **Q.**    What does that provision mean?

4    **A.**    What that means is the contractor was required to get our

5    permission to switch from one supplier to another after we

6    had -- yes, that's what it meant.

7    **Q.**    After the contract was awarded?

8    **A.**    Yes.

9    **Q.**    Okay.  Thank you.

10          I want to switch now.  I would just like to ask you a few

11    questions about defendant Michael Beker.  In August, 2005 did

12    you know Michael Beker?

13    **A.**    No.

14    **Q.**    Had you ever spoken with him on the phone?

15    **A.**    No.

16    **Q.**    In August of 2005 did you ever speak to Michael Beker

17    about the night vision goggles requirement for the Battalion

18    Set II contract?

19    **A.**    No.

20    **Q.**    In August 2005 did you ever tell anyone from Newcon that

21    TACOM would not be renewing the Battalion Set II contract with

22    ITE?

23    **A.**    Absolutely not.

24    **Q.**    In September 2005 did you have any meetings scheduled with

25    anyone from Newcon concerning Newcon taking ATN's place in

1  supplying night vision goggles for the Bat Set II contract?

2  **A.**   Absolutely not.

3  **Q.**   If there was a meeting at TACOM in August or September of

4  2005 regarding the Bat Set II contract, do you believe that you

5  would have known about it?

6  **A.**   Absolutely.

7  **Q.**   Why?

8  **A.**   Because I'm the contracting officer and if there was going

9  to be a change at all in the contract, I would be the one who

10  would be in the middle of it trying to resolve the matter.

11  **Q.**   Are you then aware of anyone at TACOM having any meetings

12  scheduled with anyone from Newcon around August or September,

13  2005?

14  **A.**   No.

15  **Q.**   Did you ever tell Michael Beker that ITE was causing TACOM

16  problems?

17  **A.**   No.

18  **Q.**   Did you ever tell Michael Beker that the ones who made the

19  decision to award the Battalion Set II contract were suspended

20  or transferred?

21  **A.**   Absolutely not.

22  **Q.**   And, in fact, was anyone at TACOM associated with the

23  Battalion Set II contract suspended or transferred?

24  **A.**   No.

25  **Q.**   Was the -- did you ever tell Michael Beker that the

1    Battalion Set II contract was being moved from one subdivision

2    at TACOM to another?

3              **MR. HOWDEN:**  Objection.  Leading --

4              **MR. MOORE:**  Objection lacks -- go ahead.  I'm sorry.

5              **MR. HOWDEN:**  Leading, lacks foundation.

6              **THE COURT:**  Objection is overruled, you may answer.

7    **A.**   No.

8    **BY MR. WARD**

9    **Q.**   And was, in fact, the Battalion Set II contract ever taken

10   from one subdivision at TACOM to another?

11   **A.**   No.

12   **Q.**   Thank you.

13        I would like to turn now your attention to the

14   investigation of these defendants.  At some point did you

15   become aware that Newcon, Arie Prilik and Michael Beker, were

16   under investigation by federal authorities?

17   **A.**   Yes.

18   **Q.**   When?

19   **A.**   In early September '05.

20   **Q.**   How did you become aware of this investigation?

21   **A.**   I was contacted by one of TACOM's procurement fraud

22   attorneys, Brad Jan, and he notified me.  He provided me with

23   that information.

24   **Q.**   And what did you learn about this investigation into the

25   defendants?

1  **A.**    I learned that there was a contractor attempting to take

2  over another contract -- let me start over.

3       I was made aware that Newcon Optik was attempting to

4  replace ATN as the supplier of night vision goggles.  I was

5  made aware that this was -- that they were trying to do it in a

6  way that might appear to be bribing them to back out of the

7  contract.

8  **Q.**    Were you asked to aid the federal authorities in this

9  investigation?

10 **A.**    Yes.

11 **Q.**    And let me back up.

12      Were you made aware of what federal agencies were

13 conducting this investigation?

14 **A.**    Yes.

15 **Q.**    And what federal agencies, as you understood it, were

16 investigating?

17 **A.**    The FBI, the CID, that's the Criminal Investigation

18 Division of the United States Army, and the Justice Department.

19 **Q.**    You said you were asked to aid this investigation.  By

20 whom?

21 **A.**    By the CID.

22 **Q.**    And what were you asked to do?

23 **A.**    I was asked to participate in a phone call, and I was

24 asked if the phone call could be recorded.

25 **Q.**    And what was your response to that request?

1   **A.**    Yes.

2   **Q.**    Was your participation in this investigation voluntary?

3   **A.**    Yes.

4   **Q.**    Why did you agree to participate?

5   **A.**    Because it's the right thing to do.

6   **Q.**    Were you given instructions about recording a call with

7   Arie Prilik?

8   **A.**    Yes.

9   **Q.**    And what instructions were you given about recording this

10  call with Arie Prilik?

11  **A.**    Well, the instructions I received was respond and converse

12  as if it was a regular routine phone call, just as if I was

13  talking to a contractor who was calling and asking questions.

14  Nothing out of the ordinary.

15  **Q.**    Let me back up, in case this isn't clear.  What were you

16  asked to do in aid of this investigation?

17  **A.**    To participate in the recorded phone call.

18  **Q.**    All right.  Did you then receive a call from Arie Prilik?

19  **A.**    Yes.

20  **Q.**    And did you speak to Arie Prilik at the time you received

21  this first call?

22  **A.**    No.

23  **Q.**    How do you know Arie Prilik called?

24  **A.**    He left a voicemail.

25  **Q.**    What did Arie Prilik say in his voicemail?

1    **A.**    He identified himself and he asked that I call him back

2    and provided the phone number to call back.

3    **Q.**    And when did he leave this voicemail?

4    **A.**    8 September, '05.

5    **Q.**    All right.  Did you return Arie Prilik's call on

6    8 September?

7    **A.**    No.

8    **Q.**    Why not?

9    **A.**    I wanted to ensure -- well, I -- I contacted the CID and

10   let them know, and I let them know that we had received this

11   call.  And they needed to set up the recording devices in my

12   office, so I delayed calling him back until that was

13   accomplished.

14   **Q.**    Who at Army CID did you contact?

15   **A.**    James McEdwards.

16   **Q.**    And what happened after you -- did you speak to Agent

17   McEdwards?

18   **A.**    Yes.

19   **Q.**    And what happened after you spoke with Agent McEdwards?

20   **A.**    He came over the next day, on the 9th of September, and

21   set up the recording equipment in my office.

22   **Q.**    What, if anything, did he do after setting up this

23   recording equipment?

24   **A.**    He tested it.

25   **Q.**    Did you see the results of that test?

MCALEER - DIRECT EXAMINATION / WARD

1    **A.**    Yes.  It was recording, so...

2    **Q.**    Were you then given any further instructions on what to

3    say or not to say when you spoke to Arie Prilik?

4    **A.**    Just to speak as if I was talking to any other contractor

5    calling in.

6    **Q.**    And who gave you those instructions?

7    **A.**    I believe it probably was the Justice Department, but

8    that's how I would have handled it anyways.  So it didn't

9    matter.

10   **Q.**    Did you then call Mr. Prilik back?

11   **A.**    Yes.

12   **Q.**    How did you know what number to call?

13   **A.**    I called the same number that he had left on my voicemail.

14   **Q.**    Was this call recorded?

15   **A.**    Yes, it was.

16   **Q.**    By whom?

17   **A.**    By the CID.

18   **Q.**    Who at CID?

19   **A.**    James McEdwards.

20   **Q.**    You can have a drink if you want.

21          (Brief pause.)

22   **Q.**    How much of that call with Arie Prilik was recorded?

23   **A.**    All of it.

24   **Q.**    Have you listened to the recording of that call?

25   **A.**    Yes, I have.

1              **MR. WARD:**  Your Honor, if I may approach?

2              **THE COURT:**  Yes.

3  **BY MR. WARD**

4  **Q.**   Showing you what's been marked Government Exhibit 93.

5              (Whereupon, document was tendered

6               to the witness.)

7  **Q.**   What is this?

8  **A.**   This is the original recorded conversation on tape.

9  **Q.**   Was this the recording that you listened to?

10  **A.**   Yes.

11  **Q.**   When did you most recently listen to that recording?

12  **A.**   Yesterday.

13  **Q.**   How do you know that that is the recording that you

14  listened to?

15  **A.**   Because I looked at the tape box and it's the same number

16  tape.  This is the recording.

17  **Q.**   Does this recording accurately reflect your entire

18  telephone conversation with Mr. Prilik?

19  **A.**   Yes, it does.

20  **Q.**   Have you also listened to a computer file of this

21  recording?

22  **A.**   Yes, I have.

23  **Q.**   Is the computer version that you listened to any different

24  than what you listened to on that tape cassette?

25  **A.**   It's identical.

MCALEER - DIRECT EXAMINATION / WARD

1   Q.   I would like to turn your attention to tab nine, if you

2   would?

3        Showing you what has been marked Plaintiff's Exhibit --

4   Government Exhibit 97, are you familiar with this document?

5   A.   Yes.

6   Q.   And what is it?

7   A.   It is the written transcript of the recording.

8   Q.   Have you read this transcript?

9   A.   Yes, I have.

10  Q.   And when did you read this transcript?

11  A.   I last read it yesterday.

12  Q.   At some point when you read this transcript, did you -- at

13  some point did you have the transcript while you were listening

14  to a recording of the telephone call?

15  A.   Yes.

16  Q.   And is the transcript an accurate representation of what

17  you heard on the telephone call?

18  A.   It's identical.

19  Q.   All right.  Turning back to your call with Mr. Prilik on

20  September 9th, when you made the call, who answered the phone?

21  A.   I -- I got a voicemail recording -- or a recording, and I

22  punched the button to access Arie's extension.

23  Q.   And what happened after you punched the button for this

24  extension?

25  A.   Arie Prilik answered the phone.

```
 1  Q.   How do you know?

 2  A.   He identified himself as Arie.

 3       MR. WARD:  Your Honor, at this point I would offer

 4  Exhibit 93, the recording, into evidence and ask -- request

 5  permission to play the recording for the jury.

 6       THE COURT:  And the transcript, are you admitting

 7  that, also?

 8       MR. WARD:  No, your Honor.  We are not admitting the

 9  transcript.

10       THE COURT:  Because it's in English.

11       MR. WARD:  Because this one is in English.

12       THE COURT:  Okay.  93 is the Exhibit?

13       MR. WARD:  Yes, your Honor.

14       THE COURT:  It is admitted.

15       (Trial Exhibit 93 received

16        in evidence)

17       MR. WARD:  And I would request permission to play the

18  recording of this telephone call for the jury.

19       THE COURT:  Yes, you may do so.

20       (Audiotape played in open court.)

21  BY MR. WARD

22  Q.   Mr. McAleer, let's discuss this call.  First, Arie Prilik

23  said this.  And let me show you a quote.

24            "Bottom line:  right now, the way the

25             situation stands, you're not going to get
```

1              any deliveries from ATN.  And we talked to

2              ATN on this situation.  And we have agreed

3              that we can try to resolve this situation."

4      Mr. McAleer, in your experience as a contracting officer,

5  how many times have you received a call from one subcontractor,

6  telling you that another subcontractor that was performing on a

7  contract was not going to deliver?

8  **A.**   Never.

9  **Q.**   And in your experience as a contracting officer, how many

10  times has a subcontractor told you that they had contacted a

11  competitor about delivery problems, and the two companies have

12  agreed that they can work together to resolve the situation?

13  **A.**   Never.

14  **Q.**   All right.  Let me direct your attention to another

15  portion of the call.  You say,

16              "In those circumstances where we run

17              into production or quality problems,

18              delivery problems, our first recourse is to

19              address it with the prime contractor.  And

20              that's across the board, for all Government

21              type, ah, contracts.  That's -- that's

22              assuming -- and if we have a problem, that

23              is the approach that we would take from

24              this end, is -- is to attempt to resolve

25              it.  Speaking in general terms, if -- if

MCALEER - DIRECT EXAMINATION / WARD

1          that attempt is not successful, then,

2          because we have a requirement to provide

3          night-vision goggles, we would then review

4          our options to come up with and fulfill

5          those requirements."

