Volume 9

Pages 1311 – 1481

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARILYN HALL PATEL

UNITED STATES OF AMERICA,           )
                                    )
              Plaintiff,            )
                                    )
   vs.                              ) NO. CR. 07-0765 MHP
                                    )
MENDEL BEKER, ARIE PRILIK, and      )
NEWCON INTERNATIONAL,               )
                                    ) San Francisco, California
              Defendants.           ) Tuesday
                                    ) January 25, 2011
_____) 8:40 a.m.


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
**For Plaintiff:**              U.S. Department of Justice
                                Antitrust Division
                                450 Golden Gate Avenue, Room 10-0101
                                San Francisco, CA  94102-3478
                                (415) 436-6673
                                (415) 436-6687 (fax)
                           BY:  **DAVID J. WARD**
                                **ANNA TYRON PLETCHER**
                                **RICHARD B. COHEN**
                                **JEANE HAMILTON**




(Appearances continued on next page)

1312

APPEARANCES (CONT'D)

**For Defendant**s:          Winston & Strawn, LLP
                             101 California Street
                             San Francisco, CA  94111
                             (415) 591-1439
                             (415) 591-1400 (fax)
                        BY:  **JONATHAN ROBERT HOWDEN**

**For Defendants**:          Martha A. Boersch
                             Attorney at Law
                             555 California Street, 26th Floor
                             San Francisco, CA  94104
                             (415) 626-3939
                             (415) 875-5700 (fax)
                        BY:  **MARTHA A. BOERSCH**

**For Defendants**:          Law Offices of William L. Osterhoudt
                             135 Belvedere Street
                             San Francisco, California  94117-3915
                             (415) 664-4600
                             (415) 664-4691 (fax)
                        BY:  **WILLIAM L. OSTERHOUDT**

**For Defendants**:          Law Offices of Frank S. Moore
                             235 Montgomery Street, Suite 854
                             San Francisco, CA  94104
                        BY:  **FRANK S. MOORE**

Also Present:       Masha Maria Entchevitch, Russian Interpreter

1                    **P R O C E E D I N G S**

2  January 25, 2011                                   8:40 a.m.

3                        **DEREK MCALEER,**

4  called as a witness for the Plaintiff herein, having been

5  previously sworn, resumed the stand and testified further as

6  follows:

7            **THE COURT:**  You may be seated.  Good morning, ladies

8  and gentlemen.

9            **THE JURORS:**  Good morning.

10           **THE COURT:**  Good morning.  Well, still is -- you

11  know, that weekend really did you some good -- right? --

12  although you were pretty, pretty lively before that.

13           Does he need his notepad?  Okay.

14           And where were we?  We were about a half hour into

15  this, I guess.

16           **MR. MOORE:**  Yeah, pretty much.

17           **THE COURT:**  Okay.  You may resume the stand.  And

18  I'll remind you you are still under oath, so the oath will not

19  be readministered.

20           **THE WITNESS:**  Yes.

21           **THE COURT:**  And you may continue, Mr. Moore.

22           **MR. MOORE:**  Thank you, your Honor.

23                 **CROSS-EXAMINATION RESUMED**

24  BY MR. MOORE

25  Q.   Mr. McAleer, I wanted to ask you some questions about how

1    records are maintained by TACOM.

2        On Friday you explained on direct examination that part of

3    your duties as a procurement contracting officer is to

4    administer TACOM contracts.  Is isn't that correct?

5    **A.**   That is correct.

6    **Q.**   And part of the administrating TACOM contracts is to

7    correspond with interested parties, as a normal part of your

8    duties in that -- in that role?

9    **A.**   Yes.

10   **Q.**   And the issues that you would be engaged in in

11   corresponding in your role as a contract officer would be

12   matters concerning the performance of those contracts.  Is that

13   correct?

14   **A.**   That is correct.

15   **Q.**   And that's -- this would include both Bat. Set I and

16   Bat. Set II contracts?

17   **A.**   Yes.

18   **Q.**   Now, as part of that correspondence, you use e-mails, I

19   take it?

20   **A.**   Yes.

21   **Q.**   And is it also true that, if you receive complaints from

22   subcontractors that didn't get the contracts, that that would

23   be responded to in the normal course of business?

24   **A.**   Yes.

25   **Q.**   And you would send e-mails to your superiors and people

 1  that reported to you if it -- if it concerned their attention?

 2  **A.**    Yes.

 3  **Q.**    And, as I understand it, these e-mails are maintained on a

 4  server or a network of servers by the U.S. military?

 5  **A.**    I believe so, yes.

 6  **Q.**    You don't have a -- your e-mail system on your computer is

 7  not just residing on your PC; it's in some kind of network,

 8  then?

 9  **A.**    I believe there's a backup.

10  **Q.**    And if issues arise where you need to determine what was

11  said or what was communicated with regard to issues concerning

12  the performance of -- of a contract, you would be able to

13  retrieve those e-mails for review.  Is that correct?

14  **A.**    I'm not certain I can fully answer that question, in that

15  I don't know how long the backup is in place.

16  **Q.**    Okay.

17  **A.**    I'm not a -- I'm not an expert in the electronic media,

18  but I do know how to use the electronic media.

19  **Q.**    Have you used it for that purpose?

20  **A.**    Have I sent e-mails?

21  **Q.**    No.  Have you used the e-mail system for TACOM to search

22  for e-mails that would -- were sent in the past?

23  **A.**    Yes, I searched my computer.  Absolutely.

24  **Q.**    And I'll show you Exhibit -- I think it's 431 in your

25  binder up there.  Do you recognize the e-mail?

MCALEER - CROSS EXAMINATION / MOORE                    1316

1   **A.**   Yes.

2   **Q.**   And on the e-mail, the top of the page shows an e-mail

3   from you, correct, sent to Derek Lindbom?

4   **A.**   Yes.

5   **Q.**   And Derek Lindbom was with CID.  Is that correct?

6   **A.**   That's correct.

7   **Q.**   And what's CID, again?

8   **A.**   The Criminal Investigation Department --

9   **Q.**   Okay.

10  **A.**   -- or Division.

11  **Q.**   And -- so you sent an e-mail on December 1st, 2005, to

12  Mr. Lindbom.  And below it, it appears that there was an

13  original message that was part of the e-mail that you sent to

14  Mr. Lindbom?

15  **A.**   Well, below it is an e-mail sent by Harry Hallock to

16  Arie Prilik, I believe.

17  **Q.**   It was sent to Arie Prilik?

18  **A.**   Yes.

19  **Q.**   And it was sent on June 3rd, 2005?

20  **A.**   Yes.

21  **Q.**   And you forwarded this particular e-mail to Mr. Lindbom on

22  December 1st, 2005?

23  **A.**   Yes.

24  **Q.**   Almost six months later, correct?

25  **A.**   Yes.

1  **Q.**   And so you had to go and search for the June 3rd, 2005,

2  e-mail in order to send that to Mr. Lindbom six months later.

3  Is that correct?

4  **A.**   I actually had the contract specialist do that; but the

5  answer is "Yes."

6  **Q.**   Okay.  So there's a custodian that can -- that retrieves

7  e-mails that were used?

8  **A.**   There are individuals on my team that are more proficient

9  than I am at retrieving e-mails.

10  **Q.**   But there's a system in place in which you can obtain

11  these e-mails as they pertain to the performance of contracts

12  that you're administering, correct?

13  **A.**   There's a system that I can go into on my computer to

14  access my sent, my deleted, my forwarded e-mails, my received

15  e-mails.  We -- we have that capability, yes.

16  **Q.**   And, to your knowledge, does the U.S. military, if not

17  TACOM, impose a requirement that these e-mails that pertain to

18  the performance of contracts be maintained?

19  **A.**   We maintain almost all correspondence, yes, that pertains

20  to ongoing contracts.

21  **Q.**   And you did that for business purposes, correct?

22  **A.**   That is correct.

23  **Q.**   Now I want to talk to you a little bit about the notes

24  that you maintained.

25  **A.**   Yes.

1  **Q.**   You documented events in -- in a -- in some kind of

2  binder.  Is that correct?

3  **A.**   Yes.

4  **Q.**   And it pertained to issues that came up with regard to

5  Bat. Set II contract, correct?

6  **A.**   Repeat the question.

7  **Q.**   Yeah.  This notepad that you kept -- was it maintained by

8  you, for purposes of your participation in the investigation

9  concerning Newcon and the Bat. Set II contract?

10 **A.**   Yes.  I made notes of every conversation that I -- that I

11 held with any representative from Newcon.

12 **Q.**   And you also kept notes that, if they weren't

13 conversations, notated events, correct; like -- like voice

14 mails?

15 **A.**   I don't know if all voice mails were saved, no.

16 **Q.**   Okay.

17 **A.**   I'm not actually sure how to save a voice mail, to tell

18 you the truth.

19 **Q.**   No.  I'm not talking about that.  I'm asking whether you

20 notated voice mails that you listened to.  So you had notes f

21 conversations, as I understand it?

22 **A.**   Yes.

23 **Q.**   So did you also maintain notes of voice mails that were

24 left for you that pertained to this investigation?

25 **A.**   Yes.

MCALEER - CROSS EXAMINATION / MOORE    1319

1  Q.   And Friday we saw your September 8th, 2005, notes of your

2  conversation that occurred on that date, correct?

3  A.   That is correct.

4  Q.   And we also saw a transcript of the September 9th

5  conversation you had with Arie Prilik.  And you maintained

6  notes on that.  Is that correct?

7  A.   Yes.

8  Q.   You had notes for a September 22nd, 2005, conversation?

9  A.   I believe I had notes for every conversation I had with

10  Arie Prilik.  And if there was one on the 27th, then, yes, I

11  did.

12  Q.   Okay.  It was actually on the 22nd.

13  A.   On the 22nd, okay.

14  Q.   Does that refresh --

15       And there were also some in October, correct?

16  A.   Yes.

17  Q.   Do you have a recollection of the dates of -- of those

18  other conversations?

19  A.   November.

20  Q.   Any particular date?

21  A.   Off the top of my head, I would say it was probably the

22  17th, but --

23  Q.   Okay.  You -- you had a May 31st, 2006, conversation that

24  you took notes of with Arie Prilik?

25  A.   I would have to check the date.

1    Q.   As you sit here today, do you have any recollection of the

2    content of those notes on any particular day?

3    A.   Yes.

4    Q.   So, for instance, on November 17th, 2005, do you have a

5    sufficient information to provide us about what was in your

6    notes on that day, without looking at them?

7    A.   I wouldn't speculate, without looking at my notes.

8    Q.   Okay.  So you can't, based on memory, recall what's in

9    your notes on November 17th, correct?

10   A.   I could speculate, but --

11   Q.   Well, I don't want you to speculate.

12   A.   But that's why I took notes.

13   Q.   Okay.  Good enough.

14        Now, you remember on Friday, when you told Mr. Ward that

15   ITE had provided you with materials from ATN in support of

16   their request to change their subcontractor.  Is that correct?

17   A.   Yes.

18   Q.   Now, you also testified that the information that ITE

19   provided on the proposed subcontractor to be substituted, which

20   was ATN -- TACOM actually had the -- the information from its

21   evaluation process, because ATN had submitted a proposal under

22   one of the other prime contractors' proposals.  Is that

23   correct?

24   A.   That is correct.

25   Q.   And so, as I understand it, then, you -- TACOM had already

 1   evaluated ATN's technical approach.  Is that correct?

 2   **A.**   Yes, they had.  Yes, we had.

 3   **Q.**   Do you remember the date of the ITE requested

 4   substitution?

 5   **A.**   The specific date?

 6   **Q.**   Yeah.

 7   **A.**   I don't know the date, off the top of my head.

 8   **Q.**   Okay.  If you can, look in the binder and see if

 9   Exhibit 315 is in there; and if not, I'll get it for you.

10   **A.**   I believe I have it.

11   **Q.**   Okay.  And does that appear to be an e-mail from Ramzi to

12   you?

13   **A.**   Yes.

14   **Q.**   Does that refresh your recollection?  Does this e-mail

15   refresh your recollection of when you were contacted to -- for

16   the purpose --

17   **A.**   Yes.

18   **Q.**   -- of substituting ATN?

19   **A.**   Yes.

20   **Q.**   Okay.  It was March 3rd?

21   **A.**   That is correct.

22              **THE COURT:**  Is this 315?

23              **MR. MOORE:**  Three one five.  Yes, your Honor.

24              **THE COURT:**  Okay.  It's not in my binder that --

25   that's supposed to be related to this witness.

1            **MR. MOORE:**  Oh.  I'm sorry.

2            **THE COURT:**  But 325 is.  And that would fall within

3  the category of the e-mails you were just asking him about, or

4  the e-mail you were just asking about, so --

5            **MR. MOORE:**  If your Honor would like, I could give

6  you 315.

7            **THE COURT:**  Well, I'm looking to see if there's

8  another binder that has it in --

9            **MR. MOORE:**  I think we ended up updating

10  Mr. McAleer's binder, and probably not yours.

11            **THE COURT:**  I see.  Was it in the original binders?

12  Okay.  Okay.  We've got it, I guess.  Yes.

13            **MR. MOORE:**  Thank you.

14  **Q.**   Now, in an e-mail Mr. Ramzi [sic] represents to you that

15  he strongly believed that ATN's product was equal or better

16  than the previously submitted, with more favorable delivery

17  schedule, and better field support.  Is that correct?

18  **A.**   That's correct.

19  **Q.**   And what he's referring to here is what -- is NiViSys,

20  correct?

21  **A.**   Yes.

22  **Q.**   And so you were satisfied with this representation,

23  because of the prior submissions ITE had made on behalf of ATN?

24  **A.**   That ITE had made?

25  **Q.**   Or anyone had made on behalf of ATN?

MCALEER - CROSS EXAMINATION / MOORE                 1323

1  **A.**    Yes, but not ITE.

2  **Q.**    Okay.

3  **A.**    They had not submitted the original proposal.

4  **Q.**    Okay.  So ATN -- the technical information with regard to

5  ATN had been submitted by some other prime contractor?

6  **A.**    Yes.

7  **Q.**    And so you were satisfied with the representation by

8  Ramzi, because that had already been vetted.  Is that correct?

9  **A.**    That is correct.

10 **Q.**    On page 2, second page of this e-mail, there's an ATN

11 submission, correct, to ITE?

12 **A.**    That is correct.

13 **Q.**    And this was attached to this e-mail?

14 **A.**    Yes.

15 **Q.**    Okay.  And in the first numbered paragraph, it says,

16             "Compliance.  ATN NVG 72 fully

17         complies, meets, and exceeds, with all and

18         every requirement set in TACOM RFP

19         W56-8" --

20     Oh, sorry.

21             -- HZV-05-R-0080"?

22 **A.**    Yes.

23 **Q.**    Is that reference to that TACOM number the Bat. Set II

24 contract?

25 **A.**    That was the solicitation number, yes.

1   **Q.**   Okay.  Back on the first page of the e-mail itself,

2   Mr. Abu-Taleb makes a representation to you that the price

3   variance is negligible between both models.  Do you see that?

4   **A.**   Yes.

5   **Q.**   What did -- what was your understanding of the price

6   variance that he was referring to?

7   **A.**   Well, it would be the cost of the night-vision goggles.

8   **Q.**   To ITE?

9   **A.**   I would guess it would be to ITE, yes.  This was a

10  fixed-price contract.

11  **Q.**   So there was not going to be any change in price to TACOM,

12  correct?

13  **A.**   That's correct.

14  **Q.**   So what he's referring to here is that the variance of the

15  price was the -- was the actually the cost to him, correct?

16  **A.**   Yes.

17  **Q.**   And did you accept this representation as true?

18  **A.**   Yes.

19  **Q.**   Why?

20  **A.**   We had a fixed-price contract.  The price was set.  The

21  contractor was required to deliver conforming equipment at that

22  price.  We had no reason to question the price that they

23  were -- that they had been awarded at.  And the night-vision

24  goggles that they were submitting were compliant to the

25  requirements.

1  Q.   Okay.  Now, if you had found out information that this

2  representation of this price variance as being negligible was

3  untrue, would that raise a red flag for you?

4           MR. WARD:  Objection.  Calls for speculation.

5           THE COURT:  The objection is overruled.

6           You may answer.

7           THE WITNESS:  We may have looked at it to determine

8  if it -- if it really was negligible.

9  BY MR. MOORE

10 Q.   Okay.  And in that case, if it wasn't negligible, and by

11 large margins, what actions would you -- would TACOM have

12 taken?

13 A.   If we could get faster deliveries -- and deliveries were

14 paramount -- we may have just accepted it as it was.

15 Q.   Did you think it was important information that should

16 have been shared with you, if, in fact, the price variance

17 wasn't negligible?

18 A.   If it wasn't negligible -- excuse me.  If it wasn't

19 negligible, yes.

20 Q.   Okay.  Now, last Friday you testified that you did not

21 have any information at your disposal that ATN had underbid the

22 NiViSys Bat. Set II price substantially, when you made the

23 decision to substitute ATN for NiViSys.  Isn't that correct?

24 A.   That is correct.

25 Q.   If you can look in your binder, Exhibit 320, do you

MCALEER - CROSS EXAMINATION / MOORE                    1326

1  recognize the document?

2  **A.**    It's an e-mail to me from NiViSys.

3  **Q.**    Okay.  And attached to it was a letter dated March 8th,

4  2005, to you?

5  **A.**    Yes.

6  **Q.**    Okay.  Now, this is the complaint, that you talked about

7  on Friday, that NiViSys had made to TACOM with regard to being

8  underbid and substituted out, or on the verge of being

9  substituted out by NiViSys.  Isn't that correct?

10  **A.**    Rephrase that question.

11  **Q.**    Yeah.  On -- you made reference on Friday that -- that you

12  actually received a complaint from NiViSys around the time that

13  you received the complaint from Newcon about ATN's alleged

14  inability to provide compliant product to TACOM.  Do you recall

15  that?

16  **A.**    Yes.

17  **Q.**    Okay.  And what I'm asking you now is -- and -- well,

18  strike that.

19        And you actually -- there was a response that went to

20  NiViSys, correct?

21  **A.**    Yes.

22  **Q.**    And the response was done because they were in privity of

23  contract with TACOM, correct?

24  **A.**    That was one of the reasons why we responded, yes.

25  **Q.**    And, as I recall, on Friday you -- you mentioned that

MCALEER - CROSS EXAMINATION / MOORE                    1327

1   Newcon didn't receive any similar response, because Newcon was

2   not in privity of contract, correct?

3   **A.**   Well, the privity of contract resides with the prime

4   contractor.

5   **Q.**   Okay.

6   **A.**   So that's who we contract with.  I'm not contracted

7   directly with the subcontractors.  I don't have a contract with

8   NiViSys; never did.  And I never had a contract with ATN.

9   **Q.**   Yeah.  I understand that.

10  **A.**   Okay.

11  **Q.**   But on Friday you testified that, because NiViSys had

12  privity of contract with ITE, that was the explanation for you

13  to send a letter to NiViSys in response to their complaint.  Am

14  I correct?

15  **A.**   I would respond to NiViSys, regardless; but yes, we did

16  respond back to NiViSys.  That is correct.

17  **Q.**   Okay.  And the rationale that you said on Friday for not

18  responding to Newcon was because they were not in privity of

19  contract?

20  **A.**   We did -- I believe we responded to all of Newcon's

21  e-mails.  I don't know which one you are referring to.

22  **Q.**   Well, I'm referring to your testimony on Friday, wherein I

23  asked you -- right after showing you the response that you gave

24  to NiViSys, I asked you specifically:  Why didn't you send a

25  response like this to Newcon?

1         And your testimony was that it was because Newcon was not

2    in privity of contract.  Do you not recall that?

3    **A.**    Yes, but the response -- I mean, we responded to all of

4    Newcon's allegations.

5    **Q.**    Well --

6    **A.**    But I think the fact I was making on Friday was that we

7    did not have privity of contract with Newcon.

8    **Q.**    Are you aware of any written correspondence that you sent

9    to Newcon in response to the March 12th complaint?

10   **A.**    Yes, we did respond to that.  Yeah.

11   **Q.**    Do you have a recollection when?

12   **A.**    Soon thereafter.  I don't have the exact date -- know the

13   exact date, off the top of my head.

14   **Q.**    Okay.  Now, with regard to this NiViSys complaint in

15   Exhibit 320, this was from a Byron Harding, correct?

16   **A.**    That is correct.

17   **Q.**    And isn't it true that Mr. Harding communicated to you in

18   this letter that he had information that ATN had made an

19   unrealistic low-ball offer for submission to ITE, to undercut

20   not only its pricing, but by a great margin of 1.3 million per

21   phase?

22            **MR. WARD:**  Objection, your Honor.  This is hearsay.

23            **MR. MOORE:**  It's not being offered for the truth.

24   It's being offered for his response.  And he's already

25   testified that he didn't have any information.  It's actually

1    impeachment as to the margins.

2           THE COURT:   Okay.  It comes in not for the truth of

3    the matter, and whether, in fact, the statements contained in

4    that letter by Mr. Harding are, in fact, true; but rather, for

5    informing Mr. McAleer what his understanding was, or at least

6    what information he was getting, and what he did with it for

7    other purposes, as well, if it contradicts earlier testimony or

8    something like that; but that's what it comes in for.

9           MR. MOORE:   Thank you, your Honor.

10   Q.   So, in fact, you did have information that there was quite

11   a -- a extreme drop in the price to ITE at the time that ITE

12   was asking you to substitute ATN for NiViSys.  Isn't that

13   correct?

14   A.   We had an allegation that the price had dropped.

15   Q.   Did you look into it?

16   A.   That is correct.  We looked at what ATN was offering us --

17   Q.   So it didn't --

18   A.   -- through ITE.

19   Q.   I'm sorry.

20   A.   Yes.

21   Q.   So it didn't concern you that Ramzi Abu-Taleb had made a

22   misrepresentation to you that the price to him was negligible?

23   A.   Well, I'm not certain that "negligible" is the right word.

24   I don't -- this was an allegation.  And I don't know how -- how

25   they would have access to exact pricing.

MCALEER - CROSS EXAMINATION / MOORE

1  Q.   Okay.  Well, you would agree with me that 1.3 million per

2  phase would be close to $4 million?

3  A.   If -- if that's the correct number, yes.  You can just

4  multiply it by four, approximately.

5  Q.   Right.  It's 3.9.

6  A.   Yeah.

7  Q.   And you're not saying that's a negligible price, are you

8  -- price difference?

9  A.   It's a price difference, if the facts are correct.

10  Q.   All right.

11  A.   I don't know that they are.

12  Q.   Okay.  Did you look into whether they were correct?

13  A.   I don't recall if we went back to Ramzi on this -- or ITE,

14  but --

15  Q.   Well, if you did --

16       I'm sorry.

17  A.   -- they were proposing a compliant -- compliant equipment

18  at the fixed price that was in the contract.

19  Q.   Okay.  And if you did look into the representation that

20  this price difference was negligible, you would have documented

21  it, wouldn't you?

22  A.   We normally would document that.

23  Q.   Do you have any documentation of looking into this

24  assertion by Ramzi that the price difference was negligible?

25  A.   No.

1  **Q.**    Okay.  So, despite this information, you approved the

2  substitution on March 11th, 2005.  Isn't that correct?

3  **A.**    It is correct that we approved -- that I approved the

4  switch in suppliers, yes.

5  **Q.**    And that was March 11th?

6  **A.**    I believe that was the date.

7  **Q.**    And on Friday, you recalled that the date you received the

8  complaint from Newcon was March 12th:  The day after that

9  substitution?

10  **A.**    I believe that's the correct date.

11  **Q.**    And do you recall also, on Friday, that you testified that

12  you sent this information off to ITE, and they responded on

13  March 23rd, 2005?

14  **A.**    Yes.

15  **Q.**    And -- and TACOM was satisfied with the response, correct?

16  **A.**    Yes.

17         **MR. MOORE:**  I'm going to -- if I can, your Honor, I'd

18  like to try to keep track of some of these dates, so I'm going

19  to put them on the board (indicating).

20         **THE COURT:**  Yes.  Do you want to move that easel, so

21  it's a little closer for -- so the jury can see it?

22         **MR. MOORE:**  Yeah.  It's going to be hard to see from

23  over there.

24         **MR. OSTERHOUDT:**  Can the Court see that?

25         **THE COURT:**  No, I can't see it at all; but the jurors

 1  also have to see it.  And I couldn't -- and I can see there's

 2  writing there.  How's that?

 3          MR. MOORE:  I've got to fit a lot on this page, so --

 4          THE COURT:  Maybe you need to use several pages.

 5          MR. MOORE:  I might have to, yeah.  Yeah.  I'll have

 6  to do something about that, I can see already.

 7          THE COURT:  Either that, or get -- I don't know.

 8          MR. MOORE:  Magnifying glass.

 9          THE COURT:  Any of these companies manufacture

10  binoculars, or something?

11          MR. OSTERHOUDT:  It's written for the youth among us.

12  BY MR. MOORE

13  Q.   Your Honor, I would offer Exhibit 315 and Exhibit 320 into

14  evidence.

15          THE COURT:  Any objection?

16          MR. WARD:  Yeah.  Objection.  Hearsay.  Lack of

17  foundation for business records, I think, for -- on both.  And

18  it's also 403.  It's prejudicial.

