```
                                        Volume 10

                                        Pages 1482 - 1662

                   UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA

              BEFORE THE HONORABLE MARILYN HALL PATEL

UNITED STATES OF AMERICA,           )
                                    )
               Plaintiff,           )
                                    )
  vs.                               ) NO. CR. 07-0765 MHP
                                    )
MENDEL BEKER, ARIE PRILIK, and      )
NEWCON INTERNATIONAL,               )
                                    ) San Francisco, California
               Defendants.          ) Wednesday
                                    ) January 26, 2011
_____) 8:40 a.m.
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
**For Plaintiff:**          U.S. Department of Justice
                            Antitrust Division
                            450 Golden Gate Avenue, Room 10-0101
                            San Francisco, CA  94102-3478
                            (415) 436-6673
                            (415) 436-6687 (fax)
                      BY:   **DAVID J. WARD**
                            **ANNA TYRON PLETCHER**
                            **RICHARD B. COHEN**
                            **JEANE HAMILTON**

(Appearances continued on next page)

1   <u>APPEARANCES (CONT'D)</u>

2   **For Defendant**s:          Winston & Strawn, LLP
                                 101 California Street
3                                San Francisco, CA  94111
                                 (415) 591-1439
4                                (415) 591-1400 (fax)
                           BY:   **JONATHAN ROBERT HOWDEN**
5
    **For Defendants:**          Martha A. Boersch
6                                Attorney at Law
                                 555 California Street, 26th Floor
7                                San Francisco, CA  94104
                                 (415) 626-3939
8                                (415) 875-5700 (fax)
                           BY:   **MARTHA A. BOERSCH**
9
    **For Defendants:**          Law Offices of William L. Osterhoudt
10                               135 Belvedere Street
                                 San Francisco, California  94117-3915
11                               (415) 664-4600
                                 (415) 664-4691 (fax)
12                         BY:   **WILLIAM L. OSTERHOUDT**

13  **For Defendants:**          Law Offices of Frank S. Moore
                                 235 Montgomery Street, Suite 854
14                               San Francisco, CA  94104
                           BY:   **FRANK S. MOORE**
15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2   January 26, 2011                              8:40 a.m.

 3         THE COURT:  You may be seated.  Good morning, he

 4   ladies and gentlemen.

 5         THE COURT:  I understand there's a problem with this

 6   real-time system, but whatever it is, we have to go forward.

 7   We can't just sit around, waiting for whatever has to happen in

 8   order to get it operating.  This has to do with what the court

 9   reporter takes down.  And it's not her fault, but there's some

10   problem with some connection somewhere, you know.  Sometimes

11   too much technology is too much technology, right?

12         Okay.  So we he have got to get through this.  You're

13   going to call a witness now.  Is that correct?

14         MR. MOORE:  Yes.  The defense would call Jeffrey Bean

15   to the stand.

16         THE COURT:  Yes.  If you'd step right up here,

17   please, and be sworn.

18         THE CLERK:  Raise your right hand, please.

19                         JEFFREY BEAN,

20   called as a witness for the Defendant herein, having been first

21   duly sworn, was examined and testified as follows:

22         THE CLERK:  Please state your full name and spell

23   your last name for the record.

24         THE WITNESS:  My name is Jeffrey Reed Bean.  B-e-a-n.

25         THE COURT:  And you may have a seat right here.
```

BEAN - DIRECT EXAMINATION / MOORE

1 <u>**DIRECT EXAMINATION**</u>

2 **BY MR. MOORE**

3 **Q.**   Good morning, Mr. Bean.

4 **A.**   Good morning.

5 **Q.**   I'm Frank Moore, one of the attorneys for the defense.  We

6 met in the corridor yesterday.

7     Can you tell the jury where you're currently employed?

8 **A.**   I'm currently employed in Warren, Michigan, at the U.S.

9 Army TACOM; better known as "the Tank Automotive Armaments

10 Command."

11 **Q.**   And what's your current position there?

12 **A.**   My current position is procurement analyst.

13 **Q.**   In 2005 did you hold a different position?

14 **A.**   Yes.  My position was contract specialist in the TACOM

15 contracting center.

16 **Q.**   And can you describe succinctly for the jury what your

17 role was; what your duties were?

18 **A.**   A contract specialist prepares contracts for award;

19 administers contracts after they are awarded; handles

20 correspondence between the government and the contractors; and

21 prepares various documents:  writes letters, e-mails.

22 **Q.**   In 2005 were you involved with what is known as the

23 "Battalion Set II contract"?

24 **A.**   That's correct.

25 **Q.**   And when did you get involved with that?

1   **A.**   It was handed to me to execute the award in February, as

2   soon as the Source Selection Board had decided who would be the

3   winning contractor.  I actually processed the signing of the

4   contract, and managed it after that.

5   **Q.**   Okay.  And were you the person that was the first person

6   responsible for managing the contract; the first in line?

7   **A.**   Yes.  I did the day-to-day work.

8   **Q.**   And you reported to Mr. Derek McAleer?

9   **A.**   That's correct.

10  **Q.**   And who was the Battalion Set II contract awarded to?

11  **A.**   A company called "ITE" -- International Trade

12  Establishment -- of Jordan.

13  **Q.**   And were you familiar with ITE's proposal?

14  **A.**   Since I wasn't in the Source Selection Board prior to

15  contract award, I didn't have detailed knowledge of it, but I

16  could -- because it was incorporated into the contract, I could

17  see it that way.

18  **Q.**   Okay.  You were aware that the proposal by ITE designated

19  that their subcontract or for night-vision goggles was NiViSys?

20  **A.**   Yes.

21  **Q.**   And you became aware, did you not, that right after the

22  award, ITE requested multiple changes thereto?

23  **A.**   Yes, they did.

24  **Q.**   Is it accurate to state that, as soon as they got the

25  award, ITE started twisting the arms of their suppliers, to get

1  better prices and schedules?

2           **MS. PLETCHER:**  Objection, your Honor.  This is

3  speculation.

4           **THE COURT:**  Would you rephrase the question so as --

5  you know, "twisting the arm" -- whatever that means.

6           **MR. MOORE:**  Sure.

7  **Q.**   Well, do you recall being interviewed by Mr. David Ward

8  and Jeane Hamilton on September 28th, 2010?

9  **A.**   Yes.

10 **Q.**   And on your -- let me see if I can find the binder for

11 you.  There are several there.  That binder there.  That one.

12 Yes.  If you could, bring that over.  If you could, open the

13 binder to page -- I mean, to Exhibit 467.

14 **A.**   Yes.

15 **Q.**   And have you seen this before?

16 **A.**   No.  I was, obviously, present at my own interview, but I

17 never saw this document.

18 **Q.**   Okay.  Do you recall informing Mr. Ward and Ms. Hamilton

19 that right after the -- or as soon as ITE got the award, ITE

20 started to try to get better suppliers -- I mean -- sorry -- to

21 get their suppliers to get better prices and schedules?

22 **A.**   Yes.

23 **Q.**   How did you learn that?

24 **A.**   Well, it wasn't just night-vision goggles.  It was

25 communications equipment, too.  In the normal course of events,

1   a prime contractor would not -- cannot place firm awards to

2   their subcontractors, until they know they've received the

3   prime contract award.  So at the time we'd made the prime

4   contract award, there would have been no firm subcontracts;

5   only possible subcontractors who had bid.

6   Q.   Okay.

7   A.   So after a company gets a government contract, there's

8   nothing that stops them from rebidding for those subcontracts.

9   Q.   Okay.

10  A.   That haven't been awarded yet.

11  Q.   So the prime is free to shop around, and try to get a

12  better deal after he has proposed or the company has proposed a

13  proposal to TACOM that actually is based on a subcontractor's

14  price bid at some earlier time.  Isn't that correct?

15  A.   That possibility exists.

16  Q.   Okay.

17  A.   Although, because the prime contract specifies the

18  products of a certain manufacturer, they can't necessarily

19  change what they're going to deliver on the contract, without

20  the government's approval.

21  Q.   Okay.  So if there is going to be a change of the

22  subcontractor at a, say, drastically lower price to the prime,

23  that still has to be approved by TACOM.  Is that correct?

24  A.   Yes, if it involves changing an item specifically

25  specified on the contract.

1  Q.   Okay.  Did you become aware that ITE had sought a

2  substitution of NiViSys subcontractor they had originally

3  proposed for someone else?

4  A.   Yes.  ITE sent a letter proposing swapping out

5  night-vision goggles and communications; both on the same

6  document.

7  Q.   Okay.  And the subcontractor that was going -- that was

8  being proposed to be traded out -- who was that?

9  A.   That was ATN.

10 Q.   And did you become aware of the price differential to ITE

11 between what NiViSys had bid, and what ATN had bid?

12 A.   No.  When questioned, ITE said the price difference was

13 negligible.

14 Q.   Did you ever come to any information that that was, in

15 fact, not true?

16 A.   I did not.

17 Q.   Okay.  Would it have been something that -- if it was

18 drastically lower price, that TACOM would want to know about?

19 A.   Well, price is always interesting, but the contractor

20 isn't allowed -- isn't required to offer us price consideration

21 on that kind of modification.

22      In this case, the consideration they offered us was a

23 better delivery schedule.

24 Q.   Okay.  And, with regard to this Battalion Set II contract,

25 was the speed of delivery more important than price?

BEAN - DIRECT EXAMINATION / MOORE

1    A.    It was.

2    Q.    Okay.  Now, had ITE made representations about the quality

3    of ATN's goggles in connection with seeking the substitution?

4    A.    Yes.  ITE again provided manufacturer's documentation,

5    asserting that they would meet the contract requirements.

6    Q.    Now, the Bat. Set II -- I'm going to refer to it as

7    "Bat. Set II" -- contract had a performance specification, did

8    it not?

9    A.    It did.

10   Q.    What is your understanding of how that performance level

11   was determined?

12   A.    The key thing was something called the "Figure of Merit,"

13   which is the product of the resolution of the signal-to-noise

14   ratio.

15   Q.    And what was your understanding of the performance level

16   that was required for the Bat. Set II contract?

17   A.    We were after a moderate level of performance; not a low

18   one; not too high a one, either.

19   Q.    And was there a range for the FOM, or the Figure of Merit,

20   that was in -- specified in the contract?

21   A.    As I recall, it was a minimum of 750, up to, I think,

22   1,250.

23   Q.    Do you know who set that specification?

24   A.    I don't know who set that specification originally.  I

25   wasn't on the Source Selection Board, so I wasn't anywhere

1    around when the requirements were being put into the original

2    solicitation.

3    Q.    Okay.  Is it accurate to state that the -- the -- what --

4    the most -- the primary factor in approving the substitution of

5    NiViSys for ATN was the expedited delivery schedule?

6    A.    That's correct.

7    Q.    Did you have discussions with people associated with

8    MNSTC-I?

9         Do you know what that acronym:  MNSTC-I?

10   A.    Multi-National Security Transition Command, Iraq.  Yes.

11   Q.    And with regard to the substitution, was there any

12   consultations with MNSTC-I?

13   A.    Yes.  We had asked them what their opinion about the

14   matter was.  And they said they'd had ATN night-vision goggles

15   before, and they thought they were okay.

16   Q.    Okay.  Now, did you become aware that Newcon made a

17   complaint to TACOM in March of 2005:  that it believed ATN

18   could not meet the 750 FOM requirement?

19   A.    Yes.

20   Q.    How did you become aware of that?

21   A.    I don't believe I received the document directly.  It was

22   addressed to Derek McAleer and some other people at TACOM, and

23   then copies were passed to me.

24   Q.    And did you have discussion with Mr. McAleer about it?

25   A.    Yes, we did.

1    Q.   And what was the substance of that discussion?

2    A.   It was along the lines of:  we really can't tell these

3    people too much about another contractor's business.  And we

4    evaluated what the assertions were and, as I recall, sent a

5    letter, saying, "We'll pay attention.  Thank you for your

6    interest" -- something like that.

7    Q.   Okay.  And was there an attempt to vet the complaint with

8    ITE?

9    A.   I believe we called ITE, and they reasserted that their

10   products would meet the requirements; but we did not insist

11   upon any fresh documentation from them.

12   Q.   Okay.  A couple months thereafter, another complaint came

13   from Newcon.  Is that correct?

14   A.   Yes.

15   Q.   And did this trigger a -- a -- a more in-depth look at the

16   complaint?

17   A.   Yes.  There was a lot more specificity to this one.  Based

18   on that, we decided to give the matter a much closer look.

19   Q.   What was the nature of the specificity that you received

20   from Newcon?

21   A.   It was along the lines of:  it was improbable or

22   impossible that there's the tubes being obtained from Russia

23   could actually perform at the required level.

24   Q.   Okay.  Did you recall whether Newcon had actually provided

25   some testing results on what they contended were ATN tubes?

1   **A.**    They did provide some documentation; some of it in

2   Russian; and their interpretation of some of that

3   documentation, in which they showed an argument saying that the

4   math didn't work out.  The tubes could not reach 750 Figure of

5   Merit.

6   **Q.**    Did you have an understanding of the math that was being

7   explained by Newcon?

8   **A.**    Well, I can tell if two numbers multiply out to get the

9   750.

10      Beyond that, all of the details about how signal to noise

11  is measured, and resolution -- no.  That sort of thing, we rely

12  on our engineers to sort out for us.

13  **Q.**    Okay.  The end result was that there was some decision to

14  have ITN's -- ATN's goggles tested, correct?

15  **A.**    Yes.

16  **Q.**    And what was your involvement in that?

17  **A.**    I coördinated with MNSTC-I to have ten sample tubes

18  returned from their stocks in Iraq, and sent to the Army's

19  Night Vision and Electronic Sensors Directorate, otherwise

20  called "Night Vision Labs," for actual testing there.

21  **Q.**    Okay.  And did you have discussion with Mr. McAleer

22  that -- to -- basically, the substance of which was that if

23  you're going to test something, you wanted to get material that

24  had already been delivered to Iraq?

25  **A.**    That's correct.

BEAN - DIRECT EXAMINATION / MOORE

1  Q.   And why was that?

2  A.   Well, in any test situation, you don't want the person or

3  party being tested to be in a position to manipulate results.

4       If we had gone to a contractor and said, "I'm going to

5  test your product," naturally, they'd pick the best, newest,

6  shiniest one they could find.

7       Much better to take something they've actually delivered,

8  and pull it randomly from stocks, and see what you actually

9  got.

10  Q.   Okay.  Did -- was there ever a discussion that you

11  participated in that -- where there was a belief that they

12  could test these products in Iraq?

13  A.   No.  I don't know how they would test them in Iraq.

14  Q.   Okay.  And on this -- do you know -- do you have a

15  recollection of when this first round of testing occurred?

16  A.   Yeah.  I believe it was early to mid June of 2005.

17  Q.   And do you recall the results of those tests?

18  A.   They showed -- well, ten tubes were sent to Night Vision

19  Labs.  One of them could not be tested because it would come

20  apart.  Nine were tested.  None of them showed that they met

21  the 750 Figure of Merit.

22  Q.   Did you also come to understand that the night -- the U.S.

23  Night Vision Labs found the resolution was fairly poor?

24  A.   Yes.  That was prior to -- I think that was the chief

25  reason why the numbers couldn't get up to 750.

 1  Q.   Okay.  During that first round of testing, did you have

 2  discussions with anyone at U.S. Night Vision Labs about the

 3  tests, themselves?

 4  A.   I coördinated with people at Night Vision Labs to get the

 5  tubes to them.  As for the actual conduct of the tests -- I

 6  really didn't have anything to do with that, other than getting

 7  them the stuff.

 8  Q.   So, as a consequence of the results, you didn't have an

 9  in-depth conversation with Night Vision Labs about why they

10  failed?  Is that fairly accurate to say?

11  A.   That's correct.

12  Q.   And, as a result of those -- that testing, TACOM concluded

13  that the materials was noncompliant?

14  A.   Yes.

15  Q.   And ITE was contacted for a response?

16  A.   Yes.

17  Q.   Now, do you recall drafting a proposed letter -- or the

18  contents of a letter -- for Mr. McAleer to send to ITE in this

19  regard?

20  A.   Well, we did send them a stop-work notice, but --

21  Q.   But before that.

22  A.   A letter of concern?

23  Q.   Yes.

24  A.   I believe there was one.  I don't recall drafting it,

25  personally.

BEAN - DIRECT EXAMINATION / MOORE

1  Q.  If you can look -- it's not going to be in that binder,

2  but in exhibit -- it will be in that one, right there

3  (indicating).  If you could, look at Exhibit 367, please.  I'm

4  sorry.  I think I got the wrong one here.  Hold on.

5  A.  It's not --

6  Q.  It will be 357.  It will be in the other binder.  Sorry.

7  A.  Yes.  I think that's it.

8  Q.  Okay.  Do you recognize Exhibit 357?

9  A.  Yes.

10  Q.  And you drafted this; the e-mail that's below?

11  A.  I don't recall drafting it, but it looks like I did, or

12  had a role in it, at least.

13  Q.  Okay.  And this was -- correct me if I'm wrong.  This was

14  a draft of a -- of what would -- was being proposed to be a

15  letter to be sent to ITE?

16  A.  Well, no, not this.  This is an internal e-mail.

17  Q.  Okay.

18  A.  It discusses what should be sent to ITE, but this is not

19  formatted like a document would actually go to a contractor.

20  Q.  Okay.  Well, you see at the top, where, right under the

21  "Subject" line for night vision, under Bat. Set II contract, it

22  says, "Sir"?

23  A.  Yes.

24  Q.  And it says,

25          "This is to inform you of a quality

BEAN - DIRECT EXAMINATION / MOORE

```
 1              problem involving the night-vision devices
 2              we bought from International Trading
 3              Establishment under the Battalion Set II
 4              contract"?
 5  A.   Yes.
 6  Q.   Who was the audience that you were sending this to?  I
 7  mean, what was this intended to be for?  Put it this way.
 8  A.   Well, it's peculiar.  That "Sir" is addressed to ITE.  And
 9  this e-mail starts out as if it was a letter to ITE, but by the
10  time you get to the bottom, it's apparent that it is not.  It's
11  like two trains of thought collided there.
12  Q.   Got it.
13  A.   And the document, by itself, isn't entirely coherent.
14  Q.   Okay.  So I'd like to show -- or direct your attention to
15  the fourth paragraph down, where it says,
16              "After the Battalion Set II contract
17              was awarded, we received some allegations
18              from another supplier, suggesting that
19              ATN's NVDs could not meet our
20              specification"?
21  A.   Yes.
22  Q.   Was that still text that you were proposing would possibly
23  be sent to ITE?
24  A.   It looks like it started that way, but by the time you get
25  to that end of the paragraph, you now have some editing remarks
```

```
 1  inserted, so that that paragraph, as it is written here, would
 2  not have been sent to a contractor.
 3  Q.    Okay.  You go on to state that,
 4              "We asked for some additional
 5              documentation from ATN.  And they gave us
 6              detailed responses.  A few weeks ago, we
 7              asked Night Vision Labs at Fort Belvior, to
 8              test a sample of ten NVDs drawn from the
 9              stocks delivered to Iraq.  NVL found that
10              the FOM ranged from 380 to 637.  Not one
11              device met the specification.  The image
12              resolution numbers were too low.
13              Signal-to-noise ratios were also quite
14              variable, indicating very loose production
15              and quality control."
16        And then you have in paren there.
17              "(Recommend dropping the last part of
18              the preceding sentence concerning
19              production and quality control, or perhaps
20              the last two sentences.)"
21        Why were you, on the one hand, proposing this
22  language to Mr. McAleer, and then also proposing maybe deleting
23  some of it?
24  A.    I don't know who they'd those editing remarks.  I don't
25  think it was me.
```

BEAN - DIRECT EXAMINATION / MOORE

1    **Q.**    Okay.

2    **A.**    It could be, because the point to make to the contractor

3    was that they did not meet the 750 requirement, and statements

4    about their production and quality control were speculative,

5    and also not to the point.  You either meet 750, or you don't.

6    **Q.**    Okay.  Fair enough.  If you can, just flip to Exhibit 358,

7    right after that.  Are you familiar with that e-mail?

8    **A.**    Yes.

9    **Q.**    And that was the same day, from Harry Hallock to -- to

10   your -- to, actually, Mike Lenaers, with you copied.  And it

11   was about a -- not quite an hour later, from what was in your

12   e-mail in Exhibit 357.  Is that correct?

13   **A.**    That's correct.

14   **Q.**    Okay.  And who is Mike Lenaers?

15   **A.**    He was the commanding general at TACOM.

16   **Q.**    And in it, it says.  "Below" -- this is Harry Hallock

17   communicating with Mike Lenaers.

18               "Below is a message I asked Jeff Bean

19          to put together for you, regarding a new

20          issue with equipment being delivered under

21          the IATF Battalion Set II contract.  We are

22          working with the issue vigorously, but

23          wanted to give you a heads-up, so we can

24          get this addressed prior to our weekly

25          update for you for LTG hack."

 1              **MS. PLETCHER:**  Your Honor, this is hearsay.  We'd

 2   like to object.

 3              **THE COURT:**  Well, I don't think it's being offered

 4   for the truth of the matter; but let's get to the substance of

 5   it, anyway.  Some of this is really not particularly pertinent.

 6              **MR. MOORE:**  Okay.

 7   **Q.**  The -- the -- the text below -- is it not a different

 8   version of what you drafted the day before -- or, I mean, the

 9   hour before, in Exhibit 357?

10   **A.**  Well, it's a different purpose to a different audience.

11   General Lenaers, even though he was the commander of TACOM, had

12   little or no involvement in the Battalion Set contract.  It was

13   necessary to give him a more general picture, and some

14   background.  He really didn't know a lot about it.

15   **Q.**  Okay, but eventually a letter was sent to ITE, in -- which

16   you spoke about earlier, that was a stop-work order?

17   **A.**  Yes.

18   **Q.**  And is it -- is it your memory that -- that ATN,

19   subcontractor, responded by saying that the testing results

20   were wrong?

21   **A.**  I'm not sure I follow the thread of that.  That ATN --

22   **Q.**  Yeah.

23   **A.**  -- disputed, in writing, the stop-work order?

24   **Q.**  Yeah.  Did you become aware that -- that ATN had disputed

25   the numbers that U.S. Night Vision Lab had come up with on the

BEAN - DIRECT EXAMINATION / MOORE

1  testing?

2  **A.**   I believe ATN sent in some long lists of test results of

3  their own, which we actually did not give any weight to at that

4  point.

5  **Q.**   Okay.  Why not?

6  **A.**   Because we had our own test results.  Why would we care

7  what they said at that point?

8  **Q.**   Okay.

9  **A.**   So they had a credibility problem with us.

10  **Q.**   Okay.  Is it also true that ITE made a proposal to TACOM

11  that they would offer a rebate, under the corrective action

12  being proposed?

13  **A.**   I believe that was mentioned in passing, but it wasn't --

14  it was not negotiated.

15  **Q.**   Then after ITN [sic] made their response to the stop-work

16  order, was TACOM's decision to do a second round of testing?

17  **A.**   That wasn't really TACOM's initiative.  I believe it was

18  an ATN proposal floated up through ITE to test six more tubes.

19  **Q.**   Okay.  As a result of ATN's proposal, was there an

20  agreement to do so?

21  **A.**   Yes.  The government agreed to do so.

22  **Q.**   Okay.  Do you recall that, as far as you were concerned,

23  around this time, that all that mattered was the specification

24  in the contract?

25  **A.**   Yes.  We had a specification.  And we figured the test

1   results would show either you met it, or you didn't.

2   **Q.**   And whether some -- whether the customer -- MNSTC-I, in

3   this case -- thought that the product was passable was not an

4   issue at that point in time, correct?

5   **A.**   We solicited their opinion later in the process.

6   **Q.**   But at that time, it was your position, was it not, that

7   all that mattered was the specification in the contract?

8   **A.**   Yes.  We were going by that.

9   **Q.**   Now, from June 23rd onwards, was there a discussion about

10  price concessions?

11  **A.**   We did mention the possibility of price concessions a few

12  times; but again, it was never the subject of any actual

13  negotiations.

14  **Q.**   Well, why was it considered at all?

15  **A.**   Well, we knew we'd have to get night-vision goggles from

16  somewhere.  And we knew we didn't have a lot of time to get

17  them.

18  **Q.**   Okay.

19  **A.**   One way of safeguarding the government's interest might be

20  to change the price to something we felt was commensurate with

21  the product.

22  **Q.**   Okay.  So were you involved in arranging for the second

23  round of testing?

24  **A.**   I had, I don't think, anything to do with that, because I

25  didn't have to coördinate getting the tubes out of Iraq.  ATN

1  provided those.

2  **Q.**   Okay.  And were you keeping people at MNSTC-I informed as

3  to the progress of that second round of testing?

4  **A.**   I don't recall how much, if anything, MNSTC-I knew about a

5  second round of testing.

6  **Q.**   Okay.  Who's Donald Adkins -- Lieutenant Donald Adkins?

7  **A.**   He was our point of contact at MNSTC-I.

8  **Q.**   If you could, turn to Exhibit 377 in that binder.

9  **A.**   377?

10  **Q.**   Yeah.

11  **A.**   Okay.

12  **Q.**   This is an e-mail you sent to Lieutenant Donald Adkins on

13  June 27th, 2005?

14  **A.**   Yes.

15  **Q.**   And does it refresh your recollection of informing

16  Lieutenant Adkins at MNSTC-I of the status of the new round of

17  testing?

18  **A.**   Yes, it does.  They didn't know about the second round of

19  testing.

20  **Q.**   And you also informed Lieutenant Adkins that, because ATN

21  is a subcontractor, they will not be able to actually negotiate

22  a cost concession; we can only do that with ITE?

23  **A.**   That's correct.

24  **Q.**   And was Lieutenant Adkins interested in a price

25  concession?

1  **A.**    I believe he was, or at least mentioned it at some point.

2  **Q.**    Below you state,

3                "We are very interested in testing some

4            devices that were delivered by Anham under

5            the Battalion Set I.  If you can find any,

6            we will arrange for testing at Night Vision

7            Labs.  If they are nonconforming, which

8            seems entirely possible, given that they

9            are -- that they also contain Russian

10           tubes, we could raise it as basis for

11           getting some financial concession from

12           Anham."

13           Do you recall that?

14  **A.**    Well, I do now.

15  **Q.**    Did you have any discussions with Derek McAleer about this

16  subject?

17  **A.**    Probably, but I don't specifically recall them.

18  **Q.**    And how did this idea germinate, if you know; this idea of

19  testing Newcon's -- well, strike that.

20        You know that Anham delivered Newcon night-vision goggles

21  under Battalion Set I, correct?

22  **A.**    Yes.

23  **Q.**    So how did the idea come to be to test Battalion Set I

24  goggles, to see if they could get a price concession from

25  Anham?

 1   **A.**   At that point, we were wondering if all of these

 2   Russian-made night-vision tubes were pretty much the same

 3   thing; the same -- made the same way by the same people.  And

 4   we really started to wonder if there was any difference between

 5   these different manufacturers and their products.  It seemed

 6   like we bought a generic product, perhaps, and that, no matter

 7   who the dealer was, they just put their name on the same stuff.

