WILLIAM L. OSTERHOUDT (SBN 043021)
DOLORES OSTERHOUDT (SBN 215537)
Law Offices of William L. Osterhoudt
135 Belvedere Street
San Francisco, CA  94117
Tel: (415) 664-4600
Fax: (415) 664-4691
Email:  Osterhoudt@aol.com

Attorneys for Defendant ARIE PRILIK

JONATHAN R. HOWDEN (SBN 97022)
jhowden@winston.com
Eva C. Chan (SBN: 233289)
echan@winston.com
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA  94111-5802
Tel: (415) 591-1000
Fax: (415) 591-1400

Martha A. Boersch (SBN. 126569)
mboersch@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:     (415) 626-3939
Facsimile:     (415) 875-5700

Attorneys for Defendants
MENDEL BEKER AND NEWCON INTERNATIONAL, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No. CR 07-0765 MHP** |
| **Plaintiff,** | |
| **v.** | **DEFENDANTS' MEMORANDUM IN SUPPORT OF COURT'S ORDER GRANTING DEFENDANTS' MOTION PURSUANT TO RULE 29 (a), F.R.CRIM.P.** |
| **MENDEL BEKER, ARIE PRILIK, and NEWCON INTERNATIONAL, INC.,** | |
| **Defendants.** | |

# TABLE OF CONTENTS

**Pages**

DISCUSSION ...................................................................................................................1

I.    INTRODUCTION. ...................................................................................................1

II.   BACKGROUND ......................................................................................................2

    A.   The Indictment .................................................................................................2

    B.   The Grand Jury Testimony ..............................................................................3

        1.   The Grand Jury was not Provided Evidence or Instruction that the Scheme to Defraud was a Scheme Premised Upon Omissions ..................4

        2.   The Grand Jury was not Presented With Evidence or Instruction That the Omissions Were Material and Could Have Deprived TACOM of Property .....................................................................................6

    C.   Trial .................................................................................................................6

        1.   The Government's Attempt to Prove That the Defendant's Alleged Omissions Were Material, that is, That They Were Capable of Influencing TACOM to Part with Money or Property.................................7

        2.   Defendants had no Agreement With ATN, and Certainly Not The Agreement Alleged in the Indictment.....................................................11

III.  ARGUMENT. ........................................................................................................17

    A.   The Evidence of Wire Fraud is Insufficient..................................................17

        1.   The Government Failed to Prove That the Alleged Non-Disclosure was Material................................................................................................17

           a.   That Newcon Was Proposing to Pay ATN to Withdraw from a Contract ATN Was Otherwise Capable of Performing ...................18

           b.   That Newcon Conceal its Agreement with ATN from ...................20

           c.   That TACOM Would Have Relieved ITE of its Obligation to Find a Suitable Replacement for ATN.......................................21

           d.   That TACOM Would Likely Resort to a Sole Source Agreement ................................................................................22

           e.   That TACOM Would Choose Newcon Over Nivisys as the Sole Source ................................................................................22

           f.   That if the Sole Source Was Awarded to Newcon, It Would Charge TACOM More then $1760 or that TACOM Would Agree to Such a Price Increase.........................................23

           g.   That TACOM Would Not Exercise its Unilateral Right to Hold ITE Responsible for Any Overage.......................................24

        2.   The Alleged Non-Disclosure Could Not Have Defrauded TACOM of Money or Property ...........................................................................25

        3.   There is no Evidence of the "Agreement" Alleged by the Government....................................................................................25

        4.   Even if there was an Agreement, There is No Evidence That

1

Defendants Concealed the Existence of an Agreement ...............................27

2

5.  The Government Failed to prove That the Defendants Intended to Defraud TACOM of Money or Property ........................................................28

3

B.  The Court Must Grant a Judgment of Acquittal on the Conspiracy and Wire Fraud Counts Because the Government's Proof at Trial

4

Constructively Amended the Indictment. ...............................................................28

5

CONCLUSION ........................................................................................................................34

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MEMORANDUM IN SUPPORT OF COURT'S ORDER GRANTING DEFENDANTS'
MOTION PURSUANT TO RULE 29 (a), F.R.CRIM.P., CASE NO. CR-07-0765 MHP

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**CASES**

4

*Elyria-Lorain Broadcasting Co. v. Lourain Journal Co.*,
298 F.2d 356 (6th Cir. 1961) ................................................................................................... 7

5

*Howard v. Daggett*,
526 F.2d 1388 (9th Cir. 1975) ................................................................................................ 30

6

*Jackson v. Virginia*,
443 U.S. 307 (1979) ................................................................................................................... 1

7

8

*Neder v. United* States,
527 U.S. 1 (1999) ..................................................................................................................... 17

9

*Stirone v. United States*,
361 US 212 (1960) .............................................................................................................. 28, 29

10

11

*United States v. Adamson*,
291 F.3d 606 (9th Cir. 2002) .......................................................................................... 28, 30, 31

12

13

*United States v. Carlson*,
616 F.2d 446 (9th Cir. 1980) ............................................................................................. 30, 31

14

*United States v. Cruz*,
554 F.3d 840 (9th Cir. 2009) ..................................................................................................... 1

15

16

*United States v. Dipentino*,
243 F.3d 1090 (9th Cir. 2001) ................................................................................................ 31

17

18

*United States v. Dowling*,
739 F.2d 1445 (9th Cir. 1984), *rev'd on other grounds*, 473 US 207 (1985) ......................... 27

19

*United States v. Garcia-Paz,*
282 F.3d 1212 (9th Cir. 2002) ................................................................................................ 28

20

21

*United States v. Mikell*,
163 F.Supp.2d 720 (E.D. Mich. 2001) ..................................................................................... 17

22

23

*United States v. Milwitt*,
475 F.3d 1150 (9th Cir. 2007) ........................................................................................... 2, 33

24

*United States v. Nevils*,
548 F.3d 802 (9th Cir. 2008) ..................................................................................................... 1

25

26

*United States v. Pierce*,
224 F.3d 158 (2d Cir. 2000) ................................................................................................ 17, 25

27

28

- iii-

DEFENDANTS' MEMORANDUM IN SUPPORT OF COURT'S ORDER GRANTING DEFENDANTS'
MOTION PURSUANT TO RULE 29 (a), F.R.CRIM.P., CASE NO. CR-07-0765 MHP

*United States v. Ranney,*
719 F.2d 1183 (1st Cir. 1983) ................................................................................. 7

*United States v. Reyna,*
148 F.3d 540 (5th Cir. 1998) ................................................................................... 2

*United States v. Shipsey,*
190 F.3d 1081 (9th Cir. 1999) ............................................................... 28, 29, 30

*United States v. Von Stoll,*
726 F.2d 584 (9th Cir. 1984) ............................................................................... 28

*United States v. Woods*,
335 F.3d 993 (9th Cir. 2003) ............................................................................... 17

**STATUTES**

18 U.S.C. § 371 ........................................................................................................ 2

18 U.S.C. § 982 ........................................................................................................ 2

18 U.S.C. § 1343 ...................................................................................................... 2

18 USC § 1001 ....................................................................................................... 19

18 USC § 1512(c) .................................................................................................. 19

18 USC § 1621 ....................................................................................................... 19

18 USC § 1623 ....................................................................................................... 19

**OTHER AUTHORITIES**

1956(a)(2)(B) ........................................................................................................... 2

Fed. R. Crim. P. 29 ........................................................................................ 1, 17, 32

Fed. R. Crim. P. 29(a) ......................................................................................... 1, 34

Fed. R. Evid. 403 ..................................................................................................... 7

On January 26, 2011, at the close of the Government's case, all defendants moved under Fed. R. Crim. P. Rule 29(a) for a directed verdict of acquittal.  The Court granted the motion, but allowed the Government a week to provide record citations it contends would show that it had proven the elements of wire fraud beyond a reasonable doubt.  The defendants respectfully submit this memorandum and proposed order in support of the Court's grant of the motion under Rule 29(a).[1]

## DISCUSSION

### I.   INTRODUCTION.

The defendants – Mendel Beker, Arie Prilik, and Newcon International – moved for a judgment of acquittal on all elements of all Counts at the close of the Government's case. Defendants focused on two major issues:  1) general insufficiency of the evidence as to the elements of each wire fraud count; 2) the proof at trial constructively amended the Indictment.

At trial, the Government attempted to prove that the defendants committed wire fraud by failing to disclose to TACOM an agreement they had allegedly reached with the Government's cooperating witness, Dmitry Rocklin, the President of American Technologies Network ("ATN"). The Government alleged at trial that defendants failed to disclose three facts:  1) that they had agreed to pay ATN to stop performing under the Battalion Set II contract; 2) that they had agreed to pay ATN $75 per paid of goggles that Newcon would deliver instead of ATN; and 3) that Newcon had sealed the arrangement with an initial $50,000 payment.  *See* United States Supplemental Statement of Facts.

A court must grant a judgment of acquittal when, "'after viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Cruz*, 554 F.3d 840, 844 (9th Cir. 2009) (reversing conviction for insufficient evidence) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); Fed. R. Crim. P. 29; *see, e.g., United States v. Nevils*, 548 F.3d 802, 805 (9th

---

[1] For the convenience of the Court, we have appended copies of the relevant trial transcripts, tape transcripts, exhibits and grand jury materials as an Excerpt of Record.  The pages of the Excerpt of Record  have been separately numbered and are referenced in the brief as "ER" in addition to the citation to the original trial record.

1    Cir. 2008) (reversing conviction for insufficient evidence); *United States v. Milwitt*, 475 F.3d

2    1150, 1154 (9th Cir. 2007).  As the Fifth Circuit has stated: "[W]hen circumstantial evidence and

3    the reasonable inferences to be drawn from it permit conclusions of both guilt and innocence that

4    are essentially in balance, there has to be reasonable doubt.  When that is the case, we have no

5    choice but to reverse the conviction."  *United States v. Reyna*, 148 F.3d 540, 547 (5th Cir. 1998).

6    No rational trier of fact could have found the essential elements of the charged offenses from the

7    evidence presented by the Government at trial.

8    **II.      BACKGROUND**

9          **A.      The Indictment**

10         On December 4, 2007, the grand jury returned the present Indictment against Mendel

11   Beker, Arie Prilik and Newcon International.  The Indictment charged all defendants with wire

12   fraud under 18 U.S.C. §  1343 and conspiracy to commit wire fraud under 18 U.S.C. § 371.

13   Defendants Beker and Newcon were also charged with money laundering under 1956(a)(2)(B).

14   The Indictment also alleged a forfeiture count under 18 U.S.C. § 982.

15         The wire fraud counts were predicated on an alleged scheme to defraud the U.S. Army

16   Tank-Automotive and Armaments Command Unit ("TACOM") in connection with TACOM's

17   purchase of night vision goggles to supply to the Iraqi Army.  TACOM awarded a contract known

18   as Battalion Set II to a prime contractor, ITE, which supplied weapons, radios, and night vision

19   goggles.  ATN became the subcontractor under that contract to supply the night vision goggles.

