UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>   v.<br><br>MENDEL BEKER, ARIE PRILIK, and<br>NEWCON INTERNATIONAL, INC.,<br><br>          Defendant.<br>_____/ | No.   CR 07-0765 MHP<br><br>**MEMORANDUM & ORDER**<br><br>**Re: Defendants' Rule 29(a) Motion for Judgment of Acquittal** |

Defendants Mendel Beker, Arie Prilik and Newcon International were indicted on charges of wire fraud in violation of 18 U.S.C. § 1343 and conspiracy to commit wire fraud in violation of 18 U.S.C. § 371. Beker and Prilik were also indicted for money laundering in violation of 18 U.S.C. § 1956(a). A nine-day trial was held between January 11, 2011 and January 26, 2011. At the close of the government's evidence, defendants moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a), which the court provisionally granted, subject to further briefing. Having considered the parties' submissions and arguments, and for the reasons set forth below, the court hereby enters the following memorandum and order.

BACKGROUND

Because the evidence relevant to defendant's motion is discussed in greater detail below, the court provides only a brief summary of the allegations and proceedings. The following facts reasonably could be determined from the evidence presented at trial.

1     In 2004, just over a year after the United States invaded Iraq, the United States determined
2 that it needed to arm and equip the Iraqi army. As part of that effort, the U.S. Army's Tank-
3 Automotive and Armaments Command ("TACOM") requested bids for a contract, denominated the
4 Battalion Set I ("Bat Set I") contract, to supply weapons and equipment. Anham Joint Venture, a
5 contracting company based in the United Arab Emirates, was named the prime contractor. One of
6 Anham's responsibilities under the Bat Set I contract was to supply night vision goggles to TACOM,
7 and in order to do so it chose defendant Newcon to be the subcontractor under that portion of the
8 contract. Newcon is a privately held Canadian company. Defendant Beker is the president of
9 Newcon, and defendant Prilik is its vice president.

10    In late 2004, the U.S. Army determined that it needed additional equipment for the Iraqi
11 army and put out a solicitation for a Bat Set II contract. Anham was not named the prime contractor
12 of the Bat Set II contract. Instead, on or about February 14, 2005, TACOM awarded the Jordanian
13 supplier International Trade Establishment ("ITE") with the $174 million, fixed-price prime
14 contract. ITE's bid for the Bat Set II contract had indicated that the night vision goggles portion
15 would be subcontracted to a company named Nivisys. On or about March 12, 2005, however, ITE
16 substituted San Francisco-based American Technologies Network, Inc. ("ATN") as the night vision
17 goggle subcontractor.

18    Defendants were upset that ATN had been chosen as the night vision subcontractor under Bat
19 Set II and repeatedly complained, including to ITE, that ATN was unable to timely supply goggles
20 that met the Bat Set II specifications. On August 17, 2005, after learning that defendants had been
21 in contact with ITE, ATN's president Dmitry Rocklin called defendants to threaten legal action.
22 Soon thereafter, defendants allegedly proposed a mutually-beneficial relationship between the
23 companies, and Rocklin contacted the FBI. Defendants and Rocklin had several telephone
24 conversations over the course of the following month, which the FBI recorded. The government
25 alleges that during these conversations, defendants and Rocklin devised a scheme whereby Newcon
26 would replace ATN as the Bat Set II subcontractor. In exchange, Newcon would pay ATN $75 for

2

each pair of goggles it supplied plus a $50,000 "good faith" payment. On September 7, 2005, Beker wired $50,000 to ATN.

On September 9, 2005, Prilik called Derek McAleer, the TACOM contracting officer responsible for the Bat Set contracts. Prilik told McAleer that ATN had run into quality, production and export problems and that ATN would be unable to meet the requirements of the Bat Set II contract. Prilik told McAleer that Newcon stood ready to step in as the night vision goggle subcontractor, but that it would be at a price higher than charged by ATN. Prilik did not mention the $50,000 payment to ATN or the $75 per-goggle fee that defendants and Rocklin had discussed. McAleer informed Prilik that when delivery problems arise TACOM only deals directly with its prime contractors—in this case ITE—and not with subcontractors.