6       You said that your first recourse would be to address

7    it with the prime?

8  **A.**    Yes.

9  **Q.**    And then you said if that attempt is not successful, "we

10   would review our options."

11      Generally, what options would you have in that situation?

12  **A.**    We were dealing with requirements that were of an urgent

13   nature.  And delivery of the night-vision goggles was critical

14   to the training and equipping of the Iraqi Armed Forces.  Under

15   those circumstances, we could -- we would probably -- our first

16   option would have been to work directly with the prime.

17      And if that was not successful, I would have the option of

18   deleting that requirement; terminating that portion of the

19   contract.  I could do a partial termination.  If they

20   absolutely, flat-out could not deliver the goods, we can

21   terminate them for that.

22      I could terminate the whole contract.  We wouldn't have

23   done that, but we probably would have terminated the portion

24   that they could not have delivered; but that would leave me

25   with one heck of a dilemma:  how are we going to meet the

1    urgent requirements in Iraq?

2    **Q.**    I'm sorry.  Please.

3    **A.**    Go ahead.

4    **Q.**    If you did a partial termination of the Bat. Set II

5    contract, what options, generally, did you then have to meet

6    the night-vision-goggles requirement?

7    **A.**    Well, we would have assessed the whole picture.

8         We currently had a Bat. Set I contract that they had

9    exercised all the options for the night-vision goggles on.

10   Under the guidance and the laws that we work under, we could

11   have gone back and increased the quantity on the Bat. Set I

12   contract.  That would have been one of the options.

13   **Q.**    Did you have any other options?

14   **A.**    Yes.

15   **Q.**    What were they, just generally?

16   **A.**    We could have attempted to compete for just the

17   night-vision goggles.  That would have been an option.

18        I'm not certain that would have been exercised, because of

19   the timing it would take to recompete, and the urgency we were

20   facing on getting the equipment delivered.

21             **THE COURT:**  When you say "recompete," are you talking

22   about -- is that just selecting out the night-vision goggles,

23   and issuing a new prospectus, or seeking bids just for that?

24             **THE WITNESS:**  Yes.

25             **THE COURT:**  I see.  Okay.

1  **BY MR. WARD**

2  **Q.**   Are there any other options?

3  **A.**   Yes.

4  **Q.**   What are they?

5  **A.**   We could have gone to the prior supplier; meaning

6  Newcon Optik.  We could have contracted directly with them.

7  That would have been one of the other options we would have

8  considered.

9  **Q.**   Is that what's known as a sole-source contract?

10 **A.**   Yes.

11 **Q.**   All right.  I'm going to talk about each of these options;

12 but first, in September 2005, were you under pressure to

13 deliver the items called for by the Battalion Set II contract?

14 **A.**   Yes.

15 **Q.**   Were you under pressure to specifically deliver

16 night-vision goggles under this contract?

17 **A.**   Yes.

18 **Q.**   Where was this pressure coming from?

19 **A.**   Our customer in country:   MNSTC-I.

20 **Q.**   And what form was the pressure taking?

21 **A.**   We were in constant communication with them on delivery of

22 all of the equipment on both Bat. Set contracts.  They needed

23 the equipment, and they needed it as soon as they could get it.

24 **Q.**   Do you know why they needed it as soon as they could get

25 it?

MCALEER - DIRECT EXAMINATION / WARD

 1  **A.**    There was an urgent requirement to train and equip the

 2  Iraqi Armed Forces.  The faster we got them up and operational,

 3  the faster we could pull our troops out.

 4  **Q.**    Was this pressure unusual, in your experience?

 5  **A.**    Yes.  This was a real-life urgency.

 6  **Q.**    I want to talk now about the various options you

 7  discussed.

 8       First, if the night-vision goggles subcontractor was

 9  unable to deliver, could you have negotiated a higher price

10  with ITE, the prime contractor?

11  **A.**    Yes.

12  **Q.**    Turning to the next item, you said that you could

13  eliminate the night-vision item from the Bat. Set II contract.

14  I believe you said it was a partial termination.

15       Is TACOM permitted to do this?

16  **A.**    Yes.

17  **Q.**    Under what authority would TACOM be allowed to partially

18  terminate a contract?

19  **A.**    Well, the Federal Acquisitions Regulations -- the "FAR" --

20  it's sort of the Bible for federal contracting.  It contains

21  the regulations and the clauses, et cetera; most of them,

22  anyways, that we have to operate under.  It does allow for

23  partial termination or complete termination of contracts.

24  **Q.**    If you were to partially terminate this contract, does

25  that relieve ITE of the obligation to supply the night-vision

1   goggles?

2   **A.**   Yes.

3   **Q.**   Would you then still -- you would then still have an

4   obligation to supply the goggles?

5   **A.**   Yes.

6   **Q.**   Let's talk about those options.  You'd said that TACOM

7   could issue a new bid for night-vision goggles?

8   **A.**   Yes.

9   **Q.**   Who would have been eligible to bid in a new bidding

10  process for night-vision goggles?

11  **A.**   Any offerer that thought they could meet the requirements.

12  **Q.**   And what factors would have been considered by TACOM in

13  determining who to award the contract to in a new solicitation;

14  a new bid process?

15  **A.**   The factors probably would have been very similar to the

16  factors under the Bat. Set II contract.  We would have looked

17  at their ability to deliver.  We would have looked at the

18  price.  We might have looked at past performance.

19  **Q.**   Are there circumstances in which, if TACOM had put out a

20  new tender or bid for night-vision goggles, they would have

21  been allowed to pay a higher price?

22        **MR. HOWDEN:**  Your Honor, I'm going to object.  This

23  entire line of questioning calls for nothing but speculation.

24        **THE COURT:**  Objection is overruled.

25        I think, based on his experience, this is not

 1   speculation.

 2              **MR. WARD:**  Thank you, your Honor.

 3   **Q.**   Let me ask you the question again.

 4        If TACOM had put out a new solicitation for bids, would

 5   TACOM be allowed to pay a higher price for a contract for

 6   night-vision goggles than it had under the Battalion Set II

 7   contract?

 8   **A.**   Yes.

 9   **Q.**   All right.  You discussed what we identified as a

10   sole-source contract.

11   **A.**   Yes.

12   **Q.**   What is a sole-source contract?

13   **A.**   It's where you eliminate competition, and you go to one

14   source.  That is a sole-source contract.

15        There are certain criteria that must be met.  The one that

16   would have applied here would have been an urgent and

17   compelling requirement.  And under that authority, I could have

18   gone directly to an entity that was able to deliver and meet

19   our schedule.

20   **Q.**   At the time, did you believe there was an urgent and

21   compelling requirement for night-vision goggles?

22   **A.**   Yes.

23   **Q.**   Under a sole-source option, would TACOM have been allowed

24   to pay a higher price than what it had paid under the

25   Bat. Set II contract to the sole-source contractor?

1  A.    Yes.

2  Q.    Would one of your options have been to sole-source with

3  Newcon?

4  A.    Yes.

5  Q.    Why?

6  A.    Because they had successfully delivered on -- under the

7  Bat. Set I contract, I believe, 4,700 night-vision goggles.

8  Q.    All right.  I want to turn to another option you

9  discussed, and ask:  could TACOM have added items --

10 night-vision goggle requirements -- to an existing contract?

11 A.    Yes.

12 Q.    And at that time, in September 2005, did TACOM have an

13 existing contract for night-vision goggles?

14 A.    Yes.

15 Q.    With whom?

16 A.    With Anham.

17 Q.    And what contract was that?

18 A.    The Bat. Set I contract.

19 Q.    All right.  Now let's turn back to your conversation with

20 Arie Prilik.  I want to show you another quote.

21           "So, yes, we are willing to work with

22           him, or if the Government decides that, or

23           recommends any other options, as long as we

24           can follow all of the legalities.  And that

25           will raise the price; probably to the same

MCALEER - DIRECT EXAMINATION / WARD                    1245

1              levels that we have supplied under the

2              previous contract."

3              When Arie Prilik said, "that will raise the price;

4    probably to the same levels that we have supplied under the

5    previous contract," what contract did you understand

6    Arie Prilik to be referring to?

7    **A.**   The Bat. Set I contract.

8    **Q.**   And what was the price TACOM was paying under the

9    Bat. Set I contract?

10   **A.**   $2,250 a unit.

11   **Q.**   And what was TACOM paying under the Bat. Set II contract?

12   **A.**   $1,760.

13   **Q.**   Let me make sure I have that clear.  The Bat. Set I

14   contract price was 2,250?

15   **A.**   Yes.  Did I misspeak?

16   **Q.**   I may have asked the question wrong, but I'm just making

17   sure it's clear.

18         Under the Bat. Set II contract, how many night-vision

19   goggles were to be supplied?

20   **A.**   We had options up to 19,113 night-vision goggles.

21   **Q.**   And at the time of this call with Mr. Prilik,

22   approximately how many goggles had already -- how many goggles

23   were left to be supplied under the contract?

24   **A.**   Well, 2,700 had been delivered.  I don't recall how many

25   we had actually optioned at that time, but there were

MCALEER - DIRECT EXAMINATION / WARD                    1246

1  additional units that were on contract, awaiting delivery.

2  **Q.**    19,000 could have been ordered; 2,700 had already been

3  ordered?

4  **A.**    A total of 19,000 could have been ordered, yes.

5  **Q.**    And the remainder is 19,000 minus 2,700?

6  **A.**    Yes.

7  **Q.**    Okay.  I won't make you do math on the stand.

8        Turning back, now, to your conversation with Arie Prilik,

9  he says,

10                "What I'm saying is that we can talk to

11             ITE, but it's just going to delay the

12             process.  At the end of the day, if you

13             want reliable supply, and quality, and the

14             paperwork, I think that we are the only

15             alternative."

16        When Arie Prilik said, "we are the only alternative,"

17  who did you understand Mr. Prilik to be referring to?

18  **A.**    Newcon Optik.

19  **Q.**    Now, I want to turn your attention to one -- another

20  quote.

21                "I think that now, you're not only

22             hearing it from us.  I would assume that

23             you're hearing it from the other supplier.

24             And with all of my respect for them, I'd

25             hate to be in a position:  I told you."

1    When Arie Prilik said "the other supplier," who did you

2  understand Mr. Prilik to be referring to?

3  **A.**   ATN.

4  **Q.**   All right.  Now, turning back to this call, now, based on

5  what Arie Prilik said to you during this call on September 9th,

6  did you have any reason to believe that Newcon had arranged to

7  pay ATN to stop supplying night-vision goggles for the

8  contract?

9  **A.**   No.

10  **Q.**   Based on what Arie Prilik said during this call, did you

11  have any reason to believe that Newcon had paid ATN $50,000, as

12  an advance on this arrangement to pay ATN to stop supplying

13  goggles under the Bat. Set II contract?

14  **A.**   No.

15  **Q.**   All right.  I want to turn your attention back to the

16  Battalion Set II contract that we talked about earlier.  Does

17  this contract have a standards of conduct and proper business

18  practices provision?

19  **A.**   Yes.

20  **Q.**   And are you familiar with that provision?

21  **A.**   In general, yes.

22  **Q.**   And how are you familiar with it?

23  **A.**   It's in the contract.  It's clause (h)(22).

24  **Q.**   All right.  Let's turn back to Tab 2.  This is 65.  It was

25  admitted as the Battalion Set II contract.  Can you turn to

1    Bates page TACOM 11587?

2    **A.**    Yes.

3    **Q.**    Is this the standards of conduct and proper business

4    practices provision of Bat. Set II?

5    **A.**    Yes.

6    **Q.**    Whose job is it to enforce these standards of conduct?

7    **A.**    That would be the contracting officers job:  myself.

8    **Q.**    You?

9    **A.**    Yes.

10   **Q.**    All right.  Let me -- highlight the second sentence.  And

11   it says,

12                    "Transactions related to the

13             expenditure of public funds require the

14             highest degree of public trust, and an

15             impeccable standard of conduct by

16             contractors, subcontractors, and any other

17             agent acting in connection with this

18             contract."

19             Do you see that?

20   **A.**    Yes.

21   **Q.**    Do those standards of conduct apply to ITE, as the prime

22   contractor?