19          MR. MOORE:  Well, your Honor, I think if the

20  parties --

21          THE COURT:  The problem -- the problem with the

22  documents is that, in fact, they do fall afoul of the hearsay

23  rule.  And it comes in to show this, you know, witness'

24  knowledge; what actions he took; and so on, and so forth.  So

25  I'm -- I'm a little concerned about actually admitting the

1  exhibit, because I think it then tends to be misleading.

2          **MR. MOORE:**  Sure.

3          **THE COURT:**  So whatever you want to make clear on the

4  record from the exhibit, make clear on the record, but the

5  exhibits will not be admitted.

6          **MR. MOORE:**  Thank you, your Honor.

7  **Q.**  Now, Mr. McAleer, you received another complaint from

8  Newcon regarding the specifications of the ATN night-vision

9  goggles on May 12th, 2005.  Isn't that correct?

10 **A.**  That's correct.

11 **Q.**  If you can turn to Exhibit 338 in that binder, do you

12 recognize the e-mail from Arie Prilik?

13 **A.**  Yes, I do.

14 **Q.**  And Mr. Prilik is alerting you to what it believes to be a

15 major fraud going on with regard to the ability of ATN to

16 produce compliant product?

17 **A.**  That is what Arie Prilik alleged.

18 **Q.**  And, in response to this e-mail from Arie Prilik, you

19 requested Jacob Hurley to assist in raising testing of ATN

20 image-intensifier tubes?

21 **A.**  That is correct.

22 **Q.**  Okay.  And that was that same day?

23 **A.**  I believe so.

24 **Q.**  Well, what was the difference between the March 12th

25 complaint by Newcon, and this May 13th -- or May 12th complaint

1  that caused you to actually test the ATN tubes?

2  **A.**   We determined that the most definitive to way to

3  determine -- I'm using "determined" twice.

4       We determined the most definitive way to prove out the

5  performance of the night-vision goggles was to have them

6  tested.  And furthermore, we tested the goggles that had

7  previously been fielded, and we tested both Newcon Optik's and

8  ATN's goggles.

9  **Q.**   Okay.  And is it true that in -- on the May 12th e-mail,

10 that Mr. Prilik had actually made representations to you that

11 they had obtained some ATN tubes, and had them tested?

12 **A.**   I believe that was part of his correspondence.

13 **Q.**   And was that type of information enough to raise your

14 concerns that maybe what Newcon or Mr. Prilik was telling you

15 was accurate?

16 **A.**   Well, I could never validate whether or not they had

17 actual tubes that ATN was using.  However, a determination was

18 made that the only way to determine if we had conforming

19 night-vision goggles was to test them, to see what the actual

20 FOM was.

21 **Q.**   Okay.  If you can -- if you can, go to Exhibit 339.  Do

22 you recall sending that e-mail to Jacob Hurley?

23 **A.**   Yes.

24 **Q.**   And who does Jacob Hurley work for?

25 **A.**   He works for TARDEC.  It's the engineering group at TACOM.

1  Q.   And, in fact, in this e-mail is when you say,

2            "The only definitive way to determine

3        if the FOM is being met is to test several

4        of the night-vision devices."

5       Correct?

6  A.   We had come to that conclusion, yes.

7       (Reporter requests clarification)

8            **THE WITNESS:**  T-A-R-D-E-C.  It's an acronym, of

9  course.

10 **BY MR. MOORE**

11 Q.   And you also communicate to Mr. Hurley that it was

12 critical that you resolve the issue as soon as possible?

13 A.   Absolutely.

14 Q.   Now, did you become aware sometime after that, that

15 Mr. Prilik had called your boss, Harry Hallock?

16 A.   All correspondence, I was privy to.  Yes.

17 Q.   If you could, look at Exhibit 347.  And this -- what is

18 this document?

19 A.   It's an e-mail.

20 Q.   It's an e-mail from Harry Hallock to you, or actually to

21 Arie Prilik?

22 A.   Yes.

23 Q.   And you were copied on it?

24 A.   Yes.

25 Q.   And Mr. Hallock informed Mr. Prilik on June 2nd that he

1    acknowledged receiving the information from May 12th.  Is that

2    correct?

3    **A.**    That is correct.

4    **Q.**    And that TACOM was conducting an investigation of ATN?

5    **A.**    He did use the word "investigation," yes.

6    **Q.**    Okay.  Now, do you recall whether Mr. -- that Mr. Prilik

7    responded to Mr. Hallock's e-mail of June 2nd, 2005?

8    **A.**    I believe he did.

9    **Q.**    Okay.  If you can, go to Exhibit 431.  And, on the second

10   page of Exhibit 431, you recognize the e-mail sent June 2nd,

11   2005, at 2:23 p.m., from Arie Prilik to Harry Hallock?

12   **A.**    Yes.

13   **Q.**    And Mr. Prilik was informing Mr. Hallock that he had been

14   contacted by a reporter from one of the major U.S. newspapers,

15   who was, apparently, already covering the alleged problems with

16   ITE and the Iraqi War.  Do you recall that?

17   **A.**    I can't draw that conclusion from what you've just stated,

18   or from what I've read here, but what I have is an e-mail from

19   Arie Prilik, stating that they had been contacted by a

20   reporter.  I don't recall any -- any follow-up to that, or any

21   additional information pertaining to that --

22   **Q.**    Yeah, but my -- my --

23   **A.**    -- statement by Mr. Prilik.

24   **Q.**    My question to you was:  Do you recall Mr. Prilik telling

25   you that Mr. Hallock that he'd been contacted by a newspaper

1   reporter with regard to ITE?

2   **A.**    Yes.  It's in black and white, on this piece of paper.

3   **Q.**    That was my question.  Thank you.

4        And also in this e-mail, Mr. Prilik informed

5   Mr. Hallock -- was that it was his understanding that there

6   should be a new tender.  Is that correct?  Is that what was

7   communicated to Mr. Hallock?

8   **A.**    That was what Mr. Prilik stated, yes.

9            **MR. WARD:**  Your Honor, I'm going to object.  I think

10  he's mischaracterizing the reference to a new tender.

11           **THE COURT:**  I'm sorry.  Your voice trailed off there.

12           **MR. WARD:**  I'm sorry, your Honor.  I'm going to

13  object.  I believe Counsel's mischaracterizing --

14           **THE COURT:**  Right.

15           **MR. WARD:**  -- what the new tender was for.

16           **MR. MOORE:**  Well, I wasn't making any representations

17  of what it was for.

18           **THE COURT:**  Just rephrase the question, so it's --

19           **MR. MOORE:**  Sure.

20  **Q.**   Mr. Prilik had communicated to Mr. Hallock that it was his

21  understanding that there should be a tender for all of the

22  vehicle and trucks, and maybe additional items.  Isn't that

23  what he said?

24  **A.**    Yes, that's what he said.

25  **Q.**    Okay.  And at that time, in June 2005, there was no

1  contemplation of a new tender, was there?

2  **A.**    There could have been.

3         You know, was I aware of one?

4  **Q.**    Right.

5  **A.**    No.

6  **Q.**    So you have no recall of there ever being any discussions

7  or correspondence or anything about a new tender on the

8  Bat. Set II contract in June?

9  **A.**    When you say "a new tender," do you mean issue a new

10 solicitation for additional quantities?

11 **Q.**    If that's what "a new tender" means to you.  Is that --

12 **A.**    Well, to me, a new tender means going back out for the

13 trucks that had been deleted from the solicitation.

14 **Q.**    So the original solicitation for the Bat. Set II contract

15 originally had trucks?

16 **A.**    Yes.

17 **Q.**    And it was eliminated as an item?

18 **A.**    Yes.

19 **Q.**    So it was your understanding what Mr. Prilik was inquiring

20 about was whether there was going to be a new tender with

21 regard to trucks?

22 **A.**    Well, it said -- I mean, he state very clearly, "for all

23 the vehicles/trucks, and maybe additional items."

24 **Q.**    And was there any contemplation by TACOM in June of 2005

25 to solicit a new tender for any additional items that would

1   include night-vision goggles?

2   **A.**   Not that I was aware of.

3   **Q.**   Now, the first page of 431, Mr. Hallock responded to

4   Mr. Prilik on later that afternoon -- oh, sorry -- the next

5   day, correct?  June 3rd?

6   **A.**   Well, I believe Mr. Hallock -- excuse me -- replied on

7   June 2nd.

8   **Q.**   Okay.  And Mr. Hallock informed Mr. Prilik that TACOM was

9   taking this matter seriously, and doing what is necessary to

10  assure items delivered under the contract comply with all of

11  the contract requirements.  Is that correct?

12  **A.**   Well, I'm looking for that language in this e-mail.

13  **Q.**   I'm sorry.  It's in paragraph one, tends towards the

14  middle, toward the bottom.  "So, as I can tell you, however,

15  that we take this matter seriously"?

16  **A.**   This is on 065?

17  **Q.**   064.  I'm sorry.  The first page.

18  **A.**   Oh.  Yes.

19  **Q.**   And did you take the matter seriously?

20  **A.**   Absolutely.

21  **Q.**   Okay.  And Mr. Hallock, right before that, tells

22  Mr. Prilik that,

23              "TACOM can neither make public the

24          results of an investigation, nor could he

25          say at this time how long the investigation

1                    would take to complete."

2                    And is that standard practice?

3  **A.**    Yes.

4  **Q.**    And, in fact, that information would be prohibited to be

5  conveyed to a subcontractor that was not involved in -- in the

6  contract, correct?

7  **A.**    That's correct.

8  **Q.**    And Mr. Hallock informed Mr. Prilik to check a website for

9  possible upcoming procurements.  Do you see that?

10  **A.**    Yes.

11  **Q.**    And is that how it's done with TACOM?  Is that --

12  **A.**    We publish requirements, yes.  We announce to the world

13  what our requirements are.  At that time, federal -- under the

14  federal business cite.

15  **Q.**    And that would be for other contracts; not the Bat. Set II

16  contract, correct?

17  **A.**    Well, we did publish the Bat. Set II contract, yes.

18  **Q.**    Yeah, but I'm talking about -- on June 3rd, 2005.  There

19  was no contemplation of posting requirements for additional

20  procurement for the Bat. Set II contract in June of 2005, was

21  there?

22  **A.**    Not that I'm aware of.

23  **Q.**    Now, are you -- do you recall Mr. Prilik responding to

24  Mr. Hallock's e-mail of June 3rd, 2005?

25  **A.**    Yes.

1  **Q.**   If you can, go to Exhibit 351 in your binder.  And do you

2  recognize this e-mail?

3  **A.**   Yes.

4  **Q.**   Okay.  And the e-mail I'm referring to is the one sent

5  Friday, June 3rd, at 3:12 p.m. that Mr. Prilik sends to

6  Harry Hallock.

7  **A.**   What page is that on?

8  **Q.**   Yeah.  It's on the first page of 351, with the Bates

9  number 8932 in the bottom quarter.

10  **A.**   Okay.

11  **Q.**   Do you see the header there:  "From the Arie Prilik to

12  Harry Hallock, June 3rd"?

13  **A.**   Yes.

14  **Q.**   And Mr. Prilik says to Mr. Hallock that he thanked him for

15  the update, and that Mr. Prilik told him if he needed any

16  inside information about night-vision goggles

17  delivery/performance, to please contact Newcon.  Isn't that

18  correct?

19  **A.**   Yes.

20  **Q.**   And then, within about -- looks like 12 minutes from that

21  e-mail, Mr. Hallock sent you an e-mail, which attached to

22  Mr. Prilik's June 3rd e-mail, correct?

23  **A.**   Well, I see that Mr. Hallock replied back to Arie Prilik.

24  "I'm happy to furnish you" --

25  **Q.**   I want you to look at the top of the header of the e-mail.

1   It says "From Harry Hallock"?

2   **A.**   Correct.

3   **Q.**   And it's sent to you, correct?

4   **A.**   Well, it's sent to Arie.

5   **Q.**   I'm talking at the very top of the page on Exhibit 351.

6   **A.**   Oh, okay.

7   **Q.**   Okay.  That's the e-mail that --

8   **A.**   Yes.  Okay.

9   **Q.**   -- mr. Hallock sent to you; not to Mr. Prilik, correct?

10  **A.**   That is correct.  Yes.

11  **Q.**   And, in fact, he's attached Mr. Prilik's e-mail to him

12  earlier that day, just 12 minutes prior, correct?

13  **A.**   Yes.

14  **Q.**   Okay.  And Mr. Hallock is sending it to you, to Mr. Bean,

15  to Kenneth Bousquet, and to John Klecha, correct?

16  **A.**   That is correct.

17  **Q.**   And there's no "cc" to Arie Prilik, correct?

18  **A.**   That is correct.

19  **Q.**   And he says to you and the other recipients that "Arie's

20  response, F.Y.I.," correct?

21  **A.**   Yes.

22  **Q.**   And he says,

23           "I plan to consider their inquiry

24        closed at this point.  Harry."

25        Isn't that what he conveyed to you?

1  **A.**    That's what it says.

2  **Q.**    Okay.  And did you consider the matter closed?  "The

3  matter" being Mr. Prilik's complaints about ATN.

4  **A.**    We were going ahead with testing the night-vision goggles,

5  I believe.

6  **Q.**    Right.

7  **A.**    Okay.  So it wasn't closed.

8  **Q.**    It wasn't closed?

9  **A.**    We were going to test the night-vision goggles.  That is

10  with a --

11  **Q.**    Right, but Mr. Hallock considered it closed.  That's what

12  he's conveying to you, correct?

13  **A.**    Well, I'm not certain that's what Mr. Hallock --

14        That's what he states, but I don't know the context of

15  what he's stating it under.

16  **Q.**    Well, he's attached Mr. Prilik's --

17  **A.**    Okay.

18  **Q.**    -- e-mail.  And -- and the e-mail that Mr. Arie [sic]

19  Sent to him was the contention that he'd been contacted by the

20  press about problems with regard to ITE, correct?

21  **A.**    Rephrase that, please.

22  **Q.**    Yeah.  Mr. -- Mr. Prilik had sent Mr. Hallock an e-mail.

23  And this was an e-mail in reply to his e-mail that started

24  earlier, about all of these complaints with ITE, and ATN's

25  failure to perform.  Isn't that correct?

1  **A.**    Well, it pertains to allegations, yes.

2  **Q.**    Yeah, right.  About the allegations.

3  **A.**    Yes.

4  **Q.**    And so my question to you is:  Your boss conveyed to you

5  on June 3rd, 2005, that he considered their inquiry --

6        That being Newcon's.

7        -- closed at this point; isn't that correct?

8  **A.**    Well, I think that what he was conveying was that he had

9  answered the mail.  The mail had been answered regarding the

10 questions raised by Arie.

11 **Q.**    Okay, but you were going to --

12 **A.**    I don't agree that there was any intention -- and that's

13 not what he was stating, was that we were closing down the

14 investigation, the review of the night-vision goggles; no, we

15 weren't.

16 **Q.**    But with regard to any communications with Newcon about

17 the status of any investigation concerning ATN's tubes, that

18 wouldn't be information that would be conveyed to Newcon

19 anyway, correct?

20 **A.**    Absolutely not.  Yes.

21 **Q.**    Okay.  Now, with regard to the attempts to test ATN's

22 tubes, is it true that there was an attempt made to ship ten of

23 their tubes back from Iraq, to have them tested by the U.S.

24 Night Vision Lab?

25 **A.**    We had -- if you can excuse me.

MCALEER - CROSS EXAMINATION / MOORE                1345

```
 1        We had ten tubes shipped back -- ten tubes that had

 2   previously been accepted -- from Iraq to the Night Vision Lab.

 3   Q.    And when you say "previously been accepted," that means

 4   actually delivered in Iraq?

 5   A.    Yes.  Yeah.

 6   Q.    And they were used in the theater?

 7   A.    They had delivered.  I don't know that they had actually

 8   been used, but as the contracting officer, I made a decision,

 9   and coördinated with our customer, to have ten tubes shipped

10   back, and tested.

11   Q.    And the results of those tests revealed that ATN's

12   night-vision goggles did not meet the minimum FOM requirements,

13   correct?

14   A.    That is what we thought at the time, yes.

15   Q.    And that was on June 16th?

16   A.    I believe it was June 16th, yes.

17   Q.    And the results of this testing was reported on the

18   following day, correct, to the various interested parties?

19   A.    Yes.

20   Q.    And, if you can, look at Exhibit 357.

21   A.    Okay.

22   Q.    And this was an e-mail sent to you by Jeffrey Bean,

23   correct?

24   A.    Yes.

25   Q.    And who's Jeffrey Bean?
```

1   **A.**   He was the contract specialist at the time.

2   **Q.**   Okay.  And Mr. Bean was drafting a proposed letter that

3   would be sent to Ramzi Abu-Taleb?

4   **A.**   Yes.

5   **Q.**   And this would -- this -- the purpose of this

6   communication was to inform Ramzi that TACOM's contract

7   specified that devices would have a Figure of Merit in the

8   range of 750 to 1250, and that that range is a measure of

9   performance, correct?

10  **A.**   Yes.

11  **Q.**   And Mr. Bean had drafted this proposed letter to be sent

12  to Ramzi, informing them that the Night Vision Lab found that

13  the ten or the nine that was actually tested -- that the

14  results ranged from 380 to 627 FOM, correct?

15  **A.**   Yes.

16  **Q.**   And ultimately, you took what was the content of 357, and

17  edited that, and actually sent something out to Ramzi, correct?

18  **A.**   Yes, I did.

19  **Q.**   And if you turn to Exhibit 358, please -- and is this

20  the -- the text that you actually adopted, and did not change

21  further, if you can recall?

22  **A.**   Give me one second to look at the standards.  This was an

23  e-mail prepared by -- I forwarded out by, I believe,

24  Mr. Hallock.  Yes.

25  **Q.**   Okay.  And was it accurate that Night Vision Lab testing

MCALEER - CROSS EXAMINATION / MOORE                1347

1  revealed that the FOM does not meet TACOM's specification?

2  **A.**   We thought that at the time, yes.

3  **Q.**   And it also indicates that TACOM had notified ATN of the

4  results, which it has not disputed.  Is that an accurate

5  statement?

6  **A.**   Yes, we notified ATN.

7  **Q.**   And they didn't dispute the results at that time?

8  **A.**   Well, they did respond, ultimately, yes.  I mean, we sent

9  the results to them.  We sent the results to ITE, also.

10 **Q.**   Okay, but it says here that,

11              "ATN didn't dispute the results."

12          Is that an accurate statement?

13 **A.**   Ultimately, they did, yes.

14 **Q.**   Okay.

15 **A.**   They did dispute the results.

16 **Q.**   But as of June 17th, they had not, correct?

17 **A.**   Correct.

18 **Q.**   But they had been contacted and told that their product

19 didn't meet spec?

20 **A.**   As soon as we thought that they had failed to meet the FOM

21 requirements, we notified everybody in the chain, cluing ATN,

22 ITE, and our customers.

23 **Q.**   And they didn't dispute those results at that time?

24 **A.**   They questioned them, but they did not dispute them at

25 that time, no.

MCALEER - CROSS EXAMINATION / MOORE

1   Q.   Okay.  And as a consequence of this, TACOM issued a

2   stop-work notice to ITE, correct?

3   A.   I issued a formal notification to them, yes.

4   Q.   And what does that mean:  Stop-work notice?

5   A.   Well, we issued -- I issued a letter telling them to stop

6   all action on -- on night-vision goggles.  This was actually

7   issued to ITE, the prime contractor.  I told them to come up

8   with a corrective-action plan.  At that time, we thought we had

9   noncompliant goggles.

10  Q.   Now, ATN had made representations in its technical

11  information, that you had approved already, that they had only

12  provided tubes that passed FOM resolution threshold of 750

13  minimum.  Isn't that correct?

14  A.   Both Newcon and ATN provided such representations, yes.

15  Q.   And, at least, as of June 18th, 2005, that proved not to

16  be true, correct?

17  A.   That is what we thought at the time.

18       MR. MOORE:  I'm going to make another stab at writing

19  on this thing here, if it's more --

20       THE COURT:  Be bold.

21       MR. MOORE:  You know what is -- is there a thicker --

22       THE COURT:  There you go.  A bolder pen.  Tony, do we

23  have any bolder pens that than that?  They brought some.

24       THE CLERK:  Yeah, there are some right there on the

25  tray for him.  Right on the tray.  Green and orange.  I'm not

 1   sure why he's not using them.  They're thick.

 2            THE COURT:  There are some on the tray, he says,

 3   right there.

 4            MR. MOORE:  Great.  Thank you.

 5            JUROR:  There's a red one.

 6            THE COURT:  You got three colors.  Right in --

 7            THE CLERK:  Right in the tray, below the paper.

 8            MR. MOORE:  This will be fabulous.

 9            THE COURT:  And right on the tray, just below the

10   paper, too.  Just --

11            THE CLERK:  Just look down.  Right there.

12            MR. MOORE:  These have really light tops.

13            JUROR:  Would I be totally out of line to say:  Use

14   the overhead that projects up there?

15            MR. MOORE:  Actually, that's a great idea.

16            THE COURT:  We could all take suggestions, right?

17            MR. MOORE:  I will do that.  I actually have all of

18   this already written down, and I didn't think of that.

19            THE COURT:  Yeah.  She's saying, "Use the equipment."

20            MR. MOORE:  Thank you.  Thank you very much.  I'll

21   use that.

22            JUROR:  That was a great idea.

23            THE CLERK:  It's turning on right now, so it will pop

24   on.

25            THE COURT:  He thought that would help.  Okay.

1  You're going to zero in on that, right?

2          **THE CLERK:**  Are you good there?

3          **MR. MOORE:**  You can do it from there?

4          **THE CLERK:**  Uh-huh.

5          **MR. MOORE:**  That's fabulous.

6          **THE COURT:**  We can also make it disappear.

7          **MR. MOORE:**  I know.  I know.  All right.

8          **THE COURT:**  You can read that now, and you have it

9  over there, also.

10          **THE JURORS:**  Nods.

11          **THE COURT:**  Excellent suggestion.

12          **MR. MOORE:**  Fabulous.

13          **THE COURT:**  Next question is, "Now can you make the

14  examination shorter," right?

15          **MR. MOORE:**  I'm trying.  I'm trying.

16  **Q.**  All right.  Mr. McAleer, the same day that the reports of

17  the first testing were done by the Army's Night Vision Lab, it

18  was decided that a second round of testing would take place?

19  **A.**  ATN requested that we do additional testing, and that they

20  witness the testing, for the purpose of understanding how the

21  tests were conducted.

22  **Q.**  Okay.

23  **A.**  And we agreed.

24  **Q.**  If you can, turn to Exhibit 361, please.  And that is an

25  e-mail from you to Dmitry Rocklin, correct?

 1   **A.**   Correct.

 2   **Q.**   And in it, it explains what the protocol would be for the

 3   second round of testing?

 4   **A.**   Yes.

 5   **Q.**   Okay.  And there were going to be six additional tubes

 6   tested?

 7   **A.**   Yes.

 8   **Q.**   And three were from the batch or the ones that had been

 9   delivered already.  Is that correct?

10   **A.**   Yes.

11   **Q.**   And there was going to be three that were proposed to be

12   as replacements.  Isn't that correct?

13   **A.**   Yes.

14   **Q.**   And then in this e-mail that you sent to Mr. Rocklin, you

15   had submitted a spreadsheet of the nine -- the results of the

16   nine tests -- the nine tubes that were tested by the Night

17   Vision Labs in the first test, correct?

18   **A.**   Yes.

19   **Q.**   Do you know who compiled that information?

20   **A.**   I believe it was -- well, it was the Night Vision Lab; but

21   I think Ray --

22       (Reporter requests clarification)

23          **THE WITNESS:**  Raymond, R-a-y-m-o-n-d.  And I'll have

24   to read you his last name.  I think it's S-t-e-f-a-n-i-c.

25   Stefanik, I think.

1          **MR. MOORE:**  Might be a "k."

2          **THE WITNESS:**  Might be a "k."

3  BY MR. MOORE

4  Q.    All right.  Now, that same day you sent a notice to Ramzi,

5  at ITE, which I believe is 362, informing him that TACOM had

6  deduced that the 1,500 goggles sent to Iraq were all

7  noncompliant?

8  A.    What was the number on that?

9  Q.    362.

10  A.    Yes, I sent him a note -- that note, correct.

11  Q.    And you sent him a note indicating that -- that it was

12  based on those test results of the first test, that you had

13  deduced that all 1,500 that had been sent to Iraq were

14  noncompliant, correct?

15  A.    Well, I believe that was in the letter that I sent to him.

16  Q.    Okay.

17  A.    The stop-work letter; the noncompliant letter.

18  Q.    And that's because they didn't meet the 750 FOM; at least,

19  at that time?

20  A.    We made that determination based upon the nine that failed

21  the testing, yes.

22  Q.    And subsequent to that, within days, is it not true

23  that -- if not that same day -- that there was some discussion

24  at TACOM that MNSTC-I, who was actually the customer --

25  A.    Yes.

MCALEER - CROSS EXAMINATION / MOORE                    1353

1  Q.  -- was -- desired to get financial consideration from ITE,

2  rather than recover and ship back the night-vision goggles?