 8   **Q.**   And was it your understanding that there was a

 9   specification of a minimum 750 FOM for the Battalion Set I

10   contract?

11   **A.**   No, I don't recall that.  I was brought in on

12   Battalion Set I long after the contract awarded.  As the matter

13   never came in dispute on that contract, I don't recall ever

14   looking at the specifications for it.

15   **Q.**   If you could turn to Exhibit 382 in your binder, do you

16   recall this e-mail?

17   **A.**   No, I don't.

18   **Q.**   It indicates that you sent it on June 28th, 2005, at

19   3:11p.m., to a Russell Draper.  Do you know who Russell Draper

20   is?

21   **A.**   Yeah.  He's a -- one of the bosses, I think, at Night

22   Vision Labs.

23   **Q.**   Okay.  And it also indicates that you sent it to

24   Derek McAleer?

25   **A.**   Yes.

1   Q.   And it says that this is a follow-up to a phone

2   conversation today between Russell Draper Derek McAleer, *et al.*

3   Do you see that?

4   A.   Yes.

5   Q.   Does it refresh your recollection of having a discussion

6   on or around June 28th with regard to testing Newcon Optik

7   goggles?

8   A.   Actually, it doesn't.

9   Q.   You see at the bottom there, it's got your name:

10  Jeffrey Bean?

11  A.   Yes.

12  Q.   Do you have any reason to believe that this is not your

13  e-mail?

14  A.   No.  I believe it is.

15       The problem is Derek was doing a lot of this business

16  himself, on the phone, and I was hearing about it secondhand;

17  for instance, the first line, "Phone call between Derek and

18  Russell Draper."

19  Q.   Do you recall there being a concern, right around the time

20  you were raising the second round of testing for ATN goggles,

21  that Mr. McAleer was very interested in testing Newcon Optik's

22  goggles from Bat. Set I?

23  A.   Well, it seems he was interested in it.  I really don't

24  recall anything specifically about it.

25  Q.   Okay.  You know, you see the second-to-the-last paragraph,

 1   where it says,

 2               "Unlike the Battalion Set II contract,

 3           which specified an FOM in the 750 to 1,250

 4           range, this contract did not rely on FOM.

 5           It specified performance in terms of

 6           comparability to certain U.S. models.  I've

 7           included the relevant page from our

 8           specification."

 9       Does that refresh your recollection that you, in fact --

10   **A.**   Yes, it does.

11   **Q.**   All right.

12   **A.**   That contract said the contractor would be required to

13   deliver night-vision goggles similar to some model, and stated

14   what the model was.

15   **Q.**   And you thought that was important fact, so that

16   Derek McAleer and Russell Draper and anyone else that was

17   discussing the purpose for testing Newcon's night-vision

18   goggles from Bat. Set II -- so they would know about it?

19   **A.**   Well, if you're going to test them to decide whether they

20   met a requirement, that's pertinent.

21   **Q.**   It would be important to know that that contract didn't

22   have such a requirement, correct?

23   **A.**   Didn't have the Figure of Merit requirement?

24   **Q.**   Yeah.

25   **A.**   Yes.

BEAN - DIRECT EXAMINATION / MOORE

1  Q.   Now, this second round of testing that Night Vision Labs

2  performed -- what was the result of those tests for ATN

3  goggles?

4  A.   It showed that, once again, they didn't hit the 750 Figure

5  of Merit requirement.

6  Q.   By the way, do you know whether these intensifier tubes

7  degrade in quality over time?

8  A.   I believe they do.

9  Q.   Okay.  And at the time that -- that Newcon Optik's --

10 well, when it was contemplated to actually test Newcon Optik

11 tubes from Bat. Set I, do you know how long they'd been in the

12 theater in Iraq?

13 A.   Probably a year.

14 Q.   And do you have any understanding that, you know, at least

15 a year has an effect on degrading the value of intensifier

16 tubes?

17 A.   No.

18 Q.   Do you have any contrary understanding?

19 A.   No.

20 Q.   All right.  Now, after you received the testing results

21 from Night Vision Labs for ATN's goggles on the second round of

22 testing, was there a discussion among people at TACOM about

23 what to do next?

24 A.   Yes, there was.

25 Q.   And was it your understanding that on the second round of

1   testing, there was going to be three tubes from the Iraqi

2   theater, and three tubes that were supposed to be new and

3   improved, from ATN?

4   **A.**    I remember that discussion of new and improved tubes.  I

5   don't recall that three came from the theater, though it may

6   have been.

7   **Q.**    Okay.  If you could, turn to Exhibit 378.

8   **A.**    Yes.

9   **Q.**    Is that your e-mail to Donald Adkins?

10  **A.**    Yes.

11  **Q.**    Now, this was dated June 27th, 2005?

12  **A.**    Yes.

13  **Q.**    And is your understanding that the testing was scheduled

14  to take place on June 28th, 2005?

15  **A.**    I don't recall that date, but I believe this was sent in

16  anticipation of test results.

17  **Q.**    Okay.  And in it, you're telling Lieutenant Adkins that it

18  now seems likely that even the most improved tubes from ATN

19  will not meet our specifications.

20       Why did you have a belief on June 27th, 2005, that ATN's

21  most improved tubes would not meet specification before the

22  testing was complete?

23  **A.**    I think it was because the first round turned out so

24  poorly, there wasn't a whole lot of belief that the second

25  round would be that much better.  And we were working some

BEAN - DIRECT EXAMINATION / MOORE

1   what-if scenarios.

2   **Q.**   Now, when there was a discussion -- after the second round

3   of testing that took place, was there a discussion about the

4   methodology used by the U.S. Night Vision Labs in their

5   testing?

6   **A.**   Yes, there was.

7   **Q.**   What was the extent of that conversation?

8   **A.**   It was along the lines of:  the targets used to measure

9   performance at Night Vision Labs were different from the

10  targets used by ATN and other Russian tube suppliers or

11  European suppliers, in general; and that the two different

12  methods and targets would yield different test results.

13  **Q.**   And who -- to your knowledge, who came up with that

14  explanation?

15  **A.**   It was summarized for us by Ray Stefanik, who is a -- I

16  believe his title is "Lead Engineer" at Night Vision Labs.

17  **Q.**   Were you aware that -- well, do you know who

18  Dmitry Rocklin is?

19  **A.**   Yes.  He's the president or CEO of ATN.

20  **Q.**   Okay.  And do you know Mr. Gaber?

21  **A.**   He was the vice president for production at ATN.

22  **Q.**   And is it your understanding that they were allowed to

23  attend the second round of testing?

24  **A.**   Yes.

25  **Q.**   And were you present in any discussions where Mr. Rocklin

 1  and Mr. Gaber were present?

 2  **A.**    I was not present at Night Vision Labs.  After their visit

 3  to Night Vision Labs they stopped at TACOM, as more of a

 4  courtesy call than anything else.

 5  **Q.**    Did you have any discussions with Mr. Rocklin about the

 6  difference in testing methodologies between Russian tubes and

 7  U.S. or European tubes?

 8  **A.**    No.

 9  **Q.**    Do you -- well, was there ever an attempt to verify that

10  there was, in fact, a different methodology being used by

11  Russian manufacturers to measure Figure of Merit?

12  **A.**    No.  We relied on Night Vision Labs to explain the matter

13  to us.  We didn't do anything beyond accept their explanation.

14  **Q.**    Okay.  And did you have an understanding that Night Vision

15  Labs had communications with Mr. Rocklin and Mr. Gaber on that

16  subject matter?

17  **A.**    I'm not sure about communications.  I know Rocklin and

18  Gaber were present at the second round of testing.  And I

19  assume discussions happened then.  I don't know about

20  communications afterwards.

21  **Q.**    Did you ever see an explanation from Mr. Stefanik about

22  the reasoning for accepting a Russian testing methodology?

23  **A.**    He wrote a one-page appreciation of what happened at

24  testing, and the different test methodologies.  And I believe

25  that's all I ever saw from him.

1  Q.    If you could, turn to Exhibit 390, please.

2  A.    Yes.

3  Q.    Is that the -- is that the explanation you were just

4  referring to?

5  A.    Yes.

6  Q.    And does it refresh your recollection that Mr. Stefanik

7  was explaining a meeting that he had with Dmitry Rocklin and

8  Leonid Gaber [sic] on June 28th, 2005?

9  A.    That meeting was the second round of testing.

10 Q.    So it was your understanding that he was documenting the

11 meeting that was had, with Dmitry Rocklin present, and members

12 of TARDEC, with regard to this second round of testing?

13 A.    Yes.  I understood this to be a summary of discussions

14 that happened at the second round of testing.

15 Q.    And so is it -- does the refresh your recollection that,

16 in fact, Mr. Stefanik discussed the testing results and the

17 differences between U.S. and Russian test methods with

18 Dmitry Rocklin and Leonid Gaber [sic]?

19 A.    Yes.

20 Q.    And Mr. Stefanik is summarizing what was discussed at that

21 meeting on this date?

22 A.    Yes.

23 Q.    And Mr. Stefanik -- well, let me ask you this.  Was

24 this -- this memorialization of this meeting used by TACOM as a

25 rationale to accept ATN's previously noncompliant product?

1    **A.**   I believe we actually got this in writing after we had

2    decided to accept ATN's -- this is a summary for the record.

3    **Q.**   I see.  So it was discussions that were had between TACOM

4    and Mr. Stefanik that led to the decision to allow ATN to send

5    out what was previously noncompliant product?

6    **A.**   Yes.

7    **Q.**   And it was your understanding that it was driven, in large

8    part, by the explanations that were given and the discussions

9    had on June 28th between Mr. Stefanik, TARDEC engineers, and

10   Dmitry Rocklin, and Leonid Gaber [sic]?

11   **A.**   Yes.

12   **Q.**   Was it your understanding that Night Vision Labs initially

13   ascertained that there were no equipment limitations with the

14   night-vision method of projecting resolution target, or with

15   reviewing output image of the Russian tube?

16   **A.**   I don't understand that.

17   **Q.**   Okay.

18   **A.**   And I don't know what "no equipment limitations" means.

19   **Q.**   Okay.  If I can refer you to the second paragraph in

20   Mr. Stefanik's memorialization of the meeting on June 28th --

21   **A.**   Yes.

22   **Q.**   Do you see that?

23   **A.**   Yes.

24   **Q.**   Was that discussed with Mr. Stefanik in the

25   decision-making process to allow ATN to ship their product?

BEAN - DIRECT EXAMINATION / MOORE

1   **A.**   I'm not sure what the implication of "no equipment

2   limitation" means.  I think when I read this, I understood it

3   to mean that the Night Vision Labs is capable of testing this

4   stuff.

5   **Q.**   Okay.  And they're capable of testing this stuff as a U.S.

6   military standard, correct?

7   **A.**   Yes.

8   **Q.**   And they were not equipped to test at some kind of Russian

9   or commercial standard, correct?

10  **A.**   Yes.

11  **Q.**   And Mr. Stefanik outlines the major difference in the

12  makeup of the resolution target employed by U.S. military

13  versus Russian?

14  **A.**   He calls it "E.U." -- European Union -- target.

15  **Q.**   Okay.  So "E.U." is -- referred to the Russian target.

16  And the "U.S. military standard" is referred to as the U.S.

17  standard, or U.S. target?

18  **A.**   Yes.  He has a USAF1951 resolution target, which he calls

19  "the U.S. target."  And another one -- the Russian and European

20  target -- he calls the "E.U. target."

21  **Q.**   Is it your understanding that this E.U. target that's

22  memorialzed by Mr. Stefanik was described by Mr. Rocklin?

23  **A.**   I don't know that.

24  **Q.**   Well, isn't that what the document says?

25           **MS. PLETCHER:**  Your Honor, you asked him his

BEAN - DIRECT EXAMINATION / MOORE

 1  understanding.  And I believe the witness has answered that

 2  question.

 3          **THE COURT:**  The objection is overruled.

 4          **THE WITNESS:**  Mr. -- it says that Mr. Rocklin

 5  described the target.

 6          I don't know if that means.  That is the only

 7  information about the target that Mr. Stefanik possesses.

 8  **BY MR. MOORE**

 9  **Q.**   In the conversations that TACOM had with Mr. Stefanik

10  which led to the decision to allow ATN to ship what was

11  formerly determined to be noncompliant product, was there ever

12  any discussion or any mention that it was Mr. Rocklin that

13  described the standard resolution target used throughout Russia

14  and Europe?

15  **A.**   Well, I know that Mr. Rocklin described it.

16          I don't know what, if anything, else was brought to bear

17  in Mr. Stefanik's evaluation of Mr. Rocklin's statements.

18  **Q.**   Was there anything that you learned subsequent to any

19  discussion with Mr. Stefanik, wherein you believe that

20  Mr. Stefanik had done something, or someone else at U.S. Night

21  Vision Lab, to vet what Mr. Rocklin had represented?

22  **A.**   No.  I'm not aware of anything like that.

23  **Q.**   Is there anything in Mr. Stefanik's memorialization of his

24  meeting with TARDEC engineers and Mr. Rocklin and Mr. Gaber

25  that led you to believe that U.S. Night Vision Labs did

1  anything to vet the representation of Mr. Rocklin?

2  **A.**    No, I don't know that.

3  **Q.**    Do you recall telling Mr. Ward and Ms. Hamilton that it

4  was -- it just wasn't plausible to get a truly conforming FOM

5  750 minimum?

6  **A.**    It seemed clear we were not going to get that FOM from the

7  Russian night-vision tubes using Night Vision Labs' methods.

8  **Q.**    Was it your belief at the time that, to get actual

9  750-minimum-FOM-conforming tubes, that you would have to do so

10  through U.S. or European sources?

11  **A.**    We didn't have evidence, but it seemed probable to us at

12  that point.

13  **Q.**    Do you recall telling Mr. McAleer that this was your

14  opinion?

15  **A.**    I believe that it was my opinion.  I don't recall what I

16  said to him exactly.

17  **Q.**    If you could, look at Exhibit 379 in your binder.

18  **A.**    Yes.

19  **Q.**    Does that refresh your recollection of sharing your

20  opinion with Mr. McAleer?

21  **A.**    This isn't addressed to Mr. McAleer.

22  **Q.**    Okay.

23  **A.**    This is addressed to upper levels of management,

24  probably --

25  **Q.**    Okay.

BEAN - DIRECT EXAMINATION / MOORE

1  **A.**   -- based on discussions that Derek McAleer and I had about

2  what our alternatives were.

3  **Q.**   Now, you say in this that tubes -- tubes that would meet

4  TACOM's spec would be made by U.S. or West European sources,

5  and might cost in the $3,000 to $3,500 range.  Is that correct?

6  **A.**   Yes.

7  **Q.**   Did Mr. McAleer ever express his disagreement with your

8  opinion in that regard?

9  **A.**   No, I don't think so.

10  **Q.**   Now, in part of the decision-making process of allowing

11  ATN to -- to proceed and deliver their product that was

12  formerly considered to be noncompliant, was there discussion or

13  consideration given to the lengthy fight you might have with

14  ITE over the subject matter?

15  **A.**   Certainly, time was very important to us.

16  **Q.**   And was part of the decision in allowing ATN to resume

17  shipments done out of expediency?

18  **A.**   Yes.

19         **MR. MOORE:**  I have no further questions, your Honor.

20         **THE COURT:**  Ms. Pletcher, I gather this is your

21  witness.

22         **MR. HOWDEN:**  Couple of supplemental questions.

23         **THE COURT:**  I didn't mean to forget about you.

24

25

1                    **DIRECT EXAMINATION**

2    **BY MR. HOWDEN**

3    **Q.**   Mr. Bean, I want to refer you back again to Mr. Stefanik's

4    memorandum.  Do you have a copy of it there?  I forget what the

5    exhibit number was.

6              **MR. MOORE:**   390.

7              **MR. HOWDEN:**   390.

8    **Q.**   Could you take a look at 390 for me, please?

9    **A.**   Yes.

10   **Q.**   As far as you're aware, this is the only memorandum or

11   report written by the Night Vision Labs discussing their

12   testing of the ATN tubes?

13   **A.**   I believe that's correct.

14   **Q.**   And in this memorandum, there's no discussion about -- or

15   explanation for the deficiency in the ATN signal-to-noise

16   values?

17   **A.**   No.

18   **Q.**   There's no reference to a different testing methodology

19   for signal-to-noise values?

20   **A.**   No.

21   **Q.**   And again, is it your understanding that the

22   signal-to-noise values are one of the two key components in

23   measuring Figure of Merit:  FOM?

24   **A.**   Yes.

25              **MR. HOWDEN:**   Okay, thank you.

1          **THE COURT:**  Ms. Pletcher.

2          **MS. PLETCHER:**  Thank you, your Honor

3                        CROSS EXAMINATION

4  **BY MS. PLETCHER.**

5  **Q.**   Good morning, Mr. Bean.

6          Mr. Bean, in February 2005 you were assigned to work on

7  the Bat. Set II contract.  Is that right?

8  **A.**   That's right.

9  **Q.**   And what was your title at that time?

10 **A.**   Contract specialist.

11 **Q.**   Your duties as a contract specialist -- they were

12 administrative in nature.  Is that right?

13 **A.**   Yes, they are.

14 **Q.**   They included keeping track of when products had been

15 shipped?

16 **A.**   Yes.

17 **Q.**   Changes in delivery schedules were something that you

18 handled?

19 **A.**   Yes.

20 **Q.**   You communicated with the customer regarding the

21 contracts?

22 **A.**   Yes.

23 **Q.**   Were you authorized to commit or to bind TACOM in a

24 decision?

25 **A.**   No.  Only a contracting officer can do that.

1   Q.   Did you need a warrant to do that?

2   A.   Yes.  A person we call a "contracting officer" has

3   specific authorization to bind the government contractually.

4   Anyone who doesn't have a warrant can't legally do that.

5   Q.   So what is a warrant, exactly, then?

6   A.   It's an actual appointment from your employing agency,

7   authorizing you to award contracts.

8   Q.   And an employee with a warrant could make recommendations

9   to commit or bind TACOM?

10  A.   They --

11  Q.   I'm sorry.

12       -- could make the final decision to commit or bind TACOM?

13  A.   Yes, they could.

14  Q.   And you did not have such a warrant?

15  A.   That's correct.

16  Q.   Who was your direct supervisor?

17  A.   Derek McAleer.

18  Q.   And he did have such a warrant?

19  A.   He did.

20  Q.   So Derek McAleer had the authority to commit or bind

21  TACOM?

22  A.   That's correct.

23  Q.   You testified, Mr. Bean, that ITE originally proposed

24  NiViSys as the night-vision goggles subcontractor for the

25  Bat. Set II contract.  Is that correct?

BEAN - CROSS EXAMINATION / PLETCHER          1521

1   **A.**    That's correct.

2   **Q.**    And at some point, ITE sought to switch

3   night-vision-goggles subcontractors?

4   **A.**    Yes, they did.

5   **Q.**    ITE wanted to switch from NiViSys to ATN?

6   **A.**    Yes.

7   **Q.**    And you testified that TACOM had to approve such a change.

8   Is that right?

9   **A.**    Yes, they did.  The requirement to deliver NiViSys goggles

10  was specifically written into the contract, by name.

11  **Q.**    When a prime contractor wants to change subcontractors,

12  does TACOM require documentation that the proposed new

13  subcontractor meet the requirements specified in the contract?

14  **A.**    Yes.  In this case, we relied on manufacturer's

15  documentation.  In other cases, actual testing could be done.

16  It depends on the circumstances.

17  **Q.**    And if the proposed subcontract or does not meet those

18  requirements, TACOM could reject that proposed subcontractor?

19  **A.**    Certainly we could just keep the contract, as written.

20  **Q.**    Who would decide whether the proposed new subcontractor

21  met the requirements?

22  **A.**    The contracting officer.

23  **Q.**    And in this case, that was Derek McAleer?

24  **A.**    Yes.

25  **Q.**    You did not have the authority to make such a decision?

1  **A.**   That's correct.

2  **Q.**   Did TACOM approve the switch from NiViSys to ATN?

3  **A.**   It did.

4  **Q.**   And who approved that change?

5  **A.**   Derek McAleer.

6  **Q.**   On June 18th, 2005, TACOM wrote a letter to ITE, telling

7  them to stop shipments of goggles for the Bat. Set II contract.

8  Is that right?

9  **A.**   Yes.

10 **Q.**   And you called that letter, I believe, a "stop-work

11 letter"?

12 **A.**   Yes.

13 **Q.**   And what did that mean:  a stop-work letter?

14 **A.**   It informed them that we would not accept any more

15 night-vision goggles from them, until we had some resolution.

16 **Q.**   Now, why was that letter written?

17 **A.**   It's a routine thing to do when you belief a contractor is

18 shipping products that don't conform to the contract.

19 **Q.**   And how is it -- and did TACOM have that belief:  that the

20 contractor was shipping goggles that did not conform?

21 **A.**   Yes.

22 **Q.**   Where did that belief come from?

23 **A.**   We had the test results at that point, I believe, which

24 pointed to them not meeting the 750 Figure of Merit.

25 **Q.**   Were you present during the testing sessions that led to

1    those test results?

2    **A.**    No.

3    **Q.**    Were you involved in the discussions that occurred during

4    those testing sessions at the testing location?

5    **A.**    No, I was not.

6    **Q.**    Do you have any independent memory of the discussions that

7    occurred at any of those testing sessions, other than what is

8    documented in what we discussed as Exhibit 490 [sic]?  That's

9    the letter from Mr. Stefanik.

10   **A.**    No, I had no involvement am this.

11              **MR. MOORE:**   390, your Honor.

12              **THE COURT:**   Yeah.  It's 390.

13              **MS. PLETCHER:**   Sorry.  Excuse me.  It's 390.

14   **Q.**    Do you have any expertise of testing of night-vision

15   goggles?

16   **A.**    No.

17   **Q.**    On June 29th, 2005, TACOM wrote another letter to ITE

18   rescinding the June 17th letter.  Is that correct?

19   **A.**    Yes.

20   **Q.**    Why was that letter written, if you know?

21   **A.**    We made a decision that we probably could not benefit from

22   prolonging a dispute over the quality of the night-vision

23   goggles; that it didn't seem that Night Vision Labs would

24   provide us a strong support over the matter of there being

25   different test targets.  And we had consulted with MNSTC-I, and

1    they thought what they were getting was good enough.

2        When we weighed all of our considerations in the balance,

3    we decided that it would be not in the government's interest to

4    defer deliveries for probably months, while we engaged in a

5    long dispute over the quality of these products.  Since they

6    seemed to be good enough, we took them.

7    **Q.**   Now, Mr. Bean, you said -- you testified earlier that you

8    relied on the opinion of the Night Vision Labs with respect to

9    the differences in testing methodologies.  Isn't that right?

10   **A.**   Yes.

11   **Q.**   You had no reason to question their decision, did you?

12   **A.**   No.

13   **Q.**   Who made the decision to send a letter to resume shipment

14   of the goggles?

15   **A.**   Derek did.

16   **Q.**   But you did not make that decision?

17   **A.**   No.  That's a contracting-officer action.

18   **Q.**   Did ITE resume shipment of ATN's goggles after June 29th,

19   2005?

20   **A.**   Yes, it did.

21   **Q.**   And did TACOM accept those goggles?

22   **A.**   Yes.

23   **Q.**   Did ATN ultimately supply all of the goggles in the

24   Bat. Set II -- the Battalion Set II contract?

25   **A.**   I don't recall.

 1  **Q.**   Did you, Mr. Bean, leave your position as a contract

 2  specialist involved in the Bat. Set II contract prior to the

 3  completion of the Battalion Set II contract?

 4  **A.**   Yes.  In the last several months of 2005, I phased out my

 5  duties there, and went to work on some other Iraqi contracts.

 6  And by 2006, I was completely out of the TACOM contracting

 7  center.

 8  **Q.**   So you would not have been present when the

 9  night-vision-goggles portion of the contract would have been

10  completed?

11  **A.**   No, not if it took many more months after June.

12         **MS. PLETCHER:**  Thank you.  One moment, please.

13         No more questions, your Honor.

14       **THE COURT:**  Thank you.  Anything further on redirect?

15       **MR. MOORE:**  Nothing further, your Honor.

16       **MR. HOWDEN:**  Nothing further, your Honor.

17       **THE COURT:**  Well, I didn't think you'd do it, but you

18  did.  Very good.

19         So you are excused.  Please do not discuss your

20  testimony with any other witnesses who may be testifying in

21  this proceeding; but you can go back to nice, warm Minnesota.

22       **THE WITNESS:**  Detroit.

23       **THE COURT:**  Michigan -- just as warm.

24       **THE WITNESS:**  Three degrees there.

25       **THE COURT:**  Or you can stay.  That's up to you; but

1   you don't have to come back here.  Okay.  Thank you very much.

2          And so, given our discussions yesterday about today's

3   schedule, we're going to recess.  And we'll keep working.

4   We've got other things we have to do in this case; but we'll

5   see you tomorrow morning at 8:30.  And tomorrow we're going to

6   have a long day.  We will take a lunch recess at noon, or very

7   close thereto, and then continue until just a little -- few

8   minutes before 4:00 o'clock tomorrow.  Okay?

9          So please follow the instructions you've been given

10  about not discussing the case amongst yourselves or anyone

11  else, and we'll see you tomorrow morning at 8:30.  You still

12  have your appointment, right?

13          **JUROR:**  Yes.

14          **THE COURT:**  Okay.  Well, good luck.  Okay?

15          **JUROR:**  Thank you so much.

16          **THE COURT:**  Thank you.  Have a very pleasant

17  afternoon and evening.

18          (Jury out at 9:51 a.m.)

19          **THE COURT:**  Now, where do we stand as far as other

20  witnesses?  What do we know?

21          **MR. OSTERHOUDT:**  We have an additional witness.

22  Mr. Prilik --

23          **THE COURT:**  Mm-hm.

24          **MR. OSTERHOUDT:**  -- will testify.  And I think his

25  direct examination will probably take approximately an hour and

```
 1   a half; maybe two.

 2           And then I don't know after that.

 3           THE COURT:  Okay.  Is Mr. Beker going to testify, or

 4   do we know?

 5           MS. BOERSCH:  We have not conclusively made that

 6   decision yet.

 7           THE COURT:  Mm-hm.  Well, can you --

 8           MS. HAMILTON:  Can we ask when, your Honor?

 9           THE COURT:  When are you going to let them know?

10   Because, you know -- because presumably, we're going to go

11   longer tomorrow.  We can finish with Mr. Prilik's testimony

12   then, and move to the next witness, if there's going to be one.

13           MS. BOERSCH:  We should be able to let them know

14   sometime tomorrow.

15           I understand they're going to be days with

16   Mr. Prilik, or --

17           MR. OSTERHOUDT:  Mr. Cohen's been threatening to be

18   several days with Mr. --

19           MR. COHEN:  No, your Honor.

20           THE COURT:  No.  That would be a threat to the jury.

21           MR. COHEN:  No.  I'm going to -- depends on what

22   Mr. Prilik says, how long I'm going to go.

23           THE COURT:  Yeah, well, okay.  Are you one of those

24   that has to elicit every last drop?

25           MR. COHEN:  No.  I try to get to the major points,
```

1528

1  and then end it at that.