20         In Paragraph 9 of Count One, it is alleged that the defendants "devised a scheme to

21   unlawfully enrich themselves by paying ATN to stop supplying night vision goggles under the

22   Battalion Set II Contract using false or misleading pretenses, at which point Newcon would

23   supply the night vision goggles at inflated prices."  Paragraph 10 of the Indictment sets out the

24   alleged fraud:

25         It was part of the alleged scheme and artiface to defraud that Beker, Prilik and
           Newcon participated in or did the following, among other things:

26         a.      BEKER contacted an ATN representative and offered to pay ATN to stop
           supplying night vision goggles under the Battalion Set II contract;

27         b.      BEKER instructed the ATN representative to create an invoice billing
           NEWCON $50,000 and to falsely describe the $50,000 as a "loan," thereby

28

DEFENDANTS' MEMORANDUM IN SUPPORT OF COURT'S ORDER GRANTING DEFENDANTS'
MOTION PURSUANT TO RULE 29 (a), F.R.CRIM.P., CASE NO. CR-07-0765 MHP

concealing the true purpose of the $50,000 – as an initial payment to induce ATN to stop supplying night vision goggles under the Battalion Set II contract;

c.      BEKER caused $50,000 to be transferred via wire from a bank account controlled by NEWCON to a bank account controlled by ATN for the purpose of paying ATN to stop supplying the night vision goggles under the Battalion Set II contract;

d.      Prilik told a TACOM contracting official that ATN could no longer supply night vision goggles due to production, export, and quality problems. Prilik's statements included false or misleading pretenses.  Prilik then informed the TACOM official that Newcon could supply the night vision goggles, but at a substantially higher price.

Nowhere in the Indictment did the Government allege that the defendants' fraud consisted of the defendants' failure to disclose the existence of the alleged agreement with ATN to TACOM or the payment to ATN of $50,000.  Indeed, the only mention of the word "omissions" in the Indictment is the boilerplate language in Paragraph 8 of the Indictment that the defendants:

did knowingly and intentionally devise and intend to devise, a scheme and artifice to defraud TACOM as to a material matter, to obtain money or property, to obtain money or property by means of materially false or misleading pretenses, representations, *omissions*, and promises, related to TACOM's purchasing of night vision goggles under the Battalion Set II contract.

Instead, the wire fraud charges were clearly premised upon the Government's contention – disavowed by the time of trial – that the defendants' complaints to TACOM about ATNs quality, quantity and delivery problems were lies.  Nothing in Indictment suggests that the gravamen of their offense was not telling TACOM about their negotiations with ATN.  There is simply nothing in the Indictment to suggest that the defendants' failure to tell TACOM of Newcon's putative arrangement with ATN, while truthfully reporting that ATN could not comply with the contract, was the basis for the grand jury's decision to issue this Indictment.

**B.      The Grand Jury Testimony**

Indeed, the grand jury transcript confirms that the grand jury could not have indicted the defendants on the theory that the Government relied upon at trial.  First, there was no evidence presented that omissions were the basis of the fraud, and second, there was no evidence on the essential element of materiality.

### 1.    The Grand Jury was not Provided Evidence or Instruction that the Scheme to Defraud was a Scheme Premised Upon Omissions

The only witness presented to the grand jury was FBI Special Agent Gregory Nestor, a summary witness who apparently did not participate in the investigation.  Agent Nestor refers to the failure of Newcon to disclose its alleged agreement with ATN only twice in the entire transcript.  First, Agent Nestor is asked:

> Q:      Now, *in this proposed agreement [sent in the email from Beker to Rocklin, marked at trial as Gov. Ex. 51]* marked ATN 19 and 20, is there any mention of the offer that Beker and Prilik made to Rocklin, in other words, that Newcon would pay ATN $75 for every pair of goggles that Newcon supplied to ATN rather than ATN?
>
> A:      No.

GJ000041-42 [ER 000041-42].  There is no further colloquy at the time about this omission.[2]

Second, Agent Nestor was asked a number of questions about the allegedly false statements that Arie Prilik made to McAleer on September 9 (the Government no longer contends these statements were false).  Then Agent Nestor was asked the following two questions:

> Q:      Okay, now during the conversation between Mr. Prilik and Mr. McAleer, did Mr. Prilik ever discuss any of the payments that were anticipated, payments made by Newcon to ATN?
>
> A:      No.
>
> Q.      Did Mr. Prilik ever disclose the proposed agreement between ATN and Newcon under which Newcon would pay ATN for every pair of goggles that Newcon supplied to TACOM rather than ATN?
>
> A.      No.

GJ000048 [ER 000048].  No further colloquy on these omissions ensued and there was no evidence before the grand jury to prove whether or how these alleged omissions were material to TACOM.

These omissions, however, were not addressed by the Government during that portion of the grand jury testimony where Agent Nestor summarized the evidentiary basis for the specific

---

[2] From their most recent pleading, it appears as though the government has obtained and intends to make reference to their colloquy with the grand jury which has not been produced to date. We respectfully reserve the right to review and respond to any issues posed by that colloquy once it has been produced to the defendants and the Court.

DEFENDANTS' MEMORANDUM IN SUPPORT OF COURT'S ORDER GRANTING DEFENDANTS'
MOTION PURSUANT TO RULE 29 (a), F.R.CRIM.P., CASE NO. CR-07-0765 MHP

1    elements of the proposed charges.  When summarizing the evidence that supported the charged

2    scheme to defraud against Beker, for instance, Agent Nestor referred to six pieces of evidence:  1)

3    Beker believed ATN would be out and Newcon would get the contract; 2) Beker told Rocklin that

4    they needed to coordinate their work so as not to ruin the market, and Beker was willing to pay

5    ATN for "placing Beker in a position to perform on the remaining Battalion Set II contract;" 3)

6    Beker told Rocklin that he was willing to pay to "smoothly solve the problems of you [ATN]

7    getting out of supplying TACOM, that is, without troubles, and us getting into it without

8    troubles.;" 4) Beker confirmed that Newcon would raise the price to TACOM;[3] 5) Beker and

9    Rocklin negotiated the payment ATN would receive; and 6) as instructed by Beker, Rocklin sent

10   a bogus invoice to Newcon.  GJ000054-57 [ER 000053-56].  Similarly, when discussing the

11   element of intent, the grand jury was not presented with the evidence that Prilik failed to disclose

12   the alleged agreement *to TACOM* to support a finding of intent.  Agent Nestor did contend that

13   the failure to disclose the alleged agreement *in the preamble to the draft written agreement* that

14   Beker sent to Rocklin could support a finding of an intent to defraud.  GJ 000058 [ER 000057].

15   But that non-disclosure is not alleged by the Government in the Indictment, nor was that a non-

16   disclosure made to TACOM.  In other words, the non-disclosure to TACOM that the Government

17   relied upon at trial as the sole support of its fraud allegations was not presented to the grand jury

18   ⎯⎯⎯⎯⎯⎯⎯⎯⎯
       [3] This statement is incorrect.  In the tape-recorded conversations Beker and Rocklin are

19   discussing the price ATN charged to ITE, not the price Newcon charged to TACOM.  See RT
     1076 [ER 000169] (Rocklin states that when Beker said "we can't deliver to him at this price,"

20   Beker meant that Newcon could not deliver *to ITE* at the price ATN was charging).  Indeed Beker
     could not have charged TACOM more, since the Battalion Set II contract was a fixed price

21   contract that TACOM had with ITE.

22        The grand jury was misled by Agent Nestor regarding the Battalion Set II contract in
     several other respects.  First, Agent Nestor testified that "ITE took bids for the goggles portion of
     the contract.  Two companies bid.  ATN won the contract, providing a much lower bid than

23   Newcon."  GJ000015 [ER 000015].  This testimony omits the fact that Nivisys won the bid with
     ITE, but after ITE was awarded the contract, with Nivisys as its subcontractor, it dumped Nivisys

24   in favor of ATN.  Second, Agent Nestor testified that "[t]he Army tested ATN's product and
     found that they met all specs under the contract."  GJ000041 [ER 000041].  In fact, ATN's

25   goggles *failed* the Army's testing twice.  The Army simply decided to accept the goggles despite
     the failures.  Finally, Agent Nestor testified that Newcon was charging TACOM $2,000 a pair

26   under Battalion Set I, and that ATN was charging TACOM $1300 per pair under Battalion Set II.
     GJ000027 [ER 000027].  This was false:  It was not Newcon, but ANHAM, the prime contractor

27   under battalion Set I, that was charging TACOM approximately $2,000 per pair.  RT 1209:13-23
     [ER 000179].  Under Battalion Set II, ITE was charging TACOM $1,760.  RT 1245:11-12 [ER

28   000192].

1   in support of the charges returned in the Indictment.

2        In sum, the grand jury could not and did not indict these defendants for their non-

3   disclosure to TACOM of their alleged agreement with ATN, the theory that was central to the

4   Government's case at trial.

5        **2.**     **The Grand Jury was not Presented With Evidence or Instruction That the Omissions Were Material and Could Have Deprived TACOM of**

6               **Property**

7        There is absolutely no testimony in the grand jury record to support a finding that the non-

8   disclosure was material, a necessary element of the offense.  Indeed, the element of materiality is

9   not even mentioned by Agent Nestor when he is summarizing the specific elements and the

10   evidence that supports each element.  The grand jury was not instructed that to be material the

11   statements or omissions had to be of a kind that would reasonably influence TACOM – the

12   alleged victim of the scheme – to part with money or property.  The grand jury was not presented

13   with *any* evidence of materiality.

14      **C.**    **Trial**

15        The Government's evidence at trial consists of three components:  1) the taped phone

16   conversations; 2) the testimony of Dmitry Rocklin regarding his "understanding" of those

17   conversations; and 3) the testimony of Derek McAleer, the TACOM contracting officer.  As

18   discussed below, the Government's proof at trial failed to prove the that the scheme to defraud

19   would have deprived TACOM of property or that the alleged omissions were material.  The

20   evidence also failed to prove the existence of any agreement between Rocklin and the defendants,

21   much less the agreement alleged in the Indictment, which could have been disclosed to TACOM.

22   Absent the predicate fact of an agreement between Newcon and ATN, there was nothing to

23   disclose that could be the basis of a scheme to defraud.  Nor did the Government prove that the

24   defendants had any duty to disclose to TACOM their business arrangements with ATN.  Lastly,

25   the Indictment was constructively amended by the evidence at trial because the grand jury did not

26   indict on an omissions theory, and was never presented with evidence of the materiality of the

27   now-alleged omissions, or that TACOM would have been deprived of property by defendants'

28   alleged scheme.