On December 4, 2007, the grand jury returned an indictment charging Beker, Prilik and Newcon with two counts of wire fraud and one count of conspiracy to commit wire fraud. *See* Docket No. 1 (Indictment). The indictment also charged Beker and Prilik with one count of money laundering and alleged a forfeiture count under 18 U.S.C. § 982. The wire fraud counts alleged that defendants "did knowingly and intentionally devise and intended to devise, a scheme and artifice to defraud TACOM as to a material matter, to obtain money and property by means of materially false and misleading pretenses, representations, omissions, and promises, related to TACOM's purchase of night vision goggles under the Battalion Set II contract." Indictment ¶ 8. The indictment explicitly lists the following four sets of fact to support its alleged scheme to defraud:

(a)  Beker contacted an ATN representative and offered to pay ATN to stop supplying goggles;

(b)  Beker instructed the ATN representative to create an invoice for a $50,000 "loan";

(c)  Beker caused $50,000 to be transferred via wire from Newcon to ATN; and

(d)  "Prilik told a TACOM contracting official that ATN could no longer supply night vision goggles due to production, export and quality problems. Prilik's statements included false or misleading pretenses. Prilik then informed the TACOM official that Newcon could supply the night vision goggles, but at a substantially higher price."

3

Indictment at ¶ 10.

At trial, the government's evidence consisted of three main components: (1) taped phone conversations between defendants and Rocklin and between Prilik and McAleer; (2) the testimony of Rocklin; (3) the testimony of McAleer; and (4) the testimony of FBI Agent Haynie. The government at no point attempted to prove that Prilik's statements regarding ATN's production, export and quality problems were in fact false. To the contrary, the government has expressly disclaimed reliance on the falsity of these statements, and it has instead insisted that defendants committed fraud solely by failing to disclose the $50,000 payment and alleged side-deal with ATN. *See, e.g.*, Docket No. 242 (11/17/10 Tr.) at 4-7. At the close of the government's case, defendants moved for a judgment of acquittal under Fed. R. Crim. P. 29(a). The court provisionally granted the motion on the grounds that (1) the government had constructively amended the indictment by shifting from a theory of affirmative false statements to a theory of material non-disclosure and (2) the government had produced insufficient evidence that defendants' alleged non-disclosure was material, *i.e.* that it was capable of influencing *TACOM* to part with money.[1] The court permitted the parties to submit supplemental briefing.

LEGAL STANDARD

Upon a defendant's motion under Federal Rule of Criminal Procedure 29, a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. "The evidence is sufficient to support a conviction if, 'viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Magallon-Jimenez*, 219 F.3d 1109, 1112 (9th Cir. 2000) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "[A]ll reasonable inferences must be drawn in favor of the government, and circumstantial evidence is sufficient to sustain a conviction." *United States v. Fleischman*, 684 F.2d 1329, 1340 (9th Cir. 1982).

4

DISCUSSION

I.    Constructive Amendment of the Indictment

Defendants argue that there must be a judgment of acquittal because the government has shifted its theory of prosecution from one based on false statements about ATN's ability to satisfy the Bat Set II contract to one based on defendants' failure to disclose an alleged side-deal with ATN. The government does not dispute that it exclusively pursued a theory of non-disclosure at trial, but it argues that the indictment nonetheless sufficiently supports this theory. The court finds the prosecution's shifting fraud theories to constitute a constructive amendment of the indictment.

"The Fifth Amendment's Grand Jury Clause endows defendants who are charged with felonies with a substantial right to be tried only on the charges set forth in an indictment by a grand jury." *United States v. Shipsey*, 190 F.3d 1081, 1085 (9th Cir. 1999). "A constructive amendment involves a change, whether literal or in effect, in the terms of the indictment." *United States v. Dipentino*, 242 F.3d 1090, 1094 (9th Cir. 2001) (citations and quotation marks omitted). A federal felony conviction may not rest on a theory of wrongdoing that was not included in the indictment returned by the grand jury. *See Shipsey*, 190 F.3d at 1087 ("[T]he district court was precluded from charging the petit jury on the theory of theft by an unauthorized taking accomplished by specific intent, which the grand jury had not included in the indictment."); *United States v. Pazsint*, 703 F.2d 420, 423 (9th Cir. 1983) (finding plain error for the district court to instruct jury on assault theory that was not charged in the indictment); *see also United States v. Stirone*, 361 U.S. 212, 218 (1960) (finding constructive amendment where indictment charged the defendants solely with interfering with shipments of sand and the district court allowed defendant to be convicted on a theory of interference with shipments of sand *or* steel).