23   **A.**    Yes.

24   **Q.**    Do these standards apply to ATN, as a subcontractor?

25   **A.**    Yes.

MCALEER - DIRECT EXAMINATION / WARD                    1249

1   Q.    Would they have applied to anyone substituted in for ATN

2   on this contract?

3   A.    Yes.

4   Q.    On September 9th, do you believe these applied to Newcon?

5   A.    Yes.

6   Q.    Why?

7   A.    Because they were --

8              MR. MOORE:  Objection, your Honor.  I'm going to --

9   this is an opinion in the nature of expert.  And he is a lay

10  witness.  And, under Rule 701, these type of hypotheticals are

11  improper.

12             THE COURT:  It's not a hypothetical.

13             The objection is overruled.

14  BY MR. WARD

15  Q.    Would this provision have applied to Newcon?

16  A.    Yes.

17  Q.    Thank you.  Now, you discussed earlier the options that

18  TACOM had if ATN was unable to supply night-vision goggles

19  under the contract.  Now, these were options that you had?

20  A.    Yes.

21  Q.    If you had known that, two days before you spoke to

22  Arie Prilik, that Newcon had wired $50,000 to ATN, would that

23  have influenced your decision as to whether to allow Newcon to

24  supply the night-vision goggles under this contract?

25             MR. MOORE:  Objection.  Lacks foundation.  Calls for

MCALEER - DIRECT EXAMINATION / WARD    1250

1  speculation.

2        **THE COURT:**  Well, I think there are some further

3  elements you would have to add to that question, in order for

4  it to really be relevant.

5  **BY MR. WARD**

6  **Q.**  You would make the decision as to whether to allow a

7  switch in the Battalion Set II contract?

8  **A.**  Yes.

9  **Q.**  And you would want to know -- what sort of information

10  would you want to know before making that switch?

11  **A.**  The first question I would ask is:  why?

12        I would want complete details on the transaction.

13        I would want to take a look at the specs that the -- any

14  potential offer or subcontractor was offering, but I would

15  certainly take a close look at -- at why they were switching.

16  **Q.**  Would it have caused you to ask further questions, had you

17  known that $50,000 had been wired from Newcon to ATN two days

18  prior to your call with Arie Prilik?

19        **MR. MOORE:**  Again, lacks foundation, and is now

20  entering into a hypothetical.

21        **THE COURT:**  Objection is overruled.

22        **MR. WARD:**  You can answer the question.

23        **THE WITNESS:**  Absolutely.

24  **BY MR. WARD**

25  **Q.**  Why?

1    **A.**    Yes.

2         Why?

3    **Q.**    Yes.   Why?

4    **A.**    Because at that point, it would start to look like there

5    was a payoff of some sort.   Money was being exchanged.   It was

6    not reported to me.

7         If I found out that money had been transferred from

8    Company A to Company B, that would have raised a lot of red

9    flags.   And it would have been looked at very thoroughly.

10   **Q.**    What would you have done if you had known that $50,000 had

11   been paid from Newcon to ATN two days prior to this

12   conversation?

13   **A.**    I'd probably would have talked to the procurement-fraud

14   attorneys at TACOM, to see if -- if something is going awry

15   here.   I'd get their legal opinion.

16        In my mind, if money's being exchanged for the purpose of

17   buying --

18              **MR. MOORE:**   Objection, your Honor.

19              **THE WITNESS:**   -- a contract --

20              **MR. MOORE:**   This is expert testimony.

21              **THE COURT:**   The objection is overruled.

22   **BY MR. WARD**

23   **Q.**    Go ahead.

24   **A.**    If money is being exchanged for the purpose of replacing a

25   contract, and I'm looking at an increase in the cost to the

1    contract -- a significant increase -- that raises a lot of

2    questions.  And that raises, to me, some severe ethical

3    questions, too.

4    **Q.**   So if you would have known that $50,000 had been wired to

5    ATN from Newcon two days prior to this call, would that have

6    influenced your decision?

7    **A.**   Yes.

8              **MR. MOORE:**  Objection.  Again, lacks foundation.

9    Incomplete hypothetical.

10             **THE COURT:**  You need to put some more facts in there.

11             **MR. WARD:**  Would this have influenced your decision

12   as to whether to allow Newcon to become the sub -- the supplier

13   of night-vision goggles under the Battalion Set II contract?

14             **MR. MOORE:**  Same objection.  Lacks foundation.

15   Incomplete hypothetical.

16             **THE COURT:**  Well, you need more facts.

17   **BY MR. WARD**

18   **Q.**   If you had known that Newcon had arranged to pay ATN $75 a

19   goggle for each goggle that it supplied under the

20   Battalion Set II contract in ATN's place, would that have

21   caused you to ask further questions before allowing a switch in

22   this contract?

23             **MR. MOORE:**  Lacks --

24             **THE WITNESS:**  Yeah.

25             **MR. MOORE:**  Lacks foundation.

```
1              THE COURT:   The objection is overruled.  That's a
2    good question.
3              THE WITNESS:   Absolutely.
4    BY MR. WARD
5    Q.   Would it -- if you had known that Newcon had arranged --
6         Let me ask this.  Why?
7    A.   Why?  Because there are transactions going on, and I want
8    to know the basis of it.  Why is money being exchanged?  What
9    is the purpose of this?
10        If I'm staring at an increase of about $490 a unit -- and
11   you can do the math, as to the quantity of potential
12   night-vision goggles; it's in the millions -- I'm going to find
13   out exactly what is transpiring before I would sign off on --
14   on such a switch from a subcontractor.
15   Q.   So what would you have done if you had known that -- if
16   you had been made aware that Newcon had arranged to pay ATN $75
17   a goggle to stop supplying TACOM with night-vision goggles?
18   A.   I would have immediately contacted our procurement-fraud
19   attorneys.  I would have run it up the flagpole at TACOM; by
20   that I mean it would go up the management chain.  Something
21   like this has to be aired properly.
22        More than likely, I would have contacted the CID at some
23   point, if not immediately, and perhaps the FBI, because it
24   looks like money was being exchanged in an attempt to extort
25   the United States Government and the taxpayers.
```

1          **MR. MOORE:**  Move to strike, your Honor.  He's giving

2    a legal conclusion.

3          **THE COURT:**  Objection is overruled.

4    **BY MR. WARD**

5    **Q.**   You would have taken all of these steps before deciding to

6    switch your night-vision-goggles subcontractor?

7    **A.**   Absolutely.

8    **Q.**   All right.  Following your September 9th call with

9    Arie Prilik, did you speak to Arie Prilik again?

10   **A.**   Yes.

11   **Q.**   When was that?

12   **A.**   Approximately two weeks later.  Maybe ten, twelve days.  I

13   don't recall the exact date.

14   **Q.**   Did you speak to Army CID before talking to Arie Prilik --

15   **A.**   Yes.

16   **Q.**   -- again?

17         And who did you speak to?

18   **A.**   I believe it was James McEdwards.

19   **Q.**   Were you given instructions by Army CID regarding your

20   phone calls with Arie Prilik?

21   **A.**   Yes.

22   **Q.**   And what were those instructions?

23   **A.**   They asked that I contact them after the phone call, and

24   review it with them.

25         They also asked that I -- I take notes of all

1   conversations that I had with Arie Prilik, or any

2   representative of Newcon Optik.

3   **Q.**   Now, following this discussion with Army CID, did you have

4   subsequent conversations with Arie Prilik in 2005?

5   **A.**   Yes.

6   **Q.**   How many?

7   **A.**   Approximately five additional.

8   **Q.**   Let me ask this.  For each call that you had with

9   Arie Prilik, did you take notes of that call?

10  **A.**   Yes.  Yes.

11  **Q.**   When did you take notes in relation to the call?

12  **A.**   Immediately thereafter.

13  **Q.**   And have you recently reviewed your notes?

14  **A.**   Yes.

15  **Q.**   Turning back to your call with Arie Prilik following your

16  September 9th conversation, do you remember when that call was?

17  **A.**   The exact date?  No.

18  **Q.**   Is there anything that would help refresh your

19  recollection as to the date of that call?

20  **A.**   Yes.

21  **Q.**   And what would that be?

22  **A.**   I'm looking at my notes.  They were dated.

23          **MR. WARD:**  I'd ask that the witness be allowed to

24  turn to Tab 14, Exhibit 85, which are his notes of this call

25  to --

MCALEER - DIRECT EXAMINATION / WARD

1          **THE COURT:**  Just to refresh his recollection.

2          **MR. WARD:**  Just to refresh your recollection.

3          **THE WITNESS:**  Okay.

4    **BY MR. WARD**

5    **Q.**   Can you take a look at those?  First of all, what is it

6    that you're looking at, Mr. McAleer?

7    **A.**   My handwritten note.

8    **Q.**   And will these notes help refresh your recollection as to

9    when you next spoke to Arie Prilik?

10   **A.**   Yes.

11   **Q.**   All right.  Why don't you take a look at your notes?

12   **A.**   The date is 22 September '05.

13   **Q.**   Now, turning away from your notes, does this refresh your

14   recollection as to when you next spoke to Arie Prilik?

15   **A.**   Yes.

16   **Q.**   And when was that?

17   **A.**   Well, it was on the 22nd of --

18   **Q.**   All right.

19   **A.**   September '05.

20   **Q.**   During this call, did Arie Prilik raise with you the issue

21   of the delivery of night-vision goggles under the

22   Battalion Set II contract?

23   **A.**   Yes.

24   **Q.**   And what did he say about that?

25   **A.**   He contacted me, and stated that I should have been

1  contacted by the other supplier about the situation in Russia.

2  **Q.**   Did he say anything about ATN's ability to deliver under

3  this contract?

4  **A.**   Yes.

5  **Q.**   Did he say -- did he make any other references to ATN?

6  **A.**   Well, he made the statement that, "by now, they should

7  have confirmed what's going on," or I believe that was the

8  extent of what he said concerning ATN.

9  **Q.**   On this call, what, if anything, did Arie Prilik tell you

10  about Newcon's ability to deliver on night-vision goggles?

11  **A.**   Newcon stated that they were able to deliver; that they

12  were willing to work through the prime contractor on the

13  Bat. Set I Anham, or that they could supply the night-vision

14  goggles directly to the Government.

15  **Q.**   All right.  At any point during this call, did Arie Prilik

16  say anything to you about an arrangement between Newcon and ATN

17  regarding the supply of night-vision goggles for the

18  Bat. Set II contract?

19  **A.**   No.

20  **Q.**   And at any point during this conversation, did Arie Prilik

21  tell you that Newcon had arranged to pay ATN to stop supplying

22  night-vision goggles un the Battalion Set II contract?

23  **A.**   No.

24  **Q.**   Did you speak to Arie Prilik again following this call?

25  **A.**   Yes.

1   Q.   When was that?

2   A.   Approximately one month later.

3   Q.   Do you remember the exact date?

4   A.   No, I don't.

5   Q.   Did you -- you took -- did you take notes of this call?

6   A.   Yes, I did.

7   Q.   Is there anything that would help refresh your

8   recollection as to the date of this call?

9   A.   Yes.

10  Q.   And what would that be?

11  A.   Reviewing my notes.

12          MR. WARD:   All right.  I'd ask that the witness be

13  allowed to review his notes.

14          THE COURT:   You may do so just to refresh your

15  recollection.

16  BY MR. WARD

17  Q.   Yes.  Would you turn to Tab 15?

18       This is Government's Exhibit 84; TACOM 1176.

19       And, for the record, the previous notes were Government

20  Exhibit 85, TACOM 1174.

21       Looking at those notes, does that refresh your

22  recollection as to when you next spoke to Arie Prilik?

23  A.   Yes.

24  Q.   When did you next speak to Arie Prilik?

25  A.   On 19 October '05.

1   Q.   During this call, what did Arie Prilik ask?

2   A.   He asked if we had received his e-mail dated 17 October,

3   concerning illegal -- I think it was illegal smuggling of

4   night-vision goggles.  Yes.

5   Q.   Did he ask about any additional orders of night-vision

6   goggles?