3  A.  Well, that was with regards to the previously delivered

4  night-vision goggles.

5  Q.  Yeah.  That's what I mean.

6  A.  Yes.  They did propose a reduction in the price for those.

7  Q.  And that was an option, correct?

8  A.  That was an option for the goggles that had already been

9  delivered, yes.

10 Q.  And with regard to product that had yet to be delivered,

11 then one of the options would be to get ATN to come up with

12 compliant product, correct?

13 A.  Correct.

14 Q.  Was there a determination made, through efforts to contact

15 MNSTC-I, that the night-vision goggles that had been delivered

16 were usable, but just not conforming?  So that's why they would

17 continue to use them, but wanted some kind of price

18 consideration for them?

19 A.  Well, I held daily conversations with MNSTC-I throughout

20 this entire process.

21 Q.  Okay.

22 A.  And the ability of them to retrieve night-vision goggles

23 that had been released to the Iraqi Armed Forces was

24 negligible.  There was no way we could get them back, because

25 they were being used.

1    Q.    Okay.

2    A.    So that's primarily, I think, what drove this.

3    Q.    And then Mr. Abu-Taleb had sent you a proposal for

4    corrective action after the stop-work order, correct?

5    A.    Yes.

6    Q.    And one of the proposals was that future product would

7    meet specification, right?

8    A.    That's correct.

9    Q.    And that meant even 750 FOM, as determined by U.S. labs?

10   A.    Yes.

11   Q.    And one of the other proposals was a rebate for those that

12   did not, correct?

13   A.    Yes.

14   Q.    If you can, look at page -- I'm sorry -- Exhibit 365,

15   please.  And this was an e-mail with an attachment sent to you

16   on June 20th from Ramzi?

17   A.    Yes.

18   Q.    On the second page of that -- the letter that was attached

19   at the very bottom -- he represents to you that the Russian

20   testing entity's results were shown to be compliant, and thus,

21   delivery began for the customer in Iraq.  And it says,

22              "Probing from suppliers that ITE did

23          not contract with yielded the necessity to

24          test the equipment delivered."

25       Now, is it your understanding what ITE was stating there

1   or making reference to "suppliers that ITE did not contract

2   with" to be Newcon?

3   **A.**   Yes.

4   **Q.**   Did you have discussions with Ramzi that it was, in fact,

5   Newcon who had made the complaint?

6   **A.**   At no time did I ever identify who was complaining.  We

7   redacted any information that pertained to who positioned the

8   complaint.  The night-vision goggles was a small --

9           **THE COURT:**  Your voice, I think, is dropping off at

10  the end of the sentence.

11          **THE WITNESS:**  Well, I have a cold, so --

12          **THE COURT:**  I'm sorry.  Okay.

13          Well, so speak right into the mic., then.

14          **THE WITNESS:**  At no point did we identify ATN or --

15  excuse me -- Newcon Optik to ATN.

16  **BY MR. MOORE**

17  **Q.**   Okay.  The sentence goes on to say that,

18              "Subsequent testing in Night Vision

19          Labs in Fort Belvoir proved that the tubes

20          did not comply with the results of the

21          Russian facilities."

22      What did you understand that to mean?

23  **A.**   He was stating, I believe, that there was a disconnect

24  between the test results in Russia, and the test results at

25  Fort Belvoir Night Vision Lab.

1  Q.   Now, at some point, the second round of testing was

2  performed, correct?

3  A.   Yes.

4  Q.   And you had arranged to have a number of individuals

5  attend that testing.  Is that correct?

6  A.   Yes.

7  Q.   And that was -- who were those people?

8  A.   ATN had requested that they be there to observe, so that

9  they could understand how the testing was conducted.  We had

10 two individuals from TARDEC; two engineers.

11 Q.   Okay.  And was it unusual to have a subcontractor attend

12 testing at U.S. labs for night-vision goggles?

13 A.   I don't know if that was unusual, but in this case, we

14 determined that it would be in the best interests to try and

15 understand -- for them to understand the test results.

16 Q.   Okay.  All right.  Now, throughout this time in -- before

17 the new -- or the new round of testing, there still were

18 discussions, were there not, about price concessions?

19 A.   For the noncompliant, that would have been one of the

20 means of addressing it, yes.

21 Q.   This price concession -- that would have to be a

22 negotiation between TACOM and ITE, correct?

23 A.   Correct.

24 Q.   You couldn't seek a price concession from ATN?

25 A.   I deal with the prime contractor.

1  **Q.**   So, I take it that means "No"?

2  **A.**   Yes.  No.

3  **Q.**   Now, do you have a recollection of when the second round

4  of testing occurred?

5  **A.**   I believe it was within a week of the initial testing.  I

6  don't have the exact date in front of me.

7  **Q.**   If I can show you Exhibit 371 in your binder -- actually,

8  strike that.

9      Make it 374.  It's going to be easier to refresh your

10 recollection, I believe.

11 **A.**   Okay.

12 **Q.**   Does that refresh your recollection of when the six tubes

13 were scheduled to be tested on the second round?

14 **A.**   Yes.

15 **Q.**   Was it June 28th?

16 **A.**   Yes.

17 **Q.**   And was that, in fact, when it occurred?

18 **A.**   Yes.

19 **Q.**   Showing you Exhibit 378, which was an e-mail from

20 Jeffrey Bean to a Lieutenant Donald Adkins on which you were

21 copied, do you recall receiving a copy of this e-mail?

22 **A.**   Yes.

23 **Q.**   And Mr. Bean is communicating to Mr. Adkins, stating that

24 it now seems likely that even the most improved tubes in ATN

25 will not meet our specifications.

MCALEER - CROSS EXAMINATION / MOORE                1358

1      Do you see that?

2  **A.**    Yes.

3  **Q.**    Now, that was the day before the actual tests occurred on

4  these three new tubes.  Isn't that correct?

5  **A.**    Yes.

6  **Q.**    What was it, to your knowledge -- or was there any

7  discussion that you were aware of that TACOM had already

8  concluded that these new tubes were not going to meet spec?

9  **A.**    There were a lot of discussions that went on at that time.

10  And I'm going to speculate, but I'm sure that there was some

11  question as to whether or not they would pass the testing.

12  **Q.**    Okay.

13  **A.**    Additional testing.

14  **Q.**    Okay.

15  **A.**    At that point, they were noncompliant.

16  **Q.**    Right, but there were supposed to be these three new tubes

17  that were not ones that were delivered, that were supposed to

18  be new and improved, correct?

19  **A.**    Yes.

20  **Q.**    And that's, in fact, what Mr. Bean is referring to, is the

21  most improved tubes?  Isn't that correct?

22  **A.**    Yes.

23  **Q.**    And when you read -- read this e-mail the day before the

24  test, did it cause you any pause, as to why Mr. Bean was

25  concluding that even the new tubes wouldn't meet spec?

1  **A.**   No.

2  **Q.**   Okay.  Why not?

3  **A.**   Because that -- that was an opinion Jeff was espousing,

4  but at that point, we really didn't know until we tested, so --

5  **Q.**   Okay.  And Mr. Bean is still advocating a price reduction,

6  correct?

7  **A.**   Yes.

8  **Q.**   As one of the options?

9  **A.**   Yes.

10 **Q.**   Both on the delivered and the yet-to-be-delivered

11 material.  Isn't that correct?

12 **A.**   That is correct.

13 **Q.**   So before the second round of testing occurred, TACOM was

14 already contemplating get a price reduction on even the new,

15 improved tubes from ATN?

16 **A.**   That would have been one of our options.

17 **Q.**   And that option would be exercised by seeking the price

18 reduction from ITE, the prime?

19 **A.**   Yes.

20 **Q.**   And it was, in fact, true that, on June 28th, these three

21 new tubes did not meet the specification:  Minimum 750 FOM?

22 **A.**   That is what we thought at that time.

23 **Q.**   And I'll refer you to Exhibit 379, please.  And this is an

24 e-mail from Jeffrey Bean to Harry Hallock and Ken Bousquet,

25 correct?

MCALEER - CROSS EXAMINATION / MOORE

1   **A.**   Yes.

2   **Q.**   And you were copied on it?

3   **A.**   Yes.

4   **Q.**   And Mr. Bean is reporting to your boss and Ken Bousquet

5   that the ATN samples tested that day did not meet the spec.

6   And he said,

7              "Even the higher-performance tubes are

8              scarcely better than the ones already

9              delivered."

10       Isn't that true?

11   **A.**   Yes.

12   **Q.**   Okay.  And MNSTC-I, he's relating to Mr. Hallock that

13   MNSTC-I definitely wanted a cash consideration for this,

14   correct?

15   **A.**   Yes.

16   **Q.**   And Mr. Bean states to Mr. Hallock that,

17              "Demanding that ITE/ATN supply per the

18              spec does not seem to be a realistic

19              option."

20       Correct?

21   **A.**   That's what he stated, yes.

22   **Q.**   Do you share that view?

23   **A.**   One of the options we would have had would have been to

24   negotiate a re-cost.

25   **Q.**   Okay.

1  **A.**   But we had multiple options.

2  **Q.**   Right.

3  **A.**   So.

4  **Q.**   And you were --

5  **A.**   I wasn't ruling anything out at that time.

6  **Q.**   And you were pursuing all of those options through the

7  prime ITE, correct?

8  **A.**   Yes.

9  **Q.**   And that's the prime thing you do?  I mean, that's a play

10  on words.  Sorry.  That's the first thing you do?

11  **A.**   Yes.

12  **Q.**   The first option is to address these types of problems

13  directly with the prime?

14  **A.**   That is correct.

15  **Q.**   Now, Mr. Bean indicates to Mr. Hallock in this e-mail

16  that,

17               "ITE/ATN's price was predicated on

18          using Gen II Russian tubes, and it appears

19          that Russian tubes just aren't that good."

20     Did you come to that same conclusion on or around

21  June 28th, 2005?

22  **A.**   At that time, we thought that the tubes being used by ATN

23  were noncompliant.

24  **Q.**   Okay.

25  **A.**   I'm not going to speculate on any and all Russian tubes.

MCALEER - CROSS EXAMINATION / MOORE

1   Q.   Okay.

2   A.   Most tubes do come out of Russia.

3   Q.   Okay.  And so, to your knowledge, was there, in fact,

4   tubes from Russia that do meet 750 FOM?

5   A.   My direct knowledge?

6   Q.   Yeah.

7   A.   I suppose that there are.  I didn't have any direct

8   knowledge.  We thought that the tubes that we were getting were

9   compliant.

10       And at this time, we thought that they were not compliant.

11  Q.   Okay.  And Mr. -- Mr. Bean states further in this that,

12              "Tubes that would meet TACOM's spec

13          made by the United States or West European

14          sources might cost in the range of $3,000

15          to $3,500, correct?

16  A.   That's what Jeff stated, yes.

17  Q.   And did you have any reason to dispute that opinion?

18  A.   I didn't think that was a correct assessment by Mr. Bean

19  at all.  No.  I actually disagreed with him.

20  Q.   Did you write an e-mail to Mr. Bean, indicating that you

21  disputed --

22  A.   No.

23  Q.   -- his contention?

24  A.   I'm sure I talked with him.

25  Q.   You're sure you talked with him about this?

1   **A.**   More than likely, yes.

2   **Q.**   Okay.

3   **A.**   I don't think that was a valid conclusion based upon the

4   information we had.

5   **Q.**   And what information did you have that made you believe

6   that Mr. Bean had it wrong?

7   **A.**   We had multiple offers who submitted highly competitive

8   proposals.  There was a range of pricing, from about 1,750 a

9   unit, upwards to around 2,250 a unit.

10      We didn't have any offerers proposing at $3,000 a tube or

11   $3,500 a tube.

12   **Q.**   Okay.  Were any of those offerers, to your knowledge,

13   using suppliers that had -- that were tubes manufactured in the

14   U.S. or Europe?

15   **A.**   No.

16   **Q.**   So your -- the basis of your opinion or the basis of your

17   disagreement with Mr. Bean was that you could get cheaper tubes

18   from a source outside of the U.S. or Europe, correct?  Isn't

19   that what you just stated?

20   **A.**   No.  I don't agree with what you just asked.

21   **Q.**   Okay.  So you didn't have any information, though, did

22   you, of what the price U.S. or European suppliers of tubes were

23   charging at that time?

24   **A.**   We knew that the cost of tubes for higher-quality U.S.

25   military-type applications would cost more than what we were

MCALEER - CROSS EXAMINATION / MOORE                    1364

1   buying here.  Yes.

2   **Q.**   All right.

3   **A.**   But those tubes would have exceeded the exportable range

4   of night-vision goggles.

5        (Reporter requests clarification)

6            **THE WITNESS:**  They would -- no, no.  We are not

7   allowed to export night-vision tubes that exceeded the 750 and

8   1250 range on FOM.  Anything over that, we're not allowed to

9   export.  So --

10  **BY MR. MOORE**

11  **Q.**   Okay, but Mr. Bean was talking about Gen II tubes that

12  would meet this contract -- Bat. Set II -- correct?

13  **A.**   That's what he was referring to, yes.

14  **Q.**   Okay.  Now, at some point, is it accurate that the

15  individuals from ATN who had attended the testing had made some

16  kind of contention that the methodology that was used to test

17  their tube by the Russian factories was somehow different than

18  what the U.S. Night Vision Lab used?

19  **A.**   Yes.

20  **Q.**   And U.S. Night Vision Labs tested these tubes with a

21  particular machine, correct, that U.S. Labs maintains?

22  **A.**   It's a machine.  There's a methodology.  And that's the

23  target that they use.

24  **Q.**   And ATN explains -- well strike that.

25        Who was it from ATN that was explaining the differences in

1   methodology?

2   **A.**    Well, it would have been the representatives from ATN.

3   They were the discussing the methodologies used by the Night

4   Vision Lab, and the methodologies used by -- I believe they

5   characterized it as the commercial marketplace; the European

6   marketplace; the Russian marketplace.

7   **Q.**    And do you know who those individuals were from ATN?

8   **A.**    I believe -- there were two of them.  I believe

9   Dmitry Rocklin may have been one.  I don't recall who the

10  second individual was.

11  **Q.**    Did you have any direct communications on this subject

12  with Mr. Rocklin?

13  **A.**    I had direct communications with the Night Vision Lab

14  personnel.

15  **Q.**    And so was it your understanding that Dmitry Rocklin was

16  making statements to Night Vision Lab personnel, explaining to

17  them that ATN used different methodology?

18  **A.**    Yes.

19  **Q.**    Okay, but you had no direct conversations or

20  correspondence with Mr. Rocklin about that contention, did you?

21  **A.**    When it was being discussed at the Night Vision Lab, I had

22  no direct --

23  **Q.**    At any time after that?

24  **A.**    Actually, ATN, when we sat down with them after the

25  testing.

1  **Q.**   And were you there?

2  **A.**   Yes.

3  **Q.**   And Mr. Rocklin was there?

4  **A.**   Yes.

5  **Q.**   Who else was there?

6  **A.**   I don't recall all of the attendees.  We had several of

7  our engineers there.  And there were -- I don't recall who the

8  second representative was from ATN.

9  **Q.**   And did Mr. Rocklin speak?

10  **A.**   Yes.

11  **Q.**   And was articulating the -- the methodology that the

12  Russian suppliers -- the manufacturers -- were using to test

13  their tubes?

14  **A.**   The purpose of that meeting was to discuss corrective

15  actions on the part of ATN.  They had requested that we sit

16  down with them, and we agreed to do that; but my objective was

17  to discuss with them how they were going to address performance

18  issues.

19  **Q.**   Okay.  And how were they going to address them?

20  **A.**   They were contending that there were no performance

21  issues, as I recall.

22  **Q.**   Okay, but the U.S. Night Vision Lab stated otherwise,

23  correct?

24  **A.**   Initially they did, yes.

25  **Q.**   Okay.  Now, do you know whether U.S. Night Vision Labs

1  made any attempt to corroborate the ATN methodology that was

2  explained by Mr. Rocklin?

3  **A.**   I don't have any direct information concerning that, no.

4  **Q.**   But prior to this, TACOM had always relied on the U.S.

5  Night Vision Labs to determine what spec was, correct?

6  **A.**   Well, we worked with Night Vision Lab and other entities

7  in developing the night-vision requirements; the

8  specifications; but they are the experts for night vision for

9  the U.S. Army.

10  **Q.**   Did you make the decision to -- to accept Dmitry Rocklin's

11  representations about the differences in methodology that were

12  used by his factory?

13  **A.**   Any decisions that were made by the United States

14  government were made based upon input from the United States

15  government personnel.  I am not going to accept an explanation

16  solely from a contractor.

17  **Q.**   Mm-hm.

18  **A.**   Decisions were made based upon information received from

19  the engineering folks at the Night Vision Lab.

20  **Q.**   Okay.  And so at some point, isn't it true that TACOM made

21  the decision to allow ATN to deliver night-vision goggles that

22  had previously been determined by the U.S. Lab to be

23  noncompliant product?

24  **A.**   A decision was made to accept night-vision goggles that

25  were determined to be compliant to the requirements of the

1   specification.

2   Q.   And how was that done?

3   A.   In consultation with the Night Vision Lab personnel.

4   Q.   Okay.  Was it your -- to your knowledge, did ATN ever meet

5   750 FOM, as measured by the U.S. Night Vision Lab in the same

6   methodology that it applied when they tested it on June 17th

7   and June 28th?

8   A.   Using that methodology?

9   Q.   Right.

10  A.   No, they could not comply.

11  Q.   All right.  And I take it it would be accurate to state

12  that this decision to accept ATN's product under a different

13  methodology -- a different testing methodology -- was never

14  communicated to anybody at Newcon, correct?

15  A.   We informed Newcon that -- well, I don't know if we

16  directly informed them; but they had contacted us.  And we told

17  them that we had tested and determined that ATN was compliant

18  to their requirements.

19  Q.   When did you do that?

20  A.   I'm sorry?  Where?

21  Q.   When did you do that?

22  A.   Well, in their multiple inquiries, actually, we told them

23  we had addressed it, and we had resolved.  I think that's how

24  it was phrased.

25  Q.   Well, my question was more specific than that.  My

 1   question was:  Did you ever inform anyone at Newcon that ATN

 2   was allowed to provide product to MNSTC-I based on a different

 3   testing methodology?

 4   **A.**   We did not discuss the testing -- excuse me -- the testing

 5   methodology that was used with Newcon.

 6        (Reporter requests clarification)

 7            **THE WITNESS:**  Excuse me.  I'm losing my voice here.

 8            **THE COURT:**  That's good, if you pull that closer to

 9   you.  Speak right into it.

10            **THE WITNESS:**  Okay.  Good.

11            **THE COURT:**  It will be easier on his voice, also.  He

12   didn't finish his answer.

13            **MR. MOORE:**  I didn't think so.

14            **THE WITNESS:**  I just stopped.

15            **THE COURT:**  Do you have the question in mind?

16            **THE WITNESS:**  Yes.  We did not inform them which

17   methodology or what methodology was used to determine

18   compliance.

19            **MR. MOORE:**  Okay.

20   **Q.**   And on June 29th, isn't it true that you informed ITE

21   that, based on this decision, ITE could resume shipments?

22   **A.**   Yeah.

23   **Q.**   And no corrective action would be required?

24   **A.**   Yes.

25   **Q.**   And, in fact, the idea of giving them price concessions

1    was dropped, right?

2    **A.**    We were getting compliant night-vision goggles, so --

3    **Q.**    So now were they compliant on June 29th, but on June 28th

4    they were not, correct?

5    **A.**    That's correct.

6    **Q.**    I'd like to go back.  I'm going to have to take that off,

7    actually.  Can we go to Exhibit 97?  It's going to be on

8    page 3.  And that's the transcript of the September 9th

9    conversation with Arie Prilik.

10   **Q.**    All right.  Let's actually -- well, let me ask you if you

11   remember --

12              **THE COURT:**   While we have this little break, about

13   how much longer are you going to be?

14              **MR. MOORE:**   Oh, I have got some time.  Probably at

15   least another hour, hour and a half.

16              **THE COURT:**   Do you want to pick up the pace?

17              **MR. MOORE:**   Promise.

18              **THE COURT:**   Can you last another 15 minutes?

19         (Jury panel nodding affirmatively.)

20              **THE COURT:**   Okay.  We will take a recess around 10:30

21   then.

22         (Document displayed)

23   **BY MR. MOORE**

24   **Q.**    Do you recall during this conversation Mr. Prilik had

25   informed you of the three issues that he had raised, which was

1  the production issue, the export issue, and the quality issue?

2  **A.**   Yes.

3  **Q.**   And right after the quality issue you state:

4              "Well, we addressed that one.  But that's

5              okay, go on."

6       Do you see that?

7  **A.**   Yes.

8  **Q.**   You say, "We addressed that one."  "We" is who?  TACOM?

9  **A.**   TACOM, the United States government.

10  **Q.**   Not -- not Arie Prilik and TACOM, right?

11  **A.**   No.

12  **Q.**   So prior to September 9th, had you had any actual

13  conversation with Arie Prilik?

14  **A.**   I don't recall any direct conversations with Arie.

15  **Q.**   I can represent that I have not seen anything.

16       Do you have any recollection of having any conversation

17  with Arie Prilik before September 9th?

18  **A.**   No.

19  **Q.**   And the same for Michael Beker?  Did you ever talk with

20  Michael Beker?

21  **A.**   No.

22  **Q.**   So you say, "We addressed that one, but go on."  And then

23  Mr. Prilik continues on.

24       But I want you to try to recall whether you had sent any

25  written correspondence to Newcon, either Arie Prilik or Michael

1   Beker, about how you'd addressed this performance issue with

2   regard to 750 FOM?

3   **A.**   No.

4   **Q.**   Now, is it true as of September 9th when Mr. Prilik raised

5   the issue, that ATN had an export problem?

6   **A.**   Can you rephrase that question?

7   **Q.**   Yeah.  Did you have any information whatsoever that as of

8   September 9th, 2005 ATN had any of their product that was

9   destined for Iraq seized by Russian officials?

10  **A.**   I don't know that there was any product that was seized by

11  Russian officials.

12  **Q.**   Do you have any information that ATN was having difficulty

13  getting product out of Russia because of Russian customs?

14  **A.**   There were allegations made by Newcon Optik that Russian

15  officials were investigating the export of tubes as it

16  pertained to our contract.

17  **Q.**   All right.  But you didn't have any -- and as of

18  September 9th, is what I'm talking about now, you didn't have

19  any information one way or the other whether ATN was having

20  difficulties with Russian customs?

21  **A.**   Direct information?  None.

22  **Q.**   And at this time was ATN having delivery problems?

23  **A.**   They were behind schedule.

24  **Q.**   Now, during that same conversation, if we can have that

25  come back up, he wanted to discuss with you pricing, is that

1    correct?

2            (Document displayed)

3    **Q.**   And starting at line 12:

4            "They" -- and he is referring to ATN -- "have

5            miscalculated their production costs and they

6            were producing them below official prescribed

7            guidelines for margins and profits."

8        Do you recall that?

9    **A.**   Yes.

10   **Q.**   And he says on line 18 that he had talked to ATN on this

11   situation and that ATN and Newcon had agreed to try to resolve

12   the situation.  Do you recall that?

13   **A.**   Yes.

14   **Q.**   So you understood that Mr. Prilik was informing you that

15   he had had discussions with ATN and whatever problems they were

16   having they were trying to collectively address them, correct?

17   **A.**   He had stated that he had contacted -- that he had talked

18   with ATN and he alleged that they had agreed to try and resolve

19   the situation.  I don't know that that's an affirmative

20   statement to me.

21   **Q.**   Well, all right.  But he's not concealing that he's

22   talking with ATN, correct?

23   **A.**   No, he didn't conceal that.

24   **Q.**   But that statement really didn't have any consequence to

25   you, right, because you deal primarily with prime contractors?

Lydia Zinn, CSR,  CRR, and Debra Pas, CSR, CRR
    Official Reporters - U.S. District Court
            (415)  531-6587

1    In fact, you deal solely with prime contractors?

2    **A.**    Unless the prime allows us to deal with their

3    subcontractors.  Then we can deal directly with them, so.

4    **Q.**    But ultimately if ITE had a problem with its

5    subcontractor, ATN, that was an issue that ITE was to address

6    with ATN, correct?

7    **A.**    We would address it with ITE, yes.

8    **Q.**    Then back to the September 9th conversation.  Right at the

9    bottom, Mr. Prilik on 22:

10              "Where we stand now, ah, the question is, ah,

11              well, I guess the first question is whether

12              TACOM still requires the product.  Maybe

13              TACOM will say that, hey, we received 2700

14              pieces and we're happy with it, and let's

15              stop with that."

16       And then you say to him:

17              "Umm, well, let me just say, Arie, you

18              realize that I can't confirm or identify, um,

19              subcontractors."

20       Right?

21    **A.**    Correct.

22    **Q.**    But you could have told Mr. Prilik at this time that you

23    were, in fact, happy with the product, right?

24    **A.**    I would not normally tell them I was happy or unhappy with

25    the product.  That would be revealing information as it

MCALEER - CROSS EXAMINATION / MOORE

1  pertains to the performance of the product to a competitor.