2          **THE COURT:**  Okay.  Well. --

3          **MR. OSTERHOUDT:**  That would be good.

4          **THE COURT:**  Okay.  We all have to be prepared.

5          Now, when is the changing of the guard, Lydia?

6          **THE REPORTER:**  Ten a.m.

7          **THE COURT:**  In other words, is that about when the

8  two of you switch.  We can take a short break.  And then what

9  you want to do the Rule 29 issues, and then the jury

10 instructions.

11         And how many -- how many of these jury instructions

12 are seriously in dispute?

13         **MS. BOERSCH:**  There are probably about eight to ten

14 that are in dispute, I would guess, between --

15         **THE COURT:**  Are there some that -- that the

16 Government submitted as disputed that you can agree to, or --

17         **MS. BOERSCH:**  We did agree to one.

18         **THE COURT:**  -- did you try to do that?

19         **MS. BOERSCH:**  We did try.  We did manage to kick one

20 over into the undisputed side; but so far, that's all we've

21 been able to do.

22         **THE COURT:**  And how about defendants?  You looked at

23 those.  And is there any agreement that you can come to with

24 respect to any of them?

25         **MR. WARD:**  I think a couple of them, we propose some

1 alternative language that maybe isn't so far from where they

2 are.  And I think we can reach agreement.

3         I think some of the defendants' proposed instructions

4 have already been heard by the Court, so I don't think we need

5 to spend a lot of time on the duty to disclose, and some of the

6 others.

7         **THE COURT:**  Well, what if I do this?  What if we take

8 a short break?  And then during that break -- you know, maybe

9 it will be longer than a usual break, if that's all right.

10 We're all going to be here, right?  And see if you can come --

11 you know what your agreement is.  And if there's some of this

12 wording proposed changing, and whether you can get some

13 agreement on that.  And then we'll know exactly which ones we

14 have a dispute on.  And we'll deal with, you know, those after

15 the Rule 29; but if you can take some time during this break to

16 do that, okay?

17         **MR. WARD:**  Yes, your Honor.

18         **THE COURT:**  And let Mr. Bowser know when you're

19 ready, because we'll be here.  And the only thing is that I've

20 got another pretrial on at 2:30 this afternoon, so we'll have

21 to wind up by that time.

22         **MR. WARD:**  I hope we're wound up well in advance.

23         **THE COURT:**  Well in advance.  Otherwise, I'll get

24 wearied out.

25         **MR. WARD:**  Thank you, your Honor.

1          THE COURT:  Okay.  Thank you.

2          (Whereupon there was a recess in the proceedings

3           from 9:54 a.m. until 10:54 a.m.)

4          (Proceedings held in open court, outside

5           the presence and hearing of the jury.)

6          THE COURT:  You're up first, Ms. Boersch.

7          MS. PLETCHER:  Actually, I would like to raise one

8  briefly.  I apologize for interrupting.  We have -- that the

9  defendants really provide notice of who they intend to call and

10 whether or not they intend to call Mr. Beker.  I mean, it's

11 only fair that we be given at least 24 hours notice to prepare.

12 And at this point it does seem --

13         MS. BOERSCH:  Well, they can assume that we're going

14 to call him, but we may change our mind.  It's his right to

15 decide and he can decide when it's time to decide, which is

16 when it's time to testify.  So they should assume he's going to

17 testify, but he may decide not to.

18         THE COURT:  Be ready.  Now, I guess --

19         MS. BOERSCH:  I'm up.

20         THE COURT:  (Continuing) -- you are up.

21         MS. BOERSCH:  Thank you, your Honor.

22         THE COURT:  This is on the Rule 29.

23         MS. BOERSCH:  Yes.  We do move under Rule 29 because

24 we think that the evidence in trial has clearly shown that the

25 government has failed to prove the elements of the charges that

1  it has brought in this case.  And, in particular, two of the

2  wire fraud elements that are necessary.

3        Number one, proof of a scheme to defraud TACOM of

4  money or property; and, number two, proof of the defendants'

5  intent to defraud.

6        Now, I want to remind the Court a little bit about

7  some of the background because I think it's important and it

8  forms what I'm going to say about some of the evidence that has

9  come in in this case.

10       The indictment in this case was presented to the

11  Grand Jury as a false statements case.  The indictment as

12  worded is worded as a false statements case.  In the pretrial

13  litigation there was much back-and-forth with the defense

14  trying to determine what exactly was false because the

15  statements we made to TACOM we believed were true, and I think

16  the government has now conceded they were true or at least they

17  have not pursued this case as a false statements case.

18       So the government then shifted its theory to one of

19  an omission.  And after being pushed by the defense, we were

20  finally told that there were three alleged material omissions

21  that the defendants are charged with in this case and that

22  formed the crux of the scheme to defraud.  This is in the U.S.

23  Supplemental Statement of Facts.

24       The first of those omissions is that the defendants

25  agreed to pay ATN to withdraw from the Bat Set II contract.

1532

1         The second is that ATN agreed to pay $75 per pair of

2    goggles that were not delivered by ATN, but were delivered

3    instead by Newcon.

4         And, third, that the defendants had sealed the

5    agreement with a $50,000 payment to ATN.

6         The problem is that the evidence at trial and the

7    evidence that the government relies on, we believe, shows

8    conclusively that there never was that predicate agreement with

9    ATN.  Newcon and ATN did not have an agreement at all, much

10   less an agreement that ATN would stop performing on the

11   contract.

12        The tapes that the government relies upon clearly

13   show that by October 4th both parties understood that they had

14   no agreement.  Mr. Rocklin himself says to Mr. Beker:  "Well,

15   it means we didn't understand each other regarding the

16   agreement."

17        Absent a mutual meeting of the minds on the terms of

18   this supposed agreement, there is no agreement.  Without that

19   predicate agreement, there can be no scheme to defraud because

20   the alleged fraud is our failure to disclose this agreement to

21   TACOM.  There was no agreement.

22        Throughout the tapes Mr. Beker repeatedly says to Mr.

23   Rocklin, "I don't understand what you want.  I don't understand

24   what our agreement is."  And it's clear that Mr. Beker believes

25   that what he's negotiating or trying to negotiate is an

1   agreement from ATN that ATN would help Newcon with NPZ -- which

2   is the assembly factory in Russia, help Newcon get the

3   component parts that ATN had already produced there for the Bat

4   Set II contract so that Newcon could then fulfill the contract.

5   So that Newcon in cooperation -- and Mr. Beker repeatedly says

6   "cooperation."  So that Newcon in cooperation with ATN could

7   fulfill the contract, not that the contract would be stopped.

8   So the tapes -- and that's all throughout the tapes are clear

9   that that was the agreement that Mr. Beker was trial to reach.

10          Mr. Rocklin, obviously, is cooperating with the

11  government.  Mr. Rocklin thinks that he's got some antitrust

12  bid rigging case going on and so he keeps trying to push Mr.

13  Beker into some other sort of agreement, but there's never a

14  meeting of the minds on that.  There is never an agreement

15  between the two as to what the scope of the agreement is at

16  all, much less a meeting of the minds that Mr. Beker was paying

17  $50,000 for ATN to stop.

18          And, again, the evidence is clear, not only from Mr.

19  Rocklin and from Mr. Beker and from the tapes, but, also, from

20  the TACOM witnesses that, in fact, ATN had stopped performing.

21  They had stopped performing before there was any contact made

22  by Mr. Rocklin to ATN.  And Mr. Beker repeatedly says that on

23  the tapes.  "I'm not asking" -- at the end in particular.  "I'm

24  not asking you to stop performing.  You've already stopped

25  performing.  You can't perform."  That was Mr. Beker's firm

1  belief and, in fact, it was true, as Mr. McAleer testified,

2  because TACOM had issued a stop order to ITE.

3          Now at some point the contract is renewed, but at the

4  point these conversations occurred Mr. Beker, clearly from the

5  tapes, is under the belief that ATN had already stopped

6  performing and that there was no need, there was absolutely no

7  need for him to pay him to stop.  He had already stopped.

8          And it's clear on the tapes he doesn't understand

9  what Mr. Rocklin is talking about in the very last conversation

10 where he says, "You wanted me to stop performing on the

11 contract."  And, again, Mr. Rocklin says, "Well, it's clear we

12 had no meeting of the minds."  And, in fact, they had no

13 meeting of the minds.

14         **THE COURT:**  Well, let me ask you this.  Can you not

15 have a scheme to defraud even though there is not meeting of

16 minds -- of the minds of the co-schemers?

17         **MS. BOERSCH:**  But Mr. Rocklin is not a co-schemer.  I

18 mean, yes, you can.  If Mr. Beker and Mr. Prilik weren't

19 exactly sure about the scope of the scheme to defraud -- I

20 mean, they are the ones charged with the scheme to defraud --

21 then yes, but that's not the issue here.

22         The issue is that the government has alleged a scheme

23 to defraud and the linchpin of that scheme to defraud is Mr.

24 Beker and Mr. Prilik's failure to disclose to TACOM an

25 agreement, a specific agreement to pay ATN to stop performing.

1    That's not -- that's not a scheme to defraud.  That's a

2    predicate, a factual predicate to the scheme to defraud that

3    these guys are charged with, and that factual predicate has not

4    been proven.

5            Absent that fact, the fact of that agreement, there

6    is nothing for these guys to disclose to TACOM.  They cannot be

7    charged with failing to disclose to TACOM a fact that does not

8    exist.  They can only be charged with failing to disclose to

9    TACOM a fact that exists.  And there is no proof that that

10   fact, the agreement between ATN and Newcon as described by the

11   government, existed.  Absent that fact, they have nothing to

12   disclose to TACOM, putting aside the issues of duty, which I'm

13   also going to talk about.

14           So it's our view that the government has simply

15   failed to prove that fundamental predicate that they have to

16   prove to prove their scheme to defraud.

17           And then on to the duty issue, which I know the Court

18   is not fond of, but I'm going to plow ahead with it anyway.

19   Even if there was some sort of agreement between ATN and

20   Newcon, I think it's clear in the Ninth Circuit under *Dowling*

21   and under *Woods* that when you're talking about a case that

22   involves mere omissions and non-disclosures and not false

23   statements that there has to be some sort of a duty on the part

24   of the defendants to disclose whatever fact it is they are

25   accused of not disclosing.  Otherwise, you turn every business

1  negotiation, every sort of discussion between two parties into

2  a potential criminal offense.  And the scope of the mail fraud

3  and wire fraud statute becomes completely overbroad and vague.

4  And particularly after *Skilling*, I don't think it's tenable to

5  maintain that you can charge someone with a scheme to defraud

6  involving the non-disclosure of a fact absent some duty that

7  that person has an obligation to disclose.

8          I think *Chiarella* supports our position.  I

9  understand it was a securities fraud case.  I don't think the

10 fact that it was a securities fraud case played into the

11 Court's analysis there.  They were talking about frauds

12 generally and said, Look, in a fraud case if it's -- if it's a

13 failure to disclose, you've got to find a duty to disclose.

14 The Ninth Circuit case in *Laurienti*, again, a securities fraud

15 case, but again I don't think that was material to their

16 analysis, says you've got to have a duty to disclose.

17          And here there simply is none.  The government hasn't

18 alleged one.  They haven't told us what that duty was.  They

19 certainly have not proven one, because they believe they don't

20 have to.  I believe they have to prove a duty to disclose.  And

21 they simply can't on this record because everyone has testified

22 that Newcon was not in a contractual relationship with TACOM.

23 There was no fidicuary relationship between TACOM and Newcon.

24 There are -- no one has cited to any statutes or regulations

25 that require Newcon to disclose anything to TACOM.  And

1    Mr. McAleer repeatedly testified here in court and, also, in

2    his conversations with Arie Prilik, that, "I don't have to tell

3    you anything.  I don't want to talk to you.  You're a

4    subcontractor.  We don't talk to subcontractors."  Converse of

5    that is, whatever the subcontractor is telling him, he's just

6    not going to listen to.  The subcontractor has no duty to tell

7    him or not tell him anything at all.

8          So we believe still that -- and we'll ask for a jury

9    instruction on this, that the government has to prove that they

10   had a duty to disclose.  So even if there was this supposed

11   agreement between ATN and Newcon, they didn't have a duty to

12   disclose it.

13         The government claims that, well, no, they don't have

14   to have a duty.  It's enough that they actively concealed the

15   existence of the agreement.  And our position is that even

16   if -- even if you go back to those active concealment cases

17   that say, well, as long as there's active concealment, there

18   doesn't have to be a duty, active concealment means taking some

19   steps beyond mere non-disclosure.  You have to intentionally

20   hide something.  You have to take some actions to try to

21   prevent the other party from finding out about the agreement.

22   And on this record the government has failed to prove that as

23   well.

24         Because, for one thing, Mr. Beker drafts a proposed

25   agreement.  He sends it to Mr. Rocklin.  And this, again, is

1  evidence of the absence of any agreement between these guys.

2  He sends this proposed agreement to Mr. Rocklin.  It sets out

3  Mr. Beker's understanding of what the agreement is, which is

4  clearly completely different from what Mr. Rocklin says it is.

5  He sends it to Mr. Rocklin and says:  Here, here is a proposed

6  agreement.  Sign it.  If you don't like it, change it.  Put

7  whatever you want in there.  Put in the money.  Put in the

8  payments.  I don't care, but I want a written agreement.  I

9  want a written agreement because I want to give it to TACOM.

10       So the evidence is clear that Mr. Beker from the very

11  beginning understood and intended that whatever agreement he

12  reached with ATN was going to be disclosed to TACOM.  That was

13  the whole reason why he sent that written agreement to Mr.

14  Rocklin and asked him to sign it and, yet, Mr. Rocklin refused

15  to sign it.

16       **THE COURT:**  Well, we don't quite know that, on this

17  record, what his intention was.  But, in fact, he did, you

18  know, send forward $50,000 and, you know, that -- that

19  certainly -- even if there is not an agreement that would be,

20  for example, enforceable because it's not signed by both

21  parties, it certainly represents some kind of a scheme, some

22  kind of an understanding regardless of what -- whether we know

23  all the details of it or have all the details.

24       **MS. BOERSCH:**  No, I disagree with that.  I mean, the

25  mere fact that they sent $50,000 to Rocklin, number one, that's

1   Rocklin asking for it.  That's the FBI asking for it.  Mr.

2   Beker resists, resists.  He finally sends it and he sends it to

3   him.  And it's clear from the tapes, and this is in the record,

4   what Mr. Beker's intent was.

5           He sends it to Mr. Rocklin because he wants Mr.

6   Rocklin's cooperation.  He wants Mr. Rocklin to help him get

7   the component parts from NPZ.  That's why he sends it.  There's

8   nothing illegal inherently about sending $50,000 to ATN.  It's

9   asked for by Mr. Rocklin.  And it doesn't reflect any sort of

10  criminal intent or illegal scheme because, again, that $50,000

11  was sent pursuant to the agreement that Mr. Beker thought he

12  had.  It was not sent pursuant to the agreement that the

13  government claims he had because there's no evidence of that

14  agreement.

15          And the evidence is very clear that Rocklin and Beker

16  never had the agreement that the government claims.  So absent

17  that agreement, the simple transfer of $50,000 is not evidence

18  of anything at all.

19          So on the concealment side, Beker clearly believed

20  and understood and wanted that that agreement would be

21  disclosed to TACOM.  He didn't try to hide anything from TACOM.

22  Mr. Beker had no contact with TACOM at all, so there was

23  nothing for him to disclose or hide.

24          As for Mr. Prilik, when he calls Mr. McAleer, he

25  tells Mr. McAleer that they're talking to ATN and at that

1  point, again, by September 9th, they don't have an agreement

2  with Rocklin.  They don't have an agreement with ATN.  They

3  sent $50,000 as an advance.  That doesn't mean there's an

4  agreement, and the tapes make it very clear there is no

5  agreement.  By October 4th Mr. Rocklin says it himself.  Well,

6  it's clear we didn't have any understanding about what our

7  agreement was.

8           So when Mr. Prilik is talking to McAleer on

9  September 9th, again, there's no agreement.  There's nothing

10 for Mr. Prilik to disclose one way or another to TACOM, and he

11 has no duty to disclose anything to TACOM.

12          And second or -- where am I -- third or fourth.  Even

13 if there was an agreement, the nondisclosure was just

14 immaterial.  They were immaterial because TACOM had no

15 contractual relationship with Newcon.  TACOM could not and

16 would not communicate with subcontractors.  TACOM, as

17 Mr. McAleer said, basically didn't care what the subcontractors

18 told them.  They dealt with the prime contractors.  They

19 resolved you will issues with their prime contractors.

20 Whatever the subcontractors are telling them is just noise,

21 they don't listen to, they are not influenced by it.  So

22 nothing that Mr. Prilik said or didn't say would have

23 influenced TACOM's actions.

24          And finally, and I think not most importantly, but

25 almost as importantly, this alleged disclosure could not have

1    resulted in any deprivation of property to TACOM.  And they are

2    charged with a scheme to defraud TACOM of their money or

3    property.  And it's clear from the evidence that there was no

4    scheme, even if there was an agreement, even if all the other

5    predicate facts had been proven.  Whatever scheme there was

6    could not and would not have deprived TACOM of money or

7    property because the potential loss -- for one, there was no

8    potential loss.  Even if there was a potential loss under some

9    theory, it was absolutely too speculative to amount to the type

10   of loss that conformed the basis of a criminal wire fraud

11   charge.

12          The evidence was that TACOM would not have suffered a

13   loss.  Assuming Newcon gets in, assuming Newcon raises its

14   prices, TACOM would not have suffered that loss.  ITE would

15   have suffered that loss.

16          McAleer testified repeatedly that he deals with the

17   prime.  The prime has to eat any loss.  TACOM does not pay any

18   loss.  That is the -- what the -- what ITE with the prime

19   contractor has to absorb.

20          So even if Newcon had come in on this $175,000,000

21   contract and raised its prices to ITE, ITE is the one that

22   takes the loss.  They've got to eat the loss in some other

23   portion of their profits and some other portion of the

24   contract.  So there would not have been any deprivation of

25   property to TACOM.

1        The government then goes back and says, Well, what

2   about Mr. McAleer.  Maybe, maybe you would have done a sole

3   source contract.  Now, after some inconsistent statement from

4   him about whether he would have or could have, the fact of the

5   matter again is that even if TACOM had done a sole source

6   contract with Newcon, which is quite questionable whether they

7   would have, again, TACOM would not have suffered any loss of

8   property because Mr. McAleer again testified that under the

9   prime contract that they had with ITE, ITE would have suffered

10  that loss.  TACOM had a contractual right to go back to ITE and

11  say, You pay us for any excess that we have to pay as a result

12  of having to go sole source because you could not fulfill the

13  contract.

14       So in our view the government has just utterly failed

15  to prove the scheme to defraud that they have alleged in the

16  indictment and the Rule 29 motion should be granted on that

17  basis.

18       The second basis that we raise and that we've

19  addressed before is the whole notion of constructive amendment,

20  which I think now that the Court has seen the evidence -- and I

21  know the Court is aware of all the briefing that has been done

22  in the past, but clearly this indictment has been

23  constructively amended from what it was initially.

24       If you look at the Grand Jury transcript, this

25  indictment was presented to the Grand Jury as a false

1    statements case.  Never in that transcript was the Grand Jury

2    told the fraud in this case is the defendants' failure to tell

3    TACOM about this money.  The omissions were raised only three

4    times in the transcript:  The fact that Prilik didn't tell

5    TACOM about payments to ATN was raised once.  The fact that he

6    didn't tell TACOM that he had an agreement, which he didn't

7    have, with ATN was raised a second time, but not at the end of

8    the Grand Jury.  Not at the end when the government is saying,

9    This is the evidence that supports the alleged fraud in this

10   case.

11           The evidence that the government sets out that

12   supports the charges in that case is entirely composed of the

13   false statements, the false statements that they then rejected.

14           So this case was not presented to the Grand Jury as

15   an omissions case.  The Grand Jury was never told, there is

16   nothing in the Grand Jury record, no evidence, that this

17   omission, even though it was mentioned, was material to TACOM,

18   that would have influenced TACOM's decision or, again, that

19   these guys had a duty to disclose it.

20           So the case just wasn't presented to the Grand Jury.

21   We don't know if the Grand Jury would have indicted these guys

22   on an omissions theory because it just was never done and the

23   elements that the government would have had to have proven were

24   not there.

25           We now at trial -- now we're at trial.  Now we have a

1   whole new theory, and I think under the cases we've cited to

2   the Court before, it's clear that the indictment has been

3   constructively amended.  That's *Chipsey* and *Stirrone* and those

4   other cases.

5          The other case I want to bring to the Court's

6   attention, because I think it's important here, and it's also

7   constructive amendment case, is *U.S. versus Millwitt*, which was

8   a case in this district where the defendant was charged -- and

9   I can give the Court the cite, but the defendant was charged

10  with supposedly defrauding, I believe, the creditors in a

11  bankruptcy proceeding, but the evidence at trial showed that

12  the only people that could have lost any money as a result of

13  the Defendant's fraud were, in fact, tenants.  The creditors in

14  the bankruptcy were landlords.

15         And the Court reversed the conviction saying, look,

16  if you have a scheme to defraud, the scheme to defraud has to

17  be a scheme to defraud a particular victim.  If the evidence at

18  trial shows that that victim would not have lost any money or

19  property, but, in fact, some other victim would have lost money

20  or property, that's a constructive amendment of the indictment.

21         And I think that's what we have here, because the

22  evidence shows that if anybody would have lost money or

23  property here, it would have been ITE and not TACOM.

24         So in our view, the indictment has been

25  constructively amended and the Rule 29 should be granted on

1  that basis as well.  And the cite to *Millwitt* is 475 F.3d at --

2  I don't have the first page, but 1156 to 1157 is where the

3  discussion is.

4          There are other reasons that we think the

5  government's proof has failed in this case, but I think

6  primarily it's failure to prove the scheme to defraud, failure

7  to prove the defendants' intent to defraud, and for that reason

8  we think the Court should grant the defendants' motion for a

9  Rule 29.

10         **THE COURT:**  Let's start at sort of the -- the end of

11 the argument, not with respect to the constructive amendment

12 aspect of it, but with respect to the scheme to defraud TACOM

13 and essentially influencing TACOM to part with money or part.

14 What is the evidence of that in this case?

15         **MS. PLETCHER:**  Yes, your Honor.  I will recite the

16 evidence in this case.

17         Before I go there, I would like to just start off

18 with what the standard is for the Rule 29 motion.  The

19 standard --

20         **THE COURT:**  I know what the standard.  I want you to

21 just answer my question.

22         **MS. PLETCHER:**  Yes, your Honor.

23         **THE COURT:**  Okay.

24         **MS. PLETCHER:**  Sure.  What is the evidence of the

25 scheme to defraud TACOM in particular --

1              THE COURT:  Uh-huh.

2              MS. PLETCHER:  (Continuing) -- is that right?

3              THE COURT:  Yes.

4              MS. PLETCHER:  Okay.

5              THE COURT:  And to deprive TACOM of money or

6  property.

7              MS. PLETCHER:  To deprive TACOM of money or property,

8  sure.

9              The scheme to defraud TACOM of money or property,

10  your Honor, starts with Dmitry Rocklin's testimony about his

11  conversations with Arie Prilik.  We would start at the very

12  beginning.

13              Mr. Prilik, I believe it was he, and Mr. Beker made

14  very clear that they had no intention of working with ITE, with

15  or through ITE.  Mr. Rocklin testified that it was his

16  understanding of -- of his conversations with Mr. Beker and Mr.

17  Prilik that there were a number of reasons why they would not

18  want to work with Mr. Ramzi at ITE.  They felt that he was

19  untrustworthy.  They felt that they already had a delivery

20  system in place.  And I believe the third -- the third reason

21  that Mr. Rocklin gave was that he just didn't like him.

22              So it was Mr. Rocklin's very clear impression that

23  the defendants never had any intention of working through ITE.

24  They intended to go directly to TACOM with their scheme.

25              Could TACOM have been deprived of money or property?

1   There is significant evidence to show that yes they could.

2   Mr. McAleer testified very clearly that if defendant's scheme

3   had been successful, ATN would not have been able to provide

4   the goggles.  That would have led to a default on the part of

5   ITE.  And in that situation there would have been three options

6   that Mr. McAleer could have looked to.  He could have tried to

7   rebid the contract.  He could have done a sole source, or he

8   could have gone to the -- to an existing contractor and asked

9   to extend their contract.  Under each of those options

10  Mr. McAleer specifically said, yes, he could be forced to pay a

11  higher price.  "He" meaning TACOM.

12          The defendants mentioned that any higher price would

13  be charged back to ITE, that TACOM would eventually recoup

14  the -- recoup any higher charge that they had to pay.  But

15  that's like saying, your Honor, that a victim of an assault and

16  battery case -- a defendant in an assault and battery case

17  could not be convicted of such because the victim recovered

18  from their wounds.  In this case --

19          **THE COURT:**  Not a good analogy, but that's all right.

20          **MS. PLETCHER:**  I think you understand, your Honor,

21  what I'm saying here; that whether a victim recovered or not,

22  does not negate the fact that a crime has been committed.

23          And that is what we're looking at here.  Mr. McAleer

24  testified unequivocally that he could have paid more here.

25  And, in fact -- well, yes, he did.  He testified unequivocally

1 that that was the case.

2          So I think we've established quite firmly that

3 materiality -- that the scheme would have been material in the

4 sense that it would have deprived TACOM of money or property.

5 And especially looking at the evidence in the light most

6 favorable to the government, which is the standard, a rational

7 trier of fact could absolutely find beyond a reasonable doubt

8 that TACOM would have been deprived of money or property.

9          **THE COURT:**  And that's what you're going to have to

10 prove.

11          **MS. PLETCHER:**  Absolutely, your Honor.

12          **THE COURT:**  Because that's what you have in the

13 indictment.

14          **MS. PLETCHER:**  Yes.  We believe that the evidence in

15 the record to date shows that the facts viewed in the light

16 most favorable to the government, meaning that the testimony

17 that we have presented through Mr. Rocklin, through

18 Mr. McAleer, through Mr. Haynie, shows that there is enough

19 evidence there to support that contention.  Certainly, enough

20 for a rational trier of fact to believe that's the case.

21          **THE COURT:**  Beyond a what?

22          **MS. PLETCHER:**  Beyond a reasonable doubt.

23          **THE COURT:**  Yes, yes, yes.  Point me to the portions

24 in the transcript that -- you know, of this proceeding that

25 make that so clear beyond a reasonable doubt.

 1          **MS. PLETCHER:**  Absolutely.  Beyond a reasonable

 2 doubt, yes.

 3          Well, if we may start with the statements from

 4 Mr. McAleer, because I believe those are the -- that is the

 5 strongest evidence that TACOM would have been deprived of money

 6 or property.

 7          In the transcript on page 1251 -- sorry.  Actually,

 8 let me give you a list of citations and then I'll walk through

 9 each of them.