1

**1.       The Government's Attempt to Prove That the Defendant's Alleged Omissions Were Material, that is, That They Were Capable of Influencing TACOM to Part with Money or Property**

2

3       The Government's sole proof that the alleged scheme would have deprived TACOM of

4   property, and that the alleged omissions were material, consisted of Derek McAleer's responses

5   to a series of hypothetical questions posed by the Government.[4]  But those responses, and the

6   evidence at trial, was insufficient to prove the Government's case and in fact showed that ITE,

7   not TACOM, was the only entity that could have been deprived of money or property, and the

8   evidence was insufficient to prove that the alleged omissions would have influenced TACOM to

9   part with money or property.

10       TACOM did not work with subcontractors and instead worked directly with the prime

11   contractor to resolve any issues that arose under either the Battalion Set I or Battalion Set II

12   contracts.  RT 1208 [ER 000178]; RT 1327 [ER000205].  The prime contractor for Battalion Set

13   II was ITE.  RT 1219 [ER 000183].  ITE's contract with TACOM was a fixed price contract for a

14   total of $174 million.  *Id*.  On a fixed price contract, the prime contractor is "locked in" to

15   providing the proposed items for the amount specified and if the prime fails to do so it can be

16   terminated.  RT 1226 [ER 000186]; RT 1268 [ER 000198] RT 1324:20-25 [ER 000204].  Thus

17   ITE – not ATN – was the supplier of the night vision goggles to TACOM.  RT 1220 [ER

18   000184]; RT 1356:24-25 [ER 000207] (McAleer couldn't seek any price concessions from ATN

19   for poor quality goggles because he deals only with the prime, ITE).  Furthermore, under the

20   contract, ATN had *no authority* to assign its rights as a subcontractor to another subcontractor –

21   that authority rests with ITE.  RT 1262:4-7 [ER 000193].  Thus, even if ATN could not perform

22   _____

23       [4]  The defendants' objected to the entire line of questioning at trial and renew their objection here.  RT 1242 [ER 000191].  McAleer's testimony was improper speculation and had little, if any probative value given its speculative nature.  *See* Fed. R. Evid. 403; *Elyria-Lorain*

24   *Broadcasting Co. v. Lourain Journal Co.*, 298 F.2d 356, 360 (6th Cir. 1961) ("a witness may not testify as to what he would have done had the situation been different from what it actually was").

25   While some courts have allowed such questions, they have noted the general rule prohibiting such hypotheticals because of the danger of eliciting mere speculation or vindictive self-serving

26   testimony, and have allowed the questions only when there is some additional evidentiary basis in the record.  *See, e.g., United States v. Ranney*, 719 F.2d 1183, 1188-89 (1st Cir. 1983) (district

27   court admission of hypothetical not abuse of discretion where there was "unrefuted" evidence that other victims did exactly what testifying victims said they would have done)  Here, as discussed

28   *infra*, there was *no* evidence of any of the facts required for the hypotheticals to be true.

1    under the contract, there would be no substitution unless ITE asked the Government to allow a

2    change, and ITE never asked the Government to make such a change.  RT 1262:8-19 [ER

3    000193]; RT 1377:3-6 [ER 000213].[5]

4          Even if ATN could not perform its subcontract with ITE under Battalion Set II, the

5    Government failed to prove that Newcon could have or would have *charged TACOM* more for

6    night vision goggles, the crux of the fraud it alleged.  First, any non-deliveries were the prime's

7    problem, not TACOM's, and there was no evidence introduced at trial as to what ITE would have

8    done had ATN actually failed to deliver the goggles.[6]  For instance, ITE could have gone back to

9    Nivisys or some other contractor without raising the issue with TACOM.  Second, even if ITE

10    were to raise the non-delivery with TACOM, TACOM's most probable course of action would

11    have been to "work directly with the prime."  RT 1238 [ER 000188].  Only if ITE "absolutely,

12    flat-out could not deliver the goods" would TACOM turn to another option – termination of the

13    goggle portion of the contract.  RT 1238 [ER 000188].  But there was no testimony from ITE or

14    from TACOM as to whether ITE would "absolutely, flat-out" fail to deliver to TACOM if ATN

15    could not supply ITE, nor was there any testimony from McAleer as to what, exactly, the

16    circumstances would be that would allow a partial termination.  Without such testimony, neither

17    the Court nor the jury can know whether the option of partial termination was even possible.

18    Moreover, McAleer admitted that, based upon what was going on with ITE's performance with

19    ATN as its subcontractor at the time, it would *not* be in the best interests of the government to

20    exercise the option of a partial termination of the Battalion Set II contract.  RT 1420:22-25 [ER

21    000227].

22          The Government proceeded, however, to assume, despite the lack of evidence, that a

23    partial termination was a possibility, and to speculate that if there were a partial termination,

24         [5] There was no evidence as to what ITE would have done because the Government did
not call any witnesses from ITE, nor did the Government interview any witnesses from ITE
25    during its investigation.  RT 1167:8-13 [ER 000177].

26         [6] Dmitry Rocklin testified that ITE was making a "large percentage of the profit" on
Battalion Set II.  RT 1074-75 [ER 000167-168].  Rocklin also confirmed that if ATN stopped
27    delivery on the NVGs, ITE "could just continue delivery; not make money on the night-vision
portion, but continue to make money on the communication equipment and weapons."  RT 1081-
28    82 [ER 000170-171].

DEFENDANTS' MEMORANDUM IN SUPPORT OF COURT'S ORDER GRANTING DEFENDANTS'
MOTION PURSUANT TO RULE 29 (a), F.R.CRIM.P., CASE NO. CR-07-0765 MHP

1   TACOM might have gone back to Anham under Battalion Set I and increased the quantity.  RT

2   1239 ER 000189].  But there was no evidence that Anham would have had Newcon supply the

3   goggles.  There was no testimony about whether the contract between Anham and Newcon was

4   still in existence or whether Anham would have renewed or extended its contract with Newcon or

5   under what circumstances.  No one from Anham testified.

6          The Government also speculated TACOM might have issued a new tender just for the

7   night vision goggles, though even McAleer conceded this was unlikely.  RT 1239 [ER 000189].

8   But if a new tender was issued, no new bids would be accepted without going through the source

9   selection process, which involves three phases, each one of which any new prime contractor

10   would have had to pass.  RT 1216-18 [ER 000180-182] (McAleer describing source selection

11   process, and noting that 25-30 people from TACOM are involved in that process).  Moreover, the

12   evidence was that TACOM would not have issued a new tender if ATN failed to supply the night

13   vision goggles, since McAleer testified that in June of 2005, when ATN's goggles failed to meet

14   specifications, TACOM never considered a new tender as an option.  RT 1388-89 [ER 000214-

15   215].  Moreover, had there been a new tender, there was no testimony as to which prime would

16   likely have won or at what prices, although McAleer conceded that the tender process is "highly

17   competitive" and that the price charged by the prime – the only price TACOM was concerned

18   with – was "controlled by [that] competition."  RT 1298-1299 [ER 000200-201].  The prime, if it

19   won the contract, would also have had to choose Newcon as its subcontractor and agree to the

20   prices Newcon was charging, and there was no evidence at trial that this scenario was likely or

21   even possible.[7]  No one from ITE testified at trial, nor did the Government ever interview anyone

22   from ITE during its investigation.  RT 1167:8-13 [ER 000177].

23          The Government also speculated that TACOM might have gone to a sole source supplier,

24   and further that the sole source supplier would have been Newcon.  RT 1240 [ER 000190].

25   However, there was no evidence that such a sole source award was even legally possible, and the

26   Federal Acquisition Regulations applicable to TACOM make it clear that sole source awards are

---

27          [7]  In fact, the evidence was that Nivisys had been the original subcontractor for the
goggles when the contract was awarded to ITE.  RT 1220 [ER 000184].  Thus, ITE could have
28   gone back to Nivisys to supply the goggles.

- 9-

1   only permissible in certain limited circumstances.  *See, e.g.,* FAR 6.300 *et seq.* (contracting

2   without providing for full and open competition or full and open competition after exclusion of

3   sources is a violation of statute, unless permitted by one of the exceptions in 6.302).  There was

4   no evidence that any of those limited circumstances existed or would have existed if ATN

5   stopped its supply.  Moreover, even if TACOM had gone to Newcon as a sole source provider,

6   and even if Newcon had increased prices, TACOM had the unilateral contractual right to impose

7   any increase in price onto the prime contractor, ITE, and McAleer most probably would exercise

8   this right.  RT 1268-69 [ER 000198-199]; RT 1419:19-1420:14 [ER 000226-227]; RT

9   1453:25-1454:21 [ER 000233-234].

10          In fact, as the government pointed out, TACOM's most probable course of action was to

11  address any issues directly with the prime contractor.  RT 1361:6-14 [ER 000208].  This first

12  option is precisely what TACOM pursued and exercised with ITE when ATN began having

13  performance problems beginning in early June 2005.  *Id.*   Indeed, during cross-examination,

14  McAleer testified that he had reviewed TACOM's options with regard to ATN's delivery of non

15  compliant night vision goggles in June of 2005, and made a determination to allow ATN to

16  resume shipments of the previously determined non compliant product by adopting the new

17  testing methodology that did not conform with the United States' Night Vision Laboratory's

18  measurement of Figure of Merit.  RT 1409:1-11 [ER 000222].  Thus, during all four

19  conversations with defendant Arie Prilik on September 9th, September 22nd, October 19th and

20  November 17th, respectively, none of the hypothetical options the Government elicited at trial had

21  been or were being considered by McAleer.  RT 1409:12-20 [ER 000222]; 1417:3-1418:16 [ER

22  000224-225]; 1427:5-1428:1 [ER 000229-230]; 1435:17-1436:11 [ER 000231-232].  Nor did

23  McAleer ever state anything in his conversations with Arie Prilik that would constitute an

24  invitation to negotiate terms by which Newcon would become a subcontractor in the Battalion Set

25  II contract.  RT 1402:25-1403:4 [ER 000219-220].  In fact, McAleer repeatedly told Arie Prilik

26  he was not going to discuss the performance of any supplier, competitor or anyone else during

27  each of these four conversations.  RT 1392:9-18 [ER 000217].

28          Most importantly, the Government's proof failed because in answer to these various

1  hypotheticals, McAleer did not testify that TACOM *would have been deprived of money or*

2  *property*.  In the end, the best McAleer could say for the Government was that, had he known of

3  the purported arrangement between ATN and Newcon, he "certainly would have looked closely

4  at what was transpiring with the contract."  RT 1264 [ER 000194].  But TACOM would not have

5  made *any* decision that could have led to a loss of money or property in the absence of a whole

6  complex of additional facts.  *See* RT 1264-67 [ER 000194-197].  Even McAleer had to

7  acknowledge that all of the Government's proposed hypotheticals "require[d] certain facts to be

8  assumed and certain events to have occurred before any" of the hypothetical options could be

9  real.  RT 1417:10-21 [ER 000224].  Yet *none* of those facts were proven at trial and *none* existed

10  when the defendants were in contact with TACOM.  RT 1418:1-9 [ER 000225].  This gap in the

11  Government's proof is fundamental and defeats their case.

### 2. Defendants had no Agreement With ATN, and Certainly Not The Agreement Alleged in the Indictment

The Government's key evidence – the tape-recorded calls – prove that there was no

agreement between ATN and Newcon at any time, and certainly not the agreement the

Government alleges.  The evidentiary foundation for the government's case – the recorded

telephone calls – not only do not support the government's case, they affirmatively demonstrate

that there was no such agreement at any time, and therefore nothing to disclose to TACOM.