A review of the indictment and the grand jury proceedings[2] that produced it clearly demonstrate that defendants were charged exclusively on a theory of fraud involving false statements about ATN's quality, production and export capabilities.

The grand jury heard testimony from a single witness, FBI Agent Nestor, who repeatedly stated that the allegations regarding ATN's quality, production and export capabilites were false.

5

Firstly, the government presented Nestor with an alleged draft written agreement between ATN and Newcon, which provided several reasons why ATN was unable to meet the requirements of the Bat Set II contract. The preamble stated that "ATN was unable to obtain the required . . . image-intensified tubes, which are the major component of goggles." Grand Jury Tr. at 40. Nestor testified that "ATN was able to obtain these parts," although it was hampered for a period of time due to the seizure of one shipment by customs. *Id*. at 40-41. The draft agreement also stated that ATN had failed to obtain proper export paperwork, and Nestor told the grand jury that this was not true based on the FBI's interview with Rocklin. *Id*. at 40. Nestor further repudiated a statement in the draft agreement that ATN was unable to supply image-intensified tubes at the earlier agreed-upon prices. *Id.* at 41. Nestor also testified that it was not true that ATN was not able to provide products at the contract specifications, because the "Army tested ATN's products and found that they met all the specs under the contract." *Id*.

Secondly, Nestor testified that Rocklin had informed McAleer on September 8, 2005—the day before Prilik spoke with McAleer—"that ATN was committed to supplying TACOM and that any rumors questioning ATN's ability to perform were false." *Id*. at 46. Thirdly, Nestor testified that several of Prilik's statements to McAleer on September 9, 2005 were false. Nestor testified that, according to Rocklin, TACOM would indeed continue to receive deliveries from ATN and that ATN supplied every single pair of goggles requested pursuant to the Bat Set II contract. *Id*. at 47-48. Fourthly, in summarizing the evidence in support of each wire fraud element, Nestor explicitly pointed to Prilik's statements to McAleer that ATN had problems with production capacities, exporting, goggle quality, and costs. *Id.* at 63-64. Also in this portion of his testimony, Nestor reiterated that ATN was able to obtain all the proper Russian export permits, that ATN's goggles met the Bat Set II specifications, and that ATN could continue to supply goggles at the agreed-upon price. *Id*. at 65-66.

The testimony before the grand jury only briefly references defendants' failure to disclose to TACOM its alleged side-deal with ATN. In discussing Prilik's September 9, 2005 conversation with McAleer, the prosecutor did ask Nestor whether Prilik had mentioned anticipated payments

6

between Newcon and ATN, and Nestor stated that Prilik had not. *Id*. at 48. He also testified that the draft written agreement did not mention these payments. *Id*. at 41-42. When summarizing the evidence in support of each element of wire fraud, however, neither Nestor nor the prosecutor made any mention at all about Prilik's failure to disclose Newcon's alleged side-deal with ATN. This is in marked contrast to Nestor's explicit linkage between the alleged false statements about ATN and the elements necessary to establish the charged crimes. Through Nestor's testimony, the government presented a theory of wrongdoing to the grand jury that clearly emphasized defendants' false statements and *not* defendants' material omissions.

This limited theory of wrongdoing is reflected in the indictment returned by the grand jury. Paragraph 10, which sets forth the facts supporting the alleged scheme to defraud, explicitly states that "Prilik told a TACOM contracting official that ATN could no longer supply night vision goggles due to production, export, and quality problems. Prilik's statements included false or misleading pretenses" There is no similar, specific statement that the fraud in any way consisted of defendants' failure to disclose an alleged financial arrangement with ATN.