7   A.   Yes, he did.

8   Q.   At any point during this call, did Arie Prilik tell you

9   that ATN had arranged -- excuse me -- that Newcon had arranged

10  to pay ATN to stop delivering goggles called for by the

11  Battalion Set II contract?

12  A.   No.

13  Q.   Did you speak to Arie Prilik at any time subsequent to

14  this call?

15  A.   Yes.

16  Q.   And when was the next time you spoke to Arie Prilik?

17  A.   I am not certain of the exact date.

18  Q.   Did you take notes of that call?

19  A.   Yes, I did.

20  Q.   Is there anything that would help refresh your

21  recollection as to the date and contents of that call?

22  A.   Yes.

23  Q.   What would that be?

24  A.   Reviewing the notes.

25            MR. WARD:   Your Honor, I'd like to show the witness

MCALEER - DIRECT EXAMINATION / WARD                    1260

1    Government Exhibit 83; TACOM 1180.

2              **THE COURT:**  Yes, for refreshing recollection only.

3    **BY MR. WARD**

4    **Q.**   Mr. McAleer, if you'd take a look at those notes --

5    **A.**   Okay.

6    **Q.**   -- does that refresh your recollection as to when you next

7    spoke to Arie Prilik?

8    **A.**   Yes.

9    **Q.**   When did you next speak to Arie Prilik?

10   **A.**   On 17 November '05.

11   **Q.**   How did this call come about?

12   **A.**   If I could review my notes for a second --

13        Well, I was contacted directly about Arie Prilik.  He

14   called me.

15   **Q.**   Did you discuss the Battalion Set II contract on this

16   call?

17   **A.**   Yes.

18   **Q.**   And did you discuss night-vision-goggle deliveries under

19   the Battalion Set II contract?

20   **A.**   Yes.

21   **Q.**   And at any point in this call, did Arie Prilik tell you

22   that Newcon had arranged to pay ATN to stop delivering goggles

23   called for by the Battalion Set II contract?

24   **A.**   No.

25   **Q.**   Did you have any additional conversations with Arie Prilik

1  in 2005?

2  **A.**    I believe that was the last conversation.  Yes, it was.

3  **Q.**    Mr. McAleer, are you aware that the defendants filed a

4  civil lawsuit against ATN in the San Francisco Superior Court

5  in February 2006?

6  **A.**    Yes.

7  **Q.**    When did you -- first become aware of this lawsuit?

8  **A.**    Two days ago.

9  **Q.**    How -- how did you become aware of this lawsuit?

10  **A.**    You informed me of it -- Justice Department.

11  **Q.**    Have you reviewed the allegations in the lawsuit?

12  **A.**    Just briefly.

13  **Q.**    Now, turning back to your conversations with Arie Prilik

14  in 2005, at any point in 2005 did Arie Prilik tell you that ATN

15  had promised to assign its rights and obligations in the

16  remainder of the Bat. Set II contract to Newcon?

17  **A.**    No.

18  **Q.**    At any point in 2005, did Arie Prilik tell you that, in

19  exchange for this assignment, Newcon had agreed to tender to

20  Mr. Rocklin and ATN payment of $75 per piece of equipment that

21  Newcon supplied under the contract?

22  **A.**    No.

23  **Q.**    Turning back to the statements or -- you had said

24  Arie Prilik never told you that ATN had promised to assign its

25  rights and obligations under the remainder of the Bat. Set II

1   contract to Newcon.

2       If you had known that information in 2005, what would you

3   have done?

4   **A.**   Well, ATN doesn't have the authority to assign their

5   rights as a subcontractor to another subcontractor.

6       The authority vests with the prime contractor.  That would

7   be ITE.

8       They could have come in and requested such a change, and

9   we would have taken a look at it and evaluated it; but

10  ultimately, it would have been the Government that made the

11  decision on the change in subcontractors on this contract.

12  **Q.**   If you had known that Newcon --

13          **THE COURT:**  Excuse me.

14          Protocol would have been for ITE to come to TACOM

15  about the substitution?

16          **THE WITNESS:**  Yes.  The prime contractor.

17          **THE COURT:**  And the subcontractor would not be the

18  one to come to TACOM and ask for that assignment change?

19          **THE WITNESS:**  That's correct.

20          **THE COURT:**  Excuse me, Mr. Ward.

21          **MR. WARD:**  Thank you.

22          **THE COURT:**  Once in a while I have to interrupt.

23          **MR. WARD:**  Please.

24          **THE COURT:**  Keeps me alert.

25

1   **BY MR. WARD**

2   **Q.**   So if you had known this information -- that ATN had

3   promised to assign its rights and obligations to Newcon --

4   would that have influenced your decision as to whether to allow

5   Newcon to take over this contract?

6            **MR. MOORE:**   Objection, your Honor.   Assumes facts not

7   in evidence.

8            This calls for speculation.   Lacks foundation.

9            **THE COURT:**   I think the -- some prelude that needs to

10  occur before we get into that.

11           **MR. WARD:**   Let me ask a few more questions.

12  **Q.**   You said that you -- Arie Prilik never told you that

13  Newcon had agreed to tender to Dmitry Rocklin and ATN a payment

14  of $75 per piece of night-vision equipment that Newcon would

15  supply under the contract.

16       If you had known that, what would you have done?

17           **MR. MOORE:**   Vague as to time.

18  **BY MR. WARD**

19  **Q.**   If you had known that in September 2005, what would you

20  have done?

21  **A.**   Repeat the question, please.

22  **Q.**   If you had known in 2005 that Newcon had agreed to tender

23  to Dmitry Rocklin and ATN a payment of $75 per piece of

24  night-vision equipment that Newcon would supply under the

25  contract -- if you had known that fact in 2005, what would you

MCALEER - DIRECT EXAMINATION / WARD                    1264

1    have done?

2             **MR. MOORE:**  It's vague and ambiguous.  It lacks

3    foundation.  I'm not certain what context this question is, and

4    what decision he's supposed to be making.

5             **THE COURT:**  Objection is overruled.

6             You may answer.

7             **THE WITNESS:**  I certainly would have looked very

8    closely at what was transpiring on that contract.  As needed, I

9    would have involved other authorities if money is now

10   exchanging hands, if agreements are being reached, and we're

11   not privy.  So this it raises a lot of red flags.

12   **BY MR. WARD**

13   **Q.**   What other facts would you have wanted to know, if you had

14   known in 2005 that Newcon had agreed to tender to ATN $75 per

15   piece of night-vision goggles that it would supply in ATN's

16   place?

17   **A.**   The first question I would have asked is:  why?  What is

18   going on here?  Why are --

19            And Newcon had -- excuse me -- ATN had successfully

20   delivered over 2,700 night-vision goggles.  And suddenly,

21   arrangements are being made with another contractor to -- I

22   would need to know what is going on.

23   **Q.**   Were actions that you would take on this contract

24   dependent on you getting additional facts?

25   **A.**    Absolutely.

Lydia Zinn, CSR,  CRR, and Debra Pas, CSR, CRR
Official Reporter -  U.S. District Court
(415)  531-6587

 1  Q.   And what actions on your part would be dependent on

 2  getting these additional facts?

 3       MR. MOORE:   It's an improper hypothetical question to

 4  a lay witness.

 5       THE COURT:   It's sort of incomprehensible, also.  Try

 6  it again.

 7  BY MR. WARD

 8  Q.   Well, you said you would have wanted to know these facts.

 9  You would have wanted to know these facts before doing what?

10  A.   Before approving a change in subcontractors.

11       MR. MOORE:   Objection.  Lacks foundation.  Move to

12  strike.  There's no evidence that any such scenario was

13  present.

14       THE COURT:   Objection is overruled.  Motion to strike

15  actually is denied.

16  BY MR. WARD

17  Q.   At any point in 2005, did Arie Prilik tell you that, under

18  this assignment arrangement, ATN would obtain from Newcon

19  approximately $225,000 in payments, and that Newcon would

20  realize approximately $645,000 in profits?

21  A.   No.

22  Q.   And had you -- had you known that information in 2005,

23  would it have caused you to ask further questions?

24  A.   Yes.

25  Q.   What sort of questions would you have asked?

1   **A.**   Why is money being exchanged?

2       What -- what is the proposal?

3       And what price would -- I mean, we had a fixed price at

4   that time on the contract.  I'd want to know how they -- how

5   this arrangement was still going to -- and the subcontractor

6   was going to perform within that price.

7   **Q.**   Would this information have raised any red flags, in your

8   mind?

9   **A.**   Yes.

10   **Q.**   What sort of red flags?

11   **A.**   Money is being exchanged for the purpose of replacing one

12   subcontract or with another.  And I'm being informed by a

13   representative of Newcon Optik that the price would probably

14   have been at the level of the Bat. Set 1 contract, which would

15   be an increase of $490 a unit.

16   **Q.**   If you had known that there was an arrangement whereby

17   AT&T in would obtain from Newcon approximately $225,000 in

18   payments to assign its rights to Newcon, and Newcon would

19   realize profits of approximately $645,000, would you have

20   talked to others about this information?

21   **A.**   Yes.

22   **Q.**   Who would you have contacted?

23   **A.**   Well, certainly, within the contracting community, I would

24   have talked to pricing specialists.

25       I probably would have also talked again with

1  procurement-fraud attorneys at TACOM.

2       And I would have questioned ATN as to what kind of

3  arrangement they are proposing.  And I would want all of the

4  facts of the arrangement.

5  **Q.**   And were any actions on your part -- would they be

6  dependent on getting these facts?

7  **A.**   Yes.

8  **Q.**   What actions would be dependent on getting these facts?

9  **A.**   My approval of a switch in subcontractors.

10 **Q.**   So then would it have influenced your decision as to

11 whether to switch subcontractors if you had known that there

12 was an arrangement whereby ATN would obtain from Newcon

13 $225,000, Newcon would be assigned the rights and obligations

14 under the contract, and they would obtain profits of $645,000?

15 **A.**   Yes.

16       **MR. MOORE:**  Objection, your Honor.  Assumes facts not

17 in evidence.

18       **THE COURT:**  I think it's been asked and answered at

19 this point.  Pretty much the same question that you asked two

20 questions ago.

21       **MR. WARD:**  All right.

22       **THE COURT:**  But I have a question.

23       If ITE were the prime contractor; comes to you and

24 says, "We've got to change subcontractors" for some reason or

25 another -- not delivering it, or whatever -- but it's --

1   there's going to be an increase in price, what is your

2   responsibility with respect to that change?  And what actions

3   do you take?

4            **THE WITNESS:**  Well, the contract that we had is fixed

5   price on those units.

6            If ITE had wanted to increase the price on that, that

7   would have been looked at to determine why; what's behind it.

8            Normally, under a fixed-price contract, you either

9   deliver, or you don't.  And if you don't deliver, that's held

10  against you.  We can termiante you for failure to conform to

11  the requirements.

12           In this instance, that may have been an option.  If

13  it was the only way to -- to get the night-vision goggles

14  delivered into Iraq, I would have had to have done a write-up

15  that would justify what we're doing.  And it would have to have

16  been on an urgency basis that the current supplier is not going

17  to be able to deliver; is not delivering.  The proposed

18  replacement supplier has successfully delivered, and has

19  successfully delivered at a price of -- whatever the price

20  was -- $2,250.  That could have been an option.  We could have

21  paid an increased price.

22           **THE COURT:**  Is the -- is it also within your

23  authority to say to ITE, "You're going to have to -- if you're

24  going to do this, you're going to have to absorb the -- the

25  cost"?

1            THE WITNESS:  Yes.

2            THE COURT:  Well, while I'm at it, do you know if --

3  do you know if on the Bat. -- the various proposals that were

4  submitted, these are -- is this in response to what is called

5  an "RFP"?

6            THE WITNESS:  Yes, ma'am.

7            THE COURT:  And so the responses to those RFPs are

8  referred to as "solicitations" or "orders," I guess?  Is that

9  correct?

10           THE WITNESS:  A proposal is submitted.

11           THE COURT:  A proposal is submitted, because the RFP

12 is a request for a proposal?

13           THE WITNESS:  Yes.

14           THE COURT:  Okay.  Do you know if, with respect to

15 the Bat. II Set [sic] contract, whether Newcon was one of the

16 proposed subcontractors on one of those proposals?