2  **Q.**   So that would be proprietary, correct?

3  **A.**   Well, it might be proprietary.  It might be OPSEC

4  concerns.  I'm talking to a contractor on the phone and they

5  are asking me:  How is the equipment that's being delivered

6  into Iraq performing?  I'm not going to answer that question,

7  never.

8  **Q.**   But did you understand it as an inquiry by Mr. Prilik as

9  to whether TACOM would be looking for alternatives to ATN?

10  **A.**   Yes.  That's what Mister -- that was the case Mr. Prilik

11  was trying to make.

12  **Q.**   But you're telling him, though, that, look, I'm not going

13  to you can talk to you about that, correct?

14  **A.**   I informed him I'm not going to identify who the

15  subcontractor was or how -- perhaps I didn't state it, but I

16  would not have identified how they were performing.

17  **Q.**   Okay.  If we go to the -- or stay on that page, a little

18  further down.

19       Well, in fact, when Mr. Prilik tries to get more

20  information from you, you tell him, in fact, that the

21  information is proprietary to the prime, right?  That's what

22  you said?

23  **A.**   Yes.  Subcontractor information is proprietary,

24  absolutely.

25  **Q.**   Than then you say:

1              "In those circumstances where we run into

2              production or quality problems, delivery

3              problems, our first recourse is to address it

4              with the prime contractor.  That's across the

5              board for all ."

6        And that was a truthful statement, right?

7    A.    Yes.

8    Q.    And, in fact, as far as you were concerned, as of June --

9    I mean, I'm sorry, as of September 9th, 2005, there were no

10   problems to address.  There was ATN delivering compliant

11   product, all be it under a different methodology, correct?

12   A.    Yes.

13   Q.    And because you had been instructed by Mr. Bradley Jan to

14   just converse with Mr. Prilik as you would any other

15   subcontractor that was making any inquiries, that's, in fact,

16   how you always respond, correct, if someone is going to make

17   that kind of inquiry to you?

18   A.    Yes.

19   Q.    And as of September 9th, the state of affairs for the --

20   the Bat Set II contract was that TACOM was satisfied with ITE's

21   performance and TACOM was not considering any change to ITE as

22   the prime contractor or any subcontractor, correct?

23   A.    Is that a question or a statement?

24   Q.    It's a question.

25   A.    Well, we weren't totally -- we were working closely with

1  them on their deliveries.  They had fallen behind somewhat,

2  yes.

3  **Q.**   All right.  And ITE as of September 9th, 2005, had not

4  approached TACOM for the purpose of seeking to substitute

5  Newcon in place of ATN, correct?

6  **A.**   They never approached us on that.

7  **Q.**   That's what I thought.

8       Now, do you know what the state of the delivery schedule

9  was?  In other words, how many night vision goggles ATN had

10 delivered to Iraq as of September 9th, 2005?

11 **A.**   I believe it was around 2700.

12 **Q.**   Okay.  And just a few days before September 9th ATN had

13 made a delivery to Iraq; do you recall that?

14 **A.**   I believe they had, yes.

15 **Q.**   It was about 150?

16 **A.**   I don't know the exact count.

17 **Q.**   I don't think you have it up there, U.S. Exhibit 73?

18      This has been marked for identification as Government

19 Exhibit 73.  And it's a two-page document and it's entitled

20 "Shipments of Night Vision Goggles Delivered Under DO-001 and

21 DO-004."

22           **MR. MOORE:**   I'm approaching, your Honor.

23           **THE COURT:**   Yes.

24 **BY MR. MOORE**

25 **Q.**   If I could just have you take a look at this document?

1            (Whereupon, document was tendered

2              to the witness.)

3  **Q.**   Do you recognize the document at all?

4  **A.**   Yes.

5  **Q.**   And what is it?

6  **A.**   This was a synopsis of the quantity that was ordered, and

7  it was a synopsis of the deliveries.

8  **Q.**   Okay.  And does it refresh your recollection that on

9  September 5th, 2005, 150 night vision goggles had been

10 delivered by ATN to MNSTKI in Iraq?

11 **A.**   If I could see the 150 here, it would refresh my memory.

12        Okay.  I believe that's it.  5 September, yes.

13 **Q.**   Okay, thank you.

14        Now, on September 9th, 2005 did you have any information

15 at your disposal that Mr. Michael Beker and Mr. Arie Prilik was

16 speaking with Mr. Dmitry Rocklin about their performance issues

17 prior to September 9th?

18 **A.**   I don't believe so, no.

19 **Q.**   So you wouldn't have any knowledge as to the status of any

20 negotiations between the two as of September 9th?

21 **A.**   I would have no knowledge.

22        **MR. MOORE:**  Your Honor, this would be -- I'm going to

23 go to a new document, so it would be a good time.

24        **THE COURT:**  So we'll take our recess.  Please follow

25 the instructions you have been given about not discussing the

1  case amongst yourselves or anyone else, and we'll see you at

2  the close of the recess.  We'll take 15 minutes.

3           And you may step down, but do not discuss your

4  testimony with any other witness.

5           (Jury exits courtroom at 10:26 a.m.)

6           **THE COURT:**  Then, as I understand it, this is your

7  last witness?

8           **MR. WARD:**  That is correct, your Honor.

9           **THE COURT:**  In terms of witnesses and I know there is

10 a -- Ms. Boersch is looking at me and she's got Rule 29 --

11          **MS. BOERSCH:**  Plastered on my forehead.

12          **THE COURT:**  (Continuing) -- all over your forehead

13 there.

14          At any rate, your witnesses are be going to be

15 Mr. Bean and anyone else?  Is that it?

16          **MR. OSTERHOUDT:**  It's our present intention that --

17 although a final decision hasn't been made even now, that I

18 think Mr. Prilik will testify.

19          **MR. HOWDEN:**  And I believe Mr. Beker will testify as

20 well, with those same caveats.

21          **THE COURT:**  Okay.  Now, I did not get jury

22 instructions -- or disputed jury instructions from the

23 defendants.  So I'm not sure when we are going to work on them,

24 although if we are going to have all that testimony we may

25 certainly have a certain amount of time.  We don't have to get

1    it done this afternoon.

2          MS. BOERSCH:  We will have some additional proposed

3    instructions that I'm working on and hoping to finish by the

4    end of the day today, but given what's likely to be the

5    schedule, I think we probably won't need to go over those until

6    tomorrow or Thursday.

7          THE COURT:  Well, one of the jurors, her spouse is

8    being naturalized tomorrow at 10:30 in the morning.  Usually

9    those are held -- Tony says they move them around.  So they do

10   them sometimes at Masonic and so forth, but that takes about an

11   hour.  Of course, if she wants to -- you know, I guess we could

12   swear him in here.  Naturalized -- we have the authority to do

13   that, I guess, but maybe she wants to go to the ceremony.  But

14   you can ask her.  Of course, we would have to work it out

15   with -- what is it now, CIS?

16         MR. WARD:  ICE?

17         THE COURT:  Not ICE.

18         MR. WARD:  CBP?

19         THE COURT:  This is Citizens-something-something.  It

20   starts with a "C" now.  CIS, used to be INS.

21         MS. BOERSCH:  He might like his own personal

22   ceremony.

23         THE COURT:  I don't know.

24         MR. OSTERHOUDT:  I think he would rather have the

25   pomp and circumstance.

1        **THE COURT:**  I don't know how much pomp and all of

2   that there is to those ceremonies, but that would mean taking

3   an hour out of -- probably at least an hour, hour and a half

4   out of the day tomorrow.

5        **MS. HAMILTON:**  Likely more, with transportation to

6   and from.

7        **THE COURT:**  And I don't know how far away it is

8   either.  Maybe if we can get some of that information from her

9   as well.  She probably knows where it is because he has to be

10  at a certain location.  You know, that will add to our time.

11  You know, who knows.

12        If he doesn't get sworn in tomorrow, the next time

13  when he could be, because it's not the most efficient

14  operation, but I hate to do that.

15        And the juror is Ms. Gibson, I believe it is.  Is

16  that her last name?

17        **THE CLERK:**  Yes.  Brenda Gibson.

18        **MS. BOERSCH:**  Is there any possibility of us going a

19  little late on Thursday just to get in more -- hopefully, to

20  get it in by the end of the week?

21        **THE COURT:**  This would be tomorrow?

22        **MS. BOERSCH:**  Right.  I know -- I understand from

23  Tony you can't go late tomorrow, so I was wondering if we can

24  go a little longer on Thursday, maybe, to get it in.

25        **THE COURT:**  I can see what the jurors have to say, or

 1   we can compensate tomorrow.  That pretrial could go over, I

 2   suppose.  Although I think the attorneys -- I have a pretrial

 3   in another criminal matter.  There are a bunch of motions in

 4   limine.

 5          MS. HAMILTON:  You mean, there is life after us?

 6          THE COURT:  Hard to believe isn't it?

 7          MR. WARD:  Your Honor, you don't think it would be

 8   possible to go late tomorrow?

 9          THE COURT:  Well, the problem is that, you know,

10   particularly I know the defense attorney in that case has some

11   other cases.  He's quite active in criminal defense work, and I

12   think he may be involved in some other cases in this

13   courthouse.

14          MR. OSTERHOUDT:  If it's possible, I would prefer not

15   to go late tomorrow, for what it's worth, unless the Court

16   finds that appropriate.

17          THE COURT:  We can try to do it -- what's the

18   situation Thursday?

19          (Discussion held off the record.)

20          THE COURT:  We have to see what will work for the

21   jurors.  But I would imagine with direct examination of each of

22   the defendants, if they are going to take the stand, it will

23   take awhile, right?

24          MR. OSTERHOUDT:  I think --

25          THE COURT:  And then cross-examination will take

Lydia Zinn, CSR,  CRR, and Debra Pas, CSR, CRR
    Official Reporters -  U.S. District Court
              (415)  531-6587

1    awhile.

2            **MR. OSTERHOUDT:**  What we can do as well, we have been

3    conferring a lot and Mr. Moore may appear deliberate, but I

4    know how much care went into minimizing this examination and I

5    think he has done -- respectfully, I think he has done that.

6            **THE COURT:**  Okay.  I think if we can move the pace

7    along.

8            **MR. MOORE:**  I will.

9            **THE COURT:**  Okay.  Find out from her where it is

10   exactly and we will figure out logistics.  So now I have eaten

11   away at least five minutes of your recess.  So it's 10 minutes.

12           (Whereupon there was a recess in the proceedings

13            from 10:34 a.m. until 11:00 a.m.)

14           **THE COURT:**  Well, it turns out that the picture is a

15   little bit different than we understood it to be.  This is not

16   a naturalization ceremony.  Its his interview for his green

17   card.  It's a long way from a naturalization ceremony.  I don't

18   know how long that's going to take.

19           I don't know whether she thought we were going to be

20   finished by now?  In any event, either we get her to try to put

21   it over -- and that's hard because dealing with that agency is

22   difficult -- or we sort of adjust and take a break tomorrow,

23   but we're not sure how long.

24           **MR. HOWDEN:**  We would suggest trying to get in

25   whatever time we can tomorrow.

 1          THE COURT:  Or we excuse her.  But that leaves us

 2   with the 12 then.

 3          MS. BOERSCH:  Your Honor, we discussed with the

 4   government the possibility of at least trying to get in an hour

 5   and a half or so tomorrow, an hour, how much we can get in.

 6          THE COURT:  Sure.  We get in as much as we can.

 7          MS. BOERSCH:  And quit for the day and maybe the

 8   Court and lawyers can take up -- we can argue the Rule 29, we

 9   would like to do that, and deal with jury instructions.  So

10   make use of the time tomorrow.

11          THE COURT:  Oh, sure, absolutely.  We are going to

12   have to do that.

13          MR. OSTERHOUDT:  And maybe have a long day, if it's

14   convenient to your court, on Thursday.

15          THE COURT:  Somewhat long.

16          MS. BOERSCH:  Longer.

17          THE COURT:  We have a passing of the gavel ceremony.

18   I keep trying to get more details as to what's when.  I can

19   miss the lunch, I think.  I think there is a dinner later.  It

20   will be a whole day affair, you know, or something.  Then

21   there's something at 4:00 o'clock, but we could wind up so we

22   could get out of here at 4:00 o'clock.

23          MR. OSTERHOUDT:  If we started 9:00, 9:30?

24          MS. HAMILTON:  Stay at 8:30.

25          THE COURT:  We can do Alsup hours and start at 7:30.

 1  We can stay here all night, you know.

 2          **MS. HAMILTON:**  Marathon session.

 3          **MR. OSTERHOUDT:**  I misspoke.  5:00 a.m. it is.

 4          **MS. HAMILTON:**  But take, obviously, a lunch break on

 5  that day.

 6          **THE COURT:**  Yeah, yeah.  Everybody gets a lunch

 7  break.  And we can even bring in lunch for the jurors, right?

 8          **MR. HOWDEN:**  Work through it.

 9          **THE COURT:**  The wonderful lunch that they get.  What

10  do they get?  Baloney sandwiches?

11          Okay.  Well, let's bring the jury out and we'll talk

12  with them and get started.

13          **MS. BOERSCH:**  You may want to emphasize if we decide

14  to take up the legal matters tomorrow, that we are doing them a

15  favor by getting it out of the way and saving them time later.

16          (Discussion held off the record.)

17          (Jury in at 11:04 a.m.)

18          **THE COURT:**  Ms. Gibson, apparently you have a matter

19  that is set for tomorrow and I'm reluctant to ask you to see if

20  it can be put over.  I assume you have to be there for it,

21  right?

22          **JUROR GIBSON:**  Yes.

23          **THE COURT:**  Because it relates -- is it to your

24  husband?

25          **JUROR GIBSON:**  Yes.

 1          **THE COURT:**  Okay.  But then if you had to reschedule,

 2  I don't know how long that that would be.  It's supposed to

 3  start at 10:30?

 4          **JUROR GIBSON:**  Uh-huh.

 5          **THE COURT:**  But that's not the most dependable

 6  agency.

 7          **JUROR GIBSON:**  Right.

 8          **THE COURT:**  You've found that out already.

 9          **JUROR GIBSON:**  I'm not sure.  It's hard for me to

10  say.

11          **THE COURT:**  I don't know how long that will take.  We

12  want to get some in this morning.  Where is that?  Is that over

13  on Sansome Street that you have to go?

14          **JUROR GIBSON:**  I'm not sure exactly.  It's a couple

15  blocks away from Montgomery and Jackson.

16          **THE COURT:**  Right, uh-huh.  Okay.  So we could at

17  least try to get an hour and a half in tomorrow.  The thing is

18  I don't know, you know, if we took a break and the jurors would

19  have to find someplace, the rest of them, to mill around down

20  here and then have you -- everybody come back after you were

21  finished.

22          I don't know how long that may take, also, because I

23  think it varies from person to person.  So, and I'm being sort

24  of oblique about this because I don't know whether the other

25  jurors are aware of the situation.  But I think, you know,

MCALEER - CROSS EXAMINATION / MOORE                1387

1  legitimately you need to go do this.

2          And I'm also reluctant to excuse you because we

3  don't -- something may happen, one of the other jurors gets ill

4  or whatever.

5          So what we'll try to do is -- can everybody stay

6  later on Thursday?  We'll give you a break for lunch, but we'll

7  stay longer on Thursday?

8          (All prospective jurors respond affirmatively.)

9          **THE COURT:**  Can you do that?  We can't to it tomorrow

10  because -- well, first of all, you would be having to hang

11  around here anyway and then come back.  We don't know how long

12  it will be.  So Thursday if you can plan to stay later, we will

13  take a break, a short break for lunch.  I have another

14  matter -- well, I have something that is a court function that

15  I have to go to at 4:00 o'clock.  So we'll have to be finished

16  here a few minutes before 4:00 at least.

17          And what we'll do is everybody in here tomorrow

18  morning.  You all have been very good about being on time.  We

19  will start at 8:30 and we'll take a break at 10:00.  That will

20  give you enough time to get over there.

21          There are some matters that counsel and I have to

22  take up anyway related to this case, legal matters, so that --

23  we'll take care of those tomorrow.  And we'll just go from 8:30

24  to 4:00 with a break for lunch on Thursday, okay?  Everybody

25  can plan their schedules accordingly?

1              (Jury panel nodding affirmatively.)

2              **THE COURT:**  Okay, fine.

3              And picking up the pace now.  Moving right along.

4              **MR. MOORE:**  Will do, your Honor.  Thank you.

5   BY MR. MOORE

6   **Q.**   Mr. McAleer, just to rephrase, the 28th was the date --

7   June 28th was the date of the testing, and June 29th was the

8   date of the decision to allow ATN to resume shipments, correct?

9   **A.**   Correct.

10  **Q.**   On the 28th, did you receive any correspondence from any

11  other subcontractor who offered to fulfill the requirements of

12  the contract?

13  **A.**   I don't recall.

14  **Q.**   I'm going to show you --

15             **MR. MOORE:**  Can I have this marked next in order?

16             **THE CLERK:**  478.

17             (Trial Exhibit  478 marked

18              for identification)

19  BY MR. MOORE

20  **Q.**   This is an email from a Pat Ralston to Derek McAleer dated

21  June 28th, 2005.

22  **A.**   What was that tab number?

23  **Q.**   It's actually not a tab.  I'm going to have to bring it to

24  you, so let me just...

25

1            (Whereupon, binder was tendered

2             to the witness.)

3  Q.   I'll show this to you.  Now, do you recall this email?

4  A.   Yes.

5  Q.   And this email is an email from a Patrick Ralston,

6  International Marketing Manager for NiViSys?

7  A.   Yes.

8  Q.   And this email is informing you that he understood that

9  there was some problems with NPZ producing and delivering

10 goggles out of Russia, is that correct?

11 A.   Yes.

12 Q.   And did he offer -- he says:

13           "We at NiViSys Industries fully understand

14           how important it is to get the night vision

15           goggles to the Iraqi forces so we can get our

16           military personnel home as soon as possible."

17      He made that representation to you?

18 A.   Yes.

19 Q.   Okay.

20           "We are ready to have discussions with TACOM

21           to assist in delivering goggles to meet the

22           contract demands."

23      He said that to you?

24 A.   That's what he put in writing, yes.

25 Q.   He said he's tried to work with ITE in the past, but to no

1  avail, so he is coming to TACOM directly?

2  **A.**   Yes.

3  **Q.**   Did you ever consider this option of actually having

4  NiViSys substituted back in to perform the Bat Set II contract?

5  **A.**   No.

6  **Q.**   Now, on September 22nd, 2005 you had an additional

7  conversation with Mr. Prilik, correct?

8  **A.**   Yes.

9  **Q.**   And you -- you took notes of that conversation?

10 **A.**   Yes.

11 **Q.**   And for the purpose of recording your recollections so

12 that you could -- if in the future you needed to recall

13 information, it would be there in your notes?

14 **A.**   Yes.

15 **Q.**   It's been previously marked as United States Exhibit 85.

16 I think that's in your binder.  Are those, in fact, your notes?

17 **A.**   Yes, they are.

18        **MR. MOORE:**  Your Honor, I would offer U.S. Exhibit 85

19 into evidence.  It's past recollection recorded.

20        **MR. WARD:**  No objection.

21        **THE COURT:**  85 is admitted.

22        (Trial Exhibit 85 received

23         in evidence)

24        **MR. MOORE:**  Can we publish 85 please?

25        (Document displayed)

1   **BY MR. MOORE**

2   **Q.**   Now, this is your notes of a conversation on

3   September 22nd at 12:50 in the afternoon, is that correct?

4   **A.**   Yes.

5   **Q.**   And this accurately reflects the content of the call you

6   had with Arie Prilik?

7   **A.**   Yes.

8   **Q.**   Now, do you have a recollection of what Mr. Prilik was

9   calling you about?

10  **A.**   It had been about two weeks, I believe, since we had

11  talked and he was providing me with some updated information.

12  **Q.**   But he wanted updated information from you, correct?

13  **A.**   Yes.

14  **Q.**   And you told him that you couldn't share any information

15  about the delivery of any equipment going to Iraq, correct?

16  **A.**   Correct.

17  **Q.**   And you underlined "any" for emphasis, I take it?

18  **A.**   I underlined it, yes.

19  **Q.**   And Mr. Prilik was telling you that as to ATN nothing had

20  changed concerning there's problems delivering the Bat Set II

21  contract; isn't that what notated in your notes?

22  **A.**   What I notated, yes.

23  **Q.**   And he informed you that ATN should have contacted you by

24  now to confirm the same picture?

25  **A.**   Yes.

1  Q.   And he also told you that Newcon had built up inventory at

2  its own risk and could provide and meet all of TACOM's

3  requirements in a short time frame?

4  A.   He indicated that they had 2000 units that they had built

5  at their own risk.

6  Q.   And you didn't inform him in this conversation that ATN

7  was providing compliant product to MNSTKI, did you?

8  A.   I didn't inform him, no.

9  Q.   In fact, you stated that you were not going to discuss the

10 performance of any supplier, competitor or anyone else,

11 correct?

12 A.   That's correct.

13 Q.   And that's just like what you said to him on

14 September 9th, pretty similar?

15 A.   Correct.

16 Q.   This remained true throughout all your conversations with

17 Arie Prilik?

18 A.   Absolutely.

19 Q.   And, in fact, you never considered replacing ATN with

20 Newcon Optik in the Bat Set II contract?

21 A.   We hadn't reached a position where such a determination

22 had to be made.

23 Q.   Okay.  Now, do you recall as of September 20th, right

24 before this conversation, that ATN had delivered another 350

25 units of the night vision goggles?

1   **A.**   I know that they were delivering.  I don't recall the 350

2   specifically.

3   **Q.**   Do you still have Exhibit 73 up there?  I think that was a

4   stand-alone.  Maybe I put it back.

5              (Whereupon, document was tendered

6               to the witness.)

7   **Q.**   If you can look at the September 20th entry on Exhibit 73.

8   Does that refresh your recollection to ATN delivering --

9   **A.**   350 goggles?  Yes.

10  **Q.**   Thank you.  I'm going to leave that up here.

11  **A.**   Okay.

12  **Q.**   And, again, just like September 9th, you didn't have

13  any -- you weren't privy to any information or any

14  conversations that either Mr. Beker or Mr. Prilik was having

15  with Dmitry Rocklin during this time frame, is that correct?

16  **A.**   That's correct.

17  **Q.**   Now, on October 4th, 2005 you had another conversation

18  that you recorded, is that correct?

19  **A.**   I don't believe that's a correct statement.

20  **Q.**   Okay.  Not with Mr. Prilik, but Mr. Lindbom?

21  **A.**   That I recorded?

22  **Q.**   No, that you recorded -- that you took down notes?

23  **A.**   Yes, I took notes.  We did not record any phone

24  conversations.

25  **Q.**   I misspoke.  I meant taking notes.

1   **A.**   Okay.

2   **Q.**   If you could look at Exhibit 469 in the exhibit binder?

3        (Witness complied.)

4   **A.**   Okay.

5   **Q.**   Now, were these the notes that you took of your

6   conversation with Mr. Lindbom on October 4th, 2005?

7   **A.**   Yes.

8   **Q.**   And was this also for the purpose of allowing you to

9   recall the substance of that conversation in the future if you

10  needed to?

11  **A.**   It was to memorialize the conversation, yes.

12  **Q.**   And it was taken down at the time that you had the

13  conversation on October 4th, 2005?

14  **A.**   Yes.

15        **MR. MOORE:**   Your Honor, I would move Exhibit 469 into

16  evidence as a past recollection recorded.

17        **THE COURT:**   469?

18        **MR. WARD:**   Objection.   Relevance.

19        **MR. MOORE:**   Well, let me get into it first and then I

20  will ask.

21        **THE COURT:**   Yes.   Okay, okay.   Otherwise, we can put

22  it aside and then rule on it during a recess.

23        **MR. MOORE:**   Sure.

24  **BY MR. MOORE**

25  **Q.**   Mr. McAleer, Mr. Derek Lindbom and you had a conversation

MCALEER - CROSS EXAMINATION / MOORE          1395

1  on October 4th, correct?

2  **A.**    Yes.

3  **Q.**    And Mr. Lindbom who -- he heads up -- well, he's in CID,

4  correct?

5  **A.**    Correct.

6  **Q.**    And do you have an understanding that he was involved in

7  overseeing the investigation for CID?

8  **A.**    He was a participant anyways.

9  **Q.**    You say he was a participant.  Was he actually listening

10  in on phone calls?

11  **A.**    No.  He was a participant in the investigation, I believe.

12  **Q.**    He informed you, did he not, that Mr. Prilik and Mr. Beker

13  were putting pressure on Mr. Rocklin of ATN regarding delivery

14  of night vision goggles?

15  **A.**    Yes.

16  **Q.**    And he was relating to you that Newcon was aware that ATN

17  was still sourcing tubes in Russia and are beginning to wonder

18  if ATN had ceased to supply or deliver night vision goggles?

19  **A.**    Yes.

20  **Q.**    Did Mr. Lindbom relate to you when he learned of Mr.

21  Prilik's or Mr. Beker's inquiries?

22  **A.**    Sorry.  Repeat that question?

23  **Q.**    Yeah.  Did Mr. Lindbom in this conversation relate to you

24  when he learned of Mr. Prilik or Mr. Beker's inquiries on the

25  subject matter?