10          (Brief pause.)

11          Okay.  Actually let me do it this way.  So in the

12 transcript on page 1251, Mr. McAleer says:

13               **"ANSWER:**  If I had found out that money had

14               been transferred from Company A to Company B,

15               that would have raised a lot of red flags and

16               it would have been looked at very

17               thoroughly."

18       He goes on to say two pages -- two pages later he's asked:

19               **"QUESTION:**  If you had known that Newcon had

20               arranged to pay ATN $75 per goggle for each

21               goggle that it supplied under the Battalion

22               Set II contract in ATN's place, would that

23               have caused you to ask further questions

24               before allowing a switch in this contract?"

25       Following some objections, the witness was allowed to

1    answer, and he said:

2              **"ANSWER:**  Absolutely."

3         That's on page 1253.

4         On pages 1263 to 64.  Mr. McAleer was asked:

5              **"QUESTION:**  If you had known in 2005 that

6              Newcon had agreed to tender to Dmitry Rocklin

7              and ATN a payment of $75 per piece of night

8              vision equipment that Newcon would supply

9              under the contract, if you had known that

10             fact in 2005, what would you have done?"

11        There were some objections.  Witness was allowed to

12   answer.  He said:

13             **"ANSWER:**  I certainly would have looked very

14             closely at what was transpiring on that

15             contract.  As needed, I would have involved

16             other authorities if money is now exchanging

17             hands, if agreements are being reached and we

18             are not privy.  So this would have raised a

19             lot of red flags."

20        So in that exchange what that's showing is that

21   Mr. McAleer would have been concerned had he known about the

22   original agreement and that he would have pursued it further

23   because it would have had an influence on his decision how to

24   obtain the goggles in the case that ATN was unable to perform.

25        Now, if we move on to --

1          **THE COURT:**  But this is not pled in the indictment as

2   a case to influence the decision making by TACOM.  It is to

3   deprive TACOM of money or property.  That's how it's pled in

4   the indictment.

5          **MS. PLETCHER:**  That's right, your Honor, and --

6          **THE COURT:**  And my question is:  Where is this

7   evidence that would persuade jurors beyond a reasonable doubt,

8   even looking at it most favorably to the government.  And I

9   would say that, yeah, there were a lot of alternatives.  There

10  were red flags.  And that was because they would have to

11  approve any switching or -- of suppliers.  But that doesn't

12  mean that TACOM would have lost money or property.

13         **MS. PLETCHER:**  That's right, your Honor.

14         The next step is what monetary effect would this have

15  had -- that's the next question -- on TACOM?

16         And in the transcript starting on pages 1241

17  Mr. McAleer is asked with respect to each of those options, if

18  TACOM would -- could have paid a higher price under those

19  various scenarios.

20         So under the first option, whether it would issue a

21  new bid in the transcript on page 1242 onto page 1243

22  Mr. McAleer says, Yes, TACOM could have paid a higher price.

23         With respect to the sole source option, this is in

24  the transcript on pages 1243 to 1244, he's asked, Could they

25  have paid a higher price?  His answer was, Yes.

1          Also, on redirect he followed up on this issue on

2     page 1449.  He believed that the sole course was actually the

3     most likely option and, yes, again, he would have been able --

4     or he could have paid a higher price in that situation.

5          The third option would have been to extend an

6     existing contract.  Again, in this case it would have been to

7     extend Newcon's existing contract with Anham under the

8     Battalion Set I.  This is in the transcript on pages 1244

9     and -- sorry, page 1244 and on redirect on page 1450.  On

10    page 1450 he again said, Yes, under this scenario we could have

11    been paying more.

12         So this evidence, your Honor, shows that TACOM could

13    have been stuck with the bill here.  We have heard from the

14    defendants that they intended to charge TACOM more money per

15    goggle.  They quoted a price of 1250, which was the price that

16    they paid on the Battalion Set I contract, compared to the 1760

17    that TACOM was currently paying ATN under the Battalion Set II

18    contract.  That's a significant difference per goggle.  And

19    that was the price that Newcon had intended to charge TACOM had

20    this scheme been allowed to progress.

21         **THE COURT:**  Well, what comes through much more loudly

22    and clearly than these "yes, they could have," you know, "might

23    have," et cetera, is that, in fact, if they -- because they had

24    to prove any switch-out of the supplier and chain, right?

25         **MS. PLETCHER:**  Yes, they did.

1          **THE COURT:**  Is that ITE would have had to have

2    suffered that -- you know, they would have lost money.  ITE

3    would have been the one to lose money and that came through, I

4    think, much more loudly and clearly as being the likely

5    prospect than any of these sort of, "Yes, could have," but does

6    "could have" really make -- you know, establish it beyond a

7    reasonable doubt to the reasonable juror?

8          **MS. PLETCHER:**  Your Honor, this is an attempt case.

9    So in a sense what we're talking about here are what the

10   defendants intended and attempted to do, not whether the scheme

11   would have been successful or actually could have played out.

12         **THE COURT:**  I understand that.  I understand that.

13         **MS. PLETCHER:**  But I respectfully disagree, your

14   Honor, that the -- that ITE, that the evidence showed that ITE

15   would have been the one left holding the bag here.

16         I think Mr. McAleer was clear that this was a very

17   urgent situation.  There was a war going on in Iraq.  The

18   United States was very eager to leave.  He made that clear.

19   And this was -- created a sense of urgency that would have

20   given him the authority to engage in -- to enter into contracts

21   that he might not otherwise have done under routine

22   circumstances.  And because of that he could have been

23   authorized to do a sole source, to extend an existing contract,

24   to let it out for bid.

25         And, again, because of the urgency their primary

consideration here was getting those goggles fast.  It wasn't

necessarily going to be the price.  And if he had to accept a

higher price, TACOM would swallow that higher price.  I think

that's what the evidence shows.

And, again, it was a fixed price contract, but

because of the urgency, it was not at all clear that ITE would

have been the one to take the cost.  That is what the evidence

shows.

**THE COURT:**  Ms. Boersch, do you wish to respond?

Because I think this is the weakest link in your

case, which is not the strongest case to begin with, but I

think it's the weakest link in the case.

**MS. BOERSCH:**  I would like to respond briefly as to

this.  And I think the evidence is quite clear, in fact, that

TACOM would not have been deprived of property.  Mr. McAleer

said, and this is at page 1419 of the transcript, he was asked:

> "**QUESTION:**  So during those hypotheticals
>
> that Mr. Ward was giving you you testified
>
> that one of your options, if you cannot work
>
> things out with the prime, was to have
>
> negotiated a higher price with ITE, correct?
>
> "**ANSWER:**  That would have been an option.
>
> "**QUESTION:**  But isn't it true that there is a
>
> provision in these contracts that especially
>
> when they are fixed price, that if you have

```
 1                to have to go out and actually get the other

 2                product that costs more, that you charge that

 3                to the prime?

 4           "ANSWER:  That is the language, yes.

 5           "QUESTION:  So that is what you would, in

 6                fact do, would you not?

 7           "ANSWER:  We would certainly attempt to

 8                recoup any monies beyond the fixed price

 9                involved, yes.

10           "QUESTION:  You had that unilateral option to

11                do that, correct?

12           "ANSWER:  It's unilateral."

13      And again on page -- sorry.  Can't operate Mr. Moore's

14 computer.  He's left-handed.

15      Page 1454, now we're at the sole source.  Now, we're not

16 talking about dealing with ITE.  And Mr. McAleer says in

17 response to a question about the sole source:

18           "QUESTION:  And you'd still have as your

19                option under the contract that you spoke

20                about earlier to assess any price increases

21                on the prime contractor, isn't that correct?"

22      This is with respect to a sole source.

23           "ANSWER:  That's correct.

24           "QUESTION:  So it would be more probable,

25                would it not, that you would exercise that
```

```
 1              option and pass a price increase on to the

 2              prime contractor because you had a

 3              contractual right to do so?

 4         "ANSWER:  Yes."

 5      And, finally, aside from the testimony of the Mr. McAleer,

 6   we have the evidence in the record that the government put in

 7   that the only price that Newcon ever quoted to TACOM for this

 8   contract, which was back in November, was $1,340, which was not

 9   the inflated price that the government alleges in the

10   indictment.  It's not the substantially higher price that the

11   government alleges in the indictment -- I'm sorry, they quoted

12   that to ITE.  That was in a letter to ITE that the government

13   introduced.

14      So, again, I think that there is -- there just is no

15   evidence in this record that this scheme, even if the

16   government had proved the scheme that they charged, would have

17   with sufficient probability deprived TACOM of money or

18   property.

19         MS. PLETCHER:  Your Honor, as to the defendants'

20   points that she just raised, it really is immaterial whether

21   the defendants were ultimately -- whether TACOM ultimately

22   would have been able to recoup the amount of money that it was

23   deprived of.  There is -- that is not an element of the crime.

24   That is not something that we need to prove.  And, in fact, I

25   would argue that it's -- it would certainly be a perverse
```

1   incentive if -- if that were an element of the crime.

2           It was not clear in the record at all that --

3   although it was, again, a possibility that TACOM could pursue

4   what's called a charge-back to ITE, it's not clear at all that

5   under worse circumstances with the urgent need that that would

6   have been something they would have pursued.  We don't know --

7   the record is very light that that is a likely conclusion.  And

8   even if it is, again, I think that's immaterial.

9           Finally, with respect to the amount of money that the

10  defendants would have overcharged the government, Arie Prilik

11  himself told Mr. McAleer that the price that he would likely

12  charge would be the price charged to Bat Set I, which was 2250.

13  Again, a significant increase over the 1760 that they were

14  currently paying.

15          **THE COURT:**  Okay.  With respect to the other

16  arguments raised, starting, you know, from the beginning with

17  respect to this -- you know, the agreement issue and the other

18  issues raised --

19          **MS. PLETCHER:**  Right.  So let's start with the --

20          **THE COURT:**  (Continuing) -- by Ms. Boersch.  Raised

21  by you.

22          **MS. PLETCHER:**  Okay.  Well, let's start with the

23  agreement issue.

24          So Ms. Boersch is arguing that there never was any

25  agreement here at all.  But by September 1st, I think it's

1  clear both in the record and in Mr. Rocklin's testimony about

2  the record, which right now is the only testimony interpreting

3  the record -- sorry, interpreting the conversations that we

4  have, that there was an agreement.  There was an agreement for

5  $75, that he would pay $75 per goggle to withdraw from the

6  contract.  That is all very clear from Mr. Rocklin's

7  interpretation of the conversations that he had and that we all

8  sat here and listened to.

9          The theories that Ms. Boersch are espousing about Mr.

10  Beker's belief about whether there was actually some more

11  friendly cooperative type of agreement that Mr. Beker had

12  intended, there is no evidence in the record that that is the

13  case.  In fact, Mr. Rocklin specifically disagreed with it.

14          Mr. Howden told us in opening that the -- the record

15  of the -- the transcripts themselves are quite ambiguous and

16  without the interpretation of somebody who was there, we really

17  don't know what they mean.

18          Right now in the record we have Mr. Rocklin's

19  interpretation.  And we have no evidence that Mr. Beker

20  believed that he was asking Mr. Rocklin to assist somehow in a

21  joint agreement of any sort, that he was asking to buy parts.

22          Mr. Rocklin vigorously disputes that was Mr. Beker's

23  intention and that that's what it says in the record.  And

24  right now there is no evidence to the contrary.

25          **THE COURT:**  Is it the government's theory of the case

1    that there has to be an agreement?

2         **MS. PLETCHER:**  The government's theory is that Mister

3    -- is that the defendants failed to disclose to TACOM the -- an

4    arrangement that they had where they would pay $75 per goggle

5    to stop ATN from producing, and the $50,000 had been paid to

6    reinforce that arrangement.

7         The reason why I hesitate to use the word "agreement"

8    is because "agreement," at least from a legal perspective, is a

9    term of art, as you know well, and especially for those of us

10   in the antitrust division.  When we think "agreement," we think

11   there's certain legal requirements that have to be met.  And

12   those -- that type of agreement is not necessary.

13        I will agree, I will say, yes, they had an agreement

14   and they failed to disclose their agreement, but that agreement

15   in no way is a formal legal agreement coming down with all of

16   the associations that one might have with that term.  All it is

17   is that Mr. Beker and Mr. Prilik and Mr. Rocklin, they

18   believed -- came to a mutual consensus on certain terms that

19   they would both carry out.

20        And, yes, we -- that is what we allege.  They failed

21   to disclose -- I will use the word "agreement" to TACOM, and

22   because of that failure it left TACOM with a misimpression, a

23   misimpression that would have caused or could have caused them

24   to lose money or property.

25        **THE COURT:**  And where was the intent that TACOM would

1  part with money or property?  Because it's not just, you know,

2  that that's the aim of it, but that, in fact -- you know, that

3  goes to the materiality, but there was the intent to, in fact,

4  accomplish that.

5          **MS. PLETCHER:**  That's correct, your Honor.

6          **THE COURT:**  Even if they didn't accomplish it, but

7  nonetheless intended to.

8          **MS. PLETCHER:**  That's correct, your Honor.  We do

9  believe that the evidence right now shows evidence that the

10 defendants intended to defraud TACOM.

11          Starting off with a motive, we believe the evidence

12 shows that the defendants had a motive here.  The motive was

13 simple, and that was that they wanted to make more money.

14          Mr. Prilik at one point says, "Money loves to be

15 counted."  We believe that shows right there one statement of

16 what he was thinking when he attempted to get into this, this

17 deal.  His initial conversation --

18          **THE COURT:**  Unless it somehow missed you or escaped

19 you, most people who are in business do love to make money.

20 That's where they are there.  And their shareholders, albeit

21 that this is a privately held company, they insist that you

22 make money.  If you don't make money, then you're out of

23 management.

24          **MS. PLETCHER:**  That's true, your Honor.  Some

25 business people will go a little farther down the road to make

1  money than others, and push the line --

2          **THE COURT:**  It is when the behavior falls afoul of

3  the law.

4          **MS. PLETCHER:**  That's exactly right.  And we believe,

5  starting from the first conversation that Mr. Prilik had with

6  Dmitry Rocklin, that he showed his state of mind and his intent

7  when he began discussing the possibility of some sort of price

8  fixing agreement.

9          We believe that showed that Mr. Prilik was not happy

10  with the state of pricing in the night vision goggles industry.

11  He was angry that Dmitry Rocklin had come in with such a

12  lowball offer.

13          If one company -- again, this is something well known

14  to everybody in business.  If one company starts pricing very

15  low, then that sets a low floor for others.  And he believed

16  from the statements that he made there that he needed to get

17  prices up because he wouldn't be able to compete at such a low

18  cost.  And that was the beginning of the scheme.

19          So when he made this initial inquiry into a

20  potentially legal price fixing agreement, it showed that he had

21  the mind set right there to cross that line from doing

22  legitimate business over to going a little bit farther than the

23  law allows in order to make money.  He asked for Dmitry Rocklin

24  to join him in holding up prices.

25          The next conversation that they had in following

```
 1   conversations he went even further and discussed the illegal
 2   antitrust section, which I think is now famous.  We have talked
 3   about it many times.  We heard of it in trial, repeatedly.  And
 4   what that whole section showed was that Mr. Prilik was very
 5   willing to cross the line into illegal business practices and
 6   he knew --
 7             THE COURT:  That may get to motive, but then motive
 8   is not something you have to prove.  You can dress up the case,
 9   I suppose, with those kinds of things and why people do what
10   they do.
11             But the question I have is:  What is the evidence of
12   the intent to defraud TACOM by depriving it of money or
13   property?
14             MS. PLETCHER:  Yes, your Honor.
15             So I spend time on the motive because it -- motive is
16   an important piece of intent.  We don't know what was going on
17   in the defendants' minds.  All we know is what they did.
18             So if we see what motivation they had that led them
19   to do the things they did, it gives us some context for what
20   they did.  So right now we know that --
21             THE COURT:  Well, it might have been -- they didn't
22   like these people at ITE, maybe they want to take a bite out of
23   their hide.
24             MS. PLETCHER:  It might have been.  I don't think
25   that's where the evidence went, your Honor, but, yes, that's
```

1    true.

2           So at this point from what I have described so far,
3    we have this --

4           **THE COURT:**  It's not good business practice, that's
5    for sure, okay.  Probably a good 17200 Business and Professions
6    Code case, civil case.

7           **MS. PLETCHER:**  That's right, it would be.

8           So this was the state of mind for the defendants.
9    Then the evidence we have here is -- this is all Dmitry
10   Rocklin's interpretation of what we -- of what we heard the
11   defendants saying in the transcripts.

12          He believed, and the government believes the
13   transcript showed, that Mr. Rocklin when he realized that --
14   I'm sorry.  When the defendants realized that Mr. Rocklin was
15   not going to engage in a price fixing conspiracy, they thought,
16   hmm.  They moved on to a different type of proposal, also
17   illegal, one in which they would pay ATN to withdraw.

18          The question then is who were they planning on
19   defrauding in this new scheme?  And as I discussed before, it
20   was very -- Mr. Rocklin made clear his interpretation of the
21   record was that Mr. Prilik and Mr. Beker did not want to work
22   with ITE.  They said -- they even went so far as to say the
23   Americans would swallow it.  They knew who would be taking the
24   hit if their scheme went through.

25          The way their scheme -- their scheme worked, it would

1  have backed TACOM into a corner.  That's why this, "The

2  Americans would swallow it" comment was so important.

3         TACOM did not have a lot of options under this urgent

4  situation to get the goggles that they needed, and the

5  defendants were aware of this.  In the transcript they said

6  that TACOM could switch -- that they either had to switch --

7  they realized that TACOM could either switch to Anham, which is

8  the existing contract option and pay 2250 per goggle, or they

9  could put it out for bid.  And Newcon was the only option who

10  could provide the goggles in the time frame they needed and at

11  a relatively lower price.

12         TACOM, Derek McAleer and Mr. Bean were both clear

13  that the government was not looking for high end goggles here.

14  They wanted a moderate range goggle, and there were not a lot

15  of options in that market for the delivery and the time

16  schedule.

17         So TACOM was -- would have been, in effect, backed

18  into a corner by this scheme, and the defendants showed that

19  they knew that.  So that, coupled with the fact that they did

20  not want to work with ITE, that they called up Derek McAleer

21  directly and a whole series of other people in the TACOM

22  organization to explain their complaints.  And in the

23  conversations with Derek McAleer they made offers and proposals

24  to him to contract directly with Newcon by taking on the

25  existing -- or to bring Newcon into this contract, either

1  through a sole source or through an existing contract.

2          I have some quotes from the transcript, your Honor

3  that I -- that support our argument here.

4          (Discussion held off the record

5          amongst government counsel.)

6          **MS. PLETCHER:**  Exhibit 141, which is tape 12, which

7  is a conversation between Mr. Prilik and Mr. McAleer.  Mr.

8  Prilik is saying:

9          "What I'm saying is that we can talk to ITE"

10         -- so this is page 6, lines 9 through 14 of

11         Exhibit 41, the conversation between Mr.

12         Prilik and Mr. McAleer.

13     Mr. Prilik says:

14         "What I'm saying is we can talk to ITE, but

15         it's just going to delay the process.  At the

16         end of the day if you want reliable supply

17         and quality and the paperwork, I think that

18         we are the only alternative and we have

19         proven it on the previous contract when we

20         delivered 5,000 pieces ahead of schedule."

21     On page 8 Mr. Prilik goes on to say, this is line 19:

22         "As long as we can follow all the legalities,

23         and that will raise the price probably to the

24         same level that we supplied under the

25         previous contract, which is still going to be

1566

```
 1                  far much faster, which is more important for

 2                  you and less expensive than sourcing the

 3                  product."

 4       So those two statements alone show Mr. Prilik was very

 5   aware of TACOM's options.  He knew that Newcon would be the

 6   only reliable option -- sorry, viable option, and he was going

 7   to charge them the same price he would have charged them in the

 8   Battalion Set II contract.  That was the intent.  Mr. Prilik

 9   said it very clearly that that's what he intended to do.

10           THE COURT:  Okay.  Now how about -- let's move on to

11   the duty to disclose issue.

12           MS. PLETCHER:  The duty to disclose, your Honor, I

13   believe we have vetted this one numerous times previously.

14           This is not an honest services case.  The cases to

15   which Ms. Boersch referred, *Chiarella* and *Skilling*, those are

16   honest services cases -- I'm sorry, *Chiarella* was a 10(B)5

17   case.  This is not such a case.

18           This is a straightforward wire fraud to deprive one

19   of money and property, not an honest services case.  So there

20   is no duty to disclose in this case.  I think the case law is

21   very clear on that point and it simply does not apply.

22           THE COURT:  And where do we go from here?  The

23   constructive amendments, I guess, were the other -- was the

24   other issue that has been raised?  Do you want to address that?

25           MS. PLETCHER:  Right.  So the defendants frequently
```

1   have stated that the government's case has shifted as it has

2   gone on, but the fact is that the indictment charges false

3   pretenses, and the -- in concealment is a type of false

4   pretenses.  We don't believe that we have amended our

5   indictment in any way.  In fact, the evidence shows -- fully

6   supports that the defendants presented false pretenses to the

7   victim, in this case TACOM.

8          And the question -- it seems that the defendants may

9   be asking whether we've identified the right victim.  If I

10  remember correctly, I think in *Millwitt*, the question there was

11  whether the right victim had been identified.  And in this case

12  the government identified TACOM in the indictment and has

13  presented evidence that TACOM is the victim.  So we believe

14  that that is entirely consistent.

15         Are there any other issues that I missed here?

16         **THE COURT:**  Well, there was some other aspects of

17  constructive amendment that were referenced as well.

18         But what I think they are complaining about, and they

19  have complained about before, is that when you go through

20  the -- on page three of the indictment, for example, it was

21  part of the scheme to defraud, et cetera, they did the

22  following things.  They contacted ATN representatives and so on

23  and so forth.

24         And then this instruction to ATN to create an invoice

25  billing that was false, et cetera, causing the $50,000 to be

1  transferred and telling TACOM that ATN could no longer supply

2  night vision goggles, et cetera.  But I think what they're

3  complaining about is that there is no allegation that this

4  arrangement that they -- you know, between ATN and Newcon was

5  not disclosed; that there was this arrangement, and it was not

6  disclosed.  And I think that's what you're complaining about,

7  correct?  That -- that really seems to be the thrust of all of

8  this, now, because you're calling it a "concealment case."  And

9  it didn't start out quite that way.  I mean, yes, you did

10 include omissions, and so forth; but I think that -- am I

11 correct?  Is that what you're alleging?

12         **MS. BOERSCH:**  That is what we're alleging.  And, I

13 mean, the indictment makes no reference to omissions at all,

14 other than the boilerplate word "omission" in the --

15         **THE COURT:**  Yes.  Right.  Mm-hm.

16         **MS. PLETCHER:**  Right.  And there's a word --

17 Ms. Boersch calls it "boilerplate," but there's a reason why

18 that word is there; because when one alleges false pretenses,

19 there are a number of ways in which the false pretenses could

20 occur.  In the indictment, the points laid out in the means and

21 methods section of the indictment, starting on paragraph 10,

22 are -- are illustrative facts that the government alleges

23 occurred.

24         Actually, we do believe that we have proved these

25 facts.  And we characterized the scheme in the indictment as

1569

1  using false or misleading pretenses, one of which could be an

2  omission.  And I don't believe that we've presented any

3  evidence to the contrary.  In fact, I believe that we've

4  presented evidence supporting exactly that.

5          **THE COURT:**  Okay.  Ms. Boersch, do you wish to

6  respond to any of what we've heard?

7          **MS. BOERSCH:**  Yeah, just briefly.

8          I mean, again, I think that there just is not

9  evidence in this record to support the agreement, or the TACOM

10  would have been defrauded of property.  Ms. Pletcher relies

11  primarily on Mr. Rocklin's testimony.

12          The problem -- if that's what they're going to hang

13  their case on, that is clearly not sufficient to prove the

14  charges beyond a reasonable doubt for a couple of reasons.

15          Number one -- and the -- we're going to ask for this

16  instruction again, but Mr. Rocklin's testimony about his -- his

17  understanding about what these guys meant on that tape is not

18  evidence of what these guys meant on the tapes, as the Court

19  repeatedly instructed the jury.

20          And I think it's -- it's error, based on *Freeman* and

21  the other cases we cite, for a lay witness to be able to opine

22  on what someone else meant.  Mr. Rocklin's understanding of

23  what they said on those tapes is, frankly, irrelevant; but it's

24  certainly not an evidentiary foundation on which these guys

25  could be convicted, particularly -- particularly because

1  Mr. Rocklin committed perjury twice in this court, and admitted

2  that he fabricated a document in an attempt to basically frame

3  these guys with the FBI.  So his testimony is absolutely not

4  credible.  And the Court certainly can't rely on his testimony

5  to support an argument that these charges have been proven

6  beyond a reasonable doubt.

7          And we are going to be asking at some point to strike

8  his testimony in its entirety, because it is based -- he sat

9  herein the court and lied twice to this jury, and admitted that

10  he fabricated a document that obstructed justice that document

11  was then presented to the grand jury and the grand jury

12  returned its indictment in part on the basis of that document.

13          **THE COURT:**  Which document are you talking about?

14          **MS. BOERSCH:**  The so-called customs letter that he.

15          **THE COURT:**  Oh that, yeah.  Mm-hm.

16          **MS. BOERSCH:**  They testified.

17          And he presented that to the FBI claiming that

18  Mr. Beker had prepared it.

19          **THE COURT:**  But it's issues of credibility.  And, as

20  you know, it's -- that's really not for me to decide at this

21  point.  The question is whether there's enough evidence that it

22  could reasonably be believed by the jury.

23          **MS. BOERSCH:**  Right, but it has to be credible

24  evidence.  And Mr. Rocklin's --

25          **THE COURT:**  You're asking me to make that -- that

 1  determination, that it's credible.

 2          **MS. BOERSCH:**  I think the fact -- we don't have a

 3  case here where a guy just says, "Oh, I'm sorry.  I forgot."  I

 4  mean, he -- he lied.  He says he -- he says these two things

 5  were attached.  Then he says, "Oh, I'm sorry.  I forgot."

 6          Okay.  So he forgot.  So maybe that's not --

 7          **THE COURT:**  But I have to take the heart the same

 8  instruction I've given the jury.  You may believe in a witness'

 9  entire testimony, or none of it, or some of it.  And the fact

10  that you don't believe some doesn't mean you have to disbelieve

11  all of it, but --

12          **MS. BOERSCH:**  Well, even if you believe -- again,

13  even if you believe Mr. Rocklin's testimony, which we think

14  is -- is utterly unbelievable, his testimony does not prove the

15  charges beyond a reasonable doubt.

16          His understanding is irrelevant.  It doesn't say

17  anything about what was actually agreed upon.  It's completely

18  belied by the tapes, when you actually look at the tapes,

19  themselves.  And it's belied by his only statement on the

20  tapes, where he says, "Well, I guess we never had an

21  understanding, did we?"  And that's on October 4th, at the end

22  of all of this.