Dmitry Rocklin himself conceded in the last recorded call that he and Beker never had any

mutual understanding that could be characterized as an agreement.  In that call on October 4,

2005, Rocklin says to Michael Beker:  "Well, it means we didn't understand each other regarding

the agreement."  Gov. Ex. 143, 10:9-10 [ER 000146].

The Government claims that Newcon and ATN agreed that ATN would stop complying

with the Battalion Set II contract in exchange for a payment of money.  But the record is clear

that such an agreement did not exist because that is not what Beker and Rocklin agreed to and

there was no reason for Newcon to solicit that agreement in any event.  Michael Beker, in his

very first call with Rocklin, clearly states that he believed that ATN had already stopped

performing on the contract because of problems it was having with the quality, quantity and

1    delivery of their NVGs.  *See* Gov.. Ex. 135, 5:15-22 [ER 000121] ("if not . . . today, then

2    tomorrow you have to report a failure to fulfill the contract . . .   Once again, this is my opinion,

3    this is what I know and what I think"); Gov. Ex. 141, 12:12-20 [ER 000138] (in response to

4    Rocklin's statement that he called TACOM and told it ATN could no longer perform, Beker

5    states:  "Dima, you would have called either way, . . . you have no choice anyway, you can't

6    deliver either today or tomorrow"); *id.* at 12:22-23 [ER 000138] ("Therefore you would have

7    called in either case").  Beker confirms this belief in later conversations.  Gov. Ex. 143, 5:11-16

8    [ER 000141] (Beker:  "Then clarify for me please . . . why did you ask to send you a money

9    advance?"  Rocklin:  "So that I would stop working on this contract."  Beker:  "But you stopped

10   working as it is"); *id.* at 7:10-11 [ER 000143] (Beker:  "I had nothing to do with it, you stopped

11   working on it anyway, without me.").  And in the last conversation Mr. Beker has with Rocklin,

12   he emphasizes that any agreement he had with Rocklin was *not* an agreement for ATN to stop

13   performing.  *See* Gov. Ex. 143, 4:10-11 [ER 000140] (Beker: "We didn't talk about . . . you

14   picking up the phone and calling [TACOM] . . . you will call anyway . . . you would call

15   anyway); *id.* at 5:5-16 [ER 000141] (Rocklin: "I went and took the step we agreed upon.  Right?"

16   Beker: "No, not quite . . . why . . . did you ask to send you a money advance."  Rocklin: "So that I

17   would stop working on this contract."  Beker: "But you stopped working as it is."); *id.* at 7:3-22

18   [ER 000143] (Rocklin: "If the issue was about this contract, we did . . . what we had to.  I stopped

19   working on it."  Beker: "[Y]ou stopped working on it anyway, without me."); *id.* at 9:10-17 [ER

20   000145] (Rocklin:  "I already gave up the contract."  Beker:  "That is to say, this is not what you

21   and I agreed upon."); *id.* at 11:21-22 [ER 000147] (Beker: "you understand only too well that you

22   could not continue working, not because . . . I or you wanted it this way").  Mr. Beker's belief

23   was corroborated by both Rocklin and McAleer at trial.  *See* RT 1109 [ER 000174] (Rocklin

24   conceding issuance of stop order); RT 1348:1-9 [ER 000206] (McAleer testified that he issued a

25   stop order to ITE in June 2005 formally notifying ITE to stop supplying the night vision goggles).

26          From the very first conversation he has with Rocklin, Beker makes it clear that he

27   believed that Rocklin wanted Newcon's help to *complete* the contract as a result of ATN existing

28   failure to perform.  Gov. Ex. 135, 5:8-19 [ER 000121] (Beker:  "I know that the production has

1    stopped . . .  The shipping is not possible . . .   if not today, then tomorrow you have to report a

2    failure to fulfill the contract. . . .  Because everything that I know . . . leads to the fact that . . .

3    you wouldn't be able to fulfill your obligations."); *id.* at 15:22-24 [ER 000122] (Beker:  "I'm now

4    not gonna make you. . . repeating it now, well, whether my help is needed or my help is not

5    needed.")

6           Thus, Beker thought he was negotiating an entirely different agreement – one not alleged

7    by the Government – pursuant to which ATN (Leonid Gaber and Marc Morgovsky) would talk to

8    their supplier in Russia (Metelskiy at NPZ) and instruct NPZ to provide already manufactured

9    component parts to Newcon, so that Newcon in cooperation with ATN could fulfill the contract.

10   Gov. Ex. 135, 61-62 [ER 000123-124] (Beker tells Rocklin to consult Morgovsky and Gaber and

11   they could prepare "all the necessary papers"); Gov. Ex. 138, 7:8-13 [ER 000128] (Beker

12   complaining that Gaber left without calling Metelskiy); Gov. Ex. 139, 7:7-18 [ER 000133]

13   (Beker:  It is needed that Mr. Gaber . . . pick up the phone and call Metelskiy . . . .  If he doesn't

14   do it you will return the money to me").  During his testimony at trial, Rocklin confirmed that this

15   was a key point in their agreement.  RT 892:14-16 [ER 000157] ("Q.  It was so important to him

16   that , in his view, the deal would be off if it didn't occur, right?  A. Yes.").  And Rocklin took the

17   position that he couldn't enter any agreement without Morgovsky's assent.  Gov. Ex. 136, 13:20-

18   22 [ER 000126] ("I need to go to Morgovsky and tell that, 'Hey, they are serious about it.'").  But

19   he reneged on this important point almost immediately.  In their very next call, Rocklin told

20   Beker that "[t]here is not need, there is no need for Laktionov to call Metelskiy and sa… and talk

21   about the fact that we have already reached an agreement about everything."  Gov. Ex. 140, 6:3-6

22   [ER 000135].

23          Beker agreed to make an advance payment so that Rocklin would sign a written

24   agreement.  Gov. Ex. 138, 21:8-13 [ER 000130] (Beker: "I think that we need some paper for us

25   to sign . . . together with this invoice, that which we agreed on, that we take over this contract till

26   the end . . . with it . . . you guys do everything to help us fulfill it, we do everything to help you

27   guys fulfill it"); Gov. Ex. 139, 3:15-16 [ER 000132] (Beker: "We'll prepare a draft now from our

28   side, the way I think this documents should look").  Beker fully intended to disclose this

1   agreement to TACOM.  Gov. Ex. 143, 9:1-4 [ER 000145] (Beker:  "I thought that you and I were

2   reaching an agreement about cooperation and a future joint activities, that is to say, addressing

3   TACOM in writing")  Gov. Ex. 143, 10:12-13 [ER 000146] (Beker:  "It means that you and I had

4   to prepare a joint paper to TACOM").

5         But even the agreement Beker believed he was negotiating never came to fruition, as the

6   tapes reveal.  Gov. Ex. 138, 17:19-21 [ER 000129] (Beker:  "I'll transfer the money to you, but it

7   seems that you and I have no agreement about anything"); Gov. Ex. 141, 12:3-8 [ER 000138].

8   ("Well, yes, frankly speaking, for now, I am not very, ah…I, I would say it this way:  this is not,

9   not quite what you and I agreed to, and not because you don't want it, because, unfortunately, this

10  is not, ah… this is not cooperation…This is not cooperation); Gov. Ex. 143, 10:9-10 [ER 000146]

11  (Rocklin:  "Well, it means we didn't understand each other regarding the agreement").  At trial,

12  Rocklin confirmed that they had not reached an agreement on this important issue:

13            Q.  You were telling Mr. Beker that there is no need for NPZ to
14            know about your agreement with Newcon?

15            A.  Yes, because it was not an agreement yet.  The agreement was
          to take a first step and transfer the money.

16            Q.  So at this point on September 7th, 2005, you and Mr. Beker still
17            didn't have an agreement?

18            A.  The agreement was not there for – we did not discuss the NPZ."

19  RT 900:9-16 [ER 000158].  Rocklin later confirms that his negotiations with Beker were

20  incomplete.

21            Q.  So this is September 7th, correct?

22            A.  Yes.

23            Q.  This is five days after he's sent you the draft agreement?

24            A.  Yes.

25            Q.  At the time he sent you the draft agreement, no money had
26            changed hands?

27            A.  No.

28            Q.  And you hadn't agreed on the terms of a written agreement?

1        A.  No.

2  RT 907:18-908:1 [ER 000159-160].  Thus two days before the date that Arie Prilik is alleged to

3  have failed to disclose material facts to TACOM, those alleged facts simply did not exist.

4        Nor did they exist on September 8, 2005, one day before Prilik's call to TACOM.  On

5  September 8, Beker had another conversation with Rocklin in which Rocklin made it clear that no

6  agreement to call NPZ actually existed.  Referring to his repeated requests that Gaber call

7  Metelskiy at NPZ, Beker states:  "a portion of our agreements consists of the fact that he would

8  call and say, but… I don't even in this… not in this connection.  The fact that it drags on, it's not

9  to everybody's benefit," and Rocklin responds:  "Yes, I understand."  Gov. Ex. 141, 7:15-20 [ER

10  000137].  At trial, Rocklin confirmed that this was a crucial issue for Newcon, but Rocklin was

11  not going to cooperate on this point:

12             Q.  …What you were telling Mr. Beker was that ATN still needed
13             the NPZ goggles.  Isn't that right?

14             A.  Yes.

15             Q.  It was important to your continued operation?

16             A.  Yes.

17             Q.  And you really didn't want NPZ to cooperate with Newcon in
18             connection with this contract, right?

19             A.  No.

20  RT 913:2-9 [ER 000161].  Beker pursues the issue with Rocklin, but Rocklin continues to

21  prevaricate.  Rocklin confirmed his stated reluctance to cooperate with Beker in his testimony at

22  trial:

23             Q.  And now, suddenly, ATN says we're not going to – we're not
24             going to communicate with NPZ and tell them to cooperate with
              you?

25             A.  There's nothing sudden.  I never promised that Lenny will give
26             a call, really.

27             Q.  Okay.  Even though Mr. Beker said at one point, if he doesn't
28             make the call, the deal's off, and you'll pay him the money back,
              right?

1          A.  Yes.

2    RT 919:4-12 [ER 000163].

3          In their final conversation on October 4, 2005, Beker catalogues Rocklin's failures to live

4    up to the terms of their agreement before finally pulling the plug on all further negotiations.  Gov.

5    Ex. 143, 9:1-9 [ER 000145] ("I thought that you and I were reaching an agreement about

6    cooperation and a future joint activities, that is to say, addressing TACOM in writing, ah... the

7    presence, a … of written agreements that you refused, and now, as I understand it, it doesn't

8    matter what's written there, what matters is that you don't want, ah… to either look at or sign it.