The government nevertheless argues that the indictment is sufficient to support a theory of material omission because paragraph 8 alleges that defendants' scheme to defraud involved obtaining money or property by means of "materially false or misleading pretenses, representations, *omissions*, and promises" (emphasis added), and because paragraph 10, above, mentions "false or misleading pretenses." Such oblique, seemingly boilerplate reference to an omission is insufficient to apprise defendants of the nature of the charges that they ultimately faced at trial. *See Shipsey*, 190 F.3d at 1087 ("An indictment must include a statement of facts and circumstances that will inform the accused of the specific offense with which he is charged." (citation and quotation marks omitted)). In *Shipsey*, paragraphs five through seven of the indictment "set forth a theory that Shipsey obtained money from First Cal and the pension funds by means of false representations and omissions," but the district court instructed the jury that Shipsey could be found guilty of theft if he more broadly engaged in "some wrongful or dishonest act or taking." *Id*. The government contended that the district court was not required to limit its jury instructions to a single, limited

7

theory of theft because the indictment broadly alleged that Shipsey did "embezzle, steal . . . , abstract and convert monies" without specifying any single means of doing so. *Id*. The Ninth Circuit rejected this argument, explaining:

> Nowhere in the indictment is there a statement of facts and circumstances that would support other possible § 664 theft theories broadly invoked in the theft counts. Thus, Shipsey had notice only of the theory of theft by fraudulent pretenses and the government was obligated to prove this theory of theft.

*Id*. Similarly here, even though paragraph 8 of the indictment may broadly invoke a wide range of theories of fraud, nowhere in the indictment is there a statement of the specific facts and circumstances that would support the theory of non-disclosure advanced at trial. The indictment gave notice to defendants that the government intended to pursue a theory that they had falsely or misleadingly informed TACOM about production, export and quality problems at ATN; it did not reasonably inform defendants that they would need to defend against any other theory that might conceivably fall within paragraph 8's catch-all language.

There are indications in the record that the government may have shifted its theory of liability upon discovering that some defendants' statements about ATN were at least partially true. *See, e.g.*, RT 1361-62, 1388-89 (testimony from McAleer regarding quality and export problems). Although such a discovery may have derailed the government's planned prosecutorial strategy in this case, the grand jury protections of the Fifth Amendment nonetheless make it inappropriate to pursue an alternative theory with only an attenuated link to the facts alleged in the indictment.

II. Materiality

The indictment alleges that defendants devised a scheme to defraud TACOM as to a material matter for the purposes of obtaining money or property. Materiality is a necessary element of a wire fraud violation. *See Neder v. United States*, 527 U.S. 1, 25 (1999). In order to establish that the non-disclosure of defendants' alleged side-deal with ATN is material, the government must show that it had the "natural tendency to influence, or was capable of influencing," TACOM's decision to part with money in connection with the Bat Set II contract. *United States v. Peterson*, 538 F.3d

8

1064, 1072 (9th Cir. 2008); *United States v. Tarallo*, 380 F.3d 1174, 1182 (9th Cir. 2004); Docket No. 289 (Joint Proposed Instruction No. 12). The "capable of influencing" test is an objective one, which looks at the intrinsic capability of a statement to influence the victim's decision, as opposed to the probabilities of doing so. *Peterson*, 538 F.3d at 1072.

Although materiality may be premised on the natural tendency of the false statements or omissions to influence "the decision of the decisionmaking body to which it was addressed" as was the case in *Neder*, 527 U.S. at 16, it most often is premised on the natural tendency of such statements or omissions to influence a person to part with money or property. The latter is the theory of the indictment in this case and was the theory of the government throughout pretrial and trial. The indictment alleges "a scheme and artifice to defraud TACOM as to a material matter, to obtain money and property . . . ." Indictment ¶ 8. This theory continued in the evidence presented by the government at trial and is borne out by its proposed jury instructions in pertinent part as follows: "a scheme or plan to defraud TACOM of money or property, or (b) a scheme or plan for obtaining money or property from TACOM . . . ." Joint Proposed Instruction No. 14. The instruction further defines materiality as that which "had a natural tendency to influence, or . . . capable of influencing, TACOM to part with money or property . . . ." *Id*.