17           THE WITNESS:  For the Bat. Set II?

18           THE COURT:  Yes.

19           THE WITNESS:  Yes, they were.

20           THE COURT:  And that was submitted by some other

21 prime contractor who was not accepted?

22           THE WITNESS:  Yes.

23           THE COURT:  All right.  Okay.  Thank you.

24           MR. WARD:  We have no further questions for the

25 witness at this time.

```
 1              THE COURT:  Did I ask all of the rest of your
 2    questions?
 3              MR. WARD:  I was going to ask those questions, and
 4    you got them in.
 5              THE COURT:  Okay.  Do you want to go forward?  Are we
 6    all set, that we can hang in there for another hour without a
 7    break?  Without a break.  I mean, you're stuck here for another
 8    hour.
 9              THE JURORS:  Short break.
10              THE COURT:  Short?  A short break?  Okay.  I'll say
11    fine minutes.  It will end up being ten.  You may step down.
12    Do not discuss your testimony with any other persons who may be
13    witnesses.  Thank you.
14              (Jury out at 12:07 p.m.)
15              MS. BOERSCH:  We have a quick issue we want to
16    discuss.
17              THE COURT:  I didn't know you also had an issue, but
18    I just thought it was rather amusing.  I'd keep looking over
19    here, and I see "Ms. Moorman" over here.  I hadn't realized
20    that, but Ms. Moorman is with us.  So she's going to clear that
21    up.
22              MS. BOERSCH:  Just a quick issue, your Honor.  The
23    Government has elicited from this witness and he seems intent
24    to throw around terms like "extortion" and "bribery."
25              Those, I think, fall in the category of the illegal
```

1271

1    antitrust.  And I think the Court should give some sort of a

2    limiting instruction to the jury that they're not charged with

3    extortion.  They're not charged with bribery.

4              **THE COURT:**  Or price fixing, or anything else.  Yeah.

5    Okay.

6              **MS. BOERSCH:**  Thank you.

7              **MS. HAMILTON:**  We have no objection.

8              **THE COURT:**  They're not being used as legal terms,

9    either.  So okay.  So what did we say?  Five minutes?

10             **THE CLERK:**  Five.

11             **THE COURT:**  Lots of luck.  Okay.

12             (Whereupon there was a recess in the proceedings

13              from 12:09 p.m. until 12:33 p.m.)

14             **THE COURT:**  You may be seated.

15             Ladies and gentlemen, in some of the testimony you've

16   heard you've heard some legal terms used such as "price fixing"

17   and I think the term "bribery" was used and "extortion."  Each

18   of those are separate kinds of conduct, some of which is

19   criminalized, and has its own definition.

20             First of all, none of those are charged in this case

21   and it's like when you use a term and you say, you know,

22   "Somebody was trying to bribe me."  You don't necessarily mean

23   in the -- you know, in the criminal context of that, because

24   each one of them has certain elements.

25             Those are not charged in this case.  And so when the

1 witness has used those terms, he's not using it in the legal

2 sense, just using it as a generalized term.  So you should not

3 assume anything with respect to whether there are any such

4 crimes involved in this case because they are not charged, and

5 that's it, and you shouldn't consider them in that respect.

6           **MR. MOORE:**  Thank you, your Honor.

7           **THE COURT:**  Okay?

8 **CROSS EXAMINATION**

9 **BY MR. MOORE**

10 **Q.**  Mr. McAleer, I'm Frank Moore.  I'm one of defense team.

11 I think we met during a break, and you met the rest of the

12 defense team.

13     I believe you've testified that there were in 2005 four

14 conversations you had with Mr. Prilik, is that correct?

15 **A.**  I believe that's the correct number.

16 **Q.**  September 9th was the recorded one, correct?

17 **A.**  Yes.

18 **Q.**  And September 22nd, you had one, October 19th and

19 November 17th, is that correct?

20 **A.**  That's correct.

21 **Q.**  And only the September 9th conversation was recorded, is

22 that correct?

23 **A.**  That's correct.

24 **Q.**  The others relied on your notes, correct?

25 **A.**  Yes.

MCALEER - CROSS EXAMINATION / MOORE                    1273

1   Q.   Why is that?

2   A.   Because I was instructed and because I took good notes

3   after each conversation.

4   Q.   Did someone at CID tell you that the decision was made not

5   to record those conversations?

6   A.   No.  I was not told that.

7   Q.   So when you had a conversation on September 22nd or

8   October 19th or November 17th, you didn't call CID or anyone

9   else up to ask them if they wanted it recorded, correct?

10  A.   For the second conversation they had -- I had contacted

11  them and at that point they told me to just go ahead and take

12  notes.

13  Q.   Who made that decision?

14  A.   I believe it was James McEdwards, I believe.

15  Q.   He was part of this CID?

16  A.   Yes.

17  Q.   You also had an October 4th, 2005 phone call with a Derek

18  Lindbom of CID, correct?

19  A.   I believe so, yes.

20  Q.   And who was Derek Lindbom?

21  A.   Well, he is a CID agent located, I think, at that time on

22  the west coast in California.

23  Q.   And was that conversation part of the investigation?

24  A.   I don't recall if that conversation was memorialized in an

25  NFR.

1  Q.   Isn't it true that you also had a -- strike that.

2       As I understand your testimony, you were informed by

3  Mr. Brad Jan, a procurement fraud advisor, that Newcon was

4  under investigation on or about September 8th?

5  A.   Yes.

6  Q.   And prior to that you didn't have any knowledge that

7  either Mr. Prilik or Mr. Beker were under investigation?

8  A.   No.

9  Q.   Now, that same day, on September 8th, you received a

10 planned phone call from a Dmitry Rocklin; do you recall that?

11 A.   Yes.

12 Q.   And is it your understanding that he was calling you

13 pursuant to the direction of the FBI?

14 A.   Yes.

15 Q.   How did you become aware of that information?

16 A.   I believe I was made aware of that by Brad Jan.

17 Q.   Okay.  And what were you informed was the purpose of that

18 conversation?

19 A.   I was informed that I would receive a phone call from

20 Dmitry Rocklin and he was going to inform me that he could

21 not -- his company, ATN, could no longer perform under the

22 contract and he was then going to state that, of course, you

23 know that that's not the case.

24 Q.   So you were told ahead of time that that's what Mr.

25 Rocklin was going to state?

1275

MCALEER - CROSS EXAMINATION / MOORE

1   **A.**   Correct.

2   **Q.**   And did you have any understanding of the purpose for

3   that?

4   **A.**   I believe -- yes.

5   **Q.**   And what was the purpose?

6   **A.**   The purpose was so that Dmitry Rocklin could state that he

7   had told -- informed me -- back to Newcon, that he had informed

8   me that they could no longer perform under the contract.

9   **Q.**   Did he say on September 8th in that planned conversation

10  that he could no longer perform the contract because he had

11  reached some kind of agreement with Newcon?

12  **A.**   No.

13  **Q.**   Okay.  So at that point on September 8th, 2005, did anyone

14  inform you that there was some purported agreement between ATN

15  and Newcon for ATN not to perform under the contract?

16  **A.**   No.

17  **Q.**   And when he told you that he would -- that he said he

18  couldn't perform, but he really could, is that a fairly

19  accurate representation of what he actually said?

20  **A.**   Yes.

21  **Q.**   Do you have a recollection of that conversation as you sit

22  here today?

23  **A.**   Yes.

24  **Q.**   Did you review your notes before appearing here today on

25  that, for that subject?

 1   **A.**   Not today, no.

 2   **Q.**   When did you?

 3   **A.**   I believe I looked at them yesterday or the day before.

 4   **Q.**   Okay.  And if you can turn to that binder right there and

 5   look at what has been marked as Exhibit -- U.S. Exhibit 88.  It

 6   should be in your binder.

 7             (Witness complied.)

 8             **THE COURT:**  88?

 9             **MR. MOORE:**  88, U.S. Government 88.

10             **THE COURT:**  Not 80-A?  88?

11             **MR. MOORE:**  88, two eights.

12             **MR. WARD:**  Objection.  Lack of foundation.

13             **THE COURT:**  For my question?

14             (Laughter.)

15             **MR. WARD:**  Your question was --

16             **THE COURT:**  There is no question yet.  I don't know

17   what he's going to do with 88, okay.

18             **MR. WARD:**  He is asking the witness to look at 88.

19             **THE COURT:**  There's nothing wrong with it.  He can

20   look at it.

21   **BY MR. MOORE**

22   **Q.**   Are these your notes that you took on September 8th, 2005?

23   **A.**   Yes.

24   **Q.**   And what was the purpose of taking these notes?

25   **A.**   To memorialize the conversation.

1   Q.    Okay.  And were they taken close in time to the event?

2   A.    Yes.

3   Q.    And was this done pursuant to the investigation that was

4   being taken place by CID?

5   A.    I believe so, yes.

6   Q.    And it accurately records the conversation that you had

7   with Mr. Rocklin?

8   A.    Yes.

9              MR. MOORE:  Your Honor, I would move U.S. Exhibit 88

10  into evidence.

11             MR. WARD:  Objection.  Hearsay.

12             MR. MOORE:  It's an exception --

13             THE COURT:  It sounds likes past recollection

14  recorded to me and introduced by an adverse party.

15             MR. WARD:  But he hasn't said that he can't recollect

16  the conversation.

17             THE COURT:  He can still introduce it.

18             MR. WARD:  He can certainly use the notes to refresh

19  his recollection.

20             THE COURT:  This is past recollection recorded.  He

21  can introduce it.

22             MR. MOORE:  Thank you, your Honor.

23             THE COURT:  It's admitted.  88 is admitted.

24             (Trial Exhibit 88 received

25              in evidence)

1          **MR. MOORE:**  Can we publish 88, please?

2          (Document displayed)

3  **BY MR. MOORE**

4  **Q.**   Now, the first part of it, at the top, is your notations

5  of the -- was that a voice message you received?

6  **A.**   Yes.

7  **Q.**   And that was from Arie Prilik?

8  **A.**   Yes.

9  **Q.**   And that occurred on September 8th, 2005?

10 **A.**   Yes.

11 **Q.**   And was this your attempt to summarize what Mr. Prilik had

12 left for you on a voicemail?

13 **A.**   Yes.

14 **Q.**   And below that there's a line, and then there's a new set

15 of text.  Is that representative of the notes that you took

16 during the planned phone call with Dmitry Rocklin?

17 **A.**   Those are the notes that I took, yes.

18 **Q.**   And what was it your understanding of whether or not ATN

19 could, in fact, perform on the contract?

20 **A.**   My understanding was that they could perform.

21 **Q.**   And you told them you understood his message, both that

22 he's telling you he couldn't perform falsely and that he really

23 could perform, is that correct?

24 **A.**   I understood that he could perform, yes.

25 **Q.**   Okay.  And you also list individuals that were present at

1  that phone call, is that correct?

2  **A.**   I attempted to capture all of the names, yes.

3  **Q.**   So Karen McGee was Mr. Rocklin's lawyer and she was

4  present?

5  **A.**   I believe so.

6  **Q.**   And Jeane Hamilton, the prosecutor that's here today, she

7  was present?

8  **A.**   Yes.

9  **Q.**   Okay.  Where was this taking place?

10  **A.**   Telephonically.  I was in my office in Warren, Michigan.

11  And I believe Brad Jan was there and John Klecha.  So they were

12  calling from San Francisco.

13  **Q.**   Okay.  And Derek Lindbom was also there on the phone?

14  **A.**   Yes, yes.

15  **Q.**   Now, I think your testimony on direct was that you had

16  listened to the tape recording of the September 9th

17  conversation with Mr. Prilik?

18  **A.**   Yes.  I --

19  **Q.**   Recently?

20  **A.**   Yes, yes.

21  **Q.**   And you also testified that you reviewed a transcript of

22  that telephone call, is that correct?

23  **A.**   Yes.

24  **Q.**   And was the contents of the transcript the same as what

25  was on the tape?

MCALEER - CROSS EXAMINATION / MOORE                1280

 1  **A.**    It was the same.

 2           **MR. MOORE:**   I believe that's Government Exhibit 97,

 3  and I'd ask to introduce Government Exhibit 97 into evidence.