1   **A.**   I believe he stated sometime in November.

2   **Q.**   Okay.  When?  Sorry?  When was that?

3   **A.**   Sometime in November?  Is that -- am I looking at the

4   right...

5   **Q.**   Well, this conversation was October 4th, 2005.  So are you

6   talking about November of 2004?

7   **A.**   Oh, I was reading it out of context.

8   **Q.**   Okay.  So did you have an understanding of when Mr.

9   Lindbom had learned of Mr. Prilik or Mr. Beker's inquiries?

10  **A.**   Let me just quickly review this.

11  **Q.**   Sure.

12           (Brief pause.)

13  **A.**   In the discussion I don't think he identified a time

14  frame.

15  **Q.**   Okay.  Now, Mr. Lindbom told you that Newcon were aware

16  that ATN is still sourcing tubes in Russia.  And then he says,

17  "Things are very transparent over there," in parentheses.

18  That's in your notes, correct?

19  **A.**   Correct.

20  **Q.**   Was that your -- is that your statement or Mr. Lindbom's

21  statement, that things are very transparent?

22  **A.**   I believe that was Mr. Lindbom's statement.

23  **Q.**   What was your understanding of that statement?

24  **A.**   That there's a lot of visibility in Russia as to -- as it

25  pertains to night vision goggles and tubes, associated tubes.

1  Q.   Did you understand that to mean that there was a lot of

2  information that competitors were privy to of each other's

3  manufacturing capabilities and other such information?

4  A.   Yes.

5  Q.   Now, Mr. Lindbom reiterates to you that the investigation

6  would not conclude until sometime in November, and the pressure

7  on ATN from Newcon Optik was continuing, is that correct?

8  A.   Yes.

9  Q.   Did you understand what pressure Mr. Lindbom was talking

10 about?

11 A.   I believe I did.

12 Q.   What was that?

13 A.   That Newcon Optik was pressuring ATN to cease performing

14 so that they could step in and perform in their stead.

15 Q.   Is that what Mr. Lindbom said to you on October 4th?

16 A.   No, but that was my perception of -- well, let me check my

17 notes.

18 Q.   All right.

19 A.   Well, he said the pressure was continuing.

20 Q.   Yeah, but you just gave an editorial of what your

21 understanding was.  I'm trying --

22 A.   Yes.

23 Q.   (Continuing) -- to ascertain from you if Mr. Lindbom

24 actually said that type of information that you didn't put down

25 in your notes or if that's just something that you perceived?

1  **A.**    Yes.  It's something that I perceived, yes.

2  **Q.**    Okay.  Now, you state in your notes that Mr. Lindbom

3  reiterated that the investigation would not conclude until

4  sometime in November.

5       Had Mr. Lindbom told you before October 4th that the

6  investigation would not conclude until sometime in November?

7  **A.**    I believe he was just stating that it would run until

8  sometime in November.

9  **Q.**    So he hadn't said that before to you?

10  **A.**    I don't recall.

11  **Q.**    Did you have any other conversations with Mr. Lindbom

12  during this time frame, from September 9th through the end of

13  the year?

14  **A.**    If I had conversations with him, I would have memorialized

15  them in an MFR.

16  **Q.**    And you would have provided them to the United States for

17  purposes of this --

18  **A.**    Yes.

19  **Q.**    (Continuing) -- matter?  Okay.

20       And do you have a recollection of taking any other notes

21  of any other conversations with Mr. Lindbom other than

22  October 4th, 2005?

23  **A.**    No.

24  **Q.**    Do you have a recollection of what time this conversation

25  was?

1  **A.**    You mean on October 4th?

2  **Q.**    Yeah.

3  **A.**    What time during the day?

4         Off the top of my head, no, I don't recall.

5  **Q.**    Were you made privy to any information about a

6  conversation that Mr. Beker had with Mr. Prilik on October 4th,

7  2005, that same day?

8  **A.**    Mr. Beker had with --

9  **Q.**    With mr. Rocklin?

10  **A.**    I'm sorry?

11  **Q.**    I'm sorry.

12  **A.**    My one ear was kind of --

13              **MR. MOORE:**   Can I strike my own question?

14              **THE COURT:**   Yes, you can, as a matter of fact.

15  BY MR. MOORE

16  **Q.**    Let me rephrase.

17  **A.**    Okay.

18  **Q.**    Were you made privy to any information about a

19  conversation that Mr. Beker had with Mr. Rocklin on

20  October 4th, 2005?

21  **A.**    No.

22  **Q.**    So you were not made aware of any information with regard

23  to the status of any negotiations between Newcon Optik and ATN

24  as of October 4th, 2005?

25  **A.**    I had no idea there were any ongoing negotiations at all

1    throughout this entire process.

2    **Q.**    Okay.  Now, in your conversation with Mr. Lindbom on

3    October 4th, he wanted you to acknowledge to either Newcon or

4    Anham, if you were contacted by either company, that you had

5    been contacted by ATN and that TACOM was reviewing its options

6    with regard to delivery problems, correct?

7    **A.**    Yes.

8    **Q.**    And Mr. Lindbom wanted you to express to either Newcon or

9    Anham that TACOM might consider negotiating with either of

10   these companies for supplying night vision goggles, correct?

11   **A.**    Correct --

12          **MR. WARD:**  Your Honor, I'm going to object.  I think

13   it misstates the memo.

14          **MR. MOORE:**  He just affirmed it, so.

15          **THE COURT:**  Well, he may answer the question.  And

16   the answer was "yes"?

17   **A.**    Could you repeat the question?  I want to make certain.

18   **BY MR. MOORE**

19   **Q.**    Yeah.  And definitely confirm in your notes whether Mr.

20   Lindbom wanted to -- you to express to either Newcon or Anham

21   that TACOM might consider negotiating with either of those

22   companies for supplying night vision goggles?

23          (Brief pause.)

24   **A.**    Yes.

25   **Q.**    Now, you told Mr. Lindbom in response that you could

Lydia Zinn, CSR,  CRR, and Debra Pas, CSR, CRR
Official Reporters - U.S. District Court
(415) 531-6587

1   acknowledge that you had been contacted by Mr. Dmitry Rocklin

2   of ATN, but that you were not going to tell Newcon that

3   deliveries were slipping or that you had been informed by

4   Newcon that they would not be able to continue supplying NVGs.

5        Is that what your notes say?

6   A.   Yes.

7   Q.   And when you say there that, "I had been informed by

8   Newcon that they would not be able to continue supplying NVGs,"

9   did you actually mean ATN?

10  A.   Yes.

11  Q.   And did you also tell Mr. Lindbom that you would not be

12  looking -- would not be telling Newcon or Anham that you were

13  looking at TACOM's options with regard to finding another

14  source of supply?

15  A.   Yes.

16  Q.   And then Mister -- you wrote that Mr. Lindbom understood

17  your position and stated that the discussion -- sorry.

18       He understood your position and stated that the decision

19  was yours, is that correct?

20  A.   Yes.

21  Q.   And you, in fact, followed through with that decision?

22  You never did, in fact, inform Newcon that you were considering

23  taking any night vision goggles from either Newcon or Anham,

24  isn't that correct?

25  A.   I did not provide Newcon any of the deliberative process

1  that the government goes through in assessing an ongoing

2  contract.  Period.

3  Q.  Because to do so would violate the Federal Acquisition

4  Regulations, correct?

5  A.  To do so would be to reveal the internal government

6  process, the deliberative process, and we don't reveal that.

7  Q.  Okay.  And your statements to Mr. Lindbom about what you

8  would not do was consistent, in fact, with your conversations

9  with Mr. Prilik when you told him you wouldn't reveal such

10 information, is that correct?

11 A.  Yes.

12 Q.  And as of October 4th, isn't it true that ATN had

13 delivered another 240 NVGs on the Bat Set II contract?

14 A.  Am I allowed to look at the --

15 Q.  You certainly are.

16 A.  (Continuing) -- the schedule which we maintained?

17     As of October 4th?

18 Q.  It would be October 1st.

19 A.  Yes.

20 Q.  Okay.

21 A.  Two hundred forty.

22 Q.  And from your perspective on October 4th, ATN was

23 delivering under the Bat Set II contract, correct?

24 A.  Yes, they were delivering.  Yes.

25 Q.  And as of October 4th, 2005, you never engaged in any

1   conversations with Arie Prilik that constituted an invitation

2   to negotiate terms by which Newcon would become a subcontractor

3   in the Bat Set II contract, is that correct?

4   **A.**   That's correct.

5   **Q.**   Now, on October 5th, the following day, did you become

6   aware that Arie Prilik spoke to Ken Bousquet?

7   **A.**   Yes.

8   **Q.**   How did you become aware of that?

9   **A.**   Ken notified me, as I recall.  I have to take a look at my

10   notes, but...

11   **Q.**   I don't know if you'll find them in your notes, but if you

12   do, let me know.  I will refer you, however, to Exhibit 419.

13   **A.**   Okay.

14   **Q.**   Just a moment, please.

15           (Discussion held off the record

16            amongst defense counsel.)

17   **Q.**   Now, you received an email from Ken Bousquet on

18   October 5th, 2005, correct?

19   **A.**   Correct.

20   **Q.**   And Mr. Bousquet sent you this email and he documented his

21   conversation with Mr. Prilik, correct?

22   **A.**   Yes.

23   **Q.**   He informed you that Mr. Prilik had informed him that

24   Newcon Optik had supplied night vision devices under the

25   battalion sets contract with Anham, correct?

1  **A.**    Correct.

2  **Q.**    And that was pertaining to Set I, correct?

3  **A.**    Yes.

4  **Q.**    Mr. Bousquet also informed you that Mr. Prilik had told

5  him that he knew that ATN was having trouble delivering night

6  vision devices under the second battalion set contract, right?

7  **A.**    I'm not certain that's exactly how it was phrased in this

8  memo.

9  **Q.**    Okay.  He said he knows that ATN is having trouble

10  delivering night vision devices under the second battalion sets

11  contract with ITE --

12  **A.**    I'm sorry.  I was looking at the next note.  Yes, he did

13  make that statement.

14  **Q.**    Okay.  And he cited two issues with ATN, right?  The lack

15  of production -- there being ATN's lack of production and their

16  inability to obtain licenses to ship material out of Russia --

17  this is for production of night vision devices -- isn't that

18  correct?

19  **A.**    That's what he alleged, yes.

20  **Q.**    He also alleged to Mr. Bousquet that there was a criminal

21  investigation underway in Russia regarding smuggling of

22  equipment out of the country.  And that was by ATN, correct?

23  That was the allegation?

24  **A.**    Well, I don't know if it was about ATN.  He made the

25  statement that there was an ongoing investigation in Russia.

1   That's what he alleged.

2   **Q.**   All right.  And Newcon -- Arie Prilik told Ken Bousquet

3   that Newcon Optik had produced a sizeable number of NVDs at

4   their own risk to be able to respond to the needs of TACOM,

5   right?

6   **A.**   That's what he said.

7   **Q.**   And they're ready to fill the backlog of requirements if

8   ATN was unable to deliver?

9   **A.**   If ATN was unable to deliver?  That's correct.

10  **Q.**   This is similar to the information that he provided you

11  had in the past, correct?

12  **A.**   Yes.

13  **Q.**   And then Mr. Bousquet told you that he told Mr. Prilik

14  that there was nothing new on the night vision devices as of

15  October 5th, 2005, right?

16  **A.**   That's what he put in the memo.

17  **Q.**   And that was true, right?  There was nothing new?  In

18  other words, ATN was performing and there was no -- no

19  contemplation of additional night vision devices or

20  substituting ATN out?

21  **A.**   I believe what Mr. Bousquet was saying was that we don't

22  have any additional information to provide to you.

23  **Q.**   Okay.  Just like --

24  **A.**   That would be my interpretation.

25  **Q.**   Okay.  And similar to what you have done, he wouldn't

1  provide such information anyway, right?

2  **A.**   No.  No, he wouldn't.

3  **Q.**   Now, on October 18th you forwarded an email that Mr.

4  Prilik had sent to your boss, Mr. Hallock, correct?

5  **A.**   I believe so.

6  **Q.**   Turn to Exhibit 425.

7           (Witness complied.)

8  **Q.**   And the second page of Exhibit 425 was an email that Arie

9  Prilik had sent to Harry Hallock, correct?

10 **A.**   Yes.

11 **Q.**   And, again, Mr. Prilik is raising four issues alleging

12 that there was illegal smuggling of night vision devices from

13 Russia --

14           **MR. WARD:**  Your Honor, I'm going to object.  This is

15 all hearsay.

16           **THE COURT:**  Where is this going?

17           **MR. MOORE:**  Well, it's not offered for the truth.

18 It's offered for what Mr. McAleer understood Mr. Prilik was

19 complaining about in October 18th, 2005.

20           **MR. WARD:**  It's cumulative, your Honor.  It's double

21 hearsay and potentially 403.

22           **THE COURT:**  It seems like this is a bit of a side

23 trip.

24           **MR. MOORE:**  Okay.

25           **THE COURT:**  And not particularly relevant.  Looking

1    at the entire, you know, second page of this attachment.

2              **MR. MOORE:**  I will move on.

3              **THE COURT:**  Yes, please.

4    **BY MR. MOORE**

5    **Q.**   On October 19th, 2005 you had another conversation with

6    Arie Prilik, correct?

7    **A.**   I believe so, yes.

8    **Q.**   And it was both you and Mr. Bousquet, right?

9    **A.**   Yes.

10   **Q.**   And you took down notes of that conversation?

11   **A.**   Yes, I did.

12   **Q.**   And that was for the purpose of being able to recall the

13   substance of the conversation in the future if you needed to,

14   correct?

15   **A.**   That's correct.

16   **Q.**   If you would turn to Exhibit 84 in your binder?

17          (Witness complied.)

18   **Q.**   And do those reflect your notes?

19   **A.**   Yes.

20   **Q.**   Okay.  And these are your notes of your conversation with

21   Mr. Prilik with respect Ken Bousquet on the phone?

22   **A.**   Yes.

23   **Q.**   In fact, Mr. Prilik had called and left a message for Ken

24   and then both of you returned his call; isn't that how it

25   worked?

MCALEER - CROSS EXAMINATION / MOORE                1408

1    **A.**    Yes.

2    **Q.**    And he wanted to verify that you had received or

3    Mr. Bousquet had received the email we were just talking about,

4    correct?

5    **A.**    Yes.  We acknowledged receipt of it.

6    **Q.**    And in that same phone call he's making the same type of

7    allegations, isn't that correct?

8    **A.**    He was discussing the illegal smuggling of night vision

9    goggles out of Russia.

10   **Q.**    And at that time you and Mr. Bousquet told Mr. Prilik that

11   TACOM would not discuss the status of any deliveries going into

12   Iraq, correct?

13   **A.**    Correct.

14   **Q.**    And he also said if TACOM was having any problems with

15   performance under the Bat Set II contract, TACOM reviews its

16   options internally to determine how to proceed?

17   **A.**    Yes.

18   **Q.**    And, in fact, that's what you had done in the June time

19   frame, correct, when there was performance issues?

20   **A.**    We had reviewed our options, is that the question?

21   **Q.**    Yeah.

22   **A.**    The --

23   **Q.**    Go ahead.

24   **A.**    Restate the question.  I want to make sure I know what I'm

25   answering.

MCALEER - CROSS EXAMINATION / MOORE                1409

1   Q.   You had reviewed your options with regard to ATN's

2   problems in June of 2005, isn't that correct?

3   A.   We had looked at some of the options, yes.

4   Q.   And you exercised those options?

5   A.   And we exercised the options?

6   Q.   Yeah.  By allowing ATN to resume shipments based on new

7   testing methodology.  That was one of the options you

8   exercised?

9   A.   We made a determination -- a determination was made that

10  the night vision goggles complied with the contract

11  requirements.

12  Q.   Okay.  And as of October 19th, 2005, there was no reason

13  for TACOM to consider any other options, because that was the

14  option that was chosen?

15  A.   We were not provided with any additional information

16  and -- as I explained to Arie Prilik before.  We review our

17  options and then decide on a path forward.

18  Q.   And there were no options under consideration as of

19  October 19th, 2005?

20  A.   No.

21  Q.   Now, you had --

22          MR. MOORE:  At this time, your Honor, I'd move

23  Exhibit -- U.S. Exhibit 84 into evidence, as a past

24  recollection recorded.

25          THE COURT:  84?

1          **MR. WARD:**  No objection.

2          **THE COURT:**  84 is admitted.

3          (Trial Exhibit 84 received

4           in evidence)

5  **BY MR. MOORE**

6  **Q.**   Now, you had another conversation with Mr. Prilik on

7  November 17th, 2005, correct?

8  **A.**    Correct.

9  **Q.**   And you memorialized those -- the substance of that

10  conversation in your notebook, correct?

11  **A.**    Yes.

12  **Q.**   And for the same purpose, so that you could recall the

13  substance of the conversation?

14  **A.**    Memorialize it, yes.

15  **Q.**   And you did it close in time to the actual conversation?

16  **A.**    Immediately thereafter.

17  **Q.**   Exhibit 83, it's in your binder, I believe is those notes.

18  Do you see those?

19  **A.**    Yes.

20  **Q.**   Now, your notes indicate that Mr. Prilik had contacted you

21  on November 17th for the purpose of informing you that TACOM's

22  prime contractor, ITE, had contacted him for the purpose of

23  potentially supplying night vision goggles under the Bat Set II

24  contract, correct?

25  **A.**    That's what I -- I already, yes.

1  Q.   And Mr. Prilik wanted you to confirm whether TACOM would

2  be ordering additional quantities of night vision goggles under

3  the Bat Set II contract, isn't that correct?

4  A.   Yes.

5  Q.   And you told him you did not know whether TACOM would be

6  ordering additional quantities of NVGs under the Bat Set II

7  contract?

8  A.   Yes.

9  Q.   And Mr. Prilik had informed you that he had knowledge that

10 Russian customs agents had tested ATN's tubes; that as a result

11 of those tests, Mr. Prilik had confirmed in his mind anyway,

12 that ATN was supplying MNSTKI with, quote, junk and did not

13 meet TACOM requirements under the Bat Set II contract?

14 A.   Yes.

15 Q.   What did you do with that information?

16 A.   There was nothing new in the information he provided us

17 with, other than his allegation that there was some sort of

18 testing going on in Russia by Russian authorities.

19 Q.   Okay.  And, in fact, according to your notes, you claim

20 that you told Mr. Prilik that as a result of his prior similar

21 allegations to you, that you had 10 ATN tubes that had been

22 delivered to Iraq tested; isn't that what your notes say?

23 A.   Yes.

24 Q.   And did you state this to Mr. Prilik on that day?

25 A.   Yes.

MCALEER - CROSS EXAMINATION / MOORE

1  Q.   And your notes further state that you reminded Arie Prilik

2  that as a result of his prior complaints, you had ATN tubes

3  tested; is that what you told him?

4  A.   Yes.

5  Q.   Now, isn't it true that this was actually the first time

6  you ever told Arie Prilik that you had had those ATN tubes

7  tested?  You didn't tell Arie Prilik anything about that before

8  November 17th, 2005?

9  A.   We didn't give him my specifics about what had -- how we

10  had addressed his concerns, but here I did, yes.

11  Q.   Right.  And we've gone through all your notes and gone

12  through the transcript of September 9th, and nowhere did you

13  tell Mr. Prilik that you had had the ATN tubes tested, correct?

14  A.   That's correct.

15  Q.   And you certainly didn't tell him that as a result of any

16  new testing methodology, that they were, in fact, compliant?

17  A.   I did not provide that information, no.

18  Q.   So when you say in your notes that you reminded Mr. Prilik

19  about that, that was a misstatement.  You hadn't ever said that

20  before, correct?

21  A.   No, I don't think that's what it says at all.

22  Q.   Okay.

23  A.   No.

24  Q.   You don't see anywhere in there that you said you

25  reminded --

1          **THE WITNESS:**  Your Honor, can I read the sentence?

2          **THE COURT:**  Yes, you may.

3  **A.**   (As read)

4               "I reminded him that he had previously made

5               the same allegation and that as a result of

6               that allegation, I had had the Army Night

7               Vision Lab test 10 night vision goggles that

8               had already been delivered to our customer in

9               Iraq."

10      That's what I said.

11  **BY MR. MOORE**

12  **Q.**   Okay.  So you weren't intending to mean that you had

13  reminded him that you told him before about the testing?

14  **A.**   No.  That's not what this says.

15  **Q.**   All right.

16  **A.**   I reminded him that he had previously made the same

17  allegations.  That's what I reminded him about.

18  **Q.**   All right.  And you also reminded him that you take

19  appropriate action if you have any delivery or defective

20  product problems, correct?

21  **A.**   Correct.

22  **Q.**   Now, did you ever tell any government authority that --

23  strike that.

24      Do you recall being interviewed by Mr. Ward and Mr. Cohen

25  on March 2nd, 2010 about this case?

 1 **A.**    I recall being interviewed.  I'm not certain of the exact

 2 date.  Yes, I think it was the 2nd of March.

 3 **Q.**    If you would look in your binder for U.S. Exhibit 77?

 4         (Witness complied.)

 5 **Q.**    I'll refer you -- well, strike that.

 6     Do you recall telling Mr. Ward and Mr. Cohen that TACOM

 7 had drafted an email and sent it to Newcon informing them that

 8 testing revealed that the ATN NVGs met the contract

 9 requirements and the result that you, Derek McAleer, considered

10 the issue closed.  Do you recall that?

11 **A.**    Is that in here?

12 **Q.**    Yes.  I'll refer you to page 4.  It's the second

13 paragraph.  Actually, just one sentence.

14 **A.**    That is what the notes say.

15 **Q.**    Does it refresh your recollection as to actually telling

16 Mr. Ward and Mr. Cohen that statement, making that statement to

17 them?

18 **A.**    I don't recall making that specific statement, no.

19 **Q.**    Okay.  And, in fact, did you ever send an email to Newcon?

20 **A.**    No.

21 **Q.**    So Mr. Ward and Mr. Cohen got that wrong?

22 **A.**    I don't know.  It's --

23 **Q.**    You didn't tell them --

24 **A.**    We did not send an email.  I may have stated that we had

25 contacted and informed them that Newcon -- excuse me, that ATN

MCALEER - CROSS EXAMINATION / MOORE

1  was compliant.

2  **Q.**   You might have said that?

3  **A.**   I might have said that, yes.

4  **Q.**   And so where -- where -- when did you tell Newcon that

5  the -- ATN's tubes were compliant with the Bat Set II contract?

6  **A.**    In the conversation, didn't I -- didn't we?  I mean, I

7  thought we -- didn't we tell him that we had tested 10?

8  **Q.**   On November 17th?

9  **A.**   Yes.

10 **Q.**   Yeah, okay.  Well, but did you tell him that it was

11 compliant product that was tested and you considered the matter

12 closed on November 17, 2005?

13 **A.**   I mean, we had --

14 **Q.**   You can go back to your notes, if you need to?

15 **A.**   We had already tested them as of November 17th.  Yes.

16 **Q.**   Right.

17 **A.**   So that is an accurate statement then.

18 **Q.**   You told Mr. Prilik on November 17, 2005 --

19 **A.**   Yes.

20 **Q.**   (Continuing) -- that as a result of testing, that ATN's

21 NVGs met contract requirements and as a result, you considered

22 the matter closed; is that what you say you said on

23 November 17th?

24 **A.**   That's what I said on November 17th, yes.

25 **Q.**   And you would expect, would you not, that if you had made

1    such a statement, that you would have documented that in your

2    notes?

3    **A.**    Didn't I document in my notes that when I talked with Arie

4    Prilik on November 17th, I informed him that we had tested 10

5    night vision goggles?

6    **Q.**    That's what you say, but you don't say in your notes that

7    you -- that they met contract specifications now, did you?

8    **A.**    Well, if I considered -- perhaps it was implied then.

9    **Q.**    Well --

10   **A.**    I guess I didn't state that then.

11   **Q.**    All right.

12   **A.**    So I stand corrected.

13   **Q.**    Okay.  You certainly didn't draft an email, correct?

14   **A.**    We may have drafted one, but we never sent one.

15   **Q.**    Okay.  Now, on Friday Mr. Ward asked you basically what

16   you'd said on September 9th to Mr. Prilik; that if there had

17   been problems with deliveries, the first option TACOM would

18   have done was to work with -- directly with the prime

19   contractor, correct?

20   **A.**    That's correct, yes.

21   **Q.**    And only if that effort failed, would you consider any of

22   the other options you identified to Mr. Ward as possibilities,

23   correct?

24   **A.**    Correct.

25   **Q.**    And, in fact, that first option didn't fail with regard to

1   the Bat Set II contract?

2   **A.**    Rephrase that question.

3   **Q.**    Yeah.  You dealt with the prime contractor throughout on

4   any ATN delivery problems, alleged or real, correct?

5   **A.**    Correct.

6   **Q.**    And so the possibilities that you identified for the jury

7   on Friday were dependent on other events and other facts that

8   did not exist as of September 9th, correct?

9   **A.**    I'm still not -- I'm not certain what it is you're asking.