23          So I don't think that the government can rely on

24  Mr. Rocklin's testimony to support its charges.

25          On the duty-to-disclose issue, the cases that we rely

1   on for that -- none of those are honest-services cases.

2   *Dowling* is not an honest-services case.   *Woods* is not an

3   honest-services case.   *Chiarella* is not an honest-services

4   case.

5          And there are other cases that we can and will cite

6   to the Court that will also not be honest-services case, that

7   say, "When you have a scheme to defraud of money or property,

8   and it's based on a nondisclosure, there has to be a duty to

9   disclose," because otherwise, as this juror said when we were

10  doing *voir dire*, when you're engaged in negotiations --

11  contract negotiations, discussions with somebody, lots of

12  things -- you don't disclose.   You have to be put on notice:

13  what is it that I'm required by law to disclose?

14         Otherwise, any nondisclosure could be picked up by

15  the government, as it has been here, and used to charge someone

16  with a very serious felony offense.

17         And we think that, absent a duty to disclose, that

18  wire fraud statute is unconstitutionally vague, and just

19  doesn't give anybody the notice that is required so that they

20  can understand what they must or must not disclose during the

21  course of discussions.

22         **THE COURT:**  Anything further, or is it submitted?

23         Well, I still come back to:  I don't think it's

24  necessary that there be an actual agreement, and that there can

25  be an arrangement or some kind of understanding, or even a

1    misunderstanding.

2           What clearly happened here was that that $50,000 was

3    transmitted.  And it was transmitted with some kind of an

4    understanding and, you know -- and with a purpose.  And so I'm

5    not that persuaded by that.

6           And again, the problem of the duty to disclose is

7    that when you're concealing this kind of conduct, I think one

8    has to look at the type of conduct that's involved, and -- and

9    it's not really -- this may sound somewhat circular, but I

10   don't think, in fact, it is, because the nature of the -- the

11   transaction and what is involved that may command that there be

12   a duty to disclose.

13          And when there is the kind of subterfuge involved,

14   then there -- seems to me that there is a greater duty to

15   disclose, if you want to call it that; but it really depends

16   upon the conduct.  And the conduct, I think, in this case, you

17   know, does not require a specific showing of duty to disclose.

18          I am still concerned, however, about this whole issue

19   of -- and whether or not there's enough evidence in the record,

20   as opposed to what could have happened, what might have

21   happened, et cetera, and a showing of the defendants' intent.

22          Yes, they wanted to make money.  They -- you know,

23   they were -- whether they were annoyed that they didn't get the

24   contract or that the prime contractor that they were working

25   with did not get the contract, and they wanted "in" on the

```
 1   deal, and so forth -- and, yes, they wanted to make money; but

 2   was there -- you know, is there enough evidence in the record

 3   from which a reasonable jury could find, beyond a reasonable

 4   doubt, again, looking at it in a light most favorable to the

 5   government, that -- and that they intended to deprive TACOM

 6   of -- of money and property?

 7            Because it's not pled as a case of influencing the

 8   decision of.

 9            It's pled as a case of intending to -- to cause TACOM

10   to to part with money or property.  And I think that that is

11   very, very -- the showing there is very, very weak, because

12   it's -- it's more a question of -- based on the evidence, of

13   what was possible?

14            We could have done this.  We could have done that, et

15   cetera.

16            But, in fact, the -- the evidence is sufficiently

17   strong that this would have come out of ITE's pocket, rather

18   than TACOM's.  And that's the problem I have with it.

19            And, you know, the constructive-amendment issue is

20   troubling, because there seemed to be -- this -- this was a

21   moving -- this case was a moving target.  We did get it nailed

22   down, I think, finally, as to what the claims were, but I'd

23   have to go over -- in order to rule on that, I'd have to go

24   over the grand-jury transcript.

25            So I'm partially of a mind to grant the motion with
```

1  respect to the intent to deprive, et cetera; but on the other

2  hand, it might be better to go forward and just take the rest

3  of the evidence, and see what we have at the end of the trial.

4           **MS. PLETCHER:**  Your Honor, if we may, if your Honor

5  is so inclined to look at further briefing on this subject, is

6  we would like to brief the Court further.

7           **THE COURT:**  Well, if we're going to -- we're going to

8  have to go forward, if we're going to do that, with -- and

9  take -- continue to take testimony, so that we can finish this,

10  and not keep the jury hanging around.

11           Did you want to say something, Mr. Osterhoudt?  You

12  were about to rise --

13           **MR. OSTERHOUDT:**  Excuse me, your Honor.

14           **THE COURT:**  -- to the occasion.

15           **MR. OSTERHOUDT:**  I didn't want to interrupt your

16  train of thought just now.

17           **THE COURT:**  Yeah.  That's easy to do, too; let me

18  tell you.

19           **MR. OSTERHOUDT:**  The only thing I was thinking on the

20  constructive-amendment issue -- I think what happened --

21  there's an explanation for it, I think.  And part of the

22  genesis of that is an odd position of TACOM in the structure of

23  the prosecution here.

24           You have CID as a buffer, like, between TACOM and

25  between the prosecution.  And throughout the case, we can kind

1  of see that.

2          We also, kind of, make an appointment to see TACOM

3  personnel.  We don't have to make advanced one as much as the

4  government, but we all have to do it.

5          So I think when the indictment came down.  I don't

6  think the prosecution, or the FBI agent, certainly, that

7  testified to the grand jury, was privy to the information about

8  what happened here.

9          I mean, in other words, the -- the -- it's hard to

10  make the case -- and it's no longer alleged -- that the

11  defendants intended to lie, you know, about ATN's abilities,

12  for example, because even if -- I mean, that was a -- but I

13  don't think that was known.  The whole business of Rocklin

14  going back and convincing people about Russian tests, or

15  whatever -- I think it was presented as a fairly

16  straightforward case.  They lied.  The defendants lied to the

17  government -- to TACOM -- regarding the capacity of ATN to

18  perform.

19          That's the way it was presented in Canada by McAleer;

20  or at least attributed to him in the record of the case there.

21  And that was the way, I submit, that it was presented to this

22  grand jury.  And so that's the reason we made the

23  constructive-amendment motion.

24          When the defendants came here from Canada, we began

25  to get discovery.  And I suspect the Government also began to

1  get discovery.  And we saw that there was a huge issue about

2  ATN's ability to perform that the defendants never knew about.

3  You know, nobody really knew this.

4          So when that was discovered, it seemed untenable for

5  the Government to contend to persist in the claim that there

6  was an intentional lie to TACOM about this issue.

7          So then the trace -- you know, it morphed into a case

8  of -- of nondisclosure, concealment, or omission; because

9  that's kind of what was left to the Government when the

10 Government looked at the situation it was presented with now:

11 March 2010.  So it's not tenable to claim -- they lied or

12 intended to lie because -- look.  They had a point here, didn't

13 they?  And so that's why we got there.

14         And I don't know how relevant that is to the Court's

15 analysis of the constructive-amendment issue, but I think it's

16 worth noting how I think it arose.  I do think it arose that

17 way.  I don't think the Government -- these prosecutors, or

18 certainly the FBI agents who presented the case to the grand

19 jury in December 2007 -- had any idea that they were bringing a

20 case about omissions; purely a case about omissions.

21         That evolved.

22         That's why I think there has been a constructive

23 amendment, as you characterized it; as a moving target.

24         And I know that you've said you will view the record

25 in that, and the transcripts.  And I respectfully urge the

 1   Court to do that.  And I only add these comments because I

 2   think that explains it -- actually what happened.

 3            So that's what I wanted to say.

 4            **THE COURT:**  How long is the -- do you have a copy of

 5   the grand-jury transcript?  How long is it?

 6            **MS. BOERSCH:**  I do, your Honor.

 7            It's not long.  I've marked it up, but we could get

 8   you a clean copy.

 9            **MS. HAMILTON:**  We can provide one to you, your Honor.

10            **THE COURT:**  Is that the extent of it -- what you have

11   there?

12            **MS. BOERSCH:**  Yes, yes.

13            **THE COURT:**  Mm-hm.  Well, let's let's go on, and deal

14   with the jury instructions.  And then I will mull this over a

15   little more.

16            **MS. PLETCHER:**  Would it help your Honor to mull it

17   over, over papers?

18            **THE COURT:**  No.

19            **MS. PLETCHER:**  Could we submit more?

20            **THE COURT:**  No.  No, no, no.  I think not.

21            I think that it's a question of looking at, you know,

22   some portions of the transcript.  And -- and so if there are

23   particular portions of the transcript, particularly on this

24   issue, that I, you know, focused on -- I mean, the grand-jury

25   transcript will be helpful; but also with respect to the trial,

1    on this issue of the evidence or lack thereof with regard to

2    the intent to deprive TACOM of money or property.  And you want

3    to cite me to certain portions of the record.

4              **MS. PLETCHER:**  Yes.

5              **THE COURT:**  You've done that somewhat, you know; but

6    if you want to give me that, that would be helpful.

7              **MS. PLETCHER:**  Yes.  We will do that.

8              **THE COURT:**  Okay.  Now, with respect to jury

9    instructions, what do we have now?

10             I have a set of the Government's disputed

11   instructions -- and there are six of them, it looks like -- and

12   then defendants' additional proposed instructions.

13             **MS. BOERSCH:**  Mm-hm.

14             **THE COURT:**  Which -- of which there -- I don't know.

15   You didn't number them, so I don't know how many there are, but

16   there are maybe -- what? eight or so of them?

17             **MS. BOERSCH:**  Yeah.  There are about six, actually,

18   there.

19             **THE COURT:**  Actually?  That's all?

20             **MS. BOERSCH:**  Six or seven.

21             **THE COURT:**  Okay, okay.  Now, during the recess, did

22   you get any of these, you know; decide to withdraw any of them,

23   or get -- come to some agreement on any of them?

24             **MS. BOERSCH:**  We did, actually.

25             **THE COURT:**  Yeah?  Okay.

1           **MR. WARD:**  Yeah.

2           **MS. BOERSCH:**  But not a lot.

3           **THE COURT:**  But not a lot.  Well, a little bit helps.

4           So what do we have left that's in dispute, starting

5    with the Government's?  And then we'll go to defendants.

6           **MR. WARD:**  Well, the Government's disputed

7    Number 1 -- I think we both agree on the -- on the first

8    sentence.

9                "Determining whether a scheme or plan

10               to defraud exists, or a scheme or plan to

11               entitled to consider not only defendants'

12               words, but also the circumstances in which

13               they were used as a whole."

14          **THE COURT:**  Mm-hm.

15          **MR. WARD:**  The second sentence, I believe, the

16   defense has objections to.

17          **MS. BOERSCH:**  No.  We've rolled on the second

18   sentence.

19          **MR. WARD:**  So they're okay on the second sentence.

20          **THE COURT:**  How about the third?

21          **MS. BOERSCH:**  We do not like the third, because of

22   this constructive-amendment issue.  It -- we think it's an

23   effort to drag back into the case these supposed false

24   statements that have been removed from it.

25          And I don't -- the Government doesn't now allege that

1581

 1  the defendants' statements were false.  And I think this

 2  invites the jury to speculate that there are some false

 3  statements here that could be the basis of a finding of guilty

 4  and -- and the case is currently postured.  That's not

 5  possible.

 6          MR. WARD:  We respectfully disagree, and we believe

 7  it should be here, so there isn't jury confusion that -- our

 8  concern -- what we're alleging is that the statements that were

 9  made -- particularly Arie Prilik's statements -- taken as a

10  whole, were misleading and deceptive, because he failed to tell

11  TACOM that, you know, they had arranged to pay him $50,000 to

12  withdraw; that they had arranged to give them $75 a goggle if

13  they withdrew; and that they --

14          THE COURT:  Well, what about putting at the end of

15  this,

16              "Thus, even if statements as part of

17              the scheme are not literally false, you may

18              consider whether the statements, taken as a

19              whole, were misleading and deceptive, by

20              reason of omissions"?

21          MR. WARD:  By reason of omission?

22          MS. BOERSCH:  If you find -- if you find the

23  omissions charged in this case.

24          MR. WARD:  Well, I think we talk about that later,

25  so --

1          **THE COURT:**  I think for the purposes of this

2   instruction, that would be sufficient, because there are

3   more -- I think there are more instructions that deal with

4   this.  So I think if you add "by reason of" -- first, of

5   course, I said it, but I didn't write it right.  By reason of

6   omissions --

7          **MS. BOERSCH:**  Or because of the omissions -- because

8   of the alleged omissions?

9          **MR. WARD:**  Yeah.  Either way is -- is fine.

10          **THE COURT:**  "By reason of," or "because of the

11   omissions."

12          **MS. BOERSCH:**  Right.

13          **THE COURT:**  Okay?  Okay.  Either one is fine.  So use

14   either one, but would you add that language?

15          What about Number 2?

16          **MS. BOERSCH:**  Your charge.

17          **MR. WARD:**  Yeah, I can add that.

18          Number 2 --

19          **MS. BOERSCH:**  Again, this is -- there are references

20   again to false statements that we think has to come out.  If

21   this is limited to omissions, we're fine; but the first

22   sentence, for instance, "All deceptive or misleading

23   statements, false statements, half-truths," blah, blah, blah --

24   any reference to that should come out.

25          I think if they want to say:  eight -- you know, in

1    the second sentence, "an omitted" -- because this is the

2    materiality instruction, "an omitted fact is material" -- I

3    mean, all materiality only applies to the omissions.  It's the

4    omissions that have to be material.

5            So all of this reference in here to false statements,

6    half-truths, is irrelevant, beside the point, confusing, and

7    invites the jury to consider a theory that's been rejected.

8            **THE COURT:**  Well, why do we even need this?  I mean,

9    because we already tell them, you know, what "materiality"

10   means.

11           **MR. WARD:**  Well, I think this is -- it helps

12   define --

13           **THE COURT:**  I mean, it says a "statement."  You know,

14   the instruction itself says,

15                  "The statements made or facts omitted

16           as part of the scheme or material; that is,

17           that they had a natural" --

18           -- you know, "tendency to influence," et cetera, et

19   cetera.

20           **MS. BOERSCH:**  Well, we agree that's sufficient.

21           **MR. WARD:**  Is that in -- that's in --

22           **THE COURT:**  That's in the -- that's in the -- yes.

23   That's in the wire-fraud instruction.

24           **MR. WARD:**  Oh, yeah.  Number 12.

25           **THE COURT:**  Yeah.  The main wire-fraud instruction.

1          **MR. WARD:**  Well, I think what this adds -- and we

2   could certainly pare down, but you know, the idea that under

3   the standards, the test is not whether TACOM made a decision --

4   actually made a decision.  The test is:  would have had a

5   tendency to influence TACOM.

6          **THE COURT:**  But you've got other ones.  Doesn't

7   matter whether it's successful or not.  It's the same thing,

8   right?  I mean, it's --

9          **MR. WARD:**  I think this is a little more specific,

10  but we do have a success of the scheme and material

11  instruction.

12         **THE COURT:**  Yes, right.  I think this is unnecessary.

13  I think, you know, the less verbiage, the better.

14         **MR. WARD:**  Okay.

15         **THE COURT:**  So that will not be given.

16         **MR. WARD:**  Good news on Instruction 3.  We agree.

17         **THE COURT:**  You agree?

18         **MR. WARD:**  Yeah.

19         **THE COURT:**  Okay.  Okay.

20         **MR. WARD:**  And good news on Instruction 4.

21         **THE COURT:**  You agree on that?

22         **MR. WARD:**  We agree, although we're going to change

23  the last paragraph, starting, "All knowing participants."

24  We're going to add the language -- and if you look at the

25  bottom, over the defendants' objections, is -- we're just going

1    to change it to add the phrase, "who have the requisite intent

2    to defraud."

3              **THE COURT:**  Yeah.  The material that's in italics

4    down there?

5              **MS. BOERSCH:**  Yeah.

6              **MR. WARD:**  Right.  We'll change our last paragraph

7    from that last paragraph.  And then we're okay, right?

8              **MS. BOERSCH:**  Right.

9              **THE COURT:**  Okay.  Mm-hm.

10             **MR. WARD:**  Number 5, we don't agree; but obviously,

11   particularly given the fact that we don't have, now, Number 2,

12   I think this is very important.  And it's --

13             **MS. BOERSCH:**  And this goes to -- and we have -- I

14   think, maybe if we talk about this in the context of one of our

15   proposed instructions, it will make some more sense.

16             **THE COURT:**  Which is on page?

17             **MS. BOERSCH:**  Page 7 of our proposed -- or --

18             **THE COURT:**  No.

19             **MS. BOERSCH:**  Actually, page 8.

20             **THE COURT:**  Six?  Eight?

21             **MS. BOERSCH:**  Seven and eight.  They're related, but

22   mostly 8.

23             **MR. WARD:**  Eight?

24             **MS. BOERSCH:**  Uh-huh.  Oh, I've I -- I'm going off

25   the one we filed -- so sorry -- which is different from the

1586

1    Word document.  I, mean the WordPerfect document.  It's the

2    last one.

3            **THE COURT:**  Yours starts out with, "Absent a duty to

4    disclose"?

5            **MS. BOERSCH:**  No.  I'm sorry.  It's confusing.

6            **MR. WARD:**  Page 10, I think, on the --

7            **MS. BOERSCH:**  Page 10.  Okay.

8            **THE COURT:**  Okay.

9            **MS. BOERSCH:**  It should be titled, "Scheme to

10   Defraud, Deprivation of Money or Property."  So we say,

11               "While it is not a defense to charge

12           participating" --

13           (Reporter requests clarification)

14           **THE COURT:**  What's the problem with this now?

15           **MS. BOERSCH:**  We want the last phrase.

16               "You must still find that the scheme to

17           defraud, if successful, would have been

18           capable of depriving TACOM of money or

19           property."

20           And that's the issue we've been talking about this

21   morning, because we think that hasn't been proven here.  And

22   there's a distinction between a scheme being successful or not

23   successful.  We understand if a scheme is unsuccessful, that's

24   not a defense; but it's not a scheme to defraud *ab initio*,

25   unless it is a scheme that, if it were successful, would have

1   deprived someone of money or property.  And that, we think, is

2   critical.  And that's why we've asked for this instruction.

3   And that's why we object to theirs, which only contains half of

4   the concept.

5          MR. WARD:  Let me try to address both of these

6   together.  I think our instruction that the success of the

7   scheme being immaterial is absolutely supported by the law.

8   It's a model jury instruction, and is critical in this case,

9   because, in fact, the scheme wasn't successful.

10          And there can't be any confusion in the jury's mind

11  that, just because the FBI caught these guys, that, well, no

12  harm; no foul.  That's not the law.  And that's -- and so I

13  think that the Government's Instruction Number 5 is -- is very

14  important in this case.

15         MS. BOERSCH:  And we don't have a problem with it, as

16  long as ours is also given.

17         MR. WARD:  And in terms of the defendants -- it's --

18  I mean, first, it's -- the statute and the indictment is not --

19  does not use the word "deprive."  it's "obtain money."

20          And it goes to the defendants' intent.  Did they

21  intend to obtain money from TACOM?

22          And that's really what we've been alleging

23  throughout.

24          This argument that, well, maybe, they could have gone

25  back and sued ITE in some speculative manner, and maybe we'd

1588

1    recover something --

2           THE COURT:  Well, what your instruction says that you

3    submitted -- your instruction on wire fraud, and the one that I

4    used at the outset is, "capable of influencing TACOM to part

5    with money or property."

6           MR. WARD:  Yes.  Absolutely.  And that's what --

7           THE COURT:  Mm-hm.

8           MR. WARD:  That's really at the heart of what this

9    case is about.  I mean, this is what they were trying to do.

10   They wanted TACOM to part with money; to give them money, which

11   is clearly evident in Arie Prilik's conversations with TACOM.

12   It's evident in the discussions.  The idea was to get money

13   from TACOM.

14          This idea that you're going to come back and around,

15   and maybe somebody will sue ITE, and maybe we could recover

16   under some theory, some way, some amount of money -- it

17   isn't -- it's -- it's really irrelevant.

18          The defendants wanted the money from TACOM.  They

19   wanted the goggles contract.  The money was coming from TACOM.

20   And --

21          THE COURT:  I guess you're making that argument,

22   going back to the -- the issue that I -- the trouble I had with

23   on the evidence.

24          MR. WARD:  I absolutely was, your Honor, because I --

25   it fits in with these instructions.

1          **THE COURT:**  You're trying to sneak that in here.

2          **MR. WARD:**  But I thought I'd just sneak it in --

3  well, I'm not trying to sneak it in.

4          **MS. BOERSCH:**  But if I could address that, that's

5  exactly the problem here, is -- because they're charged with

6  defrauding TACOM of money and property; not ITE.

7          And, unless what we have proposed is given, I'm

8  concerned that the jury will think that, although this scheme

9  never could have defrauded TACOM of money or property, because

10  TACOM only deals with the prime contractor, the fact that ITE

11  might have lost some money is sufficient for these defendants

12  to be found guilty.  And that's, A, not what they're charged

13  with, and so that would be a constructive amendment, and --

14  and -- well, I guess there is no B.  That's just not what they

15  were charged with.

16          And what -- the language we add is not at all

17  inconsistent with their instruction that, of course, you know,

18  the fact that the scheme is shut down by the FBI or the fact

19  that Rocklin was the progenitor of the scheme doesn't mean it's

20  a defense; but still, it had to have been, if successful, a

21  scheme capable of depriving TACOM of money or property.

22          **MR. WARD:**  Well, I think what we've alleged that it

23  could have -- they could have obtained money.  It's not

24  "deprived" TACOM of money; but "could have obtained" money from

25  TACOM.  So I think the language needs to be clear.  I think

1590

1    it's --

2            **THE COURT:**  Well, you're not arguing with -- with the

3    Government's proposed Instruction 5, so long as you have some

4    of this other language added to it, correct?

5            **MS. BOERSCH:**  So -- correct.

6            **THE COURT:**  Is that correct?

7            **MS. BOERSCH:**  Correct.

8            That last sentence in our --

9                "You must still find that the scheme to

10               defraud, if successful, would have been

11               capable of depriving TACOM of money or

12               property."

13           **MR. WARD:**  And we object on two levels.  We think

14   it's unnecessary; but if the Court is considering it, the

15   language needs to be "could have been capable," and it needs to

16   be "obtaining money or property from TACOM," because that's

17   what's alleged.

18           **MS. BOERSCH:**  Well, I mean, I don't know how

19   "depriving" is any different from "obtaining."  If someone

20   obtains it from TACOM, TACOM's been deprived of it.  Plus,

21   "obtaining" suggests that if they're legally paying somebody,

22   that's fine.  I mean, deprivation has the notion that it's

23   somehow a wrongful obtaining of money or property, as oppposed

24   to if TACOM decides to pay Newcon for goggles because they're

25   worth every penny of it.  That's not an unlawful obtaining of

1    money or property.

2            **MR. WARD:**  Well, there are other instructions,

3    obviously, that deal with the intent to defraud, deceive, or

4    cheat; but what's alleged in the indictment is the -- is that

5    the scheme, if -- would have been to obtain money or property

6    from TACOM.  And I think the language should track that.  And I

7    definitely think that it's -- it's "could."

8            I mean, the "would" language is too strong.  And it's

9    going back to this success of the scheme.

10           I mean, it -- you have to look at their intent, and

11   could it have possibly obtained money or property.

12           **THE COURT:**  I'm a little worried about "could it

13   possibly," but what if we just add a sentence that essentially

14   tracks the earlier instructions at the end of the Government's

15   instruction?

16                "However, the Government must prove

17           that this scheme was capable of influencing

18           TACOM to part with money or property."

19           **MR. WARD:**  The Government must prove --

20           **MS. BOERSCH:**  I still object to that.  I -- I think

21   that, again, in this --

22           **THE COURT:**  That's essentially what you're saying.

23           **MS. BOERSCH:**  No.  That it would have.  It would have

24   ultimately --

25                In other words, that it could have, after some series

1592

```
 1   of speculative -- I just don't think that is consistent with

 2   the law that the scheme has to be a scheme.

 3            THE COURT:  Doesn't say "could."  It says, "was

 4   capable of."

 5            That's the language, essentially, that's in the model

 6   instruction.

 7            However, the Government must prove that the scheme

 8   was capable.  They don't have to prove anybody lost any money.

 9            They do have to prove that the scheme of capable of

10   influencing TACOM to part with money or property.

11            MR. WARD:  So --

12            MS. BOERSCH:  Well, I guess we're -- I don't know.

13   We're mixing concepts.  The "influencing" language is relative

14   to the materiality element --

15            THE COURT:  Mm-hm.

16            MS. BOERSCH:  -- which is not what we're talking

17   about here.

18            If we just say "would have been capable of depriving

19   TACOM of money or property," I'd be fine with that.

20            MR. WARD:  So,

21               "However, the Government must prove

22            that if the scheme" --

23            MS. BOERSCH:  They're already going to be told the

24   "capable of influencing" things in the materiality instruction.

25            MR. WARD:  The way I have it --
```

1           "However, the Government must prove

2           that the scheme, if successful, was capable

3           of influencing TACOM to part with money or

4           property."

5       **MS. BOERSCH:**  And I would rather it say, if --

6   whatever -- "would have been capable of depriving TACOM."

7           **THE COURT:**  You're saying "could have."

8           And you're saying "would have."

9           And I'm saying "was."

10      **MS. BOERSCH:**  Okay -- "was capable of depriving TACOM

11  of money or property."

12          **THE COURT:**  Okay.  And that's what we're going to do.

13  It will read,

14          "However, the Government must prove" --

15          At the end of your Number 5,

16          "However, the Government must prove

17          that the scheme was capable of influencing

18          TACOM to part with money or property."

19      **MR. WARD:**  Was capable of influencing.

20      **MS. BOERSCH:**  It's the "influencing" part that I

21  object to.  I think it should say, "was capable of depriving

22  TACOM of money or property."

23      **MR. WARD:**  Well, I think the "influencing" addresses

24  the materiality.

25      **MS. BOERSCH:**  I think it has to actually deprive them

1   of money or property if it's successful; not just that it might

2   influence them somehow.

3         **THE COURT:**   This if-successful language, and so

4   forth -- I'm going to give the instruction I've just given, as

5   I've just indicated, because that only makes it more confusing.

6   And I know it helps to confuse the jury a bit, but we don't

7   want to do that.

8         **MR. WARD:**   Do you want me to write it?   Resubmit it?

9         "However, the Government must prove" --

10        **THE COURT:**   (Reading)

11        "However, the Government must prove

12        that the scheme was capable of influencing

13        TACOM to part with money or property."

14        **MS. BOERSCH:**   And I'll just preserve my objection.

15        **THE COURT:**   And your objection's noted for that.

16        **MR. WARD:**   Take out the if-successful bit?

17        **THE COURT:**   Yeah.

18        **MR. WARD:**   So then we'll -- that's five.   "Was

19   capable of influencing."

20        **THE COURT:**   And then we've got six.

21        **MR. WARD:**   Six -- we got an agreement on that.   We

22   are going to make a --

23        **THE COURT:**   Oh.   Wow.