9    It totally doesn't matter whatever is written there.  Do I get it right?").  In response, Rocklin

10   finally admits that "it means, we… didn't understand each other regarding the agreement."  Gov.

11   Ex. 143, 10:9-10 [ER 000146]. [8]  Rocklin clarified this point at trial:

12              Q.  At that point in time, you weren't sure that you guys even had
                any kind of actual understanding between each other, right?
13

14              A.  Well, because he just point out for the first time that the
                agreement was there to show to TACOM.
15

16              Q.  You didn't understand that before this conversation?

17              A.  He never pointed it out.

18              Q.  So at this point in time, once he brought up this subject, you're
                saying, 'Gee, I guess we never really had an agreement, then,'
19              right?

20              A.  In regards to the written agreement, yes, we did not have an
                agreement."
21

     RT 931:4-14 [ER 000164].

22

23

24

25

26   _____
        [8]  The four calls in which Mr. Prilik is alleged to have omitted reference to the
27   Newcon/ATN agreement occurred on September 9 and 22, October 18 and November 17, 2005.
     Given the fact that Mr. Beker terminated all further negotiations with Rocklin on October 4,
     2005, no agreement could possibly have existed on the dates of the last two calls.  As such, those
28   calls cannot support a material omission as a matter of law.

DEFENDANTS' MEMORANDUM IN SUPPORT OF COURT'S ORDER GRANTING DEFENDANTS'
MOTION PURSUANT TO RULE 29 (a), F.R.CRIM.P., CASE NO. CR-07-0765 MHP

III.    **ARGUMENT.**

   A.    **The Evidence of Wire Fraud is Insufficient**

         1.    **The Government Failed to Prove That the Alleged Non-Disclosure was Material**

   The wire fraud statute requires proof that the alleged false statements or omissions were material. *Neder v. United* States, 527 U.S. 1 (1999).  A matter is material if it is of a kind that would reasonably influence a person to part with money or property.  *United States v. Woods*, 335 F.3d 993, 1000 (9th Cir. 2003).  There is no proof of materiality if the object of the scheme is not the money or property of the alleged victim.  *See United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000); *United States v. Mikell*, 163 F.Supp.2d 720, 741-42 (E.D. Mich. 2001) (granting Rule 29 because "business practices that are unsavory, even with strong evidence of criminal intent, cannot constitute a 'scheme to defraud' under the mail and wire fraud statutes in the absence of a property right for the scheme to interfere with).  Here, the Government was required to prove that the defendants' alleged omissions would have been capable of influencing TACOM to part with property, and it is not sufficient to show that ITE would have lost money or property.

   The Government claims that the defendants' failure to disclose the supposed agreement with ATN was capable of influencing TACOM to part with property.[9]  The Government contends that, assuming Newcon kept the putative agreement secret from TACOM, TACOM might have granted a contract to Newcon and agreed to pay more for the goggles.  But the testimony presented at trial shows that this hypothetical could not have happened.

   The government's proffered theory of materiality comes at the tail end of a series of unproven suppositions, all of which are highly improbable if not actually foreclosed by the evidence.  As set forth below, the jury would have to find (a) that Newcon was paying ATN not

---

   [9]  The Government has suggested that so long as it proves that the defendants *intended* to deprive TACOM, it doesn't matter whether the defendants' omissions turned out to be incapable of influencing TACOM.[9]  But, even assuming there was such proof, which there was not, this is exactly the theory that the Supreme Court rejected in *Neder*.  527 U.S. at 24 (rejecting the government's argument that under the wire fraud statute "criminal liability would exist so long as the defendant *intended* to deceive the victim, even if the particular means chosen turn out to be immaterial, *i.e.*,, incapable of influencing the intended victim").

1   to perform a contract it was otherwise capable of completing, and that ATN would therefore

2   withdraw from the contract; (b) that Newcon would have concealed this agreement from TACOM

3   even though the telephone transcript is to the contrary; (c) that TACOM would then have relieved

4   ITE of its obligation to find a suitable replacement for ATN even though the original sub-

5   contractor, Nivisys, remained willing and able to step in; (d) that having let ITE off the hook,

6   TACOM would likely resort to a sole source agreement to complete Phase I of the Contract; (e)

7   that TACOM would, in fact, choose Newcon over Nivisys or some other supplier; and (f) that

8   Newcon would charge TACOM more then $1760, and that TACOM would agree to such a price

9   increase.  All of these inferences would have to be drawn before the jury would be asked to come

10   to the ultimate conclusion (g) that, inexplicably, TACOM would not exercise its unilateral right to

11   hold ITE responsible in this fixed price contract for any overage.  Each of these links in the

12   materiality chain fail under the proof at trial.

13           a.      **That Newcon Was Proposing to Pay ATN to Withdraw from a**
14                   **Contract ATN Was Otherwise Capable of Performing**

15           One can only reach the sole source option critical to the government's hypothetical if the

16   starting point is that ATN would withdraw from the contract.  The government's premise is that

17   had the scheme been successful, ATN would have withdrawn at the instigation of Newcon,

18   because Newcon was paying ATN to do so.  Had ATN not withdrawn, then TACOM simply

19   would have addressed any problems it identified with ATN's performance through the prime

20   contractor, ITE, and nothing Mr. Prilik said or failed to say would have been material.

21           This foundational supposition is belied by the evidence.   While Rocklin described his

22   interpretation of the recorded conversations as an offer to pay ATN to withdraw, the

23   conversations themselves do not support his testimony.  Instead, the recorded conversations leave

24   no doubt that the defendants, Beker and Prilik, were convinced that ATN could not perform and

25   would withdraw from the contract regardless of any financial arrangements between ATN and

26   Newcon. *See e.g*., Gov. Ex. 135, 5:15-22 [ER 000121]; Gov. Ex. 141, 12:12-20 [ER 000138];

27   Gov. Ex. 143, 7:3-22 [ER 000143].  Clearly Beker wanted ATN's cooperation in helping Newcon

28   complete Phase I of the contract, and assuming Newcon was allowed to assume responsibility for

1   the balance of the goggles due under the contract.   But the conversations belie any claim that

2   ATN was being paid simply to withdraw.

3          Moreover, it makes no sense to suggest the putative agreement was as Rocklin described

4   it.  As a Grand Juror cogently wondered: "And then the offer was $125 less than the expected

5   profit margin that ATN would have gotten on the goggles.  Was it reasonable to assume that ATN

6   would be encouraged to enter into such an arrangement."  GJ000085-90 [ER 000084-89].[10]  The

7   government's suggestion at trial that Newcon was simply appealing to ATN's laziness (RT

8   1088:7-1089:6 [ER 000172-173]) (wherein the Government invited Rocklin to juxtapose ATN's

9   doing nearly nothing and earning $75 against working on the contract and earning $200) is

10   patently absurd, and not supported by the recorded calls, as described above.[11]

11          If ATN did not withdraw (and was not being pressed to do so by the defendants), anything

12   said by Mr. Prilik to TACOM's McAleer would be wholly immaterial, because TACOM would

13   exercise its primary option of addressing performance problems with the prime contractor, ITE,

14   as it had done in the past.  RT 1416:15-1417:5 [ER 000223-224].  McAleer made clear that

15   TACOM dealt only with the prime contractor and had, and would have, no contractual

---

16         [10] The Grand Juror continued: "I thought the margin that they [ATN] anticipated making,

17   after – the margin – that the profit was going to be if they stayed in the contract and continued to produce, which you said they could produce and – the supply was there and everything else was

18   there, they would earn something like two hundred dollars a pair and the offer was give that profitability up for $75;" (GJ 000087 [ER 000086]) and ". . . the profit margin was less then half

19   of what they expect to make under that contract and there's no showing of a substantive contract or some other business opportunity for them to make the $200 somewhere else and the $75 here."

20   (GJ 000088 [ER 000087]).  The Government proffered in response to these concerns that in the tape recorded telephone conversations between Rocklin and Beker, Mr. Beker bargained by

21   indicating "that you[ATN] could turn around and sell those [night vision goggles] somewhere else, so in essence, it's a free $75 per pair of goggles for you" and ATN could additionally make

22   $200 on the later sale.  (GJ 000087-88 [ER 000086-87]).  Having exhaustively looked at every word in each of the recorded calls during trial, we know that Mr. Beker said nothing of the sort.

23         [11] It should also be noted that the Government's theory is entirely dependant upon an

24   uncritical acceptance of Rocklin's purported "understanding" of the recorded conversations at issue, instead of focusing on the conversations themselves, most of which do not require his

25   embellishment.  Indeed, the Court repeatedly instructed the jury that they were to look to the recorded conversations alone in determining the meaning intended by the conversing defendants.

26   And, of course, Rocklin conclusively perjured himself multiple times at trial (in violation of 18 USC § 1621), after lying to FBI Agent Haynie during the course of the investigation (in violation

27   of 18 USC § 1001), which falsehoods were repeated to the grand jury through Agent Nestor (*GJ000038 [ER 000038]*)(in violation of 18 USC § 1623), and falsified documentary evidence,

28   which was entered against the defendants in the Government's case as part of Exhibit 51 (a violation of the obstruction of justice statute, 18 USC § 1512(c)).

1   relationship with Newcon or any other subcontractor.  RT  1237:14-1238:8 [ER 000187-188];

2   1361:6-14 [ER 000208]; 1374:1-4 [ER 000210]; 1417:3-5 [ER 000224].  Indeed, TACOM would

3   not even communicate with subcontractors, let alone aspiring subcontractors, with respect to the

4   Battalion Set II contract.  RT 1374:22-1376:18 [ER 000210-212]; 1392:6-18 [ER 000217];

5   1408:10-13 [ER 000221].  Hence, any failure of Prilik to disclose the terms of any negotiations

6   with ATN was incapable of influencing McAleer's choice of action because, assuming ATN did

7   not withdraw, McAleer would never have considered forcing ITE to replace its subcontractor.

8          It is worthy of note that this is not a position McAleer adopted in deference to the ongoing

9   investigation by the FBI into Newcon's negotiations with Rocklin;  as McAleer made clear in the

10  notes of his discussion with Lindbom of CID and in his trial testimony, McAleer's refusal to

11  intervene in ITE's contractual relationship with its chosen goggle provider, ATN, or even to

12  discuss this course of action with Prilik, were positions taken in the ordinary course of his duties

13  based on longstanding policy.  RT 1375:8-1376:18 [ER 000211-212]; 1401:11-1402:11 [ER

14  000218-219].  McAleer  testified that because TACOM was treating ATN's performance

15  problems as it would in the ordinary course of business, *i.e.*, working with ITE to fix them, none

16  of the facts relied upon in the government's hypothetical existed during Prilik's conversations

17  with McAleer on September 9, September 22, October 19, or November 17, 2005.  RT 1417:10-

18  1418:16 [ER 000224-225].