If the government indicted and proceeded on a *Neder*-type theory of a tendency to influence TACOM's decisionmaking, it might have had more success. However, that was not its theory and at no time did it urge that position.

Defendants argue that there was insufficient evidence at trial to show that their alleged non-disclosures were capable of influencing *TACOM* to part with money. Instead, they argue, the overwhelming evidence demonstrates that any loss of money or property resulting from a successful scheme would have been borne by ITE, the prime contractor. Because the indictment alleged that TACOM was the victim of defendants' fraudulent scheme, it is insufficient for the government to demonstrate that ITE would part with money as a result of the omissions in question. *Cf. McNally v. United States*, 483 U.S. 350, 360-61 (1987) (reversing mail fraud conviction and explaining that where indictment named the government of Kentucky as the victims, the government could not rely

9

on loss of property to another individual); *United States v. Milwitt*, 475 F.3d 1150, 1156 (9th Cir. 2007) (holding that the prosecution in mail and wire fraud crimes must "prove that the defendant intended to defraud an identifiable individual"). The court agrees with defendants that there was insufficient evidence of materiality.

        A.        Testimony at Trial

McAleer's trial testimony demonstrates that the alleged scheme to defraud would not have a natural tendency to deprive TACOM of money in connection with its purchase of night-vision goggles. It was TACOM's policy not to directly deal with subcontractors regarding supply issues, and that if any such issues arose surrounding ATN's performance, McAleer testified that instead he would deal directly with the prime contractor, ITE. *See* RT 1375:8-1376:18, 1392:9-18. Indeed, when it appeared that ATN might be having quality issues in June 2005, TACOM discussed and pursued its available options through ITE. RT 1361:6-14. ITE had a fixed price contract with TACOM under the Bat Set II contract, and it was ITE's responsibility to make sure that TACOM was provided with the proposed items for the amount specified. RT 1324:20-25. If ATN ceased performing under the contract, and ITE was forced to find an alternative supply source, ITE would be forced to absorb any additional costs associated with the substitution. RT 1421:1-16.

McAleer testified that he would only seek to terminate the night vision goggle portion of the Bat Set II contract, and accordingly bypass ITE, if ITE "absolutely, flat-out could not deliver the goods." RT 1238. The government has failed to demonstrate, however, any reasonable likelihood that ITE would be unable to find a substitute supplier for ATN. It provided no testimony from anyone at ITE to demonstrate what it would have done had it been forced to find an alternate supply, nor did it interview anyone from ITE as part of its investigation. RT 1167:8-13. The government argues that if ATN and Newcon both refused to supply goggles to ITE, ITE would be forced to default, but the government has produced insufficient evidence that other suppliers were unavailable. The record instead indicates that Nivisys, the original night vision goggle supplier under Bat Set II, stood ready to supply goggles if ATN was unable to do so. *See* RT 1388:20-1390:5.

10

The government's materiality argument rests heavily on McAleer's testimony that if ATN did not supply night vision goggles, and ITE defaulted on that portion of the contract, TACOM could pursue three options whereby it would be forced to part with money or property. McAleer testified that TACOM could go back to Anham under the Bat Set I contract and increase quantity. RT 1239. TACOM could also issue a new tender solely for the night vision goggles. *Id*. Lastly, it could seek a sole source supplier. RT 1240. Although these options could conceivably result in TACOM parting with money in order to purchase night vision goggles from Newcon, there is nothing in the record to demonstrate more than a remote likelihood that any of these scenarios would come to pass. McAleer agreed that these hypotheticals "require[d] certain facts to be assumed and certain events to have occurred before any of those options could actually be real." RT 1417:18-21. Again, it is at best highly speculative, based on the evidence at trial, that the contingencies acknowledged by McAleer could come to pass. Moreover, even if such contingencies did come to pass, the Bat Set II contract permitted TACOM to pass on to ITE any additional costs it incurred due to ITE's inability to fulfill some portion of the contract.[3] Notwithstanding McAleer's testimony that (1) had he known about the alleged undisclosed side-deal between ATN and Newcon, he would have looked very closely at the matter, RT 1251-53, 1264, 1266, and (2) that there was a great sense of urgency in supplying the Iraqi army with night vision equipment, RT 1240-41, neither of these concerns make it any more likely that ITE would default on its obligations or that TACOM would be forced to spend additional money on night vision goggles.