 4           **MR. WARD:**   No objection.

 5           **THE COURT:**   Is this -- this is a transcript of the

 6  tape we heard?

 7           **MR. MOORE:**   That's correct.

 8           **THE COURT:**   Okay.  And you said there is no

 9  objection?  It's a transcript.  Is there any question about the

10  accuracy of the transcript?

11           **MR. WARD:**   There is no question as to the accuracy.

12  I believe that the transcript can be used, but because it's an

13  English language translation, it will not be given to the jury;

14  that they need to rely on the -- what they heard on the tape,

15  but it can be used --

16           **THE COURT:**   Well, I will admit it and then we can

17  take up whether or not it goes to the jury.  And I think part

18  of it depends on how clear -- I mean, I think it was relatively

19  clear when we heard it.

20           But if there is any question about the accuracy of

21  this, then, no, it would not go to the jury.  If, in fact, it

22  is --

23           **MR. MOORE:**   There's a --

24           **THE COURT:**   (Continuing) -- essentially totally

25  accurate, then I don't see where it couldn't go to the jury.

MCALEER - CROSS EXAMINATION / MOORE    1281

1      **MR. MOORE:**  That's correct, your Honor.  There is no

2    dispute that it is accurate.  Frankly, I'm at a hindrance here

3    because they've got excerpts and I need to use it.

4      **MR. WARD:**  We have no objection to the transcript

5    being admitted at this time, nor do we have an objection to

6    them using it.

7      **THE COURT:**  Fine.  So 97 is admitted.

8      (Trial Exhibit 97 received in

9      evidence)

10   **BY MR. MOORE**

11   **Q.**   Now, going to page 2, starting at line 2.  Now, Mr. Prilik

12   was informing you that he wanted to talk briefly on the

13   situation with night vision deliveries under the Battalion Set

14   II contract and that maybe you and he could put heads together,

15   whether you two could do something together.

16      And then he informs you:

17      "I don't know if you were informed or not,

18      but the other company that was delivering

19      basically run into the problems that we have

20      warned you about them."

21      And that company was ATN, correct?

22   **A.**   Yes.

23   **Q.**   And then Mr. Prilik identifies two issues.  The first one

24   is the lack of production capacity.  And then he says:

25      "As you know, they were quite significantly

MCALEER - CROSS EXAMINATION / MOORE                 1282

1               behind schedule, because the two production

2               facilities that they utilize has a very small

3               capacity.  And major issue is, ah, that were

4               not capable to obtain the proper export

5               permits from Russia.  Because, uh, anything

6               exported from Russia for military

7               requirements need to involve, ah, the

8               Rosoboronexport, which is the official

9               Russian arms export authority."

10      And you say:

11              "So you are telling me that they have a

12              production and an export problem.  Is that

13              what I'm hearing, is that?"

14      Mr. Prilik says to you:

15              "No, that's just the beginning of it.  And if

16              we go ahead, the -- as you know, we also have

17              the quality problem because they cannot meet

18              the 750 FOM, but that's, apparently, a

19              secondary issue."

20      Now, at this time on September 9th, 2005, Mr. Prilik had

21 expressed concerns on three subject matters that he believed

22 concerned ATN's ability to perform under the contract, isn't

23 that correct?

24 **A.**   At least three, yes.

25 **Q.**   Now, this is not the first time you heard of this from

MCALEER - CROSS EXAMINATION / MOORE          1283

1  anyone from Newcon, is that correct?

2  **A.**    That's correct.

3  **Q.**    I believe on direct examination you said you had never had

4  any conversations with Michael Beker before August of 2005.

5  That's correct, is that true?

6  **A.**    I believe I said that, yes.

7  **Q.**    But you did have some kind of contact with Michael Beker,

8  did you not?

9  **A.**    In the evaluation phase, I believe.  When we were

10  evaluating proposals, Michael Beker may have submitted

11  information.

12  **Q.**    Do you have a recollection that Mr. Beker had sent a

13  letter to TACOM entitled "Advisory Concerning Possible Problems

14  With NVG Delivery For Iraq"?

15  **A.**    Yes.  I'm very familiar with that.

16  **Q.**    And so you did have contact with Michael Beker, not by

17  conversation, but through the mails, correct?

18  **A.**    Correct.

19  **Q.**    If you could turn to Exhibit 326 in your binder?

20         (Witness complied.)

21  **Q.**    And this exhibit has been marked for identification as

22  Defendant's Exhibit 326.  It's the March 17th, 2005 letter,

23  dated March 17, 2005.  And it's entitled "Advisory Concerning

24  Possible Problems With NVG's Delivery For Iraq."

25         How did you receive this document?

1  **A.**   Electronically, I believe.

2  **Q.**   It was attached to an email?

3  **A.**   I think so, yes.

4  **Q.**   And what did you do with it?

5  **A.**   We immediately -- well, of course, first thing I did was

6  read it.  I had our engineers read it.

7       At that point I then sent the complaint to the contractor,

8  prime contractor, ITE, and asked that they respond to each and

9  all of the allegations in here.

10 **Q.**   And did you keep this document in the normal course of

11 business at -- with TACOM?

12 **A.**   This document that I'm looking at?

13 **Q.**   Yes.

14 **A.**   Yes.  Yeah.

15         **MR. MOORE:**  I would like to at this time introduce

16 into evidence Exhibit 326.

17         **MR. WARD:**  Objection, hearsay.  It's not a business

18 record.  It's not kept in the normal course of business.  It's

19 not written or...

20         **THE COURT:**  For what purpose are you seeking to admit

21 it?

22         **MR. MOORE:**  For what he does next.

23         **THE COURT:**  You're looking at the entire exhibit,

24 right?

25         **MR. MOORE:**  That's correct.

1           **THE COURT:**  Three what, three pages?

2           **MR. MOORE:**  Yes.  I'm offering it as -- for the

3   purpose of what he does next with it and what he does with the

4   information that he was provided by Mr. Beker.

5           **MR. WARD:**  Your Honor, I think he can ask what steps

6   he took afterwards --

7           **THE COURT:**  I'm concerned that even though it comes

8   in for that limited purpose, it cannot be admitted for the

9   truth of the contents in it, that's for sure.  And, therefore,

10  it really is only in terms of what information he may have had

11  or what notice and that kind of -- that kind of thing; that it

12  really -- I'm not going to admit it, because I think it is not

13  probative and is going to be misunderstood, confuse the jury.

14          **MR. MOORE:**  Sure.

15  **BY MR. MOORE**

16  **Q.**   Now, one of the specific items that Newcon was conveying

17  to you in this letter was that the factory that ATN was using

18  could not produce image intensifier tubes that would meet the

19  Battalion Set II contract minimum 750 FOM specification, is

20  that correct?

21  **A.**   That's what they alleged.

22  **Q.**   I believe Exhibit 65 is already in evidence, and that's

23  the -- the actual contract.

24          **THE COURT:**  I think so, yes.

25

1    **BY MR. MOORE**

2    **Q.**   If we could go to page TACOM 11582, and in the middle of

3    the page the last paragraph of C5.

4            (Document displayed)

5    **Q.**  Now, it says:  Beginning at:  All image intensifiers --

6    I'm sorry.

7                "All image intensification based night vision

8                devices delivered under this effort shall

9                integrate an image intensifier with a Figure

10               of Merit less than 1250 and more than 750.

11               FOM is determined" -- I think it's supposed

12               to be -- "by multiplying an image

13               intensifier's resolution by signal to noise

14               ratio.  It is required that the supplier

15               maintain/provide records by serial number of

16               the FOM value for each image intensifier

17               night vision device delivered under this

18               contract."

19       Now, was that a contract specification for the Bat Set II

20   contract?

21   **A.**   Yes.

22   **Q.**   And why was that a specification?

23   **A.**   To ensure that we did not export night vision goggles that

24   were above the 1250 figure.  The 1250 is the -- was determined

25   to be the limit that we could actually export out of the United

1  States, and we did not want an FOM of less than 750.  That

2  created the range that the offerors could offer to.

3  **Q.**   Why did you want a minimum of 750?

4  **A.**   That was the bottom line range and that was based upon a

5  determination by our subject matter experts.

6  **Q.**   Okay.  Who are the subject matter experts?

7  **A.**   That would be the night vision goggle personnel in the

8  U.S. Army.

9  **Q.**   Are you aware of whether they -- these experts consult

10  with the U.S. Night Vision Laboratory?

11          **MR. WARD:**  Objection.  Calls for specification.

12          **THE COURT:**  The question is whether he is aware of,

13  that's all.  It's a "yes" or "no."

14  **A.**   They are one in the same actually.  I used an abbreviated

15  term, Night Vision Lab.  My apology.

16  **BY MR. MOORE**

17  **Q.**   No problem.

18      Now, was it important for a supplier to be able to meet

19  the minimum 750 FOM requirement of the contract?

20  **A.**   Yes.

21          **MR. WARD:**  Objection. I'm going to object on relevant

22  grounds.  This line of questioning is not relevant to the

23  matter, to the charges in this case.

24          **MR. MOORE:**  Your Honor --

25          **THE COURT:**  Objection is overruled.

1  **BY MR. MOORE**

2  **Q.**    Now, back to Exhibit 326 that's in front of you.  Is it

3  true that another concern that Newcon raised was the inability

4  of ATN's factory to produce the required number of image

5  intensifier tubes due to production capacity?

6  **A.**    That is what they alleged.

7  **Q.**    And you said that you forwarded this complaint to

8  somebody?

9  **A.**    Yes.

10  **Q.**    Did you forward the complaint to a Mr. Harry Hallock?

11  **A.**    Harry would have seen the complaint, yes.

12  **Q.**    And who is Harry Hallock?

13  **A.**    At the time Harry Hallock was a division chief in the

14  contracting center.  He was two levels above me.

15  **Q.**    Did you report directly to him?

16  **A.**    Pretty much, yes.

17  **Q.**    And you did so by way of email, is that correct?

18  **A.**    That's one means of it, yes.

19  **Q.**    Looking at Exhibit 327 in your binder.

20  **A.**    Okay.

21  **Q.**    Is this the email that you forwarded to Mr. Harry Hallock

22  on March 18th, 2005?

23  **A.**    Yes.

24  **Q.**    And was it your practice to inform your superiors of

25  complaints that you receive with regard to suppliers in

1 contracts that you were administering?

2 A.   Yes.

3 Q.   And in forwarding this email to Mr. Hallock, to your

4 knowledge, it was maintained by TACOM in the regular course of

5 business?

6 A.   This email?  Yes.

7         MR. MOORE:  I would move Exhibit 327 into evidence,

8 your Honor.

9         MR. WARD:  Objection, your Honor.  It's hearsay.  The

10 business exception requirement doesn't apply.

11         More importantly, the email includes the entire

12 document that the Court just ruled was inadmissible.

13         THE COURT:  Well, it comes up again -- bumps up

14 against the same problem; that is, the likelihood that it be

15 perceived as being admitted for the truth of the matter when

16 what we're really talking about is what actions were taken

17 based upon what was received and questions of notice.

18         So the objection is sustained.

19         MR. MOORE:  Thank you, your Honor.

20 BY MR. MOORE

21 Q.   Mr. McAleer, when you forwarded the email that you had

22 received from Mr. Beker on March 18th, 2005 to Mr. Hallock, you

23 wrote a note to him, is that correct?

24 A.   Yes.

25 Q.   And you identified Mike as the CEO of Newcon Optik, is

MCALEER - CROSS EXAMINATION / MOORE                1290

1  that correct?

2  **A.**    Yes.

3  **Q.**    And you also identified that he -- that Newcon Optik was

4  the supplier of night vision devices to Anham under the Bat

5  Set I contract, right?

6  **A.**    Yes.

7  **Q.**    And you informed Mr. Hallock that Mr. Beker contended that

8  your supplier could not provide night vision devices that meet

9  the 750 to 1200 FOM, isn't that correct?

10 **A.**    Yes.

11 **Q.**    And you referred him to Mr. Beker's rationale, that was

12 basically the complaint that you had received, is that correct?

13 **A.**    Yes.

14 **Q.**    And you also informed Mr. Hallock that NiViSys, supplier

15 that ATN replaced, has also complained that ATN could not meet

16 the requirements of the Bat Set II contract because they were

17 going to be using inferior tubes, correct?