10  **Q.**    Well, you gave the jury, through Mr. Ward's examination of

11  you, a number of possible scenarios that TACOM would consider

12  if -- after dealing with the prime on any delivery problems or

13  quality problems or what-have-you, you might consider; isn't

14  that correct?

15  **A.**    Yes.

16  **Q.**    So those were all hypotheticals, were they not?

17  **A.**    Yes, they were.

18  **Q.**    And so like any hypothetical, it requires certain facts to

19  be assumed and certain events to have occurred before any of

20  those options could actually be real, isn't that true?

21  **A.**    I agree with that, yes.

22  **Q.**    All right.  So that was -- there was no such facts that

23  would meet those hypotheticals as of September 9th, 2005,

24  correct?

25  **A.**    Correct.

MCALEER - CROSS EXAMINATION / MOORE                    1418

1  **Q.**    And there was no such facts that would meet those

2  hypotheticals on September 22nd, 2005?

3  **A.**    Correct.

4  **Q.**    And there was no such facts that were present on

5  October 19th, 2005?

6  **A.**    If the facts had been there, we would have considered

7  them.

8  **Q.**    That's right.

9  **A.**    So the answer is correct.

10  **Q.**    And so on November 17th, 2005, if those facts had been

11  present, you might have considered them, but you didn't because

12  they weren't present, correct, to make any of those

13  hypothetical scenarios real?

14  **A.**    We had determined previously that they were meeting the

15  contractual requirements.  Therefore, we weren't considering

16  other options.

17  **Q.**    Right.  In fact, on Friday, you told Mr. Ward and this

18  jury that in August 2005, you never told anyone from Newcon

19  that TACOM would be -- would not be renewing Battalion Set II

20  contract with ITE.  That's what you said on Friday, correct?

21  **A.**    Yes.  Wait.  Your Honor, can I ask that he rephrase that

22  question?  I'm not -- I thought I knew what you were saying,

23  but --

24            **THE COURT:**  Do you want the question read back?

25  Yeah.  Just read it back.  Who got that one?

 1              **THE REPORTER:**  I'll get it.

 2              (Record read)

 3              **THE WITNESS:**  That TACOM would not be renewing the

 4   contract with ITE?

 5   **BY MR. MOORE**

 6   **Q.**   Right.

 7   **A.**   ITE had a contract at that point.

 8   **Q.**   Right.

 9   **A.**   So I -- guess I'm not certain what the question is.  I

10   don't know what you mean by "renewing the contract."

11   **Q.**   Can we go to Friday's direct examination, page 1227, line

12   20 and 23?  That was the question, right?

13   **A.**   That's an accurate statement, now that I'm reading it.

14   **Q.**   And you said --

15   **A.**   I remember making such a statement.  Yes.

16   **Q.**   You said, "Absolutely not."  You said it with emphasis.

17   Do you recall?

18   **A.**   Yeah.

19   **Q.**   All right.  All right.  So during those hypotheticals that

20   Mr. Ward was giving you, you testified that one of your

21   options, if you cannot work things out with the prime

22   contractor, ITE, was to have negotiated a higher price with

23   ITE, correct?

24   **A.**   That would have been an option.

25   **Q.**   Okay, but isn't it true that -- that there's a provision

Lydia Zinn, CSR,  CRR, and Debra Pas, CSR, CRR
        Official Reporters - U.S. District Court
                (415)  531-6587

1   in these contracts that -- that, especially when they're

2   fixed-price, that if you have to go out and actually get other

3   product that costs more, that you charge that to the prime?

4   **A.**   There is that language, yes.

5   **Q.**   And so that's what you would, in fact, do, would you not?

6        I mean, you wouldn't -- when you had that contract

7   provision to exercise and stick any cost increase to the prime,

8   you wouldn't do that?  I mean, you would do that, rather than

9   actually increase the price to TACOM?

10  **A.**   We would certainly attempt to recoup any moneys --

11  **Q.**   Right.

12  **A.**   -- beyond the fixed price involved, yes.

13  **Q.**   You had that unilateral option to do that, correct?

14  **A.**   It's unilateral.

15  **Q.**   Yeah.  And isn't it true that you were contacted by ITE on

16  November 7th, and that ITE had told you that it could get 2,000

17  NVGs from Newcon, but it would cost more to ITE?  Do you recall

18  that?

19  **A.**   I believe we said that, yes.

20  **Q.**   You documented that in your notes, correct?

21  **A.**   The 7 November notes?  I would have to --

22  **Q.**   Yes.  So let me show you -- I think it might be in

23  there -- Exhibit 81.

24  **A.**   Okay.  Would you restate your question?

25  **Q.**   Yeah.  On that -- that conversation, was that with Ramzi?

1  **A.**    Yes.

2  **Q.**    And did Ramzi tell you that, because of delivery problems

3  with ATN, ITE could get 2000 NVGs from Newcon, but it would

4  cost more to ITE?

5  **A.**    Yes, that's what they said.

6  **Q.**    All right.  They said that to do that would put them in a

7  loss position.  Isn't that correct?

8  **A.**    Yes.

9  **Q.**    So that means that any increase in price would be absorbed

10  by the prime contractor.  Is that not correct?

11  **A.**    More than likely, yes.

12  **Q.**    And, in fact, ITE never said to you on November 7th that

13  it wanted to pass that cost onto TACOM, correct?

14  **A.**    Yes.

15  **Q.**    That is correct?

16  **A.**    Yes, that's correct.

17  **Q.**    In fact, on November 7th, you advised ITE not to sign any

18  contract with a second-source supplier.  Isn't that correct?

19  **A.**    Yes, I did.

20  **Q.**    That second-source supplier would mean Newcon, or anyone

21  else, correct?

22  **A.**    At that time, yes.

23  **Q.**    That could be NiViSys as well?

24  **A.**    Mm-hm.

25  **Q     (By The Court) Is that a "Yes"?**

```
 1              THE COURT:  I'm sorry.  Yes, your Honor.  It's yes.

 2  BY MR. MOORE

 3  Q.   So as of November 7th, any such option of ITE using a

 4  second-source supplier was, in fact, dead in the water, as far

 5  as you were concerned, correct?

 6  A.   No.

 7  Q.   Well, you told them not to.

 8  A.   You have to read the entire statement I made.

 9  Q.   Oh, right.

10  A.   I said I did advise ITE not to sign any agreement with a

11  second-source supplier, as the government would have to review

12  and approve any such changes.  So --

13  Q.   Right.  Well, you're not aware of any attempt by ITE to

14  actually submit a proposal for a second-source supplier during

15  the Bat. Set II contract, other than ATN for NiViSys, correct?

16  A.   Correct.  I would -- I was advising him here that, before

17  they sign any such agreement, you would have to get the

18  approval of a contracting officer.

19  Q.   Right.

20  A.   That's what that statement says.

21  Q.   Right.  Now, isn't it true that ITE actually told you that

22  it didn't want to work with Newcon?

23  A.   That's what ITE told me, yes.

24  Q.   Yeah.  That was in May of 2006?

25  A.   I believe that was the date.
```

 1          **MR. MOORE:**  Your Honor, I'd move Exhibit -- U.S.

 2   Exhibit 87 into evidence.

 3          **THE COURT:**  Eighty-seven?

 4          **MR. MOORE:**  Yes.

 5          **MR. WARD:**  Objection.  Lack of foundation.

 6          **MR. MOORE:**  Well, I can go through the iteration of

 7   it being a past recollection recorded.  I think that's been

 8   fairly established at this point.

 9          **MR. WARD:**  And relevance, both.

10          **MR. MOORE:**  Well, the relevance is just the

11   examination that took place.

12          **THE WITNESS:**  Did you say Exhibit 87?

13          **MR. MOORE:**  I'm sorry.  Did I get the number wrong?

14   The --

15          **THE COURT:**  What number is it?

16          **MR. MOORE:**  The one that we were just talking about.

17          **THE COURT:**  I think that was the one but.

18          **MR. MOORE:**  Eighty-one.  I'm sorry.  I can't read my

19   little chicken scratch here.

20          **THE COURT:**  Well, in any event --

21          **MR. HOWDEN:**  Eighty-one.

22          **MR. MOORE:**  Eighty-one.

23          **THE WITNESS:**  Eighty-one.

24          **MR. WARD:**  Um.

25          **THE COURT:**  I have to --

1          **MR. MOORE:**  Sorry.

2          **THE COURT:**  -- lift these things.  Is there more

3  notes?

4          **MR. MOORE:**  Yeah.  It's his notes of his November 7th

5  conversation with Ramzi, of ITE.

6          **THE COURT:**  Well, you may -- you may use it, but how

7  are you intending to use it?  Is this past recollection?

8          **MR. MOORE:**  It's past recollection recorded.  I just

9  examined him on it.

10          **THE COURT:**  Yeah.  I think that I'm not sure you've

11  really established everything you need to in order to do that.

12          **MR. MOORE:**  I'll try to do that.

13          **THE COURT:**  I mean, with some of the others, it was

14  pretty clear, because he had to refer to them, you know,

15  frequently in order to answer the question.

16          **MR. MOORE:**  Right.

17          **THE COURT:**  So --

18  **BY MR. MOORE**

19  **Q.**   So, Mr. McAleer, you took the notes down on Exhibit 81,

20  just like you did the other conversations, correct?

21  **A.**   Yes.

22  **Q.**   Notes for purposes of documenting accurately the contents

23  of the conversation, in order for you, in the future, to recall

24  the substance of that substance of that conversation?

25  **A.**   Correct.

 1  Q.    And as you sit here today, without reviewing the contents

 2  of that, which you're doing right now --

 3  A.    Which I'm doing right now, yes.

 4  Q.    But without reviewing it, you didn't have a present

 5  recollection of the entire conversation?

 6  A.    Probably not the entire conversation, no.

 7          MR. MOORE:   Then submit, your Honor.

 8          THE COURT:   And the objection with respect to

 9  relevance is overruled.

10          You may -- are you moving this in, then?

11          MR. MOORE:   Just moving this in, yeah.

12          THE COURT:   Eighty-one is admitted, then.

13          (Trial Exhibit 81 received in evidence)

14          MR. MOORE:   Thank you, your Honor.

15  Q.    Now I'll refer you to Exhibit 82.  And these are your

16  handwritten notes of May 31st, '06?

17  A.    Yes.

18  Q.    And you documented your conversation with whom that date?

19  A.    With Ramzi -- or, excuse me -- with Arie Prilik.

20  Q.    Arie Prilik?

21  A.    Yes.

22  Q.    And then down below, do you see that you also had a -- you

23  documented a conversation with Ramzi?

24  A.    Yes.

25  Q.    Okay.  And that occurred on the same day?

 1  **A.**    Yes.

 2  **Q.**    And is this where Ramzi informed you that he didn't want

 3  to work with Newcon?

 4  **A.**    I believe this was the memo on it.

 5  **Q.**    Thank you.

 6          **MR. WARD:**  Your Honor, I'm going to object to this

 7  document.  It's not relevant.

 8          **MR. MOORE:**  I'm not --

 9          **MR. WARD:**  Occurring more than six months or three

10  months after the charge period in this case.

11          **THE COURT:**  That doesn't mean it's not relevant.

12  Maybe that particular issue, not so much; but there is other --

13          **MR. MOORE:**  Yeah.  I'm not --

14          **THE COURT:**  -- other statements.

15          **MR. MOORE:**  I'm not seeking to move it into evidence.

16  I just was asking questions about it.

17          **THE COURT:**  Okay, okay.

18          **MR. MOORE:**  So I am not seeking to introduce it.

19          **THE COURT:**  But there are other parts of it that

20  certainly are relevant.

21          **MR. MOORE:**  Right.

22  **Q.**    Now, on Friday you testified that you were not certain

23  that an option to recompete the night-vision goggles only would

24  have been exercised, because of the timing it would take to

25  recompete.  Isn't that correct?

1   A.    Yes.

2   Q.    And because there was urgency TACOM was facing of getting

3   the equipment delivered?

4   A.    Correct.

5   Q.    And so there really wasn't any contemplation of a

6   recompete at any time for the Bat. Set II, since you were

7   actually getting deliveries from ATN, correct?

8   A.    We would have recompeted.  That would have been one of the

9   options we would have looked at; but no, we had made no

10  determination.  It was not under consideration at that time to

11  recompete for night-vision goggles.

12  Q.    Okay.  And, in fact, to do so, you would have to go

13  through a new prospectus, and seek bids from primes?

14  A.    On an expedited basis, yes.

15  Q.    And then you would have to utilize that two-phase

16  source-selection process you testified to -- or testified about

17  on Friday?

18  A.    Not necessarily.

19  Q.    Okay.

20  A.    We would have determined the right approach, given the

21  variables that we were working with.

22  Q.    Right, but you had none of those -- none of those -- no

23  reason to do that as of -- between September 9th, 2005, and

24  November 18th, 2005?

25  A.    We were working with the prime contractor to expedite

MCALEER - CROSS EXAMINATION / MOORE                1428

 1    their deliveries.

 2    **Q.**    Now, you also testified on Friday that in a hypothetical

 3    scenario, TACOM could choose a sole-source subcontractor,

 4    correct?

 5    **A.**    Yes.

 6    **Q.**    Okay.  This option, like a recompete option, would require

 7    that TACOM terminate ITE under the Bat. Set II contract, and to

 8    relieve it of its legal liability under the contract, correct?

 9    **A.**    Yes.

10    **Q.**    And, in fact, a complete termination of the Bat. Set II

11    contract is impossible after delivery and acceptance of the

12    product, correct?

13    **A.**    No.

14    **Q.**    No?

15    **A.**    They could have terminated the remainder of the contract.

16    **Q.**    Yeah.  That would be a partial --

17    **A.**    That which has already been delivered.

18    **Q.**    That would be a partial?

19    **A.**    It would be a partial termination, yes.

20    **Q.**    But not a complete?

21    **A.**    A partial is not a complete termination.  Yes.

22    **Q.**    Right.  And it wasn't in the best interests of MNSTC-I to

23    terminate a Bat. Set II contract, given what was going on at

24    the time, correct?

25    **A.**    Correct.

1  Q.   Now, you also mentioned on Friday that you could have

2  added night-vision-goggle requirements to an existing contract.

3  Is that correct?

4  A.   That's correct.

5  Q.   And on Friday, you testified that in September 2005, TACOM

6  had an existing contract for night-vision goggles with Anham,

7  correct?

8  A.   Yes, correct.

9  Q.   But isn't it true that -- well, strike that.

10       Newcon was the subcontractor under the Bat. Set I,

11  contract, correct?

12  A.   Yes.

13  Q.   And isn't it true that by April of 2005, Newcon Optik had

14  completed all of its contractual obligations under the

15  Bat. Set I contract?

16  A.   I believe by then, they had delivered 4,700 units, yes.

17  Q.   And that was it, right?  That was all of it?

18  A.   That was the totality of the quantity on contract, yes.

19  Q.   So Anham may have been in contract with TACOM delivering

20  other goods and services, but as far as the night-vision-goggle

21  portion of the Bat. Set I contract, that had been completed,

22  correct?

23  A.   Yes.

24  Q.   And you testified today that you had the Bat. Set I

25  contract -- or strike that.

1    You testified today that you had Newcon tubes tested that

2    had been delivered under the Bat. Set I contract, correct?

3    **A.**   Yes.

4    **Q.**   And for what purpose was that?

5    **A.**   I wanted to know what the performance was of

6    Newcon Optik's night-vision goggles.  They had proposed, under

7    the Battalion Set contract, to provide the same goggles that

8    they had provided under the Battalion Set I.  I wanted to know

9    how the performance was in country.

10   **Q.**   Wait a minute.  You're saying that Arie Prilik or -- was

11   Arie Prilik that proposed that?

12   **A.**   No.

13   **Q.**   Who proposed it?

14   **A.**   I did, as the contracting officer.  I wanted to see what

15   the performance was of Newcon Optik's night-vision goggles.

16   **Q.**   Was it your understanding that the night-vision goggles

17   manufactured and delivered by Newcon under the Bat. Set I were

18   of the same performance standards and quality as those that

19   they had proposed to deliver on Bat. Set II?

20   **A.**   Yes.

21   **Q.**   What informed your understanding of that?  I mean, how did

22   you have the understanding that they were the same performance

23   quality?

24   **A.**   Oh.  Well, that's easy to answer.  During the evaluation

25   of the offer we issued and IFD; that's an Item for Discussion.

 1  We went out on multiple occasions, but we issued a specific IFD

 2  to Anham, who was proposing as one of the offerers.

 3  **Q.**    Under Bat. Set I?

 4  **A.**    Well, this is -- we went out on Bat. Set II with this Item

 5  for Discussion.  We raised questions concerning the

 6  night-vision goggles, and we sought clarifications.

 7       And in their response, we were told that they were

 8  providing the same night-vision goggles that they had provided

 9  under Bat. Set I.

10  **Q.**    Anham had made that representation to you?

11  **A.**    Well, actually, I believe the representation was written

12  by Newcon Optik, because in their response, they identified

13  their corporate headquarters as being located in Canada.

14  **Q.**    When was this representation made?

15  **A.**    That was made during the evaluation phase of the

16  Battalion Set II contract.

17  **Q.**    So it's your contention that Newcon Optik represented that

18  the night-vision goggles that they were going to deliver or

19  they proposed to deliver under Bat. Set II were of the same

20  performance parameters and characteristics as those that were

21  delivered under Bat. Set I?

22  **A.**    That was my understanding, yes.

23  **Q.**    If you could, turn to Exhibit 382 in the binder, please.

24  Now, you received a carbon copy of this e-mail on June 28th,

25  2005, from Jeffrey Bean?

1   **A.**   This is 328?

2   **Q.**   382.

3   **A.**   Oh.  I'm sorry.

4   **Q.**   Do you recall receiving a carbon copy of this e-mail?

5   **A.**   Oh, yes.

6   **Q.**   And I'll refer you to the statement by Mr. Bean.  It

7   states,

8                    "Unlike the Bat. Set I" --

9               I mean, strike that.

10                   "Unlike the Battalion Sets II

11              contract, which specified an FOM in the 750

12              to 1,250 range, this contract did not rely

13              on FOM.  It specified performance in terms

14              of comparability to certain U.S. models."

15              Now, is it your understanding that Mr. Bean is

16   referring to the Bat. Set I contract in this?

17  **A.**   Yes.

18  **Q.**   So it was your understanding that the Bat. Set I didn't

19  have a 750 FOM minimum specification, correct?

20  **A.**   I know for a fact it did.  I know what the requirement

21  was.

22  **Q.**   Yeah.  And it wasn't a 750 FOM?

23  **A.**   That's correct.

24  **Q.**   So you were attempting to have Newcon Optik's night-vision

25  goggles that were delivered under Bat. Set I tested, to see if

1  they conformed with a 750 FOM?

2  **A.**   We wanted to see what the actual FOM performance was of

3  the Bat. Set I night-vision goggles; that being the same

4  goggles that were proposed under Bat. Set II.  I wanted to know

5  how Newcon Optik's goggles would perform against the FOM

6  requirement.

7  **Q.**   Okay.  And you don't know what Newcon Optik had in their

8  inventory that they represented to you that they were willing

9  to supply in place of ATN, because they were never, in fact,

10 delivered or tested, correct?

11 **A.**   We had never tested Newcon Optik's Battalion Set I

12 night-vision goggles?  Is that your question?

13 **Q.**   No.  I'm asking a different question.

14     You knew from representations that Mr. Prilik had made to

15 you that they had -- they had inventory --

16 **A.**   Yes.

17 **Q.**   -- of goggles that they said were compliant for

18 Bat. Set II requirements, correct?

19 **A.**   They were alleging that they had --

20 **Q.**   Yeah.

21 **A.**   -- Bat. Set II-compliant night-vision goggles, yes.

22 **Q.**   And you had no occasion to know what those -- what the

23 performance ratings were on those goggles that they had in

24 inventory, because all you tested was Bat. Set I?

25 **A.**   I know what the performance ratings that they propose in

1  their proposal to the government.  And those ratings that they

2  proposed fell within the 750 to 1,250 range.

3       I wanted to see what the actuals were.

4  Q.   But the actuals that you tested were under a different

5  contract?

6  A.   No.

7  Q.   Is that correct?

8  A.   I'm making reference to Bat. Set II.

9       Bat. Set I had a different specification, yes.

10  Q.   Yeah, I know.

11  A.   We're now in Bat. Set II.

12       And the reason why I went out and had Newcon Optik's

13  night-vision goggles tested is because I wanted to know how

14  their performance would be under the Bat. Set II

15  requirements --

16  Q.   But those --

17  A.   -- for an FOM.

18  Q.   But those goggles -- where did you get those goggles from?

19  A.   I got them from the goggles that they had delivered under

20  the Battalion Set I contract.

21  Q.   Yeah.  A different goggle, correct?

22  A.   Well, not according to their proposal that they submitted

23  under the Bat. Set II contract.  They proposed to supply the

24  same night-vision goggles that they had provided under

25  Bat. Set I.

MCALEER - CROSS EXAMINATION / MOORE          1435

1          That is, the -- that was brought out in their response to

2     the IFD that we issued.  They came back and stated that they

3     were going to use the same goggles to meet the requirements

4     under Bat. Set II as they had used under Bat. Set I.

5     **Q.**   And that was in the technical information that was

6     received by TACOM through Anham?

7     **A.**   Through Anham.

8          And the information, in my -- the information made

9     reference to their corporate headquarters, located in Canada.

10         Well, it was obvious that it was Newcon Optik that had

11    prepared the documentation for Anham that was submitted to us.

12    **Q.**   You're speculating, based on something you saw in the

13    document?

14    **A.**   Based on the statement that they made that their corporate

15    headquarters were located in Canada.  That would be

16    Newcon Optik.

17    **Q.**   And at no time did you ever consider adding any additional

18    quantities to Bat. Set I contract?  Isn't that correct?

19    **A.**   It would have been a consideration if we had gone down the

20    path of trying to find another supplier.

21    **Q.**   But you didn't go down that path.  Isn't that correct?

22    **A.**   We determined that the performance of the Newcon Optik --

23    of ATN's -- excuse me.  We determined that the performance of

24    ATN's night-vision goggles met the requirements of the

25    Bat. Set II solicitation.

MCALEER - CROSS EXAMINATION / MOORE          1436

1  **Q.**    That's right.  And so you didn't have any occasion to

2  consider the option of adding goggles to Bat. Set I?

3  **A.**    If we had had to have gone down that path, yeah, we

4  would --

5  **Q.**    If something happened in the future?

6  **A.**    We did consider it.  Yes, we did.

7  **Q.**    But you didn't have any facts before you to exercise that

8  option, because, in fact, ATN was performing under the contract

9  on the new testing methodology.  Isn't that correct?

10  **A.**    ATN was performing under the contract, based upon the

11  methodology; based upon a non-DOD methodology, yes.

12  **Q.**    Yeah.  And information you'd never told Mr. Prilik in any

13  of your conversations, correct?

14  **A.**    What information?

15  **Q.**    You didn't tell him about a new methodology that was being

16  applied, correct?

17  **A.**    No.

18  **Q.**    And, in fact, in any of your conversations with

19  Mr. Prilik, you never discussed any of these hypothetical

20  options that Mr. Ward had you go through on Friday.  Is that

21  correct?

22  **A.**    I discussed in general with Mr. Prilik -- not in

23  specifics -- concerning what the government options were.

24  **Q.**    Because they weren't present.  Isn't that correct?

25  **A.**    No.  What do you mean:  Because they weren't present?

Lydia Zinn, CSR,  CRR, and Debra Pas, CSR, CRR
Official Reporters -  U.S. District Court
(415)  531-6587

1  Q.    The hypotheticals -- the facts that need to fit the

2  hypotheticals weren't present, because you were getting

3  compliant product, according to you, from ATN?

4          MR. WARD:   Objection.  Asked and answered.

5          THE COURT:   I think we're beating a dead horse.

6          MR. MOORE:   I have nothing further, your Honor.

7          MR. HOWDEN:   Very briefly, your Honor.

8          THE COURT:   Very briefly.

9                  **CROSS EXAMINATION**

10 BY MR. HOWDEN

11 Q.    I want to be clear about this issue of the Newcon goggles

12 that were provided to the Army.  Every goggle that Newcon

13 provided to the Army was pursuant to the Battalion Set I

14 contract, correct?

15 A.    That is correct.

16 Q.    And the specifications in that contract only require the

17 subcontractor to provide Generation II goggles.  Isn't that

18 correct?

19 A.    That is how it was defined, yes.

20 Q.    And the goggles that Newcon provided pursuant to that

21 contract all met specification.  Isn't that right?

22 A.    They met the specification.

23 Q.    And, in fact, they delivered them on time?

24 A.    Yes.

25 Q.    And completed their contract in every respect.  Isn't that

MCALEER - CROSS EXAMINATION / HOWDEN          1438

1  right?

2  **A.**    That's correct.

3  **Q.**    Newcon never provided any goggles pursuant to the

4  Battalion Set II contract.  Isn't that right?

5  **A.**    That's correct.

6  **Q.**    Battalion Set II contract had different specifications,

7  correct?

8  **A.**    Yes, it did.

9  **Q.**    750, 1,250 FOM?

10 **A.**    Yes.

11 **Q.**    And Newcon never produced any goggles trying to meet that

12 specification.  Isn't that right?