24        **MR. WARD:**   I know.   There's the last paragraph that

25   was taken from the *Pinkerton* charge that --

 1              **THE COURT:**  You try to sneak a little *Pinkerton* into

 2  the general conspiracy?

 3              **MR. WARD:**  Yeah.

 4              **MS. BOERSCH:**  By the way, I want to preserve my

 5  objection to any sort of *Pinkerton* instruction.  We've agreed

 6  to some language in here, but it's only because the Court has

 7  basically said you're going to give it, anyway; but I would

 8  like to preserve an objection to it.

 9              **THE COURT:**  I don't know if I said I was going to

10  give it, or not.

11              **MS. BOERSCH:**  I think in the pretrial --

12              **THE COURT:**  Mm-hm.

13              **MR. WARD:**  We did -- we got -- we ditched the longer

14  *Pinkerton* charge.

15              **THE COURT:**  Yeah.  Do we really need the *Pinkerton*

16  charge?

17              **MR. WARD:**  This is a better way to go about it.

18              **THE COURT:**  Okay.

19              **MR. WARD:**  This last paragraph we added came from

20  *Pinkerton*.  And we've agreed that just we're going to change

21  the language in the last sentence.  If one member of a

22  conspiracy commits -- instead of a "crime," we'll say "commits

23  an act in furtherance of a conspiracy," the other members --

24              **THE COURT:**  Mm-hm.

25              **MR. WARD:**  -- have committed that act.

1          **THE COURT:**  And then you agree to that?

2          **MR. WARD:**  Then we agree.

3          **THE COURT:**  Okay.  Okay.  So that takes care of

4    yours.  Now, defendants' -- the first one --

5          **MR. WARD:**  Well --

6          **THE COURT:**  Oh, yeah.  Okay.

7          **MR. WARD:**  I think we've been over this.  And the

8    Court has given sufficient instruction on understanding.  And

9    this is unnecessary.

10          It's also unfairly limited to Dmitry Rocklin.  And I

11    think it -- if there is -- if there is an instruction, it

12    should be what the Government suggests; and it should apply to

13    all witnesses.  And it should be, you know, that their

14    testimony only reflects their personal understanding of what

15    was said.

16          This idea of whether a statement is vague or

17    ambiguous -- I mean, that's a conclusion the Court reached in

18    allowing the statements.  It's not -- it shouldn't go back to

19    be considered by the jury.

20          I think the whole thing is unnecessary, because I

21    think it's been pretty clear, from your Honor's instructions,

22    that when a witness testifies as to their understanding, that

23    reflects their understanding.

24          **MS. BOERSCH:**  And I -- and I disagree.  I mean, the

25    Government's clearly -- you know, just to say that

 1   Dmitry Rocklin's understanding of what was happening is -- is

 2   proof positive of what happened here -- the problem with that

 3   is, number one, as the *Freeman* case and another case I cited

 4   earlier -- and I forget it name of it -- make it very clear

 5   that it's error.  And it's wrong for a witness to be able to

 6   opine on what someone else's intent in a particular tape.

 7           Now, we got around that by characterizing it not as

 8   an opinion, which I still think it is, but as Mr. Rocklin's

 9   understanding; but nevertheless, his understanding has to be

10   somehow relevant, and I'm not sure that it was.  So I think

11   this instruction is necessary, so that the jury clearly --

12           **THE COURT:**  This one.

13           **MS. BOERSCH:**  -- understands that it's the tapes that

14   are evidence.  It's the defendants' words, themselves, that are

15   evidence.  Mr. Rocklin's understanding is irrelevant, unless --

16   unless it helps them understand something that's ambiguous in

17   the tapes.

18           **MR. WARD:**  I just don't think that's 701 and that's

19   not the law.

20           Mr. Rocklin's testimony is evidence, just as the

21   defendants' understanding will be evidence, but the only

22   limitation is that it just reflects their understanding of what

23   was said.

24           But, certainly, witnesses are allowed to say what

25   their understanding of vague or ambiguous statements were and

 1  there were certainly many in these tapes, and it's -- and

 2  that's evidence.

 3          **MS. BOERSCH:**  Well, and this doesn't prevent the jury

 4  from considering that.  It just says, Yeah, you can consider

 5  Mr. Rocklin's understanding if you find it's ambiguous.

 6  Otherwise, you've got to consider the defendants' words on the

 7  tapes.  That's the evidence.  Not Mr. Rocklin's understanding

 8  prompted, you know, after five years of government

 9  investigation.

10          So I just think this is critical in this case, given

11  that --

12          **THE COURT:**  Let's not fill all the space.  Leave a

13  little space vacant here, because I think it can all be

14  improved upon.  And I'm just looking at it to see that --

15  because what we're really talking about are the recorded

16  conversations for the most part, right?  The tape recorded

17  conversations?  Right?

18          **MR. WARD:**  In terms of what his understanding was,

19  correct.

20          **THE COURT:**  So I think it's something along the lines

21  of:  You have heard taped conversations in this case and the

22  tapes themselves and the transcripts of them are the evidence

23  from which you are to consider what was said in those

24  conversations.  And witnesses have been permitted to testify as

25  to their understanding of certain conversations, but you may

1   consider their testimony only as to their personal

2   understanding and not as reflecting any understanding of other

3   parties to the conversation, what other persons to the

4   conversation may have meant or understood.  Something like

5   that.

6             **MS. BOERSCH:**  That's fine.

7             **THE COURT:**  You can do something like that?

8             **MR. WARD:**  Yeah, I --

9             **THE COURT:**  So a preliminary sort of statement.  I

10  mean, I can write it out myself and do it, I guess, but that's

11  -- or you can try it.

12            But it essentially would say a preliminary statement

13  about the taped conversations are essentially -- I don't want

14  to use the term "best evidence," but you know, are the evidence

15  of what was said in these -- in the conversation.  You've heard

16  testimony that -- and you're to consider it for that purpose.

17            You've heard testimony about what certain witnesses

18  understood by what was said, but their testimony reflects only

19  their personal understanding and you are not to consider it for

20  the purpose of determining whether that -- what was intended by

21  other speakers in the conversation or something like that.

22            **MS. BOERSCH:**  We'll get the transcript at the end of

23  the day and I'll draft something.

24            **THE COURT:**  And it won't be any clearer.

25            **MS. BOERSCH:**  It's easier to remember when I take a

1600

1    look at it.

2             MR. WARD:  I think we have, and it's fairly clear.

3    You have heard the taped conversations.  The transcripts,

4    because of the Russian, are the evidence of what was said.

5             And you've heard testimony from witnesses as to what

6    their understanding, and they have been permitted to testify as

7    to their understanding, and you are to consider that only as to

8    their understanding of what was said.

9             THE COURT:  And not as to the -- you know, what was

10   intended by other persons to the conversation or what was meant

11   by other persons -- by other persons of the conversation;

12   something like that, okay?

13            MR. WARD:  I think that goes a little too far.  I

14   think you can testify as to what the other person -- what they

15   understood the other person was saying.

16            THE COURT:  But it's their understanding.

17            MR. WARD:  It's their understanding, yeah.  We can

18   say it's just their understanding --

19            THE COURT:  You've got the words?

20            MR. WARD:  Yeah.

21            THE COURT:  Okay.  You've got your understanding of

22   them, but you can't use them to determine what that other

23   person really intended or meant.

24            MS. BOERSCH:  This is our instruction, so I'll get

25   the transcript at the end of the day and draft one up and give

1601

```
 1   it to Mr. Ward and he can look at it.

 2               THE COURT:  Okay.

 3               MS. BOERSCH:  Okay.  The next one this is --

 4               THE COURT:  Well, why don't we just do "inconsistent

 5   statement."  Why are we focus focusing on Dmitry Rocklin?  I

 6   mean, who else is going to testify?  It's going to apply to

 7   everybody who testifies, right?

 8               MS. BOERSCH:  I'm fine to delete his name from that.

 9               THE COURT:  And, you know, I -- I don't know why we

10   single out any particular witness.

11               MR. WARD:  I think that there's an instruction,

12   that's the proper instruction, on the credibility of all the

13   witnesses.  We've already got that.  This is --

14               THE COURT:  But there are also model instructions

15   about prior inconsistent statements or inconsistent statements

16   or a witness may be discredited or impeached by showing

17   previously made statements.  There are model instructions that

18   go to that.

19               MR. WARD:  There is this *falsus in uno, falsus in*

20   *omnibus* --

21               THE COURT:  That's right.  That's right.  Exactly.

22               MR. WARD:  But it's an extreme instruction and the

23   defendants want to characterize Dmitry Rocklin's testimony in

24   the worst light possible, but I don't think the actual

25   testimony supports that and I really think that this is a
```

1602

1 | credibility call, and the instruction on credibility is laid

2 | out in whatever --

3 |     **THE COURT:**  Yeah, right.  I know.  I will give this,

4 | but not -- it's not going to highlight any particular person.

5 |     We will just say:  You've heard the testimony of --

6 | the testimony of witnesses may be discredited or impeached by

7 | showing, et cetera.

8 |     **MS. BOERSCH:**  That's fine.

9 |     **THE COURT:**  And now the alleged scheme to defraud --

10 |     **MS. BOERSCH:**  And this --

11 |     **THE COURT:**  Why do I think there's probably an

12 | objection to this one?

13 |     **MR. WARD:**  Because you -- we raised it last time and

14 | you rejected it during the pretrial conference.  I mean, this

15 | was already addressed.

16 |     **MS. BOERSCH:**  And, again, I think since the evidence

17 | has come in, it's pretty clear that their theory is just

18 | constantly shifting.

19 |     What we were told prior to the case starting in the

20 | United States Supplemental Statement of Facts was that this was

21 | the fraud that we were charged with and this was the fraud that

22 | we should defend.  And I think the jury, similarly, has to be

23 | told and understand that this is the fraud they are charged

24 | with, and this is the fraud that you have to find.  Not some

25 | vague, you know, scheme to defraud who, why.  They need to be

1603

 1  told what the specifics of the charged scheme to defraud are,

 2  and that's why we want this one.

 3       **MR. WARD:**  Well, I think the other instructions made

 4  very clear what is required, what we're required to prove under

 5  our indictment, and what the elements are.  This is not a

 6  required instruction.  It's unduly limiting.  I think it's

 7  confusing.

 8       What we've alleged is that there were material

 9  concealments that involve their arrangement and involved the --

10  certainly, the $50,000 payment.

11       **THE COURT:**  Well, what part of this is -- is

12  erroneous in terms of what the government is contending?

13       **MR. WARD:**  Well, I don't think any of it's

14  necessarily erroneous, but it's --

15       **THE COURT:**  Are you contending more than this?  Is

16  there something you want to add to it?  Because it does help to

17  focus the jury to let them know what you're contending and what

18  you have to prove.

19       **MR. WARD:**  Well, I guess a couple of things.  I mean,

20  you know, the false pretenses piece of it, this idea that the

21  statements that were made were misleading because they

22  concealed the true nature -- because it concealed the true

23  nature of the arrangement.  And I think this is unduly limited

24  that sense.

25       You know, what the government alleged is, you know,

1604

1   that Arie Prilik is -- that the scheme to perform when Arie

2   Prilik made his calls to TACOM, he made all these statements to

3   TACOM, but in doing so he -- he left out very material

4   information, information that would have been material to Derek

5   McAleer, would have been material to TACOM, and created this

6   false impression that --

7          **THE COURT:**  Well, what about taking out the last

8   sentence and then stating something like:  The government

9   alleges the defendants... you know, through false pretenses,

10  including statements made false by reason of omissions and that

11  the scheme essentially consisted of the following material

12  omissions.

13          In other words, you put in there -- because there are

14  statements that are made, yes, and that those statements are

15  made false by reason of what they omitted or failed to

16  disclose, but that's your theory, also.  That, you know --

17         **MS. BOERSCH:**  Well I think their theory is those

18  statements, at best, were made misleading, not false.

19         **THE COURT:**  Made misleading then.  Either one of

20  those, the false or misleading you can put in.

21         **MS. BOERSCH:**  False just invites the jury to bring

22  back in this whole notion that somehow they are lying when they

23  say that ATN's goggles don't meet the specs.  They do meet the

24  specs.

25         **THE COURT:**  No, because then when I'm -- no, but --

1605

1   hold on.

2          And so, you know, to include the language about, you

3   know, statements or representations made false or misleading by

4   reason of omissions and that -- you know, and including the

5   following omissions.

6          **MR. WARD:**  Yeah.

7          **THE COURT:**  Whatever.

8          **MR. WARD:**  So the government alleges --

9          **THE COURT:**  Dress that up a little bit better than I

10  did, a little more artful.  And then take -- so that last

11  sentence doesn't -- take out the last sentence and put that in,

12  you know, somewhere in the first paragraph.

13         **MR. WARD:**  We'll before the three dots.

14         The government alleges that false pretenses include

15  statements made false or misleading --

16         **MS. BOERSCH:**  "Made misleading."  Can we just say

17  "misleading," "made misleading"?  Why do you need "false" in

18  there?

19         **MR. WARD:**  Because it was false.  It wasn't the true

20  agreement that they had.

21         **MS. BOERSCH:**  Well, the statements weren't false.

22  What you're saying is that the context what made -- it ended up

23  misleading.  See, when we get back into accusing us of a false

24  statement, that's why I have the problem.

25         I think it's enough to say:  Alleges a scheme to

```
 1  defraud, including statements made misleading by reason of

 2  three material omissions.

 3          MR. WARD:  Well, I think false --

 4          THE COURT:  But if you omit something that, you know,

 5  is material, then it can make the statement false even though

 6  some of the statement may be true.  I mean, that's left for

 7  argument.

 8          So I'll leave the "false or misleading" in, but by

 9  reason of the omissions and then spelling out what you contend

10  though those omissions are, which are those three essentially.

11          MR. WARD:  I will work on this one.

12          MS. BOERSCH:  I'm quoting directly from their

13  Supplemental Statement of Facts, yes.

14          THE COURT:  That's fine, okay.  All righty?

15          Now comes your favorite one, right?

16          MS. BOERSCH:  Yes, the duty to disclose.

17          THE COURT:  I think I will note your objection for

18  the record.

19          MS. BOERSCH:  Okay.  Thank you.

20          THE COURT:  Thank you.

21          MR. WARD:  Thank you.

22          THE COURT:  Moving right along.

23          MS. BOERSCH:  This will go up some day.  There will

24  be a case.

25          THE COURT:  Okay.  Maybe it will be this one, but...
```

1607

```
 1           MS. BOERSCH:  No, not this one.

 2           (Court reading sotto voce.)

 3           THE COURT:  What happens to this one?  We take that

 4  out too, right?

 5           MS. BOERSCH:  No, no.

 6           THE COURT:  You have to rework it.

 7           MS. BOERSCH:  They are proceeding on some sort of

 8  concealment theory.  So if they take out the duty to disclose

 9  reference, I think it should say -- and I think this is

10  absolutely required:  You are instructed that mere omissions --

11  and this is their case.  This is their theory that they

12  propounded in response to our argument on the duty to disclose.

13           So it should say:  You are instructed that mere

14  omissions cannot be actionable as fraud unless accompanied by

15  blah, blah, blah.

16           THE COURT:  Deceptive acts or contrivances, which can

17  be other statements then.  It doesn't have to be acts.

18           MS. BOERSCH:  Well, this is -- I'm not sure about

19  that.  This is a quote from their case, U.S. *Colton* --

20           THE COURT:  Oh, good old Fourth Circuit, huh?  Ninth

21  Circuit always follows the Fourth Circuit's case law.

22           MS. BOERSCH:  See, the Ninth Circuit requires a duty

23  to disclose.  So now we're going outside the circuit, but...

24           MR. WARD:  The first sentence is actually from

25  *Colton*, sort of.  The better statement of *Colton* is the one we
```

1608

1   quote down in our objection.

2          **THE COURT:**  I think this is -- this instruction is

3   more confusing than anything else.

4          **MR. WARD:**  I do, too.

5          **THE COURT:**  I'm not going to give it.  Your objection

6   is noted for the record.

7          **MR. WARD:**  Thank you.

8          **MS. BOERSCH:**  Your Honor, I think you have to give

9   some instruction on concealment because all the cases say mere

10  nondisclosure is not enough.  It's just not enough.  You either

11  have to have a duty or some form of concealment and it has to

12  be active concealment.  The law is absolutely clear on that.

13  Even the government doesn't dispute that.

14         **THE COURT:**  Then rewrite it.  Rewrite it, okay?  And

15  leave out the last sentence, which -- and I think rework the

16  first sentence a little bit.

17         **MR. WARD:**  Do you see the -- well, I think because we

18  have their prior instruction, I think that really -- that

19  really -- I mean, we're very clear here.

20         **THE COURT:**  Well, mere omissions -- that is correct,

21  mere may not be actionable.

22         **MR. WARD:**  I mean, the prior instruction.  I guess

23  not the duty to disclose, but the one -- the alleged scheme to

24  defraud.  I mean, that really --

25         **THE COURT:**  And let's take out this "cannot be

1609

1  actionable."  Let's call it -- find something else.

2            **MS. BOERSCH:**  Can't we just say "cannot be fraud"?

3            **MR. WARD:**  Well, the --

4            **THE COURT:**  "Is not sufficient to constitute fraud"?

5            **MR. WARD:**  It should be --

6            **THE COURT:**  Or, "are not sufficient to constitute

7  fraud, unless accompanied by deceptive acts or contrivances

8  intended to hide information, mislead, avoid suspicion or

9  prevent further inquiry into a material matter."

10           **MS. BOERSCH:**  Yes.

11           **MR. WARD:**  I think we should add the other sentence

12  from *Colton* there, "the latter is characterized by mere

13  silence," because that's throughout Colton.

14           **MS. BOERSCH:**  Huh-huh.

15           **MR. WARD:**  That's really the distinction that Colton

16  makes.  And the case that the defendants cite on the duty to

17  disclose, *Dowling* that was a case where it was mere silence.

18  It was the Elvis Presley records.  There wasn't any fraud in

19  the sale of the records.  The only fraud was the guy failed to

20  disclose to the copyright holders that he had -- he was selling

21  their records.

22           And so the *Colton* case spends a lot of time saying,

23  you know, if you're just silent, if you don't do anything, then

24  that's -- then that's not concealment and that's fraud.  But

25  when you take these steps, you know, deceptive acts or

1  contrivances or statements, which I think is right, that

2  becomes concealment.  I think we need the later as

3  characterized by mere silence to distinguish and not confuse

4  the jury as to the law.

5          **MS. BOERSCH:**  No, I don't think so --

6          **THE COURT:**  I think that statement makes it even more

7  than confusing.

8          **MS. BOERSCH:**  Right.  This is not a mere

9  nondisclosure case, as the government keeps saying.  So that

10 doesn't add anything or help the jury at all.  I think --

11         **THE COURT:**  Well, if you like the silence part, you

12 can use it at the --

13         **MS. BOERSCH:**  I don't like the silence part.

14         **THE COURT:**  Hold on.

15         You are instructed that mere omissions or silence

16 cannot be -- well, we are going to -- does not constitute fraud

17 unless accompanied by...

18         **MS. BOERSCH:**  That's fine.

19         **MR. WARD:**  Your Honor, I guess I'm just a little

20 concerned about this idea that "mere omissions" is going to

21 confuse the jury, because we're just saying here are the

22 omissions, here are the omissions, and now we're saying, well,

23 mere omissions.

24         **THE COURT:**  But they have to be accompanied by

25 something, right?

 1          **MR. WARD:**  Well, I think it's in the previous

 2  instruction.  It's -- they don't have to be accompanied by

 3  something.  They just have to be omissions with the intent to

 4  deceive, and we have that.

 5          **MS. BOERSCH:**  No.

 6          **MR. WARD:**  I think if you add an instruction that

 7  says -- you know, it's just much better to quote from what

 8  *Colton* said.  The law clearly distinguishes between concealment

 9  and nondisclosure.  Former is characterized by deceptive acts

10  or contrivances.

11          I just -- I'm concerned that you have this language

12  that says "mere omissions," that they are going to say, well,

13  these were just mere omissions and, in fact, exactly, they

14  were --

15          **MS. BOERSCH:**  But this is not a nondisclosure case.

16  If it were a mere nondisclosure case, then a duty is absolutely

17  required.

18          So if we're going to suggest to the jury that somehow

19  mere nondisclosure is at issue here, then we have got to have a

20  duty instruction.

21          **THE COURT:**  And, well, what you have is that, you

22  know, the mere omissions are not actionable unless you have

23  these various things that then -- that are articulated in the

24  rest of the sentence, in which case then they become

25  concealment or they amount to concealment.

1          MS. BOERSCH:  Right.

2          THE COURT:  That's what it's saying.

3          MS. BOERSCH:  Right.

4          THE COURT:  But I find that, "The latter is

5     characterized by mere silence," I short of shake my head, what

6     does that mean?  "The latter," I guess, refers to

7     nondisclosure, but it's not -- poorly constructed, if this is a

8     direct quote, but that's my grammatical opinion -- or opinion

9     on grammar, I should say.  Which wasn't a very grammatical way

10    to say it, was it?

11         What they are saying is nondisclosure -- you could

12    say "nondisclosure" or "mere omissions" or "mere silence," any

13    of those all fall in that same category.  You've got to have

14    all this other stuff.

15         MR. WARD:  I think nondisclosure or silence cannot be

16    actionable unless accompanied by deceptive acts or contrivances

17    intended to hide information, mislead, avoid suspicion or

18    prevent further inquiry into a material matter.  I think that's

19    the --

20         THE COURT:  Essentially, what you are saying is there

21    are omissions and then there are omissions.  There are

22    omissions that -- you know, that really amount to concealment

23    and there are omissions that amount to nondisclosure.

24         MS. BOERSCH:  Well, see --

25         MR. WARD:  I think there is concealment and then

1613

1    there's nondisclosure.

2              **THE COURT:**  That's what they're saying.

3              **MR. WARD:**  I think we say mere -- nondisclosure or

4    silence, mere nondisclosure.  Therefore, silence cannot be

5    actionable unless it's accompanied by deceptive acts.

6              You have got an instruction in the one prior.  You're

7    saying --

8              **THE COURT:**  Are you wed to the use of the term

9    "omissions" as opposed to "silence" or "nondisclosure"?

10             **MS. BOERSCH:**  No.  If you want to say:  You are

11   instructed that mere omissions or nondisclosure --

12             **MR. WARD:**  Nondisclosure or silence --

13             **MS. BOERSCH:**  Mere omissions or mere nondisclosure --

14             **THE COURT:**  You said --

15             **MS. BOERSCH:**  Why are you so obsessed with "silence"?

16             **MR. WARD:**  I'm okay with "silence" --

17             **THE COURT:**  No, "omissions."  The use of the word

18   "omissions" and whether it's confusing because they are

19   alleging omissions and then when you say "mere omissions," but

20   then you have got to have this --

21             **MS. BOERSCH:**  That's because that's what the case law

22   says; that if the case is based on mere omission or

23   nondisclosure, whichever you want to call it --

24             **THE COURT:**  Why don't we just call it

25   "nondisclosure," "mere nondisclosure"?

1614

```
 1              MS. BOERSCH:  That's fine.  That's fine.

 2              THE COURT:  Okay.  That's what I wanted to find out.

 3              MR. WARD:  Great.

 4              THE COURT:  See, we've got it.  And we'll just give

 5  that first sentence, and then I think the rest of it is

 6  unnecessary verbiage.

 7              MR. WARD:  Okay.

 8              THE COURT:  Okay?

 9              Now, have we taken care of --

10              MR. WARD:  We're getting closer.

11              THE COURT:  The next one on page nine?

12              MS. BOERSCH:  And this one goes to the ITE versus

13  TACOM, and it's just to make it clear that they have got to

14  find that it's TACOM and not somebody else that would have lost

15  money or would have -- that these guys would have been paying

16  money from TACOM and not somebody else.

17              MR. WARD:  I think we covered this one in the other

18  instructions.  In the joint instructions we limit the wire

19  fraud instruction, clearly, to obtain money or property from

20  TACOM.  We just went back over this government's instruction,

21  or we made clear --

22              THE COURT:  Well, it was your government's proposed

23  instruction, and the disputed ones earlier, that's the one I

24  gave.

25              And why don't we just -- why don't we just do this?
```

1   Rather than having, you know, because all this verbiage, I

2   think, you know, there's a chance it only adds to the confusion

3   sometimes.  If we take that instruction and say, you know:

4   "It had a natural tendency to influence or were capable of

5   influencing TACOM and not any other person."

6            **MS. BOERSCH:**  And which instruction are you talking

7   about?

8            **THE COURT:**  That's the basic wire fraud instruction.

9            **MS. BOERSCH:**  I see.

10           **THE COURT:**  Okay?

11           **MS. BOERSCH:**  You are in the undisputed instructions.

12           **THE COURT:**  Yes, yes.  And just adding to that:

13   "TACOM and not any other person or party."

14           **MS. BOERSCH:**  Okay.

15           **MR. WARD:**  What instruction are you -- we'll take a

16   look at it.

17           **THE COURT:**  I don't know which number it is because

18   I've got my old set of instructions here.

19           **MS. BOERSCH:**  You are referring to the one that sets

20   out the elements of wire fraud?  It says:  Second, the

21   statements made, blah, blah, blah... relating to TACOM's --

22   capable of influencing TACOM and not anyone else to part with

23   money or property.

24           **THE COURT:**  Yeah, not any other -- I would say it

25   "and not any other person or party."

```
 1              MS. BOERSCH:  Yeah.

 2              THE COURT:  Okay?

 3              MS. BOERSCH:  Okay.

 4              THE COURT:  Is that agreeable?

 5              MS. BOERSCH:  Okay.

 6              MR. WARD:  So we'll add that to the joint and take

 7    out this one at page 9.  So, again, I think --

 8              MS. HAMILTON:  I'm sorry, your Honor, one moment.

 9              (Discussion held off the record

10               amongst government counsel.)

11              THE COURT:  Are you talking to each other?  Then

12    that's fine.

13              MS. HAMILTON:  I'm sorry, your Honor.  I apologize.

14    I have a concern and I was trying to express to Mr. Ward, and

15    we folded Ms. Boersch into it.

16              MR. WARD:  I think their concern is that if the jury

17    got confused and said, well, this would have influenced TACOM

18    and it also might have influenced ITE so, therefore, it's out.

19              MS. BOERSCH:  No.

20              MR. WARD:  What needs to be clear is that it's -- the

21    issue is influencing TACOM.

22              MS. BOERSCH:  And not someone else.

23              I mean, the language the Court proposes is not going

24    to have the result that Ms. Hamilton is worried about.  It has

25    to influence TACOM and not somebody else.
```

1617

1          THE COURT:  And this is in the second element that

2  we're talking about, right?

3          MR. WARD:  Yes.

4          MS. BOERSCH:  Correct.

5          THE COURT:  The statements made or facts omitted,

6  et cetera, are capable of influencing TACOM and not any other

7  person or party.

8          I guess we can just say "party," I guess, right, or

9  "person."  Maybe we don't have to say both.  Which word do you

10  like better?

11          MS. BOERSCH:  "Entity?  "Party" suggests a party to

12  the action.  "Any other person or entity"?