19          **b.       That Newcon Conceal its Agreement with ATN from**

20                 **TACOM**

21          The next supposition in the chain, following ATN's supposed withdrawal, is that Newcon

22  would conceal its supposed agreement to pay ATN to stop providing goggles from TACOM.  As

23  explained in Section III(A)(3) of this motion, the evidence failed to establish that such an

24  agreement ever existed or was even contemplated by the defendants.  Nonetheless, the defendants

25  undeniably intended to present to TACOM the putative agreement that the defendants were

26  attempting to hash out with Rocklin, which was not for the purpose of paying ATN to stop

27  delivering goggles, once it was solidified.  Gov. Ex. 143, 9:1-9 [ER 000145].  Toward this end,

28  the defendants created a draft agreement and welcomed Rocklin to add to it or change it in any

1   way he saw appropriate during their ongoing discussions.  *See e.g.*, RT 550:1-12 [ER 000149];

2   557:22-558:9 [ER 000150-151]; 594:11-19 [ER 000152]; 884:17-23 [ER 000155]; 890:15-25

3   [ER 000156]; 913:10-914:18 [ER 000161-162].  Both Beker and Prilik implored Rocklin to

4   amend, sign and return it, so that the parties could present it to TACOM.  RT 931:1-23 [ER

5   000164].  Even though, as acknowledged by Rocklin, no agreement was ultimately made, Prilik

6   informed McAleer that Newcon had been in contact with ATN to address the situation.  RT

7   1373:3-20 [ER 000209].    There is no evidence that had an agreement been reached, the

8   defendants would not have followed through on their stated desire to bring it to TACOM's

9   attention.  Thus, on this basis as well the evidence fails.  Clearly, if there had been no omission,

10  then the omission could not be deemed material to TACOM in its decision-making process.

11
12                    **c.      That TACOM Would Have Relieved ITE of its Obligation to
                               Find a Suitable Replacement for ATN**

13              Assuming, again, that ATN would withdraw from the contract, ITE remained fully

14  responsible for ensuring that TACOM received the products ordered in the Battalion Set II

15  Contract as per specification.  RT 1324:20-25 [ER 000204].  The most probable course for ITE in

16  such a situation would be to engage a new night vision sub-contractor, and there is little doubt

17  that it could have done this.  In fact, when it appeared that ATN was having difficulties with its

18  deliveries, ITE contemplated replacing ATN with a sub-contractor who could fulfill the contract.

19  As McAleer testified, ITE's Abu-Taleb sent an email to TACOM indicating that Newcon could

20  step in as the sub-contractor, though it would reduce ITE's profit on the transaction.  RT 1421:1-

21  16[ER 000228].  No price increase to TACOM, however, was discussed or contemplated by

22  anyone.  *Id.*.  Furthermore, given that Nivisys was still available as a substitute for ATN (RT

23  1388:20-1390:5 [ER 000214-216]), ITE had choices, which presumably it would have exercised,

24  rather then defaulting on the night vision goggle portion of the contract.  Had ITE in fact chosen

25  to complete the *fixed-price* contract through a new subcontract with Nivisys or Newcon, then

26  nothing which Prilik omitted in his conversations with McAleer would have been material to

27  TACOM's decision to part with money or property.

28

1

2

### d. That TACOM Would Likely Resort to a Sole Source Agreement

3    McAleer testified that had ATN withdrawn from the contract, and had ITE not been able

4    to find a suitable replacement, TACOM would likely have resorted to a sole source agreement,

5    whereby TACOM would deal directly with a supplier to provision the remaining goggles under

6    the Battalion Set II Contract.  RT 1453:25-1454:7 [ER 000233-234].  This speculation, however,

7    is unwarranted because there was no evidence that such a sole source award was legally possible.

8    Federal Acquisition Regulations applicable to TACOM make it clear that sole source awards are

9    permissible only in certain limited circumstances.  *See e.g*., FAR 6.302-1, 6.302-2, *et. seq.*  The

10   regulations speak in terms of "unusual and compelling urgency" of such gravity that the

11   Government would be seriously injured by going through a competitive bidding process.  FAR

12   6.302-2.  There was no evidence presented at trial that this legal requirement existed.  McAleer's

13   attempt to portray TACOM's hypothetical situation as urgent because the Iraq war was in

14   progress is exceedingly unpersuasive in view of his casual acceptance of ATN's late deliveries,

15   and, of course, the Iraq war was on when the contract was originally tendered, but TACOM took

16   the time necessary to vet prospective bidders twice (the Battalion Sets I and II).  Under these

17   circumstances, the sole source option was actually quite improbable under the hypothetical posed

18   to McAleer.

19

### e. That TACOM Would Choose Newcon Over Nivisys as the Sole Source

20

21   The evidence presented by the Government at trial also did not establish the next

22   proposition – that if ATN withdrew, and ITE could not (or would not) find a suitable

23   replacement, and TACOM decided to proceed sole source, that Newcon would have been the

24   source in question.  TACOM had already vetted and accepted Nivisys as a sub-contractor under

25   the Battalion Set II contract.  RT 1220:9-25 [ER 000184]; 1222:16-25 [ER 000185].  Nivisys did

26   not go quietly when it was unceremoniously replaced by ATN, but rather alerted TACOM on

27   June 28, 2005 that should ATN fail, Nivisys stood ready to fulfill the contract.  RT 1388-1390

28   [ER 000214-216].  TACOM knew that Nivisys could do so for less then the $1760 quoted by

DEFENDANTS' MEMORANDUM IN SUPPORT OF COURT'S ORDER GRANTING DEFENDANTS'
MOTION PURSUANT TO RULE 29 (a), F.R.CRIM.P., CASE NO. CR-07-0765 MHP

1    ITE, since ITE originally charged that same amount (even including its own profit margin) with

2    Nivisys as the sub-contractor.  RT 1220:21-25 [ER 000184]; 1245:11-12 [ER 000192] .  Nivisys

3    was thus the likely and reasonable choice for sole source, had TACOM gotten to that point.

4    Clearly, if Nivisys or some other supplier, and not Newcon, was chosen as the sole source to

5    complete the contract, anything Prilik said or failed to say in his conversations with McAleer

6    could not be deemed material.

7           **f.      That if the Sole Source Was Awarded to Newcon, It Would
                      Charge TACOM More then $1760 or that TACOM Would
8                     Agree to Such a Price Increase**

9           Even if assuming that TACOM in some extreme hypothetical situation could have given

10   Newcon a sole source contract, TACOM would not have lost money or property because there is

11   no evidence that Newcon would have raised prices, or that TACOM would have accepted higher

12   prices.  In fact, McAleer testified on re-cross that Prilik never quoted any price for goggles should

13   Newcon be awarded the remainder of the sub-contract either on September 9, 2005 or during any

14   of the other conversations between them.  RT 1468-1470 [ER 000235-237].

15          Instead, Prilik stated only that Newcon's price would be in the range of the Battalion Set I,

16   but because he and McAleer were not in any kind of negotiation during this conversation, this

17   oblique statement was not clarified by Prilik, nor explored by McAleer.  What is clear, however,

18   is that Prilik made this comment in the context of a discussion concerning Newcon's working

19   with a prime contractor, in this case, specifically ITE.  The relevant segment of the September 9,

20   2005 conversation began with McAleer reasserting his consistent position that TACOM always

21   attempts to resolve contractual problems with its prime contractor (Gov. Exh. 97, 7:1-6 [ER

22   000118]) and Prilik responding that "*[i]n principle, we, we don't have any principal objections to

23   working with ITE.*"  *Id*. at 7:13-14 [ER 000118]).  Prilik then expands on this suggestion by

24   emphasizing that, presumably unlike ATN, Newcon would have to export the goggles legally,

25   rather then "*smuggle it in a suitcase*."  *Id*. at 7:16-19 [ER 000118].  After McAleer once again

26   reminded Prilik that ITE, and not the government, selects subcontractors, Prilik responded "*Um,

27   so yes, we are willing to work with him, or if um, the government decides that, or recommends*

28

- 23-
DEFENDANTS' MEMORANDUM IN SUPPORT OF COURT'S ORDER GRANTING DEFENDANTS'
MOTION PURSUANT TO RULE 29 (a), F.R.CRIM.P., CASE NO. CR-07-0765 MHP

1    *any other option.  As long as we follow all of the legalities, and that will raise the price probably*

2    *to the same levels that we have supplied under the previous contract.*"  *Id*, at 8:18-22 [ER

3    000119]).

4           Thus it does not appear that Prilik directed this brief price reference to a hypothetical sole-

5    source option, or that he was proposing to charge TACOM more money.  In fact, leaving

6    hypotheticals aside, the only actual price that was ever quoted that McAleer was aware of was the

7    "final offer" made by Beker to ITE's Abu-Taleb in November of 2005 of $1340 per goggle set.

8    Gov. Ex. 155; RT 1471 [ER 000238].  Accordingly, there is no evidentiary basis to conclude that

9    Newcon would have charged TACOM more then $1760 had they been awarded a sole source

10   contract for the remainder of Phase I of the Battalion Set II.

11          Additionally, there is no evidence that TACOM would have agreed to such a price

12   increase if it had chosen to negotiate with Newcon for the remainder of the contract.  McAleer

13   testified that he (on behalf of TACOM) never engaged in any conversations with Prilik that

14   constituted an invitation to negotiate terms by which Newcon would become a sub-contractor in

15   the Battalion Set II.  RT 1403 [ER 000220].  McAleer again shut down any conversation about

16   the contract with Prilik on October 19, 2005, and McAleer testified that no options for replacing

17   ATN were being contemplated on that date.  Ex. 84 (McAleer notes of October 19, 2005

18   discussion); RT 1408-09 [ER 000221-222].  Because there were no negotiations between

19   TACOM and Newcon for providing night vision goggles under the Battalion Set II, anything

20   Prilik omitted to say during his conversations with McAleer could not have been material.

21
             g.     **That TACOM Would Not Exercise its Unilateral Right to Hold**
22                  **ITE Responsible for Any Overage**

23          All of the above hypothetical events would have had to have taken place before TACOM

24   was placed in the position of parting with money or property.  But TACOM's contract with ITE

25   was a fixed price contract, in which TACOM had the unilateral ability to require ITE to absorb

26   any increase in the price of night vision goggles.  RT 1268-69 [ER 000198-199; 1420 [ER

27   000227].  This was true even if TACOM effected a partial termination of ITE's contract in order

28   to seek night vision goggles from a sole source.  RT 1454:5-17 [ER 000234].  McAleer stated that

1    this would have been the more probable result of any increase on the price of goggles.  RT

2    1454:18-21 [ER 000234].   Accordingly, even if all of the hypotheticals posited by the

3    Government actually occurred, TACOM would not have been out money or property.

4          In sum, the Government utterly failed to prove the materiality of any omission by Mr.

5    Prilik during his conversations with Derek McAleer, either in the grand jury or at trial.

6          ## 2.    The Alleged Non-Disclosure Could Not Have Defrauded TACOM of
             ## Money or Property

7    

8          A scheme to defraud is actionable only if it is intended to deprive the victim of a money or

9    property or to interfere with the victim's property rights.  If the scheme could not have deprived

10   the victim of property even if it had been successful, it is not a criminal offense.  *United States v.*

11   *Pierce*, 224 F.3d 158, 165-66 (2d Cir. 2000) (no scheme to defraud existed where there was no

12   evidence that the victim would have been deprived or money or property, and a "scheme to

13   engage in deceit is not, without more, a scheme to defraud").  Here, the government alleges that

14   the defendants scheme was intended to allow Newcon to supply NVGs to TACOM "at a

15   substantially higher price."  Indictment ¶ 10 [ER 000112].  For the reasons discussed about,

16   however, the evidence showed that even if the defendants' alleged scheme had been successful,

17   TACOM would not have been deprived of any money or property.

18         The Government has suggested that so long as it proves that the defendants *intended* to

19   deprive TACOM of money or property, it doesn't matter whether the defendants' omissions

20   turned out to be incapable of influencing TACOM.  But this is exactly the theory that the

21   Supreme Court rejected in *Neder*.  527 U.S. at 24 (rejecting the government's argument that

22   under the wire fraud statute "criminal liability would exist so long as the defendant *intended* to

23   deceive the victim, even if the particular means chosen turn out to be immaterial, *i.e.,*, incapable

     of influencing the intended victim").