The evidence at trial only demonstrates a remote possibility that the alleged scheme to defraud would require TACOM to shoulder the additional cost of Newcon's night vision goggles. Although the materiality inquiry does not focus on the relative probabilities that the alleged victim will or will not part with money or property, a fraudulent statement or omission cannot be "intrinsically capable" of influencing a decision to part with money or property if it is only remotely capable of causing a monetary loss to the alleged victim. *Cf. United States v. Woods*, 335 F.3d 993, 1000 (9th Cir. 2003) (affirming jury instruction that "statements or a statement or omitted fact is material if it is of a kind that would *reasonably influence* a person to part with money or property"

11

(emphasis added)). Unless a highly-speculative series of unusual circumstances came to pass, ITE—and not TACOM—would be forced to part with money or property had the alleged scheme come to fruition.

### B. Grand Jury Proceedings

The government's difficulties demonstrating the materiality element did not begin at trial, but rather emerged in a troubling, potentially prejudicial manner during the grand jury proceedings. During its initial colloquy before the grand jury, the government presented each element of the crimes that defendants were alleged to have committed, including the materiality element of wire fraud. Docket No. 302, Attachment A at 11. Before breaking for lunch, the prosecutor acknowledged to the grand jury that "I know we just blasted you with a lot of information" and directed the grand jury to a pamphlet of information summarizing the statutes identified in the indictment. *Id.* at 21-22. She continued:

> Also, we talked earlier about Agent Nestor[, who] will be providing a summary of evidence you've heard and the elements and bringing that together. So you'll get to hear everything at least twice, because I think—I could see a little moment of panic, so I wanted to allay those fears.

*Id* at 22. Notwithstanding the government's assurances that Agent Nestor would bring together the elements and a summary of the supporting evidence, his testimony did no such thing.

In describing the results of the FBI investigation, the prosecution and Nestor repeatedly conflated harms to ITE with harms to TACOM and failed to account for the contractual arrangement between these entities. As the discussion above demonstrates, these distinctions are essential in determining whether or not the alleged non-disclosure was material. For example, the government asked Agent Nestor to confirm that "at this point [on August 29, 2005], the proposal was where perhaps Mr. Newcon [sic] would supply goggles to Newcon [sic] rather than ATN and Mr. Prilik is now saying that it would be likely, he believes, that the prices to TACOM would have to be increased, the price to ITE, who is supplying TACOM would then be raised." Grand Jury Tr. at 23:24-24:4. Nestor confirmed that this was "correct" without clarifying which of the scenarios envisioned by the question—a price increase to ITE and/or a price increase to TACOM—was the

12

apparent object of the proposed scheme. *Id.* at 24:5. Next, when asking Nestor how much extra it would cost for Newcon to supply the remaining goggles under the Bat Set II contract, the prosecution asked, "So have you done a calculation for the approximate amount more that TACOM might be liable to pay if Newcon supplied the goggles rather than ATN?" *Id.* at 28:7-9. Nestor responded that it would be "approximately $11.2 million," again without indicating that ITE would take this loss at the very least in the first instance. *Id.* at 28:12. Additionally, when summarizing the evidence in support of the existence of a scheme to defraud, Nestor stated that Rocklin and Beker "discussed the prices that Beker [and] confirmed that Newcon would raise the price to TACOM." *Id.* at 56:21-23. Once again, Nestor failed to distinguish a price increase to ITE from a price increase to TACOM. Lastly, at the very end of the proceedings, one perceptive grand juror asked Nestor, "Just out of curiosity, why would ATN go directly to TACOM and not through ITE, who was technically who their contract is with, correct?" Grand Jury Tr. 107:14-16. Nestor briefly responded that this was correct and that "for this one portion" there was "a direct line of communication" between ATN and TACOM. *Id.* at 107:17-108:6. The question raised by the grand juror, however, pointed to a crucial distinction in this prosecution that should have been fleshed out more fully and explicitly by the government before it asked the grand jury to return an indictment on wire fraud charges.