18 **A.**    I don't know if it was based on inferior tubes, but I do

19 know that they complained that they could not meet the

20 requirements.

21 **Q.**    Well, you did, in fact, write in this email to Mr. Hallock

22 that the contention by NiViSys was that ATN could not meet the

23 requirements if they were going to be using inferior tubes,

24 isn't that correct?

25 **A.**    If that language is in there, then that's what I said.  I

 1  just didn't read it in my brief overview here.

 2  **Q.**   Now, you also said that you had previously approached ITE

 3  based on NiViSys's complaints and that they, ITE, had provided

 4  a certification from Ekran and a certification from ATN, isn't

 5  that correct?

 6  **A.**   Yes.

 7  **Q.**   And who is Ekran?

 8  **A.**   Ekran was identified as the tube manufacturer for

 9  Newcon -- or for ATN.

10  **Q.**   And this was the manufacturer that Michael Beker had

11  informed you, based on his opinion, that they couldn't make a

12  quality tube, isn't that correct?

13  **A.**   I believe that's true, yes.

14  **Q.**   Now, you also informed Mr. Hallock that there was a lot of

15  mud slinging going on.  Were you referring to mud slinging

16  among suppliers?

17  **A.**   Yes.

18  **Q.**   And that would include NiViSys?

19  **A.**   That would include all the -- NiViSys and ATN -- excuse

20  me, and Newcon Optik.

21  **Q.**   Was there anyone else that was mud slinging?

22  **A.**   Not that I'm aware of.

23  **Q.**   Then you say:

24          "But all of our evaluations in Bat Set II and

25          subsequent information indicate that we are

1              going to get compliant night vision devices."

2       What was the subsequent information that you had received

3  between March 17th and March 18th that indicated that you were

4  going to get compliant night vision devices from ATN?

5  **A.**   We had gone back to ITE, as I recall, and requested that

6  they respond to all of the allegations.  They did and they

7  provided credible -- a credible response to the allegations.

8  **Q.**   Do you have a recollection of when you had obtained that

9  information from ITE that led you to believe that there was not

10 going to be a problem getting compliant tubes?

11 **A.**   I don't know the specific date.  I don't recall.

12 **Q.**   I'll refer you to Exhibit 329 that's in your binder.  And

13 this is an email from Ramzi to you dated March 23rd, 2005?

14 **A.**   I don't have a Exhibit 329.

15            **MR. MOORE:**  May I approach, your Honor?

16            **THE COURT:**  Yes.  Does he have different numbered

17 tabs there?

18            **MR. MOORE:**  Okay.  It looks like it wasn't put in

19 there.  So let me... let me grab it.

20            **THE COURT:**  One is arriving as we speak.

21            **MR. MOORE:**  Approaching, your Honor?

22            **THE COURT:**  Yes.  You don't need to repeat the

23 question.

24            **MR. MOORE:**  Thank you.  Let me just put that on top.

25

MCALEER - CROSS EXAMINATION / MOORE          1293

```
 1              (Whereupon, binder was tendered

 2               to the witness.)

 3   BY MR. MOORE

 4   Q.   Showing you what has been marked as Exhibit 329, do you

 5   recognize the document?

 6   A.   Yes.

 7   Q.   Was this an email that you received from Ramzi on

 8   March 23rd, 2005?

 9   A.   Yes.

10   Q.   Who is Ramzi?

11   A.   Ramzi was the president of ITE, or is the president.

12   Q.   And below the email that you received on March 23rd is an

13   email dated March 21st, 2005 from you to Ramzi, isn't that

14   correct?

15   A.   Yes.

16   Q.   In that email is it correct that you, in essence, took the

17   substance of Mr. Beker's complaints and kind of edited it and

18   sent it off to Mr. Ramzi to respond to?

19   A.   Yes.  I did not identify the source.

20   Q.   The source being Newcon?

21   A.   Yes.

22   Q.   And why did you do that?

23   A.   Because I would not release that information to a

24   competitor.

25   Q.   So that was on March 21st, 2005 at 9:00 o'clock, correct?
```

MCALEER - CROSS EXAMINATION / MOORE                    1294

1   **A.**   Correct.

2   **Q.**   And did you receive any verbal response from Mr. Ramzi on

3   -- before he sent you a complete response on the 23rd?

4   **A.**   He may have called, yes.

5   **Q.**   Do you have any recollection of him calling?

6   **A.**   I believe that I do, but I don't recall the specifics of

7   the conversation.

8   **Q.**   Do you have any recollection that he gave you detailed

9   explanations of -- in response to the complaint by Newcon?

10  **A.**   I don't recall the level of detail in the conversation,

11  no.

12  **Q.**   Do you have any recollection of receiving any response

13  from Ramzi that was before March 21st, 2005 when you sent the

14  email to Ramzi editing the complaint by Mr. Beker?

15  **A.**   I believe that Ramzi had previously responded concerning

16  allegations raised by NiViSys, but I would actually have to see

17  the emails to make certain that was the case.

18  **Q.**   So on the, but by -- on the 18th when you wrote the email

19  you forwarded to Mr. Hallock which contained verbatim Mr.

20  Beker's complaint, which was just a day after that you received

21  it, what subsequent information did you have that indicated

22  that you were going to get compliant night vision devices from

23  ITE?

24  **A.**   Well, the information was based upon the evaluation that

25  was conducted during the source selection.  We looked at ATN's

1   technical proposal.  It was evaluated.  Nothing had changed.

2   **Q.**    Now, you responded, did you not, to NiViSys's complaint

3   that you had mentioned in your email?

4   **A.**    Yes.

5   **Q.**    And you responded to NiViSys, correct?

6   **A.**    Yes.

7   **Q.**    And why?

8   **A.**    Because they raised an issue about why we were switching

9   out night vision goggles.

10  **Q.**    And it was your understanding that NiViSys was originally

11  the subcontractor that ITE had represented to TACOM would be

12  supplying the night vision devices that -- and then they were

13  subsequently switched out, correct?

14  **A.**    They were the original supplier under the Battalion Set II

15  contract, yes.

16  **Q.**    And I think you testified that one of the reasons that you

17  allowed the switch was because ATN had represented that it

18  could have a faster delivery schedule?

19  **A.**    That is correct.

20  **Q.**    Okay.  And there was a significant price difference

21  between what ATN was charging ITE and what NiViSys was charging

22  ITE, correct?

23          **MR. WARD:**  Objection.  Calls for specification.

24  **BY MR. MOORE**

25  **Q.**    If you know.

1          **THE COURT:**  If you know, you may answer the question.

2  **A.**    The price was the price.  Rephrase your question.

3  **BY MR. MOORE**

4  **Q.**    Yeah, sure.

5  **A.**    I want to make certain I know what I'm answering and I got

6  a little lost on that.

7  **Q.**    Did you know what NiViSys's quoted price to ITE was under

8  the Bat Set II contract?

9  **A.**    Yes -- well, okay.  Umm, I don't recall what the quoted

10  price was.

11  **Q.**    But it's -- it's some margin below what ITE was charging

12  TACOM, correct?

13  **A.**    I don't -- I don't know off the top of my head, no.

14  **Q.**    Did you know that ATN's price to ITE was substantially

15  lower than NiViSys?

16  **A.**    I'm not -- I don't believe so, but -- could you rephrase

17  the question?  NiViSys --

18  **Q.**    Let me just lay a foundation, okay.

19          So when ITE presents its proposal, it gives a price that

20  it quotes to TACOM for the night vision devices, correct?

21  **A.**    That's correct.

22  **Q.**    And ITE contracts with a subcontractor at presumably a

23  lower price so they can make some profit off of it, correct?

24  **A.**    Correct.

25  **Q.**    And are you privy to the information that the prime has

1  with regard to the price that the subcontractor is charging it?

2  **A.**    I don't believe that was submitted with their proposal.

3  **Q.**    So you didn't have any of that information?

4  **A.**    We had the fixed price proposed by the prime contractor

5  for -- to deliver compliant night vision goggles.

6  **Q.**    So that's just the price to TACOM and not the prices from

7  the subcontractors to the prime?

8  **A.**    Our concern was with the price charged to the government

9  under the competitive environment that it was submitted in.

10 **Q.**    I'm sure of that.  But what I'm asking is:  Did you have

11 the information of what the prime was being charged by the

12 subcontractors?

13 **A.**    Umm, I don't believe so, no.

14 **Q.**    Does that ever concern you?

15 **A.**    If the price was going up, I'd certainly take a look at it

16 very closely.

17 **Q.**    What if a subcontractor who was already vetted who quoted

18 a price to the prime, but then a subsequent subcontractor comes

19 in and underbids after the contract has been awarded, does that

20 concern you?

21          **MR. WARD:**  Objection.  Calls for specification.

22          **THE COURT:**   Objection sustained.

23 **BY MR. MOORE**

24 **Q.**    Do you ever get involved in any of that information with

25 regard to what a subcontractor is charging the prime?

1  **A.**    Certainly on a cost type contract where we actually look

2  at the complete build up.  This was not a cost contract.  This

3  is a fixed price.

4  **Q.**    Okay.  So the only information you're concerned about

5  ultimately in making choices on who to award the contract to is

6  the price to TACOM by the -- from the prime?

7  **A.**    No, that's not the only information that I'm concerned

8  with.

9  **Q.**    I'm talking just about price though.  Not other

10  considerations, but just about price.

11  **A.**    Well, we evaluate it to determine the price was

12  reasonable, realistic and affordable.

13  **Q.**    And so you don't -- but you don't take into account what

14  margins the prime is making from the sub, is that correct?

15  **A.**    That's -- this was a highly competitive acquisition.  So

16  the -- the competition controlled the prices that the offerors

17  were proposing.

18  **Q.**    Well, if you had information that a subcontractor had bid

19  something that was unrealistic in the market, would that be

20  something that you would be concerned about?

21          **MR. WARD:**  Objection.  Vague and calls for

22  speculation.

23          **THE COURT:**  Objection overruled.  You may answer.

24  **A.**    If -- if we thought in the evaluation of a proposal that

25  the price was not realistic, there was no realism there, and

1  that it was not affordable, we would have raised that issue at

2  that time with the offeror.

3  **BY MR. MOORE**

4  Q.   But that would be only the -- the only consideration you

5  would be looking at would be what the prime's price was to you,

6  correct?

7  A.   Yes.  And that's controlled by competition.

8  Q.   So you never get into evaluating whether or not the

9  subcontractor is underbidding grossly to obtain a substitution

10 in an existing contract, do you?

11 A.   I -- I can't answer that question "yes" or "no."  It would

12 depend a lot on the circumstances.

13 Q.   Did you have any information at your disposal that ATN had

14 underbid NiViSys substantially when you made the decision to

15 substitute ATN for NiViSys?

16 A.   No.

17 Q.   Now, I'll refer you to -- I hope it's in your -- you can

18 use that binder actually, it's got everything in it -- 328,

19 Exhibit 328.

20      Now, this is an email that you sent to Mr. Higman,

21 correct, on March 21st, 2005?

22 A.   Yes.

23 Q.   And Mr. Higman was with NiViSys?

24 A.   Yes.

25 Q.   And your letter, which is the second page, this was your

MCALEER - CROSS EXAMINATION / MOORE                    1300

1  response to a Mr. Harding at NiViSys with regard to his

2  complaint about ATN's ability to perform under the contract?

3  **A.**   That's correct.

4  **Q.**   You didn't send a similar type letter to Mr. Beker, did

5  you?

6  **A.**   No, I didn't.

7  **Q.**   Why not?

8  **A.**   Mr. Beker did not have privity of contract.  Under this

9  contract we afforded NiViSys the rationale for what we were

10 doing because it directly concerned NiViSys.

11 **Q.**   Okay.  That's because NiViSys at one time had a

12 subcontract with ITE, correct?

13 **A.**   They were the original subcontractor for night vision

14 goggles, that is correct.

15 **Q.**   And that's what you mean by privity of contract?

16 **A.**   Yes.

17 **Q.**   Okay.  And you stated to Mr. Harding that:

18          "After a contract is awarded, we normally

19           expect a contractor to deliver those specific

20           goods that were the basis for the

21           negotiations in the contract award."