13 **A.**    When you say "produced any goggles," do you mean under a

14 government contract --

15 **Q.**    Well, let me rephrase.

16 **A.**    -- or under the Battalion Set II contract?

17 **Q.**    Let me rephrase the question.

18        In their proposal to TACOM, they told you that they would

19 produce goggles that met the 750, 1,250 FOM.  Isn't that

20 correct?

21 **A.**    Yes, they did.

22 **Q.**    They didn't win the contract, so they had no occasion to

23 produce goggles pursuant to that contract, correct?

24 **A.**    Correct.

25 **Q.**    Now, they listed a model type for the goggles that they

1  were going to produce, correct?

2  **A.**    I believe it was a model type, yes.

3  **Q.**    An NVS 7 -- do you remember that?

4  **A.**    Yes.

5  **Q.**    And they produced an NVS 7 model for the Battalion Set I

6  contract, as well?

7  **A.**    Yes.

8  **Q.**    And they told you that that model would include a tube --

9  an image-intensifier tube -- that would meet the 750, 1,250

10  FOM, correct?

11  **A.**    I -- I believe that's how it was phrased, yes.

12  **Q.**    And they never made any representation like that with

13  respect to the Battalion Set I contract, because they didn't

14  have to, correct?

15  **A.**    Correct.

16  **Q.**    So when you compare their performance under the

17  Battalion Set I contract and the goggles that they never had an

18  opportunity to provide you, you're really talking about apples

19  and oranges, aren't you?

20  **A.**    No.

21          **MR. HOWDEN:**  Okay.

22          **THE COURT:**  Mr. Ward, briefly.

23          **MR. WARD:**  Relatively briefly, briefly, I guess.

24

25

1                    **REDIRECT EXAMINATION**

2  **Q.**    Good morning.

3  **A.**    Good afternoon.

4  **Q.**    I don't believe you were --

5              **THE COURT:**  Yes.

6  **BY MR. WARD**

7  **Q.**    I don't believe you were asked.  You -- you had Newcon's

8  goggles tested?

9  **A.**    Yes.

10 **Q.**    Who conducted those tests?

11 **A.**    The Night Vision Lab.

12 **Q.**    Do you know what testing methodology they used?

13 **A.**    They used the one -- they used the U.S. military testing

14 methodology; the same one that had been used on ATN's goggles.

15 **Q.**    What were the results of those tests?

16 **A.**    Out of ten that we tested, all ten failed.  Not one of

17 them fell within the range of 750 to 1,250 FOM.

18 **Q.**    Okay.  Thank you.

19         You were asked about the testing of ATN's goggles.  I

20 believe you said you resumed shipments.  Did you notify ITE of

21 your decision to resume shipments?

22 **A.**    Yes.

23 **Q.**    And I'm going to show you (indicating).  Could you take a

24 look at Tab 1?  I'm showing you what has been marked

25 Defendants' Exhibit 384.

Lydia Zinn, CSR,  CRR, and Debra Pas, CSR, CRR
Official Reporters - U.S. District Court
(415)  531-6587

 1        How did you notify ITE of your decision to resume

 2   shipments of ATN's goggles?

 3   **A.**    In writing.

 4   **Q.**    Was that a letter?

 5   **A.**    Excuse me.  Yes.

 6   **Q.**    And is this the letter?

 7   **A.**    Yes, it is.

 8   **Q.**    You wrote that,

 9              "As a result of those discussions, we

10           recognize that there are significant

11           differences in the testing methodology

12           employed by Night Vision Lab, and the usual

13           methods and standards employed by European

14           and Russian manufacturers in a commercial

15           market generally."

16        Was that a factor in your decision to resume shipments of

17   ATN's goggles?

18   **A.**    Yes.

19   **Q.**    And how did you learn this fact?

20   **A.**    From the Night Vision Lab personnel.

21   **Q.**    And --

22   **A.**    Ray Stefanik.

23   **Q.**    And who, again, is Ray Stefanik?

24   **A.**    He was the engineer who was in charge of conducting these

25   tests.

1  Q.    What his role at Night Vision Labs?

2  A.    He was a supervisor, as I recall.  He's now retired, but

3  he was a supervisor.

4  Q.    And the information you conveyed to Ramzi Abu-Taleb was

5  based on your discussions with Mr. Stefanik?

6  A.    Discussions, and the written information they provided, as

7  well.

8  Q.    You wrote in your letter,

9            "The initial finding of noncompliance

10            with our specifications can reasonably be

11            attributed to these differences in test

12            methodology."

13      And was this also a factor in your decision to resume

14  shipments of ATN's goggles?

15  A.    Yes.

16  Q.    And how did you learn this fact?

17  A.    I believe it was a direct quote from the -- from

18  Ray Stefanik, or close to it.  It was based upon the

19  evaluation, and conducted by the Night Vision Lab personnel.

20  Q.    In your discussions -- in your consultations with the

21  Night Vision Labs, at any point were you advised not to resume

22  shipments of ATN's goggles?

23  A.    No.

24  Q.    Were you ever advised that Night Vision Labs was

25  uncomfortable with what they had been told about different

1  testing methodologies?

2  **A.**    No.

3          **MR. HOWDEN:**  Your Honor, this is all hearsay, and it

4  lacks foundation.

5          **THE COURT:**  The question was whether he was ever

6  told.  He can answer that "Yes" or "No," and he said "No."

7  **BY MR. WARD**

8  **Q.**   You refer to, in your letter to Mr. Abu-Taleb, the

9  commercial market generally.

10     What type of contract was the Battalion Set II contract?

11  **A.**   This was a commercial contract.  And can I explain just a

12  little bit --

13          **THE COURT:**  Well, I think --

14          **THE WITNESS:**  Normally --

15          **THE COURT:**  -- we need to go by question and answer.

16          **THE WITNESS:**  Yes.  Okay.

17  **BY MR. WARD**

18  **Q.**   Could you please explain what a commercial contract is?

19  **A.**   It's when we're buying commercial equipment.  All of the

20  equipment on this contract had been determined to be available

21  from commercial suppliers.  We use what's called a "FAR Part 12

22  contract."  That's for when you're making a commercial

23  purchase.  It contains a lot less clauses than a Part 15, which

24  has a lot of additional clauses that are incorporated in it;

25  but we -- we are buying commercial equipment, and that is the

1  basis for using a Part 12 commercial buy.

2  **Q.**    You referred to the "FAR"?

3  **A.**    Yes.

4  **Q.**    That's a Federal Acquisitions Regulations?

5  **A.**    Yes.

6  **Q.**    Were you allowed to issue a commercial contract under the

7  Federal Acquisitions Regulations?

8  **A.**    Absolutely.

9  **Q.**    And why was the fact that this was a commercial contract a

10 factor in your decision to resume shipments of ATN's goggles?

11 **A.**    Under a commercial contract, you should be -- we're -- the

12 scope of work was written around a commercial requirement.  We

13 didn't go into depth, as we would under a FAR Part 15 contract,

14 where we're buying unique and specific equipment for the U.S.

15 military.

16     We -- we use clauses that are standard or -- are standard

17 in the commercial industry, to -- as best that we can.  Our

18 standards and our requirements are written around commercial

19 quotes.

20 **Q.**    And you believe that ATN's goggles met this commercial

21 standard?

22 **A.**    Yes.

23 **Q.**    And he Night Vision Labs believed that ATN's goggles met

24 the commercial standard?

25 **A.**    Yes.

1   Q.   All right.  You were asked about your responses to the

2   complaints by the defendants.  Can you take a look at Tab 2 in

3   your binder?  I'm showing you what has been marked Defendants'

4   Exhibit 351.

5   A.   Okay.

6   Q.   Was this the response that was sent to Mr. Prilik after

7   his complaints about ATN's goggles?

8   A.   This was one of the responses, yes.

9   Q.   And, in fact, did you tell him that,

10              "This issue is now a matter between the

11          Army and our prime contractor.  And we can

12          neither make public the results, nor can I

13          say at this time how long our investigation

14          will take to complete"?

15  A.   Yes.

16  Q.   And did you tell him,

17              "I can tell you, however, we take the

18          matter seriously, and we're doing what is

19          necessary to assure the items under this

20          contract comply with contract

21          requirements"?

22  A.   Yes.

23  Q.   Okay.  Was TACOM allowed to make public the results of its

24  investigation into night-vision goggle quality?

25  A.   No.

Lydia Zinn, CSR,  CRR, and Debra Pas, CSR, CRR
       Official Reporters - U.S. District Court
                  (415)  531-6587

1   **Q.**   Let me ask more specifically.  Were they allowed to make

2   these results public to Newcon Optik?

3   **A.**   No.

4   **Q.**   And why not?

5   **A.**   Two reasons.

6       Proprietary information.  How a competitor's equipment

7   operates.  We're not allowed to release that equipment --

8   there's specific information on -- on the performance

9   characteristics of their equipment.

10      And furthermore, there is an what's called an "OPSEC"

11  concern; that's operational security.  At the time this

12  contract was in place, there was a war going on in Iraq.  And

13  we cannot release information that pertains to how equipment

14  that we're fielding into a war zone actually performs.

15  **Q.**   All right.  Thank you.

16      I want to ask you about an exhibit that you were shown by

17  the defendants; an e-mail from Byron Harding.  It is Defense

18  Exhibit 478.  Do you have a copy of that?

19  **A.**   I believe so.  Is that 478?

20  **Q.**   Maybe in the -- it wouldn't be in the binder, because I

21  think it's a new exhibit.  Do you have an extra?

22              **MR. MOORE:**  I think he's got it up there.

23              **THE COURT:**  What is the date of it?

24              **MR. WARD:**  I think that's it.  Let me just see.

25              **THE COURT:**  Is it one dated June 28th?

1      **MR. WARD:**  Yeah.  This is the June 28th.

2    Byron Harding at the top.

3      **THE WITNESS:**  Yes, yes.

4  **BY MR. WARD**

5  **Q.**   Okay.  You were asked about this document.  You're

6  familiar with it?

7  **A.**   Yes.

8  **Q.**   And who was it from?

9  **A.**   It was from NiViSys.

10  **Q.**   And it came on -- what was the date?

11  **A.**   On 28 June '05.

12  **Q.**   The same date that the ATN's goggles were tested?

13  **A.**   Yes.

14  **Q.**   Does the e-mail mention anything about the quality of

15  ATN's goggles?

16  **A.**   No.

17  **Q.**   If you look at the first paragraph, it says,

18              "We have confirmed information that the

19          company in Russia, NPZ, that was producing

20          the goggles has shut down, due to financial

21          problems, and will be declaring

22          bankruptcies."

23          Do you see that?

24  **A.**   Yes.

25  **Q.**   To your knowledge, was that -- did NPZ declare bankruptcy,

Lydia Zinn, CSR,  CRR, and Debra Pas, CSR, CRR
Official Reporters - U.S. District Court
(415)  531-6587

1448

1  and shut down?

2  **A.**   I have no idea.

3  **Q.**   I can turn -- look at the second sentence.

4        "NPZ will no longer be delivering

5         goggles for this contract."

6    Did you continue to receive goggles on the

7  Battalion Set II contract?

8  **A.**   Yes.

9  **Q.**   In fact, was the -- goggle portion of the contract

10 completed?

11 **A.**   Yes.

12 **Q.**   All right.  I want to show you a couple of quotes from

13 your conversation with Mr. Prilik on September 9th.  You

14 discussed --

15        **MR. WARD:**  Aseem, can you go to Tape 12, page 6, line

16 10 to 14?  It's the second one.

17 **Q.**   Do you see that quote Mr. McAleer?

18 **A.**   Yes.

19 **Q.**   Arie Prilik said that,

20        "We are the only alternative."

21    The only alternative for whom, as you understood

22 Arie Prilik?

23 **A.**   For the government.

24 **Q.**   Okay.  You were asked a number of questions on

25 cross-examination about the options that A -- that TACOM had if

1    ATN was unable to deliver?

2    **A.**    Yes.

3    **Q.**    And do you remember those options?

4    **A.**    Yes.

5    **Q.**    Yes, but I want to be clear on the question.

6    Specifically, if the defendants had been successful in paying

7    ATN to stop delivering, what options did you have, generally?

8    **A.**    We would have had to have found another source for the

9    delivery of the night-vision goggles.

10   **Q.**    And generally, what options were -- did you have if the

11   defendants were successful, and ATN stopped supplying?  How

12   would you have gotten the goggles?

13   **A.**    We would have gone sole-source.  That would have been

14   probably the -- the most probable approach.

15   **Q.**    Again -- and at the time, was this -- was there an urgent

16   requirement?

17   **A.**    Yes.

18   **Q.**    Was there a compelling requirement for goggles?

19   **A.**    Yes.

20   **Q.**    So if the defendants had been successful, and ATN was

21   unable to supply, would you have been able, under any of these

22   options, to pay a higher price for the goggles?

23   **A.**    Yes.

24   **Q.**    Let me show you another quote from Mr. Prilik.  This is

25   Tape 12, page 10, 4 through 9.

1          **MR. WARD:**   Aseem, this one says "Easier for us

2    personally."

3    **BY MR. WARD**

4    **Q.**   He said -- do you remember this quote Mr. McAleer?

5    **A.**   Yes.

6    **Q.**   What did you understand Arie Prilik to be saying when he

7    said,

8                    "it would be easier for us personally

9              if we can come to some kind of agreement to

10             work through the previous contractor,"

11             -- which was Anham?

12   **A.**   I understood that to mean that they would certainly be

13   willing to supply night-vision goggles -- additional

14   night-vision goggles, were we to increase the quantity on the

15   Anham contract.

16   **Q.**   And -- and specifically, what was the Anham contract?

17   **A.**   Battalion Set I.

18   **Q.**   And that contract -- even though the goggles had been

19   delivered, was that contract still in effect?

20   **A.**   Yes.

21   **Q.**   And under this option, if you had added quantities to the

22   Bat. Set I contract, would it have been possible that you would

23   have had to pay -- you would have paid a higher price for those

24   goggles?

25   **A.**   Yes.

1   Q.   All right.  You had testified on cross-examination that in

2   November, you spoke to Mr. Ramzi Abu-Taleb, from ITE?

3   A.   Yes.

4   Q.   And did you subsequently receive an e-mail from him on

5   November 8th?

6   A.   I believe so.  Yes.

7             **MR. WARD:**  And I'm going to show you what we're

8   marking as Government Exhibit 155.

9             Your Honor, here's one for you.

10            (Whereupon a document was tendered to the Court)

11            **THE COURT:**  Yes.

12  **BY MR. WARD**

13  Q.   Is this the e-mail you received from Ramzi Abu-Taleb?

14  A.   Yes.

15  Q.   Did the e-mail contain any attachments?

16  A.   Yes.

17  Q.   And what were the attachments?

18  A.   It was a final offer sent in by Newcon Optik.

19  Q.   And a final offer for what?

20  A.   To provide night-vision goggles.

21  Q.   Under what contract?

22  A.   Bat. Set II.

23  Q.   And then can you look at the -- under the final offer,

24  where it's -- the paragraph that says, "Technical Compliance"?

25  A.   Yes.

1  Q.    What does that first sentence say?

2  A.    It says,

3                "We'll provide the same model which we

4             have delivered for Battalion Set I.  It is

5             fully -- it is also fully compliant with

6             the requirements for the Battalion Set II.

7             Current project.  See our certificate,

8             accordingly attached."

9  Q.    And who's -- who's this final offer signed by?

10  A.    Michael Beker.

11  Q.    And if you would turn to the second page, the second

12  attachment, what does that say?

13  A.    That's a supplier compliance certificate.

14  Q.    And is it apparent from the document who it -- who it's

15  from?

16  A.    It's signed by Arie Prilik.

17  Q.    And can you read the sentence that begins "The goods"?

18  A.    (Reading)

19                "The goods fully complied with the

20             technical requirements of the solicitation

21             W56HZV05-R-0080.

22  Q.    Mm-hm.

23  A.    In quotes, "Iraqi Armed Forces Battalion Sets II."

24  Q.    And you received this e-mail from Mr. -- from Ramzi on

25  November 8th?

1   **A.**   Yes.

2           **MR. WARD:**   At this point, the Government would move

3   to admit Government Exhibit 155.

4           **MR. MOORE:**   Objection.   Hearsay.

5           **MR. WARD:**   The attachments are a statement of a party

6   opponent.

7           **THE COURT:**   Objection is overruled.

8           (Trial Exhibit 155 received in evidence)

9           **THE COURT:**   155 is admitted.

10          **MR. WARD:**   Okay.   Let me just throw it up on the

11  Elmo.

12  **Q.**   And the paragraph that says, "Technical Compliance" --

13  that's the paragraph you just read to us?

14  **A.**   Yes.

15  **Q.**   Just to be clear, Mr. McAleer, it says it is also fully

16  compliant with the requirements for the Bat Set II.   You

17  understand that also referred to the models which were

18  delivered under Battalion Set I?

19  **A.**   Yes.

20  **Q.**   All right.   Thank you.

21          **MR. WARD:**   I have no further questions.   Thank you.

22          **THE COURT:**   Mr. Moore, briefly?

23                     <u>**RECROSS EXAMINATION**</u>

24  **BY MR. MOORE**

25  **Q.**   You testified on redirect that if there were facts or

1   events that required TACOM to exercise an option other than the

2   first option it already had exercised with its prime, that the

3   most probable option would be sole source, is that correct?

4   **A.**   Yes.

5   **Q.**   And what does "sole source" mean again?

6   **A.**   That means that -- that we go to a single source rather

7   than compete.

8   **Q.**   And the prime remains the prime in the -- in the contract

9   situation.  They are not terminated, correct?

10  **A.**   We would have terminated that portion -- we would have

11  done a partial termination of -- if we're talking about the

12  night vision goggles, we would have terminated them and then

13  gone out to another source.

14  **Q.**   And you'd still have as your option under the contract

15  that you spoke about earlier to assess any price increase on

16  the prime contractor, isn't that correct?

17  **A.**   That's correct.

18  **Q.**   So it would be more probable, would it not, that you would

19  exercise that option and pass a price increase on to the prime

20  contractor because you had a contractual right to do so?

21  **A.**   Yes.

22  **Q.**   Now, you testified that the Newcon testing -- the testing

23  of the Newcon tubes under the Battalion Set I contract revealed

24  that they didn't meet the 750/1250 FOM, correct?

25  **A.**   That's correct.  To the military standard.

1  Q.   To the military standard?

2  A.   Yes.

3  Q.   And I think what you testified is that this Bat Set II

4  contract was a commercial contract, is that correct?

5  A.   That's correct.

6  Q.   And so was the Bat Set I a commercial contract?

7  A.   Yes, it was.

8  Q.   Is it also accurate to state that because it was a

9  commercial contract, that the suppliers of night vision goggles

10 didn't really have to meet the 750 FOM as measured by U.S.

11 Night Vision Labs?

12 A.   That would apply -- rephrase -- are you talking about Bat

13 Set I or Bat Set II?

14 Q.   I'm talking about Battalion Set II.

15 A.   Okay.  Then the answer would be they did not -- we

16 determined that the military standard was not the right

17 standard to conduct the test.

18 Q.   Right.  So it was a different standard.  So, in other

19 words, under Bat Set II, as a result of what you learned, that

20 the 750/1250 FOM was no longer a specification under the

21 contract, at least as measured by the U.S. Night Vision Labs?

22 A.   The 750/1250 remained a requirement of the contract.  The

23 specification never detailed whether it was to be 750 --

24 whether the FOM was to be tested to a military standard or to a

25 commercial standard.

1  Q.   All right.  But when you had Newcon's night vision goggles

2  tested, you had them tested by a U.S. lab, correct?

3  A.   Yes.

4  Q.   And, in fact, they would apply, would they not, a U.S.

5  standard to the Bat Set I goggles?

6  A.   We were testing them with regards to determining how they

7  performed, but more -- but, additionally, how they would

8  perform against the Bat Set II requirements.

9  Q.   Right.  Under a U.S. standard?

10 A.   Yes.

11 Q.   You weren't applying a Russian standard, were you?

12 A.   We tested against the military standard, yes.

13 Q.   Okay.  So you're holing Newcon to a standard under Bat

14 Set I that didn't require 750 FOM --

15 A.   No.  This did not pertain to Bat Set I.

16 Q.   I'm not finished with my question, okay?

17      So you were looking at a performance of Newcon under Bat

18 Set I to see how they compared to what Newcon would provide

19 under Bat Set II, correct?

20 A.   Correct.

21 Q.   And you were employing a U.S. standard for that purpose,

22 correct?

23 A.   I employed the same standard, the military standard,

24 against Newcon Optik and it was the same standard that we

25 tested ATN against.  We wanted to do a comparison to see how

1  they performed.

2  **Q.**    And, in fact, isn't it true that Newcon under the U.S.

3  standard performed better than ATN?

4  **A.**    Yeah.  They performed marginally better, but they still

5  failed against the military standard.

6  **Q.**    But I guess the question I have is:  ATN's failed against

7  the military standard --

8  **A.**    Yes.

9  **Q.**    (Continuing) -- but now under a Russian standard they were

10  now suddenly a compliant product, correct?

11  **A.**    They became compliant based upon the evaluation conducted

12  by the Night Vision Lab personnel and using it against a

13  commercial standard.

14  **Q.**    The commercial standard is now something different than

15  the military standard of 750 FOM when you changed the

16  requirement for ATN?

17  **A.**    Rephrase the question.

18  **Q.**    I --

19  **A.**    I'm not going to answer "yes" or "no" to that because I

20  want to make certain I know exactly what you're asking.

21  **Q.**    I'm trying to find out exactly what you mean that when you

22  have a commercial contract and you know that ATN couldn't

23  provide an FOM that met military specifications under 750, but

24  they could do some kind of measurement under Russian standards,

25  that the commercial nature of the contract allowed to dispense

1   with the U.S. minimum 750 FOM?

2   **A.**   I want to make sure I answer this correctly.

3   **Q.**   Please.

4   **A.**   We should have used a commercial standard of some sort.

5   Unfortunately, that wasn't in the solicitation because it was a

6   commercial buy.

7   **Q.**   So --

8   **A.**   We tested both --

9   **Q.**   I'm sorry.  Go ahead.

10  **A.**   (Continuing) -- both contractors against the military

11  standard to see how they would do.

12  **Q.**   And according to those tests, then, both ATN under the

13  Bat Set II contract failed and Newcon also failed under the

14  Bat Set I, correct?

15  **A.**   No, that's not correct.

16  **Q.**   I think you testified, correct me if I'm wrong, that when

17  you tested Newcon product, it was from the Bat Set I contract?

18  **A.**   Yes.

19  **Q.**   Okay.

20  **A.**   But I tested it against the military standard.  I wanted

21  to see how it was performing against the military standard.

22  **Q.**   Right.  And Bat Set I didn't have a military standard, did

23  it?

24  **A.**   That's correct.  So we did not go back against ATN --

25  excuse me, against Newcon Optik on the Battalion Set I contract

 1  because they had met the Battalion Set I contract requirement.

 2  Q.   Well, in fact, isn't it true that at one time you and

 3  Mr. Bean had sent emails with each other and you were trying to

 4  see if you could get a price concession from Anham under Bat

 5  Set I?

 6  A.   Yes.

 7  Q.   And, in fact --

 8  A.   Oh, wait, wait, wait, wait, wait, wait.  No, no, no, no,

 9  no, no.  That should not have been a "yes."

10  Q.   Okay.  You never sought to --

11  A.   We never sought any price concessions from Anham on the

12  Battalion Set I contract.

13  Q.   Didn't even talk about it?  Didn't contemplate it?

14  A.   Not that I'm aware of, no.

15  Q.   And it's also accurate, is it not, that you didn't seek to

16  have Newcon's Bat Set I goggles tested under the new ATN

17  Russian methodology, did you?

18  A.   We didn't test either Newcon Optik nor ATN's night vision

19  goggles against a commercial standard.

20  Q.   In fact, what you did is you just took ATN's word that

21  there was this Russian standard and never actually vetted that,

22  never actually tested it under a Russian standard?

23  A.   I did not take Newcon Optik's word.

24  Q.   ATN's word.

25  A.   Excuse me.  ATN's word, no.

1      I relied upon the night vision engineers and their

2 assessment of how to account for the differences based upon the

3 test methodology and the targets that are used.  They are the

4 subject matter experts, I'm not.

5           THE COURT:  Are we using the terms "Russian

6 technology" and "commercial technology" interchangeably?

7           THE WITNESS:  Yes.

8           THE COURT:  Okay.  In other words, the Russian

9 technology would satisfy commercial standards or vice-versa,

10 correct?

11           THE WITNESS:  Yes.

12           THE COURT:  Okay.

13 BY MR. MOORE

14 Q.   Okay.  So Russian or commercial standards didn't have to

15 meet U.S. 750 FOM under Bat Set II after June 29, 2005?

16 A.   They had to meet 750/1250 FOM, but utilizing a different

17 target, a different methodology, using the commercial

18 methodology for testing night vision goggles.

19 Q.   Did you ever see any test results which used the

20 commercial standard or Russian standard that --

21           MR. WARD:  Objection.  Asked and answered.

22           THE COURT:  Objection is overruled.  You may answer.

23 BY MR. MOORE

24 Q.   Did you ever see any actual test results reflecting that

25 ATN goggles under Bat Set II met the 750/1250 FOM under a

1   commercial standard?