13          MR. WARD:  We can say "any other person."

14          THE COURT:  Well, we now know, thanks to the Supreme

15  Court, that everything is a person.

16          MR. WARD:  But --

17          THE COURT:  Okay, "person or entity."  Okay.  And

18  that takes care of that one.  We're really whipping through

19  these here.

20          MR. WARD:  Page 10, I think, in the scheme to defraud

21  deprivation of money or property.  We just added some of this

22  language to our disputed scheme -- success of the scheme to

23  defraud.

24          THE COURT:  Right.  So this is subsumed in what we

25  did, right, with yours?

1          **MR. WARD:**  Yes.

2          **THE COURT:**  That takes care of it then, right?

3          **MR. WARD:**  Yeah.

4          **MS. BOERSCH:**  I can't read your writing at all.

5          **THE COURT:**  I always feel like this is a judicial

6   equivalent of -- you know, what they say about making

7   legislation, it's like making sausage.  The jury instruction

8   process is settling jury instructions.

9          Okay.  Does that take care of it?

10          **MS. BOERSCH:**  I think so.

11          **THE COURT:**  Okay.  Well...

12          **MS. HAMILTON:**  Your Honor, we have a copy of the

13   Grand Jury transcript for you.

14          (Whereupon, document was tendered

15           to the Court.)

16          **THE COURT:**  Okay.  And when will you get me the

17   critical citations with respect to the issue that I raised?

18   Can we get those sometime this afternoon?  It's 1:00 o'clock

19   now.

20          **MS. PLETCHER:**  Yes, your Honor.  Can we have by the

21   end of the day?  Are you leaving --

22          **THE COURT:**  I'm not hanging around late tonight, I'll

23   tell you.  So, you know, can you get them in by 3:00?

24          **MS. PLETCHER:**  By 3:00?  Ooh...  4:00?

25          **THE COURT:**  3:30.  How is that?  Can you do that?

 1  Ms. Boersch and all of you, any of the citations with respect

 2  to what was going to happen and who was going to absorb the

 3  cost and all of that.

 4          **MR. HOWDEN:**  Yes.  We will provide the Court the

 5  citations.

 6          **THE COURT:**  Okay.  With the transcript pages and

 7  lines and so forth.

 8          **MR. HOWDEN:**  Yes.

 9          **THE COURT:**  Okay.  So I will have to read this

10  sometime between now and my 2:30 p.m. pretrial.  Okay.

11          **MR. WARD:**  Your Honor, we had one last issue.  We

12  need to get from the defendants whether they -- if there is a

13  conviction, whether they want the issue of forfeiture to go to

14  the jury.

15          **MR. HOWDEN:**  We would rather reserve that issue for

16  the Court.

17          **MR. WARD:**  Fine.

18          **THE COURT:**  Okay.  What about the verdict form?  Did

19  you get that sorted out?  Is it agreeable?

20          **MS. BOERSCH:**  We don't -- I've never seen one.

21          **MS. HAMILTON:**  We filed one back in the beginning.

22          **MR. HOWDEN:**  We didn't get it sorted out.  We need to

23  do that.

24          **THE COURT:**  If you could do that as well.

25          So if we reconvene tomorrow -- Mr. Ward turned around

1620

1  very quickly, because of the conditional clause, I guess -- we

2  are going to start with Mr. Prilik, is that it?

3          **MR. OSTERHOUDT:**  That's the plan, your Honor.

4          **THE COURT:**  And then be prepared for Mr. Beker.

5          Any other witnesses or would that be it?

6          **MR. HOWDEN:**  I think that would be it, your Honor.

7          **THE COURT:**  Okay.  Well, I'll read through this and

8  I'll let you know.  The thing is, we will get it figured out.

9  Okay.  Thank you.

10         (Whereupon there was a recess in the proceedings

11          from 12:55 p.m. until 3:55 p.m.)

12         **THE COURT:**  Okay.  I reviewed the grand jury

13 transcript.  I did not -- I have not yet received -- and maybe

14 that's because, you know, the other designations -- and also

15 learned that, in fact, is we are not going to have any more

16 witnesses I guess from the defense side.  And I gather then we

17 wouldn't have any from the governments and we would proceed to

18 argument, et cetera.

19         **MS. HAMILTON:**  That's correct.

20         **THE COURT:**  But I looked -- I looked at the

21 transcript, and -- so it's really that, that I wanted to

22 address and get some responses to.

23         In going before the grand jury, do you have to layout

24 all of the elements, and have findings by the grand jury with

25 respect to all of the elements, in order to return an

1621

1   indictment on the elements that are being alleged in the

2   indictment?

3           **MS. HAMILTON:**  Yes.  Yes, your Honor.  There has to

4   be, so I'm just looking at the specific thing we got here; but

5   that there has to be -- I'm just reading it.  So the indictment

6   need only contain sufficient facts the following elements can

7   be found.  And then --

8           **THE COURT:**  And what the indictment --

9           I know what the indictment is supposed to do.

10          **MS. HAMILTON:**  Yes.

11          **THE COURT:**  What I want to know is:  does the grand

12  jury have to have before it, or be told, what all of the

13  elements are?

14          **MS. HAMILTON:**  Yes, your Honor.  I apologize.

15          **THE COURT:**  Because otherwise, how could they come up

16  with an indictment?

17          **MS. HAMILTON:**  That's correct.  That was in a

18  separate piece that we just realized was not attached to this

19  afterwards.  There was a reference at the end here to

20  "additional information provided at the end," and they were

21  provided with the elements.

22          **THE COURT:**  Well, may I see?  May I see the

23  additional that --

24          **MS. HAMILTON:**  I apologize.  I just realized on the

25  way up here that I was not provided with that information,

1622

```
 1  so -- I, mean to give to you.  So we can get it to you.

 2           THE COURT:  Well, I'd like to see it.

 3           MS. HAMILTON:  Of course.

 4           MS. BOERSCH:  Your Honor, we didn't get --

 5           THE COURT:  I'm looking through this.

 6           MS. BOERSCH:  I'm sorry.

 7           THE COURT:  I'm looking through this.  Essentially,

 8  the agent is asked -- you know, told -- he is asked:  what are

 9  the elements?

10           And he says, "There are three elements."

11           Doesn't say anything about materiality.

12           MS. HAMILTON:  Right.

13           THE COURT:  Doesn't say anything about any intent to

14  deprive TACOM of money or property at all.

15           Now, is that made up for somewhere that we didn't

16  have?

17           MS. HAMILTON:  Apparently, yes, your Honor.  There

18  was a presentation made to the jury.  It is separate, after a

19  break.  And when I asked for the copies to be made, that

20  portion was not printed out.  And I --

21           THE COURT:  I want to see it.  I want to see it right

22  now.

23           MS. HAMILTON:  Yep.

24           MS. BOERSCH:  Could the defense get a copy, as well?

25           MS. HAMILTON:  Of course.
```

1          **MS. BOERSCH:**  We didn't see that.

2          **THE COURT:**  You mean you never received a copy of

3   that?

4          **MS. BOERSCH:**  We only got this same part that you

5   have.  We didn't get the other part.

6          **MR. COHEN:**  There's a reason for -- I think one of

7   the reasons is that what they have is the factual part, as far

8   as the witness testifying is concerned; but then the Government

9   made a presentation with respect to the elements to the grand

10  jury.  And that wasn't included as part of this transcript.  So

11  they have everything that was said, as far as the evidence was

12  concerned, to the grand jury.

13         **THE COURT:**  Well, we'll see.  I -- certainly, we

14  don't have it before us now.

15         **MS. PLETCHER:**  I guess they're making copies.

16  Colloquy is always separate from the transcript of the --

17         **THE COURT:**  Mm-hm.

18         **MS. PLETCHER:**  -- witness testimony.  And it may be

19  that it was kept separate.

20         **MR. COHEN:**  In fact, in all of the years I've been

21  doing this, your Honor, I don't think we've ever turned over

22  the colloquy.

23         **THE COURT:**  Well, there's always something new, isn't

24  there?

25         **MR. COHEN:**  Yeah, there is.

1624

1          MS. PLETCHER:  As a matter of course, we don't, you

2   know, turn it over to defense.

3          THE COURT:  I understand, but there's a gap.  So I

4   want to see how it's addressed.

5          (Discussion off the record)

6          MR. WARD:  Okay.  We have something nor you.

7          THE COURT:  Yes.  What have you got?

8          MR. WARD:  There was a presentation on the law and

9   the elements and the materiality that wasn't a part of the

10  transcript portion that we have received.  So we'd have to go

11  back back and get it.

12         What we do have a copy of is the script of what we

13  presented to the grand jury, which I can provide to the Court

14  and to the defendants.  And we can represent that this was what

15  we told them.  And it clearly -- and I'll just let the --

16         (Whereupon a document was tendered to the Court)

17         MS. HAMILTON:  I mean, your Honor, it's kind of

18  ironic.  What happened is that we presented the law to the

19  grand jurors.  And so then it was considered colloquy.  And our

20  budget doesn't pay for colloquy.  It only pays for witnesses.

21  And so that's why we ended up not having -- when we pay for the

22  court reporter --

23         THE COURT:  When you do the colloquy --

24         MS. HAMILTON:  When we order it, we get authorized

25  for the witness section, and not for the colloquy, which is why

1625

```
1    we don't have it.  I think now we'd be able to justify that

2    additional expenditure, if that's necessary, obviously.

3             Did you guys get a copy?

4             MR. OSTERHOUDT:  No.

5             MS. BOERSCH:  This is not the --

6             MS. HAMILTON:  This is the outline of what was

7    presented.

8             MR. HOWDEN:  Could we have two copies?

9             MS. HAMILTON:  Yeah.

10            MR. WARD:  Did I give you guys two copies?

11            MR. COHEN:  I forgot about that.

12            MS. HAMILTON:  No, we don't pay for colloquy.

13            (Pause in proceedings)

14            THE COURT:  Now, when this was given, were the

15   evidentiary supports for each of those elements also presented?

16            MS. HAMILTON:  That's the transcript.

17            THE COURT:  Or you're depending on the transcript?

18            MS. HAMILTON:  For that piece.

19            THE COURT:  So where in the transcript would the

20   grand jury get the information that --

21            Let's see if I can -- back to my indictment here.

22   Oh, it's here.  Okay.

23             -- that the scheme to defraud was to obtain money and

24   property from TACOM?  Where is the evidence in the transcript

25   that would support that allegation?  Since that is an element
```

```
 1  that is left out of the transcript when they're laying out:

 2  Okay, there's this element; there's a scheme to defraud;

 3  there's intent to defraud; and the wires were used.  And in

 4  each of those, then, they go through the evidence.

 5          What I want to know is, then:  where is the evidence

 6  with respect to the fact that it was intended to defraud TACOM

 7  by --

 8          MS. HAMILTON:  Bear with us.

 9          THE COURT:  -- causing them to -- that would be

10  capable of influencing them in parting with money or -- or

11  property?

12          MS. HAMILTON:  It's been a few years, your Honor.

13  I'm sorry.  Let me just --

14          MS. HAMILTON:  All right.  Your Honor, we've

15  identified a number of pages.

16          THE COURT:  Yeah.  Okay.  Oh, this is -- I'm sorry.

17          MS. HAMILTON:  On page 27, there's testimony there

18  that the Battalion Set I -- if the conspiracy had gone through,

19  that there was the -- according to Arie Prilik, under the

20  Battalion Set I contract, Newcon was charging $2,000 a pair,

21  approximately.  And Battalion Set II was a less amount.  So

22  there was a difference there of $700.  So that's just to show

23  that there was this dollar amount.

24          And then in terms of --

25          MR. WARD:  Let's go back to page 23 and 24.
```

1627

```
1        MS. HAMILTON:  Oh.  Sorry.

2        MR. WARD:  (Reading)

3            "Prilik said, quote,' In all

4        likelihood, it would be required from a

5        Comrade of Jordan to raise the cost and

6        very likely to change the supplier and the

7        model.'

8        Question, further down.  Question -- so further down.

9            "The proposal was that where Mr. Newcon

10       would supply the goggles to Newcon."

11       (Reporter requests clarification)

12       MR. WARD:  (Reading)

13           "So at this point, then, the proposal

14       was where, perhaps, Mr. Newcon [sic] would

15       supply new goggles to Newcon."

16       And I think that --

17       MS. HAMILTON:  Mr. Beker.  Prilik.

18       MR. WARD:  -- says TACOM.

19           -- "rather than ATN.  And Mr. Prilik is

20       now saying that it would be likely, he

21       believes, that the prices to TACOM would

22       have to be increased.  The prices to ITE,

23       who was supplying TACOM, would then be

24       raised?"

25           "Correct."
```

1628

1           And then on page 25 --

2           **THE COURT:**  Well, I mean, what does that mean?  Is it

3    clear to the jury that the prices to TACOM would have to be

4    increased?  The prices to -- and then it says the prices to

5    ITE, who's supplying TACOM, would then be raised.

6           **MS. HAMILTON:**  March through all of the quotes that

7    we have, and then bring it up, because it's cumulative.  I

8    mean, the evidence is cumulative that's provided to the grand

9    jury.

10          **THE COURT:**  Well, go on with your other pages, then.

11          **MR. WARD:**  Actually, page 25, Beker anticipated

12   charging a higher price by saying, quote.

13          In fact, we can't supply it for that price.  That is

14   to say, a direct substitute, even if we had the desire to trade

15   places, weed be unable to, because we are unable to supply it

16   to him for this price.

17          "**QUESTION:**  And when Mr. Beker says, 'trading

18          places,' what he means -- when Mr. Rocklin

19          was asked what that meant, he says -- I'm

20          quoting from the transcript now.  Mr. Rocklin

21          was asked what that meant, what he said was

22          that it meant that Newcon would supply the

23          goggles to TACOM, rather than ATN.  Is that

24          right?"

25              "That is correct."

Lydia Zinn, CSR,  CRR, and Debra Pas, CSR, CRR
Official Reporter -  U.S. District Court
(415)  531-6587

1629

```
1              Go ahead.

2         MS. HAMILTON:  Oh.

3         THE COURT:  And then you had page 27.

4         MS. HAMILTON:  Which shows that there would be a

5   price increase.

6              And then 28.

7         MR. WARD:  Question on page 28,

8              "So have you done a calculation for

9         the" --

10        Actually, let me back up.

11        "QUESTION:  Okay.  During this August 30th

12        conversation which you've just been

13        discussing, did Mr. Beker calculate how many

14        goggles remained to be supplied?"

15        "ANSWER:  Yes.  16,000 pair, under all phases

16        of the contract."

17        "QUESTION:  So have you done a calculation

18        for the approximate amount more that TACOM

19        might be liable to pay if Newcon supplied the

20        goggles, rather than ATN?"

21        "ANSWER:  Yes."

22        "QUESTION:  How much?"

23        "ANSWER:  That was approximately

24        11.2 million."

25        And did you get one on page 29?
```

1630

1          **MS. HAMILTON:**  No.  That's next.

2          **MR. WARD:**  Twenty-nine.  Quote,

3              "They discussed pricing the goggles.

4          And Beker confirmed that it was a hundred

5          percent certain Newcon would raise the

6          price to TACOM.  Beker said, 'This is a

7          hundred percent, not because I am, like,

8          playing games or joking.  My -- my costs,

9          in the end -- it's very close, ah, over

10         1,500.'"

11         Go ahead.

12         On page 47,

13             "**ANSWER:**  Prilik told McAleer the following.

14         Prilik said, 'In another issue, of course,

15         pricing."

16         **THE COURT:**  I'm sorry.  What is the page?

17         **MR. WARD:**  Page 47, line --

18         **THE COURT:**  Four?

19         **MR. WARD:**  Forty-seven.  Yes.

20         **THE COURT:**  I'm sorry.  I heard the -- I didn't hear

21    it correctly.

22         **MR. WARD:**  (Reading)

23             "Prilik told McAleer the following.

24         Prilik said, quote, 'In another issue, of

25         course, pricing.'.  He referred to ATN,

1          saying -- 'had miscalculated their

2          production costs.  Bottom line, right now,

3          the way the situation stands, you're not

4          going to get any deliveries from ATN.'

5          Prilik also said, quote, 'The case is very

6          simple here.  Any western night-vision

7          goggles are going to cost two and a half

8          thousand dollars.  We can offer reliable

9          supply, and we can offer good quality; but

10         it's not going to cost a thousand dollars.

11         That's now how it works."

12         So Prilik then reminded McAleer that only Newcon

13  could supply the needed quality and quantity of goggles.

14         And then the -- just while we're here on 48, the key

15  questions eliciting the fact that, you know, the material

16  information was concealed or omitted.

17         **THE COURT:**  Well, all -- that's about the only place

18  where it makes any kind of reference to a failure to disclose.

19         **MS. BOERSCH:**  That is, in fact, the only place in the

20  transcript that it is.  And -- and I would point out later in

21  the transcript where they run through the elements to say to

22  the grand jury, "This is what you're going to be charging them

23  with," there is no mention of this concealment.

24         **MS. HAMILTON:**  But regardless, the information was

25  presented to the grand jury, along with an indictment that

1632

```
 1  did -- that did articulate that false pretenses was a method

 2  for a scheme to defraud.  So the information --

 3           THE COURT:  Okay.  Is that it on the --

 4           MR. WARD:  Well, there was one more on this elements,

 5  on page 56.

 6           The fourth, they discussed -- and this is line 21.

 7  The fourth, they discussed the prices that Beker confirmed that

 8  Newcon -- the price to TACOM.

 9           And then, again, on page 62, at the bottom, this is

10  line 22, page 62,

11                "Second, Prilik made it clear that ATN

12                and Newcon were the only two that could

13                supply TACOM.  Prilik said, quote, 'And

14                what would the Americans do if, shall we

15                say, neither ATN nor Newcon didn't deliver

16                the goggles?  Where would they get the

17                goggles of second generation; and at what

18                price, if that's not a secret?' Rocklin

19                replied, quote, 'Well, frankly speaking, I

20                don't know either a lot, well' -- Prilik

21                interrupted, 'Would you be able to find

22                anything today that is cheaper than $2,000

23                to $2,500?' Rocklin replied, 'If it's not

24                us, not likely, especially -- especially in

25                such quantities.'"
```

1633

```
 1           And then on page 64 -- this is a repetition of the
 2   earlier quote from Arie Prilik.
 3               "It's not going to cost a thousand
 4           dollars.  That's not how it works."
 5           Prilik then reminded McAleer that only Newcon could
 6   supply the needed quality and quantity of goggles.
 7           THE COURT:  Is that it?
 8           MR. WARD:  I think so.
 9           THE COURT:  And you can see at the end of this
10   transcript there is a little confusion.
11           One of the grand jurors asked,
12               "Just out of curiosity, why would ATN
13           go directly to TACOM, and not through ITE,
14           who was technically -- who their contract
15           is with, correct?"
16           And he says,
17               "Yes.  Their contract -- well, he says
18           their contract was with ITE."
19           MS. HAMILTON:  What page, your Honor?  I'm sorry.
20           THE COURT:  This is 107, towards the end.
21           And the grand juror asks them,
22               "So what was the line of communication?
23           Was it straight to TACOM, or was it through
24           ITE?"
25           And the witness said,
```

1634

```
 1              "I believe for this one portion where
 2         ATN spoke with TACOM's Derek McAleer, I
 3         think there was a direct line of
 4         communication.  And then ITE was not
 5         initially -- was not part of that; but I
 6         believe I quoted one point that, early on,
 7         ITE notified ATN that they were receiving
 8         pressure from Newcon, saying, 'Hey, Newcon
 9         is telling us certain things about your
10         lack of -- you know, production,'" --
11         Et cetera, et cetera.
12              -- "'and that's what prompted ATN to
13         contact Newcon.'"
14         It seems to to me that in this agent's testimony, he
15    is sort of -- you know, I don't want to say "fudging," but he's
16    talking about it in the context of TACOM, and not really
17    explaining ITE's role, and sort of using them interchangeably.
18    That is the term, almost:  Interchangeably; that ITE and TACOM
19    -- but when you go through -- but my question is:  how would
20    the jury tie -- because I read those -- but how would the jury
21    tie that up to materiality element?  That is an element.  It's
22    clearly an element.
23         And, in fact, in his testimony, he was wrong.
24         And the prosecutor never corrected him and said,
25    "Well, there's another element.  Let me ask you about
```

1635

1    materiality," or anything like that, "and what that means."

2         And is the grand jury sort of supposed to decipher

3    from all of this that, in fact, what is alleged -- that -- that

4    all of -- kinds of things you've just referred to support this

5    scheme or artifice to defraud TACOM from obtaining money and

6    property by means of -- et cetera?

7         **MS. HAMILTON:**  Well, they were instructed on the

8    materiality portion due to the legal presentation.  And, in

9    terms of materiality presented by the agent, the key was that

10   Newcon had -- page 56 is an example.  They -- Beker and Prilik

11   [sic] -- and Rocklin discussed the prices that Beker -- and

12   Beker confirmed that Newcon would raise the price to TACOM.

13        And so that's -- you know, that's the material

14   portion.  That would obviously affect -- affect TACOM, because

15   the price.  They're going to be paying a higher price.

16        **THE COURT:**  Well --

17        **MS. BOERSCH:**  But that --

18        **THE COURT:**  That's at odds with some of the -- with

19   the testimony we've been hearing.

20        **MS. HAMILTON:**  Well, the entire --

21        **MS. BOERSCH:**  If I could also point out at that point

22   of the colloquy, he mentions that not in support of the element

23   of materiality at all.  So there's nothing in this grand jury

24   transcript which would tell the grand jurors what evidence --

25   specific evidence -- is legally sufficient to support the

 1  element of materiality.  It's just not here.

 2          If I could, just a couple of comments on what they

 3  pulled out.  On page 23, they quote Mr. Prilik,

 4              "In all likelihood, it would be

 5          required" --

 6          -- blah, blah.

 7          Well, Mr. Rocklin himself testified in court, when he

 8  testified, that what he was referring to -- what he understood

 9  Prilik to be referring to here -- was that the price to ITE

10  would rise.

11          And this portion that they rely on says nothing about

12  TACOM.  They're jumping to the conclusion that it's price to

13  TACOM.

14          **MR. WARD:**  What page was that?

15          **MS. BOERSCH:**  Page 23.

16          **THE COURT:**  Well, 23, it says Prilik said, quote,

17              "In all likelihood, it would be

18          required from the comrade of Jordan to

19          raise the cost, and very likely to change

20          the supplier and model."

21          **MS. BOERSCH:**  And Mr. Rocklin testified that what he

22  understood the English is convoluted to say it would be

23  required for the comrade from Jordan, to be charged higher

24  prices.  In other words, it would be required that ITE be

25  charged higher prices.  That's what Mr. Rocklin said.  That's

1637

1   how he interprets that portion of the transcript as well; but

2   more significantly, there's no testimony -- nothing in there --

3   TACOM's not even mentioned.  They're jumping to the conclusion

4   that TACOM would suffer the loss, but there's nothing in that

5   portion that says that.

6           And, as you mention, because ITE is kind of left out

7   of the equation throughout the transcript, there's no reason

8   why the grand jurors would have thought that.  That's true,

9   too, I think with the quotes on page 25, if you look at the

10  actual transcripts, it's references to ITE; not TACOM.

11          Also, in -- in a number of these portions that they

12  cite, particularly on page 27, they're talking about prices,

13  but they're not saying that they're going to raise the price to

14  TACOM.  In other words, they're just saying, "Well, here's --

15  one price we might charge is $1,300.  Another price we might

16  charge is X."

17          They're just shooting numbers around, there.  Nowhere

18  here does he say, "Ah, yes.  I'm going to raise the price to

19  TACOM."

20          **MR. WARD:**  Well, in fact, on 28 it says what's the

21  approximate amount more that TACOM might be liable.

22          **MS. BOERSCH:**  But that's the agent making a

23  calculation and jumping to the conclusion that it would be to

24  TACOM.

25          **THE COURT:**  Well, there is all SAOPL testimony about

1638

1   the numbers, and so on, and so forth.

2        What concerns me is:  when the agent is asked, "What

3   are the elements that have to be proved to prove wire fraud,"

4   he goes through those three elements.  He does not mention

5   materiality at all.

6        I understand that at the end, they apparently got

7   this spiel, right?

8        **MS. HAMILTON:**  Right.

9        **THE COURT:**  But how were they supposed to put that

10  together with -- with TACOM being the subject of the -- of the

11  fraud?  In other words, it being deprived of money or property,

12  as you claim -- because it just says the promises -- the

13  statements were material, and they would reasonably influence a

14  person -- doesn't say whom -- to part with money or property.

15       And when the elements were recited to the grand jury,

16  that one wasn't even included.

17       So there was no showing in response to those elements

18  that the grand jury -- I mean, the grand jury has to understand

19  what's going on.  It's your job to tell them, "This is what is

20  being charged.  Here are the elements," and telling them all of

21  them, and then tying the evidence up.

22       And you did it with respect to those other elements;

23  but I mean, this is a critical one.

24       **MR. WARD:**  Well, I --

25       **THE COURT:**  It isn't tied up.  What are they supposed

Lydia Zinn, CSR,  CRR, and Debra Pas, CSR, CRR
Official Reporter - U.S. District Court
(415) 531-6587

1639

```
1   to guess?

2            MS. BOERSCH:  Well, and also if I could point out --

3            THE COURT:  I have to say one other thing, going back

4   to something else that was raised in your motion earlier.  And

5   that is, as I look through that transcript, the -- I mean

6   certainly, the indictment tracks -- in terms of what is claimed

7   to be the scheme to defraud -- the false statements, et

8   cetera -- tracks what is said in the -- in the -- in the -- in

9   the transcript.  The indictment tracks that, but --

10           MS. BOERSCH:  Sounded like Tony was dying back there.

11  I was just making sure he was okay.  Sorry.

12       That -- that -- you know, it doesn't say anything about

13  omissions and it really is a different case than what the Grand

14  Jury was looking at, and that's all we've got going here now

15  because these various statements that they were claiming were

16  being made and were untrue, you're not proving that they were

17  untrue.  You're proving that there was concealment, and that

18  really was not the heart of what was -- the Grand Jury was

19  looking at and that's why the indictment looks the way it

20  looks.

21           MR. WARD:  I think what we said in the indictment and

22  what was presented to the Grand Jury was that these were the

23  false pretenses that they were presenting to TACOM for -- for

24  the reasons that ATN wouldn't perform and, in fact, the true

25  reasons they wouldn't perform were because they were being
```

1   paid, and that is made clear throughout.

2          The money payments for ATN to withdraw is a central

3   part of what was presented to the Grand Jury, as were the facts

4   that none of this was told to TACOM and that these other

5   representations were just -- as it says in the indictment, were

6   false pretenses and just -- that we were arguing over today.

7   Statements, half-truths, however you refer to it, they are

8   pretenses.  They are designed to conceal the true agreement

9   from TACOM.

10         I think it's -- it's very clear in this what the

11  facts are of this case, what the arrangement was.  It was to

12  pay ATN to withdraw so Newcon could step in and charge TACOM a

13  higher price.  And there was no shift in the theory.