24         ## 3.    There is no Evidence of the "Agreement" Alleged by the Government

25         There is no evidence to support the government's allegation that the defendants had an

26   agreement with Rocklin, and paid Rocklin, for ATN's agreement to stop performing on the

27   Battalion Set II contract.  The evidentiary foundation for the government's case – the recorded

28   telephone calls – not only do not support the government's case, they affirmatively demonstrate

1   that there was no such agreement at any time, and therefore nothing to disclose to the

2   government. Dmitry Rocklin himself conceded in the last recorded call that he and Beker never

3   had any mutual understanding that could be characterized as an agreement. Gov. Ex. 143, 10:9-

4   10 [ER 000146] ("Well, it means we didn't understand each other regarding the agreement").

5   Rocklin and the defendants never reached any agreement during the calls, even in principle, much

6   less a formal written or oral agreement. The absence of any agreement is further demonstrated by

7   Rocklin's repeated refusal to sign or even revise the written agreement that Beker proposed. That

8   written draft agreement, and all of Mr. Beker's statements on the tapes, clearly reflect his belief

9   that ATN had stopped performing on the contract before Rocklin ever contacted Beker, and that

10  the only agreement that Beker was trying, and yet failed, to reach with Rocklin was an agreement

11  that ATN would help Newcon get component parts from ATN's supplier in Russia, NPZ, in order

12  to fulfill the contract. Thus on the date that Arie Prilik is alleged to have failed to disclose

13  material facts to TACOM, those materials facts simply did not exist.

14         All of the evidence demonstrates clearly that Newcon never offered ATN money to stop

15  ATN's performance of the Battalion Set II subcontract. ATN could not and was not performing

16  under that contract before Rocklin ever called Newcon on August 17. In fact, McAleer had

17  issued a stop order to ITE on June 17, 2005. From the very first conversation he has with

18  Rocklin, Beker makes it clear that ATN has already stopped performing under the contract, and

19  that Beker understood that Rocklin wanted Newcon's help to *complete* the contract.

20         The only agreement that the defendants anticipated, and that never came to fruition, was

21  an agreement that ATN would *cooperate* with Newcon to *fulfill* the contract by ensuring that

22  component parts that ATN had already had produced by NPZ in Russia would be made available

23  to Newcon. This is also reflected in the written agreement that the defendants sent to Rocklin on

24  September 2, but that he refused to sign. Given the lack of any mutual understanding between

25  Rocklin and the defendants, there simply was no agreement that could have been disclosed to

26  TACOM. And absent a meeting of the minds between Rocklin and Beker on the alleged

27  agreement, the mere transfer of $50,000 from Newcon to ATN is an immaterial fact that cannot

28  form the basis of a scheme to defraud and certainly was not alleged in the indictment as the basis

1    for the fraud.  Moreover, the evidence clearly demonstrates that the payment was solicited by the

2    FBI and Rocklin, and that it was never the defendants' intention to pay money to ATN to stop

3    performing on the Battalion Set II contract.

4              **4.      Even if there was an Agreement, There is No Evidence That
                         Defendants Concealed the Existence of an Agreement**

5         The Government claims that there may be a scheme to defraud based solely on a non-

6    disclosure even in the absence of a duty to disclose, and it relies upon cases from other circuits

7    that distinguish between "mere non-disclosure" or "mere omissions" from "active concealment."[12]

8    But even if the government's legal premise were correct, the evidence at trial fails to prove "active

9    concealment" and, as discussed *infra*, the defendants were never charged under that theory.

10        Again, the linchpin of the government's case – the tape-recorded calls – affirmatively

11   shows that the defendants never intended to conceal anything from TACOM.  In those tapes

12   Beker repeatedly implores Rocklin to prepare and/or sign a written agreement so that the written

13   agreement could be presented to TACOM.  The draft agreement that Newcon sent to Rocklin –

14   with repeated invitations that he add in or modify it with whatever he wanted, "including the

15   money," contained all the material elements of the agreement that Beker was trying to negotiate

16   with Rocklin (an agreement that was far different from any agreement to pay Newcon to "stop

17   performing").  Thus, the defendants fully intended that the agreement they believed they were

18   negotiating with ATN would be disclosed to TACOM.  And, when Arie Prilik called TACOM on

19   September 9, 2005, he disclosed to TACOM that Newcon was talking to ATN, which was true,

20   and which accurately reflected the state of affairs on September 9, since Rocklin had not signed

21   or even commented upon the draft agreement that Newcon had proposed.  *See* RT 1373:17-23

22   [ER 000209] (McAleer testified that Prilik never concealed fact that Newcon was talking to ATN

23   to try to collectively address ATN's problems).

24

25

26   _____

27        [12]  The defendants maintain that in the Ninth Circuit, the government must prove that they
     had a duty to disclose when a scheme to defraud is premised upon an omission or non-disclosure.
28   *United States v. Dowling,* 739 F.2d 1445 (9th Cir. 1984), *rev'd on other grounds*, 473 US 207
     (1985);

1

> **5.      The Government Failed to prove That the Defendants Intended to Defraud TACOM of Money or Property**

2

3    As the evidence summarized above demonstrates, the Government failed to prove that the

4    defendants acted with intent to defraud TACOM of money or property.  The tapes, the trial

5    testimony, and the exhibits at trial all conclusively show that the defendants never tried to hide

6    anything from TACOM, and that if the defendants reached an agreement with ATN, they fully

7    intended to document that agreement in writing and provide it to TACOM and to ITE.  This

8    evidence alone defeats the Government's case.

9

> **B.      The Court Must Grant a Judgment of Acquittal on the Conspiracy and Wire Fraud Counts Because the Government's Proof at Trial Constructively Amended the Indictment.**

10

11    The defendants were indicted by a grand jury based on an allegation that they made false

12   and materially misleading statements to TACOM in an effort to wrongfully wrest the night vision

13   sub-contract away from ATN.  Having been offered proof that all claims made by the defendants

14   regarding ATN's production quality were entirely truthful (a fact it should have known all along),

15   the government at trial contends that this prosecution can be maintained on the theory that the

16   defendants *materially omitted* information in their dealings with TACOM.  In so doing, the

17   government has constructively amended the indictment in violation of the Fifth Amendment to

18   the United States Constitution, mandating dismissal of the charges.

19    The Fifth Amendment guarantees a criminal defendant "the right to stand trial only on

20   charges made by a grand jury in its indictment."  See *United States v. Garcia-Paz,* 282 F.3d 1212,

21   1215 (9th Cir. 2002).  "After an indictment has been returned and criminal proceedings are

22   underway, the indictment's charges may not be broadened by amendment, either literal or

23   constructive, except by the grand jury itself."  See *United States v. Adamson,* 291 F.3d 606, 614

24   (9th Cir. 2002), quoting  *Stirone v. United States,* 361 US 212, 215-16 (1960).  Such an

25   amendment "occurs when the charging terms of the indictment are altered, either literally, or in

26   effect, by the prosecutor or a court after the grand jury has last passed upon them."  See *United

27   States v. Von Stoll,* 726 F.2d 584, 586 (9th Cir. 1984).  In *United States v. Shipsey,* 190 F.3d 1081,

28

DEFENDANTS' MEMORANDUM IN SUPPORT OF COURT'S ORDER GRANTING DEFENDANTS'
MOTION PURSUANT TO RULE 29 (a), F.R.CRIM.P., CASE NO. CR-07-0765 MHP

1085-1086 (9th Cir. 1999), the Ninth Circuit discussed *Stirone, supra,* 361 US 212 (1960), the

landmark Supreme Court decision on constructive amendments:

> The defendants in *Stirone* were charged with violating the Hobbs Act by
> interfering with shipments of sand coming into Pennsylvania. *Id.* at 213. The
> district court in that case, however, allowed the introduction of evidence that
> showed interference with the export of steel from Pennsylvania to other states. *Id.*
> at 215. The district court also instructed the jury that it could convict if it found
> that *Stirone* interfered with sand or steel. *Id.* Interference with commerce is an
> essential element of the Hobbs Act crime. *Id.* at 218.
>
> The Supreme Court held that if an indictment alleges interference with one
> particular kind of commerce, then the conviction must rest on that particular
> interference and not on interference with another type of commerce, even though it
> be assumed that under an indictment drawn in general terms a conviction might
> rest upon a showing that commerce of one kind or another had been burdened." *Id.*
> Because it was possible the defendant was convicted of a charge that the grand
> jury did not make against him, the district court in *Stirone* had fatally erred. *Id.*

190 F.3d at 1086. In *Shipsey, supra,* 190 F.3d 1081 (9th Cir. 2004), the Ninth Circuit likewise

held that the Fifth Amendment's Grand Jury Clause had been violated when the Indictment was

constructively amended at trial. In that case, the defendant was convicted of seven counts of theft

from a pension plan and two counts of money laundering. The appellate court held that the

district court committed plain error when it allowed the jury to convict the defendant of theft if it

found any wrongful taking from the pension funds, when the Indictment charged only theft by

false pretenses. 190 F.3d at 1083-84. In so doing, the *Shipsey* Court specifically rejected the

government's contention that "the district court was not required to limit its instructions to a

single theory because the theft counts broadly allege that Shipsey did 'embezzle, steal . . .,

abstract and convert monies' without specifying any single means of doing so." 190 F.3d at

1087. The Court explained:

> An indictment must include 'a statement of facts and circumstances that will
> inform the accused of the specific offense with which he is charged. *United States
> v. Cecil*, 608 F.2d 1294, 1296 (9th Cir. 1979); see also *Hamling v. United States*,
> 418 US 87, 117, L. Ed. 2d 590, 94 S. Ct. 2887 (1974); *Russell v. United States*,
> 369 US 749, 763-64, 8 L. Ed. 2d 240, 82 S. Ct. 1038 (1962); *Berger v. United
> States,* 295 US 78, 82, 79 L. Ed. 1314, 55 S. Ct. 629 (1935). Here, the indictment
> contained such a statement in paragraphs five through seven. These paragraphs,
> quoted above and incorporated into the theft counts, set forth the theory that
> Shipsey obtained money from First Cal and the pension funds by means of false

DEFENDANTS' MEMORANDUM IN SUPPORT OF COURT'S ORDER GRANTING DEFENDANTS'
MOTION PURSUANT TO RULE 29 (a), F.R.CRIM.P., CASE NO. CR-07-0765 MHP

1
2
3

> representations and omissions.  Nowhere in the indictment is there a statement of facts and circumstances that would support other possible § 664 theft theories broadly invoked in the theft counts.  Thus, Shipsey had notice only of the theory of theft by fraudulent pretenses and the government was obligated to prove this theory of theft.