Even more troubling, when asked to summarize the elements of wire fraud and supporting evidence, Nestor entirely omitted the materiality element. The government made no effort to correct him, notwithstanding its earlier assurances to the grand jury that Nestor's testimony would tie everything together. Although a prosecutor generally has no obligation to set out every element of a crime "so long as the instructions given are not flagrantly misleading or so long as all the elements are at least implied," *United States v. Larrazolo*, 869 F.2d 1354, 1359 (9th Cir. 1989), *overruled on other grounds by Midland Asphalt Corp. v. United States*, 489 U.S. 794, 799-800 (1989), the prosecutorial work in this case casts grave doubts on the grand jury's ability to meaningfully assess the charges brought against defendants. The grand jury was told in the morning not to "panic" regarding the lengthy recitation of the law because they would be hearing testimony from Agent

13

Nestor in the afternoon. The afternoon testimony, however, brushed aside the requisite determination of materiality and entirely glossed over the uncertainty as to whether TACOM would part with money as a result of the alleged scheme. The government's singular mention of the materiality element at the beginning of the grand jury proceedings appears wholly inadequate to ensure that the grand jury considered whether the alleged false statements and/or omissions were material.

The government's failure to adequately develop the issue of materiality before the grand jury appears to have seriously prejudiced defendants, subjecting them to trial and several years of criminal proceedings notwithstanding the paucity of evidence on the issue. Because of the insufficient evidence of materiality at trial and the related flaws in the grand jury proceedings, a judgment of acquittal is appropriate.

III.     Remaining Counts

Because there is insufficient evidence to sustain Counts 1 and 2 for wire fraud, the remaining counts must also be dismissed. Under Count 3, defendants are charged with conspiracy to commit wire fraud, which *a fortiori* requires that the object of the conspiracy constitute wire fraud. *See Skilling v. United States*, 130 S.Ct. 2896, 2934 (2010). Under Count 4, defendants Beker and Prilik are charged with money laundering, in particular "with the intent to promote the carrying on of specified unlawful activity, namely Wire Fraud as alleged in Counts One and Two herein." Indictment ¶ 16. The forfeiture allegation, paragraphs 17-19 of the indictment, in turn rests upon a conviction under Count 4. Dismissal of the wire fraud counts therefore requires dismissal of all counts of the indictment.

14

CONCLUSION

For the foregoing reasons, defendants' Rule 29(a) motion for a judgment of acquittal is GRANTED.

IT IS SO ORDERED.

Dated: February 24, 2011

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

# ENDNOTES

1. The court initially expressed concerns as to whether there was sufficient evidence of intent to deprive TACOM of money or property. After further consideration, the court does not rest its decision solely on this ground.

2. Although "[t]he general rule in this circuit is that no independent inquiry will be made into the kind of evidence presented to a grand jury, when a duly constituted grand jury returns an indictment valid on its face," *United States v. Tham*, 665 F.2d 855, 863 (9th Cir. 1981), the indictment on its face raises at the very least serious doubts as to whether the grand jury considered the theory that defendants committed fraud through non-disclosure. To the extent that there is any ambiguity as to this issue based on the indictment itself, a review of the grand jury proceedings clearly illuminates the government's shifting theories.

3. The government argues that TACOM's ability to recoup additional expenses is irrelevant to the question of whether defendants attempted to defraud TACOM. Docket No. 302 at 5-6. In support, it cites to *Tijani v. Holder*, 598 F.3d 647, 652-53 (9th Cir. 2010), in which the Ninth Circuit in dicta rejects the notion that a merchant is not defrauded by the fraudulent use of a credit card because he will be paid by the issuer of the card. This scenario mentioned in *Tijani* is qualitatively distinct from the circumstances in this case. ITE was contractually obligated to provide night vision goggles and other military equipment to TACOM for a fixed price. If ITE was unable to provide the goggles profitably, it was not relieved of its obligations under the contract and would have to take a loss on that portion of the contract. Similarly, if TACOM was itself forced to seek out a source of night vision goggles, ITE still bore the risk under the contract that the alternative supplier would charge a higher price. TACOM's ability to recoup additional costs therefore appears integrally related to ITE's general obligations under the fixed prime contract.