22          And that's generally true, correct?

23 **A.**   Yes.

24 **Q.**   And you also state:

25          "However, after contract award, we may

```
 1                 consider changes that we find to be in the

 2                 best interests of the government.  Such

 3                 changes may include improvements in the

 4                 goods, offered price or delivery schedule."

 5        And that's generally true, correct?

 6   A.   Yes.

 7   Q.   And it was the delivery schedule as to why ATN ended up

 8   getting the substitution?

 9   A.   That is correct.

10   Q.   And you also informed Mr. Harding that:

11                 "Any goods delivered under the Battalion Set

12                 II contract must meet the technical and

13                 performance requirements that were the basis

14                 for the contract award."

15        And that's generally true, correct?

16   A.   Yes.

17   Q.   And that would include in this case that the contract meet

18   the specification of 750 FOM minimum?

19   A.   As the minimum, yes, it would.

20   Q.   Now, you took Mr. Beker's complaints seriously enough to

21   require Mr. Ramzi to respond, correct?

22   A.   Yes.

23   Q.   And you consulted with Mr. Hallock on that decision?

24   A.   He was informed of the decision, yes.

25   Q.   Was it your decision or was it a joint decision?
```

1    **A.**    Ultimately it would be my decision.  I could have been

2    overruled, but I wasn't.

3    **Q.**    And who is a Ken Bousquet.

4    **A.**    Bousquet?

5    **Q.**    Bousquet.

6    **A.**    At that time Ken was a group leader, my immediate

7    superior.

8    **Q.**    Did you share this information about Mr. Beker's complaint

9    with Mr. Bousquet?

10   **A.**    I'm pretty sure I did.

11          **MR. MOORE:**  There's a subject matter I'm going to go

12   into that's going to take some time.  I can use the five

13   minutes if you want, but...

14          **THE COURT:**  Is there one that hasn't taken some time

15   in this trial?

16          (Laughter.)

17          **MR. MOORE:**  Out of continuity, I was wondering if we

18   should...

19          **THE COURT:**  Well, maybe so then.  What do you think

20   when we reconvene on Tuesday about how long will you be with

21   Mr. McAleer?

22          **MR. MOORE:**  I'm hoping to speed things up, your

23   Honor, but I think I'm going to have at least a couple hours.

24   At minimum.

25          **THE COURT:**  Okay.  And is Mr. Howden or Ms. Boersch

1    having anything, or are you going to let him carry the laboring

2    oar?

3              **MR. HOWDEN:**  He is going to carry the laboring oar.

4    I may have some things, but I intend to keep it short.

5              **THE COURT:**  This is as good a time as any I suppose.

6              So we will recess for the weekend.  We'll see you on

7    Tuesday.  You don't have to come back until Tuesday.  And if

8    you think you're having fun in here -- I don't know what they

9    are doing.  They are probably going to go play tennis or ski or

10   something, but we have a long calendar and so we'll see you on

11   Tuesday.  If you want to see what we do on the other days of

12   the week, you can come in on Monday, but we're not going to be

13   in trial.

14             So please, please follow the instructions.  It's very

15   important that you not discuss the case amongst yourselves or

16   anyone else, that you not do any investigation or Tweeting or

17   Twittering or whatever one does these days, communicating in

18   any way whatsoever, doing any reading or investigating, any

19   like that.  I would think that, you know, this is enough

20   already.  You don't need to spend your time on it over the

21   weekend.

22             So don't do anything like that and follow the

23   instructions you have been given, and don't form or express any

24   opinion based on what you heard so far because you are going to

25   have a chance to hear all the rest of it and then discuss it

```
 1   with the other jurors in deliberation and not otherwise.  Okay?

 2             So have a very pleasant weekend.  And leave your

 3   notes in your envelopes in there.  And we'll see you Tuesday at

 4   8:30.  Thank you.

 5             (Jury exits courtroom at 1:24 p.m.)

 6        THE COURT:  And you may step down, but do not discuss

 7   your testimony with any other persons who may be witnesses

 8   until the trial is over.

 9        THE WITNESS:  Yes, your Honor.

10        THE COURT:  Thank you.

11        (Witness steps down.)

12        THE COURT:  And your things will need to be cleared

13   up now because we have a big group of people coming in Monday

14   morning and Monday afternoon.  You can leave some things on the

15   side, that's fine.  It's up to you, but make sure all the

16   tables are cleared because the marshals need to be in here and

17   all that kind of thing.

18        MR. HOWDEN:  We will clean our side, your Honor.

19        THE COURT:  Okay?

20        MR. WARD:  Should we take the cart, too?

21        THE COURT:  Tony, what do you think?

22        THE CLERK:  The marshal is going to need access to

23   the door.

24        THE COURT:  I think probably so, yeah.

25             If you want to have some lunch and make arrangements
```

PROCEEDINGS                                    1305

1   for Tony after lunch to come back and get all this stuff or

2   send somebody to get it, you can do that, too.  Okay.

3          Now, where are we as far as witnesses?  We are

4   finishing with Mr. McAleer.

5          **MS. HAMILTON:**  And that's the United States last

6   witness.  We are hoping to get some sense of who the defendants

7   plan to call.

8          **THE COURT:**  Yes.

9          **MS. BOERSCH:**  We will have the normal Rule 29 motion.

10  My question is:  Do you hear argument on that?  Do we make it

11  and sit down --

12         **THE COURT:**  Just make it and let's keep going.

13         **MS. BOERSCH:**  Okay.

14         **THE COURT:**  And then preserve it, and we'll deal with

15  it all at the end, okay.

16         **MR. OSTERHOUDT:**  We are still, obviously, reviewing

17  some of the options that we have as far as the defense goes.

18  We have a witness, Mr. Bean, who is scheduled.  We have him

19  scheduled, I think now for -- we'll ask him Tuesday.

20         **THE COURT:**  Hopefully, we'll finish up with

21  Mr. McAleer and we can get to him on Tuesday.

22         **MR. OSTERHOUDT:**  We'll see where we go from there.

23  It won't be very much longer.  The defense should complete

24  their case by I'd say Wednesday.

25         **THE COURT:**  Okay.  Could you let the government know

1  by --

2                 **MS. HAMILTON:**  Right now.

3                 **THE COURT:**  Today is Friday.  By Sunday.  You have a

4  point person who can -- somebody you can get ahold of over

5  there and let them know specifically?

6                 **MR. OSTERHOUDT:**  As to who, how long?

7                 **THE COURT:**  Who you are calling and how long, besides

8  Mr. Bean, okay?

9                 **MR. OSTERHOUDT:**  All right.

10                (Discussion held off the record.)

11                **THE COURT:**  Thank you.  Have a very good weekend

12  everyone and we'll see you Tuesday morning.

13                We're going to neat to sort out jury instructions,

14  also, so let's plan on doing that Tuesday afternoon, okay?  So

15  if you could please go over whatever you're concluding -- you

16  know, agreed-upon set is and then whatever else needs to be

17  resolved, have it ready so we can deal with it Tuesday

18  afternoon.

19                **MR. WARD:**  Your Honor, I believe there were a small

20  group of disputed instructions that you asked us to refine.

21  Maybe we'll do that and --

22                **THE COURT:**  If you can get that hashed out so that by

23  Tuesday afternoon we can take them up.  Because if we finish on

24  Wednesday, it's time to tell the jury what the instructions

25  are.

```
 1              MR. WARD:  Could we file something on Monday so you
 2    could have a chance to look at them?
 3              MS. BOERSCH:  Tuesday is probably more realistic,
 4    Tuesday morning.  We don't need them Tuesday afternoon, I don't
 5    think.
 6              THE COURT:  We'll need to go over them and get them
 7    resolved.  And then I want them either on Word or Word Perfect.
 8    Unfortunately, around here we still use Word Perfect.  We can
 9    use Word if we have to.  I know it's Draconian and all the
10    rest, but...
11              MS. BOERSCH:  Well, that just means he's in charge,
12    which is fine with me.
13              MR. WARD:  We have Word Perfect.
14              THE COURT:  You are in the same boat, same
15    government, right?
16              MR. WARD:  Same government, right.
17              THE COURT:  So if you can get the final set to us,
18    also, including after we resolve the ones Tuesday afternoon so
19    that we're ready to go and we can get them printed out for the
20    jury and so forth.  Okay?
21              MR. WARD:  Yes.  So we should email them to Tony?
22              THE COURT:  Yes.
23              MR. WARD:  I will email everything we have agreed on
24    after our -- we argue over the few remaining things on Tuesday,
25    so it will come in late Tuesday and you will have them
```

1   Wednesday morning.

2          **THE COURT:**  We may have you email it -- why don't

3   you --

4          **MS. BOERSCH:**  Do we have a set -- we went through

5   this once before.  Do we have a set that we think we've agreed

6   on so far?

7          **THE COURT:**  We have a big set.  Yes, I think so,

8   that's correct.

9          **MS. BOERSCH:**  With what Judge Patel decided at our

10  last session, do we have that?

11         **THE COURT:**  What I want is one set on a CD Rom that

12  we can then print out from.

13         **MR. WARD:**  Why don't we do this?  Why don't we get

14  you that set on Monday or late Monday.

15         **THE COURT:**  That would be good.

16         **MR. WARD:**  Then you will have them and there will

17  only be a few where we are going to argue about and edit.  Then

18  we can do that Tuesday afternoon, but you'll already have the

19  Word set.

20          Tony, I will email it to you?  Mr. Bowser?

21         **THE COURT:**  If you can also maybe put two files on

22  that CD Rom; one, the agreed-upon ones, and then the ones where

23  there is a dispute.  Then I can take a look at those.

24         **MR. WARD:**  Thank you, your Honor.

25  /////                                               /////

PROCEEDINGS                                          1309

1           (Whereupon at 1:30 p.m. further proceedings

2            in the above-entitled cause was adjourned

3            until Tuesday, January 25, 2011 at 8:30 a.m.)

4                        -   -   -   -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

### I  N  D  E  X

**PLAINTIFF'S WITNESSES**                                    **PAGE**    **VOL.**

**HAYNIE, GREG**
(PREVIOUSLY SWORN)                                  1139       8
Direct examination Resumed by Mr. Ward              1140       8
Cross Examination by Mr. Howden                     1150       8
Redirect Examination by Mr. Ward                    1170       8
Recross Examination Resumed by Mr. Howden           1171       8

**PADUKONE, ASEEM**
(SWORN)                                             1178       8
Direct Examination by Ms. Hamilton                  1178       8
Cross Examination by Mr. Howden                     1195       8

**MCALEER, DEREK**
(SWORN)                                             1197       8
Direct Examination by Mr. Ward                      1198       8
Cross Examination by Mr. Moore                      1272       8

### E  X  H  I  B  I  T  S

| **TRIAL EXHIBITS** | **IDEN** | **VOL.** | **EVID** | **VOL.** |
|---|---|---|---|---|
| 477 | | | 1155 | 8 |
| 59 and 60 | | | 1174 | 8 |
| 150 | | | 1174 | 8 |
| 95, 96, and 151 | | | 1175 | 8 |
| 152, 53, 54, and 55 | | | 1176 | 8 |
| 11, 12, 13, and 153 | | | 1177 | 8 |
| 6 and 154 | | | 1177 | 8 |
| 1 | | | 1183 | 8 |
| 65 | | | 1212 | 8 |
| 317 | | | 1226 | 8 |
| 93 | | | 1236 | 8 |
| 88 | | | 1277 | 8 |
| 97 | | | 1281 | 8 |

## CERTIFICATE OF REPORTER

WE, LYDIA ZINN, and DEBRA PAS, Official Reporters for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in CR. 07-765 MHP, United States of America v. Mendel Beker, et al., were reported by us, certified shorthand reporters, and were thereafter transcribed under our direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by us at the time of filing

The validity of the reporters' certification of said transcript may be void upon disassembly and/or removal from the court file.


_____/s/ Lydia Zinn_____
            Lydia Zinn, CSR 9223, CRR


_____/s/ Debra L. Pas_____
            Debra L. Pas, CSR 11916, CRR


            Friday, January 21, 2011