2   **A.**    No.

3   **Q.**    Now, were you aware of what the model number was for ATN's

4   night vision goggles that were produced under the Bat Set II?

5   **A.**    Off the top of my head, no.

6   **Q.**    Okay.  Do you have any information that ATN had used a

7   model number over the course of time that was the same, but had

8   different tube specification measurements?

9             **MR. WARD:**  Objection.  Calls for speculation.

10            **MR. MOORE:**  I'm asking him if he knows.

11            **THE COURT:**  You may answer.

12  **A.**    Rephrase the question, please.

13  **BY MR. MOORE**

14  **Q.**    Yeah.  I mean, a model number is a model that a

15  manufacturer puts on its product, correct?

16  **A.**    Correct.

17  **Q.**    And a model number could vary in its specifications of the

18  tubes that are inside it, isn't that correct?

19  **A.**    I can't answer that question "yes" or "no."  I don't

20  honestly know.

21  **Q.**    And so if ATN had produced night vision goggles with the

22  same model number that was testing quite dramatically lower

23  than 750 FOM at one time, and that same model number was used

24  in the future with a different tube, you wouldn't know one way

25  or the other without actually having the tubes tested, correct?

1   **A.**   Are you asking -- I'd like you to rephrase that question.

2          **THE COURT:**  We can't keep going on like this.  You're

3   going to have to answer the question as best you can, otherwise

4   we'll be here forever with rephrasing.

5   **BY MR. MOORE**

6   **Q.**   Do you have any understanding that ATN's model number

7   correlates with any particular performance specification?

8   **A.**   No.

9   **Q.**   And likewise for Newcon Optik, do you know whether any of

10  their model numbers actually correlates with any particular

11  performance specification?

12  **A.**   I don't have that information, no.

13  **Q.**   Now, you testified that you'd seen a representation by

14  Anham that Newcon Optik was supplying the -- precisely the same

15  night vision goggles under Bat Set I for Bat Set II, correct?

16  **A.**   Yes, correct.

17  **Q.**   I'd like to show you Exhibit 309.  I think -- I think I'm

18  going to have to bring the binder to you.

19          (Whereupon, binder was tendered

20           to the witness.)

21  **BY MR. MOORE**

22  **Q.**   If you could take a look at Exhibit 309?

23          (Witness complied.)

24  **Q.**   Do you recognize this document?

25  **A.**   Yes.

MCALEER - RECROSS EXAMINATION/ MOORE                1463

1   Q.   What is it?

2   A.   It's an item for discussion.

3   Q.   What does that mean?

4   A.   That means that in the process of conducting an evaluation

5   of an offeror's proposal, if we have questions, we will go out

6   and request answers to them.

7   Q.   Does this have all the technical information that is

8   supplied by the subcontractor for their night vision goggle?

9   A.   Yes.

10   Q.   And this would be something that would be submitted in

11   response for a request for proposal?

12   A.   This information was submitted in response to a question

13   raised as an item for discussion where unsupported and --

14   information that lack specifics had been provided to the

15   government.  We requested additional information.

16   Q.   So this is not the document that's submitted on behalf of

17   Newcon through Anham for the request for proposal?

18   A.   This is a document that would have been -- the request

19   would have been sent back to Anham seeking a response during

20   the evaluation phases.

21   Q.   And this document you're referring to that Anham had

22   created, that you believe was actually authored by Newcon, what

23   date was that document submitted?  Do you know?

24        I'm not talking about that -- I'm talking about the one

25   you were referring to earlier when you said that Anham had

1  represented that Newcon was providing the same goggles for Bat

2  Set II that it provided under Bat Set I?

3  **A.**   I was referring to this IFD I believe.

4  **Q.**   The same document we're talking about?

5  **A.**   I believe so.

6  **Q.**   Oh, okay.

7  **A.**   That was one of the places, yes.

8  **Q.**   All right.  I'd like you to go through it for me and tell

9  me where you see in there that Newcon had represented that it

10 was providing the same tubes as that was being provided under

11 Bat Set I.

12            (Brief pause.)

13 **A.**   I don't see that information in here.

14 **Q.**   All right.  But you're certain that this was the document

15 that you had recalled earlier in your conversation -- I mean,

16 sorry, in your testimony that was the document that you

17 believed contained the information wherein Anham, through

18 Newcon, had made representations that the tubes that were being

19 provided under Bat Set II would be the same as Bat Set I?

20 **A.**   Yes, I did state that.

21       **MR. MOORE:**  At this time, your Honor, I would move

22 Defendant's Exhibit 309 into evidence.

23       **MR. WARD:**  No objection.

24       **THE COURT:**  309 is admitted.

25       **MR. MOORE:**  Thank you, your Honor.

1              (Trial Exhibit 309 received

2               in evidence)

3         **MR. MOORE:**  I have no further questions.

4         **MR. HOWDEN:**  I will be brief, your Honor.

5                    **RECROSS EXAMINATION**

6  **BY MR. HOWDEN**

7  **Q.**   Mr. McAleer, you relied on the Night Vision Laboratory to

8  provide you expert advice regarding the night vision goggles

9  produced by ATN, isn't that correct?

10 **A.**   Yes.

11 **Q.**   And they provided you information regarding how they

12 tested the ATN goggles in June of 2005?

13 **A.**   Yes.

14 **Q.**   Did they ever produce a written report detailing for you

15 or anybody else how they tested the goggles and what their

16 conclusions were?

17 **A.**   They certainly provided the results of the testing and I

18 think on a general level, they did address how the testing was

19 conducted using --

20 **Q.**   Did they use a report that --

21 **A.**   No.

22 **Q.**   (Continuing) -- discussed how they tested the goggles?

23 **A.**   No.

24 **Q.**   Did they ever write a report discussing commercial testing

25 methodologies?

**A.**    No.

**Q.**    Did they ever write a report discussing Russian testing methodologies?

**A.**    No.

**Q.**    In fact, the lab only wrote one memo relating to the test, isn't that right?

**A.**    Yes.

**Q.**    And that was a memo by Ray Stefanik?

**A.**    Yes.

**Q.**    And the only issue it addressed were the differences between Russian resolution targets and American resolution targets, correct?

**A.**    It made a distinction in that based upon the above, that primarily accounts for the differences in testing.

**Q.**    Differences in resolution testing, isn't that correct?

**A.**    Well, that's part of computing the FOM.

**Q.**    Exactly.  It's only part of computing the FOM.  The other part is the signal to noise ratio, correct?

**A.**    Yes.

**Q.**    And you don't have anything from the Night Vision Laboratory in writing relating to the testing of the signal to noise ratio?

**A.**    I don't believe so.

**Q.**    Okay.  And, in fact, the Night Vision Laboratory never even acknowledged that there was a different FOM for commercial

 1  testing or Russian testing, isn't that correct?

 2  **A.**    I'm not certain how to answer that question.

 3  **Q.**    Okay.  Well, let me ask a different one then.

 4      In point of fact, the only document that talks about

 5  differences in testing methodologies is your memo justifying

 6  the decision to continue to accept the ATN goggles, isn't that

 7  a fact?

 8  **A.**    I don't think that's a fact, no.

 9  **Q.**    All right.  Do you have any other document that you can

10  offer this jury relating to the testing by the Night Vision

11  Laboratory that deals with signal to noise?

12  **A.**    I would have to take a look at the MFR or the email that

13  was sent by Ray Stefanik.

14  **Q.**    I would invite you to do so.

15      I want to briefly discuss Government Exhibit 155.  Do you

16  have a copy of that?

17      Now, 155 involves an email sent in November of 2005, is

18  that correct?  Go ahead and look at it.

19          (Witness complied.)

20  **A.**    Is that the defendants' exhibits?

21  **Q.**    It should be the government's exhibit.  It should be up

22  there somewhere.  I'm not quite sure where.  I can get you

23  another copy, if you need one.

24          **MR. WARD:**  Here is another copy.

25          **MR. HOWDEN:**  Do you want to go ahead and give it to

1    him?

2                **MR. WARD:**  We'll just get it back.

3                **MR. HOWDEN:**  That's fine.

4                (Whereupon, document was tendered

5                 to the witness.)

6    **BY MR. HOWDEN**

7    **Q.**   Now, at no point in time were you ever privy to Michael

8    Beker's negotiations with his suppliers in Russia, correct?

9    **A.**   Correct.

10   **Q.**   You had no idea what his costs were?

11   **A.**   No, I had no idea.

12   **Q.**   Profit margins?

13   **A.**   No.

14   **Q.**   Inventory?

15   **A.**   No.

16   **Q.**   Basis for pricing decisions?

17   **A.**   No.

18   **Q.**   And that was true in November of 2005, correct?

19   **A.**   Yes.

20   **Q.**   Now, in your conversations with Mr. Prilik that had been

21   the subject of your testimony here today, in the recorded

22   conversation on September 9th, 2005 Arie Prilik never actually

23   quoted you a price for night vision goggles, did he?

24   **A.**   He said it would be in the range of the existing -- of the

25   Battalion Set I.  I'm not quoting directly, but I certainly

1  made it clear that the price would be at the same price for --

2  that we paid under the Battalion Set I contract.

3  **Q.**    But the price that you, TACOM, paid under the Battalion

4  Set I contract was to Anham, correct?

5  **A.**    That's correct.

6  **Q.**    And it was Anham's price?

7  **A.**    That's correct.

8  **Q.**    Not Newcon's price?

9  **A.**    It was the contract price, yes.

10  **Q.**    Right.  And in that conversation Arie Prilik never quoted

11  an actual price that Newcon would charge anybody, isn't that

12  right?

13  **A.**    He made reference to the -- he was discussing the

14  Battalion Set I.  And I don't know if it was a direct price

15  quote that he gave me, no, but he certainly implied that we

16  were talking about the unit price for the Battalion Set I

17  contract.

18  **Q.**    That's right.  You were talking about prices, but he

19  didn't quote a price, right?  He didn't offer to sell TACOM

20  goggles at a particular price?

21  **A.**    He referenced a price.

22  **Q.**    I don't need to quibble with you.

23       In your conversation with him on September 22nd he never

24  quoted a price to you, did he?

25  **A.**    I don't believe so.

1  **Q.**    Not even in a general way in that conversation, correct?

2  **A.**    I don't believe so.

3  **Q.**    And in his conversation with you on October 19th he never

4  quoted a price to you, isn't that right?

5  **A.**    That's correct.

6  **Q.**    Again, not even in a general way?

7  **A.**    Correct.

8  **Q.**    And in your conversation with him on November 7th, 2005 he

9  never quoted a price to you?

10  **A.**    That's correct.

11  **Q.**    Again, not even in a general way?

12  **A.**    Correct.

13  **Q.**    And I believe you've testified you never talked to Mr.

14  Beker, so he never quoted you a price at any time, isn't that

15  correct?

16  **A.**    Yes.

17  **Q.**    Now, I'd like to direct your attention to Exhibit 155.  I

18  assume it's the same Bates number for you at page two, TACOM 2.

19  Do you see that?  It's the one -- the portion entitled "Final

20  Offer"?

21  **A.**    Yes.

22  **Q.**    In point of fact, there is a price quoted by Mr. Beker to

23  ITE in this email, isn't that right?

24  **A.**    Yes.

25  **Q.**    And that price is $1,340 per unit, correct?

1  **A.**   Yes.

2  **Q.**   And in point of fact, as far as you know, this is the only

3  price that Newcon International quoted to anybody between

4  August 17th and November 7th, 2005, isn't that correct?

5  **A.**   It's the only price that I've seen.

6  **Q**   **(By Mr. Howden)**

7         **MR. HOWDEN:**  Okay.  Nothing further, your Honor.

8         **THE COURT:**  May the witness be excused without being

9  subject to being recalled?

10         **MR. WARD:**  Yes, your Honor.

11         **THE COURT:**  Do we need to have Mr. McAleer subject to

12  being recalled?

13         **MR. HOWDEN:**  I don't believe so, your Honor.

14         **MR. OSTERHOUDT:**  I don't believe so.

15         **THE COURT:**  Okay.  You are excused.  Thank you very

16  much.  Do not discuss your testimony with any other persons who

17  may be witnesses until the trial is over.

18         (Witness excused.)

19         **THE COURT:**  Okay.

20         **MR. MOORE:**  We have another witness.  I know it's

21  rather late --

22         **MR. HOWDEN:**  The plaintiffs haven't rested.

23         **THE COURT:**  You're getting ahead of yourself here.

24  He thought he was on a roll or something.

25         (Laughter.)

1          **MR. WARD:**  I thought rather than rest, I would just

2     leave, but...  The government rests.

3          **THE COURT:**  You will be deemed to have rested then.

4          **MR. WARD:**  The government rests, your Honor.

5          **THE COURT:**  And that's subject to cleaning up any

6     exhibits and making sure that what you think is in is in and

7     resolving any of those disputes, if there are any, okay.

8          **MS. BOERSCH:**  And, your Honor, on behalf of all the

9     defendants, we do move under Rule 29 and would like an

10    opportunity to present argument.

11         **THE COURT:**  And we'll take that up.  The Court may

12    reserve decision on it, but we'll, first of all, find some time

13    when it's appropriate -- maybe tomorrow when the jury has to

14    leave early -- to take that issue up.

15         **MS. BOERSCH:**  Thank you.

16         **THE COURT:**  But I do want to go forward with calling

17    other witnesses.  However, seeing the hour, I probably -- you

18    have a witness you intend to call at this point?

19         **MR. HOWDEN:**  Yes, your Honor.

20         **THE COURT:**  Okay.  We probably wouldn't do much more

21    than get that witness sworn in and get the name on the record

22    and not much else, right?  Even though Mr. Moore is raring to

23    go.

24         **MR. MOORE:**  You told me to speed up, your Honor.

25         **THE COURT:**  Okay, I did.  But I think since we're

PROCEEDINGS                                    1473

 1   keeping the jury later on Thursday, we don't want to try to

 2   start another witness today, right?

 3           Actually, maybe there's some -- maybe they would like

 4   to.  But I think that's probably what we better do.  And then

 5   we can plot out tomorrow.

 6           So we'll reconvene tomorrow morning at 8:30.  Please,

 7   follow the instructions which you have been given about not

 8   discussing the case amongst yourselves or anyone else.  Don't

 9   form or express any opinion based on what you've heard so far.

10           We'll see you tomorrow morning at 830.  It will be a

11   short day.  We will excuse you at 10:00 o'clock and then we

12   will go for the long day on Thursday.  Have a very pleasant

13   afternoon and evening.

14           (Jury exits courtroom at 1:19 p.m.)

15           **THE COURT:**  And what I will do is I will reserve on

16   the Rule 29 at least until tomorrow, and I'll hear argument on

17   it.

18           **MS. BOERSCH:**  Okay.

19           **THE COURT:**  But we can go ahead.  And so I gather

20   that the witness Mr. Moore was forging ahead on was Mr. Bean?

21           **MR. OSTERHOUDT:**  Mr. Bean.

22           **THE COURT:**  How long do you think you'll be with him

23   on direct?

24           **MR. MOORE:**  Probably an hour.

25           **THE COURT:**  Can we keep it --

Lydia Zinn, CSR,  CRR, and Debra Pas, CSR, CRR
     Official Reporters - U.S. District Court
              (415)  531-6587

 1              **MR. MOORE:**  Maybe.  Maybe less than that.

 2              **THE COURT:**  And what about cross?

 3              **MS. PLETCHER:**  A half hour, your Honor.

 4              **THE COURT:**  That's yours?  Okay.  Do you think we can

 5   actually get him on and off by 10:00 o'clock?

 6              **MR. OSTERHOUDT:**  Mr. Bean, who wants to go back home

 7   to Michigan.

 8              **THE COURT:**  Yes.  I would want to go back to

 9   Michigan myself, too.

10              **MR. OSTERHOUDT:**  Warren, Michigan.

11              **THE COURT:**  We'll see you at 8:30 and we'll get

12   started with him right away.

13              **MR. OSTERHOUDT:**  I have one thing I would like to put

14   on the record, your Honor.

15              **THE COURT:**  Yes, sir.

16              **MR. OSTERHOUDT:**  In the pretrial litigation the

17   defendants proposed to call some expert witnesses to talk about

18   such matters as night vision testing and the like.  That offer

19   was rejected.

20              And at this point I think it's only fair to state

21   that all of this is bogus, this business about Russian

22   commercial methods of testing, and the experts would so

23   testify.

24              Mr. Langsdorf is still available.  He was a witness

25   that was proposed.  He would testify that there is no such

 1  thing; that we have a military contract that meets the military

 2  FOM.  What's being stated by the -- the Night Vision Lab did

 3  not bless what he said.  The testimony is untruthful.

 4        But beyond that, the whole premise that there is a

 5  different testing methodology was the creation of Rocklin

 6  accepted by McAleer.  And it's not right to leave the jury with

 7  the impression that there's something genuine and valid about

 8  it.

 9        So we wish to renew our offer at this time on our

10  request to present in as abbreviated form as possible the

11  testimony of a qualified expert that will testify with --

12  regarding this testing methodology so that the jury won't be

13  misled.

14        **MS. HAMILTON:**  Your Honor, it's still not relevant.

15  They had the opportunity to cross examine Mr. Rocklin on it.

16  They had the opportunity to cross examine Mr. McAleer on it.

17  They have the opportunity to talk to Mr. Bean about it.

18        The point here is the material concealment.  We are

19  cutting back to -- now we are going to spend another three

20  weeks about a standard that's not at issue here.

21        **THE COURT:**  Well, and Mr. Bean, what is the nature of

22  Mr. Bean's testimony?  And from what -- and from what

23  experience does he speak?

24        **MR. MOORE:**  Well, he reported to Mr. McAleer, and

25  he's in no way, you know, an expert or a technical person.  He

1    will be able to further elucidate on us how this, you know,

2    Russian methodology was more accepted out of expediency than

3    any real basis for it.  He's not going to have technical

4    testimony.

5            He's also going to testify with regard to these

6    hypothetical scenarios that Mr. McAleer suggested and how real

7    those are.  But he's not going to be -- he can speak to some

8    knowledge about the switch from June 28th to June 29th, but not

9    from a technical standpoint.

10           **THE COURT:**  I think -- I think the posture is still

11   the same as it was.  It really does involve being sidetracked

12   on some other issues.  It's not even clear what testing was, in

13   fact, done.

14           And so, you know, I find that it really is not

15   particularly probative and unduly consumptive of time.

16           **MS. BOERSCH:**  Your Honor, we're going to ask, then,

17   for sure in the jury instructions that the jury be instructed

18   that the only thing these defendants are alleged to have done

19   is to conceal something.

20           In the redirect Mr. Ward was clearly, I think,

21   attempting to show that the defendants made some other source

22   of false statements to TACOM.  Those the government has

23   disavowed.  That's been our understanding from the outset of

24   this case, and I think that has to be made very clear to the

25   jury.

PROCEEDINGS

1          There is no allegation here that any of the

2   statements that the defendants made to TACOM or to anybody else

3   were false.  That's where Mr. Ward was going with this and

4   that's, I think, what raised Mr. Osterhoudt's concerns.

5          If we were allowed to put on expert territory, we

6   would show that, in fact, what Mr. Prilik and Mr. Beker were

7   saying was true.  So that's the concern that we have.

8          If the government wants to keep this out, I think we

9   have to clearly instruct the jury and make sure that the

10  government only argues this case as what they now say it is,

11  which is concealment.

12          **THE COURT:**  It's a concealment case.

13          **MR. WARD:**  That's where we are, your Honor --

14          **THE COURT:**  That went to somebody's credibility or

15  whatever it went to, but that's what it is.  Okay?

16          **MR. OSTERHOUDT:**  Thank you.

17          **THE COURT:**  We are not bringing those things in as

18  bases for the charges themselves.  Whether it goes to

19  somebody's credibility if somebody testifies or whatever,

20  that's another matter.

21          **MS. BOERSCH:**  And by that I take it they can't argue

22  that to support some intent theory or any other theory.  I

23  mean, they cannot say that those statements were false and,

24  therefore, support some elements of the crime that they've

25  alleged, which is mere concealment at this point.

PROCEEDINGS

1          **THE COURT:**  Well, you know, there may be evidence

2   that would support intent, but it doesn't go to the actual

3   charges of anything other than concealment.

4          **MS. BOERSCH:**  Well, it can't go to intent unless it's

5   false, that's true.  That's the problem.  So if we get into

6   this and they're allowed to argue that somehow these statements

7   of the defendants were false and, therefore, goes to their

8   intent, that's a problem.

9          **THE COURT:**  We'll have to see, and maybe we can find

10  out tomorrow.

11         Now, you've got a few disputed jury instructions.  I

12  don't know if they are really in dispute or not.  And you've

13  got some that you're going to get to us when?

14         **MS. BOERSCH:**  Today.

15         **THE COURT:**  Today.  I'm leaving here -- last night I

16  was here until -- I don't know, was it in this case or some

17  other case somebody filed something at 7:30.  I left at 7:15.

18         You.  I looked just before I left and I said to

19  Mr. Bowser, there still wasn't anything last night.  He goes,

20  Well, they filed it at 7:30.  Gee, I didn't know I should hang

21  around until 7:30.

22         **MR. WARD:**  I just wanted it to be here in the morning

23  when you got in.

24         **THE COURT:**  Oh, yeah.  Always a good way to start a

25  day.  So, but I'm going to have to leave here tonight at 5:30.

Lydia Zinn, CSR,  CRR, and Debra Pas, CSR, CRR
Official Reporters - U.S. District Court
(415)  531-6587

PROCEEDINGS

1      **MS. BOERSCH:**  You will have it before then.  And I

2  may just have to give them to Mr. Ward and the Court at the

3  same time.  I assume you are going to dispute them all anyway.

4      **MR. WARD:**  I guess we're a bit handicapped because I

5  haven't seen any of them.  Martha did sort of explain what they

6  are going to be, so I can get a sense of my objections, but I'm

7  concerned --

8      **THE COURT:**  That's more of a sense than I have.

9      **MR. WARD:**  If she gives them to you at 5:00 --

10      **THE COURT:**  Try to get them earlier than that.

11      **MR. WARD:**  (Continuing) -- then I will need a little

12  more time --

13      **MS. BOERSCH:**  I will send them first to Mr. Ward and

14  I will send them to the Court.

15      **THE COURT:**  Well, you can send them to both of us and

16  I will -- you know, they don't have to be on ECF, although

17  that's the easiest way to get them to me.  Still, they are only

18  proposed anyway.  And if he wants to agree to some of them, so

19  much the better.  Then we don't have to argue about them.  But

20  at least I'll have something to work from.

21      **MR. WARD:**  Our hope is to get something from Ms.

22  Boersch a little early so we can craft an objection, if we have

23  one, so you'll have them both together.  That's the goal.

24      **THE COURT:**  Probably I can imagine the objections on

25  both sides.

1480

PROCEEDINGS

1          MS. BOERSCH:  I suspect.

2          THE COURT:  Okay?  So we'll see you tomorrow morning

3   at 8:30.  I'm sorry about that situation.

4          MR. OSTERHOUDT:  You always have something like that

5   happen.  Thank you.

6          MR. MOORE:  Thank you, your Honor.

7          MR. WARD:  Thank you, your Honor.

8          THE COURT:  Thank you.

9          (Whereupon at 1:27 p.m. further proceedings

10          in the above-entitled cause was adjourned

11          until Wednesday, January 26, 2011 at 8:30 a.m.)

12

13                              -   -   -   -

14

15

16

17

18

19

20

21

22

23

24

25

1481

1

2

3                          **I  N  D  E  X**

4

**PLAINTIFF'S WITNESSES**                            **PAGE**    **VOL.**

5

6

7  **MCALEER, DEREK**
   (PREVIOUSLY SWORN)                                1313        9
8  Cross-Examination Resumed by Mr. Moore            1313        9
   Cross Examination by Mr. Howden                   1437        9
9  Redirect Examination by Mr. Ward                  1440        9
   Recross Examination Resumed by Mr. Moore          1453        9
10 Recross Examination Resumed by Mr. Howden         1465        9

11                        **E X H I B I T S**

12

**TRIAL EXHIBITS**                    **IDEN**   **VOL.**   **EVID**   **VOL.**

13

   487                                1388       9
14 85                                                        1390       9
   84                                                        1410       9
15 81                                                        1425       9
   155                                                       1453       9
16 309                                                       1465       9

17

18

19

20

21

22

23

24

25

Lydia Zinn, CSR,  CRR, and Debra Pas, CSR, CRR
Official Reporters -  U.S. District Court
(415)  531-6587

### CERTIFICATE OF REPORTER

WE, LYDIA ZINN, and DEBRA PAS, Official Reporters for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in CR. 07-765 MHP, United States of America v. Mendel Beker, et al., were reported by us, certified shorthand reporters, and were thereafter transcribed under our direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by us at the time of filing

The validity of the reporters' certification of said transcript may be void upon disassembly and/or removal from the court file.


_____/s/ Lydia Zinn_____
                Lydia Zinn, CSR 9223, CRR


_____/s/ Debra L. Pas_____
                Debra L. Pas, CSR 11916, CRR


               Tuesday, January 25, 2011