14         I think we could have -- in the portion where we lay

15  out the scheme to defraud elements we could have parsed it a

16  little better, but I don't think that's a fatal flaw.  I mean,

17  all of the facts were presented.  The law is clearly presented,

18  including the materiality elements, and the Grand Jury has had

19  all of this to go on in making its decision.

20         **MS. BOERSCH:**  And I --

21         **THE COURT:**  The problem is this Paragraph 10.  When

22  Beker contacted ATN representative and offered... Beker

23  instructed the ATN representative, et cetera.  Beker caused

24  $50,000 to be transferred, et cetera.

25         Prilik told to TACOM contracting official that ATN

1641

1  could no longer supply night vision goggles due to production,

2  dah, dah, dah, dah, dah, dah.  Prilik's statements included

3  false and misleading pretenses.  Statements included false and

4  misleading pretenses.  Prilik then informed the TACOM official

5  that Newcon could supply the night vision goggles, but at a

6  substantially higher price.

7            But nowhere does it say there, for example -- the

8  place it should have gone would be:  Prilik told TACOM

9  contracting official could no longer, et cetera, and those

10  statements included false or misleading pretenses when, in

11  fact, they had agreed to, et cetera, and he failed to disclose

12  that agreement, et cetera.  And it's not there.

13            MS. BOERSCH:  It's not there.  And we have to be put

14  on notice of that if that's what we're charged with, and that's

15  been our issue with this at the outset.

16            THE COURT:  I guess what I'm looking at -- excuse me

17  for interrupting you -- is sort of a collection of the totality

18  of the circumstances or whatever.  The collection of problems

19  with what I pointed out with regard to the element that's

20  missing and really was not laid out clearly for the Grand Jury,

21  and that is reflected, also, in the indictment and the fact

22  that it does consist essentially of false statements and

23  doesn't say anything about omissions.

24            But, also, the quality of the evidence with respect

25  to whether TACOM would, you know -- or whether, in fact,

1642

1  plaintiff believed that TACOM would suffer a loss.  In other

2  words, be deprived, et cetera.

3          It's possible, but is it -- is it -- you know, is

4  there sufficient evidence which this jury has that a reasonable

5  juror could find beyond a reasonable doubt that that was the

6  intent.  I know they don't have to be successful, but it was

7  intended that TACOM would suffer a loss.

8          And because the evidence tends to show that -- in

9  fact, the bulk of the evidence tends to show that ITE is, you

10  know, the one that would lose.  It's a possibility, but that

11  doesn't rise to the level of beyond a reasonable doubt.

12          **MS. HAMILTON:**  Your Honor, the -- so the concept is

13  that the defendants intended to obtain property or money from

14  TACOM, to obtain money.  And, in fact, the scheme itself was

15  structured so that that would occur.

16          The defendants refused to do business with the prime

17  contractor who currently held the contract, so that then

18  when -- that when --

19          **THE COURT:**  That's what they say.  There is

20  something -- excuse me.  There is something -- there's

21  something in the -- I think it was very interesting in the

22  transcript.  The Grand Jury transcript suggests otherwise,

23  because they contacted ITE themselves and wanted to try to do

24  business with them.

25          **MS. BOERSCH:**  That was the evidence at trial as well.

1            **THE COURT:**  But the bulk of the evidence in this

2    case, the evidence that is not, well, it could have been.  The

3    more persuasive evidence really is that ITE would most likely

4    have been the one to suffer the loss.

5            **MS. HAMILTON:**  But that's not the evidence the

6    defendants had at the time.  It's not what they understood.

7    It's not what they acted on.  They acted on the fact that they

8    wanted to obtain money from TACOM, because they wanted to

9    increase prices under the contract with ITE.  That could not

10   occur.  They could not get paid the higher amount.  So,

11   therefore, they circumvented ITE and then there were two

12   options, and both defendants talked about those options.

13            There was an option in which TACOM would go to

14   tender, and at that point there was one possibility for bidding

15   that, that -- according to both defendants, and it was Newcon.

16   And Newcon made it very clear that they were not going to be

17   charging the prices that had been charged by ATN because they

18   couldn't afford those prices.

19            The second option that both defendants talked about

20   was that TACOM could, quote, simply switch.  Which means, as

21   you know, the evidence is there, move to Anham.  And the

22   contract under Anham was for $2250, which is $490 more than

23   what TACOM was paying at the time.

24            And, again, that's what the defendants were saying

25   they were going to do, and those were the actions they

1  discussed and tried to take place with Mr. Rocklin.  And, in

2  fact, the conversations that the defendant, Mr. Prilik, had was

3  with TACOM.  And what did Mr. Prilik tell TACOM?  We're going

4  to -- you know, you can get our goggles, but it's going to cost

5  you more.  You know, we could probably charge what we did for

6  the Battalion Set I.

7           That's all evidence of their intent to obtain

8  property from TACOM, and that's part of the scheme.

9           **MR. WARD:**  And from TACOM's side, Derek McAleer

10 clearly testified this was a war.  They were getting pressured.

11 It was urgent that they got the goggles.  Delivery was the most

12 important thing.

13          So had the scheme been successful, had ATN withdrawn,

14 there were all these options.  Can we say definitively that

15 this is no possibility that TACOM wouldn't have managed to

16 recoup the money somehow?  No.  But that's not -- that's not

17 what we have to show.  It's:  Could they have lost money?

18 Absolutely.

19          They -- they likely would have done a new tender or

20 they would have gone to sole source with Newcon or they would

21 have added items under the Bat Set I contract, all of which --

22          **THE COURT:**  The contact with TACOM also was because

23 they needed to approve.  Whether they had to, you know, pay up

24 any additional -- pay any additional monies or not, they had to

25 approve any change, right?

1645

```
 1          MS. HAMILTON:  Mr. Prilik told him, you're going to

 2  have to -- you know, you're going to have to pay more money.

 3  That's what Mr. Prilik told Mr. McAleer.

 4          MR. WARD:  And, yes, TACOM would have to approve and

 5  they --

 6          THE COURT:  Well, I think the agent also in

 7  testifying before the Grand Jury said -- he sort of, you know,

 8  collapsed ITE and TACOM.  A lot of times when he should have

 9  talked about ITE, from what we heard in the testimony in this

10  trial, probably should have used ITE rather than said TACOM.

11          But, I mean, so there are a number of things about

12  this that I find very -- you know, that I could -- that concern

13  me.  But is there any -- whether it's appropriate to take

14  action now or wait and see what the jury does?

15          MS. BOERSCH:  I think you should grant the Rule 29

16  now.

17          THE COURT:  Okay.  Bite the bullet now?

18          MS. BOERSCH:  You should bite the bullet now.

19          THE COURT:  Is there anything in response to what

20  they have just said that you want to say?

21          MS. BOERSCH:  Yeah.  I mean, I think, first of all,

22  the evidence that the Court has, contrary to what Ms. Hamilton

23  said about what the defendants knew at the time, what the

24  defendants now at the time is what's on those tapes.  And

25  that's the evidence that the Court has and that's the evidence
```

1  that the Court has been listening to.  And that evidence and

2  those tapes make it very clear that it's ITE.  They had to deal

3  with ITE.

4        We have additional evidence now from McAleer, who

5  very clearly says:  It's a fixed price contract that I've got

6  with ITE.  Some subcontractor who raises the price to him, he

7  eats it.  If I want to go sole source, I go back to ITE.  I get

8  the money.

9        And, more importantly, McAleer doesn't have to give a

10  contract to anybody.  He decides in the end.  He's clearly not

11  going to give any contract to this guy, to Mr. Beker or Mr.

12  Prilik, at this point based on his demeanor here.

13        But the most important thing to me on the

14  constructive amendment is that there is nothing in this Grand

15  Jury testimony, nothing, to suggest that this Grand Jury

16  indicted these defendants for the supposed failure to disclose

17  to TACOM what they are now accused of disclosing.

18        The only mention of omissions, as I said, is in some

19  early portion of the transcript.  When the agent is summarizing

20  the elements, there's no mention of that omission.  They are

21  not charged with that.  We have no way of knowing if this Grand

22  Jury would have indicted them based solely on that omissions

23  theory.  Compounded by the fact that it's the omission that has

24  to be material; not some other statements, but the Grand Jury

25  had to have found that the omission, that our -- the alleged

 1  failure to disclose the existence of the supposed agreement was

 2  material to TACOM.

 3          It's not in here at all.  That element is not

 4  addressed at all, much less is it addressed in the context of

 5  saying to the Grand Jurors, "You have to find that this

 6  omission, that Mr. Prilik's failure to disclose this to

 7  Mr. McAleer, was material to TACOM."  And that's nowhere in the

 8  Grand Jury transcript.

 9          **MR. WARD:**  Well, we just did jury instructions and

10  agreed that it's the statements and the omissions together that

11  constitute the materiality that -- it's not just the omissions.

12  It's the false pretenses.  It's everything together.  And it

13  was made clear to the Grand Jury.

14          I also want to correct the record.  The reason Derek

15  McAleer says, No way I'm doing business with Newcon, is because

16  he knows that they were engaged in this activity because he was

17  told.  And I think that was -- the way the questions were asked

18  on cross it came out, Well, of course, I'm not going to do

19  business with Newcon.  No way I'm going to do business with

20  Newcon.  Of course, he's not.  He knows that they're under

21  investigation for fraud.

22          But this is an attempt case and the issue is had he

23  not known, would he have done business with them?  And he said,

24  yeah, clearly.  We had an urgent requirement to get these

25  goggles.  Had to get them to Iraq.  Getting pressure from Iraq

1  all the time.  Extreme urgency.  Here are the options.  Here

2  are the ones we would have used.

3          The fact that he says, I'm not going to do it now,

4  only reflects the fact that he knew they were being

5  investigated.  The testimony is that he had these options and

6  had ATN been unable to perform -- and I think this came out on

7  redirect.  Had ATN been able to perform and had he not known

8  about the fraudulent activity, yeah, you've got to get the

9  goggles.  You've got to do sole source.  You've got to do a new

10 tender, or you've got to go back to the Bat Set I contract.

11         **MS. BOERSCH:**  Or there is NiViSys, which was the

12 original subcontractor on the ITE contract.

13         So the notion they would have had to go to Newcon is

14 just false.  They could have gone to NiViSys.  They could have

15 gone to any other of a number of suppliers.

16         **MS. HAMILTON:**  All of which in the first recording

17 Mr. Prilik said were not able to provide the quantity or

18 quality of the night vision goggles.  Mr. Prilik himself said

19 that NiViSys was not an alternative.

20         **THE COURT:**  Okay.

21         **MR. WARD:**  And we don't have to prove that there is

22 no possible option by which TACOM would lose money.  All we

23 have to show is that it's capable of influencing.

24         **MR. OSTERHOUDT:**  I think -- I'm sorry.  I think your

25 Honor should grant the Rule 29 motion because the matters we

1   have been discussing here this afternoon, the government is

2   raising the impression of the comrade in Jordan raised the

3   cost, but even Mr. Rocklin testified that he took that to mean

4   cost to ITE.  He didn't take that as cost to TACOM.

5           In the fourth tape of -- that was played before the

6   jury, there was -- with Mr. Prilik and Mr. Rocklin, Rocklin

7   suggested at one point that the -- that Ramzi could raise his

8   prices, and Mr. Prilik never picked it up.  He said, No.  His

9   choices are he could either stop producing, you know, or he

10  could -- or he could just walk away from the contract or cut

11  his own profit.  It was always in terms.

12          As far as the discussion with McAleer goes on the 9th

13  with Mr. Prilik, I think the context of that comment that it

14  would cost, you know, more money was in the context of

15  discussing working with ITE.  Because even if he didn't want to

16  do it, Mr. Prilik said in principle -- that's how the paragraph

17  starts.  In principle, I've no difficulty working with ITE or

18  if you have any other options, but, you know, we could do it

19  for the cost of the prior contract.

20          But he's talking in context of working with a

21  subcontractor always.  Prior contract was with Anham.  The

22  present contract to ITE.  And Mr. Prilik makes that clear.

23          So the government has failed to prove or present

24  proof in which a reasonable jury could find beyond a reasonable

25  doubt that there was, indeed, either the intent or a realistic

 1  probability that TACOM would, in fact, be deprived of money

 2  through fraud, money or property.  And I think your Honor has

 3  noted that and we've noted it, too.

 4          And I think it's because the case was infected from

 5  the beginning by this idea that it was a different kind of

 6  case.  He always thought -- that's why, you know, shifting from

 7  the Grand Jury to the sufficiency at trial.  Because always in

 8  the beginning it was about lying about poor ATN, but as time

 9  went on, that couldn't be sustained.  So we had to create this

10  business of omissions.  It's been artificial ever since and

11  they failed now to prove it beyond a reasonable doubt.

12          **MR. WARD:**  Well, we don't have don't have to prove

13  our case beyond a reasonable doubt on a Rule 29 motion.

14  Mr. Osterhoudt's arguments are fine arguments for the jury.

15          The jury can decide what they believe of the

16  evidence.  Did they believe that Arie Prilik said he's going to

17  work with ITE, or did he believe that he said, you know, the

18  price to TACOM is going up.  I mean, there are --

19          **THE COURT:**  But the question is whether -- yes,

20  taking the evidence in the light most favorable to the

21  government and so forth, whether or not a reasonable juror

22  could find beyond a reasonable doubt.

23          So, I mean, it's -- it's not like there was a

24  preponderance or convincing or more likely so than not, which

25  is a preponderance.  It's -- and, yeah, maybe by a

1   preponderance, but beyond a reasonable doubt?

2           **MR. WARD:**  Well, I think there's just a fundamental

3   misunderstanding about what the jury has to prove.  We don't

4   have to prove --

5           **THE COURT:**  What you have to prove.

6           **MR. WARD:**  The jury has to find beyond a reasonable

7   doubt under no circumstance could there be a situation where

8   TACOM --

9           **THE COURT:**  Well, that would be beyond all doubt.

10          **MR. WARD:**  Beyond a reasonable doubt, where TACOM

11  would not lose money.  It was could they have influenced them

12  to part with money.  Could they -- was it capable of

13  influencing them?

14          I mean, because it's an attempt case, we're dealing

15  in the hypothetical.  I mean, had the -- and that's what you're

16  going to have in any attempt case.  So they are going to try to

17  second guess and say, No, this wouldn't have happened and, No,

18  this wouldn't have happened.  But what the jury has to decide

19  and what the jury instructions say is capable -- could have or

20  was it capable of influencing TACOM to part with money.

21          **THE COURT:**  That's that part of the case.

22          The thing that concerns me is there are several

23  pieces here that, you know, raise legitimate and serious

24  questions, and those are what we've gone over with respect to

25  the two issues in the Grand Jury transcript and the indictment,

1652

1   and then the testimony or the quality of the testimony or lack

2   of evidence with respect to this last matter you were just

3   talking about.

4            And it's a question of whether or not the defendants,

5   you know, in their, you know, intent and whether in terms of

6   materiality would believe they were capable -- that whether --

7   was capable of influencing the scheme, was capable of

8   influencing TACOM to part with money or property.

9            And, I mean, there is some language.  Admittedly,

10  there is some language in Mr. Prilik's statements about, you

11  know, TACOM and TACOM would have to pay more and so forth.

12  What does that reflect?

13           I think one of the problems is, again, you know, that

14  throughout this there has been a lot of -- everybody has been a

15  little bit loose about TACOM and ITE and how that operates, but

16  I think that, in fact, you know, you have to establish that

17  TACOM is the one to be deprived or that it was capable of

18  influencing TACOM to make a decision that would deprive them of

19  property or money.

20           And I -- I suppose it's somewhat of a close question,

21  and I could take -- I don't know whether to take the easy way

22  out and let's just see what the jury does and -- but I have a

23  strong feeling that I might end up undoing that which the jury

24  does if, in fact, they come back with a guilty verdict.

25           **MR. WARD:**  Well, we would like --

1653

1          THE COURT:  I mean, so that's -- that's, I guess, my

2    dilemma.  My problem, right?

3          MS. HAMILTON:  I mean, your Honor, the point, I

4    guess, I would make here is, you know, the focus was and it's

5    on the false pretenses part of it and -- with the Grand Jury.

6    The false pretenses provided to McAleer, right?

7          THE COURT:  Yes, yes, yes.

8          MS. HAMILTON:  In addition to the false pretenses

9    that were -- that were discussed with the Grand Jury, the

10   information regarding the omissions was also provided to them.

11   And the information that the scheme was -- that Newcon would

12   charge higher prices to TACOM.

13         So all of the elements are in here when the

14   defendants -- excuse me, when the Grand Jurors were provided

15   and instructed on the law.  At the end, after they had heard

16   all the evidence, then they were free to pick and choose the

17   pieces that -- I mean, for the scheme to defraud.  Because that

18   was the key, was the scheme to fraud TACOM, and that

19   information was provided to the Grand Jury.

20         MS. BOERSCH:  I have to comment there.  The Grand

21   Jurors are not free to pick and choose what evidence they are

22   going to use to support what particular element.  That's what

23   the lawyers are there for, because not all evidence is going to

24   support any particular element.

25         And that's the problem with this Grand Jury

1  transcript, is the materiality is absolutely missing.  The only

2  reference to omissions is once.  It's not in connection with or

3  in the context of any of the elements that were discussed, and

4  that's the problem.  The Grand Jurors are not free to pick and

5  choose.  It's not up to the Grand Jurors to sort of look at

6  this stew of stuff and in the end spit out some indictment.

7          **MS. HAMILTON:**  It's their job to review the evidence

8  as provided and then determine if there is probable cause.

9          **MS. BOERSCH:**  The government has to inform the Grand

10  Jurors what evidence is sufficient to support each element of

11  the charged crime, and that has not been done here.

12          **MR. OSTERHOUDT:**  Nor has the government proven those

13  elements here.

14          **MR. WARD:**  Again, I think, your Honor --

15          **THE COURT:**  Hold on.  Hold on.  Don't fill the

16  spaces, okay?  Silence is golden.

17          (Brief pause.)

18          **THE COURT:**  If you turn to page 55 of the Grand Jury

19  transcript, the agent is asked:

20          **"QUESTION:**  So what are the elements?  Three

21          elements:  Scheme to defraud, the intent to

22          defraud and the use of wires in furtherance

23          of a scheme."

24      And:

25          **"ANSWER:**  Yes.  I have identified six pieces

1        of evidence" -- is what he's referring to --

2        "which could assist the Grand Jury."

3   Number one:  Beker believed ATN would be out and Newcon

4   would simply be given a contract, or, et cetera.  The goggles

5   would be -- Newcon would win the contract, so okay.

6   Second.  And then you can read that one on page 56.  Beker

7   told Rocklin the time would come when they needed to

8   coordinate, et cetera.

9        Beker said that now that Rocklin knew Beker's

10  strategic position, it was time for Rocklin to invite Newcon

11  into the contract.

12       Third.  Rocklin told Beker that he had spoken with

13  his superior and was ready to talk, et cetera, et cetera.

14       And then fourth.  They discussed the prices.  That

15  Beker confirmed that Newcon would raise the prices to TACOM.

16  And I know that's one that you've emphasized in connection with

17  the other issue.

18       Fifth.  Beker and Rocklin then negotiated the payment

19  that ATN would receive, et cetera.

20       And then the sixth piece of evidence is:  Rocklin

21  sent the invoice and payment information to bogus invoices,

22  which characterizes the payment as a loan, et cetera.

23    That's the scheme to defraud, okay?  There is -- nowhere

24  is there in there anything about -- it was intended that, or

25  that they did not -- they did not disclose this, you know, this

1656

1   agreement that they had reached to the government.  Now, maybe

2   it's subtext there, but that is not referred to.  This

3   nondisclosure is not referred to as part of the scheme to

4   defraud.

5       And then the next -- he's asked about the intent to

6   defraud and he refers to five pieces of evidence.  Again, a lot

7   of it is similar to what we've just -- you know, I've just read

8   to you.

9           **MR. WARD:**  Well, I think in the intent -- there is --

10  it's implied from Beker's statements that:  That which you are

11  doing, to put it mildly, someone can use against us.  If we

12  reach an agreement, this is kosher, but if it's connected with

13  the money....

14          **THE COURT:**  Right, right, right.

15          **MR. WARD:**  So it's clear here that it's -- the part

16  of the scheme.

17          **THE COURT:**  Because the agreement is not kosher, but

18  not the failing to disclose it.  There is -- nowhere is it

19  referred to.  And you never even tell the jury about, well,

20  there is this fourth element you have to be concerned about.

21          I mean, it's just really sloppy prosecutorial work,

22  is what it is.

23          **MS. BOERSCH:**  And the problem, your Honor -- I mean,

24  with respect to whether to grant the Rule 29 now or later, I

25  mean, these defendants have now been dragged through this for

1  five years.  They have been extradited from their home country

2  based on a theory that was -- that there were false statements,

3  not on this omissions theory, by the way, and they are

4  continuing to be dragged through this, despite the fact that

5  nowhere in this Grand Jury testimony is the crime that they are

6  now charged with and the crime they have had to sit here for

7  three weeks and face, it's just not charged.  It's just not

8  there.

9           And for them -- to force them to sit there and go

10 through and suffer through the potential, even, of an adverse

11 jury verdict, I just think is wrong, particularly given these

12 two defendants and how they've -- they came here voluntary from

13 Canada.  They have shown up in court every day.  I just think

14 it would be wrong.

15          **MS. HAMILTON:**  And the jury was told about

16 materiality, your Honor.  It wasn't in connection with that --

17 with the agent who missed that piece of it.  But when they were

18 charged and instructed with the legal part, they were

19 instructed about materiality.  And information was --

20          **THE COURT:**  How do they tie that up?  I think the

21 omission -- the omissions in the Grand Jury transcript, both

22 with respect to omissions and nondisclosure -- whatever you

23 want to call it.  I know there is a difference, okay.  And with

24 respect to, you know, the function of the prosecutor in the

25 Grand Jury room telling the jurors what it is that has to be

1658

1  proved and laying that out and the evidence that supports it

2  just didn't do what it was supposed to do with respect to the

3  materiality aspect.

4           **MR. WARD:**  Your Honor, I think --

5           **THE COURT:**  And I think that, taken together with

6  what is, you know, I think is a deficiency see in the trial

7  with regard to the Rule 29 standard for the depriving -- the

8  scheme to deprive TACOM, et cetera.

9           I just don't think that there is enough evidence to

10 support a verdict, and I think it's going to be a lot harder to

11 set aside a jury verdict -- I mean, I would be surprised if the

12 jury came back with a favorable verdict, a verdict favorable to

13 the government.  But if it did, you know, then I'd have to set

14 it aside.

15          So I'm going to grant the Rule 29 motion. but we'll

16 have to do a written order.

17          **MR. OSTERHOUDT:**  Thank you, your Honor.

18          **THE COURT:**  Because I think everything hangs on the

19 wire fraud and the conspiracy also hangs on that, and the money

20 laundering hangs on it as well.  So I think that probably takes

21 care of the entire indictment.

22          But we'll have to write something up, so can we have

23 some post --

24          **MS. HAMILTON:**  Your Honor, you did ask for a

25 submission that I don't think you had the opportunity to

1659

 1  review, which goes again to the heart of the evidence provided

 2  at trial about the defendant's intent to obtain money and

 3  property from TACOM.

 4          **THE COURT:**  I will give you one week to get it in.

 5          **MS. BOERSCH:**  And we'll submit ours as well, your

 6  Honor.

 7          **THE COURT:**  Okay.

 8          **MR. WARD:**  So what does that mean?

 9          **MS. HAMILTON:**  To get what in, your Honor?

10          **THE COURT:**  Then what do we do with the jury?  That's

11  one of the problems.  I think what we do is tell them we're

12  putting it on hold for a week, and we'll be in touch with them,

13  and that they are subject to the same instructions that they

14  have previously been given.

15          **MR. OSTERHOUDT:**  So your Honor is granting the

16  mediation subject to the parties' right to provide you with

17  these materials?

18          **THE COURT:**  Yes, yes.

19          **MR. HOWDEN:**  Should the jury come in tomorrow and --

20          **THE COURT:**  Tony, do you think -- can they be reached

21  tonight?

22          **THE CLERK:**  I can reach them tonight.  I've got their

23  numbers.

24          **THE COURT:**  You'll be up all night tonight finding

25  jurors.

```
 1              THE CLERK:  I've got nothing to do.

 2              MS. BOERSCH:  That's sad, Tony.

 3              MR. HOWDEN:  Should we be here tomorrow morning with

 4    the jury?

 5              THE COURT:  No.  He will contact them.

 6              MR. OSTERHOUDT:  Thank you so much.

 7              MS. BOERSCH:  Thank you, your Honor.

 8              THE COURT:  But, Mr. Bowser, can we put this on the

 9    record?  You must notify the jury that they continue to be

10    jurors in this case subject to the instructions they have been

11    given about not discussing the case amongst themselves or

12    anyone else and all of that instruction.  You can read the

13    entire instruction to them maybe.  And we'll notify them if

14    their services are going to be needed any further or if they

15    are going to be excused.

16              And today is the 26th.  So what is it, February 3rd?

17              MS. BOERSCH:  February 1st would be a week -- sorry,

18    February 2nd.

19              THE COURT:  February 2nd, is that it?  Yeah,

20    February 2nd.  I need everything in by February 2nd.  Okay.

21              MR. HOWDEN:  Thank you, your Honor.

22              MS. BOERSCH:  Thank you, your Honor.

23              THE COURT:  Thank you.  Is there a further transcript

24    other than --

25              MS. HAMILTON:  We'll have to order one, your Honor.
```

Lydia Zinn, CSR,  CRR, and Debra Pas, CSR, CRR
Official Reporter -  U.S. District Court
(415)  531-6587

1661

1          THE COURT:  Okay.  Do that, please.

2          MS. HAMILTON:  We'll make it an attachment to the

3 filing.

4          THE COURT:  Thank you.

5          (Whereupon at 5:05 p.m. further proceedings

6           in the above-entitled cause was adjourned.)

7                              -   -   -   -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1662

<u>**I  N  D  E  X**</u>

**DEFENDANT'S WITNESSES**                          **PAGE     VOL.**

**BEAN, JEFFREY REED**
(SWORN)                                          1484      10
Direct Examination by Mr. Moore                  1485      10
Direct Examination by Mr. Howden                 1518      10
Cross Examination by Ms. Pletcher                1519      10

Lydia Zinn, CSR,  CRR, and Debra Pas, CSR, CRR
Official Reporter -  U.S. District Court
(415)  531-6587

## CERTIFICATE OF REPORTER

WE, LYDIA ZINN, and DEBRA PAS, Official Reporters for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in CR. 07-765 MHP, United States of America v. Mendel Beker, et al., were reported by us, certified shorthand reporters, and were thereafter transcribed under our direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by us at the time of filing

The validity of the reporters' certification of said transcript may be void upon disassembly and/or removal from the court file.


_____/s/ Lydia Zinn_____
                Lydia Zinn, CSR 9223, CRR


_____/s/ Debra L. Pas_____
                Debra L. Pas, CSR 11916, CRR


Wednesday, January 26, 2011