4

*Id.*  The Court held that the error required reversal of all of Shipsey's convictions.  190 F.3d at

5

1087-88.  And in *United States v. Carlson,* 616 F.2d 446 (9th Cir. 1980) the defendant's

6

convictions on three counts of misapplying bank funds were reversed upon finding that the

7

indictment had been constructively amended by the court's instruction to the jury.  The appellate

8

court explained:

9
10
11
12
13

> We have no quarrel with the rules of law stated in the challenged instructions and assume, without deciding, that they correctly state the law.  The difficulty is that the grand jury, in its indictment, has precisely spelled out the form of misapplication for which it concluded appellant should stand trial: that set forth in paragraph 1 of the quoted instruction.  The instructions as given, in adding paragraph 2, permitted the petit jury to find the appellant guilty of misapplication of funds based upon misconduct other than that upon which the grand jury based its charge.

14

616 F.2d at 447.  *See also Howard v. Daggett,* 526 F.2d 1388 (9th Cir. 1975) (constructive

15

amendment occurred when jury was permitted to convict defendant of prostitution charges and

16

interstate travel in furtherance thereof, relating to women other than those actually specified in the

17

Indictment).  The Daggett Court explained:  "[t]he grand jury might have indicted appellant in a

18

general allegation, without specifying the women to whom his alleged illegal acts or purposes

19

related.  But it did not do so.  To allow the jury to consider the evidence respecting the other

20

alleged prostitutes was to allow the jury to convict of a charge not brought by the grand jury."

21

    The concept of constructive amendment is closely aligned with that of variance.  In *United*

22

*States v. Adamson, supra,* 291 F.3d 606 (9th Cir. 2002), the Ninth Circuit endeavored to explain

23

the difference between the two:

24
25
26
27
28

> [t]he line between a constructive amendment and a variance is at times difficult to draw.  *See, e.g.,* 3 Charles Alan Wright, Federal Practice and Procedure, Criminal § 516 (2d ed. 1982)(observing that "[a] rather shadowy distinction has been drawn between amendment and variance"); *United States v. Antonakeas,* 255 F.3d 714, 722 (9th Cir. 2001)(observing that "the distinction between an amendment to an indictment and a variance is blurred").  Nevertheless, the line is significant because, whereas a constructive amendment always requires reversal, a variance

1   requires reversal only if it prejudices a defendant's substantial rights.

2   In our efforts to draw this line, we have found constructive amendment of an
3   indictment where (1) "there is a complex of facts [presented at trial] distinctly
    different from those set forth in the charging instrument," or (2) "the crime
4   charged [in the indictment] was substantially altered at the trial, so that it was
    impossible to know whether the grand jury would have indicted for the crime
5   actually proved." (citations omitted)

6   * * *

7   Although a constructive amendment usually involves a complex of facts, we have
8   generally found a variance where the indictment and the proof involve only a
    single, though materially different, set of facts.
9
    *Adamson, supra,* 291 F.3d at 615.

10      In this case it is clear that the government's shift from charging materially false statements

11  concerning ATN's capabilities to charging, instead, fraudulent omissions in conversations with

12  the contracting officer constitutes a constructive amendment to the Indictment, and not merely a

13  variance.  As set forth below, this is because (1) the new allegations involve a different complex

14  of facts than that considered by the grand jury and alleged in the Indictment; (2) the grand jury

15  was not presented with and did not consider the theory of material omissions, which was not

16  explicated in the charging document; and (3) had the grand jury been apprised that this would be

17  the sole theory of the prosecution, it would not have returned this Indictment, at least not without

18  adding special allegations necessary to establish criminal liability for material omissions.

19      The Government's changing theory works a constructive amendment of the Indictment

20  because it introduces a complex of facts different from those set forth in the charging instrument,

21  and substantially alters the crime charged, calling into serious question whether the grand jury

22  would have indicted for the crime now alleged.  *See United States v. Dipentino,* 243 F.3d 1090,

23  1094 (9th Cir. 2001); *United States v. Carlson,* 616 F.2d at 446, 447-448 (9th Cir. 1980).  The

24  Indictment as framed, and as presented to the grand jury, contemplated a "complex of facts"

25  centered on the quality of ATN's goggles, and the truthfulness, or lack thereof, of Newcon's

26  protestations regarding that quality.  The evidence at trial, however, focused not on the

27  truthfulness of lack thereof of defendants' statements about ATN, which indeed the government

28

- 31-

1    sought to suppress or ignore, but rather on a new set of facts regarding the defendants' alleged

2    omission of details about their arrangements with ATN.  And because the omissions theory was

3    never considered by the grand jury, the Government never presented to the grand jury any

4    evidence that the alleged omissions were material, an essential element.

5         At oral argument on the defendants' Rule 29 motion, the Government pointed to several

6    pages in the grand jury transcripts to support it's assertion that such evidence was presented to the

7    grand jury, but those portions of the transcript provide no support.  The Government pointed to

8    Agent Nestor's quotation of Prilik in one of his calls with Rocklin:  "In all likelihood, it would be

9    required from the Comrade of Jordan [ITE] to raise the cost and very likely to change the supplier

10   and model."  GJ000023 [ER 000023].  However, even the prosecutor interpreted this statement to

11   mean that prices to ITE would increase (GJ000024:3-4 [ER 000024]), and Rocklin confirmed this

12   interpretation at trial.  Thus, this does not prove that prices to TACOM would rise, and no one

13   from ITE testified that if it's costs were raised, it would have raised prices to TACOM.

14   Furthermore, even if Prilik thought the price to TACOM would rise, that is not enough to prove

15   that TACOM would have been influenced to part with money or property.  *See Neder*, 527 U.S. at

16   25.

17        The Government cited to Agent Nestor's testimony that Newcon was charging TACOM

18   $2,000 a pair under Battalion Set I, and that ATN was charging TACOM $1,300 per pair under

19   Battalion Set II.  GJ000027 [ER 000027].  This was false:  *ANHAM,* the prime contractor under

20   Battalion Set I was charging TACOM, and Newcon was charging ANHAM.  Under Battalion Set

21   II, ATN was charging ITE, and ITE was charging TACOM.  And even if those facts were true,

22   they still do not demonstrate that TACOM would in fact have been influenced to part with

23   property by the defendants statements or omissions.

24        The Government also relied on a quote of Mr. Beker, where he says:  "In fact, we can't

25   supply it for that price. . . .  we are unable to supply it *to him* for this price."  GJ000025 [ER

26   000025]; RT 1628 [ER 000241].  As the pronoun makes clear, Mr. Beker was referring to ITE,

27   and this is also made clear by the context of this statement on the tape.  The Government also

28   cited a portion of the grand jury testimony where Agent Nestor calculates the difference between

1   the two erroneous prices discussed above and summarily concludes that this is an amount that

2   TACOM would have lost.  GJ000028 [ER 000028].  This passage is not evidence that TACOM

3   would have been deprived of property because is presumes the predicate fact that TACOM, rather

4   than ITE would absorb any loss caused by a price increase, and is simply the agent speculating

5   about how much TACOM would lose if TACOM had paid that amount.  The Government quoted

6   Beker when he says that his costs are $1500 (GJ000029 [ER 000029]), but again this says nothing

7   about whether it would be TACOM, rather than ITE that would have to pay any increased price.

8   And Prilik's statements to McAller (GJ000048 [ER 000048]) similarly do not say that the price to

9   TACOM would rise, and even if it did, the fact that Prilik speculated that ITE would raise the

10  price to TACOM would increase would not be proof that in fact it would.

11      The indictment in this case has been constructively amended in another respect.  The

12  defendants here are charged with scheming to defraud TACOM of money.  Yet the evidence at

13  trial clearly showed that TACOM could not have been defrauded of money or property by

14  defendants' alleged fraud, because TACOM had a fixed price contract with ITE, and even if

15  TACOM went to a sole  source contract directly with Newcon, TACOM had a contractual right to

16  recover and price difference from ITE.  Thus regardless of how much ITE had to pay a

17  subcontractor, or regardless of how much TACOM paid a sole source, the only entity that would

18  suffer a loss was ITE, not TACOM.  In other words, even if the alleged fraud had succeeded,

19  TACOM would suffer no loss of money or property.  The only entity that might have suffered a

20  loss if the scheme succeeded was ITE.

21      But an indictment is constructively amended when the evidence at trial shows that the

22  alleged scheme to defraud would have deprived a victim other than the victim alleged in the

23  indictment.  *Milwitt*, 475 F.3d at 1156-57.  That is because the intent of the defendants "must be

24  to obtain money or property from the one who is deceived."  *Id*. at 1156.  Here, the only

25  allegations are that TACOM was deceived, and yet the proof at trial shows that the only entity

26  that potentially would have been deprived of money or property is ITE.

27  / / /

28  / / /

DEFENDANTS' MEMORANDUM IN SUPPORT OF COURT'S ORDER GRANTING DEFENDANTS'
MOTION PURSUANT TO RULE 29 (a), F.R.CRIM.P., CASE NO. CR-07-0765 MHP

1

## **CONCLUSION**

For all of the forgoing reasons, and based on the evidence herein, the Court correctly granted defendants' motion under Fed.R.Crim.P.29(a).

Dated: February 2, 2011                    Respectfully submitted,

Jones Day

By:  ___/s/ Martha Boersch_____
          Martha A. Boersch

Counsel for Defendants
MENDEL BEKER, ARIE PRILIK, AND
NEWCON INTERNATIONAL, INC.,

Dated: February 2, 2011                    Respectfully submitted,

Winston & Strawn LLP

By:  ___/s/ Jonathan Howden_____
          Jonathan Howden

Counsel for Defendant
MENDEL BEKER AND
NEWCON INTERNATIONAL

Dated: February 2, 2011                    Respectfully submitted,

Law Offices of William L. Osterhoudt

By:  ___/s/ William L. Osterhoudt_____
          William L. Osterhoudt

Counsel for Defendant Arie Prilik

SF:302264.1